

*Partially Unsealed*

**Sealed**
Public and unofficial staff access
to this instrument are
prohibited by court order.

10-16-18

**United States District Court**
**Southern District of Texas**
**FILED**

OCT 1 6 2018

David J. Bradley, Clerk of Court

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
Brownsville Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Case No. B-18-008-S1 |
| | ) |
| | ) |
| v. | ) Count 1: 18 U.S.C. § 1349 |
| | ) (Conspiracy to Commit Health Care Fraud) |
| RODNEY MESQUIAS, | ) |
| | ) Counts 2-7: 18 U.S.C. §§ 1347 & 2 |
| HENRY MCINNIS, | ) (Health Care Fraud) |
| | ) |
| JOSE GARZA, | ) Count 8: 18 U.S.C. § 1956(h) |
| | ) (Conspiracy to Commit Money Laundering) |
| FRANCISCO PENA, | ) |
| ▮▮▮▮▮▮▮▮ | ) Count 9: 18 U.S.C. §§ 1518 & 2 |
| | ) (Obstruction of Health Care Investigations) |
| | ) |
| Defendants. | ) Count 10: 18 U.S.C. §§ 1001(a)(2) & 2 |
| | ) (False Statement) |
| | ) |
| | ) Count 11: 18 U.S.C. § 1512(k) |
| | ) (Conspiracy to Obstruct Justice) |
| | ) |
| | ) Count 12: 18 U.S.C. § 371 |
| | ) (Conspiracy to Pay and Receive Kickbacks) |
| | ) |
| | ) Forfeiture Notice |

## SUPERSEDING SEALED INDICTMENT

THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment, unless otherwise stated:

## INTRODUCTORY ALLEGATIONS

**A.     The Entities**

1.      The Merida Health Care Group, Inc., ("Merida Group"), was a corporation that
purported to provide health care services throughout the State of Texas.  The Merida Group's
corporate headquarters was located at 1514 S. 77 Sunshine Strip, Suite 21-B, 78550, Harlingen,

Texas, within the Southern District of Texas.

2.      The Merida Group was affiliated with several entities ("Merida Group's affiliated entities") based throughout the State of Texas, including, but not limited to, Bee Caring Hospice Healthcare, Inc., ("Bee Caring"), in Harlingen; BRM Home Health, PLLC, ("BRM Home Health"), in Harlingen; Bee Caring Hospice, LLC ("Bee Caring Hospice"), in San Antonio; Professional Hospice Care ("Professional Hospice"), in Laredo; Merida Health Care Group of San Antonio, LLC ("Merida Group of San Antonio"), in San Antonio; Illumina, LLC ("Illumina") in Corpus Christi; Virtue Home Health, Inc. ("Virtue Home Health"), in Corpus Christi; Well-Care Home Health, Inc. ("Well-Care"), in Houston; and Excellent Homecare Provider Services ("Excellent Homecare"), in Sugar Land.

3.      The Merida Group's affiliated entities were providers authorized by the Medicare health care benefit program ("Medicare") to file claims for reimbursement for covered health care services provided to qualified beneficiaries.  The Merida Group's affiliated entities' primary business was purportedly providing hospice and home health services for beneficiaries of Medicare.

4.      Between in or about 2009 through in or about 2018, the Merida Group's affiliated entities submitted claims to Medicare for hospice and home health services totaling approximately $150,000,000, which resulted in payments to the Merida Group's affiliated entities totaling approximately $120,000,000 on these claims.

**B.    The Conspirators**

5.      Defendant **RODNEY MESQUIAS ("MESQUIAS")** owned and controlled the Merida Group and its affiliated entities. **MESQUIAS** served as its President. **MESQUIAS** supervised the overall management of the Merida Group and its affiliated entities. **MESQUIAS**

was a resident of Cameron County, Texas.

6.      Defendant **HENRY MCINNIS ("MCINNIS")** was the Chief Executive Officer of the Merida Group.  **MCINNIS** managed the day-to-day operations of the Merida Group and, in part, its affiliated entities.  **MCINNIS** was a resident of Cameron County, Texas.

7.      Defendant **JOSE GARZA ("JOSE GARZA")** was the operations manager of the Merida Group.  **JOSE GARZA** assisted with the management of the day-to-day operations of the Merida Group and, in part, its affiliated entities.  **JOSE GARZA** was a resident of Cameron County, Texas.

8.      Defendant **FRANCISCO PENA ("PENA" or "MAYOR PENA")** was the Mayor of Rio Bravo, a city in Webb County, Texas, within the Southern District of Texas.  **MAYOR PENA** was a licensed physician in the State of Texas and served as the Medical Director for the Merida Group's affiliated entities operating in and around Laredo, Texas.  **MAYOR PENA** was a resident of Webb County, Texas.

### C. The Medicare Program

11. The Medicare Program ("Medicare") was a federal government health care benefit program, affecting commerce, which provided benefits to individuals who were over the age of 65 or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b). Medicare was subdivided into multiple parts. Part A of Medicare covered hospice services. Part B of Medicare covered home health services.

12. Individuals who qualified for Medicare benefits were commonly referred to as "Medicare beneficiaries." Each Medicare beneficiary was given a Medicare identification number.

### D. Hospice Care

13. Hospice care was a set of services meant to provide for the physical, psychosocial, spiritual, and emotional needs of a terminally ill patient or the patient's family members. Hospice care was also known as palliative care, which meant care that was intended to alleviate suffering rather than to cure illness.

14. According to Medicare's regulations, to be eligible to elect hospice care under Medicare, the patient was required to be entitled to Part A of Medicare and be certified as being terminally ill. An individual was considered to be terminally ill if the medical prognosis was that the individual's life expectancy was six months or less if the illness ran its normal course. Medicare only covered care provided by (or under arrangements made by) a Medicare certified hospice.

15. A hospice company was permitted to admit a patient only on the recommendation of the hospice medical director in consultation with, or with input from, the patient's attending

4

physician, if the patient had one.  In determining whether to certify that a patient was terminally ill, the hospice medical director was required to consider at least the following information: (1) diagnosis of the terminal condition of the patient; (2) other health conditions, whether related or unrelated to the terminal condition; and (3) current clinically relevant information supporting all diagnoses.

16.     The certification of terminal illness was required to be based on the clinical judgment of the hospice medical director or physician member of the interdisciplinary group and the patient's attending physician, if the patient had one, regarding the normal course of the patient's illness. The signed certification of terminal illness had to contain the following: (1) a prognosis for a life expectancy of six months or less if the terminal illness ran its normal course; (2) clinical information and other documentation that supported the prognosis; and (3) a brief narrative explanation of the clinical findings that supported a life expectancy of six months or less.

17.     A beneficiary could be certified in this manner for two ninety-day hospice benefit periods, or for about six months.  Before a beneficiary could be further certified for additional hospice benefit periods, Medicare required that a licensed physician or nurse practitioner have a face-to-face encounter with the beneficiary to determine whether they were still hospice eligible. The physician or nurse practitioner was required to attest in writing that he or she had a face-to-face encounter with the patient, including the date of the visit.  The narrative associated with this third benefit period, and every subsequent sixty-day recertification, needed to include an explanation of why the clinical findings of the face-to-face encounter supported a life expectancy of six months or less.

18.     If the Medicare beneficiary (or the beneficiary's authorized representative) elected to receive hospice care, the Medicare beneficiary was required to file an election statement with a

particular hospice company.

### E.    Home Health Care

19.     Part B of the Medicare program covered certain eligible home health care costs for medical services. Those medical services were provided by a home health care agency to Medicare beneficiaries requiring home health services because of an illness or disability causing the beneficiary to be homebound. The Medicare program paid for home health services only if the patient qualified for home health care benefits. A beneficiary qualified for home health care benefits only if: (1) the beneficiary was confined to the home, also referred to as homebound; (2) the beneficiary was under the care of a physician who specifically determined that there was a need for home health care and established a Plan of Care; and; (3) the determining physician signed a certification statement that specified the following: (i) the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy; (ii) the beneficiary was confined to the home; (iii) a Plan of Care for furnishing services was established and periodically reviewed; and (iv) the services were furnished while the beneficiary was under the care of the physician who established the Plan of Care.

20.     Medicare regulations required home health agencies and hospice companies providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the home health agencies and hospice companies.

21.     These medical records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the home health agency and hospice company.

22.     CMS contracted with Medicare Administrative Contractors ("MACs") to process claims for payment. The MAC that processed and paid Medicare Part A and Part B claims in the State of Texas was Palmetto GBA.

23.     To bill Medicare for services rendered, an authorized provider submitted a claim form ("FORM 1500") to Palmetto GBA. When a FORM 1500 was submitted, the provider certified that: (a) the contents of the form were true, correct and complete; (b) the form was prepared in compliance with the laws and regulations governing Medicare; and (c) the services being billed were medically necessary.

24.     A Medicare claim for payment was required to set forth, among other things, (a) the beneficiary's name and unique Medicare identification number; (b) the item or service provided; (c) the cost of the item or service; and (d) the name and Unique Physician Identification Number ("UPIN") and/or the National Provider Identifier ("NPI") of the physician who prescribed or ordered the item or service.

25.     Medicare prohibited offering, paying, soliciting or receiving anything of value to induce or reward beneficiary referrals or generate Federal health care benefit program business. Such inducements were known as "kickbacks" and "bribes." Medicare would not reimburse claims for payment if Medicare knew such claims were based on kickbacks and bribes.

26.     The Grand Jury incorporates by reference and re-alleges paragraphs 1 through 25 in each Count of this Indictment as if fully set forth therein.

## COUNT 1
### (Conspiracy to Commit Health Care Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

27.     From in or about 2009 and continuing through in or about 2018, the exact dates being unknown to the Grand Jury, in the Southern District of Texas and elsewhere, defendants **RODNEY MESQUIAS, HENRY MCINNIS, JOSE GARZA,** ███████████ and **FRANCISCO PENA** knowingly and willfully did combine, conspire, confederate and agree with each other and others known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1347, that is, to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items and services.

### The Purpose of the Conspiracy

28.     It was a purpose of the conspiracy for defendants **RODNEY MESQUIAS, HENRY MCINNIS, JOSE GARZA,** ███████████ and **MAYOR PENA** and others, known and unknown to the Grand Jury, to unlawfully enrich themselves by (a) submitting false and fraudulent claims to Medicare; (b) concealing the submission of false and fraudulent claims to Medicare and the receipt and transfer of proceeds from the fraud; and (c) diverting proceeds of the fraud for the personal use and benefit of the defendants and their co-conspirators.

## The Manner and Means of the Conspiracy

29.     The manner and means by which the defendants and their co-conspirators sought

to accomplish the object of the conspiracy included, but were not limited to, the following:

a.     It was a part of the conspiracy that defendants **RODNEY MESQUIAS,**

**HENRY MCINNIS,** and **JOSE GARZA** would apply for and maintain various Medicare

provider numbers associated with the Merida Group's affiliated entities.

b.     It was further a part of the conspiracy that defendants **RODNEY**

**MESQUIAS, HENRY MCINNIS, JOSE GARZA,** ▮▮▮▮▮▮▮ and

**MAYOR PENA** would purportedly provide hospice care and/or home health services

through the Merida Group's affiliated entities to Medicare beneficiaries knowing that such

services were medically unnecessary and did not comply with Medicare's requirements for

reimbursement.

c.     It was further a part of the conspiracy that defendants **RODNEY**

**MESQUIAS, HENRY MCINNIS, JOSE GARZA,** ▮▮▮▮▮▮▮ and

**MAYOR PENA** would knowingly and willfully submit, and cause the submission of, false

and fraudulent claims to Medicare on behalf of the Merida Group's affiliated entities for

medically unnecessary services and services that did not comply with Medicare's

requirements for reimbursement.

d.     It was further a part of the conspiracy that defendants **RODNEY**

**MESQUIAS, HENRY MCINNIS, JOSE GARZA,** ▮▮▮▮▮▮▮ and

**MAYOR PENA** would conceal, and attempt to conceal, their submission of false and

fraudulent claims to Medicare by falsifying, and causing the falsification of, patient records

and other documentation related to services provided by the Merida Group's affiliated

entities.

e.      It was further a part of the conspiracy that defendants **RODNEY MESQUIAS, HENRY MCINNIS, JOSE GARZA,** ███████████████ and **MAYOR PENA** would cause Medicare to make payments to the Merida Group's affiliated entities based upon the submission of false and fraudulent claims.

f.      It was further a part of the conspiracy that defendant **RODNEY MESQUIAS** and ███████████████ would conceal the ownership of Merida Group's affiliated entities through nominee owners.

g.      It was further a part of the conspiracy that defendants **RODNEY MESQUIAS, HENRY MCINNIS,** and **JOSE GARZA** would cause kickbacks and bribes to be paid to Medical Directors of the Merida Group's affiliated entities in exchange for certifying to Medicare that patients qualified for hospice and home health services, when in fact they did not qualify for such services.

h.      It was further a part of the conspiracy that defendants **RODNEY MESQUIAS, HENRY MCINNIS,** and **JOSE GARZA** would cause kickbacks and bribes to be paid to Medical Directors for the Merida Group's affiliated entities in exchange for patient referrals.

i.      It was further a part of the conspiracy that defendants **RODNEY MESQUIAS, HENRY MCINNIS,** and **JOSE GARZA** would cause kickbacks and bribes to be paid to Medical Directors for the Merida Group's affiliated entities in exchange for signing off on face-to-face sheets.

j.      It was further a part of the conspiracy that defendant ███████████ ███████ **MAYOR PENA,** and other Medical Directors for the Merida Group's

10

affiliated entities would receive kickbacks and bribes in exchange for referring patients to the Merida Group's affiliated entities for services, including patients who did not qualify for such services.

      k.    It was further a part of the conspiracy that defendants **RODNEY MESQUIAS, HENRY MCINNIS, JOSE GARZA,** ███████████ and **MAYOR PENA** would keep patients on hospice and/or home health services for multiple years in order to increase revenue from Medicare.

      l.    It was further a part of the conspiracy that defendants **RODNEY MESQUIAS, HENRY MCINNIS,** and **JOSE GARZA** would cycle patients between and among the Merida Group's affiliated entities for hospice and home health services in order to increase revenue from Medicare.

      m.    It was further a part of the conspiracy that defendant **RODNEY MESQUIAS** would bribe patients with free medication and other items in exchange for enrolling with the Merida Group's affiliated entities for services.

      n.    It was further a part of the conspiracy that defendant **RODNEY MESQUIAS** would transfer the proceeds derived from the conspiracy to purchase luxury vehicles such as a Porsche, BMW, Mercedes-Benz, Land Rover, and Cadillac Escalade; expensive jewelry; luxury clothing from high end retailers such as Louis Vuitton; exotic vacations; season tickets for premium seating to see the San Antonio Spurs; and exclusive real estate.

      o.    It was further a part of the conspiracy that defendants **RODNEY MESQUIAS, HENRY MCINNIS,** and ███████████ would cause false and fictitious patient records to be manufactured and produced to a federal Grand Jury sitting

in the Southern District of Texas in response to a federal Grand Jury subpoena.

p.      It was further a part of the conspiracy that the Merida Group's affiliated entities submitted claims to Medicare for hospice and home health services totaling approximately $150,000,000, which resulted in approximately $120,000,000 being paid to the Merida Group's affiliated entities.

(All in violation of Title 18, United States Code, Section 1349.)

**COUNTS 2-7**
**Health Care Fraud**
**(18 U.S.C. §§ 1347 and 2)**

THE GRAND JURY FURTHER CHARGES THAT:

**A.   Introductory Allegations**

30.   The Grand Jury incorporates by reference and re-alleges paragraph 29 as though set forth in its entirety here.

**B.   The Scheme to Defraud**

31.   From in or about 2009 and continuing through in or about 2018, the exact dates being unknown to the Grand Jury, in the Southern District of Texas and elsewhere, defendants **RODNEY MESQUIAS, HENRY MCINNIS, JOSE GARZA** ███████████ **and FRANCISCO PENA,** along with others known and unknown to the Grand Jury, in connection with the delivery of and payment for health care benefits, items and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting interstate commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Medicare, all in violation of Title 18, United States Code, Section 1347.

**C.   The Execution of the Scheme**

32.   On or about the below listed dates, in the Southern District of Texas and elsewhere, for the purpose of executing the scheme and artifice to defraud, and to aid and abet the same, defendants **RODNEY MESQUIAS, HENRY MCINNIS, JOSE GARZA** ███████████ ███████ **and FRANCISCO PENA** caused the transmission of the following claims to Medicare, which were for the patients, approximate dates of service, and approximate amounts

13

listed below.

| Count | Defendant(s) | Certification Period | Entity | Description of Services | Patient | Medicare Payment |
|---|---|---|---|---|---|---|
| 2 | RODNEY MESQUIAS, HENRY MCINNIS ▇▇▇ | August 14, 2013 to October 12, 2013 | Professional Hospice Care | Hospice Services | J.H. | $2,567.52 |
| 3 | RODNEY MESQUIAS, HENRY MCINNIS, FRANCISCO PENA | December 18, 2013 to March 17, 2014 | Professional Hospice Care | Hospice Services | F.P. | $4,089.52 |
| 4 | RODNEY MESQUIAS, HENRY ▇▇▇ | November 6, 2013 to February 3, 2014 | Professional Hospice Care | Hospice Services | T.C. | $4,304.70 |
| 5 | RODNEY MESQUIAS, HENRY MCINNIS, ▇▇▇ | June 3, 2014 to August 31, 2014 | Bee Caring | Hospice Services | A.C. | $4,448.19 |
| 6 | RODNEY MESQUIAS, HENRY MCINNIS, JOSE GARZA | February 10, 2016 to April 9, 2016 | Bee Caring | Hospice Services | P.C. | $3,202.85 |
| 7 | RODNEY MESQUIAS, HENRY MCINNIS, ▇▇▇ | December 23, 2014 to March 22, 2015 | Bee Caring Hospice | Hospice Services | J.C. | $1,282.61 |

(All in violation of Title 18, United States Code, Sections 1347 and 2.)

## COUNT 8
### Conspiracy to Commit Money Laundering
### (18 U.S.C. § 1956(h))

THE GRAND JURY FURTHER CHARGES THAT:

**A.    Introductory Allegations**

33.    The Grand Jury incorporates by reference and re-alleges paragraph 29 as though set forth in its entirety here.

**B.    The Conspiracy**

34.    From in or about 2009 through in or about 2018, the exact dates being unknown to the Grand Jury, in the Southern District of Texas, and elsewhere, defendants **RODNEY MESQUIAS, HENRY MCINNIS, JOSE GARZA,** ▮▮▮▮▮▮▮▮▮▮ and **FRANCISO PENA** did knowingly and willfully combine, conspire, confederate, and agree with each other and others, known and unknown to the Grand Jury, to commit certain offenses against the United States in violation of Title 18, United States Code, Sections 1956 and 1957, to wit:

a.    to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity, that is, health care fraud and conspiracy to commit health care fraud, with the intent to promote the carrying on of specified unlawful activity, that is health care fraud and conspiracy to commit health care fraud, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

b.    to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved proceeds of specified unlawful

activity, that is, health care fraud and conspiracy to commit health care fraud, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

      c.    to knowingly engage and attempt to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, health care fraud and conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1957.

### The Manner and Means of the Conspiracy

35.    The manner and means by which the defendants and their co-conspirators sought to accomplish the objects of the conspiracy included, but were not limited to, the following:

      a.    It was part of the conspiracy that defendants **RODNEY MESQUIAS, HENRY MCINNIS, JOSE GARZA,** ▮▮▮▮▮▮▮▮▮ and **MAYOR PENA** would cause Medicare to remit payment of the proceeds of the defendants' health care fraud scheme into various corporate and personal bank accounts controlled by **RODNEY MESQUIAS** and his co-conspirators.

      b.    It was further a part of the conspiracy that defendant **RODNEY MESQUIAS** would thereafter transfer proceeds of the health care fraud scheme to other bank accounts which he also used to conduct further financial and monetary transactions.

16

c.     It was further a part of the conspiracy that defendants **RODNEY MESQUIAS, HENRY MCINNIS,** and **JOSE GARZA** would use the proceeds of their health care fraud scheme to pay Merida Group Medical Directors for certifying patients for hospice and home health services.

d.     It was further a part of the conspiracy that defendants **RODNEY MESQUIAS, HENRY MCINNIS,** and **JOSE GARZA** would use the proceeds of their health care fraud scheme to pay Merida Group Medical Directors for referring patients for hospice and home health services.

e.     It was further a part of the conspiracy that defendant **RODNEY MESQUIAS** would mischaracterize and disguise the nature and purpose of payments made to Medical Directors by, for example, indicating in the "memo" line of checks that such payments were for "Medical Director fees," when, in fact, as **RODNEY MESQUIAS** then and there well knew, the payments were for illegal kickbacks and fraudulently certifying patients for services.

f.     It was further a part of the conspiracy that defendants **RODNEY MESQUIAS** and ███████████████ would use a nominee to conceal the identity of the true beneficial owners of the Merida Group's affiliated entities.

g.     It was further a part of the conspiracy that defendants **RODNEY MESQUIAS** and ███████████████ would cause profit distributions to be issued to a nominee to conceal the identity of the true beneficial owners of the Merida Group's affiliated entities.

h.     It was further a part of the conspiracy that defendant **RODNEY MESQUIAS** would re-invest proceeds of the health care fraud scheme into the Merida

Group's various affiliated entities.

      i.     It was further a part of the conspiracy that defendants **RODNEY MESQUIAS, HENRY MCINNIS, JOSE GARZA,** ███████████████ nd **MAYOR PENA** would enrich themselves by transferring and converting, or causing the transfer and conversion, of the proceeds of their fraudulent scheme from the Merida Group corporate bank accounts to their own personal use.

      (All in violation of Title 18, United States Code, Section 1956(h).)

**COUNT 9**
**Obstruction of Criminal Investigations of Health Care Offenses**
**(18 U.S.C. §§ 1518 and 2)**

THE GRAND JURY FURTHER CHARGES THAT:

    **A.**    **Introductory Allegations**

    36.    The Grand Jury incorporates by reference and re-alleges paragraphs 29 and 35 as though set forth in their entirety here.

    **B.**    **The Obstruction**

    37.    From in or about 2017 through in or about 2018, the exact dates being unknown to the Grand Jury, in the Southern District of Texas and elsewhere, defendant **FRANCISCO PENA**, attempted to and did willfully prevent, obstruct, mislead, and delay the communication of information and records relating to federal health care offenses, that is, Health Care Fraud, in violation of Title 18, United States Code, Section 1347; Conspiracy to Commit Health Care Fraud, in violation of Title 18, United States Code, Section 1349; Conspiracy to Pay and Receive Illegal Kickbacks, in violation of Title 18, United States Code, Section 371; and Payment of Kickbacks in Connection with a Federal Health Care Program, in violation of Title 42, United States Code, Section 1320a-7b(b), to agents of the Federal Bureau of Investigation, criminal investigators duly authorized by a department of the United States to conduct and engage in investigations for prosecutions for violations of health care offenses.

## C.     The Criminal Investigation

38.     Beginning in or about 2016 and continuing through in or about 2018, the exact dates being unknown to the Grand Jury, within the Southern District of Texas and elsewhere, the Federal Bureau of Investigation ("FBI") and the Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), conducted a criminal investigation into allegations regarding an illegal health care fraud and kickback scheme involving, among others, **RODNEY MESQUIAS**, **HENRY MCINNIS, JOSE GARZA, MAYOR PENA**, and the Merida Group's affiliated entities.

39.     Confidential Source #1 ("CS-1") and Confidential Source #2 ("CS-2") worked in the health care industry in the area of hospice services.

40.     Cooperating Witness ("CW-1") was a resident of Texas.

41.     During the investigation, in or about 2017, at City Hall, Office of the Mayor for Rio Bravo, within the Southern District of Texas, CW-1 met with **MAYOR PENA**.  During the meeting, **MAYOR PENA** discussed the manner and methods he uses to make money as a physician.  For example, with respect to hospice patients, **MAYOR PENA** stated that: "the way you make money is by keeping them alive as long as you can."

42.     During the investigation, on or about August 3, 2017, at City Hall, Office of the Mayor for Rio Bravo, within the Southern District of Texas, **MAYOR PENA** met with CS-1 and CS-2.  CS-1 and CS-2 gave **MAYOR PENA** $2,500 in cash kickbacks in exchange for patient referrals for hospice services.  During the meeting, among other things, **MAYOR PENA** told CS-1 and CS-2 that he was expecting more money, to which CS-1 and CS-2 stated that they would pay **MAYOR PENA** an additional $2,500 in cash kickbacks at a future meeting.

43. During the investigation, on or about August 18, 2017, at **MAYOR PENA's** clinic, within the Southern District of Texas, **MAYOR PENA** met again with CS-1 and CS-2. During the meeting, CS-1 and CS-2 gave an additional $2,500 in cash kickbacks to **MAYOR PENA** in exchange for patient referrals for hospice services. During the meeting, **MAYOR PENA** discussed various topics, including **MAYOR PENA's** prior business relationship with the Merida Group's affiliated entities.

44. During the investigation, on or about October 27, 2017, FBI Special Agents interviewed **MAYOR PENA** at **MAYOR PENA's** clinic, within the Southern District of Texas. FBI Agents advised **MAYOR PENA** that making a false statement to a federal agent was a federal crime. FBI Agents further advised **MAYOR PENA** that they were conducting an investigation into **MAYOR PENA's** involvement in referring patients in exchange for illegal kickbacks. During the interview, **MAYOR PENA** made several statements, including the following:

    a.      **MAYOR PENA** denied ever accepting kickbacks and payments in exchange for patient referrals.

    b.      **MAYOR PENA** stated that he was a Medical Director for the Merida Group, that the Merida Group owed **MAYOR PENA** thousands of dollars, and that the Merida Group could not handle the business.

    c.      **MAYOR PENA** denied ever taking measures to extend a patient's life.

45. During the investigation, two days after the FBI interview of **MAYOR PENA,** on or about October 29, 2017, **MAYOR PENA** contacted CS-1 by telephone. During the phone call, **MAYOR PENA** informed CS-1 that the FBI had interviewed **MAYOR PENA**. **MAYOR PENA** further stated that the FBI questioned **MAYOR PENA** about illegal kickbacks. **MAYOR PENA** asked CS-1 whether the FBI had contacted CS-1. **MAYOR PENA** then told CS-1 that they would

have to take steps to conceal the kickbacks that CS-1 and CS-2 had paid to **MAYOR PENA** for patient referrals, and requested that CS-1 meet **MAYOR PENA** at his clinic.

46.     During the investigation, on or about October 30, 2017, CS-1 met with **MAYOR PENA** at **MAYOR PENA's** clinic, within the Southern District of Texas.  During the meeting, **MAYOR PENA** instructed CS-1 to provide a false and misleading statement to the FBI in the event that the FBI interviewed CS-1, all in order to conceal the kickback payments that **MAYOR PENA** received from CS-1 and CS-2 in exchange for patient referrals, which were the subject of the federal investigation.

(All in violation of Title 18, United States Code, Sections 1518 and 2.)

## COUNT 10
### False Statement
### (18 U.S.C. §§ 1001 and 2)

THE GRAND JURY FURTHER CHARGES THAT:

**A.     Introductory Allegations**

47.     The Grand Jury incorporates by reference and re-alleges paragraphs 29, 35, and 38-46 as though set forth in their entirety here.

**B.     The False Statement**

48.     On or about October 27, 2017, within the Southern District of Texas and elsewhere, defendant **FRANCISCO PENA** did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Federal Bureau of Investigation, an agency within the executive branch of the United States, in that the defendant, in response to questions posed to him by agents of the Federal Bureau of Investigation, stated that the defendant did not receive kickbacks and payments in exchange for patient referrals.

49.     As defendant **MAYOR PENA** then and there well knew when he made it, this statement was false in that: **MAYOR PENA** did receive kickbacks and payments in exchange for patient referrals.

(In violation of Title 18, United States Code, Sections 1001(a)(2) & 2.)

## COUNT 11
## Conspiracy to Obstruct Justice
## (18 U.S.C. § 1512(k))

THE GRAND JURY FURTHER CHARGES THAT:

**A.  Introductory Allegations**

50.  The Grand Jury incorporates by reference and re-alleges paragraphs 29, 35, and 38-46 as though set forth in their entirety here.

**B.  The Obstruction**

51.  Beginning in or about 2017 and continuing through in or about 2018, the exact dates being unknown to the Grand Jury, within the Southern District of Texas and elsewhere, defendants **RODNEY MESQUIAS, HENRY MCINNIS,** and ███████████████ knowingly and willfully did combine, conspire, confederate and agree with each other and with others, known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1512(c)(2), that is, to obstruct, influence, and impede a federal Grand Jury investigation, by causing false and fictitious records to be provided to federal investigators in response to a federal Grand Jury subpoena.

**C.  The Grand Jury Investigation**

52.  On or about August 30, 2017, during a Grand Jury investigation, a Grand Jury sitting in the Southern District of Texas issued a Grand Jury subpoena ("Grand Jury subpoena") to the Custodian of Records for the Merida Group and its affiliated entities, as well as "any other health care entity in which **RODNEY MESQUIAS** served as an owner, officer, or director." The Grand Jury subpoena sought the production of patient records, to include, but not limited to, face-to-face sheets and physicians' orders for hospice and home health services, concerning specific patients of the Merida Group's affiliated entities.

53.     In or about September 2017, during a Grand Jury investigation, **RODNEY MESQUIAS, HENRY MCINNIS,** and ███████████ caused the creation of various false and fictitious records, to include, but not limited to, face-to-face sheets and physicians' orders, concerning various patients whose records were requested by the Grand Jury.

54.     On or about September 11, 2017, during a Grand Jury investigation, the Custodian of Records for the Merida Health Care Group and its affiliated entities delivered a production of patient records to the office of the HHS-OIG located in McAllen, Texas, within the Southern District of Texas, in response to the Grand Jury subpoena.  The production of patient records contained the various false and fictitious records that **RODNEY MESQUIAS, HENRY MCINNIS,** and ███████████ caused to be created.

(In violation of Title 18, United States Code, Section 1512(k).)

**COUNT 12**
**Conspiracy to Pay and Receive Healthcare Kickbacks**
**(18 U.S.C. § 371)**

THE GRAND JURY FURTHER CHARGES THAT:

55.    The Grand Jury incorporates by reference and re-alleges Paragraphs 29, 35, 38-46, and 52-54 as though set forth in their entirety here.

56.    From in or about May 2009 through in or about 2018, the exact dates being unknown to the Grand Jury, within the Southern District of Texas and elsewhere, Defendants **RODNEY MESQUIAS,** and **FRANCISCO PENA** did knowingly and willfully combine, conspire, confederate and agree with others, known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a.    to violate Title 42, United States Code, Section 1320a-7b(b)(1), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering, and arranging for, and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole or in part by a Federal healthcare program, that is, Medicare; and

b.    to violate Title 42, United States Code, Section 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering,

and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole or in part by a Federal healthcare program, that is, Medicare.

<b><u>Purpose of the Conspiracy</u></b>

57.     It was a purpose of the conspiracy for defendants **RODNEY MESQUIAS,**  and **MAYOR PENA** and their co-conspirators to unlawfully enrich themselves by paying and receiving kickbacks and bribes in exchange for the referral of Medicare beneficiaries for whom the Merida Group submitted claims to Medicare.

<b><u>The Manner and Means of the Conspiracy</u></b>

58.     The manner and means by which the defendants and their co-conspirators sought to accomplish the objects of the conspiracy included, but were not limited to, the following:

a.     It was a part of the conspiracy that **RODNEY MESQUIAS** paid ▮▮▮ **MAYOR PENA,** and Medical Director 1 kickbacks and bribes in exchange for certifying and recertifying patients for medically unnecessary services.

b.     In an effort to conceal these illegal kickbacks and bribes arrangements, **RODNEY MESQUIAS** hired ▮▮▮ **MAYOR PENA,** and Medical Director 1 as "Medical Directors" of the Merida Group's affiliated entities and paid ▮▮▮ **MAYOR PENA,** and Medical Director 1 "medical director" fees, a fee per face-to-face certification, and/or ownership distributions.

c.     ▮▮▮ **MAYOR PENA,** and Medical Director 1 entered into sham contracts wherein ▮▮▮ **MAYOR PENA,** and Medical Director 1 agreed to act as "medical directors" of the Merida Group's affiliated entities and provide certain services, when, in reality, ▮▮▮ **MAYOR PENA's,** and Medical

Director 1's primary services to the Merida Group's affiliated entities was fraudulently certifying and recertifying Medicare beneficiaries for medically unnecessary home health and hospice services, and these purported director fees were nothing more than concealed kickbacks and bribes.

      d.    **RODNEY MESQUIAS** paid ███████████████ **MAYOR PENA**, and Medical Director 1 kickbacks and bribes for every patient that they certified for services with the Merida Group's affiliated entities.

## Overt Acts

59.    In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Southern District of Texas and elsewhere, the following overt acts:

      a.    In or about March 2014, **RODNEY MESQUIAS** caused an approximately $2,000 check with the memo line, "Feb 2014 Services and $500 face to face," to be paid to **MAYOR PENA**.

      b.    In or about December 2014, **RODNEY MESQUIAS** caused an approximately $2,000 check with the memo line, "Merry Christmas," to be paid to **MAYOR PENA**.

      c.    In or about October 2016, **RODNEY MESQUIAS** caused an approximately $5,000 check with the memo line, "MD Directorship-August and September Services," to be paid to **MAYOR PENA**.

d.      In or about March 2014, **RODNEY MESQUIAS** caused an approximately $5,750 check with the memo line, "27 face to face," to be paid to Medical Director 1.

e.      In or about April 2014, **RODNEY MESQUIAS** caused an approximately $11,600 check with the memo line, "Face to Face," to be paid to Medical Director 1.

f.      In or about May 2015, **RODNEY MESQUIAS** caused an approximately $2,000 check with the memo line, "10 F2F," to be paid to Medical Director 1.

g.      In or about October 2015, **RODNEY MESQUIAS** caused an approximately $12,500 check with the memo line, "F2F September 2015 Services," to be paid to █████████████████████.

h.      In or about November 2015, **RODNEY MESQUIAS** caused an approximately $8,800 check with the memo line, "October 2015 44 Face to Face Visits," to be paid to ██████████████████.

i.      In or about November 2016, **RODNEY MESQUIAS** caused an approximately $5,600 check with the memo line, "28 F2Fs," to be paid to ██████████████ ████████.

(All in violation of Title 18, United States Code, Section 371.)

## NOTICE OF FORFEITURE
### (18 U.S.C. § 982(a)(7))

Pursuant to Title 18, United States Code, Section 982(a)(7), the United States gives notice

to defendants, **RODNEY MESQUIAS, HENRY MCINNIS, JOSE GARZA,** ███████

██████ and **FRANCISO PENA,** that upon conviction of any of Counts 1 through 7 and Count

12 of this Indictment, all property, real or personal, which constitutes or is derived, directly or

indirectly, from gross proceeds traceable to such offenses, is subject to forfeiture.

## NOTICE OF FORFEITURE
### (18 U.S.C. § 982(a)(1))

Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice

to defendants, **RODNEY MESQUIAS, HENRY MCINNIS, JOSE GARZA** ███████

██████ and **FRANCISO PENA,** that upon conviction of Count 8 of this Indictment, all

property, real or personal, involved in the money laundering conspiracy or traceable to such

property, is subject to forfeiture.

### Property Subject to Forfeiture

The property subject to forfeiture includes, but is not limited to, the following property:

(a) at least $120,000,000.00 in gross proceeds;

(b) the following real property, together with all improvements, buildings,

structures and appurtenances:

    i. Real property in Austin, Texas, with a legal description of:

        Being 0.17 of an acre of land, out of the Issac Decker League, Travis
        County, Texas, and being a portion of Lot 9, Division "D", of the
        James E. Bouldin Estates, same being all of that certain Realtime
        Property Investments, LLC  0.201 acre tract recorded in document
        number 2014012170, Official Records, Travis County, Texas.

ii.  Real property in Harlingen, Texas, with a legal description of:

Lot Eight (8), Block Ten (10), Treasure Hills Subdivision, Unit No. Five (5), in the City of Harlingen, Cameron County, Texas, according to the map of said subdivision recorded in Cabinet 1, Slots 5 A-B, Map Records of Cameron County, Texas.

### Money Judgment and Substitute Assets

The United States may seek the imposition of a money judgment against each defendant. In the event that a condition listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of a defendant in substitution up to the amount of the money judgment against that defendant.

By:                                                By:

Sandra L. Moser                                    Ryan K. Patrick
Acting Chief, Fraud Section                        United States Attorney

Joseph S. Beemsterboer
Deputy Chief, Health Care Fraud Unit

KEVIN LOWELL                                       ANDREW SWARTZ
Trial Attorney                                     Assistant United States Attorney
United States Department of Justice                U.S. Attorney's Office, SDTX
Criminal Division Fraud Section                    1701 W. Highway 83, #600
1400 New York Avenue, N.W.                         McAllen, Texas 78501
Washington, D.C. 20005

A TRUE BILL:


Grand Jury Foreperson