```
1              IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF TEXAS
2                      BROWNSVILLE DIVISION

3
   UNITED STATES OF AMERICA      )
4                                )
                                 )
5  VS.                           )  CRIMINAL ACTION NO.
                                 )  B-18-CR-8
6                                )
   RODNEY MESQUIAS, HENRY        )
7  MCINNIS AND FRANCISCO PENA    )
                                 )
8

9
                          TRIAL - DAY ONE
10            BEFORE THE HONORABLE ROLANDO OLVERA
                        OCTOBER 22, 2019
11

12

13                     A P P E A R A N C E S

14
    FOR THE UNITED STATES:
15
         MR. KEVIN LOWELL
16       MR. ANDREW SWARTZ
         MR. JACOB FOSTER
17       ASSISTANT UNITED STATES ATTORNEY
         BROWNSVILLE, TEXAS 78520
18

19  FOR THE DEFENDANT RODNEY MESQUIAS:

20       MR. CHARLES BANKER
         ATTORNEY AT LAW
21       118 Pecan Boulevard
         McAllen, Texas 78501
22

23

24

25
```

```
1   FOR THE DEFENDANT HENRY MCINNIS:

2        MR. ED CYGANIEWICZ
         ATTORNEY AT LAW
3        1000 E. Madison Street
         Brownsville, Texas 78520
4
    FOR THE DEFENDANT FRANCISCO PENA:
5
         MR. ROBERT GUERRA
6        ATTORNEY AT LAW
         55 Cove Circle
7        Brownsville, Texas 78521

8   FOR THE DEFENDANT FRANCISCO PENA:

9        MS. ADRIANA ARCE-FLORES
         ATTORNEY AT LAW
10       1414 Victoria Street
         Laredo, Texas 780404
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              COURT OFFICER:  All rise for the Court.
 2              THE COURT:  Thank you, everyone.  Please be
 3    seated.  Counsel, it's my understanding that all the
 4    jurors are here.  So if we have everyone here, we can
 5    get started a bit early.
 6              I don't see anyone here at the time, at
 7    least in the public arena, but it's my understanding --
 8    or the parties want to invoke the rule, correct?
 9              MR. LOWELL:  Yes, Your Honor.
10              MR. GUERRA:  Yes, Your Honor.
11              THE COURT:  So, gentlemen, the Rule, hereby,
12    is invoked.  Please be -- officers are in charge to make
13    sure that no witness comes in inadvertently.  Obviously,
14    that doesn't apply right now.  And, as I said, let's
15    bring them on in.
16              Gentlemen, I'm assuming you want a
17    five-minute warning; is that correct?
18              MR. LOWELL:  That will be fine, Your Honor.
19    Sure.
20              THE COURT:  All right.
21              COURT OFFICER:  All rise for the jury.
22              MR. LOWELL:  Keep me in line.
23                   (Jurors enter courtroom)
24              THE COURT:  Thank you, everyone.  Please be
25    seated.
```

1              Ladies and gentlemen of the jury, again,

2    good morning.  Thank you all for your promptness.  As a

3    result of everyone being here on time, we can start a

4    little bit early.  And I remind all of you that if at

5    any time anyone needs a break, for whatever reason,

6    restroom, cramping, stretching, just raise your hand and

7    we'll be happy to take a very brief recess.

8              All right?  With that being said, though, as

9    I indicated yesterday, at this time, the parties are

10   free to make an opening statement.  I remind you,

11   nothing the attorneys stay -- say is evidence or

12   testimony.  They're advocates for their clients, and it

13   is their right to present their case to you and what

14   they believe the evidence will show during the course of

15   the trial.

16             Please listen carefully.

17             On behalf of the Government, Mr. Lowell?

18             MR. LOWELL:  Good morning, Your Honor, and

19   thank you.  May it please the Court; may I proceed?

20                     OPENING STATEMENTS

21             THE COURT:  Please proceed.

22             MR. LOWELL:  To my colleagues on the

23   defense, to my colleagues on the prosecution team,

24   ladies and gentlemen of the jury, good morning.

25             THE JURY:  Good morning.

1             MR. LOWELL:  Lies, fraud, money.  A health

2   care fraud scheme involving millions of dollars.  And

3   the Defendants are at the center of it.

4             This is a case about how the Defendants

5   conned, how they used, and how they exploited vulnerable

6   people for one thing, money.  It's about how they worked

7   together to rip off millions of dollars from Medicare.

8   Medicare.  It's a health insurance program, money

9   reserved, money set aside for the weak, the vulnerable

10   and the needy.

11             And as a part of this health care fraud

12   scheme, you will see that every lie by these Defendants,

13   every false statement, every dishonest act, was designed

14   to steal more from Medicare.

15             Now, today, I'm going to do two things.

16   First, I'm going to give you some background about the

17   case, give you some context to help understand the case.

18             And, second, I'm going walk through the

19   major parts of the Defendant's health care fraud scheme.

20   Keep this in mind -- keep this in mind, this is a

21   straightforward common sense case.  Lying for money.

22   Nothing complicated about it, nothing difficult about

23   it.  And the mountain of evidence that you will see

24   during this trial will confirm that the Defendants are

25   guilty.

1           Let's start with some background.  The

2    Merida Group.  What is the Merida Group?  The Defendants

3    were associated, worked for the Merida Group, and it was

4    really a collection of several different health care

5    companies that operated throughout Texas.  Right here in

6    your backyard in the Valley, to Laredo, to San Antonio,

7    to Houston and to Corpus.  And the evidence will show

8    that the Merida Group, the Defendants, through the

9    Merida Group, ripped off millions of dollars from

10   Medicare by billing for two kinds of health care

11   services; hospice care and home health care.

12           Let's take them both in turn.  What is

13   hospice care?  Hospice care is a very expensive, it's an

14   important service for folks who are about to die.  And

15   recognizing that, society, folks across the country,

16   have set aside money to take care of the spiritual, the

17   emotional, psychological needs of these patients in

18   their last days.  And so what -- what typically happens?

19   Well, a hospice company, like the Merida Group, provides

20   hospice care to that patient, provides the care that

21   they need in their dying days.  And, typically, the

22   patient's doctor, the doctor they know and trust,

23   refer -- refers that patient to the hospice company.

24   The company, then, provides the service that the patient

25   needs.  And the hospice company has what's called a

1    medical director.  It's a doctor.  And if that doctor

2    sees that the patient is in their last days is about to

3    die, that medical director signs a doctor's order.  That

4    doctor's order is critical, and it confirms that the

5    patient, in fact, needs hospice services.  The patient

6    lives a little bit longer, the medical director signs

7    another doctor's order confirming that the patient still

8    needs that hospice care.

9              What is home health?  Home health, like

10   hospice care, requires a doctor's order, and it's for

11   patients who are so sick, so disabled, it's difficult

12   for them to get out of bed.  So, a home health company,

13   kind of like the Merida Group, is supposed to provide

14   home health services to those homebound patients.

15              Hospice, home health.

16              Now, this is critical.  Medicare has some

17   common sense rules.  Rules everyone here already knows.

18   You can't lie and trick Medicare into believing that a

19   patient is about to die when they're not.  You can't lie

20   and fool Medicare into believing that a patient is

21   homebound when they're not.  And you can't pay doctors,

22   these medical directors, bribes.  And they're called

23   kickbacks -- and they're illegal -- to rubber stamp

24   doctor's orders and to refer patients to your hospice or

25   home health company.  And that's because Medicare has

1    these common sense rules in place because they pay, they

2    provide that money that society sets aside to pay these

3    companies to be honest and to provide legitimate

4    services to patients who truly, truly need the services.

5            And you can break those rules down into two

6    words.  And you're going to hear about them today during

7    this trial.  You can break them down into two words:  Be

8    honest.  Be honest.

9            In this case, ladies and gentlemen, the

10   evidence will show that these Defendants broke, they

11   shattered those rules over and over again.

12           Now that we've covered some background,

13   let's talk about the second part of today's

14   presentation.  Or before -- before I get there, let's

15   talk about the Defendants.  I want to introduce you to

16   the Defendants and give you some background about them.

17   Who are the Defendants?  Rodney Mesquias, Defendant

18   Rodney Mesquias.  You will learn that he was the boss.

19   He owned, he controlled, he oversaw the Merida Group's

20   fraud empire stretching across Texas.  And the evidence

21   will show that Rodney Mesquias, Mr. Mesquias, cared

22   about three things:  Money, power and greed.  And you

23   will hear that Rodney Mesquias ruled his Empire with an

24   iron fist, creating a culture of fear, a culture of

25   intimidation at the company.  You will hear that Rodney

1  would yell at his employees, quote, "Do not F with my

2  patients.  Do not F with my money".  You either went

3  along with the fraud, or you lost your job.  You either

4  did what Rodney told you to do, or you wouldn't get

5  paid.

6  The evidence will show that Rodney directed,

7  he commanded his employees to falsify patient files, to

8  trick and to deceive Medicare into believing that

9  patients were close to death, to trick and deceive

10  Medicare into believing that patients were homebound.

11  You will also hear how Mr. Mesquias bribed

12  his medical directors, his doctors.  And he would pay

13  these doctors to do two things:  He would pay them to

14  rubber stamp doctor's orders for home health and

15  hospice, and he would pay those doctors to feed his

16  company with patients.  And if you went along with the

17  fraud, you'll learn that you could get perks, benefits,

18  of going along with what Rodney Mesquias told you to do.

19  You could stay at his condo on South Padre Island, you

20  could go to Las Vegas with Mr. Mesquias.  He'd get you

21  bottle service, take you to nightclubs.  The perks, the

22  benefits of going along with the fraud.  And if you are

23  a medical director, a doctor, you'd get those kickbacks,

24  those bribes.  So Rodney Mesquias, he's at the top.

25  He didn't do it alone, he had some help.

1    The second in command was Henry McInnis.  Henry McInnis

2    was the number two at the company, and he helped enforce

3    that culture of fear, that culture of intimidation among

4    the Merida Group employees, applying pressure on them.

5            And Mr. McInnis' basic function was to keep

6    this fraud machine well oiled.  Focusing on driving up

7    the numbers.  The numbers.  He wanted to increase the

8    patient census -- simply means the number of patients at

9    the company -- even if it meant through fraud.

10           You will also hear how Henry McInnis, like

11   his partner, Rodney Mesquias, directed and ordered

12   employees to falsify the patient files.  And that's

13   because Medicare relies on those files to be accurate.

14   You see, Medicare's paying these companies to provide

15   this service, and they trust -- they trust the

16   Defendants -- that the Defendants and companies that

17   provide health care are maintaining truthful and

18   accurate records to justify the services they're

19   providing.  And so you will see that Henry McInnis

20   falsified those records to make it appear that patients

21   qualified for services.

22           You also hear that Henry McInnis enjoyed the

23   perks, the benefits, of going along with the fraud of

24   being the number two at the company, how he would go on

25   trips to Vegas, enjoy bottle service, exclusive

1  nightclubs, how he enjoyed the power of being the number

2  two at the Merida Group.

3           Last, but not least, Francisco Pena.

4  Mr. Pena was a doctor in Laredo, a couple hours away

5  from here, and he was a medical director for the Merida

6  Group.  He was one of Rodney's doctors.  And you will

7  hear how Mr. Pena wielded control and power over his

8  patients living in Laredo.

9           You'll hear how the Merida Group had

10  expanded into Laredo from here in the Valley, expanded,

11  set up an operation in Laredo, Texas.  And to do that,

12  you'll hear that they relied on Mr. Pena.  He was their

13  "go to" doctor in Laredo, Texas.  And to access that

14  pipeline of patients in Laredo, Henry McInnis, Rodney

15  Mesquias, the Merida Group, you'll hear that Mr. Pena

16  demanded kickbacks, he demanded bribes from the Merida

17  Group in order to get his -- those patients so that

18  Rodney and Henry could then sign up those patients for

19  hospice, for home health services.

20           You'll also see that Mr. Pena had a -- had a

21  problem in this case during this investigation.  You'll

22  hear that he was caught on tape.  He talks too much.

23  And you'll hear those tapes, audio, video recordings of

24  Mr. Pena talking about kickbacks for patients and

25  talking about the fraud.  You'll hear one recording and

1   video of Mr. Pena taking cash kickbacks for his

2   patients.  And what that will highlight to you about

3   Mr. Pena and his role in this case is that every patient

4   to Mr. Pena is a dollar sign, an opportunity, to make

5   and rip off more money.

6            You'll also hear something else interesting

7   and troubling in those recordings.  It's how Mr. Pena

8   views his hospice patients.  Members of the jury, you'll

9   hear a recording where Mr. Pena is talking about how he

10  keeps these hospice patients, these folks who are living

11  through the most difficult stage of their lives, as

12  long -- alive as long as possible.

13           In Mr. Pena's own words -- and you're going

14  to hear them during this trial.  Quote, "The way you

15  make money is by keeping them alive as long as

16  possible."

17           That evidence will highlight for you, will

18  show how Mr. Pena was part of this scheme to exploit

19  people, stringing them along as long as he could.

20  Because every additional day is another dollar that he

21  could get from Medicare.

22           Now that we've covered some background,

23  we've covered the Defendants, the Merida Group, let's

24  talk about the parts of this scheme.  And you're going

25  to hear about these parts in several different ways.

1   You're going to hear from witnesses.  Witnesses will

2   take that stand and they will tell you about the

3   evidence, they'll tell you about the different parts.

4   You'll hear from doctors, chaplains, nurses, folks who

5   worked at the Merida Group directly with these

6   Defendants.  They'll tell you about their involvement in

7   this scheme, what they did, what they saw, and the

8   Defendants role in that scheme.  You'll hear from

9   confidential sources.  These are folks who work

10  undercover for the Government, help the Government stop

11  serious crime.

12          And you'll hear about their involvement in

13  an undercover operation involving Mr. Pena.  You'll also

14  see documents in patient files, patient files full of

15  false information about the patients, those lies to

16  justify and make it appear that patients were close to

17  death.

18          And you'll hear from a forensic accountant,

19  a numbers guy, who's going to trace and track that money

20  as it flowed from Medicare into the Merida Group's bank

21  accounts.

22          Now, to be clear, ladies and gentlemen, no

23  one during this trial is going to take that stand and

24  tell you that every single claim that the Merida Group

25  submitted contained false information.  No one is going

1    to say that.  The reason -- the reason we're in this

2    courtroom today, is because the Defendants got greedy,

3    and they could get more money, they could steal more

4    money by committing fraud.  Doing business the honest

5    way, following the rules, wasn't enough for these

6    Defendants, and they could get more by committing fraud.

7    And that's what you'll see in this case.

8             Let's go through each part.  Again,

9    patients, lies, money, power, and the cover-up.

10             Patients.  They're really the heart of this

11   case, the reason -- one of the primary reasons we're in

12   this courtroom.  Why?  Because the evidence will show

13   that the Defendants used and exploited them.  How in the

14   Defendant's world, this world of health care fraud that

15   you'll learn about during this trial, patients are

16   dollar signs, nothing but objects, things, to be used in

17   order to fuel the fraud.  But there were people, folks

18   from right here in the Valley and across Texas.  You'll

19   hear about folks with Alzheimer's, dementia.  Some of

20   these patients could not speak, but you'll hear about

21   them in this evidence, they'll have a voice in this

22   courtroom.

23             Let me give you two specific examples.  You

24   will hear about a patient who had Alzheimer's.  She

25   lived alone in a small house in San Antonio.  She had

1    one piece of furniture, a stool.  And she would wander

2    around her house.  She wasn't about to die.  She wasn't

3    a hospice patient.  And you'll hear how one of the

4    Merida Group's medical directors was sent out to that

5    house to take advantage and sign up that patient for

6    hospice services, hospice care that she did not need.

7    And you'll hear how that patient was used and exploited.

8    Why?  So the Defendants could make more money.

9           Now, the next example is ridiculous.  It's

10   ridiculous, ladies and gentlemen, it's going to

11   highlight how ridiculous this scam was.  This next

12   patient injured himself, wasn't about to die, wasn't a

13   hospice patient.  You'll hear how he injured himself

14   dancing.  He was doing a dance.  And it wasn't just any

15   dance, it was the Macarena.  Remember that dance from

16   the 1990s?  This man is doing the Macarena, ladies and

17   gentlemen, at the time he's supposed to be passing away.

18   Highlights for you how ridiculous this scam was.

19          Now, you're also going to hear from

20   legitimate doctors, doctors who saw some of these

21   patients, these patients who were signed up with the

22   Merida Group, and they will tell you that the patients

23   that they know, the patients they had a relationship

24   with, were not about to die at the time the Merida Group

25   was lying to Medicare and was saying they were.  You'll

1    hear from those doctors.  They'll take that stand and

2    they'll tell you about their patients.

3              This brings us to the second part, lies.

4    Ladies and gentlemen, the evidence will show that these

5    Defendants lied over and over again.  It wasn't one lie,

6    wasn't a lie about one patient.  You will see a variety

7    of lies, a pattern of deception.  You'll hear how Rodney

8    and Henry would direct employees together to falsify

9    those patient records for hospice patients.  Lie and say

10   that the patient's health was declining, lie and say

11   that the patient had a bad appetite.  Because, as you'll

12   hear, folks have a bad appetite right before they're

13   about to pass away.  Trick Medicare, all a part of this

14   scam to trick Medicare into believing these patients

15   were about to die.

16             The evidence will also show that Francisco

17   Pena lied.  You'll hear about how Francisco Pena was

18   interviewed by the FBI.  The FBI was conducting an

19   investigation into Mr. Pena, into his role in illegal

20   kickback schemes.  And you'll hear that the FBI

21   interviewed Mr. Pena and asked him whether he was

22   engaged in this illegal activity, and Mr. Pena flat out

23   denied it.  Which you will see, ladies and gentlemen,

24   was a ridiculous lie.  The evidence will show that you

25   can't touch, you can't get near one of Mr. Pena's

1    patients without first paying him a bribe.

2              And one of the other lies you'll hear from

3    Mr. McInnis and Mr. Mesquias, not just those lies in the

4    patient files, you will hear how patients were lied to

5    their faces, how Mr. Mesquias would direct his employees

6    to lie to the patients and say:  You don't actually need

7    to be dying to sign up as a hospice patient.  Tricking

8    those patients to go along with getting signed up for

9    hospice care that they did not need.

10             Now, to make this company look legitimate,

11   to make it appear like it was an honest company, the

12   Merida Group relied on doctors, medical directors.  And

13   you're going to hear from two of them.  They're going to

14   take that stand, and they're going to tell you about the

15   fraud.  Dr. Carrillo and Dr. Virlar.

16             Now, Dr. Virlar and Dr. Carrillo, they've

17   pleaded guilty, they've admitted to committing various

18   crimes, including health care fraud.  They're going to

19   testify that, and acknowledge that.  By coming here to

20   you in Court, and telling you about the fraud at the

21   Merida Group, they expect, they hope, to receive a

22   lighter sentence.

23             They've already been convicted of fraud.

24   And like Mr. Pena, you'll hear that Dr. Virlar and

25   Dr. Carrillo served as medical directors for different

1    regions of the Merida Group.  You'll see that Dr. Virlar

2    was based in San Antonio.  Dr. Pena's down there in

3    Laredo.  And then Dr. Carrillo, at the bottom of the

4    page, is down here in the valley.  And what Dr. Carrillo

5    and Dr. Virlar will tell you, is that they were working

6    in these different regions, getting illegal kickbacks

7    from Rodney Mesquias through their time at the Merida

8    Group, and rubber stamping fraudulent hospice and home

9    health orders for the Merida Group.  Just like, the

10   evidence will show, Mr. Pena was doing from Laredo.

11           Let's go to the next part.  Why all the

12   lies?  Money and power.  Members of the Jury, you will

13   hear how the Defendants, the Merida Group, steamrolled

14   through Texas, sweeping up hundreds of patients in the

15   process, and billing Medicare millions of dollars for

16   hospice and home health services.

17           You'll hear how that money was laundered,

18   money laundering, how it was used to promote the fraud,

19   expand the size and operation of the fraud, to funnel

20   payments to doctors, medical directors, and to conceal

21   the scheme.

22           Now, Rodney Mesquias, the guy at the top, he

23   made the most out of anybody, the most money.  No one is

24   going to say that Henry, Mr. Pena, personally made

25   millions of dollars off this scheme.  But what you're

1  going to see in this trial, ladies and gentlemen, is

2  that the Defendants were motivated by more than money.

3  It was about power, authority, control.  You'll hear how

4  Mr. McInnis, as the number two in the company, had the

5  authority, the power, to tell other people to do the

6  dirty work, to tell other people to commit the fraud.

7  And he enjoyed that power.  He enjoyed the authority,

8  the perks, the benefits of being Rodney Mesquias'

9  right-hand man.

10             So, too, with Mr. Pena, you'll hear in those

11  tapes, the audio, the videotapes, in Mr. Pena's own

12  words, you'll hear how he enjoyed exercising that

13  control, that authority over patients in the Laredo

14  area, how you had to bribe him first in order to get

15  access to his pipeline of patients in Laredo.

16             So, money, money and power, authority,

17  control.

18             Which brings us to the fourth part, the

19  cover-up.  Members of the Jury, you will hear about a

20  cover-up from start to finish in this case.  You'll see

21  and hear how the Defendants were always trying to avoid

22  getting caught, always trying to cover their tracks, to

23  cover up the fraud.

24             Rodney Mesquias and Henry McInnis, when

25  they're directing others to falsify those patient files,

1   they're trying to cover up the patient's true condition.

2   Not just a lie in a patient file.  They're trying to

3   cover up the fact that the Merida Group was a dishonest

4   health care company.  You'll hear how Francisco Pena,

5   after he was interviewed, after he lied and misled the

6   FBI, you'll hear a recording where he was taking steps,

7   and you'll hear about how he took steps to cover up his

8   lie.

9          Members of the Jury, you'll also hear how a

10  federal grand jury -- now, a federal grand jury, unlike

11  a trial jury, like you all, a federal grand jury

12  investigates crime and figures out whether or not to

13  charge someone with a crime, and what charge to -- to --

14  to charge them with.  And you'll hear that a federal

15  grand jury was investigating the Merida Group.  And that

16  federal grand jury, issued a subpoena -- it's a request

17  for documents -- for the patient files.  They issued a

18  subpoena for the patient files.

19          And in response to that subpoena, that

20  request, the evidence will show that Rodney Mesquias,

21  Henry McInnis, and others at the company, caused the

22  creation, the manufacturer of patient records to cover

23  up the fraud, to trick, to fool the Grand Jury just like

24  they were tricking and fooling Medicare.

25          Ladies and gentlemen, you will see this

1   cover-up, this theme emerge throughout this case.

2   Patients, lies, money and power, and the cover-up.  Four

3   parts to this scheme.  Common sense case.  Lying for

4   money.

5            And in closing, ladies and gentlemen, at the

6   end of this case -- the end of this case, after you've

7   heard all the evidence, after you've heard the testimony

8   of the witnesses, the folks who worked directly with

9   these Defendants, after you've seen the documents, heard

10  the recordings, the tapes, after you've seen all of that

11  evidence, we're going to have a chance to come back

12  before you, and we're going to ask you, respectfully, to

13  return a verdict that that evidence, the evidence, the

14  documents, the witnesses, the tapes, all of that

15  evidence, will demand guilty on all counts.

16            Members of the Jury, thank you.

17            Thank you, Your Honor.

18            THE COURT:  Thank you, Mr. Lowell.

19            Gentlemen, who would like to proceed on

20  behalf of Mr. Mesquias?

21            MR. HECTOR CANALES:  I would, Your Honor.

22  Hector Canales.

23            THE COURT:  Mr. Canales, please proceed.

24            MR. HECTOR CANALES:  Thank you, Your Honor.

25            Can I get the ELMO -- ELMO, please?

1                  THE CLERK:  Yes, sir.

2                  OPENING STATEMENTS

3            MR. HECTOR CANALES:  All that -- all that,

4    and six patients, and less than $20,000.  That's what

5    the Government has cherry picked in this case.  Not

6    guilty.  The evidence in this case is going to show that

7    my client, Rodney Mesquias, is not guilty.

8            The evidence is -- is right here.  These are

9    the medical records of the six patients.  Boxes of them,

10   tens of thousands of pages of medical records that

11   document these six patients.

12           You see, the evidence here is going to

13   show -- you're going to see a theme, that the Government

14   cherry picked, from over 2,000 patients, six.  They

15   found six.  Snapshots.  You're going to see snapshots

16   over and over and over of patients.  That's what you're

17   going to hear.  But these patients are not snapshots,

18   it's not one day.

19           You're going to see here, through the

20   medical records, from start to finish, that these were

21   real patients.  Fraud, truth.  Illegitimate, legitimate.

22   These were real patients with real problems with real

23   doctors, right?  And with real clinical diagnoses by

24   these physicians.

25           See, hospice is a -- you're going to --

1    you're going to learn a lot about what hospice is, and

2    how it fits into the health care system, right?  Our

3    health care system, Medicare, takes care of millions of

4    people, right?  And not just at the end of their lives,

5    right, but during the beginning and the middle.  But

6    there's a transition.  And hospice is an election.  It

7    is a decision of the patient.  The patient says --

8    you're going to hear terms, like, palliative care.  What

9    is palliative care?  What is hospice?  Palliative care

10   and hospice is an election/decision by the patient who

11   says, "I no longer want to be cured.  I want to be

12   comfortable.  I want to live my last days in comfort."

13   But it's not just about the patient, it's about the

14   family.  It is a holistic approach to medicine, to the

15   delivery of care.  It's humane.  It is not, you will

16   hear, it is -- there are a lot of myths to hospice.  It

17   is not about simply the last two days of -- of your --

18   of your life, right?  It is a decision that's made in

19   conjunction with a doctor.

20           In this particular case, it's called --

21   under our system, called, a medical director.  All

22   right?  Where a hospice company is required by law --

23   the evidence will show in this case -- is required by

24   law to have a doctor that has the title called "Medical

25   Director".  Their job is to oversee the care.  My

1    client, Rodney Mesquias, operated hospices in -- in

2    different cities.  Each of those, he hired a medical

3    director.  The Government would say that when you pay

4    that medical director for those professional services,

5    that it's a bribe.  The Government will not say the same

6    if the Government hires experts in this case and they

7    pay them hundreds of thousands of dollars.  Is it a

8    bribe or is it professional services?

9         You will see here -- and that's part of what

10   these records are -- is the professional services being

11   rendered by the doctors as part of their role in their

12   hat as the medical director.  As a medical director,

13   their job is to put a plan of care together.  But

14   hospice doesn't just end with medical directors.

15   Hospice also has a social worker component, it has a

16   chaplain for a spiritual component, and it is a form of

17   home health care.  In other words, the patients elect

18   say, "I want to be made comfortable at home."

19         You'll hear evidence and testimony from

20   doctors and experts in this case that there are

21   different terminal -- types of terminal illnesses out

22   there.  You have a Stage 5 terrible cancer, and then you

23   have -- that can result in somebody's death fairly

24   quickly.  A severe deterioration within a matter of

25   weeks, days, months.  There are other types of terminal

1    illnesses that are death by a thousand cuts, slow.

2    Alzheimer's, dementia, debility where the mind is

3    failing.  Maybe not the heart, maybe not the cells, but

4    the mind is failing.  That takes much longer.  These are

5    not cookie cutter, black and white situations.  The

6    evidence will show that.

7            You'll see here that within these six

8    patients that the Government has -- has cherry picked,

9    that within hospice, it's sent up in terms of

10   certification periods.  You have your initial

11   certification period.  Who certifies?  A doctor.  What

12   does the doctor say?  The doctor says that I certify

13   that this patient has a terminal illness, that within --

14   that -- and that patient -- if that illness runs its

15   normal course, if nothing is done, will die within six

16   months.

17           Prognosis versus diagnosis.  It's going to

18   get a little technical here, but the evidence in this

19   case is going to be technical.  Diagnosis, past;

20   something that's happened in the past.  It's subjective.

21   It can be determined.

22           Prognosis, opinion; future prediction.  Home

23   health, you heard the Government talk about, is going to

24   be evidence about home health.  Home health is about a

25   diagnosis, qualifies by being homebound.  I have a

1    broken leg.  I can't get out of bed.  Something happened
2    to me in the past that's objective, I can see it, causes
3    me not to be able to move.  Probably temporary.
4            Hospice qualifies by a doctor saying, I
5    believe, I predict in the future, six months, based on a
6    diagnosis.
7            In this particular case, none of these six
8    patients -- all of these six patients, all of them,
9    there's no dispute about their diagnosis.
10           Number two, patient, Jack High, 76 years
11   old.  Diagnosis:  Severe Alzheimer's and debility.
12   Certified by Dr. Vincent Gonzaba.  Is that what this --
13           Dr. Vincent Gonzaba.
14           MR. HECTOR CANALES:  Dr. Vincent Gonzaba
15   from San Antonio.  You're going hear from Dr. Gonzaba.
16   Dr. Gonzaba is not part of any fraud.  He stands by his
17   clinical judgment.  No rubber stamps.  Truth,
18   legitimate, appropriate.
19           Jack High had a history of escaping, due to
20   his dementia.  His wife was overwhelmed.  She, herself,
21   was an elderly woman, trying to take care of this man by
22   herself.  Hospice, our system, our Government, provides
23   programs that help people, like, Gloria and Jack High.
24   Mr. High was unable to sign any of the documents, due to
25   his dementia.  His wife did that.

1                    Can we go to the computer here?

2                    THE CLERK:  Yes.

3                    MR. HECTOR CANALES:  That first page --

4     first page, Roy.

5                    This is -- this is right out of here of

6     these boxes here.  This is Jack High.  This is what a

7     certification looks like, right?  And if you go down to

8     the very bottom of this scroll.  You scroll up there,

9     Roy.  You're going to see right there, Box 26,

10    Certification Statement.  Blow that up.

11                   There we go.  Gonzaba, Vincent, M.D.

12    There's the certification.  A snapshot, snapshots in a

13    half truth can be as misleading as a total lie.

14                   Next page.

15                   Now, while he's pulling this up, let me be

16    real clear about these hospices.  These are businesses.

17    These are businesses, like every doctor is in business,

18    right?  Every -- every -- and within those businesses,

19    to run a hospice, there were hundreds of employees,

20    hundreds.  Doctors, nurses, staff, different kinds of

21    nurses, LVNs, RNs, nurse practitioners, right?  Billing

22    people.  Of course, all these people were involved in

23    the delivery of care and the certification of each and

24    every one of those 2,000 patients, but just the six.

25    And, especially, those -- those six.  There were dozens

of doctors involved in the certification process, and nurses and health care providers who provide the information to those doctors so they can make a clinical judgment.

What we have up here, if you'll start at the top there, is an assessment that's done by a social worker.  Now, why a social worker?  It gets back into the "What is hospice?"  Social workers are there to help the family, because this is a decision, an election by the family and the patient to get this type of care. And there are issues that go along with people at these stages of their life, to help them find the programs that are needed for them, for instance, to cover funeral expenses.  The difficulties of care, of handling people -- people, especially like Jack High, with -- with Alzheimer's and dementia.

If you'll -- if you'll scroll down to right there within the caregiver resources.  The next paragraph.  Could you go up, Roy?  Go up.  I'm sorry. Right there.

Within the caregiver resources.  Now, this is the caregiver.  This is Jack High's wife.  And this is an example of what -- not just Jack High, but other patients that you'll find in -- in the evidence here of some of the things that they go through.

1            And the caregiver, the wife, Gloria, there,

2    she says she's depressed, no life of her own.  The

3    evidence in the records are going to show she was -- she

4    was having to take care of -- he required 24-hour care.

5    Because this was fake?  Because this was not legitimate?

6    Because it was not necessary as the Government has said?

7    No.  This is real.

8            Diabetes.  This is what the caregiver has.

9    This is -- but this is part of the process, the

10    certification you saw Dr. Gonzaba, that they do.  It's

11    an ongoing process.  And every two weeks, every two

12    weeks, per the Hospice program, there's something called

13    IDT meetings or IDG, Interdisciplinary Group,

14    Interdisciplinary Team.  It's the same.  It's a team of

15    people composed of doctors, nurses, social workers and

16    chaplains.  They create what's known as a plan of care.

17    You're going to see them every two weeks, where they are

18    viewing the patient, and they all sign off on it, all of

19    them.  So there's a conspiracy, supposed conspiracy --

20    is -- it would have to be amongst, not just the

21    Defendants here, but -- but with doctors, nurses,

22    chaplains, social workers the Government hasn't even

23    bothered to speak to in this case.

24            If you go up to the -- scroll up, Roy, to

25    the patient's emotional responses to his illness.  The

 1    bottom of that page.  Right there.

 2              Anxiety, sadness, loneliness, depressive

 3    symptoms, anger, threatening to hit his spouse due to

 4    the dementia.  That was a problem for his wife.  She was

 5    very worried.  The family didn't want to take care of

 6    him.  He was unruly.  Mr. High wanted to die and see his

 7    mother.

 8              The evidence is going to show he was in bad

 9    shape.  Told Norma -- who's Norma?  The nurse, the nurse

10    employed providing these professional services by my

11    client.  It's not a kickback.  That's earned money for

12    her job, performing her job.  Jack High wants to die

13    because he's dying.  He's not well.  None of these six

14    patients are well.  And they continue to decline.  If

15    you go -- Roy, can we go to the next?  Next document.

16    One more.

17              Right there.  The -- under the narrative.

18    Again, another narrative done by a -- by a nurse, Julie

19    Jimenez.  Patient is still declining.  See, the evidence

20    in this case is going to be that, as much as five days a

21    week, Mr. Mesquias' hospice company would send, as part

22    of their service, would send nurses, aides, to visit and

23    see these patients, to deliver the care that they need.

24              Now, hospice doesn't mean you don't get any

25    care.  If you're under pain, you get pain medication.

1    If you have cancer, hospice means you don't -- you say:

2    I don't want the chemo any more.  I don't want to try to

3    cure this disease.  I just want to be comfortable.  If I

4    can't walk, I get a wheelchair.  If I need a special bed

5    to help me get up to move, I get a special bed.  If I'm

6    in pain, I get pain meds.  If I have an infection, I get

7    antibiotics.

8            Hospice doesn't mean they just sit you

9    there, leave you alone.  It's the opposite.  It's care.

10   It's trying to -- and not just to you, as I've said, but

11   to the -- to the family.  The evidence in this case will

12   show that CMS, the Government, that the Government

13   understands that this certification, that this

14   prediction by the doctor of a terminal illness within

15   six months, that qual- -- it's necessary to qualify,

16   that predicting such things is not an exact science.

17           The Government recognizes that.  They

18   educate their doctors and the auditors that this is not

19   an exact science.  And there is no risk.  There should

20   be no risk, because it's an opinion.  And if that

21   opinion is based on a diagnosis, an opinion cannot be

22   false.

23           Chocolate is better than vanilla.  And

24   you're going to hear in this case that, at times -- at

25   times, you could have two qualified doctors look at the

1    same set of facts and reach two different opinions.  Is

2    one lying?  No.  They can both be right if they are

3    exercising their clinical judgment.  That's what the

4    evidence is going to show here, is that Dr. Gonzaba,

5    Dr. Pelly, Dr. Posada, Dr. Rincon, Dr. Zertuche -- you

6    haven't heard these names yet, but you're going to hear

7    them from the defense.  All these doctors rec- -- that

8    -- that they exercise their clinical judgment, and there

9    is no evidence, zero, no evidence that they did

10   otherwise, that they acted as a rubber stamp.

11          And they didn't do these things for free,

12   because it's their job, because they went to medical

13   school for four years, they trained for four to six,

14   eight years after that, they have -- and this is their

15   business, this is their livelihood.  And they shouldn't

16   have to do it for free, because it's their job.  And

17   paying people to do their job is not a crime.  It's

18   called a fee.

19          Now, some more about hospice.  I want to

20   cover some things here.  By law -- by law, hospice --

21   how much time can you spend on hospice?  Unlimited.

22   Unlimited.  There is no cap, there is no set number of

23   days in which the Government says "No more.  180 days,

24   no more, no mas."  Unlimited, so long as you go through

25   the process, you have a doctor who certifies.

1          Now, how can that be?  How can that be when

2    the certification says six months or less?  Those are

3    the rules set up by the Government, that if a doctor in

4    his -- in his or her clinical judgment, sees the need,

5    and the patient elects, you're qualified.  Regardless of

6    how many times -- how many days before or thereafter.

7          Empire.  Building empires.  We heard -- we

8    heard that the evidence is going to show an empire?  The

9    evidence is not going to show an empire.  The evidence

10   is going to show some hard working people.  The evidence

11   is going to show that Rodney Mesquias, in addition to

12   hiring all the medical staff that he -- that he had to

13   hire to set this up, that he had to buy the equipment,

14   the computers, right?  He had to invest in the medical

15   supplies.  He had to invest and spend tens of thousands

16   of dollars on computer software to keep the records,

17   right?  He had to -- he hired lawyers, right?  These are

18   the -- and his lawyer, even became his partner in the

19   business.  And that these lawyers -- he did everything

20   that a normal, typical business owner, hospice owner,

21   would have to do.  These were not -- this was not a fake

22   company.  This was a serious company that had a massive

23   payroll, hundreds of -- hundreds of people, tens of

24   thousands of dollars a month having to meet payroll.

25   Running a business, a highly regulate -- regulated fact

1    intensive business.

2            These actions, hiring all these people,

3    hiring the doctors, hiring the nurses, hiring the

4    support staff, subscribing to the services, are the

5    actions of a legitimate business owner.  Having a lawyer

6    who specializes in health law, as your partner, is one

7    hundred percent inconsistent with what the Government

8    has to prove here, that we had this willful, deliberate

9    intent to cheat.  And in all of this, all of these

10   medical records, you will not see a single certification

11   of -- for hospice by my client Rodney Mesquias.  Not

12   one.  He's not a doctor.  The doctors have to do this by

13   law.  Rodney didn't sign a single -- didn't certify a

14   single person.  He didn't sign -- he did not provide a

15   single -- didn't interview a patient, provide any -- any

16   records to the patient, to a -- or a review --

17   assessment, excuse me, is the right word -- he did not

18   assess any of those patients, any of those six for which

19   these doctors relied upon.  Not one.

20           You're also going to hear that within the

21   Hospice program, that there are legal preferences.  All

22   right.  So think back.  You're going to see, within

23   these records here, you're going to see that certain

24   patients, they're doing fine, and then something

25   happens, they go into the hospital.  All of a sudden,

1    you're 88 years old, 89 years old, you fall, or you're

2    sick, and you -- and, all of a sudden, you go to the

3    hospital.  Your doctor shows up there at the hospital.

4    She decides:  You know what?  Things look bad.

5              They -- they've got a decision.  They can

6    discharge you, they could send you to a nursing home as

7    an option, they could send you to home health, or if the

8    patient elects, they could send you to hospice, and you

9    qualify.

10             Now, a lot of these physicians, like the

11   Gonzabas -- the Gonzabas are a -- a -- a large medical

12   group in San Antonio.  They have offices all over the

13   place.  They treat tens of thousands of patients.  Some

14   of their patients are the six that -- that are here

15   before you.  And they go into the hospital and they're

16   doctors, Greg Gonzaba, Tom Gonzaba.  Say, "You know

17   what?  I think you're eligible for hospice."  They

18   discuss it with the patient, and they refer them.

19             Greg Gonzaba, also goes by Vincent.  You saw

20   up here the -- the certification.  He was employed, he

21   wore two hats.  And this is a scenario that plays out

22   over and over.  Totally legal.  Doctor is the primary

23   care provider, PCP, you'll see.  He's their doctor.  He

24   also works as a medical director for home -- for a

25   hospice company, our hospice company.  Two jobs.  He's

1    allowed to have two jobs, for instance, a lot of the

2    doctors, they also -- they have their -- their office,

3    but they also work at the hospital as a hospitalist,

4    second job.

5              This is common within the medical community.

6    So if your patient, all of a sudden, wants to go to a

7    nursing home, home health care, or the hospice, they --

8    they can legally -- legally refer their patient to a

9    hospice at which they work.  Because the patients want

10   to keep their doctor.  They go to a hospice where he's

11   not the medical director, or she's not the medical

12   director, they're not going to be -- it's a change in

13   doctors.  So what you see here, what the evidence is

14   going to show, is that the primary care physicians, when

15   their patients are getting older and they get to this

16   stage of their life, that they refer them to a place

17   where they also are -- where they can continue with

18   their care and oversee and create these plan of care

19   that happen every two weeks in these IDT meetings, IDG

20   meetings.  They continue with that person's care.

21             Patient number three, 88 years old, chronic

22   respiratory failure, certified by Dr. Pena.  Had a

23   history of dementia, respiratory failure, severe

24   shortness of breath.

25             She was bedbound.  Unable to maintain

1   hydration or any caloric intake, any food.  She was

2   only, as the medical terms say, oriented only to person.

3   Unable to verbalize simple needs.  Fully dependent on

4   all assisted daily living activities, which means she

5   needed help bathing, cleaning, eating, everything.  She

6   was entirely dependent.

7            The chaplain, the medical records will show

8   that the chaplain spoke with the family members and told

9   them to make funeral arrangements, to help them make

10  funeral arrangements.

11           Patient number four, patient number four, 79

12  years old.  Diagnosis of chronic obstructive pulmonary

13  disease, severe chronic lung disease, hypertension.  She

14  was referred by -- by a doctor you're going to hear from

15  in this case from the Gonzaba Medical Group by the name

16  of Dr. Arizaca.  She was certified by Dr. Gonzaba, who's

17  the boss of Dr. Arizaca, and by Dr. Virlar.

18           THE COURT:  You have five minutes,

19  Mr. Canales.

20           MR. HECTOR CANALES:  She also was completely

21  responsible, dependent on care.

22           So let's talk about a little -- a little bit

23  about these doc- -- these Government cooperators, Virlar

24  and Carrillo.

25           You heard that, from the Government, that

1   they hope to secure a good deal.  They have plead

2   guilty.  But what you didn't hear -- because there's two

3   sides to every story, and you didn't get both sides in

4   the first round -- what you're going to hear is that

5   what they pled guilty to is nothing in this case.

6   Dr. Virlar and Carrillo got in trouble in McAllen and

7   San Antonio for things totally unrelated to this case.

8   Dr. Virlar had a $16 million civil judgment against him

9   on a case we had nothing to do with, medical malpractice

10  case, all at the same time that this case came down.

11  And they're hoping to get a lighter sentence.

12          What you're going to hear from them is that

13  that recommendation to the Court comes from these guys.

14  Hasn't happened yet, though.  It hasn't happened yet,

15  though.  Throughout this, ask yourself, why?  What's

16  hanging over their head?  What do they want?

17          So we heard lots about intimidation, Dr.

18  Virlar and Carrillo haven't been sentenced yet, and are

19  hoping -- hoping for something that has nothing to do

20  with my client, and they're hopping to get a better deal

21  from the Government in the future.

22          There's an assessment that will be going on

23  in this courtroom when they stand up there, as to

24  whether or not their testimony helps or hurts.  You are

25  not the only jury in here.  There is another jury that

1    is going to be -- that is going to be judging their

2    testimony for another case.

3            At the end of this case, when you've heard

4    from all of the -- from the 14 or so doctors, other than

5    the Defendants, and other than Dr. Virlar and Carrillo,

6    who were involved and certified these patients, and the,

7    at least, 27 nurses, none of which -- who -- which have

8    been indicted, been charged, accused of anything wrong,

9    when you evaluate what all these people have done, and

10   we look -- go through these records -- and we're going

11   go through them in detail -- not guilty.  Not guilty.

12   There was no -- the evidence will show that there was --

13   these patients were legitimate, necessary, that there

14   was no conspiracy to cheat, that a honest, hard working

15   business was going on here, and that the Government has

16   cherry picked and taken a snapshot and tried to portray

17   that as a movie, as an entire movie.

18           And that just ain't fair, it's not right,

19   it's not true.  Thank you.

20           THE COURT:  Thank you, Mr. Canales.  Before

21   we -- everyone 's getting the same amount of time, so we

22   still have, at least, another two 30-minute sessions.

23   Does anybody need a break before the next one comes in?

24           What?

25           Let's take a very quick five-minute recess,

```
 1    and we'll reconvene shortly.
 2              COURT OFFICER:  All rise for the jury.
 3                   (Jurors exit courtroom)
 4              THE COURT:  Thank you, everyone, please be
 5    seated.  We'll take a very brief recess.
 6                     (Off the record)
 7                        (Recess)
 8                     (On the record)
 9              THE COURT:  Ladies and gentlemen, please
10    remain standing for the jury.
11                  (Jurors enter courtroom)
12              THE COURT:  Thank you, everyone.  Please be
13    seated.
14              And, Counsel, obviously, there's quite a few
15    more people in the public arena.  Please confirm there's
16    no witnesses.
17              MR. TONY CANALES:  I've done that from my
18    side, Your Honor.
19              THE COURT:  Thank you.
20              MR. LOWELL:  No witnesses, Your Honor.
21              THE COURT:  Thank you.
22              Ladies and gentlemen of the jury, again,
23    part of any trial, there's a rule that no witness can
24    hear any part of the proceeding, unless they're
25    testifying.  So, obviously, the public is always welcome
```

1    to come into the courtroom, but we need to confirm that

2    there's no witnesses in the public arena.

3              With that being said, let's proceed with the

4    opening statements.  Mr. Cyganiewicz?

5              MR. CYGANIEWICZ:  Very briefly, Your Honor.

6    May I proceed?

7              THE COURT:  Please.

8                        OPENING STATEMENTS

9              MR. CYGANIEWICZ:  Defense counsel,

10   prosecution, good morning.

11             THE JURY:  Good morning.

12             MR. CYGANIEWICZ:  Just want, again, on

13   behalf of everyone, thank you for your being here and

14   your expected anticipation, attention and fairness.

15   That's all anyone ever asks for, just 12 open minded,

16   clean slate people that make a fair decision.

17             I'm Ed Cyganiewicz.  I represent Henry

18   McInnis.  Henry, as I told you at voir dire, is from

19   Cameron County.  From the start, I still have to carry

20   around my notes, or I'll forget something.  So I -- I

21   don't have one of these fancy PowerPoint shows, but I

22   know that you'll pay attention to the evidence.

23             Because what I said, and especially what the

24   prosecution said, his opinions and statements, as the

25   Court instructed you first, that's not evidence.  That's

1   his opinion, that's his statement, but that's not

2   evidence.  The evidence will come from the witnesses and

3   all the exhibits, and you'll get to consider and -- and

4   see all that.

5          One thing I would agree with, from the

6   start, was that prosecution told you that Henry didn't

7   make millions of dollars and didn't make a lot of money.

8   I'm court-appointed by the Judge.  He -- he couldn't

9   even afford to pay for a lawyer.  We will agree with

10   that.

11          And in opening statement, the purpose is to

12   sort of give you a preview of what we expect the

13   evidence to show.  And for anybody accused of a crime,

14   that's somewhat awkward at times, because we're going to

15   remind you of a few things that we all talked about and

16   that you agreed to, and that the Judge instructed you

17   that, as we sit here, Henry is presumed to be innocent.

18   And it's not -- not un- -- unless, but -- until.  Unless

19   he's convicted -- unless he's convicted, that innocence

20   stays and remains.  And I almost said it wrong.  It's

21   not until, but it's unless, which is a difference.  He's

22   presumed to be innocent.  And it's awkward in the sense,

23   because we're -- we're not required to put on any

24   evidence and we're not required to do a fancy slide

25   show, and we're not required to put on any exhibits.

1    Everyone accused of a crime has that same right to elect

2    not to testify, and you've all agreed that you can't

3    consider that, and you will not consider that.

4              So that's why it's somewhat awkward.  I will

5    start -- and I'm glad Mr. Canales brought out those

6    boxes, because the indictment -- basically, this mass,

7    millions of dollars fraud case involved six patients.

8    Out of the thousands of patients, the evidence will show

9    that -- I'll use the same words -- cherry picked six

10   patients.  We expect the evidence to show that those

11   patients don't even know Henry.  They probably wouldn't

12   even recognize him if they came into the courtroom, if

13   they did.  He had no dealings with patients.  So that's

14   the specific acts of fraud in the "Conspiracy to Commit

15   Health Care Fraud."  Those six patients, he had no

16   contact with.  And that's what the evidence is going to

17   show.

18             The indictment's not evidence.  I know it's

19   a long re- -- and a lot of people said, "Oh, my God,"

20   but that's not evidence.  That's like getting a ticket,

21   and now you can fight it and disagree with it.  The

22   evidence will come from what I told you, the witnesses.

23             We expect the defense to finally get their

24   opportunity, finally get their chance to explain their

25   side of the situation, their side of the allegations as

1   they are presumed to be innocent.  We expect that the

2   evidence will show that Henry was hired by a very

3   successful medical clinic, hospice, home health.

4   Henry's not a doctor, that's what the evidence is going

5   to show.  He's not a nurse.  He didn't certify patients.

6   He didn't deal with medical records.  He was the office

7   manager, the administrator.  And the Government may show

8   you exhibits where his name is on all these papers.

9   Well, that's what an officer manager or administrator

10  does.

11          He was in charge of the payroll, schedules,

12  procedures.  They had patients in different areas.

13  Thousands of patients.  He didn't deal with the patients

14  directly.  He didn't certify anything.  He did not

15  submit billings.  The evidence will show he did not work

16  on medical records.  His name will appear on the

17  documents that I've said, because he was the

18  administrator, but that's not evidence of any guilt.

19          It was a very successful medical clinic.

20  And God help us if going to Vegas with your friends or

21  your fellow workers is illegal.  My God.  Really?

22          The next thing they'll do is show you that

23  he's driving a fancy car, or driving a pickup;

24  therefore, he's guilty.  That's not fair, that's not --

25  that's -- that's not guilt.  He didn't tell doctors on

1  how to manage their patients, but he was firm with

2  employees.  So you -- some of the employees that you'll

3  hear will be disgruntled employees who were fired or

4  terminated.  You know, administrator of -- of hundreds

5  of employees dealing with them.  Do you know, if you've

6  been in management, or own your own business, or work

7  for someone, some employees, or some bosses, are -- are

8  strict, and some aren't.  But a firm boss, or a firm

9  administrator, or a firm office manager, does that equal

10  guilt of -- does that make you guilty of health care

11  fraud?  Look at that very carefully, because you'll hear

12  from disgruntled employees.  As Mr. Canales said, you'll

13  hear from doctors, who have already admitted they

14  committed fraud, that's not related to this case at all.

15  And what they're doing is, they're coming in here to try

16  to please the Government and get a better deal.

17          The Judge will even instruct you later that

18  you have to look at those witnesses with caution and

19  suspicion and what motives do they have to testify and

20  look at them and evaluate their testimony.  Because

21  they're here to make deals and get better sentences.

22          He didn't receive any kickbacks.  He didn't

23  pay any kickbacks.  He didn't get any bribes.  He didn't

24  pay any bribes.  Again, I agree with the prosecutor.  He

25  got a salary.  It's a decent, good salary, but that's

1    all the money that you'll ever see that Mr. McInnis got.

2    He was an employee.  He was in charge of billing,

3    payroll, scheduling.  Hundreds of home health providers

4    would come in, and he'd have to schedule them.  Nothing

5    to do with one-to-one contact with patients.  These six,

6    that Mr. Canales pointed out that are in the indictment,

7    don't even know him.

8              There's no conspiracy involving Mr. McInnis.

9    There's no criminal intent on his part.  Being a

10   successful business with people making money is --

11   doesn't mean that you're guilty of anything.  There's a

12   lot of successful medical clinics.  It doesn't make it a

13   crime.  Having maybe firm people, or aggressive sales

14   tax -- tactics, a lot of people to do that, a lot of

15   businesses are out there trying to shake the trees and

16   get people, get business.  That's not illegal.  He had

17   nothing to do with contacting doctors, contacting people

18   to refer patients to.

19             He's also charged with obstruction --

20   obstruction of -- of document -- document fraud.  And

21   the Government told you that Mr. McInnis, or someone,

22   was served with a subpoena that came to Mr. McInnis's

23   attention.  And I'm going to ask you to pay attention to

24   this testimony carefully, because his actions and his

25   conduct was actually, I think, the opposite, or contrary

1   to someone who was trying to obstruct justice.  First

2   thing he did is get on the phone, and said, "Listen, we

3   need to get all these records.  We only had" -- I think

4   he may have gotten subpoenaed on Thursday or Friday.

5   And we're talking about thousands of records.  What he

6   did is, he got on the phone, called all the -- "Get --

7   get these records.  We need to find them.  I'm even

8   sending trucks down to you people to get all these

9   records together" so they can come up and get them

10  together.  And when they were going through the records,

11  the Government's going to allege that somebody's

12  creating, or re-creating, documents.  He had nothing to

13  do with that.  He's not even present.  What he did is

14  tell them, "Get all these records.  We need to comply

15  with this subpoena."  That's the complete opposite of

16  what an obstruction charge is.  That shouldn't even be

17  close.  He's not guilty of that.  There's no conspiracy.

18          He contacted the staff, "Get all the records

19  immediately."  He's not involved in any destruction,

20  creation, re-creation of any documents.

21          We expect that the evidence is not going to

22  be sufficient to convict Mr. Henry McInnis.  As a matter

23  of fact, the evidence will show that he's actually

24  innocent.  Being a successful company, being a firm

25  office manager, going to Vegas with your employees, or

1    your friends, that -- that's not anything illegal.

2              He is not a doctor.  The evidence will show,

3    he doesn't certify anything.  There will be some

4    disgruntled employees.  But for every disgruntled

5    employee, there's probably ten that will say he was

6    fair, kind, and did a great job.  Yet, the next

7    thing you'll do is -- "He's guilty.  He went to Vegas.

8    He's driving a fancy car.  He's guilty."

9              Keep an open mind.  Keep an open slate.  I

10   don't want to be repetitious to what Mr. Canales told

11   you about all the hospice information.  You're going to

12   learn a lot about hospice.  I did.

13             Just be fair.  The evidence is not

14   sufficient.  Actually, it will show that he's innocent.

15   And we're going to ask that, at the conclusion, you find

16   Mr. McInnis not guilty.  Thank you.

17             THE COURT:  Thank you, Mr. Cyganiewicz.

18             Mr. Guerra?

19             MR. GUERRA:  Thank you, Your Honor.  May it

20   please the Court.

21             THE COURT:  Please.

22                     OPENING STATEMENTS

23             MR. GUERRA:  Defense counsel, counsel for

24   the Government, ladies and gentlemen of the jury, good

25   morning.

1              My name is Robert Guerra.  We met yesterday

2    during voir dire.  Along with Adriana Arce-Flores, it is

3    our distinct pleasure to represent Dr. Francisco Pena in

4    this matter.  I think it goes without saying that, even

5    up to this point, it's been a long journey so far.  And,

6    as the Court instructed, it will be a long journey.  And

7    so I ask that, as the jury, especially with me being the

8    last one, that you bear with us and you wait to allow

9    the process to go through.  And I know you took an oath

10   and that you'll do that.  And, so, as we went through

11   the process today, the Government went first, and

12   co-counsel for the other Defendants went first.  And --

13   and so as I sit here, I want you, if you can take away

14   anything from what I say, or what the Government says,

15   is I'd like to introduce you to the real Francisco Pena.

16              The Government came in and -- and said money

17   and power and lies.  Dr. Pena is an 84 -- 85-year-old

18   doctor, Laredo native.  He's a father, a grandfather.

19   Served as a doctor in Laredo for over 40 years, served

20   our country for three years in the Korean war.  He was a

21   mayor of Rio Bravo.  Served patients in Laredo

22   throughout those 40 years.  Owned businesses.  And as

23   you're going to find out during the course of this

24   trial, he was a medical director for a hospice.  And as

25   I'm sure you found out by now, if you didn't know

1   already, hospice care is difficult care.  We're dealing

2   with individuals who could be terminal, end of life.  It

3   takes a special person to interact and deal with these

4   individuals, to help them.

5          Just like you took an oath to serve as

6   jurors, Dr. Pena took an oath as a doctor.  The

7   hypocratic oath.  And that oath says, "I will do no

8   harm."  And as you will see in this trial, the care

9   Dr. Pena gave those patients, was not to do any harm.

10  He wasn't there to say, "You know what?  You're

11  certified as terminal.  You've got to get out of here in

12  six months."  That's not what the evidence will show.

13  The evidence will show that the patients that Dr. Pena

14  took care of received the best care.  Caring care.

15  Sympathetic care for both the patients and the family as

16  they dealt with end of life issues.

17          As a juror, we appreciate your service.  We

18  do.  We cannot do our job without you.  What you are

19  doing is one of the bedrocks of the judicial system in

20  the United States.

21          Recently, I had the privilege of talking to

22  Juniors and Seniors in Harlingen High School for the

23  Cameron County Bar Association Constitution Week.  And

24  kids are sharp.  And one of the things they asked me:

25  Mr. Guerra, tell us about the safeguards for people who

```
 1    are accused of crimes.  And I said:  There are three
 2    safeguards in this country, that back in 1787 were
 3    revolutionary, and to this day, continue to be so.
 4    Because when you're accused of a crime in this country,
 5    our founding fathers put in place safeguards to make
 6    sure that in a country founded on the pursuit of life,
 7    liberty, and happiness, anybody accused of a crime will
 8    have their day in court.  They have the presumption of
 9    innocence.  The burden of proof is not on the Defendant,
10    it's on the Government.  That's why they go first.  They
11    have to prove every single element beyond a reasonable
12    doubt.  That's the highest standard we have in the -- in
13    the -- in this country, in the judicial system.
14               You know, you go to Mexico a couple of miles
15    away, Defendants are presumed guilty and they have to
16    come into court and prove their innocence.  Not in this
17    country.  The burden lays directly with the Government.
18    And according to this indictment, they have to prove
19    every single element that Dr. Pena is accused of beyond
20    a reasonable doubt.
21               And you know what, folks?  They cannot do
22    that.  They will not be able to meet their burden of
23    proof in this case.  You heard their opening, but what
24    you didn't hear is that there is no direct evidence for
25    every single element in this -- in this indictment.
```

1  What you're going to hear is a story patched together,

2  mixed up, cooperating witnesses, statistical analyses,

3  witnesses, allegedly experts, paid for by the Government

4  to come in and offer their testimony in this courtroom.

5          What you're not going to hear is any direct

6  evidence between these Defendants showing a conspiracy

7  to commit Medicaid fraud.  You're not going to hear any

8  direct evidence of Dr. Pena obstructing justice, lying,

9  taking kickbacks.  Because it's simply not there.

10          You know, if you watch the news recently,

11  you've been hearing any evidence of -- or talk about

12  quid pro quo.  You know, Ukraine president.  There's

13  nothing like that here.  We don't have any of that

14  evidence.  The Government's going to have to overcome

15  that to prove the guilt of Dr. Pena beyond a reasonable

16  doubt.  And they won't be able to do it.

17          So with the Government going first, you've

18  heard a lot of things.  And so I ask, on behalf of

19  myself and Dr. Pena, the most important thing that you

20  can do as jurors right now is listen and wait.  Wait to

21  hear both sides of the story.  Because they have the

22  burden, they have to go first.  We, as the Defendants,

23  will get our shot later on.  So don't make up your mind.

24  Listen to all the evidence.  And, at the end, we are

25  confident you will find that Dr. Pena is not guilty of

1    the charges he's accused of.

2              And I know this is going to be a while, and

3    I know this is going to be a journey, but you have this

4    in you.  If you're a parent, a grandparent, aunt, uncle,

5    niece, if you've ever taken care of kids before, you

6    know.  You've listened to both sides of the story every

7    time before you made a decision.  If you're at home and

8    you hear a crash on the other side of the house, people

9    come running over to you, the two kids come up:  Mommy,

10   daddy, abuelo, abuela, so-and-so broke the lamp.

11             Do you make a decision right then and there?

12   No.  You go to the other kids, and you ask:  Well, what

13   happened?  And once you hear everything, then you make a

14   decision.  And that's what we're asking you to do in

15   this case.

16             So let's go and let's talk about what we

17   expect you're going to hear as part of the guilt and

18   innocence phase in this matter.  You've heard from the

19   Government and from co-counsel for the Defendants, Drs.

20   Carrillo and Virlar are going to come in as cooperating

21   witnesses.  I don't want to rehash it, but I think it

22   bears repeating again.  They pled -- they've pleaded

23   guilty unrelated, and their sentences depend on what

24   they say on this stand.  Think about that, think about

25   their motivations in saying what they're saying when

1    they get up here.

2              You also heard that the Government's going

3    to come out with cooperating witnesses, undercover

4    video, audio against Dr. Pena.  Ask yourselves, why are

5    they cooperating?  What's in it for them?  Are they

6    doing it out of the goodness of their heart?  Are they

7    great citizens who just can't stand the fact that

8    there's crimes being committed?  No.  The evidence is

9    going to show that they have something at risk, they

10   have something on the line that's compelling their

11   testimony against Dr. Pena.

12             And I want to talk a little bit about the

13   evidence of these videos.  Context.  Context is key.  I

14   waive this indictment around, because those individuals,

15   the cooperating witnesses we expect to testify, have

16   nothing to do with Merida.  Completely different home

17   health hospice center.  Generous.

18             Generous is not listed in this indictment.

19   The allegations being made against Dr. Pena have nothing

20   to do with generous.  This is a deal involving Merida,

21   Merida entities.  Nothing to do with generous.  Keep

22   that in mind when you listen to those cooperating

23   witnesses.  Is there any evidence showing that Dr. Pena

24   conspired to commit Medicaid fraud related to Merida?

25   Is there any evidence showing that he took he steps to

1    unnecessarily lengthen the stay of the patient at

2    Merida?   Is there any evidence on those tapes from those

3    cooperating witnesses showing that Dr. Pena conspired to

4    take kickbacks from Merida?   The answer's no.   You will

5    not see that.

6               The Government wants you to say, well,

7    you're talking about another hospice, so if he did it

8    over there, he must be doing it over here.

9               Beyond a reasonable doubt, absolutely not.

10   The Judge will instruct you on the law, but the reason I

11   keep going back to the indictment is because this is the

12   roadmap.   This is what they have to prove against

13   Dr. Pena.   Keep that in mind at all times.   And, again,

14   you heard the Government say today -- well, there's a

15   quote from Dr. Pena.   "The way you make money is keeping

16   them alive for as long as possible."   Context.   What was

17   that statement being made?   Who was it being made to?

18   And what was the context it came out in?

19               And I want to say one last thing about these

20   videos.   There may be things in these videos that aren't

21   polite.   There may be things in these videos that you

22   would definitely not say at church, definitely not say

23   in mixed or polite company.   I don't agree with it.   I

24   don't like it.   But that's not what we're here to

25   determine.   We're not here to determine if Dr. Pena may

1    have said some bad words.  We're not here to determine

2    if Dr. Pena was rude or arrogant.  That's not what this

3    is about.  This is about finding out, proving beyond a

4    reasonable doubt, if Dr. Pena committed the crimes he's

5    accused of.  That's it.

6              And so I ask that you take that part aside,

7    anything that you may consider rude or arrogant,

8    uncouth, and put it aside.  Has nothing to do with this

9    case.

10             Kickbacks.  You've heard a lot about

11   kickbacks, and you're going to hear a lot more about

12   kickbacks.  But I think the point that's been made by

13   co- -- co-counsel for the defense, and, again, I think

14   it's clear, is people get paid to do their jobs.

15   Everyone here on this side of the bar is getting paid.

16   In America, we have jobs.  People get paid for their

17   services.  Government witnesses are getting paid for

18   their services.  The FBI agents that are going to come

19   up and testify aren't doing it for free.  Maybe they

20   are, I don't know, but I'm pretty sure they're getting

21   paid too.  Everybody gets paid for their services.  And

22   there's nothing wrong in this country with parties

23   contracting for fair and honest wages for fair and

24   honest work.

25             You ask somebody to be a medical director

1   for a hospice, he's not going to do it for free.  He's

2   going to get paid, as you would expect him to do.  And

3   he's a doctor.  He will get paid for his services.  And

4   that's what happened with Dr. Francisco Pena.  He was

5   paid to serve as the medical director for Professional.

6            Now, I want to bring up that map the

7   Government showed during opening -- actually, two maps,

8   two different maps.  Dr. Pena was the medical director

9   for Professional Hospice in Laredo.  That's it.  That's

10  all he did.

11           Now, while the other Defendants may have

12  been in -- in -- in the decision-making capacity for

13  Merida, supervising hospices all across the State,

14  Dr. Pena's actions were limited solely in Laredo.

15  Government wants to paint with this wide brush saying

16  Rodney Mesquias, Henry McInnis, and Dr. Francisco Pena

17  all conspired all across the state to commit Medicaid

18  fraud, part of an ongoing scheme.

19           If you look at it closely, Dr. Pena's only

20  actions were based in Laredo.  Boys club, perks,

21  evidence doesn't show any of that.  There is no evidence

22  that Dr. Pena went to Vegas.  There's no evidence that

23  Dr. Pena had bottle service, condos on South Padre

24  Island, Spurs tickets.  None of that relates to Dr. Pena

25  or his job.

1            Government wants you to believe that.  But

2    this is a case of the Government over- -- overreaching.

3    The evidence will show selective prosecution.  As

4    Mr. Canales stood here and told you, listen, all these

5    doctors who made assessments for patients saying that

6    they deserve hospice care, they're not here.  In fact,

7    there's only one doctor who's a medical director who's

8    being tried for this, that's Dr. Pena.  Selective

9    prosecution.  None of these other doctors who are going

10   to come up who did the same thing are being accused of a

11   crime.

12           As Mr. Canales pointed out, none of these

13   other individuals, who were involved in the

14   interdisciplinary team, interdisciplinary groups, are

15   being convicted of a crime.  Just Dr. Pena and these

16   three individuals.

17           And one other point I'd like to make, too.

18   I talked about how this wide-ranging conspiracy doesn't

19   involve Dr. Pena.  They talk about home health.  The

20   evidence is going to show, Dr. Pena had nothing to do

21   with home health.  All he had to do was the role as the

22   medical director for Professional Hospice in Laredo.

23   That's all the evidence is going to show.  He had

24   nothing to do with home health, nothing to do with this

25   giant conspiracy.

1            Again, we're going to go on a long journey

2    together.  You're going to hear a lot of things.  But

3    appreciate you sticking with us.  We appreciate your

4    service.  At the end of all of this, once you hear --

5    heard from both sides, we are confident that you will

6    find Dr. Pena not guilty on all the counts presented.

7    Thank you for your time.

8            THE COURT:  Thank you, Mr. Guerra.

9            Ladies and gentlemen, that concludes the

10   opening statements of each respective party and, as I

11   stated before, and I just will reiterate once again, I

12   remind you that nothing you've heard so far is either

13   testimony nor evidence.  Obviously, we have some very

14   talented attorneys representing each party, and it is

15   their job to be advocates for their side and to

16   represent their opinion as to their position, but, back

17   to the point, it is not testimony, it is not evidence.

18   However, now we're about to commence the case in chief.

19           Mr. Lowell, please present, or --

20           MR. FOSTER:  Good morning, Your Honor.  How

21   are you?

22           THE COURT:  Good morning, sir.

23           MR. FOSTER:  Jacob Foster on behalf of the

24   United States.

25           THE COURT:  Mr. Foster, please present your

1    first witness.

2              MR. FOSTER:  Thank you, Your Honor.  The

3    Government calls Laurie McMillan as our first witness.

4              THE CLERK:  Please raise your right hand.

5                   **LAURIE MCMILLAN**,

6    having been duly cautioned and sworn, testified as

7    follows:

8              THE WITNESS:  I do.

9              THE CLERK:  Thank you.

10             THE COURT:  Thank you.  Please have a seat

11   and please position the microphone close to yourself.

12                   DIRECT EXAMINATION

13   BY MR. FOSTER:

14      Q.  Good morning, Ms. McMillan.

15      A.  Good morning.

16      Q.  Can you introduce yourself to the jury and

17   explain where you work?

18      A.  I am Laurie McMillan, and I work for a company

19   called Qlarant.

20      Q.  What is Qlarant?

21      A.  So, Qlarant has a Government contract with the

22   Centers for Medicare and Medicaid Services.  We call it

23   CMS.  And our contract is called a UPIC contract.  It

24   stands for Unified Program Integrity Contractor.  We are

25   specifically tasked with identifying fraud, waste and

1    abuse in the Medicare and Medicaid system, and we take

2    steps to protect the Medicare trust fund.

3        Q.   And is that contract that Qlarant has with CMS

4    for a particular region of the United States?

5        A.   Yes.  Qlarant actually has two of those

6    contracts, but I work on the contract that's called the

7    Southwest contract, and that includes Texas and six

8    other states.

9        Q.   And what is your role with Qlarant?

10       A.   So, currently, my title is Medical Review Law

11   Enforcement Liaison.  I am a registered nurse, and I do

12   a couple of different things.

13       Q.   And can you explain briefly what those things are

14   that you do?

15       A.   Sure.  I look at medical records and Medicare

16   claims and determine if those claims are payable.  I

17   also work with our law enforcement partners and help

18   them to find and understand Medicare regulations.  And I

19   help teach them about the regulations for things that

20   they're investigating.

21       Q.   First I want to take a step back and hear a

22   little bit about your background.  Did you go to

23   college?

24       A.   Yes, I did.  I graduated from the University of

25   Nebraska in Kearney, Nebraska.

1    Q.   What did you do after you graduated from the

2   University of Nebraska?

3    A.   So I earned a Bachelor of Science in nursing, and

4   I took my state boards in Nebraska and became a

5   registered nurse.  And I joined the United States Air

6   Force, and I practiced my nursing in the United States

7   Air Force Nurse Corps.  And I left the Air Force as a

8   captain.

9    Q.   And after you left the Air Force as a captain,

10   did you continue to work in the medical field?

11    A.   Yes.  I continued to work in clinical settings

12   for about the next 15 years.  I worked in various

13   cardiac units, in intensive care units.  I worked for a

14   large cardiology office.  I was a flight nurse at one

15   time.  And I worked on cardiac monitoring units.

16    Q.   At a certain point in time, did you leave the

17   clinical setting and begin to work in Medicare

18   compliance?

19    A.   Yes.  So in 2007, I began to work for Medicare

20   contractors, and I began to look at the medical record

21   documentation that's used to support Medicare claims.

22    Q.   When did you start working at Qlarant?

23    A.   I started working in -- at Qlarant in 2014.

24    Q.   And has Qlarant ever gone by another name?

25    A.   Yes.  When I originally joined Qlarant, we were

1    called Health Integrity.  We underwent a name change in

2    2018.

3        Q.   Now, as a Medical Review Law Enforcement Liaison,

4    do you investigate fraud as part of your job?

5        A.   Yes.

6        Q.   And does that include home health fraud?

7        A.   Yes, it does.

8        Q.   Does that also include hospice fraud?

9        A.   Yes, it does.

10       Q.   Can you explain to the jury how you conduct a

11   fraud investigation?

12       A.   So, our fraud investigations begin a couple of

13   ways.  They can begin with a complaint, or they can

14   begin from data.  We have a large data analytical

15   department, and so we look at -- when I talk about data,

16   I'm talking about information that's documented from the

17   claims system.  So that's one aspect.

18            We have a large medical review department.  We

19   are all registered nurses and we work under the

20   direction of a contract medical director, or a

21   physician.  And, then, we have a team of investigators,

22   and they interview and find out other information in our

23   fraud investigations.

24       Q.   How many fraud investigations, approximately,

25   have you been a part of?

1      A.   Hundreds of fraud investigations.

2      Q.   And you mentioned the claims data that you look

3    at in those investigations.   Can you explain to the jury

4    what the claims data is?

5      A.   So, all of the claims that providers bill to

6    Medicare come into a claim system, and our contract has

7    access to that claim system.   And our data analysts take

8    that information, and we analyze it for indicators of

9    fraud.

10      Q.   And have you reviewed claims data yourself?

11      A.   Yes, I have.

12      Q.   Does that include claims data for home health

13    programs?

14      A.   Yes.

15      Q.   And for hospice programs?

16      A.   Yes.

17      Q.   You also mentioned medical record reviews.   Can

18    you explain to the jury, generally speaking, how reviews

19    of medical records are conducted?

20      A.   Sure.   So, Medicare's claim system is all

21    electronic, and so there's -- nobody looks at a medical

22    record until we ask to see that medical record.   But

23    once that happens, the medical record is brought in and

24    we look at the claim, what is billed on that claim, and

25    then we look at the medical record, and we determine if

1    that medical record has information in it that supports

2    payment of the claim.

3         With Medicare, you're going to hear often me

4    refer to a couple of things.  One of those is the

5    conditions of payment.  Medicare specific things that

6    say if this service is billed, these are the things that

7    we have to see in that medical record in order for that

8    service to be paid.

9         You'll also hear me refer to conditions of

10   participation.  There are certain requirements that

11   Medicare asks providers to do in order to be a Medicare

12   provider, and we call those, "Conditions of

13   participation."

14        The medical record must support those.

15   Q.   And have you reviewed medical records as part of

16   fraud investigation?

17   A.   Yes.  I started reviewing medical records back in

18   2017, just reviewing them for payment issues.  And in

19   2014, I've specifically been focusing on fraud

20   investigations.  I have taken special training and

21   become a certified fraud examiner.

22   Q.   And when did you start reviewing medical records?

23   A.   Back in 2007.

24   Q.   Okay.  Thank you.  And as part of your job as Law

25   Enforcement Liaison, are you responsible for reviewing,

1    explaining and transmitting medical record reviews

2    conducted by others?

3        A.   Yes.

4        Q.   Now, in regards to trainings, do you also conduct

5    trainings of the company's investigative staff?

6        A.   Yes.  So one of my roles at Qlarant is --

7    specifically with hospice -- I teach a lot about the

8    hospice rulings and regulations.  I help new

9    investigators understand where those rules are and how

10   to interpret them, looking for special things in the

11   records that we would call red flags.

12             I also get to work with law enforcement.

13   When I talk about law enforcement, I've spoken with the

14   FBI, I've spoken with the Office of Inspector General.

15   And I also work with United States attorneys in helping

16   them read those medical records and align them up with

17   the Medicare rules and regulations.

18       Q.   And are you a Custodian of Records for Qlarant?

19       A.   Yes, I am.

20       Q.   And have you appeared in Court as a Custodian of

21   Records before?

22       A.   Yes.

23       Q.   And have you been qualified as an expert witness

24   on the Medicare program in federal court previously?

25       A.   Yes, I have.

1           MR. FOSTER:  Your Honor, at this time, I

2    would like to move to qualify Ms. McMillan as an expert

3    on Medicare's rules regarding the home health and

4    hospice programs under Rule 702.

5           THE COURT:  That is granted.

6           MR. FOSTER:  Thank you.

7    Q.  (By Mr. Foster):  I'd like to begin, Ms.

8    McMillan, with some general questions about the Medicare

9    program.  First, simply put, can you explain to the jury

10   what Medicare is?

11   A.  So Medicare is our federal government's health

12   care system that is intended for Medicare beneficiaries,

13   and that is people 65 years and older; or, if you become

14   disabled, you may qualify for Medicare benefits.

15   Q.  What are people called who receive benefits under

16   the Medicare program?

17   A.  We call them beneficiaries.

18   Q.  How is Medicare funded?

19   A.  So Medicare is funded by all of us.  The taxes

20   that we pay, some of those taxes are set aside in a

21   Medicare trust fund that is intended to take -- take

22   care of our health care.

23   Q.  And what are the consequences of fraud for that

24   trust fund?

25   A.  Well, money is not spent on the care of us, it's

1    wasted on fraud.

2        Q.   And does Medicare affect interstate commerce?

3        A.   Yes.

4        Q.   Is the Medicare program organized into what are

5    called parts?

6        A.   Yes, it is.

7        Q.   And what's Medicare Part A?

8        A.   So when we talk about Medicare Part A, we're

9    talking about the bill is coming from an organization or

10   a facility.

11            When I talk about Medicare A, we're talking

12   about your hospital insurance.  It also covers your home

13   health and your hospice.

14       Q.   And when you talk about home health and hospice,

15   who submits a claim to Medicare to get paid for home

16   health and hospice?

17       A.   That is coming from the home health company or

18   the home health provider.  When I use the term

19   "provider," that's the word I use for whoever's

20   providing that service and giving us -- giving Medicare

21   the bill.

22       Q.   Now, can any hospice or home health company

23   submit a claim to Medicare?  Or is there a process that

24   a company has to go through to become a Medicare

25   provider?

1     A.   So of health care providers out there, whether

2  you're a home health, hospice, or a hospital, you have

3  to enroll in the Medicare program in order to have that

4  as one of your insurance carriers.  So you have to go

5  through an enrollment process.

6     Q.   And as part of that enrollment process, are there

7  documents that are required to be submitted?

8     A.   Yes.

9     Q.   And what types of documents?

10     A.   Well, there's a Medicare enrollment form.  We

11  refer to it as an 855.  And you have to complete that

12  form, and it has to go through an approval process.

13          MR. FOSTER:  Can we pull up what's

14  previously been admitted as Government A2, at Page 3?

15     Q.   (By Mr. Foster):  And can you see on your screen

16  there, Ms. McMillan?

17     A.   Yes.

18     Q.   Now, what type of document are we looking at

19  here?

20     A.   This is an 855A.  This is an enrollment form for

21  Part A providers.

22     Q.   And is this document required to enroll in

23  Medicare?

24     A.   Yes.

25          MR. FOSTER:  Can we turn to Page 25 of

1    Government Exhibit A2?

2       Q.  (By Mr. Foster):  And looking at Section 2, what

3    does the enrollment application call for here?

4       A.  This is information to identify you as a

5    provider.

6       Q.  And what provider does this application, A2,

7    involve?

8       A.  This is for Bee Caring Hospice Health Care,

9    Incorporated.

10      Q.  And does Bee Caring Health Care Hospice,

11   Incorporated, have another name?

12      A.  Its other name is Merida Health Care Group.

13              MR. FOSTER:  Can we turn to Page 69 of

14   Exhibit A2, please?

15      Q.  (By Mr. Foster):  What is the title of Section 6

16   of the application?

17      A.  This is the ownership interest and/or managing

18   control information.

19      Q.  What information does Medicare ask for here?

20      A.  Medicare is wanting to know who has ownership

21   interest or is a managing -- is a managing -- has

22   managing control.

23      Q.  And what ownership interest does Medicare require

24   the provider to disclose?

25      A.  If you have five percent or more ownership

1    interest, then you have to be named on this application.

2       Q.   Why does Medicare want to know who owns or has

3    managing control over the provider?

4       A.   Medicare wants to know who's taking care of the

5    beneficiaries.   It's important to know the relationship

6    between those owners and managing employees and the

7    people who are referring beneficiaries to them.

8       Q.   If a provider fails to disclose an owner or a

9    person with managing control, what would Medicare do

10   with that application?

11      A.   The application would be invalid.

12            MR. FOSTER:   Now, can we turn to Page 93 of

13   Exhibit A2.   And can we zoom in on Section 14, please?

14      Q.   (By Mr. Foster):   Now, are there penalties for

15   not being truthful with Medicare?

16      A.   Yes.

17      Q.   And does the enrollment application warn the

18   provider of certain penalties?

19      A.   Yes, it does.

20      Q.   So does paragraph one warn that it's a crime to

21   make a false statement relating to the Medicare program?

22      A.   Yes, it does.

23            MR. FOSTER:   Can we turn to Page 95 of

24   Exhibit A2?   Can we zoom in on Paragraph 6, please?

25      Q.   (By Mr. Foster):   Does Paragraph 6 warn that

1   there is a crime of health care fraud if you defraud

2   Medicare or make a false representation to Medicare?

3       A.  Yes.

4               MR. FOSTER:  Now, can we turn to Page 99,

5   please?  Can we zoom in on Section 15?

6       Q.  (By Mr. Foster):  What is Section 15 of the

7   enrollment application?

8       A.  Section 15 is where there are certification

9   statements here.

10      Q.  And does Section 15 explain that every Medicare

11  provider has to make certain promises before they're

12  enrolled in Medicare?

13      A.  Yes.  It tells the enrollee to read these

14  requirements carefully, and they will be signing and

15  they will be agreeing to follow these requirements.

16      Q.  Now, turning to paragraph two, please.  Does

17  paragraph two require the provider to promise that they

18  read and understand there are penalties for falsifying

19  information in the application or any communication to

20  Medicare?

21      A.  Yes.

22      Q.  And is that reference to the penalties a

23  reference to the crimes, among others, of making a false

24  statement in committing health care fraud that we just

25  looked at?

1    A.   Yes.

2              MR. FOSTER:   Can we turn to Paragraph 6,

3    please?

4    Q.   (By Mr. Foster):   Can you read Paragraph 6 to the

5    jury?

6    A.   "I will not knowingly present or cause to be

7    presented a false or fraudulent claim for payment by

8    Medicare, and I will not submit claims with deliberate

9    ignorance or reckless disregard for their truth or

10   falsity."

11   Q.   Thank you.

12             MR. FOSTER:   Can we turn to Paragraph 3,

13   please?

14   Q.   (By Mr. Foster):   Can you read Paragraph 3 to the

15   jury, please?

16   A.   "I agree to abide by the Medicare laws,

17   regulations, and program instructions that apply to this

18   provider.  The Medicare laws, regulations, and program

19   instructions, are available through the Medicare

20   contractor.  I understand that payment of a claim by

21   Medicare is conditioned upon the claim and the

22   underlying transaction complying with such laws,

23   regulations, and program instructions; including, but

24   not limited to, the federal Anti-Kickback Statute and

25   the Stark law, and on the provider's compliance with all

1    applicable conditions of participation in Medicare."

2       Q.   Now, this paragraph says that the Medicare laws,

3    regulations, and program instructions are available

4    through the Medicare contractor.  How are these laws,

5    regulations, and program instructions, made available to

6    the providers?

7       A.   So, all of the Medicare rules and regulations,

8    any of you can go look at, they are located at CMS.gov

9    under "Manuals," and then the Medicare contractors, when

10   I talk about a medical contractor, there's

11   specifically -- you'll hear me call it a MAC, maybe.  It

12   stands for Medicare Administrative Contractor.  That's

13   the contractor that processes the claims and help -- and

14   deals with provider enrollment.  They have their own

15   website, and you can also access any kind of rules and

16   regulations about Medicare through them.

17          They also have resources that teach providers

18   about the rules and regulations.  You can call them on a

19   1-800 number and ask them about the rules and

20   regulations.  They send out e-mails.  There's a provider

21   resource that's called Medicare Learning Network.

22   Providers can look at YouTube videos, you can look at

23   pod casts, you can get e-mails.  There's brochures out

24   there.  You can request somebody to come out and talk

25   with you.  There's multiple resources to learn about

1    Medicare rules and regulations.

2        Q.   And what does Medicare require in terms of the

3    provider's responsibility for knowing these rules and

4    following them?

5        A.   So, Medicare instructs the providers that there's

6    rules an regulations and where they are.  And, in this

7    enrollment form, the provider's agreeing that they're

8    going to learn those rules and regulations.  They are

9    specifically agreeing to learn those rules and

10   regulations that apply to the services that they are

11   providing and billing for.

12       Q.   Now, Paragraph 3 refers to the federal

13   Anti-Kickback Statute.  Are you familiar with Medicare's

14   rules an regulations regarding kickbacks?

15       A.   Yes.

16       Q.   What is a kickback?

17       A.   A kickback is a bribe, basically.  We define a

18   kickback as soliciting, receiving, offering or paying

19   anything of value in order to refer or order a service

20   or item that's paid for by the federal government.

21            In this instance, we're specifically talking

22   about Medicare.

23       Q.   And what does Medicare require with respect to

24   kickbacks in connection with a provider who's submitting

25   claims?

 1     A.   So kickbacks are not allowed.

 2     Q.   Why does Medicare prohibit kickbacks?

 3     A.   So, kickbacks raise several concerns.  Health

 4   care should be about the care of the beneficiary, the

 5   care of the patient.  Kickbacks raise both quality of

 6   care concerns and the cost of care concerns.

 7          When you have a provider who is giving

 8   kickbacks, they have an economic incentive or a reason

 9   to offer services that maybe aren't needed.  We call it

10   "not medically necessary," or they have a reason to

11   provide services at a lower level that get billed that

12   higher level.

13          Those raise both cost concerns and quality

14   of care concerns.

15          Another reason that kickbacks are a concern

16   is because it makes for an unlevel playing field.  The

17   rule for everyone that participates in a federal health

18   care program is that there are to be no kickbacks.  When

19   you have a provider giving kickbacks, and the other

20   providers are not doing that, that's not fair, and it

21   makes for an unlevel playing field.

22          Another reason that kickbacks are a concern

23   is because health care needs to be about the

24   beneficiary's choice of who provides their care and the

25   care that they receive.  And kickbacks corrupt their

choice.

Q.   Would Medicare pay a claim, in your experience,
if it knew that a provider was paying money to a doctor
in exchange for referrals?

A.   No.   Kickbacks are not allowed in Medicare, and
they would not pay those claims.

Q.   Now, isn't it true that Medicare requires that a
hospice have a medical director?

A.   Yes.

Q.   What's the difference between paying a medical
director for their services and a kickback under
Medicare's rules?

A.   So, Medicare requires hospices to have a medical
director.   There are certain rules around paying
physicians for referrals.   Specifically when you're a
medical director, your payment cannot be what we call
volume or value based, meaning you can't be paid for the
more you refer the more you get paid.

Your payment also needs to be fair market
value, and your payment cannot increase the cost of the
care.

Q.   And what about the intent of the parties?

A.   The intent cannot be to induce those referrals.
That would be a kickback.

Q.   Now, does Medicare's prohibition on kickbacks

1    also extend to a provider providing something of value

2    to a patient?

3        A.   Yes.   It includes everybody that's involved with

4    federal health care, and that includes the patients or

5    the beneficiaries.

6        Q.   And why does Medicare prohibit providing free

7    items or inducements to patients to get them to sign up

8    for services?

9        A.   Again, we want the payment for health care to be

10   about the item or service that you're receiving for

11   health care, and not about that gift or that benefit

12   that you're going to receive.   It corrupts the -- the

13   beneficiary's choice.

14       Q.   Now, turning back to the Medicare enrollment

15   document, Government Exhibit A2.

16            MR. FOSTER:   Can we turn to Page 101,

17   please?

18       Q.   (By Mr. Foster):   Now, does Medicare require that

19   a representative of the provider sign a certification

20   statement before enrolling in Medicare?

21       A.   Yes.

22       Q.   And what promises are required to be made in the

23   certification statement?

24       A.   Well, that they've read all those statements,

25   that what the information that they're providing is

1   true, accurate, and complete, that they are agreeing to

2   follow all those rules, that they're going to submit

3   true, accurate, and honest claims, and that they

4   understand everything that they've read.

5       Q.   Why is it important for the provider to make this

6   certification to Medicare?

7       A.   Once this application is approved, then you are

8   issued a billing number, and you can begin to bill and

9   submit claims to the Medicare system.  Those claims come

10  in through a computer system.  And it's all electronic,

11  even your bank deposits.  So there's no human looking at

12  those things that are coming in, unless there's a

13  problem.  It's all electronic.  And so those claims

14  start coming in, and payment will start to be made.

15      Q.   And what would Medicare do if the provider did

16  not sign the certification?

17      A.   They would not be -- approved to be a provider.

18      Q.   And what would Medicare do if the provider made a

19  false statement or omission on the application?

20      A.   Then they would not be allowed to be a provider.

21      Q.   Who signed the certification on Exhibit A2?

22      A.   Rodney Mesquias.

23      Q.   Now, I'd like to bring up what's previously been

24  admitted as Government Exhibit H71.  Now, did you

25  examine other Medicare enrollment applications and

1  certifications in preparation for your testimony?

2      A.  Yes, I did.

3      Q.  And did you help create this chart?

4      A.  Yes, I did.

5      Q.  Can you explain what's shown on this chart to the

6  jury?

7      A.  So, this is a list of all the 855 agreements or

8  enrollment applications that were signed by Rodney

9  Mesquias for the Merida Health Group.

10     Q.  Why are there multiple applications for some of

11 the providers?

12     A.  So, there's -- you submit a -- an initial

13 application, and then any kind -- any time there's a

14 change to any of the information that is on there, the

15 provider is responsible for updating that, and also

16 Medicare may ask, at certain times, for you to update

17 that application.  So each time they do that, they have

18 to go through signing those certification statements,

19 and those are the dates that it was signed.

20     Q.  Who signed for all the providers on these dates

21 on Exhibit 71?

22     A.  Rodney Mesquias.

23     Q.  And what promises and certification did Mesquias

24 have to make on each of these applications that are

25 listed on Exhibit H71?

1     A.   The certification statements that we just went

2   through, mainly that you understand that you're

3   enrolling in the Medicare program, that you're going to

4   submit true, accurate, and honest claims, that you're

5   going to learn all the regulations, and that you

6   understand that if there's any changes, that needs to be

7   added here, and that everything is true.

8     Q.   Now, once a provider approves a provider

9   application, are they able to submit claims to Medicare

10   right away?  Or to enable that electronic process that

11   you talked about, do they have to sign another

12   agreement?

13     A.   There is another form that they sign.

14     Q.   And what's that agreement called?

15     A.   One of them is called the EDI.  It stands for

16   Electronic Data Interchange.

17          MR. FOSTER:  And can we bring up what's

18   previously been admitted as Government Exhibit A59 at

19   Page 2, please?

20     Q.   (By Mr. Foster):  And can you tell the jury what

21   this is?

22     A.   So, this is Palmetto's Medicare Electronic Data

23   Interchange Enrollment Agreement.

24     Q.   And when you say, "Palmetto," what is that?

25     A.   "Palmetto" is the name of the Medicare

1    administrative contractor, or MAC, that deals with the

2    home health and hospice claims that are coming in.

3    Their name is Palmetto.

4        Q.   And so turning to Page 5 of Exhibit A59, does

5    Medicare require the provider to agree to certain

6    requirements before submitting the claims in this EDI

7    agreement?

8        A.   Yes.

9            MR. FOSTER:   And so can we zoom in on

10   Paragraph 7, please?

11       Q.   (By Mr. Foster):   And can you read that to the

12   jury?

13       A.   That it will submit claims that are accurate,

14   complete, and truthful.

15           MR. FOSTER:   And turning to Page 6 of

16   Exhibit A59, can we zoom in on paragraph number 12,

17   please?

18       Q.   (By Mr. Foster):   In Paragraph No. 12, does

19   Medicare require the provider, again, to acknowledge

20   that it's a crime to misrepresent or falsify any

21   information relating to a claim?

22       A.   Yes, it does.

23           MR. FOSTER:   And can we turn to Page 7 of

24   Exhibit A59, please?   And please zoom in on the

25   signature section.

1    Q.   (By Mr. Foster):  Who signed this agreement on

2   behalf of Professional Hospice?

3    A.   Henry McInnis.

4    Q.   What promises did Defendant McInnis make to

5   Medicare when he signed this document?

6    A.   Several of those statements that were above, same

7   thing, that you're going to submit true, accurate, and

8   honest claims, that you're going to have all of the

9   information documented before you submit those claims,

10   that you're going to keep that documentation in case it

11   needs to be looked at by Medicare.

12    Q.   Now, I want to introduce what's previously been

13   admitted as Government Exhibit H72.  Now, did you

14   examine other EDI agreements in preparation for your

15   testimony?

16    A.   Yes, I did.

17    Q.   And did you assist in preparation of Government

18   Exhibit H72?

19    A.   Yes, I did.

20    Q.   Can you explain Exhibit H72 to the jury, please?

21    A.   So, this is a list of all the EDI agreements that

22   Merida Health Care Group submitted and signed.  It lists

23   all the different names of the providers under the

24   Merida Health Care Group, and the dates on which those

25   were signed.  It also lists which person signed those,

1    whether it was Rodney Mesquias or Henry McInnis.

2       Q.   And did Defendant McInnis sign Medicare EDI

3    agreements for numerous Medicare providers?

4       A.   Yes, he did.

5       Q.   And Defendant Mesquias as well?

6       A.   Yes.

7       Q.   And did those agreements require Defendants

8    McInnis and Mesquias to make the exact same promises to

9    Medicare that were contained in Government Exhibit A59

10   that we just looked at?

11      A.   Yes.

12      Q.   Now, we've talked about Defendants Mesquias and

13   McInnis.  Turning to Defendant Pena, was Defendant Pena

14   also enrolled in Medicare as a Medicare provider?

15      A.   Yes.

16      Q.   For example --

17           MR. FOSTER:  Can we pull up Government

18   Exhibit A51 at Page 36?

19      Q.   (By Mr. Foster):  Is this a signed enrollment

20   application by Defendant Pena?

21      A.   Yes, it is.

22      Q.   And it did require Defendant Pena to make the

23   same promises to Medicare that Defendant McInnis --

24   excuse me -- that Defendant Mesquias made?

25      A.   Yes.  It would have had those same statements on

1    it.

2        Q.   Now, I want to show you what's previously been

3    admitted as Government Exhibit H69.  Did you examine

4    other Medicare enrollment applications that were

5    submitted by Defendant Pena to Medicare in preparation

6    for your testimony?

7        A.   Yes, I did.

8        Q.   And did you assist in the preparation of Exhibit

9    H69?

10       A.   Yes, I did.

11       Q.   Can you explain to the jury what Exhibit H69

12   shows?

13       A.   This is a listing of all the 855 agreements.

14   Again, that's the same of the enrollment form that

15   Francisco Pena signed.  It gives the dates which he

16   signed those, and where the exhibit is.

17       Q.   And did they require Defendant Pena to make the

18   same promises to Medicare?

19       A.   Yes.  It has those same statements on it.

20       Q.   And did that include not to pay or receive any

21   kickbacks?

22       A.   Yes.

23       Q.   And did he certify that he was responsible for

24   understanding and complying with all of Medicare's rules

25   an regulations?

1    A.   Yes.

2    Q.   I want to introduce what's previously been

3  admitted as Government Exhibit H70.  Did Defendant Pena

4  also submit EDI agreements to Medicare?

5    A.   Yes, he did.

6    Q.   And did you assist in the preparation of Exhibit

7  H70?

8    A.   Yes.

9    Q.   And can you explain Exhibit H70 to the jury?

10   A.   So there were EDI agreements submitted by

11  Francisco Pena, and he signed them on each of the dates

12  listed, and they are all located in Exhibit A54.

13   Q.   And did those agreements require Defendant Pena

14  to make the same promises to Medicare that Defendants

15  McInnis and Mesquias made as exemplified by Government

16  Exhibit A59?

17   A.   Yes.

18   Q.   Now, you talked about the electronic system for

19  submitting claims and having them paid.  Is Medicare

20  known as what's called a trust-based system?

21   A.   Yes.

22   Q.   Can you explain to the jury what that means?

23   A.   So, once this enrollment application process is

24  completed and approved, and you're submitted that

25  number, you have all -- everything comes in electronic,

1    so all of those claims are coming in, and money, then,

2    is being transferred electronically into the provider's

3    bank account.

4              Then that occurs on a frequent and regular

5    basis.  There's nobody going in and looking to see

6    what's going on, unless that provider pops up in data or

7    a complaint comes in.

8    Q.  So if -- if -- what information, generally

9    speaking, is contained on a claim?

10   A.  So in the claim system, when a provider submits a

11   claim, it has information about the provider, who that

12   is, who's providing the service, the date that the

13   service was provided on.  It has information about the

14   beneficiary, who that beneficiary is, where the services

15   are being loca- -- or provided, the date, how much is

16   being paid and how much it's costing.

17   Q.  And if that information's on the claim, what are

18   the chances that it will be paid?

19   A.  If everything -- if every blank that's required,

20   the information in there is filled out, it gets paid.

21   Q.  And why is that?  Why does Medicare pay without

22   reviewing the patient files or other documents?

23   A.  So there are millions and millions of

24   beneficiaries, and there are numerous claims that come

25   in just for one visit to the doctor.  If we had to,

1   someone like me, review every single claim that came

2   into the system with all the documentation, claims would

3   never be paid.  There's no way we can humanly possibly

4   look at all the documentation for each and every claim

5   that comes in.  We need good providers in the system

6   that promise to make those decisions and that are out

7   there to provide health care for the beneficiaries.  And

8   so Medicare wants to make it so that those honest, good

9   providers can submit those claims and get paid in a

10   timely fashion so the beneficiaries can be taken care

11   of.

12     Q.  Now, you mentioned that the claim has a Medicare

13   beneficiary number.  Does every Medicare patient have

14   unique number?

15     A.  Yes.

16     Q.  And is that number needed by a provider in order

17   to submit claims and be paid by Medicare?

18     A.  Yes.  You have to have their Medicare beneficiary

19   number.

20     Q.  Now, even though Medicare doesn't require

21   providers to submit patient files before paying a claim,

22   does Medicare require providers to maintain those files?

23     A.  Yes.  So one of the promises you saw on that

24   application --

25          MR. CYGANIEWICZ:  I object as being

1    nonresponsive.  He asked a "yes" or "no" question,

2    basically.

3              THE COURT:  Overruled.  I'll -- I'll allow

4    it.  Please proceed.

5        Q.  (By Mr. Foster):  Please proceed.

6        A.  Can you reask me?  I'm sorry.

7        Q.  Of course.

8              Even though Medicare does not require

9    providers to submit their patient files before paying a

10   claim, does Medicare require providers to have and

11   maintain patient files?

12       A.  Yes, they do.

13       Q.  Can you explain that?

14       A.  Yes.  So, before you submit a claim, you have to

15   have all the documentation complete, because what is in

16   that documentation is what serves to support that

17   service that's being billed.  So it supports not only

18   when it was done, where it was done, and the level of

19   service that you're billing.  And so that documentation

20   needs to be completed before you submit a claim.

21             Now, Medicare asks that you complete that

22   documentation as soon as possible, or during the time

23   that you're providing that service, but Medicare allows

24   up to one year for a provider to submit that claim.  But

25   it does request that the documentation be completed

1    before that claim is submitted.

2        Q.   And does it require that documentation be

3    completed before or after the claim is submitted?

4        A.   It must be completed before.

5        Q.   Now, this case involves home health providers.

6    Generally speaking, what are home health services?

7        A.   Home health services are skilled services that

8    are provided in the home.

9        Q.   And can you give an example of a situation where

10   home health services are reasonable and medically

11   necessary.

12       A.   So you have a hip replacement and you have that

13   surgery done, but you need some physical therapy, and

14   your health condition is such that you are confined to

15   the home, it would be appropriate for you to have a

16   physical therapist come out to your home and provide

17   that short-term physical therapy to get you back up to

18   where you were.

19       Q.   Now, you mentioned "short term".  Is home health

20   services designed to be for acute care, or is it a

21   long-term service?

22       A.   It's intended to be a short-term mode of care for

23   you while you're confined to your home and need a

24   skilled service.

25       Q.   Does Medicare pay more for home health services

1    or outpatient services, such as going to a physical

2    therapy clinic?

3        A.   Home health services.

4        Q.   How much does Medicare typically pay for home

5    health services?

6        A.   So typical home health visit, or home health

7    claim for this case would be about -- over $3,000.  And

8    when I say "a claim," a claim for health covers 60 days.

9    We call it "an episode of home health".

10       Q.   So that's about $3,000 every 60 days?

11       A.   Yes.

12       Q.   Now, can all beneficiaries receive home health

13   care, or does Medicare have specific requirements?

14       A.   Medicare has specific requirements that you have

15   to meet in order to receive and bill home health.

16       Q.   And can you explain to the jury what those

17   requirements are?

18       A.   Sure.  So home health has a few basic

19   requirements.  One is that you have a skilled need.  Two

20   is that you are confined to the home.  Three is that you

21   be certified by a physician who is caring for you and

22   certifies that you're homebound and you have a skilled

23   need and signs the plan of care.

24       Q.   Now, you mentioned being homebound.  Can you

25   explain that requirement, that a beneficiary be

homebound, to the jury?

A.   When I use the term "homebound," it refers to the fact that you are confined to the home.  And there's two basic requirements to being confined to the home, according to Medicare.  Number one is that you require an assistive device, special transportation, the assistance of another person, or it's medically contraindicated for you to leave the home.

When I talk about an assistive device, I'm talking about a cane, crutches, a wheelchair, a walker, something like that.  So you have to have that -- meet that criteria.

The second criteria is that you leave home, that it's a taxing effort to leave home, and that you have a normal inability to leave your home.  You have to meet both of those criteria in order to be considered homebound by Medicare.

Q.   Is every elderly person homebound, according to Medicare's definition?

A.   No.

Q.   What about an elderly person who doesn't leave the home because they're getting older and they're pretty feeble?

A.   That still does not qualify you as homebound, according to Medicare standards.

1    Q.   What if they're a real handful and it's a problem

2    for caretakers to take care of them, or their family

3    members?

4    A.   Again, you would have to meet both of those

5    criteria, as defined by Medicare, in order to be

6    considered homebound.

7    Q.   Is every person with a disability homebound?

8    A.   No.

9    Q.   Every person in a wheelchair?

10   A.   No.

11   Q.   Can you explain to the jury why these types of

12   patients are -- are not homebound, even if they might

13   need a little help or want a little help in the home?

14   A.   Well, again, you have to meet both those

15   criteria.  And you might be in a wheelchair, but some of

16   our people that are in wheelchairs have the ability to

17   get in a car and drive, or they are very good users of

18   public transportation, or have modes of transportation,

19   and it's not physically taxing that they can't leave the

20   home.

21              There are other situations where, maybe,

22   you're a little forgetful and you need the assistance of

23   another person, but you enjoy getting out, you -- you

24   would not be considered homebound.  So you need to meet

25   both those criteria in order to be considered homebound

1    for the Medicare home health benefit.

2        Q.   What does Medicare require in terms of how often

3    a patient can leave the home and still be considered

4    homebound?

5        A.   So as long as you meet those two criteria, you

6    still must leave home on an infrequent basis, and it

7    needs to be of a short duration.

8        Q.   Will Medicare pay a home health claim if the

9    patient is not confined to the home?

10       A.   No.  Being home- -- homebound, or confined to the

11   home, is a requirement for the home health coverage by

12   Medicare.

13       Q.   Now, you mentioned another requirement, that the

14   beneficiary be under the care of a physician.  Does

15   Medicare require that a doctor certify the beneficiary

16   for home health services?

17       A.   Yes.  In order to be put on home health care,

18   you, by Medicare, you have to be certified, and a plan

19   of care has to be reviewed by the physician who is

20   ordering and certifying that you meet the requirements

21   for home health.

22       Q.   Does Medicare also require the home health agency

23   independently to assess the patient?

24       A.   Yes.  So, remember, it's both the home health

25   company and the physician that's signing that plan of

1    care that have responsibility in this.  So the -- the

2    home health company has responsibility, too.

3        Q.  And does the home health agency's assessment

4    influence how much Medicare pays them?

5        A.  Yes.

6        Q.  And can you explain that?

7        A.  So for Medicare home health, there is an

8    assessment.  We call it the OASIS assessment.  A

9    registered nurse goes out into the home, and it's a very

10   thorough assessment.  It has lots of questions on it.

11   The information that they document on that assessment

12   form is put into our system, and the information comes

13   out in codes that determine the payment for that home

14   health episode.

15       Q.  Now, does Medicare allow the home health agency

16   to just rely on a doctor's certification?

17       A.  No.  They both have responsibility.

18       Q.  What does Medicare require a home health agency

19   to do if a patient is not homebound?

20       A.  They cannot submit claims if they do not meet the

21   conditions of payment for those claims.

22       Q.  What if a doctor provided a referral?

23       A.  Again, Medicare claims are paid on the conditions

24   of pay -- of participation and those conditions of

25   payment, and the information must support that in order

1  to have the claim paid.

2    Q.  Now, you also mentioned that home health requires

3  skilled services.  Can you explain to the jury what that

4  means?

5    A.  So when I talk about skilled services, it means a

6  couple of different things.  One, skilled service can

7  come from, like, a therapist.  When I'm talking about

8  physical therapy, speech language therapy, or

9  occupational therapy, that's a skilled service.

10         Another skilled service is what comes from a

11  registered nurse or an LVN.  It is a skill that is so

12  inherently complex that it requires somebody with a

13  state license to perform or supervise that service.

14    Q.  Can you distinguish between the skilled services

15  that Medicare requires and the type of services or

16  assistance that Medicare wouldn't pay for?

17    A.  So, think of a skilled service from a nurse as

18  being something like extensive wound care for very deep,

19  infected wounds.  IV antibiotic therapy, injections that

20  are maybe for extensive pain, those are skilled

21  services.

22         What is not skilled are things that you

23  might do on a daily basis, like, take a bath, set up

24  your oral pills, you know, help you clean your house,

25  those things are not skilled.  Checking on you to see if

1    you're okay, those are not skilled services.

2        Q.   Now, we talked about home health, but this case

3    also involves hospice providers.  Generally speaking,

4    can you explain to the jury what hospice services are?

5        A.   Hospice is an approach to care that is holistic,

6    and it takes into consideration that the beneficiary is

7    dying.  And when the beneficiary chooses to go on to

8    hospice, they are switching the focus of their care from

9    a curative focus to a more palliative -- we use the word

10   "palliative," but it just means comfort care.  It's

11   based on making that patient comfort- -- comfortable

12   until they die.

13       Q.   How are hospice services different than medical

14   treatment?

15       A.   So, medical treatment, you know, the goal, when

16   you're not on hospice, is to make you better or make you

17   the best that you can be during that time.

18            Hospice is focused on providing you comfort as

19   you die.

20       Q.   Is the purpose of hospice to keep patients alive

21   as long as possible?

22       A.   So, hospice is elected once the -- they know that

23   you have a terminal illness -- and Medicare has a

24   special definition for that -- but it is intended to

25   make you comfortable as you die.

1    Q.   What about the Hippocratic Oath?

2    A.   The Hippocratic Oath has to do with, you know,

3  "Do no harm."  And they're allowing you to die under

4  certain circumstances and certain scenarios, is not

5  necessarily harmful to the patient.  There are times in

6  our lives when we are going to die, and there -- it's

7  not a bad thing to allow that to happen when the

8  beneficiary so chooses and the medical condition deems

9  that appropriate.

10    Q.   Now, let's talk about the qualification

11  requirements.  Can all beneficiaries who are receiving

12  home health also receive hospice?

13    A.   No.  So the requirements by Medicare for each of

14  those benefits is different, and so you must meet the

15  conditions of payment for each one of those benefits.

16  They're separate.

17    Q.   If someone said hospice is a form of the home

18  health benefit, would that be true or false?

19    A.   It would be false.

20    Q.   Do all homebound patients qualify for hospice?

21    A.   Actually, being homebound is not a requirement

22  for hospice.

23    Q.   Are hospice services more expensive for home

24  health or more lucrative for the provider?

25    A.   Yes.  So your typical hospice claim in this case

1   is $3,400 per month.

2      Q.   Is that over double the amount that a provider

3   can make from home health services?

4      A.   Yes.

5      Q.   Now, let's talk about some of the specific

6   requirements for the hospice benefit.  Can you explain

7   to the jury what those are?

8      A.   So, in order to be covered under the Medicare

9   hospice benefit, you have to do a couple of things.

10  One, you have to sign an election form, and there's

11  certain requirements regarding that election form.

12           Two, you have to be certified as terminally

13  ill, according to the guidelines stated in the

14  regulation.

15           The care delivered has to be according to

16  the hospice plan of care, and the hospice care has to be

17  medically reasonable and necessary.

18     Q.   Now, you talked about the requirement of a

19  certification of a terminal illness.  Can you explain to

20  the jury what it means to have a terminal illness that

21  qualifies for hospice?

22     A.   So we use the term "terminal illness".  In

23  Medicare, it's defined a certain way.  A terminal

24  illness by Medicare is defined as having a medical

25  prognosis, which that just means an expectancy, that you

1  have a terminal diagnosis where your life expectancy is

2  six months or less.

3      Q.   Now, if someone said you don't need to be dying

4  to be on hospice, would that be a true statement under

5  Medicare's rules?

6      A.   No.

7      Q.   I want to talk about Medicare's use of the word

8  "terminal".  Does every patient with a diagnosis of,

9  say, incurable cancer, qualify for hospice?

10     A.   No.  According to Med- -- Medicare regulations,

11 terminal diagnosis is someone with a prognosis of six

12 months or less if the illness runs a normal course.

13     Q.   Does every patient with Alzheimer's qualify for

14 hospice?

15     A.   No.

16     Q.   Does every patient with COPD qualify for hospice?

17     A.   No.

18     Q.   So, I want to talk about this determination that

19 a patient has less than six months or -- to live.  How

20 is this determined, in your experience, by Medicare?  I

21 mean, isn't it, basically, just always a guess how long

22 someone will live?

23     A.   It's not a guess.  It's true that there's no

24 crystal ball, and no one really can say you're going to

25 die on this day, that's true.  Medicare expects

1   sufficient documentation and other information that

2   would support a physician's statement that you are

3   terminally ill, which they define as having a prognosis

4   of six months or less, if the illness runs the normal

5   course.

6       Q.   And what types of things does Medicare look for?

7       A.   So, we look for specific clinical documentation.

8   And I'm talking about, is there lab work, what does it

9   look like, are there -- say if you have COPD -- chest

10  X-rays, what are your oxygen measurements, how are you

11  treated, how have those treatments worked, are they not

12  working, what have you done that's not working, what

13  else is going on with the patient?  Oftentimes, patients

14  who have terminal illnesses have other conditions that

15  are also affecting the outcome of that patient.

16          Not only do they have other illnesses, they have,

17  what we call, secondary conditions.  Certifications for

18  terminal illness require sufficient documentation on all

19  those conditions that support a prognosis of six months

20  or less.

21      Q.   Does Medicare allow a provider to say that a

22  certification of terminal illness is just a prediction

23  about the future so they can enroll whoever they want?

24      A.   No.

25      Q.   Now, I want to talk about the other requirements

1    that you mentioned.  You mentioned something called a

2    patient election of benefits.  Is having a terminal

3    illness alone sufficient to qualify a patient for

4    hospice?

5        A.  No.  One of the requirements to be covered by

6    hospice is that you elect the hospice benefit.  And you

7    have to elect it according to those Medicare rules.

8        Q.  Why is patient choice important in regard to

9    hospice?

10       A.  When you elect the hospice benefit, what happens

11   is that the claim system is alerted that you are on the

12   hospice benefit, and those claims for other services now

13   are stopped.  Care is to be delivered by the hospice,

14   and the hospice claims will be paid.

15       Q.  And is this an important decision?

16       A.  Yes, it is.

17       Q.  Would Medicare pay a claim if it knew that a

18   patient or their caregiver wasn't adequately informed

19   about the hospice benefit?

20       A.  No.

21       Q.  And would Medicare pay a claim if the hospice did

22   not have a signed election of benefits form in its file

23   from the patient or their caregiver prior to submitting

24   a claim?

25       A.  No.

1    Q.   Now, you mentioned it being important, because

2    the patient waived some rights.  Can you explain to the

3    jury what rights a patient is giving up if they go on

4    hospice?

5    A.   So that a hospice election statement, there is a

6    couple of key points that the providers are expected to

7    discuss with the patient.  One, the hospice election

8    form has to name the hospice that's going to provide the

9    care.

10            Two, the beneficiary or their representative

11   needs to acknowledge that they understand that the care

12   now is going to shift from a curative nature to

13   palliative, or care that's just focused on making that

14   beneficiary comfortable until they die.

15            Three, the beneficiary, or their

16   representative, acknowledges that they understand that

17   they are waiving certain benefits for Medicare.  There

18   has to be the signature of the beneficiary or their

19   representative and the date that that hospice election

20   becomes effective, because the date that that becomes

21   effective, those other benefits will be -- those other

22   claims coming in will stop.

23   Q.   So can you give an example?  What types of rights

24   does an Alzheimer's patient give up in terms of

25   treatment if they go on to hospice services?

1    A.   So, Alzheimer's is a very slow and unfortunate

2    disease.   Things -- Alzheimer's patients usually see

3    neurologists, they might need to see speech therapists,

4    they might need to see all kinds therapists, they might

5    need to see doctors that take care of other problems

6    that they're having.   And so once you elect hospice, the

7    hospice is responsible for taking care of all those

8    needs until you die.

9    Q.   What types of rights does a cancer patient give

10   up in terms of treatment if they go on hospice?

11   A.   So, hospice is elected for cancer patients when

12   they have that terminal diagnosis, and so there is no

13   curative care that's paid for by the hospice, meaning

14   you wouldn't get chemo or radiation if it was a curative

15   nature.

16   Q.   And more generally, if a beneficiary is on

17   hospice, are there types of care that they won't receive

18   from an ambulance, or a hospital, things of that nature?

19   A.   So all the claims are stopped in the system.

20   Q.   Now, I want to talk about the role of a physician

21   that you mentioned in certifying a beneficiary for

22   hospice.   Does Medicare require that a doctor certify a

23   beneficiary for hospice services?

24   A.   Yes.

25   Q.   Does Medicare also require that the hospice

1    company assess the patient?

2        A.   Yes.

3        Q.   And does Medicare just allow the hospice to rely

4    on a doctor's certification that the patient is

5    terminally ill?

6        A.   No.  So when we ask for the documentation, the

7    certification that the physician completes must be

8    supported by that sufficient information that we talked

9    about.  So it has to be supported by other medical

10   records that support those statements.

11       Q.   And does Medicare allow a hospice just to bill as

12   long as a doctor signs and the patient elects the

13   benefit?

14       A.   No.  If Medicare gets any indication that there's

15   a problem, those claims will be stopped.

16       Q.   What does Medicare require a hospice company to

17   do if a patient is not, in fact, dying?

18       A.   They should be discharged from hospice.

19       Q.   Even if a doctor provided a referral?

20       A.   So -- yes, even if a doctor provided a referral.

21       Q.   Now, I want to discuss which doctor provides the

22   certification of terminal illness.  Is the hospice

23   required to consult with the patient's primary care

24   doctor if they have one?

25       A.   So, the initial certification for terminal

1    illness is signed by the hospice medical director and

2    the patient's primary care physician or attending

3    physician.

4        Q.   Would Medicare pay a claim if it knew that the

5    hospice did not consult with the patient's primary care

6    doctor?

7        A.   No.

8        Q.   Would Medicare pay a claim if the primary care

9    doctor told the hospice that a patient didn't qualify

10   because they weren't dying?

11       A.   The patient must qualify for hospice and meet

12   those conditions of payment and conditions of

13   participation.

14       Q.   Does Medicare allow a hospice to just rely on

15   medical directors and not consult with primary care

16   doctors?

17       A.   No.

18       Q.   Now, once a patient is placed on hospice, is the

19   hospice required by Medicare to monitor if the patient's

20   condition improves?

21       A.   Yes.  So, in the Medicare hospice benefit, one of

22   the requirements is that that patient's plan of care be

23   reviewed, at least, at a minimum, of every 15 days.  And

24   it's reviewed by certain required people.  At a minimum,

25   the physician, the nurse, and a bereavement counselor,

1  and a social worker, they review the plan of care and

2  decide if the patient continues to be eligible for the

3  hospice benefit, as well as adjust any kind of plans

4  that they are using when they care for that patient.

5    Q.   And is that referred to as what's called an

6  Interdisciplinary Group, or IDG, meeting?

7    A.   Yes.  You'll hear me call it "IDG Team," or

8  sometimes we call it an "IDT".  It's that group of

9  professionals that are required to review it.

10   Q.   And what's a hospice required to do if at the IDG

11 meeting it's indicated that a patient is not, in fact,

12 dying?

13   A.   Then they are not eligible to be recertified for

14 hospice care, and plans for discharge would need to

15 ensue.

16   Q.   Are hospice services provided in what are called

17 benefit periods?

18   A.   Yes.

19   Q.   And how long are the benefit periods?

20   A.   So, hospice benefit periods, the first two

21 benefit periods are 90 days each.  After those 90 days

22 each, that's 180 days, which is essentially your six

23 months.  Then every benefit period thereafter is 60

24 days.  And each benefit period, starting with benefit

25 period number three, and every benefit period

1    thereafter, it is required to have a face-to-face visit

2    for those certifications.  Each benefit period requires

3    its own certification.

4        Q.  Why does Medicare impose these additional

5    requirements after six months?

6        A.  Because hospice is generally expected that you'll

7    be on it six months or less.

8        Q.  Now, are these home health and hospice rules

9    we've discussed made available to the providers?

10       A.  Yes.  So they are available, again, on the CMS

11   website, they're available on the Medicare

12   Administrative Contractors website, and you can access

13   rules and regulations just by Googling them and you can

14   find out the Medicare rules an regulations.

15       Q.  Now, in the course of your employment, did you

16   become aware of an investigation of Professional Hospice

17   Care in the Merida Health Care Group hospice that was

18   conducted by Health Integrity?

19       A.  Yes.

20       Q.  And how did the Health Integrity investigation

21   start?

22       A.  So Health Integrity originally was alerted by a

23   complaint that came in by an employee of the hospice.

24       Q.  And as a result of that complaint from an

25   employee of the hospice, did Health Integrity open an

1  investigation?

2      A.  Yes.

3      Q.  And what was the purpose of Health Integrity's

4  investigation?

5      A.  So, like I said, our job as a UPIC, or we were

6  formally a ZPIC, is to -- when we get suspicion of

7  fraud, waste or abuse, is to gather information to find

8  out if there is fraud, waste and abuse.

9      Q.  And as part of the investigation, did Health

10  Integrity review Medicare claims data?

11      A.  Yes.  One of the first things that we do when a

12  complaint comes in, is we run data on that provider and

13  take a look at the data to see what it indicates.

14      Q.  Why does Health Integrity review the data?

15      A.  Well, you can tell a lot from just looking at

16  claims data about a provider.

17      Q.  And did Health Integrity conduct an analysis of

18  the Merida claims data to determine the top referring

19  physicians to the hospice program?

20      A.  Yes.

21      Q.  And who was the top referring physician?

22      A.  Dr. Virlar.

23      Q.  Was that by a little or by a lot?

24      A.  A lot.  He had referred over 60 percent of the

25  hospices' patients over a three year period.

1    Q.   And what did that mean to you as a hospice fraud

2    investigator?

3    A.   That is what we call a red flag.  When there's

4    one physician who has a huge majority of those referrals

5    coming into an organization, that begs the question of

6    "Why is that?"

7    Q.   And who was the third largest referring

8    physician?

9    A.   Dr. Pena.

10    Q.   And what were the types of concerns that were

11    raised by the percentages that Dr. Virlar and Dr. Pena

12    were referring of the overall referrals to Professional

13    Hospice?

14    A.   It begged the question of where were they getting

15    those patients, because we also ran data on their Part B

16    and -- Part B is the benefit that pays for when you go

17    to see the doctor, that's pulling from your Part B

18    benefit.  And so those same patients were not often

19    found in the Part B data.

20    Q.   And why was Health Integrity doing this Part B

21    comparison?

22    A.   That's one of the steps that we do to try and

23    figure out the relationship between the doctor that's

24    referring and the beneficiary and the company that's

25    providing the care.

1    Q.   How did it influence the investigation that the

2    comparison showed that these doctors were not providing

3    many services as doctors under Part B to the patients

4    they were referring for hospice?

5    A.   Again, it -- you know, the investigators knew

6    that they needed to go on and get further information.

7    Q.   Now, you talked about the percentages.   How do

8    legitimate hospice companies differ in terms of the

9    number of doctors who are referring to a hospice?

10   A.   Their beneficiaries come from multiple sources.

11   Multiple physicians are referring into them.

12   Q.   And you also -- did Health Integrity also conduct

13   what's called a "length of stay analysis" using the

14   claims data?

15   A.   Yes.   That is one of the factors that we look at

16   when we're looking at data, and the length of stay for

17   the hospice company, far out -- far surpassed six

18   months.

19   Q.   And was that a red flag?

20   A.   Yes.

21   Q.   Why was it a red flag?

22   A.   Because, again, the expectation is that you would

23   be in hospice for six months or less.   That does not

24   mean in any terms that, you know, if you stay six

25   months, they're going to discharge you.   But, again,

1    when it is an overall characteristic of the provider, it

2    is a red flag, and it deems further investigation.

3        Q.   And did Health Integrity conduct additional

4    interviews and obtain other complaints that were filed

5    with other Government agencies as part of its

6    investigation?

7        A.   Yes.

8        Q.   And how did that influence -- well, and after

9    examining those interviews, or conducting those

10   interviews and examining the complaints, did Health

11   Integrity take the additional step of obtaining patient

12   files?

13       A.   Could you ask that again for me?

14       Q.   Sure.

15            After taking these steps, did Health

16   Integrity also request patient files?  Sorry.  It was a

17   complicated question.  Overly complicated.

18       A.   Yes, we did ask for medical records.

19       Q.   And I want to discuss those files.  Did Health

20   Integrity review the files?

21       A.   Yes.  We did a medical review.

22       Q.   And what was the purpose of the medical review?

23       A.   To see if the documentation in the medical

24   records supported those conditions of participation and

25   those conditions of payment.

1     Q.   And did Health Integrity make a determination of

2  how many of the claims were legitimate?

3     A.   So the medical records that we looked at,

4  ninety- -- almost 97 percent of them did not meet those

5  conditions of payment.

6     Q.   And why did Health Integrity determine that 97

7  percent of the claims submitted by Professional Hospice

8  did not comply with Medicare's rules and regulations?

9     A.   The documentation did not support that those

10  patients met coverage guidelines; specifically, that

11  they were not terminally ill.

12     Q.   Now, did Health Integrity go on to examine all

13  the other companies in the Merida Health Care Group?

14     A.   No.

15     Q.   What -- why not?

16     A.   So we work, Qlarant, Health Integrity, works

17  under the guidance of CMS, and our job is specifically

18  to substantiate or refute those allegations of fraud.

19  Once we have a credible allegation of fraud, our

20  contract requires us to make a law enforcement referral.

21     Q.   And did Health Integrity, in this case, based on

22  the medical review, the complaints, the data analysis,

23  the interviews, make a law enforcement referral?

24     A.   Yes.

25     Q.   And in terms of the administrative options

1    available to Health Integrity, how serious of an option

2    is a law enforcement referral?

3       A.  It is the most serious.

4                MR. FOSTER:  No further questions,

5    Your Honor.

6                THE COURT:  Thank you, Mr. Foster.

7                Let's go ahead and proceed.  Who wants to

8    go?  Mr. Canales?

9                MR. HECTOR CANALES:  Yes, sir.

10               THE COURT:  Terms of standard protocol,

11   we'll just go by defense, Mesquias, McInnis and Pena, in

12   that rotation.  Is that fine?

13               MR. CYGANIEWICZ:  That's fine.

14               MR. GUERRA:  That's fine.

15               MR. HECTOR CANALES:  That was our

16   understanding, Judge.

17               THE COURT:  All right.  That's fine.

18                     CROSS-EXAMINATION

19   BY MR. HECTOR CANALES:

20      Q.  Ms. McMillan, good afternoon.  Or almost good

21   afternoon.  My name's Hector Canales.  I represent

22   Mr. Mesquias, okay?

23      A.  Okay.

24      Q.  All right.  I want to start off with -- talk --

25   talk -- let's talk a little bit about the hospice rules

```
 1   and -- and -- and reg- -- and regulations and -- and

 2   your job.

 3           I take it that you are familiar with the

 4   CFRs regarding hospice?

 5     A.   Yes.

 6     Q.   Would you tell the jury what the CFRs are, what a

 7   CFR is as it relates to hospice?

 8     A.   So CFR stands for Code of Federal Regulation.

 9   When I talk about Medicare rules and regulations, we

10   have a hierarchy of regulations.  They start out with

11   the Social Security Code, then underneath that comes the

12   Code of Federal Regulations, and underneath that comes

13   what we call manuals, or CMS manuals, and then you have

14   more specific rules and regulations that are put out by

15   the Medicare Administrative Contractors.  We call them

16   LCDs, they're called Local Coverage Determinations.

17           You cannot override or supersede one of

18   those higher regulations, so the manuals abide by the

19   Code of Federal Regulations, and the Code of Federal

20   Regulations abides by the Social Security Act.

21     Q.   All right.  So let's -- here we go.  It was at an

22   angle.

23           Let's go through that hierarchy.

24     A.   Okay.

25     Q.   Okay?
```

1          So, in terms of -- we -- we have the

2   statute, the Medicare statute.  That would that be the

3   top of the -- of the ladder?

4       A.  Social Security Act, yeah.

5       Q.  Okay.  So that's going to be number one, the

6   Social Security Act.  And you can follow along with me

7   up here, okay?

8       A.  Sure.

9       Q.  Social Security Act.  All right.  That's number

10  one.  What comes underneath that?

11      A.  The Code of Federal Regulations or CFR.

12      Q.  CFR.  Okay.  What comes under that?

13      A.  The manuals.  You might hear them called IOM.

14      Q.  The what now?

15      A.  The Medicare manuals.  So, specifically, it would

16  be the Medicare benefit policy manual, the Medicare

17  claims processing manual.  And there are other manuals

18  in there, too.

19      Q.  Okay.  All right.  So we got the manuals.  What's

20  next?

21      A.  Then there are Local Coverage Determinations.

22      Q.  Or LCDs, right?

23      A.  Yes.

24      Q.  Okay.  And --

25      A.  Do you want me to go on?

1       Q.   Well, sure.

2       A.   Well, so underneath that, you know, clearly it

3   has to be coded correctly.   So anything that -- like CPT

4   manuals would fall underneath that.

5       Q.   I want to start here with getting some

6   terminology down.

7       A.   Okay.

8       Q.   I want to make sure we can understand, and also

9   give the jury an understanding.

10           So where does -- you talked earlier about

11  education materials, where how providers can be educated

12  about these rules and regulations.   What are some of the

13  sources of -- of -- of education.

14      A.   Okay.   Well, so a great one is the Medicare

15  Learning Network.   It provides really benefit-specific

16  information, and they can get access to that.   Actually,

17  on their provider letter, it says, "Welcome to

18  Medicare," and they have access to that.

19           You can also just Google "Medicare Learning

20  Network".   But you would go to your Medicare

21  Administrative Contractor, and they provide resources

22  for you to access those avenues.

23      Q.   And so when a -- does -- let's talk about CMS.

24  What is CMS?   Tell the jury what CMS is.

25      A.   CMS stands for Centers for Medicare & Medicaid

1    Services.  It is that department under the Government

2    that administers our health care program.

3        Q.  And -- and does the hospice program -- is it true

4    that the hospice Medicare program, is it one in the same

5    as CMS?  Is it part of CMS?

6        A.  So we are under the guidance of CMS.

7        Q.  Okay.  So I'm going to make another kind of line

8    here.  We've got CMS here.  And CMS is that equal -- can

9    we agree that that equals Medicare?

10       A.  Yes.

11       Q.  Okay.  All right.  So I'm going to put here,

12   "Equals Medicare".  I apologize for my handwriting.

13           Now, under CMS and Medicare, we've got all kinds

14   of programs that Medicare administers, correct?

15       A.  Yes.

16       Q.  All right.  This case, we're dealing with the

17   hospice program.

18       A.  Yes.

19       Q.  Right?

20       A.  The hospice benefit, yes.

21       Q.  Okay.  So I can call it here -- I'm going to put

22   under here -- we're going to say "hospice," right?

23   And -- and -- and -- and in your industry, the term of

24   art is the "hospice medicare benefit."  Do I have that

25   right?

1     A.   Yes.

2     Q.   Okay.  I get -- I see that abbreviated sometimes

3  as HMB.

4     A.   Oh.  Okay.

5     Q.   Okay?  All right.  All right.  HMB.  So that's

6  the hospice medicare benefit.  Now, there's also a home

7  health care benefit program?

8     A.   Yes, there is.

9     Q.   Okay.  Home health.

10          What about under Medicare, is there a

11  nursing home benefit?

12     A.   Yes.

13     Q.   Okay.  And for each of these benefits here, these

14  programs, whether it's the hospice, the home health, the

15  nursing home, on the left-hand side, we have the --

16  the -- the hierarchy of laws and rules and regulations

17  that govern those, correct?

18     A.   Yes.

19     Q.   Okay.  And all this -- these five examples here,

20  from the Social Security Act, down to the CPT -- those

21  are the actual codes that the doctors -- people have

22  to -- the nurse have to put in, right?

23     A.   Yes.

24     Q.   Those are all -- it's all public, right?  It's

25  public information?

1      A.   Yes.

2      Q.   It gets published?

3      A.   Yes.

4      Q.   Okay.   And are you familiar with the Federal

5   Register?

6      A.   Yes.

7      Q.   What is the Federal Register?   Tell the -- tell

8   the jury.

9      A.   So the Federal Register is -- it's published

10  daily, and it comes out with all kinds of information,

11  like -- I think about the whole federal government, but

12  I specifically look at rules that have to do with

13  Medicare.

14     Q.   Okay.   So you look at -- you look at the Federal

15  Registry.   That's part of your job.

16     A.   Yes.

17     Q.   You're familiar with it.

18     A.   Yes.

19     Q.   You're familiar with it as it relates to hospice.

20     A.   Yes.

21     Q.   Have you studied it?

22     A.   I have read it, yes.

23     Q.   Okay.   How often do you -- do you -- do you rely

24  upon it?

25     A.   I rely upon it to review my medical records.

1   Q.   All right.   Have you relied upon it today in

2   giving your testimony here today as part of your

3   training, background, education and experience?

4   A.   Yes.

5           MR. HECTOR CANALES:   May I approach the

6   witness, Your Honor?

7           THE COURT:   Yes, sir.

8           MR. FOSTER:   Your Honor, we'd request a copy

9   of anything he's showing the witness, please.

10          MR. HECTOR CANALES:   You just beat me to the

11  punch.   I'm about to give it to you.

12          MR. FOSTER:   Thank you.

13          THE COURT:   You got it resolved?   I couldn't

14  hear.

15          MR. HECTOR CANALES:   Here you go.

16          MR. FOSTER:   Thank you.

17  Q.   (By Mr. Hector Canales):   Okay.   What I have --

18  could you please -- is what I've given you, are those

19  two -- what are they?   Tell the jury what I gave you.

20  A.   So, this is a copy of the Federal Register,

21  specifically Volume 70, No. 224, published on Tuesday,

22  November 22nd, 2005.

23          And the other one is a copy of the Federal

24  Register, it's Volume 79, No. 163, and published on

25  Friday, August 22nd, 2014.

1   Q.   Now, to do your job, you've got to know what's in

2   this, right?

3   A.   Yes.

4   Q.   And whether you like it or not, what's in here

5   goes.

6   A.   That's correct.

7   Q.   Okay.  And is it true -- isn't it true that

8   within the hospice program, that -- that there are an

9   unlimited number of certification periods that a patient

10  is eligible for so long as you have the proper

11  certifications and -- and documentation?

12  A.   Unlimited, as long as you meet the conditions of

13  payment and conditions of coverage.

14  Q.   And so you talked about earlier, you told the

15  jury about the -- the -- the benefit periods, that you

16  have -- you have two.  And you have an initial period of

17  90 days, correct?

18  A.   Yes.

19  Q.   All right.  And, then, you have period number two

20  for another 90 days.

21  A.   Yes.

22  Q.   Right?  That equals the six months, the 180 days

23  or six months, right?

24  A.   Yes.

25  Q.   All right.  And, then, you can get recertified an

1   unlimited number of times so long as you have a -- a

2   doctor certifying the terminal illness.

3        A.   No.   You must be -- meet the conditions of

4   payment and the conditions of participation.

5        Q.   Absolutely.   So long as you follow the rules.

6   But -- but there is no hard limit.

7        A.   No.

8        Q.   That's not always been the case, though; has it?

9        A.   I don't know of a time when there was a limit on

10  the six months.   Is that what you're saying?

11       Q.   Yes, ma'am.

12            You don't ever remember reading that or

13  studying that in becoming an expert in this area?

14       A.   Not prior to 2009.

15       Q.   Oh.   So things that happened before 2009, you

16  don't know anything about?

17       A.   I wouldn't say I don't know anything about them,

18  but I didn't start looking at hospice claims until

19  2014 -- well, no, 2012.

20       Q.   So it's news to you that -- well, let me ask you

21  this:   Is it true that -- you've been -- you've been

22  doing this job since 2009, ten years?

23       A.   I've been working for Qlarant, or Health

24  Integrity, since 2014.   I worked for a Medicare

25  Administrative Contractor starting in 2010, but I

1    specifically looked at hospice claims starting in about

2    2013.

3        Q.   Okay.  And just real quick, how many hospice

4    reviews have you been -- you personally have been

5    involved in?

6        A.   How many hospice reviews?  I'd say between 50 and

7    a hundred.

8        Q.   All right.  Now, as part of your job, you're a

9    regular witness testifier for the Government, right?

10       A.   I have testified before, yes.

11       Q.   Okay.  But --

12               MR. GUERRA:  I'm going to object to the

13   nonresponsive answer.

14               MR. HECTOR CANALES:  Right.

15       Q.   (By Mr. Hector Canales):  My question was -- my

16   question was, you are --

17               THE COURT:  Sustained.  Repeat your

18   question.

19       Q.   (By Mr. Hector Canales):  You are a regular

20   testifier for the Government.

21       A.   I testify for the Government -- or I do not

22   testify for the Government, I testify for on behalf of

23   the Medicare trust fund.

24       Q.   Which is the Government, right?  What's the

25   difference between the Government and the Medicare trust

1    fund?   What distinction are you drawing there?

2        A.   Well, I represent the Medicare trust fund.

3        Q.   Okay.   But you are -- how many times have you sat

4    in a jury box, just like that, being asked questions by

5    federal prosecutors?

6        A.   This is my sixth time.

7        Q.   In how long of a period of time?

8        A.   I started testifying in 2017.

9        Q.   So, in the last two years, you're -- you've

10   testified, this is your sixth?

11       A.   Yes.

12       Q.   And of those -- so five prior to this one?

13       A.   Yeah.

14       Q.   Of those five prior, how many of those were

15   hospice cases?

16       A.   None.

17       Q.   None.   All right.   Now, if you'll follow -- turn

18   to the second page.   I want to draw your attention --

19              MR. FOSTER:   Objection.   Foundation,

20   Your Honor.   I believe this document's from '05.   She

21   said she started working in hospice in 2012.

22              MR. HECTOR CANALES:   It's all about her

23   qualifications and background.   She's been -- she's been

24   proffered and admitted here as an expert, Your Honor.

25   This is impeachment as to her expertise.

1          MR. FOSTER:  Ought to be a basis for

2     admissibility.

3          THE COURT:  Was this document previously --

4     is this part of the exhibits that have already been

5     admitted?

6          MR. HECTOR CANALES:  No, Your Honor.  This

7     is impeachment of the witness.  The portion that I'm

8     about to reference here references the prior -- that

9     hospice was limited to 210 days.  What I'm going to

10    establish, Your Honor, is what the rules are in relation

11    to this witness' credibility as an expert, does she

12    really know this program or not.  And -- and she has --

13    she has -- the foundation, Your Honor, is that -- is

14    that the Federal Register --

15         THE COURT:  Well, Counsel, the objection's

16    sustained.  I'll allow you to question her about the

17    rules that are in place and in effect during the

18    relevant time period, but you're going back to 2005.

19    She's already testified.

20         MR. HECTOR CANALES:  This is histor- --

21    history of the hospice program, Your Honor, and how --

22    how the rules that she's testifying about today, how

23    they came about.  If the Court would give me some

24    leeway.  It's relevant to understanding -- to provide

25    background as to how these -- the hospice claims that

1   are at issue are -- how they're legitimate.

2        THE COURT:  I'm going to give you very -- I

3   mean, I don't think there's any dispute that rules

4   change.  So -- all right.  Go ahead.  Go.  I'm going to

5   give you very slight leeway on this.  If it goes beyond

6   her scope of expertise, I'm going to cut it off.

7   Q.  (By Mr. Hector Canales):  Do you see here that

8   the total amount of hospice benefit was 210 days,

9   because of the difficulty in making a prognosis of six

10  months or less?  The 210 days' limit was repealed by the

11  Medicare Catastrophic Government Repeal Act of 1989 for

12  services.  Did you know that?

13  A.  I --

14       MR. FOSTER:  Objection, Your Honor.  1989

15  was 30 years ago.  That's far before the time period

16  alleged in this indictment, or any of the things

17  involved in this case.

18       MR. HECTOR CANALES:  Judge, my point is

19  here, what it goes to, the issue of prognosis.

20       THE COURT:  The objection is overruled.  I'm

21  going to give you some slight leeway.

22       Answer if you know.

23  A.  I didn't -- I hadn't seen this.

24  Q.  (By Mr. Hector Canales):  Okay.  I -- and I know

25  you haven't seen it.  Did you know that?

1      A.   No.

2      Q.   All right.  Did you know also, that within the

3    CFRs, and within educational materials, that CMS, CMS,

4    Medicare, has said that prognosis of life expectancy is

5    not an exact science?

6      A.   Yes, it does say that.

7      Q.   It does say that.  In fact -- now, this is

8    something that's within your wheelhouse and has been

9    part of -- part of CMS is education and the Government's

10   position when it comes to hospice and prognosis, right?

11     A.   Yes.

12     Q.   What I'm reading here, what we have up here, that

13   the amendment that we just talked about, clarify that

14   the certification is based on a clinical judgment

15   regarding usual course of a terminal illness and

16   recognizes the fact that making medical prognostications

17   of life expectancy is not always exact.

18     A.   Yes.

19     Q.   And so, in making your determinations in whether

20   it's a referral or -- or reviewing process, what you're

21   looking at is what's actually on the four corners of

22   some medical -- medical record, right?

23     A.   So the medical record in its entirety, along with

24   the claims history, is what we look at, and that

25   certification is, according to CFR, must be sorted --

1    supported by the medical record and other documentation.

2    And so it is not just that piece of paper, but it is the

3    longitudinal look at that patient and their history and

4    the documents that support those certification

5    statements.

6        Q.  Longitudinal.  I don't understand what that --

7    what does that mean?

8        A.  That means that you just don't show up one day

9    and are diagnosed terminal.  There has been a history

10   somehow of that disease process, and the other diseases

11   that are going along with it.  And so it is the

12   culmination of that information that helps to support

13   the certification of terminal illness.

14       Q.  I think you said earlier on your -- on your

15   Direct Examination, "A holistic approach".

16       A.  A holistic approach to hospice.

17       Q.  And that's the -- the doctor's approach, the

18   certified doctor's approach to being holistic, right?

19       A.  Holistic refers to the use of multiple

20   disciplines.  That could include, you know, your -- your

21   faith person, your doctor, your nurse, your social

22   worker.  Holistic, that includes all aspects of your

23   care.

24       Q.  Also not just the patient, but the family, right?

25       A.  Absolutely.

1    Q.   Right?  Because hospice is -- is -- would you

2  agree, is not just about the patient, but it's about the

3  family?

4    A.   Yes.

5    Q.   Right?  Okay.  And let's talk about some of the

6  other areas of -- of education.  Are you familiar with

7  a -- with program memorandums that are issued by CMS?

8    A.   Yes.

9    Q.   All right.  What is the program memorandum?

10   A.   They are -- I see them on e-mails.  They're notes

11 about something in the Medicare program.

12   Q.   Okay.  And who publishes them?

13   A.   I -- it depends on who's sending it out.  CMS.

14   Q.   Okay.  And what -- who are they targeting?

15   A.   The audience that they're sending them to.  Now,

16 it could be multiple different people.

17   Q.   You?

18   A.   It -- well, as a -- an employee of a contractor,

19 yes.

20   Q.   Okay.  To hospice agencies?

21   A.   Yes.

22   Q.   Right?  And I assume CMS does these program

23 memorandums, not just on -- to hospice, but to all the

24 different programs that they -- that they have, right?

25   A.   Whoever's on that list.

1    Q.  And are they useful?

2    A.  They can be.

3    Q.  Okay.  Do they represent the -- the -- the

4    position of the Government?

5    A.  They are statements that come out from CMS.

6    Q.  Could you identify -- what is that?

7         MR. FOSTER:  Objection, Your Honor.

8    Authenticity and foundation.

9         MR. HECTOR CANALES:  That's what I'm trying

10   to do, Your Honor.

11        THE COURT:  Please proceed.

12   A.  So this is dated March 28th, 2003, and it is a

13   change request, 2570.  And it's -- the subject is,

14   "Hospice Care Enhances Dignity and Peace as Life Nears

15   its End."

16   Q.  (By Mr. Hector Canales):  First, let me just ask,

17   do you agree with that statement that hospice care

18   enhances the dignity and peace as life nears its end?

19   A.  It depends.

20   Q.  It depends?

21   A.  It depends on the situation.

22   Q.  On what?

23   A.  I mean, it -- that's a pretty broad statement,

24   and I would have to say it depends on the situation.

25   Q.  Let me ask you this:  Where did you learn --

1    where did you learn that it was -- it was Medicare's

2    position that predicting life expectancy, the six

3    months, the certification of terminal illness, was not

4    an exact science?  Where did you learn that from?

5         A.   Well -- so I was trained by a Medicare

6    Administrative Contractor on the rules and regulations.

7    And it's actually in the rules.

8         Q.   Okay.  Which rule?  Do you know?

9         A.   I can't pop it off the top of my head.

10        Q.   Is it within the statute?  The CFR?

11        A.   I believe it's stated in the manual.

12        Q.   Okay.  Would you agree that -- that CMS

13   recognizes that making medical prognostication of life

14   expectancy is not always an exact science; thus,

15   physicians need not be concerned, there is no risk to a

16   physician about certifying an individual for hospice

17   care that he or she believes to be terminally ill?

18   Would you agree that that is the position of the

19   United States Government?

20        A.   I'm sorry.  I wasn't able to find where you were

21   reading from.  Can you -- is that on here?

22        Q.   Just listen, listen.

23             MR. FOSTER:  Your Honor, foundation.

24   Authenticity.

25             THE COURT:  Mr. Canales, you're reading from

1    documents that are not admitted into evidence, and this

2    is not impeachment.  This is not for impeachment.  So

3    what is the basis of this question?

4              MR. HECTOR CANALES:  I am asking her a

5    simple -- I'm asking her whether or not she agrees with

6    it.  If she doesn't --

7              THE COURT:  Let's go back to basics.

8    Counsel -- all counsel is instructed, you can only

9    present documents that have been admitted into evidence.

10   If you're going to attempt to introduce a document

11   that's not been admitted, well, then, you're going to

12   have to notify the Court for the basis of the

13   questioning on that exhibit.  Again, unless it's for

14   direct impeachment, which I -- evidently this question

15   is not.

16             MR. HECTOR CANALES:  Well, she has --

17             THE COURT:  I'm not going to allow the

18   question.  The objection is sustained.  Please move on.

19             MR. HECTOR CANALES:  Your Honor --

20   Your Honor --

21             THE COURT:  The objection's sustained.  Move

22   on.

23             MR. HECTOR CANALES:  I haven't had an

24   opportunity to impeach her.  I'm asking her if she

25   agrees with the position.  If she disagrees, there's

```
 1   nothing to impeach.  If she disagrees, then I have to
 2   impeach her.  But I'm trying to -- I haven't gotten
 3   there yet.  They jumped the gun.
 4              THE COURT:  Counsel, you've heard her direct
 5   testimony.  If you'd like to impeach her direct
 6   testimony, you're free to do so.
 7              Please proceed.
 8              MR. HECTOR CANALES:  Your Honor, my --
 9   Your Honor --
10      Q.  (By Mr. Hector Canales):  Do -- it -- does a --
11   does a physician have anything to worry about, risk, if
12   he or she honestly believes and has an opinion that life
13   expectancy is less than six months if the disease runs
14   its normal course?
15              MR. FOSTER:  Objection.  Foundation.
16   Speculation as to what a physician believes or
17   speculates or --
18              THE COURT:  You can ask the question.  He's
19   not referring to any doctor.
20              Please proceed.
21              MR. HECTOR CANALES:  Sure.
22              THE COURT:  That -- the objection's
23   overruled.  Answer, if you know.
24              THE WITNESS:  Can you ask one more time?
25   I'm sorry.
```

1     MR. HECTOR CANALES:  I'll try.  I'll try.

2  Q.  (By Mr. Hector Canales):  Does a doctor have

3 anything to risk or worry about if a doctor has an

4 honest belief and exercises clinical judgment that a

5 patient is terminally ill within six months?

6  A.  I can't really speak to what a doctor should fear

7 or not fear.  I review rules an regulations, and I

8 cannot override or supersede those rules and

9 regulations.  And the documentation must adhere to those

10 conditions of participation and conditions of par- --

11 payment.

12  Q.  But isn't it true that -- that CMS educates

13 doctors in the public that it doesn't have any -- that

14 they don't have anything to worry about or anything to

15 risk if they have an honest belief about their prog --

16 about their prediction?

17  A.  I have not seen that.

18     MR. HECTOR CANALES:  Your Honor, at this

19 point, the document says exactly that.

20  Q.  (By Mr. Hector Canales):  Isn't it true that the

21 document I provided in front of you, says that?

22     MR. FOSTER:  Objection, Your Honor.

23 Foundation.  Authenticity.

24     THE COURT:  Sustained.

25  Q.  (By Mr. Hector Canales):  You haven't seen that?

1     A.   I -- no.   Where were you reading that from?   I --

2   I didn't see it.

3              MR. FOSTER:   Same objection, Your Honor.

4              THE COURT:   Sustained.   Rephrase.   Move on,

5   Counsel, or ask a different question.

6     Q.   (By Mr. Hector Canales):   That would come as a

7   surprise to you that that would -- that it would be

8   CMS's position that a doctor has nothing to risk?

9     A.   I have not seen CMS say that a doctor has nothing

10   to --

11     Q.   There- --

12     A.   -- risk.

13     Q.   Therefore -- therefore, since you haven't seen

14   it, you did not use that criteria in any basis of any

15   hospice investigation or your testimony here today?

16     A.   We are -- we use the rules and regulations that

17   have been discussed, and we cannot override or supersede

18   those rules.

19     Q.   But if that was a part of the rule, and you

20   haven't seen it, you haven't used it?

21     A.   We cannot override or supersede those rules.

22     Q.   Switching gears a little bit.   Let's talk about

23   PCPs.   What's a PCP?

24     A.   Primary Care Provider.

25     Q.   And medical directors?

1   A.   Medical directors in this sense are those people

2   -- the -- a hospice has to have a medical director.

3   Q.   What --

4        Left-hand side there.  What rule -- law,

5   rule, or regulation, prohibits in a hospice the PCP to

6   act and to be one in the same as the medical director?

7   A.   It does not.

8   Q.   It doesn't?  So they can be the same person?

9   A.   They can.

10  Q.   All right.  What -- now, a hospice -- does a

11  hospice -- well, let's just ask this.  Did Merida, and

12  all the Merida hospices, was it within their discretion,

13  its discretion, choice, to not have or have a medical

14  director?

15  A.   No.  You must have a medical director.

16  Q.   Where does that say -- where up on the -- up on

17  one through five here does it say they must have a

18  medical director?

19  A.   You would find it in the CFR.

20  Q.   All right.  So it's not optional?

21  A.   It's not an option.

22  Q.   So the medical director is a must, and the

23  medical director may also be -- wear two hats, right?

24  A.   As long as they adhere to the rules and

25  regulations of Medicare.

1     Q.   All right.

2     A.   Within those roles.

3     Q.   Now, what -- what rule, law, prohibits the

4  hospice company for compensating, paying the medical

5  director that it must have?

6     A.   So the compensation cannot conflict with the

7  Anti-Kickback Statute.

8     Q.   Wait.  But they can pay them, right?

9     A.   Yes.

10    Q.   Okay.  And you're getting paid today, right?

11    A.   Yes.  I work for Qlarant.  I get paid by them.

12    Q.   Are you being paid for your time or testimony?

13    A.   I get -- I earn a salary from Qlarant, and that's

14  what I get paid.  I also earn the witness fee that every

15  witness comes up here and earns.

16    Q.   Right.  But my question to you is a little bit

17  more philosophical, right?  Are you being paid for the

18  substance of what you're saying?  Because the

19  Government's paying your -- your -- your company, right?

20    A.   Our -- we have a Government contract, yes.

21    Q.   Right.  So they're doing -- they're not doing

22  that for free.

23    A.   No.

24    Q.   Right?  And you're not doing anything for free?

25    A.   No.

1     Q.   Right?

2          I guess is it fair, then, should we then

3     assume that because the Government is paying your

4     company, who's paying you to be here, that everything

5     you say is just -- is fraudulent?

6     A.   Can you --

7     Q.   I mean, after all, they're paying you, right,

8     not -- not -- not me?

9     A.   So what is your question to me?

10    Q.   Is it -- is it fair to assume that what you're

11    saying is fraudulent, because they're paying you for --

12    for testifying?

13    A.   No.

14    Q.   No.  Why?

15    A.   Well, I get paid whether I testify or not.

16    Q.   Right.  So you're being paid -- fair to say

17    you're being paid for your time being here, for your

18    experience, not for what you're -- not for your opinion,

19    right?

20    A.   I'm getting paid to work for Qlarant.  And this

21    is just one of the many things I do under my job

22    description.

23    Q.   Now, a doctor who has two hats, who's the primary

24    care provider and a medical director, isn't it true that

25    in both situations, regardless of what hat he's wearing,

1    or she's wearing, that that doctor is performing

2    professional services?

3        A.   With Medicare, they -- doctors are clearly -- or

4    they're supposed to be acting within the scope of their

5    license.  But when it involves Medicare, they still have

6    to follow the rules and regulations of Medicare.

7        Q.   Let me try it again.  Let me try it this way.

8    There are certain -- would you agree that there are

9    certain professional services that a medical director

10   does that she would not do as a primary care provider?

11       A.   Yes.

12       Q.   Give me an example.

13       A.   So a medical director of hospices, just a couple

14   of their basic functions are that they certify patients

15   for hospice.

16       Q.   That's -- that's -- so the certification for

17   hospice, that's a medical director role?

18       A.   They are to be involved, yes.

19       Q.   Which they may properly be compensated for.

20       A.   They are being paid by the hospice.

21       Q.   For certifying.

22       A.   For their role as medical director.  And that

23   role includes those certifications of terminal illness.

24       Q.   And that's not a kickback.

25       A.   No.  So kickbacks, though, you cannot conflict

1   with the Anti-Kickback Statute, meaning the payment
2   cannot be volume or value based.  It must be fair market
3   value.
4       Q.  All right.  And -- and here in Harlingen, in
5   Laredo, do you know what the fair market value is for
6   medical directors?
7       A.  I personally do not.
8       Q.  You haven't looked into that?
9       A.  I do not -- no.
10      Q.  You can't give the jury any help when it comes to
11  whether or not any dollars that were paid, in this case,
12  were fair market value or not?
13      A.  I couldn't speak to that.
14      Q.  Okay.  All right.  But there's some amount
15  that's -- there is a -- there is a value that's
16  legitimate.
17      A.  Yes.
18      Q.  In your investigation, what did -- what did
19  Dr. Vincent Gonzaba tell you about his -- his
20  certifications?
21      A.  It's written in the referral, and I can't tell
22  you anything about Dr. Gonzaba off the top of my head
23  right now.
24      Q.  Did you interview him?
25      A.  Me, personally?  No, I did not.

1    Q.   Who -- did -- did you read an interview of him of

2    some place?

3    A.   Dr. Gonzaba?

4    Q.   Yes, ma'am.

5    A.   I don't recall it off the top of my head.

6    Q.   All right.   What about Dr. Posada?   Did you talk

7    to Dr. Posada?

8    A.   I don't recall that name.

9    Q.   Dr. Zertuche?

10   A.   I don't recall that name.

11   Q.   Dr. Pelly?

12   A.   I don't recall that name.

13   Q.   How about Marin?   Dr. Marin?

14   A.   I don't recall that name.

15   Q.   Yeah.   How about -- how about Dr. Virlar?   Did

16   you interview Dr. Virlar?

17   A.   I did not personally interview him, no.

18   Q.   Okay.   What about Dr. Shekar?   Do you know

19   Dr. Shekar?

20   A.   No.

21   Q.   Any -- you run across any of these doctors --

22   I'll represent to you that all the doctors I've -- I've

23   asked you about have -- have given certifications for

24   terminal illness over the six patients that are alleged

25   in this case to be fraudulent.   Did you know that?

1        A.   No.

2        Q.   Is this news to you?

3        A.   Yes.

4        Q.   So, a certification is a proper -- is something

5   that's on -- in the hat of a medical director that is

6   legitimate for him to be paid for -- to -- for him to

7   receive compensation for.  How about a -- would you

8   agree that a face-to-face assessment would also be

9   another example of a legitimate professional service

10  that a physician could be paid for from a hospice?

11       A.   So a face-to-face requirement, or visit, is

12  required for recertification on that third benefit

13  period, or thereafter.  The hospice is paid a per diem

14  rate from Medicare, or CMS, and the hospice determines

15  the payment to the physician who is providing those

16  services that are covered underneath that

17  recertification.

18            So I can't speak to how much that physician is

19  being paid, because that is between the hospice and the

20  doctor.

21       Q.   All I asked was:  Is it okay for a doctor to get

22  paid for a face-to-face?  It's that simple.

23       A.   But the doctor is being paid for being the

24  medical director, and he could be paid for that

25  face-to-face.

1    Q.   A face-to-face, put another way, is a legitimate,

2    professional service that a doctor can expect to be paid

3    for?

4    A.   Yes.

5    Q.   It's not a kickback?

6    A.   No.

7    Q.   How about -- see if we can agree on this one.

8    That's two.

9              Let's see if we can get a third.  How about

10   a plan of care done through the IDT process.  Is that

11   something -- isn't that a professional service that a

12   doctor can legitimately be compensated for by a hospice?

13   A.   So the hospice is compensating the physician for

14   his services as medical director.  The compensation

15   cannot be volume or value based.  It has to be set in

16   advance, and it can't vary during the course of that

17   contract.

18             So, essentially, it needs to be a flat rate.

19   Q.   Okay.  Flat rate.

20   A.   It can't vary during the course of the contract.

21   Q.   Okay.  But -- but a flat rate for a compensation,

22   that would be something you would approve -- you would

23   tell this jury, you would be -- approve of, a flat rate?

24   A.   That it can't be volume or value based, it can't

25   vary during the course of compensation.  Has to be fair

1    market.

2    Q.  Okay.  And what -- would you look to -- to

3    determine fair market, would it be fair to look to what

4    other hospices are paying in the area for the same or

5    similar services?

6    A.  I couldn't say -- I mean, it would have to be

7    based on fair market value, and I, specifically, can't

8    speak to that.

9    Q.  You don't know how to determine fair market

10   value?

11   A.  It would be what other people are paying, but I

12   couldn't tell you what that is.

13   Q.  And you haven't done this analysis as it pertains

14   to my clients in this case?

15   A.  No.

16   Q.  Right?  You haven't done a fair market analysis?

17   A.  No.

18   Q.  You don't even know what they're being paid, or

19   if they were paid; do you?

20   A.  I don't.

21   Q.  Okay.  You're just looking at what's on the face

22   of the medical record.

23   A.  Yes.

24   Q.  Right?  And by doing so, isn't it true that by

25   just looking at the face of the medical record, there's

1    no way you can determine what was in the mind of the --

2    the physician or the nurses who were creating, making

3    that -- that medical record?

4        A.   Claims are not paid based on what is in the mind

5    of the physician, they're paid based on meeting the

6    conditions of payment and the conditions of

7    participation, and that is supported in the

8    documentation.

9        Q.   That's an excellent point that you make there.

10   There's a difference, isn't there, between whether a --

11   a claim may be paid versus saying fraud; isn't there?

12       A.   Can you re-word that question for me?

13       Q.   Well, fraud -- fraud requires -- you understand

14   here we're in a criminal case, we're in a courtroom.

15   Fraud requires proof of the person's intent, their mind,

16   what they're thinking.   True?

17       A.   Yes.

18       Q.   You know that.   You -- you've testified that you

19   know all about Anti-Kickback law, right?

20       A.   I know about the Anti-Kickback.

21       Q.   Right.   So you know, then, that there's what we

22   call here -- our fancy word is "mens rea", right?   That

23   -- what's "mens rea" mean?   Have you ever heard of that?

24       A.   I have not.

25                 MR. FOSTER:   Objection, Your Honor.

1          MR. HECTOR CANALES:  She said no.  I'll move

2     on.

3          THE COURT:  The objection -- what is the

4     objection?

5          MR. FOSTER:  Objection, Your Honor, that

6     these are issues of law for the Judge and for the jury,

7     ultimately, and not for this witness to opine on the

8     law.

9          THE COURT:  I'll overrule it, but with the

10    understanding that this is not a legal expert.  Answer

11    if you know.

12    Q.   (By Mr. Hector Canales):  I beg to differ,

13    though.  You -- you testified that you are an expert in

14    Anti-Kickback, right?

15    A.   I'm not an expert in Anti-Kickback.  I know about

16    the Anti-Kickback law.

17    Q.   But you liaise with the Government about fraud,

18    right?

19    A.   Yes.

20    Q.   All right.  And would you agree that -- make it

21    -- agree with the distinction that you can have a

22    program violation -- in other words, something that

23    doesn't -- where a regulatory I or a T isn't crossed,

24    that is a -- that would cause a claim not to be eligible

25    for payment versus an intentional submission of a

1   phantom patient for a claim?

2      A.   So there are investigations that we do that

3   simply result in overpayment -- is that what you're

4   saying --

5      Q.   Sure.

6      A.   -- versus fraud?

7      Q.   Right.  So there's a -- there's a scale, right?

8      A.   Yes.

9      Q.   I mean, you recognize that there are some errors

10  that could be clerical or a mistake.

11     A.   That's correct.

12     Q.   Right?  And by definition, if it's a mistake,

13  there's no intent to deceive.  Would you agree?

14     A.   I really can't speak to people's intent.

15     Q.   That's my point, right?  You're not here to speak

16  to anybody's intent on any of the records or any of the

17  things that happened; are you?

18     A.   I can't override or supersede regulations.  And

19  claims are paid based on what's documented.

20     Q.   But the bottom line is, Ms. McMillan, you don't

21  know the intent behind any of the submissions and any of

22  the documents, the medical records in this case; do you?

23     A.   So Medicare does not allow for reckless disregard

24  of regulations.  And when there's reckless disregard,

25  that could be intent.

```
 1        Q.  It could be.
 2                THE COURT:  Excuse me.  There's less than
 3   five minutes left on your cross.  Please proceed.
 4                MR. HECTOR CANALES:  Okay.  Before lunch,
 5   you mean?
 6                THE COURT:  You have 45 minutes total.  Each
 7   side is going to have the equal amount of time.  Please
 8   proceed.
 9                MR. HECTOR CANALES:  What, Judge?
10                THE COURT:  Gentlemen, please proceed.  If
11   you need more time, I'll -- I'll -- ask for extension.
12   But please proceed.
13                MR. HECTOR CANALES:  Okay.
14                THE COURT:  Gentlemen.
15                MR. HECTOR0 CANALES:  I'm going to need more
16   time.
17                THE COURT:  Gentlemen, gentlemen, gentlemen,
18   before this trial started, each party presented time
19   estimates, and we were very specific that each side
20   would have the exact amount of time for each witness.
21   The Government presented its witness on direct for 45
22   minutes.  Each -- each direct and cross will be the same
23   amount of time, so it's going to be the same amount of
24   time for everybody and for each witness.  All right?
25   Let's proceed.
```

1          MR. HECTOR CANALES:  I'll make my record at

2     the appropriate time, Your Honor.

3          THE COURT:  That's fine.

4     Q.  (By Mr. Hector Canales):  Would you -- a medical

5     record -- would you agree that a medical record is a

6     snapshot of what the doctor or health care provider sees

7     that day?

8     A.  So each claim must stand on the documentation to

9     support that.

10     Q.  I'm going interrupt you, only because I've

11     been -- I've been limited here; otherwise, I'd let you

12     go.  All right?  My question is very simple.  Isn't a

13     medical record just a snapshot of what's going on with

14     that patient that day?

15     A.  It should give the patient history.

16     Q.  Right.  And within a patient's history within

17     hospice, fair to say that if you take -- that within any

18     person's patient's time period in these last six months

19     of their life, fair to say that there is going to be

20     good days and bad days?

21     A.  Yes.

22     Q.  And that one of the things within hospice you

23     want to look for is a decline, right?

24     A.  Yes.

25     Q.  And that within that decline -- but within that

1   decline, you can have some ups and downs?

2       A.  Yes.

3       Q.  But the trend is clear?  Fair?

4       A.  Fair.

5       Q.  Here's my crude chart here, right?  We have a

6   decline.  We're going downhill.  Do you see that?

7   Agree?

8       A.  Yes.

9       Q.  Right?  And here, I've got a day one.  Hey, I'm

10  above, I'm good.  Day two, I'm here.  Three, four, five.

11  Is that a fair representation of what can happen to any

12  human being in the last -- in their terminal days?

13      A.  So a decline in and of itself wouldn't

14  necessarily support a terminal prognosis with the life

15  expectancy of six months or less, it could definitely be

16  a change in the patient's condition, but, again, it

17  doesn't necessarily support that terminal diagnosis as

18  defined by Medicare.

19      Q.  My point here is, is that if I cherry picked this

20  period right here, the third period, it can be

21  misleading.

22      A.  Medicare expects sufficient documentation to

23  support that terminal diagnosis, and so just a

24  snapshot -- a snapshot, you know, might not indicate

25  truly what's going on with that patient.

1    Q.   Right.  You want to look at the holistic

2  approach.

3    A.   We want to look at a longitudinal history of the

4  patient.  Holistic approach has to do with hospice care.

5    Q.   Let me talk real quick about home health being

6  homebound.  And we've talked a lot about hospice being

7  terminally ill.  If -- and Alzheimer's -- a patient with

8  severe Alzheimer's who escapes -- that happens, right?

9  They -- they -- what do they call them, walkers?  They

10  --

11    A.   Elope.

12    Q.   Elope, right?  They -- that patient certainly

13  isn't homebound; are they?

14    A.   Well, not according to Medicare guidelines.

15    Q.   In the Medicare world of looking at things,

16  right, that patient is clearly very sick, right?

17    A.   It clearly -- you know, you don't have to be very

18  sick to be confused about, you know, where you are and

19  wanting to get away.

20    Q.   Right.  But -- but I guess what I'm trying to ask

21  you is:  You can have severe Alzheimer's and not be

22  eligible for home health care?

23    A.   Yes.

24    Q.   But you can have severe Alzheimer's and be

25  eligible for hospice?

1      A.   Again, the term severe can be defined several

2  different ways.  I mean, what is severe to you might not

3  be severe to me.

4      Q.   How about a PPS score of 30 percent?

5      A.   A score in and itself would not qualify you for

6  hospice.

7      Q.   Sure.  But it's an important factor; isn't it?

8      A.   It's one factor in determining how that patient

9  is.

10     Q.   That's right.  That's right.  But it's important?

11     A.   It's one factor that's utilized.

12     Q.   And the opposite works is true, right?  If you

13 don't -- if you don't have a -- a qualifying PPS score,

14 that doesn't negate you from being eligible for hospice

15 either; does it?

16     A.   A score, in and of itself, would not determine

17 your eligibility for hospice.

18     Q.   One way or the other?

19     A.   No.

20     Q.   All right.  Now we got ahead of the jury.

21          PPS score.  What's a PPS score?

22     A.   Palliative Performance Scale.  Basically, it's

23 just a quick snapshot of what's your functional level.

24 Functional level, when I say that, I mean, can you walk

25 and talk and go to the grocery store and make decisions

1    all on your own?  Or are you at the lower end of the

2    scale, bedridden, need total care?

3        Q.  Now, and -- and, again --

4            THE COURT:  Mr. Canales, last question,

5    please.

6            MR. HECTOR CANALES:  I'm thinking, since I

7    only got one left.

8            THE WITNESS:  Okay.

9        Q.  (By Mr. Hector Canales):  In the time period of

10   2009 to 2018 that Merida was operating as a hospice, you

11   don't have any idea about what the intent of my client

12   was, Rodney Mesquias, during that period of time; do

13   you?

14       A.  I can only speak to the fact that the --

15       Q.  Ma'am, it's a yes or no question.

16       A.  Okay.

17       Q.  Do you know what --

18       A.  I don't know the --

19       Q.  -- was going on in his head or not?

20       A.  I do not know the intent.

21       Q.  Thank you.

22           THE COURT:  Thank you.

23           Ladies and gentlemen, at this time -- please

24   remain seated.  Ladies and gentlemen of the jury, at

25   this time, we're going to break for lunch.  It's

1    approximately 12:30.  Our goal is to start at 2:00.

2    Thank you very much.

3                   COURT OFFICER:  All rise for the jury.

4                   (Jurors exit courtroom)

5                   THE COURT:  Thank you, everyone.  Please be

6    seated.  All right.  And, ma'am, you may step down.

7    You're excused.

8                   Counsel, before I break for lunch, again,

9    further admonishment, this was admonishment that was

10   made on the record months ago.  Each respective party

11   submitted their time estimates for each respective

12   witness.  I have those time estimates in front of me.

13   You should have those time estimates.  Obviously, in the

14   event a party calls a witness, and that witness

15   testifies for X, hypothetically, an hour, on behalf of

16   the Government, I would then give the defense basically

17   three hours to cross, which means each side, each

18   respective party is going to get one hour and not any

19   more.  Now, there will be time for redirect and

20   re-cross, et cetera, but, again, you need to take -- you

21   need to be aware and get rid of these looks of surprise,

22   because this was discussed a long time ago, that you

23   each -- each one of you are on very strict time limits

24   because of the expected length of trial and the number

25   of witnesses in this case.

1          So, again, I suggest you focus your

2     questions, not ask repetitive questions, not ask

3     speculative questions and get to your point.  With that

4     being said, again, I am keeping track of each respective

5     witness and the amount they testify.  This witness

6     testified for 43 minutes.  I'm giving the defense 45

7     minutes, just rounding up, each Defendant the

8     opportunity of 45 minutes, as well.

9          Now if the Government elects to redirect,

10    you'll have the same amount of time, and we'll proceed

11    on pace with that routine for every single witness.

12    This is not going to be unique to this particular

13    witness.  That is going to be the routine and protocol

14    for every witness throughout this case.  So make your

15    plans appropriately.  And you may want to revisit the

16    time estimates that you gave, and also keep track of the

17    amount of time that each witness is testifying.

18          MR. TONY CANALES:  Excuse me, Your Honor.

19    Can we borrow time from the other co-counsel?  You've

20    given us three hours.  Mr. -- he would like -- if I can

21    borrow time from Mr. Cyganiewicz, out of his time.  He

22    agreed to it.

23          THE COURT:  Well, back to the point.  In

24    this scenario, you're getting 45 minutes times three, is

25    basically two hours and 25 minutes.  I'm just rounding.

1    If you all want to share that time --

2              MR. TONY CANALES:  Yes.

3              THE COURT:  -- to be quite frank,

4    Mr. Canales asked very few questions having do with

5    Mr. Mesquias, but, gentlemen, you each represent your

6    own client.  If you -- if you want to break up your

7    time, that's a different issue.

8              MR. TONY CANALES:  Okay.  Very well.

9              THE COURT:  But what I'm saying is, you're

10   not going to get more time if -- yes.  The answer to

11   your question is yes.  If you want --

12             MR. TONY CANALES:  We can share some.

13             THE COURT:  If they want to give you -- if

14   Mr. Cyganiewicz or Mr. Guerra is willing to give

15   Mr. Mesquias more time, it's cutting into their time.

16             MR. TONY CANALES:  Yes.

17             THE COURT:  You understand that?

18             MR. TONY CANALES:  Yes, Your Honor.

19             THE COURT:  All right.  So we're clear on

20   the rules for every witness.  Understood?

21             MR. CYGANIEWICZ:  Yes, Judge.  And I

22   apologize for my face of surprise or expression of

23   surprise, because it was called an estimate.  I think if

24   we knew that it was going to be held to the minute, I

25   think our -- our -- our responses would have been

1  different.  But an estimate, to me, is a guess.  I mean,

2  I -- that's why I was surprised that you're holding us

3  to a --just the same amount of time that you're holding

4  the Government to.  What you told us to do is give you

5  an estimate, which, to me, is a guess of how much time

6  it would take, but how are we supposed to know for sure

7  how long a witness is going to --

8             THE COURT:  First of all -- first of all,

9  sir --

10            MR. CYGANIEWICZ:  I apologize for the

11  surprise.

12            THE COURT:  We're -- we're -- we're --we're

13  discussing apples and oranges.  There's no way for you

14  to guesstimate what the Government's witness is going to

15  take.  The Government's witness was on the stand exactly

16  43 minutes.  Easy-peasy.  You know you now have -- I

17  rounded up 45 minutes.  You're going to get 45 minutes

18  times three.  Now, you --

19            MR. CYGANIEWICZ:  Yes, sir.

20            THE COURT:  -- obviously, you, in terms of

21  your witness, yes, you're required to tell me no more

22  than an hour.  Well, guess what, if you tell me no more

23  than an hour, you're going to get no more than an hour.

24  But if you only take 45 minutes, the Government's only

25  going to get 45 minutes, as well.  They're not going to

1   get to bump up to an hour.  So, yes, you're required to

2   estimate a reasonable period for your respective

3   witness.

4           MR. CYGANIEWICZ:  Yes, sir.

5           THE COURT:  Because you should know what

6   your witness is going to say.  Again, these are -- these

7   are basics we've already discussed.

8           Yes, Mr. Foster?

9           MR. FOSTER:  Thank you, Your Honor.  I just

10  want to say in terms of exhibits that have not been

11  exchanged, I think the rules of evidence, authenticity,

12  foundation need to be abided by.  So I just want to hope

13  that we won't see similar things where counsel is

14  reading from documents from the Internet, or wherever,

15  in front of the jury.

16          THE COURT:  Again, to be quite frank, I

17  think the more proper objection would have been

18  "Speculation," but, again, gentlemen, that inquiry had

19  nothing to do with impeachment, to be quite frank.  I am

20  going to be strict again on objections.  Get to your

21  point, get to -- to what you want to ask, and let's

22  stick to the exhibits that are -- have been admitted.  I

23  will be much more stricter on -- on documents that are

24  not part of the exhibits.  If you're going to impeach

25  somebody, that document really better be directly on

1   point.  Obviously, the witness never said she had any

2   knowledge about any regulations prior to her scope of

3   expertise, but, again, let's not -- I don't want to look

4   backwards, let's look forward.  Gentlemen, clean it up,

5   and let's be as efficient as possible.

6              All right.  We'll be in recess.

7              COURT OFFICER:  All rise.

8                   (Off the record)

9                   (Lunch recess)

10                  (Back on the record)

11             THE COURT:  Thank you, everyone.  Please be

12   seated.

13             Gentlemen, Ms. Sandra's informed me that

14   counsel wishes to take up some issues before the jury

15   comes in?

16             MR. HECTOR CANALES:  Yes, Your Honor.

17             THE COURT:  One second.  We're missing

18   someone?

19             MR. GUERRA:  Yes, Your Honor.  I believe

20   Dr. Pena said he's on his way.  He didn't go with us,

21   and so --

22             THE COURT:  Well, is -- is his presence

23   necessary for the issues you want to take up before the

24   Court?

25             MR. GUERRA:  Absolutely not, Your Honor.

```
 1              THE COURT:  All right.  Let's proceed.
 2              MR. HECTOR CANALES:  Thank you, Your Honor.
 3    First I wanted to put on the record outside the presence
 4    of the jury, that on behalf of Defendant Rodney
 5    Mesquias, that we object to any limitation of time on
 6    our -- of our cross-examination based on our
 7    Constitutional Sixth Amendment right.  I understand the
 8    Court has issued its ruling, and is overruling that, but
 9    I just wanted to make that clear for the -- for the
10    record.
11              And second was, I just want to seek some
12    clarification from the Court on what are the ground
13    rules and what are -- what is the basis for -- for our
14    length of cross-examination.  It's my understanding that
15    the parties will be limited in time in their
16    cross-examination based on the length -- the actual time
17    of the direct examination.  So if the Government goes 45
18    minutes, then my client will get 45 minutes with the
19    ability to trade and share with -- with the other --
20    with the other defendants.  I just wanted to make sure
21    that I understood it correctly.  That's what I thought
22    just happened, but I want to make sure.  So for -- for
23    going forward purposes, planning, that that's the amount
24    of time we're going to have.
25              THE COURT:  And I may reiterate this in
```

1    front of the jury, as well.  But, first of all, let's go

2    back to basics.  And to be quite frank, I thought we

3    discussed this over a month ago before the pretrial

4    conference, but let's reiterate everything that my plan

5    of action is.  First of all, because of the length of

6    trial and the number of witnesses, the Court is within

7    its authority and jurisdiction to impose time limits on

8    witnesses.  That's standard Fifth Circuit law.  Your

9    objection to that is overruled.

10                   However, with respect to the protocol, I do

11   want to make clear, it's not just 45 minutes.

12   Hypothetically, each Defendant will be entitled to the

13   exact amount of time as the Government's direct.  So, in

14   this scenario, if it had been one hour, I would just

15   multiply by three, and then the defense would

16   technically have three hours to cross-examine.  Now, in

17   my attempt to protect the other two Defendants, I wanted

18   to give each Defendant their fair share of time.  In

19   this instance, it was 45 minutes, so each Defendant

20   would have 45 minutes.  Not just 45 minutes in bulk for

21   all three.  If that was your understanding, no, everyone

22   was going to have 45 minutes.

23                   So I think we're clear on that.  Every

24   Defendant has the right to the same amount of time.

25   Every party's going to be entitled to the same amount of

1  time.

2          Now, if the party's -- if defense elects --

3  before lunch you brought up the issue of potentially

4  merging and combining in this scenario 45 times three is

5  two hours and 15 minutes, hypothetically, if you wanted

6  to use all two hours and 15 minutes, technically, I -- I

7  don't have a problem with that, but, on the record,

8  counsel for co-defense is going to have to waive their

9  time and acknowledge that that may potentially

10  conceivably conflict with instructions that I'm going to

11  give at a later date that each Defendant is entitled to

12  be treated separately and each is entitled to their own

13  defense.  But, gentlemen, if you want to merge your

14  time, that's fine with me.  So, yes.  To answer your

15  question and the issue that was brought up before lunch,

16  if you want -- however -- if you all want to tag team

17  time and combine your time and split it up into whatever

18  pie you want, I have no problem with that.

19          MR. HECTOR CANALES:  Understood.  Thank you,

20  Your Honor, for that.  For the -- if the next --

21  hypothetically, if the next witness that the Government

22  puts on, whoever their next witness is, if it's 30

23  minutes, then just, by example, then we each have 30

24  minutes combined; is that -- is that how it works?

25          THE COURT:  That is correct.  Now, the flip

1  being, if you present a witness that takes only 30

2  minutes, they only get 30 minutes.

3           MR. HECTOR CANALES:  That -- that was my

4  next question.  I just wanted to make sure.

5           THE COURT:  Again, everyone is going to get

6  the exact -- back to what we discussed long ago,

7  everyone is going to get the exact amount of time;

8  however, the constraints are going to be strictly

9  imposed because of the length of time and the number of

10  witnesses.  I admonished all of you, to be quite frank,

11  and I'm not trying to beat up on you, but there were

12  numerous repetitive questions.  And if you -- if counsel

13  elects, for whatever strategic purpose, to either be

14  repetitive or ask hypotheticals or ask questions that

15  eat into your time, you're eating into your time, not

16  the Court's time or the jury's time, so be careful with

17  that.  I'm just telling everyone that.  I mean, again

18  the Court has other duties beyond this case, and I'm

19  trying to run this as efficient as possible, and I've

20  already warned everyone, we're going to stick by these

21  timelines.  So you need to be cognizant of that.  So I

22  was disappointed in the parties that made looks of

23  surprise, or perhaps sidebars.  Gentlemen, this should

24  not be surprise.  Everybody heard this long ago.  So

25  anything else you need me to clarify in terms of future

 1   protocol?

 2                   MR. HECTOR CANALES:  No, I think you did it.

 3   Thank you, Judge.

 4                   MR. TONY CANALES:  It's the request of both

 5   sides, right?

 6                   MR. HECTOR CANALES:  Yeah, but --

 7                   MR. FOSTER:  Your Honor, just so we're

 8   clear, in terms of recross, many judges I've been before

 9   do not allow recross and let the redirect exceed the

10   scope of the cross.  And so I want to know if, after two

11   and a half hours of the defense, if I spend five to ten

12   minutes with this witness, do they get another 15 to 30,

13   or is it the standard rule that unless you go beyond the

14   cross, we won't be going back and forth ad nauseam?

15                   THE COURT:  No, no, no.  Again, it's

16   going -- we're going to -- technically, the Government

17   gave me a time estimate of an hour and a half on this

18   witness, all right?  You -- you gave time back to the

19   Court.

20                   MR. FOSTER:  Yes.

21                   THE COURT:  You did it in 43 minutes.  Let's

22   assume on redirect you take ten minutes -- and let's

23   discuss all these issues, let's -- yes, I am going to

24   give them conceivably -- well, not conceivably, I am

25   going to give each party again ten minutes per side to

1  recross if they so elect.  I mean, but, again, it --
2  with the same admonishments, you need to focus your
3  questions to the scope of the redirect.  So any -- any
4  issues outside the scope of the redirect, I would be
5  hearing an objection to or move to -- et cetera, et
6  cetera.  So --
7            MR. FOSTER:  Thank you, Your Honor.  That
8  clarifies things.
9            THE COURT:  All right.  But, yes, we are
10  going to -- my -- my -- my plan to -- to not only keep
11  time limits -- that's what this is for -- but to give
12  everyone equal time.  On the same token, it's the same
13  thing.  On -- on re- -- recross, if hypothetically
14  Mr. Canales wants to use all 30 minutes of a ten minute
15  redirect, so be it.  But, Counsel, again, you know --
16            MR. CANALES:  Could -- could I --
17            THE COURT:  -- be mindful of that.
18            MR. HECTOR CANALES:  Could I ask of the
19  Court, you're the official score keeper, timekeeper,
20  to -- to -- to let us know, or at least let me know, I
21  don't know about the other side, what the time is?  I
22  don't --
23            THE COURT:  What I will do --
24            MR. HECTOR CANALES:  -- so when we get up
25  there --

1           THE COURT:  What I will do in the future

2   is -- is -- I know I gave you a five minute warning.  I

3   thought that's what people asked for.  But let's do

4   this.  We -- we will -- I will -- I will time how much

5   time each side gets and then announce it beforehand and

6   still continue with the five-minute warning.

7           MR. HECTOR CANALES:  Thank you.

8           THE COURT:  Any- -- anything else on

9   clarification?  Any other questions on -- on -- on

10  timing?  All right.

11          Let's -- let's bring the jury in.

12          THE CLERK:  Yes, sir.

13          (Jurors enter courtroom)

14          THE COURT:  Thank you, everyone.  Please be

15  seated.

16          Ladies and gentlemen of the jury, there may

17  be instances during this course of this trial, many

18  instances, that require the Court to take issues up

19  outside your presence.  As I may have mentioned during

20  the course of my instructions, or perhaps the

21  instructions -- general instructions did not reference

22  this, again, do not concern yourselves with issues that

23  are taken up inside the courtroom outside your presence.

24  Obviously, there's a purpose for that.  However, we are

25  now back on the record, we -- and we'll proceed with the

1    trial.

2              Ladies and gentlemen, I do, although

3    technically an explanation is not necessary, out of an

4    abundance of caution, I will inform you that as a result

5    of the expected length of the trial and number of the

6    witnesses, the Court has within its authority to impose

7    time limits on every witness and on each respective

8    side.  Counsel -- all counsel for every party was

9    advised of this rule.  As a matter of fact, each party

10   submitted their respective witness list with time

11   limitations for each respective witness long ago.

12   Again, this was -- this -- this case is not new, so

13   there's been numerous issues that have been discussed

14   well in advance of trial.  So counsel is aware of the

15   time limitations, I want to clarify that every party is

16   going to get the exact amount of time.  Hypothetically,

17   if the Government presents a witness in one hour, then

18   the defense, because we have three defendants,

19   technically in that hypothetical, would get three hours

20   for cross-examination.

21             Now, because we have three defendants, I do

22   want to make sure that each defendant gets his turn at

23   bat.  However, the defense had advised me that they may

24   choose to merge, in this hypothetical, their three hours

25   so that one attorney gets more time than the other.

```
 1   That's fine with me, but, again, they're going to be
 2   limited to my hypothetical to three hours, and I will be
 3   keeping track of the time and I will now announce the
 4   time for everyone so that -- again, everybody's going to
 5   get the same amount of time.
 6            And, again, ladies and gentlemen, I've
 7   advised counsel to -- that if they desire to do so,
 8   that's fine, but I will be giving you instructions at
 9   the end of this trial that each defendant is entitled to
10   be treated separately, and regardless of the fact that
11   they may merge time, that will not, in any way,
12   implicitly, or otherwise, change that instruction.  All
13   right?  With that being said, Mr. Canales, you used up
14   your 45 minutes.  Technically, 45 times three is two
15   hours and 15 minutes, unless my math is off.  However,
16   if you now want to continue, there's an hour and a half
17   remaining on the defense side.  So, sir, if you'd like
18   to proceed, you may, but we need -- where's the witness?
19   We do need the witness.  We'll get the witness in here
20   and --
21            MR. HECTOR CANALES:  Per the Court 's order,
22   I pass the witness.
23            THE COURT:  And Mr. Cyganiewicz?
24            MR. CYGANIEWICZ:  Yes, Your Honor.  May I
25   proceed?
```

```
 1                  THE COURT:  You may.  And, as requested, I
 2      will -- you have 45 minutes.  I'll give you a
 3      five-minute warning.
 4                  MR. CYGANIEWICZ:  I don't expect it to take
 5      close to that --
 6                  THE COURT:  That's quite all right.
 7                  MR. CYGANIEWICZ:  -- but thank you.
 8                  THE COURT:  But, again, you'll have all the
 9      time you need in that one hour and a half.
10                  Please proceed.
11                          CROSS-EXAMINATION
12      BY MR. CYGANIEWICZ:
13         Q.  Good afternoon.
14         A.  Good afternoon.
15         Q.  My name is Ed Cyganiewicz.  I represent
16      Mr. McInnis.  We've never had a chance to visit; have
17      we?
18         A.  No.
19         Q.  Did you have a chance to have lunch?
20         A.  I did.
21         Q.  Did you get to meet with the prosecutors during
22      your break?
23         A.  No.
24         Q.  No?  You didn't talk to them during the lunch?
25                  How many times have you met with them before
```

1    your testimony?

2      A.  I've spoken to them on the phone probably six to

3    eight times.  I've met with them twice.

4      Q.  Okay.  So on the phone six or eight times, plus

5    two in-person conferences?

6      A.  Yes.

7      Q.  And did you meet with them before you testified

8    either last night or this morning?

9      A.  I met with them, yes, on Sunday, whatever --

10   today's Tuesday?  What is today?  Tuesday.

11     Q.  Today is Tuesday.

12     A.  I met with him on Sunday.

13     Q.  Today's Tuesday.

14            I may have asked you, but we've never

15   talked, we've never met, right?

16     A.  No.

17     Q.  Did you ever talk to Mr. McInnis?

18     A.  No.

19     Q.  Did you ever reach out to any of the

20   Defendants --

21     A.  No.

22     Q.  -- talked to them?

23            Just let me just go back.  I know

24   Mr. Canales talked to you a lot about the rules and

25   regulations and about the hospice, timetables, and so

1    forth, so I'm not going to be repetitious.  I'm going to

2    try to focus on -- on Mr. McInnis.  When was your first

3    contact with this case, or when were you first involved

4    about this case?

5        A.  I believe it was originally scheduled for January

6    time frame, possibly, and that's when I was notified

7    that I would testify but I didn't speak with the

8    attorney until maybe late summer.

9        Q.  Okay.  Summer of?

10       A.  This year.

11       Q.  Okay.  So this indictment was filed in October

12   18th.  Before they filed the charges, did you have any

13   contact or do anything about this case?

14       A.  Just what was discussed internally in our

15   company.

16       Q.  Okay.  So before the Government filed an

17   indictment, you had no contact with them, you didn't

18   tell them anything about your investigation, correct?

19       A.  No.  That's correct.

20       Q.  And have you been -- become familiar with that

21   indictment?

22       A.  Yes, I have a copy of it.

23       Q.  Do you recall how many actually specific patients

24   are named in the indictment?

25       A.  I don't.

1    Q.   If I tell you there were six, which I think we've

2    shown, did you review any patient records of the six

3    patients that are named in the indictment?

4    A.   I did not.

5    Q.   But you're an investigator, correct?

6    A.   I'm a nurse -- a medical nurse -- I'm a Medical

7    Review Law Enforcement Liaison, I'm a nurse.

8    Q.   Okay.  So you're a Law Enforcement Liaison?

9    A.   Liaison, uh-huh.

10   Q.   Do you have any law enforcement experience?

11   A.   Not before this job.

12   Q.   Did you have any investigative experience before

13   this job?

14   A.   No.

15   Q.   Okay.  So now you're investigating possible fraud

16   claims as part of your job?

17   A.   I review medical records as part of my job.

18   Q.   And when did you start doing that?

19   A.   Well, I've been reviewing medical records since

20   2007, but as part of Qlarant, or Health Integrity at the

21   time, I've been doing the -- that as part of fraud

22   investigation since 2014.

23   Q.   I -- I know they -- Mr. Canales visited with you

24   about your pay and your -- I'm just going go over that

25   relationship.  You work for who?

1      A.   I work for Qlarant.   And Qlarant has the Unified

2  Program Integrity Contract, and I'm paid by Qlarant.

3      Q.   Okay.   And you have a contract with Medicare?   Or

4  who do you have a contract with?

5      A.   They have a contract with CMS.

6      Q.   Okay.   And is that funded by the federal

7  government?

8      A.   Yes, it is.

9      Q.   But you're not considered a federal employee?

10      A.   No.

11      Q.   But your money's coming from the federal

12  government?

13      A.   Through the contract, yes.

14      Q.   The same people that pay the prosecutors?

15      A.   I'm --

16      Q.   The same people that pay the prosecutors?

17      A.   Yes.

18      Q.   I know you said you were here on your salary.

19  Who pays for your expenses and things like that?

20      A.   When I'm testifying?

21      Q.   Yes.

22      A.   It's the Department of Justice.

23      Q.   So the prosecution?

24      A.   Yes.

25      Q.   Okay.   And you submit bills, and they pay you,

1   right?

2       A.   I submit my travel expenses.

3       Q.   So your -- your company doesn't pay you, it's the

4   prosecution that's paying you?

5       A.   I submit my expenses to the Department of

6   Justice.

7       Q.   To who?   The Department of Justice.

8       A.   Uh-huh.

9       Q.   And are -- in addition to that, are you -- are

10  you paid as being an expert witness?

11      A.   No.

12      Q.   And you've said you've testified how many times

13  since 2017?

14      A.   This is my sixth.   My sixth.

15      Q.   Since 2017, just the last year and a half or two

16  years?

17      A.   Yes.

18      Q.   And has it always been -- have you always been a

19  witness for the prosecution?

20      A.   A witness representing Medicare.

21      Q.   But who's calling you?   Who's designated you as

22  an expert, the defense or the prosecution?

23      A.   The prosecution.

24      Q.   In those six trials, have you ever testified for

25  a defendant or as a defense witness?

1      A.   No.

2      Q.   But you're here to try to be open minded and

3  fair; isn't that right?

4      A.   That's my job.

5      Q.   I wanted to just visit with you about -- was it

6  the EDI, Electronic Data Interchange or Intercharge?

7      A.   EDI, the form.   Uh-huh.

8      Q.   And that -- that is what submits the claims

9  electronically?

10     A.   That is a form that the provider signed so that

11 they're clear on how and what needs to take place when

12 they submit electronic information.

13     Q.   And who -- who -- who normally would sign that;

14 the owner, did you say?

15     A.   So, initially, the authorized official.   And

16 after the initial application -- not authorized

17 official.   The appointed official.   And then the

18 authorized official can make changes or updates.

19     Q.   Do you have any personal knowledge that

20 Mr. McInnis submitted any claims himself personally?

21     A.   No.

22     Q.   Did he?

23     A.   I don't know.

24     Q.   You're the investigator, though, right?

25     A.   I'm the nurse -- medical nurse reviewing.

1    Q.   Liaison to the law enforcement?

2    A.   Yes.

3    Q.   And you referred this case for prosecution?

4    A.   I was part of the Qlarant personnel that did,

5    yes.

6    Q.   So you can't tell the jury that Mr. McInnis

7    submitted any claims himself?

8    A.   No, I can't.

9    Q.   Do you know what his role in the company was?

10   A.   He was the CE- -- not CEO -- CFO, or he was --

11   Q.   Do you know what his daily routine would involve?

12   A.   I just know that he signed as -- I -- a managing

13   employee.

14   Q.   And that's normal, isn't it, in the industry?

15   A.   Yes.

16   Q.   But you don't know what he did on a daily basis?

17   A.   No, I don't.

18   Q.   Except, you are telling us, he did not submit any

19   claims himself?

20   A.   I don't know whether he did or not.

21   Q.   Regarding the hospice procedure, who signs the

22   election form?

23   A.   The election statement is signed by the

24   beneficiary or their representative.

25   Q.   Okay.  Would -- would a beneficiary normally be

1    the patient?

2        A.   Yes.

3        Q.   Okay.  So the patient's basically signing

4    something saying I'm consenting or agreeing to hospice?

5        A.   That election form, yes.

6        Q.   And who does the certification of terminally ill?

7        A.   It is the medical director, along with the

8    patient's attending physician.

9        Q.   Does an administrator or office manager have

10   any -- sign off on certifying patients?

11       A.   No.

12       Q.   Do they see patients normally?

13       A.   It would depend on the hospice and who they were.

14       Q.   In this case, you don't know -- you don't have

15   any knowledge that Mr. McInnis actually saw or had

16   contact with any patients?

17       A.   I have no knowledge of that.

18       Q.   How about the six patients named in the

19   indictment, did he have any involvement with them?

20       A.   I have no knowledge of that.

21       Q.   You never talked to them or even interviewed

22   them, correct?

23       A.   No.

24       Q.   Never even reviewed their medical records?

25       A.   That's correct.

1    Q.   Who develops the plan of care?

2    A.   The members of the Interdisciplinary Team.

3    Q.   And I know we talked about, and Mr. Canales

4    talked a long time about there's no hard limit, or it's

5    a guess or an estimate.  What -- what -- what's the

6    difference between a guess and an estimate?

7    A.   So, there's -- you know, I can speak to you have

8    to do the best you can with the objective clinical

9    evidence or medical record to support the statements of

10   that terminal illness.

11   Q.   But I thought you may have said, and I could be

12   wrong, that you -- it's not an estimate -- it's not a

13   guess, it's an estimate.  Is that right?  Is that what

14   you said?

15   A.   It's the physician's judgment based on the

16   evidence.

17   Q.   Do you know what the difference is between

18   guessing at something and estimating at something?

19   A.   I wouldn't want to debate that with you.

20   Q.   And that's the doctor's opinion, basically?

21   A.   Um, based on the medical record.

22   Q.   From your experience, some people in hospice live

23   a short period of time, and some prolong for a longer

24   period; is that right?

25   A.   There -- it -- life and death varies.

1    Q.   And there's no hard rule regarding that, is

2    there?

3    A.   Whether life varies?

4    Q.   Yes.

5    A.   No.

6    Q.   So only an M.D. can do the certification,

7    correct?

8    A.   That's correct.  Well, M.D. or D.O.

9    Q.   And the D.O. is?

10   A.   Doctor of Osteopathy.

11   Q.   I think Mr. Canales already covered that it's

12   okay to be a director and the primary care physician,

13   correct?

14   A.   Yes.

15   Q.   I think you mentioned something about the health

16   integrity was alerted.  Do you know how that alert came

17   in?

18   A.   The OIG hotline.  OIG stand for --

19   Q.   So --

20   A.   -- Office of Inspector General.

21   Q.   I'm sorry.

22   A.   That's okay.

23   Q.   I have a habit of doing that.  My wife gets

24   really mad when I do that.

25            Do you have -- was that an anonymous call?

1    A.  No.  There was a name included with that.

2    Q.  And you said as part of your investigation, you

3  ran data on a provider, correct?

4    A.  Yes.

5    Q.  But you didn't see the patient's files in this --

6  in that -- that are included in this indictment?

7    A.  Me, personally?

8    Q.  Yes.

9    A.  So, once I would --

10   Q.  I mean, did you see them or not is my question?

11   A.  I looked at a couple.  I couldn't tell you their

12  names, though.

13   Q.  Okay.  After your referral to some sort of law

14  enforcement, what was your role in this case?

15   A.  Only answering questions that the prosecution was

16  asking me.

17          MR. CYGANIEWICZ:  Pass the witness,

18  Your Honor.

19          THE COURT:  Thank you, Mr. Cyganiewicz.

20          Mr. Guerra?

21          MR. GUERRA:  Thank you, Your Honor.

22                    CROSS-EXAMINATION

23  BY MR. GUERRA:

24   Q.  Ms. McMillan, good afternoon.

25   A.  Good afternoon.

1    Q.   I am the third one up to bat, so I'll try to make

2    this as quick as possible.

3    A.   Thank you.

4    Q.   But I can't make any promises.

5    A.   Okay.

6    Q.   You work for Qlarant; is that correct?

7    A.   Yes, I do.

8    Q.   And it's spelled, Q-L-A-R-A-N-T; is that right?

9    A.   Q-L-A-R-A-N-T.

10   Q.   Qlarant is based out of Maryland; is that right?

11   A.   Baltimore, Maryland, yeah.

12   Q.   Right.  And you're based out of Dallas, correct?

13   A.   Yes.

14   Q.   Okay.  And I believe when you were talking with

15   Mr. Foster earlier, you began to say that Qlarant has

16   two UPIC contracts in the United States, correct?

17   A.   Yes.

18   Q.   One of those contracts is for the Southwestern

19   jurisdiction, which Texas is one, correct?

20   A.   Yes.

21   Q.   The other one is for the Western jurisdiction,

22   correct?

23   A.   Correct.

24   Q.   Are you aware that Qlarant is paid $87 million

25   for the Southwestern contract?

1     A.   I had no idea.

2     Q.   Okay.   And I would imagine the answer's the same,

3   but I'm going to ask it anyway.   Are you aware that

4   Qlarant has a contract for the Western jurisdiction in

5   the amount of $88 million?

6     A.   I had no idea.

7     Q.   Okay.   Are you aware that Qlarant procured that

8   contract through an open bidding process?

9     A.   Yes.

10     Q.   Okay.   And you are aware that other --

11     A.   Contractors.

12     Q.   -- entities, institutions, similar to Qlarant,

13   put in a bid to the Government to receive the UPIC

14   contract?

15     A.   Yes.

16     Q.   Okay.   And are you also aware that Qlarant got

17   the bid because they were the lowest bidder for those

18   services?

19     A.   I didn't know that.

20     Q.   Okay.   Are you aware that Qlarant got the bid

21   because it was $20 million cheaper on the contract than

22   the nearest bidder?

23     A.   I didn't know that.

24     Q.   Qlarant has a duty to find fraud on behalf of the

25   Government, correct?

1    A.   Yes.

2    Q.   And, in fact, if you don't find fraud, Qlarant

3    could lose the Government contract, correct?

4    A.   That would be correct.

5    Q.   I mean, this is what you're hired to do at the

6    UPIC; is that right?

7    A.   Yes.

8    Q.   But there are other duties, as well, for UPIC,

9    other than finding fraud; is that right?

10   A.   Like?

11   Q.   Well -- and I believe you testified earlier that

12   Qlarant works for CMS; is that right?

13   A.   Yes.

14   Q.   Okay.  Are you aware that CMS puts out an annual

15   report every year?

16   A.   Yes.

17   Q.   Have you ever read an annual report from CMS?

18   A.   I don't recall off the top of my head, but I may

19   have.

20   Q.   Okay.  Do you recall reading a report for CMS for

21   2017?

22   A.   Not off the top of my head.

23   Q.   Okay.  And --

24   A.   I read a lot of things.  Sorry.

25   Q.   Well, within that contract, within that report,

1    rather, it lists about six duties for Qlarant.  And I

2    just want to read them to you.

3        A.   Okay.

4        Q.   And tell me if you agree that these are the jobs

5    that Qlarant has under the UPIC?

6        A.   Okay.

7        Q.   Does that sound fair?

8        A.   Yeah.

9        Q.   Qlarant is supposed to investigate leads

10   generated by the Unified Case Management system?

11       A.   Yes.

12       Q.   That's part of your job?

13       A.   Yes.

14       Q.   Qlarant is supposed to perform proactive data

15   analysis to identify cases of suspected fraud, waste and

16   abuse?

17       A.   Yes.

18       Q.   Qlarant is also supposed to make recommendations

19   to CMS for appropriate administrative actions; is that

20   right?

21       A.   Yes.

22       Q.   And by "administrative actions", we mean that if

23   Qlarant finds something wrong with a Medicaid

24   submission, the administrative action is to kick out

25   that provider from the system; is that right?

1    A.   That could be one option, yes.

2    Q.   What other administrative actions are there?

3    A.   So, denial of claims, suspensions, revocations,

4    which would be kicking them out.

5    Q.   Right.  So if Qlarant were to discover,

6    basically, fraudulent submissions, one of the actions

7    they could take would be to administratively take action

8    against the offending provider submitting those claims,

9    correct?

10   A.   Yes.

11   Q.   Right.  So, in other words, if Merida was

12   submitting fraudulent claims, they could have been

13   gotten kicked out of Medicaid -- Medicare; is that

14   right?

15   A.   They could have.

16   Q.   Payment could have been denied, correct?

17   A.   They could have.

18   Q.   Under the UPIC contract, Qlarant is also required

19   to conduct medical review for Medicare and Medicaid

20   program integrity purposes, correct?

21   A.   Yes.

22   Q.   We talked about your investigation of fraud.

23   Qlarant is also required, as part of your contract, to

24   support ongoing law enforcement investigations, correct?

25   A.   Yes.

```
 1      Q.   Right.  So, again, if you don't --

 2      A.   All --

 3      Q.   -- if you don't do that --

 4      A.   Uh-huh.

 5      Q.   -- Qlarant could lose the contract; is that

 6   right?

 7      A.   That's correct.

 8      Q.   Qlarant is also required to identify those

 9   payments to be recovered within Medicare and Medicaid;

10   is that correct?

11      A.   Yes.

12      Q.   And Qlarant is supposed to assist the Government

13   in retrieving those payments; is that right?

14      A.   We -- we don't actually do the personal

15   retrieving, it's turned over to the Medicare

16   administrative contractor to take that money back.

17      Q.   But you assist them --

18      A.   Yes.

19      Q.   -- in any way; is that right?

20      A.   Uh-huh.

21      Q.   Yes?

22      A.   We give them the amount that's due, and the MAC

23   pulls that back.

24      Q.   And then that's it, that's the extent of

25   Qlarant's involvement?
```

1    A.   So we, under our contract, we identify the

2    overpayment, and then it is submitted to the MAC.

3    Q.   How do you get assigned a case to serve as a

4    witness?

5    A.   That's a great question.   Normally, I get a phone

6    call.

7    Q.   Okay.   A phone call from your boss?

8    A.   It could be from my boss, or it could be either

9    the OIG or the Department of Justice.

10   Q.   Okay.   So -- so the DOJ, the Department of

11   Justice, can just call you directly and say, "Ms.

12   McMillan, we need you as a witness"?

13   A.   Yes.

14   Q.   Did that happen in this case?

15   A.   It -- I think I originally just got subpoenaed

16   right off the bat.

17   Q.   Okay.   And you testified with Mr. Canales and

18   Mr. Cyganiewicz, that you've testified six times as an

19   expert since 2017; is that right?

20   A.   Only twice.   Well, I was certified as an expert

21   twice.   One of them, they pled guilty right before I got

22   on the stand, so I didn't get to testify.

23   Q.   So you've only testified as an expert at trial

24   one other time other than this?

25   A.   Yes.

1    Q.   The other six times you testified, did you

2    testify as a lay witness?

3    A.   A fact witness.

4    Q.   A fact witness.  In each of those times, you

5    testified on behalf the Department of Justice, correct?

6    A.   On behalf of Medicare.

7    Q.   Okay.  And I'm a little confused.  You work for

8    Qlarant.  And -- and -- and I apologize.  You've used

9    the terms "we", "Medicare", interchangeably earlier.  So

10   for clarification purposes, are -- are -- do you work

11   for Qlarant?  Do you work for Medicare?  Who do you work

12   for?

13   A.   I work for Qlarant, which is employed -- which it

14   has a contract under Medicare, which is a part of CMS.

15   Q.   Okay.  But, in your mind, you see yourself as

16   working for Medicare, correct?

17   A.   Yes.

18   Q.   Okay.  So Qlarant's really not independent from

19   Medicare; is that right?

20   A.   Independent -- well, we are not a Government

21   agency, we are a private contractor.

22   Q.   But for all intents and purposes, you are a

23   Government agency, correct?

24   A.   I couldn't define that, quite honestly.  I don't

25   know what that exactly would mean.

1    Q.  In all those cases where you've testified,

2  whether as a fact witness, or whether as an expert, you

3  have found fraud; is that right?

4    A.  For the fact witness testimony, I'm just

5  testifying, basically, explaining the rules.

6    Q.  Okay.  And the other time you testified as an

7  expert, you found fraud; is that right?

8    A.  Did I personally find fraud?

9    Q.  Well, did you give an opinion that fraud was

10  present?

11    A.  So, I was certified as an expert for a certain --

12  and I don't know the -- like there was an argument that

13  went on with the judge, and they let me speak about one

14  specific thing as an expert.

15    Q.  Okay.  So you did not find fraud in that other

16  one, that other case; is that correct?

17    A.  Well, he was guilty of fraud.

18    Q.  Did you opine that fraud was present in the

19  materials you looked at?

20    A.  I did not, no.

21    Q.  Okay.  I want to go to what you covered with

22  Mr. Foster previously marked as Exhibit A2.

23            MR. GUERRA:  Roy, could you put that up,

24  please?  I'm sorry.  Sandra?

25    Q.  (By Mr. Guerra):  All right.  You testified

1    earlier with regards to Exhibit A2, specifically Section

2    14.  And I believe the sections you testified to

3    previously with Mr. Foster were sections one and two --

4    or paragraphs one and two.  Do you recall that?  And

5    we're going to blow it up so you can see it.

6        A.  Okay.

7        Q.  You recall testifying on those, correct?

8        A.  Yes.  Yes.

9        Q.  What you didn't testify to is paragraph number

10   three.

11              MR. GUERRA:  Can we put that up?

12       Q.  (By Mr. Guerra):  This is the Civil False Claims

13   Act.  Do you see that?

14       A.  Yes.

15       Q.  Are you familiar with the Civil False Claims Act?

16       A.  In general, yes.

17       Q.  Yes.  So, in other words, if someone were to

18   submit a claim that's considered fraudulent, it's not

19   necessarily a criminal violation, correct?

20       A.  Not necessarily.

21       Q.  It could be a civil violation, correct?

22       A.  It could be.

23       Q.  And it could be an administrative violation, like

24   you talked to earlier.

25       A.  It could be.

1    Q.   There is no bright line rule determining whether

2    or not something is a criminal violation, a civil

3    violation, or an administrative violation.

4         MR. FOSTER:   Objection.   Speculation.   Legal

5    conclusion.

6         MR. GUERRA:   Your Honor, she's an expert

7    who's testifying on Medicare.   This is in a Medicare

8    document.

9         THE COURT:   I'll allow the question.

10   Just -- just rephrase.

11        MR. GUERRA:   Sure.

12        THE COURT:   Rephrase it.

13        MR. GUERRA:   Yes, Your Honor.

14        THE COURT:   The way you asked it was more of

15   a statement than a question.

16   Q.   (By Mr. Guerra):   Is there a bright line rule

17   differentiating between a criminal violation, civil

18   violation and administrative violation?

19   A.   So, in my line of work, I don't determine which

20   kind of -- whether it's civil or criminal.   We -- once

21   we have credible allegation, it gets handed off to law

22   enforcement, and they make that determination.

23   Q.   Right.   In other words, law enforcement can

24   decide:   You know what, this is a civil matter, correct?

25   A.   Yes.

1     Q.   Or they could say:  You know what?  We'll just

2  handle this administratively.  Is that right?

3     A.   CMS decides whether it's handled administratively

4  or --

5     Q.   Okay.

6     A.   -- a law enforcement referral.

7     Q.   And just so we go through this --

8          MR. GUERRA:   Could you pull up the entirety

9  of number four, Roy?

10    Q.   (By Mr. Guerra):  So this also talked about under

11 the Social Security Act, a potentially fraudulent claim

12 submitted could be civil, as well; is that right?

13    A.   That's correct.

14    Q.   Right.  And in paragraphs one through four, which

15 you've testified on, both during your direct and during

16 cross, there's nothing that gives anybody any guidance

17 to determine what's criminal or civil contained in this

18 document; is that right?

19    A.   Like I say, I don't decide whether it's criminal

20 or --

21    Q.   I understand.

22    A.   -- civil.

23    Q.   But you're familiar --

24    A.   But there's no guidance in here.

25    Q.   Yes.  And just for -- I understand we talked over

each other, but there's no guidance to say:  You know
what, X, Y and Z make it criminal, X, Y and Z make it
civil?

A.   That's correct.

Q.   Nothing contained in this page, correct?

A.   Not that I'm aware of.

Q.   I want to go to what's been previously marked and
admitted as Government Exhibit E20, and specifically
Bates number Mesquias 240677.

MR. GUERRA:  And could you zoom up to the
title, Roy?

Q.   (By Mr. Guerra):  Have you ever seen a document
like this before, ma'am?

A.   Yes.

Q.   Okay.  And can you tell the ladies and gentlemen
of the jury what this is?

A.   This is a -- a Medicaid physician certification
of terminal illness.

Q.   Okay.  And in Section 10 right there, it states,
"Check appropriate box under date, either certification
or recertification."  Do you see that?

A.   No.

Q.   Number 10?

A.   Got you.  Okay.

Q.   Yeah?  Do you see that there?

1    A.   Yes.

2    Q.   So, in other words, when somebody's going to

3    certify a terminal illness, they could either certify

4    someone as terminal or recertify, correct?

5    A.   So this is a Medicaid certification statement,

6    and Medicaid and Medicare have different rules for

7    hospice.  And I am a Medicare expert, and so I can't

8    really speak to this form.  So when you are on hospice

9    and you have both benefits, they have different rules

10   and regulations.

11   Q.   Well, let me ask you this question.  And if you

12   don't know the answer, you don't know the answer.

13   There's no limit on the recertification on the forms for

14   Medicare; is that right?

15   A.   Of course they have to meet the conditions of

16   payment and conditions of participation.  There is no

17   limit.

18   Q.   I understand.  But I'm saying, on the form for

19   recertification for Medicare, there is nothing on there

20   that says, "Recertification period, one of six,"

21   correct?

22   A.   No.

23   Q.   Right.  And, in fact, on Medicare forms, as well,

24   as you talked about with Mr. Canales and

25   Mr. Cyganiewicz, there is actually an allowance for a

1  primary care physician to be the medical director for a

2  hospice; is that right?

3      A.  "An allowance," you mean, it is allowed?

4      Q.  Well, not only is it allowed, they have to sign

5  off and verify that; is that correct?

6      A.  They are part of the certification if they are

7  still part of that patient's care, yes.

8      Q.  Correct.  And so, in Government documents, they

9  even anticipate that by including that signature form on

10  the bottom of those recertifications; is that right?

11      A.  So Medicare does not have a certain form for

12  hospice recertification.  Medicaid does.

13      Q.  Okay.  Are you familiar with the Journal of

14  Palliative Medicine?

15      A.  I don't read it.

16      Q.  Okay.  You know it exists; is that right?

17      A.  Yes.  Uh-huh.

18      Q.  Is it a useful tool within the industry?

19      A.  I don't know, because I don't read it.

20      Q.  Okay.  Are you aware of a study within the

21  Journal of Palliative Medicine that says that some --

22  that 12 to 15 percent of hospice patients live more than

23  six months?

24      A.  I'm not aware of that.

25      Q.  Okay.  Is that something that you could possibly

1   use in your analysis to determine whether or not frauds

2   being submit- -- claims being submitted on hospice are

3   possibly fraudulent?

4       A.   So I can't override or supersede Medicare

5   regulations, and Medicare requires certain things to use

6   their benefit.  And what the Journal of Palliative

7   Medicine says, or doesn't says -- doesn't affect me in

8   the determination of payment of a claim.

9       Q.   So, in other words, you don't consider that when

10  you look at determination, correct?

11      A.   No.

12      Q.   You talked earlier about red flag indicators.

13  What journals or treatises are you relying on for those

14  red flag indicators?

15      A.   What?  Say that again.

16      Q.   Sure.  What journals or treatises are you relying

17  on to find those red flag -- red flag indicators of

18  fraud?

19      A.   What journal?

20      Q.   Yeah.

21      A.   None.

22      Q.   Any manuals you rely on?

23      A.   No.

24      Q.   So where do you come up with these red flags that

25  indicate to you that there's potential fraud?

1    A.   So there are abnormal indicators of what you

2    would not expect for filing claims, and we refer to

3    those as red flags.

4    Q.   I understand.  So what tells you it's abnormal?

5    Where do you know to look to say:  Ms. McMillan, this is

6    abnormal?

7    A.   Well, so we attend fraud presentations.  I'm a

8    certified fraud examiner, so I attend training on a

9    national basis.  And they present indicators of fraud

10   within those.

11   Q.   Such as -- give me an example.  What -- what type

12   are we looking for?

13   A.   For indicators of fraud?

14   Q.   Yes.

15   A.   Well, hospice would be length of stay.

16   Q.   Okay.

17   A.   The same physician certifying everybody, alive

18   six months after discharge --

19   Q.   Right.

20   A.   -- those are examples.

21   Q.   So, again, you're looking for a red flag based on

22   training that you received, but you're not even taking

23   into account that 12 to 15 percent of hospice patients

24   could live more than six months; is that correct?

25              MR. FOSTER:  Objection.  Foundation.

1            THE COURT:  That's overruled.  I'll allow

2    it.  Answer if you know.

3        A.  Can you repeat that?

4        Q.  (By Mr. Guerra):  Sure.

5            All I'm asking is, you're -- you're looking,

6    as an indicator of fraud, whether or not a patient is on

7    hospice for more than six months.

8        A.  Yes.

9        Q.  Correct?

10       A.  Yes.

11       Q.  And the question I asked is, you're not taking

12   into account, when doing that, that 12 to 15 percent of

13   hospice patients live longer than six months, correct?

14       A.  So we are strictly using Medicare guidelines and

15   regulations.

16       Q.  So -- so my question's correct?

17       A.  That's correct.

18       Q.  Thank you.

19           So with regards to the certification and

20   renewal process, at the outset, you need a primary care

21   physician and the medical director to sign off; is that

22   correct?

23       A.  So the initial certification is done by the

24   hospice medical director and the attending physician, if

25   there is one, yes.

1    Q.   Okay.   After that, when you recertify, you don't

2    need as much, is that correct, by law?

3    A.   It should -- the recertifications are done by the

4    hospice employed physician, which would be that medical

5    director.

6    Q.   Right.   And you don't need to go back to the

7    primary care physician; is that right?

8    A.   That's correct.

9    Q.   When you were talking with Mr. Canales earlier,

10   he asked you what could or could not go into payment of

11   a medical director.   Do you recall that part of your

12   testimony?

13   A.   Yes.

14   Q.   I believe one of the things he asked was if you

15   could get paid for being certified for hospice as a

16   medical director, and you said yes, correct?

17   A.   That's one of the duties.

18   Q.   Face-to-faces are also another one of the duties;

19   is that correct?

20   A.   That is.

21   Q.   Attending Interdisciplinary Group meetings; is

22   that correct?

23   A.   Yes.

24   Q.   Is it also part of the duties of a -- of a

25   medical director to be on call 24 hours a day for the

1    patient?

2        A.   There has to be availability of the medical

3    director at all times.

4        Q.   And that is something that they can get paid for

5    as well; is that correct?

6        A.   I would assume.

7        Q.   Right.  Yeah.  Because nobody's going to wake up

8    at 2:00 in the morning for free, right?

9        A.   Right.

10       Q.   And just to be clear, again, you know, and I know

11   it's -- it's been a long direct and cross, but I think

12   there's some words that might have gotten used

13   interchangeably, as well.  For the purposes of Medicare,

14   when someone is certified as terminal, it's not

15   necessarily that they're going to die in six months,

16   correct?

17       A.   The expectation is that they'll have a terminal

18   diagnosis.  And terminal diagnosis, defined by Medicare,

19   is life expectancy of six months or less.

20       Q.   Well, isn't Medicare defined, a terminal

21   diagnosis, as someone will die should the disease run

22   its normal course within six months?

23       A.   That the disease run its normal course is part of

24   that definition, yes.

25       Q.   Right.  So, again, they're not going to

1   die within -- or should not be expected to die within

2   the six months, it's that if the disease will run its

3   course within those six months, the patient will die?

4       A.   A terminal diagnosis with the prognosis of six

5   months or less if the disease runs its normal course.

6       Q.   Earlier you talked about looking at some claims

7   regarding professional health.  Do you make any

8   determination with regards to which of those claims were

9   submitted by Dr. Virlar, and which of those were

10  submitted by Dr. Pena?

11      A.   What was the first name?

12      Q.   Sure.  When you said you looked at some claims

13  regarding professional health hospice, did you determine

14  which of those claims were being reviewed by Dr. Virlar

15  and which of those were being reviewed by Dr. Pena?

16      A.   No.

17      Q.   Sorry.  Dr. Virlar.  That -- I'm sorry.

18      A.   I'm sorry.

19      Q.   No, that's just the way I was brought up to say

20  the name.  I'm sorry.

21      A.   Yes.  If you wouldn't mind spelling it, we

22  probably can talk --

23      Q.   V-I-R-L-A-R.

24      A.   Yes, they were re- -- he was on there.

25      Q.   Yeah, I know he was on there.  I'm just saying,

1    did you make a determination as to which claims were

2    Dr. Virlar's and which claims were Dr. Pena's?

3        A.   For the medical review?

4        Q.   Yes.

5        A.   There weren't any that were Dr. Pena's.

6        Q.   They were all Dr. Virlar's?

7        A.   Not all.

8        Q.   Okay.  But none of Dr. Pena's, correct?

9        A.   That's correct.

10       Q.   The EDI agreement that we looked -- I believe it

11   was Government Exhibit H69 for Dr. Pena, those weren't

12   strictly hospice-based EDI's; is that correct?

13       A.   That's correct.  In order to exchange data and

14   finish your application, everyone has to sign an EDI

15   agreement.

16       Q.   Right.  And you're aware that Dr. Pena had his

17   own medical practice in Laredo, correct?

18       A.   Yes.

19       Q.   Okay.  And so those EDIs weren't specific to any

20   particular job; is that right?

21       A.   That's correct.  It's just simply the filing of

22   those claims.

23       Q.   If he has a -- if he has an MPI, which is

24   basically a provider number, that applies to any of the

25   clinics that he works at; is that right?

1    A.   Just to clarify, an MPI and a PIN are separate.

2    Q.   Right.

3    A.   A PIN is your Medicare billing number.

4    Q.   Okay.

5    A.   And so you could have an MPI and not be Medicare

6    approved.

7    Q.   Okay.  But he would --

8    A.   Can you reask me that question?

9    Q.   Sure.  I know it was a bad question on my part.

10   Thank you so much for reminding me.

11           Their -- the numbers that Dr. Pena had in

12   the EDI, they applied across the board and weren't

13   limited strictly to professionals; is that correct?

14   A.   That's correct.

15           MR. GUERRA:  I appreciate your time.  I'll

16   pass the witness, Your Honor.

17           THE COURT:  Thank you.

18           Mr. Foster, anything else?

19           MR. FOSTER:  Yes, Your Honor, just briefly.

20                     REDIRECT EXAMINATION

21   BY MR. FOSTER:

22   Q.   Now, Ms. McMillan, you were asked a lot of

23   questions about whether hospice is a unlimited benefit.

24   Do you remember those?

25   A.   Yes.

1      Q.   Are there restrictions on certifying

2  beneficiaries for an unlimited amount of time on

3  hospice?

4      A.   So when we talk about certifying a beneficiary,

5  we're talking about that they meet those conditions that

6  we've talked about.  And they must meet those

7  qualifications to qualify for hospice.  It's only

8  unlimited in the sense that you still have to qualify

9  for the benefit.

10     Q.   Now, in your experience with the hospice program,

11  how quickly do patients typically die of legitimate

12  hospice companies?

13               MR. HECTOR CANALES:  Objection, Your Honor.

14  Calls for speculation.

15               MR. GUERRA:  Same objection, Your Honor.

16               MR. FOSTER:  She's a certified fraud

17  examiner on the hospice program.

18               THE COURT:  I'll overrule.  Answer only if

19  you know.

20               THE WITNESS:  So does that mean I can

21  answer?

22               MR. FOSTER:  Yes.

23     A.   Okay.  So my experience in reviewing claims for a

24  Medicare Administrative Contractor and a fraud

25  contractor are two different universes.  With the

1   Medicare Administrative Contractor, those people came on

2   and died, or they came on and came off very quickly.

3        I didn't ever see providers that have the length

4   of stays and the conditions that I see working for a

5   fraud contractor, Qlarant.  It is two vastly different

6   universes of claims that I look at and have experienced

7   in these two job positions.

8   Q.  And is that true with the Merida Group claims

9   that you looked at, that they're vastly different?

10  A.  Yes.

11  Q.  Now, you were asked a lot of questions about

12  hospice not always being an exact science, because

13  sometimes disease don't run their natural course.

14  A.  Yes.

15  Q.  Do you remember those questions?

16  A.  Yes.

17  Q.  In your experience investigating hospice fraud,

18  is it a red flag if patients are living beyond six

19  months?

20  A.  It is -- so if one patient lives beyond six

21  months, that's unique, you know, it's not unheard of.

22  It is when living beyond six months, in fact, a year or

23  two or more, and that is characteristic of that

24  provider, that is considered a red flag of fraud in

25  hospice.

1    Q.  And was it a characteristic of the Merida Group?

2    A.  Yes.

3    Q.  And was that a close call, or was that an easy

4  call to make based on the data?

5    A.  It was clearcut.

6    Q.  Now defense counsel asked a question,

7  Mr. Canales, where he was saying that it's important

8  that a doctor don't just show up one day.  Do you

9  remember that?

10   A.  Yes.

11   Q.  Is that why it's important to involve the primary

12  care physician and not just use medical directors?

13   A.  Yes, because they have that longitudinal look and

14  knowledge of that beneficiary, or the patient, and how

15  they have progressed through their disease.

16   Q.  Now, you previously mentioned that many of the

17  Merida referring physicians did not have a prior Part B

18  relationship with the patient.  Can you explain what a

19  Part B relationship is?

20   A.  So, when you go to the doctor and you're on

21  Medicare and you have Part A and B, all those claims

22  will come through the Part B claim system when you are

23  going to the doctor.  As -- when we do analysis, and

24  looking at a certification for terminal illness,

25  statements that are made on that claim and in that

1   medical record, it is natural course for us to go back

2   and see, "Are these statements validated in the claims?"

3   And when a physician is making longitudinal statements

4   about a patient and, yet, there's no claims ever filed

5   by him, it is difficult to determine how he's getting

6   all that information, unless it's being passed on to him

7   from another person.

8      Q.   So if a patient has a primary care physician,

9   will they be submitting claims under Part B for things

10   like office visits and things of that sort?

11      A.   So once you go on to hospice and claims continue

12   to be submitted into the system by another physician

13   that is not related to the hospice, that is suspicious,

14   because, normally, when you're on hospice, you are being

15   cared for by the hospice only and not those other

16   physicians.

17      Q.   So let's back up, because I think you

18   misunderstood the question.

19      A.   Okay.

20      Q.   When a patient has a primary care physician and

21   they see a patient for an office visit, do they submit a

22   claim under Medicare Part B?

23      A.   Yes.

24      Q.   Okay.   And in looking at the data for the Merida

25   Group, was it a red flag that the physicians, who are

1   referring patients to the group, did not submit any Part

2   B claims for them?

3       A.   Yes.

4       Q.   Now, defense counsel mentioned a list of

5   physicians, including Dr. Gonzaba.  Do you remember

6   that?

7       A.   Yes.

8       Q.   And did Health Integrity analyze Dr. Gonzaba's

9   Part B relationship with the patients he referred to the

10  Merida Group hospice?

11      A.   He was one of those top referring.

12      Q.   And what did it find in terms of whether he had a

13  Part B relationship with them?

14      A.   That most of them did not have a Part B

15  relationship.

16      Q.   And did Health Integrity also analyze patient

17  files from Dr. Gonzaba?

18      A.   He was part of the medical review.

19      Q.   And what did Health Integrity determine through

20  that medical review, including a review of Dr. Gonzaba's

21  patients?

22      A.   The medical record did not support that those

23  beneficiaries had a terminal illness with the prognosis

24  of six months or less.  They did not qualify for

25  hospice.

1    Q.   Now, there were a lot of questions regarding the

2    difference between civil things and administrative

3    things and fraud.  Do you recall those questions?

4    A.   Yes.

5    Q.   Now, there was a medical review conducted in this

6    case, right?

7    A.   Yes.

8    Q.   And a number of interviews?

9    A.   Yes.

10    Q.   Did Health Integrity determine that this was a

11    situation where seeking an overpayment or administrative

12    remedy was appropriate?  Or did it determine that it was

13    a more serious situation?

14    A.   Because it had credible allegations of fraud, it

15    deemed a law enforcement referral.

16    Q.   Now, counsel, I believe referred to as clerical

17    errors and mistakes.  Is that the type of thing that

18    Health Integrity was seeing here in terms of the claims?

19    A.   No.

20    Q.   Now, there were lots of questions about medical

21    directors for hospices and what they can do, what their

22    jobs and responses are.  Do you recall those questions?

23    A.   Yes.

24    Q.   Now, Medicare doesn't have a problem with medical

25    directors getting paid for legitimate services, like

1    taking care of patients.  Is that fair?

2        A.   That's fair.

3        Q.   Okay.  And this can involve filling out

4    documentation, such as the face-to-faces, and plans of

5    care, CTIs that defense counsel talked about; is that

6    fair?

7        A.   Yes.

8        Q.   So let's talk about what Medicare prohibits.

9    Does Medicare prohibit kickbacks?

10       A.   Yes.

11       Q.   And is it a kickback if a medical director's

12   compensation depends on referring a certain number of

13   patients?

14       A.   If the referral is based on getting paid, yes.

15       Q.   And so if a provider says to a medical director,

16   "I'm not going to pay you unless you refer me patients,"

17   is that allowed or prohibited by Medicare?

18       A.   Say that again.

19       Q.   If a provider says to a medical director, "You're

20   not getting paid unless you refer me patients".

21       A.   Okay.  So the re- -- Medicare wants the patient

22   to have a choice, and so they want the patient's medical

23   care to be based on their medical needs.  And so it also

24   has to be based on their insurance benefit.  And so, if

25   they have that requirement, that requirement still needs

1    to take -- factor in those elements.

2    Q.  And so is it a kickback if a provider says to a

3    medical director that they won't get paid unless they

4    refer patients?

5    A.  If that payment is value or volume based, or

6    above market value, or varies during the course of that

7    contract, yes.

8    Q.  And what if the parties intend to conceal payment

9    for patients by signing contracts to make it look like

10   they're being paid for other services; is that allowed

11   by Medicare?

12              MR. HECTOR CANALES:  Objection, Your Honor.

13   Calls for speculation.  Improper hypothetical.  No facts

14   in evidence.

15              THE COURT:  Overruled.  Answer if you know.

16   A.  I'm sorry.  Could you repeat that?

17   Q.  (By Mr. Foster):  Sure.

18              Does Medicare allow parties to conceal

19   payments for patients by signing contracts to make it

20   look like they're getting paid for legitimate work?

21   A.  So whether it's concealed or not, it -- you know,

22   it needs -- you need to reveal things up front, and the

23   payment cannot be a kickback.

24   Q.  And would Medicare pay claims if a medical

25   director was being paid to sign face-to-faces,

1  regardless of whether they were medically necessary or

2  not?

3      A.   Payment based on volume or value is not allowed,

4  because it could be a kickback.  Face-to-face visits are

5  part of that hospice responsibility to have done, and

6  part of that medical director's duty to do.

7      Q.   But do they have to be medically necessary?

8      A.   The face-to-face visits?

9      Q.   Yes.

10     A.   Face-to-face visits are part of the requirement

11 for certification, so for certification of benefit --

12 benefit period three, and every benefit period

13 thereon -- thereafter, they are required.  It's not a

14 medical necessity kind of thing.

15     Q.   And would Medicare pay the claims if the

16 face-to-face visits were being fabricated, where no

17 face-to-faces were being done?

18     A.   Yes.  The face-to-face is required for the

19 eligibility for benefit period three, and thereon.  And

20 if you're submitting false information, those are not

21 payable claims.

22     Q.   And same thing.  Would Medicare pay claims if a

23 medical director was being paid to send -- sign plans of

24 care, regardless of whether the patients really needed

25 it?

1     A.   Medicare does not want to pay claims, does not

2  pay claims that do not meet those conditions of payment

3  and conditions of participation.

4     Q.   And, you know, you've referred to volume or value

5  a lot.  So just so we can be clear with the jury, when

6  we talk about volume, are we talking about the number of

7  patients?

8     A.   Yes.

9     Q.   And when we talk about value, are we talking

10  about your ability to make money off these patients by

11  billing Medicare?

12     A.   Yes.

13     Q.   Now, you -- there were a lot of a questions about

14  Qlarant, and your role with Qlarant.  Do you recall that

15  questions?

16     A.   Yes.

17     Q.   Does your salary depend, in any way, on the

18  results of this trial?

19     A.   No.

20     Q.   Does Qlarant's contract with the Government

21  depend, in any way, on the results of this trial?

22     A.   No.

23     Q.   Is there -- it was suggested that there -- this

24  was a situation where you had to, you know, go out and

25  find things to do, unless Qlarant would lose their

1    contract.  Is there any shortage of work that you have

2    at Qlarant investigating fraud, waste and abuse?

3        A.  No, there is not.

4        Q.  And I take it there are other things you could be

5    doing if you weren't here today?

6        A.  Yes.

7        Q.  Now, defense counsel asked you a lot of questions

8    about people who Health Integrity interviewed or didn't

9    interview.  You remember that ques- -- those questions?

10       A.  Yes.

11       Q.  And he asked a lot of questions about fair market

12   value.  You remember those questions?

13       A.  Yes.

14       Q.  And asked you a lot of questions about your

15   personal opinion about Rodney Mesquias' intent.  Do you

16   remember those questions?

17       A.  Yes.

18       Q.  Did -- did Health Integrity need to interview

19   those people, do a fair market value analysis, or get

20   inside Rodney Mesquias' mind to make the law enforcement

21   referral in this case?

22       A.  No.  Our job really is, once we have credible

23   allegation of fraud, to refer it.  If law enforcement

24   accepts it, they move forward with the investigation and

25   we stand down.  It's called a zone restriction.

1    Q.   And what was the law enforcement referral based

2    on?  Was it just one interview?  Or were there five

3    employees or former employees interviewed?

4    A.   There were several -- excuse me.  There were

5    several interviews, and the content of the information

6    coming in was very concerning for providing service that

7    wasn't medically necessary, that did not qualify for the

8    benefit, that they were billing for services that they

9    weren't providing, and those are credible allegations of

10   fraud.  And at that -- when that came into light, it was

11   recommended that we make a law enforcement referral.

12   Q.   And did those -- did that information relate to

13   just a -- a small handful of patients, or did it relate

14   to scores of patients who didn't qualify for the

15   program?

16   A.   So the investigators interviewed -- interviewed

17   former employees, and they gave us the names of certain

18   patients, but then they also did a data analysis, and

19   that further supported those allegations.

20   Q.   And in terms of the medical review, can you

21   explain to the jury what was in the medical records that

22   resulted in Qlarant finding that 97 percent of the

23   claims did not qualify for Medicare reimbursement?

24   A.   So, the medical records de -- describe people who

25   had chronic conditions.  These people had chronic

```
 1   disease states, but the evidence that they submitted did
 2   not support that they had a prognosis of six months or
 3   less.
 4              MR. FOSTER:  No further questions,
 5   Your Honor.
 6              THE COURT:  Thank you, sir.
 7              Gentlemen, the Government redirect was
 8   approximately 15 minutes.  Defense has a grand total of
 9   45 minutes, 15 per Defendant.  If you choose to merge
10   it, that's fine as well.
11              MR. HECTOR CANALES:  I yield all my time to
12   my other Defendants.  No questions, Your Honor.
13              MR. CYGANIEWICZ:  No further questions,
14   Your Honor.
15              THE COURT:  Mr. Guerra?
16              MR. GUERRA:  None, Your Honor.
17              THE COURT:  Thank you, ma'am.  You may step
18   down.
19              THE WITNESS:  Thank you.
20              THE COURT:  Before we call the next witness,
21   does anyone need a restroom break or anything else?
22   I'm -- yes?  Don't be ashamed.
23              THE JURORS:  Yes.
24              THE COURT:  It's okay if it's the same
25   person.  Let's -- ladies and gentlemen, let's take a
```

1    very brief recess before we call the next witness.

2             COURT OFFICER:  All rise for the jury.

3                  (Jurors exit courtroom)

4                       (Off the record)

5                       (On the record)

6             COURT OFFICER:  All rise for the jury.

7                  (Jurors enter courtroom)

8             THE COURT:  Thank you, everyone.  Please be

9    seated.

10             Mr. Foster, next witness, please.

11             MR. FOSTER:  Thank you, Your Honor.  The

12   United States calls Ernesto Gonzalez.

13             THE COURT:  Good afternoon, sir.  Please

14   remain standing.  Let me swear you in, please.

15             THE CLERK:  Raise your right hand.

16                  **ERNESTO GONZALEZ**,

17   having been duly cautioned and sworn, testified as

18   follows:

19             THE WITNESS:  I do.

20             THE COURT:  Thank you, sir.  Please have a

21   seat.  Please position the microphone close to you.

22             Mr. Foster, please proceed.

23                  DIRECT EXAMINATION

24   BY MR. FOSTER:

25     Q.  Good afternoon.

1    A.   Good afternoon.

2    Q.   Can you introduce yourself to the jury?

3    A.   My name is Ernesto Gonzalez.

4    Q.   And where do you live?

5    A.   San Antonio, Texas.

6    Q.   How long have you lived in San Antonio?

7    A.   For the past 39 years.

8    Q.   Are you currently employed?

9    A.   Yes, I am.

10   Q.   Where are you employed?

11   A.   With Brookdale Hospice.

12   Q.   What do you do at Brookdale Hospice?

13   A.   I'm a hospice care coordinator.

14   Q.   And what does a hospice care coordinator do?

15   A.   Does the consultations with the families for

16   hospice services.

17   Q.   Can you tell the jury about your educational

18   background?

19   A.   Associate's degree.

20   Q.   And how did you first become involved in the

21   medical field?

22   A.   Right out of high school in '98 working in

23   dialysis.

24   Q.   And did you later begin to work with home health

25   agencies?

1        A.   Yes, I did.

2        Q.   And when did you start working with home health

3   agencies?

4        A.   I started home health probably in the year

5   2007/2008.

6        Q.   And did you also work with hospice agencies?

7        A.   Yes, I did.

8        Q.   When did you start working with hospice agencies?

9        A.   Around the year 2014.

10       Q.   Is there a reason why you were interested in

11   working with hospice programs?

12       A.   Yes, there is.

13       Q.   And can you explain that to the jury?

14       A.   I had a bad experience with hospice when my

15   grandfather was put on hospice a few years back.

16       Q.   And would you mind, without going into too many

17   personal details, explaining that?

18       A.   When it was time for my grandfather to be placed

19   on hospice, he was needing hospice care in the hospital.

20   Agency was called out.  They did the consultation with

21   the family, and my grandfather passed within 15 minutes

22   of them putting him on hospice.  The hospice nurse just

23   kind of just sat back at the nurse's station and let the

24   hospital staff perform all the work, didn't consult with

25   the family, didn't do anything with my grandmother, or

1    anything like that.  And, to me, I just saw that as that

2    agency just sat back and collected a check on behalf of

3    my father -- my grandfather's death.

4        Q.  And how -- how did that influence your desire to

5    work with hospice programs?

6        A.  I didn't want families to go through what I went

7    through and what my -- what my family went through, so I

8    wanted to kind of get into hospice and make that change

9    so that way they wouldn't go through what I went

10   through.

11       Q.  Now, are you familiar with the Merida Group?

12       A.  Yes, I am.

13       Q.  And how are you familiar with the Merida Group?

14       A.  I used to be employed by -- by them.

15       Q.  And how long did you work there?

16       A.  For about two-and-a-half years.

17       Q.  What was your position there?

18       A.  I was a marketer.

19       Q.  And did you later become a manager of other

20   marketers, as well?

21       A.  Yes, I did.

22       Q.  And how much were you paid, approximately?

23       A.  If I'm not mistaken, like 60,000 a year.

24       Q.  Now, I want to bring up what's previously been

25   admitted as Government's Exhibit L1.

1                    Now, do you recognize these locations on the

2    map?

3        A.    Yes, I do.

4        Q.    And can you explain to the jury what they are?

5        A.    They were agencies throughout the state that

6    Merida had for home health hospice and provider

7    services.

8        Q.    And what areas of the state were you involved in?

9        A.    I was with San Antonio, Corpus, and Laredo.

10       Q.    San Antonio, Corpus, and Laredo.  What type of

11   services did the Merida Group offer in those areas?

12       A.    Home health, hospice and provider services.

13       Q.    Now, did you eventually stop working at the

14   Merida Group?

15       A.    Yes, I did.

16       Q.    And after you stopped working at the Merida

17   Group, did you file a complaint with law enforcement?

18       A.    Yes, I did.

19       Q.    And what was that complaint that you filed?

20       A.    I filed a complaint with the OIG's office.

21       Q.    And what did that complaint concern?

22       A.    It was to let the OIG's office know the

23   fraudulent activity that was going on within the

24   organization, and I just felt that they needed to know.

25       Q.    And generally speaking, can you explain to the

1   jury the fraud that was going on at the Merida Group?

2       A.   Enticements for patients to sign on to services,

3   face-to-faces by the physicians that were not being

4   done, kickbacks being paid to physicians for referrals

5   to the agency, and patients that were being admitted

6   that were not hospice appropriate.

7       Q.   Now, it's -- it's obviously hard for you to be

8   here testifying, and there was this personal situation

9   with a family member.  How did that make you feel in

10  terms of what the Merida Group did?

11      A.   It kind of took a -- it kind of took away what I

12  got into the industry for, was to do the right thing.

13  And during my time with the Merida Group, I was lied to

14  the entire time of what the services really entailed.

15      Q.   Now, who is responsible for the fraud at the

16  Merida Group?

17      A.   Rodney Mesquias.

18              MR. HECTOR CANALES:  Objection.  Objection,

19  Your Honor.  Calls for speculation.  Lack of foundation.

20  No personal knowledge.

21              MR. GUERRA:  Same objection.

22              MR. HECTOR CANALES:  Assumes facts not in

23  evidence.

24              THE COURT:  Rephrase the question.

25              MR. FOSTER:  Sure.

1   Q.   (By Mr. Foster):   Were you directed to commit

2   fraud at the Merida Group?

3   A.   I wouldn't say directly told to commit fraud,

4   because at the time I didn't know what the services

5   actually entailed.

6   Q.   Were you a directed to sign up patients who

7   weren't dying for hospice?

8   A.   Yes.

9   Q.   And were you directed to sign up patients who

10  weren't homebound for home health?

11  A.   Yes.

12  Q.   And did you become aware of kickbacks being paid

13  to medical directors?

14  A.   After a while with the agency, yes, I was.

15  Q.   And who directed you to sign up patients for

16  hospice who weren't dying?

17  A.   Rodney Mesquias.

18  Q.   And was Defendant Henry McInnis also involved in

19  directing you to do that?

20  A.   Yes, he was.

21  Q.   And is the same true of signing up patients for

22  home health who weren't homebound?

23  A.   Yes.

24  Q.   And was Defendant Pena also involved in the fraud

25  scheme?

1     A.   Out of the Laredo office, yes.

2               MR. GUERRA:   Calls for legal speculation.

3               THE COURT:   Overruled.   I'll allow that

4     question.   Rephrase --

5               MR. FOSTER:   I can lay the foundation,

6     Your Honor.

7               THE COURT:   Repeat the question, then.

8               MR. FOSTER:   Sure.

9     Q.   (By Mr. Foster):   Was Defendant -- did you become

10    aware, while working at the Merida Group, that Defendant

11    Pena was involved in the fraud?

12    A.   Yes, out of the Laredo office.

13    Q.   Okay.   And did you become aware of that as a

14    result of direct interactions with him?

15    A.   Yes.

16    Q.   And things that he said to you --

17    A.   Yes.

18    Q.   -- that indicated that he was referring patients

19    in exchange for kickbacks?

20    A.   Yes.

21    Q.   Okay.   And we'll get to all these things in

22    greater detail after we provide a high-level view of the

23    Merida scheme.   I want to discuss each of their roles in

24    the company, each one of these Defendants.

25              MR. FOSTER:   Can we bring up what's been

1   admitted as Exhibit L3?

2      Q.  (By Mr. Foster):  Now, who was the owner and

3   CEO -- who was the owner of the Merida Group?

4      A.  Rodney Mesquias.

5      Q.  And who was the CEO and second in command?

6      A.  Henry McInnis.

7      Q.  And who are the doctors who referred most of the

8   patients to the Merida Group?

9      A.  Dr. Virlar, Dr. Pena, and Dr. Carrillo.

10     Q.  And I want to talk about Defendant Mesquias.  How

11  much control did Defendant Mesquias have over the Merida

12  Group?

13     A.  He had pretty much 95 percent control of the

14  agency.

15     Q.  Who was the primary owner?

16     A.  Rodney Mesquias.

17     Q.  Who made the final decisions?

18     A.  Rodney Mesquias.

19     Q.  Who made the rules?

20     A.  Rodney Mesquias.

21     Q.  How involved was Defendant Mesquias in operating

22  this business?

23     A.  He was very involved with the agency.

24     Q.  Can you explain to the jury what it was like to

25  have Rodney Mesquias as a boss?

     1     A.   Every time Mr. Mesquias would walk into the

     2   office, everybody would get quiet, it's like walking on

     3   egg shells.  He was a man that was very degrading,

     4   awful, just would yell at you for no reason, kind of

     5   belittle you in front of other employees.

     6     Q.   Did Defendant Mesquias direct you to admit

     7   patient to hospice who were not dying?

     8     A.   Yes.

     9     Q.   And did he direct other Merida employees to admit

    10   patients to hospice who were not dying?

    11     A.   Yes, he did.

    12     Q.   If a Merida employee told Defendant Mesquias that

    13   a patient didn't qualify for the services, what would he

    14   say?

    15     A.   He'd get very upset.  When we would come back and

    16   tell him that the patient did not qualify -- one

    17   instance, he actually got in my face, yelled at me, and

    18   basically told me not to --

    19              THE WITNESS:  Is it okay if I swear,

    20   Your Honor?

    21              THE COURT:  It --

    22     A.   Basically, he --

    23              THE COURT:  You're here to tell the truth,

    24   obviously.  It's not for me to tell you what to say or

    25   not say.  You've been sworn to tell the truth.  Tell the

1    truth in your own words.

2        A.   So he would basically get in my face and tell me

3    not to fuck with his patients or fuck with his money.

4        Q.   (By Mr. Foster):   Not to fuck with his patients

5    or fuck with his money?

6        A.   That is correct.

7        Q.   That's what he said when you told him a patient

8    didn't qualify for the hospice program?

9        A.   Yes.

10       Q.   What did Defendant Mesquias mean when he said

11   don't fuck with my patients?

12       A.   Patients that are not being admitted to the

13   agency is basically taking money away from him.

14       Q.   Now, did Defendant Mesquias fire employees if

15   they let the number of admissions drop?

16       A.   Yes, he would.

17       Q.   And did he threaten to fire employees if they

18   didn't admit patients?

19       A.   Yes, he would.

20       Q.   Did he intimidate employees?

21       A.   Yes, he did.

22       Q.   Did he yell at employees if the number of

23   patients or the census dropped?

24       A.   Yes.

25       Q.   What was the number one rule that Defendant

1    Mesquias had in running the Merida Group?

2        A.   Admit patients.

3        Q.   Whether they qualified for services or not?

4        A.   That is correct.

5        Q.   And did the employees' livelihood and their jobs

6    depend on following Defendant Mesquias' rules?

7                 MR. HECTOR CANALES:  Objection, Your Honor.

8    Calls for speculation as to what other employees

9    thought.  And leading.

10                THE COURT:  Rephrase the question.  Limit it

11   to himself.

12       Q.   (By Mr. Foster):  Did you see Defendant Mesquias

13   threaten to fire employees who did not admit patients?

14       A.   Yes.

15       Q.   And did you see him fire employees who did not

16   admit patients?

17       A.   Yes, I would.

18       Q.   And did he direct you to fire employees who did

19   not admit patients?

20       A.   Yes.

21       Q.   And I want to turn now to Defendant McInnis.

22   What was his role in the company?

23       A.   He was the second in command.

24       Q.   And how much power did he have?

25       A.   I would say he had about 75, 80 percent of

1    control.

2        Q.   Who was the right-hand man of the owner of

3    Mesquias?

4        A.   Henry McInnis.

5        Q.   And what does it mean that Defendant McInnis was

6    Defendant Mesquias' right-hand man in the company?

7        A.   In the event that Mr. Mesquias was not around,

8    Henry McInnis would make the decision.

9        Q.   When you had important business to discuss, would

10   both Mesquias and McInnis be on the call?

11       A.   Yes, I would.

12       Q.   Who would Defendant Mesquias consult with before

13   making important decisions?

14       A.   With Henry.

15       Q.   If Defendant Mesquias couldn't attend a meeting

16   or a phone call, who would sit in on the meeting or

17   phone call for him?

18       A.   Henry.

19       Q.   Now, I want to talk about what kind of boss

20   Defendant McInnis was.  Did McInnis agree with Defendant

21   Mesquias' rules?

22       A.   About 95 percent of the time, yes.

23       Q.   And did he agree with the rule to admit patients,

24   whether they qualify or not?

25       A.   Yes, he would.

1    Q.   And what was Defendant McInnis' role in enforcing

2    Defendant Mesquias' rules?

3    A.   It was the same thing, admit patients whether or

4    not they qualified or not.

5    Q.   Did Defendant McInnis fire employees if they

6    wouldn't admit patients?

7    A.   Yes, he would.

8    Q.   Did he threaten to fire employees if they

9    wouldn't admit patients?

10   A.   Yes, he would.

11   Q.   Did he intimidate employees?

12   A.   Yes, he would.

13   Q.   And did employees' livelihood and their jobs

14   depend on following McInnis' rules?

15   A.   Yes, they did.

16   Q.   Now, I want to turn to Defendant Pena.  What was

17   his role in the Merida Group?

18   A.   He was the medical director out of the Laredo

19   office.

20   Q.   And did you interact with him in Laredo?

21   A.   Yes, I did.

22   Q.   And what was your position in relation to the

23   Laredo office?

24   A.   I was the marketing manager for the marketing

25   team for Laredo.

1    Q.   And did he refer patients to the Merida Group in

2   exchange for payment?

3    A.   Yes, he would.

4    Q.   And did Defendants Mesquias and McInnis agree to

5   make those payments to Defendant Pena?

6    A.   Yes, they did.

7    Q.   Now, I want to go back and start at the

8   beginning.   How were you employed before you started

9   working at the Merida Group?

10    A.   I was working for a home health agency.

11    Q.   What type of position did you apply for at the

12   Merida Group?

13    A.   I actually applied for a marketing position with

14   the home health side.

15    Q.   Did you interview for the home health marketing

16   position with Defendant Mesquias?

17    A.   Initially, I thought I was being interviewed for

18   the home health position, but I ended up being

19   interviewed for a hospice position.

20    Q.   And what type of job did Defendant Mesquias offer

21   you?

22    A.   He offered me a hospice position.

23    Q.   And did he tell you why you should do hospice

24   instead of home health?

25    A.   He said hospice would be very lucrative than home

1    health.

2        Q.   Had you ever worked for a hospice before?

3        A.   No, sir.

4        Q.   So I want to talk about the Merida marketing

5    strategy for hospice.  When you started working there,

6    did you speak with Defendants Mesquias and McInnis about

7    the marketing strategy?

8        A.   Yes, I did.

9        Q.   And did you market directly to patients?

10       A.   Yes, I would.

11       Q.   And did you oversee marketers who marketed to

12   patients?

13       A.   Yes.

14       Q.   Who was your boss?

15       A.   Rodney.

16       Q.   And who was the second in command over marketing?

17       A.   Henry.

18       Q.   And did you speak with Defendant Mesquias and

19   McInnis frequently about the marketing plan?

20       A.   Yes, I would.

21       Q.   Now, was the Merida marketing plan to sign up

22   patients for hospice who weren't actually dying?

23       A.   Yes, it was.

24       Q.   Who directed the marketers to do that?

25       A.   Rodney did.

1    Q.  Can you explain that to the jury?

2         THE COURT:  Out of an abundance of caution,

3    let's -- I know it's a course of habit during the course

4    of conversation to just use first names, but let's use

5    their last names, Mr. Mesquias, Mr. McInnis.

6         THE WITNESS:  All right.

7         THE COURT:  I know you're saying Rodney and

8    Henry, et cetera, but let's -- let's be a little bit

9    more formal, if you can.  If you slip up, that's fine.

10   Please proceed.

11   Q.  (By Mr. Foster):  Now, can you explain to the

12   jury how they directed the marketers to sign up patients

13   who weren't actually dying?

14   A.  So we were told to tell patients and their family

15   that because a patient is going on hospice doesn't

16   necessarily mean that they are -- reached their end of

17   life stage, it just means that they need extra help, and

18   the services of hospice would help them in that way.

19   Q.  Did the Merida Group lie to patients about

20   whether they needed to be dying to be on hospice?

21   A.  Yes, they did.

22        MR. HECTOR CANALES:  Objection, Your Honor.

23   Objection, Your Honor.  Calls for speculation to the

24   Merida Group.  It was a who.  And what's the basis for

25   it?

1              MR. FOSTER:  Okay.

2              THE COURT:  Sustained.  Rephrase the

3    question, sir.

4    Q.  (By Mr. Foster):  What would Defendant Mesquias

5    tell you about whether the patients needed to be dying

6    to be on hospice?

7    A.  That they didn't need to be dying in order to be

8    on hospice services.

9    Q.  He told you they didn't need to be dying?  Isn't

10   that what hospice is?

11   A.  Correct.

12             MR. HECTOR CANALES:  Objection.  Leading.

13             THE COURT:  Overruled.

14   Q.  (By Mr. Foster):  Now, did you, then, tell that

15   to patients?

16   A.  We would direct -- direct that to patients that

17   they don't need to be dying to be on hospice.

18   Q.  And do you consider that a lie?

19   A.  Yes, I do.

20   Q.  And did Defendant Mesquias also refer to hospice

21   in relation to home health as a different type of home

22   health?

23   A.  He referred to it as the new home health of the

24   agency.

25   Q.  And did Defendant Mesquias tell you to tell

1    patients that they didn't need to be dying to be on

2    hospice?

3        A.   Yes, he did.

4        Q.   And were you present when Defendant Mesquias told

5    other marketers to tell that to patients?

6        A.   Yes, I was.

7        Q.   Now, what would Defendant Mesquias say if a

8    marketer told him that a patient refused to sign up for

9    hospice because they weren't dying?

10       A.   He would get upset, and he would make the

11   marketer, or a different employee marketer go out and

12   speak to the family again and convince them of the

13   services that they would be getting while in hospice,

14   even though they didn't need to be dying to be on it.

15       Q.   And what would Defendant McInnis say if a

16   marketer came to him and said, "Patient doesn't want to

17   sign up.  They're not dying"?

18       A.   The same thing.  Go back out there and convince

19   the family or the patient to, you know, sign up for

20   services.

21       Q.   Did Defendant McInnis also agree with Defendant

22   Mesquias that you should tell patients that they didn't

23   need to be dying to be on hospice?

24       A.   Yes.

25       Q.   And can you describe Defendant McInnis' role to

1   the jury?

2      A.   He oversaw the -- I guess I would call like the

3   South Texas area, so the staff was instructed, same

4   thing that Mr. Mesquias would say, is, go out, find

5   patients, sign them up, even though they're not dying to

6   be on hospice, but they need to be on, and get them

7   qualified and signed up.

8      Q.   Now, did this Merida marketing strategy, you

9   don't need to be dying to be on hospice, allow you to

10  sign up a lot of patients?

11     A.   Yes, it did.

12     Q.   Can you explain how that worked to the jury?

13     A.   So we would go out, talk to a family, talk to a

14  patient, let them know that they were being referred to

15  for hospice.  They would question why.  We were told to

16  let them know that they need more services in their

17  home, something that home health cannot offer and

18  Medicare offers all these services at a hundred percent,

19  and that they won't be responsible for any payment for

20  services whatsoever, because Medicare covered it at a

21  hundred percent.  We would, then, convince the family

22  that your loved one does not need to be dying in order

23  to be on services.  The minute a lot of families would

24  hear those words, they would agree to sign their loved

25  one up for services.

1    Q.   Now, when you were going out and marketing, were

2    there only a small number of patients with -- well,

3    actually, who had at less than six months to live?

4    A.   Very few, yes.

5    Q.   And are there many more Medicare patients who

6    have health issues but aren't dying?

7    A.   That's correct.

8    Q.   And which group did Defendant Mesquias and

9    McInnis direct you to market to?

10   A.   To the patients who had a longer life expectancy

11   than the actual hospice patient.

12   Q.   And did Defendant Mesquias and McInnis instruct

13   you to sign up any patients with certain types of

14   diagnoses?

15   A.   Yes.

16   Q.   And can you explain that to the jury?

17   A.   The certain diagnoses that they would have us

18   looking for are Alzheimer's patients, patients with

19   congestive heart failure, pulmonary disease, and renal

20   failure.

21   Q.   And did it matter whether those patients were

22   dying?

23   A.   It did not matter.

24   Q.   And did telling patients they didn't need to be

25   dying, was that a successful marketing strategy?

1      A.   Yes, it was.

2      Q.   Did Merida get more patients?

3      A.   Yes, they did.

4      Q.   And did it bill more to Medicare?

5      A.   Yes, they did.

6      Q.   Was this marketing strategy wrong, in your

7   opinion?

8      A.   Yes, it was.

9      Q.   Can you explain that to the jury?

10      A.   It doesn't --

11           MR. HECTOR CANALES:  Objection, Your Honor.

12           THE COURT:  Your objection?

13           MR. HECTOR CANALES:  Lacks foundation.  This

14   witness is a fact witness.  He's not an expert of any

15   kind.  He has no qualifications to determine what is

16   proper or not proper under the Medicare statutes and

17   rules.

18           MR. FOSTER:  That's not my question, Your

19   Honor.

20           THE COURT:  Rephrase the question.

21      Q.   (By Mr. Foster):  Can you explain to the jury why

22   this marketing strategy was wrong to you?

23      A.   Because in order for a patient to be on hospice,

24   their life ex- -- their expectancy should be six months

25   or less.

1          MR. HECTOR CANALES:  Objection, Your Honor.

2    The patient is -- the witness is now attempting to

3    recite the -- the rules and regulations.  The question

4    presumes that he has -- that he's qualified to give

5    answers.

6          THE COURT:  The objection's overruled.

7    Answer if you -- answer if you know.

8    Q.   (By Mr. Foster):  Was this marketing strategy

9    wrong?

10   A.   It was wrong.

11   Q.   Can you explain that to the jury?

12   A.   Patients that needed to be on services, should

13   have been qualified actual hospice patients with

14   terminal diagnosis -- a terminal diagnosis who are no

15   longer seeking any type of curative treatment.

16   Q.   And, now, you mentioned you hadn't worked for

17   hospice before Merida, correct?

18   A.   That is correct.

19   Q.   And when you started working there, did you

20   become increasingly concerned?

21   A.   After a while, I started doing my research and

22   looking up all the Medicare regs and regulations.

23   Q.   And so you reviewed those rules and regulations

24   because you were concerned about what was going on?

25   A.   That is correct.

1      Q.   Now, I want to talk about another aspect of the

2   marketing strategy, and that is the word "hospice"

3   itself.   What did Defendant Mesquias tell you about

4   whether you could leave out the word "hospice" when

5   marketing to patients?

6      A.   We were told to let the family's know that it is

7   additional nursing services that were being provided

8   that was covered under Medicare, and not to let the

9   family's know that their loved one is being placed on

10   hospice services.

11      Q.   Additional nursing services.   Were you marketing

12   a nursing program or a hospice program?

13      A.   It was supposed to be a hospice program.

14      Q.   Now, did Defendant McInnis agree with Defendant

15   Mesquias about leaving out the word "hospice"?

16      A.   Yes, he did.

17      Q.   And what did Defendant Mesquias and Defendant

18   McInnis instruct you to tell the nurses at Merida about

19   the word "hospice"?

20      A.   If at all possible, leave the word "hospice" out

21   from families and patients.

22      Q.   Were patients deceived, who you interacted with?

23      A.   Yes, they were.

24      Q.   Did patients or family members know what they

25   were signing up for?

1    A.  Not --

2              MR. HECTOR CANALES:  Objection, Your Honor.

3    Calls for speculation as to what is in the minds of

4    other patients and family members.

5              THE COURT:  Sustained.  Rephrase the

6    question.

7    Q.  (By Mr. Foster):  Did you interact with patients

8    or family members?

9    A.  Yes, I did.

10   Q.  And did they complain to you?

11   A.  Yes, they did.

12             MR. HECTOR CANALES:  Again, Your Honor, it

13   calls for hearsay what they said.

14             MR. FOSTER:  I'll lay the foundation,

15   Your Honor.

16             THE COURT:  Sustained.  Rephrase the

17   question.

18             MR. FOSTER:  Sure.

19   Q.  (By Mr. Foster):  Did you receive complaints from

20   patients and family members that you relayed to

21   Defendants McInnis and Mesquias?

22   A.  Yes, I did.

23   Q.  Okay.  And what was the nature of those

24   complaints --

25             MR. HECTOR CANALES:  Again, Your Honor --

1     Q.   (By Mr. Foster):   -- you relayed to the

2   Defendants?

3              MR. HECTOR CANALES:   Again, Your Honor, he's

4   eliciting hearsay --

5              MR. FOSTER:   It's not hearsay.

6              MR. HECTOR CANALES:   -- what those

7   persons were saying.

8              MR. FOSTER:   It's not for the truth, Your

9   Honor.   It goes directly to their knowledge and intent.

10              THE COURT:   The objection's overruled.

11     Q.   (By Mr. Foster):   So did you relay complaints

12   from patients and family members to Defendants McInnis

13   and Mesquias?

14     A.   Yes, I did.

15     Q.   And what was the nature of those complaints?

16     A.   They were questioning why their -- their loved

17   ones were placed on hospice services and why nobody told

18   them that they were on hospice services.

19     Q.   And did they indicate that they were deceived?

20     A.   Yes, they did.

21     Q.   And how did Defendants Mesquias and McInnis

22   react?

23     A.   They didn't react in any way.   They basically

24   just said they'll take care of it, and to go out and get

25   more patients.

1    Q.   Now, is it important that a patient or family

2   member know that they're on hospice?

3    A.   Yes, it is.

4    Q.   In your current job at a different hospice

5   company, how much time do you spend counseling a patient

6   about hospice?

7    A.   Anywhere from an hour to three hours.

8    Q.   Can you explain to the jury how Merida was

9   different?

10    A.   We would, within 30 minutes, tell the family's

11   the -- the whole spew of hospice without of either using

12   the word "hospice", or telling the family that it's a

13   new type of home health and their loved ones need this

14   extra assistance.

15    Q.   Now -- and who directed you to do that?

16    A.   Rodney did.   Rodney Mesquias.

17    Q.   Now, I want to talk about another aspect of the

18   marketing plan.   Did Defendants Mesquias and McInnis

19   direct you to offer inducements to patients?

20    A.   Yes, they did.

21    Q.   And can you explain to the jury what an

22   inducement is?

23    A.   When you are bribing a patient or family with a

24   good, or service, to sign up for your services.

25    Q.   And as you became increasingly concerned, did you

1  research Medicare's rules related to patient

2  inducements?

3      A.  Yes, I did.

4      Q.  And does Medicare prohibit these inducements?

5      A.  Yes, they do.

6      Q.  How does legitimate marketing differ from

7  providing inducements to patients?

8      A.  When you're telling the family the entire scope

9  of the hospice program, the dying process, and what the

10 expectations are while their loved one is on services.

11     Q.  And what was the marketing at the Merida Group

12 that you were directed to do?

13     A.  Convince the families to sign up for services.

14 If we felt that they needed special equipment, we would

15 bribe them with that type of special equipment so that

16 way they would agree to sign up for services.

17     Q.  Now, what about the use of the word "free"?

18     A.  We would use that word very openly.

19     Q.  And who directed you to offer free equipment and

20 supplies?

21     A.  Rodney Mesquias.

22     Q.  And how was that part of the marketing plan at

23 the Merida Group?

24     A.  Any time a family would hear the word "free",

25 they would agree to the services, even though it was

1    already a benefit given to the family and their -- and

2    their loved ones while on services through Medicare.

3        Q.   Now, did you believe that some of these patients

4    and their family members, who you were marketing to,

5    were vulnerable?

6        A.   Yes.

7        Q.   Can you explain that to the jury?

8        A.   A lot of times, we would go after the families

9    and the patients, who either didn't have loved ones here

10   in the city, or just needed that extra assistance, and

11   we would convince them the benefits of using the Merida

12   Group, to send the nurses out as often as they had to to

13   keep an eye on their loved one and, you know, give

14   feedback to families.

15       Q.   And, in your opinion, were these vulnerable

16   patients exploited?

17       A.   Yes, they were.

18       Q.   Can you explain to the jury?

19       A.   We would tell the families and the patients that

20   they're getting a free service, whether it's with

21   medications or equipment or incontinence supplies.  A

22   lot of these -- these patients were on fixed income, so

23   they would agree to the services because they would be

24   saving money on their end while getting these services

25   from the agency itself.

1   Q.  Did you and other marketers tell patients that

2   they could obtain all of these free medical supplies and

3   leave out the part of it requiring a terminal diagnosis?

4   A.  Yes.

5          MR. HECTOR CANALES:  Objection to the "other

6   marketers" part, Your Honor, "you and other marketers".

7          MR. FOSTER:  He already testified he oversaw

8   them, Your Honor.

9          THE COURT:  Overruled.  Obviously, answer

10   only as to what you spoke about.  Go ahead.

11   Q.  (By Mr. Foster):  Did you and other marketers

12   tell patients that they could obtain all of these free

13   medical supplies and leave out the part that they had to

14   have a terminal diagnosis?

15          MR. HECTOR CANALES:  Same -- same,

16   Your Honor.  Question calls for hearsay, calls for what

17   other marketers are doing.

18          THE COURT:  Rephrase the question as to his

19   -- his knowledge of --

20          MR. FOSTER:  Sure.

21          THE COURT:  -- in terms of his

22   conversations, sir.

23          MR. FOSTER:  Sure.

24   Q.  (By Mr. Foster):  Did you tell patients that they

25   could obtain all these free medical supplies and leave

out the part about requiring a terminal diagnosis?

A.  Yes, I would.

Q.  And did you direct other marketers to do the same thing?

A.  Yes, I would.

Q.  And were you aware that other marketers did the same thing?

A.  I was aware.

Q.  And who told you to tell that to patients?

A.  Rodney Mesquias.

Q.  And what was McInnis' involvement?

A.  At the time, Henry McInnis and I didn't have that conversation.  It was directly with Rodney Mesquias.

Q.  And were these inducements successful in getting patients to sign up for hospice?

A.  Yes, they were.

Q.  Can you explain how that worked to the jury?

A.  Like I mentioned before, any time a family member or patient would hear the word "free", they would jump all over that and sign up their loved one to obtain these free goods that were being offered.

Q.  What if a marketer told Defendant Mesquias that they were unable to sign up a patient because that patient wasn't interested in hospice?

MR. HECTOR CANALES:  Objection, Your Honor.

1    Calls for speculation, "what if".

2        Q.   (By Mr. Foster):  Did -- I'll rephrase.

3            THE COURT:  Rephrase.

4        Q.   (By Mr. Foster):  Did marketers tell Defendant

5    Mesquias that they were unable to sign up patients

6    because the patients were not interested in hospice?

7        A.   Yes, they would.

8        Q.   And what did Defendant Mesquias say?

9        A.   He would get very upset, and he would send out

10   another marketer to go meet with the family and convince

11   them to sign up for services.

12       Q.   And did marketers similarly tell Defendant

13   McInnis that they were unable to sign up a patient

14   because the patient was not interested in hospice?

15       A.   Yes.

16       Q.   And what did Defendant McInnis say?

17       A.   The same thing, go back out and -- and convince

18   the family to sign them up.

19       Q.   Now, did other marketers complain that it was

20   wrong to be offering these inducements?

21            MR. HECTOR CANALES:  Objection, Your Honor,

22   what other -- he's asking what other marketers said.  It

23   calls for hearsay.

24            THE COURT:  Sustained.  Rephrase the

25   question.

1    Q.   (By Mr. Foster):   Did you convey complaints to

2    Defendant Mesquias and McInnis that came from other

3    marketers?

4    A.   Yes, I did.

5    Q.   And what were those complaints from other

6    marketers that you conveyed to Defendants Mesquias and

7    McInnis?

8    A.   That we were leaving out the important aspects

9    of -- of what the meaning of hospice was, and that

10   telling these families that what they were getting as

11   free is not actually free because it's an entitled

12   benefit that these patients earned over the years.

13   Q.   And were these complaints common?

14   A.   Very common.

15   Q.   And were they frequent?

16   A.   Yes, they were.

17   Q.   And did you raise these complaints on one

18   occasion or multiple occasions with Defendants Mesquias

19   and McInnis?

20   A.   I raised them on multiple occasions.

21   Q.   And what would they say?

22   A.   Don't mess with their money, it's their company,

23   they can run their agency the way they want.

24   Q.   Now, I want to talk about a particular type of

25   inducement that Defendants Mesquias and McInnis offered

1   to patients, and that's power wheelchairs.  What can you

2   tell the jury about power wheelchairs?

3       A.  During -- during the time there was a power

4   wheelchair craze, and a lot of patients that were on

5   services were wanting to come off of hospice because

6   they wanted to obtain a power chair through the Medicare

7   program.  While a patient is on hospice, Medicare will

8   deny those services for the patient, and so we would

9   then tell the patient if they stay on services we will

10  get them a power wheelchair that they can use while on

11  services.

12      Q.  Well, let's take that one step at a time.  Are

13  power wheelchairs covered by Medicare if you're on the

14  hospice benefit?

15      A.  Not while on --

16              MR. HECTOR CANALES:  Objection.

17      A.  -- hospice.

18              MR. HECTOR CANALES:  Objection, Your Honor.

19              THE COURT:  One second.  One second.  Please

20  proceed.

21              MR. HECTOR CANALES:  What's covered, not

22  covered under -- under hospice mitigates outside -- it's

23  not fact testimony, it's expert testimony, and he's not

24  qualified for it.

25              THE COURT:  Answer -- overruled.  Answer

```
1    only if you know.
2        A.   It's not a covered benefit under -- while a
3    patient is on hospice.
4        Q.   (By Mr. Foster):  And did Defendant Mesquias
5    direct individuals at the Merida Group in your presence
6    to go out and purchase power wheelchairs?
7        A.   Yes.
8        Q.   And can you describe that to the jury why he
9    wanted to purchase power wheelchairs?
10       A.   He wanted to keep the patients on services than
11   losing them, possibly, to another agency because they
12   came off services while they tried to obtain these power
13   chairs.
14       Q.   Did Defendant McInnis, was he involved in this,
15   as well?
16       A.   At the time that this was being done, it was a
17   direct conversation between Rodney Mesquias and myself.
18       Q.   And later on, after that first direct
19   conversation with Defendant Mesquias, did Defendant
20   McInnis become involved in giving out the power
21   wheelchairs?
22       A.   Yes, he did.
23       Q.   And can you explain that to the jury?
24       A.   We were needing authorization to go out and
25   purchase more power chairs for patients that were,
```

1    again, wanting to come off services.  And we needed to

2    go out and buy more chairs, so I needed direction on

3    which way to go, so I reached out to Henry McInnis on

4    that.

5        Q.  How expensive is a new power wheelchair?

6        A.  A basic power wheelchair can be upwards of

7    $1,200.

8        Q.  Did Defendant Mesquias direct you to buy new

9    power wheelchairs for patients?

10       A.  Not new ones.

11       Q.  What did he want to do?

12       A.  We would --

13       Q.  What did he do?

14       A.  We would purchase used ones from pawn shops or

15   Craigslist.

16       Q.  Pawnshop power wheelchairs?

17       A.  Correct.

18       Q.  Who paid the invoices for those power

19   wheelchairs?

20       A.  Rodney Mesquias.

21       Q.  Were you successful in getting patients to sign

22   up for hospice or stay on hospice by offering them free

23   power wheelchairs?

24       A.  Very successful.

25       Q.  Were all these patients actually dying?

1    A.   No, they weren't.

2    Q.   And did they all have a medical need for these

3    power wheelchairs?

4    A.   No.

5    Q.   Did Merida submit claims to Medicare for them?

6    A.   No.

7    Q.   Now, did some of these power wheelchair patients

8    eventually complain?

9    A.   Yes, they did.

10   Q.   And did you convey those complaints to Defendants

11   Mesquias and McInnis?

12   A.   Yes, I did.

13   Q.   And can you tell the jury about the types of

14   complaints that were made?

15   A.   A lot of patients eventually were starting to

16   realize that they were lied to.  Family members were

17   realizing that they were --

18            MR. HECTOR CANALES:  Objection, Your Honor.

19   Answer is providing hearsay and speculation of what

20   other family members thought and believed and said.

21            THE COURT:  Overruled in part, and sustained

22   in part.  Sir, again, the question was proper in terms

23   of -- please relay to the jury what you relayed -- what

24   you conveyed via the -- the terms of the complaint.

25   A.   I would relay the messages to Rodney Mesquias

1    about the complaints that the families were -- were

2    complaining about, about how their loved ones were put

3    on services, and these power chairs, and how they got

4    involved and, on some occasions, on the faultiness of

5    these power chairs.

6         Q.   (By Mr. Foster):   When you say the faultiness of

7    these power chairs, what were the complains that you

8    conveyed to Defendants Mesquias and McInnis about that?

9         A.   That they were --

10             MR. CYGANIEWICZ:   I object to him using a

11   compound question of Mr. Mesquias and Mr. McInnis.   I

12   mean, if it's -- if it's just one person, that's fine,

13   but combining them together on this line of questioning

14   is very confusing and compound and vague.

15             THE COURT:   Let's break it up.   Please

16   convey your conversation for each Defendant separately.

17        Q.   (By Mr. Foster):   Did you convey --

18             THE COURT:   Unless they were there at the

19   same time, then let us know.

20        Q.   (By Mr. Foster):   Did you convey these complaints

21   to Defendant Mesquias?

22        A.   I did.

23        Q.   And what were the nature of the complaints about

24   the condition of the power wheelchair that you conveyed

25   to him?

1    A.   The conditions were that either they weren't

2  working, batteries kept dying, the cleanliness of the

3  power wheelchairs, families and patients were not taught

4  how to use these power wheelchairs or how to charge

5  them.

6    Q.   And did you convey those to Defendant McInnis?

7    A.   Just to Rodney Mesquias.

8    Q.   Okay.  And what about complaints regarding the

9  hospice services that you conveyed to Defendant

10  Mesquias?

11    A.   I did.  I did, yes.

12    Q.   And can you explain those complaints that you

13  conveyed to him?

14    A.   The families that would complain to me felt that

15  their loved one did not need to be on hospice, and who

16  was the doctor that wrote the order to put these

17  patients, or their loved ones, on hospice services.

18    Q.   And now you've talked about how the Merida

19  marketing plan was to sign up patients for hospice who

20  weren't dying.  How did Merida get marketers to carry

21  out this marketing plan?

22    A.   So we had a handful of salaried employees, and

23  then we had what we called contract employees.

24    Q.   And did Merida pay kickbacks to these contract

25  employees?

1    A.   They were paid on a per patient basis.

2    Q.   And who at Merida came up with the plan to pay

3  these kickbacks to marketers?

4    A.   Rodney Mesquias.

5    Q.   How do you know that?

6    A.   Because I -- we had the conversation.

7    Q.   What did he say about that?

8    A.   That it would be lucrative for the agency to hire

9  contract employees and pay them on a per patient basis,

10  because that will entice these -- these employees or

11  contract employees to bring in more patients the more

12  that they get.

13    Q.   Did Defendant McInnis agree with this plan?

14    A.   Yes, he did.

15    Q.   How was he involved?

16    A.   He was actually on the phone at that time when we

17  had that conversation.

18    Q.   And did you also have a conversation with him

19  when he came to San Antonio about it?

20    A.   Yes, I did.

21    Q.   And can you relay to the jury what Defendant

22  McInnis said in that conversation?

23    A.   He said that Rodney made the decision to go ahead

24  and proceed with having contract employees.  I told him

25  that it was wrong to pay these employees on a per

1    patient basis.  And I was told to stay out of it, it's

2    their company, and they can operate how they see fit.

3         Q.   And why did you tell them that it was wrong to be

4    paying these marketers on a per patient basis?

5         A.   You can't be paying for patient referrals.

6         Q.   Now, did Merida, paying for patient referrals,

7    leave marketers to sign up patients who didn't need the

8    services?

9         A.   Yes, it did.

10        Q.   Can you explain to the jury how that worked?

11        A.   The marketers would go out, whatever patient

12   referrals that they would get from doctors' offices, or

13   families that they met with, they would convince these

14   families, again, to go on hospice services with the free

15   services they would be getting.  In return, they would

16   bring the -- the patients onto the agency services and

17   would be paid a stipend for each referral that they were

18   brought in.

19        Q.   How late in the night sometimes would you be

20   spending signing up patients for hospice?

21        A.   I've been out with a physician till, you know,

22   2:00 in the morning signing up patients in the hospital.

23        Q.   Now, did Defendant Mesquias attempt to conceal

24   the payment of these per patient fees?

25        A.   Yes, he did.

Q.   How did he do that?

A.   He didn't want anybody in the office to know that these contract employees were actually contracted marketing employees.

Q.   And what was Defendant McInnis' involvement?

A.   I don't know what Mr. -- Henry McInnis had involved.

Q.   Well, did you have a conversation with Defendant Mesquias and McInnis regarding whether these payments should be kept quiet?

A.   I did have a -- a conversation with Rodney Mesquias on these -- on these payments, and told him that everybody should know who's doing what so that way there was no stepping into different physicians' office that others marketers were actually marketing too.

Q.   And what did he say?

A.   He says that it's his agency, he's going to take care of it, and just to continue to go out and get more patients.

Q.   Now, did you become concerned that Merida was violating the Anti-Kickback statute?

A.   Yes, I did.

Q.   Did you contact research about it?

A.   Yes, I did.

Q.   How did you conduct research?

1      A.   I got onto the CMS website and started looking up

2   the rules and regulations for the anti-kickback.

3      Q.   And based on your research, what did you find

4   out?

5      A.   That the way the agency was operating with paying

6   these employees and enticing these patients was illegal.

7      Q.   And did you tell anyone about that?

8      A.   I did bring it up to Rodney Mesquias' attention.

9      Q.   And what did you tell him?

10     A.   I told him, the way that we are bringing on these

11  patients and paying these contract employees was wrong,

12  and that we can actually get into a lot of trouble with

13  it, and was told that it's his company and he can do how

14  he wants.

15     Q.   And were there also occasions where you raised

16  concerns with Defendant McInnis?

17     A.   On one -- one occasion, yes.

18     Q.   Can you describe that to the jury?

19     A.   I made a phone call to Henry McInnis regarding

20  employees down in the Corpus office and was told the

21  same thing:  It's their company, they've already done

22  the research, and what they're doing is not illegal.

23     Q.   And what was their reaction when you spoke to

24  them about Medicare's rules?

25              MR. CYGANIEWICZ:  Again, Your Honor, I

1    object to "their" being confusing.  Vague and compound.

2              THE COURT:  Rephrase the question.

3    Q.  (By Mr. Foster):  What was Defendant Mesquias'

4    reaction when you spoke to him about Medicare rules?

5    A.  He was actually kind of surprised that I actually

6    did my research on knowing what the regs and

7    regulations -- the rules and regulation were of -- of

8    hospice and the kickbacks, knowing that I didn't do

9    hospice prior to working for this agency.

10   Q.  And did he seem surprised to hear about these

11   rules?  Or did it seem like he already knew about them?

12   A.  He seemed like he already knew, just didn't care.

13   Q.  And what about Defendant McInnis?

14   A.  I didn't have an interaction with him on that.

15   Q.  Did he think that it was important to follow

16   these Medicare rules?  Or did he continue these

17   practices?

18   A.  Rodney Mesquias just continued the way he was

19   operating before.

20   Q.  Now, I want to talk about how the marketers found

21   patients for the hospice program.  Are you familiar with

22   the term "recycled patients"?

23   A.  Yes.

24   Q.  And what does that mean?

25   A.  So we would get patients that were already on

services, whether through provider services or through

home health, and trying to get them to sign up for the

hospice services.

Q.   And who told you to do that?

A.   Rodney Mesquias.

Q.   And did he direct marketers to solicit patients

from the home health program for the hospice program?

A.   Yes, he did.

Q.   And did Defendant McInnis agree that patients

should be taken from home health to hospice?

A.   Yes, he did.

Q.   And can you explain his involvement to the jury?

A.   The same involvement as Rodney was -- you know,

we were -- I was directed to let the -- my team know to

go into the provider services' office or to the home

health office and see what patients we can bring on to

hospice so we can add more -- you know, build the fences

over there.

Q.   Why did Defendant Mesquias say that he wanted to

move patients from home health to hospice?

A.   It's more lucrative financially for a patient to

be on hospice than it would be for home health or

provider services.

Q.   How did Defendant Mesquias direct marketers to

take patients from the home health program and move them

1    to the hospice program?

2        A.   So we would reach out to the families, let the

3    families know that their loved one has a diagnosis, and

4    we would mention the additional services and free

5    services that their loved one would get on hospice

6    instead of the current services that they are on, which

7    is home health.

8        Q.   What, if anything, did Defendant Mesquias ask you

9    to do with the medical charts of patients on the home

10   health program?

11       A.   So we would then -- we would ask the medical

12   director to sign off on the hospice orders giving us

13   permission to go out and -- and speak with the families.

14       Q.   Did he ask you to, and other marketers, to look

15   through the patient files?

16       A.   Yes, he did.

17       Q.   And can you explain to the jury what he wanted

18   you and other marketers to do with those patient files?

19       A.   So we were looking for certain diagnoses of the

20   congestive heart failure, COPD, Alzheimer's patients,

21   that were noted in their charts.

22       Q.   Now, you're a marketer, correct?

23       A.   That is correct.

24       Q.   You're not a medical professional?

25       A.   No.

1    Q.   You've worked as a marketer for over a decade?

2    A.   That is correct.

3    Q.   Have you ever been asked to do -- well, is there

4    something wrong with this?

5    A.   It is.

6    Q.   And why do you feel that there's something wrong

7    with this?

8    A.   I'm not a clinician, so I shouldn't be the one to

9    make the decision whether or not a patient qualifies for

10   hospice or not.

11   Q.   And did Rodney Mesquias want patients with

12   certain diagnoses on home health to be moved to hospice?

13   A.   Yes.

14   Q.   And did those include congestive heart issues?

15   A.   Yes.

16   Q.   Alzheimer's patients?

17   A.   Yes.

18   Q.   COPD?

19   A.   Yes.

20   Q.   Did it matter whether they were terminally ill?

21   A.   No.

22   Q.   Matter whether they were dying?

23   A.   No.

24   Q.   Was there a meeting with Defendant McInnis in

25   Harlingen where he directed you to do a similar thing?

1     A.   He directed me to carry out the same duties out

2  in Corpus, as well as Laredo.

3     Q.   And did Merida convert patients from home health

4  to hospice using this strategy?

5     A.   Yes, they did.

6     Q.   Now, you've talked about there being medical

7  directors.

8            MR. FOSTER:   And can we display Exhibit L3.

9     Q.   (By Mr. Foster):   Now, I want to talk to you

10  about how Merida got orders from doctors.   Did the

11  majority of orders that Merida come from a patient's

12  primary care physician or did they come from the medical

13  directors?

14            MR. HECTOR CANALES:   Objection, Your Honor.

15  Lacks foundation.   All of Merida?   I don't think the

16  witness has any knowledge about all of Merida's file and

17  studied how they rate them, where they came from.

18            MR. GUERRA:   Also calls for speculation,

19  Your Honor.

20            THE COURT:   Rephrase the question.

21            MR. FOSTER:   Thank you, Your Honor.

22     Q.   (By Mr. Foster):   What areas were you a marketer

23  in?

24     A.   San Antonio, Corpus, and Laredo.

25     Q.   And what areas did you oversee other marketers?

1      A.   San Antonio, Corpus, and Laredo.

2      Q.   And in San Antonio, Corpus, and Laredo, did you

3  have occasion to become familiar with who was making the

4  referral for the hospice program?

5      A.   Yes, I did.

6      Q.   And how did you become familiar with that?

7      A.   We would go to the actual medical directors that

8  were on -- on our agency and have them sign the orders

9  for these patients.

10      Q.   And so in the majority of orders that you were

11  familiar with in these three areas of the Merida Group,

12  did they come from the patient's primary care physician

13  or from the medical directors?

14      A.   95 percent of them came from the medical

15  directors themselves.

16      Q.   Now, were there occasions where a primary care

17  physician was consulted and refused to sign the order

18  because the patient was not dying?

19      A.   Yes.

20      Q.   And what did Rodney Mesquias tell you to do when

21  the patient's primary care physician refused to sign an

22  order?

23      A.   Give it to the medical director so, then, that

24  way, they can sign off on the order.

25      Q.   Did Henry McInnis agree with Rodney Mesquias that

1    you should have a medical director certify a patient for

2    hospice if their primary care physician refused to do

3    so?

4            MR. CYGANIEWICZ:  Objection.  Calls for

5    speculation.

6            THE COURT:  Rephrase the question.

7    Q.  (By Mr. Foster):  Were there occasions where

8    primary care physicians refused to certify a patient for

9    hospice because they weren't dying?

10   A.  Yes.

11   Q.  And what did Henry McInnis say to do in that

12   situation?

13   A.  The medical -- have the medical director sign off

14   on the order.

15   Q.  Thank you.

16           What did you think about that?

17   A.  I thought that was wrong.

18   Q.  Why?

19   A.  Because the primary care physician that oversees

20   these patients knows more about their patients than the

21   medical director for the agency did.

22   Q.  Now, when you and other marketers went through

23   these home health files, who were you directed to get

24   the orders from?

25   A.  So we were told to attempt to try to get them

1   from the primary care doctor, but if we were

2   unsuccessful, to give it to the medical director to sign

3   off on.

4       Q.   Now, I want to talk about why the medical

5   director signed these unnecessary orders.   Did you have

6   a conversation with Defendant Mesquias about how he was

7   paying the medical directors?

8       A.   Yes.

9       Q.   What did he tell you about how he was paying the

10   medical directors?

11       A.   They were being paid for services as being a

12   medical director, but also for signing on -- signing off

13   on orders for patients, as well.

14       Q.   And did that alarm you that they were being paid

15   also for signing off on orders and referring patients?

16       A.   Yes, it did.

17       Q.   Why?

18       A.   Because the medical director's job is to oversee

19   the clinical part of the hospice agency, not to be

20   signing off on orders that other primary care doctors

21   refuse to sign on.

22       Q.   Now, did you have a phone call with Henry McInnis

23   where he made a similar comment about the medical

24   directors?

25       A.   Yes.

1    Q.  And can you describe that phone call to the jury?

2    A.  So I had a phone call -- I received a phone call

3    when I was in our Corpus office and received the -- a

4    concern from our Laredo office regarding one of our

5    medical directors, Dr. Pena, stating how he hadn't been

6    paid by Merida, and he was threatening to take his

7    patients that he had on services and discharge them from

8    the agency.  I did make the phone call to Henry McInnis

9    about that, voicing the concern.  He then called Rodney

10   Mesquias.  Originally, they were just going to not pay

11   Dr. Pena and let him do what he wanted with his

12   patients, but after Henry McInnis did the calculations

13   on the number of patients that we would be losing out of

14   that office, it was cheaper to just pay out Dr. Pena for

15   his medical directorship than to lose these patients off

16   services.

17   Q.  So let's break that down one step at a time.

18   What was Defendant Pena saying that he was going to do

19   with his patients if he didn't get paid?

20        MR. GUERRA:  Objection, Your Honor.  Calls

21   for hearsay.

22        THE COURT:  Rephrase the question in terms

23   of saying who.

24   Q.  (By Mr. Foster):  Yeah.  Did you speak with

25   Defendant Pena?

1    A.   Yes, I did.

2    Q.   And what did Defendant Pena say he would do with

3  his patients if he didn't get paid?

4    A.   He was going to take his patients off services.

5    Q.   And did you speak with Defendants McInnis and

6  Mesquias?

7    A.   Yes, I did.

8    Q.   And what did Defendant McInnis tell you about the

9  amount of money that Merida would lose if Defendant Pena

10  took his patients to another hospice company?

11    A.   They would be losing thousands of dollars

12  compared to what Pe- -- Dr. Pena would be.

13    Q.   And did Defendant McInnis then tell you that they

14  decided to pay Defendant Pena --

15         MR. CYGANIEWICZ:   Objection.   Leading,

16  Your Honor.

17         THE COURT:   Rephrase the question.

18    Q.   (By Mr. Foster):   What did Defendant McInnis tell

19  you they decided to do?

20    A.   They were going to pay out Dr. Pena his medical

21  directorship.

22    Q.   And did he say that he -- did he say whether he'd

23  consulted with anyone about that?

24    A.   He did say that he spoke to Rodney Mesquias about

25  how it's cheaper to just pay out Dr. Pena his medical

1    directorship than to lose these patients.

2         Q.   Now, did you have another interaction with

3    Defendant Pena in person?

4         A.   Yes, I did.

5         Q.   And what role were you in with the Merida Group

6    at that time?

7         A.   I was the marketing manager.

8         Q.   And where did you meet with Defendant Pena?

9         A.   At his office.

10        Q.   And what did he say to you?

11        A.   So, when I went in to Dr. Pena's office in

12   Laredo, I went in to introduce myself, along with one of

13   my marketers, kind of told him how I was overseeing the

14   marketing team for the Merida Group.  Dr. Pena welcomed

15   me and told me that if we wanted to go through his

16   medical records charts to see what patients would

17   benefit from hospice, to go ahead and go through those

18   charts, and he'll sign off on the orders.

19        Q.   How did you react when Defendant Pena told you

20   that you could go through his charts and pick out people

21   to be signed up for hospice?

22        A.   I was taken aback.

23        Q.   Why were you taken aback?

24        A.   Because that's a clear violation of -- of HIPPA.

25        Q.   Was there any other concern you had about that,

1   too?

2     A.  I'm not a clinician, nor -- so I shouldn't be

3   going through somebody else's medical records to see

4   whether or not they qualify.

5     Q.  And to be clear, did Defendant Pena indicate to

6   you that he would be conducting some additional medical

7   assessment, or that he would sign off on anyone you

8   identified?

9     A.  He would just sign off on whoever we identified.

10     Q.  Now, focusing on the other Merida Group medical

11   directors, and Dr. Virlar, specifically, did you

12   interact with Dr. Virlar?

13     A.  Yes, I did.

14     Q.  How often did you interact with Dr. Virlar?

15     A.  Almost on a daily basis.

16     Q.  And who was the doctor who referred most of the

17   patients to Merida in San Antonio while you were there?

18     A.  Dr. Virlar.

19     Q.  And what percentage of the patients did he refer?

20     A.  About 90 percent.

21     Q.  And would he admit patients to hospice without

22   ever seeing them?

23     A.  Yes, he would.

24     Q.  How do you know that?

25     A.  We would get -- I would meet with the -- I would

1    reach out to the families, and the families were asking

2    which doctor was the one that made these -- these

3    hospice orders.  I would let them know that Dr. Virlar

4    was the one that made the order.  And they had no

5    recollection of ever meeting or seeing with a Dr. Virlar

6    ever.

7        Q.  Now, you talked about how the marketers would be

8    signing up all these patients who weren't dying, didn't

9    qualify for hospice.  Did Dr. Virlar sign those orders?

10       A.  Yes, he did.

11       Q.  And did you obtain an understanding, through a

12   conversation with Dr. Virlar, about why he was signing

13   these medically unnecessary orders?

14       A.  Yes, I did.

15       Q.  What did Dr. Virlar tell you?

16       A.  He was the medical director for the agency and he

17   was being paid to be medical director and to sign off on

18   orders on patients that we brought in for services.

19       Q.  Now, I want to turn to a doctor who was a medical

20   director for a brief period of time.  Isn't up on this

21   chart.  Are you familiar with someone named

22   Dr. Escamilla?

23       A.  Yes, I am.

24       Q.  Who is Dr. Escamilla?

25       A.  He is a primary care physician in San Antonio,

1    Texas.

2        Q.   Did Dr. Escamilla work for the Merida Group?

3        A.   For a very short time.

4        Q.   And, as he was there for a short time, while he

5    was there, did he perform the duties of a medical

6    director?

7        A.   Yes, he did.

8        Q.   And can you explain to the jury what that means?

9        A.   He would write the prescriptions for the patients

10   that needed the medications, he would attend the IDG

11   meetings, he would take on call after hours for any

12   concerns that nurses would have regarding patient care

13   after hours.

14       Q.   But did Dr. Escamilla refer patients to the

15   Merida Group?

16       A.   Very few.

17       Q.   Was Dr. Escamilla terminated as a medical

18   director?

19            MR. HECTOR CANALES:   Objection.   Form.

20   Objection, Your Honor.   Calls for speculation.

21            THE COURT:   Answer if you know.

22       Q.   (By Mr. Foster):   Was Dr. Escamilla terminated as

23   a medical director?

24            MR. HECTOR CANALES:   Objection, he lacks

25   personal knowledge as to whether or not he -- and

1   foundation as to whether or not he could even know the

2   reasons.

3               MR. FOSTER:  I'm asking him if he knows,

4   Your Honor.

5               THE COURT:  The objection's overruled.

6   Answer only if you know.

7       A.  Yes, I -- I was aware that Dr. Escamilla was

8   terminated.

9       Q.  (By Mr. Foster):  And did you have a conversation

10  with Rodney Mesquias regarding the termination of

11  Dr. Escamilla?

12      A.  Yes, I did.

13      Q.  And can you describe to the jury why Rodney

14  Mesquias told you that he was terminating Dr. Escamilla?

15      A.  I had called Rodney Mesquias to voice my concern

16  on why he was terminating Dr. Escamilla, because

17  Dr. Escamilla was a very -- he was a very good

18  doctor when it came to hospice care.  I was told that

19  Dr. Escamilla was not referring patients to the agency,

20  so that's why he was being terminated.

21      Q.  Now, in addition to the medical directors, were

22  nurses at Merida required to assess patients?

23      A.  Yes, they were.

24      Q.  And were you present when nurses spoke to

25  Defendant Mesquias about patients?

1     A.   Yes, I was.

2     Q.   And did nurses tell Defendant Mesquias that

3  patients should not be admitted because they weren't

4  dying?

5     A.   Yes.

6     Q.   How did Defendant Mesquias react when a nurse

7  told him patients should not be admitted because they're

8  not dying?

9     A.   He would get very upset.  We'd be in the

10  conference room, he would slam his hands on the desk, or

11  on the conference table, and just start yelling at the

12  nurses for them to find a qualifying diagnosis for these

13  patients.

14     Q.   And would he accept the judgment of the nurse

15  that these patients didn't qualify?

16     A.   Not always.

17     Q.   And what would he do?

18     A.   He would then have a second nurse that he knew

19  would qualify these patients to go out and sign them up.

20     Q.   And were there some nurses who admitted every

21  patient?

22     A.   There were a few, yes.

23     Q.   And did you have conversations with Henry McInnis

24  about a similar topic where a nurse wouldn't admit a

25  patient because they said they didn't qualify?

1    A.   I had -- usually my conversations on those was

2  with Rodney Mesquias.

3    Q.   And what would -- do you recall a conversation

4  with Mr. McInnis about whether other nurses should be

5  used if one nurse wouldn't admit a patient?

6    A.   I didn't agree with the fact that -- I would tell

7  Henry McInnis that I didn't agree that certain nurses

8  that we knew would qualify patients should go out and do

9  an evaluation, that we should send out a different nurse

10  other than those that will qualify these patients to go

11  out and do a second assessment on these patients.

12    Q.   What would happen to the original nurse who said

13  a patient didn't qualify?

14    A.   They would no longer be able to do admissions on

15  patients.

16    Q.   And who directed that they would no longer be

17  allowed to do admissions on patients?

18    A.   Rodney Mesquias.

19    Q.   Now, were you also present at what are called

20  IDG, or Interdisciplinary Group meetings?

21    A.   Yes, I was.

22    Q.   And what would happen in those meetings?  Well,

23  was Rodney Mesquias present at some of those meetings?

24    A.   On occasion.

25    Q.   And were there occasion where he was present and

1    a nurse said that a patient should be discharged because

2    they didn't qualify for the services?

3        A.   Yes.

4        Q.   And how would he react?

5        A.   He would get upset again.  He didn't want any

6    patients within his agency to be discharged from

7    services without either consulting with Rodney Mesquias,

8    or consulting with a medical director.

9        Q.   Now, did some nurses quit?

10       A.   Yes, they did.

11       Q.   And did those nurses, when they quit, raise

12   concerns that you conveyed to Defendant Mesquias?

13       A.   Yes.

14       Q.   And can you describe those conversations to the

15   jury?

16              MR. HECTOR CANALES:  Objection, Your Honor.

17   Calls for hearsay, the conversations of these other

18   nurses.

19              THE COURT:  Again, sustained in part.

20   Obviously convey what you relayed to Mr. Mesquias.

21       Q.   (By Mr. Foster):  Yes.  The question was:  What

22   were the complaints that you relayed to Mr. Mesquias?

23              THE COURT:  I think you limited it in scope

24   properly, but I wanted to make sure.  Go ahead.  Answer

25   the question in terms of your conversation with Mr.

Mesquias.

A.   The conversations that I had with some of these nurses that I had good relationships with --

MR. HECTOR CANALES:  Objection, Your Honor. It's hearsay.  Even so, Your Honor, I'd object because it's hearsay within hearsay.

MR. FOSTER:  It goes to the knowledge and intent of the Defendants, which is directly at issue. It's non-hearsay.

THE COURT:  I'll allow you to say -- I don't want to hear what they told you.  I want to hear what you told Mr. Mesquias.

A.   So the conversation that I would relay to Mr. Mesquias was that we're losing good nurses because they are not qualifying patients that are not hospice appropriate, and they are very good nurses, not wanting to risk their license is what I would -- the conversations that I had with Rodney Mesquias.

Q.   (By Mr. Foster):  And how did he react?

A.   He really didn't care because he knew that he had staff that would admit his patients regardless.

Q.   Now, I want to talk about what happens after patients would be put on hospice.  Do you have to waive certain rights to go on hospice?

A.   Yes, you do.

1    Q.   Are there drawbacks to being put on hospice if

2    you don't need it?

3    A.   Yes, there are.

4    Q.   Can you describe those to the jury?

5    A.   The drawbacks of being on hospice when you're not

6    needing hospice at the time is, after being on hospice

7    for so long, then, of course, eventually, you're going

8    to come off services.  When the time does come that a

9    patient is truly needing the hospice care, they would

10   have already burned through so many of their hospice

11   benefits, that a legitimate agency is going to be

12   skeptical on picking up these patients, because there's

13   really no more funds on this -- for this patient to get

14   the services that they -- they worked hard all their

15   life to get.

16   Q.   Are there also rights to curative treatment that

17   are waived when you go on hospice?

18   A.   When you go on hospice, you do waive your -- your

19   right to a seek any time of aggressive or curative

20   treatment.

21   Q.   And would patients, or their family members,

22   become angry when they found out about this?

23   A.   Yes.

24   Q.   And can you describe that anger for the jury?

25   A.   Families were questioning, you know, why their

1    loved one was on services, who put them on services, who

2    wrote the order, because these family members felt that

3    their loved one still wanted to seek curative treatment

4    and continue to still want to go to the hospital when

5    needed, and seek their services that they wanted to stay

6    alive and not be put on hospice.

7        Q.   Did you also receive complaints from primary care

8    doctors that you conveyed to Defendant Mesquias?

9        A.   Yes, I would.

10       Q.   And can you describe what you conveyed to

11   Defendant Mesquias about complaints from primary care

12   doctors?

13       A.   These doctors' offices called complaining of who

14   was the one who put their patient on hospice, and why

15   wasn't the primary care physician consulted first prior

16   to their patients being put on hospice.

17       Q.   And what was Defendant Mesquias' reaction?

18       A.   He didn't care.  He got these patients on

19   services, and that's all he was worried about.

20       Q.   Would he want you to take this patient off

21   services immediately, or do something else?

22       A.   So when a family member, or the primary care

23   doctor would call us wanting to take these patients off

24   services, we would -- we were told to kind of stall the

25   families or the patients from taking them off services,

1    hoping that the families would eventually just forget

2    that they're on services and continue to keep them on

3    services.

4        Q.   Who told you to stall in taking the patients off

5    services?

6        A.   So we would tell the families that, you know,

7    we're consulting with their doctors, or, you know, we're

8    consulting with other medical providers to see, you

9    know, if they should really come off services or not.

10       Q.   And who directed you to stall?

11       A.   Rodney Mesquias.

12       Q.   Now, I want to turn to some specific patients who

13   you interacted with.

14            MR. FOSTER:  Can we bring up what's been

15   admitted as H36?

16       Q.   (By Mr. Foster):  Is this a specific patient you

17   interacted with?

18       A.   Yes, it is.

19       Q.   Did you go out and meet with her at her home?

20       A.   Yes, I did.

21       Q.   Did you recommend that she be admitted to the

22   home health program or the hospice program?

23       A.   The home health program.

24       Q.   Was she admitted to the home health program, or

25   was she admitted to the hospice program?

1      A.   She was admitted to hospice.

2      Q.   Who directed that she be admitted to the hospice

3  program?

4      A.   Rodney Mesquias.

5      Q.   Why did you recommend that she be on home health

6  and not on hospice?

7      A.   When I met with patient, Ms. Conti, being a

8  non-clinician, she didn't -- she flat out told me she

9  didn't want hospice.  She just wanted some type of

10  therapies, she needed some equipment, but she wasn't

11  ready to -- to die, or anything like that.  She was

12  still wanting to seek a period of treatment for her

13  disease.

14      Q.   Did Ms. Conti have a particular valuable type of

15  insurance?

16      A.   Yes, she it.

17      Q.   And did Mr. Mesquias make a comment about that

18  when he directed that she be put on hospice?

19      A.   She -- she -- the agency would be more

20  lucrative in receiving Ms. Conti on hospice than it

21  would be -- would be on home health paymentwise.

22      Q.   Is that what Defendant Mesquias said?

23      A.   Yes.

24      Q.   And did you continue to see Ms. Conti after the

25  time that she initially put on hospice?

1     A.   Yes, I did.

2     Q.   And after a while, did she become upset?

3     A.   She did.

4     Q.   And did you convey complaints from her to

5  Defendant Mesquias?

6     A.   Yes, I did.

7     Q.   And what did you convey to Defendant Mesquias

8  about Ms. Conti's complaints?

9     A.   That she was wanting to come off services, the --

10  she was receiving crappy care from the agency, her

11  nurses weren't going out to see her, her aides were

12  skipping days on -- on bathing, she wasn't getting her

13  incontinence supplies as promised, and if she was

14  getting her incontinence supplies, she was getting very

15  cheap incontinence supplies.

16     Q.   Did Defendant Mesquias tell you to offer Ms.

17  Conti something to stay on services?

18     A.   Yes, he did.

19     Q.   What did he tell you to offer --

20     A.   A power chair.

21     Q.   -- Ms. Conti?

22     A.   A power chair.

23     Q.   And did you offer Ms. Conti a power chair?

24     A.   Yes, I did.

25     Q.   And did she stay on services for a little while

```
 1   longer?
 2       A.   For a short period, she did.
 3       Q.   And did she, then, complain to Defendant Mesquias
 4   directly?
 5       A.   Yes, she did.
 6       Q.   And did she complain about something she called
 7   "the corruption"?
 8       A.   Yes.
 9       Q.   And what was that?
10       A.   She knew that the -- the way Rodney Mesquias was
11   operating his agency was not for patient care, it was
12   just for money.  She would voice her concern to me that
13   it's a corrupt agency, how can I be associating
14   myself --
15            MR. HECTOR CANALES:  Objection, Your Honor.
16   This is all hearsay about what Ms. Conti is saying.
17   Witness is not testifying.
18            THE COURT:  Sustained.  Let's limit the
19   scope of this question.  Rephrase.
20            MR. FOSTER:  Sure.
21            THE COURT:  New question, please.
22            MR. FOSTER:  Yes.
23       Q.   (By Mr. Foster):  And in addition to complaining
24   to Rodney Mesquias, did you become aware that she
25   complained to a medical director at Merida?
```

1    A.   She did, yes.

2    Q.   And did you then become aware that the medical

3    director indicated that it was time to take Ms. Conti

4    off services?

5    A.   Yes.

6    Q.   And which medical director was that?

7    A.   Dr. Greg Gonzaba.

8    Q.   What did Defendant Mesquias do?

9    A.   The only thing that he did was he took Ms. Conti

10   off of Dr. Gonzaba's panel and put it on Dr. Virlar's

11   panel.

12   Q.   Now, when you said took off Dr. Gonzaba's panel

13   and put on Dr. Virlar's panel, what do you mean there?

14   A.   For IDG meetings, we had the different medical

15   directors who oversaw different teams within the agency.

16   Q.   And so what does that mean that Ms. Conti was

17   then put on Dr. Virlar's panel?

18   A.   So -- because Dr. Gonzaba wanted to discharge Ms.

19   Conti from services, all Rodney Mesquias did was moved

20   her from Dr. Gonzaba's oversight and put her under Dr.

21   Virlar's oversight.

22   Q.   And what did Dr. Virlar do?

23   A.   He continued to write orders and certify Ms.

24   Conti.

25   Q.   Even though Dr. Gonzaba wanted her discharged?

1      A.   Correct.

2      Q.   Now, let's talk about the services that were

3   provided at Merida.  Did you become aware that Merida

4   was billing Medicare for services that were not being

5   provided?

6      A.   Yes.

7      Q.   How did you become aware of that?

8      A.   I had family members reaching out to me.

9      Q.   And did you examine the files to see what was

10   being billed to Medicare?

11      A.   I was looking at the patient charts to see of

12   nurses or the aides were actually going out on the set

13   days that they were supposed to when a family member

14   would call me.

15      Q.   And what did you discover?

16      A.   That, from what the families were telling me, was

17   not matching up to what the charts were saying, but,

18   yet, it was showing that the visit was made and being

19   billed for.

20      Q.   And did you talk to Defendant Mesquias about

21   this?

22      A.   I did.

23      Q.   And what did he say?

24      A.   It's his company, he'll continue -- he'll look

25   into it, but continue to go out and do my job.

1    Q.   And did anything change?

2    A.   No.

3    Q.   And were there occasions where you went out to

4    check whether nurses were doing visits?

5    A.   I was -- I was very involved with a lot of my

6    families, so I would do spot visits just to see how

7    things were going, if there was any complaint that the

8    families would have, because, if anything, I would want

9    to catch it early instead of waiting until it escalated.

10   And that's how I would start to notice that nurses were

11   not going out for days at a time, weeks at a time,

12   patients were going weeks without being bathed, supplies

13   were just being dropped off, and then they would just

14   leave.

15   Q.   Now, when you told Defendant Mesquias about this,

16   did he appear to care if they saw the patients?

17   A.   Not at all.

18   Q.   Now, what did he appear to care about?

19   A.   Just money.

20   Q.   What gave you that impression?

21   A.   Every time I would speak with him, it was, "I

22   want more patients.  Go out and get me more patients."

23   Q.   Did he tell you how he was spending the Medicare

24   money?

25   A.   He wouldn't tell -- tell us directly.  We would

1    see it.

2        Q.   What would you see?

3        A.   The luxury vehicles that he would pull up in, a

4    tailor would show up to the office to size Rodney

5    Mesquias for clothing, we would have dry cleaning being

6    brought into the office every single time for Rodney

7    Mesquias, his lavish lifestyle that he was living, trips

8    that he would be taking to Vegas.

9        Q.   After trips to Vegas, what would happen with

10   payroll?

11       A.   The payroll for the providers --

12              MR. HECTOR CANALES:  Objection.  Objection,

13   Your Honor.  Relevance and lack of foundation, and --

14   and calls for hearsay.

15              MR. FOSTER:  Goes to his motive and intent.

16              MR. HECTOR CANALES:  He's a marketer, Judge.

17   He has nothing --

18              THE COURT:  One second.

19              MR. HECTOR CANALES:  -- to do with payroll.

20              THE COURT:  One second, gentlemen.  One

21   second, gentlemen.  Overruled as to hearsay, but let's

22   lay some foundation if you have -- before you ask -- so

23   rephrase the question.

24              MR. FOSTER:  Sure.

25       Q.   (By Mr. Foster):  Did Defendant Mesquias talk

1   about what he would do in Vegas?

2      A.   It was posted on social media.

3      Q.   And what would you see on social media?

4      A.   Lavish parties on a party bus on a Vegas trip

5   with Rodney Mesquias and a crew just living it up in

6   Vegas.

7      Q.   And did you become aware of payroll not being met

8   after those trips?

9      A.   Yes, I was.

10      Q.   How did you become aware of that?

11      A.   The employees on the provider side were

12   complaining that they weren't being paid or the checks

13   were bouncing.

14           MR. HECTOR CANALES:   Again, Your Honor,

15   objection.   It's not proper foundation and, again, the

16   witness keeps providing hearsay testimony.

17           THE COURT:   Again, limit -- limit your

18   testimony as to what you personally experience and not

19   what other people told you at this time.

20           Please proceed.

21           MR. FOSTER:   Thank you.

22      Q.   (By Mr. Foster):   Was there something known as a

23   boys club at the Merida Group?

24      A.   Yes.

25      Q.   And who was in the boys club?

1    A.   Anybody that would be a "yes, sir" to Rodney

2  Mesquias.

3    Q.   And when you say a "yes, sir", explain to the

4  jury what you mean.

5    A.   Basically somebody who would not tell Rodney no.

6  So if he wanted you to go out and find patients who

7  didn't qualify, you were out there getting these

8  patients that didn't qualify for services.

9    Q.   And was Defendant McInnis in that club?

10    A.   Yes, he was.

11    Q.   And Dr. Virlar?

12    A.   Yes.

13    Q.   And did you see postings of them on social media?

14    A.   Yes, I did.

15    Q.   And did those illustrate the perks of being in

16  the club?

17    A.   Yes, it did.

18    Q.   And what did you see?

19    A.   The perks of going on these Vegas trips, the use

20  of condos in San Antonio, the use of the luxury vehicles

21  that Rodney Mesquias would own.

22    Q.   Now, I want to turn to the documentation of

23  Merida.  Did Merida submit claims without the necessary

24  documentation?

25    A.   Yes.

 1      Q.   And what types of documentation was missing?

 2      A.   The face-to-face.

 3              MR. HECTOR CANALES:  Objection, Your Honor.

 4   Lack of foundation.  The witness has said -- no question

 5   has been asked, no foundation as to what his involvement

 6   with -- with patients beyond marketing.  He's not a --

 7   he's not a nurse, he's not an --

 8              THE COURT:  Sustained.  Rephrase the

 9   question.

10              MR. FOSTER:  Sure.

11      Q.   (By Mr. Foster):  Did you -- how did you become

12   aware that face-to-faces were not being done?

13      A.   Family members were calling.

14      Q.   Okay.  And did you check the files?

15      A.   I did.

16      Q.   Okay.  And did you also observe the medical

17   director come into the office?

18      A.   Yes, I would.

19      Q.   And can you tell the jury what you observed?

20      A.   The medical direct- -- the medical director

21   signing a stack of face-to-faces and backdating these

22   face-to-faces to show that they were actually done

23   during that time that they should have been done.

24      Q.   And did you review the face-to-faces yourself?

25      A.   I would glance over them, yes.

1    Q.   Okay.  And what did you observe when you reviewed

2    the face-to-faces yourself?

3              MR. GUERRA:  Your Honor, I'm going to

4    object.  He's speaking in such broad terms.  If we could

5    get specificity as to what he's looking at, go for it;

6    otherwise, he's leaving the jury with a mistaken

7    impression as to what it is he's reviewing.

8              THE COURT:  That's overruled.  I think it --

9    you specifically asked face-to-face documentation,

10   correct?

11             MR. FOSTER:  That's correct, Your Honor.

12             THE COURT:  Overruled.

13   A.   So what I would see on these face-to-faces, after

14   reviewing multiple face-to-face encounters, was that the

15   wording on each face-to-face was identical to previous

16   face-to-faces for different patients, just worded

17   differently.

18   Q.   (By Mr. Foster):  And what did you think about

19   that?

20   A.   I thought that was wrong.

21   Q.   Why?

22   A.   Because the doctor, himself, was not going out to

23   physically see these patients like he should have.

24   Q.   And did you tell anyone about that, about your

25   concerns?

1    A.   I did bring it up to Rodney Mesquias.

2    Q.   And what did you tell him?

3    A.   That the doctors are not going out to do these

4  face-to-faces as they said they are.   And his response

5  was, "I'm sure they are".

6    Q.   And did things change after you talked to him?

7    A.   No.

8    Q.   Now, as time went on, did you become increasingly

9  concerned?

10   A.   What was the question?

11   Q.   As time went on, did you become increasingly

12  concerned about what was occurring at the Merida Group?

13   A.   Yes.

14   Q.   And what did you do?

15   A.   I decided to start seeking employment elsewhere.

16   Q.   And -- and did you also raise concerns

17  internally?

18   A.   They were raised at the time.

19   Q.   And what happened as a result of the concerns

20  that you were raising?

21   A.   I started getting a lot of my job duties taken

22  away from me as far as management oversight.

23   Q.   Who took your job responsibilities away?

24   A.   Henry McInnis.

25   Q.   Who did he give your responsibilities to?

1    A.    He gave them to a female marketer out of

2    Harlingen.

3    Q.    And did you observe how she carried out the job?

4    A.    Yes, I did.

5    Q.    What did you observe?

6    A.    That she was the "yes, sir" type person, she

7    would do whatever was asked of her to make the agency

8    successful.

9    Q.    And did you eventually decide to leave?

10    A.    Yes, I did.

11    Q.    And were you looking for other employment?

12    A.    Yes, I was.

13    Q.    And why were you looking for other employment?

14    A.    I no longer wanted to be associated with the

15    agency that was not on the best interest of the patient.

16    Q.    Can you describe the personal toll that that took

17    on you?

18    A.    When I got into hospice, it was personal for me.

19    I didn't want the families to go through what I went

20    through.  But after a while, I started turning into that

21    person that Merida wanted me to be, and, for me, it

22    was -- I -- I lied to a lot of families that I shouldn't

23    have lied to.  There was nights where I had trouble

24    sleeping, because when I -- what I was doing was wrong.

25    And I just told myself:  You know what?  I need to get

1  out.  I need to get out now before it takes a bigger

2  toll on myself than what it already has.  And I felt

3  like I let down a lot of families.

4     Q.  And when you started looking for another job, did

5  others at Merida find out about that?

6     A.  Yes, they did.

7     Q.  And what happened?

8     A.  I was terminated immediately.

9     Q.  And after you left Merida, did you file a

10  complaint?

11     A.  Yes, I did.

12     Q.  And why did you file that complaint?

13     A.  I wanted the complaint to the OIG's office to

14  know everything that I witnessed within this agency, and

15  I wanted it to be looked at, because these families'

16  livelihoods depended on it.  They were robbed of their

17  benefits that they worked their entire life for, and it

18  was being taken away at the snap of a finger to this

19  agency for their personal gain and not for the patients'

20  benefit.

21           MR. FOSTER:  Thank you, sir.  No further

22  questions.

23           THE COURT:  Thank you, Mr. Foster.

24           Gentlemen, the Government used approximately

25  an hour and 15 minutes with this witness.  And so only

1    -- 4:35, approximately.  So, Mr. Canales, what we'll do

2    is please proceed, but we'll probably break before you

3    finish your entire time, around the 5:30 range -- 5:15,

4    5:30 range, and, then, obviously, reconvene in the

5    morning.  All right?

6              MR. HECTOR CANALES:  Very well, Your Honor.

7              THE COURT:  All right.  Please proceed, sir.

8                      CROSS-EXAMINATION

9    BY MR. HECTOR CANALES:

10      Q.  Good afternoon, Mr. Gonzalez.

11      A.  Good afternoon.

12      Q.  You were fired, you were terminated in 2016,

13   February 2016.  Did I understand your testimony correct?

14      A.  That is correct.

15      Q.  All right.  You didn't quit.  You were fired.

16      A.  I was terminated for seeking employment.

17      Q.  All right.  Where?  Where were you seeking

18   employment at?

19      A.  At another agency.

20      Q.  What was the name of that agency, sir?

21      A.  Generations Hospice.

22      Q.  Were you successful in -- in becoming employed at

23   Generations?

24      A.  It took a while.

25      Q.  How long?

 1    A.   It took a little over a year and a half to become

 2   successful.

 3    Q.   No, no, no.   Forgive me.   Did you get the job?

 4    A.   I did.

 5    Q.   Right.   Right away?

 6    A.   Correct.

 7    Q.   Okay.   Also in February '16?

 8    A.   Correct.

 9    Q.   So you didn't quit this hospice agency that was

10   just -- sounded like an absolute nightmare to work for.

11   You had to be fired before you left?

12    A.   I was already seeking employment elsewhere at the

13   time.

14    Q.   But you didn't quit.

15    A.   I was about to.

16    Q.   What were you waiting on?

17    A.   I was just waiting for my offer letter from the

18   other agency.

19    Q.   So it wasn't so bad that -- and you weren't so

20   offended that you just would quit immediately.   You were

21   waiting for two years to find out from some other

22   hospice, ended up being Generous -- Generations?

23    A.   No, I didn't wait two years.

24    Q.   Well, you worked there for two years; didn't you?

25    A.   I worked at Merida for two years.   It was about

1    within a year and a half that I started to realize all

2    the corruption that was going on.

3        Q.   Okay.  So the first year and a half of the two

4    years, you didn't realize anything, you didn't see

5    anything?

6        A.   I would see things, but I would question myself,

7    because, again, I didn't have a hospice background.

8        Q.   So these -- all these kind of general generic

9    conversations that you just told the jury that -- and it

10   really sounds like it happened in the last six months;

11   fair?

12       A.   No.

13       Q.   No?  Okay.  Well --

14       A.   Any time that there was a complaint, even with

15   other agencies, I would voice the concerns to

16   leadership.

17       Q.   But the first year and a half, you didn't feel so

18   bad about the place that you -- you didn't consider

19   leaving until six months -- until after about a year and

20   a half.  Is that -- am I understanding your testimony?

21       A.   That is correct -- incorrect.

22       Q.   Okay.  When did you -- when did you first say:

23   I've got to get out of here?

24       A.   Within a year.

25       Q.   A year?

1    A.   Correct.

2    Q.   All right.  So during the first year, you never

3    had those thoughts ever cross your mind?

4    A.   No.  I was learning the industry.

5    Q.   Okay.  So all the areas that we talked -- I'm

6    trying to figure out, get a general time frame of

7    when -- because we never heard any of that.  We just

8    heard these generalities, all these conversations that

9    happened.  We never got any time frame.  So I'm trying

10   to kind of figure that out.  It sound like it's in the

11   second year of your employment at Merida that you had

12   all these conversations that you're talking about.

13   A.   Any -- any time I had a concern, or anything like

14   that, I would bring it up to leadership, and I would

15   give it -- let them have it.  I mean, it was out of my

16   control.  So once I passed it on to leadership, it

17   was -- it's on them.

18   Q.   So -- and then I believe you said you -- my notes

19   are, you no longer wanted to be associated with Merida.

20   A.   That is correct.

21   Q.   Correct?  And that's why you decided you started

22   putting your application for Generations Hospice?

23   A.   Correct.

24   Q.   All right.  Where is Generations located as it

25   related to the hospices -- the Merida hospice?

1   A.  It was next door.

2   Q.  Next door?

3   A.  Correct.

4   Q.  But completely separate ownership?

5   A.  Correct.

6   Q.  They have nothing to do with Merida?

7   A.  Not at all.

8   Q.  So you didn't want anything to do with Merida --

9   Merida, but you did want Joanne Conti as a patient for

10  Generations; didn't you?

11  A.  I did not solicit Joanne Conti.

12  Q.  You didn't?

13  A.  No, I didn't.

14  Q.  Isn't it true that Joanne Conti was discharged

15  from Merida and ended up going to Generations by your

16  hand, sir?

17  A.  Not by me, no.

18  Q.  No?

19          Okay.  What about the other part?  We'll get

20  into that in a second, whether you were involved or not.

21  But what about, is it true that Generations Hospice took

22  Joanne Conti as a hospice patient?

23  A.  They did.

24  Q.  Was there any delay between her being a hospice

25  patient for Merida and being a hospice patient for

1    Generations?

2       A.   There was.

3       Q.   How long?

4       A.   I can't remember.  That was a couple -- a few

5    years back.  But there was a delay.  There was -- they

6    were questioning her eligibility.

7       Q.   Ultimately, how was that question answered?

8       A.   The medical director went out and had a

9    face-to-face with Ms. Conti and deemed her qualified for

10   hospice at that time.

11      Q.   Okay.  And so she was qualified -- and do you

12   agree, sir, that that was a legitimate qualification for

13   Ms. Conti moving from Merida to Generations?

14      A.   Patient has a right to choose where they want to

15   go.

16      Q.   Sir, that wasn't my question.  You're right, they

17   do have that choice.  But my question to you is not

18   whether or not she chose.  My question to you was:  Do

19   you believe that that was a legitimate, lawful hospice

20   enrollment with -- with Gena- --

21      A.   With Generous or Generation?

22      Q.   I'm sorry.  Forgive me.  I got it wrong.

23   Generations.

24      A.   If Generations felt that she was hospice

25   appropriate at the time that they admitted her, then

1    they felt that she was appropriate.

2       Q.   Okay.  Well, sir, you haven't been shy of being

3    critical of Merida here all day today.  Do you have any

4    criticisms of -- of Generations?

5       A.   There are a few.

6       Q.   About -- about -- about Ms. Conti?

7       A.   I did.

8       Q.   About what -- about her -- about them certifying

9    and admitting her into hospice?

10      A.   I did.

11      Q.   You think that was wrong of them, that they

12   committed fraud?

13      A.   Again, if they sent their medical director out to

14   go evaluate Ms. Conti on a face-to-face visit, then, the

15   medical director that went out to go see her to qualify

16   her felt that she deemed -- was deemed appropriate.

17      Q.   And you don't question that -- that -- that

18   medical director, whoever it was, as you sit here today?

19      A.   The doctor actually physically went out to go see

20   her.

21      Q.   Sir, my question to you -- tell the jury.  Do you

22   question the legitimacy, the necessity, the adequacy of

23   that -- of Ms. Conti becoming a -- enrolling in hospice

24   with Generations?

25      A.   If the -- again, if the medical director felt

1    that she was appropriate to be on hospice, then that's

2    the medical director's decision.

3        Q.  Well, did he?  Or she?

4        A.  They felt that she was appropriate at that time.

5        Q.  All right.  And, as you sit here today, do you

6    have any criticisms of -- of how they felt in their

7    decision?

8        A.  I did.

9        Q.  All right.  And did you tell them?

10       A.  I did.

11       Q.  All right.  And what happened?

12       A.  They took her off services.

13       Q.  They took her off services?

14       A.  They did.

15       Q.  Immediately?

16       A.  I want to say within a month or two she'd been on

17   services, if I'm not mistaken.

18       Q.  So because -- you're telling me that -- that that

19   doctor, upon you telling him, he changed his mind

20   because of what you told him?

21       A.  I didn't say the doctor changed his mind.  The

22   ownership changed their mind on keeping her on services.

23       Q.  Okay.

24       A.  They even felt she was more home health

25   appropriate.

Q.   Who was the doctor?

A.   I can't recall who the medical director was at that time.

Q.   And -- and how is it that you're remembering all these -- these details about all these various -- various patients?  Have you reviewed records recently?

A.   I -- again, I've had a lot of interactions with my families.  I was very involved with my families.

Q.   Sir, my question is:  Have you reviewed any records recently?

A.   I don't -- I don't review records that are not within my agency.

Q.   Let me try it again.  Have you reviewed any records recently?

A.   None -- no records that are not on Brookdale Hospice do I not see.  I only see patients that are on Brookdale Hospice.

Q.   Is Ms. Conti, did she ever go to Brookdale Hospice?

A.   No, she didn't.

Q.   Okay.  Did she -- were there any other hospices that Ms. Conti was enrolled in other than Generations, that you know of?

A.   Not that I know of.  I'm not sure.

Q.   Were you involved in the care of Ms. Conti at

Generations?

A.   I wouldn't say I was involved in the care.  I'm not a clinician.

Q.   Okay.  Well, what was your involvement with her at Generations?

A.   Again, I've good rapports with my patients as well as my families.

Q.   Again, sir, thank you for sharing that.  But what was your involvement, if any, with Ms. Conti?  Describe it.  Explain it.

A.   The relationship that I had with Ms. Conti was I wanted to make sure that all my patients are taken care of and cared for the way they should be.

Q.   Okay.  So what does that entail?  How do you do that?

A.   I'd go out and visit with them, have a conversation with them, see how they're doing, see if their needs are being met.

Q.   On what frequency?

A.   I would do it maybe twice a month, if anything.

Q.   Twice a month.  All right.  Is that mandated by any rule or regulation that you -- that a marketer has to go and visit a patient?

A.   No.  I did it on my own, because, again, to me, this was personal.

1    Q.   All right.   And I guess to be clear, you don't

2  have any sort of health care specialized training; do

3  you?

4    A.   Dialysis training.

5    Q.   Dialysis training.   Okay.   Have you -- are you

6  a -- are you an RN at all, have any nursing, any medical

7  training, any medical education or training?

8    A.   Just whatever I obtained from my degree.

9    Q.   Okay.   Well, what is that?

10    A.   Biomedical equipment repair.

11    Q.   Biomedical equipment repair.   Okay.   So you're

12  not licensed -- are you licensed by the State of Texas?

13    A.   No.

14    Q.   In any way?

15    A.   No.

16    Q.   No.   Okay.   Was it part of your response -- I'm

17  switching back to your time at Merida now, okay?   Was it

18  part of your responsibilities, or do you recall at all

19  at Merida that you would witness documents signed by the

20  patients and/or their families?

21    A.   Are you asking if I saw patients sign the

22  documentation?

23    Q.   Did you sign documentation along with them?   Were

24  you a witness?   For instance, the consent.   Like the --

25  the -- the -- the -- the patient consent form would

1    often call for a witness to sign along with the patient.

2    A.  Correct.

3    Q.  True?

4    A.  True.

5    Q.  All right.  Did you ever -- did you ever sign --

6    do you recall ever signing, as a witness, any of those

7    consents or acknowledgments?

8    A.  Yes.

9    Q.  All right.  Do you recall doing one with Ms.

10   Conti?

11   A.  Yes.

12   Q.  All right.  What's the purpose of getting consent

13   from a -- from a patient?

14   A.  Giving us authorization to treat them.

15   Q.  And what did that signify to you that when a

16   patient says that -- that she consents to hospice?  What

17   does that mean to you?

18   A.  Based on the way we would explain it to the

19   families and to the patients is what they were -- felt

20   that they were signing.

21   Q.  All right.

22              MR. HECTOR CANALES:  And, Roy, pull up for

23   me -- let's see, Government Exhibit E10, or Conti's --

24   Ms. Conti's medical records that have been admitted into

25   evidence.  So from E10, pull up Bates number Mesquias

1    00261806.  And, I guess, why don't you blow up half of

2    it, Roy.  We'll start at the top and we'll scroll --

3    scroll down.

4        Q.  (By Mr. Hector Canales):  You -- you recognize

5    this document from your time at Merida?

6        A.  Yes, I do.

7        Q.  All right.  And you see there it states Joanne

8    Conti.  You know who she is, right?

9        A.  I do.

10       Q.  All right.  Are you aware, sir, that Ms. Conti

11   is -- makes up the substance of Count Seven in this

12   case, in this indictment, you know that?

13       A.  No.

14       Q.  Okay.  I'll make that representation to you,

15   okay?

16             Now, this says here -- can you read the

17   first sentence there, sir?

18       A.  "I, Joanne Conti, do agree and comply with the

19   following."

20       Q.  And what's the first thing she agrees to?

21       A.  "I understand that I have an illness which has

22   been diagnosed as appropriate for hospice care."

23       Q.  All right.  And if we -- and was that true?  Do

24   you know?  Can you say, as you sit here today?

25       A.  I cannot say.

1    Q.  Okay.  All right.  And the second bullet point

2  there states, "That the goal of hospice care is to" --

3  there should be a space there, looks like -- "to

4  relieve, control, or minimize symptoms to maintain

5  optimal quality of life in patients with a lifelong

6  limiting illness".  Do you agree with that statement,

7  sir?

8    A.  Not with what you just read, no.

9    Q.  No?  What part do you disagree with in that

10  statement?  That's not the goal of hospice?

11    A.  You stated "lifelong limiting illness".

12    Q.  With -- I'm sorry.  "With a life limiting

13  illness."

14    A.  With life limiting illness, yes.

15    Q.  So you agree with that?

16    A.  With -- yes.

17    Q.  Okay.  Let's scroll down to the bottom, then.

18  That's your signature; isn't it?

19    A.  That is correct.

20    Q.  All right.  And that's Ms. -- and that's Ms.

21  Conti's signature; isn't it?

22    A.  That is correct.

23    Q.  Did you force her to sign this?

24    A.  What I told Ms. Conti, during signing this

25  paperwork, was that she does not live -- she does not

1   have a caregiver that lives with her, that she lives

2   alone, and she signed it.

3       Q.  My question was:  Did you force her to sign it?

4       A.  I -- like I had mentioned, I told Ms. Conti that

5   by signing this paper, she lives alone, and she doesn't

6   have a caregiver living with her.

7       Q.  Okay.  Did you intimidate her?  Do you think you

8   were intimidating at all to her?  Do you think she

9   signed this not of her own will and understanding?

10      A.  I don't -- I didn't intimidate Ms. Conti

11  whatsoever.  She stated that she lives alone, so she

12  signed the paperwork.

13      Q.  Any reason that -- that the jury should

14  disregard -- as you established -- disregard Ms. Conti

15  and your -- your signatures?

16      A.  What was the question?

17      Q.  Any reason to disregard it?

18      A.  What's there to disregard?

19      Q.  All right.  I think you answered the question.

20              MR. HECTOR CANALES:  Let's move on to same

21  exhibit, Government Exhibit E10.  We're going to move --

22  Bates number 00261876.  Let's start again at the top,

23  Roy.

24      Q.  (By Mr. Hector Canales):  What's this that we're

25  looking at?

1    A.   A 3071 form.

2    Q.   All right.  And, for the jury, what's a 3071

3    form?  What does that mean to you?

4    A.   When a patient has Medicaid, that you know

5    Medicaid would also pay for hospice services for the

6    patient.

7    Q.   Can you see up there on box number one, is it

8    indicating that it looks like there are four choices of

9    what you can do with this election form?  Right?  Which

10   one is marked?

11   A.   Election.

12   Q.   Okay.  And what is the terminal diagnosis there?

13   A.   The terminal diagnosis that was placed in there

14   was post-inflammatory pulmonary fibrosis.

15   Q.   All right.  Now, let's switch gears just here.

16   Put this on pause for a second.

17           You, twice -- twice, you met with Government

18   agents.  They interviewed you, right?

19   A.   Correct.

20   Q.   Was anybody from the defense there when those

21   interviews took place?

22   A.   They weren't interviews, they were -- I was

23   speaking what I knew within the agency.

24   Q.   All right.  You were contacted?

25   A.   I was.

1     Q.   Right?  By whom?

2     A.   By the Government.

3     Q.   Do you remember a name?

4     A.   It was many years ago, so I don't remember.

5     Q.   How about Fuentes, Mario Fuentes?  Ring a bell?

6     A.   It does, yes.

7     Q.   Okay.  Did Mr. Fuentes show up unannounced, or

8  did he have an appointment with you?  Or how did -- how

9  did the encounter happen?

10    A.   He wanted me to meet him down at his office.

11    Q.   All right.  And did you agree?

12    A.   I did.

13    Q.   All right.  Did you understand that you were

14  going to meet with a Government investigator?

15    A.   I did.

16    Q.   All right.  Did you understand that, when you

17  speak to the Government, that you have to tell the

18  truth?

19    A.   That is correct.

20    Q.   Did you tell the truth to Mr. Fuentes?

21    A.   I did.

22    Q.   All right.  Did you understand that, when you

23  were talking to Mr. Fuentes in that interview, that if

24  you didn't tell the truth, that you could get in a lot

25  of trouble, you could get charged with a crime?  Did you

1  know that?

2     A.  I did.

3     Q.  Did they make that clear to you?

4     A.  They did.

5     Q.  Now, it's true, is it not, that in that interview

6  with Mr. Fuentes, you said a lot of what you -- they

7  asked you about today, but that you also told them

8  that --

9              MR. FOSTER:  Objection, Your Honor.

10  Hearsay.  It's improper impeachment.

11              MR. HECTOR CANALES:  I'm not impeaching.

12              THE COURT:  Well, let me hear the question

13  first.  I thought he was asking the question about what

14  he said.

15              MR. HECTOR CANALES:  Yes.

16              THE COURT:  All right.  Let me hear the

17  question.

18     Q.  (By Mr. Hector Canales):  You told the Government

19  that -- that you believe that the referrals made by

20  Dr. Virlar were legitimate; didn't you?

21     A.  I -- I thought they were.

22     Q.  Right.  And you still think that here today?

23     A.  At the time when I met with Virlar early into my

24  employment, I didn't know any better for hospice.

25     Q.  Right.  But you told the Government you thought

1  that -- that the -- that the referrals Virlar made were

2  legitimate.  That's what you told him.

3      A.  Two years ago or three years ago.

4      Q.  And that was the truth then?

5      A.  Correct.

6      Q.  Okay.  And if Dr. Virlar made 60 percent of all

7  the referrals for Merida, then those 60 percent of his

8  referrals, according to you, from your perspective,

9  would be legitimate; fair?

10     A.  I'm not the medical director or the doctors, so I

11  just do as I was told.

12     Q.  But what you told the Government, you meant it?

13     A.  I felt that at the time Virlar was a legitimate

14  physician.

15     Q.  Okay.  And you also told him that you believe

16  that Virlar, he did do patient visits, that he actually

17  -- on face-to-faces, he actually did do the patient

18  visits?

19     A.  On occasion.

20     Q.  But you told him he did them.

21     A.  That doesn't mean that he did all of them.

22     Q.  Sir, my question to you is:  Did you not tell the

23  Government that Virlar did -- you believed Virlar did

24  the face-to-face visits?  That's what you told him,

25  right?

1    A.   That I believe, in my opinion.

2    Q.   Yes, sir, that's all I am asking for.  That's all

3    you can give.  Right?

4    A.   In my opinion, I thought they were being done.

5    Q.   Okay.  So, back to this here.  Let's scroll up.

6    Who is the attending physician, according to this

7    document, E10, who's the attending physician for Ms.

8    Conti?

9    A.   What's written in there is Jesus Virlar.

10   Q.   Okay.  And then -- and -- and in blocks 25 and

11   26, that's you, right?

12   A.   That is my signature, but that is not my

13   handwriting for number 22.

14   Q.   Okay.  Fair enough.  But -- but 26, that's your

15   signature?

16   A.   26 is my signature.

17   Q.   Right.  And -- and 25, all you're saying is you

18   didn't write your name "Ernesto Gonzalez" there,

19   somebody else wrote that?

20   A.   No, I said 22.

21   Q.   Okay.  All right.  Is that your -- what about in

22   25?  Is that your sig- -- is that your handwriting

23   there?

24   A.   25 is my handwriting.

25   Q.   That's your handwriting.  And that's your

1    signature?

2       A.   That is my signature.

3       Q.   And you dated it?

4       A.   As we were told to date, yes.

5       Q.   December 22nd, 2014.  Do you recall?  Did you

6    talk to Dr. Virlar about -- about Ms. Conti here and

7    about her election to hospice?

8       A.   No, I didn't.

9       Q.   All right.  Did you tell the Government that this

10   was legitimate?

11      A.   I didn't tell the Government that this form right

12   here was legitimate.

13      Q.   Right.  But -- but when you interviewed with them

14   back in -- in 2017, you believed that because Virlar did

15   it, it was legitimate?

16      A.   To my knowledge, I didn't know that Dr. Virlar's

17   name was being put on this form without my knowledge.

18      Q.   Okay.  But -- but if Dr. Virlar certified Conti,

19   it's legitimate, right?

20      A.   I would have thought Dr. Virlar would have been a

21   legitimate physician had he not worked out -- had he

22   worked outside of Merida.

23      Q.   Okay.  What about Dr. Montemayor from the Gonzaba

24   Medical Group?  Have you ever heard of him?  Ring any

25   bells, as it relates to Ms. Conti?

1      A.   I've heard of her.

2      Q.   All right.  Tell us what you remember about

3  Dr. Montemayor with Ms. Conti.

4      A.   I had --

5      Q.   What was the connection?

6      A.   I didn't have very much connection with

7  Dr. Montemayor.

8      Q.   All right.  Now, it's true, is it not, that the

9  Gonzaba Medical Group would -- is not a hospice

10  organization, right?

11      A.   At the time, they weren't.

12      Q.   Right.  They were primary care providers, right?

13      A.   That is correct.

14      Q.   All right.

15           MR. HECTOR CANALES:  Roy, again, on Ms.

16  Conti, this is going to be a new Bates number.  All

17  right?  00261463.  00261463.  There we go.  And let's

18  just start at the top half and scroll down.

19      Q.   (By Mr. Hector Canales):  All right.  You see

20  there at the top the Gonzaba Medical Group, Northwest

21  Family.  Are you familiar with them?

22      A.   I am.

23      Q.   All right.  Now, I want to draw your attention

24  here -- and, of course, you agree that this is a record

25  with Ms. Joanne Conti?

1    A.   That's what it looks like, yes.

2    Q.   All right.  And it appears to be the date,

3  October 16, 2014.  You see that?

4    A.   I do.

5    Q.   They're documenting an office visit?

6    A.   Correct.

7    Q.   When you were testifying earlier about having

8  gone in and looked at records and stuff, is this one --

9  do you remember looking at any Gonzaba Medical Group

10  records for Ms. Conti?

11    A.   I didn't look at any medicals for -- from the

12  Gonzaba Group.

13    Q.   All right.  It's true, though, that some of those

14  primary care documents, primary care physician records,

15  if there's coordination between the primary care

16  physician and the hospice, that some of those records --

17  some of their records would be within the hospice,

18  right?

19    A.   They would be sent over to the agency, correct.

20    Q.   Right.  That happened, right?  And do you

21  recall -- don't you remember that with Ms. Conti, that's

22  what happened here, that the Gonzaba Medical Group sent

23  over their records to the -- to Merida Hospice?

24    A.   Actually, the way Ms. Conti was -- was sent over

25  to the Merida Group was through the hospital by

1   Dr. Virlar.

2     Q.   Okay.  You remember that.  All right.  We'll come

3   back to that.  I'll come back to that in a second.

4          Look here, look at patient instruction

5   number two.  "We have discussed and reviewed your

6   overall health status today.  You are currently on

7   hospice services, which I feel provides you with an

8   extra layer of care that you need at this time.  As

9   mentioned before, you may follow up with me and my

10   clinic as long as you are physically able to do so.  If

11   you have any concerns or questions, please do not

12   hesitate to call my office."  And let's see --

13          MR. HECTOR CANALES:  Roy, scroll up.  Scroll

14   up to the bottom of the page.  Right there.

15     Q.   (By Mr. Hector Canales):  Electronically signed

16   by Dr. Montemayor.

17          Does that refresh your memory, sir, that

18   Dr. Montemayor, the primary care physician of the

19   Gonzaba Group, knew and was aware that Ms. Conti was on

20   hospice?

21     A.   To my knowledge.

22     Q.   And not only that he knew and was aware of it,

23   but he approved of it, right?

24     A.   Whatever standards the Gonzaba Group has for the

25   hospice patients, it's on them.  We just went ahead and

1    went over the referrals with their patients.

2       Q.   Right.   But you -- you went through a whole thing

3    earlier with the Government about how the primary care

4    providers and -- were not coordinating, and -- and they

5    didn't know, they didn't know that they're -- they're

6    complaining, that their patients didn't -- they didn't

7    know that they were on hospice.   Do you remember that

8    testimony?

9       A.   I do.

10      Q.   Well, you didn't mean to leave the impression

11   that that was the case as it relates to the Count Seven

12   in this case with Ms. Conti; did you?   That would be

13   wrong.

14      A.   Again, the -- the referral was made out of the

15   hospital.   I was still fairly new to the agency at -- in

16   2014, so I didn't know the hospice regs at that time and

17   how patients qualified for services.

18      Q.   But I'm talking about, did you not -- and correct

19   me if I'm wrong.   If I am, I'll move on.   But correct me

20   if I'm wrong.   Did you not just sit here and tell the

21   jury and complain to them saying that you received

22   complaints from primary care providers that their

23   patients were on hospice without them knowing about it?

24      A.   But I didn't --

25      Q.   Didn't you tell that to them?

1    A.   I did say that to the jury, but not specific

2    physicians.

3    Q.   Okay.  All right.  You told that.  So all I'm

4    trying to clear up, as that complaint relates to Count

5    Seven in this case, to this cherry pick patient, it

6    doesn't apply.  Agree?

7    A.   I don't agree.

8              MR. FOSTER:   Objection, Your Honor.

9    Argumentative.  And he never said it applied to Ms.

10   Conti at all.

11             MR. HECTOR CANALES:  Well, that's what I'm

12   trying to clear up, Judge.

13             THE COURT:  One second.  One second.  The

14   objection's overruled.  I'll allow the question.

15   Q.   (By Mr. Hector Canales):  Let me just ask it.

16   Isn't it -- it's undisputed, isn't it, that Ms. Conti's

17   primary care provider knew that she was on hospice;

18   isn't it?  That's not up for debate; is it?

19   A.   It's not up for debate.

20   Q.   Okay.  Not only is that not up for debate, it's

21   also undebatable that he approved of it.  He liked it.

22   He gave it the thumbs up, right?

23   A.   Again, the way the Gonzaba organization works, I

24   have no -- I have no knowledge of how they do it, other

25   than certain guidelines to send patients to hospice.

1      Q.   I'm not asking you, sir, whether you -- about

2  their guidelines and whether -- I'm just asking you, can

3  you tell from --

4            MR. HECTOR CANALES:   Roy, go up.

5      Q.   (By Mr. Hector Canales):   Based on number two,

6  sir, do you -- can you tell the jury, do you have an

7  opinion, sir, whether or not Dr. Montemayor was in favor

8  or not of hospice for Ms. Conti?

9      A.   I cannot answer that.

10     Q.   You can't.   Okay.   Fair enough.

11           MR. HECTOR CANALES:   Roy, let's go to --

12           THE COURT:   And, Mr. Canales, I think at the

13  time it's an appropriate break point.

14           MR. HECTOR CANALES:   That's fine,

15  Your Honor.

16           THE COURT:   You've only gone 30 minutes and

17  you have plenty of time.

18           MR. HECTOR CANALES:   That works for me.   I'm

19  getting -- I need a little water.

20           THE COURT:   Here's a water.   All right.

21  You'll have a full 45 minutes tomorrow --

22           MR. HECTOR CANALES:   Thank you, Your Honor.

23           THE COURT:   -- or if y'all decide to -- to

24  merge.

25           Ladies and gentlemen, again, this is, I

1   think, a proper break point.  It's been a long day,

2   including opening arguments and testimony.

3              Again, I remind you of your instructions.

4   Thank you for your hard work and your patience.  Don't

5   discuss the case with anyone.  Get some rest.  We do

6   want to do -- follow the same routine tomorrow, starting

7   sharply at 9:00, perhaps earlier, if everyone is able to

8   get here early.  But with that being said, tomorrow

9   we -- we should have a full day of -- of testimony.  And

10  thank you for your service.  Have a nice evening.

11             COURT OFFICER:  All rise for the jury.

12                 (Jurors exit courtroom)

13             THE COURT:  Everyone, please be seated.

14  Counsel, we'll be in recess.  Thank you, everyone.

15             COURT OFFICER:  All rise.

16                 (Court in recess)

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

   I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


                    /s/*Sheila E. Perales.*_____
                    SHEILA E. HEINZ-PERALES CSR RPR CRR
                    Exp. Date:  January 31, 2021