```
 1                    IN THE UNITED STATES DISTRICT COURT
                         SOUTHERN DISTRICT OF TEXAS
 2                          BROWNSVILLE DIVISION


 3
      UNITED STATES OF AMERICA        )
 4                                    )
                                      )
 5    VS.                             )  CRIMINAL ACTION NO.
                                      )  B-18-CR-8
 6                                    )
      RODNEY MESQUIAS, HENRY          )
 7    MCINNIS AND FRANCISCO PENA      )
                                      )
 8

 9
                              TRIAL - DAY TWO
10              BEFORE THE HONORABLE ROLANDO OLVERA
                         OCTOBER 23, 2019
11


12


13                    A P P E A R A N C E S

14
       FOR THE UNITED STATES:
15
           MR. KEVIN LOWELL
16         MR. ANDREW SWARTZ
           MR. JACOB FOSTER
17         ASSISTANT UNITED STATES ATTORNEY
           BROWNSVILLE, TEXAS 78520
18

19     FOR THE DEFENDANT RODNEY MESQUIAS:

20         MR. CHARLES BANKER
           ATTORNEY AT LAW
21         118 Pecan Boulevard
           McAllen, Texas 78501
22

23

24

25
```

```
1    FOR THE DEFENDANT HENRY MCINNIS:

2        MR. ED CYGANIEWICZ
         ATTORNEY AT LAW
3        1000 E. Madison Street
         Brownsville, Texas 78520
4
     FOR THE DEFENDANT FRANCISCO PENA:
5
         MR. ROBERT GUERRA
6        ATTORNEY AT LAW
         55 Cove Circle
7        Brownsville, Texas 78521

8    FOR THE DEFENDANT FRANCISCO PENA:

9        MS. ADRIANA ARCE-FLORES
         ATTORNEY AT LAW
10       1414 Victoria Street
         Laredo, Texas 780404
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Thank you, everyone.  Please be

2   seated.  Good morning.

3          Counsel, it's my understanding that jurors

4   have all now arrived so we'll start a few minutes early

5   as soon as we get them in here, so -- let's go ahead and

6   call the witness up to the stand.

7          COURT BAILIFF:  All rise for the jury.

8          (JURY IN.)

9          THE COURT:  Thank you, everyone.  Please be

10  seated.  Ladies and gentlemen of the jury, again, good

11  morning.  And, again, thank you for your promptness.

12  With that being said, we'll start a few minutes early.

13          Mr. Canales.

14          MR. HECTOR CANALES:  Yes, Your Honor.

15          THE COURT:  Please proceed as soon as we get

16  the witness in here.

17          Good morning, sir.

18          THE WITNESS:  Good morning.

19          THE COURT:  Please have a seat.  I remind

20  you you're still under oath.

21          Thank you, gentlemen.  Please proceed.

22                  CROSS-EXAMINATION

23  BY HECTOR CANALES:

24     Q.  Good morning, Mr. Gonzalez.

25     A.  Good morning.

1     Q.   You doing okay?

2     A.   Doing good.

3     Q.   Good night sleep?

4     A.   For the most part.

5     Q.   Okay.  Very good.  Between yesterday when we

6     concluded things for the day and -- and today, who if

7     anybody did you speak with about your testimony?

8     A.   Nobody.

9     Q.   Nobody, okay.  Any meetings with the Government,

10    or any other lawyers, or anybody?

11    A.   No.

12    Q.   Okay.  While I'm asking that and thinking about

13    it, prior to today had you and I ever had an opportunity

14    to -- to meet?

15    A.   I don't even know your name.

16    Q.   Okay.  Very well.  I knew yours.

17         How about with the Government, how many times,

18    for preparation for today's trial, how many times, if

19    any, did you meet with anybody from the Government?

20    A.   Probably three or four times.

21    Q.   Three or four times.  And when was the most

22    recent time prior to your testimony yesterday?

23    A.   Sunday afternoon.

24    Q.   And how long did you meet?

25    A.   I think about an hour and a half, two hours.

1    Q.   And who did you meet with here?

2    A.   With the Government.

3    Q.   Right.  Any of the lawyers or people present at

4    the table here?

5    A.   Yes.

6    Q.   Who?  If you don't know their name, you can --

7    you can point them out?

8    A.   Second one on the right.

9    Q.   Same gentlemen who asked you questions yesterday?

10   A.   Correct.

11   Q.   Did he preview to you what questions he was going

12   to be asking you?

13   A.   He -- he asked me questions that -- about the

14   case and I answered them.

15   Q.   Did he ask you the same questions yesterday that

16   he did in this meeting, this preparation you had?

17   A.   Not all the questions were exact.

18   Q.   But substantially the same?

19   A.   Correct.

20   Q.   Right.  So when you came on to the stand, you had

21   a pretty good idea about what the Government was going

22   to ask you?

23   A.   I did.

24   Q.   And they had a really good idea of what you were

25   going to say, right?

1     A.   Yes.

2     Q.   When you did this preparation, did you bring any

3   materials or documents with you?

4     A.   No.

5     Q.   All right.  Did they show you any documents?

6     A.   On?

7     Q.   Anything.

8     A.   On when?

9     Q.   At that -- at that -- at that rehearsal, at that

10  meeting?

11    A.   The meeting on Sunday?

12    Q.   Yes, sir.

13    A.   So we just went over the exhibits that we showed

14  yesterday.

15    Q.   You -- you went over the exhibits that he showed

16  yesterday?

17    A.   Correct.

18    Q.   Okay.  Any others?  Do you recall were there any

19  exhibits that we went over you with that weren't shown

20  yesterday?

21    A.   No.

22    Q.   All right.  Okay.  And so we'll call that -- were

23  there any other prep sessions before the Sunday one?

24    A.   Well, like I mentioned the previous times that I

25  had met with them in the past.

1      Q.   Okay.  And how many other --

2            THE COURT:  Gentlemen, move the microphone

3      just a bit closer to you.

4      Q.  (By Mr. Hector Canales)  I'm sorry, forgive me

5      for asking, I should have written it down.  How many

6      other ones were they before you've answered this, but I

7      just can't remember?

8      A.   I just answered that a few minutes ago, three to

9      four times.

10     Q.   Three to four times, I'm sorry.  And that's three

11     to four times in addition to Sunday, or is that

12     including Sunday?

13     A.   That's combined.

14     Q.   Combined, okay.  Okay.  I mean, let me get back

15     to where -- where I was -- where I was going.

16           You made a lot of general accusations yesterday

17     of fraud.  My question to you, sir, is so you know, or

18     at least you have in your own mind your own definition,

19     I take it, of fraud, right?

20     A.   Correct.

21     Q.   Lying, would that -- would that -- would your

22     definition include lying?

23     A.   It would.

24     Q.   Saying things that -- pretending to be somebody

25     that you're not?

1    A.   I didn't pretend to be anybody that I am not.

2    Q.   No, I'm just asking you of whether or not that

would include fraud in your mind?

3

4    A.   Well, it's a form of identity.

5    Q.   Okay.  All right.  Have you, sir, have you ever

6    committed a fraud in your life?

7    A.   About 20 years ago.

8    Q.   What was it?

9         MR. FOSTER:  Objection, Your Honor.  You

10   ruled on this issue directly, you prohibited them from

11   addressing it in your order.

12        MR. HECTOR CANALES:  I don't know what

13   he's -- I'm just asking if he ever committed fraud,

14   Judge.

15        MR. FOSTER:  May we approach to side bar,

16   Your Honor?

17        THE CLERK:  Gentlemen, just make sure you

18   speak into that mike there so Ms. Sheila can hear.

19        (BENCH CONFERENCE.)

20        THE COURT:  Gentlemen, you have a microphone

21   here.  As much as possible speak into the microphone.

22        MR. FOSTER:  Your Honor, we filed a notice

23   of prior conviction that was from Mr. Gonzalez dating

24   back to the 1990's, Your Honor issued a written order on

25   that and ordered the defense not be permitted to inquire

1  into it.  Defense just violated your order in front of

2  the jury and I believe that remark, that question should

3  be stricken and he should be reprimanded for his conduct

4  for violating the Court's order.

5          THE COURT:  And remind me as to the criminal

6  conduct that was in reference.

7          MR. FOSTER:  In the 1990's it was --

8          MR. CYGANIEWICZ:  '99 forgery, Judge.  A

9  1999 state felony forgery conviction when he went to

10  prison.

11          MR. FOSTER:  Your Honor ruled inadmissible.

12          THE COURT:  I do recall the limine issue.

13          Mr. Canales it appears that you're, perhaps,

14  unintentionally going into that area.

15          MR. CANALES:  I did not ask anything about

16  the conviction, Your Honor.  I haven't asked about his

17  criminal history, I simply asked the witness put into

18  play --

19          THE COURT:  Speak into the microphone.

20          MR. CANALES:  The witness put into play

21  yesterday by making, you know, an hour long testimony of

22  general fraud accusations against my client.  I simply

23  just asked him if he -- if he had ever committed a fraud

24  himself.  I think he admitted on the stand that he

25  committed fraud with -- with Merida.  I don't know what

1    he's going to answer, I haven't impeached him on

2    anything.

3              MR. FOSTER:  He specifically referenced

4    decades ago.

5              THE COURT:  The witness was -- one second,

6    one second, one second.  Rephrase the question to limit

7    it in scope to anything having to do with fraud having

8    to do with Merida.

9              MR. CANALES:  Okay.

10             THE COURT:  He was -- I agree with

11   Mr. Foster he was just about to go into the criminal

12   conviction.

13             MR. CANALES:  And I just want the record to

14   be clear.  My question --

15             THE COURT:  I understand.

16             MR. CANALES:  The witness' answer may have

17   violated our -- or gotten into the limine issues but the

18   question certainly didn't.

19             THE COURT:  Back to the point be more

20   specific with the issue in terms of fraud having to do

21   with Merida.

22             MR. CANALES:  Okay.

23             (OPEN COURT.)

24             THE COURT:  All right.  The -- the objection

25   is sustained.

```
 1              Any remarks with respect to the last

 2   question are stricken from the record.

 3              And Mr. Canales, please rephrase the

 4   question.

 5              MR. HECTOR CANALES:  Yes, sir.

 6      Q.  (By Mr. Hector Canales)  Mr. Gonzalez, did you

 7   personally ever commit any acts of fraud while at

 8   Merida?

 9      A.  During that time that I was there --

10      Q.  Yes, sir.

11      A.  -- I provided the duties and acted out duties

12   that were told to me to do.

13      Q.  So yes or no?

14      A.  Whether or not they were fraudulent at that time

15   I cannot say.

16      Q.  You're not sure?

17      A.  Correct.

18      Q.  Okay.  That's the best you can -- that's the best

19   answer you can give the jury here as to whether you

20   personally committed any acts of fraud at Merida, you

21   don't know?

22      A.  Like I said, when I got into hospice, Merida was

23   the first agency that I started learning the hospice

24   realm of things, and then I started looking into the

25   actual rules and regulations myself later on during my
```

1    tenure there.

2        Q.  And that self-study, as you sit here today, your

3    answer is I don't know, I'm not sure?

4        A.  After I -- after I reviewed the rules and

5    regulations, then it start -- started to -- I started to

6    realize that a lot of the stuff I was doing in the past

7    with the agency was wrong.

8        Q.  All right.  Well then let me ask you again

9    because I'm not certain here.  Do you -- did you

10   personally ever commit any acts of fraud while at

11   Merida?

12       A.  After knowing the rules and regulations, I guess

13   I would -- I would say yes.

14       Q.  All right.  And did you tell the Government that,

15   that you believed that you -- that you had committed --

16   you understand fraud is a crime, right?

17       A.  I do understand.

18       Q.  Right.  And did you tell them that you had

19   committed a crime?

20       A.  Not to -- I can't recall, I don't --

21       Q.  Are you a criminal?

22       A.  I don't think I am.

23       Q.  Have any charges been brought against you by the

24   Government for these crimes?

25       A.  No.

1    Q.   You expect any?

2    A.   If they come on at a later time, then I will

3  accept them.

4    Q.   Would you plead guilty to those charges?

5    A.   I would.

6    Q.   For health care fraud?

7    A.   I would fight the same way that we're doing

8  today.

9    Q.   I'm sorry, you would what?

10   A.   I would fight the same way we're doing today.

11   Q.   Fight?  Is that what you are doing, you're

12  fighting here?

13   A.   I didn't say I was fighting, I said I would fight

14  personally if I was to be brought up with any charges

15  the same way that's being done today.

16   Q.   Okay.  You would fight them?

17   A.   Correct.

18   Q.   Okay.  Let me -- let's -- I want to take us back

19  to, I think yesterday you had a memory of -- and correct

20  me if I'm wrong, I want to try to summarize -- that you

21  recalled Conti, I'm going to back to Joanne Conti, that

22  she had gotten to Merida hospice through the hospital,

23  through a hospital referral.  Do you recall that

24  generally?

25   A.   Yes, I do.

1       Q.   Okay.   Roy, can you put up -- this is out of

2    Conti's medical records, Government Exhibit E-10, the

3    first page.   Well I'll read for the record it's bait

4    number Mesquias 00261466.

5           In fact, Roy, before we go there, can you -- can

6    you do the Government H Exhibit on Conti?

7              THE MARSHALL:   Excuse me, Your Honor, I was

8    informed by one of the jurors that they forgot their

9    glasses in the office, in the jury room when we were

10   walking in.

11             THE COURT:   Let's take a very brief

12   recess -- why don't you go get them, if you don't mind,

13   sir, or accompany the juror.

14          Does anybody need a quick break while we're

15   retrieving the glasses?   Are you sure?

16             POTENTIAL JUROR:   I'm positive.

17             THE COURT:   That's quite all right.

18             (Brief pause in proceedings.)

19             THE COURT:   All right.   Please proceed,

20   Mr. Canales.

21             MR. HECTOR CANALES:   The air condition works

22   in here.

23             THE COURT:   You're not wearing a black dress

24   so we keep it cold.

25      Q.   (By Mr. Hector Canales)   Okay.   Go ahead and --

1  go ahead and put it back up.  Do you recognize, sir, the

2  individual depicted on Government Exhibit H-36?

3       A.  Yes, I do.

4       Q.  Who is it?

5       A.  It's Joanne Conti.

6       Q.  All right.  And are you aware, sir, that -- that

7  this certification period from December 23rd, '14 to

8  March 22nd of '15 has been alleged by the Government to

9  be a -- a fraudulent certification period for Ms. Conti?

10      A.  I'm unaware of that until now.

11      Q.  You didn't hear that, they didn't tell you about

12  that in your meetings with them?

13      A.  No.

14      Q.  Okay.  All right.  Let's, Roy, go back to Exhibit

15  E 10, Conti's medical records, bates number 00261466.

16  And if we could take the top half.

17          Baptist Health System, are you familiar with the

18  Baptist Health System up there, do you know what this

19  is, can you tell?

20      A.  It's a physician order.

21      Q.  All right.  And is -- where, from what type of

22  facility, can you tell?

23      A.  A hospital.

24      Q.  Okay.  And if you can, you see the -- so the date

25  there, physician's orders under the date over -- it's

1   handwritten to the left right there.  What's that look

2   like to you?

3      A.   09/02.

4      Q.   '14, maybe?

5      A.   Possibly.

6      Q.   All right.  Maybe if I can help.  Let's see if

7   you see on the right see the little bar code it says

8   09/01/14, gives you the year?

9      A.   Correct.

10      Q.   All right.  Based on that, would you say it's

11  fair to say that that's -- that's a physician's order of

12  09/02/14?

13      A.   Based on the handwriting, I cannot confirm that

14  it's on the 14th, but based on what's time-stamped on

15  the paperwork I can.

16      Q.   Okay.  All right.  So we got a date now.  And the

17  second -- I want to look at that second bullet point

18  there.  I -- I read that as Merida hospice eval and

19  treat, agree?

20      A.   Agree.

21      Q.   Okay.  All right.  So now we have a physician's

22  order on 09/02/14 out of a hospital record from Baptist

23  Health Systems to -- for -- for Conti, you see up there

24  on the right it says above the -- the bar code, for

25  Conti?

1      A.   Correct.

2      Q.   So some physician is ordering Joanne Conti from

3   the hospital to Merida hospice, correct?

4      A.   That's correct.

5      Q.   Do you know who that is, before we get there,

6   before we get to the bottom, do you know who did this?

7      A.   Looking at the handwriting, yes.

8      Q.   Who?

9      A.   Dr. Virlar.

10     Q.   Dr. Virlar.  You're familiar with Dr. Virlar's

11  handwriting?

12     A.   Yes, I am.

13     Q.   All right.  You're familiar with his signature?

14     A.   Yes, I am.

15     Q.   Is it legible in terms of can you see every

16  letter of his name?

17     A.   No, but you can see the first two letters of his

18  first and last name.

19     Q.   Describe it, what -- you see his first

20  two letters, describe it.

21     A.   You see a J. and a V.

22     Q.   All right.  Let's go up to the bottom of the

23  page.  Okay.  Now, right above where it says facts,

24  bottom right-hand corner, Roy, facts, right there, see

25  that, highlight that, that's Dr. Virlar's signature; is

1  it not?

2      A.   That is.

3      Q.   Okay.  So no dispute here, Dr. Virlar that Ms.

4  Conti was at the hospital in September of '14, right?

5      A.   Correct.

6      Q.   And that Dr. Virlar out of the hospital referred

7  her to Merida hospice, right?

8      A.   That is correct.

9      Q.   Okay.  Do you know under what capacity Dr. Virlar

10 was working at the Baptist Health System?

11     A.   He was a hospitalist for the Gonzaba Medical

12 Group.

13     Q.   Okay.  So while Dr. Virlar was there, that is --

14 you would agree, sir, that is not as his -- as a medical

15 director for Merida, right?

16     A.   I would say in both realms he was wearing the hat

17 of Merida and Gonzaba.

18     Q.   Who's paying him as a hospitalist for that job?

19 Who's -- who was his employer as a hospitalist?

20     A.   The Gonzaba Medical Group.

21     Q.   Okay.  Any problem with Dr. Virlar's decision

22 here to -- to refer her, his -- his judgment?

23     A.   Based on when I spoke with Ms. Conti when this

24 referral was made she had no recollection of ever being

25 made aware of a referral to hospice.

```
1       Q.   She didn't?

2       A.   No.

3       Q.   That's what she told you?

4       A.   Right, sir.

5       Q.   Okay.  And you believe her?

6       A.   I did.

7       Q.   All right.  And -- and that was part of your

8    testimony yesterday.  Let's talk about consent and

9    election.  You talked about that a little bit yesterday

10   with the -- with -- with the Government, that some --

11   that patients didn't know.

12           There's a process within hospice, it's -- maybe

13   you read this in some of your self-study that within --

14   in it hospice, isn't it true, that the patient has to

15   elect and a doctor has to certify, right?

16      A.   Correct.

17      Q.   If a patient elects but a doctor doesn't certify,

18   you can't go on hospice; can you?

19      A.   That is correct.

20      Q.   And the opposite, if a doctor certifies you but

21   the patient doesn't consent, you can't go on hospice;

22   can you?

23      A.   But if you're -- if you're not being --

24      Q.   Sir, is that true?

25      A.   That is true but if you're not --
```

1           MR. FOSTER:  Allow him to answer the

2    question, Your Honor.

3           THE COURT:  Are you finished answering the

4    question, sir?

5           THE WITNESS:  If you're not being truthful

6    with the patient then you're not giving them the proper

7    consent to the services.

8       Q.  (By Mr. Hector Canales)  Okay.  All right.  So,

9    okay, fine.  But -- but the point remains the answer is,

10   yes, both the patient and the doctor have to be on

11   board?

12      A.  That is correct.

13      Q.  Okay.  All right.  And your contention here is

14   Ms. Conti didn't know?

15      A.  She was unaware that she was -- a referral was

16   made for hospice out of the hospital.

17      Q.  Okay.  What about let's add to how you get in,

18   let's -- let's talk about getting out of hospice.  Can a

19   patient revoke their hospice stay?

20      A.  At any time.

21      Q.  At any time, all right.  And would you agree that

22   in order to -- to say I want out, you got to know you're

23   in, it's kind of common sense, right?

24      A.  True.

25      Q.  And if Ms. Conti on multiple occasion revoked her

1  hospice at Merida, right?

2  A.  I cannot recall that far back.

3  Q.  You can't?

4  A.  No.

5  Q.  You can't recall that far back?

6  A.  That she was taken on and taken off, no, sir.

7  Q.  But you did recall that far back yesterday, same

8  time periods we're dealing with?

9  A.  I recall meeting with her the initial time, she

10 was a very complex case that I dealt with.

11 Q.  Okay.  You dealt with, you're a marketer?

12 A.  I was the one who was doing the consultation.

13 Q.  Right, but -- but you're not a health care

14 provider, you're a marketer, right?

15 A.  Again, I was a consultant speaking on behalf of

16 Merida for -- with the families and the patients

17 explaining the agency services.

18 Q.  Sir, my question is you're a marketer not a

19 health care provider, right?

20 A.  Again, the tools that I was trained at the Merida

21 Group taught me what to do and what to say to families

22 and patients to get them signed up for services.

23 Q.  She was already signed up.  Are you saying you

24 continued to market her after --

25 A.  I have to --

1     Q.   Excuse me, let me finish.  That you continued to

2  market her after she had already elected and started her

3  hospice care?

4     A.   So when Ms. Conti was on services, like I

5  mentioned before, I get -- I was very involved with a

6  lot of my families and their patients.

7     Q.   Did you on -- on September -- in September of

8  14th, that order, September Dr. Virlar's order, did you

9  persuade or market Dr. Virlar to write that order?

10     A.   It was a known fact that Dr. --

11     Q.   Sir, my question is, it wasn't a known fact, my

12  question to you was whether or not you persuaded in

13  September 2nd of '14, Dr. Virlar to write those orders?

14     A.   Merida persuaded Dr. Virlar to write the orders,

15  not I.

16     Q.   Merida did?

17     A.   Yes.

18     Q.   Right?  Were you there at the hospital?

19     A.   I was actually there, I did meet with Ms. Conti

20  there at the hospital.

21     Q.   In September?

22     A.   Yes.

23     Q.   Okay.  Now, Roy, let's go to same Government

24  Exhibit 10, Mesquias 00262091.  And scroll -- you'll see

25  Merida, Merida form.

1       This is the Merida revocation statement form,

2    you're familiar with that, true?

3       A.   Yes, I am.

4       Q.   All right.  And it involves Ms. Conti.  And she's

5    stating what, sir?  Read that first line.

6       A.   I Joanne Conti Medicare Medicaid number --

7       Q.   You can skip the number.

8       A.   -- hereby revoke my Medicare Medicaid hospice

9    election made on 12/23/14.

10      Q.   That's the same date we looked at yesterday where

11   you signed, right, with her.  You witnessed her

12   election, right?

13      A.   That is correct.

14      Q.   So do you still stand by your testimony here,

15   sir, that Ms. Conti did not know or consent to her

16   hospice election?

17      A.   I never said she didn't consent, I -- I never

18   said she didn't consent to the services.  When I spoke

19   with Ms. Conti she was more home health appropriate than

20   hospice appropriate.  I went back to the office and made

21   that known that she was more home health I was told to

22   go back and convince her to get on hospice which is what

23   I did.

24      Q.   So your testimony now to be clear to the jury is

25   that you never said Ms. Conti didn't know that she was

1    on hospice or didn't consent to it?

2        A.   I never -- I never said that she wasn't on

3    hospice.

4        Q.   Okay.

5        A.   Or didn't know she was on hospice.

6        Q.   So she knew it.  So now we can just say in the

7    affirmative Conti knew she was on hospice?

8        A.   Correct.

9        Q.   Okay.  Let's -- let's scroll up to the bottom.

10   And let's stop right there.

11           What's the reason, and this is, by the way this

12   was April, we just passed it, but she -- she did this

13   revocation on April 21st of 2015.  Why?  What does the

14   document say why she revoked?

15       A.   According to that handwriting it states

16   hospital -- hospitalization for treatment of condition

17   unrelated to hospice diagnosis.

18       Q.   So she had to go into the hospital?

19       A.   To my knowledge, that's not my handwriting, so

20   I'm assuming.

21       Q.   All right.  And so since she got out of the

22   hospital, she -- Merida took her off hospice?

23       A.   That is correct.

24       Q.   So there's no double-dipping going on?

25       A.   She -- apparently not.

1    Q.  All right.  And let's -- and there's an

2    acknowledgment there?

3    A.  Correct.

4    Q.  About her not being covered, her signature --

5    keep going, Roy, a little bit more.

6        That's your signature again; isn't it?

7    A.  Correct.

8    Q.  Does this refresh your memory, sir, about Ms.

9    Conti's knowledge about her role in hospice?

10    A.  Again, like I'd mentioned, I never stated that

11    she didn't say she was on hospice.

12    Q.  Now, let's talk about --

13        MR. HECTOR CANALES:  How much time do I

14    have, Your Honor?

15        THE COURT:  Well, the defense in total has

16    three hours and 45 minutes, you have approximately 20

17    minutes in your section.

18        MR. HECTOR CANALES:  Okay.

19    Q.  (By Mr. Hector Canales)  Let's talk real quick

20    about wheelchairs.  Ms. Conti was -- first of all, fair

21    to say that Ms. Conti was approximately, at this period

22    of time, approximately 5'1, 300 pounds?

23    A.  It would be safe to say that.

24    Q.  With a history of falls and fractures to her --

25    to her feet, legs?

1    A.   During the time that I've known Ms. Conti I have

2  never known her to fall down.

3    Q.   Okay.  Well, how about have any fractures?

4    A.   Not to my knowledge.

5    Q.   All right.  Let's look at again E 10, Mesquias

6  Exhibit 0 -- or bate number, excuse me, 00262167.

7         While that's coming up, isn't it true that as --

8  as a hospice agency while they are -- there's a lot of

9  evaluations that go on of a patient, including their

10 ability to move or ambulate, as they say, or

11 transportation; is that fair to say that that's a common

12 practice within hospice?

13   A.   If the patient is going to the hospital, it is up

14 to the agency whether or not to pay for the

15 transportation services or not based on the diagnosis.

16   Q.   Okay.  And so what I'm going to look at here and

17 try to speed things up here a little bit, this is a

18 transportation assistance registry survey that was

19 performed on April the 29th, '15 regarding Ms. Conti;

20 are you with me?

21   A.   I am.

22   Q.   Okay.  And if you scroll down, Roy, to, let's

23 just go down to there where it says level 3.

24        You see there that level 3 has been circled for

25 Ms. Conti?

1      A.   Yes.

2      Q.   You see that?   That's level 3 indicates a person

3  needing assistance with medical care, administration,

4  monitoring by nurse, dependent on equipment, assistance

5  with medications, mental health disorders; you see that?

6      A.   I see, I do.

7      Q.   Okay.   And if you scroll -- Roy, if you scroll

8  all the way to the bottom there.

9           Final question on this page:   Do use a

10  wheelchair?   What's indicate there for Ms. Conti?

11      A.   Yes.

12      Q.   Do you require power for medical equipment.   What

13  is indicated?

14      A.   Do you require power for medical equipment.

15      Q.   Okay.   Let's move to this -- to the Mesquias

16  page, same Exhibit, E-10 Mesquias 00261286.

17           All right.   And just start at the top again, Roy,

18  so we can get the -- just so that we can see that this

19  is a record that relates to Ms. Conti.

20           Agreed this is a -- a communication note on

21  Ms. Conti?

22      A.   Yes.

23      Q.   Okay.   And if we go down to the entry for

24  01/21/16, 11:36, 47 seconds a.m., created by Jeanette

25  Rodriguez, RN; do you know her?   Do you know

1    Ms. Rodriguez?

2        A.   I do.

3        Q.   Okay.  Let's go through it real quick.

4    61-year-old female on services for pulmonary fibrosis,

5    comorbid DM.  Do you know what DM means?

6        A.   Yes.

7        Q.   What?

8        A.   Diabetic, whatever that M. word is, but it's a

9    diabetic term.

10       Q.   All right, two, type-two diabetic?

11       A.   Type-two diabetic.

12       Q.   All right.  With neuropathy and cardiomegaly?

13       A.   That I don't.  It's related to the heart I know.

14       Q.   All right.  PPS 60 percent.  Do you know what

15   that means?

16       A.   It's a scale that's used.

17       Q.   All right.  Two patient identifiers name -- name

18   and date of birth verified by the patient, patient lives

19   alone with family and friends visiting multiple times

20   per day, HHA three times weekly to assist with hygiene,

21   linen changes.  Have I read all that right?

22       A.   Yes.

23       Q.   Patient exhibits shortness of breath, oxygen is

24   ordered at 3 LPM.

25            What does that mean 3 LPM via NC?

1      A.   Three liters per minute via nasal cannula.

2      Q.   Oxygen saturated 88 percent on room air, that's

3  bad; isn't it?

4      A.   It is.

5      Q.   After mild exertion, patient FX, is an

6  abbreviation, medical abbreviation for fracture; is it

7  not?

8      A.   It is.

9      Q.   Conti fractured to left foot.  You didn't know

10  about that; did you?

11      A.   I didn't.

12      Q.   All right.  You couldn't tell the Government when

13  you were interviewing with them these three or four

14  times that Ms. Conti had a broken foot when you were

15  complaining about her not needing a wheelchair?

16      A.   I never stated she did not need a wheelchair.

17      Q.   Okay.  All right.  But -- but regardless you

18  didn't know that she had a fractured foot?

19      A.   No, I didn't.

20      Q.   And how about did you know that she had a

21  fracture to the right foot also?

22      A.   Again, I didn't know she had a fractured foot.

23      Q.   To both her feet?  Either one?  All right.  But

24  that's what it says here that she healed a fracture to

25  her right foot?

1    A.   Nowhere does it state in here that she had two

2  fractures other than the patient had a fracture to the

3  left and a healed fracture to the right so nowhere in

4  this note did it state that she had double fractures.

5    Q.   Okay.  That's what you get out of this that --

6  that you -- that you can't tell the jury here that she

7  had a fracture to her right foot and her left foot?

8    A.   So, again, from what I'm reading, it just states

9  that she had a fracture to the left foot, it doesn't

10  state whether or not it was done while on services with

11  hospice or not, but it does state that she had a heel

12  fracture to the right foot.

13    Q.   Is this the same -- with the way that you're

14  analyzing and reviewing this record here and describing

15  it to the jury, is that the same way that you -- you

16  looked at things in the past to form the opinions that

17  you've given to the jury here?

18    A.   No.  If it's -- right here it's cut and dry it's

19  in black and white, nowhere does it state that she has

20  the double fracture.

21    Q.   Okay.  Very well.  Let's get to the next sentence

22  here.  PCP, what does that mean?

23    A.   Primary care physician.

24    Q.   What did the primary care physician in black and

25  white order, sir?

1    A.   To remain in a wheelchair with boot on.

2    Q.   What's a boot?

3    A.   A protective device that's over the foot to

4    protect injury.

5    Q.   Is Rodney Mesquias a primary care provider?

6    A.   He is a hospice provider.

7    Q.   A primary care provider is a physician, sir, you

8    know that.

9    A.   I do.

10   Q.   All right.  So the -- the direct answer to my

11   question was no, right?

12   A.   You asked me if Rodney Mesquias was a -- a direct

13   provider, care provider.

14   Q.   No, sir, I asked you if he was a primary care

15   provider?

16   A.   He's not a primary care physician, but he's a

17   provider for hospice.

18   Q.   But PCP, excuse me, excuse me.  PCP is a primary

19   care physician?

20   A.   Correct.

21   Q.   He's not a physician; is he?

22   A.   No, he's not.

23   Q.   He didn't order the wheelchair; did he?

24   A.   Through a hospice.  It was ordered through

25   hospice.

1    Q.   Rodney Mesquias did not order it, the physician

2    ordered it, right?

3    A.   If you look back to the record --

4    Q.   Sir, why are you fighting me?

5    A.   I'm not fighting you, I'm speaking the facts.

6    Q.   The facts are then -- the facts are in black and

7    white as you said here, clear cut, rod -- the doctor

8    ordered the wheelchair not Rodney Mesquias, true or

9    false?

10   A.   I can't answer that.

11   Q.   Why not?  It says it right there?

12   A.   We don't have the medical record -- the medical

13   record from the primary care physician to state whether

14   or not she ordered this wheelchair, we have what was

15   written by Merida employees.

16   Q.   Okay.  So this isn't enough for you?

17   A.   No, it would not be.

18   Q.   Is -- is -- is -- is -- is Jeanette Rodriguez,

19   this nurse, is she a liar?

20   A.   She was an internal case manager.

21   Q.   My question is, is she a liar, sir?

22        MR. FOSTER:  Can the witness be allowed to

23   answer the question, Judge?

24        MR. HECTOR CANALES:  I would like him to

25   answer the question, Your Honor, that's what I'm trying

1    to get him to do.

2              THE COURT:  Gentlemen, gentlemen.  Answer

3    the question if you can.

4              THE WITNESS:  She's a nurse who was working

5    inside the office.

6    Q.  (By Mr. Hector Canales)  Do you recall what my

7    question was, sir?

8    A.  I cannot state whether or not she's a liar or

9    not, she was an internal case manager.

10   Q.  Do you know her to be a liar?

11   A.  I didn't know Jeanette very long.

12   Q.  You've got a lot of opinions here you've been

13   free to give, sir.  I'm asking for your opinion.  Is

14   Jeanette Rodriguez a liar, are you going to tell all

15   these people here in this courtroom and these jurors

16   that she was a liar?

17   A.  I'm not going to slander somebody that I don't

18   know very much about, so --

19   Q.  Okay.  How about Laura Wise, do you know Laura

20   Wise?

21   A.  I know --

22   Q.  RN?

23   A.  I know of a Laura, yes.

24   Q.  Okay.  She was a nurse?

25   A.  Correct.

1     Q.  Is she a liar?

2     A.  Again, I'm not going to slander any employees

3  that I don't know very much about.

4     Q.  Okay.  You don't have any reason here to tell

5  this jury that she was a liar, she's not -- she's

6  untrustworthy, Ms. Wise I'm talking about?

7     A.  I'm not going to slander an employee.

8     Q.  All right.  Let's go to Mesquias Exhibit

9  00261316.

10     Now, real quick here, there is an electronic

11  system in which records are kept, right?

12     A.  Correct.

13     Q.  All right.  And is this what this looks like to

14  you?  Are you familiar with that system there, Merida?

15     A.  Yes.

16     Q.  How they were entered?

17     A.  Yes.

18     Q.  Okay.  And again, here if we go down to --

19  actually, Roy, go to the very top, just -- oh, man, it's

20  really blacked-out there.

21          MR. HECTOR CANALES:  May I approach the

22  witness, Your Honor, very quickly?  You can't see it for

23  some reason there on that copy there, but I just don't

24  want there to be --

25     Q.  (By Mr. Hector Canales)  Would you confirm, sir,

1    this is a skilled nursing note for Joanne Conti?

2       A.   Yes.

3       Q.   That's what it says, but you can't see it on the

4    screen, right?

5       A.   That is correct.

6       Q.   But it's here on the -- it's here on the page?

7       A.   Correct.

8       Q.   Just the scanned copy is bad.

9            All right.  So I want to go again to the note, to

10   the narrative notes at the bottom here.  See that these

11   notes were electronically signed.  Go up a little bit

12   more so we can see the bottom.  Scroll up, Roy.  There

13   you go.

14           Electronically signed by Ms. Laura Wise an RN on

15   February the 4th of '16.  You see that?

16      A.   I do see that.

17      Q.   Do you remember what happened on February the 9th

18   of '16, five days later?

19      A.   No, I don't.

20      Q.   Is February 9th of '16, isn't that the date that

21   Ms. Conti -- that you -- well, first of all, that you

22   got fired and you left?  You got fired from Merida?

23      A.   I know it was in February, I just don't recall

24   the date itself.

25      Q.   All right.  February the 9th, all right, keep

1    that in the back of your head, all right?  And -- and

2    right here again, right in the middle, you'll see the

3    fractures and again you see the note.  PCP has ordered

4    patient to remain in a wheelchair.  This time it says

5    with a soft cast on; do you see that?

6        A.   I do.

7        Q.   So Ms. Wise has said the same thing that Ms.

8    Rodriguez said, right?  A little bit different, instead

9    of a boot she calls it a soft cast.  Right?

10       A.   Correct.

11       Q.   Again, Ms. Wise says, Mr. Mesquias did not order

12   the wheelchair, a physician did, right?

13       A.   A wheelchair is a -- a covered hospice benefit

14   with the DME so it was ordered through hospice to get

15   Ms. Conti this wheelchair.

16       Q.   We all know that, sir, that wasn't my question.

17   Please listen to my question.  My question was, the

18   physician -- I'll try to simplify it.  The physician

19   ordered the wheelchair, right?

20       A.   Without any documentation to state that the

21   physician ordered the wheelchair, I cannot answer that

22   with a yes or no answer.

23       Q.   Where did Ms. Wise get this information from?

24       A.   That is your question as mine.

25       Q.   You doubt it?

1    A.   I'm not saying I doubt it, I'm just saying I

2    cannot answer the question you're asking me about the

3    primary care physician.

4              MR. FOSTER:  Objection, Your Honor.  This is

5    about a document the witness has never seen that he has

6    no personal knowledge about, there's no foundation for

7    what this person may have put or not put in this

8    document.

9              MR. HECTOR CANALES:  That wasn't a problem

10   yesterday when he was asking questions, Judge.

11             THE COURT:  Gentlemen, gentlemen, gentlemen,

12   let's -- you can ask him a question about the document

13   if he knows.

14             MR. HECTOR CANALES:  You know what, I think

15   it's clear.

16   Q.  (By Mr. Hector Canales)  Let's move on --

17             THE COURT:  Mr. Canales, you have about five

18   minutes left in your session.

19             MR. HECTOR CANALES:  Very well, Your Honor.

20             THE COURT:  Unless you want to take more

21   time.

22             MR. HECTOR CANALES:  Very well.

23   Q.  (By Mr. Hector Canales)  Let's move on to that

24   February 9th date, right?  The month that you got fired.

25   Same Exhibit E-10, Mesquias 00261265.

1         Again, another revocation statement, the same

2    form that we saw before but a different date, correct?

3         A.   That is correct.

4         Q.   All right.   But it's also with Ms. Conti.   And

5    what reason -- you recall the reason before was she had

6    to go to the hospital, right?

7         A.   Correct.

8         Q.   Now she's saying what?

9         A.   Desires treatment not in hospice plan.

10        Q.   Okay.   She didn't want to be in hospice anymore.

11   Let's go to the top.   She signs it, right?

12        A.   She did.

13        Q.   Keep going up.   But this one, you don't sign this

14   one, every other election and revocation that we've seen

15   today you signed, you witnessed with her, but this one

16   somebody else, right?

17        A.   That is correct.

18        Q.   You know who that is?   It says RN, some nurse,

19   but do you know who it is?

20        A.   No, I don't.

21        Q.   All right.   On the same -- on the same date.   All

22   right.   Let's move to the next document in the medical

23   records of Ms. Conti.   Mesquias 00261261.   This is a

24   three-page fax that ends on bates number 63 -- 61 to 63.

25   Start at the top, Roy.

1       This is the fax cover sheet from Generations

2  Hospice Care, Inc. let's start there.  That's the

3  hospice that you went to, right?

4       A.  That is correct.

5       Q.  All right.  And they are -- and by the way

6  they're literally next door to Merida, right?

7       A.  Where Merida used to be, yes.

8       Q.  So when you took a -- when you changed jobs, when

9  you got fired from Merida and you went to Generations,

10  you literally just went one door over?

11       A.  One parking lot over to the other.

12       Q.  One parking lot over, okay.  And so here let's

13  see, can we look at the top fax.  When was this fax,

14  when did Generations send this fax to Merida?

15       A.  February 9th, 2016.

16       Q.  Why is that date significant?  What is

17  significant within Ms. Conti's hospice care at Merida on

18  February 9th?  What did we just see?  That's the same

19  day she did what?

20       A.  A revocation.

21       Q.  All right.  So on that same day of revocation,

22  Generations is faxing to, scroll up, the case manager,

23  right, that's the case manager for Merida, right?

24       A.  Correct.

25       Q.  All right.  Regarding Ms. Conti, transfer

1   revocation; you see that?

2       A.   Yes.

3       Q.   All right.  And what are they telling -- what is

4   Generations asking Merida to do?

5       A.   To just -- to please DC patient ASAP, patient has

6   elected to -- and signed consents to receive hospice

7   care from our agency.

8       Q.   That's because you stole her; didn't you?

9       A.   I was not employed with Generations at that time.

10      Q.   You stole her, you -- you stole Ms. Conti and put

11  her at Generations; didn't you?

12      A.   No, I didn't.

13      Q.   You were mad, you were mad at -- at -- at Rodney

14  for firing you; weren't you?

15      A.   No, I wasn't.

16      Q.   You weren't mad?

17      A.   No.

18      Q.   You weren't working for them at the time, though,

19  right?

20      A.   No.

21      Q.   So you wouldn't have any business signing these

22  documents for Generations, then; would you?

23      A.   Correct.

24      Q.   All right.  Let's go to the next page, Roy, of

25  the fax, page 2 of the fax.  Start just like we've been

1    doing the top half.

2         Authorization for release of medical information.

3    Again, standard procedure by a hospice, but now we're

4    looking at Generations forms not Merida's, right?

5       A.   Correct.

6       Q.   They're asking Ms. Conti to acknowledge and

7    consent to provide her records, right?

8       A.   Correct.

9       Q.   And they're providing this to Merida so that

10   Merida -- because Merida can't release her records

11   unless they get Ms. Conti's approval, right?

12      A.   That is correct.

13      Q.   And Generations was doing this with the intent to

14   put her into their hospice care, right?

15      A.   Possibly.

16      Q.   Why else would they be asking, that's what they

17   want to do, right?

18      A.   Possibly to look for evaluation on whether or not

19   Ms. Conti qualified or not.

20      Q.   And there's nothing wrong with that.  We

21   shouldn't be surprised that hospice companies look to

22   find people to put into hospice, that's what they do,

23   right?

24      A.   Correct.

25      Q.   All right.

1              THE COURT:  Mr. Canales, technically your

2    hour and 15 minutes has completed, but I'm assuming you

3    want to continue; is that correct?

4              MR. HECTOR CANALES:  Yes, sir.  I think

5    my -- we've -- in hand signals.

6              MR. CYGANIEWICZ:  How much time am I

7    allocated, Your Honor?

8              THE COURT:  Well, as I indicated each

9    attorney -- each defense has been allocated one hour and

10   15 minutes --

11             MR. CYGANIEWICZ:  Okay.

12             THE COURT:  -- for a grand total of three

13   hours and 45 minutes.

14             MR. CYGANIEWICZ:  Yes, sir.

15             THE COURT:  He's now completed one hour and

16   15 minutes.

17             MR. CYGANIEWICZ:  So he's covered a lot of

18   materials I would have so I have no problem and I've

19   consulted with Mr. McInnis about giving some time.

20             MR. HECTOR CANALES:  Thank you.  I'm going

21   to try and wrap it up.

22             THE COURT:  Please proceed.

23             MR. HECTOR CANALES:  Thank you, Your Honor.

24             THE COURT:  We're keeping everybody on

25   notice in terms of what the time is.

1          MR. HECTOR CANALES:  We're good.

2          THE COURT:  Please proceed.

3          MR. HECTOR CANALES:  Thank you, Your Honor.

4     Q.  (By Mr. Hector Canales)  Let's scroll all the way

5     to the top -- to the bottom of the page, excuse me.

6          Here Ms. Conti is granting permission to Merida

7     to release the records, right?

8     A.  Correct.

9     Q.  On February the 9th.  Okay, now let's get to the

10    last page of the -- of the fax.  Start at the top, Roy,

11    see page 3 of 3?

12         Now, this is a notice of services not covered by

13    hospice.  This is standard form to election -- part of

14    the election form for hospice patients, right?  You've

15    got to inform them, tell them, get them to acknowledge

16    what services are covered, what services aren't covered,

17    right?

18    A.  Right.

19    Q.  That's to give the patient informed consent so

20    that they know what they're doing -- what they're

21    getting into, right?

22    A.  Correct.

23    Q.  All right.  Let's go on now to the bottom.

24         So the election of the -- the election of the

25    Medicare Medicaid hospice benefit, I was transferred

1    from the Merida Group on February 9th, '16.  I elected

2    to have Generations hospice care provided -- provide

3    palliative hospice care to me.  No dispute, right, we've

4    established those are the facts?

5        A.   No, she revoked her services according to your

6    last exhibit.

7        Q.   Okay.  So the form says transfer, but to be even

8    more precise you would say cross out transferred and say

9    revoked?

10       A.   There's a big difference.

11       Q.   Okay.  All right.  Very well.  Let's scroll up

12   and get to the bottom of this thing.

13            That's your signature.

14       A.   Actually, that isn't my signature.  It's similar

15   to my signature but it's not.

16       Q.   Oh it's not?

17       A.   No.

18       Q.   Similar but not your signature?

19       A.   Similar but not.

20       Q.   That is your testimony?

21       A.   That is my -- again, that is similar to my

22   signature but not my signature.

23       Q.   Okay.  Because if it were your signature, then

24   that would have made what you just said that you weren't

25   involved in the transfer or revocation or stealing of

1    Ms. Conti, right, that would have made that a lie?

2       A.   That would have.

3       Q.   Just coincidence somebody has a non-descript

4    similar signature as yours out there at Generations in

5    the same month that you got fired from Merida and

6    employed at Generations?

7       A.   My signature at the time was very easy to

8    duplicate and that is why I've changed it.

9       Q.   Is that what happened here, sir?  Are you now

10   saying that somebody at Generations duplicated your --

11   your -- your signature?

12      A.   All I'm stating is that that is not my signature.

13      Q.   Forgery is a very serious offense; isn't it?

14      A.   I understand that.

15      Q.   Forgery is a crime?

16      A.   It is.

17      Q.   Forgery makes you a liar, right?

18      A.   That is correct.

19      Q.   So did somebody at -- I mean, let's lay it out

20   there.  Did somebody at Generations forge your signature

21   or -- or try to make it look like yours?

22      A.   That is the -- this the first time that I'm

23   actually seeing this record --

24      Q.   That's right, the Government never showed you

25   this; did they?

1    A.   They never did.

2    Q.   They didn't question or cross-examine like

3 I cross-examined your story, did they?

4    A.   They didn't.

5    Q.   In all those meetings that they had, these are

6 their exhibits, did you know that, sir?

7    A.   I was unaware of that.

8    Q.   Right.   These lawyers here, all this table here,

9 they -- they never showed this to you, they didn't cross

10 check you; did they?

11    A.   No, they didn't.

12    Q.   They took what you had to say, they liked it and

13 they put you up here, right and they prepared and

14 planned for you to get up here and smear my client?

15    A.   I'm not smearing your client.

16    Q.   You won't smear Laura Wise, you won't get up here

17 and smear these other people, but you'll get up here

18 unprepared not knowing what you've signed, make

19 allegations against my client; won't you?

20          MR. FOSTER:   Objection, argumentative,

21 Your Honor.

22          THE COURT:   Rephrase the question.

23 Sustained.

24          MR. HECTOR CANALES:   No more questions.

25          THE COURT:   Thank you, sir.

1    Mr. Cyganiewicz.

2              MR. CYGANIEWICZ:  Yes, Your Honor.  May it

3    please the Court?

4              THE COURT:  Please proceed.

5                        CROSS-EXAMINATION

6    BY MR. CYGANIEWICZ:

7        Q.  Good morning, sir.

8        A.  Morning.

9        Q.  Ed Cyganiewicz I represent Mr. McInnis, we

10   haven't met again have we?

11       A.  What is your name again?

12       Q.  My name is Ed Cyganiewicz.

13       A.  No.

14       Q.  Lawyer in Brownsville.

15       A.  No.

16       Q.  We've never met?

17       A.  No.

18       Q.  We haven't talked three or four times have we?

19       A.  No.

20       Q.  By the way and I'll ask you questions later,

21   those three or four meetings with the prosecutors in

22   getting ready for trial, did those include those two

23   meetings with your agents three years ago?

24       A.  What was that?

25       Q.  The -- the meetings that you described as three

1   or four meetings with the prosecutors, does that number

2   four include the two meetings you had, the interviews

3   you had originally in -- in three years ago with the

4   agents?

5       A.   No.

6       Q.   Okay.  And I think yesterday you said it's kind

7   of hard to remember what happened, or what you said

8   three years ago; is that right?

9       A.   That is correct.

10      Q.   Would you agree that it would be easier to

11  remember things closer to the event?

12      A.   What event are we talking about?

13      Q.   You could remember more in 2017 three years ago

14  than you could today?  Or do you remember more now than

15  you did then?

16      A.   I mean, things come to memory as -- as we --

17  as we --

18      Q.   Can you agree with me that your memory would be

19  better closer to the event when you're telling people

20  what happened, or is it better three years later?

21      A.   My memory would be a lot better than it was when

22  I spoke with the agents.

23      Q.   Okay.  So you're telling the jury now that

24  three -- even though you said yesterday three years is a

25  long time ago, you're telling the jury this morning that

1  your memory is better three years ago than it was when

2  you spoke to the agents 2017?

3      A.   When you guys were asking me about documentations

4  and --

5      Q.   Can you answer my question?

6      A.   I am answering your question.

7      Q.   I mean it seemed like you've answered the

8  prosecutor's questions so directly but every -- I mean

9  it's like pulling teeth from you from a Defendant.

10  Why -- why is that?

11      A.   I'm answering your question.

12      Q.   Okay.  Is your memory better now you're saying

13  than it was three years ago?

14      A.   From the events that happened then I was able to

15  speak to the events that happened now to what you guys

16  are asking me, it's -- it's kind of up -- up in the air.

17      Q.   So you -- three years ago you never mentioned a

18  lot of these things to the people when you were first

19  interviewed closer to the event; did you?

20      A.   When I -- when I met with the agents about three

21  years ago we were not getting into great detail of the

22  way --

23      Q.   What was the -- what was the purpose of that

24  meeting?  They were investigating, right?

25      A.   They were doing an investigation.

1    Q.   And it was an interview; was it not?

2    A.   You can say that.

3    Q.   Okay.  Well, isn't that what the -- we have the

4    agent's reports, have you had a chance to see these?

5    A.   No, I haven't.

6    Q.   Would it help you to refresh your memory on what

7    you told them then if I showed it to you?

8    A.   That would be great.

9         MR. CYGANIEWICZ:  May I approach,

10   Your Honor?

11        THE COURT:  You may.

12   Q.   (By Mr. Cyganiewicz)  You talked yesterday about

13   conversations and all kinds of things that -- well,

14   first of all you said -- they said this, they said that

15   and then when I objected you said, well, Henry wasn't

16   involved in some of those discussion; is that correct?

17   A.   That's correct.

18   Q.   This is a three-page report what you told

19   Mr. Fuentes three years ago.  Can you just go through

20   that and tell me if you said anything about Mr. McInnis?

21   And take your time:

22   A.   (Witness reviewing report.)

23        MR. FOSTER:  Your Honor, I object.  This is

24   improper attempt.  He hasn't asked the witness if he

25   recalled anything, so he's not refreshing his

1    recollection about anything.

2                    MR. CYGANIEWICZ:  He says his memory was bad

3    back then, it's better today, Your Honor; I'm giving him

4    the report to refresh his memory.  It's proper.

5                    MR. FOSTER:  We filed a Motion in Limine on

6    this as well that Your Honor ruled on.

7                    MR. CYGANIEWICZ:  That we can't impeach

8    witnesses?

9                    THE COURT:  One second.  Gentlemen,

10   gentlemen.  I -- the predicate was proper, he asked --

11   Mr. Cyganiewicz's predicate was proper at this time so I

12   do need to hear the question but depending upon --

13                   MR. CYGANIEWICZ:  My question was is there

14   anything, can you tell me what he said three years ago

15   when it was closer to the event about Henry McInnis.

16                   THE COURT:  You can answer that question.

17       Q.   (By Mr. Cyganiewicz)  Did you find something

18   about Mr. McInnis?

19       A.   I -- the only thing I mentioned --

20       Q.   Did you find something about Mr. McInnis?

21       A.   Can you allow me to answer?

22       Q.   Yes, yes or no?

23       A.   What I have in here --

24                   MR. CYGANIEWICZ:  Judge, it's a very simple

25   question, he's been evasive during the whole time.

1          THE COURT:  Mr. Cyganiewicz he's allowed to

2    answer the question.  Again, but answer only the

3    question.  Did you find anything about Mr. McInnis in --

4    in that report?

5          THE WITNESS:  What I mentioned was his

6    position with the -- with the company.

7    Q.   (By Mr. Cyganiewicz)  What you said yesterday he

8    was working for Mr. Mesquias?

9    A.   He was second in charge, yes.

10   Q.   And you worked for Mr. Mesquias also, did you

11   not?

12   A.   I did.

13   Q.   Okay.  Why don't you hold onto that and let me

14   ask you some further questions about it.

15        Did you -- how did you describe your position

16   with Merida to this agent Fuentes back three years ago

17   when it was closer in time?

18   A.   So I started off as a marketer.

19   Q.   Okay.

20   A.   Went as marketing manager then was pushed back

21   down to a regular marketer.

22   Q.   Okay.  Does -- does your -- does the report say

23   anything that you were pushed down, or what does it say?

24        MR. FOSTER:  Same objection, Your Honor.

25        THE COURT:  The -- again, the -- that --

1    that is sustained.  Again, you need to establish the

2    predicate before you refer to that.

3        Q.   (By Mr. Cyganiewicz)  Did you tell the agent that

4    you were hospice marketer and was hired by Merida?

5        A.   Yes.

6        Q.   Did you say anything else to them about being --

7    having any type of different position?

8        A.   No, I didn't.

9        Q.   And now you're telling the jury that you were --

10   you were some sort of consultant also for Merida?

11       A.   For the marketing position we were known as the

12   consultants on behalf of the agency speaking to the

13   families about the services.

14       Q.   You know, and I know we've talked and used that

15   phrase marketing or marketers throughout this last day.

16   What exactly would a marketers job be, what was your job

17   and role as a marketer?

18       A.   To go out and find patients that needed services.

19       Q.   Like a sales position?

20       A.   I wouldn't call it sales.

21       Q.   You do remember -- I don't know if they still

22   have them, the pharmacy company reps where they go to

23   the doctors office and gives samples and get the doctors

24   to write their prescriptions, you're out there looking

25   for patients, right?

1      A.   That is correct.

2      Q.   And the purpose of a clinic is to make money,

3   correct?

4      A.   That is correct.

5      Q.   And your -- where were you working, in what area?

6   Were you in the San Antonio office, excuse me?

7      A.   I was based out of the San Antonio office.

8      Q.   Did you work out of the Harlingen office?

9      A.   I just frequently visited that office.

10     Q.   Where was Mr. McInnis working?

11     A.   Out of the Harlingen office.

12     Q.   And how often would Mr. McInnis go to

13   San Antonio?

14     A.   I mean, I never counted the times that he would

15   show up to San Antonio.

16     Q.   But he was based in Harlingen, correct?

17     A.   Correct.

18     Q.   And you were basically working in San Antonio?

19     A.   Correct.

20     Q.   And who was the administrator -- was Mr. McInnis

21   referred to as administrator?

22     A.   Yes, he was.

23     Q.   And who was the administrator for the San Antonio

24   office?

25     A.   We had an alternate administrator.

1    Q.   What was his name?

2    A.   Eddie Zuniga.

3    Q.   So Mr. Zuniga while in San Antonio with you be

4    your boss?  Your immediate supervisor?

5    A.   You could say that also.

6    Q.   So if you had a concern there, you would go to

7    Mr. Zuniga first, probably?

8    A.   No, I was told to go to either Rodney or to

9    Henry.

10   Q.   So there was an alternate administrator

11   Mr. Zuniga and he was in San Antonio with you, correct?

12   A.   That is correct.

13   Q.   And Mr. McInnis was the administrator in

14   Harlingen?

15   A.   He was the administrator for the entire agency.

16   Q.   And his office was where?

17   A.   In Harlingen.

18   Q.   I know I asked you about what you -- if that

19   refreshed your memory about what you told the agents.

20   Did -- is there anything in there -- does it refresh

21   your memory, did you say anything in there about

22   Mr. McInnis having conversations with you that you

23   described to the jury yesterday?

24   A.   In this -- in -- in this report, no, doesn't.

25   Q.   And the purpose of that meeting, they were

1    investigating a crime, correct?

2        A.   Correct.

3        Q.   And you didn't think that would be important to

4    tell the investigators at that point what -- what you

5    told the jury yesterday?

6        A.   During the time that I spoke with the agents on

7    this, and after I had spoken with the agent De la -- or

8    De -- Agent Fuentes after speaking and all that, a lot

9    of stuff started coming to mind --

10       Q.   Okay.

11       A.   -- of events that happened there at Merida.

12       Q.   But you're still saying you remember more today

13   than you did three years ago?

14       A.   That is correct.

15       Q.   And you had an opportunity to meet with another

16   federal agent or another agent a few months later,

17   correct?

18       A.   I believe so, yes.

19       Q.   Okay.  You recognize this gentleman Mr. Garcia,

20   the agent.  Do you remember meeting him in San Antonio?

21       A.   Just recently, yes.

22       Q.   Okay.  How about back in -- we have another

23   report back from a few months after that one in 2017;

24   remember that meeting with Mr. Garcia?

25       A.   To my knowledge I really don't.

1    Q.   Okay.   May I approach to show him this report to

2    refresh his memory?   This is dated June 2017.   When was

3    that first one dated, January?

4    A.   January.

5    Q.   It says you -- what date did you meet with

6    Mr. Garcia in San Antonio?

7    A.   Are we going by the date of entry or the date

8    that's written?

9    Q.   Well it says on certain date I met with

10   Mr. Gonzalez, what is that date?

11   A.   On that date it says 05/31.

12   Q.   Okay.   And that was -- you had some months to

13   think about it, you know, maybe Mr. Fuentes has got your

14   memory sparked, is there anything -- did you tell

15   Mr. Garcia and the other federal agents that were

16   present at -- in May of 2017 about any conversations

17   with Henry and him ordering you to do certain things, is

18   there anything in that at all, did you say anything

19   about that?

20            MR. FOSTER:   Same objection, Your Honor.

21            THE COURT:   Same objection as to?

22            MR. FOSTER:   As to the Motion in Limine,

23   improper impeachment.

24            THE COURT:   The question is limited in scope

25   to whether he referenced Henry McInnis; is that correct?

```
 1              MR. CYGANIEWICZ:  Yes, Your Honor.

 2              THE COURT:  I'll allow that question.

 3                  (Witness reviewing document.)

 4      Q.  (By Mr. Cyganiewicz)  Get a chance to read it?

 5      A.  (Witness reviewing document.)  Okay.

 6      Q.  Is there any mention about the conversations you

 7   testified for about an hour yesterday to the jury that

 8   you told them that you had Mr. McInnis told you and

 9   instructed you to do certain things, is there anything

10   in there about that?

11      A.  Yes, there is.

12      Q.  Okay, tell me -- read what part.

13      A.  Gonzalez was aware of Dr. Francisco Pena, he was

14   the medical director for Laredo office.  Gonzalez heard

15   that Pena gave permission to go through his charts to

16   see if his patients qualified for hospice.  If he did he

17   signed them up.  When Gonzalez heard about this, he told

18   those he worked with not to participate.  Dr. Pena was

19   the medical director for several companies.  At one

20   point Henry McInnis told Gonzalez to make Dr. Pena happy

21   because he did not want to lose his patients.

22      Q.  Okay.  So you're saying that at one point what

23   you told him was Henry told Gonzalez to make Dr. Pena

24   happy because he's bringing in patients, that's your

25   job, isn't it?
```

1      A.   Correct.

2      Q.   My question is was there anything in there, did

3  you tell the agents anything about these conversations

4  and these so-called conversations you had with

5  Mr. McInnis or even Mr. Mesquias yesterday about how

6  they told you to do things and they were -- you don't

7  even mention any of that, do you?

8      A.   At this time, no, I didn't.

9      Q.   The part that -- the part that you read is the

10  only time you ever mentioned McInnis?

11     A.   That is correct.

12     Q.   And it's just keep the doctors happy, I mean, you

13  know, we need the patients, correct?

14     A.   That is correct.

15             MR. CYGANIEWICZ:  May I approach and get

16  these?

17             THE COURT:  You may.  And ladies and

18  gentlemen of the jury, Mr. Cyganiewicz, let's take a

19  very brief recess for approximately five minutes.  I

20  need to handle some criminal cases having nothing to do

21  with this case.  Do we have the prosecutors and defense

22  attorneys ready on all of these?

23             THE CLERK:  Yes, sir.

24             THE COURT:  All right.  Please start coming

25  forward.  Ladies and gentlemen, take about five minutes.

1    Let's take a brief recess.

2                COURT BAILIFF:  All rise for the jury.

3                (JURY OUT.)

4                (UNRELATED MATTERS TAKEN UP.)

5                THE COURT:  All right.  Mr. Cyganiewicz

6    we're going to start shortly.

7                MR. CYGANIEWICZ:  May I bring up a matter

8    without the jury before we start?

9                THE COURT:  Sure.  Well, take a quick break,

10   we don't have anybody in here.

11               MR. CYGANIEWICZ:  Yeah, I know, they're just

12   outside using the restroom.  No problem.

13               THE COURT:  All right.  Let -- let -- let --

14   let them know that you want to take something up.

15               (COURT IN SHORT RECESS.)

16               THE COURT:  All right.  Sheila, we ready?

17               COURT REPORTER:  Yes, sir.

18               THE COURT:  All right, gentlemen, as

19   promised the sentencings have now been completed.

20   Mr. Cyganiewicz, you informed me you wanted to address

21   the Court outside the presence of the jury.

22               MR. CYGANIEWICZ:  Well, it's related to our

23   bench conference.  I'm asking Court to reconsider the

24   order not allowing us to impeach this witness by showing

25   that he's been convicted of forgery.

1          Since our bench trial we had testimony from

2    him where he's now saying that his own signature was

3    forged, he's familiar with forgery, he thinks forgery is

4    bad, forgery is lying.  I think he may have opened the

5    door himself, but if he did or didn't, I think the

6    probative value now is -- is much -- much more

7    outweighed any type of prejudicial effect.

8          It would show the -- give the jury a true

9    image and true picture of this man.  When he says that's

10   a forgery, I think -- I think that the Court should

11   reconsider.  So we're asking for me to just allow him if

12   he's ever been convicted of forgery.  I won't go into

13   any details, but I think now it should be allowed.

14          MR. HECTOR CANALES:  Rodney Mesquias joins

15   in that request, Your Honor.

16          MR. GUERRA:  Defendant Pena as well,

17   Your Honor.

18          THE COURT:  Government's response, please.

19          MR. FOSTER:  Your Honor ruled 1999 state

20   Court conviction was inadmissible prior to trial,

21   there's nothing that happened here today that changed

22   that.  He was shown a document that he'd never seen

23   before and he said he'd never seen it before and it

24   wasn't sis signature.

25          Now the fact that he has a state Court

1   conviction doesn't bear in any way on that particular

2   document whether it's his signature or not.  He's not

3   alleged to have forged someone else's signature on the

4   document, and thus there's no relevance, it's highly

5   prejudicial given its staleness and given the

6   authorities that the Government cited it should remain

7   inadmissible.

8           MR. CYGANIEWICZ:  Judge, I don't know who it

9   would be prejudicial to, I think not allowing it would

10  be prejudicial to the Defendants.  And I don't think

11  there's any distinction on a crime of felony conviction

12  of moral turpitude whether it's in state Court or

13  federal court.  It's forgery, it's a conviction, it's a

14  felony and it involves moral turpitude and goes directly

15  to his credibility and his character.

16          MR. CANALES:  Your Honor, I would add that

17  the witness has portrayed himself in his Direct

18  Examination through the Government to be an honest

19  person who is motivated by trying to do the right thing,

20  my words, they've portrayed himself in that way.

21          When confronted with those -- crossed on

22  those issues, he cites the very crime that he was

23  convicted of as the defense to his own credibility.  He

24  raised it, Your Honor, he raised forgery as a defense to

25  the Cross-Examination of something.

1              And I believe, Your Honor, it would be

2    highly prejudicial to the Defendants to not be able to

3    fully cross-examine this witness on an issue that the

4    Government has made with this witness.  They chose to

5    bring him up and portray him as an honest person here to

6    do the right thing because he cares about patients and,

7    you know what, Your Honor, he brought in forgery, he

8    has -- his credibility is at issue and nothing could be

9    more prejudicial to my client than to not allow the jury

10   to see to fully, Judge, the -- the voracity, the

11   honesty, the truthfulness of this witness.

12             THE COURT:  Gentlemen, respectfully the

13   request is denied.  Again, obviously we've all heard his

14   testimony.  The witness quite simply said that was not

15   his signature, he did not use the word forgery.

16             MR. CYGANIEWICZ:  Yes, he did.

17             THE COURT:  Mr. Canales.

18             MR. CANALES:  He did, Your Honor.  I

19   respectfully disagree with the Court, he used forgery

20   multiple times.

21             THE COURT:  Well, even if he did, I don't

22   think he accused anyone of -- of -- my ruling stands.

23   You're free to -- you're free to compare signatures,

24   you're free to ask him again about the signature, but

25   Mr. Cyganiewicz and -- and ask him to confirm but,

1  again, the -- the State conviction having to do with he

2  forging someone else's signature is -- is distinct and

3  apart.  The Court's ruling stands.  All right.

4            MR. FOSTER:  Your Honor --

5            THE COURT:  Again, you're free to ask him

6  about his signature and someone else forging -- if he's

7  alleging someone's forging his signature, again, that's

8  a distinct issue from him being convicted for forgery on

9  the State issue.

10            MR. FOSTER:  Yes, Your Honor.

11            Prior to trial Your Honor granted the

12  Government's Motion in Limine, number one, based on

13  clear Fifth Circuit precedent that interview reports

14  cannot be used to impeach Government witnesses at trial

15  because they're not a statement of the witness under the

16  *Jencks* Act.  What we saw today was improper impeachment.

17  The way to impeach a witness with refreshed recollection

18  would be to ask him whether he recalled making a

19  specific statement to the agents when he was reviewed.

20  The witness says, yes, he recalls that, he can give the

21  statement.  If he says no he doesn't recall it, that's

22  the end of the inquiry.  If he says he doesn't remember,

23  he can be asked whether the report refreshes his

24  recollection, but to simply put these interview reports

25  up on the stand in total is contrary to the Court's

```
 1    ruling.
 2                 THE COURT:  Gentlemen, the Court -- the
 3    Government has a point.  The -- there has been a
 4    practice and now for the past two days of putting the
 5    cart before the horse on the impeachment issue.
 6                 Ask a question.  If the question that is
 7    answered is materially different than what you recall
 8    being in a document that's not in evidence, well, then
 9    that opens the door.  But giving the -- the witness the
10    document first claiming it's impeachment, again, is
11    reversing the process.
12                 So, again, technically, if you had asked a
13    question, did you mention Mr. McInnis --
14                 MR. CYGANIEWICZ:  I did ask those questions,
15    Your Honor.
16                 THE COURT:  Well, but I think --
17                 MR. CYGANIEWICZ:  And then I -- then when he
18    said no, I said well did you tell the agent, will that
19    help you refresh your memory, I think that's all proper
20    and not allowing that one --
21                 THE COURT:  If you did so be it.  I know
22    yesterday that was not the case.  But again, let's be
23    careful, very careful on -- on -- gentlemen, you know
24    how to impeach a witness, I mean you need to lay the
25    proper predicate and if he answers a question directly
```

1    opposite to what you're aware of, then that opens the

2    door.

3           But you can't present the document first and

4    say I'm impeaching him.  So I under -- I understand the

5    concern.  Again, I thought this was a gray line

6    because -- a gray area because I thought Mr. McInnis was

7    asking about Mr. McInnis's context so that was a close

8    call.  But again, let's be very careful in terms of -- I

9    think the -- the word impeachment is being used too

10   loosely.  If you're going to go down the impeachment

11   route, make sure you lay the proper predicate in terms

12   of what is the statement that you're attempting to

13   impeach.  All right?

14           MR. CYGANIEWICZ:  Yes, sir.

15           MR. GUERRA:  Yes, sir.

16           MR. FOSTER:  Thank you.

17           THE COURT:  Anything else?

18           MR. FOSTER:  No, Your Honor.

19           THE COURT:  All right.  Thank you.  Unless

20   there's anything else, let's get the jury back in here.

21           COURT BAILIFF:  All rise for the jury.

22           (JURY IN.)

23           THE COURT:  Ladies and gentlemen, please be

24   seated.  Thank you.  Members of the Jury, please be

25   seated.

```
 1                  Again ladies and gentlemen, there may be
 2     instances where we need to address matters outside your
 3     presence, please don't concern yourself.  In this
 4     particular instance, for example, our standard
 5     sentencings are on Wednesday's and we literally handled
 6     all of that in the last ten minutes.  So it has nothing
 7     whatsoever to do with this case but we're now free to
 8     proceed.
 9                  Mr. Cyganiewicz.
10                  MR. CYGANIEWICZ:  Just a couple questions.
11                  THE COURT:  Please proceed, sir.
12                  MR. CYGANIEWICZ:  Thank you, Your Honor.
13                           CROSS-EXAMINATION
14     BY MR. CYGANIEWICZ:
15        Q.  Mr. Gonzalez, did you get to visit with anybody
16     during the break?
17        A.  No.
18        Q.  Are you here with anybody?
19        A.  No.
20        Q.  Have you talked with anyone outside the
21     courtroom?
22        A.  No.
23        Q.  There's not a lady that you were speaking to?
24        A.  Just right now?
25        Q.  Yeah.  During the break, I just asked you?
```

1      A.   We weren't talking about the case.

2      Q.   Okay.  But you just told me you weren't

3   talking to anybody.

4      A.   She was escorting me around the courthouse.

5      Q.   So you did speak to someone, I mean is that so

6   hard to admit?

7      A.   Depends on how you're asking the question.

8      Q.   I asked if you spoke to anyone during the break.

9      A.   We didn't really speak.

10     Q.   I told you again --

11     A.   She asked me if I needed to go to the restroom

12   and she escorted me downstairs.

13     Q.   Okay.  I just -- forgive me if -- if I'm not

14   clear on this, I just want to make sure I understood

15   because sometimes maybe I wasn't paying attention, but I

16   know when Mr. Canales was questioning you and he had a

17   chart up there and it said that Ms. Conti had a left

18   foot fracture and then something was fractured on her

19   right side; remember that?

20     A.   I do.

21     Q.   Does that what the report said?

22     A.   The report stated --

23     Q.   Left -- left and then something on the right

24   fractures?

25     A.   A left fracture or right heel fracture.

1    Q.   Right.  And you're still telling the jury that

2    that doesn't -- that doesn't mean there were two

3    fractures?

4    A.   Again, there was nowhere in previous

5    documentation that states --

6    Q.   No, I'm just saying on that document it says left

7    fracture, right fracture, to you that doesn't mean two

8    fractures?

9    A.   The question was asked if there was fractures to

10   her foot.

11   Q.   Okay.

12   A.   I said according to that documentation there is,

13   but prior to that I can't answer.

14   Q.   Maybe I was wrong.  I thought you were asked was

15   there two fractures and you said you couldn't tell.

16   What else would it take for you to determine whether's

17   two fractures --

18   A.   A question was asked if there was a fracture.

19              THE COURT REPORTER:  Can you wait until he

20   finishes.

21   Q.   (By Mr. Cyganiewicz)  What would it take for you

22   to say there's two fractures when the report says

23   there's a fracture on the left and the fracture on the

24   right?

25   A.   It stated that one was a heel fracture and then

1    there was a right fracture.

2        Q.   Okay.   You used the word fracture twice?

3        A.   Fracture was used twice, yes.

4        Q.   All right.   Thank you.

5              MR. CYGANIEWICZ:   That's all I have,

6    Your Honor.

7              THE COURT:   Thank you.

8              MR. GUERRA:   May I proceed, Your Honor?

9              THE COURT:   Mr. Guerra, please.

10             MR. GUERRA:   Thank you, Your Honor.

11                     CROSS-EXAMINATION

12   BY MR. GUERRA:

13       Q.   Mr. Gonzalez, good morning.

14       A.   Good morning.

15       Q.   Yesterday before the jury, you testified

16   regarding a meeting you had with Dr. Pena at his offices

17   in Laredo; is that correct?

18       A.   May I ask who you are?

19       Q.   I'm sorry.   My name is Robert Guerra and I

20   represent Francisco Pena in this matter?

21       A.   Thank you.

22       Q.   Thank you for asking.   When you spoke about the

23   meeting with Dr. Pena, when was that?

24       A.   I can't recall the date and -- the month and

25   date.

1    Q.   How long had you been working for Merida at that

2    time?

3    A.   Within a few months, I could say.

4    Q.   Okay.   So would it be safe to say sometime 2014,

5    2015?   Does that sound about right?

6    A.   Within that time period.

7    Q.   And you went to Dr. Pena's office and it was

8    during that time he told you to go through his patient

9    files is that your testimony?

10   A.   We were in an exam room where I had met with

11   Dr. Pena along with another marketer to introduce myself

12   to Dr. Pena as kind of doing the oversight of the

13   marketing team for Laredo location.

14   Q.   And who was the other marketer?

15   A.   Her name was Joyce.   I can't -- I think it's

16   Neira.

17   Q.   What was that?

18   A.   I think the last name is Neira.

19   Q.   So the two of you went in an exam room and Dr.

20   Pena told you to feel free to go through his patient

21   files to see who qualified for hospice; is that right?

22   A.   That's correct.

23   Q.   And he would sign off on whomever you chose; is

24   that correct?

25   A.   That is correct.

1      Q.   And I believe the testimony you gave yesterday

2  was that you were taken aback by such an offer; is that

3  right?

4      A.   I was.

5      Q.   It was shocking to you that he would, A, violate

6  HIPPA, correct?

7      A.   Correct.

8      Q.   And I guess it was also shocking to you that he

9  would be so outright about this fraud; is that right?

10     A.   So outright to allow me to go into his medical

11 records room to pull patient charts that I thought would

12 be hospice appropriate.

13     Q.   And so how many patient files did you go through?

14     A.   None.

15     Q.   Why?

16     A.   Because it's a HIPPA violation and it's against

17 the law to do that.

18     Q.   Did you decline right then and there and tell him

19 I'm not going to do that?

20     A.   I did say I'm not going to do that, I even told

21 my marketer once we left the office that we were not

22 going to follow that practice.

23     Q.   This Joyce lady, correct?

24     A.   Correct.

25     Q.   Okay.  And you left Merida in January 2016; is

1    that right, or February 2016?

2        A.   You know what, mean -- sometime between those

3    dates.

4        Q.   Okay.   So it's fair to say for the ladies and

5    gentlemen of the jury that from January 2014 to about

6    January/February 2016 you worked for -- you worked for

7    Merida; is that right?

8        A.   I want to say it was from January to January, so

9    it would be 20 -- January 2014 to January 2016.

10       Q.   When you left Merida, were you angry that you got

11   fired?

12       A.   No, I wasn't.

13       Q.   Okay.   Were you upset at the way they were

14   treating patients?

15       A.   I was taken back on the way they were treating

16   their patients.

17       Q.   Right.   And I believe the testimony yesterday was

18   given a personal relationship you had issues with the

19   way they were doing business; is that right?

20       A.   Those were my issues, yes.

21       Q.   And I believe your testimony yesterday too is you

22   couldn't even sleep or deal with yourself because of

23   what you were seeing over at Merida; is that right?

24       A.   That is correct.

25       Q.   And so that's what prompted you to reach out and

1    make a complaint to the OIG hotline; is that right?

2        A.   It was to let the OIG hotline know of the

3    activity that was going on within that organization.

4        Q.   And the first meeting you had with anybody from

5    the Office of Inspector General occurred January 2017;

6    is that right?

7        A.   If that's what the paperwork states, I mean, I

8    don't recall the dates but --

9        Q.   Okay.  So about a year after you left is the

10   first time you met with anybody from the Government

11   about these allegations; is that right?

12       A.   We can say that I -- I -- I would say.

13       Q.   Okay.  And during that one year you had to deal

14   with, I guess the emotional baggage of what you

15   experienced over at Merida; is that right?

16       A.   That is correct.

17       Q.   And for a year it was eating you up inside;

18   wasn't it?

19       A.   It was.

20       Q.   And so when you went to the Office of Inspector

21   General this was your time to bring wrongdoing out to

22   the forefront; is that correct?

23       A.   That is correct.

24       Q.   So when you had your opportunity to meet with

25   Agent Fuentes at the Government offices, you're going to

1    tell him everything you knew; is that right?

2        A.  Everything that I could remember at that time,

3    yes.

4        Q.  Right.  Everything that you remembered giving

5    your recent tenure over at Merida, correct?

6        A.  Correct.

7        Q.  Would it surprise you that during that January

8    2017 meeting you did not mention Dr. Francisco Pena once

9    to Agent Fuentes?

10       A.  I mean, if -- if -- if it wasn't there and I may

11   have slipped my mind then, I mean, we all make mistakes

12   I know that.

13       Q.  This was something so shocking that you were

14   taken aback by it you didn't think to mention it to

15   Agent Fuentes?

16       A.  But as you bring it up, time and time the

17   memories of the timeline start to come back to your

18   memory.

19       Q.  Okay.  Could we have the screen on the Elmo,

20   please?

21            THE CLERK:  Yes, sir.

22       Q.  (By Mr. Guerra)  You just testified that January

23   2014, January 2016 was when you were a marketing

24   director for Merida; is that right?

25       A.  Not during the whole two years, but within those

1    two years.

2        Q.   Okay.  You worked in marketing for Merida at that

3    time?  Does that sound fair to say?

4        A.   That is correct, yes.

5        Q.   Let's just be accurate.  It was marketing for

6    Merida during those two years, correct?

7        A.   Correct.

8        Q.   That's accurate, yes?

9        A.   That is accurate.

10       Q.   So at some point 2014, 2015 you met with Dr. Pena

11   at his office; is that fair to say?

12       A.   That would be fair to say.

13       Q.   A month that you could think about?

14       A.   I can't think of the month.  I know it was during

15   the summertime.

16       Q.   Okay.  Summer of 2014 or summer of 2015?

17       A.   I don't recall.

18       Q.   Okay.  We'll just put 2014, 2015 maybe summer; is

19   that fair to say?

20       A.   Correct.

21       Q.   Okay.  January 30th, 2017, you go to the offices

22   of Inspector General HHS and meet with Agent Fuentes

23   there in San Antonio; is that right?

24       A.   If the date -- if the month is in January, I

25   mean, I -- excuse me, like I said I don't recall the

1    month, but if that's what is being said then okay.

2        Q.   You don't mention Dr. Pena during that interview,

3    fair to say?

4        A.   Fair to say.

5        Q.   And you read that report with Mr. Cyganiewicz,

6    correct?

7        A.   Correct.

8        Q.   Nothing about Dr. Pena in there, correct?

9        A.   Correct.

10       Q.   And I believe your testimony was, well, you go

11   through and maybe you remember some things.

12            So four months later, May 31st, 2017, you go back

13   and not only do you meet with Agent Fuentes you meet

14   with Agent Garcia right here, correct?

15       A.   I believe so.

16       Q.   I mean, you recognize this man?

17       A.   I mean, to be honest with you I really -- really

18   don't, but I just -- if you were to bring in Agent

19   Fuentes in here I probably wouldn't recognize him

20   either.

21       Q.   But you met with Agent Garcia recently, correct?

22       A.   I mean, in the San Antonio office, yes.

23       Q.   Did you meet with him any other time to prepare

24   for trial?

25       A.   I didn't meet with him directly.  He was in the

1   room during the interview process with the prosecutor.

2   Q.   And when you met with Agent Fuentes, and as you

3   covered with Mr. Canales, you were told that you needed

4   to be truthful, correct?

5   A.   That is correct.

6   Q.   And you were told during that interview you

7   needed to tell the truth, otherwise you could possibly

8   face criminal charges, correct?

9   A.   That is correct.

10   Q.   And you were given that same admonishment in May

11   2017 when you met with Agent Garcia, and I apologize it

12   wasn't Agent Fuentes that time, it was FBI Agent Cary

13   Johnson; is that correct?

14   A.   I know there was an FBI agent there I just don't

15   recall the name.

16   Q.   And you were told that lying to an FBI agent is a

17   crime, correct?

18   A.   Correct.

19   Q.   So you were going to be as truthful as possible

20   in May 2017; is that correct?

21   A.   That is correct.

22   Q.   Here we are May 31st, 2017.  You meet with Agent

23   Johnson and Agent Garcia, correct?

24   A.   Correct.

25   Q.   You don't mention your meeting with Dr. Pena

1    during that -- that interview either, correct?

2        A.    That is correct.

3        Q.    In fact, you just told the ladies and gentlemen

4    of the jury the only time you mentioned Dr. Pena was

5    that you heard of something; is that right?

6        A.    It was brought to my attention from the Laredo

7    office that I received a phone call while I was in

8    Corpus that Dr. Pena was wanting to transfer his

9    patients out of the agency because he hadn't been paid

10   for his services.

11       Q.    Understood.   But that wasn't a meeting that you

12   just described to the ladies and gentlemen of the jury

13   maybe five minutes ago?

14       A.    It was a meeting that I did state yesterday while

15   I was up here that I received a phone call from my

16   Laredo office stating that -- what Dr. Pena's intentions

17   were.

18       Q.    Mr. Gonzalez that's not what we're asking.   You

19   testified directly under oath from that witness stand

20   that you had a meeting with Dr. Pena in an exam room,

21   correct?

22       A.    My initial meeting with Dr. Pena I had an initial

23   meeting to introduce myself to Dr. Pena, I had at his

24   office in Laredo in an exam room that he had there.

25       Q.    But you were taken aback by this meeting, you

1    don't mention it to Agent Johnson or case Agent Garcia,

2    correct?

3        A.   That is correct.

4        Q.   And in fact, the first time you tell anybody

5    about it, as far as I can tell, is in 2019, correct?

6        A.   As I started to think back of everything that

7    happened during that time, everything started coming

8    back to memory.

9        Q.   Right.  So basically, you're still taken aback,

10   you're still moved, overcome with anger and grief and

11   what not, you wait two years to tell somebody that

12   Dr. Pena asked you to violate HIPPA to go through

13   medical records?

14       A.   As -- like I said, as the memory started coming

15   back and remembering everything I started to remember

16   everything that was going on during my tenure there at

17   Merida.

18       Q.   You had the ability to contact Special Agent

19   Fuentes to tell him about this alleged meeting, correct?

20       A.   I didn't have Agent Fuentes' number.

21       Q.   He didn't give you a card?

22       A.   Not that I can recall, I don't remember.

23       Q.   You could have gone to his office where you went

24   twice in 2017 to get this off your chest?

25       A.   I could have, yes.

1    Q.  Right.  You could have called Special Agent

2  Garcia and told him about that?

3    A.  I could have.

4    Q.  Right.  So you never told anybody about this

5  meeting because it never happened, correct?

6    A.  That is incorrect.

7    Q.  Then why wait four or five years from the time

8  this meeting happened before you brought it to light?

9    A.  Because it took -- after the time that I met with

10  the agents there in their office, it took a couple of

11  years before we actually met again to -- to let -- let

12  me know that trial was going -- going to start.

13    Q.  Oh, so you brought it up to people only because

14  trial was happening?

15    A.  No, as, again, like I had mentioned a few minutes

16  ago, as I started to remember everything on the

17  timeline, everything started coming to memory.  I didn't

18  keep the card of Agent Garcia with me, I mean it's

19  probably in my stack of business cards that I have in a

20  box.  I figured when I meet with them again I'll be able

21  to share everything that has been coming to light.

22    Q.  The first time you told anybody from the

23  Department of Justice about this alleged meeting with

24  Dr. Pena was in July 2019 when you met with Agent Garcia

25  and Mr. Lowell to prepare for trial, correct?

1      A.   If that's what your -- if that's what you're

2   stating.

3      Q.   I'm asking you?

4      A.   I don't know the date that I told them.

5      Q.   You never told them in 2017, correct?

6      A.   That is correct.

7      Q.   And of the three or four meetings you had with

8   the Government, when was the time that you told him for

9   the first time that Dr. Pena took you to an exam room

10  and told you to go through his patient files?

11     A.   The times that I met with the prosecutors in

12  their office, I did let them know the stuff that was

13  going on in Dr. Pena's office and what I was told.

14     Q.   Two years later, correct?

15     A.   Which is the time that I was -- I received a call

16  stating to come into the office again.

17     Q.   What else did you tell them?  What else did you

18  suddenly remember after two years?

19     A.   So, again, the whole conversation that we had

20  with Dr. Pena and then the instances that we had with

21  the other two Defendants Rodney Mesquias and Henry

22  McInnis, and the conversations that we had.

23     Q.   You never mentioned those conversations in your

24  January 30th, 2017 -- 2017 meeting, correct?

25     A.   That is correct.

1     Q.   And in fact, you never mentioned those phone

2  calls on your May 31st, 2017 meeting; is that right?

3     A.   What was the question again?

4     Q.   You never mentioned those phone calls in your May

5  30th, 2017 meeting as well, correct?

6     A.   At the time I -- like I said it didn't come to

7  mind until probably afterwards.

8     Q.   I mean, you -- that's what you testified to with

9  Mr. Cyganiewicz?

10    A.   Correct.

11    Q.   So again, you waited over two years until the eve

12 of trial before you even started mentioning phone calls

13 relating about paying Dr. Pena for his medical

14 directorship, correct?

15    A.   If that's what is -- is documented, I mean --

16 whether it was two years or whether it was, you know,

17 two months, I mean the fact that I still brought it up

18 to their attention regardless if it was on the eve of

19 trial, the memories started coming back as far as what

20 was being done.

21    Q.   And again this is a big deal because as you

22 testified to the ladies and gentlemen of the jury

23 earlier you didn't testify about knowing Dr. Pena in

24 your May 30th, 2017 interview, you testified that you

25 were only aware of him, correct?

1      A.   What do you mean aware of him?

2      Q.   Well, those are your words that you said earlier

3   when -- under Cross-Examination from Mr. Cyganiewicz.

4   You said I am aware of Dr. Pena?

5      A.   No, I said I met with Dr. Pena in his --

6      Q.   You told the ladies and gentlemen of the jury

7   that you met with Dr. Pena?

8      A.   In his Laredo office when I went down there to

9   introduce myself.

10      Q.   When you -- when you were being questioned by

11   Mr. Cyganiewicz and he had you read a section, you

12   recall that, right?

13      A.   Correct.

14      Q.   The only thing that you told the ladies and

15   gentlemen of the jury based on your -- your

16   conversations with the agent was that you were aware of

17   Dr. Pena, correct?

18      A.   That I went down and I spoke with Dr. Pena so I

19   could introduce myself as the marketing manager for the

20   Laredo office.

21      Q.   That's not what you said on May 30th, 2017 to the

22   agents, correct?

23      A.   Again, what was said to the agents back then and

24   what I'm speaking now also it's in correlation to me

25   meeting with Dr. Pena in his office in Laredo.

1    Q.   So were you being truthful in 2017 or are you

2  being truthful now?

3    A.   I was being truthful on both when I mentioned Dr.

4  Pena.

5    Q.   But you never mentioned any visits with Dr. Pena

6  in 2017, you omitted that, correct?

7    A.   If the paperwork states I never met with him,

8  again I've met with Dr. Pena -- the time that I was with

9  Merida in the Laredo office I met with him possibly

10  twice.

11    Q.   You never brought that up, period, end of story,

12  correct?

13    A.   If that's what y'all are stating.

14    Q.   Well that's not what I'm stating it's what you

15  just read to the ladies and gentlemen.

16    A.   Correct.

17            MR. FOSTER:   I think he's answered the

18  question, Your Honor.

19            THE COURT:   Move on.

20            MR. GUERRA:   Yes, Judge.

21    Q.   (By Mr. Guerra)  You had three or four prep

22  sessions with the Government, you talked about the

23  meeting you had with the Government on October 20th,

24  2019 which was Sunday, correct?

25    A.   Correct.

1    Q.   We have records of you meeting with the

2    Government in July of 2019 to prepare for trial,

3    correct?

4    A.   Correct.

5    Q.   Who was at that meeting?

6    A.   What was --

7    Q.   Who was at that meeting?

8    A.   Agent Garcia and --

9    Q.   Mr. Lowell?  I'm sorry, Mr. Foster?

10   A.   Which one is Mr. Foster?

11   Q.   This is Mr. Foster.

12   A.   Yes, okay.

13   Q.   What about any other meetings?  I think you said

14   three or four meetings to prepare for trial.  When was

15   the other meeting?

16   A.   I -- I can't recall the months, but I know they

17   were leading up to trial dates.

18   Q.   Okay.  And what did you talk about at those

19   meetings?

20   A.   What I re -- what I recall from my time there at

21   Merida.

22   Q.   And we've talked about the October 20th, 2019

23   meeting, we talked about the July 2019 meeting to

24   prepare for trial.  At the other trial -- excuse me at

25   other meeting to prepare for trial, who do you recall

1   being at that meeting?

2       A.   I know I met with the prosecutor again.

3       Q.   Was there an agent there?

4       A.   There was an agent.

5       Q.   Which agent?

6       A.   It was either Garcia or there was another agent

7   there on Garcia's behalf possibly.

8       Q.   Okay.  Do you recall that agent's name?

9       A.   No, I don't.

10      Q.   What was talked about at that meeting?

11      A.   Same stuff that I had discussed now, things --

12  timelines that I saw there at trial -- at the Merida

13  Group.

14      Q.   So is your -- is your meet -- I want to be clear,

15  is your memory better today or is it better three years

16  ago?

17      A.   I mean, it comes and goes.

18      Q.   Okay.  What do you mean it comes and goes?

19      A.   My memory comes and goes.

20      Q.   Okay.  But you're asking the ladies and gentlemen

21  of the jury to take your memory at its word, correct?

22      A.   That is correct.

23      Q.   So now your testimony is your memory may not be

24  that accurate; is that right?

25      A.   I'm not stating that.

1    Q.   Well you say it comes and goes?

2    A.   That doesn't mean it's not accurate.

3    Q.   Okay.  Understood.

4         MR. GUERRA:  Pass the witness, Your Honor.

5         THE COURT:  Anything else, Mr. Foster?

6         MR. FOSTER:  Yes.  Could I have that?

7         MR. GUERRA:  What?

8         MR. FOSTER:  The demonstrative?

9         MR. GUERRA:  Sure.

10        MR. FOSTER:  Thank you.

11                     REDIRECT EXAMINATION

12   BY MR. FOSTER:

13   Q.   Good morning.

14   A.   Good morning.

15   Q.   So there are a lot of questions about all these

16   reports; do you remember those questions?

17   A.   Some of them, yes.

18   Q.   Yeah.  Did you ever see these reports before

19   today?

20   A.   No, I didn't.

21   Q.   Were they a transcript of everything you told the

22   agents?

23   A.   No, they weren't.

24   Q.   Do you know whether the agents wrote down

25   everything you said?

1                    MR. GUERRA:  Objection, Your Honor.

2     Leading.

3                    THE COURT:  Overruled.

4                    THE WITNESS:  What was the question?

5        Q.  (By Mr. Foster)  Do you know whether the agents

6     wrote down everything you said?

7        A.  No, I don't.

8        Q.  Now there were a lot of questions about this

9     interview back in 2017 with an Agent Fuentes, do you

10    remember those questions?

11       A.  Yes.

12       Q.  And you were approached by the federal agents and

13    asked questions, did you answer the questions that they

14    asked?

15       A.  I did.

16       Q.  And at the time, were they -- well, let me ask

17    you this.  So were those meetings a lot shorter or were

18    they longer than the meetings you later had in

19    preparation for trial?

20       A.  They were a lot shorter.

21       Q.  Okay.  And when you were asked questions, did you

22    answer them?

23       A.  Yes, I did.

24       Q.  And do you recall being asked questions about

25    Defendant Pena?

1     A.   No, I don't.

2     Q.   Okay.   And early on were the agents questions

3  primarily focused on Mesquias?

4     A.   Yes, they are.

5     Q.   And later on did they ask more questions about

6  Mr. McInnis and Mr. Pena?

7     A.   Yes, they were.

8     Q.   And did you answer those questions truthfully?

9     A.   Yes.

10    Q.   And did you state those individuals were involved

11  with the fraud?

12    A.   I did state that, question.

13    Q.   Now, you were asked a lot of questions --

14            MR. GUERRA:   Objection, Your Honor.

15  Objecting to the question in which he requested legal

16  conclusion from the witness.

17            THE COURT:   Overruled.

18    Q.   (By Mr. Foster)   Let's look at this -- this May

19  31st, 2017 meeting.   Do you recall, and I think you

20  looked at that report, do you recall telling the agents

21  about Defendant Pena in that meeting?

22    A.   I did let them know that I was aware of a Dr.

23  Pena in the agency.

24    Q.   And what did you tell him about -- what did you

25  tell the agents at that meeting about his involvement in

1    the fraud?

2       A.   That he was the medical director for the Laredo

3    office.

4       Q.   So that was the first interview that you had and

5    that second interview about 05/31, do you recall telling

6    them about getting permission for the Merida staff to go

7    through his charts?

8       A.   That's the conversation that I had with Dr. Pena.

9       Q.   Okay.  And can you explain to the jury what you

10   told the agents in that May 31st, 2017 meeting about

11   Dr. Pena?

12      A.   That we were -- when I had gone to introduce

13   myself to Dr. Pena, that he did state that he was the

14   medical director for the Merida Group and that if we

15   wanted to go through his charts, to go ahead and feel

16   free to go through his charts and pull whatever charts

17   we think would be hospice appropriate and he would sign

18   off on the orders for Merida.

19      Q.   So when it says no mention of Dr. Pena during the

20   interview of May 31st counsel put on here, would that be

21   correct or incorrect?

22              MR. GUERRA:  Your Honor, I'm going to

23   object.  That's a mischaracterization of the

24   demonstrative and his testimony.  It clearly says no

25   mention of meeting of Dr. Pena during interview.

1              MR. HECTOR CANALES:  Join in the objection,

2    Your Honor.

3              THE COURT:  Rephrase the question.

4        Q.  (By Mr. Foster)  Sure.  When it says no mention

5    of meeting Dr. Pena during the interview, is that

6    correct or incorrect given your recollection of what you

7    told the agents?

8        A.  To my recollection, I mean I did let them know of

9    my meeting with Dr. Pena.

10       Q.  Okay.  You see this two years note on this

11   demonstrative?

12       A.  Yes.

13       Q.  Were you ever contacted by the Government in

14   those two years?

15       A.  Not within those two years, no.

16       Q.  Okay.  And what were you doing with your life

17   with the -- within those two years?

18       A.  Trying to move on with my life.

19       Q.  Okay.  And it's fair to say you were thinking

20   about other things?

21       A.  Yes.

22       Q.  Did anyone ever reach out to you to ask you about

23   questions?

24       A.  No.

25       Q.  Okay.  And then later on when you were preparing

1    for trial, did the Government talk to you and ask you

2    questions about what happened?

3        A.   Yes.

4        Q.   And did they ask you more specific questions

5    about Mr. McInnis' and Mr. Pena's involvement?

6        A.   Yes.

7        Q.   And did you tell them -- well, and is that what

8    you relayed to the jury on Direct Examination?

9        A.   Yes.

10       Q.   What their involvement was?

11       A.   Yes, I did.

12       Q.   Okay.  So let's talk about their involvement.

13   Now, you said that you committed some fraud at Merida;

14   do you remember that?

15       A.   I do remember that.

16       Q.   Who directed the fraud?

17       A.   Rodney Mesquias.

18       Q.   And who else was involved in the fraud?

19       A.   Henry McInnis.

20            MR. CYGANIEWICZ:  Objection, Your Honor.

21   Vague as to who's involved.  He's just trying to get him

22   to say Mr. McInnis and he's putting words in his mouth.

23            THE COURT:  Overruled, Mr. Cyganiewicz.

24   Overruled.

25       Q.   (By Mr. Foster)  Who else was involved in the

```
 1   fraud?

 2      A.  Henry McInnis.

 3      Q.  Okay.  And were you in management at the Merida

 4   Group?

 5      A.  For a brief time, yes.

 6      Q.  And whose orders did you follow?

 7      A.  Henry McInnis and Rodney Mesquias.

 8              MR. CYGANIEWICZ:  Again, Your Honor, we're

 9   going to object to compounding and joining those people

10   together.  It's leaving an impression that -- at

11   times even yesterday he admitted that, no, Mr. McInnis

12   was not involved in a lot of these discusses.

13              THE COURT:  It's overruled.  The question

14   was proper, whose orders did he follow.

15              MR. FOSTER:  Thank you.

16      Q.  (By Mr. Foster)  And why did you follow these

17   orders even though you later came to realize that they

18   were the wrong thing to do?

19      A.  I needed a job.  I still had a living, I have a

20   daughter to take care of and my livelihood depended on

21   it.

22      Q.  And were you afraid of losing your job if you

23   didn't follow these orders?

24      A.  I was.

25      Q.  And can you explain to the jury how that made you
```

1  feel?

2      A.  I mean, I -- I felt bad.  I mean, continuing to

3  do something that was against my moral obligation just

4  to -- to keep a job to be able to -- to be able to have

5  a job and still be able to support my daughter, you

6  know, the way she needed to be supported financially.

7      Q.  Now, you were asked a lot of questions about

8  whether Merida employees were liars; do you remember

9  those questions?

10      A.  I do.

11      Q.  You were asked to give your opinion about whether

12  various Merida employees were liars; do you remember all

13  those questions?

14      A.  I do.

15      Q.  I have a slightly different question.  Do you

16  have an opinion about whether Merida employees lied?

17  They weren't liars, but they lied in order to keep their

18  jobs?

19      A.  That would be safe to say, yes.

20      Q.  And can you explain to the jury why they would

21  lie in these documentation and other documents in order

22  to keep their job?

23      A.  They had -- they needed a job as well.  I mean,

24  they had families to feed as did I and again their

25  livelihood depended on following the orders of Rodney

1    Mesquias and Henry McInnis and the agency.

2       Q.  Now you were asked a lot of questions about Ms.

3    Conti; do you recall those?

4       A.  I do.

5       Q.  I want to go back to the beginning.  When you saw

6    Ms. Conti, you testified that you recommended that she

7    be put on home health and not hospice.  Can you explain

8    to the jury why you wanted her -- her put on home

9    health?

10      A.  At the time that I met with her, she -- one, she

11   did not have any recollection of being mentioned the

12   word hospice to her in the hospital, and she didn't --

13   she still wanted to seek curative treatment so I figured

14   home health would have been the best route and not

15   hospice since if she would have gone on hospice she

16   would have been stopping all curative treatment she was

17   wishing to seek.

18      Q.  And who told you to go out and see Ms. Conti?

19      A.  Rodney Mesquias.

20      Q.  And you were shown this thing from a hospital,

21   was that the -- was that document sufficient to get her

22   admitted to Merida for hospice?

23             MR. HECTOR CANALES:  Objection, Your Honor,

24   lacks foundation, witness is not qualified, he's a

25   medical -- he has no background in -- in hospice -- in

1    hospice, he's not a doctor, he's not a nurse, he's not

2    qualified to opine.  No foundation has been laid or can

3    be.

4                    THE COURT:  Rephrase the question,

5    Mr. Foster.

6        Q.  (By Mr. Foster)  Why did you go out to meet with

7    Ms. Conti?

8        A.  Because we had a physician's order to go out and

9    evaluate and treat Ms. Conti.

10       Q.  And is there a difference between evaluating and

11   treating and admitting someone?

12       A.  There is.

13       Q.  Okay.  Can you explain to the jury what that is?

14       A.  The evaluation is to go out and see whether or

15   not the patient qualifies for hospice services, explain

16   the services to the patient in great detail what the

17   expectations are of hospice, the admission is when the

18   nurse goes out and does a full assessment on the patient

19   and continues with the admission to add the patient onto

20   services based on their qualifications as a medical

21   professional that they do qualify for services.

22       Q.  Now, when you went back to the office, what did

23   Defendant Mesquias tell you about whether she should be

24   placed on hospice instead of home health?

25       A.  To bring her on for hospice, it's more lucrative

1    for her to be on hospice than it would be to have her on

2    home health services.

3        Q.   Was that back in 2014 when Ms. Conti was put on

4    hospice, approximately?

5        A.   When she was discharged from the hospital.

6        Q.   Okay.  And when is the last time you saw her?

7        A.   (No response.)

8        Q.   Approximately?

9        A.   Approximately, I mean it's -- saw her, saw her

10   it's been over a year.

11       Q.   Okay.  But she was still alive when you saw her?

12       A.   Correct.

13       Q.   Okay.  And -- and in your opinion, did she ever

14   have less than six months to live at any time you saw

15   her?

16       A.   As a non-medical professional I didn't think she

17   did.

18       Q.   Okay.  And you were shown a lot of paperwork

19   about Ms. Conti, various doctors, various nurses notes,

20   were you present when any of those things were recorded?

21       A.   No.

22       Q.   Do you know whether they're true or not true?

23       A.   No.

24       Q.   Fabricated, not fabricated?

25       A.   No.

Q.   Whether those people had financial relationships, kickback relationships with the Merida Group or not?

A.   No.

Q.   Now, you were shown some patient election forms the patient signed.  Did the documents that patients were signing match what was happening in reality in terms of how the Merida program was being marketed?

A.   No.

MR. CANALES:  Objection, Your Honor.  Lacks personal knowledge; calls for speculation.

MR. FOSTER:  Marketer of the Merida program, Your Honor.

THE COURT:  Overruled.  I'll allow the question.

Q.   (By Mr. Foster)  Can you explain to the jury how these documents did not match how the Merida program was actually being marketed?

MR. CANALES:  Objection, Your Honor. There's been no foundation laid, the Government hasn't offered a single piece of paper as to how the marketing plan was -- was made.  The witness -- he's asking the witness to just guess.

THE COURT:  Overruled.  You can speak about your marketing expertise.

THE WITNESS:  So the way we were -- we were

1    told to market to these patients is use the word free,

2    use the word extra services, extra nursing care, there

3    will be no out-of-pocket expense to you whatsoever, get

4    the families to agree so that way we can get them on

5    services and start billing for services immediately.

6              It doesn't mean that the services that are

7    supposed to be provided to these patients was actually

8    going to be happening once they were on services.

9    Q.  (By Mr. Foster)  And did patients -- these

10   patients were elderly and disabled I take it, Medicare

11   patients?

12   A.   That is correct.

13   Q.   And did they sign documents not understanding the

14   nature of the program?

15             MR. CANALES:  Objection, Your Honor.  Calls

16   for speculation as to what some unknown patient in the

17   question understood or didn't understand.

18             THE COURT:  Rephrase the question.

19             MR. FOSTER:  Sure.

20   Q.  (By Mr. Foster)  Did you sign up patients?

21   A.   I did.

22   Q.   And did many of those patients not understand the

23   nature of the hospice program?

24             MR. CANALES:  Objection, Your Honor.  Calls

25   for speculation as to what those patients understood or

1    didn't understand.

2              THE COURT:  Sustained.

3      Q.  (By Mr. Foster)  Did those patients tell medical

4    caregivers in your presence that they did not understand

5    the nature of the hospice program?

6              MR. CANALES:  Objection, calls for hearsay,

7    vague, Your Honor.  He's not identifying which patient

8    which would also cause the witness to speculate about

9    hearsay.

10              MR. FOSTER:  803d4, a statement made for

11    medical diagnosis or treatment.

12              THE COURT:  That's overruled.

13              MR. CANALES:  Which patient, Your Honor?

14    Who is he talking about?  When?

15              THE COURT:  Overruled.  You can answer the

16    question if you know.

17              THE WITNESS:  What was the question?

18      Q.  (By Mr. Foster)  Yes.  Did patients in your

19    presence, in the presence of the other medical

20    professionals at the Merida Group express that they did

21    not understand that they had been enrolled in hospice?

22      A.  Yes, they did.

23              MR. CANALES:  Move to strike that answer,

24    Your Honor.  That answer is completely speculation on

25    which patients are speculating what they said or

1    believed.

2              THE COURT:  Overruled.  Request denied.

3        Q.  (By Mr. Foster)  Now, we talked about

4    wheelchairs.  Are you -- you asked a lot of questions

5    about wheelchairs for Ms. Conti; do you remember those?

6        A.  Yes.

7        Q.  Is there a difference between the type of

8    wheelchair you can get in the hospice program and the

9    type of wheelchair you can't get in the hospice program?

10       A.  Yes, there is.

11       Q.  Can you explain that to the jury?

12       A.  You're allowed to get a manual wheelchair through

13   the hospice program not a power chair through the

14   hospice program.

15             MR. CANALES:  Your Honor, may I take the

16   witness on voir dire as to his qualifications and -- on

17   these regulations?

18             MR. FOSTER:  On direct Your Honor he already

19   testified that he read the regulations about this.

20             MR. CANALES:  The witness is now talking

21   about regulations within hospice, I'd like to take the

22   witness on voir dire regarding his training -- training

23   in which -- what he's talking about.

24             THE COURT:  The request is denied.  You --

25   you can cross-examine on that issue through -- the

1    question was very limited in scope to the whole chair

2    issue.

3                   Please proceed.

4         Q.   (By Mr. Foster)  And what did Defendant Mesquias

5    direct you to do in regards to power wheelchairs?

6         A.   To go ahead and purchase power wheelchairs for

7    patients who were wanting a power chair instead of

8    taking them off of services so that way we could keep

9    them on services.

10        Q.   Did he direct you to get a doctors order for

11   those?

12        A.   No, he didn't.

13        Q.   Did he direct that those be billed to Medicare?

14        A.   No, he didn't.

15        Q.   And where did you get the power wheelchairs?

16        A.   Through Craigslist or pawn shops.

17        Q.   Now, you were asked some questions about

18   "stealing a client, stealing a patient", do you remember

19   that?

20        A.   Yes I do.

21        Q.   And you also talked about on direct how Defendant

22   Mesquias would talk about "his patients"; do you recall

23   that?

24        A.   I do.

25        Q.   Did you have a problem with the way that

patients, human beings, were talked about at the Merida

Group?

     A.   I did.

     Q.   And can you explain to the jury what your problem

was?

     A.   The patients that were on services were being --

were supposed to be being treated for a terminal

diagnosis not to be used as personal gain for purchases

of lucrative luxury items or vacations.

     Q.   Do patients belong to any company?

     A.   No, they don't.

     Q.   Do they have the choice of where to go or where

not to go?

     A.   A patient and a family has the right to choose

where they would like their loved one to be placed on

services.

     Q.   You were asked something about a break, as a

witness in this courtroom are you escorted around the

building so you don't talk to anyone?

     A.   I was escorted around the building.

     Q.   Is that what happened during the break?

     A.   That was.

     Q.   Okay.  Now finally you were asked a lot of

questions about going to other hospices, companies after

you left and I believe Brookdale hospice right now; is

1    that correct?

2        A.   That is correct.

3        Q.   And can you explain to the jury how Brookdale

4    hospice difference from the Merida Group?

5        A.   Brookdale hospice is a large corporation that

6    specializes in senior living with hospice services.

7    They are very by the book.  They will not take patients

8    that they feel don't have the life expectancy of six

9    months or less with the proper documentation that is

10   needed and to show their trend in -- in decline in their

11   condition.

12       Q.   How do -- how does it differ in terms of what you

13   tell patients about the hospice program when you meet

14   with them?

15       A.   So we actually go into great detail of the

16   program itself, which takes anywhere from an hour to

17   three hours with the families going over all the

18   services, the benefits, the expectations of what's going

19   to happen during the time that they are on service and

20   any questions and answers that the families may have

21   during that time as well.

22       Q.   And how does that differ from Merida?

23       A.   With the Merida Group it was more fabricate

24   the -- fabricate the services, don't read exactly what

25   is on the consent forms, kind of summarize it up to

```
 1    where the families will believe the services for the --
 2    that way they can sign up on the agency services.
 3                    MR. FOSTER:  Thank you.  No further
 4    questions, Your Honor.
 5                    THE COURT:  Mr. Canales?
 6                       RECROSS-EXAMINATION
 7    BY MR. HECTOR CANALES:
 8       Q.  So you stayed because you needed money?
 9       A.  I needed a job.
10       Q.  Money was important?
11       A.  Well, I have to make a living.
12       Q.  Everybody does, right?
13       A.  To support my daughter.  Correct.
14       Q.  Nothing wrong with making a living, right?
15       A.  The proper way.
16       Q.  You've got a problem with people buying fancy
17    cars?
18       A.  I don't.
19       Q.  You've got a problem with people going to Spurs
20    games?
21       A.  I don't.
22       Q.  All right.  You a Spurs fan?
23       A.  I am.
24       Q.  Ever been to a game?
25       A.  I have.
```

1    Q.   Does that make you a good or a bad person?

2    A.   I don't spend thousands of dollars on the use of

3 patients to get these services or these benefits.

4    Q.   Are you fighting me right now?

5    A.   I'm not fighting you, I'm answering your

6 question, sir.

7    Q.   What did I ask about -- anything about patient

8 services with this question?

9    A.   You asked me if it -- if it's okay to do that and

10 I explained --

11    Q.   You don't like it, you don't like it that my

12 client Rodney Mesquias the owner of this business went

13 to Spurs games, you think there's something wrong about

14 that, right?

15    A.   If I wanted to, sir, I can go and purchase Spurs

16 tickets myself but I choose not to.

17    Q.   My question, sir, you think there's something

18 wrong, you're critical of my client because he used his

19 money to buy Spurs tickets, that's important to you?

20    A.   That is not important to me how he -- if he wants

21 to spend that money on Spurs tickets.

22    Q.   Okay.  So let's clear it up.  There's nothing

23 wrong with that?

24    A.   There's nothing wrong with attending a Spurs

25 game, no.

1    Q.   Whether you want to sit in the front row or in
2    the nosebleed, hey, that's your call.   Whatever you do
3    with your money, it's your call?

4    A.   It's going to be based and depend how you obtain
5    that money, but, yes.

6    Q.   Okay.   Right, and -- and you obtained money -- I
7    think what was your salary again?   How much were you
8    getting paid by Merida?

9    A.   55, 60,000.

10   Q.   All right.   That's a lot of money, right?

11   A.   To some people it is.

12   Q.   To you?

13   A.   It's -- it's average.

14   Q.   All right.   How about at Generations, what were
15   they paying you?

16   A.   77.

17   Q.   Paying you more?

18   A.   Correct.

19   Q.   Okay.   All right.   And -- and were you having --
20   so you stuck around -- were you having problems, were
21   you worried, was there something that was bothering you
22   that thought maybe you wouldn't be able to get another
23   job?

24   A.   The economy was tough at the time so, yes.

25   Q.   All right.   Worried about any -- but so you were

1    trying to get another job?

2        A.   I was looking for other employment while I was

3    with Merida, yes.

4        Q.   Okay.  All right.  Now, you testified here on --

5    on redirect, they brought up this idea, you thought

6    that -- that Conti should be on home health care instead

7    of hospice?

8        A.   At the time of the services, yes.

9        Q.   Right.  Right.  Right.  But you're not a doctor,

10   right?

11       A.   That is correct.

12       Q.   Right.  Sir, isn't that decision -- isn't a

13   doctor -- in fact, you're not qualified at all to make

14   that decision; are you?

15       A.   No, sir.

16       Q.   Right, because those decisions involve clinical,

17   medical decisions of which you don't have any training

18   in?

19       A.   Correct.

20       Q.   But you're fine here coming up here and telling

21   the jury your medical opinion even though you have zero

22   medical training?

23       A.   It is my opinion.

24       Q.   Right.  But -- but it's an uneducated opinion; is

25   it not?

1    A.   I wouldn't say it's uneducated but it's my

2    opinion --

3    Q.   You're not trained, right?

4    A.   -- from what I've seen over the years.

5    Q.   You understand what's going on here, sir?  You

6    understood my client is here for -- is on trial for his

7    life; you understand that, right?

8    A.   I do understand that.

9    Q.   So you -- you take this seriously, right?

10   A.   As I am.

11   Q.   Okay.  All right.  And -- and but for -- I'm sure

12   in this Google Internet research that you did, you found

13   out that being for home health you have to be homebound,

14   right?

15   A.   It wasn't a Google search but go ahead.

16   Q.   Well, you've got to be homebound?

17   A.   You have to be homebound.

18   Q.   Right.

19   A.   Be considered homebound status to --

20   Q.   Conti wasn't homebound?

21   A.   How she was not homebound?

22   Q.   You thought she was?  You think she was eligible?

23   A.   If it requires a taxing effort to get around

24   mobility-wise to get around, then yes, it is.

25   Q.   Okay.  And that's your view is that Conti was

```
 1    eligible that she was taxing for her to get around and

 2    she was homebound?

 3        A.   That is correct.

 4        Q.   Okay.  All right.  But not terminal?

 5        A.   Not terminal.

 6        Q.   Okay.  All right.  Because in your medical

 7    experience you know what terminal is?

 8        A.   A terminal diagnosis is when somebody has a

 9    non-curable disease and eventually, yes, they are going

10    to pass away from that disease.

11        Q.   Non-curable equals terminal?

12        A.   Non-curable eventually leads to terminal.

13        Q.   All right.  Roy, can you pull up for me on E-10

14    again the medical records of Joanne Conti.  This is

15    Mesquias 00261462.

16             THE COURT:  While we're doing that, the

17    Government took approximately 18 minutes, I'll give the

18    defense each 20 minutes per --

19             MR. CANALES:  Thank you, Your Honor.

20        Q.   (By Mr. Hector Canales)  All right.  Let's zoom

21    in there.  Yeah, start at the top.  All right.

22             These are Dr. Montemayor's records that we

23    reviewed earlier, okay?

24        A.   Okay.

25        Q.   Just refreshing your memory.  You see Gonzaba
```

1    Medical Group referring to Joanne Conti.  This is

2    October 16, 2014.  Go down to the assessment and plan.

3    Problem number one.  What is problem number one?

4        A.  A lung disease.

5        Q.  What kind of lung disease?

6        A.  Interstitial, I believe, I mean --

7        Q.  You don't even know what it is, do you?

8        A.  I don't know what that word means, but she's got

9    pulmonary fibrosis.

10       Q.  You know she's got a lung disease but you don't

11   know what kind?

12       A.  Correct.

13       Q.  All right.  Do you think Dr. Montemayor knows?

14       A.  I believe so.

15       Q.  Okay.  All right.  Let's look at what he says

16   here.  He says plan, currently relatively stable.  Will

17   continue to follow the signs and symptoms of worsening

18   pulmonary status.  PFT and lung imaging, considering

19   pulmonary consult if worsening.  Discussed the natural

20   history of this condition.  What does he say the natural

21   history of Ms. Conti's condition is, sir?

22       A.  That it's not curable or treatable.

23       Q.  In your words, under your understanding that

24   means he's terminal, right?

25       A.  I said it leads to terminal.

1      Q.   Sir, you said not curable means terminal to you?

2      A.   A non-curable disease will lead to a terminal

3   disease.

4      Q.   All right.  I'm not going to argue with anyone.

5   But Montemayor believes that this lung disease is not

6   curable or treatable, right?

7      A.   I'm not arguing that.

8      Q.   But you are arguing; aren't you?

9      A.   No, I'm not.

10      Q.   Do you have some belief or duty that it's your

11   job to argue, to take a position, to take a side in this

12   case?

13      A.   I don't know where you see that I'm trying to

14   argue with you, sir.

15      Q.   Well you just -- I -- where I see it from is your

16   own words, you said that's not what you're arguing?

17      A.   I'm not arguing the fact that she had a

18   non-curable condition.

19      Q.   Well then I'm sorry, I must not be hearing you

20   right.  All right.  Let's go to the next page.  The

21   middle half, Roy, all the way to the bottom so I can see

22   the signature.  (Talking to staff.)

23          Right there, the patient instruction.  Recall

24   this?  You're currently on hospice.  This is the patient

25   instructions that Mr. -- Dr. Montemayor gives to Conti?

1          MR. FOSTER:  Objection, foundation,

2     Your Honor.

3          MR. CANALES:  It's in evidence.

4          MR. FOSTER:  He doesn't -- he's never seen

5     this document.  He doesn't know what Mr. Montemayor said

6     to Conti.

7          MR. CANALES:  I'm asking --

8          THE COURT:  One second, one second.  You may

9     ask questions from the exhibit.  It's been admitted.

10    Q.   (By Mr. Hector Canales)  Here's my point.  You

11    testified when this lawyer was up here talking to you

12    that Ms. Conti didn't want to be on hospice, right?

13    A.   When I initially met with her that is correct.

14    Q.   Well right here Dr. Montemayor is saying in his

15    record that he told her that she was currently on

16    hospice, right?

17    A.   She did tell her that she was on hospice.

18    Q.   So she would have known it?

19    A.   That is correct.

20    Q.   Right?  Okay.  And he agreed with it, he thought

21    it was good for her, right?

22    A.   She -- Dr. Montemayor did agree.

23    Q.   Because she had this non-curable, non-treatable

24    disease, lung disease?

25    A.   But I --

1    Q.   According to Dr. Montemayor, correct?

2    A.   That is correct.

3    Q.   All right.  Now, this case the Government has

4    made allegations and brought accounts, they want to put

5    my client in jail, right, for a certification period

6    with Ms. Conti.  Let's pull that up, Roy.  Can you pull

7    up the H series exhibits for Conti.  Keep in mind this

8    is -- this is October of '14.

9         They're alleging in this case for the period of

10   December 23rd, '14 to March of '15 that was fraud, that

11   she was not appropriate for hospice, she's not have a

12   terminal illness.  You understand that, are you with me?

13   A.   I do.

14   Q.   What we just saw was that within six months,

15   October of '14, within six months Dr. Montemayor put in

16   his medical record, in the Government's records that

17   they have here put in here that she had a non-treatable

18   disease, right?

19   A.   It does state that but --

20   Q.   Within six months, within six months of him

21   saying that, we have a certification period here on

22   trial, right?

23   A.   Correct.

24   Q.   So you would agree that according to

25   Dr. Montemayor, Ms. Conti had a terminal illness within

1    six months of those dates, right?

2        A.   You can say that.

3        Q.   Would you say it?

4        A.   I haven't read the entire record so --

5        Q.   You haven't read the entire record?

6        A.   Not for Ms. Conti.

7        Q.   But you do know -- no, never mind.  Do you know

8    Dr. Greg Gonzaba?

9        A.   Yes, I do.

10       Q.   Is he a liar?

11       A.   I cannot slander Dr. Gonzaba.

12       Q.   You're not going to slander him either.  This is

13   the not slander side at Gonzaba?

14       A.   I'm not going to talk about somebody that's not

15   here to defend themselves either.

16       Q.   Let's talk about -- let's talk about -- Roy,

17   let's go to Mesquias, this is again E-10, Mesquias

18   00261809.

19           Now, this is -- are you familiar with what this

20   is, sir?  What does it say at the top?

21       A.   CTI form.

22       Q.   CTI?

23       A.   That's a certification of terminal --

24       Q.   What does CTI stand for?

25       A.   Certification of terminal illness.

1     Q.   You see that is for the certification date of

2   count number seven on Joanne Conti that I just put up on

3   the board?

4     A.   I see that.

5     Q.   And it's for pulmonary fibrosis, you see that,

6   that's a lung disease?  You see that?

7     A.   I do see that.

8     Q.   All right.  And some nurse signed this, right?

9     A.   I see that.

10     Q.   Do you recognize who that is?

11     A.   No, I don't.

12     Q.   All right.  Read back circled, what does that

13   mean to you?

14     A.   To my knowledge I have no idea.

15     Q.   You don't know?  Okay.  Fair enough.  I'll ask

16   somebody else.  Scroll up to the bottom.

17          That's Dr. Greg Gonzaba's signature there, isn't

18   it, certifying Ms. Conti, right?

19     A.   If that is his signature, I mean, I don't know

20   what his signature looks like.

21     Q.   And is it a coincidence that Dr. Greg Gonzaba, is

22   there a connection between Dr. Greg Gonzaba and the

23   Gonzaba Medical Group that Mr. Montemayor is working for

24   in those records we just saw?

25     A.   They all work together within the same

1    organization.

2        Q.   Is Dr. Gonzaba the main -- is he -- is it named

3    after him and his family?

4        A.   It's named after his dad.

5        Q.   Okay.  He's the son?

6        A.   He's the son.

7        Q.   All right.  How many -- and he's got some

8    brothers, right?

9        A.   He's got one other brother.

10       Q.   Tom, Dr. Tom Gonzaba?

11       A.   That's correct.

12       Q.   Is he a liar?

13       A.   Again, I cannot speculate that.

14       Q.   Okay.  All right.  So Dr. Gonzaba is agreeing

15   with Dr. Montemayor, right?

16       A.   Again, if Dr. Gonzaba knows this patient very

17   well, then I would agree.

18       Q.   And they're the doctors, not you?

19       A.   That is correct.

20            MR. CANALES:  Pass the witness.

21            THE COURT:  Mr. Cyganiewicz.

22            MR. CYGANIEWICZ:  Just a few questions,

23   Your Honor.

24       Q.   (By Mr. Hector Canales)  Mr. Gonzalez, you -- you

25   were terminated for looking for a different job?

1     A.   Yes, I was.

2     Q.   Okay.   How long did it take you to find the new

3  job?

4     A.   (No response.)

5     Q.   Well, when did you start working after you were

6  fired?

7     A.   What was the question?

8     Q.   When were you -- when did you start working, how

9  long after you were fired did you start working with

10 Generations?

11    A.   Maybe a month, month-and-a-half or so.

12    Q.   But you had -- you had some sort of contact with

13 Ms. Conti almost immediately?

14    A.   No, sir.

15    Q.   What's the February 9th date?

16    A.   I didn't have any contact with Ms. Conti once I

17 left --

18    Q.   That's not the document you're saying that

19 someone forged your name on, is it?

20    A.   That's the document that I said that -- a

21 signature that looks similar to mine.

22    Q.   That involves Ms. Conti on February 9th?

23    A.   Correct.

24    Q.   Correct?   Okay.   And did you ever go to her

25 house?

1    A.  Not after I left the Merida Group, but when I was

2    employed there, yes.

3    Q.  Did you ever go to her house to try to get her to

4    sign up with Generations?

5    A.  No, sir.

6    Q.  Did you testify earlier that you thought she was

7    more appropriate for home health?

8    A.  At the time of services back in 2014, yes.

9    Q.  Okay.  And when you got hired with Generations,

10   is that a hospice company?

11   A.  It's a home health and hospice company.

12   Q.  And did -- did you sign up Ms. Conti with

13   Generations?

14   A.  I did not sign her up.

15   Q.  Did someone else sign her up?

16   A.  Possibly.

17   Q.  And you don't know for sure?

18   A.  It was -- again --

19   Q.  Again, that's the signatures you were saying

20   that's a forgery?

21   A.  That's a signature that I did not sign.

22   Q.  So you're still saying that's not your signature?

23   A.  That is not my signature.

24   Q.  Did she sign up for -- was she ever a hospice

25   patient for Generations?

A.   To my knowledge.

Q.   You're saying that she was more appropriate for home health, but as soon as you get to Generations she's -- she's on hospice?

A.   She was more appropriate for home health back in 2014 when I first met with her.

Q.   But then as soon as she gets to Generations, she's -- she's eligible for hospice in your mind?

A.   Again, I wasn't the medical professional that went out to go see her.

Q.   And she is still alive today, correct?

A.   To my knowledge, yes.

Q.   Again with Generations she was on hospice, correct?

A.   If I'm not mistaken she may have been on their services for a brief period.

Q.   You're not sure?

A.   I'm not sure.

Q.   You didn't have any contact with her trying to get her to go over to Generations?

A.   I did not speak with her, no.

Q.   I'm not going to use the word stole, but she was a Merida patient and then when you left she became a Generations patient; is that right?

A.   Again, she may have known where I ended up or was

1  going to be going to because I had relationships with

2  the physicians that she had services with.

3     Q.  Okay.  You don't -- you can't tell us if she was

4  a hospice patient with Generations?

5     A.  Again, during my tenure --

6     Q.  You're the one that went to her house?

7     A.  I did not go to her house when --

8     Q.  You didn't?

9     A.  No.

10            MR. CYGANIEWICZ:  That's all I have,

11  Your Honor, thank you.

12            THE COURT:  Thank you, Mr. Guerra?

13            MR. GUERRA:  No further questions,

14  Your Honor.

15            THE COURT:  Thank you, sir.  Well, I'm

16  sorry, Mr. Foster, anything else?

17            MR. FOSTER:  Nothing further, Your Honor.

18            THE COURT:  Thank you, sir.  You may step

19  down.  And you're excused.

20            Next witness, please.

21            MR. LOWELL:  Thank you, Your Honor.

22  United States calls Joanne Conti.  She may take a

23  moment, Your Honor.

24            THE COURT:  Do you need a quick break while

25  we get the next witness?

```
 1              All right, let's get Ms. Conti situated,
 2    let's take a very quick break.
 3              COURT BAILIFF:  All rise for the jury.
 4              (JURY OUT.)
 5              (COURT IN SHORT RECESS.)
 6              COURT BAILIFF:  All rise for the jury.
 7              (JURY IN.)
 8              THE COURT:  Thank you, everyone.  Please be
 9    seated.  Make sure we get everybody situated.
10              All right.  Ms. Sandra, let's go ahead and
11    swear in Ms. Conti, please.
12              THE CLERK:  Yes, sir.
13              Please raise your right hand.
14              (WITNESS SWORN IN.)
15              THE WITNESS:  Yes, I do.
16              THE CLERK:  Thank you.
17              THE COURT:  Thank you, ma'am.  Please make
18    yourself comfortable.  Position the microphone as close
19    to you as possible.
20              Mr. Lowell, please proceed.
21              MR. LOWELL:  Thank you, Your Honor.
22                        DIRECT EXAMINATION
23    BY MR. LOWELL:
24       Q.  Good morning.  Please state your name?
25       A.  My name is Joanne Conti.
```

1    Q.   Ms. Conti, are you currently retired?

2    A.   Yes, I am.

3    Q.   And do you live in San Antonio?

4    A.   Yes, I do.

5    Q.   What part of San Antonio?

6    A.   I live in the Bexar County on the south side of

7    town.

8    Q.   Now, before you retired, did you work for the

9    San Antonio School District?

10   A.   Yes, I did.

11   Q.   And approximately how many years?

12   A.   Total maybe 25 years, subbing and as a full-time

13   para-professional.

14   Q.   And would you tell the jury what you did as a

15   schoolteacher?

16   A.   I worked with the problem children in the back

17   unit which are mostly gang members and troubled

18   children.

19   Q.   And what kinds of things would you do with those

20   kids?

21   A.   I'd sit and help them with their work, I'd

22   discipline them, I would walk them to and from classroom

23   if they were mainstream.  I would just mainly help them

24   and talk to them.  They were all middle school aged

25   children from 13 to 16.

1    Q.   Now, Ms. Conti, directing you to between,

2    approximately, 2014 and 2016, were you a patient with

3    the Merida Group?

4    A.   Yes, I was.

5    Q.   Were you signed up with the Merida Group as a

6    hospice patient?

7    A.   Yes, I was.

8    Q.   I want to -- I want to focus on 2014, about five

9    years ago, were you given a diagnosis of having a few

10   months to live?

11   A.   Yes, I was.

12   Q.   Did a doctor from the Merida Group sign you up?

13   A.   Yes, he did.

14   Q.   Who signed you up?

15   A.   Dr. Virlar.

16   Q.   Do you know an individual named Rodney Mesquias?

17   A.   Yes, I do.

18   Q.   And did you meet or interact with Mr. Mesquias

19   during your time as a hospice patient with the Merida

20   Group?

21   A.   I saw him one time.

22   Q.   Now, Ms. Conti, you have some health issues; is

23   that right?

24   A.   Yes, I do.

25   Q.   And at the time that you were signed up as a

hospice patient with the Merida Group, did you want home health?

A.   I'm sorry?

Q.   Did you want home health?

A.   I really didn't want it, but they said that I needed it.

Q.   Okay.  And you were put on hospice; is that right?

A.   Yes, I was.

Q.   Now, Rodney Mesquias, did you have conversations with Rodney Mesquias about whether you needed hospice care?

A.   Yes, I did.

Q.   Tell the jury what Mr. Mesquias said to you?

A.   He said that I needed to be cared for 24 hours; that I needed to be monitored because I was ill and so he wanted me to stay on hospice even though I didn't want to.

Q.   Now, why didn't you want to stay on hospice?

A.   I'm sorry?

Q.   Why didn't you want to stay on hospice?

A.   Because I felt that I could stay on my own, do things on my own and that I really didn't need to be, you know, monitored or watched.  I mean, I felt that I was, you know, old enough to take care of myself.

1    Q.   Now, did you have conversations with Rodney

2  Mesquias about your terminal illness and having less

3  than six months to live or less to live?

4    A.   Yes, I did.

5    Q.   And what did Rodney Mesquias say to you about

6  that?

7    A.   Rodney said that I needed to be on hospice and to

8  have them take care of me because I was dying, that my

9  illness was -- that I was going to die.

10   Q.   Did that hospice diagnosis, did it impact your

11  life?

12   A.   I'm sorry?

13   Q.   Did that diagnosis, did it impact you at the

14  time?

15   A.   It didn't impact me very much.  I mean, how would

16  you like to have somebody come into your hospital room

17  and just tell you you have three to six months to live

18  and your family's standing there in shock, nobody had

19  told me that and it took a lot for me to -- to digest,

20  to -- to -- to think about it.  I mean, I cried a lot at

21  home, I was very depressed, I didn't leave my home for

22  over three months because I didn't know if I was going

23  to wake up or not.  I would cry everyday, I would --

24  sometimes I would eat, I wouldn't eat.  I was very

25  depressed.  I had thoughts of suicide so that my family

1    wouldn't have to go through watching me die.  It was

2    very hard, very depressing.

3        Q.  Now, before you were told that you were dying,

4    what -- tell the jury what kinds of activities you would

5    do?

6        A.  My son has three -- the youngest three children,

7    the youngest three boys.  I would go with them

8    everywhere, to football games because we had them in

9    leagues out of the school.  I would go to different

10   activities with them to school.  We would go out to

11   Corpus, we would do all kinds of family things.  And

12   then I just stopped because I didn't want to be a burden

13   on them.

14       Q.  So after you became a hospice patient, after you

15   got this diagnosis, what did you do, what kind of

16   activities could you do?

17       A.  For the first three to -- about three or four

18   months, I didn't do anything, I stayed home and cried.

19   I didn't want to -- I didn't want to go out because I

20   was afraid if I would be out I would take my last breath

21   and that would be it.  I was always afraid if I was

22   going to wake up from one minute to the other because

23   they told me I was going to die.

24       Q.  So did it affect your sleep?

25       A.  Yes, I didn't sleep very much because I was

1  afraid if I went to sleep I wouldn't wake up, and

2  sometimes I wake up gasping for air because I get

3  anxiety attacks.

4      Q.  Did it affect your interactions with family

5  members?

6      A.  Yes.  My son stopped coming around a lot because

7  he said he couldn't see me die.  My grandsons didn't

8  know what to expect, especially the little one.  They

9  would tell me you can't die and leave us by ourselves,

10 grandma, we need you.  So it was very hard on all of us.

11     Q.  Ms. Conti, were there occasions when Rodney

12 Mesquias would contact you by phone?

13     A.  I'm sorry?

14     Q.  Were there times when Rodney Mesquias call you?

15     A.  Yes, he did.  That's the -- that's what I started

16 talking to him was through the phone.

17     Q.  And tell the jury what -- what Rodney Mesquias

18 would say to you over the phone?

19     A.  He said that I needed the care, that I needed

20 because I was -- I was in -- in good health and that I

21 was going to die and I needed to stay on hospice and I

22 would tell him I didn't want to.  I felt like I was

23 going to be a -- I was a hostage to him, that I was

24 being tied down, I had to stay with him, I couldn't

25 say -- I couldn't get off, he wouldn't let me.  He would

1    say that he would do -- he would do -- all of a sudden

2    he was sending me the supplies I wasn't getting, he sent

3    a bunch of them to me, he sent a scooter.  He sent me a

4    scooter because he knew I wanted one so he sent it, that

5    he was trying to keep me happy too stay on hospice.

6        Q.   Now, you mentioned that you felt like you were a

7    hostage?

8        A.   Yes.  Well, he wouldn't let me sign off, he

9    wouldn't sign the paper to let me get off hospice.

10       Q.   Now when you say he, are you talking about Rodney

11   Mesquias?

12       A.   Rodney Mesquias, yes, Rodney.

13       Q.   And who did you feel had taken you hostage?

14       A.   Well, Rodney and -- and the group because they

15   wouldn't sign the paper to let me get off.

16       Q.   Now, was there a time when you interacted with

17   Rodney Mesquias in person?

18       A.   Yes, I -- I saw Rodney Mesquias when I went to my

19   doctor's appointment and I was leaving, I heard somebody

20   calling my name and saying, I want to meet the person

21   with the voice.  And then he came up to me, grabbed me

22   by my arm, he held my arm and he said, I'm Rodney

23   Mesquias I'm the one that you've been talking to, you're

24   Ms. Conti and I said, yes, I'm the one you're keeping

25   hostage very loud in the clinic.  And he just smiled and

1    he held my hand and then he walked away.

2        Q.   Now, you mentioned -- you mentioned a scooter,

3    did you have a conversation with Mr. Mesquias about a

4    scooter?

5        A.   Yes, I had kind of -- I had told him that I had

6    been asking for a scooter so that I could go out because

7    I couldn't walk right and he told me that he would get

8    me one.  He sent me one.

9        Q.   Tell the jury what happened with the scooter?

10       A.   Well, my daughter took -- and my son-in-law put

11   it in the back of the car, we went to Wal-Mart, I was in

12   Wal-Mart and you know how people get in front of you,

13   well, I tried to stop, well, apparently the handles

14   wasn't right.  When I went to stop, I went flying

15   forward because something was wrong with the handle, I

16   think they were broken.  And my daughter says, oh, well,

17   now you are going to die because of a scooter?  And so

18   we -- I called him when I got home and told him I didn't

19   want it anymore and he sent somebody over to the house

20   right away.

21       Q.   So when you say he again are you referring to

22   Mr. Mesquias?

23       A.   Rodney, I'm sorry, yes, Rodney.

24       Q.   So did you tell Mr. Mesquias that the scooter was

25   broken?

1    A.   I told him that it was broken and I told him that

2   I almost fell off of it and I didn't -- you know, why

3   did I want a broken scooter.

4    Q.   Now, while you were a patient with the Merida

5   Group, did you speak to nurses about your terminal

6   diagnosis?

7    A.   Yes, I spoke to my nurse.  I had -- I think I had

8   three nurses and the third one was Laura, and I would

9   tell her about my -- my sicknesses and my -- you know,

10  how I felt and I would cry with her.  She would comfort

11  me.  I would tell her what I would need and she would

12  tell me, oh, don't worry about it, I'm going to go buy

13  you what you need, your personal items that you need,

14  your toiletries that you need.  So she would come with

15  my -- with my pads, she would come with different things

16  for me.  She bought me my pill box, so I would separate

17  all my pills that I take three or four times a day and

18  she was there to comfort me.

19   Q.   You know Greg Gonzaba?

20   A.   Yes, I know Greg he used to be my doctor.

21   Q.   And what would Dr. Greg Gonzaba say to you when

22  you talked to him?

23   A.   When I would visit him because he was my primary

24  doctor, he would walk in and say, hey, beautiful I don't

25  see anything wrong with you, you look nice, you look

1    beautiful.  That's all he would ever tell me.

2       Q.  Did Dr. Gonzaba ever tell you you were about to

3    die?

4       A.  Dr. Gonzaba never told me that.

5       Q.  What did Dr. Gonzaba say to you?

6       A.  Dr. Gonzaba would always tell me, good morning,

7    how are you, hi beautiful, you look nice today, you

8    don't look sick to me.

9       Q.  That's what Dr. Gonzaba said?

10      A.  That's Dr. Gonzaba.

11      Q.  Now, going back to 2014, roughly five years ago,

12   you were signed up for hospice.  Based on your

13   conversations with Rodney Mesquias, did you think you

14   would be alive today?

15      A.  No, I thought I'd be dead by now.

16      Q.  And tell the jury why you think that?

17      A.  Well because he was always telling me I was going

18   to die.  You know, when you get told to your face and

19   you're not expecting it that they're going to come in

20   and tell you something like that, you know, and then

21   they continue to tell you something, you -- you believe

22   them, they're the doctor, they're people that are

23   supposed to know.  You know, you get -- you get

24   depressed, you cry.  I mean, I -- I wouldn't do that to

25   a person, I would gradually go into it with them, but I

1    wouldn't just boom right in your face and keep telling

2    you that you're going to die.  So --

3        Q.  And in addition to Rodney Mesquias, did

4    Dr. Virlar also tell you you were about to die?

5        A.  Yes, Dr. Virlar is the one that told me that I

6    only had three to six months to live.  He told my

7    daughter because my daughter said, what are you talking

8    about?  And he said, your mother has a condition that I

9    can be talking to her right now and she'll be gone,

10   she'll just stop breathing, her lungs will stop, that's

11   it.  And I mean I was sitting on the -- in a hospital

12   bed, my daughter was standing next to me, one of my

13   grandsons was there, my son-in-law was there and he's

14   dark and he turned white, he just went like, what are

15   you talking about, too and that's all I heard, that's

16   all I heard every time I talked to anyone from Merida.

17   They would tell me that I was going to die, that I was

18   going to die so -- and God has me here.

19       Q.  Ms. Conti, do you feel like the Merida Group

20   including Rodney Mesquias and Dr. Virlar took advantage

21   of you?

22       A.  I think they did.  I think they did because they

23   just had me as a patient, very seldom did I get the

24   supplies I needed.  If it wasn't for Ernest or for Laura

25   to come to my house with what I needed, I want -- I

1    would have had to go buy them myself.  And why should I

2    buy something that's already being -- being paid for

3    through my insurance or to Medicare?  I mean, I'm not

4    rich to be doing that.

5        Q.  Did you feel like the Merida Group, including

6    Rodney Mesquias and Dr. Virlar lied to you?

7        A.  I guess they did, I mean, how do you -- you know,

8    when your doctor comes in and runs out how do you know?

9    I mean sometimes he checked my lungs, sometimes he

10   didn't.  I mean, I can't say because I -- personally I

11   wasn't treated right, I know I wasn't because I wouldn't

12   treat a person that way.

13            MR. LOWELL:  Your Honor, I'll pass the

14   witness.

15            THE COURT:  Thank you, Mr. Lowell.

16            I'll allow 15 minutes per side, please.

17                    CROSS-EXAMINATION

18   BY MR. HECTOR CANALES:

19       Q.  Ms. Conti, hello.  My name is Hector Canales.

20       A.  Uh-huh.

21       Q.  I represent Rodney Mesquias in this trial, okay?

22       A.  Okay.

23       Q.  Now, when you came into the courtroom, did you

24   walk in, ma'am?

25       A.  No, I did not.

1    Q.   How -- how did you come in?

2    A.   I came in a wheelchair.

3    Q.   Where is that wheelchair?

4    A.   I'm sitting in it.

5    Q.   You're sitting in it?

6    A.   Yes.

7    Q.   And who provided that wheelchair to you?

8    A.   This wheelchair here?

9    Q.   Yes, ma'am.

10   A.   This is my mother's wheelchair.  When she died,

11   we had it and so this is the wheelchair I use.

12   Q.   Okay.  And you need that wheelchair?

13   A.   Yes, I do.

14   Q.   How long have you needed that wheelchair, ma'am?

15   A.   Maybe three years.

16   Q.   Okay.  Now, I don't have a lot of time so I want

17   to try to cover some -- some quick topics here.  You

18   said that you felt trapped and a prisoner, right?

19   A.   Yes.

20   Q.   Okay.  Do you recall, ma'am, on at least two

21   maybe three different occasions where you revoked or

22   quit Merida hospice?

23   A.   Yes.

24   Q.   You did that, right?

25   A.   Yeah.

1   Q.   And they allowed you to do that?

2   A.   Yeah, they didn't like it but yes.

3   Q.   Right.   Right.   But regardless of what -- how

4   they felt about it, they -- they -- they let you revoke?

5   A.   Yes.

6   Q.   Right?   And in fact --

7            THE COURT:   Ma'am, again, speak loudly into

8   the microphone, please.

9            THE WITNESS:   I'm sorry.

10   Q.   (By Mr. Hector Canales)   Okay.   And -- and -- and

11   when you said Ernest and Laura a second ago, are you

12   speaking of about Ernest Gonzalez?

13   A.   Yes, Ernest Gonzalez.

14   Q.   All right.   And -- and Laura Wise?

15   A.   Yes.

16   Q.   She was the nurse for you?

17   A.   Yes.

18   Q.   Okay.   All right.   And nurse Laura I think is

19   what you called her, right?

20   A.   Yes.

21   Q.   She took good care of you?

22   A.   Yes.

23   Q.   You liked her?

24   A.   Yes.

25   Q.   She did a good job?

1    A.  Yes, she did.

2    Q.  Right.  Right.  We can trust Ms. Laura is a

3  trust -- trustful person, right?

4    A.  Yes.

5    Q.  Right.  And so if Ms. Laura in doing her job you

6  think that she would have written anything down about

7  you that wasn't true about your condition?

8    A.  No, I don't think so.

9    Q.  Okay.  All right.  So let me show you real quick

10  here, this is one of the rev -- one of the revocation

11  statements.  Is that your signature there?

12    A.  Yes.

13    Q.  Okay.  And you recall that -- that Ernest,

14  Mr. Gonzalez, he helped you with this process, right?

15    A.  Yes, he did.

16    Q.  Okay.  And that -- and this one is dated 04 --

17  04/20/15, right, and -- and right here, sorry.

18    A.  Uh-huh.

19    Q.  And it says here you went to the hospital.  Do

20  have you a memory of why you went to the hospital back

21  then, if you do?  I know it was a long time ago but --

22    A.  No.

23    Q.  No, okay.  All right.  And so then here again,

24  ma'am, you also revoked again on February the 9th of

25  '16, correct?

1    A.  Yes, I believe that was the date.

2    Q.  Okay.  And that's your signature there?

3    A.  Yes.

4    Q.  All right.  And -- and I think -- I think that --

5  and -- and on this date, on February the 9th of '16

6  after you left Merida, you went to another hospice

7  agency, right?

8    A.  Yes, I went to another one.

9    Q.  All right.  Which one?

10    A.  I believe that's -- I went to Generation.

11    Q.  All right.  And was Generations in -- in -- in

12  space was it close to Merida or far away; do you

13  remember?

14    A.  I couldn't tell.

15    Q.  You don't remember?

16    A.  I've never been to either one of the buildings.

17    Q.  Okay.  Okay.  Because all this care happened --

18  they would all come to you at your home, right?

19    A.  They would come to my home, yes.

20    Q.  And I believe that -- that Mr. Gonzalez helped

21  you sign up for -- with Generations; didn't he?

22    A.  After I talked to them I believe, yes, he came

23  and had me sign papers.

24    Q.  Right.

25    A.  He -- he didn't come to my house and say do you

1    want to go on Generations.

2        Q.   You said he didn't come to your house?

3        A.   No, he didn't come to my house and tell me after

4    I quit Merida if I wanted to go to Generations.

5        Q.   Okay.  Now prior to today, ma'am, you --

6    you've -- you've had multiple interviews with the

7    Government, correct?

8        A.   Yes, I have.

9        Q.   With the lawyers over here?

10       A.   Yes, I have.

11       Q.   And I believe back on May 31st of '17 you had an

12   interview with the FBI agent special -- Special Agent

13   Cary Johnson and -- and Miguel Ramirez; do you remember

14   that?

15       A.   Yes.

16       Q.   Okay.  And do you remember, ma'am, telling those

17   agents that -- that before you moved to Merida Ernesto

18   Gonzalez came by the house to get you to sign paperwork

19   for Generations hospice?

20       A.   Well, he came to the house after I talked to

21   Generations.

22       Q.   Is that what you told him?

23       A.   Yes.

24       Q.   So you told -- you told the Government that

25   Mr. Gonzalez came by your house to get you to sign the

1    paperwork for Generations?

2       A.  Yes, he did.

3       Q.  All right.  And that's true?

4       A.  Yes, that's true.

5       Q.  All right.  And -- and that would have happened

6    also right here in February, right?

7       A.  I'm sorry?

8       Q.  One second here, let me -- here, February the

9    9th?

10      A.  Uh-huh.

11      Q.  That's your signature right down here, correct?

12      A.  Yes.

13      Q.  On February the 9th Ernesto Gonzalez came to your

14   house to help you sign up, leave -- leave Merida and

15   sign up with Generations, right?

16      A.  Not on the same day.

17      Q.  Not on the same day?

18      A.  No.

19      Q.  What's the date that it says there, ma'am?

20      A.  The 9th.

21      Q.  February the 9th, right?

22      A.  Yes.

23      Q.  What's the day here of your revocation?

24      A.  The 9th.

25      Q.  Does that refresh your memory, ma'am, that it was

1    the same day?

2        A.   I don't remember it being the same day but it

3    could have been.

4        Q.   That's what at least the documents say, right?

5        A.   Okay, they can say that then, okay.

6        Q.   These are documents that have your signature on

7    them, right?

8        A.   Okay.

9        Q.   And it was -- I understand it was -- it was

10   several years ago, three years ago?

11       A.   Yeah, it was.

12       Q.   Okay.  But -- but no dispute the documents show

13   that on the same day that you left Merida, Ernest

14   Gonzalez signed you up and you signed up for

15   Generations?

16              MR. LOWELL:  Objection, asked and answered,

17   he's asked this same question multiple times.

18              MR. CANALES:  Your Honor --

19              THE COURT:  Rephrase the question.

20       Q.   (By Mr. Hector Canales)  I'm just trying to make

21   sure we're on the -- we're on the same page.  Right here

22   that's your signature, correct?

23       A.   Yes, it is.

24       Q.   All right.  And I'm trying to understand your --

25   your feeling -- you know, I -- I believe you when you

1    say -- I'm trying to square this idea of being a

2    prisoner at Merida, on Merida hospice and not wanting to

3    be on hospice and then on the same day going from Merida

4    to another hospice.  Could you please explain?

5        A.  Well maybe because Merida wasn't treating me

6    right.

7        Q.  Okay.

8        A.  And wasn't giving me the supplies I needed.

9    Maybe the people that were in my home as Laura as my

10   nurse was respecting me and treating me with respect and

11   being nice to me.

12       Q.  Okay.  So --

13       A.  But I'm talking about the Merida Group.

14       Q.  Okay.  So it was more Merida that you're upset

15   with not the idea of being on hospice.  You're okay with

16   being on hospice you just wanted to be on hospice with

17   somebody else?

18       A.  I wanted to be with somebody to take care of me

19   if I needed it and get me what I needed, not somebody

20   that was just having me there and not giving me what I

21   needed.

22       Q.  And what was it, ma'am, that you weren't getting?

23       A.  I wasn't getting my supplies.

24       Q.  Like what?

25       A.  Okay.  You want to be personal?  My pads that I

1    have to wear because I wet myself a lot.

2        Q.  Okay.

3        A.  Being embarrassing here, okay.  I don't think

4    it's right that you're doing this because that's

5    personal.  I'm saying my personal items, you should know

6    what they are.

7        Q.  I apologize, ma'am.  I don't --

8        A.  I'm very -- getting very embarrassed right now.

9        Q.  I apologize, ma'am, it's not my intent I'm trying

10   to do my job.

11       A.  Well be more respectful to older people.

12       Q.  Yes, ma'am.  Now, with regards to -- so you

13   willingly and it was your -- you weren't -- you knew

14   when you went to Generations, you knew that Generations

15   was a hospice, right?

16       A.  Yes, I knew what it was.

17       Q.  And do you remember Dr. Montemayor?

18       A.  Yes, I do.

19       Q.  All right.

20       A.  He's my doctor.

21       Q.  Okay.  He's your doctor.  And do you recall

22   Dr. Montemayor telling you that you had a -- a lung

23   condition, the natural history of that condition is not

24   curable or treatable; do you remember that?

25       A.  Yes, she told me.

1    Q.   And I can certainly understand that's terrible

2    news to get, right?

3    A.   Yes.

4    Q.   Now, and it's -- as you said it's upsetting and

5    caused some depression, right?

6    A.   Yes.

7    Q.   And I'm sorry to be personal, but there's no way

8    around this.  You had -- prior to hearing that terrible

9    news from Dr. Montemayor, you had experienced depression

10   prior to that, that was part of your history, that

11   was -- it didn't start then, right?

12   A.   Yes, I was depressed, I had lost my husband.

13   Q.   When did you lose your husband?

14   A.   On April -- I mean, November the 1st -- 2nd,

15   November the 2nd, 2001.  He died all of a sudden.

16   Q.   Okay.  I --

17   A.   And I lost my mother November the 1st.

18   Q.   Yes, and death is a very scary topic?

19   A.   Yes, it is.

20   Q.   And when somebody, hospice, you kind of -- you

21   put them together, right?

22   A.   Yes.

23   Q.   Hospice means death, that's scary?

24   A.   Yes.

25   Q.   It scared you?

1    A.   Yeah, it does scare you.

2    Q.   Sure.   Sure.   But -- but when you're dealing --

3  would you agree doctors that's part of the hard job that

4  a doctor has to do is not just give the good news but

5  they have to give the bad news, too, right?

6    A.   Yes, but it's the way they say it.

7    Q.   Right.   The bedside manner.   Have you ever heard

8  that expression?

9    A.   Oh, I've heard it all the time.

10    Q.   And Dr. Gonzaba you think he had a good bedside

11  manner?

12    A.   I've never had him in a hospital.

13    Q.   All right.   Well, when you were around him --

14    A.   Gonzaba was always telling me when he came in the

15  room, hi beautiful, how are you today, you don't look

16  sick today, what's wrong.

17    Q.   He was -- you think he was trying to make you

18  feel good?

19    A.   Yes, yes.

20    Q.   Pick up your spirits a little bit?

21    A.   Yes, yes.

22    Q.   Do you think Dr. Gonzaba knew that you were

23  depressed and scared?

24    A.   I don't know if he knew if I was depressed or

25  scared, he never asked me.

1    Q.   Okay.  All right.  But I'm going to show you --

2    this is a medical record of yours from the Gonzaba

3    Medical Group.  You see that?

4    A.   Yes.

5    Q.   All right.  And here with -- on 09/12/14, you

6    went in for an office visit with Dr. Montemayor at the

7    Gonzaba Medical Group Northwest Family location; do you

8    remember that?

9    A.   Uh-huh.

10   Q.   How did you get there that day; do you remember?

11   A.   My daughter might have taken me.

12   Q.   Okay.  Okay.  And so there's this visit and this

13   is -- following up the hospital visit that you -- you

14   had had?

15   A.   Yes.

16   Q.   Where I believe Mr. Gonzaba -- I mean Dr. Virlar

17   referred you to hospice; remember that?

18   A.   Yes.

19   Q.   After that hospital visit and referral you go

20   back to Gonzaba Medical Group for a checkup follow-up?

21   A.   Uh-huh.

22   Q.   Remember that?

23   A.   Yes.

24   Q.   Okay.  And -- and here they -- they do this

25   office follow-up visit, and it says here SOB, is that

1    shortness of breath; do you see that?

2        A.   Okay.

3        Q.   Okay.  Is that something that you suffer from now

4    shortness of breath?

5        A.   Yes.

6        Q.   That's why you have the oxygen?

7        A.   That's why I have the oxygen.

8        Q.   Is that part of the lung condition that you have?

9        A.   Yes, it is.

10       Q.   Okay.  And here within the medical record on the

11   next page it indicate a past medical history that was

12   reviewed back from the year and a half before May 13th

13   of 2013, and it -- it notes the doctor notes depression,

14   major depression recurrent.

15       A.   Yes.

16       Q.   Would you agree with that?  Would that pass as

17   the finding that you had been depressed?

18       A.   Yes.  How would you like to feel to sit all day

19   with an oxygen on you?

20       Q.   I wouldn't.

21       A.   Okay.  Thank you.

22       Q.   I wouldn't.  I'm not criticizing you, ma'am, I'm

23   just trying to point out things.  Okay.  I understand

24   that Dr. Gonzaba told, you feel good, feel better, when

25   it's also true that Dr. Gonzaba certified that you had a

1    terminal illness for hospice; did you know that?

2       A.   Yes.

3       Q.   Okay.   And so what he wrote on paper, this is the

4    CTI for you for January the 23rd, the certification

5    period of January 23rd.

6          And I'll represent to you that's Dr. Gonzaba's

7    signature there.   But you knew that already, I didn't

8    have to show that, you knew Dr. Gonzaba certified you

9    for hospice, right?

10      A.   Yes.

11      Q.   Okay.   And he says here that you had pulmonary

12   fibrosis, does that sound familiar to you?   Do you know

13   what that is?

14      A.   Yes.

15      Q.   Is that true that you have pulmonary fibrosis?

16      A.   That's what they told me.

17      Q.   Okay.   And oh, I forgot, let me real quick here.

18   I'm going back here to Dr. Montemayor's time with you,

19   this record here.   Dr. Montemayor says that he discussed

20   with you the history -- natural history of your

21   condition and that is usually not curable or treatable.

22   That has to have made you very upset?

23      A.   Yes.   Yes.   But the way she told me wasn't coming

24   to my face and telling me you have three months to

25   leave, maybe six.   She told me gently and she just told

1   me it was uncurable and that I just had to, you know, be

2   on my oxygen, take it easy and not get, you know,

3   stressed out or excited or anything that would stress

4   me.  It would affect my lungs.

5            THE COURT:  Mr. Canales the defense's first

6   15-minute session has expired.

7            MR. CANALES:  Okay.

8            THE COURT:  There's two more 15-minute

9   sessions.

10            MR. CANALES:  Can I take five minutes?

11   Thank you.

12   Q.  (By Mr. Hector Canales)  Now, do you remember a

13   nurse by the name of Marcus Sosa?

14   A.  Who.

15   Q.  Marcus Sosa?

16   A.  Oh, yeah.

17   Q.  Right?  And do you remember back on December 23rd

18   of 2014 that he -- that -- that Nurse Sosa came and did

19   an initial assessment of you at your home?

20   A.  Yes.

21   Q.  All right.  And here do you have -- are you

22   aware -- do you know what hypertension is, has anybody

23   ever told you of hypertension?

24   A.  I'm sorry, I can't hear you.

25   Q.  Sorry.  Hypertension, has anybody told you you

1  have hypertension?

2     A.   Yes, my high blood pressure, yes.

3     Q.   Okay.   What about diabetes?

4     A.   I just got diabetes.

5     Q.   Arthritis?

6     A.   Yes.

7     Q.   All right.   And being a little heavy, overweight?

8     A.   Yes.

9     Q.   Okay.   Cardiomegaly, an enlarged heart, has

10  anybody said you have an enlarged heart?

11     A.   Yes.

12     Q.   Okay.   And back in 20 -- here, Nurse Sosa says

13  that you were in a chair and you were on oxygen back

14  then, true?

15     A.   Yes.

16     Q.   Okay.   And they took your vitals and that you

17  weighed 302 pounds, that sound about right?

18     A.   I guess.

19     Q.   Okay.   And that you required assistance with

20  daily living activities.   You needed help around the

21  house getting things done?

22     A.   Yes.

23     Q.   Okay.   All right.   And that you were unable to

24  bathe or dress without assistance?

25     A.   Yes.

1      Q.   And again I apologize, I'm sorry, I would not be

2    doing this if I didn't have to.  Dyspnea, shortness of

3    breath, is that something you experienced?

4      A.   Yes.

5      Q.   Are you familiar with the word Dyspnea?  No?

6      A.   No.

7      Q.   That you told Nurse Sosa that you had become more

8    fatigued over the last three months?

9      A.   Yes.

10     Q.   Remember saying that?

11     A.   Yes.

12     Q.   All right.  That you had recently gained 20

13   pounds in the last three months.  But even though you

14   had a decrease in appetite, remember saying that?

15     A.   Did I have what?

16     Q.   That you had -- you can follow along it's on --

17   I'm reading from there, that -- that you recently

18   gained -- you had a 20-pound weight gain in the last

19   three months but -- but had a decrease in appetite?

20     A.   Well, I've been -- yes, I believe this is when I

21   was going through the depression of -- of not wanting to

22   eat.

23     Q.   All right.  But Merida on this day that you

24   started this hospice care, that's the issue that the

25   Government is alleging here in this count the dates,

1   January -- January 23rd of '14, on that day this nurse

2   came out to see you; you remember that, he took -- he

3   did this assessment on you; you remember that?

4       A.  Yes.

5       Q.  Okay.  Again from Exhibit E-10 Mesquias for the

6   record 00261527, do you remember a Dr. Rincon?

7       A.  No.

8       Q.  No, okay, that's fine.  He was the medical

9   director with Merida; do you remember that?  It's okay

10  if you don't, I just --

11      A.  No.

12      Q.  It's not a memory test I'm just asking.  Okay.

13  All right.  And it says here that the patient agrees

14  with the plan of care and that -- that this IDT or IDG

15  group came up with.  Did you agree with the plan of

16  care, ma'am?

17      A.  I'm sorry?

18      Q.  Did you agree with the plan of care of how they

19  were going to take care of you?

20      A.  Do I agree with the way they took care of me?

21      Q.  No.  I know you didn't like that -- that they

22  weren't nice enough and I know the --

23      A.  That's not what I'm asking, I'm asking what you

24  asked, I didn't hear you, you're talking low -- you're

25  talking that way not to me.

1    Q.   I'm sorry, I'm trying to read the document.  I

2    apologize, I'll do -- I'll do better, I'll do better.  I

3    tell you what --

4    A.   I have this machine here it makes noise so you

5    have to speak up or I won't hear you.  If I talk to you

6    over here, can you hear me?

7    Q.   I'll try to stay in the microphone is that

8    better?

9    A.   Thank you, yes.

10   Q.   Okay.  All right.  Very good.  Hang on I need to

11   cover something up here.  I just want to cover something

12   up here.  I'm going to show the witness from Exhibit

13   E-10 at Mesquias 00261534.

14        This is a -- do you recall being discharged from

15   Merida hospice -- hospice from Bee Caring to Embrace

16   hospice.  Let me ask this way, Embrace hospice, were you

17   ever a patient of Embrace hospice?

18   A.   I might have been.

19   Q.   You might have been?

20   A.   Yes.

21   Q.   Okay.  All right.  Dr. Rincon, Dr. Rincon signed

22   an order on December the 11th of '14 transferring you

23   from Merida -- revoking you transferring you from Merida

24   to Embrace, can you -- can you elaborate, do you know

25   anything about this, can you tell the jury anything?

1   What do you remember?

2       A.  Yeah, yeah, I -- I wanted to transfer.  I

3   transferred from Merida to them for a little while.

4       Q.  Because I think you were -- like you've been

5   describing here you were upset with the way they were

6   talking to you --

7       A.  Yes.

8       Q.  -- and the manner and things?

9       A.  Yes.  Because I think I had a different nurse at

10  that time.

11      Q.  Right.  You didn't like the nurses?

12      A.  No, I mean, treat people with respect.

13      Q.  Right.

14      A.  If I'm going to die at least treat me right.

15      Q.  And so you -- you wanted to go again to another

16  hospice?

17      A.  Yes, because they wanted me on hospice.

18      Q.  And when you went to that other hospice did

19  you -- did you consent to going to Embrace or did you

20  get permission to go to Embrace?

21      A.  Yes, yes.

22      Q.  That's what you wanted to happen?

23      A.  Yes.

24      Q.  And -- and Dr. Rincon here in Merida they honored

25  your -- your --

```
 1      A.   Yes.

 2      Q.   -- request --

 3      A.   Yes.

 4      Q.   -- to leave?

 5      A.   Yes.

 6      Q.   They didn't hold you back?

 7      A.   No.

 8      Q.   Okay.  Very quickly here again, E-10, Mesquias

 9   00261814.  Ma'am, this is a -- a consent or hospice

10   consent for you and I just want to confirm, ma'am, that

11   that's your signature at the bottom?

12      A.   Yes, it is.

13      Q.   All right.  Thank you very much.  The date of

14   that is December 22nd of '14?

15      A.   Yes.

16      Q.   Right?  That's the day before your certification

17   period started, that is the Government is alleging in

18   this case; are you aware of that?

19      A.   No.

20      Q.   Okay.  Now, do you remember a -- a Nurse Belinda

21   Gonzalez?

22      A.   Belinda who?

23      Q.   Gonzalez?

24      A.   I believe so.

25      Q.   Okay.  You believe so, okay, maybe.  Let's see if
```

1    this refreshes your memory and let's show you a

2    document, this is Mesquias 00261836, Government Exhibit

3    E-10.

4         And on this date on the 23rd, Dr. -- Dr. or Nurse

5    Gonzalez came and did an evaluation of you; do you

6    remember that?

7    A.   Not really.

8    Q.   Okay.  Do you remember, ma'am, how long each

9    certification period, or each period within hospice

10   lasts?

11   A.   To be certified?

12   Q.   Yes, ma'am.

13   A.   It would take about 30 minutes to an hour, maybe

14   longer.

15   Q.   Okay.  You're talking about the meeting that --

16   that they would?

17   A.   Yeah, when they would come to my house and stuff

18   like that.

19   Q.   The assessment?

20   A.   Yes, the assessment.  A long time.

21   Q.   And they would do that over and over, each time

22   every 60 days they would have to do that, right?

23   A.   Yes.

24   Q.   And I believe you -- there was eight

25   certification periods that you had with Merida, right?

1      A.  I believe so.

2      Q.  Sound about right?  Can you give us your best

3  answer or best guesstimate on how many other

4  certification periods you had with other hospices, for

5  instance with Generations and with Embrace I believe it

6  was?

7      A.  I mean, well, one each.

8      Q.  Okay.  That's it?

9      A.  Yes, because I didn't stay with them very long.

10     Q.  Okay.  And so this is a -- did you know that on

11  March 19th Greg Gonzaba certified you for hospice as I

12  have up here on the screen?

13     A.  No, I don't remember this one.

14     Q.  Okay.  What about Dr. Benjamin Zertuche, ever

15  heard of him?

16     A.  I met him one time.  Yes, I met him one time.

17     Q.  All right.  And do you know if Dr. Zertuche

18  worked at Gonzaba Medical Work?

19     A.  I believe it was through Gonzaba I'm not sure.

20     Q.  And were you aware that Dr. Zertuche also

21  certified you on June 27th of '15 for hospice?

22     A.  Well, he came to assess me, I guess he did.  Yes.

23     Q.  And again, Dr. Gonzaba on June 25th of '15?

24     A.  Okay.

25     Q.  All right.  And again Dr. Gonzaba in August of

1    '15?

2       A.   Okay.

3       Q.   And again in October of '15?

4       A.   I guess he did, I'm not sure.

5            MR. LOWELL:   Your Honor, I'm going to object

6    to counsel just putting these documents in front of the

7    witness without her identifying the documents,

8    identifying the handwriting, who the names are.   He's

9    basically testifying through the series of documents.

10           MR. CANALES:   Your Honor, I'm using the

11   Government's documents, these are their exhibits.

12           THE COURT:   Let's just be a little more

13   specific with the question.

14           MR. CANALES:   Okay.

15      Q.   (By Mr. Hector Canales)  Did the Government in

16   any of the times you met with them --

17      A.   I'm sorry, I can't hear you.

18      Q.   I'm sorry.   I'm sorry.   Did the Government ever

19   show you your medical records, ma'am?

20      A.   No.

21      Q.   Did you know that the Government had all of your

22   medical records, your hospice records?

23      A.   No, I didn't know.

24      Q.   Okay.   Was that something you would have liked to

25   have seen?

1     A.   Why would I want to see my medical records when I

2   know what's wrong with me?

3     Q.   Okay.  All right.  And, ma'am, thank you very

4   much for your time.

5     A.   Uh-huh.

6               MR. CANALES:  That's all the questions I

7   have right now.

8               THE COURT:  Thank you, Mr. Canales.

9   Mr. Cyganiewicz.

10               MR. CYGANIEWICZ:  I have no questions for

11   this witness.

12               THE COURT:  Thank you, sir.

13               MR. GUERRA:  No questions for this witness,

14   Your Honor for Dr. Pena.

15               THE COURT:  Thank you, gentlemen.

16               Mr. Lowell, anything else?

17               MR. LOWELL:  Just briefly, Your Honor.

18                    REDIRECT EXAMINATION

19   BY MR. LOWELL:

20     Q.   Ms. Conti, today are you on hospice care?

21     A.   No, I'm not.

22               MR. LOWELL:  No further questions,

23   Your Honor.

24               MR. CYGANIEWICZ:  Nothing Your Honor.

25               THE COURT:  Anything else, gentlemen?

 1           MR. CANALES:  Pass the witness, no

 2   questions.

 3           MR. GUERRA:  Nothing, Judge.

 4           THE COURT:  Thank you ma'am.  You're now

 5   excused, let's make arrangement to lower the platform,

 6   please.

 7           And while we're doing that, ladies and

 8   gentlemen, I think this is an appropriate time for our

 9   lunch break.  Let's go ahead and reconvene at 1:45, all

10   right?

11           At this time we'll be in recess.

12           Thank you, everyone.

13           COURT BAILIFF:  All rise for the jury.

14           (JURY OUT.)

15           (COURT IN LUNCH RECESS.)

16           THE COURT:  Thank you, everyone.  Please

17   remain standing, we're bringing in the jury.

18           COURT OFFICER:  All rise for the jury.

19           (JURY IN.)

20           THE COURT:  Thank you, everyone.  Please be

21   seated.  Ladies and gentlemen of the jury, welcome back

22   for the afternoon session.

23           Mr. Foster, next witness, please.

24           MR. FOSTER:  Thank you, Your Honor.

25           The United States calls Amber Kelso.

1           THE COURT:  Good afternoon, ma'am.

2           THE WITNESS:  Good afternoon.

3           THE COURT:  Please remain standing while we

4   swear you in.

5           THE CLERK:  Please raise your right hand.

6           (WITNESS SWORN IN.)

7           THE WITNESS:  Yes.

8           THE COURT:  Thank you.  Please make yourself

9   comfortable and adjust the microphone close to you.

10                    DIRECT EXAMINATION

11   BY MR. FOSTER:

12    Q.  Good afternoon, Ms. Kelso.

13    A.  Good afternoon.

14           THE COURT:  Please proceed.

15    Q.  (By Mr. Foster)  Could you introduce yourself to

16   the jury, please.

17    A.  My name is Amber Kelso.  I've lived in the

18   San Antonio area for about 35 years, and a single mom.

19   I have my daughter, she just recently turned 18 so I'm

20   kind of enjoying freedom now.  But I've been a nurse for

21   14 years and been focusing my career on hospice for the

22   last six years.

23    Q.  Are you currently employed?

24    A.  Yes, I am.

25    Q.  Where are you employed?

1     A.   With another hospice agency in San Antonio.

2     Q.   And what's that hospice agency see called?

3     A.   Kendrid Hospice.

4     Q.   And what do you there?

5     A.   I'm an LVN, I do lots of things as far as patient

6     care.  I see patients in their homes, if they're at

7     home.  Where ever their home setting is, if it's a

8     nursing home, their physical home.  I also provide

9     education to families for people that have loved ones

10    that are in the hospital and a doctor has suggested

11    hospice services for them.

12         It's a delicate conversation to have so they like

13    to leave it to the experts.  So my company has me go out

14    to hospitals, nursing homes, whatever setting, and

15    provide education to families on what a hospice level of

16    care is, why their loved one is appropriate, explaining

17    the disease process and just, you know, explaining why

18    their loved one was referred for hospice.

19    Q.   Do you have any degrees?

20    A.   I do.  My nursing degree as an LVN.

21    Q.   And do you hold any professional licenses?

22    A.   My LVN.

23    Q.   What was the first hospice agency you worked for?

24    A.   When I first hired it was named Professional

25    Hospice and Bee Caring, it was two companies that they

1   operated at the same time.

2      Q.   And when you say they operated, who do you mean?

3      A.   Mr. Mesquias.

4      Q.   And did those names later change to the name of a

5   different company?

6      A.   Yes, I believe it was after I'd been there about

7   a year maybe, it was re named Merida Hospice.

8      Q.   And what city did you work in?

9      A.   San Antonio.

10      Q.   While working at the Merida companies, did you

11   become aware of fraud that was occurring there?

12      A.   Yes.

13      Q.   Can you explain to the jury what that fraud was?

14      A.   So Medicare's criteria for a hospice patient is

15   that a patient must have a terminal diagnosis that gives

16   them a life expectancy of six months or less.  In the

17   time I spent at Merida, I learned that a vast majority

18   of the patients did not meet that criteria.

19      Q.   Who was responsible for the fraud at Merida?

20      A.   Mr. Mesquias.

21      Q.   How long did you work at the Merida Group?

22      A.   I believe it was a year and a half.

23      Q.   Was the fraud occurring the entire time you were

24   working at the Merida Group or only for a short period

25   of time?

1    A.  The entire time.

2    Q.  Did you realize that it was fraud at first or did

3 it take some time after you started?

4    A.  It took some time.

5    Q.  Why did it take time?

6    A.  When I was first hired I was lucky enough that

7 Mr. Mesquias knew that I did not have any experience in

8 hospice, but he -- that didn't worry him, he said we'll

9 train you.  So I was gracious that he was willing to

10 take that opportunity, so I accepted his offer and

11 started working there.  And, but I was told that even

12 though I had no experience they would train me, they

13 would teach me what hospice is, they would train me on

14 what hospice is and how to care for these patients.

15    Q.  Did they in fact train you?

16    A.  No.

17    Q.  And did you begin to conduct research on your

18 own?

19    A.  I did because I didn't feel like I had gotten the

20 training he told me he would get, I started doing my own

21 research and started educating myself.

22    Q.  And based on your own research, what did you find

23 out about Medicare's requirements for hospice?

24    A.  That the vast majority of the patients didn't

25 meet the requirements.

1      Q.   And when you say the vast majority of the

2   patients, do you have an estimate of the percentage of

3   patients you saw who did not meet Medicare requirements?

4      A.   80 to 85 percent of the patients that were on

5   service.

6      Q.   Was that a close call as to whether they were

7   terminally ill or did they definitely did not qualify?

8      A.   Oh, they definitely didn't qualify.

9      Q.   Can you explain to the jury why they definitely

10   didn't qualify?

11      A.   The main most important criteria is they have to

12   have a life expectancy of six months or less, and most

13   of the patients that were on services did not.  They had

14   a -- a far longer life expectancy of years.

15      Q.   In saying that 80 to 85 patients qualify, was

16   this just a handful of patients or was it all of the

17   patients that you saw?

18      A.   Well, yeah, it was all the patients that I saw.

19      Q.   How many patients in the San Antonio offices of

20   Professional Bee Caring and later Merida would you say

21   that you saw?

22      A.   90 percent.  It's hard to give a number because

23   some patients would pass away during and -- so to give

24   an exact number, it's hard to say but I'd say at least

25   90 percent.

1    Q.   Did you learn why these patients were being put

2    on hospice if they didn't qualify for it?

3    A.   Through my --

4              MR. CANALES:  Objection, Your Honor.  Calls

5    for speculation, lacks foundation.

6              THE COURT:  Rephrase the question.

7    Q.   (By Mr. Foster)  Did Defendant Mesquias tell you

8    why and -- he wanted to admit patients?

9              MR. CANALES:  Objection, Your Honor,

10   leading.

11             THE COURT:  Rephrase the question.

12   Q.   Sure.  What conversations, if any, did you

13   overhear involving Defendant Mesquias and the topic of

14   why patients should be admitted?

15             MR. CANALES:  Objection, Your Honor.  Calls

16   for hearsay, what conversations from some unknown

17   source.

18             THE COURT:  Rephrase the question.

19             MR. FOSTER:  It's a statement by the

20   Defendant.

21             THE COURT:  You were going to -- again, ask

22   about the Defendant.

23   Q.   (By Mr. Foster)  What statements, if any, did you

24   overhear Defendant Mesquias make about why patients

25   should be admitted?

1    A.   From him personally I did not hear any

2    statements, but in doing my own education too --

3              MR. CYGANIEWICZ:  Nonresponsive.

4              THE COURT:  Again, only -- only answer the

5    question and -- if he did not speak to you directly then

6    that's a different line of questioning.

7              Please proceed with a new line of

8    questioning, please, or a different question.

9    Q.   Yeah.  Were you present when the topic of taking

10   patients off hospice came up?

11   A.   Yes.

12             MR. CANALES:  Objection, Your Honor, with

13   who?

14             THE COURT:  The question was proper, that

15   can be clarified.

16   Q.   (By Mr. Foster)  And were you present when

17   Defendant Mesquias made statements about that topic?

18   A.   Yes, about patients being discharged?

19   Q.   Correct.

20   A.   From services, yes.  I was present in the office

21   on two occasions that I can recall that it was brought

22   to Mr. Mesquias' attention.  One instance was where the

23   patient's primary care physician --

24             MR. CANALES:  Objection, Your Honor, lack of

25   personal knowledge.  She's recounting a statement made

1   by somebody else.

2            THE COURT:  Let's ask a specific question,

3   Mr. Foster.

4   Q.  (By Mr. Foster)  What did Defendant Mesquias say

5   when he was told the patient should be taken off

6   hospice?

7   A.  Don't mess with my patients.

8   Q.  And did he say anything about his money?

9   A.  Um --

10           MR. CANALES:  Objection, Your Honor,

11  leading.

12           THE COURT:  Sustained, rephrase the

13  question, please.

14  Q.  (By Mr. Foster)  What, if anything did he say

15  about his money?

16  A.  He --

17           MR. CANALES:  Your Honor, that's still

18  leading.

19           MR. FOSTER:  That question was proper.

20           MR. CANALES:  The question is leading and

21  suggests the answer to the witness.

22           THE COURT:  What else, if anything, did he

23  say?

24           THE WITNESS:  He said don't mess with my

25  patients, don't mess with my money.

1      Q.  (By Mr. Foster)  Thank you.  Now, in terms of the

2    15 percent of patients at Merida you estimated were

3    actually terminal ill, how do you feel about the hospice

4    services they received?

5              MR. CANALES:  Objection, Your Honor.

6    Relevancy of a witness' feelings about facts that have

7    not -- not been put into evidence.  It's irrelevant.

8              THE COURT:  Rephrase the question,

9    Mr. Foster.

10             MR. FOSTER:  Sure.

11     Q.  (By Mr. Foster)  Was Merida billing Medicare for

12   hospice services to your knowledge?

13     A.  Yes.

14             MR. CANALES:  Objection, Your Honor, leading

15   question, again, he's suggesting the answer to

16   the witness.  It's direct examination:  Who, what, when,

17   why and how, proper questioning.

18             THE COURT:  Rephrase the question, please.

19     Q.  (By Mr. Foster)  What insurance carriers did

20   Merida bill?

21     A.  The primary biller was Medicare.

22     Q.  Okay.  And what services did Merida bill for?

23     A.  Hospice services.

24     Q.  How do you feel about the services the patients

25   receive?

1       MR. CANALES:  Objection, again, Your Honor,

2  to her -- the witness' feelings are irrelevant to this

3  proceeding.

4       THE COURT:  That's overruled.  She -- she

5  may answer if she knows.

6       THE WITNESS:  Sub-par.

7  Q.  (By Mr. Foster)  Why do you say that?

8  A.  The -- I was not only one who was hired by Rodney

9  with no experience, the vast majority of his employees

10  had no hospice experience.  We were all told that we

11  would be trained and that training was not received.  So

12  with hospice is a very special level of care, it's a

13  certain phase --

14       MR. CANALES:  Objection, Your Honor.

15  Narrative, there's no question here.

16       THE COURT:  That's overruled.  Please

17  proceed.

18       THE WITNESS:  You -- hospice is a special

19  time in someone's life and you have to have specific

20  knowledge in how to -- how to help a family cope as well

21  as help the patient in that specific time of life.  And

22  a lot of even primary care physicians don't know how to

23  manage that level of care in that time in someone's

24  life, and so in order to be a nurse helping these

25  patients you have to have the special training that is

1    required.  Hospice level of care patients do not --

2    can't receive the same as, you know, a -- you might get

3    at your primary care physician, or even in the hospital,

4    it's a totally different type of nursing, it's a totally

5    different type of care and you have to be educated on

6    how to effectively help your patients.

7    Q.  (By Mr. Foster)  After you got hired, what was

8    your job when you started at Merida?

9    A.  I was -- they had me go out in the field,

10   meaning, go see patients in their home-setting, whether

11   that be nursing home or their actual home.

12   Q.  And what would you do when you went to patients'

13   homes?

14   A.  I was trained to do a basic assessment, check

15   blood pressure, pulse, take -- take -- sorry, take their

16   temperature, listen to their heart rate, listen to their

17   lungs sounds and see if they needed any medications and

18   that was it.

19   Q.  And what, if any, other providers could patients

20   receive these same services from?

21   A.  Same services can be received by home health,

22   their primary care physician.

23   Q.  And what can you tell the jury about whether the

24   cost of those providers is the same, less or greater

25   than hospice services?

1    A.   It's significantly cheaper.  Those other services

2    are significantly cheaper than hospice.

3    Q.   When you went out to see these patients, did you

4    form an opinion about whether they needed hospice

5    services?

6    A.   I felt that most of them did not qualify.

7    Q.   And did you become concerned?

8    A.   Yes, absolutely.

9    Q.   What concerned you?

10    A.   That I was working for a company that was billing

11    Medicare for over 100 patients on services when the vast

12    majority of them didn't meet the Medicare's guidelines

13    for the services.

14    Q.   Did you research Medicare's rules and

15    regulations?

16    A.   I did.

17    Q.   How did you conduct your research?

18    A.   Google is a wonderful thing, there's lots of

19    resources, hospice organizations that explain the -- the

20    qualification, but most importantly Medicare, Medicare's

21    website explains what their qualification are.

22    Q.   How hard were these rules to find?

23    A.   Not hard at all.

24    Q.   How hard were they to understand?

25    A.   Not hard.

1    Q.   And can you describe to the jury what you learned

2  about Medicare's rules and regulations?

3    A.   I mean it's pretty easy, patient has to have a

4  terminal diagnosis with the life expectancy of six

5  months or less.

6    Q.   What rules did Merida follow?

7    A.   I'm sorry?

8    Q.   What rules did Merida follow?

9    A.   They admitted patients whether they were

10  appropriate or not.

11    Q.   Did Merida ever discharge patients?

12    A.   No.   Unless they passed away, that's the only

13  time they were discharged.

14    Q.   Now, you previously said that Defendant Mesquias

15  was responsible for the fraud.   Who owned or controlled

16  all of the companies in the Merida Group?

17    A.   Mr. Mesquias.

18    Q.   How much control did he have over those

19  companies?

20         MR. CANALES:   Objection, Your Honor.   Lacks

21  foundation, calls for speculation.

22         THE COURT:   Answer if you know.

23         THE WITNESS:   Mr. Mesquias.

24    Q.   (By Mr. Foster)  Can you describe his control to

25  the jury in your experience?

1      A.   Sorry, can you repeat the question?

2      Q.   Yeah, can you describe how he controlled the

3  companies to the jury?

4      A.   He was very -- he was very controlling, you know,

5  everything -- it had to go his way.  There were days

6  that he was at the office and was laughing and joking

7  and then all of a sudden was yelling and screaming at

8  the staff.  It was a very tense workplace when he was in

9  the office.  Most of the time the office staff gave us

10  advance notice when he was going to be there so we could

11  avoid the place.

12      Q.   How did that make you feel to work there?

13      A.   It was very stressful.

14      Q.   What was Defendant Mesquias' main priority that

15  he conveyed to you for the Merida Group?

16           MR. CANALES:  Objection, Your Honor.  Calls

17  for speculation.

18           THE COURT:  Overruled, the question was what

19  he conveyed to her?

20           MR. FOSTER:  Uh-huh.

21           MR. CANALES:  No, the question, Your Honor,

22  was what Mr. Mesquias' feeling?

23           MR. FOSTER:  That was not the question.

24           THE COURT:  Please proceed.  Did you

25  understand the question?

1           THE WITNESS:  Can you repeat the question,

2    please?

3        Q.  (By Mr. Foster)  Yeah.  What was Defendant

4    Mesquias' main priority for the Merida Group that was

5    conveyed to you?

6           MR. CANALES:  Objection, Your Honor.  Ms.

7    Kelso cannot know what is in Mr. Mesquias' mind, calls

8    for speculation.

9           THE COURT:  Overruled.  If he conveyed

10   anything to you, you can answer the question.

11           THE WITNESS:  He was -- regularly when he

12   was in the office, he was talking to us about our

13   numbers, how many patients we had on service and how it

14   was important to always hit a certain number.  The first

15   goal that he set for our office was for 100 patients and

16   that we needed to -- to hit that goal.

17       Q.  (By Mr. Foster)  And what did he say that he

18   would provide to the staff if they admitted 100

19   patients?

20       A.  He provided a very nice dinner at the Tower of

21   the Americas for the employees once that goal was hit,

22   as well as took us to a bar for beverages and it was

23   open bar.  So unlimited number of drinks at his cost.

24       Q.  Did providing a fancy dinner and an open bar in

25   exchange for admitting more patients concern you?

1    A.   Yes.

2    Q.   Can you explain to the jury why that concerns

3    you?

4    A.   I mean, providing lavish gifts and rewards for

5    something that's your job, it encourages you to turn a

6    blind eye.

7    Q.   When you say turn a blind eye, what do you mean?

8    A.   Kind of just ignore what's going on even if you

9    think it's not right because you're getting these nice

10   rewards for doing it anyways so --

11   Q.   Can you give the jury an example of the types of

12   patients who were admitted to get to that 100 patient

13   level?

14           MR. CANALES:  Objection, Your Honor.  Lack

15   of foundation.  I think the -- in order for the question

16   to be proper, he'd have to establish a foundation, which

17   patients she was involved in admitting to demonstrate

18   some personal knowledge before he asks a general

19   question like that.

20           THE COURT:  Rephrase the question as to her

21   experience with that.

22           MR. FOSTER:  Thank you, Your Honor.

23   Q.   (By Mr. Foster)  Were you involved in admitting

24   patients to get to the 100 patient number?

25   A.   I was not.  As an LVN Medicare does not allow

1    LVNs to admit patients.  I was involved in patient care.

2    Q.  Were you assigned to the care of patients who

3    were admitted as part of those 100 patients?

4    A.  Yes.

5    Q.  And can you describe to the jury the patients who

6    were admitted who you went out and saw?

7              MR. CANALES:  Objection, Your Honor.  The

8    witness just testified that she was not involved in the

9    admission process; therefore any questioning along those

10   lines she lacks any personal knowledge or proper

11   foundation to competently testify -- testify about those

12   matters.  Object.

13             THE COURT:  Overruled.  She may testify as

14   to the patients she saw.

15             THE WITNESS:  There was -- I was called to

16   see a patient in Cotulla, and from San Antonio that's an

17   hour and a half, I believe, hour and a half, two-hour

18   drive from San Antonio.  With each hospice company you

19   set up a service area, and the general service area is

20   usually an hour away.  And for Professional Bee Caring

21   Merida, I don't remember the name that we were under

22   when the specific patient was admitted, but our service

23   area was an hour, it was within an hour of the city of

24   San Antonio, that way we could adequately reach our

25   patients when they had a need.

 1                This patient was in Cotulla, you know, much

 2    further outside of our service area.  And typically,

 3    that patient would have been serviced, I believe it was

 4    by the Harlingen office.  And when I asked the manager

 5    why our San Antonio office was admitting that patient

 6    when it was so far outside the service area, they said

 7    because we needed -- the San Antonio office needed that

 8    admission to reach the 100 patient mark and so it was

 9    directed by Mr. Mesquias to admit the patient to the

10    San Antonio office.

11       Q.   (By Mr. Foster)  When you reached 100 patients,

12    did Defendant Mesquias change the number at all?

13       A.   Yes, the goal was then increased to 150 patients.

14       Q.   In your experience, did Defendant Mesquias ever

15    tell you that a patient should not be admitted to

16    hospice?

17       A.   No.

18       Q.   Did you learn that Defendant Mesquias had

19    directed that every patient referred by doctors should

20    be admitted?

21       A.   Yes.

22       Q.   How did you learn that?

23       A.   Management team.

24       Q.   Can you recall Defendant Mesquias ever saying

25    once that a patient should be discharged?

1    A.   No.

2    Q.   Did Defendant Mesquias ever express once any

3    concern for the well-being of patients in your presence?

4              MR. CANALES:   Objection, Your Honor,

5    leading.   That's two in a row.

6              THE COURT:   Rephrase the question.

7    Q.   (By Mr. Foster)   What was your impression of how

8    Defendant Mesquias viewed the patients?

9    A.   They were a source of income for him.

10             THE COURT:   Closer to the microphone, I

11   didn't hear that.

12             THE WITNESS:   They were a source of income

13   for him.

14   Q.   (By Mr. Foster)   I want to show what's been

15   previously been admitted as Government Exhibit L-2.

16        So what area were you involved in?

17   A.   San Antonio.

18   Q.   And you talked about Merida admitting patients

19   who weren't qualified for hospice, do you know which

20   doctor admitted them?

21   A.   Dr. Virlar, Jesus Virlar.

22   Q.   And at the time you were working for the Merida

23   Group in San Antonio, do you know what percentage of

24   patients were admitted -- referred by Dr. Virlar?

25   A.   I would say at least 80 percent.

1          MR. CANALES:  Objection -- objection,

2    Your Honor, calls for speculation.  No foundation has

3    been laid whether she's reviewed documents, she's done

4    any sort of analysis on her own, whether she's trained

5    to do such analysis or anything.  She's just simply

6    asking -- guessing questions, guess how much Dr. Virlar

7    did, it's not a proper question.

8          MR. FOSTER:  Question was did you know,

9    Your Honor.

10         MR. CANALES:  Before you can even ask do you

11   know, he needs to lay a predicate as to whether or not

12   the personal knowledge is relating to that issue.

13   Premature.

14         THE COURT:  The objection is overruled, if

15   she knows.

16   Q.  (By Mr. Foster)  Did you know?

17   A.  Yes.

18   Q.  What percentage was it?

19   A.  80 percent, 80, 85 percent.

20   Q.  Can you tell the jury how you knew that?

21   A.  In my time at Merida I started off doing the

22   field visits, seeing patient in their homes.  At a

23   certain point in time with the company, we were getting

24   more patients, the nurse manager Amy needed help in the

25   office, it was just her trying to do all of the nurse

1    management paperwork on her own, so she pulled me out of

2    the field and had me assist her in the office.  And

3    there in the office I was in charge of helping her with

4    paperwork, helping her with orders.  We also have weekly

5    meetings.  Every -- every two weeks he have meetings

6    with our doctors to establish the eligibility of the

7    patients.  I was in charge of those meetings.  I had to

8    print all of the orders and all of the certification

9    paperwork so I saw the doctors' names of who the

10   referrals was on all of these forms for all of our

11   patients.  I would -- I was the only one who printed the

12   paperwork during that period of time.

13   Q.   Was every patient that Dr. Virlar referred that

14   you were aware of admitted to the Merida Group?

15   A.   Yes.

16   Q.   Why?

17            MR. CANALES:  Objection, form, Your Honor,

18   calls for speculation.  Every patient without even

19   identifying them?

20            THE COURT:  Rephrase the question.

21   Q.   (By Mr. Foster)  In your experience running this

22   IDT -- IDG meetings -- well let me ask you this:  Was

23   Dr. Virlar present at those meetings?

24   A.   Yes.

25   Q.   Okay.  And at these meetings, did you go over

1  patients?

2     A.  Yes.

3     Q.  And how long would Dr. Virlar spend reviewing

4  each patient's case?

5     A.  Five seconds.

6     Q.  Five seconds, okay.  And did he ever discharge a

7  patient?

8     A.  No.

9     Q.  Okay.  And did you also become aware of patients

10 who were referred by Dr. Virlar to the Merida Group?

11    A.  Yes.

12    Q.  And how did you become aware of that?

13    A.  The referrals were gone over in the meetings,

14 they were on the agenda as far as new admissions and it

15 was on the paperwork of who the referral -- the

16 referring physician was.

17    Q.  And did you know whether the patients were

18 admitted or not admitted?

19    A.  Yes.

20    Q.  And in your time there, was any patient of Dr. --

21 Dr. Virlar referred ever not admitted?

22    A.  No.

23    Q.  Were there occasions where there was no medical

24 record for the patient that Dr. Virlar referred?

25    A.  Yes.

1    Q.   What happened?

2    A.   I was working in the office at the time, one of

3  my coworkers who was an RN was assigned to admit a

4  patient onto services and she was trying to complete her

5  documentation for the -- well, complete the admission

6  and complete her documentation and she called the office

7  because she didn't have any records.  The patient's

8  medical record hadn't been uploaded into the medical

9  system yet, so she called me asking what the patient's

10  diagnosis was, if I could read through the medical

11  records for her and tell her kind of what was going on

12  with the patient and what the different medical

13  conditions were and I didn't find any.  And when I went

14  and asked the management team where the records were for

15  the patients, they said we had none.  All we had was an

16  information sheet from the hospital that had the

17  patient's name, address, social and contact information

18  and insurance.  There was no medical information on that

19  form, that was all that we had.

20    Q.   Did it concern you that that patient was

21  admitted?

22    A.   It did.

23    Q.   Can you explain to the jury why that concerned

24  you?

25    A.   You have to have medical records to show

1    justification for services and there were no medical

2    records to show that the patient needed services.

3       Q.   Now, you previously discussed that 80 to 85

4    percent of the patients didn't qualify for hospice.  Did

5    you become interested in finding out why Merida was

6    getting so many patients referred to it?

7       A.   I did.

8       Q.   And why were you interested in finding that out?

9       A.   There were just so many patients on services and

10   as I was being patients in the home, I found that a lot

11   of them didn't really know what hospice was, didn't

12   realize what the services were and some of them didn't

13   even realize they were on hospice.

14      Q.   Did you talk to members of the marketing team at

15   Merida?

16      A.   I did.

17      Q.   Did members of the marketing team tell you who

18   was responsible for the marketing plan?

19               MR. GUERRA:  Objection, Your Honor.

20               THE WITNESS:  Yes.

21               MR. GUERRA:  Calls for hearsay.

22               MR. FOSTER:  It's 801(d)(2)(d), Your Honor.

23   Well, first the question did she have the conversation

24   is not hearsay so --

25               MR. GUERRA:  But --

```
 1                MR. FOSTER:  -- that objection should be
 2    overruled, and then 801(d)(2)(d) statement of the
 3    parties employed.
 4                THE COURT:  One -- one second, gentlemen.
 5    All right.  Let's break it up one piece at a time.
 6    Rephrase your question again.  Let me -- let me hear it.
 7      Q.  (By Mr. Foster)  Did you talk with members of the
 8    marketing team about who was responsible for the
 9    marketing plan?
10                THE COURT:  Did she speak to them?
11                MR. FOSTER:  Yes.
12                THE COURT:  That -- I'll allow that.
13                THE WITNESS:  Yes.
14      Q.  (By Mr. Foster)  And what did they tell you?
15                MR. GUERRA:  Objection, Your Honor.  That
16    goes to hearsay.  Out of Court statement offered for the
17    truth of the matter asserted for people who are not in
18    this case.
19                MR. FOSTER:  It was -- Your Honor under
20    801(d)(2)(d), it was made by the Defendant's employee
21    about a matter in the scope of the employment
22    relationship so it falls squarely within that hearsay
23    exception.
24                THE COURT:  Let's clarify who she -- who
25    they is referring to before I allow that.
```

1          MR. FOSTER:  Sure.

2     Q.  (By Mr. Foster)  Who did you speak with?

3     A.  The name?

4     Q.  Sure.

5     A.  Or their title?  It was one of the marketers, her

6     name was Crystal.

7     Q.  Was she employed by the Merida Group?

8     A.  Yes.

9     Q.  Did you speak to her about the Merida Group

10    marketing plan?

11    A.  Yes.

12    Q.  What did she tell about that plan?

13         MR. CANALES:  Objection, Your Honor.

14         MR. GUERRA:  Same objection.

15         THE COURT:  I'll allow that.  Overruled.

16         THE WITNESS:  That when meeting with new

17    families that they were instructed to highlight the

18    benefits of hospice, not necessarily the six-month or

19    less life expectancy, not to mention that, but highlight

20    the free things that they get to be on services.  The

21    free medicines that they get, the free supplies that

22    they get like -- we call them briefs not diapers, but

23    briefs and wipes, Ensure, equipment, oxygen, hospital

24    bed, shower chairs things of that nature.

25    Q.  (By Mr. Foster)  Did that concern you?

1        A.   Yes.

2        Q.   Can you explain to the jury why that concerned

3   you?

4        A.   The ma -- the majority of the patients that we --

5   that we had on our services were indigent patients, they

6   were of low income and most of them barely had means to

7   feed themselves and ate very little.  So it felt like

8   they were being enticed with all of these free things to

9   come on our services when they weren't properly educated

10  on what services they were actually signing up for.

11       Q.   Now, did you also go out and visit patients?

12       A.   Yes.

13       Q.   And did you speak with patients for the purpose

14  of their medical treatment?

15       A.   Yes.

16       Q.   And what, if anything, did the patients say to

17  you when they were -- you were discussing their medical

18  treatment with them?

19       A.   There was -- you know, many patients that I

20  talked to, and if the patient wasn't capable of

21  understanding or making their own decisions, their

22  caregiver was, so it was either the patient or the

23  caregiver.  But -- you know, many of them didn't realize

24  that to be on hospice that they had to have life

25  expectancy --

1           MR. CANALES:  Objection, Your Honor.  The

2    testimony about many other people realized or -- or

3    didn't realize calls for hearsay, speculation; the

4    witness -- the witness has no personal knowledge of what

5    other people knew or realized.

6           THE COURT:  Let's -- let's limit the scope

7    of the answer.  Let's have a more specific question now.

8           MR. FOSTER:  Sure.

9    Q.  (By Mr. Foster)  What did the patients say to you

10   when you were discussing their medical treatment?

11          MR. GUERRA:  Objection, Your Honor.

12          MR. CANALES:  Objection, Your Honor.  Calls

13   for hearsay.

14          MR. FOSTER:  Under 803(d)4, Your Honor,

15   statements made by patients in connection with medical

16   diagnoses and treatment are exception to the Hearsay

17   Rule.

18          MR. GUERRA:  Your Honor, he's asking a broad

19   scope, a broad question.

20          THE COURT:  The objection is overruled,

21   obviously you're limiting this in scope as to what they

22   spoke with her patients.

23          MR. FOSTER:  Yes, sir.

24          MR. CANALES:  Could we at least get the name

25   of the patient who we're supposedly hearing testimony

1   about?

2                   THE COURT:  Again --

3                   MR. CANALES:  Is that too much --

4                   THE COURT:  -- the objection overruled.  She

5   may answer.

6       Q.  (By Mr. Foster)  Now, do you recall the question?

7       A.  Yes.

8       Q.  Okay.

9       A.  In going to the homes and meeting with the

10  families and their care -- and their loved one's

11  caregiver, whoever was taking care of them, many of them

12  did not realize that in order to be on hospice that you

13  had to have a six-month or less life expectancy.  So you

14  know I -- when I would talk to them about that assuming

15  that they already had that knowledge, here I am giving

16  them this heart wrenching information that they had no

17  idea.  And sometimes they would get upset and say, what

18  do you mean, nobody told me that before, I didn't know

19  I'm dying.  And because no doctor had told them that

20  they had a life expectancy of six months or less.  And

21  so they said, well, we were told that we would just have

22  nurses come and see us and we would get free medicine.

23      Q.  And is the -- can you explain -- well is patient

24  choice an informed consent important in the hospice

25  context?

1     A.   Yes.

2     Q.   Can you explain to the jury why that is?

3     A.   Informed consent for hospice is very important

4   because if you don't know -- if you sign up for hospice

5   you -- it's a service for patients who no longer want

6   aggressive treatment.  Their doctors have told them,

7   look, you have a medical condition that's terminal and

8   unfortunately there's nothing else we can do.  You can

9   come to the hospital but there's nothing here that a

10   physician can do, there's no surgeries, there's no

11   medicines.  Unfortunately, your condition is at the

12   terminal stage.  Basically all we can do for you is to

13   help you stay comfortable.

14        And if patients aren't -- if a patient is not in

15   that stage and they're on hospice, then there's other

16   things -- other types of treatments that might improve

17   their quality of life, they wouldn't -- that they

18   wouldn't be able to get because you can't get aggressive

19   treatment when you're on hospice services.  It's comfort

20   care only, no aggressive treatment.

21     Q.   And can you give an example to the jury?

22     A.   Physical therapy.

23     Q.   Any other?

24     A.   Dialysis, chemo.

25     Q.   Now, I want to talk about some of the specific

1    patients who you saw.  Can we bring up what's previously

2    been admitted as Government Exhibit H-26.

3         Did you visit personally with this patient?

4    A.  Yes, Jack High, yes.

5    Q.  Can you tell the jury about Mr. High?

6    A.  Cute elderly man, loved to aggravate his wife.

7    She was -- his wife was about 15 to 20 years younger

8    than he was and she could get stressed out a little

9    easily and he just kind of wanted to be left alone and

10   he -- he liked to kind of get under her skin, and very

11   friendly man, though.  I was called out to -- he was on

12   service for Alzheimer's.  I was called out one day to go

13   and see him because he was complaining of knee pain.

14   And when I went to go and see him, he -- I asked him

15   what happened.  And he provided me with details of his

16   weekend, how his -- they had a celebration at home.  I

17   don't remember if it was a holiday, but they had a

18   celebration at his home and his kids and grand kids had

19   come over and he was enjoying the company and dancing

20   the Macarena in the living room with his family and

21   twisted his knee.

22   Q.  Dancing the Macarena, what -- was Jack High ever

23   terminal, expected to die within six months during the

24   time you saw him?

25   A.  No, and with the diagnosis he had he definitely

1    didn't meet Medicare's qualifications with his

2    diagnosis.

3        Q.   Can you explain to the jury why he definitely

4    didn't meet Medicare's qualification with his diagnosis?

5        A.   As an Alzheimer's or dementia patient, in order

6    to be considered terminal, basically the disease has to

7    be in the stage where there is no memory and the ability

8    to communicate is very limited.  So if you ask

9    someone -- if you ask a patient in the terminal stages

10   of dementia and Alzheimer's a question, they're not

11   going to be able to answer appropriately.  They're going

12   to give you scattered words that aren't relevant to the

13   question that you asked.  And the fact that Mr. High was

14   able to recall from a day or two prior his events of the

15   day, that goes to show his mental capacity was better

16   than the terminal -- the terminal level.

17       Q.   After Merida was shut down, did they refer

18   Mr. High to another hospice agency?

19       A.   Yes, the current hospice company that I work for,

20   he was referred.

21       Q.   And did your hospice company admit him?

22       A.   No.

23       Q.   Why not?

24       A.   He wasn't eligible based on Medicare's

25   guidelines.

1    Q.   Do you recall patient named James Allen?

2    A.   Yes.

3    Q.   What do you -- can you tell the jury about

4    Mr. Allen?

5    A.   Mr. Allen was a tall, slender African American

6    male, very, very nice, lived at home with his -- with

7    his sister, great sense of humor, loved company, and a

8    lot of times if -- when the staff would go and see him,

9    if we didn't tell him ahead of time like, hey I'm going

10   to see you next Monday, he would go run errands, he

11   would walk to the corner store and -- so there were

12   times that we would go and see him that he wasn't home

13   but you know we made sure and communicated that to the

14   staff so they knew, you know, if he didn't answer the

15   door that more than likely he was down at the corner

16   store or at a friend's house.

17   Q.   Was Mr. Allen dying when he was at the corner

18   store or at a friend's house?

19   A.   No, he was on service for COPD.

20   Q.   Can you explain to the jury what that is?

21   A.   Chronic obstructive pulmonary disease, it's

22   significant breathing disorder.  Medicare's guidelines

23   for COPD states that the patient has to be on oxygen 24

24   hours a day and, Mr. Allen was not dependent on oxygen

25   24 hours a day.

1    Q.   How long was Mr. Allen on hospice services during

2   the time you were Merida Group?

3    A.   I believe he was on the whole time.  I know he

4   was still on services when I left.

5    Q.   And how -- how long were you there again?

6    A.   A year and a half, I believe.

7    Q.   Do you recall a patient named Aurora Montemayor?

8    A.   Yes.

9    Q.   Can you tell the jury about Ms. Montemayor?

10    A.   Very sweet lady, she shared a home with her

11   family but she was usually home by herself.  You -- in

12   order to enter her home, you didn't use her front door,

13   you had to use the side door to the garage but when you

14   would get to the home, because she was home alone, you

15   would ring the doorbell and she would greet you from --

16   she would come from her room to greet you at the door.

17   Her room was on the far end of the house so for her to

18   walk to the door to come and greet you was probably

19   about 50 feet, and I do believe she was on services for

20   COPD as well.  Again, supposed to be on oxygen 24 hours

21   a day and most of the time when she'd greet you she

22   didn't have her oxygen on.

23    Q.   And how long was she on hospice at the Merida

24   Group during the time that you were there?

25    A.   I believe -- the -- I know she was still on

1    services when I left, I believe the majority of the

2    time, I don't remember her exact admission time.

3        Q.   Now, you previously talked about how patients

4    waived their rights to curative treatment when they're

5    on hospice.  Did any patients receive worse care in your

6    opinion by being placed on hospice for -- with the

7    Merida Group?

8        A.   Oh, absolutely.

9        Q.   And can you give an example to the jury?

10       A.   There was a patient that we had on services, his

11   name was Richard McDonald, he was a very large man,

12   morbidly obese, over 400 pounds, relied -- he wasn't

13   able to walk because of his large size.  He required a

14   motorized wheelchair to get around his home.  And he --

15   he was on services for COPD and he kind of had an

16   awakening one day and said, you know what I'm only in my

17   50s, I've got a long life left to live and if I don't

18   change what I'm doing, I'm going to die and I am

19   not ready for that yet.  You know, my kids are just out

20   of high school, he told me this, my kids are just out of

21   high school, you know they'll be getting married, going

22   to college, getting married, I want to see my grand kids

23   get, you know, be born and help raise them, and where

24   I'm at I'm not going to be able to do that.

25           So he started eating better so he could lose

1   weight, but he also wanted to start doing physical

2   therapy that way that would help him lose weight

3   faster to live a -- and so that way he would be more

4   mobile so he could start walking on his own again and

5   improve his quantity of life as well as his quality, but

6   mostly he wanted to improve his quantity of life.

7       Q.   And how was being on the hospice benefit

8   detrimental to Mr. McDonald?

9       A.   You can't receive physical therapy when you're on

10  hospice.   And so for Mr. McDonald he wouldn't have been

11  able to improve and receive the physical therapy that he

12  wanted to help increase his quantity and quality of

13  life.

14      Q.   And did you become aware of his primary care

15  physician contacting Merida?

16      A.   Yes.

17      Q.   And did you convey information his primary care

18  physician to the management team?

19      A.   The management team was aware, the doctor himself

20  called the office and notified the management team that

21  he wanted Mr. McDonald removed -- discharged from

22  services.

23      Q.   And what were you told by other employees at

24  Merida that Rodney Mesquias wanted to do in response to

25  the request from the primary care physician that

1   Mr. McDonald be discharged?

2                MR. CANALES:  Objection, Your Honor, to the

3   question of calling for a response from other employees,

4   that calls for hearsay.

5                MR. FOSTER:  Rule 801(d)2(d), Your Honor,

6   made by an employee within the scope of the relationship

7   directing her how to care for this patient.

8                THE COURT:  Overruled, I'll allow it.

9                THE WITNESS:  Rodney's response when he was

10  notified -- I'm sorry, Mr. Mesquias' response when he

11  was notified was he didn't care what the primary

12  physician wanted the patient wasn't coming off of

13  services.

14      Q.  (By Mr. Foster)  Did you in fact overhear a

15  conversation later on involving the management team and

16  Defendant Mesquias?

17      A.  In the same patient, yes, I did.

18      Q.  And then that was later in time?

19      A.  Yes.

20      Q.  Another conversation?

21      A.  Yes.

22      Q.  And where were you when that conversation

23  occurred?

24      A.  I was in one of the offices, the -- our office

25  wasn't very big.

1    Q.   And were you able to hear Defendant Mesquias

2    talk?

3    A.   Yes.

4    Q.   And what did you hear?

5    A.   The management team notified Mr. Mesquias that

6    Mr. McDonald's primary care physician had called the

7    office again, was very upset that Mr. McDonald still had

8    not been taken off services, that the physician, the

9    primary care physician demanded that he be taken off of

10   services, and Mr. Mesquias replied that he didn't care,

11   he wasn't discharging the patient, that the office was

12   not to discharge the patient.

13   Q.   What did Defendant Mesquias sound like when he

14   said that?

15   A.   He was very angry.

16   Q.   And did he express any concern about what the

17   primary care doctor thought?

18   A.   He said he didn't care what the primary care

19   physician wanted.

20   Q.   And you're -- are you aware whether Merida then

21   continued to submit claims for hospice services for

22   Mr. McDonald?

23   A.   Yes, Mr. McDonald stayed on services after that,

24   yes.

25   Q.   Now, you talked about the IDT meetings that you

1    were present at?

2       A.   Uh-huh.

3       Q.   And can you describe to the jury what doctors

4    attended these IDT meetings at the Merida Group?

5       A.   Dr. Virlar and Dr. Gonzaba.

6       Q.   Did primary care doctors ever attend?

7       A.   No.

8       Q.   Now, you said the -- that Dr. Virlar discussed

9    each patient for about five seconds before recertifying

10   them, is that the same or different from your experience

11   with IDT meetings at other hospices you worked at?

12      A.   Very different.

13      Q.   Can you explain that to the jury?

14      A.   In the IDT meetings for the current company that

15   I work for each patient is discussed at least five to

16   ten minutes each time.  And the IDT meetings with

17   Merida, the nurses would usually just say, oh no changes

18   still qualifies and while the doctor was texting or

19   having a phone conversation on his phone not listening.

20      Q.   And you talked about Dr. Virlar, were you also

21   present at IDT meetings with Dr. Gonzaba?

22      A.   Yes, I was present for both.

23      Q.   And how long was each patient discussed at the

24   IDT meetings with Dr. Gonzaba?

25      A.   Ten seconds.  Again the nurses would give about

1    the same response, no changes, patient still eligible.

2    Dr. Gonzaba at least listened to what he was being told,

3    but no questions were asked, no digging deeper about the

4    patients or their -- their qualifications.  They just

5    signed off on the forms.

6        Q.   Did Dr. Gonzaba recertify every patient at the

7    IDT meeting?

8        A.   Yes.

9        Q.   Now, can you give the jury -- you've given the

10   jury a number of examples, do you recall a patient Ms.

11   Carson?

12       A.   Yes.

13       Q.   And can you describe to the jury Ms. Carson?

14       A.   Very sweet elderly lady on services for

15   Alzheimer's.  She lived with her daughter.  Loved to

16   eat, every time you went to see her she was always

17   asking when her next meal was.  She -- again, she was on

18   services for Alzheimer's.  Multiple times I would go to

19   see her for visits and she was always very

20   conversational.  If you went to go and see her, you

21   know, Monday or Tuesday, ask her how her weekend was she

22   could give you a full report on her weekend.

23       Q.   And did she qualify for hospice services?

24       A.   Not with -- not with the diagnosis Alzheimer's.

25       Q.   And were you present when Defendant Mesquias was

1    notified that Ms. Carson did not qualify for hospice

2    services?

3        A.   Yes.

4        Q.   And did you overhear a conversation involving

5    Defendant Mesquias where this topic was discussed?

6        A.   Yes.

7        Q.   Can you tell the jury what you overheard?

8        A.   The nurse, the primary nurse for the patient

9    verbalized her concern to the manager Amy that the

10   patient was not appropriate for services.  I was present

11   in the office when the nurse manager Amy then brought it

12   to Rodney's attention that there was concern that Ms.

13   Carson didn't qualify and that it was very strongly

14   viewed that she didn't qualify and that she would

15   probably need to be taken off of services.  And Rodney

16   became very angry and yelled at Amy, don't mess with my

17   patients, don't mess with my money.

18       Q.   And can you describe how angry he was?

19       A.   Oh, he was very angry.  He was yelling.

20       Q.   And how many people were around the office while

21   he was yelling, don't mess with my patient, don't mess

22   with my money?

23       A.   Ten.

24       Q.   And was it easy to hear him or hard to hear him?

25       A.   Oh, it was very easy to hear.

1    Q.   And what did you take it to mean when he said his

2    patients?

3    A.   His money.

4    Q.   And how did it make you feel to hear him say

5    that?

6    A.   Very uneasy.  It was like he felt that he -- he

7    owned these people and they're patients that we're

8    supposed to be caring for, there's no ownership there.

9    Q.   Are you aware as to whether Merida continued to

10   submit claims for Ms. Carson even after Mr. Mesquias was

11   told that she didn't qualify?

12   A.   Yes.

13   Q.   Now, did you continue to research the rules and

14   regulations related to hospice?

15   A.   Yes.

16   Q.   Did you become increasingly concerned?

17   A.   Yes.

18   Q.   What were you concerned about?

19   A.   That it was being brought to Rodney's attention

20   that there were parents on services that didn't qualify

21   and he was refusing to discharge them.

22   Q.   And did you eventually decide to leave the Merida

23   Group?

24   A.   Yes, I did.

25   Q.   Why did you decide to leave?

1    A.   I mean, I worked very hard for my nursing license

2    and I didn't -- felt like I was working for someone who

3    was intentionally committing Medicare fraud and by

4    staying employed with him that puts my license on the

5    line and I worked too hard to get that, I wasn't going

6    to lose it because of somebody else.

7    Q.   Did you meet with any of the medical directors

8    before you left?

9    A.   No.

10   Q.   Did you meet --

11   A.   Oh, yes, I did, I'm sorry, yes.

12   Q.   And who did you meet with?

13   A.   Dr. Gonzaba.

14   Q.   And is Dr. Gonzaba one of the directors who

15   signed orders for patients who didn't qualify?

16   A.   Yes.

17   Q.   And what did you tell Dr. Gonzaba?

18   A.   I had to go to his office to have some orders

19   signed, and in that time I hadn't notified the

20   management at Merida that I was leaving, but I did

21   convey to Dr. Gonzaba that I was planning on leaving the

22   company.  And he replied back that he was sorry to see

23   me go, he enjoyed working with me, but then informed me

24   that he was also looking for a way out because he didn't

25   like the things that were going on in the company, but

 1   he was afraid of what Rodney might do to him.

 2       Q.   And did you subsequently decide to leave the

 3   company?

 4       A.   Yes.

 5       Q.   And did you quit or were you terminated?

 6       A.   I quit.

 7       Q.   And after you quit, did you file any sort of

 8   complaint?

 9       A.   I notified Medicare of the fraud that was going

10   on.

11       Q.   And was it important to you to file that

12   complaint?

13       A.   Oh, absolutely.

14       Q.   And can you explain to the jury why that was?

15       A.   I mean hospice is a wonderful benefit that so

16   many people benefit from and, you know, people that are

17   intentionally billing Medicare for services, billing

18   Medicare for millions of dollars for services that

19   aren't warranted, I mean, that's a lot of money that the

20   Government's putting out that could be used for other

21   things.

22               MR. FOSTER:   Thank you.

23               No further questions, Your Honor.

24               THE COURT:   Thank you.  Gentlemen, the

25   Government used, approximately, 46 minutes.  I'll give

1    the defense same amount of time, 46 minutes as well.  So

2    let's just round it up to 50, 50 times three is easier

3    for me so we'll do it that way.  Three 50-minute

4    sessions.

5                        CROSS EXAMINATION

6    BY MR. HECTOR CANALES:

7        Q.  Good afternoon, Ms. Kelso, how are you?

8        A.  Good afternoon.  I'm good, thank you.

9        Q.  My name is Hector Canales; I represent Rodney

10   Mesquias in this case, okay?

11       A.  Okay.

12       Q.  Did you personally at your -- during your time at

13   Merida, did you personally ever commit health care

14   fraud?

15       A.  Not to my knowledge.

16       Q.  Okay.  And so any work that you did then you

17   stand behind 100 percent?

18       A.  Yes.

19       Q.  All right.  You wouldn't have put -- you would

20   not have personally been involved in the care of

21   somebody that you believed was part of some fraud,

22   right?

23       A.  Not intentionally, no.

24       Q.  Okay.  Well, as you sit here today

25   unintentionally, did you unintentionally commit a fraud?

1    A.   Yes, I did unintentionally.

2    Q.   With who?

3    A.   The patients that I was seeing.

4    Q.   And what -- what was that?

5    A.   I'm sorry?

6    Q.   What fraud did you commit?

7    A.   Seeing patients that weren't eligible for

8    hospice.

9    Q.   Okay.  And you didn't tell anybody you -- you

10   kept these opinions to yourself?

11   A.   No.

12   Q.   All right.  So you told people, as soon as you

13   had this opinion that you were working with patients,

14   you said something, right?

15   A.   Yes, I did.  I, I asked my manager directly Amy

16   when I began educating myself on what the hospice

17   guidelines were and began realizing that the patients we

18   had on services didn't meet Medicare's guidelines, I

19   went to my boss who was in charge of -- who was my

20   superior and who I reported to and asking her, you know,

21   well, why -- why is this patient on hospice, why are

22   they appropriate.  And she would give me her opinion of

23   what made the patient eligible, so then I would then do

24   further research and I didn't agree with what she was

25   told.

1    Q.   So you're talking about Amy Cooley?

2    A.   Yes.

3    Q.   All right.  So you would tell Amy Cooley that you

4    had problems with -- you disagreed with the physician's

5    clinical judgment about hospice eligibility, right?

6    A.   No.

7    Q.   You wouldn't tell her that?

8    A.   No.

9    Q.   Okay.  Well, what did you tell her?

10   A.   I asked her why they were appropriate for hospice

11   and she gave me her opinion.

12   Q.   And you weren't satisfied with Amy Cooley's

13   opinion?

14   A.   Right.

15   Q.   Did you -- Dr. Gonzaba, did you ever tell

16   Dr. Gonzaba that you disagreed with his clinical

17   judgment?

18   A.   No.

19   Q.   Why not?

20   A.   Because he really didn't know anything about the

21   patients to have clinical judgment.  The nurses were

22   just telling him the patient is appropriate.  He never

23   questioned the nurses, well what's their condition, well

24   what's happened over the last several months, he never

25   dug into -- he just signed the paperwork that was put in

1    front of him.

2        Q.   How do you know Dr. Gonzaba didn't review the

3    patients outside of your presence?  Is that possible?

4        A.   No, he didn't go to homes.

5        Q.   Right, but there's medical records, right?

6        A.   There are medical records, yes.

7        Q.   You created medical records yourself.  When you

8    would go to the home, you would document what was in

9    there, right?

10       A.   Uh-huh.

11       Q.   Is that a yes or a no?

12       A.   Yes, I'm sorry, yes.

13       Q.   You documented patients?

14       A.   Uh-huh.  Correct.

15       Q.   Now, I take it you knew before you had day one of

16   experience as an LVN or within hospice or anything that

17   falsifying that -- that you don't put false information

18   in a medical record, right?

19       A.   Right.

20       Q.   And did you ever do that, did you personally ever

21   say something in a medical record that wasn't true?

22       A.   Not that I recall.

23       Q.   Well, have you ever?

24       A.   No.

25       Q.   You don't --

1      A.   Not intentionally.

2      Q.   Right.  Right.  But if you put it in a medical

3   record and you did it, it was the truth?

4      A.   At the time, yes, I felt it was.

5      Q.   Okay.  But again, with Dr. Gonzaba, you didn't

6   express your disapproval, or your difference of opinion

7   in terminal illness; did you, to him directly?

8      A.   No.

9      Q.   Did you have an opportunity to do that?

10      A.   I could have made the opportunity.

11      Q.   But you made a conscience decision not to?

12      A.   Yes, because I knew even if Dr. Gonzaba wanted

13   the patient off of services they wouldn't be taken off

14   of services.

15      Q.   That was an assumption you made?

16      A.   No, there was two separate accounts.  When

17   physician -- when patients should have been taken off of

18   services and they weren't.

19      Q.   And how long did you remain employed where --

20   where you held these beliefs?

21      A.   I didn't -- I was there probably close to a year

22   before I started doing my own research.  And once I

23   started doing my own research, it wasn't an overnight

24   thing, it was, you know, I live life so I would look up

25   a little bit here and then maybe a couple weeks look up

1    a little bit more here, and I mean it was a cumulation

2    of education, it wasn't just an overnight cram session.

3        Q.   And you as part of this education, did you say

4    Google is a wonderful thing, did you -- did Google send

5    you and find your way to -- to the CMS website?

6        A.   I -- I mean this was five years ago, I believe it

7    was the CMS website, but I looked up what Medicare's

8    regulations were and I was -- found what the hospice

9    criteria was.

10       Q.   And -- and did you find in your research that

11   Medicare -- Medicare's position on assessing and

12   prognosing terminal illness that it is -- Medicare's

13   position is that it's an inexact science, did you find

14   that?

15       A.   Uh-huh.  Absolutely.  Yes, I'm sorry, yes.

16       Q.   Absolutely.  In other words, and as an LVN,

17   correct?

18       A.   Yes.

19       Q.   All right.  As an LVN, you understand the

20   difference between a diagnosis and a prognosis, correct?

21       A.   Correct.

22       Q.   All right.  And as it comes to you from the

23   cert -- now, are you qualified under the medical --

24   under the Medicare's rules, can you, with your training

25   with your LVN status, are you eligible according to the

1    Government Medicare to certify a patient for hospice?

2        A.  No.

3        Q.  Why not?

4        A.  Medicare says that an -- well, as far as

5    admission a physician has to certify them, but RN's are

6    the ones who admit -- have to admit a patient onto

7    services.

8        Q.  Right, but doctors only M.D.'s and D.O.'s can

9    certify, right?

10       A.  Correct.

11       Q.  Right.  And since you're not, your opinion or

12   your prognosis from Medicare's standpoint is invalid,

13   right?

14       A.  No.

15       Q.  So but you do agree that a prognosis, would you

16   not agree that a prognosis is a prediction of the

17   future?

18       A.  In the medical field it's based on the patient's

19   condition and the trends of the patient's condition.

20       Q.  Sure, that's what -- that's what the prediction

21   is based on, right?

22       A.  Right.

23       Q.  Right.  But it is a -- it is a prediction of --

24   into the future, a prognosis, right?

25       A.  Yes.

1   Q.   A diagnosis is something looking to the present

2   or past, right, something that -- that's -- this is what

3   you have currently?

4   A.   Uh-huh.

5   Q.   Correct?

6   A.   Correct.

7   Q.   And the prognosis has to take into that diagnosis

8   what do you have, and then the doctor makes a clinical

9   judgment based on that diagnosis, and is that it, or

10  does the doctor look to other things in hospice or to

11  just the diagnosis, the primary diagnosis?

12  A.   I mean the doctor's with Merida didn't even look

13  at the diagnosis.

14  Q.   Ma'am, my question to you was whether or not in

15  making a prognosis doctors solely look at the primary

16  diagnosis, or do they also look at secondary diagnoses

17  and other co-morbidity factors of a patient?

18           MR. FOSTER:  Objection, speculation, vague

19  as to which doctors as well.

20           MR. CANALES:  I'm asking her in her training

21  as an LVN and her personal experience, Your Honor, what

22  a prognosis is based upon.

23           THE COURT:  I'll allow the question.

24           THE WITNESS:  Yes, it is.

25           THE COURT:  Answer if you know.

1              THE WITNESS:  Yes, it is based on all their

2     comorbid's and their past medical history.

3         Q.  (By Mr. Hector Canales)  Would you agree that the

4     clinical judgment of a doctor for hospice certification

5     is done on a holistic approach?

6         A.  Not sure I understand the question.

7         Q.  All right.  Well, holistic meaning that you look

8     at the -- you look at the whole picture you don't look

9     at a snapshot of a patient to determine whether or not

10    to -- to develop a prognosis clinical judgment about

11    their life expectancy, you look at it holistically, you

12    look at the entire patient, right?

13        A.  Right.  Correct.

14        Q.  So we're in agreement then that when it comes to

15    the hospice certification it's -- it should be done in a

16    holistic approach versus a snapshot, right?

17        A.  Correct.

18        Q.  And you can't get into anybody's mind other than

19    yourself about a -- another doctor's clinical judgment

20    when it -- with regards to life expectancy, right?

21    You're not a mind-reader, right?

22        A.  Correct.

23        Q.  And have you ever experienced in your career

24    where two doctors have a different opinion about the

25    same patient?

1        A.   Absolutely.

2        Q.   And does that mean one doctor is right and the

3   other doctor is wrong?

4        A.   No.

5        Q.   Both can be right, correct?

6        A.   Correct.

7             THE COURT:  Ms. Kelso, again --

8             THE WITNESS:  Sorry.

9             THE COURT:  That's quite all right.

10       Q.   (By Mr. Hector Canales)  And that's not unusual

11   at all.  I'm sure in your life maybe you've heard of, or

12   maybe you've done, have you ever asked for a second

13   opinion?

14       A.   Yes.

15       Q.   Right?  And oftentimes the second opinion is

16   different than the first opinion, doctor's opinion,

17   right?

18       A.   Sometimes.

19       Q.   Because there are -- sometimes, right?  And again

20   in that situation when two doctors exercising their

21   clinical judgment looking at the same patient come to

22   different conclusions, that happens everyday in

23   medicine; doesn't it?

24       A.   It does.

25       Q.   And nurses can disagree with doctors all the

1    time, right?

2        A.   Correct.

3        Q.   And that's what we have here, right, don't we?

4    We have a disagreement between you and Dr. Gonzaba as

5    you've been describing?

6        A.   No.

7        Q.   No, you agree with him then?

8        A.   No.

9        Q.   Okay.  Well, I -- is there another option, you

10   agree or disagree with him, which is it?

11       A.   They didn't have any opinions on whether the

12   patients qualified, they just signed the paperwork.

13   They didn't know enough about the patients to make an

14   informed decision whether they qualified.

15       Q.   And you know this because of your conversations

16   with Dr. Gonzaba what knows and didn't know?

17       A.   Because of the IDT meetings that I explained

18   earlier that I was at every two weeks with both doctors

19   and I led those IDT meetings letting the nurses know

20   which patients needed to be discussed at what point in

21   time, and I heard the conversations that went -- that

22   took place and the lack of information being given to

23   the doctor as he's signing the paperwork.

24       Q.   And which IDT meeting, which patients are you

25   talking about, ma'am?

1    A.   All of them.

2    Q.   Who?  Can you give us a name?

3    A.   From five years ago?

4    Q.   Yeah.

5    A.   No.

6    Q.   No name?

7    A.   With all of the patients that were discussed

8    every single day, I mean if you have the IDT meetings, I

9    would --

10   Q.   Were you involved, ma'am, with every single

11   patient that Merida had?

12   A.   Yes.

13   Q.   Every single one, in all those locations, you

14   were -- you were the nurse on all of them?

15   A.   In the San Antonio office I was.

16   Q.   Okay.  All right.

17   A.   I was in charge of keeping, maintaining the

18   agenda which had all of the patients on services, I was

19   in charge of keeping track of the census.  So every

20   single patient that was admitted onto services, I had to

21   write it down, I assigned who the nurse was, I assigned

22   who the chaplain was, the social worker, I even assigned

23   who the hospice medical director would be, and every two

24   weeks we discussed every single patient that Merida had

25   on services, so, yes, I was involved in every single one

1    of the patients that was on services in the San Antonio

2    office.

3        Q.   All right.  Well let's talk about one of those

4    patients right now.

5            Roy, can you put up the combination of H-26 and

6    from -- which is -- all right.  Here we go.

7            So let's get specific here.  Let's talk about the

8    patient that the Government has alleged in this case,

9    Mr. Jack High.  You spoke about him earlier.

10       A.   Yes.

11       Q.   Okay.  In this particular case, Count Two

12   involves the time period of August the 14th, 2013

13   through October the 12th of '13.  See that?

14       A.   Yes.

15       Q.   All right.  And here is the certification period.

16   And down in the bottom right corner that's the

17   certification of Dr. Greg Gonzaba, correct?

18       A.   Yes.

19       Q.   And you disagree with Dr. Gonzaba's certification

20   here?

21       A.   It's my opinion the patient wasn't appropriate

22   for services.

23       Q.   Okay.  All right.

24           Roy, let's go to Mesquias 00252963.

25           Now, as part of your job, you conducted some

1    professional services, right, part of those would be

2    making visits to the -- to the patients, right?

3        A.   Correct.

4        Q.   And that's a professional service you rendered,

5    right?

6        A.   Correct.

7        Q.   And you got paid for it, right?

8        A.   Yes.

9        Q.   Was that a bribe when they paid you for it to do

10   that job?

11       A.   No.

12       Q.   Okay.  So, here, we have here, we start off looks

13   like this was your -- it says there agent name Amber

14   Kelso, that's you, right?

15       A.   Correct.

16       Q.   And you visited Mr. High on December 18th of

17   2012, right?

18       A.   Correct.

19       Q.   That is about ten months before the certification

20   period that the Government has put in issue here of

21   August of '13; see that?

22       A.   Okay.

23       Q.   All right.  And there's a time in and time out.

24   How long did you spend with Mr. High?

25       A.   According to that it -- that is I believe 42

1    minutes.

2        Q.   42 minutes.   42 minutes, okay.   Now, this record,

3    you created it?

4        A.   Did I complete the documentation that is present,

5    yes.

6        Q.   Yeah.   And is it reliable, the information that

7    is in this record, is it reliable?

8        A.   I believe so at the time.

9        Q.   Was it truthful?

10       A.   Well, I don't know, I can't see the documentation

11   from the vital signs that you're showing me.   I would

12   assume that they're correct.

13       Q.   You don't know if your own document is -- is

14   truthful or not?

15       A.   (No response.)

16       Q.   Let me ask you this:   What causes you to not be

17   able to give a -- or what's your hesitation in being

18   able to give an affirmative yes or no to whether or not

19   a document you created is truthful?

20       A.   Documentation that I complete on patients was

21   always -- always truthful in my own opinion at the time.

22   Is it truthful to the -- I can't say is it truthful to

23   what I later learned but, at the time, I answered the

24   way that I was educated.

25       Q.   Do you know what's in this document?

1    A.   No.

2    Q.   Has the Government --

3    A.   I mean it's a note from a visit that I did on

4    December 18th on the patient.

5    Q.   Right.

6    A.   That's all I know.

7    Q.   It should be no big deal, right?

8    A.   Right.

9    Q.   And has the Government ever reviewed with you

10   the -- the notes that you made on -- on -- on Jack High

11   or any other patient?

12   A.   No.

13   Q.   Okay.   That's a pretty precise 8:52.   Did you put

14   in 8:52 or 10:52, excuse me?

15   A.   The program that we used, it was a program that

16   was on -- it required an electronic device the company

17   provided us with cell phones and so when you log into

18   the program and click the button start visit, it

19   captures whatever time.   So did I physically put that

20   time in, no, my device captured that time of when I

21   clicked the start button.

22   Q.   Oh, so it doesn't even give you the option to

23   make it longer or shorter, that's actual, as an

24   electronic part of the software?

25   A.   Correct.   Uh-huh.   Correct.

1    Q.  And -- and who provided you that cell phone?

2    A.  The Merida company.

3    Q.  Okay.  And that software who provided -- did you

4    have to get that -- as an LVN to get your job, did you

5    have to get that software?

6    A.  The company --

7    Q.  Come out of pocket for it?

8    A.  Again the company provided it.

9    Q.  Okay.  All right.  Any idea of the cost of what

10   it cost a hospice company to subscribe to these

11   software?

12   A.  No.

13   Q.  Any idea what it costs the company to outfit all

14   of its nurses, or outfit you with the cell phone?

15   A.  No.

16   Q.  All right.  Are you the -- have you ever been the

17   owner of a business?

18   A.  No.

19   Q.  So I take it then you've never made payroll, had

20   to make payroll?

21   A.  No.

22   Q.  So, all right, so we're -- you're there for --

23   between 8:52 and 11:34, you -- and you do the vitals

24   there.  And Mr. High -- how old is he?

25   A.  I'm not sure, it's not showing.

1    Q.   There's got to be a date of birth on here

2    somewhere.  Let's see -- we'll find it in a second.

3    I'll represent to you he's 76 years old at the time;

4    sound about right?

5    A.   I'm not sure.

6    Q.   Okay.  All right.  When I come across it later,

7    we'll point that out.

8    A.   I would guess 70s, 80s when at the time, not

9    sure.

10   Q.   Okay.  Fair enough.  There's 122.8 pounds; do you

11   see that?

12   A.   Yes.

13   Q.   Why would you take the weight of a man?

14   A.   Because his wife insisted on it because she said

15   he didn't eat enough and she was worried about him

16   constantly losing weight.

17   Q.   Is it a problem within elderly care where you

18   have a lot of weight loss within a short period of time?

19   A.   Correct.

20   Q.   I'm sure you've seen and know of the standard of

21   losing more than ten percent of your body weight within

22   a -- how long of a period of time as an indicator for

23   terminal illness?

24   A.   They -- they take it into consideration for the

25   last three months.

1    Q.   Three months?

2    A.   Three months, six months.

3    Q.   That's part of the holistic approach, right?

4    A.   Uh-huh.   Correct.

5    Q.   That's not maybe due to any particular disease,

6    but you got to look at what's going on with the -- with

7    the patient.   If you're losing a lot of weight, that can

8    relate in what's called failure to thrive, are you

9    familiar with that diagnosis?

10   A.   I am and it's not a Medicare approved hospice

11   qualifier.

12   Q.   Well thank you for that.   But it is recognized by

13   the medical community, right?

14   A.   It is.

15   Q.   Okay.   All right.   That's a real issue for -- for

16   people, for the elderly, a failure to thrive, right?

17   A.   Yes.

18   Q.   Are you trying to leave the impression with the

19   jury with your extra answer there that failure to thrive

20   isn't a real serious problem for people?

21   A.   Not at all.

22   Q.   Okay.

23   A.   I'm saying that unfortunately Medicare doesn't

24   recognize that as a reason to qualify for hospice, that

25   alone.

1     Q.   But a doctor can take that into account in a

2   holistic approach if they feel it's happening, right?

3     A.   Absolutely.

4     Q.   Okay.  And you can be failing to thrive as an

5   individual because your mind is -- is -- is

6   deteriorating, right?

7     A.   I'm not sure I understand the question.

8     Q.   Well, with Alzheimer's patients, dementia, people

9   with severe dementia, the mind is -- the brain is an

10   organ too, right?

11    A.   Absolutely.

12    Q.   Right.  And you can have -- your brain can be

13   failing you and that organ can be failing you in such a

14   way that it makes you -- it -- it makes you sick, right?

15    A.   Yes.

16    Q.   Okay.  So let's keep going on here.  And so

17   there's an assessment, scroll up, Roy, right there.

18   Starts with your identifying the patient, can you

19   identify the patient's name and visual recognition; do

20   you see that?

21    A.   Yes.

22    Q.   And just to kind of so that the -- the jury

23   hasn't seen one of these exact -- this format before,

24   you see patient identifier and then describe to them

25   there's -- looks like there's no question mark at the

1    end, but there's a -- a line that, you know, there's a

2    statement that's underlined and then underneath it looks

3    like a little bit bolder print and you have patient name

4    and visual recognition.  How is this program designed?

5    What's going on there?

6       A.   The underlined portion is the question asked by

7    the program and the bold responses underneath are the

8    options that I selected.

9       Q.   Now, these programs are -- are -- are medical

10   records programs that hospice businesses subscribe to,

11   correct?

12      A.   Yes.

13      Q.   Right?  And those programs are designed and

14   advertised as to help the hospices comply with all the

15   rules and regulations, right?

16      A.   Correct.

17      Q.   So they're asking you, they create the form for

18   the nurses and for the hospice business, they ask all

19   the right questions and for you to -- so that you can

20   create the documentation, right?

21      A.   Correct.

22      Q.   Right.  Now, is this a requirement in your

23   research, ma'am, did you find that -- that -- that

24   Medicare, that the Government requires hospices to

25   subscribe and to pay for any of these electronic medical

1    record services that provide all of this stuff?

2        A.   No.

3        Q.   That's an option, right?

4        A.   Correct.

5        Q.   And that was an option that -- that Mr. Mesquias

6    made, took in terms of getting these software programs,

7    getting you the cell phone so that you could make sure

8    and ask the right questions and document, right?

9        A.   I would assume so.

10       Q.   Okay.

11       A.   He didn't directly tell me.

12       Q.   Okay.

13       A.   But I would assume so.

14       Q.   All right.  And so let's -- let's go to the next

15   page, Roy.  Same doctor.

16            It asks the questions and there's on this

17   assessment:  Indicate the patient's current

18   cardiovascular status, mark all that apply.  What did

19   you mark?

20       A.   Deteriorating.

21       Q.   All right.  Is that true?

22       A.   I would assume so at the time.

23       Q.   You must have had seen -- had some basis to do

24   that, right?

25       A.   Correct.

1    Q.   Were you alone at this meeting?

2    A.   Was I alone in the --

3    Q.   Right, did anybody from Merida go with you?

4    A.   I don't recall.

5    Q.   All right.  Was Mr. Mesquias hovering over you,

6    yelling at you in a bad mood telling you to put

7    deteriorate?

8    A.   No.

9    Q.   Okay.  All right.  How about -- we go down,

10   there's another deteriorating.  No, it's -- okay.

11   Patient indicates current nutritional status, what did

12   you say?

13   A.   Deteriorating.

14   Q.   Right.  You indicate the patient's nutritional

15   status deteriorating, right?

16   A.   Yes.

17   Q.   All right.  And then again you say, you indicate

18   the current status of the patient's mental status.

19   Deteriorating, right?

20   A.   Correct.

21   Q.   Below that, his emotional status, deteriorating,

22   right?

23   A.   Correct.

24   Q.   Then the -- at the very bottom there it says

25   indicates status of the patient's mood, deteriorating,

1  right?

2      A.  Correct.

3      Q.  Anxiety score, caregiver assisted, what's that

4  mean?

5      A.  His wife, his wife would be the caregiver.

6      Q.  Okay.  All right.  But it seems to be pretty

7  clear here you're saying Mr. High is getting worse?

8      A.  No, it's just saying that day he was having a bad

9  day.

10     Q.  That --

11     A.  What are --

12     Q.  How come it doesn't say that?

13     A.  Because that's not an option.  You can't type in

14  your own responses, there's only certain options that

15  you can choose from, and having a bad day or being

16  grumpy isn't an option.  Deteriorating or no change, I

17  don't recall now what the different options were but I

18  do definitely know that you couldn't type in your own

19  response and you couldn't check grumpy or having a bad

20  day, the only option was to --

21     Q.  There was no option to put in your own response?

22     A.  Not that I recall.

23     Q.  Okay.

24     A.  There might have been and I just don't recall.

25     Q.  Okay.  All right.  Let's go to the next page.

1    Keep going down.  Right there.  Zoom in on right above

2    the narrative.

3              THE COURT:  Excuse me, Mr. --

4              THE MARSHALL:  Your Honor, one of the jurors

5    needs a break.

6              THE COURT:  Somebody needs a break?  That's

7    fine.  Mr. Canales, let's take a very brief recess.  You

8    can also take a brief recess.

9              THE WITNESS:  Okay, thank you.

10             COURT OFFICER:  All rise for the jury.

11             (JURY OUT.)

12             THE COURT:  Thank you, everyone.  We'll be

13   in recess.

14             (COURT IN SHORT RECESS.)

15             COURT OFFICER:  All rise for the jury.

16             (JURY IN.)

17             THE COURT:  Thank you, everyone.  Please be

18   seated.  Get everyone situated.

19             One second, Mr. Canales.

20             MR. CANALES:  Yes, sir.

21             THE COURT:  Mr. Foster, do we need to wait

22   on Mr. Lowell or --

23             MR. FOSTER:  One second, Your Honor.

24             THE COURT:  All right.

25             Thank you, Mr. Canales, please proceed.

1          MR. CANALES:  Thank you, Your Honor.

2     Q.  (By Mr. Hector Canales)  I kind of forgot where

3  we were.

4          Roy, did -- can we put that document back up?  Do

5  you need a page number?

6          THE CLERK:  There's a little delay in --

7          MR. HECTOR CANALES:  Oh, okay.  I gotcha, I

8  gotcha.

9     Q.  (By Mr. Hector Canales)  I apologize for turning

10  my back on you, ma'am, at times when I'm trying to do

11  this.

12     A.  That's okay.

13          THE COURT:  All right.  Let's get started.

14     Q.  (By Mr. Hector Canales)  Okay.  So, does this

15  refresh your memory here, this is the same -- by the way

16  the same document that we're just looking now, we're now

17  on the third page, does this refresh your memory now,

18  ma'am, that there is a narrative portion to the program

19  that allows you to put in whatever you want to put in?

20     A.  I'm very familiar with the program, I use it

21  everyday.  I'm aware that there's a narrative portion.

22     Q.  Okay.  All right.  I want to make sure -- before

23  you said it didn't give you the options to put in bad

24  day, it only gave you deteriorating as an option?

25     A.  I said for the specific questions it didn't give

1   me that option.

2       Q.   Okay.  But so just to make -- forgive me I

3   misunderstood you, then.  So there's a portion there at

4   the end for a narrative where you can type in whatever

5   you want?

6       A.   Correct.

7       Q.   Right?  Okay.  And let's -- so let's look at what

8   you typed in.  You said skilled nursing visit, 12/18/12

9   for patient on service with adult FTH, failure to

10  thrive?

11      A.   I'm not sure what that means, it -- there is an

12  option in the patient's medical records where their

13  diagnosis is listed and I copied it directly out of the

14  diagnosis area of the chart.

15      Q.   Well, it's your record, ma'am, you wrote FTH; my

16  understanding in the medical community FTH is a short

17  version for failure to thrive.  My question to you is

18  what did FTH mean to you here, what were you trying to

19  say?

20      A.   I copied it from the diagnosis section that was

21  in the patient's chart.

22      Q.   Okay.  I understand where you -- where you got

23  the information from, did you not know what FTH meant?

24      A.   I'm not sure.

25      Q.   And your testimony today sitting here today you

1  still don't know?

2      A.   As -- to me right now FTH does not mean failure

3  to thrive.

4      Q.   Okay.  All right.  Does it have any meaning to

5  you other than just the letters F, T and H?

6      A.   No.  I would -- if I typed it in, I would have

7  been FTT as failure to thrive, it could be that that's

8  how it was abbreviated in the diagnosis section, or I

9  may have accidentally hit the wrong letter and it's a

10  typo.

11     Q.   So it could be FTT?

12     A.   Could be.

13     Q.   All right.

14     A.   Not sure.

15     Q.   And failure to thrive and dementia?

16     A.   I'm not going to agree to failure to thrive

17  because I don't know what FTH means, dementia, yes.

18     Q.   Fair enough.  But it's true, is it not, that

19  failure to thrive and dementia do kind of go hand in

20  hand; don't they?

21     A.   Sometimes.

22     Q.   All right.  Patient PT, that's short for patient,

23  correct?

24     A.   Yes.

25     Q.   Patient resting in bed upon approval.  Patient

1   continues to refuse food resulting in gradual weight

2   loss?

3       A.   Correct.

4       Q.   Is that -- is that something you found or that

5   you copied from somebody -- some prior record?

6       A.   I would have looked at the -- when we see

7   patients at home we also take into consideration what

8   the family says.  The wife could have reported to me

9   that he's lost weight, or I looked in the medical record

10  at the previous weight that was in the chart and

11  compared it to what I obtained that day and saw a

12  gradual loss.

13      Q.   Okay.  So then you state episodes of confusion

14  and memory loss continue to increase.  You got that

15  information from somewhere, too, right?

16      A.   Could have been from the wife, not sure.

17      Q.   All right.  These things you don't have a clear

18  memory of as I'm asking you, correct?

19      A.   No, because I saw him on many occasions and that

20  was seven years ago.

21      Q.   Okay.  But some of the other testimony that you

22  had earlier this morning from the same seven year ago

23  period, you have very clear memories of -- of those

24  conversations; didn't you?

25      A.   They're very specific things that happened that

1   made them stick in my head, yeah.

2      Q.   So this just didn't stick in your head while

3   others do, that's your explanation?

4      A.   Correct.

5      Q.   Okay.  All right.  Patient denies any pain or any

6   other problems at the time, patient's wife to call with

7   any questions, concern or development of new sometimes?

8      A.   That was probably supposed to be symptoms, again,

9   that was a typo on my part.

10      Q.   All right, that makes sense.  So when you made

11   this record you knew that this record would be, or could

12   be relied upon by any physician that -- that comes into

13   contact with Jack High thereafter, right?

14      A.   At the time I will say no I didn't.  Looking at

15   the date I'd only been employed with the company for

16   maybe two months.

17      Q.   Right, but you knew and know just -- that's why

18   you have medical records, you take them in the first

19   place is because they -- other doctors, other nurses

20   come -- come after you, they -- so they can look at and

21   rely on what -- what -- the history, what was happening,

22   right?

23      A.   Uh-huh.

24      Q.   Was that a yes?

25      A.   Yes.

1    Q.  I'm sorry, the Court Reporter needs a yes or a

2    no, sorry.  And -- and that didn't take any specialized

3    training, that's something you learned in your training

4    to be a nurse, right, that medical records are going to

5    be relied upon by others?

6    A.  Correct.

7    Q.  So if a primary care physician can get the

8    records of a hospice group, right, and have an

9    understanding of what's going on and what the nurses and

10   things happen, right, so you get this holistic approach,

11   right?

12   A.  Uh-huh.  Yes.

13   Q.  Okay.  And that's what's -- and you knew that

14   when you wrote all this stuff down, you knew that these

15   records, they weren't -- you weren't taking them for

16   funzies, you were doing this because there is a role

17   within the medical -- as a nurse, right?

18   A.  Yes, and it was pertinent to the patient at that

19   time.

20   Q.  Okay.  And then here, if you look on the

21   intervention provided, number three, read number three.

22   Out loud, please?

23   A.  Instruct patient caregiver of the cause of pain

24   in the terminally ill.

25   Q.  Did you do that?

1    A.   I can't recall what was discussed during a visit

2  so long ago.

3    Q.   It says you did it though?

4    A.   It says I did.

5    Q.   And that's kind of --

6    A.   But what specific conversation took place, what

7  type of pain the patient was having, I'm not sure.

8    Q.   That's kind of the point of the record though so

9  we don't have to rely on your memory seven years later,

10  we can rely on the record, right?

11    A.   Right.

12    Q.   Okay.  Because your memory has limitations; does

13  it not?

14    A.   It can.

15    Q.   Now, Mr. High and -- and I appreciate -- I never

16  had the pleasure of getting to know Mr. High, but I

17  appreciate the description of him as a happy man.  But

18  as an Alzheimer's patient, he put a tremendous amount of

19  stress due to his condition upon his caregivers and his

20  wife and his family; did he not?

21    A.   Any family member that's taking care of a loved

22  one it's stressful.

23    Q.   Especially one with dementia, right?

24    A.   Can be.

25    Q.   All right.  And it was for -- it was for Ms.

1    High, do you remember her name?  Gloria?

2        A.   I didn't recall it until you said it.

3        Q.   Right.  Gloria High, that was his wife?

4        A.   Uh-huh.  Yes.

5        Q.   And she was under a lot of stress, right?

6        A.   Yes.

7        Q.   What's respite care?

8        A.   It is where the hospice benefit pays for a

9    patient to go to a nursing home for five nights so the

10   caregiver can have relief.

11       Q.   Why would a caregiver need relief?

12       A.   It's extremely exhausting caring for a loved one.

13       Q.   Do you recall approving respite care for -- for

14   Gloria --

15       A.   No.

16       Q.   -- and Jack?

17       A.   That was outside of my scope of practice.

18       Q.   All right.  Roy, can I -- can you pull up

19   Mesquias 00253373.

20            Let's look up at the top here.  Is that a humane

21   thing to do?  Is there really any medical need for --

22   for a patient to go to -- to have respite care?  Is it

23   for the patient or is it for the caregiver mostly?

24       A.   It's for both, if the caregiver is stressed they

25   don't take care of the patient as well.

1    Q.   Okay.  All right.  And -- and so here we have an

2    order from Dr. Virlar regarding -- on Jack High a verbal

3    order dated October 25th of 2013; do you see that?

4    A.   Yes.

5    Q.   That's two weeks after the certification period

6    the Government has put in issue here.  And it's for

7    respite care; do you see that?

8    A.   Yes.

9    Q.   Effective 10/25/13; see that?

10   A.   Yes.

11   Q.   Okay.  And if you'll -- let's go to the

12   signature -- oh, hang on Roy, real quick there.

13        And so you said four days or five days?

14   A.   Five -- five nights.

15   Q.   All right.  So and that's what this order is

16   consistent with your -- with your opinion there from the

17   25th to the 29th respite care?

18   A.   Okay.

19   Q.   And -- and -- and the Government pays for this to

20   go to the nursing home, to give a break to the

21   caregiver, to help the patient, right?

22   A.   Right.

23   Q.   Okay.  And let's go down and see -- let's go down

24   to that right there.  It says you approved it.  Do you

25   recall that?

1    A.   I do not.

2    Q.   Can you zoom in on that, Roy.

3         And -- and to be fair, Ms. Kelso, this was in

4    October of 2013.

5    A.   I see that.

6    Q.   So that's six years ago.  That's a long time ago.

7    But that's what the medical record says, right?

8    A.   Correct.

9    Q.   So this is an example of -- of where the -- your

10   memory is failing in comparison to the medical record,

11   right?

12   A.   I don't recall acknowledge -- or authorizing

13   that.

14   Q.   How about Placido Madera?  Do you know Placido?

15   A.   We called him Chacho.

16   Q.   Right, but that's a real person?

17   A.   Yes.

18   Q.   Okay.  All right.  Okay.  Thank you very much.

19   Let me -- Roy, can you put up Mesquias 00253378.

20        Now, I think you, at a minimum left the

21   impression that Dr. Virlar never saw a patient that he,

22   you know, wouldn't put into hospice, something to that

23   effect, right?  But -- but there are instances in which

24   Dr. Virlar and others discharged patients all the time,

25   too, right?

1       A.   Not for being inappropriate for hospice.

2       Q.   No?   And -- and would that somehow make a

3   difference in your opinion today if I showed you an

4   instance where doctors discharged them for -- for not --

5   no longer complying with -- no longer be part of --

6   eligible for hospice, would that make any -- change your

7   opinion at all today?

8       A.   There's lots -- there's multiple reasons why a

9   discharge order could be written, if a patient went to

10  the hospital, was admitted to the hospital, then --

11      Q.   If it specifically said -- excuse me.   If it

12  specifically said, because I don't think that they're

13  eligible for hospice anymore, would that change your

14  mind, or are you feet set in concrete and nothing I show

15  you would change your mind?

16      A.   I'm not saying it never happened, it would be

17  very rare if it did.

18      Q.   It would be what?

19      A.   Very rare.

20      Q.   Very rare, okay, well --

21      A.   If they were discharged for ineligibility.

22      Q.   All right.   We'll get back to that.   Here is an

23  order where Dr. Virlar is discharging Mr. High per the

24  patient request.   That's what it says, right?

25           Is that a yes, I'm sorry I just didn't hear.

1    A.   I didn't know you were asking me, yes.

2    Q.   That's what's happening here?

3    A.   That's what it says, correct.

4    Q.   And that's a valid reason.  If the patient wants

5    to revoke his election for hospice benefits and get back

6    onto a different curative treatment plan other than

7    palliative, that's his prerogative; that's his right,

8    right?

9    A.   Correct.

10   Q.   And it appears here Dr. Virlar honored that

11   request of Jack or Gloria High, right?

12   A.   Correct.

13   Q.   All right.  And let's go to the signature lines

14   here.  And you signed it.  You took that order from

15   Dr. Virlar; didn't you?

16   A.   Correct.

17   Q.   Because this was a verbal order, right, within

18   the medical field doctors give verbal orders to nurses

19   all the time and then the nurse, tell me if I'm wrong,

20   and then the nurse will document what the doctor said

21   and put it into the record, right?

22   A.   Correct.

23   Q.   That's what's happening up here, right?

24   A.   Correct.

25   Q.   So Dr. Virlar came to you and said Jack High, or

1   his wife want off of hospice, Ms. Kelso, make it happen

2   and you made it happen according to the medical record,

3   right?

4       A.  We actually notified him but, yes, he agreed.

5       Q.  All right.  That's not something that you told

6   the Government in preparation for your testimony here

7   today; did you?

8       A.  Do I remember every single piece of documentation

9   I documented on over seven years ago, no.

10      Q.  Okay.

11      A.  But I also don't recall why the patient was

12  discharged from services.  If they went to the hospital,

13  they had to be discharged from services otherwise

14  Medicare wouldn't pay for their hospital stay.  And that

15  was -- to my knowledge that was the only time patients

16  were ever discharged from hospice unless they passed

17  away is if they went to the hospital so Medicare could

18  pay for their hospital stay.

19      Q.  It doesn't say any of that here?

20      A.  Right.

21      Q.  And if at any time you felt like -- no, that's

22  okay.  All right.  Let's go, Roy, to Exhibit -- or still

23  Government Exhibit -- Government Exhibits for Jack High,

24  his medical records, 00252973.

25          This is another report of yours on Mr. High for

1    Count Two, okay?  But it is a year later from the first

2    one that we looked at.  I'll refresh your memory here.

3                   MR. CANALES:  May I approach, Your Honor?

4                   THE COURT:  Yes, sir.

5        Q.   (By Mr. Hector Canales)  This is the first one we

6    looked at Ms. Kelso, and it was -- sorry, wrong one, I'm

7    showing you the wrong one.

8            Well, in my confusion, I -- I can't find it right

9    now, I'll find it in a second.

10           Let's look at this one.  This one -- I'll submit

11   to you the other one was in 2012, in January of -- of

12   2012.  All right.  So we're looking at, same thing, Jack

13   High, and his weight is at 118 pounds; do you see that?

14       A.   Yes.

15       Q.   Okay.  I think the last time before that it was

16   120 or so, does that ring a bell?

17       A.   I believe it was 122.

18       Q.   All right.  122.  So percentage-wise how much is

19   that of a loss, those five pounds?

20       A.   Four pounds.

21       Q.   Four pounds, not much, right?

22       A.   No, not in a year.

23       Q.   Okay.  Okay.  All right.  You indicate there he

24   has a pain score of five, you see that, five out of ten?

25       A.   No.  All I can see are the --

1    Q.   I'm sorry, you've got to scroll up for me.  Keep

2  going.  It's right in the middle there, right there.

3         What's the HOS stand for, I don't know that one,

4  next to the pain score?

5    A.   Not sure.  It's not something I entered, it's

6  part of the program.

7    Q.   Okay.  Roy, let's go to page 3 of 6 of that

8  document, ending in bate number 75.

9         And if we get down there to the indicated the

10  patient's current nutritional status.  Still

11  deteriorating, right, from a year before?

12    A.   Correct.

13    Q.   All right.  And then keep scrolling, Roy.

14         And there again, stop, we've got his emotional

15  status a year later is still deteriorating; you see

16  that?

17    A.   Yes.

18    Q.   Okay.  And go down.  Keep going, Roy.

19         Depression score is five out of ten.  Right?

20  That's something you did.  And then the last one

21  indicate the current status the patient's cognitive

22  function.  Let's go to the next page.  And your answer

23  is deteriorating again, you see that?  That's what you

24  put?

25    A.   Yes.  Yes.

1    Q.   Okay.  All right.  And his musculoskeletal status

2    is deteriorating.  What's that?  How do you evaluate the

3    musculoskeletal --

4    A.   The strength of their arms and legs.

5    Q.   So it's weaker, getting weaker, that's what is

6    happening here?

7    A.   On that visit.  He was.

8    Q.   Okay.  Okay.  And then down under care

9    coordination, keep going, Roy, right before the

10   narrative, right there.

11        The patient or caregiver was in agreement with

12   the POC, tell the jury what a POC is?

13   A.   Plan of care.

14   Q.   And the plan of care, that's the plan of care for

15   Mr. High?

16   A.   Yes.

17   Q.   That plan of care in the hospice system is

18   developed by the interdisciplinary team, correct?

19   A.   Yes.

20   Q.   And interdisciplinary team is made up of a nurse,

21   correct?

22   A.   RN, yes.

23   Q.   An RN, it's made up of a chaplain, correct?

24   A.   Yes.

25   Q.   It's made up of a certified social worker,

1    correct?

2       A.   Yes.

3       Q.   And it's made up of an M.D. or a D.O., right?

4       A.   Yes.

5       Q.   Also known as the medical director, correct?

6       A.   Correct.

7            THE COURT:   Again, Ms. Kelso, please get

8    closer to the mike.

9            THE WITNESS:   Sorry.

10           THE COURT:   Speak as loudly as you can.

11   Thank you.   Thank you.

12      Q.   (By Mr. Foster)  Have I missed anybody on the IDT

13   team, those four roles?   Is there anybody else, is there

14   a fifth or sixth or any others?

15      A.   There's a home health aid that's required to be

16   assigned.

17      Q.   Okay.   So home health aid.   Thank you.   And every

18   two weeks the -- by rule every two weeks the IDT team

19   has to meet to go over the plan of care with the -- for

20   the patient, right?

21      A.   Yes.

22      Q.   All right.   Now, within that team there were --

23   at Merida, there were multiple -- were you the only

24   nurse?

25      A.   No.

1    Q.   Were there more than one social workers?

2    A.   Yes.

3    Q.   Was there more than one chaplain?

4    A.   Yes.

5    Q.   Was there more than one medical directors?

6    A.   Yes.

7    Q.   All right.  Was there more than one hospice aids?

8    A.   I'm sorry?

9    Q.   What did you say, the aid, nurse aid?

10   A.   Home health aid, yes.

11   Q.   Home health aid?

12   A.   Nursing assistant, yes.

13   Q.   Were there more than one of those?

14   A.   Yes.

15   Q.   Okay.  All those people, if they're qualified,

16   can sit on the IDT team, right?

17   A.   Yes.

18   Q.   They can be interchanged, right?

19   A.   Yes.

20   Q.   All right.  And the practice at Merida was every

21   week there would be IDT meetings, right?

22   A.   No, every two weeks.

23   Q.   Every two weeks?

24   A.   Yes.

25   Q.   They would review, okay.  That happened?

1    A.   Yes.

2    Q.   All right.  So here it says that the patient

3  caregiver is in agreement with the POC, the plan of

4  care, right?  It also says that you coordination of care

5  performed with IDG members and you say yes, right?

6    A.   Yes.

7    Q.   When you said yes what are you indicating?  What

8  does that mean that the coordination of care?

9    A.   That I notified them of the status of my visit.

10    Q.   All right.  And then it also says under visit

11  notes discussed with IDG members, what did you say?

12    A.   Yes.

13    Q.   All right.  So that means you discussed these

14  notes with them, you told them Jack High was

15  deteriorating, right?

16    A.   I let them know he was having a bad day, or how

17  my visit went.

18    Q.   Did you try to minimize it that way, is that how

19  you told them?  I'm getting the sense that what

20  you're -- you're trying to minimize that he just had a

21  bad day, that somehow that was an aberration, there --

22  this really wasn't a picture of who Jack High is, am I

23  wrong about that or getting the wrong impression?

24    A.   He had good days and bad days.

25    Q.   Right.

1    A.   I mean just because it says deteriorating doesn't

2  mean every single time he was seen he was in a worse

3  state than he was the day before.

4    Q.   Right.  And -- and --

5    A.   There were also documents that said improved.

6    Q.   And with -- sure, and -- and that's normal,

7  right, it's normal that within a period of time for an

8  elderly patient like Jack High who has the issues that

9  he has that he's going to have good days and bad days,

10  right?

11    A.   Correct.

12    Q.   All right.  But the trend is declining according

13  to your record, right?

14    A.   (No response.)

15    Q.   It's all relative, isn't it, whether you're

16  having a good day or a bad day, isn't that kind of

17  relative to how you're doing overall?

18    A.   Not really, if you're having rare bad days.

19    Q.   Have you ever seen those -- those -- the graphs

20  of the -- of a stock market, how it goes going up and

21  down, up and down, up and down?  Have you seen that?

22    A.   Uh-huh.  Yes.

23    Q.   Right?  The thing that was going up and down,

24  trends happen, right; maybe going up and down maybe

25  volatile from a day-to-day standpoint, but when you step

1  back and look there's a trend; maybe it's getting higher

2  or maybe it's getting lower, with ups and downs in

3  between, right?

4      A.  Correct.

5      Q.  People are no different, right?

6      A.  (No response.)  Sorry I'm having a hard time

7  comparing a patient to the stock market.  People have

8  good days and bad days, too.

9      Q.  Okay.  Well --

10          THE COURT:  Very quickly, the first

11  50-minute session has expired.  Please continue.

12          MR. CANALES:  Thank you, Your Honor.  Thank

13  you.

14      Q.  (By Mr. Hector Canales)  I finally found the

15  other report.  Roy, can you pull up 00252963.  And just

16  go to the top there where we can get the -- the date.

17  There you go.

18          Just to refresh your memory.  So now it was

19  December of -- of '12; you see that?

20      A.  I do.

21      Q.  Okay.  Let me move on here.  Oh, I'm sorry, Roy,

22  go back.  Let's go back to the report that we were just

23  looking at, 00252976.  And let's zoom in on the

24  narrative there, Roy.

25          Let's see what you -- this narrative is longer

1  and different than the one -- than the one before, okay?

2  He's a 79-year-old patient so now we know the age from

3  you, correct?

4      A.  Yes.

5      Q.  All right.  On service with dementia, right?  Any

6  disagreement with your words there?

7      A.  No.

8      Q.  All right.  Upon arrival the patient is resting

9  in his bed, alert and oriented times two.  What's times

10  two versus times three?

11     A.  Times two means he's oriented to himself, person

12  and place he's oriented to himself and where he is.

13  Oriented times three means he's aware of who he is,

14  where he lives and the date and time.

15     Q.  So he doesn't know date and time?

16     A.  No.

17     Q.  Okay.  Patient and wife report right knee pain

18  times two days causing difficulty walking or standing.

19  Physical exam reveals right knee swollen and no redness

20  and painful with movement.  Tramadol 50 milligrams POD,

21  QID.

22         Tramadol, what, is that pain medication?

23     A.  Yes, it is.

24     Q.  All right.  And POQUID means basically, take

25  whenever you need it, right?

1    A.   No, it means by mouth four times a day.

2    Q.   Okay.  And that was ordered by Dr. Virlar?

3    A.   Yes.

4    Q.   All right.  And called into H-E-B pharmacy as the

5    prescription was not covered by hospice, right?

6    A.   Yes.

7    Q.   And so that's instance where he's in pain and

8    unfortunately that pain, this medication is not covered

9    by hospice, right?

10   A.   I'm sorry?

11   Q.   This -- he's in pain so he needs the medication,

12   right, he needs the pain meds?

13   A.   Correct.

14   Q.   Right?  But it's not covered under hospice?

15   A.   Typically pain med -- medications were covered

16   under hospice so why at that time it wasn't I'm not

17   sure.

18   Q.   Okay.  Let's skip ahead here a little bit.  Wife

19   states patient already -- oh, hang on here.  You

20   recommend -- recommend patient rest as much as possible

21   and -- and also alternate heat and ice.  Wife states

22   patient already rests too much and is becoming lazy and

23   more depressed so she is going to ignore my instructions

24   because he needs to be up and moving more.  You remember

25   that?

A.   Not specifically.

Q.   Do you remember Gloria getting pretty frustrated with -- with her husband Jack?

A.   I do.

Q.   Yeah.  That's kind of what it sounds like is happening here, she's getting -- her rope's getting short, right?

A.   She stayed pretty frustrated with him.

Q.   Life, I believe that's a typo, it means wife?

A.   Wife, yes.

Q.   Okay.  We can agree on that, is also very angry because patient continues to lose weight.  That's consistent with your notes from above, right, about his weight loss and deterioration of his musculoskeletal condition, right?

A.   Yes.

Q.   Patient says he isn't hungry.  That happens a lot with Alzheimer's folks and dementia, they actually forget to eat, right?

A.   Yes.

Q.   Okay.  That's part of why it's so deadly; isn't it, dementia, Alzheimer's is because -- not because in and of itself is going to kill you, but the symptoms, the things that it makes people do can -- can kill them, right?

1      A.   They can lose weight and be malnourished, yes.

2      Q.   Like not eating?

3      A.   Right.

4      Q.   That will certainly kill you, right?

5      A.   Absolutely.

6      Q.   A lot of times that's what happens, right, it's

7  not the disease itself but it's the symptoms of the

8  disease that get you, right?

9      A.   It's a complication of the disease, yes.

10     Q.   And Alzheimer's and dementia failure to thrive is

11  one of those slow processing diseases in which people

12  don't die fast, it's a terrible disease and it causes

13  people and their families to suffer for a long time,

14  right?

15     A.   It can, yes.

16     Q.   And you would agree, ma'am, that that -- when

17  you -- that when a patient has Alzheimer's like that and

18  dementia, that it makes prognosis, which is already in

19  inexact and difficult, it makes it even harder; doesn't

20  it?

21     A.   Can you repeat the question?

22     Q.   Sure.  When you've got somebody with a disease

23  like Alzheimer's, dementia like Mr. High here, it makes

24  the prognosis which is already recognized by Medicare as

25  being inexact and difficult even more inexact and even

1   more difficult, agree?

2       A.   No.

3       Q.   All right.  Well as compared to some other

4   illness, for instance, if you have stage 5 lung cancer,

5   that could kill you quick, right?

6       A.   Absolutely.

7       Q.   That's an easier prediction, right, than a --

8   somebody with a slow disease process like Alzheimer's,

9   right?

10      A.   Very different.

11      Q.   Very different.  Very different.  And isn't it

12  true that in a disease process, slow disease process

13  like Alzheimer's, failure to thrive, that there's even

14  more chance, more chance, greater room for a difference

15  in clinical judgment between doctors and nurses as to --

16  as to the life expectancy of that patient?

17      A.   There can be.  But at the stage that he's at was

18  not in the terminal stage.

19      Q.   That's your opinion, right?

20      A.   It's based on the criteria that Medicare set up

21  of what qualifies for Alzheimer's.

22      Q.   Sure, but it's still an opinion, and that's --

23  it's still just an opinion, you're entitled to it, I'm

24  not trying to take that opinion away from you, ma'am.  I

25  think maybe you think that's what I'm trying to do, but

1    I'm not, but all it is is an opinion of yours, right?

2        A.   No.

3        Q.   Okay.  Well -- and -- and to be certain, within

4    the Medicare hospice program, there are no objective

5    findings that take you in or out of eligibility for

6    hospice, right?  There's no boxes to check that

7    automatically puts you in or automatically take you out,

8    are there?

9        A.   There are qualifiers for different diagnoses that

10   you have to meet the eligibility qualifiers.

11       Q.   But it's a holistic approach, meaning one

12   qualifier doesn't get you in, it's ultimately up to the

13   clinical judgment of the physician, right, taking into

14   account the holistic approach, right?

15       A.   The Medicare guidelines specifically state a

16   patient for Alzheimer's must have a fast score of 7A and

17   he did not.

18       Q.   He didn't?

19       A.   And a fast score of 7A means that he has in

20   incontinent of bowel and bladder, he cannot control

21   urine, he cannot control his feces and he must speak

22   less than five intelligible words a day.

23       Q.   How about a PPS score?

24       A.   I mean his PPS score was -- I mean, he could feed

25   himself, he was at least --

1     Q.  No, no, no, no, I'm sorry, I wasn't precise

2   enough.  How about a criteria of PPS score?  What's that

3   need to be in your opinion?

4     A.  It may have been used as a additional information

5   that might help in the qualifications, but it very

6   clearly states for Alzheimer's that a patient must have

7   a fast score of 7A.  There is no specific requirement

8   for PPS.

9     Q.  All right.  Is there a percentage though that

10   would -- I'll draw your attention, less than 70 percent

11   say?

12     A.  I don't understand the question.

13     Q.  Well isn't it true, ma'am, that under the --

14   under the -- these are guidelines that you're talking

15   about, right?  Hospice eligibility guidelines?

16     A.  Set forth by Medicare, yes.

17     Q.  Guidelines, right?  They are not mandatory -- if

18   you meet them, great.  But if you don't, doesn't make

19   you ineligible either.  Certainly if you have them, it

20   bodes very strongly in favor of eligibility, right?

21     A.  They're -- they are guidelines, yes, but there

22   are certain requirements that have to be met.

23     Q.  Right.  Ultimately that requirement is the

24   clinical judgment of the doctor which must be based on a

25   diagnosis, a history, right?

1       A.   A doctor can say that a patient is eligible for

2   hospice and if their fast score is not a 7A, they're not

3   eligible.  No matter whether the doctor says that they

4   feel they're eligible or not, if -- if their -- if their

5   fast score is a 6A just because a doctor says they're

6   eligible for hospice for Alzheimer's doesn't make them

7   eligible, they have to be a 7A according to Medicare's

8   guidelines.

9       Q.   Which guideline are you referring to?  Where is

10  it?  Because I haven't seen that.

11      A.   Medicare's guidelines.

12      Q.   Where?

13      A.   You can look it up on hospice eligibility

14  criteria for different medical conditions.

15      Q.   But is there -- is there a CFR that you can point

16  us to that you're relying upon for this?

17      A.   I don't know what a CFR is.

18      Q.   You don't know what a CFR is?

19      A.   No.

20      Q.   Would you defer to a Government expert on the

21  rules and regulations of -- a Government expert who

22  knows what a CFR is, would you refer to that expert's

23  opinion over your own?

24      A.   I mean, if they knew better than I did of course.

25      Q.   And they would, right, they would know better

1    than you?

2        A.   Possibly, I'm not sure what their job

3    qualification would be.

4        Q.   If the Government put somebody up and said

5    they're an expert and that expert knows what a CFR is

6    and knows the rules of Medicare that person is more

7    qualified than you, right?

8        A.   Yes.

9        Q.   Okay.  All right.  Let's move on to the next

10   exhibit and this is going to be Mesquias 00253248.

11        Did Mr. High ever tell you he wanted to die?

12        A.   I don't recall.

13        Q.   Is that consistent with what you remember of him

14   is that his mental state and desire that he wanted to go

15   see his mom, he wanted it to be over?

16        A.   I don't recall him ever saying that.

17        Q.   Is -- is that consistent with a person who's

18   happy and in good spirits and -- and -- and thriving,

19   somebody who expresses a desire to openly to people that

20   they want to die?

21        A.   Some people have bad days.

22        Q.   Okay.  All right.  Let me show you, this is a --

23   we show at the top, Roy, the jury's already seen this

24   once before.

25        This is the medical social worker part of the

1    comprehensive assessment.  And let me just stop there.

2    Can you confirm with us that at each certification

3    period from the initial, the second, so on and so on at

4    Merida, that there was -- each one as required you have

5    to do an assessment of the patient prior to

6    recertification, right?

7        A.  Unless the family refuses, yes.  Family was

8    allowed to refuse social worker chaplain services.

9        Q.  Right, but the assessment for certification, that

10   has to happen at every period, right?

11       A.  Yes.

12       Q.  Right.  And -- and it's not just the medical from

13   the IDT team, you have not just the medical, the nurse's

14   assessment but you have the social worker's assessment,

15   right?

16       A.  Yes.

17       Q.  And the -- the chaplain will assess for spiritual

18   needs, right?

19       A.  Yes.

20       Q.  And who am I missing?

21       A.  The chaplain, social worker and nurse are the

22   only ones who assess --

23       Q.  Okay, they do the assessments, right?  So what

24   we're looking at is the social worker's assessment of

25   Jack -- of Jack High, all handwritten in.  And I just

1   wanted to bring your attention to see if it refreshes

2   your memory at all, if you'll go down to the patient's

3   response to the illnesses at the very bottom there.

4        See there it says anger and then dash threatening

5   to hit his spouse.  That's not because Mr. High was a

6   bad guy, that's because part of the dementia and

7   Alzheimer's and stuff that's going on, but do you recall

8   Ms. High telling you about being scared about him, being

9   physical?

10    A.  No.

11         MR. FOSTER:  I missed it, is this her

12   document, Your Honor, or someone else's document?

13         MR. CANALES:  It's your exhibit, you didn't

14   miss that.

15         MR. FOSTER:  This particular page, is this

16   something she offered or someone else authored that she

17   has no personal knowledge of?

18         THE COURT:  What was the question?

19         MR. CANALES:  Whether I was asking her if it

20   refreshed her memory as to her interactions with

21   Mr. High, and I'll remind the Court that the witness and

22   the Government's response to my objections was that she

23   dealt with every patient, all patients, and so I think

24   she's established herself as having some knowledge about

25   everything, not just the things that her name is on.

1            THE COURT:  Understood.  But the question

2    for her on this document.

3            MR. CANALES:  Yeah, did she remember Gloria

4    telling -- telling him that he was going to hit her?

5            THE WITNESS:  That's not my documentation, I

6    didn't write that, but no I don't recall that.

7    Q.   (By Mr. Hector Canales)  All right.  And what

8    about that he wants to die, do you recall that?

9    A.   I didn't write that, so, no, I don't recall.

10   Q.   And since you didn't write it, I mean, you take

11   the coaching well, since you didn't write it, you can't

12   say one way or the other?

13   A.   I don't recall his wife ever telling me those

14   things, that he said those things, or him saying those

15   things to me.

16   Q.   Okay.  Okay.  All right.  Very good.  Let's look

17   at 00252712.  Also part of the process.

18        And you've been very critical with Merida in

19   their process of admitting patients, right, that's part

20   of why you're here to criticize them, right?

21   A.   No.

22   Q.   Okay.  But you have been critical?

23   A.   I don't think so.

24   Q.   Oh, okay.  Have you been supportive?  Should we

25   interpret your testimony today with the Government as

1    supportive of Merida?

2        A.  Do I support Medicare fraud, no.

3        Q.  Okay.  All right.  So did you get my number, I'm

4    sorry, 00252712.

5            Each patient has to consent to going into hospice

6    care, right?

7        A.  Yes.

8        Q.  They have to give consent, right?

9        A.  Yes.

10       Q.  What happens if a patient isn't able to give his

11   consent because he's mentally incapacitated?

12       A.  The caregiver or the next of kin can sign for

13   them.

14       Q.  Okay.  All right.  And as it relates to Mr. High

15   here, that's what's happening, right, this is his

16   consent from May 25th of '12?

17           Can you blow that up down there?

18           Ms. High, Gloria, is signing, right?

19       A.  Yes.

20       Q.  Why -- why -- what's the reason the document says

21   she's signing for -- for him, why isn't Mr. High doing

22   it?

23       A.  Because of his dementia.

24       Q.  And the attending physician there is indicated as

25   who?

1    A.   Dr. Greg Gonzaba.

2    Q.   All right.  Very good.  Steven Dellwo, do you

3  know Steven Dellwo?

4    A.   He was an RN at the company.

5    Q.   All right.  Steven fraudster?

6    A.   I don't know, I don't know what he documented in

7  his charts, I didn't --

8    Q.   I know, but I mean, but you -- you've -- you were

9  around, you were involved with everybody; so was Steven,

10  right?  Steven was another nurse just like you?

11    A.   He was an RN, yes.

12    Q.   And he was involved in the care of the same

13  patients you were involved with, right?

14    A.   Yes.

15    Q.   All right.  And over the time that you were

16  there, you got to, I guess see him, right, interact with

17  patients and do his job?

18    A.   No.

19    Q.   No, okay.  Well, do you have any reason here to

20  believe or say that Steven Dellwo was involved in some

21  sort of health care fraud while at -- while at Merida?

22    A.   No, but I do know that Steven didn't know the

23  qualifications for hospice eligibility.  He verbally

24  told me that on multiple occasions.

25    Q.   Oh, he did.  He just came and confessed his

1    incompetence to you, right, that's what people do?

2       A.   No, actually it was because he was doing an

3    admission on a patient and he wasn't given a diagnosis

4    and he asked me what diagnosis to use and because one

5    wasn't given to him and I told him to assess the patient

6    and based on his assessment of the medical records to

7    determine what the appropriate diagnosis was, and he

8    told me, I don't know what -- I don't know what the

9    requirements are.

10      Q.   All right.  And so I'm sure as part of that and

11   with all the experience and training as, you know, the

12   super nurse that you are, you set him straight, you

13   trained him and you got him right, right?

14      A.   No, because at the time I didn't even know what

15   the qualification were.

16      Q.   Oh, okay.  I see.  I see.  You didn't either.  So

17   you just said, well, gosh Steven I don't know either?

18      A.   I told him to contact the doctor.

19      Q.   We're SOL.  Okay, and do you have any reason to

20   believe he didn't follow your advice and go do that?

21      A.   I have no idea if he did.

22      Q.   People have questions all the time, right?

23      A.   Right.

24      Q.   About what to do and what not to do.  Doesn't

25   make you incompetent at the time.  Were you incompetent?

1     A.   No.

2     Q.   Okay.

3     A.   I don't feel I was.

4     Q.   And neither was Mr. Dellwo, you're learning on

5 the job?

6     A.   Correct.

7     Q.   Right?  You don't learn everything you need to

8 learn in school; do you?

9     A.   No.

10    Q.   They probably told you that in nursing school,

11 too, didn't they?

12    A.   Yes.

13    Q.   Yeah.  Let's pull up -- hang on a second here.

14 00252989.  Scroll up to the top there.  We're still

15 on -- on Jack High.  And -- and -- this is the wrong

16 one.  Let's see 00252989.  There we go.

17       So this one is dated -- this is another visit,

18 but it's a hospice recert assessment, right, with -- of

19 Mr. High; you see that?  It's the 12th visit that

20 Mr. High is receiving from a nurse; see that?

21    A.   Yes.

22    Q.   And it's dated January the 15th of '13, which is

23 just 12 days --

24          MR. CANALES:  May I approach, Your Honor?

25          THE COURT:  You may.

1    Q.  (By Mr. Hector Canales)  -- which is just 12 days

2    after the last assessment we just went over with you; do

3    you see that?

4    A.  Yes.

5    Q.  All right.  So you didn't do every single visit

6    with Mr. High; did you?

7    A.  Correct, I did not.

8    Q.  And that's normal, isn't it?

9    A.  Yes.

10   Q.  Because it's not humanly possible for you to be

11   everywhere with every patient all the time?

12   A.  Correct.

13   Q.  Right.  So there's multiple people now, Mr. -- am

14   I saying that right, I've never met him.

15   A.  Dellwo.

16   Q.  Dellwo.  He -- he is an RN also?

17   A.  Yes.

18   Q.  Like you?

19   A.  No, I'm an LVN.

20   Q.  You're an LVN, okay.  But nonetheless, he's

21   qualified to go and do these nurses, these visits and

22   these assessments, correct, by training and education

23   he's qualified?

24   A.  He was assigned to go and do them.

25   Q.  Okay.  All right.  And he's on -- but as a

1    registered nurse, he's bound and obligated by the rules

2    and standards to be truthful and accurate in his

3    recording of medical information, right?

4        A.  Yes.

5        Q.  Okay.  And so let's look -- and here he says --

6    let's look -- let's go down to the assessment, Roy, just

7    scroll -- scroll on up there.

8            Patient continues -- indicate health history,

9    patient conditions to lose weight and have poor

10   appetite, that's consistent with what you said, right,

11   the week before?

12       A.  Yes.

13       Q.  All right.  Now, eligibility criteria here.

14   These are the questions that the program asks you,

15   correct?

16       A.  Yes.

17       Q.  These are not questions that were designed by

18   Mr. Mesquias, these are questions that are designed by

19   the companies who -- who make this software program,

20   right?

21       A.  Yes.

22       Q.  Okay.  And so patients condition is life

23   limiting; see that?

24       A.  Yes.

25       Q.  The patient and family are aware of this

1    condition.   The patient has elected hospice care.

2    That's true, we just saw that -- the -- the consents,

3    right?

4        A.   Yes.

5        Q.   Okay.   Indicate the primary significant hospice

6    diagnosis, mark all that apply, debility, unspecified,

7    see that?

8        A.   Yes.

9        Q.   And debility is a recognized terminal illness by

10   Medicare, correct?

11       A.   As a co-morbid.   It can't be the primary

12   condition.

13       Q.   Okay.   Okay.   And then patient should meet the

14   following debility unspecified criteria:   Functional

15   decline and dependence in two or more ADL stands for

16   assisted daily living activities, correct?

17       A.   Yes.

18       Q.   Weight loss of ten or more percent in the prior

19   six months.   We asked you -- I asked you about that

20   earlier, right?

21       A.   Yes.

22       Q.   Progression of disease over time in a palliative

23   performance scale PPS of 40 percent or less.   See that?

24       A.   Yes.

25       Q.   All right.   Then here, look at this, it says he

1    indicated the objective supporting data of ten percent

2    weight loss.  Patient weight dropped 130 pounds down to

3    114 pounds in two weeks.  That's not good; is it?

4        A.  No.

5        Q.  That's consistent with what we heard from Ms.

6    High reporting to you that he was refusing to eat, he

7    didn't want to eat, that's what happened to you, right?

8        A.  I --

9        Q.  You don't eat you're going to lose weight?

10       A.  Well, right, I just don't agree with that

11   documentation since the note from December of 2012 of

12   mine that you showed the weight of 122 pounds.

13       Q.  All right.  But --

14       A.  So --

15       Q.  But my question to you, ma'am, is that if you

16   stop eating and if you're 79 years old and you have all

17   the conditions and problems that Jack High has you can

18   go off a cliff pretty quick; can't you?

19       A.  That's a significant amount of weight to lose in

20   two weeks.

21       Q.  Uh-huh.  Patient is becoming more lethargic and

22   not willing to get out of bed in the morning.  Well,

23   that -- that could be me, too, so let's -- let's move on

24   from that one.

25            Patient should meet -- next page, Roy.

1          Patient has clinical evidence of advancing

2    illness.   Recent decline in functional status.

3          You said that, right, that you said beforehand

4    that he had a decline in functional status, right?

5        A.   I believe so.

6        Q.   Right.   You said declining, remember that, twice,

7    right?

8        A.   Yes.

9        Q.   Okay.   There's the weight loss again.   Decrease

10   in moral intake, less predictive, how would you

11   interpret that as a nurse, less predictive.   What's

12   going on there?

13       A.   I'm not seeing where it says that.

14       Q.   Under indicate clinical evidence of advancing

15   illness mark all that apply, the second one there, can

16   you -- there you go.

17          Decreasing oral intake less predictive.

18       A.   Oh.

19       Q.   Translate, please.

20       A.   I'm not sure what that means.

21       Q.   Okay.

22       A.   Less oral intake, he's not eating any -- not

23   eating as much, but I don't know what the less

24   predictive means.

25       Q.   Maybe it's less predictive of when he's going to

1   eat or not eat, that's how I interpret it.  Is that a

2   fair interpretation?

3       A.   I don't know.

4       Q.   Okay.  All right.  Only eating two meals a day,

5   50 percent.  So again here, I -- I guess at minimum, at

6   minimum we've got another bad day, right?  Would you

7   agree?  I mean you -- you characterized it well the

8   two -- the two notes you said before we had two bad days

9   and now we got another -- at a minimum we got another

10  bad day, right?

11      A.   I wasn't there.

12      Q.   I know you weren't there.

13      A.   I mean it sounds like -- it sounds like maybe he

14  was having a bad day, but this note right here is

15  supposed to be an accumulation of the last two weeks.

16      Q.   All right.  Let's go to the last page, Roy, to

17  the narrative.

18          While he's doing that, would you -- would you

19  agree, do you see a trend here of -- of deterioration

20  and bad days, do you see a trend, ma'am?  Yes or no?

21      A.   I see the documentation continues to say

22  deterioration.

23      Q.   Okay.  And my question to you is as best you can

24  answer to this jury, do you see a trend; yes or no?

25      A.   Yes.

 1    Q.   All right.  And it's a downward trend, right?

 2    A.   For his nutritional status.

 3    Q.   Is that -- okay.  Does that mean a yes?

 4    A.   Yes.

 5    Q.   Okay.  All right.  So let's look at the

 6  narrative.  Skilled nursing visit made Tuesday, vital

 7  signs, patient complaining of pain to right knee.

 8         Where did it go?  This is the wrong one, sorry.

 9  All right.  Let me move to the next one here.  Sorry.

10  Let's go to 00252469.  Scroll up there.

11         How about -- do you remember Ms. Amy Cooley?

12    A.   Yes, she was my manager.

13    Q.   You don't like her; do you?

14    A.   She was my manager.

15    Q.   I know, but personally, ma'am, in all honesty,

16  you didn't care for Ms. Cooley very much; did you?

17    A.   That's not true.

18    Q.   Okay.  All right.  You all were good friends?

19    A.   We were coworkers.

20    Q.   Friends, outside of work?

21    A.   No.

22    Q.   Okay.  All right.  She is a nurse as well like

23  you?

24    A.   Yes.

25    Q.   Okay.  And again, she did visits, nursing visits

1  with Jack High, correct?  See that up there?

2      A.  According to this she did.

3      Q.  All right.  And this one was back in May of '12,

4  see that?

5      A.  (No response.)

6      Q.  See that?

7      A.  Yes.

8      Q.  Okay.  And if we go down, let's look at the

9  eligibility criteria.  Scroll down, Roy, keep going.

10 All right.

11         So eligibility criteria, indicate health history

12 obtained.  There's debility again, you see that, again,

13 by Ms. Cooley?

14     A.  Yes.

15     Q.  Multiple falls, significant weight loss, the

16 multiple falls.  When you were reviewing Jack High's

17 history, did you see that as part of your history of his

18 history when -- when you went to his visits?

19     A.  I don't recall.

20     Q.  This would have been -- this is the same system

21 though, you would have access through your phone of all

22 the records that you have had prior to visiting

23 Mr. High, right?

24     A.  No.

25     Q.  No, you didn't have access to his records?

1    A.   His entire chart, no.

2    Q.   Okay.

3    A.   What -- what specific records you're able to view

4    are limited based on the benefit period that he's in.

5    Q.   Okay.  So you can -- so you can only look at

6    what's in that benefit period?

7    A.   Yes.

8    Q.   For and ever amen, you couldn't look past benefit

9    period?

10   A.   Not in the device that we had, no.

11   Q.   Not on your phone, no?

12   A.   No.

13   Q.   But what about on a laptop or a desktop at the

14   office?

15   A.   We didn't have access to those, the desktops were

16   being used by staff.

17   Q.   Okay.  So when you went and you looked back

18   history-wise all you would see is within the period,

19   this is -- the period that you were in, right?

20   A.   Yes, when I'm seeing a patient, and I'm looking

21   at their history it's right there in front of the

22   patient with my device, I did not have access to any

23   other devices to --

24   Q.   Okay.  Let's scroll up to the very beginning,

25   then, Roy, at the top.

1        So visit number one here, this is a certification

2   period, and for the jury's benefit, you know, you have

3   certification periods are either 90 days or 60 days,

4   right?

5        A.  Yes.

6        Q.  Right.  And so each visit when you go, this is --

7   this is visit number one of the certification period

8   beginning May 25th of '12, right?

9        A.  Yes.

10       Q.  Okay.  And so what you're saying is Ms. Cooley,

11  if there were a prior certification period, 60 days of

12  hospice, she or you wouldn't -- wouldn't know what

13  happened, have the records from the prior service; am I

14  understanding you right, the system right?

15       A.  Not directly there at our fingertips, no, while

16  in the patient's home.

17       Q.  I'm sorry for interrupting you.  Were you done?

18       A.  Yes.

19       Q.  So within -- so this record, if it's the first

20  one, that means she didn't have any prior access to any

21  prior records to create this document, it would have had

22  to have to have come from her observation?

23       A.  Unless she had seen the patient before.

24       Q.  Well, but this is a visit; isn't it, of the

25  patient?

1    A.   I don't know if this is the beginning of the

2    benefit period or if this is his very first visit of

3    starting service.

4    Q.   Okay.  All right.  Forget it, sorry, that was

5    probably more for my benefit than anybody else's.

6         Let's scroll back up.

7         Multiple falls, you -- you don't recall multiple

8    falls; do you?

9    A.   I know when he was on service he had a couple,

10   how many, I'm not sure.

11   Q.   Okay.  And then there's a continuous decline over

12   the past six months; do you see that?

13   A.   Yes.

14   Q.   I'll ask you again, does this -- are you -- are

15   you seeing a trend of decline of Mr. High here?

16   A.   I see it's being documented, yes.

17   Q.   Roy, can you go to page 5 of that document.

18   There you go, the top half.

19        Abnormal cognitive functions, abnormal attention,

20   remote memory, recent memory, new learning ability.

21   That's not good; is it?

22   A.   No.

23   Q.   Indicate abnormal attention findings, poor

24   performance of digit span.  What's that?

25   A.   I'm not sure.

1    Q.   That's some test that you don't know about?

2    A.   Huh-uh.

3    Q.   Serial sevens, do you know what that is?

4    A.   No.

5    Q.   Now, are these just -- are these options, or you

6    think this is stuff that Ms. Cooley was able to type in,

7    or are these like you were saying earlier when it comes

8    to, when you said deteriorating you didn't -- you

9    thought you might not have options, are these options on

10   there or is this her -- do you know?

11   A.   I don't know.

12   Q.   You don't know, okay.  All right.

13        Remote memory.  He couldn't remember his birthday

14   or anniversary, Social Security number or schools, or

15   recent events, couldn't repeat three -- three or four

16   words after review of minutes of unrelated activity.

17   These are all signs of debility, dementia, right?

18   A.   Yes.

19   Q.   All supportive of that disease process?

20   A.   Yes.

21   Q.   Let me ask you this, is Alzheimer's curable?

22   A.   No.

23   Q.   It's not like cancer when on hospice, you go on

24   hospice for cancer you can say, you know I don't want

25   chemo anymore because it makes me feel -- I just want to

1    be made comfortable.  Well there's a cure for some

2    cancers, right?

3         A.   Some.

4         Q.   But there's some terminal illnesses that are

5    truly terminal, there's no cure, Alzheimer's, dementia,

6    debilities fits in that category, correct?

7         A.   Correct.

8         Q.   Do you believe Ms. Amy Cooley was committing

9    health care fraud here?

10        A.   I believe she didn't educate the staff.

11        Q.   That was not my question, ma'am.

12             Is there a reason why you won't answer just my

13   simple question there?

14        A.   Because they're not always yes or no answers.

15        Q.   Okay.  Well, Amy Cooley, whether or not -- do you

16   believe that she was committing health care fraud here?

17        A.   I don't know, I wasn't employed with the company

18   at the time so I didn't know the patient at the time.  I

19   can't answer that yes or no.

20                  MR. CANALES:  Thank you for your time.

21                  THE WITNESS:  You're welcome.

22                  MR. CANALES:  Pass the witness.

23                  THE COURT:  Mr. Cyganiewicz, do have you any

24   questions?

25                  MR. CYGANIEWICZ:  Judge I have no questions

 1   for this witness.

 2              THE COURT:  Mr. Guerra?

 3              MR. GUERRA:  Briefly, Your Honor.

 4              THE COURT:  Please proceed.

 5                      CROSS-EXAMINATION

 6   BY MR. GUERRA:

 7      Q.  Ms. Kelso, good afternoon.

 8      A.  Good afternoon.

 9      Q.  My name is Robert Guerra; I represent

10   Dr. Francisco Pena.  I have, hopefully, a couple

11   questions for you.  In your testimony, I believe you

12   said that you worked solely out of the San Antonio

13   office; is that correct?

14      A.  Yes.

15      Q.  And all the patients you discussed today for

16   Mr. High to Mr. -- Mr. and Ms. Carson, Mr. McDonald all

17   the patients you referred to were out of the San Antonio

18   office, correct?

19      A.  Correct.

20              MR. GUERRA:  That's all I have.

21              Pass the witness, Your Honor.

22              THE COURT:  Mr. Foster.

23              MR. FOSTER:  Thank you, Your Honor.

24

25

REDIRECT EXAMINATION

BY MR. FOSTER:

Q.   Ms. Kelso, you were asked a lot of questions about Jack high; do you recall all -- well, do you recall some of those questions?

A.   I -- yes, sir.

Q.   Do all Alzheimer's patients qualify for hospice?

A.   No.

Q.   Do all patients with a non-curable disease qualify for hospice?

A.   No.

Q.   Do all patients with a diagnosis for failure to thrive qualify for hospice?

A.   No.

Q.   Does having a bad day make you qualify for hospice?

A.   No.

Q.   Do all patients with dementia qualify for hospice?

A.   No.

Q.   Do all patients with multiple falls qualify for hospice?

A.   No.

Q.   Patients with caregivers?

A.   No.

1    Q.   Patients who sometimes get better, sometimes get

2  worse, I believe like counsel said like the stock market

3  or something, do they all qualify?

4    A.   If -- no, I mean, they have to have more bad days

5  than good days.

6    Q.   Can you explain to the jury what Medicare's

7  qualifications were?

8    A.   They have to have a terminal diagnosis and a life

9  expectancy of six months or less.

10    Q.   And so counsel put some documents up on the

11  screen, can we bring up E-16 of page 525.  And can we

12  zoom in on the neurologic there.

13         And so you indicated that, for example, Jack

14  High's mental status was deteriorating?

15    A.   Yes.

16    Q.   Is that correct?  Did that mean he qualified for

17  hospice?

18    A.   No.

19    Q.   Can you explain to the jury?

20    A.   I mean with dementia you're going to deteriorate,

21  I mean that's just the nature of the disease.  But the

22  fact that he was deteriorating, was he still within that

23  six-month or life expectancy?  And I mean, this note was

24  from December -- I believe it was December of 2012, they

25  had me review a note from a year later.  He was still on

1    service.   That shows he didn't -- he was not in the

2    six-month or less life expectancy of the Alzheimer's

3    dementia diagnosis.

4        Q.   Now, they asked you a lot of questions about

5    other people's notes and various files; do you recall

6    those questions?

7        A.   Some of them, yes.

8        Q.   And had you ever see those documents before?

9        A.   Not that I recall.

10       Q.   Were you out with those people when they saw the

11   patients?

12       A.   No, usually the nursing visits that we did were

13   alone, they were independent.

14       Q.   Do you remember them asking questions whether in

15   your opinion these Merida employees were fraudsters if

16   they indicated that Jack High was dying; do you remember

17   those questions?

18       A.   Yes.

19       Q.   Do you have an opinion about why others at Merida

20   would have put false documentation in the files?

21       A.   Either because -- well, did they intentionally

22   put false documentation it --

23            MR. CANALES:   Objection, Your Honor.   The

24   witness is speculating about what other people are

25   alleged, or may have un -- unidentified people have

```
 1   done.   She's speculating about people she doesn't know
 2   about.
 3                MR. FOSTER:   He opened the door for it, Your
 4   Honor.
 5                THE COURT:   The door's been opened by asking
 6   about other documents.
 7                MR. HECTOR CANALES:   I can't open the door
 8   for speculation, Judge.   She's guessing.
 9                THE COURT:   Overruled.   Overruled.   Please
10   proceed.
11                THE WITNESS:   Sorry, can you repeat the
12   request?
13      Q.   (By Mr. Foster)   Sure.   Do you have an opinion
14   about why there was false fraudulent documentation in
15   some of the patient files?
16      A.   I can't say whether the nurses intentionally
17   falsified it, but they were very limited to their own
18   education.   You know, did they know better, or did they
19   document to the best of their amount based on their
20   education level, I -- I don't know.
21      Q.   And do you have an opinion about how the people
22   that Rodney Mesquias hired played a role in that?
23                MR. HECTOR CANALES:   Objection, Your Honor.
24   The witness just said she did not know, Rule of Evidence
25   601 patient lacks personal knowledge.
```

1          THE COURT:  I think that question is

2    overbroad, Mr. Foster.  Again, let's limit it to the

3    documents she was asked about in terms of this line of

4    questioning.

5    Q.  (By Mr. Foster)  Sure.  Did you interact with

6    other nurses at Merida?

7    A.  Not while they were seeing patients but, yes,

8    yeah.

9    Q.  Otherwise?

10   A.  Yes.

11   Q.  And did have you conversation with them?

12   A.  Yes.

13   Q.  And did you form an impression of their

14   experience level?

15   A.  Yes, most of them were -- some of them were brand

16   new graduates, brand new nurses, had no nursing

17   experience but the vast majority of them had no hospice

18   experience.

19   Q.  And what happened to nurses with experience at

20   Merida?

21          MR. HECTOR CANALES:  Objection, Your Honor.

22   Speculative.

23          THE COURT:  Sustained.

24   Q.  (By Mr. Foster)  Were there nurses you

25   encountered with who had more experience at Merida?

1      A.   Just the managers.

2      Q.   Okay.   And did they instruct the other staff on

3    the qualifications of Medicare?

4      A.   No.

5      Q.   Now, going back to Mr. High, in the entire time

6    that you were there, and you interacted with him and you

7    remember being asked questions, you're not a doctor,

8    right?

9      A.   Right, correct.

10     Q.   Did you need to be a doctor to know that Jack

11   High was not dying when you saw him?

12     A.   No.

13     Q.   Can you explain that to the jury?

14     A.   I mean he had his good days and bad days, but I

15   mean he could -- he could get up and walk if he wanted

16   to, he had his days where he just wanted to be left

17   alone.   And his, you know, he would not physically fight

18   his wife, but he would give his wife resistance, he just

19   wanted to be in bed.   But he was able to get up and walk

20   with a walker, if he wanted to.   He was able to talk to

21   you, if he wanted to.   You know, he was able to tell me

22   about the weekend he spent with his family dancing the

23   Macarena, I mean that's -- that's not the terminal end,

24   that's not the terminal part of dementia and

25   Alzheimer's.

1    Q.   And can we bring up what's -- well, let me ask

2    you this, do you remember counsel showed you a document

3    from 2012 when Mr. High was put on services with Merida;

4    do you recall that document?

5    A.   The election of benefits form?

6    Q.   It was a note of Ms. Cooley's?

7    A.   Oh, okay.

8    Q.   Do you recall that being from 2012?

9    A.   Yes.

10   Q.   Can we bring up what's been admitted as

11   Government's Exhibit H-27.

12        Can you read to the jury Mr. High's date of

13   death, please?

14   A.   June 16th, 2018.

15   Q.   How long was that after he was put on services

16   from Merida?

17   A.   Six years.

18   Q.   And how long was it after he left getting

19   services from Merida?

20   A.   I'd say, looks like he left services August 12th,

21   2016, so two years.

22   Q.   And how much money did Merida make from having

23   Jack High on hospice for over four years?

24             MR. CYGANIEWICZ:  Objection, Your Honor.

25   She doesn't have knowledge of that, it's called

1   speculation.

2                   MR. FOSTER:  I think they --

3                   MR. HECTOR CANALES:  Outside the scope of

4   the cross, Your Honor.

5                   MR. TONY CANALES:  Outside the scope.

6                   MR. FOSTER:  They put plenty of documents

7   before her, Your Honor.

8                   MR. HECTOR CANALES:  I didn't bring up

9   money, Judge.

10                  THE COURT:  The -- the -- the -- the -- the

11  objection is sustained.

12                  Next question, please.

13                  MR. FOSTER:  Thank you.  No further

14  questions, Ms. Kelso.

15                  THE WITNESS:  Thank you.

16                  THE COURT:  Mr. Canales.

17                  MR. CANALES:  Could have I the Elmo, please.

18                  THE CLERK:  Yes, sir.

19                  THE COURT:  And redirect was seven minutes.

20                  MR. CANALES:  That's fine, it won't even

21  take me that long.

22                       RECROSS-EXAMINATION

23  BY MR. HECTOR CANALES:

24      Q.  FAST score of 7A qualifies for hospice, right, or

25  greater?

1    A.   Yes.

2    Q.   What's Jack High's -- on 10/13 what's his FAST

3 score?

4    A.   Says 7B.

5    Q.   That's higher than 7A, right?

6    A.   Yes.

7    Q.   The doctor -- so according to your own standards

8 and your study he's eligible?

9    A.   But it has to consistent --

10    Q.   It's a yes or no answer.

11    A.   It's not, it's not because FAST scores can change

12 from day -- from visit to visit.

13    Q.   According to this he's eligible.

14    A.   That day yes, but he --

15    Q.   Okay.

16    A.   But he has to consistently stay on -- at that

17 level.  So if he -- if that was a bad day and that he

18 was graded as a 7B, maybe he had an upper respiratory

19 infection, I don't know, but then if he goes back up

20 though and he starts talking again in the next few weeks

21 then the FAST score changes back to another level.  He

22 has to -- just because he reaches a 7B level at one

23 point in time doesn't mean he can't improve from that,

24 he has to stay at that level consistently or decline.

25    Q.   And you don't know, ma'am, as you sit here

1    whether he did or didn't?

2        A.   Right.

3        Q.   But you've been up here all day with the

4    Government leaving the impression to this jury that Jack

5    High was never eligible and that fraud was committed

6    over all the years that -- that you were there at

7    Merida, that's the impression you're trying to leave,

8    right?

9        A.   The jury just saw proof he was on services.  He

10   didn't die for six years after he was admitted onto

11   services.  Life expectancy is six months or less.

12   That's clear proof that he wasn't eligible.  He didn't

13   meet the requirements.

14       Q.   Okay.  So if you don't die within the first six

15   months, then it's fraud?

16       A.   For an Alzheimer's patients, yes, there are other

17   medical conditions where you can be on hospice for a

18   couple of years but Alzheimer's no.

19       Q.   But ultimately it's not an LVN's decision,

20   ultimately it is a doctor, a medical doctor's clinical

21   judgment as to certification.  You're not eligible or

22   qualified to make this decision; are you?

23       A.   And I never said I was making the decision I'm

24   offering my opinion.

25       Q.   That's right, that's just your opinion, ma'am.

1      A.   Right.

2      Q.   And you know what, and Medicare allows for

3  unlimited amount of services so long as a doctor

4  certifies a patient thereafter, right?  Beyond six

5  months, correct?

6      A.   There has to be proof that they meet Medicare's

7  guidelines.  A doctor can continue writing for 20 years

8  that a patient's eligible for hospice, that doesn't mean

9  that they are.

10     Q.   And this is proof, isn't it?

11     A.   That that day he was a 7B?

12     Q.   This is proof, isn't it?

13     A.   That he was permanently eligible for hospice, no.

14     Q.   I'm not -- have we said permanent anywhere?

15     A.   On that day --

16     Q.   It's proof of eligibility, is it not?

17     A.   On that day when 7B was documented, yes, he was

18  eligible for services.

19             MR. CANALES:  Pass the witness.

20             THE COURT:  Anything else, Mr. Foster?

21             MR. FOSTER:  No, Your Honor.

22             THE COURT:  Thank you, ma'am.  You may step

23  down.

24             THE WITNESS:  Thank you.

25             THE COURT:  All right.  Gentlemen, unless

1    the next witness is an extremely short witness, or we

2    still have some time, who's the next witness?

3              MR. CANALES:  I vote -- I vote to break,

4    Judge.

5              MR. TONY CANALES:  The Astros are playing

6    tonight.

7              THE COURT:  It's not even 5:00 yet --

8              MR. SWARTZ:  I apologize, go ahead.  I

9    apologize I interrupted the Court.

10             THE COURT:  No, no, Mr. Swartz.  We --

11             MR. SWARTZ:  We can break now, that's

12   totally fine.

13             THE COURT:  All right.  In other words,

14   there's other consideration, are they out of town, is it

15   a short witness?

16             MR. SWARTZ:  We have a witness here, but if

17   it please the Court to break for the day, that's not a

18   problem to start again tomorrow.

19             THE COURT:  Again, back to the point.

20             MR. SWARTZ:  Yes, Your Honor.

21             THE COURT:  How lengthy of a time --

22             MR. SWARTZ:  I would expect 45 to an hour.

23             THE COURT:  Let's work until at least 5:00.

24             MR. SWARTZ:  Yes, Your Honor.

25             THE COURT:  Let's work until at least 5:00.

1              MR. SWARTZ:  The Government calls Belinda

2    Gonzalez.

3              THE COURT:  Wait real quick.

4              Does anybody need a quick break, restroom

5    break?

6              POTENTIAL JUROR:  We'll wait to 5:00.

7              THE COURT:  We're going to try to go until

8    about 5:00.  All right.

9              Good afternoon, ma'am.  Please remain

10   standing; please raise your right hand.

11             Ms. Sandra, please swear her in.

12             (WITNESS SWORN IN.)

13             THE WITNESS:  Yes.

14             THE COURT:  Thank you.  Please be seated.

15   Please be careful to stay close to the microphone so

16   that we can hear you, speak loudly and clearly.

17             THE WITNESS:  Okay.

18             MR. SWARTZ:  May I proceed, Your Honor?

19             THE COURT:  Mr. Swartz, you may proceed,

20   yes, sir.

21                     DIRECT EXAMINATION

22   BY MR. SWARTZ:

23     Q.  Good afternoon, Ms. Gonzalez.

24     A.  Hello.

25     Q.  My name is Andrew Swartz; I'm a prosecutor for

1    the United States, thank you for being here today.

2    Would you please tell the jury your name.

3        A.   Belinda, it's Belinda Gonzalez Galindo.

4        Q.   Where do you live currently?

5        A.   San Antonio, Texas.

6        Q.   How long have you lived in San Antonio?

7        A.   About ten years.

8        Q.   Are you a licensed nurse?

9        A.   Yes, I am.

10       Q.   What kind of license do you have?

11       A.   A registered nurse.

12       Q.   When did you receive your RN license?

13       A.   2001.

14       Q.   From whereabouts, what school?

15       A.   In Waukesha, Wisconsin.

16       Q.   And after -- did you say 2001?

17       A.   That's when I graduated, yes.

18       Q.   After graduating in 2001, have you worked in the

19   hospice field?

20       A.   Yes, I have.  I did two years in an ICU when I

21   initially graduated, and from there I've been in the

22   hospice in palliative care field since then.

23       Q.   So sitting here today, how many years of hospice

24   experience do you have?

25       A.   Probably about 17 years.

1    Q.   How many -- have you worked at different hospice

2 companies?

3    A.   Yes, multiple hospices.

4    Q.   How many hospice companies have you worked at?

5    A.   Probably at least six or seven different ones.

6    Q.   In late 2013, did you come to work at a company

7 called the Merida Group?

8    A.   Yes, I did.

9    Q.   Who did you interview with in order to get that

10 job?

11    A.   Rodney Mesquias.

12    Q.   Can you tell the jury about Mr. Mesquias, was he

13 in charge of the company?

14    A.   My understanding is he was the owner.

15    Q.   And what was your interview like?

16    A.   I was told a little bit about the company and

17 some of the issues that he had been having in the

18 company, that he wanted to look into as far as on-call

19 issues with the on-call nurse and -- and that he was

20 needing some help internally so he needed some internal

21 case managers is what they were calling them.  And

22 basically I told him that I knew hospice and that had

23 been in the hospice field and basically was offered a

24 job from there.

25    Q.   Were you sent to a particular location?

1     A.   Initially I was sent to the Harlingen office.

2     Q.   Government's Exhibits L-1, please.

3          While we pull up that exhibit, when you went to

4     Harlingen, who was your impression of the person in

5     charge of that location?

6     A.   Henry McInnis.

7     Q.   Based on what you saw in Harlingen, what role did

8     Mr. McInnis have at the Harlingen location?

9     A.   He was the administrator.

10    Q.   When you say administrator, what do you mean by

11    that?  What kind of things did you see him doing?

12    A.   He was in charge of the entire operation in

13    Harlingen.

14    Q.   When you say --

15              THE COURT:  Ms. Gonzalez, let me interject.

16              MR. SWARTZ:  Yes, Your Honor.

17              THE COURT:  Please get closer to the mike

18    and speak a little bit louder if you can.

19              THE WITNESS:  Okay.

20              THE COURT:  Speak loudly and clearly.

21    Please proceed.

22    Q.   (By Mr. Swartz)  When you said that Mr. McInnis

23    was the administrator?

24    A.   Yes.

25    Q.   What kinds of things did you see Mr. McInnis

1    doing?

2       A.   Day-to-day operations, overseeing all the workers

3    there, looking into any issues that might arise during

4    the day.  Different workers would come into his office

5    and troubleshoot things, you know, as far as the

6    day-to-day operation.

7       Q.   When you're saying day-to-day operation, are the

8    day-to-day operation of -- of a hospice company?

9       A.   Of hospice, yes, like, you know, admissions,

10   discharges, anything, you know, as far as scheduling

11   stuff like that.  That's usually the day-to-day

12   operation stuff.

13      Q.   Mr. McInnis was involved in admissions at the

14   hospice company?

15      A.   Well, he wasn't involved in it but he was aware

16   of them.

17      Q.   And you said the day-to-day operations, and what

18   kinds of things -- what are the -- give the jury an idea

19   of what the day-to-day operations are for a hospice

20   company?

21      A.   Basically, overseeing making sure that the

22   patients are scheduled to be seen in accordance to

23   Medicare guidelines, which would be every 14 days for an

24   RN scheduling out CNAs for those patients that required

25   CNAs, making sure, you know, chaplain and social worker

1    were involved, any type of volunteer requests; also

2    looking at any incoming referrals from referral sources,

3    making sure those got taken care of and, you know,

4    scheduled out to the -- you know admitted or not

5    admitted based on their assessment.

6        Q.   And based on the time you spent in Harlingen

7    Mr. McInnis was involved in all those aspects of the

8    hospice business?

9        A.   Yes.

10       Q.   After you -- did you have a short stay in

11   Harlingen?

12       A.   About a week and a half.

13       Q.   And I've got the Government's Exhibit L-1 up on

14   the screen.   Is this -- I guess the county colored in

15   yellow, is that the location where you were?

16       A.   Yes.

17       Q.   And then after that, did you go to a different

18   location?

19       A.   San Antonio.

20       Q.   Can you -- what was the role that you got in

21   San Antonio, what -- what position did you have?

22       A.   Initially when I went to San Antonio I was not in

23   the office for at least the first week.   I was given the

24   role of being behind the scenes and answering phone

25   calls.   As the primary person to answer the phone calls

1    and triage it to our -- or not triage it but rather give

2    it to the RN on call to time like how long it took the

3    RN to answer and if they were sufficiently doing their

4    job.

5        Q.   What kind of impression did that give you, that

6    that was the initial role that you were assigned?

7        A.   That maybe there was some issues going on with

8    the nursing staff and they were trying to figure out

9    where the issues were and who the issues were caused by.

10       Q.   And was Mr. Mesquias, based on that, did he

11   appear to be involved in the day-to-day operations at

12   the San Antonio location?

13       A.   Not so much to my knowledge.  He was aware of

14   certain things, but he wasn't -- I didn't see him a lot

15   on the day-to-day operations of it.

16       Q.   Now, after that initial period, how long was

17   that?

18       A.   As far as what I did, like the --

19       Q.   Yes.

20       A.   That was for about a week, and after that I was

21   put into the office as what they call an internal case

22   manager.

23       Q.   What's an internal case manager?

24       A.   It's -- most of the hospices will call it a

25   patient care manager where you manage the team and so I

1    managed a team of -- I managed two teams, which was the

2    South team, which was six nurses, two chaplains, two

3    social workers and two medical directors, and I oversaw

4    the day-to-day scheduling of my team and those patients

5    and held the IDT meetings and made sure that any of the

6    doctors were signing off on recertifications and any

7    other paperwork that needed to be done.

8       Q.  Did part of your responsibilities include seeing

9    patients in the field?

10      A.  Only if there was no other nurse, so it was very

11   minimal at Merida that I was on the field.

12      Q.  Did most of your duties include staying in the

13   office?

14      A.  Yes.

15      Q.  Now based on your years of experience in the

16   hospice field, are you familiar with the Medicare

17   requirements for hospice?

18      A.  Yes.

19      Q.  Are you familiar with the requirements to admit a

20   patient to hospice?

21      A.  Yes.

22      Q.  Can you just generally state what those are?

23      A.  So generally you get a referral from a doctor,

24   you have to have a doctor's order, we usually look for

25   having a history and physical on that patient, prior to

1    going out with the order, and then once that happens,

2    you schedule an RN to go out and assess the patient

3    for -- to see if they're eligible for hospice.

4          As an RN, we usually look at different scales and

5    stuff that we have, little guidelines, and then based on

6    the history and based on our physical assessment, we

7    make a judgment if we feel that this patient meets

8    requirements and then from there you take it to the

9    doctor who then signs on it whether they agree or not.

10   Q.   And did you become aware of the requirements to

11   recertify a patient for hospice?

12   A.   Yes.

13   Q.   During the time you were at Merida --

14   approximately, how long did you work at Merida?

15   A.   I came in at the end of the year of 2013 and I

16   was out of there by 2015.

17   Q.   And you mentioned IDT meetings, what's an IDT

18   meeting?

19   A.   IDT meeting is a meeting that's held every 14

20   days with the doctor, with the team members, like the

21   chaplain, social worker and the nurses, and we discussed

22   the plan of care for the patient over the last -- what's

23   happened over the last two weeks and for the next two

24   weeks going forward.  Any decline in the patient, any

25   increase in visits or anything that's needed from the

1    doctor and -- and just update everybody as a group signs

2    off on the plan of care for the upcoming two weeks.

3        Q.   And did you become familiar with the patients

4    that are on hospice with Merida?

5        A.   Yes.

6        Q.   During the time that you worked at Merida

7    starting in late 2013, did you come to believe that

8    there were patients at Merida that were not qualified to

9    be in hospice?

10       A.   Yes.

11       Q.   Could you just tell the jury what you saw?

12       A.   Based on looking at some of the patients that

13   were under me, as far as my team there was a lot

14   patients that had been on for several years that seemed

15   to have the same type of issues they did in the

16   beginning.  There was patients that were very high

17   functioning for a hospice patient that was unusual.

18   Reports of a nurse going out to a hospice patient's home

19   that was actually outside painting the house, things

20   like that don't usually happen when you're having

21   chronic illnesses and terminal illnesses.

22       Q.   So let me just break some of those down a little

23   bit, I think you mentioned the length of time that

24   patients are in hospice?

25       A.   Yes.

1    Q.  Based on your experience in the hospice field,

2    what's -- I know there's not an exact number, but what

3    is a typical length of stay that you would expect to see

4    for a hospice patient?

5               MR. CANALES:  I'm going to object,

6    Your Honor.  This witness is not qualified as an expert;

7    it's also repetitive, there's been testimony of this by

8    the Government's expert earlier in the week, this

9    witness is not qualified, they've laid no foundation as

10   to what research she's done, what she's relying upon so

11   that we couldn't effectively cross-examine as such a

12   guess.

13              MR. SWARTZ:  Your Honor, she just testified

14   that she has 16 years in the hospice field, she's

15   worked --

16              THE COURT:  Objection is overruled, answer

17   if it you know.

18   Q.  (By Mr. Swartz)  Do you remember the question?

19   A.  I don't remember the question, sorry.

20   Q.  What's a typical -- based on your experience in

21   the hospice field, what's the typical length of stay for

22   a hospice patient?

23   A.  In my experience it's been anywhere from six to

24   nine months.

25   Q.  And what kinds of lengths of stay were you seeing

     at Merida?

          A.   Several years.   Anywhere from a year to two to

     three years.

          Q.   And what -- how many -- is this a couple of

     patients or a lot of patients?

          A.   Several patients.

          Q.   At any other hospice -- hospice company you

     worked at, did you see lengths of stay like you saw at

     Merida?

          A.   No.

          Q.   What about hospitalizations, did you -- did

     you -- anything jumped out to you about hospitalizations

     of hospice patients?

          A.   Yes, we had a lot of patients that were

     frequently going to the hospital and then would come

     right back on service once they were discharged from the

     hospital.

                    MR. CANALES:   Your Honor, I'm going to

     object to the "we" part of the narrative, lacking

     personal knowledge.

                    MR. SWARTZ:   She just testified that she's

     in charge of the team of employees at Merida.

                    MR. CANALES:   Yes, Your Honor, but again

     we're having the same thing of this generic we, all.

                    THE COURT:   One second, one second,

1  gentlemen.  Rephrase the question so it's more question

2  and answer.

3            MR. SWARTZ:  Yes, Your Honor.

4     Q.  (By Mr. Swartz)  During the time that you were --

5  what was the name -- the name of your title patient

6  care?

7     A.  Internal case manager.

8     Q.  Internal case manager?  As your role, position of

9  internal case manager, did you become familiar with

10  patients who would go off of hospice to go on -- go to a

11  hospital?

12    A.  Yes.

13    Q.  Did that happen at Merida frequently or

14  infrequently?

15    A.  Frequently.

16    Q.  And is there anything about that that's a red

17  flag for you?

18    A.  Yes.

19    Q.  What is it?

20    A.  In my experience a patient that continues to seek

21  aggressive treatment --

22            THE COURT:  Again ma'am, speak loudly and

23  clearly.

24            THE WITNESS:  Sorry.  In my experience a

25  patient that continues to go to the hospital and seek

1    aggressive treatment is not yet ready for hospice and

2    maybe wants to continue with curative measures or

3    treatment and is not yet on the hospice page as far as

4    wanting just palliative and comfort care at home.

5        Q.   (By Mr. Swartz)  And what about, I think you

6    mentioned activities that patients were engaged in,

7    what -- what kinds of activities were patients engaged

8    in at the Merida Group that raised red flags for you?

9        A.   I did get a report from a nurse that went out to

10   see a patient.

11            MR. CYGANIEWICZ:  Objection, Your Honor,

12   hearsay on a report they she may have gotten from

13   someone else.

14            MR. SWARTZ:  Your Honor, it's an agent of

15   the Defendant's company that's reporting this

16   information to her.

17            MR. CYGANIEWICZ:  It's still hearsay, Judge,

18   out of court statement being offered for the truth.

19            MR. SWARTZ:  801(d)(2)(d), the employee was

20   relaying information to her in the scope of the

21   employee's --

22            THE COURT:  Rephrase the question so that

23   it's clear that you're asking about medical history of

24   the -- of this patient.

25            MR. SWARTZ:  Yes, Your Honor.

1    Q.   (By Mr. Swartz)  So were there employees that you

2    interacted with at the Merida Group?

3    A.   Yes, my -- my nurses.

4    Q.   Were there nurses that reported --

5                THE COURT:  Loud voice, ma'am.

6                THE WITNESS:  My nurses.

7    Q.   (By Mr. Swartz)  Were there nurses reporting to

8    you in the scope of their employment?

9    A.   Yes.

10   Q.   Did they relay information to you within the

11   scope of their employment about hospice patients

12   engaging in activities that appeared inappropriate to a

13   hospice patient?

14   A.   Yes, they did.

15   Q.   Can you describe those activities that you

16   learned from your employees, from the nurses reporting

17   to you?

18   A.   A nurse reported a patient that she didn't

19   recognize as being a patient on her first visit because

20   patient was outside painting the house.  Another patient

21   I know was outside doing lawn care and weed-eating and

22   lawn mowing.

23   Q.   Painting a house?

24   A.   Yes.

25   Q.   Lawn care?

1    A.   Yes.

2    Q.   Anything else?

3    A.   Not that I can think of, no.

4    Q.   Amusement parks?

5    A.   Well, we did have a report of a patient having a

6    missed visit because they were at Fiesta.

7    Q.   Excuse me?

8    A.   They were at the Fiesta in San Antonio.

9    Q.   Are those the kinds of -- in your years of

10   experience in the hospice field, are those the kinds of

11   activities that a hospice patient, somebody who's

12   terminally ill and not expected to survive six months

13   would be engaged in?

14   A.   No.

15   Q.   Now, what about -- during the time that you were

16   at Merida did you become familiar with the patient's

17   plan of care?

18   A.   Yes.

19   Q.   What is a plan of care?

20   A.   A plan of care is something that every hospice

21   patient has to have, it serves as our treatment record

22   of what we plan on doing with that patient.  Any issues

23   that they're having, symptom control, such as pain,

24   nausea, fall risk anything like that you put into place

25   on admission.  Once that patient is -- is on service and

1    the plan of care is adjusted according to the patient's

2    needs and as you treat them.

3        Q.   And at the Merida Group, did you notice anything

4    with respect to the plan of cares that raised red flags

5    for you?

6        A.   Yes, a lot of the patients had what I call

7    cookie-cutter plan of cares, meaning that they were all

8    typically standard plan of cares of just putting the

9    same ones in every patient's profile.

10       Q.   And why would a cookie-cutter plan of care raise

11   concerns for you?

12       A.   Because it's not -- because when a patient comes

13   in hospice they should all have their own individual

14   problems and symptoms that you need to control.  If

15   you're looking at somebody who has standard plan of

16   care, it just shows that everybody's typically the same

17   and there may not be any real issues that you're dealing

18   with at that time.

19       Q.   Now, these patients that you observed based on

20   your work at the Merida Group, they were on hospice for

21   a long period of time, did you notice anything about

22   their plans of cares, were they changing, not changing?

23       A.   No, what I noticed is they weren't changing a

24   lot.  When you look at a patient on hospice, in my

25   experience the plan of care should be changing as the

1    patient is changing, the medications should be changing

2    according to the patient changing, such as increases or

3    decreases in medication to control symptoms as they

4    decline.

5        Q.   What about were there instances were you became

6    aware in your role at Merida Group that patients were

7    placed on hospice without the knowledge of their primary

8    care physician?

9        A.   Yes, there was.

10       Q.   Can you describe that for the jury?

11       A.   There was two instances specifically that I

12   recall receiving phone calls as the internal case

13   manager from very irate and upset --

14              MR. CANALES:   I -- Your Honor --

15              THE WITNESS:  -- physician.

16              MR. CANALES:  May we approach?

17              THE COURT:  One second.

18              (BENCH CONFERENCE.)

19              MR. CANALES:  Your Honor, I let this go with

20   the last witness, but it looks like they're getting into

21   testimony concerning patients or event that are not

22   indicted, no notice of with patients and complaints.

23   There's no specificity as to who this patient is but

24   they're certainly not one of the six hospice patients

25   that are in the indictment.

1                So getting into what was happening, what

2      this witness is going to say about, I don't know what

3      she's going to say about what witness, but that it's

4      improper for -- I believe for the Government to get into

5      and we have no notice of prior bad acts before --

6      beforehand.

7                MR. SWARTZ:  Your Honor, the indictment

8      charges Conspiracy to Commit Health Care Fraud that went

9      from 2009 to 2018.  And the witness worked at Merida,

10     there were things she personally observed in the course

11     of her employment there, it's entirely proper for her to

12     relay, what she witnessed and observed and learned in

13     the course of employment here.  It isn't limited to the

14     six health care fraud counts, but there's conspiracy.

15               THE COURT:  Gentlemen.

16               MR. CANALES:  They provided no notice of

17     these other patients to us, Your Honor, and at any point

18     in time.  They're required -- if they're going to show

19     other bad acts outside of the indictment, they can do

20     that, but they provided no notice of these people.

21     We -- you know, there's no mention of any of that in her

22     302's, Your Honor, now all of a sudden, they did this

23     with the last witness, they started talking about

24     witnesses we've never seen before, we don't have -- we

25     haven't had an opportunity to interview them, to

1   investigate those -- those people, and it's completely

2   improper for the Government to try to surprise us

3   getting into testimony of -- of patients that we have no

4   knowledge and they never alleged any problems with.

5             MR. SWARTZ:  Your Honor, the witness is not

6   talking about other bad acts, this is the bad act

7   charged in the indictment, it's entirely -- we have the

8   burden of proof, we're eliciting evidence to support

9   that burden of proof.

10            THE COURT:  The objection to -- the

11   objection -- well, we can go back on the record.

12   Gentlemen, I'm going to overrule this obviously.  Again,

13   this is the conspiracy for many years not limited in

14   scope just to the six Defendants, the last witness spoke

15   about 100 different patients, again I'm only going to

16   let her speak about the patients she has knowledge about

17   but --

18            MR. CANALES:  We would ask, Your Honor, so I

19   don't have to keep getting up and down that -- that you

20   instruct the Government to ask that, to not generically,

21   but let's talk about which patients she's actually

22   talking about, if she knows.

23            They need to establish who are those

24   patient.  The last witness on cross, when I asked her

25   what the patients, I can't remember a single name,

1     they're just giving these generalities.

2               MR. SWARTZ:  That sounds like a topic you

3     can take up on cross.

4               THE COURT:  Again gentlemen, the Government

5     is free to ask about the patients that they have

6     knowledge about.  Gentlemen, the Court will be

7     consistent about allowing hearsay exceptions as to

8     employees, nurses, patients, discussions about the

9     medical history or their treatment during the course of

10    the treatment.  You're free to make those hearsay

11    objections, but the Court will consistent in allowing

12    that kind of entry into the record.

13              Anything else?

14              MR. CANALES:  I need to make the objection,

15    Judge.  I understand where the Court -- I'm just --

16              THE COURT:  I'm just saying just so you

17    know, I mean -- now, if the -- if the nurse or a doctor

18    is speaking outside the scope of their employment, or it

19    doesn't have anything to do with the patient, obviously

20    that would be a different issue.  All right.

21              (OPEN COURT.)

22              THE COURT:  Let's do this.  First of all,

23    the -- the objection -- well, the Court has ruled on the

24    objection.  Why don't we take a break at this time.

25              MR. SWARTZ:  Yes, Your Honor.

1          THE COURT:  Obviously, I think we've had a

2    long day and I did promise the jury to break at 5:00 and

3    we'll give you a few minutes.  So rather than get back

4    into it, let's start fresh tomorrow.

5          Ladies and gentlemen of the jury, again,

6    thank you for your hard work, your patience, your

7    attention.  Same instructions as before, please do not

8    discuss the case, research the case, but please be here

9    promptly, again, we'll try and start promptly at 9:00,

10   if not, a few minutes earlier.  You've done a fantastic

11   job of getting here early, and I know we've been saving

12   a few minutes, so let's keep up that -- that standard

13   protocol.

14          At this time we'll be in recess for the

15   evening.  The witness is excused.  Again, ma'am, you're

16   not to discuss this case with anyone and please --

17   you're still under oath please report here promptly

18   before 9:00.  All right.  Thank you.  We'll be in

19   recess.

20          COURT OFFICER:  All rise for the jury.

21          MR. GUERRA:  There's one matter I'd like to

22   take outside the presence.

23          THE COURT:  No problem.  Thank you,

24   everyone.

25          (JURY OUT.)

1            THE COURT:  Mr. Guerra, let's go back on the

2   record.  Wait.

3            MR. GUERRA:  Yes, Your Honor.  Just this

4   morning we were -- briefly, Your Honor.  This morning

5   the Defendants were handed some additional 302's of

6   witness statements, I guess that the Government took in

7   preparation for trial.  They have to deal with

8   confidential informant, but the items were redacted and

9   so we're just making the request on the record that we

10  be provided with which of the confidential human

11  informants they talked to because they're blacked out.

12  Just for purposes of preparation of trial, we just want

13  to know who they talked to.  So whether they can do it

14  in open Court, whether they send an e-mail we're just

15  making the request on the record.

16            MR. LOWELL:  We'll send counsel an e-mail

17  this evening.

18            MR. GUERRA:  Okay.

19            THE COURT:  All right.  Well, give them the

20  information as quickly as possible.

21            MR. GUERRA:  Thank you, Your Honor.

22            THE COURT:  All counsel obviously.

23            MR. SWARTZ:  Your Honor, one additional

24  point.  So far the Government, I think we've been on

25  track at giving the Court back time with each of our

1    witnesses, there -- there is one witness where we think

2    we may need a little bit additional time than we

3    originally estimated, so we wanted to raise that with

4    the Court to -- to see if we could potentially allocate

5    some time we've given back.

6                    THE COURT:  Okay.  If -- all of these

7    estimates that you've given have been -- you have been

8    giving me back time, if there's one, let's not make a

9    habit of it, but for all parties, again, Mr. Cyganiewicz

10   we -- we gave you an opportunity to update your

11   estimates as well, there were numerous NA's that we

12   were --

13                   MR. CYGANIEWICZ:  Judge, I told your Court

14   that NA means that we don't plan to call that witness so

15   I didn't want to --

16                   THE COURT:  Okay, I thought you just didn't

17   have a -- you've clarified that.  Just let me know

18   ahead -- in terms of which witness it is and how much

19   time you need.

20                   MR. TONY CANALES:  Which witness we're

21   talking about.

22                   MR. SWARTZ:  We'll look at our list and

23   we'll update you all this evening when you -- we give

24   you your list for tomorrow.  Special Agent Neal

25   Williams.

```
1                    MR. TONY CANALES:  Who?

2                    THE COURT:  He's expected, do you want to

3    call him tomorrow.

4                    MR. SWARTZ:  We anticipate we may call him

5    tomorrow.

6                    THE COURT:  All right.  And Neal Williams,

7    one second, you've already scheduled him for 1.5.

8                    MR. SWARTZ:  Yes, Your Honor.

9                    The issue is that we anticipate that we'll

10   play some video clips that are in evidence and there may

11   be some logistical issues because there's the clips,

12   there's translations that go along with the clips, we

13   frankly just don't know how long that process will take.

14                   THE COURT:  All right.  Well, taking into

15   account the video clips, do you want to extend an hour

16   or --

17                   MR. SWARTZ:  If the Court could indulge with

18   an additional hour that would be wonderful.

19                   THE COURT:  The Court will allow -- will now

20   amend to 2.5 hours.

21                   MR. SWARTZ:  Thank you, Your Honor.

22                   THE COURT:  All right.  Anything else,

23   gentlemen?

24                   MR. SWARTZ:  No, Your Honor.

25                   MR. CYGANIEWICZ:  No, sir.
```

1          THE COURT:  Thank you.  We'll be in recess.

2          (COURT IN RECESS.)

1                           REPORTER'S CERTIFICATE

2

3        I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled

5    matter.

6

7

8                          /s/Sheila E. Perales_____
                            SHEILA E. HEINZ-PERALES CSR RPR CRR
9                           Exp. Date:  January 31, 2021

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25