```
 1              IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION


 3
    UNITED STATES OF AMERICA      )
 4                                )
                                  )
 5  VS.                           ) CRIMINAL ACTION NO.
                                  ) B-18-CR-8
 6                                )
    RODNEY MESQUIAS, HENRY        )
 7  MCINNIS AND FRANCISCO PENA    )
                                  )
 8

 9

                          TRIAL - DAY THREE
10            BEFORE THE HONORABLE ROLANDO OLVERA
                       OCTOBER 24, 2019
11


12


13                  A P P E A R A N C E S

14
     FOR THE UNITED STATES:
15
         MR. KEVIN LOWELL
16       MR. ANDREW SWARTZ
         MR. JACOB FOSTER
17       ASSISTANT UNITED STATES ATTORNEY
         BROWNSVILLE, TEXAS 78520
18

19   FOR THE DEFENDANT RODNEY MESQUIAS:

20       MR. CHARLES BANKER
         ATTORNEY AT LAW
21       118 Pecan Boulevard
         McAllen, Texas 78501
22
         MR. HECTOR CANALES
23       MR. TONY CANALES
         ATTORNEYS AT LAW
24       2601 Morgan Avenue
         Corpus Christi, Texas 78405
25
```

```
1    FOR THE DEFENDANT HENRY MCINNIS:

2        MR. ED CYGANIEWICZ
         ATTORNEY AT LAW
3        1000 E. Madison Street
         Brownsville, Texas 78520
4
     FOR THE DEFENDANT FRANCISCO PENA:
5
         MR. ROBERT GUERRA
6        ATTORNEY AT LAW
         55 Cove Circle
7        Brownsville, Texas 78521

8    FOR THE DEFENDANT FRANCISCO PENA:

9        MS. ADRIANA ARCE-FLORES
         ATTORNEY AT LAW
10       1414 Victoria Street
         Laredo, Texas 780404
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Thank you, everyone.  Please be

2    seated.

3          Gentlemen, Sandra informed me that counsel

4    may want it addresses some issues outside the presence

5    of the jury; is that correct?

6          MR. LOWELL:  Thank you, Your Honor, and good

7    morning.  Kevin Lowell on behalf of the United States.

8          Over, the past couple of days, there's been

9    a number of comments and questions, and, frankly,

10   argument about a number of topics that the Government

11   feels is inappropriate and totally irrelevant to the

12   evidence that the jury is going to be considering in

13   this case.

14         And so we would move to exclude the defense,

15   preclude the defense from making any argument, making

16   any comments or asking any questions about four distinct

17   topics:  The first is punishment.  The Court may recall

18   that Mr. Canales, Hector Canales, made a comment, I

19   believe it was yesterday during Cross-Examination about

20   Rodney Mesquias, Defendant Rodney Mesquias facing a

21   possible life sentence.

22         As the Court knows, the law is clear on this

23   point, the jury's considering guilt or innocence, this

24   is not the sentencing phase, and any comments about the

25   potential penalty in this case is totally irrelevant to

1     the elements of defense.

2              So we'd ask the Court to exclude any comment

3     about the potential penalties in this case.

4              The second --

5              THE COURT:  Let's take each one, I'm sorry,

6     up one moment at a time.

7              Mr. Canales, were the -- again, it was a

8     long day, if there were any comments about sentencing, I

9     don't recall that.

10             MR. HECTOR CANALES:  No, no, Your Honor,

11    there -- there wasn't.  I didn't talk about sentencing

12    at all.  But I -- I believe I -- the question was with

13    Mr. Gonzalez, I was cross-examining the witness to -- on

14    the issue of whether or not he understood the gravity of

15    the situation and the importance of being in a

16    courtroom, and I said my client is on trial for his

17    life, which is true, that's not about sentencing, I mean

18    any -- whether it's a day in jail, but I will -- let me

19    just shortcut things, I will not ask any question about

20    sentencing any pro prospective juror.

21             THE COURT:  Witness.

22             MR. HECTOR CANALES:  Excuse me, witness.

23             THE COURT:  Gentlemen, all -- obviously,

24    again, in -- in general terms, avoid any issues having

25    to do with sentencing or punishment and -- and be

1    careful how you phrase your questions.

2              MR. HECTOR CANALES:  I will, Your Honor.

3              THE COURT:  All right.  What's the next

4    issue?

5              MR. LOWELL:  Second topic, Your Honor, is

6    selective prosecution.  We heard that theme, it came up

7    during the defense, the defense opening.  Again, that

8    has nothing to do, no bearing on the charges on whether

9    or not the Defendants are guilty or innocent.

10             So any comment about selective prosecution,

11   whether there have been Defendants who have not been

12   charged with a crime, totally irrelevant to what the

13   jury is going to be considering during the guilt phase

14   of this case.

15             THE COURT:  Mr. Guerra?

16             MR. GUERRA:  Your Honor, we completely

17   disagree.  We believe it's a valid defense.  The

18   Government presents no case law or precedent to show

19   that why this is an inappropriate argument for the jury,

20   and as the jury's already heard, there are other doctors

21   not part of this indictment who have not even been

22   spoken to by the federal government who witnesses

23   produced by the Government they are doing the exact same

24   thing.  I believe that's a valid area for the defense to

25   get into and I -- the jury needs -- I believe the jury

1    needs to understand that.

2              MR. HECTOR CANALES:  And Your Honor, I will

3    add there is ample Fifth Circuit precedent that the

4    defense is entitled to a theory of their case, right,

5    and the defense is entitled to full and open

6    Cross-Examination of a witness.

7              THE COURT:  Gentlemen, again, selective

8    prosecution Mr. Lowell in the way you're using it, I

9    mean, again that can mean many things.  So I -- I need a

10   little more specifics in terms of what you're referring

11   to.

12             The one example Mr. Guerra just brought up

13   would be a valid defense of strategy, but, again, can

14   you be a little more specific in terms of what you're

15   referring to?

16             MR. LOWELL:  Absolutely, Your Honor.  And so

17   I mean it was a theme, it was a general theme that

18   was -- that was argued in the opening.  And the issue,

19   the risk is the jury is deciding the guilt or innocence

20   as to these three Defendants.  They're not here to

21   decide whether other uncharged parties were guilty of

22   the same crimes.  So injects these other facts that have

23   no bearing on this specific case, and there is case law

24   that supports that proposition, the Government's happy

25   to brief the issue in a very motion if the Court would

1    consider it, but I think it's totally improper.

2                    THE COURT:  All right.  Well, if you want to

3    brief the issue and present it to me later, I think it's

4    premature for me to make a ruling now.  I'd like for

5    specifics.  Obviously, I'll -- I'll take that under

6    advisement.

7                    MR. LOWELL:  And I -- thank you, Your Honor,

8    I appreciate.  And I would just add that there are the

9    all sorts of factors that go decision -- charging

10   decisions and who the Government charges and whether

11   certain people will be charged in the future.  The jury

12   is not going to hear any of that.

13                   MR. HECTOR CANALES:  As -- as Mr. Swartz,

14   that's your name, right?

15                   MR. SWARTZ:  Yes.

16                   MR. HECTOR CANALES:  Told the Court

17   yesterday with me, Judge, that I'm sure that's something

18   they can bring up on Cross-Examination themselves or

19   argue themselves.

20                   The Government, we're in the middle of

21   trial, Your Honor, all this has been waived, they've

22   brought -- they've made their opening statements, we've

23   made ours, let the players play and let the jury hear

24   the evidence.

25                   Now -- now they're asking the Court to come

1    in and -- and -- and ask you to, you know, put a hand

2    behind our back, stand on one leg, I mean it's -- it's

3    really silly.

4                THE COURT:  Again, gentlemen, I'm not

5    granting anything that's been said so far unless it's

6    been agreed to.

7                Is there any other issue you want to bring

8    before the Court?

9                MR. LOWELL:  Just two -- two additional

10   brief -- brief issues.  Counsel for Mr. McInnis has

11   referred to himself as an unpaid lawyer, we would just

12   ask the Court to --

13               MR. CYGANIEWICZ:  I'm getting paid,

14   Your Honor, I didn't say that.  I just said the Court

15   assigned this case to me.

16               THE COURT:  All right.  You're

17   court-appointed.

18               MR. CYGANIEWICZ:  Yeah, I'm getting paid by

19   the Government, same as them.

20               THE COURT:  I signed the voucher so please

21   be careful in terms of any reference that you're not

22   being paid.

23               MR. CYGANIEWICZ:  Okay, sir.

24               THE COURT:  I think that's agreed to, you're

25   not going to refer to yourself as unpaid lawyer; is that

1   correct?

2            MR. CYGANIEWICZ:  No, I never have and never

3   will, even though I've represented many people and not

4   been paid but --

5            THE COURT:  Anything -- anything else?

6            MR. SWARTZ:  Your Honor, if I may just add

7   to that.  I think the statement that Mr. McInnis made in

8   opening is that his client could not afford a lawyer so

9   he was appointed, and that fact is not relevant at all

10  to the case.

11           The fact Mr. McInnis could not afford a

12  lawyer and was appointed one by the Court really should

13  be of no bearing to the jury or heard by the jury in

14  this case.

15           THE COURT:  Well, again, I -- gentlemen,

16  that's come and gone, I think we can't go back in the

17  past, there was no objection at the time.  The Court

18  will instruct Mr. Cyganiewicz not to make any references

19  that would imply that you're not being paid.  If you

20  want to admit you're court-appointed, that's a different

21  issue but you are being paid.

22           MR. HECTOR CANALES:  I'd like to point out

23  the irony, Judge, it's only important if it's rich, if

24  he's poor, it's not important and irrelevant and --

25           THE COURT:  Gentlemen, let's move on, let's

```
 1   move on, let's move on.
 2            MR. LOWELL:  Thank you, Your Honor.  One
 3   final topic.  We've heard argument, or there have been
 4   questions about civil statutes, civil regulations and
 5   the civil law governing health care fraud enforcement.
 6            As the Court knows, those civil statutes and
 7   laws concern a different level of mens rea, different
 8   burden of proof, different elements.
 9            We would ask the Court to exclude defense
10   from asking questions about civil statutes, civil
11   mens rea and anything that has nothing to do with the
12   criminal statutes that the jury's going to be
13   considering and applying in this case.  Confuses the
14   issues.
15            MR. GUERRA:  Your Honor, that -- that line
16   of questioning that the Government refers to was
17   specifically addressed to the Medicare expert that they
18   brought up.  Within the Medicare regulations, there are
19   different charging mechanisms.  She explained why she
20   referred it to the law enforcement and she actually
21   said, we didn't make a decision as to whether or not
22   it's criminal or civil, I think that settled the issue
23   and I don't anticipate it coming up again unless they
24   bring it up, first of all; second of all, with regards
25   to the mens rea as we brought up with the expert there
```

1    is no difference in the mens rea.  They both say

2    knowingly and they both say willingly.  So there is no

3    difference with the mens rea, in fact it's a judgment

4    call that the Government makes as to whether or not it's

5    criminal or civil issue.

6                    THE COURT:  Listen, the questioning to the

7    expert or, I forget --

8                    MR. GUERRA:  Ms. McMillan.

9                    THE COURT:  Ms. McMillan's questioning in

10   terms of the numerous options, whether it's an

11   administrative issue, a civil issue, a penal issue was

12   proper, there was no objection at the time.

13                   In the event there's some expert in the

14   future that -- that -- that is discussing the criminal

15   penalties, if the defense wants to bring up the other

16   options that are available under the code, that would be

17   allowed.  That would be allowed.  All right.

18                   MR. HECTOR CANALES:  Your Honor, I have one

19   more -- I have one matter.  Are you done?

20                   MR. LOWELL:  Sure.

21                   MR. HECTOR CANALES:  I have one matter.  The

22   Court's order document 329, Your Honor, on order of

23   pretrial matters.

24                   I bring the Court's attention to item number

25   two here.  It states the Court will issue a limiting

1    instruction to the jury.  The Government is not

2    attempting to infer all -- all claims Medicare paid were

3    fraudulent; the jury is to consider only the Medicare

4    claims alleged to be fraudulent.

5              Your Honor, quite frankly, I -- I should

6    have brought this to the Court's attention earlier with

7    some of the prior witnesses because there certainly has

8    been testimony from them that all claims have been,

9    which they want to do that, that's -- that's their

10   prerogative, that's the case they want to try, but we

11   would request that the jury instruct -- that the Judge

12   instruct, as you've ordered here, that issue this

13   limiting instruction as per the Court's order that the

14   Government is not attempting to infer all claims

15   Medicare were fraudulent and the jury is only to

16   consider only Medicare claims considered to be

17   fraudulent.

18             I think that instruction is already proper

19   for the witness that's on the stand and based on the

20   302's that we received of the upcoming witnesses it will

21   be proper for them as well, so we'd request that the

22   Court issue this instruction as you ordered it.

23             MR. LOWELL:  Your Honor, I don't know that

24   we need it to take up this specific issue right now.

25             THE COURT:  Mr. Canales, Mr. Lowell -- well

1    go ahead, your response, please.

2              MR. LOWELL:   No, I was just going to say

3    that we submitted an instruction on this point for the

4    Court's consideration.

5              THE COURT:   Gentlemen, to be quite frank,

6    that paragraph was in reference to the proposed jury

7    instructions that will be, at least that was my

8    understanding.   Again, the only time the -- the Court is

9    going to be issuing instructions to the jury, aside from

10   the initial jury instructions that I read into the

11   record about conduct and what have you, will be in the

12   charge.

13             MR. HECTOR CANALES:   No, no, let me --

14             THE COURT:   I'm --

15             MR. HECTOR CANALES:   No, Your Honor, this is

16   with regards to witnesses.   Paragraph B.

17             THE COURT:   Ruling on objection, go ahead.

18             MR. HECTOR CANALES:   With ruling on

19   objections, paragraph B. One, sorry, 1, 2, and here in

20   fact, 1 we should have -- should have been some

21   instructions there but -- but to the point here, 2

22   instruction to the jury the Government's not attempt --

23   this is in regards to witnesses.

24             The evidence is being allowed to come in

25   because we objected, Your Honor, I'll refresh the

1    Court's memory, we objected as to the scope of the -- of

2    the witness' testimony and the Court denied that in a

3    sense that, no, I'm going to allow them to bring in this

4    evidence but I'm going to limit -- I'm going to make

5    sure and give an instruction to the jury they understand

6    what the purpose of this evidence is, right?

7              But, and that's how all this came about in

8    the Court -- in the Court's order here.  This is --

9    you're right, there will also be an instruction in the

10   charge, but the Court is to give the jury the

11   instructions so they can properly consider the -- the

12   testimony of the witness right now.

13             And that's what this -- that's what your

14   ruling is here, Judge.

15             THE COURT:  Mr. Canales, you're -- you're --

16   I believe your interpretation is overly broad, the Court

17   will not issue that instruction for every single

18   witness.  The Court has no way of knowing --

19             MR. HECTOR CANALES:  Well, I'm going to

20   stand up and request it, Judge.

21             That's -- that's -- I mean you don't have to

22   do it on your own, I'm going to stand up and say, Judge,

23   I request the Court issue the limiting instruction.

24   And -- and all you have to do is read what -- what your

25   order says right here, paragraph two.

```
 1              THE COURT:  Mr. Lowell, Government's

 2    response?

 3              MR. LOWELL:  Your Honor, at the charging

 4    conference we did submit an instruction for the Court's

 5    consideration.  Evidence about the claims that were

 6    submitted that were fraudulent and the number of claims

 7    and the testimony that the Court is hearing is all

 8    relevant to both the conspiracy charge that the Court

 9    noted and observed yesterday on the -- at the side bar

10    as well as the substantive counts.

11              MR. HECTOR CANALES:  Judge, I don't

12    understand how their suggestion to you trumps your

13    order.  This is -- this is -- this is your order, Judge.

14    I -- I don't think -- I don't think I'm out of bounds to

15    ask the Court to read what the Court said that it's

16    going to -- I mean, I don't get it, I don't get -- they

17    submitted an instruction --

18              THE COURT:  Well, and back to the point.

19              MR. HECTOR CANALES:  And -- and, Your Honor,

20    I was going to just say that was in response to what

21    this was here.

22              THE COURT:  Mr. Canales, I understand, I

23    understand what you're saying, sir, but again at least

24    when the Court drafted that order in response to the

25    objections to the witnesses and the objections to the
```

1   witnesses that -- that addressed that issue, the

2   response to your objection -- not yours, the defenses'

3   objections --

4           MR. HECTOR CANALES:  Right.

5           THE COURT:  -- was that there would be a

6   limiting instruction and, to be quite frank, I perhaps

7   should have been more specific, but at least my

8   recollection in reading that was that I would issue a

9   limiting instruction in the jury charge as to that

10  issue.

11          MR. HECTOR CANALES:  Right, but -- sorry.

12          THE COURT:  Again, I did not contemplate

13  that the defense was requesting that I read that

14  instruction to any potential witness that it applied.

15          MR. HECTOR CANALES:  Well, the defense under

16  rule --

17          THE COURT:  On the same token, for example,

18  again, I -- I understand your defense of strategy but --

19          MR. HECTOR CANALES:  It's not a strategy.

20          THE COURT:  The Court is not going to be

21  saying the indictment is limited only to six, or it's

22  limited -- or it's -- it's broad based or -- I mean,

23  again, the Court is not going to be giving instructions

24  on each side prospective's side strategy.

25          MR. HECTOR CANALES:  I'm not asking for

1    that, Judge.  Pursuant -- this is a request to be clear

2    for the record.

3                    THE COURT:  All right.

4                    MR. HECTOR CANALES:  This is request

5    pursuant to Federal Rule of Evidence 105, which is

6    specific with the Court gives instructions to jury.

7    It's a request by the defense to give an instruction.

8    My position, Your Honor, for my client is that that's

9    exactly what -- what we brought up in these pretrial

10   matters that the Court granted that -- granted that

11   request.  It is proper and happens in every trial that

12   I've ever been in, Your Honor, where a -- where a Judge

13   properly instructs the jury as to the scope and the

14   purpose of the evidence that the witness is testifying

15   at the time and during trial.  It's in the rules of

16   evidence.  We believed, Your Honor, that this order

17   was -- was clear that we -- and we're relying on the

18   Court's order, my client was relying on the Court's

19   order to issue this limiting instruction to the jury

20   that -- that the Government is not attempting to infer

21   all claims of Medicare paid were fraudulent.  The jury

22   is to consider only the Medicare claims alleged to be

23   fraudulent.  And -- and -- and for the record,

24   Your Honor --

25                    THE COURT:  Why don't we -- why don't we do

```
1    it this way, Mr. Canales, unless I hear an objection.
2              I have no -- again, I intend to read that
3    into record in the charge, I have no problem reading it
4    into record in front of the jury before we get started.
5    But rather than --
6              MR. HECTOR CANALES:  Fine.
7              THE COURT:  -- read it into the record for
8    every witness --
9              MR. CYGANIEWICZ:  You don't have to do that.
10             MR. HECTOR CANALES:  If you can do that, you
11   can do that.
12             MR. CYGANIEWICZ:  I don't think we need to
13   read it for every witness, Your Honor.
14             MR. SWARTZ:  May -- may I just interject
15   here?
16             THE COURT:  Yes, sir.
17             MR. SWARTZ:  I think Mr. Canales is taking
18   this out of context.  How this arose was the indictment
19   lists the total amount billed and paid by the Merida
20   Group to Medicare and they objected to that saying, oh
21   well, you're -- you're saying all this amount billed to
22   Medicare and Medicaid, that's prejudicial and the Court
23   said, well, in order to address that, the Court will
24   issue an instruction during jury instructions saying
25   that the Government is not required to prove that every
```

1    single dollar paid to Medicare and Medicaid was

2    fraudulent.

3            And then the Court -- we addressed that at

4    that hearing, the Government suggested that the

5    Government would submit a proposed instruction on that

6    point, which the Government did.  I don't believe the

7    defense responded to it.  The proposed instruction is

8    document 334.  But there was never a discussion about

9    instructing witnesses, it was just a jury instruction

10   issue about the specific point in the indictment about

11   the total amount billed and paid to Medicare.

12           THE COURT:  Back to my point, it's my

13   recollection that, obviously, not the entire amount of

14   150 million, I'm just -- I believe that's the number

15   that was used back then, not the entire 150 million is

16   deemed fraudulent.  Obviously, it's -- it's a percentage

17   less than that.  And back to the point, that -- my

18   recollection is that that was the purpose of that

19   language.

20           Now, but on the same token, I have no

21   problem reading that instruction to the jury.  It's

22   going to be read to the jury at the end of the trial

23   anyway.

24           MR. HECTOR CANALES:  That's what we request,

25   Your Honor, that -- that when the jury comes in before a

1    question is asked to the witness that the Court instruct

2    the jury per its order.

3            THE COURT:  All right.

4            MR. FOSTER:  If I may, Your Honor.  At the

5    charge conference, the Government raised a question just

6    about the technical accuracy of that instruction and

7    indicated we'd brief the issue for Your Honor so that

8    Your Honor could consider whether that instruction

9    should be given to the jury, or whether a modified form

10   of instruction should be given.  And that was document

11   334 which the Government submitted along with case law

12   from the Fifth Circuit and other circuits.

13           So we would just ask that before the Court

14   gives any instruction to the jury on this issue, you

15   consider the Government's filing, which we filed on

16   September 9th in regard to this specific instruction and

17   the defense never responded to.

18           THE COURT:  Back to the point, gentlemen,

19   that very short -- I don't know if it's one sentence or

20   two sentences, I don't mind reading that into the jury.

21   That's it, I'm not -- I'm not going to do it again until

22   it's placed back into the charge.

23           MR. GUERRA:  Correct.

24           THE COURT:  Are you objecting to the

25   language in -- in -- in the order, Mr. Foster, or do

```
 1    you -- are you requesting that it be amended in some
 2    way?
 3                 MR. FOSTER:  Yes, Your Honor, and -- and --
 4                 THE COURT:  One second.  Let me see it.
 5                 MR. FOSTER:  Yeah.
 6                 THE COURT:  The Court will issue a limiting
 7    instruction that the Government is not attempting to
 8    infer all claims paid from fraudulent.  The jury is to
 9    consider -- one sentence with a semicolon, the jury is
10    to consider only the matter alleged to be filed.  All
11    right.
12                 MR. FOSTER:  Yes, so at the charge
13    conference, Your Honor, the Government indicated that we
14    had a concern about that language and we'd like to brief
15    it for your consideration before the final form was
16    given to the jury.  Your Honor indicated that the
17    Government should brief that issue before it was given
18    to the jury and we did brief that issue.
19                 So we would just ask that you consider the
20    briefing that we filed on it.
21                 THE COURT:  All right.  Well, back to the
22    point Mr. Foster, they're asking that I read this
23    instruction now.  If -- if I were to read it now, what
24    is it that you're objecting to in that language or that
25    you're requesting be amended?
```

```
 1              MR. FOSTER:  Yes, Your Honor.  I don't have
 2    the language -- the language itself.
 3              THE COURT:  Here, would you like --
 4              MR. FOSTER:  Yeah.
 5              THE COURT:  It's one sentence.
 6              MR. FOSTER:  Yes, Your Honor.
 7              MR. SWARTZ:  If I may pass up to the Court
 8    document 334 which has the Government's proposed
 9    language?
10              MR. HECTOR CANALES:  Judge --
11              THE COURT:  Let me see the proposed language
12    by the Government as well.  Go -- go ahead.
13              MR. FOSTER:  Yes, Your Honor.  So the issue
14    with the -- the technical issue with the language is the
15    phrasing that the Government is not attempting to infer
16    all claims Medicare paid were fraudulent.
17              And that slightly invades the province of
18    the jury.  What the law is, is that the Government is
19    not required to prove that all claims submitted were
20    fraudulent, but the jury can of course infer that based
21    on the evidence and there's no restriction in the
22    Government preventing -- presenting evidence, or the
23    jury reaching a conclusion that all of the claims were
24    fraudulent.
25              The issue is that the Government is not
```

```
 1    required to prove that all of the Medicare claims were
 2    fraudulent.
 3              And so by suggesting that we are not
 4    attempting to infer, or that the jury in some way cannot
 5    infer that all the claims were fraudulent, that invades
 6    the province of the jury to make their determination
 7    based on the evidence.
 8              THE COURT:  May I see -- may I see the --
 9    the Court's order again?
10              MR. GUERRA:  Your Honor, respectfully the
11    order of the Court was made based on the motions in
12    limine filed by all Defendants.  The Court gave it due
13    consideration, first of all.
14              Second of all, we know the Government is
15    arguing that all claims are fraudulent, that's basically
16    the substance of the bench conference yesterday.
17    However, they also realize that they --
18              THE COURT:  Well, that's incorrect.
19    Gentlemen, wait a second, wait a second.  First of all,
20    attempting to -- the substance of the bench conference
21    yesterday, there's a distinction there, Mr. Guerra.  The
22    defense was attempting to limit the scope of the, I
23    guess upcoming question and evidently a defensive
24    strategy that somehow the indictment was only limited in
25    scope to the six patients referenced in Count Seven or
```

1    Eight, I forget which one it is.

2              Obviously, the indictment is far broader

3    than that, the Government argued.  The -- the -- the

4    indictment covers any and all claims that were

5    fraudulent.

6              Now, so --

7              MR. GUERRA:  Right.

8              THE COURT:  -- there's a distinction between

9    the Government --

10              MR. GUERRA:  Understood, Your Honor, yes --

11              THE COURT:  -- attempt to go prove all

12    fraudulent claims and there's also a further distinction

13    between not every single claim that was submitted over

14    the span of these years was fraudulent.

15              MR. GUERRA:  And that's the defense

16    argument, Your Honor, that not every single claim over

17    the course of the indictment was fraudulent.  And all we

18    ask is the Court give that instruction to the jury.

19              If the Court intends to give it at the time

20    of the charge, there's no harm in doing it now.

21              THE COURT:  It's not the Court's practice to

22    give jury instructions at this stage of the trial.  Why

23    is this even being brought up at this stage?

24              MR. GUERRA:  Well --

25              MR. HECTOR CANALES:  Because the federal --

```
 1    the Rules of Evidence, Judge, Rule 105 instructs the

 2    Court to -- when requested by the defense to give the

 3    proper scope.

 4            For instance, another example that it

 5    happens regularly is, in cases like this, you have

 6    multi-parties, right, where you have -- where you have

 7    multiple Defendants and say, hey, hey, this -- this

 8    evidence can only be considered as to Defendant A not as

 9    to Defendant B.  That happens all the time, and this is

10    no different.  This type of evidence that you're going

11    to hear is to be considered this way.  That happens all

12    the time.

13            THE COURT:  Mr. Canales, again, why wouldn't

14    that be brought up during your cross or --

15            MR. HECTOR CANALES:  It's not that -- I am

16    going to bring it up, Judge.

17            THE COURT:  Witness X, you failed to mention

18    my client, witness X, you only had dealings with

19    Defendant Z.

20            MR. HECTOR CANALES:  I'm certainly going to

21    do that, Your Honor, but that's totally different than

22    when the rules require that the Court to do it upon the

23    Defendant's request, and even more so in this case when

24    the Court has actually ruled, made that ruling.

25            THE COURT:  I -- I want to see the rule
```

1    you're referring to --

2                    MR. HECTOR CANALES:  Yes, sir.

3                    THE COURT:  -- that requires the Court to

4    read the instruction to the jury at this time.

5                    MR. GUERRA:  And Your Honor, also the order

6    was made with regards to witnesses.  When we did file

7    our pretrial objections to witnesses and Exhibits, I --

8    I believe, I know I speak for Defendant Pena we did

9    object and ask the Court for a limiting instruction

10   based on the fact that it did not apply to every single

11   witness.  So I believe we timely filed it and the Court

12   made its ruling.

13                   MR. CYGANIEWICZ:  Sorry about that small

14   print, Judge.  I have that in my pocket at all times.

15                   MR. TONY CANALES:  It's on the screen.

16                   THE COURT:  All right.  Time-out, gentlemen.

17                   THE CLERK:  I can put it on the --

18                   MR. HECTOR CANALES:  I have it -- I have it

19   on the screen, Judge.

20                   On timely request -- the Court on timely

21   request must restrict the evidence to its proper scope

22   and instruct the jury accordingly.

23                   And, Your Honor, we made this request

24   timely.  It was a pretrial matter that the Court

25   entered.

```
 1                    (Brief pause in proceedings.)
 2                    THE COURT:  Respectfully, gentleman, I
 3      disagree with your position on Rule 105.  Again, this
 4      has to do with limiting evidence that is not admissible
 5      against other parties.  How is that applicable in this?
 6      All of this is -- is evidence applicable to all three
 7      Defendants.
 8                    MR. GUERRA:  I'm sorry, Your Honor?
 9                    Well, with regards to Defendant Pena, at
10      least the witnesses yesterday were all testifying that
11      they were in San Antonio, I did take them on
12      Cross-Examination.  However, the impression that the
13      witnesses are giving from the stand is that all claims
14      from Merida were fraudulent; we respectfully disagree,
15      and in conjunction with the order of the Court, we
16      request the limiting instruction be made.  That's all
17      we're asking, Your Honor.
18                    MR. HECTOR CANALES:  And they're all ors,
19      Judge, it's ors and ors.
20                    MR. SWARTZ:  Your Honor, what they're asking
21      the Court to do, they say they have a view of the
22      evidence and they want the Court to instruct the jury as
23      to what the evidence should be.
24                    As Mr. Foster pointed out that's the
25      province of the jury not the province of the defense
```

```
 1    counsel or the Court.

 2                 MR. FOSTER:  Also, Your Honor --

 3                 MR. HECTOR CANALES:  And we have --

 4    hang on --

 5                 MR. FOSTER:  Rule -- if I may --

 6                 MR. HECTOR CANALES:  Can we do a one horse,

 7    one rider rule, Judge?  A one horse, one rider rule.  I

 8    got -- we got three lawyers, can we one have speaking,

 9    who's the lead counsel?

10                 THE COURT:  I think we've got three and

11    three, it's a fair match.

12                 MR. HECTOR CANALES:  I'm the only one

13    speaking for my client.

14                 THE COURT:  Gentlemen, all right, I'm

15    sorry --

16                 MR. FOSTER:  Rule 105 is the Rule of

17    Evidence.  There's no question that this evidence is

18    admissible because it's within the time period of the

19    charges in the indictment.

20                 The question is under the legal requirements

21    for Conspiracy to Commit Health Care Fraud and the

22    substantive offense of health care fraud whether the

23    Government is required to prove every claim is

24    fraudulent.  It's clear that the law is that the

25    Government is not required to prove that, but the jury,
```

1    of course, may infer that if they would like but, as

2    Your Honor has indicated, that is a question of the

3    substantive law which is appropriate for the jury

4    conference which is why when we had the conference on

5    this issue the Government requested whether the Court

6    would consider modifying this language; the Court

7    indicated we could brief something, we did brief

8    something back in September, it's never been responded

9    to, if they wanted to file a response, they're free to,

10   but at this moment in time, I think it would be

11   premature to instruct the jury without considering those

12   issues.

13             MR. HECTOR CANALES:  Judge, I'm not arguing

14   admissibility.

15             THE COURT:  Let me, let me, let me, address

16   that.  First of all, Mr. Foster, paragraph two in this

17   order was not -- was never intended to be the exact

18   language that was going to be in the charge when this

19   was drafted months down the road.  This was, basically,

20   a response to the objections that were made to the

21   defense that not all $150 million were fraud.  So again

22   that is the context in terms of how this was drafted,

23   gentlemen.

24             Now -- let -- let's move away from that.

25   The language in the charge is not going to be taken

1    strictly out of paragraph number two, so the -- that's

2    not the issue here.

3              Mr. Canales and Mr. Guerra are asking for

4    the Court at this time to issue an instruction to the

5    jury, and again, it doesn't have to be a -- paragraph

6    number two in response to this issue back whenever this

7    was is not necessarily the language that -- back to the

8    point is going to be in the charge, or that may be read

9    to the jury if there's no objection to it.

10             If the parties want me to read an

11   instruction to the jury at this time in order to clarify

12   issues, I mean, I technically -- I don't mind doing

13   that, I think it's a bit -- I think it's odd; I may not

14   be applicable, I may not do it but, again, give me a

15   reason to, you're -- you're arguing that you think I

16   should at this time.  I haven't heard -- you've been

17   concentrating about the language in the future, that's

18   not the case.

19             Does the Government have an objection to me

20   reading some form of this language, and it can be more

21   precise, back to the point of the Government's not

22   required to prove or, you know, again we can get the

23   language in correctly.

24             MR. HECTOR CANALES:  Switching horses.

25             MR. LOWELL:  Switching horses here.

1            Your Honor, we do object to the issue of

2    that instruction.

3            In the Southern District of Texas there is

4    no precedent supporting reading an instruction like this

5    at this stage of the proceeding.

6            I've tried health care fraud cases in this

7    district and I've never seen an instruction like this

8    issued prior to witness testimony.

9            THE COURT:  All right.  Gentlemen --

10           MR. HECTOR CANALES:  And I have -- so that

11   doesn't do anything, Judge.

12           THE COURT:  Well gentlemen, again the

13   request is denied.  My reading of Rule 105 does not --

14   is not applicable to this scenario in the way you're

15   asking it.  I believe -- I've just read Rule 105.

16           Again, defense counsel is free to -- to

17   clarify any witness as to what experience or exposure or

18   contacts or communications they had with their

19   respective client.

20           To be quite frank, I think it's clear and it

21   will be made clear at the end that not every single

22   claim of the 150 million was fraudulent.  On the same

23   token, I think it's also clear that this indictment is

24   not limited in scope to just six patients.

25           So there -- there's two extremes here and --

1    and -- and -- and there's two extremes here and the

2    instructions at the end of the trial will hopefully

3    clarify that.

4              Back to the point, I made my ruling.

5    Anything else?

6              MR. HECTOR CANALES:  I would request then in

7    light of the Court's ruling, Your Honor, I would ask

8    wide latitude on Cross-Examination to be able to make

9    the point that -- that Your Honor just said that I -- I

10   can do in lieu of this -- in lieu of the Court's ruling.

11             THE COURT:  Gentlemen, again, I think you're

12   free -- I don't know what you mean, you're free to ask a

13   potential witness that knows about the claims, you're

14   not claiming that 100 percent were fraudulent, some --

15   some people have said 97 percent, some people have said

16   80, 85, those questions have already been asked.

17             MR. HECTOR CANALES:  I'm just anticipating

18   the Government screaming when I -- when we try to --

19   when we try to fully Cross-Examine these people,

20   Your Honor.

21             THE COURT:  But back to the joint,

22   gentlemen, you've already been asking these questions

23   and different witnesses have said different things and

24   so --

25             MR. HECTOR CANALES:  All right.

```
 1              THE COURT:  To be quite frank.
 2              MR. HECTOR CANALES:  All right.  So what
 3   I've been doing is okay, got it.
 4              THE COURT:  I don't see -- I don't see what
 5   would be different about future witnesses and the
 6   questions that you've asked, what percentage were -- did
 7   you think were fraudulent, or whatever and --
 8              MR. GUERRA:  All right.
 9              THE COURT:  You've already done that.
10              MR. HECTOR CANALES:  That's fine.  I'm just
11   anticipating, trying to avoid more bench conferences
12   that what we've done in the past, is okay and we can
13   keep doing it, that's all I needed to hear.
14              Thank you, Your Honor.
15              THE COURT:  Well, what you've done in the
16   past, unless there's been objections and it's sustained.
17              MR. HECTOR CANALES:  Well, of course.
18              THE COURT:  All right.  In other words,
19   gentlemen, again, I -- I would encourage you, and to be
20   quite frank, I -- I will -- during the course of the
21   trial you attempt to educate the jury and educate them
22   about what hearsay is and -- and so I've already told
23   the attorneys -- well, you've seen my pattern and I -- I
24   stated it in the bench conference that, gentlemen,
25   again, obviously the Court is attempting to be strict
```

1    with speculation, re -- repetition, hearsay, but

2    exceptions to hearsay and whether -- if -- if an agent

3    or representative or employee of Merida said X, or a

4    patient said Y in response to medical treatment or

5    medical history, what have you, those kind of -- of

6    statements are not considered hearsay by the rules

7    and -- and the Court is not going to sustain hearsay

8    objections on -- along those lines.

9              So --

10             MR. GUERRA:  Understood, Your Honor.

11             THE COURT:  To be quite frank it is a waste

12   of the time for you to say hearsay to those type of

13   questions.  If you want to continue to do so, I'm just

14   telling you upfront that that's not considered hearsay

15   by the Court nor by the rules.

16             All right, so, so again just in response to

17   that, I mean, I mean -

18             MR. HECTOR CANALES:  I would like to say

19   for --

20             THE COURT:  You can modify your conduct, but

21   on the same token you can keep doing what you're doing,

22   I mean so be it.

23             MR. HECTOR CANALES:  I'd like the record to

24   reflect that the Government did not provide any argument

25   or evidence as to how it would be prejudiced by the

1    Court reading the instruction that it intends to --

2    intends to provide to -- to the jury at a later point in

3    time.  There's --

4              THE COURT:  Well gentlemen, let's do this,

5    again, have you -- again, let me -- let me be clear.

6    This paragraph number two was -- is -- was never

7    intended to be the instruction that was going to be in

8    the charge.

9              So, again, when I say that the Court will

10   make a limiting instruction, well, I am going to make an

11   instruction in the jury charge on this issue.  I'm --

12             MR. HECTOR CANALES:  I'm not aware of any

13   prohibition that the Court can only do it once.

14             THE COURT:  Again, it's not the practice of

15   the Court to give jury instructions until I read it in

16   the charge, that's my practice, so back to my point.  If

17   you all want to confer and come up with language that

18   you agree on that eventually will be in the charge and

19   you agree on me reading it into the jury, I'll consider

20   it.

21             At this point in time, my problem is -- is

22   twofold:  Number one, this is not the language that's

23   going to be in the charge, so I would not want to read

24   something that's either incomplete or not completely

25   accurate or -- that is going to be different than what's

1   in the charge.

2          So if you want to come up with a statement

3   that everybody agrees with on this issue having to do

4   with, again, the issue here initially had to do with

5   Court understands not the entire $150 million in claims

6   was fraudulent, a lesser portion of that is and -- and

7   be more specific, or what the -- the burden of the

8   Government is in proving, etcetera, etcetera, let's see

9   it, I'll consider it.

10          But at this point in time the language in

11   paragraph number two will not be read to the jury.  All

12   right.

13          MR. GUERRA:  And so just for the purposes of

14   the record the defense motion to have the instruction

15   read at this moment is denied?  Is that correct,

16   Your Honor?

17          THE COURT:  The defenses' motion is denied

18   because this is not the instruction that will be read to

19   the jury.

20          MR. GUERRA:  Okay.

21          THE COURT:  So you're asking me to read to

22   the jury --

23          MR. GUERRA:  Yes before evidence today.

24          THE COURT:  A -- a section of an order that

25   is not intended to be in the jury charge.

1          MR. GUERRA:  Okay.

2          THE COURT:  Paragraph number two of this

3   order was never intended to be the language that would

4   be in the -- the final charge to the jury.

5          And to be quite frank the defenses' motion

6   is asking me to treat it as such in the Court's

7   interpretation.  All right?

8          MR. CYGANIEWICZ:  Judge, I want to make sure

9   for the record that Mr. McInnis is joining in this

10  objection and argument, and adopting the arguments and

11  motions made by codefendants' counsel.

12         THE COURT:  Unless I hear otherwise,

13  gentlemen, I will take that to be the -- the standard

14  case for all.

15         Thank you, Mr. Cyganiewicz.

16         MR. CYGANIEWICZ:  For all rulings?

17         THE COURT:  Yes, sir.

18         MR. CYGANIEWICZ:  Yes, sir.

19         THE COURT:  Well, unless you state

20  differently or what have you but --

21         MR. CYGANIEWICZ:  Okay.  Thank you,

22  Your Honor.

23         THE COURT:  So I'm not going to over --

24  rather than say overruled, overruled, overruled three

25  times, yes, it will be applicable to all three

```
 1    defendants.
 2                MR. CYGANIEWICZ:  Yes, sir, thank you.
 3                MR. LOWELL:  Thank you, Your Honor.
 4                THE COURT:  Anything else, gentlemen?
 5    Whose -- whose copy is this?
 6                COURT OFFICER:  All rise for the jury.
 7                (JURY IN.)
 8                THE COURT:  Ladies and gentlemen, again,
 9    good morning.  Please be seated.
10                And I know you may or may not know this, but
11    first of all everyone here was on a timely basis.  I
12    again thank you for your promptness.  But again there
13    will be many instances where we need to take up matters
14    outside your presence and that obviously you need to be
15    patient for until those issues are addressed.  We have
16    finished with hearing those miscellaneous matters
17    outside your presence, we're now free to proceed with
18    Ms. Gonzalez, I believe?
19                MR. SWARTZ:  Yes, Your Honor.
20                THE COURT:  Please bring in the witness.
21                THE CLERK:  Come up to the stand.  Just
22    remember to be careful with the chair.
23                THE COURT:  Ms. Gonzalez, please make
24    yourself comfortable.  I remind you you're still under
25    oath.  Please position the microphone closely to you
```

1    and, again, from the diaphragm.

2                   THE WITNESS:  Okay.

3                   THE COURT:  Loudly and clearly.

4                   THE WITNESS:  Okay.

5                   THE COURT:  Thank you very much.

6                   THE WITNESS:  Thank you.

7                   THE COURT:  Mr. Swartz, please proceed.

8                       DIRECT EXAMINATION, CONT'D.

9    BY MR. SWARTZ:

10       Q.   Good morning.

11       A.   Good morning.

12       Q.   I think where we left off yesterday, I was asking

13   you about patients that were placed on hospice with

14   Merida without the knowledge of their primary care

15   physician.  Do you remember that question from

16   yesterday?

17       A.   Um, not the whole question, no.

18       Q.   Okay.  Well, let me ask the question -- we were

19   interrupted.  While you were at Merida in your position

20   overseeing other nurses, overseeing the documentation

21   for hospice patients, did you become aware of patients

22   that were placed on hospice with Merida without the

23   knowledge of their primary care physicians?

24       A.   Yes.

25       Q.   Can you describe that for the jury.

1    A.   So there was two instances that I can recall

2    receiving phone calls as the internal case manager from

3    very upset physicians asking who gave the order to put

4    their patient on hospice, and why the patient was signed

5    on the hospice without their consent or knowledge.

6    Q.   Was that a red flag to you?

7    A.   Yes.

8    Q.   Why is that?

9    A.   Because typically the primary care physician is

10   the one who refers to hospice.   Not all the time, but

11   typically if a primary care physician is involved and

12   realizes that a patient was placed on hospice without

13   their consent, then they're very involved in the patient

14   care.

15   Q.   At other hospice companies you've worked at were

16   primary care physicians involved in the decision to

17   place their patients on hospice?

18   A.   Yes.

19   Q.   I want to ask you about the rate of admission of

20   patients at Merida.   Did anything jump out to you about

21   the rate of patients who were coming being referred to

22   hospice that were ultimately admitted to hospice at

23   Merida?

24   A.   Yes, just about every patient that was referred

25   was admitted to hospice services.

1     Q.   And does that differ from what you experienced at

2    other hospice companies?

3     A.   Yes.

4     Q.   Can you describe that for the jury.

5     A.   In my experience with hospice, I would say if

6    you're looking at a ratio of ten patients, at least one

7    to two out of the ten don't get admitted.  Either it's

8    they don't qualify or the patient and family themselves

9    deny hospice.

10    Q.   And how is Merida different from that?

11    A.   Everybody was placed on hospice.  It was very --

12    I -- in my experience when we had a referral, they were

13    admitted.

14    Q.   So a lot of the questions I had asked you

15    related --

16          THE COURT:  Yes, Ms. Gonzalez, please

17    clarify what you just said because I may have misheard

18    and again forgive me.

19          Did you say only one or two -- one -- I did

20    not hear you -- your answer in terms of when asked out

21    of the ten patients only one or two qualified, or only

22    one or two requested -- I didn't hear what you said.

23          THE WITNESS:  In my experience as a hospice

24    nurse, like if I was looking at a ratio of ten -- ten

25    referrals, I would say one to two out of those ten

```
 1   probably would not be put on hospice because either they
 2   didn't qualify according to the nurse or the patients
 3   themselves would deny it or the family saying they
 4   weren't ready for hospice services.
 5            THE COURT:  All right.  I heard you now.
 6       Q.  (By Mr. Swartz)  So is another way of saying that
 7   at other hospice companies, 80 -- well 20 percent of the
 8   patients that are referred get turned away; is that a
 9   fair statement?
10       A.  Yes.  Yes.
11       Q.  At Merida, what was the percentage of hospice
12   patients that were referred that got admitted to
13   hospice?
14            MR. HECTOR CANALES:  Objection, Your Honor,
15   calls for speculation.
16            MR. SWARTZ:  I think she's already laid the
17   foundation for that answer, Your Honor.
18            THE COURT:  Overruled.
19            THE WITNESS:  All of them, 100 percent.
20       Q.  (By Mr. Swartz)  So I'd ask you questions about
21   whether patients you witnessed, or you observed patients
22   that were placed on hospice with Merida that did not
23   qualify.  Based on the time that you were there, what
24   percentage of patients in your assessment were on
25   hospice with Merida that did not qualify for hospice
```

```
 1   care?
 2      A.   I would say 50 percent of the patients.
 3      Q.   I want to ask --
 4            MR. HECTOR CANALES:  Objection, Your Honor,
 5   the witness's answer I would say indicates that it was a
 6   guess, and we request that the Court instruct the jury
 7   to disregard any guesses or testimony that it does not
 8   directly from personal knowledge.
 9            THE COURT:  Rephrase the question in terms
10   of proper predicate.
11            MR. HECTOR CANALES:  And -- and my request,
12   Your Honor, to instruct the jury to disregard that
13   answer?
14            THE COURT:  The -- the --
15            MR. SWARTZ:  Your Honor --
16            THE COURT:  The request is granted, let's --
17   let's lay some predicate.
18            Yes, the -- the -- the jury is to disregard
19   the -- I would guess 50 percent.
20      Q.   (By Mr. Swartz)  Ms. Gonzalez, how long did you
21   work at Merida?
22      A.   For about a year -- a little over a year.
23      Q.   And did you see -- you interacted with other
24   nurses at Merida?
25      A.   Yes, I did.
```

1      Q.   Nurses reported to you?

2      A.   Yes.

3      Q.   You participated in IDT meetings?

4      A.   Yes.

5      Q.   Did you come to understand that there were

6  patients being admitted at Merida that did not qualify

7  for hospice care?

8              MR. HECTOR CANALES:  Objections, Your Honor,

9  leading, also asking for speculation, did you come to

10  understand that no -- no prior predicate.

11              MR. SWARTZ:  Your Honor, the foundation --

12              THE COURT:  That's overruled.  Answer if you

13  know.

14              THE WITNESS:  Yes.

15      Q.   (By Mr. Swartz)  So of the numbers of patients

16  that you saw while you were at Merida within that year

17  where you're overseeing other nurses, what percentage of

18  the patients did you see that were placed on Merida on

19  hospice with Merida that did not qualify for hospice?

20      A.   50 percent.

21      Q.   I want to ask you about documentation at Merida.

22  While you were at Merida, did you see signs of fraud in

23  the medical documents at Merida?

24      A.   Yes.

25      Q.   Could you describe that for the jury?

1          MR. HECTOR CANALES:  Objection, Your Honor,

2    calls for a legal conclusion, the witness is not a

3    lawyer and asking to give an opinion of law.

4          THE COURT:  Overruled.  Answer if you know.

5          THE WITNESS:  I saw that patients were being

6    changed from one diagnosis to the next without evidence

7    of a doctor changing the diagnosis, or a history and

8    physical that indicated that patient had the diagnosis.

9    Q.  (By Mr. Swartz)  Could you just -- how did that

10   come to your attention?  Walk the jury through how you

11   came to learn that?

12   A.  So the one point in time, Medicare had gotten rid

13   of two diagnoses that we're able to use in the hospice

14   process which was debility and failure to thrive and

15   dementia as a primary diagnosis so patients that were on

16   with that as a primary diagnosis either had to be

17   discharged, or you had to find the diagnosis maybe a

18   comorbid that would fit that patient at the time.

19         We were told to change anybody with dementia to

20   Alzheimer's.  I had inquired that were we going to set

21   up appointments to doctors, were doctors going to be

22   visiting to do this.  I never really got a concrete

23   answer, and then later on noticed that all the patients

24   that had those diagnosis had already been changed in the

25   computer system.

1    Q.   You used the phrase, we were told, who -- who

2    told you?

3    A.   So I was told by Eddie Zuniga that it came from

4    Harlingen to change it.

5    Q.   And when you say came from Harlingen, based on

6    your experience working at Merida for the time you were

7    there, who was in charge in Harlingen?

8    A.   Henry McInnis.

9    Q.   So did you have an understanding based on your

10   experience working at Merida would have given

11   the instruction to change those diagnosis?

12             MR. CYGANIEWICZ:   Objection, Your Honor,

13   calls for speculation, somebody named Eddie told her

14   something and she assumes it comes from Mr. McInnis.

15             THE COURT:   Rephrase the question,

16   sustained.

17   Q.   (By Mr. Swartz)   So you mentioned yesterday that

18   you worked at the Harlingen location?

19   A.   Yes.

20   Q.   What -- and you became familiar with Mr. McInnis?

21   A.   Yes.

22   Q.   What was your understanding of who was in charge

23   of issuing directives regarding issues like that,

24   changing diagnosis codes at the Harlingen location?

25             MR. CYGANIEWICZ:   Objection, Your Honor,

1   yesterday she even testified he was not involved with

2   any admissions or patients' files.

3              MR. SWARTZ:  That's actually contrary to

4   what she testified yesterday.

5              THE COURT:  That's overruled.  Answer --

6   answer if you know.

7              THE WITNESS:  Henry McInnis.

8   Q.  (By Mr. Swartz)  So if a direction like that is

9   coming out of Harlingen, who based, on your experience

10  working at Harlingen and at Merida, who have about been

11  in charge of that instruction?

12             MR. CYGANIEWICZ:  Objection, that's nothing

13  more than a guess.  Speculation, based on your

14  experience --

15             THE COURT:  I think she's already answered

16  it, but it's overruled.

17  Q.  (By Mr. Swartz)  You may answer.

18  A.  Henry McInnis.

19  Q.  So during the time you were at Merida, did you

20  become familiar with patient files?

21  A.  Yes.

22  Q.  Did you see the documents that were in patient

23  files?

24  A.  Yes.

25  Q.  Did you come to notice that there was

1    documentation missing from patient files?

2        A.  Yes.

3        Q.  Did you -- are you familiar with face-to-face

4    forms?

5        A.  Yes.

6        Q.  Are those important for the Medicare process of

7    qualifying a patient for hospice?

8        A.  Yes, that's -- that's a requirement that came to

9    be, and any patient that's on for two terms, which is

10   their first six months prior to being put into the third

11   recertification, requires a face-to-face visit by either

12   a nurse practitioner or a physician.

13       Q.  So a face-to-face form is a requirement of

14   Medicare; is that right?

15       A.  Yes.

16       Q.  Did you notice that face-to-face forms were

17   missing from the patient files?

18       A.  Yes.

19       Q.  Are these just a couple face-to-face forms or a

20   lot of face-to-face forms?

21       A.  Several.

22       Q.  Now, did you notice anything about -- were there

23   other directives given from -- you mentioned directives

24   from Harlingen about diagnosis codes.  Were there other

25   directives given from Harlingen about patient records

1    and documentation of medical records?

2       A.   Directives from Harlingen to do certain plans of

3    cares for every patient that they should have the same

4    plan of cares as far as like the cookie-cutter plan of

5    cares, every patient needs to have this, this and this

6    in their file.

7       Q.   So could you just explain -- so how -- how would

8    Harlingen tell you in San Antonio to --

9            MR. CYGANIEWICZ:   Your Honor, I would object

10   to the vague question of Harlingen.  Who was she talking

11   to in Harlingen?  She has no communication with anyone

12   in Harlingen, it's speculation, it's guessing and it

13   assumes facts not in evidence.  He's trying to leave the

14   false impression that all these conversations were with

15   Mr. McInnis, Your Honor.

16           THE COURT:   One second, Mr. Cyganiewicz.

17   Rephrase your question.

18           MR. SWARTZ:   I'll clarify, Your Honor.

19      Q.   (By Mr. Swartz)  You mentioned cookie-cutter, a

20   plan of care?

21      A.   Uh-huh.

22           THE COURT:   Ma'am, please answer out loud.

23           THE WITNESS:   Yes.

24      Q.   (By Mr. Swartz)  Where did that instruction come

25   from?

1     A.   I would talk -- I can't recall the name of

2   somebody, but I know I would get phone calls from

3   Harlingen.   Unfortunately, I -- there was very high

4   turnover so there was different people working several

5   different jobs --

6               MR. CYGANIEWICZ:   Now she's testified she

7   does not know the name, Your Honor, so I'm going to ask

8   the Court to instruct the jury about her statements

9   about Mr. McInnis giving these instructions to disregard

10   those.

11               THE COURT:   That's overruled.

12               Please proceed.

13     Q.   (By Mr. Swartz)  So can you just explain -- give

14   the jury a little context about what exactly the

15   instruction was about the plan of care?

16     A.   So we would get phone calls from the -- the

17   quality assurance nurses, the people that were actually

18   looking over the plans of care, the nursing notes and --

19   and they would tell us that, when they were reviewing

20   the notes, they all had to have the same plan of care,

21   they had to have pain as one of them, they had to have

22   definitely constipation as one of them, that every

23   patient should have at least three to four of the same

24   plans of care no matter what.

25               MR. HECTOR CANALES:   Judge, we'd object to

1   the response to the part that they told us as being

2   vague and ask that it be stricken.

3               THE COURT:  Overruled.

4      Q.  (By Mr. Swartz)  So --

5               MR. HECTOR CANALES:  As to my objection,

6   Your Honor, I don't know how to cross-examine "they".

7               THE COURT:  Overruled.

8      Q.  (By Mr. Swartz)  During the time you were at

9   Merida, to change topics a little bit, did you become

10  familiar with a Dr. Gonzaba?

11     A.  Yes.

12     Q.  What, if any, relationship does -- did

13  Dr. Gonzaba have to the Gonzaba Medical Group?

14     A.  He was a doctor there in the clinic.

15     Q.  Did the Gonzaba Group have a close relationship

16  with the Merida Group?

17     A.  Yes.

18     Q.  Was there a Merida employee at the Gonzaba Group?

19     A.  Yes.

20     Q.  Can you explain that to the jury?

21     A.  They employed a case manager named Alex that also

22  worked -- was employed with the Gonzaba Group and he was

23  also being paid by Merida.

24     Q.  Now, at any of the hospice company you've worked

25  with, has the hospice company had a paid liaison at some

```
 1   other medical practice?
 2             MR. HECTOR CANALES:  Objection, Your Honor,
 3   I'm going to object to the -- to the paid portion, no
 4   foundation has been laid as to the personal knowledge of
 5   the -- of the witness that this person was being paid
 6   and employed by anybody.
 7             MR. SWARTZ:  I'll clarify, Your Honor.
 8             MR. HECTOR CANALES:  What's her personal
 9   knowledge, how does she know -- know that?  And that
10   would not be an exception, Your Honor.
11             MR. SWARTZ:  I'll clarify.
12       Q.  (By Mr. Swartz)  So this -- you mentioned an Alex
13   that was a liaison?
14       A.  Uh-huh.
15       Q.  What was your understanding of what -- who Alex
16   was employed by?
17       A.  I was --
18             MR. HECTOR CANALES:  Excuse me, that
19   understanding calls for hearsay testimony, Your Honor.
20   He's asking the witness to, essentially take -- tell me
21   what Alex told you about my employment.
22             MR. SWARTZ:  I didn't ask her what Alex told
23   her, I said what was her understanding.
24             MR. HECTOR CANALES:  Well, he's smart enough
25   that he knows that question will be sustained and so
```

1    he's asking in an indirect way and trying to get the

2    same hearsay information.

3              THE COURT:  The question is proper, answer

4    if you know.

5              THE WITNESS:  I'm sorry, can you repeat the

6    question?

7       Q.  (By Mr. Swartz)  What was your understanding of

8    who Alex was employed by?

9       A.  My understanding he was employed by Gonzaba as

10   well as Merida.

11             MR. HECTOR CANALES:  Objection, Your Honor,

12   how does she know that?

13             THE COURT:  You can ask her that,

14   Mr. Canales.  The -- the -- the question was proper.

15             MR. HECTOR CANALES:  I would be eliciting

16   hearsay to do so, Your Honor, he's not asking it

17   intentionally.

18             THE COURT:  Mr. Canales, the question was

19   proper, the objection's overruled.

20             Please proceed.

21      Q.  (By Mr. Swartz)  Now, at any other hospice

22   company you've worked with, and how many hospice

23   companies have you worked for?

24      A.  Five to six.

25      Q.  At any of these other companies, have you noticed

1    or experienced a dual employee of the hospice company

2    and a medical practice?

3         A.   No, sir.

4         Q.   Now, did you notice with regard to the Gonzaba

5    Group whether patients were being referred from the

6    Gonzaba Group to the medical -- to the Merida Group for

7    hospice care?

8         A.   I'm sorry, can you repeat that?

9         Q.   With regard to the Gonzaba Group and the Merida

10   Group, did you notice that hospice -- that patients were

11   being referred from the Gonzaba Group to the Merida

12   Group?

13        A.   Yes.

14        Q.   Was it a couple patients, or did you notice a lot

15   of patients?

16        A.   There was several, several patients.

17        Q.   Did you have concerns based on what you saw about

18   the patients coming out of the Gonzaba Group about

19   whether they qualified for hospice care?

20             MR. HECTOR CANALES:  Objection, leading,

21   Your Honor, suggesting to the witness the answer.

22             THE COURT:  Rephrase the question.

23        Q.   (By Mr. Swartz)  What, if anything, did you

24   notice about the patients being referred from the

25   Gonzaba Group to the Merida Group?

1    A.   I noticed that a lot of the patients that were

2    being put on hospice were what we like to refer to as

3    high maintenance patients, patients that call a lot,

4    that require a lot of care, those sort of things.

5    Q.   Now, are you familiar with a Dr. Virlar?

6    A.   Yes.

7    Q.   Who -- what relationship, if any, did Dr. Virlar

8    have to the Gonzaba Group?

9    A.   He was a hospitalist for the Gonzaba Group.

10   Q.   And did you notice whether or not Dr. Virlar, as

11   a hospitalist with the Gonzaba Group, was referring

12   patients to the Merida Group?

13   A.   Yes, he was.

14   Q.   Now, talking about Dr. Virlar, did you

15   participate in it IDT meetings with Dr. Virlar?

16   A.   Yes, I did.

17   Q.   And how -- how -- what is the role of an IDT

18   meeting in the care of a hospice patient?

19   A.   An IDT meeting is held every 14 days.  We have

20   the medical director there, we have the nurses, the

21   chaplain, the social worker, anybody involved in the

22   patient's care.  It's a requirement that we discuss the

23   last two weeks of the patient's care and moving forward

24   the next two weeks for the plan of care, any changes,

25   any issues with the patients, anything that's further

1   needed with the patients.   It's just kind of like an

2   overall discussion of the patient's care.

3       Q.   What, if anything, did you notice about how

4   Dr. Virlar conducted himself -- himself in IDT meetings?

5       A.   He didn't participate.   He was on his phone half

6   the time, he was either eating his lunch and drinking

7   his coffee, and just really not interacting with the

8   staff, just kind of there signing paperwork.

9       Q.   What about a doctor named Dr. Eduardo Carrillo,

10  did you become familiar with him while you were at the

11  Merida Group?

12      A.   Only by name.

13      Q.   Did you notice anything in the documentation, or

14  in your -- in connection with your role in San Antonio

15  about Dr. Carrillo having any involvement in the -- in

16  the San Antonio area with respect to the Merida Group?

17      A.   Yes.   It's my understanding he was doing

18  face-to-faces for San Antonio patients.

19      Q.   And did you see the documentation that would be

20  put together for Dr. Carrillo for the face-to-face he

21  was going do -- the face-to-faces he was going to do in

22  the San Antonio area?

23      A.   Yes, I did.

24      Q.   And what did you notice about the face-to-faces

25  that Dr. Carrillo was supposed to be doing in the

1   San Antonio area?

2       A.   He was being scheduled close to 24 to 30 visits

3   over a weekend.

4       Q.   Over a weekend?

5       A.   Yes.

6       Q.   Based on your experience, can a doctor do that

7   many face-to-faces in a weekend?

8       A.   No.

9       Q.   Did you have any concerns based on what you saw

10  whether or not Dr. Carrillo was actually doing these

11  face-to-face visits?

12      A.   Yes, I did.

13      Q.   Could you describe that for the jury.

14      A.   So as the internal case manager, it was my job to

15  let the patients nurses notify the patients that they

16  were up for recertification, that the doctor or nurse

17  practitioner would be visiting them, so they were aware

18  when they got the phone call to allow them to go so they

19  could be recertified for hospice.  So my nurses would

20  let the patients know.

21          And after the weekend when they were scheduled,

22  we were getting phone calls and also I was getting

23  information from the nurses that the doctor never showed

24  up, we were expecting the doctor to be here, I was told

25  I was going to see a doctor and nobody has shown up.

1     Q.   So I want to ask you about Rodney Mesquias.   Was

2   Rodney Mesquias your boss at Merida?

3     A.   He was the owner, yes.

4     Q.   What was he like as an owner?

5     A.   He was -- he would be there, not all the time,

6   but he was there at times.

7     Q.   Did you ever hear Mr. Mesquias raise his voice

8   with employees?

9     A.   Yes.

10     Q.   About what, what would he raise his voice about?

11     A.   Mostly regarding census and admissions and

12   discharges.

13     Q.   And what do you mean, what would he say about

14   census, discharges and admissions?

15     A.   His priority was always what was a census when he

16   was in the San Antonio office.   Any patients that were

17   wanting to come off service or being discharged he would

18   become angry and ask why and try to send the marketers

19   out to save that patient.

20     Q.   At other hospice companies you've worked at, are

21   patients discharged from hospice?

22     A.   Yes.

23     Q.   What about the Merida Group, was the Merida Group

24   different than that?

25     A.   Yes, we rarely had discharges.

1    Q.   And what about, did you ever hear Rodney Mesquias

2    interacting with marketers?

3    A.   Yes.

4    Q.   Would he ever raise his voice with marketers?

5    A.   Yes.

6    Q.   What kinds of things would he raise his voice

7    with marketers about?

8    A.   About increasing the census, about making sure

9    that the patients don't want to come off service and --

10   and getting to the bottom of why patients would be

11   asking to come off service.

12   Q.   Did you ever hear Mr. Mesquias talking with

13   anybody at Merida about giving incentives to patients to

14   come or stay on hospice?

15   A.   I know that he was asking for a motorized

16   wheelchair for a patient to stay on service.

17   Q.   And you said asking, did -- did he ask politely

18   or was he asking loudly?

19   A.   He had asked one prior person to do it and that

20   person was yelled at, and I noticed that she was crying

21   and she had quit because he had yelled at her that she

22   hadn't gotten it done yet.

23   Q.   So he wasn't asking, he was yelling?

24   A.   Yes.

25   Q.   Now, how do you -- so -- based on your -- you

1    have -- when you joined Merida, you had experience in

2    the hospice field; is that right?

3        A.   Yes.

4        Q.   Did you feel like your expertise as an RN in the

5    hospice field was utilized at Merida?

6        A.   No, I felt more like a body with a license being

7    put in a place.

8        Q.   What happened to experienced nurses at Merida?

9        A.   Experienced nurses didn't last at Merida.

10       Q.   What kinds of nurses did -- did last at Merida?

11       A.   They were hiring a lot of new nurses, nurses with

12   not a lot of experience.

13       Q.   And you left Merida in 2015; is that what you

14   said?

15       A.   Yes.

16       Q.   Can you tell the jury why you left?

17       A.   I left after I had a conversation, and it was in

18   the office of Eddie Zuniga, and a conversation was

19   brought up to me with Eddie and Henry McInnis was on the

20   phone.  It was stated to me that I was being bullying

21   and being non-courteous to other employees and asked to

22   correct my behavior.

23          When I asked Mr. McInnis what behavior I needed

24   to correct and what he was referring to, he didn't give

25   me an example or anything.  And so I said, if you want

1    me to correct a behavior I have to be told exactly what

2    it is we're referring to.  And he said I just don't need

3    anybody quitting because of you.

4           And so after that conversation he said that we

5    would talk more the next week and I had just decided

6    that I would leave because I had really not been happy

7    for a little bit there anyways so --

8    Q.   What they were saying about your behavior, from

9    your perspective what was your behavior?

10   A.   So I -- I am -- I will admit I am passionate

11   about my work and when you hire other people that I have

12   to coincide with and they're not doing stuff correct, I

13   will be, you know, straightforward with people and let

14   them know, hey, you can or can't do this, or this needs

15   to get done because it's important to the patient care.

16          So I -- I do tend to be, you know,

17   straightforward with people and some people may take

18   that as -- as being rude or bossy, but I only do what I

19   know is the right thing to do.

20   Q.   How did it make you feel that you were being

21   reprimanded or doing what you felt was the right thing

22   to do in terms of the hospice patients?

23          MR. CYGANIEWICZ:  Objection, Your Honor, she

24   didn't use any type of word or reprimand, it was just a

25   conversation, she quit on her own.

1    Q.   (By Mr. Swartz)   How did you feel about that

2  reprimand?

3                 THE COURT:   Overruled.

4                 THE WITNESS:   I felt a little disappointed

5  because, you know, I always try to do my best at my work

6  and -- and, like I said, if -- if -- if I was doing

7  something wrong and I'm asked to correct a behavior, I

8  expect an answer as to what I am doing wrong so I am

9  able to comply.

10                 And so by being so vague I felt like I was

11  being pinpointed because I wasn't -- I wasn't doing what

12  they wanted me to do, I wasn't being -- I wasn't being

13  quiet about -- and just doing what they said.

14    Q.   (By Mr. Swartz)   You mentioned somebody named

15  Eddie Zuniga, who is that?

16    A.   He was the alternate administrator in the

17  San Antonio office.

18    Q.   And what does alternate administrator mean?

19    A.   He was the one that was there when Henry McInnis

20  was the administrator, but he was the second

21  administrator in charge of San Antonio.

22    Q.   So who was the top administrator in charge of

23  San Antonio?

24    A.   I was told Henry McInnis was the administrator

25  overall.

1          MR. CYGANIEWICZ:  Objection, Your Honor, as

2    to what she was told as hearsay, it's been clear that

3    Mr. Zuniga was in charge of the San Antonio office.  The

4    Court can instruct the jury to disregard.

5          MR. SWARTZ:  That's not what the witness

6    testified to, Your Honor.

7          THE COURT:  That's overruled.  And again,

8    ladies and gentlemen, hearsay is -- is a legal term as

9    to statements made by other persons that are not

10   testifying or nor parties.  However, there are

11   exceptions.  Any employee or agent or representative of

12   Merida, those statements are not hearsay, likewise

13   patient statements of Merida that in terms of medical

14   history or -- or diagnosis, patient statements are not

15   hearsay.

16          So back to the point, I think you do need to

17   clarify if you're referring to an employee of Merida,

18   well, that's not hearsay.

19          So again Mr. Cyganiewicz, your objection is

20   overruled.  I believe the witness is testifying about an

21   employee -- a co-employee telling her a statement,

22   again, employees of Merida, those are not hearsay

23   statements.

24          MR. CYGANIEWICZ:  Judge, we object to the

25   Court commenting on the weight of the evidence in front

```
 1   of the jury, Your Honor.
 2              THE COURT:  That's overruled.  So the --
 3   back to the point, please -- please ask the question.
 4              MR. SWARTZ:  No further questions,
 5   Your Honor.
 6              THE COURT:  All right.
 7              MR. SWARTZ:  Thank you.
 8              THE COURT:  Mr. Canales.
 9              MR. HECTOR CANALES:  Oh, I'm up.
10              Could I get that microphone again?
11              What's my time, Your Honor?
12              THE COURT:  Everyone will have 45 minutes,
13   sir.
14              MR. HECTOR CANALES:  Thank you.
15              THE COURT:  Well, three 45 minutes sessions.
16              MR. HECTOR CANALES:  Thank you, Your Honor.
17              (Brief pause in proceedings.)
18                     CROSS-EXAMINATION
19   BY MR. HECTOR CANALES:
20      Q.  Good morning.  Okay.  Good morning, Ms. Gonzalez.
21   My name is Hector Canales, I represent Rodney Mesquias,
22   okay?
23      A.  Good morning.
24      Q.  Where are you employed right now?
25      A.  I have two different jobs.  I'm employed
```

1    part-time at both jobs.  I work for Complete Care

2    Hospice and Life Care Hospice.

3        Q.   Okay.  So you are a full-time hospice broken up

4    into -- with two hospices?

5        A.   Yes.

6        Q.   Okay.  And are your roles the same at both of

7    those?

8        A.   No, they're different.

9        Q.   What -- what are the -- what the names of the

10   hospices again?

11       A.   Complete Care Hospice and Life Care Hospice.

12       Q.   Day care?

13       A.   Complete Care and Life Care.

14       Q.   Oh, Complete Care and Life Care?

15       A.   Uh-huh.

16       Q.   Are they related, affiliated at all or separate?

17       A.   No, they're separate.

18       Q.   Okay.  And do each of those companies know that

19   you're working for competitors?

20       A.   Yes, they do.

21       Q.   Okay.  And what is your role at Complete Care?

22       A.   I work as a prn nurse so I do admissions for

23   them, I also see four patients for them and I do quality

24   assurance, which is reviewing their nurses notes and

25   sending them back if they need correction, or if

1    something's not in the note asking the nurses if they're

2    appropriate or not.

3        Q.   And Life Care, what do you do for them?

4        A.   I am a QA nurse, Life Care is a new, excuse me,

5    is a new company so I got signed on as a QA nurse just

6    to monitor the notes and put them in compliance and get

7    them survey ready.

8        Q.   Does Complete Care employ a medical director?

9        A.   Yes.

10       Q.   Does that medical director get paid?

11       A.   Yes.

12       Q.   All right.  Does Complete Care employ marketers?

13       A.   They have one.

14       Q.   All right.  Do you know -- do you remember

15   Ernesto Gonzalez?

16       A.   Yes.

17       Q.   All right.  He was a marketer for Merida, right?

18       A.   Yes.

19       Q.   Okay.  And so Complete Care has a marketer as

20   well, right?

21       A.   Yes.

22       Q.   And does he get paid for marketing?

23       A.   Yes.

24       Q.   Is marketing legal?

25       A.   Yes.

1    Q.   All right.   There's nothing wrong with that,

2    right, nothing wrong with a hospice employing and paying

3    a marketer to market hospice services, right?

4    A.   Right.

5    Q.   Would it be fair to say, would you agree, that

6    another word or way to describe marketing would be

7    promoter of the services?

8    A.   I wouldn't agree as promoter, I mean, I don't

9    know that you promote services, I think --

10   Q.   Well, encourage, you highlight, you educate,

11   right?

12   A.   Education, definitely.   But not promote.

13   Q.   Because generally patients and families don't

14   know all the ins and outs or what Medicare offers in

15   terms of services, right?

16   A.   Right.

17   Q.   Right.   And so it's true, is it not, that there

18   are a lot of myths and misconceptions that patients and

19   families have about hospice, right?

20   A.   That's true.

21   Q.   Right.   Hospice is pretty common when people

22   think of hospices, they don't like it because it --

23   they -- it -- they have to face their death, mortality,

24   it's connected to death, right?

25   A.   Yes.

1    Q.   So people avoid it, right?  They don't want to be

2  in hospice, nobody wants to go to hospice, right?

3    A.   There are some people that are at that level of

4  care where they had enough of the doctors and they just

5  want to be kept comfortable.

6    Q.   Hence the role of the marketer, right, to help

7  educate people and let them know about the benefit of

8  a -- of a hospice, right, to alleviate maybe some of

9  these concerns and -- and the stigma of hospice, right?

10    A.   Yes, if that marketer is educated correctly.

11    Q.   Right.  Right.  But that's the point of the

12  marketer and that's why the Government allows for a

13  hospice to pay somebody to -- to -- to market hospice,

14  right?

15    A.   Yes.

16    Q.   Okay.  Have you ever encouraged a patient to get

17  on hospice?

18    A.   Educated, I wouldn't say encouraged, no.

19    Q.   But the intent and the purpose of your education

20  is to that -- somebody you believed is eligible and

21  could benefit from hospice, have you educated them with

22  the intent and -- and hope that they actually take the

23  services because you believe they need them?

24    A.   Yes, but I've also had people turn me down and

25  say they weren't ready.

1    Q.   Sure, and I'm not saying you didn't, but I
2  just -- it seems like common sense that -- you believe
3  in hospice, right?

4    A.   I do.

5    Q.   It's a good program.

6    A.   When it's used correctly, yes, sir.

7    Q.   That's right.   That's right.   So you encourage --
8  you encourage patients to join it if -- properly, right?

9    A.   I disagree with the word encourage.

10   Q.   Okay.   What word would you substitute encourage
11 with?

12   A.   I educate a family on it and let them know the
13 services that are available.

14   Q.   Would you educate a -- a family or somebody you
15 didn't believe was eligible?

16   A.   I would educate anybody who wants to know about
17 hospice services.

18   Q.   Now Life Care, do they also employ a medical
19 director?

20   A.   Yes, they do.

21   Q.   And does that medical director get paid?

22   A.   Yes.

23   Q.   All right.   And same with the marketer?

24   A.   There's no marketer at Life Care.

25   Q.   There's no marketer, okay.   Is if required, is it

1    required, good point here, is it required for a hospice

2    to have a marketer?

3    A.   No, sir, it's not.

4    Q.   Is it allowed?

5    A.   It's allowed.

6    Q.   Okay.  Some hospices have them, some don't?

7    A.   That's correct.

8    Q.   All right.  Now, during your time -- how long

9    were you there at -- at Merida again?

10   A.   End of 2013 to 2015.

11   Q.   End of '13?

12   A.   Uh-huh, like December.

13   Q.   All right.  Can you give me an estimate, I don't

14   want to testify for you.

15   A.   A little over a year.

16   Q.   A little over a year, okay.  Oh, let me ask you.

17   At -- at Complete Care and Life Care, the medical

18   directors there, do they work -- do they have another

19   office that they work out -- another medical facility

20   they work at as well?

21   A.   Yes.

22   Q.   All right.  So are they primary care providers

23   somewhere else?

24   A.   Yes.

25   Q.   Okay.  And do they serve at times, do they serve

1    as both the primary care physician and the medical

2    director over their patient?

3        A.   Yes.

4        Q.   All right.  So that's allowed, right?

5        A.   Yes.

6        Q.   Let me ask it better.  Medicare allows for that

7    to happen, right, for the -- for the referring doctor as

8    the primary care physician to refer his patient to

9    medical -- to a hospice facility where they are served

10   as the medical director, right?

11       A.   Yes.

12       Q.   All right.  And that happens in the hospices that

13   you're working at now, right?

14       A.   Actually Complete Care we don't get very many

15   from our medical director at all.

16       Q.   Okay.  But if you do, it's legal?

17       A.   Yes, you can refer a patient.

18       Q.   Right.  And there is a good medical reason behind

19   that called continuity of care, right?

20       A.   Yes.

21       Q.   Explain to the jury from a medical standpoint

22   what continuity of care means?

23       A.   So continuity of care would be when you try to

24   continue care for a patient with either the physician or

25   the nurse so that the patient feels comfortable with the

1    care they're receiving and they're comfortable with

2    the -- either the physician or the nurse they had been

3    receiving care with.

4        Q.   A 100 percent legitimate concern and -- and goal

5    of a patient and a doctor is to maintain this continuity

6    of care, right?   Totally legitimate?

7        A.   Yes.

8        Q.   You believe in that as a health care provider

9    yourself?

10       A.   Continuity of care, yes.

11       Q.   All right.   And so when a doc -- when a patient

12   of -- when a -- when a patient of a particular doctor

13   starts to get sick, come -- contracts a terminal illness

14   and goes into the hospital, right, that primary care

15   physician then has some decisions to make over his

16   patient at the hospital, correct?

17       A.   Yes.

18       Q.   One, and at the end of it -- the stay, the doctor

19   can -- could choose to discharge the patient and send

20   him home, right?

21       A.   Yes.

22       Q.   The doctor could choose to send that patient to

23   hospice, correct?

24       A.   Correct.

25       Q.   The doctor could choose -- or could say, you know

what, I'm going to send you to home, discharge you but

enroll you in home health, correct?

   A.   Correct.

   Q.   I'm going to discharge you and admit you if you

have the insurance to a nursing home, right?

   A.   Correct.

   Q.   Those are just four, there may be others but

those are at least four of the different options that

doctor can make, right?

   A.   Yes.

   Q.   All right.  And it's perfectly legal, and in fact

under the idea of continuity of care, it makes sense

that a doctor would want to -- to refer his patient to

a -- a -- if he decides to send him to a nursing home,

for instance.  Nursing homes have medical directors,

too, right?

   A.   Yes.

   Q.   And so if he wanted to continue to see that

patient and keep that relationship, and if the patient

wanted to continue that relationship as well, perfectly

legal and justified for that doctor to say, you know

what, I prefer to refer this patient to a nursing home

at which I am also the medical director, right?

   A.   Correct.

   Q.   Nothing wrong with that, in fact that's just good

1    medicine, right?

2        A.  I don't practice medicine so --

3        Q.  Oh, okay, all right.  Is that how you would want

4    to be treated?

5        A.  I would like to be given a choice, which is

6    ultimately what every patient should be given is a

7    choice.

8        Q.  And especially a choice to keep your doctor,

9    right, to not go to the nursing home, not be sent to the

10   nursing home and then have a whole new doctor, somebody

11   who doesn't even -- somebody you don't know, right?

12       A.  If that would be my choice, yes.

13       Q.  Would that be your choice?

14           MR. SWARTZ:  Your Honor, asked and answered.

15           MR. HECTOR CANALES:  I'm sorry, if she

16   answered it I missed it, Your Honor, indulge me if you

17   can answer it again.

18           THE COURT:  Overruled.

19           THE WITNESS:  Can you repeat the question?

20       Q.  (By Mr. Hector Canales)  Sure.  Would that be

21   your choice to keep your doctor, to not have to switch?

22       A.  If the place that I was going home health or

23   hospice was adequate, I wouldn't keep my doctor if I

24   didn't like the company.

25       Q.  And that could be a conversation you would have

1    with the doctor, right?

2        A.   Correct, I would want to choose which company I

3    go with.

4        Q.   Okay.  All right.  There's a lot of -- a lot of

5    factors to consider, right, but certainly one would be

6    staying with your doctor, right?

7        A.   Possibility, yes.

8        Q.   Okay.  And -- and especially though the

9    continuity of care not having to change would be

10   especially important in a situation where you're dealing

11   with people whose cognitive abilities or their minds are

12   deteriorating, right?  Change is difficult for those

13   folks, right?

14       A.   Yes.

15       Q.   Right.  So there's even a higher incentive with

16   patients from a doctor's standpoint to refer patients in

17   their primary care physician role to a hospice facility

18   for those patients that are suffering from some sort of

19   dementia, cognitive problems, Alzheimer's, failure to

20   thrive, agree?

21       A.   Yes.

22       Q.   And so if the impression is left with the jury

23   that a primary care physician has this preference to --

24   to refer patients to a hospice which he -- which he's a

25   medical director, if an impression was made upon the

1    jury that that was somehow sneaky, bad or illegal, you

2    wouldn't want the jury to take that impression; would

3    you?  That wouldn't be right?

4        A.  That wasn't my impression, the impression was it

5    was the hospitalist not the primary care physician

6    referring the patient.

7        Q.  But a hospitalist is a form of a primary care

8    physician; isn't he not?

9        A.  But's not the patient's primary care physician,

10   he's just rounding at the hospital.

11       Q.  Okay.  Well, let's talk specifically.  Let's get

12   specifics here finally about Dr. Virlar.  It's true, is

13   it not, that Dr. Virlar was employed by the Gonzaba

14   Medical Group, right?

15       A.  Yes, he was.

16       Q.  And the Gonzaba Medical Group out of San

17   Antonio -- you're in San Antonio, right?

18       A.  Yes.

19       Q.  You -- you -- so you're familiar with that group,

20   right?

21       A.  Yes.

22       Q.  They're massive, right, the Gonzaba Group?

23       A.  They're a big group.

24       Q.  Is there anybody bigger in San Antonio than them?

25       A.  There's Well Med Group.

1      Q.   Well Med Group?

2      A.   I don't know if they're bigger, I don't --

3  they're big, too.

4      Q.   Those are the two top dogs in San Antonio?

5      A.   Yeah.

6      Q.   How many locations does the Gonzaba Medical Group

7  have in San Antonio?

8      A.   I don't know that.

9      Q.   You don't know?

10     A.   No.

11     Q.   More than -- can you -- more than -- more than

12  five?

13     A.   I believe so, yes.

14     Q.   All right.  Tens of thousands of patients?

15     A.   I -- again, I don't know.

16     Q.   You don't know, okay, all right, you don't know.

17  But you do know Dr. Virlar, and so -- and they have

18  dozens of doctors that work under the umbrella of the

19  Gonzaba Medical Group, right?

20     A.   Yes.

21     Q.   And there's some doctors, Dr. Montemayor, do you

22  know her?

23     A.   Not personally, no.

24     Q.   Okay.  There's some doctors that are clinicians

25  under -- in the Gonzaba Medical Group that they work in

1  the -- in the office when the patients come, right?

2  True?

3      A.  Say that again, I'm sorry.

4      Q.  There are some doctors within the Gonzaba Medical

5  Group that work as clinicians in the medical -- within

6  the medical -- at an office where the patients come

7  to -- to the doctor's office, right?

8      A.  Yes, I would assume so.

9      Q.  And -- and then there are some, like Dr. Virlar

10  who are assigned not to the clinic but to the hospital

11  to cover the Gonzaba patients, right?

12      A.  Yes.

13      Q.  Right.  Because, as you, I think pointed out,

14  you -- you know, you can't be everywhere all the time,

15  right?

16      A.  No, you can't.

17      Q.  Right.  While that doctor, like Dr. Montemayor is

18  in her office seeing patients some of her other patients

19  may be over in the hospital, right?

20      A.  Yes.

21      Q.  So they have to -- so the Gonzaba Group has to

22  employ another doctor, like Virlar to be at the hospital

23  to cover all these patients, right?

24      A.  Yes.

25      Q.  Makes sense.  Anything -- anything sneaky, bad

1   about that, anything that smells to you?

2      A.   My only concern would be when the physician

3   themselves are calling saying they weren't notified that

4   the patient was on hospice.

5      Q.   We're going to get to that.  That's something you

6   believe happened, right?

7      A.   No, I took the phone calls; that's when it

8   happened.

9      Q.   Okay.  We're going to -- I'm going to come back

10  to that topic, I've got -- I've got that.  But I just

11  want -- the structure of that, of a group having

12  these -- having a hospitalist and clinician doctors,

13  there's nothing wrong with that, that's typical, normal

14  medicine, right?

15     A.   Yes, sir.

16     Q.   And so when those patients, when you're with a

17  massive group like Gonzaba and there's a lot of people

18  coming there, and those patients go into the hospital,

19  Dr. Virlar has a particular role as a hospitalist in

20  treating those Gonzaba patients, right?

21     A.   Yeah, I would assume so.  I don't know whether --

22     Q.   And so while they're there, have you ever seen

23  the hospital records where there is a -- a -- the

24  physicians write their physician orders to discharge the

25  patient, right, where to send them?

```
 1              MR. SWARTZ:  Your Honor, I object, he's
 2   asking about the internal practices of Gonzaba Group, he
 3   hasn't established the witness knowing anything about
 4   that.
 5              MR. HECTOR CANALES:  I think she established
 6   this witness claims to know everything about every
 7   patient and all the practices at the Merida Group.
 8              MR. SWARTZ:  What she testified to was what
 9   she witnessed from within the Merida Group about the
10   Gonzaba Group sending patients to the Merida Group.
11              THE COURT:  Where are we going with the
12   Gonzaba Group?
13              MR. HECTOR CANALES:  I'm asking her if she
14   witnessed Dr. Virlar referring patients under the
15   umbrella of Gonzaba to the --
16              MR. SWARTZ:  He was asking about
17   documentation and practices.
18              THE COURT:  Rephrase the question.
19   Rephrase.
20      Q.  (By Mr. Hector Canales)  It's true that
21   Dr. Virlar referred patients as a hospitalist for the
22   Gonzaba Group that he referred some of those patients
23   over to Merida where he was a medical director, right?
24      A.  Yes.
25      Q.  Just like doctor at -- doctors at Complete Care
```

1    have done as well, right?

2        A.   Very different process.

3        Q.   Right, but -- but it's the same concept; is it

4    not, that you've got a hospitalist, or you have a

5    primary care physician referring to a hospice at which

6    he's a medical director?  You've already agreed to that

7    that's legal.

8        A.   Yes, but Dr. Virlar wasn't their primary care

9    physician.

10       Q.   Oh, okay.  So you're drawing a distinction

11   between -- you said -- in this -- in this particular

12   case, if the -- it would have to come from the

13   clinician, the doctor in the -- in the medical office

14   not from the hospital?

15       A.   Yes.

16       Q.   All right.  And what rule or regulations, ma'am,

17   are you relying on for that opinion?

18       A.   Just in my experience when we do have an order

19   from a hospitalist, we still, as an -- as a nurse, we

20   still are required to get the primary care physician's

21   signature, we cannot just get the hospitalist's

22   signature.

23       Q.   I -- I understand.  My question wasn't about your

24   experience, ma'am.  My question was what rule or

25   regulation are you relying upon?

```
1        A.   For what answer?

2        Q.   The one you just gave.  Where's the rule where it

3    says it can't come from the hospitalist?

4        A.   We can get a referral from the hospitalist.

5        Q.   Oh, you can?

6        A.   Yes.

7        Q.   That's just not your experience?

8        A.   No, my experience is it has to be -- we have to

9    notify the primary care physician.

10       Q.   Okay.  Okay.  All right.  All right.  Very well.

11   Let's -- let's get to some of your -- some of your work

12   in this case.

13            Did you ever personally, knowingly commit fraud,

14   falsify a record?

15       A.   No.

16       Q.   Did you ever sign something that was false?

17       A.   No, not to my knowledge.

18       Q.   All right.  So if you see your signature on a

19   document, on a medical record with a patient at Merida,

20   the jury can put it in the bank it's legit, right?

21       A.   In -- what I signed, I got from the records and I

22   had no knowledge that anything was falsified.

23       Q.   You stand behind what you said, what you signed?

24       A.   Yes.

25       Q.   It's true, is it not, that in all of your
```

1    testimony with the Government in those 45 minutes, and

2    correct me if I'm wrong, I didn't hear you say by name

3    any particular patient name; is that true?

4       A.   I wasn't asked about a particular patient.

5       Q.   You weren't.  Okay.  You had a meeting -- you've

6    met with the Government several times before your

7    testimony today here; haven't you?

8       A.   Yes.

9       Q.   How many times have you met with the Government?

10      A.   I don't know, three, four, I don't -- I didn't

11   count.

12      Q.   Where did these meetings take place?

13      A.   San Antonio.

14      Q.   Okay.  But at your home, at their offices, at

15   a -- at a pizza parlor, where?

16      A.   At their offices.

17      Q.   At the Government's offices?

18      A.   Yes.

19      Q.   How did you know to go there?

20      A.   I was instructed to go there.

21      Q.   Were you given a choice?

22      A.   Yes.

23      Q.   Okay.  How were you -- who instructed you, how,

24   by paper, by tell you, how?

25      A.   I received a phone call.

1    Q.   From who?

2    A.   From a Special Agent.

3    Q.   Do you remember his name?

4    A.   Mike Garcia.

5    Q.   All right.  And he -- Mr. Garcia, what did he

6    tell you?

7    A.   He just said he had some questions for us and

8    wanted to discuss -- wanted to talk to me about the

9    Merida Group.

10   Q.   Were you truthful when you went to their offices,

11   to Mr. Garcia -- and you accepted the invitation?

12   A.   Yes, I did.

13   Q.   All right.  And when you went there, were you

14   truthful to them?

15   A.   Yes.

16   Q.   Did you tell them everything you knew?

17   A.   Yes.

18   Q.   All right.  And did you tell them Dr. Gonzaba,

19   that you didn't believe Dr. Gonzaba did anything wrong?

20   A.   I told them I didn't work with his -- his side,

21   he wasn't one of my doctors.

22   Q.   Did you tell him that Dr. Gonzaba never received

23   kickbacks?

24   A.   I didn't tell them anything like that, I wasn't

25   asked that.

1     Q.  You didn't tell him anything like that?  Were you

2  aware that while you were there that the agents were

3  taking notes on what you said?

4     A.  Yes.

5            MR. HECTOR CANALES:  May I approach the

6  witness, Your Honor?

7            THE COURT:  You may.

8     Q.  (By Mr. Hector Canales)  I'd like to refresh your

9  memory.  Read that highlighted portion.

10           MR. SWARTZ:  Objection, Your Honor --

11    Q.  (By Mr. Hector Canales)  And then I'd like to ask

12 you a question.

13           MR. SWARTZ:  I apologize, I thought he was

14 asking her to read it out loud.

15           MR. HECTOR CANALES:  No, no.

16    Q.  (By Mr. Hector Canales)  I'd like to ask you a

17 question.

18    A.  Okay.

19    Q.  Does that refresh your memory -- and hang on, you

20 know what, I only showed you the last page.  Let me show

21 you what this is.  And if you want to, you can look

22 through all of this.

23    A.  Uh-huh.

24    Q.  That doesn't belong there.  That's a stapling

25 mistake.

1      A.   Okay.

2      Q.   You got it?

3      A.   Yeah.

4      Q.   Does that refresh your memory that you told the

5  Government that Dr. Gonzaba did not receive any

6  kickbacks?

7           MR. SWARTZ:   Your Honor, I object.   First of

8  all, he's saying that he's refreshing her memory.   The

9  witness did not say that she lacked memory, in fact, she

10  said she recalled.   There's no basis to refresh her

11  memory.

12           MR. HECTOR CANALES:   All right.   Well, I'll

13  call it impeachment then, Your Honor.   I'm trying to be

14  polite.

15           THE COURT:   Ask the question.   Repeat the

16  question, Mr. Canales.

17      Q.   (By Mr. Hector Canales)   Isn't it true that

18  you -- you just -- let me say it the way they want me to

19  say it.

20       Isn't it true, all right, that what you just said

21  on the stand is completely inconsistent and different

22  from what you told the Government?

23           MR. SWARTZ:   Objection, Your Honor.   That's

24  improper impeachment because you can only impeach with

25  her prior statement.   That is not her statement.

1            THE COURT:  That's sustained.

2            Rephrase the question.

3            MR. HECTOR CANALES:  Well then, Your Honor,

4     it's a refreshing of her memory.

5     Q.  (By Mr. Hector Canales)  Is your memory now

6     refreshed, ma'am, that you told the Government that

7     Dr. Gonzaba not receive kickbacks?

8     A.  No, what I said is I never saw him receive

9     kickbacks, I had no knowledge of it.

10    Q.  Oh, okay.  All right.  But --

11    A.  And I don't believe I said that he did.

12    Q.  But that's not what the agent -- that's not what

13    the agent's notes reflect, is it?

14    A.  It just says didn't receive any kickbacks.

15    Q.  That's what they think you said?

16            MR. SWARTZ:  Objection, Your Honor.  Again,

17    he's asking for the content of a document that she did

18    not complete.

19            THE COURT:  That's speculation.  Rephrase

20    the question.

21    Q.  (By Mr. Hector Canales)  All right.  Bottom line

22    is, though, you don't have any evidence, you can't get

23    up here and say one way or the other, however you saw it

24    or didn't see it, that Dr. Gonzaba received any

25    kickbacks, right?  That's kind of the point?

1     A.   I didn't see anybody receive any kickbacks.

2     Q.   Okay.

3     A.   All I know is what I know from my experience in

4  the company.

5     Q.   Okay.   Roy, let's put up -- this is out of

6  Exhibit E-16, medical records of Jack High, Mesquias

7  00254822.

8         By the way, let me ask this as a little preface

9  here.   Would it surprise you that if the Merida hospice

10  entities, these -- these three -- these three entities

11  that over a period of, you know, from 2009 through 2019

12  had a total of about 2200 patients, would that surprise

13  you?   Would that seem about right to you?

14     A.   I wouldn't know.

15     Q.   You wouldn't know?   All right.   So what --

16  what -- what is -- you're familiar with this form; are

17  you not?

18     A.   Yes.

19     Q.   All right.   What is it?

20     A.   It's a certification of terminal illness.

21     Q.   And that's you right there, your signature,

22  right?

23     A.   Yes.

24     Q.   You signed it?

25     A.   Yes.

1    Q.  All right.  And -- and it looks like to me, but I
2    would like to ask you, it looks like the -- everything
3    above your signature is in the same handwriting; is that
4    your handwriting?
5    A.  Yes, it is.
6    Q.  So you filled all that out?
7    A.  Yes, I did.
8    Q.  All right.  All right.  And it says red back in
9    the a circle.  What does that indicate?  What's the
10   purpose of -- you -- you circled that; did you not?
11   A.  Yes.
12   Q.  Why?  What does that mean?
13   A.  That's for your verbal -- verbal order date.
14   Q.  All right.  But what does it mean, read back,
15   what did you read back and to whom?
16   A.  So it's indicated that the doctor was notified of
17   the admission.
18   Q.  So you read it back to Dr. Virlar?
19   A.  No.
20   Q.  Okay.  Well, who --
21   A.  The admitting nurse did.
22   Q.  Okay.  Somebody read it back to Dr. Virlar?
23   A.  The admitting nurse does.
24   Q.  Right, that's not -- but not you?
25   A.  No, I only fill out paperwork.

1    Q.   So where did you get the information to circle

2    yes or no?

3    A.   The admission.

4    Q.   So there would have been a basis for you to do

5    that?

6    A.   Yes, I look at the admission from the admitting

7    nurse.

8    Q.   You wouldn't have made it up if it wasn't there?

9    A.   No.

10   Q.   Okay.  All right.  Let's scroll -- let's scroll

11   up.

12        That's Dr. Virlar's signature, right?

13   A.   Yes, I believe so.  I'm not sure but that's --

14   Q.   Okay.  If you don't know, you don't know, all

15   right?  It's the medical director's signature, we don't

16   know who, you can't -- you're not sure?

17   A.   Yes.

18   Q.   Okay.  But -- but again, the handwriting there in

19   the narrative above, that looks like it matches your

20   handwriting; is it true?

21   A.   Yes.

22   Q.   All right.  And so the actual -- what's in there

23   80-year-old male, DX is short for diagnosis, correct?

24   A.   Yes.

25   Q.   All right.  What's the abbreviation for

1    prognosis?

2        A.   Prognosis?

3        Q.   Is there -- uh-huh.

4        A.   I don't know, I don't write it.

5        Q.   Okay.   DX is what?

6        A.   Diagnosis.

7        Q.   All right.   I'm sorry, what's the diagnosis that

8    you wrote?

9        A.   Debility.

10       Q.   And again there would have been a basis for that

11   somewhere, you wouldn't have put it down if you didn't

12   believe it to be true?

13       A.   All the information was taken from the nurses

14   admission note.

15       Q.   Who was that?

16       A.   I believe -- what patient was this, Jack High, I

17   believe the nurse was Steve Dellwo.

18       Q.   Steve Dellwo?

19       A.   Uh-huh.

20       Q.   Is he an honest guy?

21       A.   I have no reason to believe he's not.

22       Q.   All right.   No reason to believe he was engaged

23   in any sort of conspiracy to commit health care fraud?

24       A.   I have no knowledge if he was or wasn't.

25       Q.   Okay.   All right.   And a PPS of 30 percent, do

```
 1   you know what that means?
 2      A.  Yes.
 3      Q.  Describe to the jury what somebody with a PPS
 4   score of 30 percent, what that means physically for
 5   them?
 6      A.  That's a palliative performance scale.  It means
 7   that the patient is mainly bed bound.
 8      Q.  FAST, you see that?
 9      A.  Yes.
10      Q.  What's the score?
11      A.  6D.
12      Q.  6D.  How many levels of -- within the six are
13   there?
14      A.  That's the last of the six.
15      Q.  And the level is 7A?
16      A.  Uh-huh.
17      Q.  Okay.  All right.  What's the next -- what's that
18   say incontinence of bowel and bladder.  That -- what
19   does that mean?
20      A.  That means the patient is unable to use the
21   bathroom in a timely manner and --
22      Q.  Right.  Poor appetite, right, is that what that
23   says?
24      A.  Yes.
25      Q.  Why don't you just read the rest of it, it's in
```

1    your handwriting, read the rest of it.

2        A.   Poor appetite is 25 percent or less of all meals.

3    He's cachetic which means he's thin, requires assist

4    with all ADL's, which ADL's meaning his bathing and

5    grooming and probably needs assistance with some stuff,

6    confused and forgetful, prognosis less than six months

7    of disease runs its natural course.

8        Q.   Now, within your experience as a -- as a nurse,

9    it is typical, normal and acceptable that doctors -- and

10   doctors routinely rely upon their staff -- their

11   nurse -- nurses, right, to exercise their clinical

12   judgment, correct?

13       A.   Somewhat.

14       Q.   Right.  That's part of the role of the -- in the

15   relationship between the doctor and the nurse, you

16   are -- you would agree you work as kind of a team?

17       A.   Yes, it's a team effort.

18       Q.   Right.  And part of your role on the team is to,

19   as the nurse, is to gather the information, the -- the

20   history and the physical and the information so that the

21   doctor can then exercise his clinical judgment about

22   making a diagnosis or a prognosis, fair?

23       A.   Yes.

24       Q.   Right.  And that's what you were in fact doing,

25   you were relying on another nurse, the -- Mr. Dellwo,

1  right, to get some information to put in this document

2  so that a doctor, a medical director could then rely

3  upon it, right?

4      A.  Yes, I was just getting the information from

5  there, yes.

6      Q.  And again, this is just the normal process

7  between nurses and doctors, right?

8      A.  Yes.

9      Q.  Okay.  And so you felt comfortable putting this

10  information there, even though, I take it, you didn't

11  actually put your eyes on doctor -- on Mr. High?

12      A.  Right, I felt comfortable because it was

13  discussed in IDT with the actual nurse that was there

14  and the discussion happened with that nurse as well as

15  the doctor had access to all the medical records that he

16  could review as well.

17      Q.  And that was the case, these IDT meetings at

18  Merida, they happened every two weeks, right?

19      A.  They did.

20      Q.  Okay.  And -- and -- and you know what it's like

21  to be accused of being something that you're not, or

22  another person saying, I think you there was testimony

23  beforehand, you know, people accused you of being a,

24  what was it, a bully?

25      A.  Yes.

1    Q.   Having bad behavior?

2    A.   I'm sure I have had bad behavior, I don't claim

3    to be perfect.

4    Q.   We all have, right, we all sometimes have acted

5    poorly.  But -- but your explanation was that you're

6    just a straightforward person, right?

7    A.   No, at times I probably can be bossy or bully, I

8    agree with that.

9    Q.   Right, on matters that you believe are important

10   to you, right?

11   A.   Yes.

12   Q.   Sure.  And -- and -- and if people interpret that

13   as being negative, or they don't like you, if it's a

14   matter that's important to you, well, it's important to

15   you, right?

16   A.   Yes.

17   Q.   Okay.  And but sometimes people might get the

18   wrong impression, right?

19   A.   Yes.

20   Q.   And everybody's entitled to their opinion?

21   A.   Yes.

22   Q.   Okay.  Now, how about Dr. -- how about

23   Dr. Escamilla, do you remember Dr. Escamilla?

24   A.   Yes, I do.

25   Q.   All right.  And was -- and was Dr. Escamilla

1    engaged in fraud?

2        A.  Not to my knowledge, no.

3        Q.  Okay.  So -- all right, Roy let's pull up again

4    Government Exhibit E-16, Mesquias 00254817.

5            In fact, Dr. Escamilla, he's a pretty tough --

6    tough guy, right?

7        A.  I don't know.

8        Q.  Not somebody who's going to get pushed around,

9    he's not going to let people push him around, right?

10       A.  I didn't experience anything like that with him

11   so --

12       Q.  Fair enough.  Thought you might.  Thought you

13   might know.  Again, this is -- this is Jack High and

14   this is an IDG meeting that took place on October the

15   10th of 2014; you see that?

16       A.  Yes.

17       Q.  And just like we saw before, there's Dr. --

18   Dr. Escamilla, all right, and you see there that Jack

19   High is 80 years old, right?

20       A.  Yes.

21       Q.  A diagnosis of debility, right?

22       A.  Yes.  Yes.

23       Q.  That -- that's mirroring what you said in your

24   certification we just looked at a moment ago, right?

25       A.  Yes.

1      Q.   All right.   Here the PPS score went from a 30 in

2    yours to a -- to a 40, right?

3      A.   Yes.

4      Q.   And just to refresh your memory and for

5    everybody's benefit, but what we just looked at before

6    the -- the previous page of this exhibit was dated

7    09/18/14, all right, so it's just less than a month,

8    this what we're looking at now is just less than a month

9    after your -- your signature on the certification; you

10   agree?

11     A.   Yes.   Yes.

12     Q.   Okay.   And here the PPS score went up to 40

13   percent, but the -- and the FAST score went up from a 6D

14   to a 7A, right?

15     A.   Yes.

16     Q.   All right.   And -- and, look, people go up and

17   down, right?

18     A.   Well --

19     Q.   Patients go up and down?

20     A.   They -- they really should be going down, but,

21   again, it depends on the -- the nurse that did the

22   assessment.   So sometimes you'll see a difference in

23   that with the nurse who did the assessment.

24     Q.   And here he is going down, a 7A is worse than a

25   6D.

1    A.   But his PPS went up so that should -- that's

2    probably a difference in nursing assessment as well.

3    Q.   You know what, let's talk about that for a little

4    bit.  A difference in nursing assessment.  Can do nurses

5    legitimately look at the same patient and come to a

6    different assessment of them?

7    A.   Yes, based on nursing experience.

8    Q.   Sure.  And -- and if two nurses are looking at

9    this and -- and doing different, is one of them lying

10   and one of them telling the truth?  Or can they both be

11   right?

12   A.   I would say they wouldn't both be right, I would

13   say it would be lack of experience.

14   Q.   All right.  But it's their judgment, right, we're

15   talking about a clinical judgment?

16   A.   For me being a nurse, I would say clinical

17   judgment if -- if I had doubts of anything, or was

18   uneducated I would either educate myself or refer to

19   other nurses for assistance.  I would not --

20   Q.   Medicine is an art as much as it is a science; is

21   it not, isn't that fair?

22   A.   I don't see it that way but --

23   Q.   Exercising your clinical judgment, right, is not

24   an exact science; is it?

25   A.   It's not exact, we're not -- we're not -- nobody

1    knows for sure everything, no.

2        Q.   Right.   And so what's happening here is somebody,

3    and we're about to find out who, somebody was exercising

4    their clinical judgment on this date, on October the

5    10th of '14 on Jack High and this is what they wrote,

6    right?

7        A.   Yes, I guess so.

8        Q.   All right.   And their clinical judgment that day

9    was that he was a -- that he had a PPS score of 40

10   percent and a FAST score of 7A, right?

11       A.   Yes.

12       Q.   And your judgment the other day was very close

13   but a little different, right?

14       A.   Well, that wasn't my assessment, it was

15   assessment of somebody else.

16       Q.   Somebody else, but you adopted their assessment,

17   did you not?

18       A.   No, I just wrote it down.

19       Q.   Right, but you didn't -- you didn't --

20       A.   I can't say it was my assessment because I didn't

21   see the patient.

22       Q.   And I agree, I agree with that, but when you

23   wrote it down and put your name on it you adopted it?

24           MR. SWARTZ:   Objection, Your Honor.   I think

25   she's said that she did not adopt it, she wrote down

```
 1    what was in the nurse assessment.
 2              MR. HECTOR CANALES:  Right, but my question
 3    was -- is that when she said --
 4              THE COURT:  I'll allow the question.
 5    Q.  (By Mr. Hector Canales)  Right.  But when you --
 6    your signature means something on there, right?
 7    A.   It means that I got the information from the
 8    nurse who went to see the patient is what it means to
 9    me.
10    Q.   Right.  But if you didn't -- if you had some
11    reason to believe or doubt that information, you
12    wouldn't put your signature to it, right?
13    A.   I don't typically doubt people, I don't give --
14    that don't give me a reason to doubt them or have
15    concern.
16    Q.   And if you had reason for concern you wouldn't
17    have put your name, you wouldn't have signed your name
18    RN to it, right?
19    A.   Correct.
20    Q.   Because you know, you've been trained that you --
21    your license is at stake if you sign something knowing
22    or having a doubt about it, right?  You aren't going to
23    do that?
24    A.   Nope.
25    Q.   Okay.  Alert but confused, ambulates
```

1    independently with a slow gait, on and on.

2         Scroll up, Roy.

3         Now, this is an IDG meeting -- IDG, IDT same

4    difference, right?

5    A.   Yes.

6    Q.   It was an IDG meeting.

7         Keep going, Roy.  Right there.

8         You see those initials, R.E., whose initials are

9    those?

10   A.   I don't know.

11   Q.   You don't know?  You don't know if that's

12   Dr. Escamilla's?

13   A.   It could be.

14   Q.   It could be?  Okay.  Fair enough, just asking.

15        Roy, turn to the last page of the IDG meeting

16   ending bates number 21.  And go to the -- go to the

17   bottom.  Actually, start at the top, start at the top,

18   sorry.

19        So let's look at the attendees of this IDG

20   meeting for Jack High.  You were there, right?

21   A.   Yes.

22   Q.   Along with Melissa Hernandez?

23   A.   Yes.

24   Q.   All right.  Is Ms. Hernandez engaged in any fraud

25   to your knowledge?

1      A.   I have no knowledge of it.

2      Q.   All right.  And Dr. Escamilla, you see that

3  there?

4      A.   Yes.

5      Q.   There's a typo there, it's not an O, it's an A at

6  the end, right?  How about Esther Foster, do you know

7  Esther?

8      A.   She was a social worker.

9      Q.   Ms. Foster engaged in any sort of health care

10  fraud?

11      A.   I would have no way of knowing.

12      Q.   How about Daniel Portillo, did he engage in any

13  health care fraud?

14      A.   Again I would have no way of knowing that.

15      Q.   And so it says here the IDG meeting held

16  discussed plan of care.  Patient condition and vital

17  signs, no changes to current plan of care.  That's what

18  happened, that's an accurate depiction of what happened

19  at the meeting you were at, fair?

20      A.   That's the summary, yes, we discussed the

21  patient.

22      Q.   All right.  Let's see, let's go to the bottom.

23  You signed it, that's your summary, right?

24      A.   That is -- I sign off on all the meetings, it's

25  not my summary.

1    Q.   Right, but -- but it's the last page of the

2    document, you signed off on the document?

3    A.   I sign off on the meetings.

4    Q.   Okay.

5    A.   I did not create that document.

6    Q.   All right.  But it happened, the meeting

7    happened?

8    A.   Yes, and as an internal case manager we have to

9    complete the meetings, which means we sign off on the

10   meeting.

11   Q.   And this is textbook, textbook hospice practice,

12   right, by the -- by the book, this is exactly what's

13   supposed to be happening with a patient, right?

14   A.   We're supposed to have meetings, but they're

15   supposed to -- yes, we discuss the patients.

16   Q.   And all the people of the team are there, the

17   nurse is there, the social worker's there, the chaplain

18   is there and the doctor is there, right?

19   A.   Yes.

20   Q.   Let's look at Mesquias 00255014.

21   This is a face-to-face or, no, this is a -- yeah,

22   it's a face-to-face form, right?

23   A.   Yes.  No, this is a recertification form, sorry.

24   Q.   Okay.  Recertification?

25   A.   But it's not -- it's not -- it's on paper.  It's

1    a paper form of recertification.

2       Q.   Okay.  All right.  And it's for Jack High again,

3    see that?

4       A.   Why he.

5       Q.   Okay.  And says there the attending physician,

6    Escamilla, right, see that?

7       A.   Yes.

8       Q.   All right.  And then this looks like there -- the

9    indication is disease progression/continuing need for

10   hospice.  That handwriting, that's your handwriting is

11   it not?

12      A.   The handwriting on the bottom is mine, the

13   terminal diagnosis and conditions is not my handwriting.

14      Q.   The handwriting is yours -- okay, well, which --

15   okay, which part is -- is yours?

16      A.   So --

17      Q.   Is that all your handwriting in that area?

18      A.   That's all mine, that one right there, yes.

19      Q.   And then what's not?

20      A.   The top where it says terminal secondary and

21   comorbid is not mine.

22      Q.   Oh, right, right, somebody else did that?

23      A.   Yes, because you'll notice his -- his terminal

24   diagnosis was changed.

25      Q.   Right.  Okay.  So here but then you sign it,

1    right?

2        A.   I signed off on the assessment part.

3        Q.   So that was your assessment?

4        A.   No, that was the nurse's assessment that I wrote

5    in there for the doctor to see.

6        Q.   You're taking, again we're in the process, I know

7    that you didn't -- that you didn't actually do the

8    assessment with Jack High, but again, you were

9    comfortable enough to take the work of maybe a Steven

10   Dellwo like we had and put it on this document?

11       A.   I was doing my job.

12       Q.   All right.   In -- in compliance with the rules

13   and obligations of your license?

14       A.   No based on what was there in front of me I was

15   doing it.

16       Q.   Right, but you were -- but you were -- I mean

17   were you violating state nursing rules?

18       A.   I was taking the information that was given to me

19   by the nurse and putting it on paper for the doctor to

20   look at and for him to make a decision to sign off on it

21   or not.

22       Q.   Consistent with the law, right, or -- or were you

23   breaking the law here?

24       A.   I was doing my job.

25       Q.   Ma'am, was your -- were you breaking the law --

1    was your job to break the law?

2        A.   No.

3        Q.   Okay.

4             THE COURT:   Mr. Canales, first 45-minute

5    session has concluded.

6             MR. HECTOR CANALES:   Has concluded?   Yes,

7    Your Honor.

8        Q.   (By Mr. Hector Canales)   And do you know who the

9    handwriting of -- the other handwriting on here is?   Do

10   you know who that is?

11       A.   I'm assuming it's one of the physicians.

12       Q.   All right.   But you don't know which?

13       A.   No, I can't be sure.

14       Q.   Okay.   Let's move on to the next document.

15   00255146.   What's this form?

16       A.   It looks like a paper IDT form that was created

17   by Merida.

18       Q.   A -- an IDT form?

19       A.   Yeah, a paper one like the one you were looking

20   at was in the EMR, electronic medical record -- maybe

21   the EMR wasn't working and they just did on the paper at

22   the time, but it's an IDT form.

23       Q.   And from -- from a rules perspective, it makes no

24   difference whether you've got a fancy electronic

25   software subscription, or whether you create your own

1   form like this one, what matters is that the IDT meeting

2   get done, right?

3       A.   So it matters is that it gets done and all the

4   information is put down that you need, yes.

5       Q.   Right.  And so here we're doing it by hand?

6       A.   Yes.

7       Q.   All right.  And so there was an IDT meeting on

8   Jack High on 01/30/15 at the top right-hand corner if

9   you scroll up a little bit, Roy.

10          You see that?

11      A.   Yes.

12      Q.   Okay.  And -- and so you've got the -- the

13  nursing, the social work, the chaplain, and then it

14  looks like the meeting notes there at the bottom that

15  looks like your signature and your handwriting; do you

16  agree?

17      A.   Yes.

18      Q.   Can you read what you wrote there out loud to the

19  jury.

20      A.   Recertification assessment and plan of care

21  discussed, all disciplines in agreement with

22  recertification and current plan of care.  Plan of care

23  to be updated every 14 days and as needed.

24      Q.   All right.  Is that true?

25      A.   I'm assuming, yes, it's true.

1    Q.   All right.   Were you there at that meeting?

2    A.   I was.

3    Q.   All right.   So at that meeting then you had --

4    you had the nurse, who was the nurse there, it looks

5    like up at the top Diane Fowler?

6    A.   Yes.

7    Q.   So Diane Fowler was in agreement with

8    recertification of a terminal illness of Jack High,

9    right?

10   A.   Yes.

11   Q.   And Esther Foster was also in agreement to

12   recertify Jack High for hospice, correct?

13   A.   I don't know, I would assume so, I mean she

14   didn't say otherwise.

15   Q.   Well, wait a minute.   Why -- why don't you know,

16   your -- your -- your note here says that all disciplines

17   in agreement?

18   A.   So I -- so what nobody said that they weren't in

19   agreement is what it means, I don't know what she

20   thought.

21   Q.   Okay.   All right.   That's what you meant by --

22   that's the clarification you want to make that nobody

23   said -- said -- said otherwise?

24   A.   Right.

25   Q.   But you interpreted that in your clinical

1    judgment to mean that they all were in agreement?

2        A.  Yes, if there's no disagreement and the doctor

3    signs it I assume that nobody has anything to say.

4        Q.  All right.  All right.  Well, thank you for

5    pointing that out.

6            And the chaplain, Daniel -- who's the chaplain?

7    What's the last name there?

8        A.  I believe it was Daniel Portillo.

9        Q.  Portillo, Daniel Portillo was also -- also, I

10   guess, did not express any objections?

11       A.  I'm assuming not.

12       Q.  And then we see that little signature down there

13   at the bottom, the R.E. again, right?

14       A.  Yes.

15       Q.  But you don't know who that is?

16       A.  I'm assuming it's the doctor.

17       Q.  Dr. Escamilla?

18       A.  I would assume so, but I don't know his

19   signature.

20       Q.  Fraud, yes or no?

21       A.  How would I know?

22       Q.  You were there.

23       A.  But I don't know what somebody's thinking or

24   doing.

25       Q.  Okay.  You weren't committing fraud when you were

1    there?

2        A.   I was just doing my job.

3        Q.   All right.  Let's look at again E-10 -- E-16

4    excuse me, Government Exhibit E-16, medical records of

5    Jack High, Mesquias 00255147.

6            This is another IDT meeting that you participated

7    in, but now it's in February of '15; see that?

8        A.   (No response.)

9        Q.   Has a similar line up there of nurses, social

10   workers, chaplain and doctor, right?

11       A.   Yes.

12       Q.   And we scroll down, let's go down to the comments

13   there.  And again we see, again, the 40 percent, the

14   FAST 7A, right?

15       A.   Yes.

16       Q.   The score.  Alzheimer's and debility can be a

17   very slow process; can it not?

18       A.   Yes.

19       Q.   There's some disease processes that kill you

20   quick, right?

21       A.   Yes.

22       Q.   And there's some that kill you death by a

23   thousand cuts, right?

24       A.   Yes.

25       Q.   Let's just skip to the -- to the -- to the second

1    to last page here ending in 151 and go to the bottom.

2         That's you again, right, ma'am?

3    A.   Yes.

4    Q.   All right.  So again, no objections, nobody

5    voiced any objections and you digitally signed this

6    document, this plan of care?

7    A.   Again, I signed off on the meeting that I held

8    the meeting.

9    Q.   All right.  And let's go to the next page, Roy,

10   to the top of the next page.

11        The mystery is solved.  Dr. Escamilla signs off

12   on it, too, right?

13   A.   Yes.

14   Q.   So those R.E.'s that we were looking at a little

15   bit more, can we now say -- can you now say with

16   confidence and under oath that when you saw that R.E.

17   before in the prior exhibits that it was in fact

18   Dr. Escamilla who was signed off at least here on

19   multiple IDT's for Mr. High?

20   A.   I can't say with 100 percent confidence.

21   Q.   The R.E. next to his name doesn't give you 100

22   percent confidence?

23   A.   Not necessarily because the -- that is

24   auto-generated.

25   Q.   The R.E.?

1    A.   No, the -- the medical doctor's names are

2    auto-generated in the EMR system.

3    Q.   Is that your handwriting?

4    A.   That's not my handwriting, no.

5    Q.   Okay.   98 percent?

6    A.   I mean I just -- I can't remember.

7    Q.   How -- how --

8    A.   I mean I can't --

9         MR. SWARTZ:   Objection.

10   Q.   (By Mr. Hector Canales)   I'm moving on.   Let's

11   talk about, let's move to the issue that you raised

12   about primary care physicians not knowing that their

13   patients were on -- on -- on hospice, okay, and this --

14   this complaint that you had.

15   A.   Okay.

16   Q.   That kind of falls under the category, would you

17   agree, of continuity of care where a doctor might kind

18   of go, hey, you're -- you're disturbing my continuity of

19   care with my patient, do you agree that's kind of the

20   source of the complaint?

21   A.   No.

22   Q.   Oh, okay.   Well, let's pull up again E-16 for

23   Jack High.

24        Well, let me ask you this before I do that, do

25   you have a specific memory, can you tell the jury on one

1    of these complaints about the PCP not knowing that their

2    patient was on hospice, did that complaint regard Jack

3    High?

4       A.  Not to my knowledge, no.

5       Q.  Who did it involve?

6       A.  I can't recall the name of the patient.

7       Q.  What?  You don't know?

8       A.  No.

9       Q.  You just have this -- was it -- how -- how

10   about -- how about --

11            MR. HECTOR CANALES:  Can I have the ELMO

12   real quick?

13            THE CLERK:  Yes, sir.

14      Q.  (By Mr. Hector Canales)  All right.  Here are the

15   patients at issue in this case.  It wasn't Jack high,

16   right?  PCP didn't complain about not knowing Jack High

17   was on -- on --

18      A.  No.

19      Q.  All right.

20      A.  It wasn't Jack High.

21      Q.  What about Francisca Perez?

22      A.  I can't recall the patient's name.

23      Q.  You can't testify that any of these patients for

24   counts two through seven, Jack High, Francisca Perez,

25   Teresa Calvillo, Arcadio Castaneda, Petra Cerda, or

1    Joanne Conti that these complaints that you testified

2    about relate to any of them?

3        A.   I don't recall the patient's name.

4        Q.   Do you think that's maybe because they knew?

5        A.   No.

6        Q.   Are you sitting here under oath going to tell

7    this jury that -- that the primary care physician as it

8    relates to Jack High, Francisca Perez, Calvillo,

9    Castaneda, Cerda and Conti that their primary care

10   physicians did not know they were on hospice?

11       A.   I don't know that.

12       Q.   You don't know one way or the other?

13       A.   Nope.

14       Q.   All right.  Let's pull up Exhibit

15   Mesquias 00253253.  Oh, you know what, I'm sorry, I'll

16   just do this on the ELMO.  It's already up.  This will

17   be -- try to go through this fast.

18            Jack High, Count Two, Dr. Gonzaba knew because he

19   wrote the script.  He put it on the prescription.

20            MR. SWARTZ:  Objection, Your Honor, has he

21   laid the foundation for whether she knows whether Dr.

22   Gonzaba wrote this prescription or not?  He's asking her

23   to leap to a conclusion he hasn't laid the foundation

24   for.

25            MR. HECTOR CANALES:  She said she didn't,

1   Your Honor; I'm now impeaching her that she did because

2   the Government's position in this case is they didn't

3   know.

4                THE COURT:   Rephrase the question.   She said

5   she didn't know.

6   Q.   (By Mr. Hector Canales)   What is this?

7   A.   It looks like a prescription pad order.

8   Q.   From who?

9   A.   I'm sorry, it's hard for me to read on my end.

10  The prescription pad looks like it says Gonzaba.

11  Q.   Does that help?

12  A.   It's just really blurry, I apologize.   Gonzaba --

13  it says Gonzaba Medical Group on the top.

14  Q.   Okay.   How about this?   Technology blurs it out.

15  A.   Yes, Gonzaba, Gonzaba Medical Group on the top.

16  Q.   And on the bottom there the stamp that says what,

17  who's the doctor?

18  A.   V. Gregory Gonzaba.

19  Q.   And -- and it is a -- all right.   Now, the

20  Gonzaba Medical Group, is that a primary care provider

21  group or a hospice group?

22  A.   I believe it's a primary care provider group.

23  Q.   What's the date?

24  A.   I can't see it from here again, I'm sorry.

25  Q.   Sure, all right.

1      A.   08/13/13.

2      Q.   Very well.  08/13/13.  08/13/13.  And the

3  certification period for Jack High, that's the

4  allegation in the case, is August 14th, 2013 to October

5  '13.  So this is the script the day before August 14th,

6  correct?

7      A.   Yes.

8      Q.   Is there any doubt in your mind that Dr. Gonzaba

9  knew Jack High was going to hospice?

10              MR. SWARTZ:  Objection, speculation,

11  Your Honor.

12              MR. HECTOR CANALES:  I'm asking her mind,

13  Your Honor.

14              MR. SWARTZ:  He's asking her if Dr. Gonzaba

15  knew that --

16              THE COURT:  Rephrase the question.

17      Q.   (By Mr. Hector Canales)  Do you have any doubt

18  that the PCP knew that he referred his patient to

19  hospice?

20              MR. SWARTZ:  Objection, speculation,

21  Your Honor.

22              THE WITNESS:  I don't know.

23      Q.   (By Mr. Hector Canales)  Okay.  What's it say

24  there?  What was the prescription for?

25      A.   Hospice eval and treatment.

1    Q.   In all those meetings that you had with the

2  Government, did they go over the -- you knew today

3  before you were getting here you were going to get asked

4  questions about this issue about a primary care

5  physician have -- knowing or not knowing their patient

6  was in hospice, you knew that question was coming;

7  didn't you?

8    A.   No.

9    Q.   You didn't know that?

10   A.   No.

11   Q.   How many times did you meet with them again?

12   A.   Three or four.

13   Q.   When was the last time you met with them?

14   A.   I don't know, two days ago.

15   Q.   Two days ago?

16   A.   I -- the other day before I got on the stand, I

17  don't remember.

18   Q.   And -- and -- and you met to prepare for today,

19  right?

20   A.   Yes.

21   Q.   All right.  And you rehearsed?

22   A.   No, I wouldn't say rehearsed I was asked

23  questions like I was from the beginning, the same

24  questions I've been asking and been answering.

25   Q.   Okay.  All right.  Let's look at Mesquias

1    00290119.  Oh, shoot, I keep forgetting I'm on the ELMO.

2    This is --

3                    THE CLERK:  Oh, you want the ELMO?

4                    MR. HECTOR CANALES:  Yeah, let me just do

5    the ELMO, sorry.

6                    THE CLERK:  Okay.  There you go.

7    Q.  (By Mr. Hector Canales)  Another script, right?

8    A.  Right.

9    Q.  For which patient?

10   A.  Teresa Calvillo.

11   Q.  To do what, what are they prescribing?

12   A.  Hospice eval and admission.

13   Q.  So some doctor at the Gonzaba Group is

14   prescribing Calvillo to be admitted, right?

15   A.  Somebody signed off on it.

16   Q.  All right.  So this particular -- yeah, some

17   doctor, right, you see circled M.D.?

18   A.  I would assume that --

19   Q.  And this is a prescription for Calvillo to be

20   admitted to hospice out of a primary care provider's

21   office?

22                   MR. SWARTZ:  Objection, Your Honor.  He's

23   asking her to speculate about what this document is, he

24   hasn't established that she knows the document, that she

25   had any involvement in this prescription.

1          THE COURT:  Sustained.  Sustained.

2          Rephrase the question.

3          MR. HECTOR CANALES:  Well, I'll do it again.

4     Q.  (By Mr. Hector Canales)  The Gonzaba Medical

5  Group, you know who they are, right?

6     A.  They're a medical group.

7     Q.  They're a primary care provider group?

8     A.  Correct.

9     Q.  All right.  So this -- this is a prescription

10  from that primary care provider group, right?

11          MR. SWARTZ:  Objection, Your Honor,

12  speculation.  He's not laid the foundation that she

13  would know what this prescription relates to, she

14  doesn't have any personal knowledge about this document.

15          THE COURT:  Rephrase the question.

16          MR. HECTOR CANALES:  It's -- it's --

17     Q.  (By Mr. Hector Canales)  See over there, see with

18  this, what is this universally stand for?  RX written

19  like that, what does that mean?

20     A.  A prescription.

21     Q.  Does that help you understand what this is, that

22  is a prescription?  Does that help?

23     A.  I don't work --

24          MR. SWARTZ:  Your Honor, same objection.

25  He's asking her to make conclusions about a document

1    that she has no personal knowledge of.

2              MR. HECTOR CANALES:  All right.  Okay.

3      Q.   (By Mr. Hector Canales)  Well, you know what,

4    I -- I challenge the Government on redirect to ask you

5    about this, okay?

6              THE COURT:  Simply ask her do you know what

7    that is?

8              THE WITNESS:  It's a prescription.

9              THE COURT:  Go ahead, Mr. Canales.

10              MR. HECTOR CANALES:  All right, I'm going to

11   move on.

12      Q.   (By Mr. Hector Canales)  Let me -- we're going to

13   look at another Government Exhibit, this comes from your

14   files, Exhibit DX -- GX D-2 Mesquias 00313802.

15         I'm -- I'm -- Pavlov would be very upset right

16   now with me.  Here we go.

17         Did you get it, Roy?  I'm sorry, here we go.

18   Government Exhibit D-2, 00313802.

19         Well, let me just have the ELMO, I'm sorry, I'm

20   almost through with this part -- point anyway.  I'm

21   sorry.  I apologize.

22         There's the Gonzaba Medical Group that we --

23   we've -- we've been discussing.  This is regarding

24   Arcadio Castaneda, right, the subject of the

25   Government's allegations in this case and count -- in

1   Count Five, okay?  I want to call your attention to

2   here -- first, let me ask, William T. Gonzaba, do you

3   know William T. Gonzaba?

4       A.   No.

5       Q.   All right.  Have you ever heard of him?

6       A.   No.

7       Q.   Tom Gonzaba?

8       A.   Oh, yes.

9       Q.   All right.

10      A.   I've heard of him, but I don't know him.

11      Q.   All right.  And he's one of the owners of the

12  Gonzaba Medical Group?

13      A.   I don't know that.

14      Q.   All right.  There's a Tom and there's a Greg or

15  Vincent Gonzaba; is --

16      A.   Yeah, but I don't know the ownership.

17      Q.   Okay.  All right.  Here Dr. Tom Gonzaba is

18  telling his patient Castaneda, he discusses to the

19  client the progression of his disease.  Symptoms he

20  experiences are directly related to his progressive

21  decline.  We've outlined the most effective medication,

22  regiment and treatment plan.  I want to continue to

23  monitor your health status and clinic visits.

24  Many patients prefer to focus on comfort measures at

25  this point rather than seeking aggressive and invasive

```
 1    procedures.  I'm just going to stop right there.

 2          That's a hard message to get from a doctor; isn't

 3    it?

 4       A.  I would assume so, I've never gotten one.

 5       Q.  Reading between the lines what's he saying?

 6       A.  He's saying that he has a progressive disease

 7    process.

 8       Q.  Get ready to die, right?

 9       A.  I don't know that.

10       Q.  As a means to increase home services, provide

11    necessary equipment and medicine to optimize your

12    comfort and moral/spiritual support, I recommend you

13    consider hospice services.  Hospice services are free

14    for appropriate patients such as you.

15          Anything wrong, any fraud in Dr. Gonzaba's

16    counsel, advice, doctoring here to Mr. Castaneda?

17       A.  I don't -- I don't know the doctor, I don't know

18    what he's thinking, I don't know the patient so --

19       Q.  Just what he says right here, ma'am, in black and

20    white?

21                MR. SWARTZ:  Your Honor, speculation.

22                MR. HECTOR CANALES:  She's given opinions.

23       Q.  (By Mr. Hector Canales)  Answer --

24                THE COURT:  It's been asked and answered she

25    doesn't know.
```

1        THE WITNESS:  Is there anything with --

2    Q.  (By Mr. Hector Canales)  You don't know if

3   there's any fraud going on here?

4    A.  I don't know that.

5    Q.  You don't have any opinion one way or the other?

6    A.  I don't know the patient, I don't know the

7   doctor, sir.

8    Q.  So, therefore, you have no opinion -- and I'll

9   move on, I just need to know if have you an opinion or

10  not?

11   A.  No.

12   Q.  No opinion.  All right.  You think Mr. --

13  Dr. Gonzaba didn't know Castaneda went to hospice?

14        MR. SWARTZ:  Objection, speculation.

15        THE COURT:  Sustained.

16   Q.  (By Mr. Hector Canales)  All right.  This comes

17  from Mesquias 00286465.  Relates to Count Six, Petra

18  Cerda.

19        This is another physician's order, you see that?

20  True?

21   A.  Yes.

22   Q.  You know who that physician's signature is?

23   A.  I do not.

24   Q.  You think that physician knows that he's sending

25  his patient to hospice?

1          MR. SWARTZ:  Objection, speculation,

2   Your Honor.

3          THE WITNESS:  I don't know what the

4   physician thinks.

5          THE COURT:  Sustained.

6     Q.  (By Mr. Hector Canales)  This is a physician

7   order from the Baptist Health System.  Can you read

8   that?

9     A.  Merida Hospice, it looks like eval and treat.

10    Q.  In your experience, ma'am, this physician order,

11  is this a physician order out of a hospice or out of a

12  primary care provider?

13    A.  That's looks like hospital orders.

14    Q.  All right.  And it relates to Joanne Conti,

15  right?

16    A.  Yes.

17    Q.  Ms. Conti is Count Seven, right?  You don't know;

18  do you?

19    A.  I mean, I --

20    Q.  Okay.

21    A.  I don't know what Count Seven is.

22          COURT OFFICER:  Excuse me, Your Honor.  The

23  jury needs a break.

24          THE COURT:  Mr. Canales, I've been informed

25  the jury needs a very quick break.

1           Let's take a very brief recess.

2           COURT OFFICER:  All rise for the jury.

3           (JURY OUT.)

4           (COURT IN SHORT RECESS.)

5           THE COURT:  Please remain standing for the

6      jury.

7           COURT OFFICER:  All rise for the jury.

8           (JURY IN.)

9           THE COURT:  Thank you, everyone.  Please be

10     seated.

11          Ladies and gentlemen of the jury, I received

12     some lunch questions for lack of a better word.  First

13     of all, feel free to bring your own lunch if you would

14     like to, if you'd like to stay in the jury room.

15          In terms of getting stuff delivered, that's

16     logistically difficult because of security and what have

17     you, but if you'd like to bring your own lunch that's

18     acceptable and regrettably because of budget and what

19     have you, we can't buy you lunch, but we can buy you

20     lunch once you start your deliberations.

21          So that's a little bit down the road, but

22     once we finish trial you'll be your own judges in terms

23     of -- of how you want to proceed through your

24     deliberations, and at that time we -- we're authorized

25     to get you lunch.

 1                    But back to my point, for -- for the time

 2    being either bring your own lunch or proceed as you've

 3    already been doing.  All right.

 4                    Let's get back to the case at hand.

 5    Mr. Canales, please proceed.

 6                    MR. HECTOR CANALES:  May I proceed,

 7    Your Honor?  Thank you.

 8        Q.   (By Mr. Hector Canales)  Are you ready to

 9    proceed, Ms. Gonzalez?

10        A.   Yes.

11        Q.   Okay.  Let me pull up -- let's -- we've been

12    discussing, just kind of shift gears a little bit, we've

13    been discussing a lot of Jack High and the records,

14    things, signatures, your role with Jack High.  I'm going

15    to move now to a different patient, patient Arcadio

16    Castaneda.

17        A.   Okay.

18        Q.   Do you remember Mr. Castaneda?

19        A.   I remember the name.

20        Q.   You remember the name, okay.

21             And, Roy, could you pull up -- and this is out of

22    Government Exhibit E-6, the medical records of

23    Castaneda, Mr. Castaneda.  00230357.

24             Let -- let's start at the bottom.  Let's just --

25    down at the bottom, that's your signature there?

1    A.   Yes.

2    Q.   And your handwriting?   And what do you -- what do

3    you say here?

4    A.   No changes to current plan of care, all

5    disciplines in agreement with current plan of care.

6    Q.   Just like the last time we saw another one of

7    these with -- with Jack High I believe, right?

8    A.   Right.

9    Q.   And again, and so if we -- we look up, let's go

10   to the top now.   Nursing -- somebody typed this out, do

11   you know what nurse signed that?

12   A.   Looks like -- it looks, I mean, I don't know, but

13   it looks to me like it was copied and paste maybe from

14   the assessment and, you know, like the initial

15   assessment, I don't know.

16   Q.   And do you recognize that nurse's signature

17   there?

18   A.   I do not.

19   Q.   Okay.   And so with Mr. Castaneda, the patient was

20   admitted to hospice with a DX of CHF.   What's CHF?

21   A.   Congestive heart failure.

22   Q.   Okay.   Patient denies any SOB, what's that mean?

23   A.   Shortness of breath.

24   Q.   Okay.   While -- while sitting down, or any ill

25   symptoms such as dizziness.   Has the patient -- has a

1    history of falls.  Why would that be something of --

2    that a nurse would note, a history of falls?

3        A.   Why would it be something the nurse would know?

4        Q.   Sure.

5        A.   Maybe from history that they had in front of

6    them?

7        Q.   But why even ask, why is that pertinent?

8        A.   We always ask a patient if they've had any recent

9    falls, or as -- so we can put them down as a safety risk

10   and also to indicate that possibly they're having

11   difficulty ambulating.

12       Q.   And why is that important, how does that fit into

13   the picture of providing hospice care?

14       A.   They may be getting progressively weaker, they

15   may have underlying symptoms of possible stroke or TIA's

16   which is mini-strokes.

17       Q.   All right.  And because you have the primary

18   diagnosis, right, but then there's something in medicine

19   known as -- well, there's secondary diagnoses, right?

20       A.   Yes.

21       Q.   Because you could have more than one thing wrong

22   with you unfortunately, right?

23       A.   Yes.

24       Q.   And -- and the body and organs are all connected.

25   So when the heart -- if you start having problems with

1   the heart that can affect the other systems of the body

2   and other organs, fair?

3      A.   Yes, it could.

4      Q.   All right.  And so that might lead to a different

5   disease?

6      A.   Yes.

7      Q.   Secondary to the primary one, right?

8      A.   Right.

9      Q.   So what are some of the other problems that

10  congestive heart failure can cause in a patient?

11     A.   Shortness of breath, weakness, fatigue, could

12  cause blood pressure problems.

13     Q.   Symptoms, right, symptoms of the problem?

14     A.   Yes.

15     Q.   Right.  And then there's another concept out

16  there in medicine called co-morbidities, right?

17     A.   Yes.

18     Q.   What is a morbidity?

19     A.   Comorbidity is classified as something else.  The

20  way we use it in hospice is something else that could

21  contribute to the terminal illness that would cause the

22  patient to pass away.

23     Q.   Right.  So if you are Alzheimer's and you're a

24  sundowner -- I don't know what I'm doing wrong -- I'm

25  just going to turn it off.

1          If -- if somebody needs it, I'll try to make sure

2    to speak up.

3          What's a sundowner?

4     A.   A sundowner is somebody who once the nighttime

5    comes they have their night and day mixed up and they

6    may -- it may cause increased confusions, they may get

7    combative, they may not know where they are.  It happens

8    a lot with patients in the hospital when they're

9    misplaced there and they're not used to it, they get

10   more increasingly confused.

11    Q.   Other people call it, like these Alzheimer's

12   patients they escape, right, they leave?

13    A.   Some of them are flight risks, yes.

14    Q.   Right.  And -- and -- and that is a co-morbidity

15   or a symptom of a larger problem, right?

16    A.   Sundowners, I wouldn't consider a comorbid, maybe

17   a secondary condition of what they're experiencing, but

18   not -- I don't think you can actually -- it's not a

19   fatal issue that you have.  It's a behavioral disorder

20   that is --

21    Q.   Right.  But it can indicate the severity,

22   obviously if you have somebody who's a sundowner and

23   that level of confusion it -- it sheds light on how

24   serious of the -- the primary condition of dementia or

25   debility or Alzheimer's is, right?

1    A.   I disagree.

2    Q.   You disagree?

3    A.   Yes.

4    Q.   All right.  So people who are sundowners --

5    patients who get so confused they don't know whether

6    it's night or day and they leave, that's not an

7    indicator of a more severe case than a patient with the

8    same disease who doesn't do that?

9    A.   It can happen sporadically so it's not

10   necessarily like -- like I said in the hospital, you can

11   get patients that walk in with no dementia at all and

12   they can get sundowners just out of confusion and it's

13   very controllable so it doesn't -- in my experience it

14   doesn't say whether a patient is worse or -- or not,

15   it's just a symptom that they're experiencing.

16   Q.   I get where you're coming from, I mean really

17   every case is unique, correct?

18   A.   That's correct.

19   Q.   There's no cookie-cutter approach to medicine,

20   right?

21   A.   Correct.

22   Q.   All right.  And so you -- that's why within

23   hospice you take a holistic approach, you've got to look

24   at not just the primary diagnosis, but you've got to

25   look at the symptom, the co-morbidities, all the other

1    things that are going on, the circumstances with that

2    patient, right?

3        A.  Yes.

4        Q.  That's what the clinical judgment of a provider

5    is about, right?

6              MR. HECTOR CANALES:  Could I have the ELMO?

7    It's faster for me.

8              THE CLERK:  Yes, sir.

9        Q.  (By Mr. Hector Canales)  And so going back to the

10   very first document that I showed you that you -- that

11   you wrote, the clinical judgment here of the prognosis

12   of less than six months of the disease runs its normal

13   course.  That's based on a holistic approach, you've got

14   to look at not just the primary diagnosis in this

15   particular case of debility, but you've got to look at

16   all of the -- all the things going on, right?

17       A.  You do.

18       Q.  And taking that into account here, you wrote

19   down, I guess your abbreviation for prognosis is PROG,

20   right?

21       A.  Yes, that's a statement that has to be in

22   every -- every note that's signed by the doctor, the

23   doctor has to have that in the statement.

24       Q.  The statement you wrote in your hand?

25       A.  Yes, it has to be on there.

1    Q.   All right.  So let's get back to this here.   So

2    everybody was in agreement, the social worker, Esther

3    Foster, correct?

4    A.   (No response.)

5    Q.   He was in agreement or she was in agreement,

6    excuse me?

7    A.   As I said before nobody disagreed so --

8    Q.   All right.  That equals agreement then to you?

9    A.   It just means nobody disagreed with the plan of

10   care, and we proceeded --

11   Q.   How come you didn't say that?  If you're making

12   that -- that's -- that's an important distinction to

13   you, I take it, because, you know, here you're -- you're

14   making that second or third time you made that

15   distinction, that's an important distinction to you,

16   right?

17   A.   Yes.

18   Q.   Well, how come you didn't say that here?  You

19   didn't say nobody disagreed, you said all disciplines in

20   agreement.  What changed?

21   A.   Nothing changed.

22   Q.   But your testimony is different?

23   A.   It's not different, it's just that's the way that

24   I write my IDT's.

25   Q.   But you say it different -- you write it one way

1    but you come here to Court --

2        A.   But you're asking me specifically if Esther

3    disagreed or agreed and I can't tell you because I

4    didn't look at her and say do you agree or disagree so I

5    am just saying I'm assuming she did not.  She didn't

6    disagree.

7        Q.   And -- and you -- your -- that's out of memory

8    from February the 5th of '15?

9        A.   Because I know how I run IDT and I don't

10   specifically look at each individual and ask them, hey,

11   are you agreeing or disagreeing, I never have.

12       Q.   Daniel Portillo again, chaplain, right?

13       A.   Yes.

14       Q.   I'm going to look at -- I'm going to put on the

15   screen here Government Exhibit E-4, that's a portion of

16   the medical records of Teresa Calvillo, okay?

17            For the record, it is Mesquias 00289986, okay?

18            You'll see here, let me just go to the bottom

19   here.  See your name there?  See that?

20       A.   Yep.

21       Q.   This gets entered in on the computer, you see

22   this on the computer?

23       A.   Yes.

24       Q.   All right.  You know who that is?

25       A.   Nope.

1      Q.   No?

2      A.   It's one of the doctors, I don't know who.

3      Q.   This -- is it Dr. Gonzaba?

4      A.   Possibly, yes, I would assume that's who they got

5  to sign it.

6      Q.   Look like the same signature?

7      A.   I --

8      Q.   Let me get another -- I'll find another one.

9  We'll get to that point, not -- not -- not the biggest

10  point.  All right.  So there's a diagnosis and a

11  certification again, right, for Teresa Calvillo?

12     A.   So that's not a complete -- that's not completed.

13     Q.   What's missing?

14     A.   The doctor's narrative.

15     Q.   It says here it's a face-to-face encounter,

16  right?

17     A.   It has the date and it says signature on paper.

18     Q.   Okay.

19     A.   But there should be some type of attachment, or

20  he should have written on that.

21     Q.   Oh, yeah, there it is.  Let's look at it.

22  Recertification, right, May of '13, May -- May 4th --

23  May 3rd of '15; see that?

24     A.   Certification for six, four to eight --

25     Q.   Do you know who this is here?

1    A.   Nope, no, I don't.

2    Q.   Dr. Carrillo?  That's what it says, right?

3    A.   That's what it says.

4    Q.   All right.  And you recall your testimony earlier

5    that Dr. Carrillo was not doing the face-to-faces?

6    A.   That's -- yes, that's what I said.

7    Q.   Whose signature is this?

8    A.   It's written as the patient, but I don't know

9    that it's hers.

10   Q.   All right.  So here you've got a -- you've got a

11   face-to-face for this certification, right, and the

12   attachment says you've got Carrillo, he signs the

13   face-to-face, and it has Calvillo sign it too, that's

14   what the document says, right?

15   A.   Yeah.  Well, I also see it as a narrative

16   explanation.  Says see attached physician progress note,

17   I don't see the attached progress note on what --

18   Q.   Well, hang on, here it is.  Satisfied now?

19   A.   Okay.

20   Q.   So it's there, it's all there, right, the

21   certification is there, the face-to-face is there, the

22   narrative is there and the patient even signed -- signed

23   it, right?

24   A.   Yes, but the verbal order is missing and also the

25   indication of --

1    Q.   Here's the verbal order right here, ma'am.

2    A.   Right.  But Dr. Carrillo can't do the -- he can

3    do the face-to-face but he wasn't the IDG physician.

4    The actually IDG physician should be doing the

5    recertification.

6    Q.   That's the medical director, right?

7    A.   Yes.

8    Q.   Right.  And he did it right here, he signed it,

9    Greg Gonzaba signed it?

10   A.   But he didn't do his narrative is what I'm

11   saying.  He has to do a narrative.

12   Q.   He can rely on the face-to-face?

13   A.   He has to have the face-to-face, but he also has

14   to have a narrative, you have to have both.

15   Q.   And he had the face-to-face, ma'am, is two pages.

16   A.   I'm asking for the narrative from --

17   Q.   Let me ask my question.  Is there not a narrative

18   attached to the face-to-face?

19   A.   It's the face-to-face.

20   Q.   There's a face-to-face with a narrative?

21   A.   The narrative has to be from the IDG physician.

22   Q.   It is?

23   A.   Where?

24   Q.   It was not -- is it not true that Dr. Carrillo

25   was also a medical director for Merida?

1    A.   Yes, but he was not the IDG physician.

2    Q.   Isn't it true under the rules that a face-to-face

3  can be done by a nurse as well or a doctor?

4    A.   A nurse practitioner.

5    Q.   Right.  So you don't have to have doctor do the

6  face-to-face?

7    A.   No, you do not.

8    Q.   So Dr. Carrillo is over-qualified.  We're sending

9  an M.D. to do the job of a nurse practitioner here,

10  right?

11    A.   No, but you're still missing the IDG physician

12  narrative, you have to have a narrative from the IDG

13  physician.

14    Q.   Has the Government shown it to you?

15    A.   Has the Government shown me what?

16    Q.   How do you know it's not there?

17    A.   I -- what you're showing me it's not there.

18    Q.   Right.

19    A.   That's what I'm referring to.

20    Q.   How do you know it's not?

21    A.   What you're showing me I'm telling you it's not

22  there.

23    Q.   How do you know it's not there?

24         MR. SWARTZ:   Objection, Your Honor, asked

25  and answered.

1              MR. HECTOR CANALES:  She hasn't answered --

2      asked that.

3              MR. SWARTZ:  He's asking her to speculate or

4      testify about what documents are not in evidence.

5              THE COURT:  Next question, please.  Next

6      question.

7          Q.  (By Mr. Hector Canales)  Do you know how many

8      thousands of pages are involved in the medical record

9      of -- of Calvillo?

10         A.  No, I don't.

11         Q.  Has the Government shown you one page of it?

12         A.  No.

13         Q.  Am I the first person to even ever -- in all

14     these meetings and in this trial, in this case, starting

15     from the invitation to come talk with you, did they ever

16     ask you, did they ever show you any of these patient

17     records?

18         A.  No.

19             THE COURT:  Mr. Canales, while you're

20     organizing, you're near the second 45-minute session.

21             MR. HECTOR CANALES:  Thank you, Your Honor,

22     I appreciate that.  I intend to yield back some time.

23         Q.  (By Mr. Hector Canales)  This is a page out of

24     the medical records of Ms. Joanne Conti, Government

25     Exhibit E-10, bates number Mesquias 00261836.

1        Again, your signature, correct?

2    A.   Correct.

3    Q.   Your handwriting, correct?

4    A.   Correct.

5    Q.   Your date?

6    A.   Correct.

7    Q.   It happened, right?  What you wrote there in your

8    date the 12/23/14 with Ms. Conti, that happened?

9    A.   That, again I base everything off of the nurse's

10   notes.

11   Q.   And you had a basis to put -- you didn't make

12   that up?

13   A.   I referred to the nurse's note.

14   Q.   That's right, but -- that's what I'm saying.  You

15   had a basis, there was documentation within the record

16   to support you putting what you -- you did there?

17   A.   Yes.

18   Q.   All right.  You didn't -- you didn't make it up,

19   you didn't lie?

20   A.   No.

21   Q.   All right.  And you knew that whatever medical

22   director was assigned to this patient was going to be

23   relying on your word, your signature there?

24   A.   Relying on -- I would take it more on the notes

25   of the patient, but I wrote it down, yes.

1    Q.   Whoever is going to come into the care and

2    responsibility for Joanne Conti, you know that these

3    records are going to follow this patient to whatever

4    doctors they go to, right?

5    A.   So not only --

6    Q.   My question is simple, do you know that -- what

7    you write here, it stays in the medical record and other

8    doctors are going to rely on it in the future?

9    A.   Yes.

10   Q.   Thank you.  For every medical record you write,

11   that's why we keep them, right?

12   A.   Correct.

13   Q.   So doctors can look back at them and can rely on

14   what's written, right?

15   A.   Correct.

16   Q.   Because you may not be here for whatever reason,

17   the patient can transfer, and when they transfer care,

18   right, when you're at your -- at your job now and you

19   get a -- and a patient transfers from one hospice into

20   yours, don't you send a request back to the other

21   hospice for those medical records?

22   A.   Yes, we do.

23   Q.   Why?

24   A.   To have it as reference.

25   Q.   And you knew when you signed all these things

1    that that could happen, that's just medicine, that's

2    just the way it works, right?

3        A.   Yes.

4        Q.   Would you agree that's Dr. Gonzaba's signature

5    there next to his certification?

6        A.   Again, I don't know his signature.

7        Q.   The name next to the signature is what?

8        A.   The typed name says Vincent Gonzaba.

9        Q.   Is it customary in your experience as a nurse

10   that doctors sign next to their typed name?

11       A.   Yes.

12              MR. HECTOR CANALES:  Pass the witness,

13   Your Honor.

14              THE COURT:  Mr. --

15              MR. HECTOR CANALES:  Hang on.

16              (Brief pause in proceedings.)

17              MR. CANALES:  Pass the witness, Your Honor.

18              THE COURT:  Mr. Cyganiewicz?

19                        CROSS-EXAMINATION

20   BY MR. CYGANIEWICZ:

21       Q.   Good afternoon.  Well, I'm sorry, good morning.

22       A.   Good morning.

23       Q.   It seems like the afternoon.  How are you today?

24       A.   I'm doing all right.  Thank you.

25       Q.   I'm Ed Cyganiewicz.  I represent Mr. McInnis.  I

1  don't think I'm going to be as close to as long as

2  Mr. Canales.

3     A.  Okay.

4     Q.  I'll just have a few questions.  You don't

5  understand something, please let me know, okay?

6     A.  Yes.

7     Q.  You live in San Antonio right now, correct?

8     A.  I do.

9     Q.  Okay.  And are you enjoying your time in

10  Brownsville?

11     A.  Could be better.

12     Q.  After you left the stand yesterday, the witness

13  stand, did you have any conversations with any of these

14  people before you testified today?

15     A.  No, I did not.

16     Q.  But before that time, it's -- what did you say,

17  three or four times?

18     A.  Yes.

19     Q.  We've never had a chance to visit; have we?

20     A.  No.

21     Q.  You work for Merida for, approximately, one year?

22     A.  A little over a year, yes.

23     Q.  And was it -- again, correct me if I'm wrong, I'm

24  trying to go over my notes on what you said yesterday,

25  but for the first week you were in Harlingen?

1 A. About a week and a half, I believe it was.

2 Q. And was that for some sort of training?

3 A. Yes, I was introduced to Mr. McInnis at the time

4 and to try to get a feel for the company.

5 Q. Was everything okay down there for you?

6 A. Yes.

7 Q. He treated you okay; didn't he?

8 A. Yes, he did.

9 Q. And he was the administrator in Harlingen,

10 correct?

11 A. Yes, sir.

12 Q. And who was the administrator in San Antonio?

13 A. I was told that Eddie Zuniga was the alternate

14 administrator.

15 Q. But he was in San Antonio, correct?

16 A. Yes.

17 Q. And the alternate, he's the administrator when

18 the director or administrator is not available?

19 A. Yes.

20 Q. Would you agree that Mr. Zuniga was in the San

21 Antonio office on a daily basis?

22 A. Yes.

23 Q. And Mr. McInnis would go up once or twice a year

24 or --

25 A. Probably maybe every couple of months.

1    Q.   So maybe six or -- you're saying maybe six times

2    a year?

3    A.   Maybe, yes.

4    Q.   Maybe.

5    A.   Yes.

6    Q.   On a daily basis you were working with

7    Mr. Zuniga, and that's Eddie Zuniga, correct?

8    A.   Yes.

9    Q.   And Mr. Zuniga was not a doctor or a nurse?

10   A.   No.

11   Q.   And Mr. McInnis is not a doctor or a nurse,

12   correct?

13   A.   Correct.

14   Q.   And the administrator is -- is it sort of like

15   the office manager running the day-to-day operation

16   would you say?

17   A.   They oversee the entire operation is my

18   understanding.

19   Q.   I know you said yesterday it was day-to-day,

20   oversee the workers, patient schedules, right?

21   A.   Correct.

22   Q.   And he may disagree with you, but I know they

23   tried to tell you, or say something to you that he was

24   admitting patients and you said he does not, and he's

25   not involved in admissions; is that correct?

1    A.   So he's --

2    Q.   Is he involved in admissions?

3    A.   Like as far as admitting a patient?

4    Q.   Yes.

5    A.   No, he doesn't admit patients.

6    Q.   Does it have to be a nurse or a doctor?

7    A.   Nurse has to admit, an RN has to admit a patient.

8    Q.   He couldn't certify patients or recertify

9  patients; could he?

10   A.   No.

11   Q.   He couldn't discharge patients; could he?

12   A.   No, only a doctor can discharge.

13   Q.   And when you met with the, I think the agent back

14  in San Antonio, you -- you did tell them that Eddie

15  Zuniga was the acting administrator in San Antonio,

16  correct?

17   A.   He was the one in San Antonio, yes.

18   Q.   And I want to talk to you about when Mr. Zuniga

19  told you to change the dia -- diagnosis of a patient; do

20  you recall saying that?

21   A.   No.

22   Q.   You didn't say that to Mr. Swartz this morning?

23   A.   No.

24   Q.   Okay.  You didn't say that, who told you, and you

25  said it was Eddie Zuniga told me someone from Harlingen

1    and Eddie Zuniga told you to change it?

2        A.   No, I said I received a call from somebody in

3    Harlingen, I can't recollect who it was because there

4    was a lot of different people that worked there and the

5    instruction was we needed to started changing that.

6        Q.   My notes say you were told by Eddie Zuniga and

7    that Eddie told you, oh, somebody in Harlingen told me,

8    is that not what you said?

9        A.   No, sir.

10       Q.   So you never talked to Mr. McInnis about that,

11   did you?

12       A.   Not directly, no.

13       Q.   And you never called him after Eddie talked to

14   you?

15       A.   No, sir.

16       Q.   And you don't really know who they talked to in

17   Harlingen; didn't you?  Isn't that what you said you

18   didn't know who they talked to in Harlingen?

19       A.   No, I know I received a phone call from some -- I

20   don't know the name of the person who called to say we

21   needed to do that.

22       Q.   But it wasn't Mr. McInnis?

23       A.   No.

24       Q.   Just -- you left Merida, I mean I thought -- I

25   appreciate your honestly in saying some people thought

1    you were bossy and I think you agree sometimes you

2    appear to be bossy, is that --

3        A.   That's correct, sir.

4        Q.   Is that what you said?

5        A.   Yes, sir.

6        Q.   And the other six or seven places you worked, did

7    you ever work for a year or less at these -- I'm sorry,

8    I think you testified for 15 years you worked at seven

9    places involving hospice?

10       A.   Yes.

11       Q.   Did you ever work at a place for longer than

12   three or four years?

13       A.   I worked at one place for about three and a half

14   years when I was in Wisconsin.

15       Q.   So the other places would be a year or less or --

16       A.   Probably like close to two years, one to two

17   years, and most of the time leaving to advance myself.

18   I started as a case manager.

19       Q.   I was going to ask you sometimes you got better

20   position?

21       A.   Better position, opportunities for more

22   education.

23       Q.   And were some of those reasons because you were

24   moving locations?

25       A.   I moved from Wisconsin to Texas, yes.

1    Q.   Are you the -- are you the young lady that's from

2    Stevens Point?

3    A.   No.

4    Q.   You're not from Stevens Point, Wisconsin?

5    A.   No, sir.

6    Q.   But with Merida you were there for a year?

7    A.   A little over a year, yes.

8    Q.   And I guess you're going to agree that you

9    interacted a lot more with Mr. Zuniga than you did with

10   Mr. McInnis; is that right?

11   A.   I actually didn't interact with -- I mean,

12   Mr. Zuniga kind of came and went.  He was more on the

13   home health side.

14   Q.   Okay.  Did -- did you ever confront Mr. Zuniga

15   about patients not declining and any of that?

16   A.   No, sir, no, sir, I did snot.

17   Q.   Did you ever tell the Government that when

18   confronted you would -- he would tell you that

19   Dr. Virlar would sign off on it, don't worry about it?

20   A.   Dr. Virlar did sign off on a lot of stuff, yes.

21   Q.   My question is when you met with the Government,

22   did -- did you tell them that Mr. Zuniga said that when

23   he was confronted about a patient he said, don't worry

24   about it, Dr. Virlar is going to sign off on it, do you

25   remember saying anything like that?

1      A.   Yes.

2      Q.   Is that true?

3      A.   It is.

4           MR. CYGANIEWICZ:   That's all I have.   Thank

5    you.

6           THE COURT:   Mr. Guerra?

7           MS. ARCE-FLORES:   It's actually me, Judge.

8    I'm going to be very brief.   It's still morning.

9                     CROSS-EXAMINATION

10   BY MS. ARCE-FLORES:

11     Q.   Good morning, Ms. Gonzalez.   I'm attorney Adriana

12   Arce-Flores, and along with Mr. Guerra we represent

13   Dr. Pena.   And so I'm actually going to be very brief

14   because Mr. Cyganiewicz just stole all my questions and

15   so I just have very few.

16          I know that you mentioned that you were employed

17   with Merida and that was for about a year-and-a-half;

18   that's correct?

19     A.   That's correct.

20     Q.   Okay.   And you stated that you were in -- in

21   Harlingen about a week, a week-and-a-half?

22     A.   About a week-and-a-half, yes.

23     Q.   And then your permanent location was actually the

24   Merida office in San Antonio; is that accurate?

25     A.   That's accurate.

1      Q.   Okay.  And then when you ended your employment

2  with Merida, that was also exclusively in San Antonio,

3  Texas; would that be accurate?

4      A.   Yes.

5      Q.   Okay.  And to- I guess, today you are still

6  residing in San Antonio?

7      A.   Yes, ma'am.

8      Q.   And you're still employed in San Antonio?

9      A.   Yes, ma'am.

10     Q.   Okay.  And that's all I have for you.

11     A.   Thank you.

12               MS. ARCE-FLORES:  Thank you, Judge.

13               THE COURT:  Thank you, Ms. Arce-Flores.

14  Mr. Swartz?

15               MR. SWARTZ:  Thank you, Your Honor.

16                     REDIRECT EXAMINATION

17  BY MR. SWARTZ:

18     Q.   Ms. Gonzalez.

19     A.   Hi.

20     Q.   A few more questions.

21     A.   Okay.

22     Q.   So you were -- during the cross of Mr. Canales

23  you were shown a whole bunch of medical records; do you

24  recall that?

25     A.   Yes.

1    Q.   Now, in your role at Merida, did you personally

2    and directly interact with those patients?

3    A.   I did not.

4    Q.   Did you rely on others to convey the conditions

5    of those patients to you?

6    A.   Yes, I did.

7    Q.   Did you rely on the information that you were

8    provided from others in order to complete the documents

9    you completed?

10   A.   I did.

11   Q.   And one of the documents that they put up there,

12   if you recall, was a document about an IDG meeting and

13   one of the participants was a nurse Melissa Hernandez;

14   do you recall that?

15   A.   Yes.

16   Q.   So in your role, did you rely on -- on people,

17   Merida employees like Ms. Hernandez, to report

18   information to you?

19   A.   Yes.

20   Q.   And you relied on them to provide accurate

21   information?

22   A.   Yes, I did.

23   Q.   Now, if nurses like Ms. Hernandez provided

24   inaccurate information to you, that could cause you to

25   put inaccurate information into your documents; is that

1    correct?

2        A.   That is correct.

3        Q.   And if there's inaccurate information in the

4    documents that's conveyed from nurses like Ms.

5    Hernandez, could patients who are unqualified be

6    admitted for hospice?

7        A.   Yes.

8        Q.   And if there's inaccurate information conveyed by

9    nurses like Ms. Hernandez, and other Merida employees,

10   could patients be recertified for hospice care who are

11   unqualified?

12       A.   Yes, that's correct.

13       Q.   And you were asked specifically about a Mr. Jack

14   High; do you recall that?

15       A.   Yes.

16       Q.   Did you ever see Mr. Jack High personally?

17       A.   No.

18       Q.   And I think one of the questions they asked you

19   was about different FAST scores; do you remember that?

20       A.   Yes, sir.

21       Q.   And different numbers for scores having to do

22   with Alzheimer's; is that right?

23       A.   Right.

24       Q.   And one of the scores was like a 7A; do you

25   remember that?

A.   Yes.

Q.   Can you tell the jury what -- a patient with a
FAST score of 7A, what is that patient like?

A.   A patient with a FAST score of 7A should be
primarily needing assistance with all ADLs, maybe some
incontinence and having difficulty, you know, your
grooming, your bathing, that sort of thing, some
incontinence, occasionally incontinence.

Q.   Are they going to be, I mean, moving around the
house or primarily in the bed?

A.   They were -- would still be ambulatory at that
time but unsteady.

Q.   Unsteady.  Okay.  And they would be -- need
assistance with you said the activities of daily living?

A.   Yeah, like some -- some not total dependence in
their activities of daily living, but some dependence in
this, like maybe assistance with the bath or, you know,
they can still dress themselves but you just need to
help them in and out of the bathtub, that kind of thing.

Q.   Is that the kind of patient you would expect to
go to the house and see dancing?

A.   No.

Q.   Is that the kind of patient you would expect to
see doing the Macarena?

A.   No.

1    Q.  You were also asked, well I guess regarding

2  Mr. -- Mr. High, I'm going to put Government's Exhibit

3  H-27 on the ELMO, if I may.

4        Can you see that, Ms. Gonzalez?

5    A.  Yes.

6    Q.  According to what's in Government's Exhibit H-27,

7  when did Mr. High come onto services?

8    A.  It looks like May 25th of 2012.

9    Q.  And then where does it show him coming off of

10  services?

11    A.  It looks like he had services until 09/09 and

12  then was put back on service again, and then until --

13  kind of confusing, because it says he died on 06/16 and

14  also says to 08/12/16.

15    Q.  Does it show that Mr. High was on services with

16  Merida for over four years?

17    A.  Yes, it does.

18    Q.  Now you mentioned during the Direct Examination

19  about your experience at other hospice companies.  Did

20  you say that at other hospice companies you expect to

21  see hospice patients on services for a certain period of

22  time?

23    A.  Yeah, usually the standard is anywhere from six

24  to nine months is where we have patients.

25    Q.  Not -- not four years?

1      A.   No, sir.

2      Q.   And with respect to Mr. High, during your time in

3    Merida, did you have concerns that Mr. High was not

4    appropriate for hospice?

5              MR. HECTOR CANALES:   Objection, leading,

6    Your Honor, suggesting the answer to the witness, the

7    answer to the question.

8              THE COURT:   Rephrase the question.

9      Q.   (By Mr. Swartz)  Did you have concerns about

10   Mr. High?

11     A.   Yes, I did.

12     Q.   What were those concerns?

13     A.   Mr. High was a patient that kept coming on and

14   off of service.  He would go to the hospital frequently

15   and then be back on service post-hospitalization or

16   post-ER visits.  It was a concern to me because

17   typically a patient that continues to go to the hospital

18   or gets anxious about their condition and wants

19   treatment, it typically means they're not ready -- to

20   pass away, they're not ready for the comfort care, they

21   still want aggressive treatment, they still want to seek

22   help for disease process.

23     Q.   And when you're talking about patients that you

24   were concerned about at Merida, was Mr. High one of

25   those patients?

1     A.   Yes.

2     Q.   Now, you were asked some questions about a

3  Dr. Escamilla; do you recall that?

4     A.   Yes.

5     Q.   Now, while you were at Merida, were patients

6  discharged -- not patients who were revoking services,

7  but was it common for patients to be discharged by

8  Merida?

9     A.   It was not common, no.

10    Q.   Do you recall any instances in which a patient,

11  not revoked their services, but was actually discharged

12  by Merida?

13    A.   Yes.

14    Q.   How many?

15    A.   Probably two in my time there.

16    Q.   Did any of those patients have to do with

17  Dr. Escamilla?

18    A.   Yes.

19    Q.   And which -- can you describe for the jury what

20  that -- what related to that patient?

21    A.   The patient was discussed and had been on for a

22  long length of stay and the discussion ended with the

23  agreement of the entire team to go ahead and discharge

24  for what we call extended prognosis, which means the

25  patient has been either stable or has had no condition

1    that would warrant that they're declining at this time.

2       Q.   Then what -- what happened?

3       A.   We discharged the patient and then the patient

4    ended up back on service on another doctor's roster.

5       Q.   Which doctor?

6       A.   Dr. Virlar.

7       Q.   So when Dr. Escamilla discharged that patient, he

8    was immediately readmitted to Merida by another doctor?

9       A.   Yes.

10              MR. HECTOR CANALES:  Objection, Your Honor.

11      Q.   (By Mr. Swartz)  Was Merida --

12              MR. HECTOR CANALES:  Wait, objection,

13   Your Honor.  Calls for -- calls for speculation.  She's

14   recalling this out of pure memory, no documents been put

15   in front of her, she's speculating as to what happened.

16              MR. SWARTZ:  Counsel asked her to speculate

17   about documents she's never seen, I'm asking her to

18   rely -- I'm asking her to rely --

19              THE COURT:  Gentlemen, gentlemen, gentlemen,

20   the objection is overruled.  She may answer if she

21   knows.

22      Q.   (By Mr. Swartz)  You may answer.

23      A.   I'm sorry, could you repeat the question, please?

24      Q.   Sure.  So when Dr. -- the patient was discharged

25   by Dr. Escamilla they were immediately readmitted by

1  Dr. Virlar?

2     A.   Yeah, it was within a day or two.

3     Q.   Oh, another day or two.

4     A.   Yes.

5     Q.   Okay.  Had anything changed with that patient?

6     A.   Not according to the records or what was put in

7  the -- the notes, no.

8     Q.   By immediately readmitting that patient, or I

9  guess within a day or two, was Merida respecting the

10 medical judgment of Dr. Escamilla?

11          MR. HECTOR CANALES:  Objection, Your Honor.

12 It's Merida.  Calling the witness to speculate into the

13 mind of an -- of a business entity.

14          THE COURT:  Calls for speculation, that's

15 sustained.

16          MR. SWARTZ:  Okay.

17    Q.   (By Mr. Swartz)  You recall that Mr. Canales

18 asked you -- was asking you about a prescription and

19 then he -- he asked me to ask you some questions about

20 it; do you recall that?

21    A.   Yes.

22    Q.   Mr. Canales, do have you that prescription?

23          MR. HECTOR CANALES:  No, sir, I don't.

24          MR. SWARTZ:  You don't have it?

25          MR. HECTOR CANALES:  I don't know where it

1   is, I'm preparing for my cross right now, counselor, but

2   if you want to look into five thousand pages of exhibits

3   I've got those here.

4       Q.   (By Mr. Swartz)   Well, do you recall generally

5   when you were asked about a prescription?

6       A.   Yes.

7       Q.   Now, had you seen that prescription before?

8       A.   No.

9       Q.   Did you know anything -- had you been involved in

10  that -- writing that prescription?

11      A.   No.

12      Q.   Did you know that doctor?

13      A.   No.

14      Q.   Do you know anything about that doctor's

15  relationship with Merida?

16      A.   I do not.

17      Q.   Do you know if that doctor received any

18  incentives from Merida to refer patients?

19      A.   I don't know that.

20      Q.   Do you know it that doctor received any kickbacks

21  from Merida?

22      A.   I don't know that.

23      Q.   Do you know if that doctor received any

24  enticements, like exotic trips from Merida?

25      A.   I don't know that.

1    Q.   Do you know anything about why that doctor was

2    signing that prescription; do you?

3    A.   No, sir.

4    Q.   You were asked some questions --

5              MR. HECTOR CANALES:   Here you go, sir.

6    They're right here.

7              THE COURT:   Mr. Canales.

8              MR. HECTOR CANALES:   He asked me,

9    Your Honor.

10             THE COURT:   That's not what was requested.

11   Please avoid side-bars or approaching without

12   permission.

13             Please proceed.

14   Q.   (By Mr. Swartz)   Ms. -- Ms. Gonzalez, now you

15   were asked some questions about the impact of false

16   medical records on patients; do you recall that?

17   A.   Yes.

18   Q.   I think Mr. Canales was saying that if Merida

19   created records that were false, that can follow the

20   patient, right?

21   A.   Correct.

22   Q.   And can have a negative impact on patients; is

23   that right?

24   A.   True.

25   Q.   So if Merida is creating false records about

1    patients, can that have a negative impact on Merida's

2    patients?

3        A.   Yes.

4        Q.   Now, let me put another document up on the ELMO.

5            MR. HECTOR CANALES:   Government's Exhibit

6    L-1?

7        Q.   (By Mr. Swartz)   That's a map that says Merida

8    Health Care Group, you see that?

9        A.   Yes.

10       Q.   Has different locations on it.   Mr. Cyganiewicz

11   was asking you about Mr. McInnis; do you recall that?

12       A.   Yes.

13       Q.   And do you recall him talking about, you know,

14   the time he spent down in Harlingen, correct?

15       A.   Yes.

16       Q.   And then -- when you moved back to San Antonio,

17   you said, I think different times during your direct,

18   you received communications from employees from the

19   Harlingen location; is that right?

20       A.   Yes.

21       Q.   And he said that Mr. McInnis only came up -- I

22   mean, he said he came up to -- to the San Antonio

23   location on certain occasions?

24       A.   Just sporadically, it was not -- nothing like

25   scheduled or nothing.

1    Q.   How often, though, did you actually receive

2    communications from employees in Harlingen?

3    A.   Probably once or twice a week.

4    Q.   So pretty frequently?

5    A.   Yes.

6    Q.   Did you receive directives from Harlingen?

7    A.   Yes.

8    Q.   Did you -- was Harlingen the one looking at

9    medical records coming out of San Antonio?

10   A.   Yes.

11   Q.   Did you see Harlingen making changes to medical

12   records that came out of San Antonio?

13   A.   Yes.

14   Q.   Did Harlingen make changes to diagnoses?

15   A.   Yes.

16   Q.   Based on your experience at Merida, what was

17   going on in San Antonio, was that being controlled and

18   administered by Harlingen?

19           MR. CYGANIEWICZ:   Again, Your Honor, I'm

20   going to object about vague questions about she cannot

21   say who she spoke to or she's obviously said she didn't

22   speak to McInnis, it's leaving a false impression with

23   the jury.

24           MR. SWARTZ:   I'm asking generally about

25   the -- how the company was administered and the role of

1   Harlingen.

2            THE COURT:  The objection is overruled; the

3   question was proper.  Answer if you know.

4            THE WITNESS:  I'm sorry, could you repeat?

5       Q.  (By Mr. Swartz)  Sure.  What I'm asking,

6   generally, was Harlingen the nerve center of Merida?

7       A.  Yes.

8       Q.  Was Harlingen controlling and overseeing what you

9   were doing in San Antonio?

10      A.  Yes.

11      Q.  And who is the administrator and person in charge

12  of Harlingen?

13      A.  Henry McInnis.

14            MR. SWARTZ:  No further questions,

15  Your Honor.

16            THE COURT:  Mr. Canales, one second.

17                   RECROSS-EXAMINATION

18  BY MR. HECTOR CANALES:

19      Q.  The --

20            THE COURT:  One second, please.

21            MR. HECTOR CANALES:  Sure.  All right.

22  Defense has three 12-minute sessions.  Please proceed.

23      Q.  (By Mr. Hector Canales)  Ma'am, did you see with

24  your own eyes some hospice patient doing the Macarena?

25      A.  No.

1      Q.   You heard that?

2      A.   I actually never heard that.

3      Q.   You never heard that, okay.  I thought there was

4   just testimony about somebody dancing, patients dancing.

5   Did I make that up?

6      A.   No, he just asked me if that would be at -- a

7   patient at that level would he be doing that and I said

8   no.

9      Q.   Oh, okay, right.  So was that a rumor going

10  around there at all within Merida about some -- some

11  patient dancing?

12     A.   The nurses would be reporting back, just like the

13  patients painting the houses and stuff that when they

14  went to the houses that's what they experienced.

15     Q.   Okay.  Painting the houses.  Did you see Jack

16  High --

17               THE COURT:  Ms. Gonzalez, I need you to

18  speak louder because I'm losing part of what you're

19  saying.

20     Q.   (By Mr. Hector Canales)  Did you see, observe,

21  witness Jack High painting his house?

22     A.   No, sir, I did not.

23     Q.   Did you ever document that, that -- that that

24  occurred, with Jack High?

25     A.   No.

1    Q.   How about with Francisca Perez, same two

2  questions with Francisca Perez?

3    A.   I didn't see any of these patients.

4    Q.   Any dancing, painting with Jack High, Francisca

5  Perez, Teresa Calvillo, Arcadio Castaneda, Petra Cerda

6  and Joanne Conti?

7    A.   I didn't see the patients.

8    Q.   You didn't see them painting, dancing, anything

9  like that?

10    A.   I only know what I was reported back to.

11    Q.   Ma'am, I'm just asking if you saw something or

12  didn't, did you ever see these patients painting or

13  dancing?

14    A.   I didn't see the patients.

15    Q.   So that's a yes, you never saw them?

16    A.   No, I didn't see the patients.

17    Q.   Okay.  Now, you just asked a question, Steven

18  Dellwo, remember him?

19    A.   He was an RN.

20    Q.   RN, right, RN.  And you testified earlier that

21  you didn't have any basis to believe that he was

22  committing any fraud or lying about doing his job,

23  right?

24    A.   I had no basis to believe, no.

25    Q.   Okay.  All right.  Now, keep in mind here these

1   dates right here for the next line of questioning I'm

2   going to give you, all right, October -- August of '14,

3   '13 through October the 12th of '13.  You see that?

4       A.  Yes.

5       Q.  And this -- for -- for Jack High.  This is a

6   recertification questionnaire for Jack High on October

7   the 1st of '13, correct?

8       A.  Yes.

9       Q.  That is during this period before October the

10  12th, right?

11      A.  Yes.

12      Q.  So we're in this certification period right here,

13  agree?

14      A.  Yes.

15      Q.  And again, this is standard procedure, SOP,

16  standard procedure of having these recertifications and

17  these -- these types of formats where you have the nurse

18  go to the -- to the patient to start these

19  recertification process to go into the next period,

20  right?

21      A.  Yes.

22      Q.  All right.  And this one is being conducted by

23  Steven Dellwo, correct?

24      A.  Yes.

25      Q.  And he indicates here that the patient continues

1    to deteriorate, have a poor appetite, report --

2    reportedly sundowns, bad at night, that's what it says,

3    right?

4        A.  Yes.

5        Q.  Those documents, the things that you wrote in

6    your hand, this is the type of document you would go to

7    in order to fill it in, right?

8        A.  Yes.

9        Q.  This might have even been one of them for all you

10   know, right?

11       A.  I don't remember.

12       Q.  Okay.  It's possible, though?

13       A.  Possible, yes.

14       Q.  Okay.  All right.  Nurse Dellwo says the patient

15   has life limiting conditions and has elected hospice

16   care, right, that's what he says?

17       A.  That's what he marks, yes.

18       Q.  Okay.  Weight loss of more than ten percent in

19   the prior months, right?

20       A.  That's what he markets, yes.

21       Q.  Now, that's not any sort of medical condition,

22   but it is a -- it's a potential symptom of a bigger

23   problem going on, right?

24       A.  Yes.

25       Q.  Nurse Dellwo says there's been progression of

 1   disease over time, that's what he says, right?

 2      A.   That's what he marks, I won't say that's what he

 3   says because these are EMR's you're able to mark so

 4   they're standard format.

 5      Q.   Okay.  All right.  And he indicates a FAST score

 6   of 7B; see that?

 7      A.   Yes.

 8      Q.   That's Steven Dellwo's professional judgment,

 9   clinical judgment, right?

10      A.   I --

11      Q.   Yes?

12      A.   If he wrote it, then, yeah, I would --

13      Q.   That's his judgment, right?

14      A.   I don't know his judgment, sir.

15      Q.   Well, what he puts in the form is -- is -- is --

16   whatever nurse is doing these assessments, they're

17   exercising their clinical judgment, correct?

18            MR. SWARTZ:  Objection, Your Honor,

19   speculation.

20            MR. HECTOR CANALES:  She's a nurse, Judge.

21            THE COURT:  Rephrase the question.

22      Q.   (By Mr. Hector Canales)  Right?  When -- when a

23   nurse is -- is -- is putting things down in a medical

24   record, they're exercising their -- their professional

25   judgment?

1     A.   I would assume so.

2     Q.   Right?

3     A.   Yes.

4     Q.   And some other nurse could have their own

5  different professional judgment, right, everybody's

6  entitled to their opinion?

7     A.   Correct.

8     Q.   These are just educated opinions based on

9  education and training that these nurses, specialized

10  training that they've had, right and you've had, right?

11     A.   Yes, I would assume so.

12     Q.   All right.  All right.  And so again there's more

13  judgments being made here by Dellwo of deterioration,

14  correct?  That's an opinion; is it not?

15     A.   Yes, but it's a non-specific opinion.

16     Q.   Okay.  It's important to you to point out it's

17  non-specific.

18     A.   Yes, because I guess in my experience, if I was

19  filling it out I would say deteriorating and -- and put

20  examples of how.

21     Q.   Okay.  Do you know whether in this program that

22  you have the option to write -- to do -- do anything

23  more than deteriorating?  Can you write more than that

24  if you want to here?

25     A.   Yes, you can.

1      Q.   You can.   So you're not limited -- so if -- if --

2    if Nurse Dellwo here or Nurse Kelso, remember -- do you

3    know Amber Kelso?

4      A.   I know her name, but I didn't know her, she left.

5      Q.   If Amber Kelso wanted to write more or Dellwo

6    more than deteriorating, your sworn testimony is she

7    could write -- she could have said more?

8      A.   Yes, and there's a narrative at the end of every

9    EMR note.

10     Q.   And you're 100 percent sure about that?

11     A.   Yes.

12     Q.   Okay.   Now, one to two falls in the past month,

13   that's not an opinion, those are facts, right?

14     A.   Yes.

15     Q.   Six out of ten of high risk, that's an opinion,

16   right?   Oh, sorry.

17     A.   That's --

18     Q.   An opinion, right?

19     A.   That's a fall risk, I believe, we do it by a

20   scale.

21     Q.   But it's an opinion, again, exercising of a

22   judgment, right?

23     A.   I would believe it would be hopefully based on

24   his assessment.

25     Q.   Right.   Somebody -- but that assessment, somebody

1    might say, yeah, I think he's five, no, I think he's a

2    seven?

3        A.   It's based -- again, it's like a scale that we

4    use that's already prewritten.

5        Q.   Okay.  Again here, again more judgment calls, 40,

6    30, 7A, 7B, right, judgment calls?

7        A.   Yes.

8        Q.   This is a narrative.  L skilled nursing visit

9    made Tuesday, October 10th.  What's VS WNL mean to you?

10       A.   Patient's wife -- where are you at --

11       Q.   Right there, highlighted up there, L skilled

12   nursing visit made Tuesday, October VS WNL, what's that

13   mean?

14       A.   Vital -- vital signs within normal limits.

15       Q.   Oh, okay.  There you go.  But the patient's wife

16   increasingly frustrated with inability to put patient

17   into nursing home without significant financial impact

18   on herself.  That's not a clinical judgment, that's a

19   fact of what they're documenting, right?

20       A.   I don't know if it's a fact.  I don't know the

21   wife, I don't know the patient.

22       Q.   Okay.  The patient reportedly took a knife and

23   sliced up a chair while insisting it was a watermelon,

24   then throwing the knife at the wife.

25           Mr. High doesn't know the difference between a

1    watermelon and a chair.  In your clinical judgment,

2    ma'am, what does that tell you?

3        A.   It tells me he has uncontrolled symptoms.

4        Q.   That's it?

5        A.   Yes.

6        Q.   Do you know how old Jack High is at this time?

7        A.   No, I don't.

8        Q.   Have you ever had a knife thrown at you?

9        A.   Actually, yes, I have.

10               MR. SWARTZ:  Objection, relevance.

11               MR. HECTOR CANALES:  Relevance?  Well, it's

12   in the medical records.

13               MR. SWARTZ:  Whether the witness has?

14               THE COURT:  Over -- overruled.

15       Q.   (By Mr. Hector Canales)  Amy Quintanilla?  Do you

16   know Nurse Quintanilla?

17       A.   Nope.

18       Q.   Here's another progress note for Jack High.  You

19   talked about wanting to see a score of 7 that you're

20   having incontinence of bowel and bladder, right?  That

21   was your testimony, right?

22       A.   Occasional incontinence, yes.

23       Q.   Down here, this signature, this physician's

24   signature down here indicates that Jack High, amongst

25   other things, is incontinent of bowel and bladder,

```
 1   right?
 2      A.   Looks like it's patient is occasional incontinent
 3   in bowel and bladder, yes.
 4               THE COURT:  Again, Ms. Gonzalez, please
 5   speak up.
 6               THE WITNESS:  Sorry.  Yes, it looks like it
 7   says that the patient is occasional incontinent in bowel
 8   and bladder.
 9      Q.   (By Mr. Hector Canales)  And what about the
10   cognition, is it getting better?
11      A.   It says it has decreased.
12      Q.   And what do they say -- what do they find about
13   his ability to make decisions?
14      A.   Patient is unable to make his medical decisions.
15               THE COURT:  The first 12-minute session has
16   expired.
17      Q.   (By Mr. Hector Canales)  Weight is decreased,
18   right?  With a BMI score of less than 22.  That's
19   another warning sign, right?
20      A.   It shows decline, yes.
21      Q.   We get to learn here about some medical
22   terminology.  Max, assist ADL, assisted daily living
23   activities, that's what ADL stands for, right?
24      A.   Correct.
25      Q.   Max means he needs help with all of them?
```

1        A.   It means he needs maximum assistance, he can

2    still perform them, he's not dependent yet.

3        Q.   Are you trying to minimize Jack High's condition

4    here?

5        A.   No.

6        Q.   Are you trying to leave the impression that Jack

7    High isn't sick?

8        A.   No.

9        Q.   Okay, all right.  Occurrent, I thought you said

10   occasionally.  Did I -- did I miss-hear you before?

11       A.   It looks like OCC incontinent B and B, which to

12   me means incontinence of bowel and bladder.

13       Q.   Okay.  Certification for terminal illness with a

14   narrative, correct?

15       A.   Correct.

16       Q.   Signed by a medical director, a physician.

17            Who is the physician giving the clinical judgment

18   that Jack High, that a terminal condition that if it ran

19   its normal course, you'd be terminal within less than

20   six months?

21       A.   The physician's name is stated as Escamilla.

22       Q.   And that's an opinion, right?

23       A.   An opinion for the name?

24       Q.   Mr. -- Dr. Escamilla, this is his opinion?

25       A.   I don't know what his opinion is.

1      Q.   Sure we do.

2           MR. SWARTZ:   Your Honor, objection, it's

3      speculation.   She's already said she doesn't know.

4           THE COURT:   Sustained.

5      Q.   (By Mr. Hector Canales)   You don't know that a

6      CTI is a doctor's opinion of terminal illness?   You

7      don't know that?

8      A.   I don't know a doctor's opinion unless I ask him.

9      Q.   What about if you see it in black and white on

10     a -- on a -- on a page?   No?

11     A.   It still doesn't mean I know his opinion.

12     Q.   Okay.   Well, how old is Jack High?

13     A.   He's 80 years old.

14     Q.   What is this certification for terminal illness

15     of Jack High by Dr. Escamilla indicate his FAST score

16     was?

17     A.   7B.

18     Q.   And how many ADLs is he dependent on?

19     A.   Five out of six.

20     Q.   And what is B and B incontinent mean to you?

21     A.   Incontinent of bowel and bladder.

22     Q.   HX, what does HX stand for?

23     A.   History.

24     Q.   Of what?

25     A.   Of falls and UTIs.

1      Q.   What's a UTI?

2      A.   A urinary tract infection.

3      Q.   Can that lead to greater problems with an

4   80-year-old man who thinks watermelons are chairs?

5      A.   It could cause increased confusion.

6      Q.   Depression?

7      A.   Depression?

8      Q.   Wanting to die can cause depression, right?

9      A.   It would depend on the state of depression of the

10  patient.

11     Q.   What's -- what's down arrow and that word mean to

12  you?

13     A.   Decreased appetite.

14     Q.   80-year-old, what's -- and decipher this line

15  right here, what I just highlighted right there.

16     A.   80-year-old with endstage Alzheimer's disease,

17  requires total care -- the prognosis less than six

18  months.  Continue with hospice care.

19     Q.   Endstage Alzheimer's?  Are there different stages

20  to Alzheimer's?

21     A.   Yes.

22     Q.   I guess endstage is self-explanatory, right?

23     A.   Right.

24     Q.   End meaning end of life?

25     A.   Endstage would mean that, yes.

 1    Q.   Again, Jack High's -- Jack High's medical

 2   records, these medical records here, that's all of them.

 3   Right here, here's a page, 09/21/15.   Zoom in.

 4        Jennifer LeCavalier.   You know Jennifer?

 5    A.   No, that was after I left.

 6    Q.   He's now 81, endstage Alzheimer's is cruel and

 7   that can take a long time to kill somebody, can't it?

 8    A.   Endstage, she should probably be --

 9        MR. SWARTZ:   Your Honor, if I may, the

10   witness has already said she was not working at Merida

11   at this time and he's asking her about a document that

12   came after her employment.

13        MR. HECTOR CANALES:   I haven't asked her a

14   question about it.

15        MR. SWARTZ:   It's speculation because the

16   witness has no personal -- well, the witness said she

17   has no personal knowledge --

18        THE COURT:   Technically, the question wasn't

19   about the document, he asked if Alzheimer's could be

20   cruel.   I believe that was the final question.

21    Q.   (By Mr. Hector Canales)   That was, because it was

22   so slow, that's part of what makes it cruel?

23    A.   Endstage Alzheimer's should not be longer than a

24   year because if you're truly endstage you should be

25   close to dying.

1    Q.  But -- but if you're getting treatment, you're

2    getting care, you're getting taken of, that might

3    actually -- you can't cure it, but it might actually

4    make it last longer?

5    A.  It does progress slowly, that's why we have to be

6    careful when we admit them too early.

7    Q.  And -- and although -- gosh, the world would be

8    great if everything happened the way it should, but --

9    but predicting how long endstage is going to be from

10   patient to patient, you would agree is an inexact

11   science?

12   A.  It is, that's why they have the recertification

13   process.

14              MR. HECTOR CANALES:  No further questions.

15              MR. CYGANIEWICZ:  Just a few, Your Honor.

16              THE COURT:  Please proceed, Mr. Cyganiewicz

17   for the record.

18              MR. CYGANIEWICZ:  Excuse me, Your Honor?

19              THE COURT:  Mr. Cyganiewicz is up for the

20   record.

21              MR. CYGANIEWICZ:  Thank you.

22                   RECROSS-EXAMINATION

23   BY MR. CYGANIEWICZ:

24   Q.  Ms. Gonzalez, in your current positions, do you

25   do any quality assurance?

1    A.   Yes, I do.

2    Q.   You do?

3    A.   Yes.

4    Q.   Is that part of your job, then, is -- is to

5    correct nursing documentation when they agree?

6    A.   So I send back nurses and put questions on them

7    to see if they failed to put something on there, to see

8    if that's really the -- you know what, they're leaning

9    towards or not, but I don't correct their notes, I'm not

10   allowed to change their notes.

11   Q.   Do you ask them to change it?

12   A.   Well, I ask them to look at that and see if -- if

13   this is, you know, if they have discrepancies, like

14   one -- one part says, for instance, they said maybe the

15   FAST was this and then later in the recertification they

16   put a different one, I ask them to clarify which one it

17   really was.

18   Q.   So do you ask them to make changes or

19   clarifications to records?

20   A.   Clarifications to their work.

21   Q.   And are -- are documents then amended during

22   quality assurance?

23   A.   The documents are amended by the actual nurse and

24   then they're sent back to QA to look at it once again.

25   Q.   Is that a common practice in a hospice industry?

1      A.   It is, yes.

2      Q.   And Merida had a quality assurance person or

3  someone down in Harlingen; didn't they?

4      A.   They did.

5      Q.   Does the administrator, either in San Antonio or

6  Harlingen ever direct you to change documents?

7      A.   The administrator?

8      Q.   Yeah.

9      A.   No.

10      Q.   Henry McInnis never directed you to change any

11  documents; did he?

12      A.   He never directed me, no.

13      Q.   And you're not telling the jury under oath that

14  these directives or instructions from Harlingen came

15  from Mr. McInnis; are you?

16      A.   No, they came from Harlingen is what I said.

17      Q.   Not from Mr. McInnis, you don't know that?

18      A.   He didn't directly call me, no, sir.

19      Q.   And you don't have any e-mails or any records?

20      A.   I don't have an e-mail from him, no.

21      Q.   So is the Government assuming they're coming from

22  Mr. McInnis in your opinion?

23      A.   No, it was under my assumption that they would

24  come from him because he was the one leading Harlingen.

25      Q.   So if the Government's indicating it came from

1   Mr. McInnis would you agree that's also an assumption?

2       A.   I don't know.

3       Q.   And again, maybe I didn't state it correctly, and

4   maybe I didn't listen correctly, you never testified

5   earlier that Mr. Zuniga asked you, or told you to change

6   diagnosis to Alzheimer's?

7       A.   No.

8       Q.   Okay.

9              MR. CYGANIEWICZ:  That's all I have,

10  Your Honor.

11             THE COURT:  Ms. Arce-Flores, anything else?

12             MS. ARCE-FLORES:  We have no questions.

13             THE COURT:  Mr. Swartz, anything else?

14             MR. SWARTZ:  Just one moment, Your Honor.

15  Just very briefly.

16             (Brief pause in proceedings.)

17                 FURTHER DIRECT EXAMINATION

18  BY MR. SWARTZ:

19      Q.   Mr. Cyganiewicz asked you about quality assurance

20  just a moment ago.

21      A.   Yes.

22      Q.   And he was asking you if you ever made changes to

23  documents as part of quality assurance; you recall that?

24      A.   Right.

25      Q.   And -- and I think you testified that you -  you

1   don't yourself make the changes?

2      A.   Correct.

3      Q.   You don't instruct nurses to make changes?

4      A.   No, I just ask for clarification if I have

5   concern, or if there's discrepancies I ask them to make

6   their own changes.

7      Q.   So how -- you did -- or you do quality assurance.

8   Is that how it was done at Merida?

9      A.   Not to my knowledge, no.

10     Q.   Would -- at Merida, did they instruct employees

11  to make changes?

12     A.   No.

13     Q.   Did they make changes without employees --

14  without the nurses knowing?

15     A.   I did have a few of my nurses say that the care

16  plans were changed and they had never put that on and

17  what were they supposed to do because they didn't feel

18  it was an issue, like, pain was added and they hadn't

19  added pain as a -- as an issue.

20     Q.   And then Mr. Cyganiewicz was say -- asking you if

21  you -- if Mr. McInnis told you to do stuff, told you to

22  make changes; do you recall that?

23     A.   Not directly, no.

24     Q.   When you say not directly, could you explain what

25  you mean to the jury?

```
 1              MR. CYGANIEWICZ:  Speculation, Your Honor,
 2    it's not from Mr. McInnis.
 3              MR. SWARTZ:  I'm just asking her to explain
 4    what she meant.
 5              MR. CYGANIEWICZ:  Assuming and speculating.
 6              THE COURT:  One second, one second.
 7              MR. SWARTZ:  I asked the witness to explain
 8    what she meant by that.
 9              THE COURT:  Please proceed.
10              THE WITNESS:  I would receive phone calls
11    from the nurses in Harlingen to make changes, and so
12    since he was running Harlingen I would think that he was
13    aware of the changes being made.
14              MR. CYGANIEWICZ:  Again, Your Honor, that's
15    speculation on her part and we'd ask you to instruct the
16    jury to disregard.  I'm assuming that the nurses then
17    spoke -- that's just guessing, Your Honor.
18              THE COURT:  That's overruled.  And again,
19    ma'am, you really do need to speak up.
20              Please proceed.
21              MR. SWARTZ:  Nothing further, Your Honor.
22    Thank you.
23              THE COURT:  All right.  Mr. Canales?
24              MR. HECTOR CANALES:  No questions.
25              THE COURT:  Mr. Cyganiewicz?
```

```
 1              MR. CYGANIEWICZ:  No, sir.

 2              THE COURT:  Ms. Arce-Flores, anything else?

 3              MS. ARCE-FLORES:  Nothing, Judge.

 4              THE COURT:  Thank you.  Ladies and

 5    gentlemen, we're going to go ahead and take a lunch

 6    break.  Let's see here.  Let's reconvene at -- let's

 7    reconvene at, approximately, 2:00.

 8              It's now about -- just past 12:30, well

 9    let's reconvene at 2:10 and I'll give you -- I want to

10    make sure you all get your break.  We'll reconvene at

11    2:10, we'll reconvene at 2:10.  If we can start earlier,

12    we will.

13              COURT OFFICER:  All rise for the jury.

14              (JURY OUT.)

15              THE COURT:  All right.  Sheila, off the --

16    Sheila, off the record.

17              COURT REPORTER:  Yes, sir.

18              (COURT IN LUNCH RECESS.)

19              THE COURT:  Thank you, everyone.  Please

20    remain standing for the jury.

21              COURT OFFICER:  All rise for the jury.

22              (JURY IN.)

23              THE COURT:  Thank you, everyone.  Please be

24    seated.

25              Ladies and gentlemen of the jury, counsel, I
```

1    thank everyone again for their promptness.  Let's get --

2    let's get started.

3            Mr. Lowell, next witness, please.

4            MR. LOWELL:  Good afternoon, Your Honor.

5    The United States calls Eduardo Carrillo.

6            THE COURT:  Good afternoon, sir.

7            THE WITNESS:  Good afternoon.

8            THE COURT:  Please remain standing, we're

9    going to swear you in.

10            (WITNESS SWORN IN.)

11            THE WITNESS:  I do.

12            THE COURT:  Thank you, sir.  Please have a

13    seat, make yourself comfortable.  Be careful to position

14    the microphone closely to your mouth.  Please speak

15    loudly and clearly throughout your testimony.

16            Mr. Lowell, please proceed.

17            MR. LOWELL:  Thank you, Your Honor.

18                    DIRECT EXAMINATION

19    BY MR. LOWELL:

20      Q.  Good afternoon.  Please state your name for the

21    record.

22      A.  Eduardo Carrillo.

23      Q.  And Mr. Carrillo, what state do you currently

24    live in?

25      A.  In Louisiana.

 1    Q.   Did you previously practice as a doctor?

 2    A.   Yes, I did.

 3    Q.   In Texas?

 4    A.   Yes.

 5    Q.   For approximately, how long?

 6    A.   For about 15 minutes.

 7    Q.   Describe your medical education for the jury.

 8    A.   I graduated from Johns Hopkins University.  That

 9  was followed by medical school at the University of

10  Texas Health Science Center in San Antonio.  I followed

11  that with a medical -- family medicine residency in

12  McAllen, Texas, and a few years later I earned a

13  Master's in Business Administration from the University

14  of Tennessee.

15    Q.   Now, Mr. Carrillo, what do you currently do as a

16  living?

17    A.   I currently work as a construction foreman for a

18  company in Louisiana.  It's a petrochemical energy

19  company.

20    Q.   Tell the jury what your duties are in that

21  position as a foreman?

22    A.   So as a foreman I supervise about -- a team of

23  about 20 employees.  I supervise their job activities as

24  it relates to installing installation and aluminum metal

25  on mechanical systems likes pipes and tanks.

1    Q.   Is that a dangerous position?

2    A.   It can be, but one of my responsibilities is to

3  make sure that everyone works safely.

4    Q.   Now, today you're not a practicing doctor; are

5  you?

6    A.   No, I'm not.

7    Q.   Okay.  So let's talk a little bit about why.

8  Mr. Carrillo, were you arrested in 2015?

9    A.   Yes, I was.

10   Q.   And you were indicted; is that correct?

11   A.   That's correct.

12   Q.   Tell the jury what you were charged with?

13   A.   I was charged with health care fraud and

14 aggravated identity theft.

15   Q.   Were you also charged with false statements?

16   A.   Yes.

17   Q.   Kickbacks for patients?

18   A.   Yes.

19   Q.   And after that, you were then indicted again; is

20 that right?

21   A.   That's correct.

22   Q.   How soon after the first indictment?

23   A.   About two months, in August of 2015.

24   Q.   Now, why were you indicted again?

25   A.   I fraudulently submitted claims to Medicare for

1   home -- home -- home visits that never occurred,

2   specifically, I submitted claims on about 34 patients

3   that had passed away.

4       Q.   So to be clear, you were submitting bills for

5   patients who weren't even alive; is that right?

6       A.   That's correct.

7       Q.   Now, are you familiar with a company called the

8   Merida Group?

9       A.   Yes, I am.

10      Q.   And did you previously serve as a medical

11  director for the Merida Group?

12      A.   Yes, I did.

13      Q.   And was that, approximately, between 2014 and

14  2015?

15      A.   Yes.

16      Q.   Now, the charges that you just described, the

17  ones that you pleaded guilty to, did they relate to your

18  job at the Merida Group?

19      A.   No, they did not.

20      Q.   They related to other health care fraud schemes

21  you were involved in; is that right?

22      A.   Yes.

23      Q.   Now, after you pleaded guilty, did you enter into

24  a plea agreement with the United States?

25      A.   Yes, I did.

1    Q.   And could we pull up Government's Exhibit J-1,

2    please.

3         Mr. Carrillo, is this your plea agreement?

4    A.   Yes, it is.

5    Q.   And as part of your agreement, you'd pleaded

6    guilty to two different charges; is that right?

7    A.   Yes.

8    Q.   One count of aggravated identity theft, and one

9    count of health care fraud; is that correct?

10   A.   That's correct.

11   Q.   And when you committed these two felonies, you

12   were a practicing doctor; is that right?

13   A.   Yes.

14   Q.   Now, on the identity theft charge, what exactly

15   did you do?

16   A.   I submitted to -- I referred two patients for

17   home health, patients that I had previously seen,

18   consulted several months before.  I referred these two

19   patients to a home health company in return for $3,000.

20   Q.   And to be clear, you used the identifying

21   information of those two patients; is that correct?

22   A.   That's correct.

23   Q.   Without their authorization?

24   A.   That's correct.

25   Q.   And the health care fraud charge, that related to

1    the billing for the parents who had passed away; is that

2    right?

3         A.   That's correct.

4         Q.   Now, Mr. Carrillo, you understand that one of the

5    potential benefits of testifying here today is that you

6    could get a lower sentence; is that right?

7         A.   Yes.

8         Q.   And who ultimately decides how much prison time

9    you get?

10        A.   The Judge will.

11        Q.   Do you hope to do less time in jail?

12        A.   Yes.

13        Q.   Has the Government made any promises to you about

14   what sentence you'll get?

15        A.   No, sir.

16        Q.   And in order to be considered for the benefit of

17   a possible lower sentence, what's your bottom line

18   understanding of what you must do today?

19        A.   I must speak the truth.

20        Q.   What happens if you violate that plea agreement?

21        A.   The agreement becomes null and void, and I may

22   face prosecution.

23        Q.   Now, in addition to your plea agreement, you also

24   entered into a proffer agreement; is that right?

25        A.   Yes, sir.

1    Q.   And under that proffer agreement, the Government

2    agreed not to use your statements against you in a

3    prosecution; is that correct?

4    A.   That's correct.

5    Q.   What happens if you violate that proffer

6    agreement?

7    A.   I may face prosecution.

8    Q.   And if you were -- if you were to lie, or mislead

9    the jury, what could happen to you?

10   A.   The plea agreement and the proffer agreement

11   become null and I can be sent to prison.

12   Q.   And you could also be prosecuted for other crimes

13   that the Government dismissed against you; is that

14   right?

15   A.   That's right.

16   Q.   Now, Mr. Carrillo, you previously struggled with

17   substance abuse; is that right?

18   A.   Yes.

19   Q.   Tell the jury about that.

20   A.   So in -- in 2006, I suffered a -- a hemiplegic

21   stroke, I was left paralyzed from my neck to my feet.  I

22   was also left with excruciating -- excruciating pain.

23   My neurologist and I, we tried different medication for

24   the pain, nothing seemed to work until we found nasal

25   narcotic, the name of the medicine is Stadol.  I started

1    using that narcotic and very quickly I became addicted

2    to it.

3        Q.   Was that an opioid?

4        A.   Yes, it's an opioid.

5        Q.   Are you clean today?

6        A.   Yes.   I've been sober for four years.

7        Q.   Now, as part of your cooperation, did you meet

8    with the Government?

9        A.   Yes, sir.

10       Q.   Did you meet with the Government multiple times?

11       A.   Yes.

12       Q.   And during your meetings with the Government, did

13   you discuss your involvement in fraud?

14       A.   Yes.

15       Q.   And I want to focus on your involvement in fraud

16   at the Merida Group.  Did you commit fraud when you were

17   at the Merida Group?

18       A.   Yes.

19       Q.   And you were a medical director; is that right?

20       A.   That's correct.

21       Q.   And were you assigned to a specific region in

22   Texas?

23       A.   Yes.

24       Q.   Take a look at Government's Exhibit L-2, please.

25   Mr. Carrillo, where on this map were you assigned?

1    A.   I was assigned to the lower Rio Grande Valley,

2  which includes Starr County, Hidalgo County and

3  Cameron County.

4    Q.   You were the medical director over that region?

5    A.   I was one of the medical directors, yes.

6    Q.   And that particular region, the Harlingen area,

7  was that the main headquarters, the corporate office for

8  the Merida Group?

9    A.   Yes.

10   Q.   Now, showing you Government's Exhibit L-1, what

11 does this depict, Mr. Carrillo?

12   A.   It shows the different locations where Merida

13 operated in Texas.

14   Q.   Now, beyond the Valley, what other towns did you

15 work in?

16   A.   Beyond the Valley, I saw patients in

17 Bexar County, I also saw patients in Laredo as well as

18 in Corpus Christi.

19   Q.   Do you know Rodney -- Rodney Mesquias?

20   A.   Yes, I do.

21   Q.   Did Rodney Mesquias hire you -- hire you as a

22 medical director for the Merida Group?

23   A.   Yes.

24   Q.   Do you know Henry McInnis?

25   A.   Yes, I do.

1      Q.   Showing you Government's Exhibit L-3.
2   Mr. Carrillo, do you see Rodney Mesquias and Henry
3   McInnis depicted here?
4      A.   Yes.
5      Q.   And is it fair to say that Mr. Mesquias and
6   Mr. McInnis were the leadership team at the Merida
7   Group?
8      A.   That's correct.
9      Q.   Did they supervise you?
10      A.   Yes.
11      Q.   Did they give you directives?
12      A.   Yes.
13      Q.   They give you instructions?
14      A.   Yes.
15              MR. CYGANIEWICZ:  Your Honor, I object to
16   the they, they, they as opposed to naming each person
17   specifically as the last witness said sometimes he
18   didn't talk to Mr. McInnis.
19              MR. LOWELL:  May I respond?  He just
20   identified Rodney Mesquias and Henry McInnis as the
21   leadership team of the company, and then just testified
22   that they gave him orders, instructions and directives.
23              THE COURT:  The objection is overruled,
24   let -- just clarify that obviously he had a working
25   relationship with each individual.

1             MR. LOWELL:  Yes.

2      Q.  (By Mr. Lowell)  Did you have a working

3  relationship with Mr. McInnis during your time at the

4  Merida Group?

5      A.  Yes.

6      Q.  Did you also have a working relationship with

7  Mr. Mesquias during your time there?

8      A.  Yes.

9      Q.  And based on your experience there, would they

10  typically make decisions together?

11             MR. CYGANIEWICZ:  Your Honor, that calls for

12  speculation.

13             THE COURT:  Sustained.

14      Q.  (By Mr. Lowell)  Based on your experience there,

15  would Rodney Mesquias and Henry McInnis collectively,

16  together, give instructions to staff?

17      A.  Yes.

18      Q.  Based on your experience there, would Rodney

19  Mesquias and Henry McInnis give orders to staff?

20      A.  Yes.

21      Q.  And did that include you?

22      A.  Yes.

23      Q.  Now, the fraud at the Merida Group that you were

24  involved in, were other people involved?

25      A.  Yes.

1    Q.  Did you participate with Rodney Mesquias in that

2  fraud?

3    A.  Yes.

4    Q.  Did you participate with Henry McInnis in that

5  fraud?

6    A.  Yes.

7    Q.  I want to talk about that fraud.  As part of that

8  fraud, Mr. Mesquias -- or Mr. Carrillo, did you falsify

9  patient files for the Merida Group?

10    A.  Yes, I did.

11    Q.  At whose direction?

12    A.  At the direction of Rodney Mesquias and Henry

13  McInnis and Joe Garza.

14    Q.  And who is Joe Garza?

15    A.  He was the -- I believe the director of nursing

16  at the time.

17    Q.  And as a part of that fraud, did you sign up

18  patients for hospice who were not dying?

19    A.  Yes, I did.

20    Q.  At whose direction?

21    A.  At their direction.

22    Q.  Who's their?

23    A.  Joe Garza, Henry McInnis and Rodney Mesquias.

24    Q.  As a part of the fraud at the Merida Group, did

25  you sign up patients for home health who were not

1    homebound?

2        A.  Yes, I did.

3        Q.  At whose direction?

4        A.  At the direction of the leadership:  Henry

5    McInnis, Rodney Mesquias and Joe Garza.

6        Q.  And as part of the fraud at the Merida Group, did

7    you refer patients to the Merida Group in exchange for

8    kickbacks?

9        A.  Yes.

10       Q.  And who paid you the kickbacks?

11       A.  The Merida Home Health or Health Care Group.

12       Q.  Did it also include the hospice companies?

13       A.  Yes.

14       Q.  Now, I want to focus, Mr. Carrillo, on the very

15   beginning period after you were first hired as a medical

16   director.  Do you recall getting a list of,

17   approximately, 30 patients?

18       A.  Yes.

19       Q.  Did you see the patients?

20       A.  Yes, I did.

21       Q.  And did you turn in doctor's orders to the Merida

22   Group?

23       A.  Yes, I did.

24       Q.  And was that the location in Harlingen?

25       A.  Yes.

1     Q.   And was that where Mr. McInnis worked?

2     A.   Yes.

3     Q.   Was it where Mr. Mesquias worked?

4     A.   Yes.

5     Q.   As well as Joe Garza?

6     A.   Yes.

7     Q.   And when you turned in your doctor's orders were

8  they rejected?

9     A.   Yes, they were.

10    Q.   Did Rodney Mesquias and Henry McInnis reject

11  them?

12    A.   Yes.

13    Q.   Did Joe Garza?

14    A.   Yes.

15    Q.   Tell the jury why they rejected them?

16    A.   Well, initially when I first began consulting

17  patients at their home, I turned in a -- a -- a very

18  complete evaluation assessment and diagnoses of

19  patients, however when I turned them in, they were very

20  quickly returned to me.  And at the direction of Rodney

21  Mesquias, Mr. Joe Garza and the nurse sat with me and

22  pretty much told me what diagnoses to use --

23              MR. BANKER:  Judge, I object to hearsay.

24              MR. LOWELL:  He's an employee of the

25  company.

1          THE COURT:  Overruled.

2          THE WITNESS:  So they directed me to -- they

3    sat with me and they went over diagnoses that have been

4    used before on all these -- all these patients were

5    recertifications, they weren't any new patients, so they

6    went over a brochure, they basically told me that --

7    that -- that I needed to use these diagnoses, or

8    continue using the diagnosis that were used before me by

9    other medical directors so that the patients can

10   continue receiving hospice care?

11     Q.  (By Mr. Lowell)  Okay.  Let's just cut right to

12   it.  Was the information that you were directed to add

13   to those files, was it true or was it false?

14     A.  It was false.

15     Q.  Tell the jury why it was false?

16     A.  It was false because patients were not at the end

17   of their disease process, they weren't actively dying.

18   A lot of patients had diagnoses of COPD, which is

19   chronic obstructive pulmonary disease, but they're not

20   endstage, that's one of the criteria or the requirements

21   for hospice care is that patients have endstage COPD, or

22   endstage dementia, or endstage CHF.

23          These patients did have those diagnoses, but they

24   were in the early stages, first stage, maybe second

25   stage but not -- they didn't -- they didn't have less

1    than six months to live.

2         Q.   They didn't qualify for hospice; is that right?

3         A.   Right.

4         Q.   And to be clear, at the time you got that

5    instruction, those orders to add that false information,

6    Rodney Mesquias was present?

7         A.   Yes.

8         Q.   Henry McInnis was present?

9         A.   Yes.

10        Q.   Joe Garza was present?

11        A.   Yes.

12        Q.   And there was a nurse who was present?

13        A.   Correct.

14        Q.   Now, when you -- I want to just focus on this for

15   a minute.  When you were turning your orders in, were

16   you trying to do things the right way?

17        A.   That's correct, I was trying to do -- use my

18   medical expertise to properly diagnose patients and --

19   and evaluate them and treat them.

20        Q.   And based on your discussions with -- with

21   Rodney -- just staying with that same meeting, that same

22   interaction, based on your discussions with Rodney

23   Mesquias, Henry McInnis, Joe Garza and the nurse, were

24   they all aware this information was false?

25        A.   Yes.

1    Q.   How?

2            MR. BANKER:   I would object, that calls for

3    speculation.

4            THE COURT:   Overruled.

5    Q.   (By Mr. Lowell)   How?

6    A.   Well, when I submitted my initial assessments,

7    you know, these were assessments on -- on -- on the

8    patients that I had seen, and they -- Joe Garza

9    specifically told me that -- that I -- I couldn't use

10   those diagnoses because patients wouldn't qualify for --

11   for hospice, that I needed to use diagnoses that they

12   provided.

13           So from that point forward, I was provided a list

14   of patients to see, accompanied by their demographic

15   information, address, phone number, as well as a list of

16   diagnoses.   So every patient that I saw from that point

17   forward, I had that information, that list of diagnoses

18   and -- and so I was instructed to simply transfer those

19   diagnoses to my face-to-face encounter.

20   Q.   And Dr. Carrillo, you did that for patients who

21   didn't have those diagnoses; is that correct?

22   A.   That's correct.

23   Q.   And is Rodney Mesquias a doctor?

24   A.   No.

25   Q.   Is Henry McInnis a doctor?

1       A.   No.

2       Q.   To your knowledge does Henry McInnis have any

3  medical training?

4       A.   Not to my knowledge.

5       Q.   So on this discussion when you're adding this

6  information and changing diagnoses, who, in your

7  opinion, was the medical decision maker, you or Henry

8  McInnis, Rodney Mesquias, Joe Garza and the nurse?

9       A.   In this -- in this instance, I wasn't making any

10  medical diagnoses or opinions, it came directly from --

11  from Rodney Mesquias, McInnis and Joe Garza.

12      Q.   Why didn't you push back?

13      A.   Initially, when I first started, I -- I did my

14  best to do a good job in diagnosing patients, evaluating

15  patients, but I soon realized that that wasn't the

16  reason why I was hired, I was hired to sign

17  certifications and to certify patients that they only

18  had less than six months to live.  And I realized that

19  if I didn't play the game, if you will, I -- I would be

20  fired.  I wouldn't get paid.

21      Q.   Well, what was the game?

22      A.   The game was to make money.

23      Q.   Now, I want to talk about your job, your job as a

24  doctor, a medical director for the Merida Group.  Was it

25  your job as a medical director for the Merida Group to

1  exercise your medical judgment?

2      A.  No.

3      Q.  Are you familiar with the term medical opinion?

4      A.  Yes.

5      Q.  What is it?

6      A.  A -- a doctor, in order to provide a medical --

7  an accurate medical opinion, the physician needs to

8  properly evaluate a patient, do a complete history and

9  physical, assess the patient.  So when a physician is

10  asked for a medical opinion, those are part of the

11  initial steps.

12      Q.  That's what a doctor is supposed to do, right?

13      A.  Yes.

14      Q.  Was it your job as a medical director for the

15  Merida Group to give an honest medical opinion?

16      A.  No.

17      Q.  What was your job?

18      A.  My job was to sign and certify patients for

19  hospice.

20      Q.  Was your job to make an honest diagnosis of

21  patients?

22      A.  No, not at all.

23      Q.  Now, there were other medical directors at the

24  Merida Group; is that correct?

25      A.  Yes.

1    Q.   Are you familiar with Dr. Virlar?

2    A.   I've heard of him.

3    Q.   Did you have conversations with Rodney Mesquias

4    about Dr. Virlar?

5    A.   Yes, I did.

6    Q.   Was it your understanding based on those

7    conversations that Dr. Virlar was also involved in the

8    fraud?

9    A.   Yes.

10   Q.   Tell the jury what, if anything, Rodney Mesquias

11   said about Dr. Virlar?

12   A.   Usually, every Friday I would go to the Merida

13   head -- headquarters in Harlingen, I would sit with

14   Rodney Mesquias in his office, and he would talk about

15   Dr. Virlar and -- and how good of a medical director he

16   was.  And he would compliment me on the work that I was

17   doing, and he would make comments like -- such as

18   continue -- continue with the same lines.  I always

19   reward my doctors if they -- if they're productive, and

20   he would describe trips that he would take to places

21   like Las Vegas with Dr. Virlar and others.

22   Q.   So a couple things there, you said continue on

23   the same line; is that what Rodney Mesquias said?

24   A.   Yes.

25   Q.   What did that mean?

1    A.   That meant for me to continue certifying patients

2  for hospice.

3    Q.   Did you ever not certify a patient for hospice?

4    A.   In the beginning.

5    Q.   After that beginning point?

6    A.   During -- in the beginning with those 30

7  patients.

8    Q.   But after that -- after those 30 patients, did

9  you ever not certify a patient for hospice?

10    A.   No.

11    Q.   What, if anything, did Rodney Mesquias say about

12  Dr. Virlar's productivity?

13    A.   That he was very productive.  At this point, I

14  wasn't referring any new patients for hospice or home

15  health, and Mr. Mesquias made it a point to remind me of

16  that, that I wasn't referring any new patients and he

17  wanted me to begin referring patients like Dr. Virlar

18  was.

19    Q.   Was it your understanding that Dr. Virlar was

20  also involved in a kickback relationship with Rodney

21  Mesquias?

22    A.   Yes.

23    Q.   You mentioned trips to Vegas, what -- what did

24  Rodney Mesquias mean by that?

25    A.   Well, he talked about a trip that he took to

1    Vegas with Dr. Virlar and -- and others, and he

2    suggested -- or not suggest, but he -- he said that if I

3    continue being productive that I may -- that he may take

4    me to one of those trips.

5        Q.   Was it your understanding that other doctors went

6    on those trips?

7        A.   Yes.

8        Q.   In addition to the conversations about Vegas,

9    what, if any conversations did you have with Rodney

10   Mesquias about cars?

11       A.   Yes, Rodney Mesquias mentioned to me that -- he

12   told me that he -- he took care of his doctors, and some

13   time in -- before I was arrested, some time in March of

14   2015, he asked me what kind of car I wanted.

15       Q.   What kind of car did you want?

16       A.   I told him that I wanted a Mercedes SUV.

17       Q.   Did Mr. Mesquias agree to buy you the Mercedes

18   SUV?

19       A.   Yes.

20       Q.   Did you get the SUV?

21       A.   No.

22       Q.   Why not?

23       A.   I was arrested shortly thereafter.

24       Q.   Do you recall Rodney Mesquias referring to

25   Dr. Virlar as the model doctor for the Merida Group?

1      A.   Yes.

2              MR. BANKER:   Judge, that's leading.   Leading

3      the witness.

4              THE COURT:   Rephrase the question.

5      Q.   (By Mr. Lowell)   What if any conversations did

6      you have with Rodney Mesquias about Dr. Virlar's

7      position within the Merida Group?

8      A.   Mr. Mesquias made Dr. Virlar seem like he was the

9      model doctor to follow in terms of the number of

10     patients that he was referring to Merida Hospice and the

11     certifications that he was performing, that he was

12     doing.   So he -- he implied to me that he should be

13     the -- the doctor that I should try to be like.

14     Q.   Fair to say that he was the standard at the

15     Merida Group, Dr. Virlar?

16     A.   Yes.

17     Q.   And based on your conversations with Rodney

18     Mesquias, was it your understanding that Dr. Virlar was

19     also falsifying medical records?

20     A.   Yes.

21     Q.   During your conversations with Rodney Mesquias,

22     did he ever complain about Dr. Virlar?

23     A.   No.

24     Q.   Always positive?

25     A.   Yes.

1    Q.   And based on your conversations with both Rodney

2    Mesquias and Henry McInnis, did Mr. McInnis appear to

3    agree with Rodney Mesquias's opinion of Dr. Virlar?

4    A.   Yes.

5    Q.   Why is that?

6    A.   He -- he -- they -- they both --

7         MR. BANKER:   That calls for speculation,

8    Your Honor, objection.

9         MR. LOWELL:   Based on his conversations with

10   Rodney Mesquias and Henry McInnis.

11        THE COURT:   Clarify the question in terms of

12   what Mr. McInnis told him.

13   Q.   (By Mr. Lowell)   What did Mr. McInnis say about

14   Dr. Virlar?

15   A.   Mr. McInnis really never said anything to me

16   about Dr. Virlar.

17   Q.   Would Mr. McInnis be present during your

18   conversations with Rodney Mesquias about Dr. Virlar?

19   A.   Yes, sometimes.

20   Q.   Now, I want to focus on your compensation.   You

21   were paid as a medical director; is that right?

22   A.   Yes.

23   Q.   Now, were you being paid for legitimate

24   professional services?

25   A.   No.

1    Q.   What were you being paid for?

2    A.   I was being paid to falsely certify patients,

3    certifying that they would pass away within six months

4    of the -- of the date that I visited them, and I was

5    being paid also to refer patients for hospice and home

6    health.

7    Q.   Okay.  So your job had a couple different parts.

8    Part of your job was to falsify records; is that right?

9    A.   Yes.  Yes.

10   Q.   And the other part of your job was to refer

11   patients in exchange for kickbacks?

12   A.   Yes.

13   Q.   Now, these doctor's orders that you signed, what

14   are they referred to as?

15   A.   They're referred to as face-to-face encounters.

16   Q.   And were you paid for every face-to-face

17   encounter that you signed?

18   A.   Yes.

19   Q.   Now, if you were -- if you didn't sign a

20   face-to-face order, would you be paid?

21   A.   No.

22   Q.   Would it be fair to say that you were

23   incentivized to sign these doctor's orders?

24   A.   Yes.

25   Q.   How so?

1    A.   It -- it very quickly became evident to me that

2    the more certifications I signed, the more money I would

3    make.   So I was financially motivated and incentivized

4    to sign these certifications.

5    Q.   So would it be fair to say the more patients that

6    you said were dying at six months or less to live the

7    more money you made as a doctor at the Merida Group?

8    A.   That's correct.

9    Q.   Could we pull up Government's Exhibit M-4,

10   please.

11        Mr. Carrillo, do you -- do you recognize this

12   check?

13   A.   Yes, I do.

14   Q.   Who signed the check?

15   A.   Rodney Mesquias.

16   Q.   And what's the date?

17   A.   March 18th, 2014.

18   Q.   Now, with this check, is this a check that you

19   received?

20   A.   Yes.

21   Q.   And were you being paid for legitimate doctor

22   services?

23   A.   No.

24   Q.   At this point, tell the jury what you were being

25   paid to do?

1    A.   I was being paid to falsely certify patients that

2    they would die within six months.

3    Q.   How much money did you make in this check?

4    A.   5,750.

5    Q.   Now, I want to focus on conversation -- a

6    conversation with Rodney Mesquias and Henry McInnis.

7    Did you have a discussion with the two of them about

8    moving your clinic?

9    A.   Yes.

10   Q.   Tell the jury about that discussion.

11   A.   So when I first met with Rodney Mesquias, I was

12   practicing in Elsa, Texas.  I was practicing in a very

13   small clinic in Elsa.  In a short time after I met with

14   Mr. Mesquias and Mr. McInnis, since I wasn't referring

15   any new patients to their home health or their hospice,

16   they -- they recommended that I find a location in

17   Mission.  And the reason for that is because several

18   years prior I had a very large practice in -- in

19   Mission, and so they felt that since -- if I were to be

20   back in the -- in the same area where I used to have a

21   lot of patients, I can hopefully regain these old

22   patients and refer these patients to Merida Hospice or

23   Merida Home Health.

24   Q.   I want to be clear, just unpack that.  Both

25   Rodney Mesquias and Henry McInnis wanted you to move

1   your clinic; is that right?

2       A.   Yes.

3       Q.   And they wanted you to move your clinic so you

4   could refer patients to the Merida Group; is that

5   correct?

6       A.   That's correct.

7       Q.   And was that to refer patients for hospice

8   services?

9       A.   Hospice services and home health services.

10      Q.   Were any steps taken to hide this agreement?

11      A.   So in order for this to happen, I needed to find

12  a -- a clinic location, I needed to furnish the clinic,

13  I needed to purchase medical equipment, it was going to

14  be costly.

15          Henry McInnis and Mr. Rodney Mesquias agreed to

16  finance this endeavor 100 percent, so I made a list of

17  everything that I thought I needed, which was over

18  $50,000, I don't remember the exact figure, but it was

19  over $50,000.  And usually every week, Rodney Mesquias

20  would pay me an amount ten, $11,000 weekly and hide that

21  as a face-to-face encounter.

22      Q.   Why was it hidden?

23      A.   Because it's illegal.

24      Q.   What's illegal?

25      A.   It's illegal for anyone that's not a doctor to

1    finance a medical clinic for a doctor in return for

2    referrals.

3        Q.   Would it be fair to say that both Henry McInnis

4    and Rodney Mesquias had an ownership interest in this

5    plan?

6        A.   They were financing it 100 percent.

7                MR. CYGANIEWICZ:  Calls for speculation.

8                MR. LOWELL:  They invested in the company.

9                MR. CYGANIEWICZ:  He has not specified --

10               THE COURT REPORTER:  Mr. Cyganiewicz, please

11   speak into the microphone.

12               THE COURT:  Mr. Cyganiewicz, anything else?

13   Ms. Sheila didn't get what you said.

14               MR. CYGANIEWICZ:  No, Your Honor.

15               THE COURT:  Okay.  Rephrase the question.

16       Q.   (By Mr. Lowell)  So I believe you said that at

17   this particular transaction, the investment, this was

18   the investment by Rodney Mesquias and Henry McInnis; is

19   that right?

20       A.   Yes.

21       Q.   I believe you testified that that transaction was

22   hidden; is that correct?

23       A.   Yes.

24       Q.   Based on your conversations with Rodney Mesquias

25   and Henry McInnis, why did they want to hide this

```
 1   transaction?

 2       A.   Well, because it is not legal for any person or

 3   entity to finance a -- a doctor's clinic, or a doctor's

 4   practice in return for that doctor sending this person

 5   or this entity referrals or patients.

 6       Q.   And ultimately, was this a way for the Merida

 7   Group to make more money?

 8       A.   Yes.

 9       Q.   Why?

10       A.   More referrals that I potentially could send to

11   Merida would increase their revenue, would increase

12   their patient census and geographical reach, so it meant

13   more money more Merida, for money for Henry McInnis and

14   Rodney, and of course more money for me.

15              THE COURT:   Mr. Carrillo, again, speak

16   loudly and clearly into the mic.

17              THE WITNESS:   Okay, sorry.

18       Q.   (By Mr. Lowell)  Mr. Carrillo, I'm going to show

19   you what's been marked as Government's Exhibit M-5.

20              Mr. Carrillo, do you recognize this check?

21       A.   Yes, I do.

22       Q.   Who signed this check?

23       A.   Rodney Mesquias.

24       Q.   And what's the date?

25       A.   April the 8th, 2014.
```

1        Q.   And for how much money?

2        A.   11,600.

3        Q.   And what does the memo line say?

4        A.   Face-to-face.

5        Q.   Was that true or false?

6        A.   That's false.

7        Q.   Why is that false?

8        A.   It's false because the checks that -- that Rodney

9    Mesquias would pay me in return for certifying patients,

10   in return for completing face-to-face forms, on the memo

11   it actually listed the number of face-to-face forms that

12   I completed, for example the previous one I think was 27

13   or 28, this one doesn't have any number attached to it

14   so this was payment for financing my -- they were

15   financing my clinic.

16       Q.   Did this payment relate to the investment by

17   Rodney Mesquias and Henry McInnis in moving your clinic?

18       A.   Yes, it did.

19       Q.   Is this one of those hidden payments that you

20   just testified about?

21       A.   Yes.

22       Q.   And to be clear, when we looked at the previous

23   check, there was a specific number attached to the

24   number of face-to-faces; is that right?

25       A.   That's correct.

1    Q.   That number is missing from this check; is that

2    correct?

3    A.   That's correct.

4    Q.   Now, your conversations with -- with Rodney

5    Mesquias, did you have a conversation with Rodney

6    Mesquias about your cost to the company?

7    A.   Yes.

8    Q.   Tell the jury about that conversation.

9    A.   Some time in November of 2014, Rodney Mesquias

10   made a comment to me, this was after they had financed

11   my -- the clinic 100 percent, so he had a conversation

12   with me, essentially telling me that I was taking money

13   away from -- from his practice -- from his Merida Group,

14   that I was stealing money from the group.

15   Q.   You said they, who are you referring to?

16   A.   Rodney Mesquias and Henry McInnis.

17   Q.   Could we please go to Government's Exhibit M-6.

18   Mr. Carrillo, what's the date on this check?

19   A.   May 1, 2015.

20   Q.   Who -- who signed it?

21   A.   Rodney Mesquias.

22   Q.   Was Rodney Mesquias paying you to provide

23   legitimate doctors services for the Merida Group on this

24   date?

25   A.   No.

1    Q.  Tell the jury what he was paying you to do?

2    A.  He's paying me to certify -- falsely certify --

3    falsely certify patients for hospice.

4    Q.  Now, I want you to focus on the date.  What was

5    that date again?

6    A.  May 1st, 2015.

7    Q.  You had talked earlier about your substance abuse

8    issues; do you remember that?

9    A.  Yes.

10   Q.  Is there any significance to this date?

11   A.  Yes.

12   Q.  Tell the jury what the significance is?

13   A.  A month prior to this date, on exactly April the

14   1st, 2015, I suffered a -- an opioid induced seizure

15   while I was in the conference room at Merida Health Care

16   Group and an ambulance was called, I was taken to the

17   emergency room, and after my recovery, Mr. Joe Garza

18   went to the ER to visit me.

19        After my recovery, about a -- a few weeks later,

20   I was -- I continued seeing patients for Merida Health

21   Care Group despite the fact that they knew that I was on

22   opioids, addicted to opioids.

23   Q.  So you said they knew you were addicted to

24   opioids.  Did Rodney Mesquias know you were addicted to

25   opioids?

```
 1      A.   Yes.

 2      Q.   Henry McInnis?

 3      A.   Yes.

 4           MR. BANKER:   Your Honor, I'd object, calls

 5  for speculation.

 6           MR. LOWELL:   He said they knew.   I'm

 7  clarifying who's they.

 8           THE COURT:   Specify, yes, rephrase the

 9  question.   I'm sorry, did you say they?

10           MR. LOWELL:   He said they knew.   I'm

11  clarifying who they is.

12           THE COURT:   You then asked did Rodney

13  Mesquias know?

14           MR. LOWELL:   Yes.

15           THE COURT:   I'll allow it.

16      Q.   (By Mr. Lowell)  Did Rodney Mesquias know that

17  you were addicted to opioids when you were a medical

18  director for the Merida Group?

19      A.   Yes, he did.

20      Q.   Did Henry McInnis?

21      A.   Yes.

22      Q.   Did Joe Garza?

23      A.   Yes.

24      Q.   Were you fired on the spot?

25      A.   No.
```

1    Q.   Did you continue falsifying doctor's orders after

2   that date?

3    A.   I continued for a short while up until June the

4   15th -- 16th, 2015.

5    Q.   Now, these checks that you received, in exchange

6   for receiving these checks as a medical director for the

7   Merida Group, did you refer patients for fraudulent

8   hospice and home health services at the Merida Group?

9    A.   Yes.

10    Q.   How if at all did that benefit the Merida Group?

11    A.   Well, it -- it increased their patient census

12   which meant more payments from Medicare to -- to Merida.

13   It -- it also increased, not only did -- were they able

14   to retain their old patients, but they were acquiring

15   new patients that I was certifying as well.  And it also

16   meant more money, not just for Rodney Mesquias and Henry

17   McInnis, but more money for me, too.

18    Q.   You personally benefit -- benefited, right?

19    A.   Yes.

20    Q.   We talked about the referrals.  In exchange for

21   receiving checks as a medical director at the Merida

22   Group, did you sign false doctor's orders?

23    A.   Yes.

24    Q.   Staying on this topic of the paychecks, did --

25   did Rodney Mesquias ever withhold a paycheck from you?

1     A.   Yes.

2     Q.   Why?

3     A.   Initially, in the beginning --

4          MR. BANKER:   Judge, I'm going to object.

5     That calls, clearly calls for speculation, why -- why

6     would -- how would he know why a check was withheld?

7          THE COURT:   Rephrase the question, did

8     Rodney Mesquias tell him why it was withheld.

9     Q.   (By Mr. Lowell)  Did Rodney Mesquias tell you why

10    he withheld the check from you?

11    A.   Yes.

12    Q.   Tell the jury why.

13    A.   It occurred a couple of times.  One time I --

14    this was in the beginning with those 30 patients, I --

15    I -- I didn't certify a few of those patients, and I

16    did -- I wasn't following their recommended protocols on

17    diagnosing on -- on writing in the adequate diagnoses

18    that they felt needed to be written on the face-to-face

19    in order for the patient to qualify for -- for hospice.

20         Of those 30 patients that I initially saw, a few

21    of them, maybe three or four, I felt they didn't qualify

22    for hospice and so I -- I wasn't paid until after I met

23    with Mr. Joe Garza and I changed the -- the forms.

24    Q.   You falsified doctor's orders?

25    A.   Yes.

1    Q.  So to be clear, Rodney Mesquias withheld your

2  check as a medical director until you falsified those

3  doctor's orders; is that right?

4    A.  That's correct.

5    Q.  And I believe you testified that you were -- you

6  were not following someone's protocol, whose protocol

7  was that?

8    A.  That was the protocol that was set by the

9  leadership at Merida Health Care Group, which included

10  Rodney Mesquias, Joe McInnis -- I am sorry, Henry

11  McInnis and Joe Garza.

12    Q.  And again, where was that leadership team based

13  primarily?

14    A.  Harlingen.

15    Q.  Here in Harlingen.  Now, in addition to moving

16  your clinic, were there other sources of patient streams

17  that you were finding as a medical director?

18    A.  Yes.

19    Q.  Where?

20    A.  There -- there was a marketer that worked -- who

21  worked for Merida who began helping me set appointments

22  to go to adult day care centers in -- in the Rio Grande

23  Valley.  He would schedule about two visits to adult day

24  care centers during the lunch hour which was between

25  12:00 and 1:00, so I -- I would go visit these day care

1    centers and try to recruit patients.

2        Q.   Did you recruit patients?

3        A.   Yes.

4        Q.   What would you say to them?

5        A.   There at the day care center I usually gave a

6    presentation on diabetes or high blood pressure.   I

7    would leave my card and a brochure.   They would come

8    into the clinic.   More -- more -- very often this

9    marketer would bring in the patients to the clinic and I

10   would refer these patients to Merida Home Health or

11   hospice.

12       Q.   Did that include patients who were not homebound?

13       A.   Yes.

14       Q.   Did that include patients who were not hospice

15   eligible?

16       A.   Yes.

17       Q.   And to be clear, were these patients, these

18   patients from the adult day care centers, were these

19   patients who were then referred to the Merida Group?

20       A.   Yes.

21       Q.   Was it your understanding that these patients

22   were then signed up for services with the Merida Group?

23       A.   Yes.

24       Q.   Was it your understanding that these patients

25   were then billed to Medicare?

1     A.   Yes.

2     Q.   Would it be fair to say that these patients were

3   misled?

4     A.   Yes.

5     Q.   How?

6     A.   They -- they were being told that they would

7   qualify for home health and, despite the fact that most

8   of these patients, all these patients, were not

9   homebound, they did have diagnoses of diabetes, high

10  blood pressure, but they weren't homebound, and -- and

11  that was because they weren't at home, they were going

12  to day care centers everyday.   So they were misled into

13  believing that they were actually homebound.

14    Q.   You mentioned a marketing plan earlier.   Was this

15  part of the marketing plan at the Merida Group?

16    A.   Yes.

17    Q.   Here in the Valley?

18    A.   Yes.

19    Q.   And beyond the Valley?

20    A.   Yes.

21    Q.   Now, during your time as a medical director for

22  the Merida Group, did you see an increase in the number

23  of patients assigned to you?

24    A.   Yes.

25    Q.   What was your understanding of why you got an

1    increase in patients?

2       A.   It was my understanding that I was doing a great

3    job for Merida Health Care.

4       Q.   And could you tell the jury what doing a great

5    job as a doctor, as a medical director at the Merida

6    Group means?

7       A.   It means I -- I was certifying all the patients

8    that they were giving -- being given to me.  I was

9    recertifying these patients for continued hospice care.

10      Q.   Does it mean falsifying doctor's orders?

11      A.   Yes.

12      Q.   Does it mean referring patients in exchange for

13   kickbacks?

14      A.   Yes.

15      Q.   Based on your discussions with Rodney Mesquias,

16   did he approve the work that you were doing?

17      A.   Yes, he did.

18      Q.   How about Henry McInnis?

19      A.   Yes.

20      Q.   Did Henry McInnis -- did Henry McInnis ever

21   accuse you of fraud?

22      A.   No.

23      Q.   Rodney Mesquias?

24      A.   No.

25      Q.   Now, I want to show you a couple of exhibits, a

1    couple of patient files.

2         Could we go to Government Exhibit E-21.

3         Mr. Carrillo, this is the Merida Group patient

4    file for Francisca Perez.  Did you review this patient

5    file prior to coming to Court today?

6    A.   Yes.

7    Q.   And is this the Merida Group patient file for

8    Francisca Perez?

9    A.   Yes.

10   Q.   And if we look at the top of the page, whose name

11   appears as the doctor for Ms. Perez?

12   A.   Can you repeat the question?

13   Q.   Yes, I'm going to direct you to page 58.

14   Mr. Carrillo, whose name appears as the doctor for Ms.

15   Perez?

16   A.   Francisco Pena.

17   Q.   What title does Mr. Pena have?

18   A.   Medical director.

19   Q.   Is that medical director for the Merida Group?

20   A.   Yes.

21   Q.   Could we highlight the hospice certification

22   period.

23        Starting with I certify, can you read that into

24   the record, Mr. Carrillo?

25   A.   I certify that the patient's prognosis is six

1   months or less if the disease runs its normal course,

2   certification of terminal illness and physical chart.

3        Q.   And what doctor made that certification?

4        A.   Francisco Pena.

5        Q.   In what year did Dr. Pena certify that patient

6   Francisca Perez had less than six months to -- or less

7   to live?

8        A.   September 2014.

9        Q.   I'm directing you to page 2.  Did you also sign

10  medical records for Francisca Perez?

11       A.   Yes, I did.

12       Q.   Do you recognize this document?  What kind of

13  document is this?

14       A.   That's a face-to-face certification form.

15       Q.   And to be clear, this is for Francisca Perez; is

16  that correct?

17       A.   Yes.

18       Q.   And is this a patient in Laredo?

19       A.   Yes.

20       Q.   Now, like Dr. Pena, did you certify that

21  Francisca Perez had six months or less to live in 2014?

22       A.   Yes, I did.

23       Q.   And you described this fraud earlier in your

24  testimony.  At the time -- is your signature on this

25  document?

1    A.  Yes, it is.

2    Q.  And you were a doctor at the time, right?

3    A.  Yes.

4    Q.  You were a medical director for the Merida Group?

5    A.  Yes.

6    Q.  At the time you signed this document, was this

7 during the fraud that you were committing at the Merida

8 Group?

9    A.  Yes.

10    Q.  And the order that Dr. Pena signed, he signed

11 that after you, right?

12    A.  Yes, he signed it in September.

13    Q.  A few months later?

14    A.  Yes.

15    Q.  Standing here today, do you have any idea whether

16 Francisca Perez is still alive?

17    A.  No.

18    Q.  Now, on the hospice side of the Merida Group,

19 what portion of the patients, based on your experience,

20 you saw patients, right?

21    A.  Yes.

22    Q.  What portion of the patients, what percentage of

23 the patients didn't qualify for hospice?

24    A.  Of the hundreds of patients that I saw, I'd say

25 more than 80 percent of the patients did not qualify for

1    hospice.

2       Q.   More than 80 percent of the patients didn't

3    qualify for hospice; is that right?

4       A.   Yes.

5       Q.   And you're in San Antonio; is that correct?

6       A.   I -- this included the patients that I saw in the

7    Rio Grande Valley, San Antonio and Laredo and Corpus.

8       Q.   All over the place?

9       A.   Yes.

10      Q.   Not just six or seven patients, right?

11      A.   Correct.

12      Q.   Now, how if at all did that benefit the Merida

13   Group?

14      A.   Well, it increased -- it increased -- it not only

15   increased their patient census, but also expanded their

16   geographical reach.  It benefited them financially,

17   their gross revenues increased, it meant more money for

18   Merida as well as to Rodney Mesquias and Joe McInnis and

19   of course myself.

20      Q.   So you mentioned geographical reach, what do you

21   mean by that?

22      A.   What -- what I mean is they expanded to different

23   counties in Texas, it increased the patient numbers

24   within those counties as well, for example they were

25   able to see more patients in -- in San Antonio, and the

1    San Antonio area or Harlingen area, and the more

2    patients that I certified, then that meant more money

3    for me.

4        Q.  Did you have an understanding that the Merida

5    Group was seeking to continue to expand?

6        A.  Yes.

7        Q.  And why did you have that understanding?

8        A.  Because Rodney Mesquias always stressed to me

9    that I needed to refer more patients and more patients.

10   He even went to as far as wanting me to get hospital

11   privileges in order for me to be able to refer hospice

12   patients and home health patients to Merida.

13       Q.  Which hospitals?

14       A.  I obtained hospital privileges in -- at Harlingen

15   Medical Center as well as a hospital in Brownsville, I

16   just forgot -- forget the name of the name.

17       Q.  So Harlingen Medical Center --

18       A.  Valley Baptist, sorry.

19       Q.  So Harlingen Medical Center and Valley Baptist;

20   is that right?

21       A.  Yes.

22       Q.  And did you refer patients from both of those

23   hospitals?

24       A.  I didn't get a chance to.

25       Q.  What happened?

1    A.   I was arrested.

2    Q.   Now, we're talking about a couple of patient

3  examples.  You don't recall every patient -- patient's

4  name that you saw, right?

5    A.   No.

6    Q.   Do you recall visiting a couple in San Antonio

7  that had been fraudulently signed up for hospice?

8    A.   Yes, I do.

9    Q.   Tell the jury about that couple.

10   A.   The -- this couple in San Antonio, I visited a

11 number of times.  A few of those times, when I arrived

12 at their home, they would be outside gardening, they

13 were tending to their -- their shrubs, or their flowers,

14 so these were patients that are supposed to be ending --

15 be towards the end of their lives.  Patients that had

16 less than six months to live.  However, they were

17 outside gardening.

18   Q.   Now, when you went to go visit these patients in

19 San Antonio, did you have their patient files?

20   A.   I had just the demographic information and -- and

21 a list of diagnoses.

22   Q.   Okay.  And who had done the previous diagnoses;

23 do you know?

24   A.   I believe it was -- in that specific case, I

25 believe it was Dr. Virlar.

1    Q.   In your role as a medical director for the Merida

2    Group, would it be fair to say that you took advantage

3    of those patients, the couple?

4    A.   Yes.

5    Q.   How so?

6    A.   As a -- as a doctor, I -- I failed to provide

7    them with a proper evaluation and diagnosis.  I -- I

8    essentially just continued recertifying them.

9    Q.   Do you recall a time when you had to go see

10   hospice patients in Corpus?

11   A.   Yes.

12   Q.   Merida Group had an operation in Corpus; is that

13   right?

14   A.   Yes.

15   Q.   Was that operation in Corpus also involved in

16   fraud?

17   A.   Yes.

18   Q.   Did you actually see those patients in Corpus?

19   A.   I saw most of the patients, but there were, I'd

20   say maybe 12 or so patients that I didn't see.

21   Q.   Why not?

22   A.   These patients lived across the Corpus channel

23   and in order to get there, you would have to take a -- a

24   ferry, and I didn't visit them, so I called Mr. Henry

25   McInnis, I spoke to him and -- and he recommended -- he

1   told me that as long as I spoke to them via phone and

2   consult them via telephone, I can do a certification.

3       Q.   You didn't have to see them?

4       A.   I didn't have to see them.

5       Q.   Was that based on Henry McInnis's directive?

6       A.   Yes.

7       Q.   Did you follow Henry McInnis's directives?

8       A.   Yes.

9       Q.   And Henry McInnis was the number two at the

10  company; is that right?

11      A.   Yes.

12      Q.   He was based in Harlingen?

13      A.   Yes.

14      Q.   Now, we talked about hospice, I want to pivot and

15  talk a little bit about the Merida Group, their home

16  health services.  You also worked in the home health

17  side; is that correct?

18      A.   Yes.

19      Q.   And just as with hospice, Merida Group's hospice

20  operation, did you lie about patients on the home health

21  side?

22      A.   Yes, I did.

23      Q.   Tell the jury what you lied about?

24      A.   Well, for one thing the majority of the forms

25  that I had to fill out, that I was asked to fill out for

1    the home health, these forms are -- are referred to as

2    485's, I signed these forms without seeing -- ever

3    seeing the patients.  These -- usually when I would

4    visit, or go to the Merida offices on Fridays to pick up

5    my check for the hospice certifications, I would be

6    given a -- a pile of 485's, usually by a nurse or

7    Mr. Joe Garza, for me to sign.  And I would sign them

8    without seeing the patients.

9        Q.   Why did you sign false doctor's orders for home

10   health patients at Merida?

11       A.   Because -- I signed them because I -- I felt that

12   if I didn't sign them, I wouldn't receive my paycheck

13   for that -- for those certifications.

14       Q.   Now, these Merida Group patient files, would you

15   add false diagnoses to these records?

16       A.   Yes.

17       Q.   What is failure to thrive?

18       A.   That's a -- that's a medical term given to a

19   patient that -- who despite the patient's effort to --

20   despite the patient's effort to gain weight, the patient

21   doesn't gain weight, even though the patient is eating,

22   there's no -- the patient doesn't thrive, the patient

23   doesn't gain -- gain weight, that's failure to thrive.

24       Q.   Now, the failure to thrive diagnosis, was that a

25   false diagnosis that you would add to the Merida Group

1 patient files?

2    A.   Yes.

3    Q.   How about a diagnosis of dementia?

4    A.   Yes.

5    Q.   Why?

6    A.   I did that in order for the patients to -- you

7 know, these -- these were patients that were already

8 receiving hospice care, so in order for the patients to

9 continue receiving hospice care, I would write in these

10 diagnoses.  And these diagnoses, I would, essentially,

11 transfer from the prior face-to-face that another

12 medical director completed.

13    Q.   Is that another medical director at the Merida

14 Group?

15    A.   Yes.

16    Q.   How about Alzheimer's, was that also a false

17 diagnosis that you would add to the patient files?

18    A.   Yes.

19    Q.   Debility?

20    A.   Yes.

21    Q.   How about CHF?

22    A.   Yes.

23    Q.   What is CHF?

24    A.   It's congestive heart failure, the heart is --

25 has become weak and is not pumping sufficient blood to

1    the extremities, brain, other organs, so the patient

2    is -- is weak.  Usually is in -- in respiratory

3    distress, has a very hard time breathing.

4        Q.  And to be clear, why would you add these false

5    diagnoses to these patient files?  What did that

6    accomplish?

7        A.  It -- it guaranteed that the patient would

8    continue receiving hospice services.

9        Q.  Made the patient look like they were dying; is

10   that right?

11       A.  Yes.

12       Q.  Even when they weren't?

13       A.  Correct.

14       Q.  Based on your experience at the Merida Group, was

15   that a pervasive practice?

16       A.  Yes, it was.

17       Q.  Could we pull up Government's Exhibit E-17.

18   Could we go to page 5, please.

19           Mr. Carrillo, is this the Merida Group patient

20   file for Jack High?

21       A.  Yes.

22       Q.  Does your signature appear on this document?

23       A.  Yes, it does.

24       Q.  You've talked a lot about certifying false

25   records and having false diagnoses, did you certify in

1    this document that Jack High was about to die?

2        A.   Yes.

3        Q.   And was this during the time you were committing

4    fraud at the Merida Group?

5        A.   Yes.

6        Q.   Do you see the terminal diagnosis indicated for

7    Jack High?

8        A.   Yes.

9        Q.   What is it?

10       A.   Cachexia.

11       Q.   Was that a false diagnosis that you would add to

12   patient files at the Merida Group?

13       A.   Yes, it is.

14       Q.   Tell the jury why you would add that specific

15   diagnosis?

16       A.   It's a diagnosis that I was told, it's kind of a

17   generic diagnosis, but patients that are diagnosed this

18   way do qualify for hospice care.

19       Q.   Is it basically a guarantee that the patient is

20   going to qualify?

21       A.   Yes.

22       Q.   Can we go to Government's Exhibit E-5, please.

23   Page 1.

24            Mr. Carrillo, this is the Merida Group patient

25   file for Teresa Calvillo.

1      A.   Yes.

2      Q.   Does your name and signature appear on this

3    document?

4      A.   Yes, it does.

5      Q.   Did you certify in this document that Teresa

6    Calvillo was about to die?

7      A.   Yes, I did.

8      Q.   And was this during the time you were committing

9    fraud at the Merida Group?

10     A.   Yes.

11     Q.   Could we go to page 3, please.

12          I'm going to direct you to the middle of the

13    page, the medical information section.

14          What's the diagnosis there for Teresa Calvillo?

15     A.   Unspecified dementia.

16     Q.   Is that the diagnosis that you put?

17     A.   Yes.

18     Q.   And is that a false diagnosis that you would use

19    in your documents?

20     A.   Yes, it is.

21     Q.   Why was unspecified dementia a false diagnosis

22    that you would use or that you would put in the Merida

23    Group patient files?

24     A.   The patients -- the patient, or these patients

25    would suffer from memory loss, which is -- which is very

1    common in a patient that's 80 years old.  But memory

2    loss by itself maybe would qualify the patient for home

3    health, but not for -- for hospice so I used dementia.

4        Q.  Why?  Why did you use unspecified dementia?

5        A.  In order for the patient to qualify for hospice.

6        Q.  Could we go to Government's Exhibit, I believe

7    it's 7, patient file for Ms. Conti.

8               MR. LOWELL:  Court's indulgence.

9               THE COURT:  Yes.

10              MR. LOWELL:  My apologies, Judge.  We're

11   pulling up a document, one more patient file.

12              COURT OFFICER:  Excuse me, a juror member

13   can't hear the witness.

14              THE COURT:  All right.  Again Mr. Carrillo,

15   I know it's difficult sometime just to forget -- in the

16   course of a conversation to forget, but please speak

17   loudly and clearly into the mic.

18       Q.  (By Mr. Lowell)  Mr. Carrillo, I am showing you

19   Government's Exhibit E-11, that's page 7.

20              You see that, Dr. Carrillo?

21       A.  Yes.

22       Q.  And this is the patient file for Joanne Conti; is

23   that right?

24       A.  Yes.

25       Q.  And you see your signature at the bottom of the

1    page?

2        A.  Yes, I do.

3        Q.  And what's the date?

4        A.  It's April the 9th, 2015.

5        Q.  And April 9th, you said 2015 or 2016?

6        A.  2015.

7        Q.  April 9th, 2015, did you certify that Joanne

8    Conti was about to die?

9        A.  Yes, I did.

10       Q.  And was this during the time that you were

11   committing health care fraud at the Merida Group?

12       A.  Yes.

13       Q.  Now, Mr. Carrillo we've -- we've talked about

14   these patient files, we've walked through a couple of

15   them.  Based on your -- your experience at the Merida

16   Group as a medical director, you were someone who

17   reviewed the files; is that right?

18       A.  Yes.

19       Q.  Did the Merida's Group medical records contain

20   truthful information?

21       A.  No.

22       Q.  Was it common to see false information in the

23   patient files?

24       A.  Yes.

25       Q.  How common?

1      A.   Very common, pretty much every single patient.

2                MR. LOWELL:  Your Honor, we'll pass the

3      witness.

4                THE COURT:  Gentlemen, one second,

5      Mr. Banker, we need a quick break?

6                Let's go ahead and take a break before we

7      start the -- the cross.

8                COURT OFFICER:  All rise for the jury.

9                (JURY OUT.)

10               (COURT IN SHORT RECESS.)

11               THE COURT:  Please remain standing for the

12     jury.

13               (Brief pause in proceedings.)

14               COURT OFFICER:  All rise for the jury.

15               (JURY IN.)

16               THE COURT:  All right.  Thank you, everyone.

17     Please be seated.

18               We have Mr. Banker now, correct.

19               MR. BANKER:  That's right, Judge, may it

20     please the Court.

21               THE COURT:  Please proceed when you're

22     ready.  And, yes, sir.

23               And again, just a quick reminder, I know

24     it's difficult, but please remember to speak loudly and

25     clearly into the microphone.

1          THE WITNESS:  Yes, sir.  Yes, sir.

2          THE COURT:  No problem.  No problem.

3    Gentlemen, please proceed.

4                    CROSS-EXAMINATION

5    BY MR. BANKER:

6      Q.  Good afternoon, Mr. Carrillo.

7      A.  Good afternoon.

8      Q.  My name is Charles Banker and I represent Rodney

9    Mesquias.  I have a few questions for you, if you don't

10   under -- understand a question, or you want me to repeat

11   it, I certainly will, okay?

12         Now, you told us at the beginning of your

13   testimony here that part of your deal with the

14   Government was to tell the truth in Court, right?

15     A.  That's correct.

16     Q.  And that if you didn't tell the truth, that you

17   could be prosecuted, right?

18     A.  Yes.

19     Q.  Okay.  Well, isn't it fair to say that the entity

20   that determines whether you're telling the truth or not

21   and face prosecution would -- would be these fellas

22   right here, right?  They're the ones who are going to

23   determine that, right?  Correct?

24     A.  I think the Judge is going to determine that.

25     Q.  No, no, the Judge doesn't have anything to do

1    with it.  The prosecution determines that.  They

2    determine whether to prosecute somebody or not for

3    making a false statement.  Just like they determined

4    whether to prosecute you or not back in June of 2015

5    when you gave a false statement to a Government agent;

6    remember that?

7        A.  Yes.

8        Q.  Okay.  So the bottom line to that is that your

9    version of the truth needs to be the same as their

10   version of the truth, right?  True?  In order to not

11   face prosecution?  Correct?

12       A.  I'm not sure if I follow you.

13       Q.  Okay.  Well, I mean, you --  you've admitted, or

14   you understand now that they're the ones that determine

15   whether you're telling the truth or not, right?

16       A.  I am under oath so I -- I am telling the truth.

17       Q.  Right.  Okay.  Well, I'm sure they told you to

18   say that, too, right?

19       A.  No.

20       Q.  In terms of truthfulness, would you agree with

21   the statement that a truth-teller has a history of

22   telling the truth?

23       A.  (No response.)

24       Q.  A truth-teller has a history of telling the

25   truth, would you agree with that statement?

A.   Yes.

Q.   Okay.  And on the converse, a liar has a history
of telling lies, right?

A.   That would be correct.

Q.   So let's talk about your lies, because we have a
lot of lies, we have history of lies with you.  You know
that, right?  Right?

A.   I was --

Q.   Well, no, yes or no?

A.   -- a liar before but not today.

        MR. BANKER:  Nonresponsive, Judge.

        THE COURT:  Just -- just listen to the
question and answer it.

Q.   (By Mr. Banker)  You have a history of telling
lies, right?

A.   I had a history.

Q.   So let's talk about those lies.  You were charged
in 20 -- June of 2015 with conducting a kickback scheme,
right?

A.   Yes.

Q.   Okay.  Making a false statement to a Government
agent, right?

A.   Right.

Q.   And a result of that you got arrested?

A.   That's correct.

1     Q.   December 2015?

2     A.   Yes.

3     Q.   And that was after you were working for Rodney

4  Mesquias, correct?

5     A.   That was during the time that I was working with

6  Rodney Mesquias.

7     Q.   Well, it was at the end of your work with him,

8  right?

9     A.   I was still an employee of Rodney Mesquias.

10     Q.   But the conduct that involved those charges,

11  those go back to 2011 and 2012, right?

12     A.   That's correct.

13     Q.   And those charges stemmed from you -- you got a

14  job with a Dr. Jorge Trevino, right?

15     A.   That's correct.

16     Q.   Okay.  And that was in -- at the end of 20 --

17  2011, correct?

18     A.   Yes.

19     Q.   And they got wind of you making referrals to home

20  health agencies in exchange for money, correct?

21     A.   Correct.

22     Q.   And that was a kickback?

23     A.   Correct.

24     Q.   Okay.  And they did their own little internal

25  investigation, right?  They -- they brought a person

1   that acted like they were with the home health agency,

2   they set up a meeting and you talked to them, right?

3       A.   Yes.

4       Q.   And you -- you -- you agreed with them that in

5   exchange for money you would give them referrals?

6       A.   That's correct.

7       Q.   And in one of those conversations, which were

8   taped, right, they were recorded?

9       A.   Yes.

10      Q.   You even said, well, if you don't have money,

11  I'll take sex, right?  You said that; didn't you?

12      A.   Yes.

13      Q.   Well, once that happened, you got fired from

14  Dr. Trevino's office, correct?

15      A.   Correct.

16      Q.   And then you go over and you start working in

17  South Texas Medical Clinic in Mission, right?

18      A.   Yes.

19      Q.   And so the same guy who talked to you about doing

20  a deal that posed as a -- as a home health agent person,

21  they, along with the Government agent, went and talked

22  to you again; didn't they?

23      A.   Yes.

24      Q.   Okay.  And you made the same proposal.  Money for

25  referrals, correct?

1      A.   That's correct.

2      Q.   Okay.   And you had even involved your wife at

3  that time, Martha Medrano, right?

4      A.   That's correct.

5      Q.   She was indicted with you?

6      A.   Yes.

7      Q.   Okay.   And these were recorded conversations, and

8  you gave them money, right?   You gave money?

9      A.   I was given money, yes.

10      Q.   I'm sorry, you gave them referrals for the money,

11  you were given money.   And in that money, you didn't

12  take a check; did you?

13      A.   Either checks or cash.

14      Q.   You took a check?   You took a check on the -- on

15  this -- on this deal?

16      A.   Not on this one.

17      Q.   Okay, correct, oh, I'm talking about on the deal

18  that you plead guilty to, to doing a kickback scheme,

19  you didn't take any checks, you took cash, right?

20      A.   Yes.

21      Q.   Because cash can't be traced, right?

22      A.   That's correct.

23      Q.   Someone wrote you a check for referrals, that

24  would be like telling the Government I'm guilty, I'm

25  paying this guy money, it's got my name on it, it's got

1    my -- my check on it, my address on it, right?  That

2    didn't happen in that kickback scheme, right?

3        A.   Right.

4        Q.   And that doesn't happen in kickback schemes; does

5    it?  It doesn't happen, right?

6        A.   I don't -- I don't know about that.

7        Q.   Well, you've been doing this a long time?

8        A.   I -- I've been paid checks before.

9        Q.   You've gotten cash --

10               THE COURT:  One second, let him finish.

11               THE WITNESS:  I've been paid both cash and

12   checks.

13       Q.   (By Mr. Banker)  I take it you're saying the

14   check that Rodney Mesquias gave you was -- was -- was

15   one that you got a check for, right?

16       A.   That was one of them, but there were others.

17       Q.   Oh, there were others, okay.  So you've been

18   doing this a long time, right?

19       A.   Yes.

20       Q.   You know, and -- and the reason that you got

21   involved in trying to do this type of thing, as you

22   stated in your direct testimony, was for money, right?

23       A.   Correct.

24       Q.   Okay.  And you needed money because back in 2010,

25   2011 you had some failing businesses, right?

```
 1        A.   Correct.

 2        Q.   You got a divorce, right?

 3        A.   In 2014 I got a divorce.

 4        Q.   But you sep -- you filed for a divorce earlier

 5   than that, right?

 6        A.   Yes.

 7        Q.   Okay.  The actual decree was signed in 2014?

 8        A.   Yes.

 9        Q.   And you owed the federal government a lot of

10   income tax money, right?

11        A.   That's correct.

12        Q.   Upwards of almost a million dollars, if -- if I'm

13   correct?

14        A.   That's correct.

15        Q.   Would that be fair to say?

16        A.   Yes.

17        Q.   And you had all kinds of money judgments against

18   you from people that you didn't pay back, like banks and

19   companies that you owed money as a result of your

20   failing business, right?

21        A.   Yes, sir.

22        Q.   That's -- and that's in the range of hundreds of

23   thousands of judgments, right?

24        A.   That's correct.

25        Q.   And you got liens all over the place in Hidalgo
```

1    County, right?

2        A.   Yes.

3        Q.   And that's a public record; isn't it?

4        A.   I had declared bankruptcy.

5        Q.   And one of those liens that has -- that you have

6    against you in Hidalgo County is a child support lien

7    for about $78,000; you know about that, right?

8        A.   Yes, sir.

9        Q.   So you don't pay child support; do you?

10       A.   I do pay child support now, not before.

11       Q.   Now -- now you do?

12       A.   Not before.

13       Q.   But that indicates -- a person who doesn't pay

14   their child support, a person that -- that reneges on

15   their obligations, a person that doesn't pay their

16   income taxes, especially in upwards of over a million

17   dollars, that's not a truth-teller; is it?  That's not a

18   truth-teller; is it?

19       A.   I never said I was a truth-teller.

20       Q.   Well, I agree with you on that.

21       A.   Before -- before 2015.

22       Q.   That's the history of someone who has a history

23   of telling lies, right?  A liar?

24       A.   This is -- this is true for my case before 2015.

25       Q.   Okay.

1    A.   But not today.

2    Q.   Well, that's what you want the jury to believe

3    about you, right?

4    A.   No, that's the -- that's the truth.

5    Q.   You want the jury to believe that because you

6    want to get credit for your testimony today, right?

7    A.   I'm speaking the truth, that's part of the deal.

8    Q.   Let the jury -- the jury is the -- has the

9    authority, not you, to determine whether you're telling

10   the truth.  You -- you realize that, right?

11   A.   That's correct.

12   Q.   There's people that come up in these courthouses

13   in this country everyday that they'll stand up there and

14   say, before God I tell the truth, right?  But they're

15   not telling the truth, they're not all telling the

16   truth; are they?

17        Would you agree with me that everybody that comes

18   up to the witness stand in front of juries and swears

19   they're telling the truth, do you think they're telling

20   the truth, everyone?

21   A.   I wouldn't know, I could only attest to what I'm

22   saying the truth.

23   Q.   Common sense says no, doesn't it?  Right?

24   A.   I wouldn't know.

25   Q.   They have the province of determining whether

1    you're telling the truth today, not you.

2         So anyway, you're approached while you're

3    working -- you went to this other clinic, and you start

4    doing the same thing there, and you start doing this

5    kickback scheme and you get money and -- and then one

6    day federal agents come knocking at the door, right?

7    A.   Yes.

8    Q.   Okay.  But let me back up a minute.

9         Before June 15th, and after you did -- you

10   started talking to these undercover agents and they

11   recorded you, you met with a Government agent on April

12   5th of that 2012; remember that?

13   A.   Yes.

14   Q.   And where was -- where did that happen?

15   A.   I don't -- I think a restaurant.

16   Q.   Okay.  And they asked you specifically whether

17   you'd been involved in anything like that, right?

18   A.   Yes.

19   Q.   And they introduced themselves as Government

20   agents, right?

21   A.   Yes.

22   Q.   And they told you to tell the truth, right?

23   A.   Yes.

24   Q.   And you lied to them, right?

25   A.   Yes, I did.

1    Q.   Just like you're lying today, right?

2    A.   No, I'm not lying today, I'm under oath.

3    Q.   You like to hide behind things like, I'm telling

4    the truth, or you like to hide behind your license, you

5    like to hide behind your degrees, right?  That's

6    something that you've learned to do, correct?

7    A.   I'm not hiding -- I don't have a license today.

8    Q.   But you've learned to do that, right?

9    A.   This was -- this was before 2015.

10   Q.   And you're doing that today?

11   A.   I'm not doing that today.

12            MR. LOWELL:  Objection, Your Honor,

13   argumentative.

14            THE COURT:  Sustained.

15   Q.   (By Mr. Banker)  So back before you were arrested

16   in June 2015, you lied to Government agents, and I bet

17   you sat there in that restaurant just as calmly as

18   you're sitting here today?

19            MR. LOWELL:  Objection, argumentative.

20            MR. BANKER:  That's cross, I can -- I can do

21   this.

22            THE COURT:  First of all, it's been asked

23   and answered, but go ahead and ask him about his

24   conversation with the agents.

25   Q.   (By Mr. Banker)  You were sitting in that little

1   restaurant, wherever that was, and you calmly, as you

2   are so calmly sitting here today, looked those

3   Government agents in the eyes and you told them an

4   outright lie; isn't that true?

5       A.   Can you remind me the -- the meeting I had

6   with -- in the restaurant?  At that time I didn't know

7   they were Government agents, they were undercover.

8       Q.   Okay.

9       A.   So --

10      Q.   I'm not sure -- you told me you met with

11  Government agents in a restaurant, I -- I don't know

12  where you met them, but you -- there was a time that

13  Government agents -- you and Government agents met and

14  they told you they were Government agents, right?

15      A.   Yes.

16      Q.   Okay.  I'm not saying -- I'm not saying it's a

17  restaurant, you said that.  But in that meeting, you sat

18  before them, the same as you're sitting before these --

19  these jurors here, and in your calm, collected manner

20  you told them a lie; didn't you?

21      A.   Well, the circumstances were different.

22      Q.   Okay.  The -- you're not answering my question.

23      A.   I did.

24      Q.   You told them a lie, right?

25      A.   I did.

1 Q. Okay.  Just as calmly and matter of factly that

2 you're doing that today, right?

3 A. I don't recall what my composure was back then.

4 Q. All right.  So then you get indicted, you get

5 arrested in June of 2015, right?

6 A. Yes, sir.

7 Q. You make a bond, right?

8 A. I make a what?

9 Q. A bond, a bond.

10 A. Yes.

11 Q. You made bond and got out of jail?

12 A. Yes.

13 Q. You did that as quickly as you could, I -- I

14 would imagine, right?

15 A. Yes.

16 Q. Because you didn't like jail, right?

17 A. It was an unsecured bond.

18 Q. I'm not asking you that.  You didn't like jail,

19 right?

20 A. No.

21 Q. Who likes jail?  It's a lot nicer being out here

22 in the free world than sitting in a ten by ten cell with

23 a toilet and a bunk bed, right?

24 A. Right.

25 Q. A lot nicer, right?

1      A.   Right.

2      Q.   You made bond and high-tailed it out of there;

3  didn't you?

4      A.   I wouldn't refer to it as high-tailing it out --

5  high-tailing it out of there, but yes.

6      Q.   All right.  So you got of bond -- you got out on

7  bond.  And that was in mid June, right?

8      A.   Yes, sir.

9      Q.   And then as early as July 3rd, you're already

10  doing another fraud scheme, right?

11      A.   Yes, sir.

12      Q.   All right.  And in that scheme, you used the

13  identity of deceased people to submit claims, right?

14      A.   I submitted claims on patients that I had seen

15  through home health.  At that time, I didn't know they

16  were deceased.

17      Q.   Okay.  The -- the fact of the matter is it was a

18  false claim, whether you knew it was -- they were

19  deceased or not?

20      A.   That's correct.  That's correct.

21      Q.   So you sat a day in jail, you get out on bond,

22  and within a week or -- two weeks, maybe a

23  two-and-a-half weeks, you're already committing another

24  crime, right?

25      A.   Yes, sir.

Q.   You don't think that's a big deal?

A.   It -- it was a big deal for me.

Q.   Well, the way you answer that question when I ask you, you just act like it's no big deal, but it's a big deal; isn't it?

A.   It is a big deal.  I mean don't -- don't confuse my calm demeanor with -- with -- don't imply that it's not a big deal because it is.

Q.   All right.  Well, that calm demeanor has made you a lot of fraudulent money; hasn't it?

A.   Yes.

Q.   Because that calm demeanor can be a very attractive if you're a doctor giving people advice, right?  I mean, it's a trust demeanor, correct, wouldn't you say?  You've learned that trust demeanor; haven't you?

A.   I -- I didn't learn it, that's -- it's my character since I was --

Q.   All right.

A.   -- young.

Q.   Fair enough.  But like I said earlier, you've learned to hide behind that trust demeanor; haven't you?  True?

A.   Before 2015, yes.

Q.   And you've used it to your benefit, right?

1    A.   Before, yes.

2    Q.   So you started committing another fraud, making

3  money off the federal government, and that was in -- as

4  early as July 3rd for the next few weeks you were doing

5  this scheme, correct?

6    A.   Yes.

7    Q.   Okay.  And then you get arrested in August for

8  that charge?

9    A.   Yes, sir.

10   Q.   Right?  And you get put back in jail?

11   A.   That's correct.

12   Q.   And you didn't like that, right?

13   A.   No, sir.

14   Q.   Okay.  And you didn't make -- they didn't you a

15  bond because as a condition of that first bond you were

16  supposed to not commit any more crimes, right?

17   A.   That's correct.

18   Q.   That was a condition and you violated that

19  condition, you commit -- you continued committing crime,

20  right?

21   A.   That's correct.

22   Q.   So then you're sitting in jail, and at some point

23  you understood that the only way you're going to get out

24  of jail is to do a guilty plea and start cooperating

25  with the Government, right?  Right?

1      A.   Right.

2      Q.   You learned that I'm -- either through somebody

3   in jail, or through your own attorney at that time,

4   right, you -- you could do that, that's a way to get

5   out, right?

6      A.   Well, during my time in jail, I came to terms

7   of -- with everything that I had done, fraudulent --

8   fraudulently.

9           MR. BANKER:   Judge, I'd object to

10   nonresponsive, I asked him a yes or no question.

11           THE COURT:   Overruled, you asked him whether

12   that was right.   Answer if you can.

13           THE WITNESS:   Can you rephrase the question?

14      Q.   (By Mr. Banker)   You stated and you said yes to

15   my earlier question, which was while in jail you came to

16   realize that the only way to get out of there was to --

17   to do a plea deal and start cooperating with the

18   Government, right?   You -- you understood that?   Yes or

19   no?

20      A.   Yes.

21      Q.   So then that's what -- exactly what happened when

22   you entered a plea deal, we already saw in Government

23   Exhibit that you entered a plea back in -- in November

24   of -- of 2015 -- wait a minute, you -- 2015, right?   You

25   got out in November 2015, correct?

1    A.   Yes.  Yes.

2    Q.   And as a result of you saying guilty, you get a

3  new bond and you get out, right?

4    A.   Correct.

5    Q.   And then you start talking to the Government?

6    A.   Correct.

7    Q.   Had you already talked to any Government agents

8  while you were in jail?

9    A.   No.

10    Q.   Okay.  So then you start talking to Government

11  agents, right?  You set up meetings, right?  Your

12  attorney sets up meetings?

13    A.   Correct.

14    Q.   And in those meetings, you start talking about

15  some information that you had on Rodney Mesquias,

16  correct?

17    A.   (No response.)

18    Q.   Yes or no?

19    A.   Yes.

20    Q.   And had your attorney mentioned to you before

21  that they wanted information on Rodney Mesquias?

22         MR. LOWELL:  Objection as to any

23  conversations between Mr. Carrillo and his attorney.

24         MR. BANKER:  Fair enough.

25         THE COURT:  That's sustained.  Rephrase the

1  question.

2    Q.  (By Mr. Banker)  You had information prior to

3  going into those meetings that they were -- the federal

4  government was interested in information about Rodney

5  Mesquias, right?

6    A.  No.

7    Q.  Okay.  So the first time you found out about that

8  was in the meeting?

9    A.  No.

10   Q.  When did you find out about that?

11   A.  When I first met with the Government, I -- I told

12  the Government everything that I -- that I came clean, I

13  told the Government everything I was involved in, and

14  that included Merida -- Rodney Mesquias and Merida, but

15  they never brought it up to me.

16   Q.  But you understood that by telling the Government

17  things about other people that would somehow benefit

18  you, right?

19   A.  Yes, I understood that.

20   Q.  In fact, in one of your debriefings, you make a

21  laundry list, almost looked like it was something taken

22  out of a yellow page add.  You make a laundry list of

23  people and -- and home health agencies that you say you

24  know information about, right; do you remember that?

25   A.  Yes.

1       Q.   Southern Valley Home Health, Ruben Alfaro, MCCI,

2   Hospitalist, San Antonio, Alamo Osteopathic San Antonio,

3   Henry Hernandez, Orozco Home Health, Comfort Home

4   Health, Baptist Home Health, Corazon Home Health --

5              MR. LOWELL:   Objection, Your Honor, as to

6   the reading of the statement into the record.  It's not

7   the witness's statement.

8              MR. BANKER:   Okay, I have no problem.

9       Q.   (By Mr. Banker)  Do you recall all those --

10      A.   Yes, I do.

11      Q.   Do you recall the people that you -- you

12  talked -- you gave them -- said this is -- you have

13  information on?  Do you remember that?

14      A.   I remember, yes.

15      Q.   It was a whole long list of those people, right?

16      A.   Yes.

17      Q.   And you knew that at this point the only way to

18  save your skin was to somehow come up with something

19  that would implicate somebody else, right?

20      A.   No, not entirely.

21      Q.   So you -- they -- you -- you had like four

22  debriefings over a period of a year-and-a-half; is that

23  fair to say?

24      A.   I believe so.

25      Q.   Okay.  And you -- do you know how long those

1    debriefings were?

2        A.   Each de -- each debriefing usually was a couple

3    of hours.

4        Q.   Okay.  And -- and you -- you tried to remember as

5    much as you could about your involvement with

6    Mr. Mesquias and -- and Bee Caring and Merida, right?

7        A.   That's correct.

8        Q.   Now, interestingly enough, the very first

9    question that the Government asked you when you started

10   testifying here about that relationship, you stated that

11   immediately, it sounded like to me, and correct me if

12   I'm wrong, that you were presented with 30 miles, is

13   that what you said, 30 patients or how -- what was that?

14       A.   A list of 30 patients to visit.

15       Q.   Okay.  Right.  And -- and when was that, when did

16   that happen?

17       A.   So I met with Mr. Mesquias at an Olive Garden

18   around February 2014, and I met him again, I met

19   Mr. McInnis and Joe Garza that same week and I started

20   seeing patients right away.

21       Q.   Okay.  So you met Mr. Mesquias and you talked --

22   you and him conversed about you being the medical

23   director, right?

24       A.   Yes.

25       Q.   Okay.  And of course being a medical director,

1   you had -- you knew what that involved, right?

2       A.   Yes.

3       Q.   A medical director for hospice -- a home health

4   or hospice, I'm sorry, not home health but hospice,

5   right?

6       A.   Right.

7       Q.   And you knew what the duties of a medical

8   director were, right?

9       A.   Not -- not -- no, I didn't, not for hospice I've

10  never worked for hospice before.

11      Q.   So you had to learn what that was, right?

12      A.   Yes.

13      Q.   And so then you -- after you met with

14  Mr. Mesquias at the restaurant, you -- then you say you

15  met with Mr. Garza and Mr. McInnis?

16      A.   At the Harlingen office, yes.

17      Q.   And how soon after that -- how soon after the

18  restaurant meeting did you do that?

19      A.   Within a -- less than a week.

20      Q.   Okay.  And so at -- at that point, you're saying

21  that you were handed a list of 30 people?

22      A.   Correct.

23      Q.   Who handed you that list?

24      A.   We were in Henry -- I'm sorry, we were in Rodney

25  Mesquias' office and Joe Garza was there and Mr. McInnis

1    were there and Joe Garza handed me a list.

2       Q.   Okay.  And then you -- you say that after you

3    took the list you went and started doing your work?

4       A.   I started visiting the patients at home.

5       Q.   Right.  And so then how long did that take for

6    you to visit those folks?

7       A.   It took about three days or so.

8       Q.   Okay.  And then you say after those three days or

9    so you came back to the office?

10      A.   Yes.

11      Q.   Okay.  And -- and where -- where was that?

12      A.   The office in Harlingen.

13      Q.   Okay.  And who was at the office in Harlingen

14   when you came back with those --

15      A.   It was Rodney Mesquias and Mr. Joe Garza.

16      Q.   Okay.  And so you made it sound like that was

17   kind of a big event for you when you say they started

18   evaluating your work, right?

19      A.   Well, I turned in -- when I went to see the

20   patients, I completed -- I did a thorough physical exam,

21   thorough assessment and plan.  I turned in my findings,

22   my report to Rodney Mesquias and Joe Garza.

23   Immediately, Rodney Mesquias pushed -- pushed back and

24   directed Mr. Garza --

25      Q.   Excuse me, you've already testified about that,

1    that's not answering my question.

2         You said -- I asked you that was kind of a -- you

3    made it sound like when you testified on direct that

4    that was kind of an important event for you, or you

5    began to realize, oh my God, what am I getting into,

6    right?  Fair enough?

7       A.   No.  Can I explain?

8       Q.   So you -- it wasn't a big event; is that what

9    you're saying?

10      A.   It was a big event.

11      Q.   It was?

12      A.   But not like you're --

13      Q.   Okay.

14      A.   Saying it.

15      Q.   All right.  But let me go back.  It was a big

16   event for you?

17      A.   Yes.

18      Q.   Let's start there?

19      A.   Yeah, it was.

20      Q.   Okay.  Would it surprise you to know that you

21   don't talk about that in any of these debriefings?  You

22   don't talk about that event where you came back with

23   these files and you showed them the files and -- and

24   they're telling you, oh this isn't -- this isn't -- this

25   isn't work.  You didn't say that in here; did you,

1   right?

2     A.  I don't -- I don't recall what I said.

3     Q.  Okay.  Okay.  Did you review these reports before

4   your testimony here today?

5     A.  Not those reports, no.

6     Q.  Okay.  What did you review?

7     A.  We reviewed the -- the files that were shown

8   today.

9     Q.  Okay.  All right.  Would it help you to refresh

10   your memory if I showed you these reports or -- or not?

11     A.  No, my memory is very clear today.

12     Q.  Okay.  So to answer my question, then, if your

13   memory is clear, in those doc -- in those reports, in

14   none of those four meetings did you talk about that

15   event of doing your work and coming back and showing

16   them your results, right?  You didn't put that in your

17   report?

18              MR. LOWELL:  Objection, asked and answered.

19              THE COURT:  Sustained.  Rephrase the

20   question.

21     Q.  (By Mr. Banker)  Do you remember it or not?

22     A.  Not -- in those initial debriefings, I don't

23   remember.

24     Q.  Okay.  All right.  So is it fair to say I could

25   say that you didn't do -- you didn't say that, right?

1        A.   Right.

2        Q.   Right?   That's what -- that's where you're

3    heading here, right?

4               MR. LOWELL:   Objection, Your Honor, asked

5    and answered.

6               MR. BANKER:   Okay.

7               THE COURT:   That's been asked and answered.

8    Move -- move on, Mr. Banker.

9        Q.   (By Mr. Banker)   Okay.   Now, that agreement that

10   you made with the Government to cooperate not only

11   helped you get out on bond so you wouldn't be sitting in

12   jail waiting to get sentenced, because you're not in

13   jail; are you?

14       A.   No, sir.

15       Q.   You've been out now for almost four years?

16       A.   Yes, sir.

17       Q.   You've been out being able to go out to dinner

18   with your wife, right?

19       A.   Yes, sir.

20       Q.   You've been out being able to take a little

21   vacation if you need to, right?

22       A.   No, I haven't taken vacation.

23       Q.   But you have that option if you wanted to, right?

24       A.   No.

25       Q.   Okay.   Oh, because you're on pretrial services,

1    right, so they say you can't do that?

2         A.  No, because I work 84 hours a week in

3    construction and I don't have the time.

4         Q.  Okay.  So the -- the fact is, and where I'm

5    heading is you've been able to live a pretty normal

6    life, right, since you've been out for these last four

7    years, correct?

8         A.  Correct.

9         Q.  You don't have the license anymore to hide

10   behind, nobody can call you Dr. Carrillo anymore, right?

11        A.  I'm still -- I still have my medical degree, I

12   don't have a license to practice medicine.

13        Q.  Right.  That's what I'm saying, you don't have

14   the license to practice medicine, you have a degree?

15        A.  Right.

16        Q.  You can't change that.  But your license has been

17   revoked, right?

18        A.  Correct.

19        Q.  You can't practice medicine here in the State of

20   Texas or anywhere else, right?

21        A.  Correct.

22        Q.  So you've been able to live a pretty normal life

23   out there, not in custody.  So you've been benefited

24   that way, right?

25        A.  I'm sorry, I didn't hear you.

1    Q.   You've been benefited that way, you haven't been

2    able -- you haven't been sitting in jail for the last

3    four years right?

4    A.   That's correct.

5    Q.   And basically you're waiting for this trial to

6    get over with so the Government can reward you at

7    sentencing, right, for telling their version of events

8    before this jury, fair to say?

9    A.   No, the Government hasn't promised me anything.

10   Q.   Okay.  But you -- you do understand that you have

11   an understanding as a Defendant who's been charged and

12   plead guilty awaiting sentencing that you can be

13   benefited for your testimony, I think you already told

14   us that earlier, right?

15   A.   That's correct.

16   Q.   And the benefit is not only you're out on jail --

17   you're out now, but you could get a significantly

18   reduced sentence, right?

19   A.   It's only if I say the truth.

20   Q.   Well, at least the Government's version of the

21   truth, right?

22   A.   No, my truth.

23   Q.   Okay.  So -- and you know, that's called --

24   you've heard the term 5K1 motion, you've heard that?

25   A.   Yes.

1    Q.   So you know what a 5K1 motion is, right?

2    A.   That's the proffer agreement.

3    Q.   That's the motion the Government files to reduce

4    your sentence?

5    A.   Okay.

6    Q.   At sentencing.

7    A.   Okay.

8    Q.   That you've been waiting for four years, right?

9    A.   Right.

10   Q.   Now, during your tenure at Merida, you were paid

11   via check not cash, $4,000 a month for being a medical

12   director, right?

13   A.   Yes, sir.

14   Q.   Okay.  And that was paid to you every month with

15   a check signed by Rodney Mesquias, right?

16   A.   Right.

17   Q.   Okay.  And that was just for being the medical

18   director, right?

19   A.   Yes.

20   Q.   Now, you also had agreement -- an agreement to

21   get an additional $200 by doing the face-to-faces,

22   right?

23   A.   By certifying -- falsely certifying patients.

24   Q.   Well, you say certifying, but you were shown

25   documents by the Government that were -- were documents

1   that you document when you do a face-to-face, right?

2       A.   They're -- they are documents, but they're mainly

3   fill in the blank forms.

4       Q.   I'm not -- I'm not asking you that.  I'm asking

5   you the documents that they showed -- that they put on

6   the screen, those are the documents that you fill out

7   when you do the face-to-faces, right?

8       A.   Yes, it is.

9       Q.   Did you do face-to-faces?

10      A.   Yes.

11      Q.   Okay.  And your agreement with Mr. Mesquias was

12  that he would pay you $200 for every one of those

13  face-to-faces, right?

14      A.   That's correct.

15      Q.   And those were professional services that you --

16  you provided, that you -- your license and your back --

17  your degree, you -- you got paid for that service,

18  right?

19      A.   I got paid for signing those certification forms,

20  but I -- I didn't provide my medical opinion at all.

21      Q.   Okay.  Well, you know what, that's something that

22  the jury's going to have to decide, right, because they

23  have to decide, like I said earlier whether you're

24  telling the truth about that, right?

25      A.   Yes, sir.

1    Q.   Correct?

2    A.   Yes.

3    Q.   So also as a part of your duties, besides being

4    paid for those professional services, you would -- you

5    would go to these IDG meetings, correct?

6    A.   Yes.

7    Q.   And that was done quite often.   How -- how often

8    would you go to those meetings?

9    A.   Once a month.

10   Q.   Okay.   And at those meetings, that's where the

11   LVN's and the RN's and the social workers and the

12   chaplain, you all -- you all got together and you're

13   talking about patients, right?

14   A.   Yes.

15   Q.   And you're taking the documents that were

16   generated from the plan of care and determining whether

17   that person should be re -- recertified or not, right?

18   A.   No.

19   Q.   Okay.   What would you do at those meetings?

20   A.   We would discuss patients -- specific problems

21   with patients such as controlled blood pressure,

22   uncontrolled pain.

23   Q.   Okay.

24   A.   The patients were already certified so during

25   the -- that meeting, there were no certifications, it

1   was just a continuation of plans of care and management

2   on patients.

3       Q.   Right, okay.  So those are people that are

4   already certified, you were just reviewing to determine

5   whether the plan of care should be maintained or not,

6   right?

7       A.   Yes.

8       Q.   Is that right?  Okay.  Excuse me for that.  And

9   how long would those meetings last normally?

10      A.   Varied, on average an hour-and-a-half or so.

11      Q.   Okay.  And you were faithful in attending those

12  meetings?

13      A.   Yes, I was.

14      Q.   And there was open discussion about the patient

15  at those meetings?

16      A.   Excuse me, yes.

17      Q.   They were review of -- of documentation that was

18  done during the course of that plan of care?

19      A.   No, usually the nurse -- the chaplain would -- if

20  anyone had anything to say about the patient's status,

21  they would say it.

22      Q.   So it could vary is what you're saying?

23      A.   It varied a lot.

24      Q.   Okay.  Fair enough.  But that meeting lasted an

25  hour -- at least an hour and a half, maybe more, right?

1    A.   Right.

2    Q.   That took a lot of your time, right?

3    A.   Once a month.

4    Q.   And you would issue orders as a result of that --

5    that -- those discussions?

6    A.   Yes.

7    Q.   Now, you were aware, sir, were you not, that

8    there were other medical directors associated with Bee

9    Caring?

10   A.   Yes.

11   Q.   Back then, they had a Dr. Marin, right?

12   A.   I don't recall Dr. Marin.

13   Q.   If you recall.  A Dr. Pelly?

14   A.   Yes, I -- I recall Dr. Pelly.

15   Q.   Dr. Shekar?

16   A.   I don't recall that name.

17   Q.   Do you remember meeting other doctors that were

18   also medical directors?

19   A.   The only doctor I met was Dr. Pelly.

20   Q.   Okay.

21   A.   And I had dinner with a Dr. Posada once.

22   Q.   Dr. Posada, okay.  And he was also one of the

23   medical directors?

24   A.   Yes, he was.

25   Q.   Now, as a result of what you say to the jury, you

1    uncovered through your association with Merida -- did

2    you ever consult with any of your colleagues about that?

3         A.   About what?

4         Q.   About this so-called fraud that you were involved

5    with?  Did you ever go talk to anybody about it?

6         A.   No.

7         Q.   Another colleague?

8         A.   No.

9         Q.   No?  Just kept it to yourself?

10        A.   I didn't talk about it with anyone else.

11        Q.   Did you -- did you think about maybe asking

12   Dr. Pelly or Dr. Posada about this?

13        A.   I didn't ask anyone.

14        Q.   What's going on?  Hey, this doesn't seem right.

15   I need to talk to my -- a colleague, a trusted person in

16   my field, you didn't do that?

17        A.   I didn't feel the need to.

18        Q.   You didn't feel a need to?

19        A.   Right, because in the beginning, I was -- when I

20   turned in these forms, they were sent back to me and

21   I -- I was told from the beginning by Mr. Mesquias and

22   Joe Garza how these forms needed to be filled out.

23        Q.   Okay.  Fair enough.  Okay.  But you -- you -- you

24   thought -- I mean, you've told the jury here that at the

25   very beginning you -- you -- you -- you thought this was

1    fraud, this was wrong, right?

2        A.   Yes.

3        Q.   Okay.   So I guess you answered my question.

4    You -- you didn't go consult somebody else, you didn't

5    ask Dr. Pelly about it, you just -- you just said, hey,

6    these guys are right about this, is that -- is that what

7    you said to yourself?

8        A.   I didn't think -- I didn't think that, I didn't

9    think they were right about this, I just knew that if I

10   didn't do as I was told I wouldn't get paid and I needed

11   the money.   As you said I had a lot of debts, I needed

12   the money and so I continued.

13       Q.   Alrighty.   So you -- besides the monthly check

14   that you got for being a medical director, you got these

15   other checks for being -- for doing face-to-faces,

16   right?

17       A.   Yes.

18            MR. BANKER:   May I have a moment,

19   Your Honor?

20            THE COURT:   Yes.

21            MR. BANKER:   Judge, may I have just -- I'm

22   looking -- oh, here they are.

23       Q.   (By Mr. Banker)   So, Roy, if you could pull up

24   000001994.   Okay.

25            Now, on this exhibit the Government showed you

1    the same Exhibit which was a check.  This is the -- the

2    check on -- on May 1st for $2,000.  Have you ever

3    seen -- remember seeing that by the Government?

4        A.  Can you repeat the question?

5        Q.  This is a check stub or receipt that the Mesquias

6    business had that was from that check that the

7    Government showed you in their exhibit, right?

8        A.  Yes.

9        Q.  And if you look at the second page, there's a

10   list of -- that a document that was generated back then

11   by the Mesquias Merida Company that states:  Here is the

12   list of face-to-face, F2F, completed and verified that

13   Dr. Carrillo did last week.  You see that?

14       A.  Yes.

15       Q.  And then this third page, again, this is Laredo

16   face-to-faces that you did in April 2015, right, that

17   you turned in, correct?

18       A.  Yes.

19       Q.  And that's what you would do, right, you would

20   doc -- you would -- you would turn in to them the

21   face-to-faces that you did?

22       A.  That's correct.

23       Q.  Right?  And -- and so then they would document

24   that, correct, obviously?  That's a documentation,

25   right?

1     A.   That's correct.

2     Q.   Once it's verified that it was done, that you did

3     those, then you could get a check just like on this one,

4     right?

5     A.   That's correct.

6     Q.   Okay.  And then the Government also showed you,

7     and this would be Defendant's Exhibit 22, and this is

8     the check that you talked about that was -- you stated

9     that was money that was kind of funneled to you, hidden

10    money that was being used for your Mission office,

11    right?

12    A.   That's correct.

13    Q.   Okay.  And so if you could then go to the second.

14    Again, here's documentation that the Mesquias Merida

15    Company, part of their records that have been admitted

16    here in evidence, uncontested by the Government, that

17    shows verification of face-to-faces that you conducted.

18    It says face-to-face tracking, Dr. Carrillo, right?

19    A.   Yes.

20    Q.   And that's supporting the -- the support

21    documents to justify that check, right?

22    A.   No.

23    Q.   Okay.  So you're sticking with the story, I take

24    it, that -- that that money -- this check was for

25    something else; is that it?

1      A.   That's correct.

2      Q.   And that this documentation isn't accurate,

3  right?

4      A.   That would be correct.

5      Q.   Is that what you're wanting to tell the jury

6  here?

7      A.   That is correct.

8      Q.   Okay.  Well, you know, you -- you did state, I

9  believe, that when you -- in your direct testimony that

10 they -- they -- that he funneled 50, 60, how many

11 thousands of dollars to you for that office?  Right?  Is

12 that right?

13     A.   Yes.

14     Q.   Was it -- was it that much, or more, or how much

15 was it?

16     A.   It was more than 50,000, I'm not exactly sure on

17 the number.

18     Q.   Okay.  And this doesn't look like anything close

19 to 50,000; does it?

20     A.   No, sir, that was just one of the checks, there

21 were a number of checks.

22     Q.   Well, you know, the Government has had access,

23 complete access to his bank accounts, Mesquias' bank

24 accounts.  You -- you knew -- you must know that, right?

25     A.   Yes.

1    Q.   Right?  And they brought to you in evidence one

2  check that you can say, oh, oh, I know that -- that had

3  to be part of that 50, 60,000, right?  They haven't

4  brought you anything else, right?  They haven't showed

5  you anything else; have they?

6    A.   No, that was the only check.

7    Q.   Okay.  Your -- your point, I believe was, oh,

8  gosh, I mean, just because they -- they someone --

9  someone didn't put the number of face-to-faces, that it

10  must -- that's -- that's somehow proof, that's what you

11  want the jury to believe, right?

12   A.   What I want the jury to --

13   Q.   Yes or no?

14   A.   -- to believe.

15   Q.   Yes or no?

16   A.   No.

17   Q.   Okay.

18        THE COURT:  Mr. Banker be careful because

19  when you get in between the mike's I'm not hearing

20  everything.

21        MR. BANKER:  Okay.

22   Q.   (By Mr. Banker)  Did the Government show you when

23  they showed you those checks, did they show you Defense

24  Exhibit Number 22 that we have -- we had up there that

25  showed the documentation that supported that check, did

1    they show you that?

2        A.   No.

3        Q.   Okay.   Roy, could you pull up Exhibit 26.

4    Exhibit 26, take a look at that, Mr. Carrillo.

5             And those say San Antonio face-to-faces, right?

6        A.   Yes.

7        Q.   And that's your signature down there?

8        A.   Yes.

9        Q.   And you submitted that to Merida, or how did --

10   how did this document come about?

11       A.   Mr. Joe Garza, or one of the nurses would provide

12   me a -- this list of face -- of patients to see.

13       Q.   Okay.

14       A.   There were 33 patients, and I signed that I

15   received that list on the 20th of March.

16       Q.   Okay.   Let's pull up Exhibit Number 29.

17            This exhibit also indicates that you did some

18   face-to-faces as early as February 2014, and this had to

19   do with an invoice that you gave them in January, right?

20   Right?

21       A.   Yes, that's what it says.

22       Q.   And then the -- the nurse says, I reviewed these

23   face-to-faces and made sure the dates and documentations

24   were accurate.   All three face-to-faces meet hospice

25   criteria guidelines for face-to-face.   Okay.   Exhibit

1    Number 28.  Again, there is a -- some documentation that

2    face-to-face were completed and turned in, and this

3    document says they hadn't been paid for yet, right?

4         A.   Yes, that's what it says.

5         Q.   It has your name along with Dr. Posada as seeing

6    a few of these, correct?

7         A.   Yes.

8         Q.   Okay.  Exhibit 24.  On this one, this was a

9    letter that you sent Merida informing them of your

10   relocation to Dilley, Texas.  You state that my

11   employment commences Monday, October 6th.  What -- what

12   was that about?

13        A.   Yes, I -- I went to help out at a clinic in

14   Dilley, Texas as for a couple of weeks.

15        Q.   A what?

16        A.   I went to a clinic to help that clinic in Dilley,

17   Texas for -- for about two weeks.

18        Q.   And -- and whose clinic was that?

19        A.   That clinic was owned by -- by Nicks Hospital.

20        Q.   By what?

21        A.   The Nicks Hospital out of San Antonio.

22        Q.   Did you do that as a favor to them, or what did

23   you do there?

24        A.   No, it was just a temporary job that I had.

25        Q.   You did state that I will continue my obligations

1   as medical director, I will continue performing

2   face-to-face encounters on a weekly basis, and I will

3   have the IDG meetings via phone conference every two

4   weeks.

5          This relocation will place me closer distance to

6   both San Antonio and Laredo.  I will overnight express

7   mail face-to-face encounters and list patients to be

8   seen can be e-mailed to me, right?  And that's your

9   signature down there, right?

10   A.  Yes, it is.

11   Q.  So you were doing face-to-faces, right, and you

12   were getting paid for them, right?

13   A.  I was getting paid for certifying patients for

14   hospice.

15          THE COURT:  And Mr. Banker, the first

16   one-hour session has concluded.

17          MR. CYGANIEWICZ:  Judge, I'm sorry, how much

18   time is each defense lawyer allocated?

19          THE COURT:  A grand total of three hours.

20   Q.  (By Mr. Banker)  I'm going to talk to you a

21   little bit now about -- Mr. Carrillo, about whether you

22   know some information about hospice and -- and kind of

23   the history of hospice here in the United States, okay?

24   You've been licensed for how long, or you were licensed

25   since when?

1      A.   For about 15 years.

2      Q.   Okay.  Did you -- did you know that back in the

3    late 90s and 2000s, or prior to that time, hospice was

4    kind of a one-time shot where if a person was certified

5    as terminally ill, after 110 days if they remained --

6            MR. LOWELL:  Objection, Your Honor, as to

7    anything outside the scope of this indictment, he's

8    talking about the 1990s.

9            MR. BANKER:  Well, Judge, I'm getting to

10   something here, I'm getting to -- to find out -- I'm

11   just giving him a little background here and what

12   came -- what came next, which is what we're dealing with

13   here today.  I'm giving him a background about hospice

14   in the past and what hospice is now.

15           MR. LOWELL:  We need a question.

16           MR. BANKER:  It's very relevant.

17           Okay, I'll ask a question.

18           THE COURT:  Let me hear the question.

19     Q.   (By Mr. Banker)  Did you know that about hospice?

20     A.   From the 1990s, no.

21     Q.   Before this new program came in?

22     A.   I'm not familiar with the history of hospice.

23     Q.   And that after 110 days they -- they -- if they

24   survived after that --

25           THE COURT:  Mr. Banker, he's already said

1    he's not familiar with those issues.

2    Q.  (By Mr. Banker)  So the law changed, did you know

3    that?

4    A.  No, sir.

5    Q.  The law now states that you can now go beyond

6    that period of time, okay, if you're certified to be

7    terminally ill, okay, up to 180 days now, which is the

8    six-month certification, right?  You understand that?

9    A.  I understand that.

10   Q.  And now as long as -- as long as it's documented,

11   you can be recertified, right?  You understand that?

12   A.  I think the key word is terminally ill.

13   Q.  Right.  Terminally ill with a life expectancy if

14   the illness runs its course six months, okay?

15        But we all know that the illness doesn't always

16   run its course that quickly, certain illnesses don't run

17   that fast, right?  Correct?

18   A.  That's correct.

19   Q.  Okay.  So our Government in their compassion they

20   said, well, let's -- let's keep people on that if they

21   qualify as a result of trying to give the people the

22   quality of life, right?  Not just terminate them after

23   100 -- 110 days if they are still living but continue,

24   give them the quality of life.  Because of some of these

25   illnesses don't do it in the six months, right?  You

1   understand that?

2       A.   I understand that.

3       Q.   Okay.  And there has to be documentation in order

4   to qualify.  And there's certain illnesses that qualify

5   and don't qualify, right?  And even in the Government's

6   own --

7               THE COURT:  Is there a question there?

8               MR. BANKER:  I said right; I think he nodded

9   his head.

10               THE COURT:  All right.  Sir, you need to

11   answer out loud.  I didn't hear the question or answer.

12   Sir, go ahead and answer the question if you know.

13               THE WITNESS:  I agree.

14       Q.  (By Mr. Banker)  He agreed.  Roy, if you could

15   pull up -- so this document, it may have been one of the

16   documents, I'm not sure that the Government showed you,

17   but this was Francisca Perez.  She was one of the -- one

18   of the -- in Count Three of the indictment, and I just

19   wanted to point out in this document that if you look at

20   certification period, okay, if you could highlight that

21   part, certification period check one.

22        I mean, the Government's own documents are

23   acknowledging that people with terminal illness, the

24   illness might not run the course that maybe it -- a

25   doctor may think it would.

1          So there's additional certification periods,
2     right?  You know that, you've dealt -- you've dealt with
3     these documents before, right?  So you get a third, you
4     got a fourth, you got a fifth, you got another and
5     that and just the third, fourth and fifth can take a
6     person maybe over a year, right?  Correct?
7        A.   I can't answer your question with just a yes or
8     no answer.  Can I expand my answer?
9        Q.   So you disagree with that?
10       A.   Yes.
11       Q.   And what do you disagree with?
12       A.   I really can't comment on -- on the voracity of
13    these medical records because I've already -- I have
14    already admitted to falsifying medical records.
15       Q.   Wait a minute.  Wait a minute.  Wait a minute.
16    I'm not talking to you about this particular individual
17    right now, I'm talking to you about the certification or
18    the face-to-face document itself that the Government
19    puts in and allows the doctor to extend the
20    certification periods, right?
21         The first two are the 180, 90 and 90, right?  The
22    third is 60, the fourth is 60, the fifth is 60 and these
23    can then -- this is indicative of a doctor being able to
24    monitor a patient to see how they're progressing and
25    whether they should remain on hospice or not, right?

 1    Correct?

 2        A.   If the patient is actually terminally ill, I

 3    agree.

 4        Q.   I got you.  And that's what the certification is

 5    about to determine that, correct?

 6        A.   Yes.

 7        Q.   Okay.  But my point is this new way of doing

 8    hospice that the Government instituted out of compassion

 9    and care for an individual who may not die within that

10    110 days, that that illness may draw out, and as long as

11    there's documentation that says, yes, there's -- there's

12    a possibility or good possibility they're going to die

13    in 180 days you can get recertified, right?

14              MR. LOWELL:  Objection, Your Honor,

15    Mr. Bankers is giving a speech.

16              MR. BANKER:  Yes or no?

17              THE COURT:  At -- overruled.  I'll allow the

18    question.  Answer if you know.

19              THE WITNESS:  Again, if the patient is

20    actually terminally ill, there is legal justification

21    for hospice care.

22        Q.   (By Mr. Banker)  I'm not disputing that point,

23    sir.  I'm just saying the Government has done this

24    program now to allow for that possibility out of

25    compassion and comfort for a dying individual, right?

1    A.  Yes, sir.

2    Q.  Okay.  Now, back to this document here, if you

3  can expand it, Roy.

4        You -- at the very bottom of that document,

5  there's a -- there's an initial -- there's an X with an

6  initial, right?  And is that -- is that the initial of

7  the patient?

8    A.  I don't recall.

9    Q.  Well, let me show you another one.  Let me show

10  you -- on that document, you see a signature at the very

11  bottom there where Teresa Calvillo signed off on that?

12    A.  Yes, that's my signature.

13    Q.  That's your signature, or is that her signature?

14    A.  The one on top is my signature.

15    Q.  Okay, but the one on the bottom, that's her

16  signature, right?

17    A.  Yes.

18    Q.  Okay.  And you had her sign the face-to-face?

19    A.  Yes.

20    Q.  Why -- why did you do that?

21    A.  I did that in order to -- in order for Merida to

22  verify that the patient was actually seen.

23    Q.  Was there a concern on Merida's part that you

24  weren't seeing patients?

25    A.  Well, I mentioned earlier that during my trip to

1    Corpus I didn't see -- actually see a few patients under

2    Mr. McInnis' direction and -- so I continued that

3    practice afterwards on -- on a number of patients.  I

4    didn't -- I didn't -- I spoke to the patients on phone,

5    I didn't actually see them.  Shortly thereafter, Mr. Joe

6    Garza and Rodney Mesquias, we -- we I agreed that I -- I

7    should continue seeing the patient, so -- so we -- so I

8    started having the patient sign the face-to-face.

9        Q.   Okay.  Now, let me -- let me switch gears real

10   quick.

11           So that -- that's indicative of the fact that you

12   were -- you were doing face-to-faces, right?

13       A.   Yes, sir.

14       Q.   You haven't denied that, you were doing

15   face-to-faces and you were getting paid to do

16   face-to-faces, right?

17       A.   Yes.

18       Q.   Now, I want to have you look at -- you had

19   stated -- bates number 00241802.

20           You had testified on direct about Francisca

21   Perez, and so you had indicated to the jury that the

22   document that was shown to you by the Government was a

23   fraudulent document, right?

24       A.   That's correct.

25       Q.   Okay.  And then this document is a document

1  generated after that so-called false cert --

2  face-to-face certification, right?  2015, April 2015?

3      And in that documents this nurse states, this is

4  on Francisca Perez, patient recertification assessment,

5  completed in determining patient continues to meet the

6  hospice criteria, continues slow, cognitive and

7  functional decline in condition.  Respiratory failure.

8  Continues with the notable shortness of breath at rest.

9  Scant Sputum voluntarily expelled by patient.  Thin

10  clear secretions.  Nebulizer treatments.  Six hours

11  facility with assist five/five ADLs and IADL's,

12  dependent on repositioning.  Patient is urinary and

13  fecal incontinent.  No consistent meaningful words or

14  the ability to speak is limited to a few intelligible

15  words.  Patient food intake is 50 percent of medium

16  sized puréed chicken nectar liquids with poor detention

17  and aspiration precautions.  Peg tube for medication

18  administration.  I mean that sounds like somebody that

19  is pretty much on the decline; wouldn't that be fair to

20  say?

21    A.   I can't comment on the truthfulness of any

22  medical record that you show me because I've already

23  admitted to falsifying medical records just like other

24  medical directors had done before me so I really can't

25  comment on the -- on this medical record.

1    Q.   Well, if you don't know what other medical

2    record -- you have no personal knowledge about what

3    other medical directors have done, right?  You have

4    personal knowledge?

5    A.   I was following their -- their plans of care

6    before me.

7    Q.   Okay.

8    A.   That's what Mr. --

9    Q.   So you saw a medical director falsify a document,

10   did you witness that?

11   A.   Whenever I would --

12   Q.   Answer my question.  Did you witness it or not?

13   Did you witness a medical director working for Merida

14   falsify documents?

15   A.   Not directly.

16   Q.   Okay.  That's all I need to know.

17        Let me -- let's go to the counts in the

18   indictment, Roy.

19        And as you know because by now you're pretty

20   familiar what an indictment is, a federal indictment,

21   right?

22   A.   Yes.

23   Q.   You've had two of them against you?

24   A.   Yes.

25   Q.   Right?  And you know that the federal indictment,

1   or any kind of criminal indictment is outlying what the

2   Government or -- or the State prosecutor is -- has to

3   prove to find somebody guilty.  You know that, right?

4       A.  Yes.

5       Q.  You've probably become a little more familiar

6   with the process lately, right?  Right?

7       A.  Yes, I've already answered.

8       Q.  Because of your experience.  And you know that

9   when the Government makes an accusation there has to be

10  proof to support that accusation, right?  Right?

11      A.  Yes.

12      Q.  And in fact, you probably know from your high

13  school history class that that proof has to be beyond a

14  reasonable doubt.  It's a high standard of proof, right?

15      A.  Yes.

16      Q.  It's the highest standard of proof in the

17  American legal justice system, right?

18      A.  Yes.

19      Q.  Right?  And so when they present an indictment,

20  they're having to tell this jury that we can back that

21  up with proof, not just nice words, or the Government's

22  take on things, or the Government's view of things, or

23  somebody's cheap talk, there's got to be substance,

24  right, you know that, behind an indictment?  There has

25  to be proof that's substantial that's based on fact not

1    someone's opinion, okay?  Right?  You understand that,

2    right?

3        A.   Yes.

4        Q.   Talk is cheap, proof costs something, okay?

5    You -- you agree with that statement; wouldn't you?

6        A.   Yes.

7        Q.   So when we got here, Count Two of the indictment,

8    we have Jack High.

9            Can we put that up there, Roy?

10           The certification of Jack High, certification --

11   if you need a number, I'll give it to you.

12           Jack High, okay?  On the left is a document that

13   tracks the indictment, okay?  And in -- in the

14   indictment, this is -- this is the certification dates

15   that the Government in this indictment is saying was

16   false:  April 14th, 2013, October 12th, 2013.

17           And there you see in that -- that certification

18   document, the certification period matches what's in the

19   indictment.  That's a hospice certification.

20           And if Roy you could down to the bottom of that.

21   You didn't certify that, right?

22       A.   No, sir.

23       Q.   That was Dr. Vincent Gonzaba, correct?

24       A.   Yes.

25       Q.   Now, let's look at count -- Count Three,

1    Francisca Perez.  If you could highlight the

2    certification dates.  The dates for Count Two, excuse me

3    Count Three on Francisca Perez is the date December

4    18th, 2013 to March 17th, 2014.

5         And if you look at the certification on that

6    document, which was a certification by, let's see who

7    that was by, that says Amy Cooley, and then the next

8    page there's a verbal order that's associated with that

9    document.

10        And the verbal order, if you could highlight the

11   verbal order there at the top, the medical director that

12   gave the verbal order.  At the top of that document

13   there.  Oh Fran -- oh, there, yeah, Dr. Pena, okay, is

14   that right?  Dr. Pena's the one, you didn't do that one,

15   right?

16      A.  No.

17      Q.  Okay.  Let's look at Count Four.

18        Count Four is Teresa Calvillo, November 6th, 2013

19   to August 31st, 2014.  And this document, if you go down

20   and look at the next page, medical director who

21   certified this document was Dr. Virlar, it wasn't you;

22   was it?

23      A.  No.

24      Q.  Let's look at Count Five.  And again, I'm -- I'm

25   focusing on what the Government's indictment says and

```
 1    what they have to prove to the jury beyond a reasonable

 2    doubt that fraud occurred.

 3            You're not associated with that -- these -- these

 4    first three; are you, or four, right?  You didn't do

 5    that, correct?

 6       A.   Correct.

 7       Q.   We were looking at number -- we're looking at --

 8    00229973 and 74.  Okay.  If you could highlight the

 9    certification periods and how they match the indictment.

10            Certification period 06/03, 2014 to 08/31, 2014

11    and that matches the indictment brought by the

12    Government to Count Five.  Arcadio Castaneda.

13            And let's look down to see what doctor did this.

14                (Brief pause in proceedings.)

15       Q.   And that's not you either, right?

16       A.   Right.

17       Q.   Let's look at Count Six.  You need a bates number

18    on that one?  00286466.

19            Notice that the cert -- certification periods

20    match, February 10th, 2016, April 9th, 2016, they match

21    the indictment, right?

22       A.   Yes.

23       Q.   And let's see -- and you're not the medical

24    director that signed off on that either, right?  You

25    didn't certify that?
```

1    A.   It's 2016, I was no longer a licensed physician.

2    Q.   Okay.   Count Seven, Joanne Conti.

3         And on Joanne Conti, if you look at the dates on

4    that, that matches 12/23, 2014, 03/22, 2015.   Okay.   And

5    let's see who did that one, not you, right, that's not

6    your signature?

7    A.   Right.

8              MR. BANKER:   Pass the witness.

9              THE COURT:   Mr. Cyganiewicz.

10             MR. CYGANIEWICZ:   Judge, I don't know what

11   you were going to say but, Your Honor, I would -- with

12   no disrespect intended ask if we could break now for the

13   day and let me start tomorrow.

14             THE COURT:   I was going to ask you if you

15   preferred to break or --

16             MR. CYGANIEWICZ:   Yeah, I'm pretty tired and

17   I'm sure everyone is.

18             THE COURT:   That's quite all right.

19             MR. CYGANIEWICZ:   Thank you, Your Honor.

20             THE COURT:   That's what I was going to ask

21   you.   Ladies and gentlemen, and coincidentally the

22   defense at this time has used an hour-and-a-half of its

23   three hours so you still have halfway to go, so let's go

24   ahead and take a break at this time.

25             Ladies and gentlemen, again, same

```
1    instructions, thank you for your patience, thank you for

2    your hard work, do not discuss the case.  Same routine,

3    please before here before 9:00 and we'll try to start as

4    close to 9:00 as possible.

5                 COURT OFFICER:  All rise for the jury.

6                 (JURY OUT.)

7                 THE COURT:  And Mr. Carrillo, you're still

8    under oath, please report again as prompt -- be here

9    before 9:00, I would guesstimate about 8:45 we'll be

10   attempting to start as close to 9:00 as possible, all

11   right?

12                THE WITNESS:  Yes, sir.

13                THE COURT:  And you're excused for the day,

14   sir.

15                MR. TONY CANALES:  Judge, can we -- Tony

16   Canales, can you instruct the witness not to be able to

17   talk to the Government -- he's still under cross.

18                THE COURT:  Sir, do not discuss the case

19   with anyone including the Government.

20                MR. TONY CANALES:  Thank you so much,

21   Your Honor.

22                THE COURT:  Anything else, gentlemen?

23                Have a nice evening.  All right.  All right.

24   Gentlemen, we'll be in recess.  Sheila, let's go off the

25   record.
```

1          COURT REPORTER:   Thank you.

2          (COURT IN RECESS.)

3

4                  REPORTER'S CERTIFICATE

5

6    I certify that the foregoing is a correct transcript

7  from the record of proceedings in the above-entitled

8  matter.

9

10

11      _/s/Sheila E. Perales_____
        SHEILA E. HEINZ-PERALES CSR RPR CRR
12      Exp. Date:  January 31, 2021

13

14

15

16

17

18

19

20

21

22

23

24

25