```
 1                IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
 2                      BROWNSVILLE DIVISION


 3
     UNITED STATES OF AMERICA        )
 4                                   )
                                     )
 5   VS.                             )  CRIMINAL ACTION NO.
                                     )  B-18-CR-8
 6                                   )
     RODNEY MESQUIAS, HENRY          )
 7   MCINNIS AND FRANCISCO PENA      )
                                     )
 8

 9
                            TRIAL - DAY FOUR
10              BEFORE THE HONORABLE ROLANDO OLVERA
                        OCTOBER 25, 2019
11


12


13                    A P P E A R A N C E S

14
      FOR THE UNITED STATES:
15
           MR. KEVIN LOWELL
16         MR. ANDREW SWARTZ
           MR. JACOB FOSTER
17         ASSISTANT UNITED STATES ATTORNEY
           BROWNSVILLE, TEXAS 78520
18

19    FOR THE DEFENDANT RODNEY MESQUIAS:

20         MR. CHARLES BANKER
           ATTORNEY AT LAW
21         118 Pecan Boulevard
           McAllen, Texas 78501
22
           MR. HECTOR CANALES
23         MR. TONY CANALES
           ATTORNEYS AT LAW
24         2601 Morgan Avenue
           Corpus Christi, Texas 78405
25
```

```
 1   FOR THE DEFENDANT HENRY MCINNIS:

 2        MR. ED CYGANIEWICZ
          ATTORNEY AT LAW
 3        1000 E. Madison Street
          Brownsville, Texas 78520
 4
     FOR THE DEFENDANT FRANCISCO PENA:
 5
          MR. ROBERT GUERRA
 6        ATTORNEY AT LAW
          55 Cove Circle
 7        Brownsville, Texas 78521

 8   FOR THE DEFENDANT FRANCISCO PENA:

 9        MS. ADRIANA ARCE-FLORES
          ATTORNEY AT LAW
10        1414 Victoria Street
          Laredo, Texas 780404
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Thank you, everyone.  Please be

2     seated.  Good morning.

3          Yes, Mr. Foster.

4          MR. FOSTER:  Good morning.

5          Your Honor, we have three brief issues to

6     take up, I think they all fall within the same rubric,

7     but we can take them one at a time.

8          Basically, the rubric is that under Rule

9     611, of course as the Court is well aware, although you

10    have given defense counsel three times the amount of

11    time to cross-examine a witness, the Court ultimately

12    has the wide discretion to control the Cross-Examination

13    for the purposes of allowing the jury to get the truth

14    and to avoid the undue consumption of time.

15         The first issue we'd like to bring up is in

16    regards to Rule 602, personal knowledge.  Yesterday we

17    had multiple hours of Cross-Examination about documents

18    that a witness had never seen before and had no personal

19    knowledge of.  And a witness, of course may testify only

20    if evidence is introduced sufficient to support a

21    finding that a witness has personal knowledge of those

22    documents.

23         So we would ask that a tighter leash be kept

24    on that going forward.

25         THE COURT:  Any response?

4

1          MR. HECTOR CANALES:  Yes, I oppose any leash

2   being put on me.  Maybe he likes leashes, I don't, so

3   seriously -- in seriousness, Your Honor, I'm sorry.

4          THE COURT:  I'm sorry, that was --

5          MR. HECTOR CANALES:  That was pretty good,

6   though, right?

7          THE COURT:  That was pretty good.

8          MR. HECTOR CANALES:  Your Honor, when a

9   document is already been put -- pre-admitted in evidence

10  like they have here, a witness can be cross-examined on

11  the subject matter of which they have testified, right?

12  Using any document that is in evidence.

13          These witnesses -- all of the documents that

14  are being admitted here are about patients that their

15  testimony is being painted with a broad brush that

16  they're in respects there's fraud going on at Merida

17  with specific patients, all patients, in generalities

18  and so, Your Honor, what the Cross-Examination is

19  attempting to do is show -- is refute the testimony and

20  the case -- the theory of the case that the Government

21  is -- is putting forth.

22          It's entirely -- entirely proper to ask a --

23  to ask a witness what they think, or isn't this true, do

24  you agree, do you disagree with this, whether they've

25  seen it or not.

```
 1              THE COURT:  Let me interject.  Again,
 2    gentlemen, as you're well aware, in order to attempt --
 3    attempt to be expeditious, the Court pre-admitted
 4    basically everything.  So all of these documents are
 5    admitted into evidence.
 6              If the defense elects to ask a witness about
 7    a document they know nothing about, that's just eating
 8    into their time, so -- but it would be feasibly,
 9    logistically not only difficult, but I don't think
10    feasible to say this is admitted into evidence, but the
11    witness can't testify about an exhibit that's been
12    admitted into evidence.
13              So while I understand your concerns,
14    Mr. Foster, again the key defense is going to be free to
15    ask a witness about any exhibit that's been admitted
16    into evidence.
17              MR. FOSTER:  Would we be permitted to submit
18    a brief on that for your consideration?
19              THE COURT:  Sure.  Sure.
20              MR. FOSTER:  The second issue is that in
21    regard to the forms of the questions yesterday of the
22    current witness by Mr. Banker.  I think there were a
23    couple problems the Government has with them.
24              The first is that many of the questions, a
25    question that ends in a question were preceded by a
```

1    speech.  And under Rule 603 and 103D counsel cannot

2    testimony.

3            Many of those speeches included facts that

4    were not in evidence, such as purported regulation in

5    1999 which he represented repeatedly that existed as a

6    fact and of which there's been no evidence of.

7            So we would ask under Rule 611 that counsel

8    ask questions of the witness and not give speeches.

9            THE COURT:  Mr. Banker was -- this is in

10   reference to Mr. Banker, I would -- I -- I would

11   admonish you to keep your questions more on a question

12   like -- there was some extremely long narratives that

13   basically ended with the word "right", so I -- I'd

14   admonish you to be careful on that issue.

15           MR. BANKER:  No problem, Judge.

16           THE COURT:  All right.  So --

17           MR. FOSTER:  Thank you, Your Honor.  I

18   think --

19           THE COURT:  That will be curtailed.

20           MR. FOSTER:  Thank you.  I think the final

21   issue is recross, Your Honor.

22           The defense is not entitled under the rules

23   to re-cross examination after a redirect has concluded.

24   They're not entitled to an equal amount of time.  The

25   scope of any re-cross, and in my experience re-cross is

1    relatively rare, is usually limited to a new issue that

2    has been brought up on redirect and is relatively brief.

3            I'm not aware of a practice in this

4    district, and certainly hasn't been the practice in --

5    in other courts of allowing the defense to have, as a

6    matter of right, a re-cross which gives them the last

7    word.  And obviously the Government in its, you know,

8    time estimates for this trial and witness availability

9    didn't build in those time periods.

10           And so we just wanted to, one, express our

11   view on that in light of Rule 611(b), and also alert the

12   Court that obviously we're going slower than

13   anticipated.

14           THE COURT:  Well, again, I -- I don't -- I

15   don't recall any instance where re-cross has actually

16   occurred, but in the event -- the Court would allow, to

17   be -- again, if it's very -- when and if a re-cross is

18   requested, it would -- could only be limited in scope to

19   a new issue brought up on redirect.

20           So, yes, I'm not opening the door and it's

21   not the Court's intent nor should it be the defenses'

22   position to -- to re-cross if that situation arises on

23   any prior issues already discussed.  Only -- only new

24   issues.  And I don't think --

25           MR. CYGANIEWICZ:  Judge, I concur with you,

1   I don't think there's been an abuse of that at all in

2   this case.

3           THE COURT:  I don't think -- I don't think

4   that's been an issue.

5           MR. CYGANIEWICZ:  And the prosecution also

6   mentioned something about time and, Judge, nobody here

7   is in a hurry to put these people to -- to justice.  We

8   want to make sure we get a fair -- fair trial, which I

9   believe we're getting, so please I -- I don't want the

10  Court to be concerned about, you know, them saying it's

11  going too slow it's -- I think it's going relatively

12  pretty --

13          THE COURT:  Gentlemen, everybody's been well

14  within the time limits including the Government.  And

15  again, I wanted estimates that, you know, once you give

16  me an estimate, I -- I will -- but in the instance with

17  the witness that the Government requested is going to be

18  lengthier and you give me notice beforehand, again, the

19  Court will modify it; same with defense, if you feel

20  your estimate is too short, well tell me beforehand.

21          So, again, let -- let's proceed

22  logistically, I'm sure we're going to modify certain

23  positions as we go, perhaps the Court will modify

24  practices as we go.

25          I will say I've been concerned about, for

1    example, the using of the agent's records for

2    impeachment where in technically, so far there's been no

3    impeachment and technically obviously the agent's

4    records are not the prior statements of the witness.

5    Although they may contain notes about the witness, so

6    let's -- again, gentlemen, we're going to be here a long

7    time, but let -- let's -- let's -- let's attempt to be

8    as expeditious and efficient as possible and modify our

9    practices if they're incorrect.  So --

10                MR. FOSTER:  Thank you.

11                THE COURT:  Anything else, gentlemen?  What

12    about --

13                MR. SWARTZ:  One final issue.  Your Honor,

14    the Government anticipates calling a witness this

15    morning that has a medical issue for which she takes

16    medication that gives her dry mouth, and in order to, I

17    guess generate saliva to help her speak she chews gum,

18    while I've never made this request before, Your Honor,

19    may she chew gum on the stand?

20                THE COURT:  She may -- she may -- she may

21    chew gum while she's on the stand.

22                MR. SWARTZ:  Thank you, Your Honor.

23                MR. GUERRA:  No objection from the defense.

24                THE COURT:  All right.  Gentlemen, the other

25    miscellaneous issue is I gave both sides the -- a rough

```
1    draft of a prospective limiting instruction to the jury

2    on the issue that was presented to the Court yesterday.

3              MR. TONY CANALES:  Your Honor, Tony Canales

4    for Mr. Mesquias.  We -- we would object to this

5    particular instruction, Judge, that's not what we asked

6    for.  This particular instruction has nothing to do with

7    limiting instruction to the jury during the -- during

8    the incoming testimony.

9              But I think we would like to be able to give

10   a little bit more research on this issue.  We got it

11   last night from you, of course, but we need a little bit

12   more time.  It's not going to come up today, I don't

13   think so.

14             THE COURT:  All right.  Again gentlemen, I

15   believe the limiting instructions that we're going to

16   give in the jury charge should be submitted but the

17   Court is amenable to requesting input from the parties.

18   Back to the point, the language in that order was not

19   intended to be a jury instruction or limiting

20   instruction.

21             MR. TONY CANALES:  Thank you.

22             MR. LOWELL:  Your Honor, the Government has

23   no objection to the instruction, it's fully supported by

24   Fifth Circuit law.

25             THE COURT:  All right.  Again, I'm not going
```

1   to get into that.  If the parties want to review drafts

2   between themselves, that's fine, but let's move forward.

3                  MR. GUERRA:  Yes, Judge.

4                  THE COURT:  Ms. Sandra.

5                  THE CLERK:  Yes, Judge.

6                  THE COURT:  Let's --

7                  COURT OFFICER:  All rise for the jury.

8                  (JURY IN.)

9                  THE COURT:  Thank you, everyone.  Please be

10  seated.

11                 Ladies and gentlemen again, thank you for

12  your promptness, I do know everyone was here on time,

13  but we did have to handle some matters outside the

14  presence.  Everyone here was also on time, even

15  beforehand, so again thank you for your promptness, this

16  is going to help in moving the trial along as quickly as

17  possible.

18                 Let's go ahead and proceed with

19  Mr. Carrillo.

20                 Mr. Carrillo, good morning, sir.

21                 THE WITNESS:  Good morning.

22                 THE COURT:  Again, please make yourself

23  comfortable, please position the microphone closely to

24  you and speak loudly and clearly.

25                 THE WITNESS:  I will, Your Honor.

1          MR. CYGANIEWICZ:  Your Honor, can you again

2    remind me of how much time limit the --

3          THE COURT:  I will give you the exact time,

4    Mr. Cyganiewicz.  All right.  The defense has an hour

5    and 27 minutes left, obviously there were three one-hour

6    sessions, you're in the second one-hour session.

7          MR. CYGANIEWICZ:  Thank you, Your Honor.

8                    CROSS EXAMINATION

9    BY MR. CYGANIEWICZ:

10   Q.  Good morning, Dr. -- Dr. Carrillo.

11   A.  Good morning.  Good morning.

12   Q.  I'm sorry, do they still refer to you as a doctor

13   or --

14   A.  I'm still -- I still have a medical degree, I

15   just don't have a license.

16   Q.  Do people normally still call you doctor?

17   A.  Yes.

18   Q.  How do you wish for me to refer to you as?

19   A.  I'm sorry?

20   Q.  Mr. Carrillo, Dr. Carrillo, how would you want --

21   it doesn't matter?

22   A.  It doesn't matter.

23   Q.  I'm Ed Cyganiewicz, I represent Mr. McInnis and I

24   want to go through some questions, and I have some time

25   restraints so I'm going to -- excuse me if I'm going a

1    little bit too fast, but I want you to take your time

2    with your answers, okay?

3        A.   Yes.

4        Q.   You said you had a medical license but you're no

5    longer licensed, correct?

6        A.   I have a medical degree and I'm no longer

7    licensed, yes.

8        Q.   And did you lose your license because of your

9    conviction in this case where you made a deal with the

10   prosecutors, or did you lose it for some other reason?

11       A.   I lost it because of my conviction.

12       Q.   Were you disciplined for other reasons as a

13   doctor by the State?

14       A.   No.

15       Q.   You didn't have a problem delaying the signing of

16   death certificates and was disciplined by the State

17   Board?

18       A.   That occurred twice several years before.

19       Q.   Okay.  But my question was were you ever

20   disciplined by the State for other than this conviction,

21   and you said no, but the answer is yes; is that right?

22       A.   That's correct.

23       Q.   And that was for something to do with death

24   certificates?

25       A.   Yes, I -- I signed a death certificate two or

```
 1    three days past the deadline.
 2       Q.   Any other disciplinary action taken by the State
 3    in your performance as a doctor?
 4       A.   No, not -- not that I can recall.
 5       Q.   No?   Wouldn't that be something you would
 6    remember?
 7       A.   Well, the answer would be no.
 8       Q.   Let me first talk to you about the deal you made
 9    with the prosecutors, and I know Mr. Banker went through
10    that with you in detail and I'm trying not to be
11    repetitive, but what -- what were the -- how many
12    charges were you originally charged with; do you recall?
13       A.   Quite a few charges, I -- I don't recall the
14    exact number.
15       Q.   Well, you -- you plead to -- do you remember
16    pleading to Count Six and Seven; is that right?
17       A.   I -- I plead to health care fraud and identity
18    left.
19       Q.   What counts were they in the indictment, you
20    know, like which number charge was that?
21       A.   I don't recall the number.
22       Q.   You're familiar with the indictment, though,
23    aren't you?
24       A.   Yes, sir.
25       Q.   Who's Martha Uribe Medrano?
```

1    A.   She is my wife.

2    Q.   She was also charged; was she not?

3    A.   Yes, sir.

4    Q.   Was part of your deal is that they would drop the

5    charges against her?

6    A.   No, sir.

7    Q.   Is her charges still pending?

8    A.   She was sentenced to house arrest.

9    Q.   Oh, she didn't do any jail time?

10   A.   No, sir.

11   Q.   So it says Count Seven through 12, so there's at

12   least 12 charges, correct?

13   A.   Yes, sir.

14   Q.   And how many did you plead guilty to?

15   A.   To two.

16   Q.   And what happened with the other charges?

17   A.   They were dismissed.

18   Q.   But they haven't been dismissed yet; have they?

19   A.   No, sir.

20   Q.   When you -- when you plead guilty, was -- was it

21   in 2015?

22   A.   Yes, November 2015.

23   Q.   And for conduct alleged to be criminal back in

24   when, 2012 or 2013?

25   A.   Yes, about the -- that time, 2012.

1    Q.   So it's been four years since you've plead

2  guilty, these other cases -- you plead guilty to two

3  charges, correct?

4    A.   Yes, sir.

5    Q.   The other cases have -- they've agreed to be

6  dismissed, correct, as part of your deal?

7    A.   Yes, sir.

8    Q.   And to this date those charges have not been

9  dismissed?

10   A.   Correct.

11   Q.   And you have not been sentenced?

12   A.   That's correct.

13   Q.   What is your understanding in the delay for four

14  years in your sentencing?

15   A.   Well, the delay primarily has been because of my

16  plea agreement and my proffer agreement.

17   Q.   Okay.  Basically, you're saying they want to see

18  if you're -- you know, you agree with their version of

19  the case and they have the ultimate decision in filing a

20  motion to reduce your sentence; is that correct?

21   A.   No, sir.

22   Q.   Okay.  Who has the -- can your lawyer file a 5K

23  motion to reduce your sentence?

24   A.   No, sir.

25   Q.   You mentioned a 5K, you know what that is, right?

1    A.   Yes, sir.

2    Q.   It's a motion by the prosecutor?

3    A.   Right.

4    Q.   To reduce your sentence, and it's only -- they're

5    the only people that make that decision; is that right?

6    A.   Yes, sir.

7    Q.   So you're trying to -- honestly you're trying to

8    make them happy, are you not?

9    A.   No, sir, I'm just here to say the truth.

10   Q.   Truth.  Let me jump to the truth for a second and

11   talk about your history of lying.

12        Yesterday you testified you have a history of

13   lying; do you remember saying, I never said I was a

14   truth-teller.  Do you remember saying that yesterday?

15   A.   Yes, sir.

16   Q.   So are you now depending on the jury to believe

17   that now today you are truth-teller?  That's what you're

18   hoping for; is that right?

19   A.   I wasn't a truth-teller before, but today under

20   oath I am.

21   Q.   And you're hoping that the jury believes that,

22   that you're -- that you're a truth-teller today and

23   yesterday, that's what your hope is, correct?

24   A.   Again, I'm here to say the truth of the jury --

25   Q.   You want them to believe you; do you not?

1    A.   Again, I'm here to speak the truth, if the jury

2    believes me it's really not up to me.

3    Q.   You want the prosecutors to think you're telling

4    the truth; do you not?

5    A.   I'm here to speak the truth.

6    Q.   Do you want them to say today, yes, I -- I am a

7    truth-teller today even though I have a -- I admit I

8    never said I was a truth-teller, okay.  How -- how are

9    you -- but -- excuse me.

10        You're saying now that, I'm not lying just

11   because I'm under oath; is that -- is that what you're

12   trying to say?

13   A.   Yes, sir.

14   Q.   You -- so it's okay to lie other times?

15   A.   I'm not saying it's okay, but today and yesterday

16   under oath I'm here to speak the truth.

17   Q.   You -- if you lie to a federal agent and you're

18   not under oath, is that a crime?

19   A.   Yes, it is.

20   Q.   Have you been charged with anything like that?

21   A.   No, sir.

22   Q.   By the way, in those 12 charges, were you ever

23   charged with money laundering?

24   A.   No, sir.

25   Q.   And didn't you plead guilty and admit to taking

```
 1     $3,000 in cash for somebody's ID number or Medicare
 2     number; is that one of the charges you plead guilty to?
 3         A.   For referring patient -- two patients, yes.
 4         Q.   Right, but -- but the point is that you received
 5     some -- some cash for doing that?
 6         A.   Yes, I did, 3,000.
 7         Q.   That's illegal money; isn't it?
 8         A.   Yes, sir.
 9         Q.   But nobody talked to you, or you were never
10     charged with -- with money laundering?
11         A.   No, sir.
12         Q.   I guess you reported that cash to the IRS; didn't
13     you?
14         A.   I don't believe, sir.
15         Q.   You have a -- you have a problem with the IRS
16     right now; don't you?
17         A.   Yes, sir.
18         Q.   How much is it, a million dollars that you have a
19     lien on?
20         A.   It's for a clinic that I used to own that I filed
21     bank -- bankruptcy for.
22         Q.   So a federal income tax is also payable to the
23     Government, correct?
24         A.   Yes, sir.
25         Q.   Are you -- are you hoping for some sort of relief
```

1    in your tax bill from -- by cooperating with the

2    prosecution?

3        A.   No, sir, not at all.

4        Q.   Are you hoping for some sort of help in all the

5    child support that you owe in -- in exchange for your

6    cooperation?

7        A.   No, sir.

8        Q.   Let me go back to the -- the case where you plead

9    guilty.   That -- that had nothing to do with

10   Mr. McInnis; did it?

11       A.   No, sir.

12       Q.   Nothing to do with Merida?

13       A.   No, sir.

14       Q.   You know what the maximum punishment that you're

15   facing on those charges?

16       A.   It varies between five and ten years, I believe.

17       Q.   Is ten years the maximum on one of those cases?

18       A.   Yes.

19       Q.   So possibly you could be facing ten years in

20   prison?

21       A.   Yes, sir.

22       Q.   That's why you're here to try to get a better

23   deal, correct?

24       A.   Yes, sir.

25       Q.   Now, back to what Mr. Banker told you, you --

```
 1    were you -- you were arrested in 2015; is that correct,

 2    Mr. Carrillo?

 3        A.   Yes.

 4        Q.   And at that time you were working for Merida?

 5        A.   Yes.

 6        Q.   And at that -- after that, of course, you didn't

 7    work for them any longer; did you?

 8        A.   No.

 9        Q.   And how long were you in jail when you were

10    arrested?

11        A.   The first time or the second time?

12        Q.   Let's talk about the first time.

13        A.   A day, a night.

14        Q.   Then the second time you got arrested again?

15        A.   90 days.

16        Q.   And is that the time when you said the only way

17    to get out of jail is to plead guilty and to cooperate?

18        A.   No, I --

19        Q.   That's what you said yesterday; do you recall

20    that testimony?

21        A.   Yes, sir.

22        Q.   And did -- did you plead guilty and cooperate and

23    get out of jail?

24        A.   Yes, sir.

25        Q.   I want to ask you some questions that I'm really
```

1    not trying to humiliate you because I think you've

2    admitted to being a drug abuser, you know, because I

3    understand an addiction is a -- is a disease.

4         What -- when did you start abusing drugs?

5    A.   I started using the opioid in 2006 after my

6    stroke.

7    Q.   And how -- for how long did you continue to use

8    opioids?

9    A.   Up until my arrest in 2015.

10   Q.   So for almost ten years?

11   A.   Nine years.

12   Q.   And just during that whole time at Merida you

13   were a drug abuser and an addict?

14   A.   Yes, sir.

15   Q.   And you -- I know you say opioids, was it

16   Hydrocodone or another very strong painkiller, or which

17   ones were they?

18   A.   It was Stadol, it's a nasal opioid, Stadol.

19   Q.   Did you ever take pills also?

20   A.   I would take Hydrocodone.

21   Q.   That's what I just asked, you took those, too?

22   A.   Hydrocodone, yes.

23   Q.   I think you told the federal agents that; didn't

24   you, when you were interviewed at some point?

25   A.   Yes.

1    Q.  And I -- I'm going to ask you later about -- I

2  know it's three or four years ago when you were

3  interviewed by the prosecutors and the agents and asked

4  if you remember saying something and just, you know, if

5  you could just let me know if you remember, if you don't

6  remember.  Okay.

7       Would you agree that when you -- let me get back

8  to that in a second.

9       Would you agree being an abuser of drugs and

10  lying they're almost like co-existed and connected each

11  other?

12    A.  Yes.

13    Q.  Did you try to hide your drug abuse from your

14  family?

15    A.  No.

16    Q.  Did you try to hide your drug abuse from your

17  friends and patients?

18    A.  I didn't really try to hide my drug abuse from

19  anyone.

20    Q.  That's -- that's -- maybe -- did you ever admit

21  to patients or friends that you were a drug abuser?

22    A.  Not to patients.

23    Q.  Did you admit that to your wife and talk to her

24  about it?

25    A.  Yes.

1    Q.   What other drugs did you abuse besides the nasal

2  opioid and the Hydrocodone?

3    A.   I also used an antianxiety medication, Lorazepam.

4    Q.   Is that different than Xanax?

5    A.   It's about the same.

6    Q.   So you were also taking something that was pretty

7  similar to Xanax?

8    A.   Yes, sir.

9    Q.   And did you tell people at -- at Merida that you

10  had a drug problem?

11    A.   I spoke with Mr. Mesquias once in his office

12  about that.

13    Q.   And you would see Mr. Mesquias in his office

14  often or how -- how often?

15    A.   Every week.

16    Q.   And is Mr. McInnis's office in a different

17  location?

18    A.   It's --

19    Q.   Not in a different building, but in a different

20  area of the building?

21    A.   Same building, different area of the building.

22    Q.   On the other side of the building?

23    A.   Yes, sir.

24    Q.   And at some point when you met with the agents,

25  that you did actually, did you do a description of the

1    office and describe on -- where everything was?

2        A.   Yes, sir.

3        Q.   You never told Mr. McInnis anything about your

4    drug abuse; did you?

5        A.   No, not directly to him.

6        Q.   And when I ask you about Mr. McInnis, I'm not

7    going to -- I'm not saying -- I'm not asking you about

8    they, I'm asking you specifically what did Mr. McInnis

9    tell you and what your conver -- because a lot of your

10   questions were they, they, they, but trying to blend in

11   or mix in a couple people; do you understand what I'm

12   saying?

13       A.   Yes, sir.

14       Q.   Is that okay to do that?  Can I ask you -- I'm

15   asking you only about Mr. McInnis?

16       A.   Yes, sir.

17       Q.   Thank you.  During your drug abuse times at

18   Merida, was there a time when you had a seizure and you

19   had to go to the hospital?

20       A.   Yes, sir.

21       Q.   And did -- did Mr. McInnis, or anyone at Merida

22   help you go to the hospital?

23       A.   Yes, sir, any -- anyone.

24       Q.   Was that a drug abuse related seizure?

25       A.   Yes, it was an opioid induced seizure.

1    Q.   And you -- when you went to the hospital, would

2    you agree with me that the doctors wanted to do some

3    testing but you wanted to checkout on your own, and in

4    fact that's what you did; is that correct?

5    A.   They -- they did the preliminary testing in

6    the -- in the emergency room and then I was discharged.

7    Q.   Do you disagree that they want -- oh you're

8    saying a doctor discharged, or you wanted -- you self

9    discharged?  Do you remember that?

10   A.   If I remember -- I don't remember.

11   Q.   Okay.  I -- do you remember that you didn't want

12   your blood drawn, that's the point; do you remember

13   that?  No, I don't want any blood test; do you --

14   A.   That's correct.

15   Q.   And is that because you were trying to hide your

16   drug abuse?

17   A.   No, they did a urine drug test and it came out

18   positive.  I didn't want my blood drawn because they

19   have -- nurses have trouble finding my vein.

20   Q.   Yeah, I have that problem sometimes.

21        Last area on the drug abuse is were you aware

22   that complaints were made about you stealing drugs from

23   patients?

24   A.   Yes, I am.

25   Q.   Tell us what you did?

1     A.   There were a couple of instances where when I

2  would visit patients at their homes I would write out a

3  prescription for, say Hydrocodone to the patient, or

4  Lorazepam and I would take their bottles that still had

5  some medications in them with me.

6     Q.   So you would take their pills and replace it with

7  a new prescription?

8     A.   Yes, sir.

9     Q.   How do you feel about that?

10    A.   I'm ashamed and embarrassed.

11    Q.   Okay.  I know I visited briefly about meeting

12 with the prosecutors, and you said, I don't want to go

13 over everything Mr. Banker talked about three or four

14 times with the people basically preparing you for trial;

15 is that correct?

16    A.   They were preparing me to be comfortable with

17 this process here.

18    Q.   Right.  Right.  And it was with these gentlemen

19 here to my right?

20    A.   Yes, sir.

21    Q.   Was it about three or four times?

22    A.   Yes, sir.

23    Q.   Okay.  And we never had a chance to visit; did

24 we?

25    A.   No, sir.

1    Q.   Now, let me go back to -- after you plead guilty,

2   the process is you plead guilty, now the Government

3   wants to proffer or debrief you and talk to you,

4   correct?

5    A.   Yes, sir.

6    Q.   And you -- you had at least two or three of these

7   sessions with the federal agents?

8    A.   Yes, sir.

9    Q.   And at times the prosecutors were -- were also

10   there?

11    A.   Yes, sir.

12    Q.   And I think in your -- you know, let me ask you

13   about this.  Those sessions, for some reason, are -- are

14   not order; are they?

15    A.   I wouldn't know about that, sir.

16    Q.   Okay.  If federal agents say, no, we don't record

17   that, is there any reason to doubt that?

18    A.   That never came up.

19    Q.   They never told you they were recording anything;

20   did you?

21    A.   Not that I recall.

22    Q.   Do you remember seeing a video camera in the

23   room?

24    A.   I really never checked for one.

25    Q.   Tape recorder?

1    A.   Not that I recall.

2    Q.   Would you agree with me that instead of fighting

3  about what you said and didn't say, wouldn't it be so

4  much easier if they just recorded these meetings and we

5  would probably save three or four days in trial?

6         Do you know why they don't record those meetings?

7    A.   No, sir.

8    Q.   Do you agree with me that it would be -- that's

9  the best way to preserve what you said and to -- to

10  prove exactly what you said instead of trying to

11  speculate?

12    A.   I -- I wouldn't know about that, sir.

13    Q.   So you don't think a recording of somebody's

14  interview is more accurate than an agent sitting there

15  and taking a lot of notes?

16              MR. LOWELL:   Objection, asked and answered.

17              MR. CYGANIEWICZ:   I don't think he answered

18  that, Your Honor.

19              THE WITNESS:   No, sir.

20              THE COURT:   One second.   One second.

21              MR. CYGANIEWICZ:   He answered, excuse me.

22    Q.   (By Mr. Cyganiewicz)   Now, they did sit there and

23  take very detailed notes; didn't they?   Did you see the

24  agents taking notes?

25    A.   Yes, sir.

1    Q.   And we have copies of those reports, they type

2    them up in a report, I think you said you've never --

3    you haven't read these; have you?

4    A.   No, sir.

5    Q.   Did the -- when you met with the prosecutors, did

6    they go over it and -- and read these in front of you?

7    A.   No, sir.

8    Q.   But you, I think in one of these you said I told

9    the Government everything; is that right?

10   A.   I believe so.

11   Q.   And the purpose of this meeting is what, to not

12   just for you to get a lower sentence, but to -- for

13   further investigation; is that right?

14   A.   Well, I -- I felt that I needed to come clean

15   with everything that I knew.

16   Q.   You're providing them information?

17   A.   Correct.

18   Q.   And it's -- it's important information?

19   A.   Yes, sir.

20   Q.   And this information is, what, 20 -- you're

21   talking to them in 2016 and 2017, correct?

22   A.   Yes, sir.

23   Q.   And this is right after you left Merida in 2015?

24   A.   Correct.

25   Q.   Okay.  Are you going to be a witness who also

```
 1    says my memory now four years later is better than it
 2    was back in 2016?
 3        A.   No, I don't think I've ever said that, sir.
 4        Q.   And you're not saying that today; are you?
 5        A.   No.
 6        Q.   Okay.  Because you were clean in 2015; weren't
 7    you?
 8        A.   In July -- in June -- from June the 16th of 2015
 9    forward.
10        Q.   So after you plead guilty of course you
11    weren't -- I would hope you weren't taking any more
12    drugs; were you?
13        A.   No.
14        Q.   These meetings with the agents were after you
15    plead guilty, correct?
16        A.   Yes, sir.
17        Q.   So your mind was clear at that point?
18        A.   Yes, sir.
19        Q.   And you want -- your goal was to tell them
20    everything you knew about it, correct?
21        A.   Yes, sir.
22        Q.   And they talked to you about how you first got
23    involved with Merida; is that correct?
24        A.   Yes, sir.
25        Q.   Okay.  Let me go into that.  When was that, was
```

1    that -- I'm sorry.

2        Do you recall when that was and how that started?

3    A.   It began with a meeting that I had with

4    Mr. Mesquias at an Olive Garden in Weslaco.

5    Q.   And who -- who set up that meeting?

6    A.   I had met a gentleman who was in -- in a --

7    Q.   Can I help you?  Was it Joe Garza, just to kind

8    of speed things up.  There's no dispute about that; is

9    it?

10   A.   No.

11   Q.   Joe Garza is the one who set up this meeting?

12   A.   Correct.

13   Q.   And would you agree with me throughout your time

14   with Merida you had more contact and interaction with

15   Mr. Joe Garza than you did with Mr. McInnis?

16   A.   That's correct.

17   Q.   As a matter of fact, you had a lot of contact

18   with Mr. Garza, correct?

19   A.   Yes.

20   Q.   And was Mr. -- what was -- Mr. Garza was a nurse,

21   or in charge of the medical side, or what was he doing?

22   A.   He was I believe a -- the director of nursing.

23   Q.   And I know you talked about these people giving

24   you, or they giving you, or they doing this giving you

25   patients lists, Mr. Garza's the one that would give you

1  those patients lists; wouldn't he?

2      A.   Under the direction of Mr. Mesquias, yes.

3      Q.   Who gave you the list?

4      A.   Mr. Garza.

5      Q.   Every time you went there for a list, who gave it

6  to you?

7      A.   Either one of the nurses or Mr. Garza.

8      Q.   And Mr. McInnis never gave you any kind of list;

9  did he?

10     A.   No, Mr. McInnis --

11     Q.   Mr. McInnis never gave you any kind of money; did

12 he?

13     A.   No.

14     Q.   This -- this investment you talked about of

15 $50,000, you never got a penny from Mr. McInnis; did

16 you?

17     A.   I received the checks from Mr. Mesquias.

18     Q.   That's what I was trying to ask you about, I'm

19 asking you about Mr. McInnis, and you promised that you

20 would -- would answer those directly.

21         Did Mr. McInnis ever give you any money to invest

22 in this so-called clinic you were going to do?

23 Mr. McInnis.  You could talk about other people later

24 but -- I think you said you -- did he give you any money

25 at all?

     1      A.  Do I have to answer with just a -- I can't answer

     2   it with a yes or no.

     3              MR. CYGANIEWICZ:  Judge, did Mr. McInnis

     4   ever invest in this company with him, it's a yes or no

     5   answer, he could explain on re-cross or redirect.

     6              THE COURT:  Again, sir.

     7              THE WITNESS:  No.

     8              THE COURT:  You understand the question,

     9   answer the question.

    10              THE WITNESS:  No.

    11      Q.  (By Mr. Cyganiewicz)  And Mr. McInnis wasn't at

    12   this meeting at the Olive Garden; was he?

    13      A.  No.

    14      Q.  And so you have this meeting, and what's the next

    15   thing that happens?  Well, can I -- can I try to speed

    16   this up and say you reached an agreement with -- with

    17   Mr. Mesquias to be the medical director; is that right?

    18      A.  Yes, sir.

    19      Q.  And you reached on agreement to -- to be paid a

    20   certain amount of money per month plus a certain amount

    21   of people -- patients you certified, correct?

    22      A.  Yes.

    23      Q.  And -- and was that negotiated with who, between

    24   you and who?

    25      A.  Between Rodney Mesquias and myself.

1    Q.   Mr. McInnis had nothing to do with that and he

2    wasn't at that meeting; was he?

3    A.   No.

4    Q.   The next thing you do is don't you go to

5    Merida -- and this what you told the agents years ago,

6    correct?

7    A.   Yes, sir.

8    Q.   The next thing you do is go to the Merida

9    location in Harlingen; is that correct?

10   A.   Yes.

11   Q.   And is it Mr. Garza that you meet again at that

12   time?

13   A.   And Mr. Mesquias.

14   Q.   And is it Mr. Garza that goes around and

15   introduces you to the staff?

16   A.   Yes, sir.

17   Q.   And do Mr. Garza introduce to you Mr. McInnis?

18   A.   Yes, sir.

19   Q.   And at that point, when you first meet

20   Mr. McInnis, you already had an agreement to be the

21   medical director, correct?

22   A.   Yes, sir.

23   Q.   And he had nothing to do with that, negotiations

24   or payments or anything?

25   A.   Correct.

1    Q.   I want to talk to you about Mr. Garza again, talk

2  to you -- is Mr. Garza the one who explained the

3  hospice?  And again I'm trying to just read the notes to

4  see if you remember this.  Did you tell them that

5  Mr. Garza was the one who explained the hospice process

6  to you?

7    A.   Yes, he was one of them.

8    Q.   Is he the one that gave you the hospice pamphlet

9  regarding the different symptoms?

10    A.   Yes, sir.

11    Q.   That's Mr. Garza, correct?

12    A.   Yes, sir.

13    Q.   Is Mr. Garza the one that gave you the blank

14  prescription pads?

15    A.   It was -- it was not -- not only him.

16    Q.   Okay.  Other nurses?

17    A.   Yes.

18    Q.   Okay.  Not Mr. McInnis?

19    A.   No.

20    Q.   Did Mr. Zuniga, do you know Eddie Zuniga?

21    A.   Yes.

22    Q.   What was his position?

23    A.   I believe he was in charge of the -- the --

24    Q.   San Antonio office?

25    A.   -- San Antonio office.

```
 1        Q.   He was in charge up there, correct?

 2        A.   Yes.

 3        Q.   And you got to know him, correct?

 4        A.   Yes.

 5        Q.   Did you also give him a bunch of blank

 6   prescription forms?

 7        A.   Yes, sir.

 8        Q.   You know what Mr. Garza and Mr. Zuniga were going

 9   to do with those prescription forms?

10        A.   I -- I assume they were going to use them for --

11   for patients.

12                  MR. CYGANIEWICZ:   One moment, Your Honor,

13   please.

14        Q.   (By Mr. Cyganiewicz)   Was it also Mr. Garza that

15   reviewed the paperwork that you submitted for patients?

16        A.   Yes, sir.

17        Q.   Did he instruct you on how to fill out the forms

18   by using the pamphlet?

19        A.   Yes, sir.

20        Q.   Mr. McInnis was an employee; was he not?

21        A.   I'm sorry, can you repeat?

22        Q.   Mr. McInnis was an employee of Merida?

23        A.   Yes.

24        Q.   He was not a doctor, or not a nurse, correct?

25        A.   Correct.
```

1    Q.   Was it Mr. Garza that also gave you the stack of

2    those 485's that you -- that you signed?

3    A.   Yes, sir.

4    Q.   You -- you didn't have any quota though for

5    patients; did you?

6    A.   No, sir.

7    Q.   And you were not told by anyone to see more

8    patients; were you?

9    A.   No, sir.

10   Q.   How often were you even at the Harlingen office?

11   A.   Weekly.

12   Q.   I think we went over this investment, talked

13   about the prescription forms.

14        Let me ask you, I think yesterday you testified

15   that -- I really just ask that you be honest about that,

16   I -- about this.  You testified that Mr. McInnis told

17   you it was okay to talk to patients on the phone?

18   A.   Yes, sir.

19   Q.   Okay.  Did you have a -- and you said you told

20   that to the agents; did you, in your first meeting with

21   them?

22   A.   Yes, sir.

23   Q.   Okay.  Do you remember in a second meeting

24   telling them -- trying to explain that or clarifying

25   that?

1      A.   I believe so.

2      Q.   Okay.   What did you tell them then, that

3  what meant -- did you tell him that what you meant was

4  tele-medicine or tele-health; do you remember telling

5  them that?

6      A.   Yes.

7      Q.   So when Mr. McInnis -- what you interpreted was

8  the phone what he was talking about was a tele-medicine

9  where the patient is on the screen in one location and

10  the doctor is on the screen in another location; are you

11  familiar with that process, did that exist when you were

12  practicing?

13      A.   Mr. McInnis told me to -- that I could speak to

14  the patients on the phone.

15      Q.   Okay.

16      A.   I referred to --

17      Q.   I'm sorry?

18      A.   I referred to it as tele-medicine.

19      Q.   That's what he said.

20      A.   Because that's what I thought he --

21      Q.   Right, that's what he meant, tele-medicine?

22      A.   No, he didn't say tele-medicine, he said you can

23  speak to the them on the phone.

24      Q.   But that's what you meant?   That's what you

25  thought he meant?

1     A.   When you consult a patient over the phone, it's

2     considered a -- a tele -- tele-medicine, you know,

3     you're performing medicine over the phone.

4          Q.   No, no, no, that's not tele-medicine.   Who told

5     you that?   Tele-medicine is when you sit in an office

6     and a doctor is on the screen.   My last five visits were

7     doctored by tele-medicine.   You never did that?

8          A.   No, I never did that.

9          Q.   Get on the computer and the doctor is on one --

10    instead of going out to these rural areas that the

11    doctor would be -- it would easier with the nurse

12    present, the doctor is on the screen and the nurse is

13    present with the patient, that's what he meant; didn't

14    he?

15         A.   No, sir.

16         Q.   Did you ever do that?

17         A.   No, sir.

18         Q.   Let me just ask you, do you remember saying this

19    to the agents in your second meeting.   Tele-medicine was

20    a term used by McInnis when Carrillo was told that he

21    could visit with a patient by telephone.

22              Do you remember telling them that?

23         A.   Yes, sir.

24         Q.   You told them tele-medicine was the term used by

25    McInnis; is that correct?   That's what you told them

1  back then; isn't it?

2     A.  Yes, sir.

3           MR. CYGANIEWICZ:  How much time do I have,

4  Your Honor?

5           THE COURT:  Approximately, 34 minutes.

6           MR. CYGANIEWICZ:  34 I've used?

7           THE COURT:  Oh, no, no, the defense now has,

8  approximately, 34 minutes.

9           MR. CYGANIEWICZ:  Well, let me --

10     Q.  (By Mr. Cyganiewicz)  Doctor, I wish you the

11  best --

12           THE COURT:  No, no, I'm sorry, I'm sorry,

13  Mr. Cyganiewicz, I misspoke.  An hour and four minutes.

14  The defense has an hour -- it's a three-hour session

15  that I allotted you, you're about to get to two hours,

16  you're at one hour and 57 minutes.

17     Q.  (By Mr. Cyganiewicz)  So there were some things

18  you told the agents back four years ago when your memory

19  was fresh that -- that -- you're saying things that you

20  did not say that you're saying today for the first time,

21  right?

22     A.  I'm sorry, can you repeat the question?

23     Q.  I'll just withdraw that.  Thank you.

24           MR. CYGANIEWICZ:  Pass the witness.

25           THE COURT:  Mr Guerra.

```
 1              MR. GUERRA:  Thank you, Your Honor.

 2              THE COURT:  You basically have a full hour.

 3              MR. GUERRA:  Hope not to use it, but thank

 4   you, Your Honor.

 5                        CROSS-EXAMINATION

 6   BY MR. GUERRA:

 7      Q.  Mr. Carrillo, good morning.

 8      A.  Good morning.

 9      Q.  My name is Robert Guerra, I apologize, I

10   represent Dr. Pena.  You never met Dr. Pena, correct?

11      A.  That's correct.

12      Q.  You never spoken with Dr. Pena before?

13      A.  Never.

14      Q.  And in fact, when you met with these Government

15   agents back after your deal, you never brought up

16   Dr. Pena when you listed off all the doctors, correct?

17      A.  Correct.

18      Q.  So you don't know what Dr. Pena did in Laredo,

19   correct?

20      A.  Correct.

21      Q.  You don't know what -- you never had any

22   discussions with him, so you don't know what

23   arrangements or conversations he had with the Merida

24   Group, correct?

25      A.  Correct.
```

1    Q.   Now, speaking of the Merida Group, you've been

2    using the term medical director for Merida Group.   Are

3    you the medical -- were you the medical director for the

4    entire company or just for a location?

5    A.   Just for the location.

6    Q.   Which location?

7    A.   The Harlingen location -- well, I was one of the

8    medical directors in Harlingen.

9    Q.   Okay.   And -- and -- and I noticed you caught

10   yourself because there were a couple of locations in

11   Harlingen, correct?

12   A.   Correct.

13   Q.   Who was the medical director for the other

14   location in Harlingen?

15   A.   I don't know.

16   Q.   Okay.   Do you know who the medical director was

17   for any other location in the Valley?

18   A.   I heard the name Dr. Pelly, but I don't know what

19   location he was a director for.

20   Q.   And in fact, yesterday you told the ladies and

21   gentlemen of the jury that you met Dr. Pelly; is that

22   correct?

23   A.   I met him once.

24   Q.   And it was your understanding he was the medical

25   director for Brownsville?

1       A.   I believe so.

2       Q.   Okay.  Who is the medical director in Houston?

3       A.   I don't know.

4       Q.   And did you ever meet the medical director for

5    Sugar Land?

6       A.   For -- no.

7       Q.   A medical director in Corpus Christi?

8       A.   No.

9       Q.   Dr. Carrillo, what -- what training do you have

10   in the field of hospice?

11      A.   None.

12      Q.   Okay.  Have you taken any courses with regards to

13   hospice?

14      A.   No.

15      Q.   Okay.  And other than your time working for

16   Merida, that was the only time you practiced in the

17   field of hospice?

18      A.   The -- I wouldn't refer to it as practicing in

19   the field of hospice, I was pretty much just signing

20   certification forms.

21      Q.   Okay.  And -- and correct -- refresh my memory,

22   and I apologize, how long did you work at -- at Merida?

23      A.   For about a year and four or five months.

24      Q.   Okay.  About 2014 to 2015; is that correct?

25      A.   Yes.

1    Q.   What were you doing in 2013, sir?

2    A.   I was -- I was in San Antonio.

3    Q.   Okay.   Were you working for Merida at the time?

4    A.   No.

5    Q.   Were you doing any sort of contract or at-will

6    employment for Merida at the time?

7    A.   No.

8    Q.   So your involvement with Merida began in 2014; is

9    that right?

10   A.   Yes, sir.

11   Q.   Now, I know you talked about it with Mr. Lowell

12   and you talked about it with the attorneys for the other

13   Defendants as well, we've talked about your pleas, we

14   talked about your, I guess, agreement or necessity to

15   come in and tell the truth today, but there was one word

16   that we heard yesterday that I don't know if we actually

17   talked about which is called a proffer agreement; do you

18   recall that?

19   A.   Yes, sir.

20   Q.   And correct me if I'm wrong, but a proffer

21   agreement is basically when a witness comes in and is

22   told by the Government as long as you tell the truth

23   about anything, we're not going to use those statements

24   against you; is that correct?

25   A.   Yes, sir.

1    Q.   And it's my understanding that under a proffer

2    agreement, the more you say the wider the immunity net

3    goes; is that fair to say?

4    A.   I would think so.

5    Q.   Right, so in other words, the more you talk

6    about, the more protection you get from prosecution,

7    agreed?

8    A.   Yes, sir.

9    Q.   That's your understanding; is that right?

10   A.   Yes, sir.

11   Q.   Other than your proffer agreement to testify in

12   this case, what other cases are you testifying on?

13   A.   I'm not testifying in other cases.

14   Q.   Have you met the Government to talk about other

15   medical clinics that you've been involved in?

16   A.   I -- I told the Government everything that I was

17   involved in.

18   Q.   Okay.  We know about Merida, and we know about

19   the contents of your plea agreement because you talked

20   about it with the attorneys for the other Defendants,

21   what else is out there that you're informing on with the

22   Government?

23   A.   I think you -- I think you have a -- I think one

24   of the attorneys referred to that as a -- as a grocery

25   list or a laundry list.

1     Q.   Okay.

2     A.   When I spoke to the Government.

3     Q.   Okay.  So when Mr. Banker was reading that list

4  yesterday, you were informing on those clinics as well?

5     A.   After -- after that first visit, that was the

6  only time that I mentioned everything that I was

7  involved in.

8     Q.   Okay.  But are you still giving information on

9  those other clinics to the Government as we sit here

10  today?

11     A.   No, sir.

12     Q.   Are you informing on other doctors in those other

13  clinics as we sit here today?

14     A.   No, sir.

15     Q.   In your proffer agreement, do you have a time

16  limit?

17     A.   Not that I think so.

18     Q.   In other words, there's no set time or term by

19  which your involvement to testify, or inform to the

20  Government ends, correct?

21     A.   I would agree with that.

22     Q.   So, in other words, it ends when they tell you

23  it's over, correct?

24     A.   Correct.

25     Q.   And they can come back to you and say,

1    Mr. Carrillo, oh, by the way, XYZ Clinic in Kingsville,

2    we need to talk to you about that, and under the terms

3    of your agreements, the litany of agreements that you

4    have, you've got to do it, correct?

5        A.   Correct.

6        Q.   And that's why you haven't been sentenced for

7    over four years, corrected?

8        A.   Correct.

9        Q.   And as we sit here today there is no end in site

10   as to when you could be sentenced, correct?

11       A.   I have sentencing scheduled next -- November.

12       Q.   That's not the first time you've been scheduled

13   for sentencing, correct?

14       A.   Correct.

15       Q.   How many times has your sentencing been

16   rescheduled because you had to testify in a case or give

17   information?

18       A.   Since -- it's been four years.

19       Q.   How many times has it been rescheduled?

20       A.   I don't know the exact number.

21       Q.   More than five?

22       A.   Probably.

23       Q.   More than ten?

24       A.   No.

25       Q.   Okay.  And every single time it's been because

1    you had to go back and give more information, correct?

2        A.   Correct.

3        Q.   And so this November is the date for your

4    sentencing, as far as you know it could go or it could

5    be moved depending on the needs of the Government,

6    correct?

7        A.   Correct.

8        Q.   Yesterday you brought up -- or the Government

9    asked you questions about Francisca Perez; do you recall

10   that?

11       A.   Yes, sir.

12       Q.   And you were shown a face-to-face form for

13   Francisca Perez; do you recall that?

14       A.   Yes.

15       Q.   And it was your testimony to the ladies and

16   gentlemen of the jury that you never did that

17   face-to-face; is that right?

18       A.   That's correct.

19       Q.   And it's your testimony to the ladies and

20   gentlemen of the jury that all you did was sign that

21   form, correct?

22       A.   Correct.

23       Q.   Well, since you testified earlier, you never

24   coordinated any of that with Dr. Pena; is that right?

25       A.   That's right.

1    Q.   Did you just sign that form; is that fair to say?

2    A.   Yes.

3    Q.   Roy, could you pull up Government Exhibit E-20,

4  and specifically go to page 240530.   Bates number 240530

5  on Government Exhibit E-20.   Mesquias 240530, there you

6  go.

7         Could you scroll to the bottom.   The signature

8  line, Roy.

9         That's your signature, correct, Mr. Carrillo?

10   A.   That is my signature.

11   Q.   And it's dated September 19th, 2013, correct?

12   A.   Yes, it is.

13   Q.   Okay.   And Roy, could you, at the top where it

14  says patient name.

15        This was a certification for Fran -- Francisca

16  Perez, correct?

17   A.   Correct.

18   Q.   Are you aware that this was the initial

19  certification period for Ms. Perez?

20   A.   No.

21   Q.   So as the medical director for Merida you signed

22  Ms. Perez into hospice; is that fair to say?

23   A.   Yes.

24   Q.   Okay.   But you weren't working for Merida in

25  September 2013?

1    A.   That's correct.

2    Q.   Sow did your signature get on this page?

3    A.   Well, it was a common practice there on the -- on

4  the Friday's that I would go that I was -- I would be

5  given a bunch of forms to sign, and I would sign them.

6    Q.   Roy, on the same Exhibit, go to bates number

7  240675.

8         That's your signature as well; isn't it?

9    A.   Yes, sir.

10   Q.   Okay.  And it's dated December 28, 2013?

11   A.   Yes, sir.

12   Q.   Okay.  At the top, Roy.

13        It's also for Francisca Perez, this is for her

14  second certification period in hospice, correct?

15   A.   That's correct.  But if you read the narrative,

16  it basically tells you that the patient has continued to

17  worsen, so I think the dates are wrong because the

18  patient has -- was already in hospice.

19   Q.   Okay.

20   A.   So this is just a nurse's evaluation.

21   Q.   Okay.  So it's your testimony that for the

22  second -- it's wrong because in the second benefit

23  period, a patient on hospice is showing physical

24  decline?

25   A.   No, if you go back to the first one you showed

1    me, if you -- if you read the narrative.

2        Q.   Okay.

3        A.   Can you go back to the first one?

4        Q.   No, if you read the narrative, I'm listening to

5    your explanation sir.

6        A.   If you read the narrative, it states the patient

7    continues with worsening of -- of oxygen and clinical

8    findings.

9        Q.   Right, but isn't that the point of hospice,

10   somebody has a physical condition that is going to

11   worsen over the course of time, correct?

12       A.   That is correct.

13       Q.   Okay.  And so here I've shown you your signature

14   on certification periods over the course of six months

15   which you ably pointed out to the ladies and gentlemen

16   of the jury that Ms. Perez is worsening, correct?

17       A.   You know, I -- I admitted to falsifying records,

18   I admitted to certifying patients that weren't at the

19   end of their disease process, so I -- I really can't

20   comment on the medical record that I feel is -- is

21   untruthful.

22       Q.   So this is fraudulent?

23       A.   In my belief it is.

24       Q.   Okay.  And it's fraudulent because you disagree

25   with it, or is it fraudulent because you don't have any

1    independent recollection of signing this document?

2       A.  No, I -- I -- I feel that it's fraudulent, or

3    un -- untruthful because of the prac -- of the practice

4    from other medical directors and myself of falsifying

5    diagnoses and -- and falsely certifying patients for

6    hospice.

7       Q.  Agreed, but you just testified to the ladies and

8    gentlemen of the jury you had no idea what Dr. Pena was

9    doing in Laredo, correct?

10      A.  Well, that's correct, yes.

11      Q.  Okay.  So basically you're saying everything on

12   this document is incorrect, correct?  I mean, that's

13   what we're talking about here?

14      A.  Yes.

15      Q.  Okay.  So you never saw Ms. Perez; is that your

16   testimony?

17      A.  No, that's not my testimony.

18      Q.  So you did see Ms. Perez?

19      A.  I did see Ms. Perez.

20      Q.  Okay.  So when you saw Ms. Perez you certified

21   her for hospice, correct?

22      A.  When I saw Ms. Perez, like a lot of the patients

23   that I saw, they had a diagnoses, for example, of COPD,

24   but it wasn't terminal but I followed along and

25   continued with the terminal diagnosis.

1    Q.   Okay.  So you -- you will agree with me that

2    September 2013 to March 2014 is a six-month period,

3    correct?

4    A.   Yes.

5    Q.   Okay.  Her condition was worsening, at least

6    according to these documents, correct?

7    A.   According to these documents, yes.

8    Q.   Okay.  So if Ms. Perez was rushed to the hospital

9    in April of 2014 because her condition was becoming

10   gravely ill, would that be the normal course of her

11   physical condition?  It would; wouldn't it?

12   A.   Yes.

13   Q.   Okay.  And so when Ms. -- you never saw Ms. Perez

14   in April of 2014, correct?

15   A.   I don't recall.

16   Q.   Okay.  So you're not aware that Ms. Perez had a

17   history of strokes, correct?

18   A.   I don't recall.

19   Q.   Okay.  You're not aware that at the time that Ms.

20   Perez was certified for hospice because of past strokes

21   she did not have the use of the left side of her body;

22   is that fair to say?

23   A.   Again, I can't really comment on any patient that

24   you bring up to me because I falsified these records.

25            THE COURT:  One second.

1          MR. GUERRA:  I'm sorry.

2     Q.  (By Mr. Guerra)  You're unaware --

3          THE COURT:  Did you get --

4     Q.  (By Mr. Guerra)  That on April 28th, 2014 Ms.

5  Perez was in the hospital because she became

6  unresponsive; is that right?

7     A.  I wouldn't know.

8     Q.  Right.  You're unaware that Ms. Perez had a

9  tracheostomy, correct?

10    A.  I'm not aware.

11    Q.  Okay.  She -- are you aware that she had

12  aspirational pneumonia in April 2014 at the hospital?

13    A.  No.

14    Q.  Are you aware that she had vascular dementia

15  because of those strokes in April 2014?

16    A.  No.

17    Q.  Are you aware that she had Alzheimer's related

18  dementia in April 2014?

19    A.  No.

20    Q.  You had no idea that over the course of seven

21  months Ms. Perez was declining to the point where she

22  was almost dead, correct?

23    A.  If that -- if that's what you're saying, yes.

24    Q.  Okay.  And you will agree with me that in hospice

25  care, even though someone is terminal, they're not

1    necessarily allowed just to wither on the vine and die

2    for lack of a better term, correct?

3        A.   Correct.

4        Q.   Unless there's a do not resuscitate order, even

5    if someone's on hospice, Medicaid allows for people at

6    the hospital to take extraordinary measures to save

7    their life, correct?

8        A.   Correct.

9        Q.   You could have a patient like Ms. Perez there

10   crashing on a downward slide going to the hospital, but

11   when she gets to the emergency room without a DNR they

12   have to do everything in their power to save her life,

13   correct?

14       A.   Correct.

15       Q.   Do you know if Ms. Perez had a do not resuscitate

16   order at the time she went to the hospital in April

17   2014?

18       A.   No, I don't.

19       Q.   Roy, call up E-20, bates 240438.

20            You -- go to the top, Roy.

21            What is this, sir?

22       A.   It's a DNR order.

23       Q.   For who?

24       A.   Francisca Perez.

25       Q.   Okay.  And the Government showed you yesterday a

1    recertification document from May to July 2014; is that

2    correct?

3        A.   Yes.

4        Q.   Roy, in the middle there's some dates, can you go

5    down?

6            I believe this DNR is dated 06/26/14; you see

7    that there, sir?

8        A.   Yes.

9        Q.   Okay.  So after Ms. Perez goes to the hospital

10   with this litany of medical conditions, after you

11   recertify her for hospice for the next certification

12   period, her family signs a DNR; is that correct?

13       A.   Yes.

14       Q.   That sounds like someone who is basically ready

15   for the end of life, correct?

16       A.   Correct.

17       Q.   But it's your testimony to the ladies and

18   gentlemen of the jury you wouldn't know because you

19   never saw her; is that right?

20       A.   That's correct.

21       Q.   And it's your testimony to the ladies and

22   gentlemen of the jury that the certification period for

23   which this DNR is in the middle of was done by you

24   fraudulently, correct?

25       A.   Correct.

```
 1              MR. GUERRA:  Pass the witness, Your Honor.

 2              THE WITNESS:  Your Honor, may I take a

 3   bathroom break?

 4              THE COURT:  Yes, sir.

 5              Let's go ahead and take a very brief recess,

 6   ladies and gentlemen, for a restroom break.

 7              COURT OFFICER:  All rise for the jury.

 8              (JURY OUT.)

 9              THE COURT:  We'll be in recess.

10              Please proceed.

11              (COURT IN SHORT RECESS.)

12              THE COURT:  Thank you, everyone.  Please

13   remain standing, we're going to bring in the jury.

14              COURT OFFICER:  All rise for the jury.

15              (JURY IN.)

16              THE COURT:  Thank you, everyone, please be

17   seated.

18              Mr. Lowell, please proceed.

19              MR. LOWELL:  Thank you, Your Honor.

20                   REDIRECT EXAMINATION

21   BY MR. LOWELL:

22     Q.  Good morning, sir.

23     A.  Good morning.

24     Q.  Do you recall -- you got a lot of questions about

25   meetings with Henry McInnis, Rodney Mesquias, Joe Garza
```

1  and others; do you recall those questions?

2      A.  Yes.

3      Q.  And do you recall testifying yesterday --

4  yesterday about a meeting where you were directed to

5  change and falsify patient diagnoses?

6      A.  Yes.

7      Q.  And to be clear, was Rodney Mesquias present at

8  that meeting?

9      A.  Yes, sir.

10     Q.  Was Henry McInnis?

11     A.  Yes, sir.

12     Q.  Joe Garza?

13     A.  Yes, sir.

14     Q.  And there was a nurse; is that right?

15     A.  Yes, Ms. Amy Cooley.

16     Q.  Okay.  And you were directed to falsify the

17  paperwork for those patients; is that right?

18     A.  Yes.

19     Q.  In the presence of Henry McInnis?

20     A.  Yes.

21     Q.  Now, Mr. Carrillo, when you -- you would see

22  hospice patients; is that right?

23     A.  Yes, sir.

24     Q.  And you would see hospice patients in Laredo?

25     A.  Yes.

1    Q.   In San Antonio?

2    A.   Yes.

3    Q.   Now, when you would see these patients, and you

4    would see -- would you have like a document that would

5    list their diagnoses?

6    A.   Yes.

7    Q.   And was that diagnosis consistent or inconsistent

8    with what you saw with the patient?

9    A.   They were inconsistent.

10   Q.   Okay.  And were you relying on other doctor's

11   orders in the Merida Group patient file?

12   A.   Yes.

13   Q.   And so based on what you observed in those

14   doctor's orders, these are from other doctors; is that

15   right?

16   A.   That's correct.

17   Q.   And was it your understanding that these were

18   other medical directors or doctors associated with the

19   Merida Group?

20   A.   Yes.

21   Q.   And in those specific records, did you identify

22   false information?

23   A.   Yes.

24   Q.   What was false about those records?

25   A.   The terminal diagnosis was -- was false, for

1  example a patient was diagnosed as endstage COPD,

2  chronic obstructive pulmonary disease, and when I would

3  see the patient I would -- I was expecting the patient

4  to -- to be in -- in shortness of breath, at rest, in

5  respiratory distress, maybe even with an oxygen tank,

6  and a lot of these patients were -- were comfortable,

7  they -- some of them were gardening outside their home.

8  So, yes, the diagnoses was -- was false.

9    Q.  To be clear, that was a diagnosis from another

10  doctor whose record was in the Merida Group patient

11  file; is that right?

12    A.  Yes.

13    Q.  Now, yesterday you were shown some records by --

14  by counsel for Mr. Mesquias, I wanted to go through a

15  couple of those records.

16       First of all, just to be clear, you've -- you've

17  described the fraud that you were involved in at the

18  Merida Group, it didn't involve just six or seven

19  patients, did it?

20    A.  No.

21    Q.  Much more than that, right?

22    A.  Yes.

23    Q.  I want to talk about that.  So, this is Defense

24  Exhibit 25.  Remember that document, Mr. --

25  Mr. Carrillo, from yesterday?

1     A.   Yes.

2     Q.   These are orders for hospice that you signed; is

3  that right?

4     A.   Yes, that's correct.

5     Q.   Those are all fraudulent and false doctor's

6  orders; is that right?

7     A.   Yes.

8              MR. BANKER:   Leading the witness,

9  Your Honor.

10             THE COURT:   Overruled, I'll allow the

11  question.

12    Q.   (By Mr. Lowell)   Approximately, how many

13  fraudulent and false doctor's orders did you sign here?

14    A.   It's 77.

15    Q.   Approximately, how many patients?

16    A.   That's 77 patients.

17    Q.   What's that timeframe at the top of the page?

18    A.   August the 24th, 2014 through October the 22nd,

19  2014.

20    Q.   Now, if you scan down that column in the document

21  to the next page, would you agree with me that this was

22  just over a few months?

23    A.   Yes.

24    Q.   In 2014?

25    A.   Yes.

1    Q.   77 patients signed up fraudulently for hospice;

2    is that correct?

3    A.   Yes.

4    Q.   That was at the Merida Group?

5    A.   Yes, sir.

6    Q.   You see this document?

7    A.   Yes.

8    Q.   For the record, this is Government's Exhibit L-3.

9    Those 77 orders, was that done at the direction of Henry

10   McInnis?

11   A.   Yes.

12   Q.   Rodney Mesquias?

13   A.   Yes.

14   Q.   Mr. Carrillo, I'm showing you Defense Exhibit 33.

15   Do you recall seeing this document yesterday?

16   A.   Yes.

17   Q.   These are hospice orders that you signed for

18   patients at the Merida Group; is that right?

19   A.   Yes, sir.

20   Q.   And if you look at the -- directing you to the

21   top of the page, top left corner, what region of the

22   Merida Group did you sign these fraudulent false orders?

23   A.   The Laredo region.

24   Q.   Approximately, how many false orders did you sign

25   in this document?

1    A.   36.

2    Q.   Approximately, how many separate patients?

3    A.   36.

4    Q.   Now, those 36 patients that you signed up

5  fraudulently in Laredo, did you do that at the direction

6  of Henry McInnis?

7    A.   Yes.

8    Q.   Rodney Mesquias?

9    A.   Yes.

10   Q.   And was that consistent with the meeting that you

11 had earlier with them when you first started with the

12 Merida Group?

13   A.   Yes.

14   Q.   Were you following Rodney Mesquias' and Henry

15 McInnis' orders?

16   A.   Yes, I was.

17   Q.   Mr. Carrillo, do you remember seeing this

18 document yesterday?  This is Defense Exhibit 26.

19   A.   Yes.

20   Q.   And are these fraudulent hospice orders that you

21 signed in San Antonio?

22   A.   Yes.

23   Q.   That was for the Merida Group?

24   A.   Yes.

25   Q.   Approximately, how many patients did you

1    fraudulently sign up for hospice services?

2        A.   33.

3        Q.   What month did that occur in?

4        A.   In March.

5        Q.   What year?

6        A.   2014.

7        Q.   Just one month?

8        A.   Yes.

9        Q.   And these -- these fraudulent orders, these 33

10   fraudulent orders that you signed in San Antonio, did

11   you do that at the direction of Henry McInnis?

12       A.   Yes.

13       Q.   Rodney Mesquias?

14       A.   Yes.

15       Q.   And was that consistent with your early meeting

16   with them where they direct you to falsify records?

17       A.   Yes.

18       Q.   This is Government's Exhibit L-1.

19            Mr. Carrillo, I just want to understand the scope

20   of your involvement in the fraud.  You were signing

21   fraudulent orders for the Merida Group in Rio Grande

22   Valley?

23       A.   Yes.

24       Q.   Laredo?

25       A.   Yes.

 1    Q.   Also in San Antonio; is that correct?

 2    A.   Yes.  And Corpus Christi.

 3    Q.   Also in Corpus Christi?

 4    A.   Yes.

 5    Q.   Anywhere else that you can remember?

 6    A.   In the McAllen area, Weslaco.

 7    Q.   You were --

 8    A.   Hidalgo County, throughout the Valley, yes.

 9    Q.   Now, you were asked questions about specific

10  patients, you were only asked about six; is that right?

11    A.   Yes.

12    Q.   Approximately, six patients.  Remember the

13  questions about Francisca Perez?

14    A.   Yes.

15    Q.   How long was Ms. Perez on hospice with the Merida

16  Group?

17            MR. GUERRA:  Objection, Your Honor, witness

18  has no personal knowledge of it.  This is outside his

19  term of employment.

20            THE COURT:  That's overruled.

21    Q.   (By Mr. Lowell)  According to this record, how

22  long was she on hospice?

23    A.   Close to three years.

24    Q.   Approximately, how much money, according to this

25  exhibit, did the Merida Group make off this patient?

1    A.   $134,180 was paid.

2    Q.   How much did the Merida Group bill?

3    A.   $196,582.

4    Q.   And this is a patient that you fraudulently

5    signed up for service; is that right?

6    A.   Yes.

7    Q.   Now, let's assume that there were hundreds of

8    patient records, hundreds, in the Merida Group patient

9    file for Francisca Perez, documenting her conditions,

10   her history, good days and bad days, would you trust

11   those records?

12             MR. GUERRA:  Your Honor, I'm going to object

13   to this question, calls for speculation, he's not

14   certified as an expert witness to allow for him to

15   speculate.

16             MR. LOWELL:  He's a doctor.

17             MR. GUERRA:  He's not a doctor.

18             MR. HECTOR CANALES:  No, he's not.

19             THE COURT:  Mr. Guerra, gets closer to a

20   mic.

21             MR. GUERRA:  I'm sorry.  Your Honor, again

22   he's not certified as an expert witness, he is not

23   currently a medical doctor, and he's being asked to

24   offer his opinion on anything regarding Ms. Perez,

25   especially after he left.  He's -- the Government is

1    asking him to assume hundreds of thousands of -- of

2    fraudulent claims, and hundreds of thousands of I guess

3    bad information.  I waited for counsel to finish his

4    question before I objected because I wanted to see where

5    he went with it.  I think this line of questioning is

6    improper for this witness.

7                    MR. LOWELL:  May I respond?

8                    THE COURT:  Please.

9                    MR. LOWELL:  Completely proper.  He was a

10   medical director within the Merida Group; he's already

11   testified that he personally observed lies in the

12   patient files.

13                   THE COURT:  The objection is overruled, I'll

14   allow the question.

15                   MR. LOWELL:  Thank you, Your Honor.

16                   MR. BANKER:  We would also object it's

17   outside of the cross, I mean he's starting to bring up

18   new information.

19                   Redirect is designed to supplement what was

20   done or not add information, you -- you gave that

21   instruction.

22                   MR. LOWELL:  May I respond, Your Honor?

23                   THE COURT:  You may.

24                   MR. LOWELL:  Mr. Banker asked him about

25   every one of the patients listed in the indictment.

1              THE COURT:   Again, gentlemen, the -- the

2      documents that were -- have been shown to the -- the

3      witness by numerous defense attorneys go all the way to

4      September of 2013, through that, I'll allow them -- I'll

5      allow those documents to -- again all these documents

6      have been admitted.   You may proceed, Mr. Lowell.

7          Q.   (By Mr. Lowell)   Mr. Carrillo, let's assume that

8      there are hundreds of medical records for Francisca

9      Perez in the Merida Group patient file that contain

10     records from other clinics as well.   Would you trust

11     those records?

12         A.   No, I would not.

13         Q.   Now, just by way of demonstration, if you had a

14     box of Francisca Perez patient records from the Merida

15     Group detailing conditions, good days, bad days, would

16     you trust those records?

17         A.   No, I would not.

18         Q.   Explain to the jury why you wouldn't trust them.

19         A.   I -- I've admitted to falsifying, continuing to

20     falsify patient's diagnoses that would allow them to

21     continue receiving hospice care on -- on many patients.

22     I continued certifying these patients at other medical

23     directors were also certifying so I would simply just

24     transfer their diagnoses to my face-to-face.   And when I

25     would visit the patient, I realized that the patient --

1    the patient was already diagnosed with dementia, but in

2    visiting the patient I would realize that the patient

3    did have some memory loss but was not demented, or was

4    not in -- in the endstage of the dementia process.

5            So I went ahead and still certified the patient

6    with that diagnosis, certify that the patient had

7    falsely certified that the patient had less than six

8    months to live.

9    Q.   So to be clear, you were observing doctor's

10   orders from other doctors that were also false?

11   A.   Yes.

12   Q.   And you continued to falsify the paperwork; is

13   that right?

14   A.   Yes, I did.

15   Q.   Government's Exhibit H-27.

16        Remember talking about Jack High?

17   A.   Yes.

18   Q.   And you signed false orders for Jack High, right?

19   A.   Yes.

20   Q.   How much money did the Merida Group bill for Jack

21   High?

22   A.   $286,149.

23   Q.   How much money did the Merida Group make off

24   Mr. High?

25   A.   $198,031.

1    Q.   How many years was Mr. High at hospice?

2    A.   A little over four years.  Yeah, four years.

3    Q.   Is that unusual based on your experience at the

4    Merida Group for a patient to be on hospice for four

5    years?

6    A.   No.

7    Q.   Why not?

8    A.   Because patients there at Merida were continually

9    retained for long periods of time.

10   Q.   Again, you've got a box of patient files from the

11   Merida Group, other clinics listing all sorts of issues

12   with Jack High, would you trust that box?

13   A.   No, I would not.

14   Q.   Why not?

15   A.   Because the -- the information -- the diagnosis

16   that I provided were -- were false, they were -- I was

17   continuing a practice of fraudulently certifying

18   patients and falsely diagnosing patients as other

19   medical directors had -- had done before me.

20   Q.   Government's Exhibit H-47, this is Ms. Conti.

21   You signed a fraudulent order for Ms. Conti; is that

22   right?

23   A.   Yes, sir.

24   Q.   How much did the Merida bill for Ms. Conti?

25   A.   $94,576.

1    Q.   How much was paid?

2    A.   $53,833.

3    Q.   By the way, do you know if Ms. Conti's alive

4    today?

5    A.   No, I do not.

6    Q.   Would it surprise you if she were alive today?

7    A.   It wouldn't surprise me.

8    Q.   Why not?

9    A.   Because her -- this patient, like other patients,

10   were not terminally ill at the time of -- when I -- when

11   I saw her, so I wouldn't be surprised if she's still

12   alive.

13   Q.   Again, same question, box of -- box of records

14   for Ms. Conti from the Merida Group from different

15   doctors, would that change your opinion about the

16   accuracy of those records?

17   A.   No, I wouldn't trust them.

18   Q.   Why not?

19   A.   Because they contain false information.

20   Q.   Government's Exhibit H-31, Teresa Calvillo.

21        How much did the Merida Group bill for Ms.

22   Calvillo?

23   A.   $202,012.

24   Q.   How much was the Merida Group paid?

25   A.   $154,330.

1    Q.   How many years was she on hospice?

2    A.   Three years.

3    Q.   Again, hundreds of pages of medical records from

4  the Merida Group on this patient.   Would you trust those

5  records?

6    A.   No.

7    Q.   What are some other examples of false information

8  that you would see in doctor's orders in those Merida

9  Group patient files?

10   A.   Primarily just, you know, the diagnoses and the

11 certifications.

12   Q.   What do you mean by the certifications, is that

13 the hospice order?

14   A.   Yes, the -- these would be the face-to-face

15 certification that I would sign, I would falsely certify

16 that patients were actively dying and had less than six

17 months to live.

18   Q.   And based on your review of those records, were

19 other doctors doing the same thing?

20   A.   Yes.

21   Q.   And do you know that based on your personal

22 observation of those patients?

23   A.   Yes.

24   Q.   Did that happen frequently?

25   A.   Yes, it did.

1    Q.  Did it happen in San Antonio?

2    A.  Yes.

3    Q.  Laredo?

4    A.  Yes.

5    Q.  Throughout the Valley?

6    A.  Throughout Texas.

7    Q.  Showing you Government's Exhibit H-35.  This is

8    patient Petra Cerda.

9        How long was Ms. Cerda on hospice?

10   A.  For about three-and-a-half years.

11   Q.  How much did the Merida Group bill to Medicare

12   for Ms. Cerda?

13   A.  $275,558.

14   Q.  How much money did the Merida Group make off Ms.

15   Cerda?

16   A.  $225,623.

17   Q.  Again, box of medical records, hundreds of pages,

18   different doctors signing orders, different nurse's

19   notes, would you trust that information?

20   A.  No.

21   Q.  Tell the jury why.

22   A.  Because that -- because I was falsely certifying

23   patients and falsely --

24              THE COURT:  One second.

25              THE WITNESS:  Writing out diagnoses.

1          THE COURT:  I need to hear the objection.

2          MR. BANKER:  We would object that's been

3   asked and answered probably twice and I didn't object.

4          MR. LOWELL:  Different patient now.

5          MR. BANKER:  Repetitive now.

6          THE COURT:  Overruled, it's a different

7   patient.

8      Q.  (By Mr. Lowell)  I believe I skipped this

9   patient, Government's Exhibit H-33.

10         Mr. Castaneda, do you see that?

11     A.  Yes.

12     Q.  How long was he on hospice?

13     A.  About two-and-a-half years.

14     Q.  How much did the Merida Group bill to Medicare

15   for this patient?

16     A.  $142,525.

17     Q.  How much did the Merida Group make off this

18   particular patient?

19     A.  $116,087.

20     Q.  Would you trust any Merida Group patient records

21   relating to Mr. Castaneda?

22     A.  No.

23     Q.  Now, just quickly, Mr. Carrillo, you were -- you

24   were indicted a couple years ago, right?

25     A.  I'm sorry, can you repeat the question?

1    Q.   You were indicted a couple years ago?

2    A.   Yes.

3    Q.   As part of that indictment you were charged with

4    health care fraud; is that correct?

5    A.   Yes.

6    Q.   Aggravated identity theft?

7    A.   Yes.

8    Q.   And you were also charged with lying to a federal

9    agent; is that correct?

10   A.   Yes.

11   Q.   And was -- and was that during an interview with

12   HHS?

13   A.   Yes, sir.

14   Q.   The Department of Health and Human Services?

15   A.   Yes.

16   Q.   And what did you lie to HHS about?

17   A.   They -- I lied about being a medical director and

18   receiving money in return for referring patients.

19   Q.   Now, we talked about these lies in the medical

20   records, would it be fair to say that you added these

21   lies --

22            MR. BANKER:   Judge, I'm going object to

23   leading the witness.

24            THE COURT:   Let me hear the question.

25   Q.   (By Mr. Lowell)   So you were asked a lot of

1    questions about your experience in the Merida and the

2    work you were doing at Merida; is that correct?

3         A.   Yes.

4         Q.   And part of your work was lying in the medical

5    paperwork; is that right?

6         A.   Yes.

7         Q.   Would it be fair to say that you added hundreds

8    of lies to the patient files?

9         A.   Yes.

10        Q.   Did you add those lies to the patient files at

11   the direction of Henry McInnis?

12        A.   Yes.

13        Q.   Rodney Mesquias?

14        A.   Yes.

15        Q.   And others at the company were involved; is that

16   correct?

17        A.   Yes.

18        Q.   Including Joe Garza?

19        A.   Yes.

20        Q.   Would you agree with me that having one lie in a

21   medical record would have an impact on your diagnosis?

22        A.   Yes.

23        Q.   Tell the jury why that is.

24        A.   On my diagnosis today or back then?

25        Q.   Just generally, if there was an intentional lie,

1    any lie in a medical record of any patient, why is that

2    important?

3        A.   Well, it's important because the patient is being

4    falsely dia -- diagnosed which can affect the patient's

5    treatment plan, it can affect the patient in a -- in a

6    negative -- negative way.

7            And other physicians rely, other health care

8    providers rely on -- on an accurate evaluation and

9    diagnosis of a patient so that they can continue

10   properly treating the patient.

11       Q.   If I understand you correctly -- correctly, I

12   believe you testified that you would see lies in the

13   patient files from other doctors; is that correct?

14       A.   Yes.

15       Q.   And then you would add additional lies; is that

16   right?

17       A.   Yes.

18       Q.   Continuing the process at the Merida Group?

19       A.   Yes.

20       Q.   I believe you were asked questions about -- I

21   think you mentioned Dr. Pelly; is that correct?

22       A.   Yes.

23       Q.   Do you recall meeting with Dr. Pelly and Rodney

24   Mesquias?

25       A.   Yes, I do.

1    Q.   And was Dr. Pelly a doctor with the Merida Group?

2    A.   Yes, I believe so.

3    Q.   What was --

4         MR. BANKER:   Judge, I'm going to object.

5    This is going, again, beyond the scope of -- of the

6    cross.

7         MR. LOWELL:   They opened the door, he

8    mentioned Dr. Pelly, mentioned meeting him.

9         THE COURT:   I believe that -- that was

10   referenced, overruled.

11   Q.   (By Mr. Lowell)   Let me talk about that meeting.

12   What was said during that meeting with Dr. Pelly and

13   Rodney Mesquias?

14   A.   Rodney Mesquias took me to Dr. Pelly's office,

15   it -- it was more of just a social visit.   Dr. Pelly, I

16   remember him --

17        MR. BANKER:   Judge, I'm going to object to

18   hearsay.

19        MR. LOWELL:   It's an employee of the

20   company.

21        THE COURT:   Overruled.

22   Q.   (By Mr. Lowell)   What did Dr. Pelly say?

23        MR. GUERRA:   Your Honor, I'll reissue that

24   objection.   If he's an employee of the company, the

25   statement has to be made in the course and scope of the

1    employment, just because it's an employee doesn't allow

2    it to be a hearsay exception.  He hasn't laid the

3    predicate to show that it's part of it.

4            THE COURT:  All right.  Please lay the

5    predicate that this was done during this course of -- of

6    Dr. Pelly's employment.

7            MR. LOWELL:  Thank you, Your Honor.

8    Q.  (By Mr. Lowell)  Now, this meeting that you

9    described with Dr. Pelly and Rodney Mesquias was -- was

10   that done during the course of your employment with the

11   Merida Group?

12   A.  Yes.

13   Q.  And was it your understanding that Dr. Pelly was

14   an employee as well?

15   A.  Yes.

16   Q.  What -- what, if anything, did Dr. Pelly say

17   during that meeting?

18   A.  What he said that -- that I remember clearly, he

19   made a comment that he -- he eats what you kill.

20   Q.  You said eat what you kill?

21   A.  Yes.

22   Q.  What does that mean?

23           MR. BANKER:  Judge, I'm going to object to

24   speculation.  He's trying to speculate what that -- a

25   phrase meant that somebody said.

1            MR. LOWELL:  To Mr. Carrillo.

2            THE COURT:  That's overruled, he can answer

3    what he interpreted that to mean.  It was said to him,

4    correct?

5            MR. LOWELL:  Yes.

6    Q.  (By Mr. Lowell)  Eat what you kill, what did that

7    mean to you?

8    A.  What that meant was that the more patients that

9    you see, the more patients that you eat or kill, the

10   more money you make.

11   Q.  Dr. Pelly, he's a doctor; is that right?

12   A.  Yes.

13   Q.  Were you surprised by that comment?

14   A.  No.

15   Q.  Why not?

16   A.  Because at the time I felt the same way.

17   Q.  You're also shown certain checks that you

18   received, you were shown one or two checks that you

19   received during your time at the Merida Group; is that

20   right?

21   A.  Yes.

22   Q.  You weren't shown all of the money you received;

23   is that correct?

24   A.  No.

25   Q.  Now, at least some of the money that you received

```
 1    from the Merida Group, did it relate to the investment
 2    in your medical practice?
 3        A.   Yes.
 4        Q.   And the checks that you would receive from the
 5    Merida Group, they would be signed by Rodney Mesquias;
 6    is that correct?
 7        A.   Yes.
 8        Q.   And they would list the Merida Group Company at
 9    the top of the check?
10        A.   Yes.
11        Q.   They wouldn't list Henry McInnis' personal name
12    on the check?
13        A.   No.
14        Q.   And they wouldn't list his name; is that right?
15        A.   I'm sorry?
16        Q.   They would not list his name; is that correct?
17        A.   Right.
18        Q.   That's because those were checks that were issued
19    from --
20               MR. CYGANIEWICZ:  Objection to leading,
21    Your Honor.
22               THE COURT:  Re -- rephrase the question.
23               MR. LOWELL:  Yes.
24        Q.   (By Mr. Lowell)  The checks that you received at
25    the Merida Group, were they issued from the Merida
```

1  Group's corporate bank accounts?

2      A.  Yes.

3      Q.  And Mr. -- Mr. McInnis, he was the number two at

4  the company; is that correct?

5      A.  Yes.

6      Q.  Now, several times you were called a liar, and

7  you were a liar in the past; is that right?

8      A.  Yes.

9      Q.  You committed fraud?

10     A.  Yes.

11     Q.  Committed lots of fraud; is that correct?

12     A.  Yes.

13     Q.  As a former medical director for the Merida

14  Group, have you taken responsibility for your actions?

15     A.  I'm trying to.

16     Q.  Tell the jury how you're trying to.

17     A.  I've taken responsibility for the criminal

18  activities that I -- that I was engaged in, I'm ashamed

19  and I'm not proud of them.  I've plead guilty to those

20  activities.  And what I'm trying to do now is -- is to

21  remedy in a way the things that I've done in the past.

22     Q.  You're not practicing as a doctor anymore; are

23  you?

24     A.  No.

25     Q.  Tell the jury what you're doing for a living

1   today.

2       A.   I work as a construction foreman for a

3   petrochemical energy company at -- at a plant in

4   Louisiana.  And I started off as a -- as an apprentice

5   and over the last three-and-a-half years I moved up, I'm

6   currently a foreman, and I supervise a team of 20

7   coworkers.  And we insulate pipes, tanks and -- and

8   place metal on them as well.  I also supervise their --

9   make sure that they work safely.  It is a dangerous job

10  and I make sure --

11          MR. CYGANIEWICZ:  I object to any personal

12  feelings about the job and it's not -- it's

13  nonresponsive and becoming a narrative.

14          MR. BANKER:  Also irrelevant, Your Honor.

15          MR. CYGANIEWICZ:  Also beyond the scope of

16  cross.

17          THE COURT:  Gentlemen, let's move on.

18  That's been asked and answered in terms of his initial

19  direct.

20          MR. LOWELL:  Pass the witness, Your Honor.

21          THE COURT:  Mr. Banker.

22          MR. BANKER:  Thank you, Your Honor.

23          THE COURT:  And one second, let me get

24  everything situated before you begin.

25          Gentlemen, the Government used 30 minutes in

1  redirect.  Again, on re-cross limit the issues to only

2  new issues brought up through -- in redirect.  Let's not

3  go back through the direct and cross that's already been

4  taken place.

5          MR. BANKER:  Your Honor, there were some

6  issues that if I might, excuse me to interrupt, that

7  were brought up on cross by other attorneys.  I think I

8  would be able to --

9          COURT OFFICER:  Excuse me, Your Honor.  The

10  jury can't hear.

11          THE COURT:  Yes.  Mr. Banker, again, get --

12  get close to the microphone.

13          Any new issues brought up I'm going to get

14  back to my point.

15          MR. BANKER:  Okay.

16          THE COURT:  Let's deal with new issues that

17  deal with your client not -- don't repeat questions that

18  have already been done.  But please proceed.  Please

19  proceed.

20          MR. BANKER:  I will, thank you, Your Honor.

21                  RE-CROSS EXAMINATION

22  BY MR. BANKER:

23    Q.  Good morning, Mr. Carrillo.

24    A.  Good morning.

25    Q.  I just have a few more questions for you.

1          Now, after yesterday's Cross-Examination, direct

2     testimony, did you meet with Government agents between

3     then and this morning and talk about your testimony?

4          A.   No, sir, I did not.

5          Q.   Yesterday I did ask you about whether you met any

6     of the other medical directors, right?

7          A.   Yes, you did.

8          Q.   And you said, yeah, you met Dr. Pelly?

9          A.   Yes.

10          Q.   Had you ever told any Government Agent or

11     prosecutor about this discussion you say you had with

12     Dr. Pelly and Mr. -- and Mr. Mesquias?

13          A.   Have I ever told, yes.

14          Q.   Yeah.

15          A.   Yes.

16          Q.   When did you tell them that?

17          A.   Throughout the course of the last couple of

18     years, I believe.

19          Q.   Okay.

20          A.   I don't remember exactly when.

21          Q.   Well, would it surprise you that in none of those

22     meetings that we talked about yesterday where you spent

23     an hour, hour-and-a-half that you told them about that

24     meeting?  Would it surprise you that's not in those 302

25     statements?

1    A.   I -- I wouldn't know, I mean --

2    Q.   So that's not something that -- you're saying

3  that that's not something that after yesterday you and a

4  prosecutor and an agent talked about?  Let's talk about

5  Dr. Pelly and then they can ask you some questions about

6  that this morning?

7    A.   I had no interaction --

8    Q.   That didn't happen?

9    A.   I had no interaction with the prosecution after

10 yesterday.

11   Q.   All right.  So let's talk about -- a little bit

12 about what Mr. Lowell was talking to you just now on

13 direct, redirect.

14        You would not disagree with me that doctors can

15 differ in their diagnosis of a patient, correct?

16   A.   (No response.)

17   Q.   That can differ, right?

18   A.   It depends.

19   Q.   Okay.  So that answer to me says -- is saying,

20 yes, that can differ.  You can have a different

21 diagnosis of a patient, correct?

22   A.   Not when it comes to a terminal diagnosis.  You

23 can defer on hypertension, for example, there's

24 different categories of hypertension, there's stage one,

25 stage two.

1    Q.   Okay.

2    A.   Blood pressure fluctuates so it can differ --

3              THE COURT:  Let him finish.  Go ahead.

4              Did you finish?

5              THE WITNESS:  No.  So for blood pressure,

6    there's stage one through four, so -- so it -- there can

7    be a difference in between physicians in -- in the stage

8    that the patient is in during the time -- during the

9    time that the patient visits that doctor.

10             But when it comes to a terminal diagnosis

11   where a patient has less than six months to live, then

12   there shouldn't be any question that -- on the

13   diagnosis.

14   Q.   Okay.  That's your opinion, right?

15   A.   That's my medical opinion.

16   Q.   Okay.  And that opinion could differ among

17   doctors, right?

18   A.   Not that specific opinion.

19   Q.   All right.  Okay.  But you wouldn't disagree with

20   me that a prognosis could be different between different

21   doctors?

22   A.   That -- that can vary.

23   Q.   Okay.  And now the Government has, in a broad

24   sweep of things, given you this question about all the

25   documents contained in Merida's files as being

1    fraudulent, right?  And you said, of course you said yes

2    and you said yes very quickly.  There was no hesitation

3    in your yes like you hesitate when I ask you a question.

4                MR. LOWELL:  Objection, Your Honor.  This is

5    the -- this is the cross from yesterday.

6                MR. BANKER:  Judge, this is cross.

7                MR. LOWELL:  No, this is the re-cross.

8                THE COURT:  Again, limit your re-cross to

9    the new issues that you're concerned about, Mr. Banker.

10               MR. BANKER:  Well, Judge, I was I thought

11   but --

12               THE COURT:  But -- but I'll allow the

13   question, he did ask about --

14               MR. BANKER:  The records.

15               THE COURT:  -- the specifics of the six --

16   six or seven patients.

17               MR. BANKER:  Right.

18               THE COURT:  As to -- so, yes, that is --

19   that is new.  So, yes, go ahead.

20               MR. BANKER:  Okay.  Thank you, Judge.

21       Q.  (By Mr. Banker)  All right.  So and you -- in --

22   in a broad sweep in front of this jury, you have

23   stated -- all of -- they're all fraudulent, they're all

24   tainted.  But when it came to examples, they've given

25   you one patient, right, they've given you some documents

1    yesterday and today on Francisca Perez, right?

2        A.  Yes.

3        Q.  Have they ever gone through with you the files

4    and -- and -- and showed you specific documents that you

5    would say, oh, I disagree with that doctor, or I

6    disagree with that one, or that one was wrong, they

7    haven't done that, right?

8        A.  No.

9        Q.  And of course because they haven't done that, you

10   can't come in here to this courtroom and say that

11   they've given you specific examples except the one,

12   Francisca Perez, right?

13       A.  I would have to answer that with a complete

14   sentence.  I just can't answer it yes or no.

15       Q.  Well, the question is have they shown you other

16   documents, and you said no, right?

17       A.  No, but you're asking me if that makes the whole

18   medical record false or not.

19       Q.  I'm not asking you that; am I?  I'm not asking

20   you that.  I'm asking you what they've done, okay?

21   You're not here to defend them, right?

22       A.  I'm not defending them.

23       Q.  Okay.

24       A.  If -- if --

25       Q.  That's -- that's enough.

1     A.   Okay.

2     Q.   Now, are you also saying that if there are -- are

3   medical files in the Merida files that are from another

4   doctor that may have seen the patient before they came

5   to Merida, are you saying those documents are false,

6   too?  Fraudulent?

7     A.   I'm only saying the Merida files are fraudulent.

8     Q.   So if -- if there are files contained in -- in

9   these documents, or whatever documents that are in this

10  case, and -- and they are from another doctor's files

11  and those files show a diagnosis, and maybe even a

12  prognosis that is similar to what was being done or

13  documented in Merida, you're not saying that that would

14  be false, too, right?

15    A.   Again, I'm only referring to the Merida files.

16    Q.   Okay.  Now, it was brought up about your drug

17  usage on -- on -- by one of the other attorneys.

18         You've admitted to being --

19              MR. LOWELL:  Objection, outside the scope.

20              MR. BANKER:  Judge, this was done on

21  Cross-Examination by one of the other lawyers.

22              THE COURT:  Again, his drug use was handled

23  in direct.  New issue, please.

24              MR. BANKER:  Well, I thought -- excuse me,

25  Judge, I don't mean to -- I -- I just thought that you

1    said that if another lawyer brought up an issue that

2    I -- that was a new --

3            THE COURT:  A new issue, yes, but I don't

4    think -- again, the drug use was not a new issue.

5            MR. BANKER:  But it was more elaborate -- it

6    was elaborated by the other attorney, and I think it

7    opened up a door for me to ask him a little bit more

8    about it.

9            MR. LOWELL:  Your Honor, the re-cross is

10   tied to the redirect, not the Cross-Examinations after

11   the initial direct.

12           THE COURT:  Again, I -- that's an overly

13   broad interpretation, yes.  Let -- let's go back to

14   basics.  I am limiting re-cross to new issues brought up

15   by the Government.

16           Now, I may have misinterpreted what you

17   said, but, yes, there were new issues brought up to each

18   Defendant, but I'm not sure that's what you're trying to

19   get to, Mr. Banker.  So again limit your re-cross --

20           MR. BANKER:  I don't mean to be

21   argumentative with the Court --

22           THE COURT:  Again, the drug issue is not

23   relevant to re-cross in the Court's opinion, please

24   proceed with a new line of questioning.

25   Q.  (By Mr. Banker)  Now, it was brought up in the

 1    Cross-Examination of another -- of another lawyer this

 2    issue of that laundry list of -- of -- of people and

 3    agencies that you worked with, or you had information

 4    about that you gave -- you gave the Government, remember

 5    I even asked you that on re-cross, on cross?

 6                 MR. LOWELL:  Objection, that has to do with

 7    the cross after the initial direct.  Has nothing to do

 8    with the Government's redirect.

 9                 THE COURT:  Let me hear the question to see

10    if it's proper, but again Mr. Banker --

11                 MR. BANKER:  Okay.

12                 THE COURT:  Questions you've already asked

13    you don't need to re-ask.

14    Q.   (By Mr. Banker)  On that laundry list, did the

15    Government ever, like, pursue that with you on those

16    other entities that you gave some kind of brief basic

17    information about?

18                 MR. LOWELL:  Same objection.

19                 THE COURT:  Sustained, that's been asked and

20    answered as well.

21                 MR. BANKER:  I'll pass the witness,

22    Your Honor.

23                 THE COURT:  Mr. Cyganiewicz.

24                 MR. CYGANIEWICZ:  Just a few questions,

25    Your Honor.

```
 1                    RE-CROSS EXAMINATION
 2   BY MR. CYGANIEWICZ:
 3      Q.   Hello, sir, just bear with me I don't have that
 4   many questions.  I know Mr. -- I'm going to just try to
 5   stick with what Mr. Lowell questioned you and some
 6   related areas, but you -- you said you accepted -- have
 7   accepted responsibility; is that correct?
 8      A.   Yes.
 9      Q.   Were you ever even charged with anything
10   involving Merida?
11      A.   No.
12      Q.   And I -- I couldn't remember what you said about
13   you were -- were you charged or have you plead guilty to
14   lying to a federal agent?
15      A.   I plead guilty to --
16      Q.   Health care fraud?
17      A.   Health care fraud and identity theft.
18      Q.   Were you charged with lying to an agent?
19      A.   I was -- I was charged, but I wasn't -- it was
20   not part of the -- that was -- that was not part of the
21   counts that I agreed to.
22      Q.   Was it something else, some other count, some
23   other case or --
24      A.   No.
25      Q.   You were never charged with lying to a federal
```

1    agent?

2       A.   Like indicted, that was not part of the

3    indictment, no.

4       Q.   Were you ever charged and arrested for that?

5       A.   No.

6       Q.   Okay.  Regarding these lists of -- that were

7    shown to you, the 77 orders and -- you remember

8    testifying that Mr. Garza would give you the patients

9    list or some nurses, correct?

10      A.   Yes.

11      Q.   And the -- this first list, did you say that they

12   were in Laredo, these patients?  The 70 something

13   patients?

14      A.   I don't recall where they were at, I think it was

15   33 from Laredo.

16      Q.   33 was in San Antonio.

17      A.   Okay.

18      Q.   And then the 77, I think you said was Laredo, or

19   the prosecutor did?

20      A.   Okay.

21      Q.   Correct?

22      A.   Okay.

23      Q.   So it was Laredo and San Antonio, correct?

24      A.   Yes.

25      Q.   Not Harlingen?

1      A.   No.

2      Q.   And you talked about Mr. McInnis being present

3  when you were instructed.  You didn't say much about Joe

4  Garza.

5      A.   No, they were all present.

6      Q.   You had a lot of contact with Mr. Garza, right,

7  you just left Joe out of it?

8      A.   No, they were all present initially.

9      Q.   At one point did you approach Joe because you had

10  a concern about certifying patients?

11      A.   Right in the beginning.

12      Q.   And again I'm trying to remember what the -- you

13  told the agents.  Didn't Mr. Garza say that other

14  doctors are doing it, it's legal, right?

15      A.   Yes.

16      Q.   Mr. McInnis never said anything like that to you;

17  did he?

18      A.   No.

19      Q.   And remember an incident where I -- I think I --

20  you said you were -- Joe would bring you, Mr. Garza

21  would bring you a bunch of stack of these forms, the

22  485's to sign?

23      A.   Yes.

24      Q.   And you would sign them?

25      A.   Yes.

1    Q.   Right?  You remember telling the agents about an

2    e-mail you got from Mr. Garza saying that you -- he

3    wanted you to use a specific date for the certification

4    form and not the date you actually saw the patient?

5    A.   Yes.

6    Q.   Mr. McInnis didn't say that to you; did he?

7    A.   No.

8    Q.   And these -- Mr. McInnis being present during

9    some sort of instructions, in all these ten pages when

10   you talked to the federal agents back when it was fresh

11   in your mind, you never said anything about that; did

12   you?

13         Is there anything in here about the 77 patients

14   and the 33rd patients, or even anything that says

15   Mr. McInnis instructed me to commit fraud, or that is

16   even present, is there anything in these?

17              MR. LOWELL:  Objection Your Honor, he --

18   he's already testified he didn't review any reports.

19              MR. CYGANIEWICZ:  I'm just asking if he said

20   anything like that to the agents.

21              THE COURT:  Well, rephrase the question.

22   Q.   (By Mr. Cyganiewicz)  Did you say anything like

23   that to the agents?

24              THE COURT:  Again, rephrase the question.

25   He has no knowledge of what --

```
 1      Q.  (By Mr. Cyganiewicz)   The reports indicate that
 2  -- excuse me?
 3              THE COURT:  Please, rephrase the question.
 4              MR. CYGANIEWICZ:  Yes, sir, I'm sorry.
 5      Q.  (By Mr. Cyganiewicz)  Did you tell the agents
 6  back in 2016, four years ago, that Mr. McInnis was
 7  instructing you about these 77 and 33 patients to commit
 8  fraud?
 9      A.  (No response.)
10      Q.  Yes or no?  Did you ever say anything like that
11  to them?
12      A.  Yes, in the beginning, yes.
13      Q.  Did you show me where it was in the reports?
14      A.  I don't have access to the report, I don't know
15  what was written.
16      Q.  Would you have a reason to doubt me if I say
17  there's nothing in these reports about that?
18      A.  No, sir.
19              MR. LOWELL:  Objection.  Same objection,
20  Your Honor.
21      Q.  (By Mr. Cyganiewicz)  No, sir, correct?
22      A.  No, sir.
23              THE COURT:  He answered the question.
24      Q.  (By Mr. Cyganiewicz)  Okay.  So today you're
25  saying it for the first time basically?
```

```
 1        A.   Basically.
 2                   MR. CYGANIEWICZ:  Thank you.
 3                   THE COURT:  Mr. Guerra?
 4                   MR. GUERRA:  Briefly, Your Honor.
 5                   THE COURT:  And Mr. Carrillo, in the future
 6    before you answer, if an -- an attorney stands up to
 7    make an objection, just wait.
 8                   THE WITNESS:  Okay.
 9                   THE COURT:  Before you answer the question
10    so I can address it.
11                   THE WITNESS:  Okay.
12                   THE COURT:  All right?
13                   MR. GUERRA:  Hopefully that won't come up in
14    the next --
15                   THE COURT:  Hopefully that won't come up.
16                   MR. GUERRA:  I can't make any promises.
17                        RE-CROSS EXAMINATION
18    BY MR. GUERRA:
19        Q.   Mr. Carrillo, briefly, sir, I was a little bit
20    confused during your testimony during redirect.  Did you
21    rely on the primary doctor's orders, or were you just
22    signing blank forms presented to you?
23        A.   You mean on the diagnosis?
24        Q.   Yes.
25        A.   Yes, that's what I was instructed to do.
```

1    Q.   Just signing blank forms?

2    A.   Transferring the information from prior

3    face-to-face forms completed by other medical directors

4    transferring them over to the new form and -- and -- and

5    signing them.

6    Q.   Okay.  You -- you conducted no independent

7    analysis of those records, correct?

8    A.   I tried initially the first time, but I was told

9    not do that.

10   Q.   Okay.  With regards to your tenure at Merida, you

11   left in May 2015; is that correct?

12   A.   When I was arrested June 15th -- June 16th.

13   Q.   Well, let's just say June 2015.  After that

14   timeframe, you didn't review any medical records,

15   correct, from Merida?

16   A.   No.

17   Q.   You had no involvement in those medical records,

18   correct?

19   A.   Correct.

20   Q.   Sow can't tell the ladies and gentlemen of the

21   jury based on your own personal knowledge whether any

22   medical records from June 2015 onward are true and

23   correct; is that right?

24   A.   That's correct.

25            MR. GUERRA:  Pass the witness, Your Honor.

```
 1              THE COURT:  Anything else, Mr. Lowell?
 2              MR. LOWELL:  Your Honor, just briefly.
 3   Thank you.
 4                      FURTHER DIRECT
 5   BY MR. LOWELL:
 6        Q.  Mr. Carrillo, Mr. Banker just asked you on his
 7   re-cross whether you testified about only one patient;
 8   is that right?
 9        A.  Yes.
10        Q.  You testified about a lot more patients than
11   that; didn't you?
12        A.  Yes.
13        Q.  77 patients?
14        A.  Yes.
15        Q.  36?
16        A.  Yes.
17        Q.  33; is that right?
18        A.  Yes.
19        Q.  And by my math, it's not one patient, that's
20   approximately 147 patients; is that correct?
21        A.  That's correct.
22        Q.  And those 147, approximately, patients, you
23   signed up fraudulently for the Merida Group; is that
24   right?
25        A.  That's correct.
```

1    Q.   Those 147 patients you signed them up

2    fraudulently at the direction of --

3         MR. BANKER:   Your Honor, I object, that's

4    been asked and answered.

5         THE COURT:   That has been asked and

6    answered.

7    Q.   (By Mr. Lowell)   I just want to be clear about

8    something.   Mr. Cyganiewicz was asking you about the

9    lying charge that you had.   You were -- you were charged

10   with lying to a federal agent, right, a couple years

11   ago?

12   A.   I believe so, yes.

13   Q.   Okay.   Now, that charge, just to be clear for the

14   record, you didn't plead guilty to that charge; is that

15   right?

16   A.   Right.

17   Q.   Okay.   You plead guilty to other charges?

18   A.   Right.

19   Q.   What were those other charges?

20   A.   Health care fraud and identity theft.

21   Q.   Just quickly.   Mr. Guerra asked you about,

22   something about the records, and you testified that you

23   would take the prior information from other medical

24   directors and then you would place it in the new hospice

25   order; is that right?

A.   Yes.

Q.   And when you would transfer that information from other Merida Group medical directors, did you observe that that information was false?

A.   Yes.

Q.   Was that based on your personal observation of patients?

A.   Yes, it was.

Q.   Was it based on your review of that other medical director's patient file?

A.   Yes.

MR. LOWELL:  Nothing further, Your Honor.

MR. BANKER:  Are we done?

THE COURT:  Yes, Mr. Banker, anything else?

MR. BANKER:  I do.

FURTHER CROSS

BY MR. BANKER:

Q.   Just to clarify, my -- my question about this so-called fraudulent activity, my question was, besides your broad, sweeping declaration of fraud in those files, has the Government come up and shown you specifically incidents besides that one yesterday, Francisca Perez?

MR. LOWELL:  Objection, asked and answered.

MR. BANKER:  I'm just trying to clarify how

1  he -- he redirected him.  He's -- he's saying that I

2  only -- I only -- that I only said there was one, my --

3  my question was have you gone through the files with any

4  specificity and shown the Government and specified -- or

5  even this Court anything specific?

6          And he -- his earlier testimony was no.  He

7  came up here and tried to redirect him to say, oh, no,

8  there's more.  I'm just wanting to clarify the point,

9  Judge.

10         THE COURT:  All right.  So you're asking

11  has -- has he -- has he seen any other documentation; is

12  that correct?

13         MR. BANKER:  Correct.

14         THE COURT:  Sir, have you seen any other

15  documentation?

16         THE WITNESS:  No.

17         MR. BANKER:  Okay.

18  Q.  (By Mr. Banker)  Now, you -- prosecutor brought

19  up this question about being charged with making a false

20  statement to -- to an agent.

21         Part of your plea bargain deal that got you out

22  of jail, you didn't plead guilty to that, right?

23         MR. LOWELL:  Objection.

24         THE COURT:  That's -- that's been asked and

25  answered.

1          MR. BANKER:  Okay.  And the -- well, I think

2     the follow-up is, it was part of a plea bargain as far

3     as why he didn't plead guilty to it, right?

4          THE COURT:  Well, that's been asked and

5     answered as well, sir.

6     Q.  (By Mr. Banker)  Okay.  Then the next question is

7     you're not saying you're not guilty of that, right?  You

8     did that, right?

9     A.  Yes, I did.

10    Q.  Okay.  And there was an earlier question about,

11    oh, all I did was just say I didn't take money for

12    referrals, right?

13         Isn't that what you told the -- Mr. Lowell when

14    he asked you how you lied to them?

15    A.  I don't recall that question, can you -- can

16    you --

17    Q.  Okay.

18    A.  -- rephrase it?

19         THE COURT:  Well, Mr. Lowell.  Again, now

20    you're going outside the scope of the redirect.  Those

21    questions have been asked and answered.

22         MR. BANKER:  All right, Judge.  Thank you.

23                   FURTHER CROSS

24    BY MR. CYGANIEWICZ:

25    Q.  Just a couple questions about Mr. Lowell asked

1   you about the charge that you were lying; you remember

2   that, correct?

3       A.  Yes.

4       Q.  And was it just like three or five minutes ago

5   that I asked you and you told me, no, you were not

6   charged, or did you just forget, or were you trying to

7   hide that from somebody?

8       A.  No, what I meant was that -- that it was not part

9   of the -- of what I plead guilty to.

10      Q.  My question wasn't that, it was were -- I think I

11  asked you were you ever -- ever charged with lying and

12  you -- you right here today in front of everybody told

13  me no.

14      A.  I believe it was part of the indictment.

15      Q.  So now you're telling me you were charged?

16      A.  I believe so.

17      Q.  You believe so?

18      A.  Yes.

19      Q.  You don't know when someone -- you don't even

20  know if you're charged with a federal crime of lying to

21  an officer?

22      A.  I believe -- I believe I was charged.

23      Q.  Then again I guess my question is why did you

24  tell me, no, just a few minutes ago you were not

25  charged?

1    A.   I misunderstood your question.

2    Q.   Do you understand it now?

3    A.   Yes.

4    Q.   You weren't trying to hide anything then?

5    A.   No.

6    Q.   And is that a case that's also going to get

7    dismissed, or has that already been dismissed?

8    A.   It's already been dismissed, I believe.

9              MR. CYGANIEWICZ:   Thank you.

10             MR. GUERRA:   Nothing further, Your Honor.

11             THE COURT:   Anything else?

12             MR. LOWELL:   Your Honor, just one point of

13   clarification.

14                      FURTHER DIRECT

15   BY MR. LOWELL:

16   Q.   Mr. Carrillo, during your years -- during your

17   tenure at the Merida Group, you reviewed more than one

18   patient file; is that correct?

19             MR. BANKER:   Judge, I'm going to object to

20   leading the witness.

21             THE COURT:   Let me hear the question.

22   Q.   (By Mr. Lowell)  During your tenure at the Merida

23   Group, did you review more than one patient file?

24             MR. BANKER:   That's leading the witness,

25   Judge.

1          THE COURT:  How many files did you review

2    during your tenure?

3        Q.  (By Mr. Lowell)  How many files --

4          THE WITNESS:  You're asking me?

5        Q.  (By Mr. Lowell)  How many files did you review

6    when you were at the Merida Group?

7        A.  Hundreds of files.

8        Q.  And during your review of those files, did you

9    identify false information in more than one?

10       A.  Yes.

11       Q.  How pervasive was that false information?

12       A.  It was very constant.

13       Q.  What do you mean by that, tell the jury what you

14   mean by that?

15       A.  Say out of ten patients, eight, maybe one or two

16   did actually qualify for hospice or met the criteria for

17   hospice with the proper diagnoses.  The other eight --

18   80 percent, the diagnoses was not accurate, it was

19   false.

20          MR. LOWELL:  Nothing further, Your Honor.

21          THE COURT:  Gentlemen, anything else?

22          MR. BANKER:  No, Your Honor.

23          MR. GUERRA:  No, Your Honor.

24          MR. CYGANIEWICZ:  No, sir.

25          THE COURT:  Thank you, sir, you're excused.

1    You may step down.

2              Before we go to the next witness, do we need

3    any -- don't ask her, I'm asking -- anybody, going once,

4    going twice, all right, let's proceed with the next

5    witness, please.

6              MR. SWARTZ:  Your Honor, the Government

7    calls Melissa Hernandez.

8              THE COURT:  And I'm sorry, Mr. Swartz, who?

9              MR. SWARTZ:  Melissa Hernandez.

10             THE COURT:  All right.

11             Good afternoon, ma'am.  That is, good

12    morning, what am I saying?

13             Good morning.  Please remain standing, raise

14    your right hand, please.

15             THE CLERK:  Please raise your right hand.

16             (WITNESS SWORN IN.)

17             THE WITNESS:  Yes.

18             THE COURT:  Please make yourself comfortable

19    and speak loudly and clearly into the microphone, make

20    sure you position it closely, all right?

21             MR. SWARTZ:  May I proceed, Your Honor?

22             THE COURT:  Yes, please.

23                          DIRECT EXAMINATION

24    BY MR. SWARTZ:

25       Q.  Good morning.

1    A.   Good morning.

2    Q.   Will you please tell the jury your name?

3    A.   Melissa Hernandez.

4    Q.   Ms. Hernandez, I noticed that you are chewing

5    some gum?

6    A.   Yes.

7    Q.   I don't mean to embarrass you but you can just,

8    without getting into any personal details, but can you

9    explain to the jury why you're chewing gum?

10   A.   I take really strong diarrhetics and so my mouth

11   gets super dry all day, so if I don't have gum in my

12   mouth, my mouth sticks together, so I'm having to chew

13   gum all day and drink water to keep it lubricated.

14   Q.   Okay.  I'm sorry I have to embarrass you with

15   that question.

16        Ms. Hernandez, where do you live currently?

17   A.   I'm sorry?

18   Q.   Where do you live currently?

19   A.   I live in San Antonio.

20   Q.   Are you a licensed nurse?

21   A.   I am.

22   Q.   What sort of license do you have?

23   A.   I have a registered nurse license.

24   Q.   How long have you been a registered nurse?

25   A.   Since August of 2012.

1     Q.   Where exactly did you receive your training as an

2   RN?

3     A.   Baptist School of Health Professions.

4     Q.   Approximately, how long have -- have you

5   practiced as an RN?

6     A.   Since August of 2012.

7     Q.   Could you explain to the jury, did you ever work

8   for a company called Professional Hospice, or Merida?

9     A.   Yes, sir.

10    Q.   Approximately, what time period?

11    A.   From about, maybe, 2013, maybe, 2014.

12    Q.   Could you pull up Government's Exhibit L-1,

13   please.

14    A.   I started in 2012 with BRM, which was kind of

15   a -- the same kind of company, and then they were

16   changing names and so I moved over from the home health

17   to the hospice side.  I don't remember if it was a year

18   or two years after, but then I was in the hospice side,

19   which was Professional Hospice and then changed to

20   Merida.  I don't recall exactly what timeframe, it would

21   have been, maybe a year or two years later.

22    Q.   Okay.  Thank you.

23    A.   Uh-huh.

24    Q.   Just one moment.  Okay.  So on the screen is

25   Government's Exhibit L-1.

1          Could you indicate to the jury where exactly you

2     worked for the Merida Group?

3          A.   Well, primarily I worked in Bexar County, but

4     there was times when I was sent to Houston, to Corpus

5     and to Laredo to train other nurses.

6          Q.   And what were your duties at the Merida Group?

7          A.   I managed patient care, case loads, I did

8     scheduling, I did -- ordered supplies, ordered

9     medications, and performed regular tasks, you know,

10    assessed patients, requested orders from doctors for

11    certain types of symptoms they were having, assisted

12    with managed -- managed care as far as their symptoms,

13    symptom control.

14         Q.   What was the -- could you just give the jury an

15    idea of what the approximate census was of the Merida

16    Group while you were working there?

17         A.   Wow, it was in the hundreds, I would say maybe

18    100 to 200, just pretty large.

19         Q.   And when you're going through some of the duties

20    you had there, did you actually see and interact with

21    patients out in the field?

22         A.   Everyday.

23         Q.   Did you go to patient's homes?

24         A.   Everyday.

25         Q.   Did you observe their conditions?

     A.  Yes, sir.

     Q.  And as an RN working in the hospice field, did
you become with -- familiar with the Medicare
requirements to admit a patient to hospice?

     A.  Yes, I did.

     Q.  Did you become familiar with the requirements to
recertify a patient for hospice services?

     A.  Yes, sir.

     Q.  Can you just give the jury a very brief overview
of, from your training as an RN in the hospice field,
what kind of patient qualifies under Medicare for
hospice services?

     A.  So, when a patient is presented to you, you get a
copy of their H&P, which is called history and physical,
and you kind of review in black and white what a
patient's diagnoses are.  For example, if they have
cancer, if they have COPD, if they have liver failure,
things like that.  But not only do have you to see it in
black and white, you have to see it in the actual
patient.  So just because a patient has cancer, for
example, they can have early stages of cancer and they
don't technically qualify for hospice, they kind of have
to be very advanced where they're already
non-ambulatory, taking large amounts of medication to
control pain, maybe not eating anymore, maybe

1    hallucinating, things like that, so you're looking for

2    not only in paper-wise but looking at the actual patient

3    and saying, yep, this is a patient that qualifies.

4    They're -- they're kind of close to getting to knocking

5    on the door is what I always use.

6        Q.   Does a patient have to be terminally ill?

7        A.   Yes, sir.

8        Q.   And in terms of the length of time that they're

9    expected to survive, in order to be on hospice is there

10   a length of time requirement?

11       A.   Technically, it should be six months or less.

12       Q.   Now, while you're at working at the Merida Group

13   in your role, did you participate in what are known as

14   IDT meetings?

15       A.   Yes, sir, I did.

16       Q.   Can you explain to the jury what an IDT meeting

17   is?

18       A.   IDT stands for interdisciplinary team, or

19   sometimes they call it IDG, interdisciplinary group, and

20   it's a group of nurses that gets together with the other

21   disciplines, for example, the social worker, or the

22   chaplain and the doctor that's in charge of your group.

23   And so in those meetings, you're discussing patient A,

24   and I say, patient A has this and this and this and they

25   need to continue to stay on hospice because this is

1    happened within these past two weeks.

2         Sometimes a patient doesn't have a decline within

3    those two weeks and that's okay, but it doesn't happen

4    very -- it's not very common for that to happen.  So

5    maybe two weeks have passed and there hasn't been a

6    change, but the weeks prior to that there has been some

7    type of decline that shows why a patient should remain

8    on hospice.

9        Q.  And in these IDT or IDG meetings at the Merida

10   Group, did you interact with a doctor known as

11   Dr. Virlar?

12       A.  Yes, I did.

13       Q.  Did -- during the time you were at Merida Group

14   in IDT, IDG meetings with Dr. Virlar, did Dr. Virlar

15   ever pressure you to falsify medical records?

16       A.  He did.

17       Q.  Can you explain that to the jury.

18       A.  It would have been probably the second IDT

19   meeting we had.  I'm sorry.

20       Q.  Take -- take the time you need, ma'am.

21       A.  And I was still learning hospice.  I was new to

22   hospice and I was learning, and I said the first meeting

23   I didn't have an actual case load, so two weeks after

24   that, which is your meeting every two weeks, two weeks

25   after that I had my case load of patients that I had

1   already been seeing and comes to me, and it's patient A,

2   for example, and I would say, I don't see anything to

3   keep this person on hospice for.  I don't find anything

4   that's showing decline.

5         And he said, somebody show this pendeja how to

6   document.  And I felt so stupid, but he was telling the

7   director of nurses behind me that, and I was shocked,

8   I'd never heard a doctor talk like that to anybody.  So

9   I just went, okay.

10        And so they went around and then it was another

11  patient that was mine, and I just kind of said the same

12  thing.  I don't know what -- and I didn't even want to

13  say anything, but I said I didn't even know what else to

14  put for this patient I don't know to say, and he was,

15  like, I don't know what I'm doing.

16        And from that point on, I wasn't -- I don't want

17  to say the word allowed, but if I were to say I don't

18  find anything to keep this person on hospice for, it was

19  like, well, pendeja you should know what to put this

20  hospice for.  Somebody show her how to document.  Like

21  in other words I better put down something that's

22  showing he's declining or she's declining, otherwise,

23  I'm too pendeja to keep him on service.

24        And that's kind of how the meetings ran.  So if

25  we were too dumb enough not to find something, then we

1    better find something to show that they were declining.

2        Q.   And can you explain to the jury just what sorts

3    of things do you put into documentation to make it

4    appear that a patient is -- qualifies for hospice, or is

5    declining?

6        A.   So when you work in hospice and -- and as I've

7    learned, you need to put down something that shows a

8    patient is qualified.  For example, if a person was

9    eating three meals a day a month ago, two months ago,

10   three months ago, then now I'm going to recertify a

11   patient which is two months or three months later and

12   I'm going to put down, well, two months ago this person

13   was eating three cups of oatmeal everyday and now

14   they're only eating two, two-and-a-half cups, that's an

15   amount that I'm showing, an actual amount that they're

16   declining.

17            So it got to be to the point where I didn't want

18   to lie, but instead of me saying, well, the patient now

19   is using two bottles of morphine a week, I would put

20   down they're using more medication.  They're eating

21   less.  They're sleeping more.  They're having more

22   hallucinations.  I wouldn't use an actual amount, I

23   would just say eating, sleeping less or sleeping more,

24   eating less.  I would always say those terms so I

25   wouldn't put down an actual amount.

1          It was not true, but that way I could kind of get

2     away from giving a fixed amount rather than if I just

3     said, oh, they're sleeping more and eating less, they're

4     sleeping more and eating less, and that's just the way

5     it was, eating more, sleeping less, they're comfortable

6     with current interventions and go on that way so I could

7     get away from being ridiculed from not finding reasons

8     to certify a patient.

9     Q.   So, to be clear, based on what happened at the

10    Merida Group, did you document the patients were

11    declining when the patients were not declining?

12    A.   I did.

13    Q.   Did you document patients qualified for hospice

14    when they did not qualify for hospice?

15    A.   I did.

16    Q.   During the time you worked at the Merida Group,

17    did you create false medical records?

18    A.   I did.

19    Q.   Now, you interacted with other nurses?

20    A.   I did.

21    Q.   Other employees in the Merida Group?

22    A.   Yes.

23    Q.   Based on what you observed at the Merida Group

24    and what happened in those IDT meetings, were other

25    nurses doing the same thing?

1      A.   Yes, they were.

2      Q.   And was this a rare practice or pervasive

3   practice?

4      A.   It was pretty common.   That was kind of the norm.

5      Q.   So if a box of medical records for a patient, if

6   you had a box of medical records, based on what you

7   observed at the Merida Group, could the jury rely on

8   those records?

9      A.   No.

10      Q.   What did you feel like, based on what you saw and

11   experienced at the Merida -- Merida Group, what did you

12   think would happen if you didn't go along with that

13   instruction?

14      A.   I'd probably not have a job.

15      Q.   And who was in charge during the time you were

16   there, who was the boss?

17      A.   The main boss, Rodney was our boss.

18      Q.   During time you were there, did Mr. Mesquias have

19   any views on whether patients should ever be discharged?

20      A.   They should never be discharged, everybody should

21   be admitted and never discharged for whatever reason

22   unless they died.

23      Q.   And when he was talking about patients

24   admissions, did he have any phrases he liked to use?

25      A.   His common phrase was, feed the machine, feed the

1   machine.  And I mean, you could picture him in your

2   mind, feed the machine, feed the machine, that was

3   his -- that was his phrase.

4       Q.  And in your experience there and what you saw and

5   observed, was that expression, feed the machine, is that

6   linked to the false medical records that were being

7   created?

8       A.  It would be, because if a patient -- even if a

9   patient didn't want to be on hospice, you better admit

10  the patient.

11      Q.  Going back to Dr. Virlar for just a brief moment,

12  you've worked at other hospice companies?

13      A.  I have.

14      Q.  You've been in other IDT meetings at

15  other hospice companies?

16      A.  Yes.

17      Q.  At other hospice companies, what would an IDT

18  meeting be like about a specific patient?

19      A.  So if I had a patient that was coming up for

20  re-cert I needed to present quantitative data to keep

21  this patient on.  If I were to come to a meeting and I

22  were to say this patient is sleeping more and eating

23  less, then a doctor's saying, well, how much more,

24  what -- what is eating more, tell me what they're

25  eating, what is their PPS score, palliative performance

1    score, which means their type of activities, what is

2    their FAST score, which is somebody related to dementia,

3    they didn't want to hear sleeping more, eating less,

4    more meds, they wanted to have an amount, tell me how

5    much.  This is not eating -- eating less and sleeping

6    more is not a valid reason to keep them on service, you

7    need to tell me why.

8         And so that's when I started seeing, oh, so this

9    is really not what I'm supposed to be saying, I should

10   be saying, oh, okay, this guy eats a cup of oatmeal and

11   it's pureed, and it's thickened liquids, it's not just,

12   you know, he's drinking a gallon of water a day, I need

13   to tell them exactly what -- what they're eating, what

14   they're drinking, what they're doing, how much are they

15   pooping, things likes that.

16        I have to tell them; I could not get away with

17   sleeping more and eating less, that just was not a valid

18   reason to keep somebody on hospice.

19   Q.   And at Merida with Dr. Virlar, describe for the

20   jury what an IDT meeting was like, how was it

21   different from these other companies?

22   A.   If we discussed a patient, maybe 30 seconds,

23   maybe of, you know, the patient is sleeping more, eating

24   less, they're comfortable with current interventions

25   okay.  The next person -- (speaking Spanish.)  He's

1  sleeping more, eating less.  Next patient, eating more

2  sleeping less, it was maybe ten, 30 seconds a patient.

3  It was pretty quick.

4      Q.  What was Dr. Virlar like, is he engaged?

5      A.  No.

6      Q.  What was he doing?

7      A.  No.  Drinking his coffee and just signing away.

8      Q.  Based on what you saw at the Merida Group, did

9  you, I guess have an impression of the percentage of

10  patients that actually qualified for hospice?

11      A.  The majority did not qualify for hospice.

12      Q.  So --

13      A.  75 percent, 80 percent.

14      Q.  Did not qualify?

15      A.  Did not qualify.

16      Q.  I want to ask you a little bit about consent.  Is

17  the -- is consent important for the hospice program?

18      A.  Very much.

19      Q.  Can you explain to the jury why?

20      A.  When a patient signs a consent to be on hospice,

21  they're agreeing first that they're going onto hospice

22  care, which means that a patient is forfeiting their

23  right for aggressive treatments.  Meaning, chemotherapy,

24  radiation, aggressive treatments of whatever kind.

25  They're agreeing to receive comfort measures only, for

1  example, medications, things like that sort.

2       They're not supposed to be going to the hospital

3  anymore for whatever reason or getting aggressive

4  treatments for whatever condition they may be having.

5     Q.   During the time you were at the Merida Group, did

6  you get the impression there were patients there who had

7  not really consented to be on hospice?

8     A.   Absolutely.

9     Q.   And can you explain that to the jury.

10    A.   I can give an example of a patient that I

11 was sent to go admit.

12    Q.   Okay.  Please do.

13    A.   There was a time that I was sent to go admit a

14 certain patient for hospice services, and I went in, it

15 was after hours, probably 6:00 or 7:00 in the afternoon,

16 evening, and I went in, and usually it's, do you have

17 any questions, I always ask do you have any questions

18 before I go on.

19       And the man said, I don't know why you're here.

20 And I said, oh, I'm here to admit for hospice, hospice

21 services for Merida.  No, uhn-uhn, I didn't want hospice

22 services.

23       I said are, you, and I said the name, whatever

24 name it was, and he said, yes, but I told them I didn't

25 want hospice services, I didn't want to sign on.

1       I said, I'm so sorry I must have misunderstood,

2   maybe I got the wrong address, I apologize.

3       And so I left and I got in my car and I drove up

4   maybe about a block and I called Rodney because Rodney's

5   the one that sent me to go see this specific patient.

6   And I told him, hey, Rodney, did you send me to the

7   right guy because this guy told me that he didn't want

8   hospice.

9       And he says, no, no, no, no, you were just

10  supposed to admit the patient.  You don't have to worry

11  about anything else.  I said --

12          MS. ARCE-FLORES:  Your Honor, I'm going to

13  object at this time.

14          THE COURT:  Your Objection?

15          MS. ARCE-FLORES:  Narrative and leading.

16          MR. SWARTZ:  I just asked her to --

17          THE COURT:  It's overruled.  I'll allow it.

18  Q.  (By Mr. Swartz)  You were explaining your -- the

19  conversation you had with Mr. Mesquias.

20  A.  So he told, me, no I was supposed to admit the

21  patient.  And so I said, well, he didn't want services.

22  He says, you know what I'm doing going to do, I'm going

23  to send you somebody that's going to teach you how to

24  admit patients.  And when he told me that I was, really,

25  I said I would love for you to show me how to admit a

1    patient because if somebody is telling me --

2              THE COURT:  One second, ma'am, it is

3    becoming now more of a narrative.  Let's ask more

4    questions.

5       Q.  (By Mr. Swartz) So this particular patient, did

6    you become aware that that patient was, in fact,

7    admitted to hospice?

8       A.  He was.

9       Q.  Now, as an RN --

10      A.  Yes.

11      Q.  -- do you feel like you have ethical duties --

12              MS. ARCE-FLORES:  Your Honor, again, I

13   object to leading, this is direct.

14      Q.  (By Mr. Swartz)  Do you feel like you have any --

15              THE COURT:  Rephrase the question.

16      Q.  (By Mr. Swartz)  Do you feel like have you any

17   duties as an RN?

18      A.  I do.

19      Q.  Duties to patients?

20      A.  To what?

21      Q.  Do you have duties to patients?

22      A.  Yes.

23      Q.  During the time you were working at the Merida

24   Group, do you feel like you were able to live up to

25   those duties to patients?

1        A.   No.

2        Q.   Why not?

3        A.   I think patients were under the impression that

4    they were on services just to get extra stuff.

5             MR. BANKER:  Judge, we'd object.  That calls

6    for speculation.

7             THE COURT:  The question was proper.  Again,

8    answer what you know.

9             THE WITNESS:  Patients were expecting extra

10   stuff.  They weren't there because they were refusing

11   aggressive treatment, they just wanted extra services.

12       Q.   (By Mr. Swartz)  Was Rodney Mesquias aware that

13   patients were getting onto hospice just to get extra

14   services?

15       A.   Yes.

16       Q.   And can you explain that to the jury.

17       A.   There was another patient that he sent me out to

18   admit and, same thing, I went out and I said I'm here

19   from Merida to admit you for hospice services and the

20   gentleman told me that he wasn't getting on hospice

21   services.

22            And so his mother -- his daughter was standing

23   behind him and she went, and I just kind of looked, and

24   she says, no, we were just getting on hospice just so we

25   could get the medications and some supplies.

```
 1          And so I said, can you give me a minute?  I'm
 2   going to go to the car and get something.  And I
 3   actually called Rodney and I asked him --
 4      Q.  And what did Rodney say?
 5              MS. ARCE-FLORES:  She's going into a
 6   narrative, Your Honor.
 7              THE COURT:  The objection is that she's
 8   going into a narrative.
 9              MR. SWARTZ:  I'm happy to ask a question,
10   Your Honor.
11              THE COURT:  Please ask a question.
12      Q.  (By Mr. Swartz)  And what, if anything, did
13   Mr. Mesquias say?
14      A.  He said, just admit the patient.
15              MR. SWARTZ:  No further questions.
16              THE COURT:  Mr. Canales.
17              MR. HECTOR CANALES:  Thank you, Your Honor.
18              THE COURT:  And gentlemen one second, let me
19   get situated as well.
20              The Government lasted 20 minutes with this
21   witness.
22              Please proceed.
23              MR. HECTOR CANALES:  Thank you, Your Honor.
24                   CROSS EXAMINATION
25   BY MR. HECTOR CANALES:
```

1      Q.   Ms. Hernandez, my name is Hector Canales.   I

2  represent Mr. Rodney Mesquias in this case, okay?   It's

3  nice to meet you.

4      A.   Nice to meet you.

5      Q.   All right.   This is the first time we've had an

6  opportunity -- we've ever met, right?

7      A.   No, I've not met you, I actually saw you

8  yesterday coming out of the mall.

9      Q.   Right, we ended up at Luby's together, right?

10     A.   Yes.

11     Q.   I mean, coincidence, right?

12     A.   Uh-huh.   Small town.

13     Q.   And I normally would not ask this, but -- but

14  it's been brought up, are there any other medications or

15  medical conditions that are affecting your testimony

16  here today that you're on or have problems?   You're

17  chewing the gum, you mentioned something, but --

18     A.   Other than my hearing, I have an ear condition

19  that's why I take a medication for that, so sometimes I

20  may ask to repeat the question but, no other condition.

21     Q.   But no other medications or conditions that

22  affect your testimony here today?

23     A.   No, sir.

24     Q.   Okay.   All right.   Very well.   Thank you.

25          Now, I take it were there any -- were there any

1    instances in your -- in your employment there that you

2    can recall with the Merida Group where things were done

3    by the book, textbook, absolutely appropriate?

4         A.   No.

5         Q.   Never?

6         A.   No, I can't say never, but the ones that I was

7    involved in, no.

8         Q.   Right.  And so you -- for instance, there was

9    never a situation that you were involved in where a

10   fellow nurse -- well, let me ask you this way:  Would

11   you agree that if -- if -- if you, or a nurse upon

12   evaluating a patient who was on hospice came to the

13   determination that patient was no longer eligible for

14   hospice, what should happen if that's the case?  What

15   would be the textbook, 100 percent proper thing to do if

16   some -- somebody brought that to the attention of

17   Merida?  What should happen?

18        A.   We would go to our director of nurses to discuss

19   that, or we would call whoever sent us there to discuss

20   the reason why we felt they shouldn't be admitted.

21        Q.   Well, no, no, this is -- my scenario is this

22   person is already on hospice, a -- a nurse goes to a

23   visit and determines based on that nurse's clinical

24   judgment that the patient no longer meets the

25   eligibility criteria for hospice.  What should happen at

1   that point in time, by the book?

2      A.   We discuss it with our doctor during IDT.

3      Q.   Uh-huh.

4      A.   In order to discharge them from hospice.

5      Q.   They should be discharged, right, that's what

6   should happen?

7      A.   Correct.

8      Q.   Right.  And that would -- an event like that

9   would be completely, completely, 1,000 percent opposite

10  of what you just described was going on at Merida to the

11  jury, right?

12     A.   As far as cases that I was involved in, yes.  I

13  can't speak for everyone else and every other patient, I

14  didn't handle every single patient.

15     Q.   Right.  Do you remember Ms. Teresa Calvillo as a

16  patient?

17     A.   I -- I might, if I saw her face.

18     Q.   Okay.  All right.  You know what -- we'll look

19  for it.  We'll have a picture maybe put up in a second

20  while he's doing that.

21          How about a Vanessa Redway?

22     A.   What was the last name?

23     Q.   Vanessa Redway.  Do you remember -- do you

24  remember Ms. Redway, nurse?

25     A.   The nurse?

1    Q.  Yes.

2    A.  Um --

3    Q.  She was an RN.

4    A.  I'd have to see her face.  I'm -- I'm not good

5    with names, but if I see a face.

6    Q.  Okay.  All right.  All right.  But -- all right.

7    Well, let me --

8    A.  I think she looks familiar.

9    Q.  Okay.  There's -- there's Ms. Calvillo on the

10   screen, you see -- you remember her now?

11   A.  I think I remember her.

12   Q.  Okay.  All right.  And so Roy, put up -- let's

13   put up on the screen here out of Government Exhibits

14   medical records for Ms. Calvillo, Mesquias 00290066.

15       Actually -- 00290071.  All right.  Let's start at

16   the top.  We're deal -- we're talking about, you see --

17   you're familiar with the electronic record system that

18   was in place there with Merida, right?

19   A.  Yes, sir.

20   Q.  All right.  And so here what we have here is a

21   record for Ms. Calvillo, right, and with the agent name

22   Hernandez, Melissa; that's you, right?

23   A.  Yes.

24   Q.  All right.  And let's -- let's go up all the way

25   to the bottom, Roy.

1        That's your signature, right?

2    A.   Yes, it.

3    Q.   And the date of your signature on this document

4    is what?

5    A.   September -- September 12th, 2014.

6    Q.   September the 12th, 2014.  I'm going to ask you

7    just to make -- keep that in the back of your head,

8    September the 12th, '14.  All right.  And what are you

9    doing here?  Let's scroll up.

10   A.   Do I --

11   Q.   We're going to it here.  Sorry here.

12        What's going on here?

13   A.   It says I'm discharging her.

14   Q.   You're discharging her, right?  So September the

15   12th of '14, you discharged Theresa Calvillo from

16   hospice, right?

17   A.   (No response.)

18   Q.   I need a yes or a no?

19   A.   Yes.

20   Q.   Do you recall at this point why?

21   A.   I need to look at all my other -- if I can see

22   all the records as far as why.

23   Q.   All right.  Let me just show you here, it will be

24   faster here, there's the full page.

25        Does it tell you on there what's going on?

1    A.   Well, it says that she's transferring, so does it

2  show that she was going to the hospital?

3    Q.   I don't know, it just -- it's your record, ma'am.

4    A.   Okay.  So when you're transferring, then that

5  means you're transferring somewhere else, either to

6  rehab or a hospital.

7    Q.   All right.

8    A.   Usually, it's discharge for another reason, not a

9  transfer.

10    Q.   All right.  But all it says is transfer, right?

11    A.   Correct.

12    Q.   No elaboration?

13    A.   Correct.

14    Q.   All right.  Let's look at the medical record from

15  the day before on September the 11th, the date that's

16  pretty easy to remember, all right?

17        Roy, let's go back to Mesquias 00290066.

18        Start at the top.  Same patient, Ms. Calvillo,

19  correct?

20    A.   This says Redway on it, the nurse.

21    Q.   I'm with the patient, right?  And what's the date

22  that Ms. Redway went to visit Ms. Calvillo?

23    A.   The day before.

24    Q.   The day before, right?  Okay.

25        And Roy, let's go to the fourth page, let's go to

1    the narrative of this visit.  Highlight that narrative

2    up there in the second paragraph.  Just the second

3    paragraph.  I want to focus on that one.

4         Would you read aloud what it says, what Ms.

5    Redway's narrative is on the day before you discharged

6    her?

7       A.  It says, patient is not appropriate for hospice.

8    Patient requires help with provider only.  Options on

9    eligibility criteria had to be selected in order to

10   proceed.  Health status has improved.

11      Q.  Textbook, textbook 100 percent what should

12   happen.  Ms. Redway went and saw her, thought she was

13   not eligible and the next day, boom, you discharged her,

14   right?

15      A.  Uh-huh.

16      Q.  Textbook.

17              THE COURT:  One second, ma'am.

18              THE WITNESS:  Yes.

19              THE COURT:  Please answer loudly and

20   clearly.

21      Q.  Textbook perfect, right?

22      A.  Yes.

23      Q.  Did the Government and -- when is the first time

24   that the Government came to talk to you about my client

25   Rodney Mesquias and his business?

1      A.   Probably about two years ago.

2      Q.   Two years?

3      A.   Yes, sir.

4      Q.   Two years, two years ago.  And -- and in the --

5   over the last two years, ma'am, have you ever been shown

6   this textbook example of a discharge of a patient who

7   didn't qualify?

8      A.   Have I been shown with --

9      Q.   Yeah.

10     A.   With who?

11     Q.   Has anybody done what we just did here in the

12  last five minutes or so, shown you this textbook

13  example?

14     A.   This specific example, no, sir.

15     Q.   No, and it's a specific example of a patient you

16  were handling, right?

17     A.   Correct.

18     Q.   All right.  And so earlier, when you were leaving

19  the impression with the jury that, I mean, and you said

20  earlier, nothing was ever done right, you were wrong,

21  you were mistaken?

22     A.   Yes.

23     Q.   And when you were saying that -- isn't it also

24  true, ma'am, that this, what you -- we just showed that

25  you did, you and Ms. Redway, to put it nicely is a

1   completely inconsistent with the testimony you said that

2   my client of feeding the machine, right?

3        A.   This specific one, yes, sir.

4        Q.   This is the opposite of feeding the machine,

5   right?

6        A.   Yes, sir.

7        Q.   And it's completely inconsistent with a --

8   with -- with a description of my client; isn't it?

9        A.   With this specific patient, yes, sir.

10       Q.   What's your explanation, ma'am, what's your

11   explanation for coming in here and -- and saying these

12   terrible things about a -- about a company, disparaging

13   somebody into a Court of law and telling people one

14   thing, five minutes later having to say, this is

15   completely opposite, what's your explanation?  Explain

16   to the jury how can you do that?

17       A.   Sir, I didn't say -- I didn't say 100 percent, I

18   said about 80 percent of the patients.

19       Q.   Okay, well, 80 percent, ma'am.

20       A.   This is just one specific patient.

21       Q.   Yes, but you understand we're in a Court of law

22   in a criminal trial, right?

23       A.   Yes, I do.

24       Q.   You take this matter seriously?

25       A.   I do very seriously.

1    Q.   Did you ask them, hey, before -- hey, guys, can

2    you -- can you -- I need to refresh my memory, can I see

3    my records, can I see what I've done, did you ask them

4    that?

5    A.   No, I did not.

6    Q.   Did they offer, before they put they put you up

7    here to testify under oath, did they offer to you at all

8    to say, hey, you know what, let's go over your medical

9    records, let's go over these patients, did they ever do

10   that?

11   A.   No.

12   Q.   Would now, ma'am, after having shown you this one

13   example, is -- is that something you wish they had done?

14   A.   I don't know how to answer that.

15   Q.   If you were on trial, is that how you would want

16   to be treated?

17   A.   I think I'd want what was fair.

18   Q.   And do you think your testimony, your

19   descriptions, the characterizations now after we've seen

20   this that you've made of my client and his business are

21   fair?

22   A.   I do.

23   Q.   Do you think you've been fair?

24   A.   I do.

25   Q.   You think it was fair to leave that out of your

1   testimony?

2             MR. SWARTZ:  Objection, asked and answered,

3   and he's being argumentative, Your Honor.

4             THE COURT:  One second.  She can answer it.

5   Q.  (By Mr. Hector Canales)  You bet it's

6   argumentative, you'd argue the same thing, wouldn't you?

7   A.  For this one patient, yes.

8   Q.  How do you know, ma'am, how do you know there's

9   not more examples of this if you haven't looked at the

10  records?

11  A.  I don't know, I can only tell you what I was

12  involved in, sir.

13  Q.  All can you do is guess, right?

14  A.  I can't guess, I can only tell you what I was

15  involved in.

16  Q.  How about -- all right, let's -- let's try

17  another example, I got another one for you, all right,

18  you talked about Dr. Virlar, Dr. Virlar made you very

19  emotional, right?

20  A.  Yes.

21  Q.  Made you -- thinking back on it made you cry?

22  A.  Yes.

23  Q.  And that's terrible, that's inexcusable, nobody

24  should call anybody a pendeja, or those names, right,

25  that's wrong; I agree with you.

1    A.   Not in the position I was in.

2    Q.   In no position, right, that's not -- that's not

3  right, nobody should do that.

4         THE COURT:  And Mr. Canales, let me

5  interject.  I know Sheila -- it has nothing to do with

6  the question, I think everyone is bilingual, but I don't

7  want to take that for granted.  The term --

8         MR. HECTOR CANALES:  Not everybody, Judge.

9         THE COURT:  The term pendeja or pendejo is a

10  vulgar expression for a synonym of idiot in the English

11  language, just use your imagination of the vulgarity in

12  terms of what that means in Spanish.  So just for those

13  of you that are not bilingual.

14         Please proceed.

15         MR. HECTOR CANALES:  Got it.  Thank you,

16  Judge, I appreciate that.  Threw me off a little bit.

17  Oh --

18         THE COURT:  You were going to ask about --

19    Q.   (By Mr. Hector Canales)  Yes.  So, so, so are

20  there -- were there any other doctors -- were there any

21  other doctors who treated you that way?

22    A.   No.

23    Q.   In Merida?  So that was isolated to Dr. Virlar?

24    A.   That was -- I'm sorry, what?

25    Q.   Isolated incident to Dr. Virlar?

1        A.   Was it one incident, no.

2        Q.   No, no, I meant he was the only one who -- who

3    treated you that way in -- from the -- from the doctor's

4    side?

5        A.   Yes.

6        Q.   Now, Dr. Chandra --

7        A.   Chandrahasan, yes.

8        Q.   And Dr. Chandrahasan did anybody come up with

9    a -- that's not a good American name like Canales or

10   Hernandez, what's the first -- what was Dr. -- first

11   name; do you remember, I don't know -- it's male or

12   female?

13       A.   It's a male.

14       Q.   It's a male.

15       A.   I don't know why I want to say it's Gopinath.

16       Q.   It's something along those lines, right, so

17   was -- was there a nickname for Dr. Chandrahasan, or no,

18   you called him Dr. Chandrahasan?

19       A.   I -- that's what I called him.

20       Q.   Okay.  All right.  And so Dr. Chandrahasan

21   certainly never called you any bad names or pressured

22   you or made you feel intimidated, right?

23       A.   No, he didn't, he just never paid attention to us

24   when we were in IDT.

25       Q.   Right, okay, but he didn't put any pressure on

1   you like Dr. Virlar did to -- to do anything wrong?

2       A.   No, not in that that way, no.

3       Q.   In these IDT meetings he wasn't abusive?

4       A.   No.

5       Q.   All right.

6            Roy, let's pull up out of patient Arcadio

7   Castaneda, which is Count Five, Mesquias 00229591.

8            All right, do you see at the top left corner,

9   ma'am, this is a -- a -- a medical record involving --

10      A.   Yes, I remember this patient specifically.

11      Q.   You do, okay, great.

12      A.   I do.

13      Q.   All right.  Very good.  Very good.

14           And so Roy, go to the second page of this

15  document.

16           We've got -- in the bottom half there, bottom --

17  all right.  We've got -- that's your signature there on

18  the right?

19      A.   Yes, it is.

20      Q.   Okay.  And then over here on the left, that's

21  Dr. Chandrahasan's signature, right?

22      A.   I'm not familiar with his signature.

23      Q.   Okay.  All right.  Well, let's see if this helps

24  refresh your memory here.  One second.  Come back to the

25  signature.

1    I have another document I'll show you that has

2    his name next to that signature and we'll come back --

3    A.  If you say it's his signature I believe you, I

4    just --

5    Q.  Okay.  Okay.  And -- and we'll get there -- we'll

6    get there in a second.

7    If Roy, you'll go to page 5 of 6 of this

8    document.  Labeled up at the top right hand corner.  In

9    the bottom half there I just want to focus on the

10   narrative.

11   And -- and it says, there prep notes, they were

12   created by you, correct?

13   A.  Yes.

14   Q.  I want to go through those real quick with you.

15   And this was done on January 27th of '16; do you see

16   that?

17   A.  Yes.

18   Q.  He was an 80-year-old male; see that?

19   A.  Yes, I remember this exact patient.

20   Q.  You do?

21   A.  I -- I know this patient and I can tell you that

22   this patient did not qualify for hospice.

23   Q.  He didn't?

24   A.  No, sir.

25   Q.  Okay.  Okay.  And that -- that's -- that's your

1   professional clinical opinion?

2      A.   My opinion, yes, sir.

3      Q.   Okay.  And under hospice, you are not, under the

4   hospice rules, an RN is not qualified to make the

5   clinical judgment for terminal illness, right?

6      A.   Correct, I don't sign that form.

7      Q.   Right.  Who is?

8      A.   The doctor.

9      Q.   The doctor.  Okay.  So you're entitled to your

10  own -- your own opinion, but your opinion cannot

11  supersede that of a doctor, right, when it comes to

12  certification for hospice, right?

13     A.   Correct.

14     Q.   All right.  And did you tell Dr. Chandrahasan

15  that you disagreed with the certifying doctor's opinion?

16     A.   No, I did not.

17     Q.   Do you have any explanation why -- so Nurse

18  Redway was -- obviously felt free enough to document and

19  say, hey, I don't think this patient is -- meets the

20  criteria for hospice?

21     A.   Correct.

22     Q.   Right?  Can you explain how it is that Ms.

23  Redway -- Redway felt she could do it.  Why didn't you

24  do it, why didn't you do what Ms. Redway said here, why

25  not?

1    A.   I can't tell what you she was thinking or what

2    she was feeling so I have no idea.

3    Q.   I'm asking you, now that you know it happened,

4    you were part of it, you were part of it.

5    A.   Yes, I was.

6    Q.   Why didn't you do like Ms. Redway?

7    A.   Because I felt like I was not allowed to

8    discharge patients, and I don't want to say 100 percent

9    of patients, I'm just saying a lot of the patients that

10   I was in charge of I felt like I could not discharge

11   them freely like the way she might have felt.  I can't

12   tell you --

13   Q.   And so let's look at here, this here, the -- the

14   -- on service for congestive heart failure, right?

15   A.   Correct.

16   Q.   CHF.

17   A.   Yes.

18   Q.   Right, that's the acronym for it?

19   A.   Yes, it is.

20   Q.   All right.  Patient is hypertensive, right?

21   A.   Yes.

22   Q.   Chronic dialysis patient, right?

23   A.   Correct.

24   Q.   PPS of 40?

25   A.   Correct.

1    Q.   Right.  All right.  So let me just ask you here,

2    are you disagreeing, are you saying that with those

3    diagnoses that -- that Mr. Castaneda did not have

4    congestive heart failure, he wasn't hypertensive and he

5    didn't have chronic dialysis?

6    A.   Yes, I am disagreeing with it, because when

7    somebody is -- when someone is a dialysis patient,

8    that's a form of aggressive treatment, and whenever you

9    have a heart condition, eventually your kidneys are

10   going to start to fail and vice-versa.  If your kidneys

11   are failing, then eventually your heart is going to

12   start to fail, so when somebody's got congestive heart

13   failure, they should not be receiving dialysis and you

14   accept them for congestive heart failure because they're

15   together and so, technically, they're still getting

16   aggressive treatment.

17   Q.   Ultimately, ma'am, would you defer to the opinion

18   of the primary care physician for Mr. Castaneda as to

19   whether or not he had congestive heart failure, he was

20   hypertensive, he was on dialysis, and ultimately hospice

21   was appropriate, would you -- would you defer to that

22   doctor to the primary care physician?

23   A.   Can you repeat what you're asking me?

24   Q.   Sure.  Mr. Castaneda's primary care physician --

25   A.   Okay.

1    Q.   -- prior to hospice, would you defer to that

2  doctor as -- opinion, clinical judgment on the diagnosis

3  of congestive heart failure, hypertensive and dialysis?

4    A.   Are you saying originally when they referred?

5    Q.   Yeah.

6    A.   No, I wouldn't, I wouldn't --

7    Q.   You know better than his primary care physician?

8    A.   No, I wouldn't say that.

9    Q.   Well, that's my question:  Do you know better

10  than the primary care physician?

11   A.   No, I don't know better than the primary care

12  physician, but --

13   Q.   The primary care physician is in a better

14  position than you are to make an opinion, right?

15   A.   Yes, they are.

16   Q.   All right.  It doesn't mean you can't have an

17  opinion; I'm not trying to say or imply to you that you

18  can't have an opinion, but -- but I'm -- my question to

19  you is, is that the primary care physician is in a

20  better spot to make those calls, right?

21   A.   I would guess so, yes.

22   Q.   And you would agree that the primary care

23  physician says he's got congestive heart failure, you're

24  not going to dispute that -- that doctor; are you?

25   A.   Just because they have CHF does not mean you

1   automatically qualify.

2       Q.   I'm -- and -- and, you know, that's a good --

3   let's -- let -- let's pars this up.  I'm just talking

4   about --

5               THE COURT:  The first 20 minute session has

6   expired.

7               MR. HECTOR CANALES:  Okay.

8       Q.   (By Mr. Hector Canales)  I'm just talking about a

9   diagnosis, right, not -- not -- not whether or not

10  they're eligible for hospice, but just are you saying

11  that -- that the diagnosis is fake?

12      A.   No, I'm not saying the diagnosis is fake.

13      Q.   So Mr. Castaneda had CHF?

14      A.   Correct, he did.

15      Q.   All right.  He was hypertensive?

16      A.   That's correct.

17      Q.   All right.  He did have chronic bowel -- he was a

18  chronic dialysis patient?

19      A.   That's correct.

20      Q.   Which means he had severe diabetes, right?

21      A.   No, that has to with your kidneys not working.

22  It may be related to it, but it doesn't mean that when

23  you're on dialysis you automatically have diabetes.

24      Q.   You're having chronic renal failure?

25      A.   Correct.

1    Q.   Renal meaning kidney?

2    A.   Correct.

3    Q.   And part of the reason you have chronic renal

4    failure is because you have a condition known as

5    diabetes, right?

6    A.   No, not necessarily.

7    Q.   No?

8    A.   You can have chronic renal failure and not be

9    diabetic.

10   Q.   But in this particular case, Mr. Castaneda was a

11   type two diabetic?

12   A.   I don't have any records.

13   Q.   You don't remember that?

14   A.   I don't remember that, but I don't see it on here

15   so --

16   Q.   We're not talking about the diagnosis, you're not

17   disputing the diagnosis, fair?

18   A.   Correct.

19   Q.   You're disputing the prognosis of a terminal

20   illness within six months?

21   A.   Correct.

22   Q.   Right.  And would you agree, ma'am, that in your

23   study that a prognosis is a prediction of the course of

24   how a diagnosis is going to run into the future?

25   A.   Yes.

1    Q.   All right.   And that prediction is somebody's

2    opinion, right?

3    A.   Correct.

4    Q.   All right.   And two people can have -- a doctor

5    and a nurse can have two different opinions or prognosis

6    about a patient, right?

7    A.   Yes.

8    Q.   And they can both be right, both opinions can be

9    right because they're opinions, right?

10   A.   It's just an opinion.

11   Q.   Right.   And you've probably run into that before,

12   right, where you have an opinion about a prognosis

13   that's different than another nurse, right?

14   A.   Yes.

15   Q.   And you here might have an opinion that conflicts

16   with the doctor, right?

17   A.   Yes.

18   Q.   Dr. Tom Gonzaba.   You know Dr. Tom Gonzaba?

19   A.   Tom Gonzaba, I do not.

20   Q.   Are you familiar with the Gonzaba Medical Group

21   out of San Antonio?

22   A.   Yes, I am.

23   Q.   All right.   They're a big group, right?

24   A.   Yes, they are.

25   Q.   All right.   Let me just have the Elmo, it will be

1    faster with the ELMO.

2         Did you know that Dr. Tom Gonzaba was the primary

3    care physician for Mr. Castaneda?

4    A.   I don't recall that.

5    Q.   You don't recall that, all right.

6         Let me show you Government's Exhibits here bates

7    number Mesquias 00313795.

8         All right.  This is the medical record from

9    Dr. Gonzaba's Group.  You'll see here we're going to

10   begin, this is October 16th of 2013.  I'm going to

11   represent to you that this is going to be the six months

12   of Mr. Castaneda's medical records we're about to go

13   through leading up to his certification for hospice,

14   okay.  Are you with me on the timeframe?

15   A.   (No response.)

16   Q.   Can I get a yes?

17   A.   Yes.

18   Q.   Thank you.  You'll see here that at this point in

19   time had Dr. Gonzaba had an end-of-life discussion, had

20   it occurred yet with Mr. Castaneda?

21   A.   It says no.

22   Q.   No, right?  Does it appear that Dr. Gonzaba had

23   an end-of-life discussion with Mr. Castaneda as of

24   October of 2013?

25   A.   No.

1     Q.   Just go through these real quick, sorry.

2          Current meds.  You said something about being on

3     a lot of medications, that looks like that's a lot of

4     medications, right?

5     A.   That's quite a bit.

6     Q.   Quite a bit, all right, okay.

7          Past medical history, nephritis, angioplasty,

8     myocardial infarction, that means the whole heart attack

9     right?

10    A.   Yes.

11    Q.   All right.  Diabetes, you see that?

12    A.   Yes.

13    Q.   With polyneuropathy, that means it's causing

14    multiple problems with his neurological system?

15    A.   In the extremities, yes.

16    Q.   Insulin use?

17    A.   Yes.

18    Q.   That's for uncontrolled diabetes, right?

19    A.   Correct.

20    Q.   Would neuro-comp, that's neuro complications?

21    A.   Correct.

22    Q.   All right.  Peripheral vascular disease, that's

23    not good for you; is it?

24    A.   No.

25    Q.   All right.  Renal disease, chronic, right?

1      A.   Correct, that's why he was on dialysis.

2      Q.   That's right.  What stage?

3      A.   Stage four.

4      Q.   Out of how many stages, possible stages?

5      A.   Well, they say five.

6      Q.   Right.  So he's a four out of five here, right?

7      A.   Stage zero is considered the first stage.  I

8  don't know if that makes a difference.

9      Q.   He's close to the very end?

10      A.   He's at the end of stage, yes.

11      Q.   Diabetes Type One, I was wrong, he's Type One

12  diabetic, not Two, right?

13      A.   No, it's Type Two.

14      Q.   Well, it says right here Type One, doesn't it?

15      A.   It's Type Two on the top.

16      Q.   And Type One.  The very bottom?

17      A.   Uh-huh, yes, I see that.

18      Q.   Okay.  The plans, problem.  All right.  The

19  problems kind of are indicative of -- a lot of problems

20  here.

21           Problem six, kidney disease, problem nine, these

22  are all diagnoses, are they not?

23      A.   Yes.

24      Q.   Endstage renal failure, that's a problem.

25           Oh, what did I do?  Sorry.  All right.  We're

```
 1    back.   All right.
 2         Then he tells him on the 16th -- would you read
 3    Dr. -- would you read aloud to the jury Dr. Gonzaba's
 4    instructions to Mr. Castaneda on the 16th of -- of 2013.
 5       A.   You want me to read this down here?
 6       Q.   The patient instructions, yes, sir -- yes, ma'am.
 7       A.   We discussed once again the decline in your
 8    health and progression of your disease.  Symptoms you
 9    are experiencing are directly related to the progressive
10    decline.  We have outlined the most effective medication
11    regiment and treatment plan.  I want to continue to
12    monitor your health status with clinic visits.  Many
13    patients prefer to focus on comfort measures at this
14    point rather than seeking aggressive and invasive
15    procedures as a means to increase home services provide
16    necessary equipment and medicines to optimize your
17    comfort and moral/spiritual support.
18         I recommend you consider hospice services.
19    Hospice services are free for appropriate patients such
20    as you.
21       Q.   And you do not recommend hospice services for
22    Mr. Castaneda?
23       A.   I did not, no, sir.
24       Q.   You and Dr. Gonzaba are at odds?
25       A.   That's correct.
```

1     Q.   The care continues.   Now, we're in December, two

2  months later.   There's another office visit.

3  Mr. Castaneda with his doctor, PCP, that's what that

4  means, right, primary care physician?

5     A.   Yes.

6     Q.   He's presenting -- this thing is in a very

7  awkward spot for the future.

8          Past medical history -- we've got those long list

9  of meds; I'm trying to go fast here I'm running low on

10  time, congestive heart failure, right?

11     A.   Yes.

12     Q.   That's what was in your record, right?

13     A.   Yes.

14     Q.   That you put up?

15     A.   That's correct.

16     Q.   So this is where you're in agreement with

17  Gonzaba, right?

18     A.   As far as his diagnosis, yes.

19     Q.   Right.   Right.   And this is the source of the

20  medical records, right?

21     A.   Correct.

22     Q.   You didn't get this stuff from Dr. Carrillo; did

23  you?

24     A.   No.

25     Q.   That's okay.

1    A.   Why would I?

2    Q.   Okay.  All right.  Just checking.  It makes sense

3   to other people, don't worry.  And then he's got -- his

4   problems.  HTN is short for, fill in the blank?

5    A.   Hypertension or high blood pressure?

6    Q.   That was another thing you had in your record,

7   remember, it was CHF, hypertension, right?

8    A.   Correct.

9    Q.   Again, we're -- you're -- as far as the

10   diagnosis, you're inline with Gonzaba.

11    A.   Yes.

12    Q.   With failure, heart disease, right?

13    A.   Correct.

14    Q.   You, as a nurse, know that when your heart muscle

15   goes bad and dies, does it ever come back?

16    A.   No.

17    Q.   Non-curable, right?

18    A.   Correct.

19    Q.   Cerebral vascular disease.  That's -- cerebral,

20   that's the brain, vascular, blood vessels, that means

21   you've got a stroke, right?

22    A.   Correct.

23    Q.   Endstage renal.  Would you agree Mr. Castaneda is

24   extremely sick?

25    A.   By looking at this record, yes.

1    Q.  All right.  Then continuity of care.  You know

2    what continuity of care is between a patient and a

3    doctor, right?

4    A.  Correct.

5    Q.  All right.  And -- and that's a positive thing,

6    that's a -- it's a good thing, right?

7    A.  Yes.

8    Q.  To maintain a continuity of care?

9    A.  Yes.

10   Q.  It's bad when the patient losses his or her

11   doctor, has to switch doctors?

12   A.  Yes.

13   Q.  It's -- it's also hard on the whole medical

14   system, right, because medical records, you have a

15   transfer, you lost it, the goal is a -- it's a worthy

16   goal, right, maintaining continuity of care?

17   A.  Yes.

18   Q.  Okay.  And on the patient instructions number

19   three here, I'd like to draw your attention to -- this

20   says, you got any problems, direct you to a 24-hour

21   day/seven days a week.  We have a walk-in urgent clinic

22   and he gives the location.  But if the medical situation

23   occurs that a life is threatening and urgent are closed,

24   I recommend you seek care at Baptist Hospital Systems,

25   three hospitals there in San Antonio.  These facilities

1    are staffed by our GMG hospitalist and specialists

2    network.   This allows me to communicate with them about

3    your care more effectively.

4          See that?

5      A.   Yes.

6      Q.   Dr. Virlar was a hospitalist for the GMG Group;

7    was he not?

8      A.   Yes, I believe so.

9      Q.   And that's how Dr. Virlar came in contact with

10   Mr. Castaneda, right?

11     A.   Yes, I -- I'm assuming so, yes.

12     Q.   Right.   Right.   And -- and what Dr. -- you would

13   agree Dr. Gonzaba here is describing a flow of

14   continuity of care.

15          Hey, if, you know, if you get sick, you can't

16   come to the office, go to the -- go to our emergency

17   clinic; if the emergency clinic is closed, I recommend

18   you go to these hospitalist where we have our people on

19   staff who can see you so that we can maintain

20   communication or continuity; is that a fair description

21   of what's going on here?

22     A.   Yes.

23             MR. SWARTZ:   Your Honor, Mr. Canales, just

24   for the record, what page are you referring to from

25   Government's Exhibit E-6?

1          MR. HECTOR CANALES:  Happy to tell you.

2   00313782.  Okay.  Okay.

3      Q.  (By Mr. Hector Canales)  So then the timeline

4   continues.  Now, we're in February -- in January.  So

5   we've now moved on to another visit.  He's -- he's back,

6   okay?  And no surprise we see a lot of the same thing.

7   We've got --

8          MR. SWARTZ:  Your Honor I apologize, I don't

9   mean to interrupt.  I just -- I was unable to locate the

10  document he's referring to, I would like to make sure

11  I'm looking at a copy and I can redirect on the same

12  thing.

13         MR. HECTOR CANALES:  I'll give you -- you

14  can have this one, you can have this set, okay?

15         MR. SWARTZ:  I appreciate that.  Thank you.

16     Q.  (By Mr. Hector Canales)  Problem number three,

17  CHF, right?

18     A.  Yes.

19     Q.  Heart disease?

20     A.  Yes.

21     Q.  Order monitor to prevent -- to treat, prevent

22  further damage of heart muscle and worsening of the

23  congestive heart failure, right?

24     A.  Correct.

25     Q.  Because these diseases are all interlinked,

1  right?

2    A.  Correct.

3    Q.  What we've seen here is we've seen an entire

4  organ, body, all his major systems are -- are sick, his

5  brain, right, the kidneys, the heart, the lungs, right?

6    A.  Yes.

7        MR. SWARTZ:  Your Honor, objection.  We're

8  getting into the territory where counsel is testifying

9  and just adding right at the end of his testifying and I

10  object to that.

11        MR. HECTOR CANALES:  I get to lead,

12  Your Honor, you're absolutely right I'm suggesting the

13  answer.

14        THE COURT:  The question was proper.

15        MR. HECTOR CANALES:  Thank you.

16        THE COURT:  All right.  Please, avoid the

17  term right at the end, but aside from that --

18        MR. HECTOR CANALES:  I'm sorry, I'm not --

19  I'm not very smooth.

20        THE COURT:  The question was proper.  The

21  question was proper.

22        MR. HECTOR CANALES:  Thank you.

23    Q.  (By Mr. Hector Canales)  All right.  And just

24  like at the end he gives instructions.

25      Would you read instruction number five that

1    Dr. Gonzaba gives to Mr. Castaneda.

2       A.   It says we discussed the decline in your health

3    and progression of your disease.  We reached a point

4    where changes in the treatment plan have little or no

5    impact.  We turn to aggressively managing your symptoms

6    to make you comfortable and give you the best quality of

7    life.  I anticipate your symptoms will worsen over the

8    next six to 12 months.  You will likely notice changes

9    and a decrease in your body's ability to tolerate minor

10   illnesses, or to recover to your baseline.

11          I will continue to follow you in the clinic.

12   Next visit I would like to discuss your health status

13   again with you and your family (friends).  It is

14   recommended that you define/review your advance

15   directives with both your family and me.

16      Q.   Have you ever told somebody that they need to

17   discuss with their -- them -- their friends and their

18   family advanced directives?

19      A.   Have I ever done that?

20      Q.   Yeah.

21      A.   Yes, I have.

22      Q.   All right.  Why did you do that with them?

23      A.   Because I think they needed to get their affairs

24   in order.

25      Q.   In preparation for death?

1      A.   Um, in preparation for death, or just to be

2   prepared.  I did it with my mom about three years ago,

3   and I just did it because I was getting ready to

4   anticipate something happening.

5      Q.   Right.  And -- and that's what -- is it fair to

6   say, do you have an opinion whether or not, one way or

7   the other, whether or not that's exactly what

8   Dr. Gonzaba is doing here, he's predicting death?

9      A.   Not necessarily always death.  When I said that I

10   discussed this with my mom it's because sometimes people

11   won't be able to make decisions on their own and my -- I

12   did with my mom three years ago, my mom's still alive,

13   she's not anywhere near death, but you do it because you

14   don't know if in the future someone may not be able to

15   respond for themselves and you prepare for when

16   something does happen, if they're -- you know, out and

17   can't speak for themselves, then you have the

18   opportunity to do that.

19      Q.   And again, Dr. -- the primary care physician

20   Dr. Gonzaba, of all the people out there, of all the

21   providers out there, he is in the best position to

22   evaluate the patient, right?

23      A.   Yes.

24             THE COURT:  Defense counsel, we're now at

25   the second termination of --

1     MR. HECTOR CANALES:  I -- I -- he -- Mr. --

2  can I have a few more minutes?  I'm almost done.

3     THE COURT:  Just keeping track.

4     MR. HECTOR CANALES:  Okay.

5  Q.  (By Mr. Hector Canales)  Now, here we are

6  February 14th, a month after we just saw get ready, talk

7  to your friends and family, all right, you with me?

8  A.  Yes.

9  Q.  All right.  Now, the question, has Dr. Gonzaba

10  had an end-of-life discussion with Mr. Castaneda?

11  A.  Yes.

12  Q.  I'm terrible with this machine, I'm sorry.

13     So back in February -- no, that's his date of

14  birth.  This was -- back in October '13 and now we're in

15  February of '14, over the four-month period it went from

16  a no to a yes?

17  A.  Yes.

18  Q.  Something changed in Dr. Gonzaba's opinion,

19  right?

20  A.  Not the opinion, just if he discussed end of

21  life.

22  Q.  Okay.  All right.

23  A.  And advanced directives.

24  Q.  So the rest of that patient meeting, they

25  document all the medications again, see all those?

1    A.   Yes.

2              MR. SWARTZ:  Your Honor, again, I'm just --

3    we're having troubling following what document he's

4    referring to, I'm not even certain if they're admitted

5    exhibits, we just need to identify for the record

6    what exhibit they're coming from and what page they are.

7              MR. HECTOR CANALES:  It's Castaneda's --

8    it's his -- your E series exhibit, or the E

9    series exhibit.

10             MR. SWARTZ:  And what exhibit number and

11   what page from that exhibit number?

12             MR. HECTOR CANALES:  It's -- D, what's

13   Castaneda?  Hang on, let me get my notes.

14             THE COURT:  Well, Mr. Canales, go ahead and

15   continue.  You have co-counsel to find that, co-counsel

16   find the exhibit numbers and just provide it to

17   Mr. Swartz while Mr. Canales is questioning.

18             MR. SWARTZ:  Your Honor, I just -- I have --

19   the Government has a concern that these may not be

20   admitted exhibits so --

21             MR. HECTOR CANALES:  I don't have the

22   document.  They did come from the Government,

23   Your Honor.

24             MR. SWARTZ:  Before we proceed with it --

25             THE COURT:  Are we -- we do need to confirm

1    these are documents that have been admitted into

2    evidence before --

3                    MR. HECTOR CANALES:  They are the medical

4    records of Arcadio Castaneda, which is an E series

5    exhibit.

6                    MR. CYGANIEWICZ:  They seem to have it on

7    their screen, Your Honor.

8                    THE CLERK:  Yes.

9                    MR. HECTOR CANALES:  That's from the ELMO.

10                   THE CLERK:  What is Mesquias 00313746?

11                   MR. HECTOR CANALES:  That's the bates number

12   for the document.

13                   THE CLERK:  For yours?

14                   MR. HECTOR CANALES:  That the Government

15   placed on these.

16                   THE CLERK:  Then that's their bates number

17   right?

18                   MR. HECTOR CANALES:  Right.

19                   THE CLERK:  The bates number is 00313746.

20                   MR. SWARTZ:  Okay.

21                   COURT OFFICER:  Excuse me, Your Honor.  The

22   jury needs a break.

23                   THE COURT:  All right.  Gentlemen, why don't

24   we -- let's take a very quick recess break.  And during

25   this interim, gentlemen, make sure that we allocate the

 1    exhibits and what have you, all right?

 2              Let's take a brief recess.

 3              COURT OFFICER:  All rise for the jury.

 4              (JURY OUT.)

 5              THE COURT:  All right.  We'll take a very

 6    brief recess.

 7              (COURT IN SHORT RECESS.)

 8              COURT OFFICER:  All rise for the jury.

 9              (JURY IN.)

10              THE COURT:  Thank you, everyone.  Welcome

11    back.  We'll be taking a break momentarily, please be

12    patient we'll take your lunch break soon.

13              Mr. Canales does want to confirm and all

14    parties want to confirm for the exhibits, the documents

15    were part of the admitted exhibits.

16              Mr. Canales, please proceed.

17              MR. HECTOR CANALES:  For purposes of the

18    record, Your Honor, the Dr. Gonzaba GMG medical records

19    that we've been going over with the witness come from

20    Government Exhibit D-2, the Court can see it is an

21    extremely voluminous document and these are pages that

22    are from Exhibit D-2.

23              THE COURT:  Thank you, Mr. Canales.

24              MR. HECTOR CANALES:  Thank you, Your Honor.

25              THE COURT:  And I haven't started the clock,

 1   but there's exactly 17 minutes left on the defense's

 2   side.

 3              MR. HECTOR CANALES:  Thank you, Your Honor,

 4   I appreciate it.

 5              THE COURT:  Let me know when you're ready.

 6              MR. HECTOR CANALES:  I'm ready.  May I

 7   proceed?

 8   Q.  (By Mr. Hector Canales)  Ms. Hernandez, you ready

 9   to proceed?

10   A.  Yes.

11   Q.  I want to draw your attention, and just bring us

12   back to where we're at here.  This is a -- a follow-up

13   visit with Dr. -- with Dr. Gonzaba on February the 28th

14   of '14.  I'm going to the end of that -- of that patient

15   record from that -- from that day.  Again to the patient

16   instructions.

17        And it's very similar to the instructions that

18   we -- that we saw before, mentions of a progressive

19   decline, and as a means to increase home services -- let

20   me just stop, I'm going to stop here and here's my

21   question.

22        Hospice, Medicare hospice benefits are typically

23   provided at the home, right?

24   A.  Typically, yes.

25   Q.  Right.  They could be also provided at a nursing

1   home, right?

2      A.   That's correct.

3      Q.   But -- but in that sense would you agree that

4   hospice benefits are home health benefits, but I don't

5   mean home health in the way of home health, right, but

6   they're benefits that are -- that are typically given at

7   the patient's home?

8      A.   Normally they're in their home.  Where they

9   reside, you should -- because they may reside in a

10  nursing home, a personal care home, so where they

11  reside.

12     Q.   So within Medicare, you have different types of

13  Medicare benefits.  You have a hospice benefit, correct?

14     A.   Correct.

15     Q.   You have a home health benefit, correct?

16     A.   Correct.

17     Q.   And a home health benefit and a hospice benefit

18  are two different types Medicare benefits, right?

19     A.   Correct.

20     Q.   With different eligibilities requirements, right?

21     A.   Correct.

22     Q.   Right.  To get the home health benefit, you've

23  got to be bed bound?

24     A.   To get the home health benefit?

25     Q.   Yes, ma'am.

1    A.   You have to be bed bound?

2    Q.   Yes, ma'am?

3    A.   Not necessarily, no.  No, sir, you have to be

4    called homebound.

5    Q.   I'm sorry, my fault, you're correct.  I use --

6    homebound, right?

7    A.   Correct.

8    Q.   All right.  But you don't have to be homebound in

9    order to get hospice benefits?

10   A.   Not necessarily, no, sir.

11   Q.   Right.  For instance, you could be on -- you

12   could be a cancer -- you could have stage five lung

13   cancer?

14   A.   Yes.

15   Q.   And be -- and say, you know what, this is my last

16   days, I want to go to Fiesta Texas?

17   A.   Correct.

18   Q.   Right?  And that wouldn't disqualify from

19   somebody being on hospice just because they're out

20   trying to enjoy their last day, right?

21   A.   That's correct.

22   Q.   You see like the -- are you familiar with the

23   Make A Wish Foundation?

24   A.   A little bit.

25   Q.   Right, you see really sick kids and people at the

1    end of their lives, terminally ill going out to the

2    World Series and trying to enjoy themselves, right?

3        A.   Right.

4        Q.   But that doesn't disqualify them from hospice,

5    right?

6        A.   Correct.

7        Q.   Right.  And being on hospice for a real long

8    time, even though maybe it's unusual, it happens, right?

9        A.   Right, yes, correct.

10       Q.   Do you remember -- do you remember sometime back

11   Terri Schiavo?  Remember that case Terri Schiavo?

12       A.   The wife, yes, sir, I do.

13       Q.   Right.  She was on hospice for a decade, right?

14       A.   She was receiving aggressive treatment in the

15   hospital, yes, sir.

16       Q.   For -- for like a decade, years?

17       A.   I'm not familiar exactly how long, but for a long

18   time, yes.

19       Q.   All right.  All right.  So here, so as a means to

20   increase home services, provide necessary equipment and

21   medicines, turn to the next page, to optimize your

22   comfort, let me stop there.  That is a goal of the -- of

23   the Government, to optimize people's comfort in hospice,

24   right?

25       A.   Yes.

1    Q.   You are trying to make them feel good, right?

2    A.   Yes.

3    Q.   Treat their symptoms, if they got a headache, you

4    give them -- you give them Tylenol or -- or Aspirin or

5    Advil, right?

6    A.   Yes.

7    Q.   Moral/spiritual -- moral/spiritual support, the

8    chaplain is there to deal with the concept that -- that

9    they're dying, right?

10   A.   Yes.

11   Q.   What does Dr. Gonzaba recommend here in the last

12   sentence to --

13   A.   It says, I recommend you consider hospice

14   services, hospice services are free and appropriate for

15   a patient such as you.

16   Q.   Is Dr. Gonzaba doing anything wrong by describing

17   these services as free?

18   A.   No, absolutely not.

19   Q.   I told you I would show you Dr. Chandrahasan.  At

20   the top here, you remember we went over that was your

21   signature next to an unidentified one?

22   A.   Yes.

23   Q.   You cannot testify with any more certainty that

24   that was a plan of care, IDT meeting conference that you

25   were in with Dr. Chandrahasan?

1    A.   If you say that's his signature, I can't dispute

2    that.   I don't recall his signature, so if that's his

3    name with the signature then that's --

4    Q.   I'm not testifying here.   You see there at the

5    bottom, those two signatures you see how it's typed as

6    Chandrahasan, M.D. and the signature to the right is

7    highlighted?

8              MR. SWARTZ:   Objection, Your Honor.   First,

9    asked and answered, and also she's already testified

10   that she doesn't know the signature of the doctor,

11   making her -- walking through this document is not

12   helping here.

13             MR. HECTOR CANALES:   I'm just asking if

14   she --

15             THE COURT:   Let me hear the question.

16   Q.   (By Mr. Hector Canales)   Do those look the same

17   to you?

18   A.   They look the same, but if you say it's his

19   signature I can't tell you I recognize what his

20   signature looks like.

21   Q.   Okay.   Do you think a cardiologist is in a better

22   position than you are, a cardiologist who's examined

23   Dr. -- examined Mr. Castaneda is in a better position

24   than you are to evaluate his -- his -- his heart

25   condition?

1    A.   I would hope so, yes.

2    Q.   Did you know that, again Your Honor this is out

3  of Exhibit -- Government Exhibit D-2 -- did you know

4  that Mr. Castaneda was sent to a cardiologist prior to

5  his admission of hospice?

6    A.   I would hope so, yes.

7    Q.   So here, I apologize, this copy is very poor,

8  that's just the way -- the way it -- the way we received

9  it, all right?

10       You see here this is March 27th of '13, you with

11  me?  You with me?

12    A.   I can tell March 27th, I can't tell the year

13  but --

14    Q.   So I'm right there, HPI -- HPI, that's history

15  and physical, right?

16    A.   Uh-huh.

17    Q.   78-year-old man with known CAD?

18    A.   Yes, coronary artery disease.

19    Q.   Coronary artery disease?

20    A.   Yes.

21    Q.   Okay.  That's illegible to me.  Possibly others

22  and CKD, right?

23    A.   Correct.

24    Q.   CKD is chronic kidney disease?

25    A.   Correct.

1    Q.   PVD?

2    A.   Peripheral vascular disease.

3    Q.   All right.  Again, we're seeing these are the

4    things that were established in Gonzaba's record.  And a

5    prior stroke, you see that?

6    A.   Yes.

7    Q.   Did you know that, that he had a prior stroke?

8    A.   I would have known that, yes, then.

9    Q.   All right.  It says Dr. Gonzaba -- on the next

10   paragraph there, Dr. Gonzaba's treated him with -- with

11   neb yesterday for wheezing, what's neb mean?

12   A.   A nebulizing treatment, it just helps with the

13   shortness of breath, kind of helps to open up your lungs

14   and kind of get more air in.

15   Q.   Okay.  All right.  And this is -- do you know

16   Dr. Noah Greene?

17   A.   I do not, no.

18   Q.   And so then on the second page of the -- of -- of

19   the record, Dr. Greene gives his assessment.  Let's see

20   if I can zoom in here.

21        His multiple -- highlighted there.  Something his

22   multiple -- I don't know MI risk factors, see that, MI?

23   A.   I -- I do.

24   Q.   All right.  MI is myocardial infarction?

25   A.   Yes.

1    Q.   Heart attack.  So he has a heart attack risk

2    factors?

3    A.   Yes.

4    Q.   Has not had angina, that's chest pain?

5    A.   That's correct.

6    Q.   But does have significantly limited functional

7    capacity, right?

8    A.   Yes.

9    Q.   That's what it says.  This could be due to

10   cardiac disease, or his anemia, or both?

11   A.   Okay.

12   Q.   Okay.  He is pre-op for surgery.

13              THE COURT:  One second, one second.

14              MR. SWARTZ:  Your Honor, objection, counsel

15   is reading from a document that the witness has no

16   personal knowledge of, first of all; he also cannot read

17   the document because it's illegible and he just skipped

18   a word because he couldn't read it.

19              THE WITNESS:  I can't tell what it says.

20              THE COURT:  Let me hear the objection.

21              MR. SWARTZ:  The Government objects to him

22   asking the witness a question about a document she has

23   no personal knowledge of, especially when it's illegible

24   even to counsel.

25              THE WITNESS:  I can't see what that says.

1          MR. HECTOR CANALES:  Your Honor, I was going

2     to ask her if she can't read it, that's why I'm asking

3     her and reading it to see if she agrees that that's what

4     if says.  And I agree that that word there is not -- I'm

5     going to ask her, can you read it?

6         A.  I can't read hardly any of this.

7               THE COURT:  I'm going to rule answer if you

8     know.

9         Q.  (By Mr. Hector Canales)  But the last word there,

10    would you agree, is a risk surgery?

11        A.  No, I would not agree with that because I cannot

12    tell what that says at all, maybe surgery, but I don't

13    know that that says risk surgery on there.

14        Q.  Unless -- the next sentence -- unless this

15    surgery is urgent, would recommend the following prior,

16    see that?

17        A.  I see that, yes.

18        Q.  Would you agree that Dr. Greene is -- is -- the

19    cardiologist is saying unless the surgery is urgent, he

20    recommends doing something else?

21        A.  Right, I just can't tell what the something else

22    is.

23        Q.  Right, that happens all the time, by the way,

24    that -- that before somebody goes in for a surgery

25    and -- who has a history like Mr. Castaneda's that you

1   consult with a cardiologist and say, hey, can he survive

2   the surgery?

3      A.  Correct.

4      Q.  And it appears here, would you agree, that

5   Dr. Greene is saying, unless it's urgent, try these

6   other things?

7      A.  I can't really say that that's what the doctor

8   was saying, I -- I can just say, okay, because this is

9   what's written because I don't -- I can't really know

10   what the doctor was thinking at the time.

11      Q.  And let me address the objection here of -- of

12   Mr. Swartz.

13      Isn't it true that everyday within a nurse's work

14   as part of their work that you rely on medical records

15   taken by and from people that you don't have any actual

16   personal knowledge of yourself?

17      A.  Correct.

18      Q.  So I'm not asking you to do anything here today

19   that you don't do, you haven't been trained, you don't

20   do everyday in your own job; am I?

21      A.  Correct.

22             THE COURT:  Mr. Canales, five minutes.

23      Q.  (By Mr. Hector Canales)  Now, all the dates we

24   have been talking about with regard to Castaneda are --

25   have been in -- remember Gonzaba was between October of

1    '13 and February of '14, recall that?

2        A.  Yes.

3        Q.  Okay.  And the initial period, the period that is

4    at issue in this case -- did you know the period at

5    issue in this case with Mr. Castaneda the Government has

6    alleged in case is on June -- June 3rd of '14 to August

7    of '14?  Did you know that?

8        A.  I -- I wouldn't be able to tell you the exact

9    date, but if you're showing me that this is the date

10   then --

11       Q.  But all the documents, all the evidence we just

12   saw, this is what --

13       A.  Led up to initial admission.

14       Q.  Right.  And so when he is -- when Dr. Gonzaba is

15   recommending and going to hospice after that,

16   Mr. Castaneda went into hospice a few months later?

17       A.  If this is what this is saying, yes, sir.

18              MR. HECTOR CANALES:  No further questions.

19              THE COURT:  Thank you.  Technically, we have

20   a few minutes left, does anyone want to use up about --

21              MR. CYGANIEWICZ:  Can we have two extra

22   minutes for lunch?  I don't have any questions,

23   Your Honor.

24              THE COURT:  Mr. Guerra, any -- anything, Ms.

25   Arce-Flores.

1                    MS. ARCE-FLORES:  We have nothing.

2                    THE COURT:  Thank you, both.  All right,

3     ladies and gentlemen, I think back to Mr. Cyganiewicz's

4     point is well taken.  Let's go ahead and take a nice

5     lunch.

6                    Again, thank you for your hard work.  Please

7     report back, what is it, 12:45, let's go -- let's go

8     ahead and reconvene at 2:15.

9                    MR. SWARTZ:  Just -- the Government will

10    continue after lunch with the witness.

11                   THE COURT:  No, no, she's not excused, I

12    understand.

13                   MR. SWARTZ:  Okay.

14                   THE COURT:  You're excused for lunch, ma'am,

15    but report back before 2:15.

16                   MR. SWARTZ:  Thank you, Your Honor.

17                   THE WITNESS:  Okay.

18                   THE COURT:  All right.  Thank you, everyone.

19    We'll be in recess.

20                   COURT OFFICER:  All rise for the jury.

21                   (JURY OUT.)

22                   (COURT IN LUNCH RECESS.)

23                   THE COURT:  Thank you, everyone.  Please be

24    seated.

25                   Gentlemen, it's my understanding that you

```
 1   wanted to address a matter outside the presence of the
 2   jury.
 3               MR. SWARTZ:  Yes, yes, Your Honor, if we
 4   may.
 5               THE COURT:  Do we need to excuse the witness
 6   as well?
 7               MR. SWARTZ:  No, I don't believe so for
 8   this.
 9               THE COURT:  Okay.
10               MR. SWARTZ:  Your Honor, as you recall
11   yesterday, the Court admonished defense counsel about
12   certain conduct in the courtroom.
13               Today it was disturbing to see a
14   demonstration, which I think it's not only
15   unprofessional but not becoming of somebody a
16   practitioner of the federal bar, when Court was
17   explaining to the jury translation of the word pendeja
18   and the Court indicated well not everybody speaks
19   Spanish, Mr. Canales was standing right behind the
20   prosecution table and when the Court said that, he made
21   a gesture, prosecution does not speak Spanish, which,
22   number one, is -- is incorrect because there are those
23   of us at that table that do speak Spanish and are from
24   the Rio Grande Valley.
25               Number two, frankly it's racist to suggest
```

1   that if people look white, then they must not speak

2   Spanish.

3            And then finally, it's just inappropriate,

4   and it's attempting to prejudice the jury against the

5   prosecution in a manner that's unbecoming of the

6   standard that we should see in federal court.

7            So the Government would like to raise this

8   Court to the Court's attention, particularly since the

9   Court has already admonished Mr. Canales about his

10  conduct, and the Government requests the Court address

11  this in the presence of the jury, I mean it's to address

12  any potential prejudice against the Government from that

13  conduct.

14           THE COURT:  Gentlemen, to be quite frank I

15  didn't see that, Mr. Canales, any response?

16           MR. HECTOR CANALES:  Overreacting, I -- I

17  don't remember doing anything, Your Honor, I mean,

18  I'm -- I make a lot of movements, I'm loud with my

19  hands.  If -- I don't know, Judge, just --

20           THE COURT:  You're requesting that I state

21  something to the jury, sir?

22           Obviously, obviously the Court would not

23  allow any kind of implicit, or constructive, or actual

24  criticism on any type of racial basis but --

25           MR. SWARTZ:  Well, we don't need to address

1    this in front of the jury.  I just want to raise it with

2    the Court, particularly --

3              THE COURT:  I was not -- and again, I was

4    speaking to the jury.

5              MR. SWARTZ:  Yes, Your Honor.

6              THE COURT:  I don't know who speaks Spanish

7    and who doesn't.  On the same token, just because they

8    have surnames that are Hispanic doesn't they speak

9    Spanish so I was addressing the jury, I wasn't

10   addressing counsel.

11             MR. SWARTZ:  No, and I know the Court was

12   not addressing counsel.

13             THE COURT:  So back to my point, gentlemen,

14   let's just do this.  Again, to be quite frank, I didn't

15   notice any -- I didn't see it, I didn't notice it.

16             Mr. Canales, if you made a gesture that --

17   that you feel was inappropriate, obviously they saw

18   something that they felt was inappropriate, I -- I

19   caution you to -- I would just -- I would just about to

20   jokingly award credit for y'all behaving so well in

21   exchanging threes exhibits.

22             MR. TONY CANALES:  We'll take it back.

23             MR. HECTOR CANALES:  I thought we were

24   getting along great, too, Judge.

25             THE COURT:  Well, again, and I'm not -- hey,

1    listen, I'm not trying to make light of the issue,

2    again, I did not notice it.

3              Gentlemen, again, we're -- we're in a

4    marathon, let's -- let's do every possible -- let's be

5    cognizant of everyone's feelings and professionalism at

6    all times, courtesy at all times, and obviously, if

7    there's any kind of implicit or -- or gesture, or

8    side-bar that you don't feel comfortable, please notify

9    me immediately in the future and can I address it in

10   front of the jury, or to counsel at that time.

11             MR. SWARTZ:  Yes, Your Honor.

12             THE COURT:  So -- so let's move on.

13             MR. SWARTZ:  Okay, yes, Your Honor.

14             THE COURT:  Thank you, Mr. Swartz.

15             Let -- let -- gentlemen, are we ready to

16   proceed?

17             MR. SWARTZ:  Yes, Your Honor.

18             THE COURT:  All right.  Let -- let --

19   let's -- let's come back.

20             COURT OFFICER:  All rise for the jury.

21             (JURY IN.)

22             THE COURT:  Thank you, everyone.  Please be

23   seated.

24             Mr. Swartz, please proceed.

25             MR. SWARTZ:  Thank you, Your Honor.

1    Q.   (By Mr. Swartz)  Ma'am, are you ready to proceed?

2    Okay.  Earlier you were asked some questions about --

3    you call that you testified earlier that 80 percent of

4    the patients at Merida did not qualify.

5    A.   I don't want to give an exact percentage, but it

6    was a large amount.

7    Q.   And then Mr. Canales on cross asked you some

8    questions; do you recall that?

9    A.   Yes, I do.

10   Q.   And he asked you -- he suggested that, oh, you're

11   exaggerating, and he showed you a couple examples?

12   A.   A couple, yes.

13   Q.   And he seemed to be suggesting that because

14   you're casting this wide net across patients at Merida

15   that you're misleading the jury; do you recall that?

16   A.   Yes.

17   Q.   Could you pull up Government's Exhibit H-30.

18   And -- okay.  On the screen is Government's Exhibit H-30

19   and that's Ms. Calvillo; do you recall that?

20   A.   Yes.

21   Q.   And I think Mr. Canales used the word textbook;

22   do you recall that?

23   A.   Yes.

24   Q.   And he said, this is a textbook example of how to

25   run a hospice company; do you recall that?

1      A.   Yes.

2      Q.   And he showed you Government's Exhibit E-4, page

3  431.  Do you recall that document?

4      A.   Yes.

5      Q.   And is that a record for Ms. Calvillo?

6      A.   Part of it, yes.

7      Q.   So it's got Ms. Calvillo's name at the top, and

8  he asked you about a Ms. Vanessa Redway; do you remember

9  that?

10      A.   Yes.

11      Q.   And then he pointed out the date 99/11/2014?

12      A.   Yes.

13      Q.   That's a date that's significant to all of us.

14      A.   Yes.

15      Q.   Could you go to page 434 of this same Exhibit.

16  And he showed you some different pages from that same

17  document; do you recall that?

18      A.   Yes.

19      Q.   Showed you that the box right under the name, and

20  he showed you -- he pointed you towards that last

21  paragraph that says, patient is not appropriate for

22  hospice.

23      A.   Correct.

24      Q.   Patient requires help with provider only.

25  Remember that?

1     A.   Yes.

2     Q.   Health status has improved; remember that?

3     A.   Yes.

4     Q.   And then he showed you page 436.

5          Zoom in on that top section.  You see where it

6     says discharge?

7     A.   Yes, sir.

8     Q.   And he -- he pointed you to that language;

9     remember that?

10    A.   Yes.

11    Q.   And I think you -- you noticed the word transfer

12    in there; do you remember that?

13    A.   Yes, sir.

14    Q.   And -- and you kind of had a question about that,

15    remember?

16    A.   Well, it -- it -- the word transfer does --

17    doesn't mean that they transferred home, the word

18    transfer can mean a lot of different things.  Sometimes,

19    for example, this is just one page of the chart.  I --

20    if this was my company, and I just use that as an

21    example, I would want to see how long this patient has

22    been on service before I would discharge or recertify

23    them.

24         So to transfer, that might mean that she went

25    into the hospital, might have meant she went to another

1    agency, it -- it means a lot of things, so transfer just

2    means transfer.

3           I mean, that's not a whole explanation.  If I

4    filled this out, that probably was me because it was

5    very minimal as far as what information I provided, the

6    least amount the better.  But transfer, I'd have to see

7    why she transferred so I can recall more of what

8    happened.

9       Q.  Right, so you'd want to see what happened after

10   this, right?

11      A.  Yes, sir.

12      Q.  Where did she go after she was transferred?

13      A.  Yes.

14      Q.  And it would be -- the same document says she's

15   not -- she doesn't qualify for hospice, right?

16      A.  Correct.

17      Q.  So she shouldn't be transferring to another

18   hospice company; should she?

19      A.  She shouldn't be, no.

20      Q.  Well, let's go to Government's Exhibit E-4, page

21   405.

22           Is this another document for Ms. Calvillo?

23      A.  Yes.

24      Q.  And is the physician Dr. Virlar?

25      A.  Yes.

1    Q.   And it says at the bottom, order description,

2    patient transferred to another hospice; do you see that?

3    A.   Yes.

4    Q.   Would that strike you as odd?

5    A.   Yes.

6    Q.   She doesn't qualify?

7    A.   She doesn't qualify.

8    Q.   Well, let's go to page -- Government's Exhibit

9    H-31.  So where was she transferred after 09/11, 2014?

10   A.   She transferred to Rodney's company.

11   Q.   What --

12            THE COURT:  I'm sorry, I didn't hear that?

13            THE WITNESS:  It was Professional Hospice

14   was one of Rodney's companies and Bee Caring was also

15   Rodney's agency.

16   Q.   (By Mr. Swartz)  So a patient that didn't qualify

17   for hospice was discharged on September 11th, 2014?

18   A.   Yes, sir.

19   Q.   On September 12th, 2014 she started with another

20   Rodney Mesquias company?

21   A.   Yes, sir.

22   Q.   Does that strike you as odd?

23   A.   Yes.

24   Q.   Is that a textbook example of how things happened

25   at Merida?

1    A.  It was common that this happened because the

2  agency changed names and so we'd have to transfer a

3  patient from one agency to another.  So I didn't even

4  remember about this, but, yeah, it was Professional

5  Hospice before it was Bee Caring and then it was Merida

6  after that.

7    Q.  So Mr. Mesquias is admitting a patient to his

8  hospice company that doesn't qualify for hospice?

9    A.  Correct.

10   Q.  Okay.  Another patient he asked you about --

11  well, the -- the other patient that he asked you about

12  was a Mr. Castaneda; do you remember that?

13   A.  Yes, I remember him.

14   Q.  Okay.  Let's pull up Government's Exhibit H-32.

15   A.  (Chuckling).

16   Q.  And you recognize this guy right away?

17   A.  I remember him, I remember driving to his

18  apartment every week.

19   Q.  What do you remember about him?

20   A.  He was pretty active, a pretty active man.  He

21  drove himself everywhere.  And when I say that, I don't

22  want to say that hospice patients can't drive anywhere

23  because they can, but this man was, even though the

24  documentation said in black and white this patient had

25  this, this patient had that, you have to see the person,

1    too.  You can't just rely on what's black and white.

2        So when you would see this guy, you would never

3    imagine that he had heart failure.  You didn't even know

4    he was in dialysis, he didn't look like a dialysis

5    patient, you'd have to see his color, I don't know if

6    I'm describing it, they get this weird ashy color, and

7    he might be a little dull looking there, but he didn't

8    look like this.  He was pretty, I don't even want to say

9    the word alive, but he was pretty active.  I mean, I --

10   I distinctly remember him.

11       Q.  Was -- was he one of the patients that you

12   observed at Merida that did not qualify for hospice?

13       A.  I would say, yeah, that he did not qualify.

14       Q.  And could we pull up Government's D-2 page 549.

15   Mr. Canales, do you recall, showed you some examples of

16   documents relating to Mr. Castaneda; do you remember

17   that?

18       A.  Yes.

19       Q.  And he showed you this section, and he kind of

20   walked you through all the issues with Mr. Castaneda; do

21   you remember that?

22       A.  Yes.

23       Q.  He didn't mention number two there.

24           Could you highlight that?

25           What does that say?

1    A.   Oh, yeah.   It says discussed importance of

2  regular exercise and recommended starting or continuing

3  a regular exercise problem for good health.   Example,

4  daily walking programs starting out walking about ten

5  minutes and progressing to two miles walking 30 minutes.

6    Q.   Now, if it a patient is terminally ill and

7  they're not going to live past six months, would an

8  objective for that patient to be to get them to walk two

9  miles?

10   A.   No, it would not.

11         MR. HECTOR CANALES:   Objection, Your Honor,

12  calls for speculation of Dr. Gonzaba, the reason he

13  would given these instructions.

14         MR. SWARTZ:   I think she's already answered.

15         THE COURT:   Overruled, she's already

16  answered.

17   Q.   (By Mr. Swartz)   Let's go to Government's Exhibit

18  H-33.   H-33, what does H-33 show about the time period

19  that Mr. Castaneda was on services with any of Rodney

20  Mesquias's companies?   How long was he on hospice?

21   A.   From here on this document?

22   Q.   Yes, ma'am.   Yes, ma'am.

23   A.   A little bit over two years, outreach -- oh

24  that's the Merida Group.   So two-and-a-half years, I

25  guess, I'm not calculating exact but --

1    Q.   Is that a long time?

2    A.   That's a long time.

3    Q.   In your experience, what's the effect on patients

4    on these vulnerable people of putting them on hospice

5    for too long, or too early, or when they don't qualify?

6    A.   I'd have to explain a little bit.

7    Q.   Yes, ma'am, please.  Feel free.

8            MR. HECTOR CANALES:  Objection, Your Honor,

9    calls for speculation as to the effect.  If she's asking

10   to get into the minds of -- of -- of people put on -- on

11   hospice.  She can't -- she can't possibly know,

12   Your Honor, how other people are feeling.

13           MR. SWARTZ:  I'll clarify the question,

14   Your Honor.

15           THE COURT:  Clarify the question.

16   Q.   (By Mr. Swartz)  I'm not asking about how the

17   patients feel.  How does it impact their hospice

18   benefits and their care going forward if they're on

19   hospice, or they're placed on hospice because they're

20   really qualified.

21   A.   Correct.

22   Q.   And they're kept on hospice past the time that

23   they qualify?

24   A.   So when a patient is on --

25           MR. HECTOR CANALES:  Excuse me, excuse me.

1   The question still appears to be asking her to speculate

2   about the effects on a third -- an unidentified third

3   person.

4                    THE WITNESS:  I can explain.

5                    THE COURT:  One second, one second, one

6   second.  The objection is overruled, answer, if you

7   know.

8                    THE WITNESS:  Can I use my personal?

9   Q.   (By Mr. Swartz)  Please, tell the jury.

10  A.   So I recently bought a hospice license myself in

11  December and we have to review everything that a patient

12  qualifies for hospice, so just because I see this in

13  writing and a doctor is giving me an order, I have to

14  look at the big picture, so I look at how long a person

15  has been on hospice.

16                    Unfortunately, when a person has passed a second

17  benefit period, meaning they've already passed six

18  months, then people tend to think, oh, why would

19  somebody be on hospice for three benefits periods, four

20  benefit periods, five benefit periods, and people tend

21  not to want to help that patient because they've already

22  been on hospice for so long.

23                    MR. HECTOR CANALES:  Objection, Your Honor,

24  this is what people, other people may tend to do.

25                    THE WITNESS:  I can tell you what I think.

1          MR. HECTOR CANALES:  The witness is now --

2          THE COURT:  Let him finish, go ahead --

3          MR. HECTOR CANALES:  The witness is now

4    speculating and giving testimony about how other people

5    react to a certain situation.  It's improper testimony

6    and we request it be stricken and the Court instruct the

7    jury to disregard.

8          THE COURT:  Ma'am, limit your question to

9    what you know, do not speculate about what other people

10   may think.

11         THE WITNESS:  Okay, I can give you an

12   example of one --

13         THE COURT:  Now, one second, one second.  So

14   let's go ahead and break it up into question and answer.

15         MR. SWARTZ:  Yes, Your Honor.

16   Q.  (By Mr. Swartz)  So you are -- you now have

17   experience with -- with a hospice company?

18   A.  Yes.

19   Q.  On your own; is that right?

20   A.  Yes, I do.

21   Q.  And you now have experience evaluating hospice,

22   potential hospice patients for admission?

23   A.  Yes, I do.

24   Q.  What impact does it have on your decision to

25   admit a patient if they've been on hospice for a long

1   time already?

2      A.   I'd have to see the reason why they were on

3   hospice before and the reason why they were discharged

4   before prior to admitting them again.

5           I'd have to see a significant decline as far as

6   why they were on services before and why they were taken

7   off.

8           I'd need to see a reason to now they qualify,

9   they've been on hospice for so long, why now do they

10  qualify?  When someone's admitted in the very beginning,

11  the reimbursement rate is higher and so people tend to

12  take them quicker, and when they've been for a longer

13  time, three, four, five, ten, 12 benefit periods, they

14  don't get as much reimbursement rate, but it doesn't

15  mean the patient doesn't qualify.

16          So you'd need to show some type of decline every

17  time in order to maintain them, or keep them on service.

18          So before I would accept a patient, I have to

19  make sure, okay, they were discharged in August, why now

20  in October am I going to take them now?

21          What's the difference between two months ago to

22  now?

23          I'd need to see an actual decline.  Honestly, I

24  don't care what the doctor -- just what the doctor says,

25  I don't want to say I don't care --

1           MR. HECTOR CANALES:  Judge, is there a

2    question in the future?

3           THE COURT:  Let her finish.

4           THE WITNESS:  It --

5           MR. HECTOR CANALES:  Well, I'm objecting to

6    the narrative answer, Your Honor, at this point in time.

7    I mean, the question was proper, but now the witness is

8    going into a narrative which is improper.

9           MR. SWARTZ:  Your Honor, I can simplify the

10   question.

11          THE COURT:  Please.

12   Q.   (By Mr. Swartz)  To put it simply Ms. Hernandez,

13   if a patient has been on hospice for a long time, like

14   Mr. Castaneda, if he came to your hospice company, he'd

15   been on hospice with Merida for over three years, are

16   you going to hesitate to take him on as a patient?

17   A.   Yes, I would.

18   Q.   What about Ms. Castillo -- Ms. Calvillo, she'd

19   been on hospice for a long time, too.  She came to your

20   company, would you hesitate to take her?

21   A.   Yes, I would.

22   Q.   You were asked questions by Mr. Canales about

23   medical opinions; do you remember that?

24   A.   Yes.

25   Q.   And he was showing you what various doctors had

1    written in documents or -- I guess you hadn't seen those

2    documents before; had you?

3        A.   No, I had not.

4        Q.   And he was asking you, well, you wouldn't dispute

5    what this doctor said about this patient; would you;

6    remember that?

7        A.   Yes.

8        Q.   Now, when were you at Merida and you were seeing

9    patients who were at Merida on hospice, these patients

10   you indicated didn't qualify, was that a close call?

11       A.   What do you mean?

12       Q.   I mean, was it -- was it -- did you have to look

13   really carefully to determine if that patient didn't

14   qualify for hospice, or was it pretty obvious?

15       A.   Sometimes it was pretty obvious.

16       Q.   And you're an RN?

17       A.   Yes.

18       Q.   You have training in the medical field, you

19   interact with these patients?

20       A.   Yes.

21       Q.   You are familiar with the requirements to be

22   placed on hospice?

23       A.   Yes.

24       Q.   Were you qualified -- you had the qualifications,

25   you were seeing these patients, and from your own

1    training could you tell that they didn't qualify?

2        A.   I guess a lot of the time, yes, I could tell.

3        Q.   Now, counsel, he was -- Mr. Canales was showing

4    you a lot of medical records.  So this practice at

5    Merida that you were talking about when Dr. Virlar

6    pressured you and others to fabricate medical records;

7    do you recall that?

8        A.   Yes.

9        Q.   So if you pulled up a box of records from the

10   Merida Company, can you rely on those records?

11       A.   No.

12       Q.   And so that patient has a medical file now with

13   inaccurate records?

14       A.   Yes.

15       Q.   Do those records go along with that patient maybe

16   to other companies?

17       A.   They do.

18       Q.   Does that impact their care?

19       A.   It does.

20       Q.   So these -- these patients we're talking about,

21   Ms. Calvillo, Mr. Castaneda, how do you feel about how

22   they were treated by Merida?

23            MR. HECTOR CANALES:  Objection, Your Honor.

24   Her feelings about it are -- are irrelevant to this

25   proceeding.

1    MR. SWARTZ:  I think it's directly relevant,

2    she interacts with these patients.

3           THE COURT:  One second, one second.

4           MR. HECTOR CANALES:  That fact, Your Honor,

5    has no bearing on the issues -- it's not a part of the

6    defense, it's not part of the prosecution, and it -- and

7    it will bear no bearing on the jury's deliberation.

8           THE COURT:  Let's move on.

9    Q.  (By Mr. Swartz)  So on -- on the record, if

10   yourself and others at Merida Group are putting these

11   lies in the patient records, does that contaminate the

12   records?

13   A.  Yes.

14   Q.  And these patients that were on hospice for

15   years, these 80 percent of patients that were on hospice

16   and didn't qualify, how did that strike you?

17   A.  I don't understand what you mean.

18          MR. HECTOR CANALES:  Again -- again,

19   Your Honor, how something strikes the witness, the

20   witness is a fact -- a fact witness not an opinion

21   expert opinion testimony.

22          THE COURT:  I think it's moot, she didn't

23   understand the question.

24   Q.  (By Mr. Swartz) So then let me go to this.

25   The -- when you were testifying about Mr. Mesquias and

1    feed the machine, was that what was driving Merida?

2      A.   Yes.

3                MR. SWARTZ:  Pass the witness, Your Honor.

4                THE COURT:  Mr. Canales?

5                     RECROSS-EXAMINATION

6    BY MR. HECTOR CANALES:

7      Q.   I just want to clarify --

8                THE COURT:  And very quickly Mr. Canales,

9    you have 18 minutes.

10               MR. HECTOR CANALES:  Yes, sir, yes, sir, I

11   won't even take that long, close to that.

12     Q.   (By Mr. Hector Canales)  I just want to clarify,

13   based on your latest round of questioning, you don't --

14   you're not authorized by rule or by law to admit anyone

15   to hospice as an RN?

16     A.   I -- I don't admit the patient, I evaluate the

17   patient.

18     Q.   Right.  So when you were -- when were you

19   answering the Government's question here about, I

20   wouldn't admit that patient, that -- that was -- you

21   misspoke a little bit there, right?

22     A.   As an administrator?

23     Q.   That's not accurate that you -- because you can't

24   admit anybody?

25     A.   Process and admission to services I would still

1   need a doctor's, physician's order, a doctor's order to

2   admit the patient.  I would need permission from the

3   doctor to admit, but if I were to see a patient that

4   didn't qualify, then I'd say we're not admitting the

5   patient.

6       Q.  And if the doctor -- and if the doctor disagreed

7   with you, it's the doctor's ultimate call in this -- to

8   admit or not admit, not the nurse?

9       A.  Then if -- then the doctor can send it to another

10  agency.

11      Q.  Or he can disagree with you and say --

12      A.  Disagree with me, yes.

13      Q.  Right.

14      A.  And that happens a lot.

15      Q.  You can't leave the impression that you admit

16  anybody because you don't have that power or right; do

17  you?

18      A.  Correct.

19      Q.  All right.  I just want to make sure.

20          All right.  And -- and do you know who the -- any

21  change in your testimony about the primary care

22  physician is in the best -- is in the best position to

23  make the determination of -- of their -- of a patient's

24  health, diagnosis and prognosis?

25      A.  Um --

1       Q.   That's not changing?

2       A.   Well --

3       Q.   Didn't change over lunch; did it?

4       A.   No, it didn't change over lunch but --

5       Q.   And so -- and so do you know who Theresa

6   Calvillo's primary care physician was?

7       A.   I don't recall.

8       Q.   All right.  But just like with Mr. Castaneda, you

9   would defer to that primary care physician, just like

10  you did -- would -- just like you said with

11  Mr. Castaneda, right?

12      A.   I guess I would.

13      Q.   All right.

14           MR. HECTOR CANALES:  Thank you.  That's all

15  the questions I have.

16           THE COURT:  Anything else, gentlemen?

17           MR. SWARTZ:  Nothing from the Government,

18  Your Honor.

19           THE COURT:  Thank you, ma'am.  You may step

20  down.  You're excused.

21           Anybody need a break by anyone before we

22  call the next witness?  All right.

23           The next witness, please.

24           MR. FOSTER:  Your Honor, the United States

25  calls Eddie Zuniga, Eduardo Zuniga.

```
 1                    THE COURT:  Good afternoon, sir.
 2                    Please remain standing.
 3                    Let's go ahead and swear him in, please.
 4                    THE CLERK:  Please raise your right hand.
 5                    (WITNESS SWORN IN.)
 6                    THE COURT:  Please make yourself
 7      comfortable, sir.  Position the microphone closely to
 8      you.
 9                    THE WITNESS:  Yes.
10                    THE COURT:  Please speak loudly and clearly
11      into the microphone.
12                    Mr. Foster, please proceed.
13                    MR. FOSTER:  Thank you, Your Honor.
14                         DIRECT EXAMINATION
15      BY MR. FOSTER:
16         Q.  Good afternoon, Mr. Zuniga.
17         A.  Good afternoon.
18         Q.  Could you introduce yourself to the jury.
19         A.  My name is Eddie Zuniga.
20         Q.  And where were you born?
21         A.  Here in the Valley.
22         Q.  And what city do you live in now?
23         A.  San Antonio.
24         Q.  How long have you lived in San Antonio?
25         A.  Since 2010, summer of 2010.
```

```
 1      Q.   Are you a medical professional?

 2      A.   No.

 3      Q.   Are you a doctor?

 4      A.   No.

 5      Q.   Are you a nurse?

 6      A.   No.

 7      Q.   Did you work for Defendant Rodney Mesquias?

 8      A.   Yes.

 9      Q.   When did you start working for him?

10      A.   November 2003.

11      Q.   How old were you in November 2003?

12      A.   20, around 20 years old.

13      Q.   Where did you work before Defendant Mesquias

14   hired you?

15      A.   I was a golf cart attendant in a local country

16   club here in Harlingen.

17      Q.   After he hired you as a golf cart attendant, how

18   many years did you work for him?

19      A.   Maybe about 17 years, 16, 17 years.

20      Q.   Is it hard for you to be here today?

21      A.   Yeah.

22      Q.   Were you subpoenaed by the Government to testify?

23      A.   Yes.

24      Q.   Would you rather be somewhere else?

25      A.   Of course.
```

1    Q.   Can you explain to the jury why it's hard to be

2    here testifying in a case involving Mr. Mesquias?

3              MR. CYGANIEWICZ:   Objection, Your Honor,

4    that's not relevant to any issue in the case,

5    Your Honor.

6              THE COURT:   That's overruled.

7    Q.   (By Mr. Foster)   You can go ahead.

8    A.   I -- I'm grew up with Rodney, you know, it's very

9    hard.   Somebody I trusted, somebody that I admired.

10   Q.   Who -- who was your boss at the Merida Group?

11   A.   Rodney Mesquias and Henry McInnis.

12   Q.   Did you have one boss or two bosses?

13   A.   Two.

14   Q.   Can you describe to the jury what you mean when

15   you say you had two bosses?

16   A.   We -- I always had to get clearance from either

17   one of them, if not both.

18   Q.   And what roles did you did at the Merida Group?

19   A.   I started off as a branch monitor in 2008, and

20   then in 2010 moved to San Antonio and was given the role

21   of alternate administrator in San Antonio.   And then in

22   summer of 2016, I was given the role of director of

23   operations.

24   Q.   How long did you have two bosses while you were

25   at the Merida Group?

1      A.   Since 2008.

2      Q.   Was it always Rodney Mesquias and Henry McInnis?

3      A.   Yes.

4      Q.   Can you describe Defendant Mesquias' role in the

5  company?

6      A.   He was the owner, very involved in the

7  operations.

8      Q.   Can you describe Henry McInnis' role in the

9  company?

10     A.   He was administrator in charge of, you know,

11  daily operations of the company.

12     Q.   Daily operations in one area of Texas, or in all

13  the areas?

14     A.   No, in all, all areas.

15     Q.   When you were the alternate administrator in

16  San Antonio, who did you report to?

17     A.   To Henry and Rodney.

18     Q.   And what was your impression of how Defendant

19  McInnis enjoyed his role in the company?

20     A.   I mean, he liked his position.

21     Q.   Can you explain that to the jury?

22     A.   He liked to oversee and, you know, manage, have a

23  big role and manage the whole operation.

24     Q.   How frequently did you communicate with Defendant

25  Mesquias while you worked at the Merida Group?

1      A.   Pretty often throughout the day, maybe daily.

2      Q.   How frequently did you communicate with Defendant

3  McInnis while you worked at the Merida Group?

4      A.   I would say at least three to four times a week,

5  via phone or text message.

6      Q.   Do you know how frequently Defendant Mesquias and

7  McInnis communicated with each other?

8           MR. CYGANIEWICZ:  Calls for speculation,

9  Your Honor, objection.

10           THE COURT:  Sustained.

11           MR. FOSTER:  The question was whether or not

12  he knew, Your Honor, not the substance.  I'll lay the

13  foundation.

14           MR. CYGANIEWICZ:  We don't know about

15  speculation or hearsay, Judge.

16           THE COURT:  Rephrase the question.

17      Q.   (By Mr. Foster)  Were you frequently in Defendant

18  Mesquias' presence?

19      A.   That he spoke with Henry?

20      Q.   Uh-huh.

21      A.   Yes.

22      Q.   And did you also spend time in person with

23  Defendant McInnis?

24      A.   Yes.

25      Q.   And would he receive phone calls when you were in

1   his presence?

2       A.   Yes.

3       Q.   Who would be calling him?

4       A.   Rodney.

5       Q.   How frequently would that happen?

6       A.   When I would be around, it would be often.

7       Q.   Okay.  Now, did you oversee hospice marketers at

8   Merida?

9       A.   Yes.

10      Q.   Who did you report to at Merida regarding the

11  marketing?

12      A.   Henry and Rodney.

13      Q.   Did Defendant Mesquias tell you why he wanted to

14  provide hospice services?

15      A.   To increase revenue.

16      Q.   When the hospice program first started at Merida

17  at the very beginning, were there a lot of admissions?

18      A.   Not -- not too much, yeah.

19      Q.   Why not?

20      A.   We weren't converting admissions.  We weren't

21  converting the referrals that were coming into the

22  company into admissions into the hospice program.

23      Q.   Did Defendant Mesquias come up with a marketing

24  plan?

25               MR. HECTOR CANALES:  Objection, Your Honor,

1    leading.  Suggesting the answer to the witness.

2              THE COURT:  Rephrase the question.

3       Q.  (By Mr. Foster)  Would it -- how did Defendant

4    Mesquias react that you weren't admitting lots of

5    patients?

6              MR. HECTOR CANALES:  Again, Your Honor, he's

7    still the who, what, why, where, at the end of the

8    question he's getting him to ask for -- calling for a

9    yes or no answer.

10              MR. FOSTER:  It's a proper question.

11              THE COURT:  That's overruled.  Answer if you

12   know.

13      Q.  (By Mr. Foster)  How did Defendant Mesquias

14   react?

15      A.  He would question why.

16      Q.  And did he come up with a plan?

17      A.  Yes.

18      Q.  What was the plan?

19      A.  To offer these patients the medications that the

20   hospice program had to offer, the equipment, the medical

21   supplies.

22      Q.  What, if anything, did he say about whether

23   patients needed to be dying?

24      A.  Yes, they had -- they did not have to be dying in

25   six months.

1    Q.   Can you tell the jury what he told you?

2    A.   That they did not have to be dying in six months

3    to be on hospice.

4    Q.   And how frequently did he say this?

5    A.   Whenever -- whenever there was a marketer that

6    couldn't convert the patient, he would ask why and

7    that's when he would tell the marketer that.

8    Q.   What did Defendant Mesquias tell the marketer?

9    A.   That they did not have to be dying within six

10   months to be on hospice.

11   Q.   Did Defendant McInnis also instruct you on how to

12   market the hospice program?

13   A.   Yes.

14   Q.   What did Defendant McInnis tell you?

15   A.   The same thing, that they didn't have to be dying

16   in six months to be on services.

17   Q.   And did you -- did Defendant McInnis oversee

18   marketing in the Valley?

19   A.   Yes.

20   Q.   And were you aware of what he instructed

21   marketers in the Valley?

22          MR. CYGANIEWICZ:  Objection, Your Honor,

23   that calls for speculation or hearsay.

24          MR. FOSTER:  The question is a proper

25   foundational question, was he aware?

1           MR. CYGANIEWICZ:  Of what he did.

2           MR. FOSTER:  I'll ask him how he's aware.

3           THE COURT:  The -- the -- let's go through

4    the predicate.  The question was proper, overruled.

5    Q.  (By Mr. Foster)  Were you aware of how he

6    instructed marketers to market hospice in the Valley?

7    A.  The same way.

8    Q.  How were you aware of that?

9    A.  He would tell us that that's what they're doing

10   down there.

11   Q.  What would Defendant McInnis say to you about how

12   hospice was marketed?

13   A.  That they didn't have to be dying to be on six

14   months to offer, you know, the medications, the

15   equipment, the supplies.

16   Q.  Did Defendant Mesquias instruct you how to pay

17   marketers?

18   A.  To give them a bonus if they would bring in a

19   particular referral to the program.

20   Q.  How was that bonus calculated?

21   A.  On admission.

22   Q.  Per patient admission?

23   A.  Yes.

24   Q.  Did Defendant Mesquias track the number of

25   patients each marketer brought in?

1      A.   Yes.

2      Q.   How did he track that?

3      A.   Each location had a referral log that noted every

4   single referral that came in the company per location

5   noting a status, whether if it was admitted, pending or

6   not admitted.

7      Q.   How frequently did Defendant Mesquias request and

8   obtain that information?

9      A.   Once a week, every Friday before the end of the

10   day.

11      Q.   How did you know that?  How do you know that?

12      A.   He would request it and if we didn't send it, he

13   would call us or give us a text, where are my numbers.

14              MR. HECTOR CANALES:  Objection to the we,

15   Your Honor, calling for hearsay, speculation.  Not

16   demonstrate the witness has personal knowledge,

17   Your Honor.

18              THE COURT:  Overruled.  You can answer the

19   question.

20              THE WITNESS:  What was the question?

21      Q.   (By Mr. Foster)  How frequently did Defendant

22   Mesquias request this information about the number of

23   patients each marketer recruited from you?

24      A.   Every Friday.

25      Q.   And what did he tell you to do if a marketer

```
 1   didn't bring in the number of patients that he wanted
 2   them to bring in?
 3       A.   To put them on a probation; if they didn't
 4   produce, to terminate them.
 5       Q.   How quickly did he want to terminate them?
 6       A.   It happened pretty frequent -- frequent depending
 7   on the salary that each employee was making.
 8       Q.   Now, did Defendant Mesquias even fire you on a
 9   number of occasions?
10       A.   Yes.
11       Q.   How many times?
12       A.   Total of four times.
13       Q.   Did he hire you back each time?
14       A.   Yes.
15       Q.   Generally speaking, why did he fire you?
16       A.   He would call me back, you know, and ask me if I
17   wanted to come back because he needed to get me back in
18   there.
19       Q.   And why were you fired in the first place,
20   generally speaking?
21               THE COURT:   Sir, again, speak loudly and
22   clearly into the microphone.
23               THE WITNESS:   What was the question?
24       Q.   (By Mr. Foster)   Why were you fired, generally
25   speaking?
```

1      A.   For not -- for not -- not listening to him, not

2  doing what he wanted me to do.

3      Q.   Now, did you also speak with Defendant McInnis

4  about per payment patients to marketers?

5      A.   He would review the invoices that would come in,

6  he would approve them so --

7      Q.   And what would be in those invoices?

8      A.   The total admissions per marketer.

9      Q.   And what would happen, if anything, in terms of

10 bonuses if they didn't think -- if theft Mesquias didn't

11 think there were enough patients being brought in?

12     A.   Can you repeat the question?

13     Q.   Yeah, what would happen in terms of offering

14 bonuses if not enough patients were being brought in?

15     A.   If they would bring in admissions?

16     Q.   And would there be per payment bonuses offered?

17     A.   Yes.

18     Q.   And would Defendant Mesquias offer those?

19     A.   Yes.

20     Q.   And did Defendant McInnis pay those?

21     A.   Yes.

22     Q.   And he didn't pay them personally?

23     A.   He approved them.

24     Q.   He approved them, okay.  Now, did the Merida

25 Group have rules for the admission of patients into

```
 1   hospice?
 2        A.   It was pretty much every referral that comes in,
 3   he wanted a patient admitted.
 4        Q.   When you say he, who are you referring to?
 5        A.   Rodney.
 6        Q.   What did he tell you about that?
 7        A.   That he wanted every single referral admitted.
 8        Q.   And what about -- did you speak with Defendant
 9   McInnis about the same thing?
10        A.   Yes.
11        Q.   What did he tell you he wanted?
12        A.   The same thing.
13        Q.   Did Defendant Mesquias put pressure on you to
14   admit every patient whether or not they were dying?
15                  MR. HECTOR CANALES:  Objection, Your Honor,
16   leading.
17                  THE COURT:  Rephrase the question.
18                  MR. FOSTER:  Sure.
19        Q.   (By Mr. Foster)  Was there pressure placed on
20   you?
21        A.   Yeah.
22                  MR. HECTOR CANALES:  Leading, Your Honor.
23                  THE COURT:  Rephrase the question.
24        Q.   (By Mr. Foster)  What was your impression of what
25   Defendant Mesquias wanted you to do?
```

1    A.   To admit the patients.

2    Q.   And how forceful was he?

3    A.   He was aggressive, he would get upset if some of

4    these patients were not converted into the program.

5    Q.   And can you describe his demeanor to the jury?

6    A.   At the time of the non-admission?

7    Q.   Uh-huh.

8    A.   He would question upset in upset ways, he would

9    threaten us, yell, why are we paying you so much,

10   towards the marketers.

11   Q.   Now, did you observe occasions where a nurse told

12   Defendant Mesquias that a patient should be discharged?

13   A.   We had case conference meetings and that would

14   be -- come up, patient needed to be discharged, and

15   Rodney would mention, you know, question the nurse and

16   why -- questioned their judgment.

17   Q.   Would he raise his voice?

18   A.   At times he would, yeah.

19   Q.   Did he have a thing that he was known for saying?

20   A.   Yeah, don't fuck with my money, don't fuck with

21   my patients.

22   Q.   How frequently would he say, don't fuck with my

23   money, don't fuck with --

24   A.   Typically, when there was a nurse or a marketer

25   that weren't, you know, converting patients or were

1   losing patients.

2       Q.   And when you say that, when a nurse wanted to

3   discharge a patient?

4       A.   Not during at that point, but he did say it when,

5   you know, the nurses were not admitting the patients.

6       Q.   And did Defendant Mesquias, in your presence,

7   allow nurses to freely not admit or discharge patients?

8       A.   Can you ask the question again?

9       Q.   Yeah, did he allow nurses to freely discharge

10  patients?

11      A.   No.  No.

12      Q.   I assume there were some patients who were

13  discharged over --

14      A.   Yeah, there were some parents that were

15  discharged.

16      Q.   Was it easier or was it hard to discharge

17  patients at Merida?

18      A.   No, it was pretty difficult.  They'd have to have

19  a very good reason on why they were being discharged and

20  that reason had to be relayed to Rodney.

21      Q.   When you observed nurses tell Defendant Mesquias

22  that patient didn't qualify, what would happen to those

23  nurses?

24      A.   He would ask us not to use that nurse anymore and

25  to assign somebody else.

1    Q.   What did that mean for that nurse's livelihood,

2    position in the company?

3    A.   They would be terminated.

4    Q.   And what would happen with the patient who the

5    nurse told Defendant Mesquias shouldn't be admitted?

6    A.   He would be -- they would receive an assessment

7    by another nurse.

8    Q.   And would they be admitted?

9    A.   Yes.

10   Q.   Now, can you describe the turn-over in nursing

11   staff in the San Antonio office to the jury?

12   A.   For a while my -- the location that I oversaw had

13   the longest tenured nurses.  And then once Rodney

14   started coming up to San Antonio, I mean, we had to run

15   adds on a daily basis and have them actively running

16   because we never knew when we were going to need to

17   replace a nurse and replace them fast.

18   Q.   Can you explain to the jury how it changed when

19   Defendant Mesquias came to San Antonio?

20   A.   We started losing nurses.

21   Q.   Why?

22   A.   Because --

23        MR. HECTOR CANALES:  Objection, Your Honor,

24   calls for speculation.

25        THE COURT:  Overruled, you can answer if you

1    know.

2                    THE WITNESS:  Can you ask the question

3    again?

4        Q.  (By Mr. Foster)  Yeah, why did you lose nurses

5    when Rodney came to San Antonio?

6        A.  They weren't meeting, you know, Rodney's

7    expectations by admitting patients or discharging

8    patients.

9        Q.  Now, can you recall Defendant Mesquias ever once

10   saying that a patient should not be admitted to home

11   health or hospice services?

12       A.  No.

13       Q.  Can you recall Defendant Mesquias ever once

14   saying that a patient should be discharged from home

15   health or hospice services?

16       A.  No.

17       Q.  You spent 16 years working with Defendant

18   Mesquias.  In those 16 years, can you tell the jury

19   whether he ever once showed any compassion for a

20   patient?

21       A.  I mean, I -- not in front of me, no.

22       Q.  How did he talk about the patients in your

23   presence?

24       A.  As a number, a census.

25       Q.  Dollars?

1    A.   Yes.

2    Q.   Now --

3              THE COURT:   One second.   You all right?

4              (Brief pause in proceedings.)

5              THE COURT:   Please proceed.

6              MR. FOSTER:   Thank you, Your Honor.

7    Q.   (By Mr. Foster)   Turning to Defendant McInnis,

8    did he give you instructions regarding the admission of

9    patients?

10   A.   Yes.

11   Q.   What instructions did he give you?

12   A.   The -- the same ones, you know, need to make sure

13   we admitted patient.

14   Q.   How forceful was he?

15   A.   He -- he wasn't as aggressive, but he -- I mean,

16   he was pretty straightforward and -- that we needed to

17   make that happen.

18   Q.   How frequently would he want you to admit

19   patients?

20   A.   Everyday, you know.

21   Q.   And did you observe him put pressure on other

22   Merida employees in meetings in Harlingen in your

23   presence?

24   A.   I saw it once or twice, but not as often as

25   San Antonio.

1     Q.   What did you see when you were at those meetings

2  in Harlingen?

3     A.   The -- the same -- the same thing.

4     Q.   Can you describe it to the jury.

5     A.   Questioning why the admissions, asking them, you

6  know, to do the same thing, to offer these services,

7  additional items, medications, equipment and to use

8  other nurses if they're not admitting the patient.

9     Q.   So let's focus on that.  At the meetings in

10  Harlingen, did you observe conversations about nurses

11  who didn't want to admit patients?

12     A.   Did I observe?

13     Q.   Yeah.

14     A.   No, I wouldn't say I saw in person.

15          THE COURT:  Again, sir, speak loudly, I know

16  during the course of conversation it's -- you lower your

17  voice, but speak loudly.

18     Q.   (By Mr. Foster)  Did you have conversations --

19  did have you conversations with Defendant McInnis about

20  nurses not wanting to admit patients?

21     A.   Yes.

22     Q.   And what did he -- what did you tell him?

23     A.   That, that, you know, we're not getting the

24  admissions that they want and he asked why, I said we're

25  not -- patients are not being admitted due to

1    non-admits, and he asked to use another nurse, not to

2    use the same nurse that we were using.

3        Q.   When you say non-admits, can you explain that to

4    the jury, why they were not being admitted in the

5    nurse's opinion?

6        A.   Either not being homebound or not meeting

7    criteria for hospice.

8        Q.   And what did Defendant McInnis tell you to do

9    with that nurse who didn't want to admit a patient for

10   not being homebound, or not being qualified for hospice?

11       A.   Not use them again.

12       Q.   And what did that mean for that nurse's

13   livelihood?

14       A.   Terminate them.

15       Q.   And what did Defendant McInnis tell you to do

16   with the patient?

17       A.   To send another nurse.

18       Q.   How long did you work with Defendant McInnis?

19       A.   Directly, I started working with him in 2008.

20       Q.   And when did you leave the company?

21       A.   In 2017, the end of -- December or January.

22       Q.   And those, approximately, nine years in your

23   conversation with him, did he ever express any

24   compassion for any of the patients?

25       A.   No.

1    Q.   How did he talk to you about these patients?

2    A.   The same way as -- as census, it was all about

3    census.

4    Q.   Did you have conversations with Defendant

5    Mesquias about moving patients from the home health

6    program to the hospice program?

7    A.   Yes.

8    Q.   What did he tell you to do?

9    A.   He -- he wanted us to go through each patient,

10   each chart on each of the programs that we offered and

11   to flag the diagnoses that would qualify for --

12   potentially qualify for the hospice program.  After we

13   flagged the patients, he wanted us to send out a

14   marketer and explain these programs to -- to the

15   patients.

16   Q.   And how were the programs explained?

17   A.   That how the marketing strategy was?  To offer

18   them the program.

19   Q.   You don't have to be dying?

20   A.   You don't have to be dying to be on services.

21   Q.   Did you have conversations with Defendant McInnis

22   about moving patients from home health to hospice?

23   A.   Yes.

24   Q.   And what did he tell you to do?

25   A.   The -- the same thing, similar things, you know,

1    to find out the patients that have those qualifying

2    diagnoses because they're doing it down in Harlingen,

3    why aren't we doing it, we should do it, stuff like

4    that.

5        Q.   Was that with just a few patients, a handful or

6    was it with all the patients on home health?

7        A.   No, we needed to go through all the patients that

8    were on services on our programs.

9        Q.   Did Defendant Mesquias tell you who to get the

10   doctor's order from in San Antonio for those home health

11   patients?

12       A.   Initially, we started with PCPs and they weren't

13   converting fast enough, they weren't signing.  There was

14   a delay or they would refuse to sign.  At that point,

15   that's when Rodney would ask -- instruct us to send

16   Dr. Virlar to give us the order.

17       Q.   What percentage of orders did Dr. Virlar sign

18   during your time in San Antonio for hospice?

19       A.   Well, I would say, you know, at one point all the

20   patients were under his name, maybe 90 percent.

21       Q.   Did you receive complaints from primary care

22   physicians about their patients being signed up for

23   hospice by Dr. Virlar without the primary care

24   physician's knowledge?

25       A.   Yeah, I recall receiving one complaint via fax.

On the letterhead from that physician office in big bold

Sharpie letters it said this patient does not belong on

hospice.  He should not be on hospice.

Q.  Did you tell Defendant Mesquias about this?

A.  Yes.

Q.  Did you give him the fax?

A.  I showed it to him.

Q.  What did Defendant Mesquias say?

A.  He said not to worry about it.

Q.  What did he do?

A.  He waved his hand and said, don't worry about it.

Q.  Did he appear concerned?

A.  No, no.

Q.  Did Merida keep the patient on services?

A.  Yes.

Q.  Even though the primary care physician said they

didn't qualify for hospice?

A.  Yes.

Q.  Now, turning to the Defendant McInnis, was

Defendant McInnis in charge of accounts payable?

A.  Yes.

Q.  And after Defendant McInnis was running accounts

payable, did you discuss with him instances where the

primary care physician would refuse to sign the order of

admission?

1    A.   Yes.

2    Q.   And what did Defendant McInnis say to do?

3    A.   To use Dr. Virlar.

4    Q.   Are you aware of whether Defendant Mesquias

5    provided perks to Dr. Virlar for admitting patients?

6    A.   No.

7    Q.   Were aware of trips that Defendant Mesquias took

8    Dr. Virlar on?

9    A.   Yes, yes.

10   Q.   Did you go on some of these trips?

11   A.   Yes.

12   Q.   And how many times did you go on trips?

13   A.   I -- I went in total of four.

14   Q.   Where did you go?

15   A.   To Las Vegas.

16   Q.   And how many people went on these trips?

17   A.   It would depend, roughly, around ten maybe.

18   Q.   Who paid for the flights?

19   A.   Rodney.

20   Q.   Who paid for the hotels?

21   A.   Rodney.

22   Q.   Who paid for the restaurants?

23   A.   Rodney.

24   Q.   Did you go to nightclubs?

25   A.   Yes.

1    Q.   Who paid for the nightclubs?

2    A.   Rodney.

3    Q.   Can you describe what these nightclubs are like

4    to members of the jury who may have never been to a

5    nightclub in Las Vegas like this?

6         MR. CYGANIEWICZ:  Your Honor, I'm going to

7    object to the relevancy of what a nightclub in Vegas

8    looks like, that has no bearing and that's to inflame

9    the jury, Your Honor.

10        MR. HECTOR CANALES:  Join, Your Honor.

11        MR. CYGANIEWICZ:  Relevancy -- what's the

12   relevancy?

13        THE COURT:  Overruled.  I'll allow it.

14   Q.   (By Mr. Foster) Can you describe what these

15   nightclubs are like to members of the jury who may have

16   never been to a nightclub like this in Las Vegas?

17   A.   They were -- they were top -- top of the line,

18   you know, there's high well-known DJs performing at

19   those clubs, they were table service only clubs,

20   standing room but if you wanted a table you had to --

21   you had to pay for your table, bottle service type of

22   club.

23   Q.   And were you at a table with bottle service?

24   A.   Yes.

25   Q.   Private security?

1     A.   Yes.

2     Q.   And recalling these trips, how did they influence

3  you?

4     A.   I mean, it's something that I had never

5  experienced and just work harder.

6     Q.   Can you explain that to the jury.

7     A.   It was just something I've never really been a

8  part of or experienced in my life, so coming from

9  obviously the Valley and it's just something fun,

10 something fun.

11    Q.   Did you talk to Defendant Mesquias about the

12 discharge of patients?

13    A.   Can you ask the question again?

14    Q.   Yeah, did you talk to Defendant Mesquias about

15 discharging patients?

16    A.   When -- yeah, you would know the -- the patients

17 that would be discharging.

18    Q.   What was the most common situation where a

19 patient would be discharged?

20    A.   The most common would probably say, you know,

21 patient, you know, goes med, or refusing, I mean, the

22 patient request -- it was really patient request was the

23 most common.

24    Q.   When -- when a patient requested to be

25 discharged, would Defendant Mesquias get upset?

1     A.   Yes.

2     Q.   What would he be upset about?

3     A.   He wanted to know why they were requesting to be

4  discharged and obviously because they weren't going to

5  be in our services anymore.

6     Q.   And what did he talk about in terms of how that

7  affected the bottom line?

8     A.   We needed patients, we needed our census to be

9  met.

10    Q.   Were there occasions where patients would be

11 taken off services to go to the hospital?

12    A.   Yes.

13    Q.   And what did Defendant Mesquias instruct you to

14 do after the patient was discharged then from the

15 hospital?

16    A.   He wanted us to send -- obviously, flag the

17 patient, he wanted us to send the marketer to the

18 hospital and visit, make sure we don't lose it, make

19 sure we get the patient back on services and not lose it

20 to another agency.

21    Q.   Did you speak with Defendant McInnis about

22 patients in the hospital?

23    A.   Yes.

24    Q.   And what did Defendant McInnis instruct you to do

25 if a patient was discharged from the hospital?

1      A.   The same, the same thing.  He wanted us to flag

2  the patient and make sure we got that patient back on

3  services.

4      Q.   You recall going to Alabama with Defendant

5  Mesquias and McInnis?

6      A.   Yes.

7      Q.   And when, approximately, was that?

8      A.   It was April 2016.

9      Q.   And did you observe a conversation between

10  Defendants Mesquias, McInnis and Dr. Virlar?

11      A.   Yes.

12      Q.   And was that conversation -- what was that

13  conversation about, generally speaking?

14      A.   That conversation was about, you know, they were

15  blaming -- Rodney and Virlar were blaming Henry for the

16  re -- the letterhead coming in from Medicare requesting

17  money back.  So they were blaming Henry for -- for that,

18  that it was his fault that they owed all that money back

19  to Medicare.

20      Q.   What did Henry say?

21      A.   That it wasn't, that it was their fault for

22  keeping those patients on services too long.

23      Q.   After this conversation that you observed between

24  Dr. Virlar, Defendant McInnis and Defendant Mesquias,

25  did Merida's policies changes in regards to marketing or

1    admission that we talked about?

2      A.   No.

3      Q.   Now, you're not a medical professional, but were

4    you present when nurses spoke with Defendant Mesquias

5    about home health patients?

6      A.   Yes.

7      Q.   Did nurses tell Defendant Mesquias about patients

8    who were not homebound?

9      A.   Yes.

10     Q.   What do you recall them saying about these

11   patients, why they weren't homebound?

12     A.   Can -- what was the last part?

13     Q.   Do you recall them talking about patients who

14   weren't home?

15     A.   Yes.

16     Q.   Patients who were out driving?

17     A.   Yes.

18     Q.   Working?

19     A.   Yes.

20     Q.   Out of town?

21     A.   Yes.

22     Q.   What would Defendant Mesquias say?

23     A.   To send somebody else.

24     Q.   And focus on the hospice program, did nurses

25   express concern to you about patients not being

1   qualified?

2      A.   They -- they would come up and say these patients

3   shouldn't be on service anymore.

4      Q.   Was that rare or frequent?

5      A.   It would be often, you know.

6      Q.   And are you also familiar with up-coding?

7      A.   Yes.

8      Q.   What is up-coding?

9      A.   Increasing your -- changing your code so that you

10  could increase your reimbursement on the claim that

11  you're submitting to the insurance carrier.

12     Q.   Did Defendant Mesquias talk to you about

13  up-coding, talk to the staff about?

14     A.   The staff, yes, not directly, but yeah, to the

15  staff, yes.

16     Q.   And what did he say?

17     A.   He had a QA department that would note -- note

18  diagnoses that would pay more so that the nurses doing

19  the assessment could change those diagnoses and so that

20  they could submit the claim.

21     Q.   Did he want staff to use the correct diagnosis,

22  or the one that would make the most money?

23     A.   The one that would make the bigger reimbursement.

24     Q.   And was there a computer program that he used?

25     A.   The software would generate which one -- the

1    anticipated payment.

2        Q.   And did Defendant McInnis also use that computer

3    program?

4        A.   Yeah, it was agency-wide.

5        Q.   And did Defendant McInnis also instruct staff in

6    your presence to engage in up-coding?

7        A.   The -- yes.

8        Q.   What did he say?

9        A.   He would -- he have the QA department host

10   in-services down at the main office in Harlingen, so

11   they would host those and show -- show them on, and

12   explain to why they were doing so that they could get a

13   better reimbursement rate.

14       Q.   Did you receive complaints from nurses at Merida

15   about these instructions?

16       A.   There's a handful of nurses that didn't want to

17   change their -- their assessment, their documentation.

18       Q.   What did Defendant Mesquias say to do with those

19   nurses?

20       A.   To give them training to get them contacted with

21   QA department so the QA department can get to -- get

22   them to understand why.

23       Q.   And did some of them refuse to change their

24   documentation?

25       A.   There -- there was some that they would not

1    change it.

2        Q.   And what happened to them?

3        A.   Not use them again.

4        Q.   What happened to them?

5        A.   You know, terminate them.

6        Q.   And was Defendant McInnis aware of that?

7        A.   Yes.  Yes.

8        Q.   Can you explain to the jury how you know that he

9    was aware of that.

10       A.   Because he -- he was in charge of the QA, he was

11   in charge of the billing.

12       Q.   Now, did you eventually become aware that there

13   was an HHS, OIG investigation?

14       A.   Excuse me, yes.

15       Q.   And how did you become aware of that?

16       A.   The fax, there was a fax that came in and landed

17   on my desk.  That's how I was aware.

18       Q.   And how did that influence you?

19       A.   It influenced me by asking questions, what's

20   going on?

21       Q.   How did it influence your trust in Defendant

22   Mesquias?

23       A.   Oh, no, yeah, I mean, I asked -- I asked him, you

24   know, I thought everything had been resolved, or I

25   thought everything we were doing was -- was right.  And

1    he said not to worry about it.

2        Q.  And did you eventually decide to leave the Merida

3    Group?

4        A.  Yes.

5        Q.  Were you fired or did you quit?

6        A.  I decided to resign only because two weeks into

7    my vacation, you know, I started receiving calls and

8    text messages that he was going to fire me so I just

9    decided to resign at that point.

10       Q.  And did you ultimately purchase a home health

11   agency?

12       A.  Yes.

13       Q.  Do you do things the same or different as what

14   was done at the Merida Group?

15       A.  No, different.

16       Q.  Did you start to research rules and regulations

17   after purchasing an agency yourself?

18       A.  Yes.

19       Q.  When you were working at Merida, were you

20   responsible for the rules and regulations in your job?

21       A.  No, I was not.

22       Q.  Okay.  And now, looking back on it, how do you

23   feel today in terms of how your work at Merida?

24       A.  You know, completely different, you know, the --

25   not having to feel the pressure of, you know, not

1    meeting your own salary, that you're getting paid, you

2    know, the pressure of admissions and obviously always

3    being pressured on not meeting the expectations from the

4    Valley to Corpus to Laredo and always being compared,

5    you know, that we're not doing what we're supposed to be

6    doing when we're working hard everyday.

7        Q.   Who was the pressure coming from, from the

8    Valley, from Laredo, from those areas?

9        A.   It was -- it was both Rodney and -- and Henry.

10       Q.   When you say not doing what you were supposed to

11   be doing, what did Defendant Mesquias and McInnis want

12   you to do?

13       A.   Admit patients, increase the census.

14       Q.   Did it matter whether they qualified or not?

15       A.   No.

16              MR. FOSTER:  No further questions,

17   Your Honor.

18              THE COURT:  Mr. Canales.

19              MR. HECTOR CANALES:  Thank you, Your Honor.

20              THE COURT:  One second.

21              COURT OFFICER:  Excuse me, Your Honor, the

22   jury needs a break.

23              THE COURT:  The jury needs a break, that's

24   fine.  All right.  The defense will have three,

25   30-minute sessions.

```
 1              COURT OFFICER:  All rise for the jury.
 2              (JURY OUT.)
 3              THE COURT:  And we will take a break.
 4              (COURT IN SHORT RECESS.)
 5              THE COURT:  Ladies and gentlemen, please
 6    remain standing for the jury.
 7              COURT OFFICER:  All rise for the jury.
 8              (JURY IN.)
 9              THE COURT:  Thank you, everyone.  Please be
10    seated.
11              Again, Mr. Zuniga, please make yourself
12    comfortable, position the mic close to you, and please
13    speak loudly and clearly.
14              Mr. Canales, please proceed.
15              MR. HECTOR CANALES:  Thank you, Your Honor.
16                       CROSS-EXAMINATION
17    BY MR. HECTOR CANALES:
18       Q.  Mr. Zuniga, my name is Hector Canales, I'm the
19    attorney for Rodney Mesquias in this case, do you
20    understand?
21       A.  Yes, sir.
22       Q.  All right.  Now, you're -- currently, what's the
23    name -- what's the name of the agency that you're
24    working at right now?
25       A.  Santa Rita Home Health Services.
```

1    Q.   And are you a -- an owner, or an employee, or

2  both?

3    A.   I am an owner and an employee.

4    Q.   Are you a 100 percent owner, or do you have

5  partners?

6    A.   Partners.

7    Q.   Who are your partners?

8    A.   Roland Aguilera and Dora Plaza.

9    Q.   And what's the ownership percentages between

10 the -- between the three?

11   A.   33.

12   Q.   To who?

13   A.   To me, 33 to Roland and 25 to Dora.

14   Q.   And where's the rest?

15   A.   33 --

16   Q.   That doesn't add up to 100?

17   A.   33 point -- I don't know, if you want to give me

18 a calculator, I could --

19   Q.   All right.  That's the best -- as you sit here

20 today that's the best you can give?

21   A.   There's a 33, whatever it is 33 -- she's 25

22 percent and the rest is divided between me and Roland.

23   Q.   Okay.  Okay.  And Mr. Roland Aguilera, he also

24 worked with you at Merida, right?

25   A.   Yes.

1    Q.   And the other -- your other partner, the lady,
2    what was her name again, I'm sorry?
3    A.   Dora Plaza.
4    Q.   Plaza, P-l-a-z-a?
5    A.   That is correct.
6    Q.   Did she also, Ms. Plaza, also work at Merida?
7    A.   No, no.
8    Q.   And now you -- you quit Merida because Rodney
9    found out that you and Roland, while employed by --
10   by -- employed by Rodney, your friend, were going behind
11   his back to go and start Santa Maria, right?
12   A.   No.
13   Q.   Well, you quit -- you -- you were going to get
14   fired, right?  You said you thought you were going to
15   get fired, but you quit before he could fire you, right?
16   A.   I quit before he fired me the fifth time.
17   Q.   Well, the last time, right, and the last time
18   immediately after getting fired, you went into and you
19   Roland had this plan together, right?
20   A.   The company was already existent, I didn't start
21   anything.
22   Q.   Oh, right, but you invested in it, right?
23   A.   Not initially, I was just an employee.
24   Q.   Right.  But you and Roland had gotten together
25   and were talking about it without having telling your

1    boss Rodney that you guys had plans to go in and invest

2    and -- and buy this new agency, right?

3        A.   Yes.

4        Q.   That -- you -- you -- you would -- you had not --

5    you didn't disclose it to him, right, you were

6    concealing that information from Rodney, right?

7        A.   I don't see why I had to tell him.

8        Q.   Well, you were his -- you were his employee,

9    right?

10       A.   Yeah.

11       Q.   He was paying you?

12       A.   Yes.

13       Q.   To do -- to work for the company, right?

14       A.   Yes.

15       Q.   Do you -- sir, do you not believe that an

16   employee has an obligation of uphold a duty of loyalty

17   to -- to his employer?

18       A.   Very true, but also I believe as an owner he has

19   a duty to, you know, take care of his employees as well.

20       Q.   And he didn't do that, in your -- at your -- so

21   that's why you didn't -- you -- you hid from Rodney --

22       A.   No, I'm answering your question that's what I'm

23   doing.

24       Q.   Excuse me, let me finish.  Let me finish.

25            Is that your explanation why you and Roland hid

1    the fact from Rodney that you guys were working on this

2    plan to go to another competitor?

3         A.   No.

4         Q.   Okay.  All right.  But -- but certainly, as an

5    owner of a business, you'd fire one of your employees if

6    he was going behind your back with one of your other

7    employees to go start another business, right?

8         A.   No, I actually encourage that.  I encouraged one

9    of our -- two of our nurses, I encouraged them to start

10   their own company.

11        Q.   Okay.  All right.  Well, how much was Rodney

12   paying you?  You were on a salary?

13        A.   I was on salary.

14        Q.   And what was your salary at Merida?

15        A.   My final salary was $125,000.

16        Q.   $125,000 a year?

17        A.   Uh-huh.

18        Q.   So you were working full-time?

19        A.   24/7.

20        Q.   And while Rodney is paying you this full-time --

21   well, not quite 24/7 because you and Roland were out

22   there, you guys were spending some of your time planning

23   your new venture, right?

24        A.   No, we were multi-tasking.

25        Q.   Oh, okay.  All right.  And -- and that

1    multi-tasking didn't distract you from your job and what

2    you were supposed to be doing at Merida, right?

3        A.   No.

4        Q.   What was -- by the way, you were in charge of --

5    you're not a -- you're not a doctor, right?

6        A.   No.

7        Q.   You're not a nurse of any kind, right?

8        A.   No.

9        Q.   You hold no licenses or certifications by the --

10   by the State to -- to administer any kind of health

11   care, right?

12       A.   I hold a license by the State of Texas to provide

13   home health.

14       Q.   As a business owner?

15       A.   Yes.

16       Q.   Right.  But as a health care provider, you're not

17   a license health care provider of any kind?

18       A.   I'm not a licensed clinician of any kind.

19       Q.   So but you can -- you can be an owner of a health

20   care business in the State of Texas even though you

21   don't have any education, skill or training as a health

22   care pro -- provider?

23       A.   Yes, anybody in the State of Texas can.

24       Q.   All right.  And that's -- and -- and the skills

25   that have allowed you to become this owner of your own

business and the experience you got working with your

friend Rodney, right?

     A.   Yes.

     Q.   And he compensated you for all that time, right?

     A.   Correct.

     Q.   Now, your -- so your job was not to provide any

health care, your job at Merida was to manage people,

right?

     A.   Yes.

     Q.   All right.  How many people did you manage?

     A.   Well, it was quite a few, a lot.  A lot of

people.

     Q.   Hundreds?

     A.   You could say that, yes.

     Q.   And -- and that's a large payroll; is it not?

     A.   Yes.

     Q.   Now as a business owner, you understand the idea

of making payroll; don't you?

     A.   Yeah.  Yes.

     Q.   And as an owner, do you even pay yourself, do you

include yourself as an employee?

     A.   No.

     Q.   No?

     A.   No.

     Q.   You just take profits from the company?

1        A.   Yes.

2        Q.   Is that how you now support yourself?

3        A.   Yes.

4        Q.   And your company, your home health care company

5    when you and Roland started it, it was competing with

6    Rodney's, right?

7        A.   Yes.

8        Q.   And did you take patients from Rodney's companies

9    over to yours?

10        A.   No.

11        Q.   How many patients do you have -- what's --

12    forgive me, I didn't write it down, the name of your

13    company again is?

14        A.   Santa Rita Home Health Services.

15        Q.   Santa Rita.  Okay.  How many patients right now

16    do you service within Santa Rita?

17        A.   71.

18        Q.   Is that also known as a cen -- so your census is

19    71 patients?

20        A.   Correct.

21        Q.   Why do you know that, why -- why do you know

22    that?

23        A.   Because I'm pretty much all three roles of the

24    inside management.

25        Q.   Is -- is that -- is that important to you as an

1    owner to have -- to know the census of your -- of your

2    business?

3        A.  Yes.

4        Q.  Why?

5        A.  Well, you need, as an administrator as well,

6    since I'm doing both, I need to know how many staff I

7    need to service these patients.

8        Q.  And -- and so when Rodney was asking you about --

9    concerned about census, there's a legitimate business

10   reason for wanting to know your census, right?

11       A.  Yes.

12       Q.  There's -- there's nothing wrong with that,

13   right?

14       A.  I never said that.

15       Q.  Okay.  All right.  And are you in business for

16   profit?

17       A.  For profit.

18       Q.  And that's -- that's the point of being in

19   business, right, to make -- turn a profit?

20       A.  Correct.

21       Q.  Or to make money, right?

22       A.  To make a profit, yeah.

23       Q.  Right.  And we can -- but that's to make money,

24   right, profit is we're talking about money, right?

25       A.  Yes.

1    Q.   And there's nothing wrong with that; is there?

2    A.   Of course not.

3    Q.   You wouldn't want anybody to hold that against

4    you for the fact that you know your census and that

5    you're in it for money, right?

6    A.   Correct.

7    Q.   And if you had an employee that was a bad

8    employee, not doing their job, you'd fire them, right?

9    A.   If they're not doing their job, explain why --

10   how in it what way?

11   Q.   In whatever way you -- sir, if they're not doing

12   their job, they're not fulfilling their job

13   responsibilities?

14   A.   If they're not fulfilling their job duties?

15   Q.   Yes, sir.

16   A.   Yes.

17   Q.   Get rid of them?

18   A.   Well, you would do a three-step process, you

19   know, warn them, counsel them, terminate them.

20   Q.   Or -- but as the boss you can decide, hey, I want

21   to make it a one-step, pa fuera, you're out, let's go,

22   right?

23   A.   It's up to whatever you're saying yeah, I mean,

24   I'm not agreeing to it.

25   Q.   All right.  Now, do you employ marketers at Santa

```
 1   Rita?
 2       A.   Yes.
 3       Q.   Is there anything illegal about that?
 4       A.   No.
 5       Q.   Do they work for free?
 6       A.   No.
 7       Q.   And if a marketer is bad at his job, is it okay
 8   to fire a marketer if he's not good at marketing?
 9       A.   If it's not good at marketing in what way?
10       Q.   He's not good at marketing, I don't know how to
11   ask it any other way, he's a marketer, he's not good at
12   his job, is it okay to fire him?
13       A.   Yes.
14       Q.   Would you defer -- now, let me ask this:  Santa
15   Rita, you said home health, are you engaged in the
16   business of any hospice at -- care through Santa Rita or
17   is it just home health care?
18       A.   It is home health care, we're in the process of
19   initiating a hospice program.
20       Q.   You're starting it?
21       A.   Yes, that's our plan.
22       Q.   Okay.  Have you picked out a medical director
23   yet?
24       A.   Yes.
25       Q.   Who?
```

1     A.   Dr. Magdalena Trout.

2     Q.   Okay.  Dr. Trout?

3     A.   Yes.

4     Q.   All right.  Does Dr. Trout work -- have her --

5  have her own private practice somewhere?

6     A.   Yes, she does.

7     Q.   All right.  And does she have a lot of patients?

8     A.   I wouldn't be able to tell you that.

9     Q.   All right.  All right.  Why are you picking Ms.

10 Trout, why -- why do you want her?

11    A.   She's easy to work with, easy to contact,

12 accessible, she was available for meetings, calls.

13    Q.   What are you going to pay her for the medical

14 directorship?

15    A.   The going rate of $250 per hour.

16    Q.   Is there a cap on that at all?  In other words,

17 can she work 100 hours, or ten hours, or what's the --

18 what's the other terms?

19    A.   There's no cap, not that I know of, no.

20    Q.   All right.  So if she can -- if she works 20

21 hours a week, you're going to pay her 20 -- 20 times

22 250?

23    A.   That is correct.

24    Q.   All right.  While at Merida, did you ever become

25 familiar -- I'm going to -- can I get the ELMO up,

1    please?

2              THE CLERK:  Yes, sir.

3    Q.  (By Mr. Hector Canales) Let me ask you some

4    questions about a list here of -- of doctors and nurses.

5         Did you -- during your time there at Merida, did

6    you ever come across Greg Gonzaba, Dr. Greg Gonzaba?

7    A.  Yes.

8    Q.  All right.  Is Dr. Greg Gonzaba a liar?

9    A.  I can't tell you that.

10   Q.  All right.  What about his brother Dr. Tom

11   Gonzaba, is he a liar?

12   A.  I can't tell you that.

13   Q.  Pelly, Dr. Pelly, is he a liar?

14   A.  I cannot tell you that.

15   Q.  Dr. Patricia Arizaca, is she a liar?

16   A.  I don't know who she is.

17   Q.  All right.  Do you know -- what about

18   Dr. Chandrahasan?

19   A.  I don't know who he is.

20   Q.  Let me just ask you this, do you know

21   Dr. Escamilla?

22   A.  I met him once.

23   Q.  Is he a liar?

24   A.  I can't tell you.

25   Q.  All right.  Is he the type of guy who would

1    certify a patient as terminally ill and it be false?

2        A.  I can't answer that, sir.

3        Q.  Okay.  All right.  What about Dr. Ben Zertuche?

4        A.  What's your question?

5        Q.  You don't --

6        A.  Do I know him?  I met him.

7        Q.  Is he a doctor who would commit health care

8    fraud?

9        A.  I can't tell you that.

10       Q.  All right.  Any of these doctors on here, would

11   any of those doctors -- do you know any of them, do you

12   know the rest of them?

13       A.  No.

14       Q.  Any of those -- all right, so you don't know any

15   of them, so you couldn't give an opinion one way or the

16   other to whether or not they would -- they're the type

17   of people who would commit health care fraud?

18       A.  Not one way or the other, I just can't tell you

19   if -- I'm not them.

20       Q.  But you don't have any evidence or first-hand

21   knowledge about any of these doctors committing health

22   care fraud?

23              MR. FOSTER:  Objection, Your Honor, asked

24   and answered.

25              THE COURT:  I'll allow the question.

1          THE WITNESS:  What was your question?

2     Q.  (By Mr. Hector Canales)  You don't have any

3  personal knowledge or evidence of any of these doctors

4  having committed health care fraud?

5     A.  Not that I know of, no.

6          MR. HECTOR CANALES:  Pass the witness.

7          THE COURT:  Mr. Cyganiewicz.

8          MR. CYGANIEWICZ:  A few questions,

9  Your Honor.

10                    CROSS-EXAMINATION

11  BY MR. CYGANIEWICZ:

12     Q.  Morning, sir.

13     A.  Hello.

14     Q.  How are you?

15     A.  Good.

16     Q.  I'm just going to ask a few questions.  I'm Ed

17  Cyganiewicz, I represent Mr. McInnis.  What's -- what's

18  your current position in your new business?

19     A.  Administrator, owner.

20     Q.  Okay.  So you're also an owner and an employee,

21  correct?

22     A.  Correct.

23     Q.  And in -- in for Merida, you were the

24  administrator in San Antonio; is that correct?

25     A.  I was the alternate administrator.

1    Q.   And does that mean that when Mr. McInnis wasn't

2    available, you were in charge in San Antonio?

3    A.   Yes.

4    Q.   Some people have previously testified that you

5    were pretty much there in San Antonio on a daily basis

6    in charge; is that right?

7         MR. FOSTER:   Objection, Your Honor, counsel

8    cannot testify as to what other witnesses said outside

9    the presence.

10        MR. CYGANIEWICZ:   Oh, excuse me.

11        THE COURT:   Rephrase the question.

12   Q.   (By Mr. Cyganiewicz)   Is that true?   Were you in

13   San Antonio most of the time on a daily basis?

14   A.   I was traveling a lot.

15   Q.   How often would you be in San Antonio?

16   A.   Maybe here late -- towards the end.

17   Q.   No, just --

18   A.   Couple a months.   Maybe once a week.

19   Q.   And earlier before that?

20   A.   Same, I would always travel.

21   Q.   Well, now if people testified that you were there

22   on a daily basis, that's not true?

23   A.   I think you should ask what time of year or what

24   time -- when it was and I could answer that.

25   Q.   So when -- when -- when Mr. McInnis was not

1    available, were you in charge of San Antonio, is that

2    what you're saying?

3        A.   I -- no.

4        Q.   No?

5        A.   I'm not saying that.

6        Q.   So you were not in charge of San Antonio?

7        A.   I was never in charge of San Antonio, I was the

8    person on the ground.

9        Q.   So you're telling us today that as the

10   administrator, or alternate administrator in San Antonio

11   you were not in charge of that office?

12       A.   You can rephrase what I was in charge.

13       Q.   You direct the day-to-day operation?

14       A.   Day-to-day operation, yeah.

15       Q.   So what's the administrator's job?

16       A.   To ultimately be responsible for the agency.

17       Q.   For the day-to-day operations?

18       A.   Yes.

19       Q.   And isn't that what you were doing in

20   San Antonio?

21       A.   Yes, yes.

22       Q.   Okay.  What's the difference when you became a

23   director of operations, is that a higher position?

24       A.   I don't know, that's something you would want to

25   ask Rodney.  I don't know why really he gave me that

1    role.

2        Q.   You were named the director of operations at some

3    point, correct?

4        A.   Correct.

5        Q.   And you're also an administrator?

6        A.   Yes.

7        Q.   You're doing the same thing, the day-to-day

8    scheduling, and things like that?

9        A.   Yes.

10       Q.   And you're also an owner, correct?

11       A.   Correct.

12       Q.   You can make the ultimate decisions?

13       A.   Not myself.

14       Q.   You -- the owners could?

15       A.   The team, yeah.

16       Q.   Mr. McInnis didn't have that authority to make

17   the ultimate decisions, did he?

18       A.   I can't tell you that.

19       Q.   Who was the boss and owner?

20       A.   Rodney Mesquias.

21       Q.   You say two bosses because Mr. McInnis was the

22   administrator and you were the alternate administrator?

23       A.   No, I had to get answers from him everyday, you

24   know, if I had questions, I couldn't make a decision

25   without either of them being aware.

1      Q.   So on a day-to-day basis when you were scheduling

2   patients and scheduling employees you had to contact

3   them all the time?

4      A.   Yes.

5      Q.   So --

6      A.   To schedule a patient, no.

7      Q.   Excuse me?

8      A.   To schedule a patient, no.

9      Q.   Right.   That was one of your main jobs, right?

10     A.   Yeah.

11     Q.   And you weren't allowed too admit a patient, were

12  you?

13     A.   Myself, no.

14     Q.   Or discharge a patient?

15     A.   Myself, no.

16     Q.   Give any type of orders?

17     A.   No.

18     Q.   Henry wasn't also, was he?

19          THE COURT:   Gentlemen, quickly I'm missing

20  some answers.   Speak loudly into the microphone.

21          THE WITNESS:   I can't tell you that.

22     Q.   (By Mr. Cyganiewicz)  Who -- who -- are you

23  familiar with the hospice rules?

24     A.   No.

25     Q.   Okay.   Do you know who can certify or recertify a

1    patient for hospice?

2         A.   A doctor.

3         Q.   Okay.  Not an administrator?

4         A.   No.

5         Q.   And was -- Henry is not a doctor or a nurse; is

6    he?

7         A.   Not -- not that I know of, no.

8         Q.   My point was he doesn't have the authority to

9    admit or discharge patients?

10        A.   Oh, okay, when you say that, no.

11        Q.   Nor do you in your current position?

12        A.   Correct.

13        Q.   In your current position you could make ultimate

14   decisions with the other owners; is that right?

15        A.   Ultimate decisions?

16        Q.   The final decision.

17        A.   Towards a patient?

18        Q.   Towards --

19        A.   No, I can't.

20             COURT REPORTER:  One at a time, sir.

21             What is your question, Mr. Cyganiewicz?

22        Q.   (By Mr. Cyganiewicz)  Towards the administration

23   of the business?

24        A.   Yes, yes, that's correct.

25        Q.   You mentioned that Henry liked his job?

1    A.   Yes.

2    Q.   Liked to manage?

3    A.   Yes.

4    Q.   Is there something wrong with that?

5    A.   No.

6    Q.   And is there something wrong with bringing

7    employees to Vegas?

8    A.   No.

9    Q.   Did you go?

10   A.   Yes.

11   Q.   How many times did you go?

12   A.   Four times.

13   Q.   Did you complain about why am I going to Vegas

14   and refuse to go or anything like that?

15   A.   No.

16   Q.   So you went along and had fun with the fellow

17   employees, correct?

18   A.   Correct.

19   Q.   You said you weren't an expert in hospice.  Let

20   me ask you, you keep saying that, you say they, they,

21   but they didn't have to die in six months to be on

22   hospice, you -- you still say that's the absolute truth,

23   only six months and then, boom, it just disappears and

24   is terminated?

25   A.   What are you asking me?

1    Q.   You told -- you testified that Mr. Mesquias, or

2    someone else said they didn't have to die in six months

3    to be on hospice, and you're -- that's true, isn't it?

4    A.   That's what I said, yes.

5    Q.   But is it -- is that a true statement, you could

6    be on hospice longer than six months if you're --

7    A.   Yeah.

8    Q.   So what's wrong with them saying that you didn't

9    have to be hospice -- you didn't have to die in six

10   months to be on hospice?

11   A.   I don't see there's nothing wrong.

12   Q.   Okay.  I just want it make sure.

13   A.   Uh-huh.

14   Q.   And I think you were talking about patients

15   getting free services or free supplies?

16   A.   No.

17   Q.   You didn't say anything about that?

18   A.   No.

19   Q.   Okay.  Don't -- doesn't medication or equipment

20   or things that are needed go along with Medicare and

21   hospice?

22   A.   Yes.

23   Q.   So they're not getting anything that they're not

24   supposed to get; are they?

25   A.   Correct.

1      Q.   And Henry would pay the bills, as administrator

2  would Mr. McInnis pay the bills?

3      A.   Yes.

4      Q.   As your administrator, do you do anything like

5  that?

6      A.   Yes.

7      Q.   There's no nothing wrong with that, is there?

8      A.   No.

9      Q.   He never gave you any personal funds; did he?

10     A.   No.

11     Q.   I think you said he can't certify or recertify

12  patients, correct?

13     A.   Correct.

14     Q.   And when you got bonuses or people got bonuses

15  that wasn't Henry paying people; was it?

16     A.   No.

17     Q.   You also said about Henry, Mr. McInnis, excuse

18  me, Your Honor, not being as aggressive as others in the

19  census counting?

20     A.   Correct.

21     Q.   And that maybe once or twice he put pressure on

22  people?

23     A.   Correct.

24     Q.   And is that, what, over a seven, eight, nine-year

25  period?

1    A.   Well, he -- yeah, correct, yeah.

2    Q.   And the business -- or your business is, the goal

3  is to make money; is it not?

4    A.   Yes.

5    Q.   And census is important?

6    A.   Yes.

7    Q.   Aren't marketers trying to bring in more

8  patients; isn't that their job?

9    A.   Correct.

10    Q.   And what was Mr. McInnis getting blamed for in

11  Alabama?

12    A.   That it was his fault that we're in a position of

13  owing Medicare all that amount of money, that they were

14  reporting to pay back.

15    Q.   And he replied that it was not his fault?

16    A.   Correct.

17    Q.   And you agreed with that, didn't you?

18    A.   No, I couldn't agree yes or no because I wasn't

19  familiarized.

20    Q.   Okay.

21    A.   With of any of that, rules or regs or payment

22  plans, or any of that.

23    Q.   Okay.  Did you -- do you know Belinda Gonzalez,

24  is she a nurse or someone that worked with you in

25  San Antonio?

1     A.   Yes.

2     Q.   Did she ever -- did you ever tell her to change a

3  diagnosis?

4     A.   No.

5     Q.   Do you know Dr. Carrillo?

6     A.   I heard of him.

7     Q.   Did he ever give you a big blank pad of

8  prescription pads?

9     A.   Not me.

10    Q.   That's not true?

11    A.   No, not me.

12    Q.   No?

13    A.   No, I'm not -- I should say I -- I have no -- I

14  don't know what you're talking about.

15    Q.   So if he said he gave them to you, that's not

16  true?

17    A.   That's not true.

18    Q.   Now, you know anything about a primary care

19  physician, whether they need his consent to have someone

20  be admitted to hospice, you know anything about that?

21    A.   Not -- no.

22    Q.   Now, let me talk to you about your meetings with

23  the prosecutors.  I'm assuming that you prepared for

24  your -- are you -- are you looking at something, I'm

25  sorry?

1    A.   No.

2    Q.   Was that your watch or no?

3    A.   It's something from church, that's it.

4    Q.   What's that?

5    A.   It's something -- a bracelet from church.

6    Q.   Okay.  That's what you were just looking at now?

7    A.   Yeah.

8    Q.   Okay.  That's nice.  Talked to you about the

9  business goal, do you remember what I was just going to

10  ask you?  I'm sorry I distracted myself?

11    A.   No.

12    Q.   Anything illegal about going to Vegas.

13         Oh, you said Dr. Carrillo did not give you those

14  prescription pads, correct?

15    A.   That is correct.

16    Q.   I was telling you about, I'm assuming you

17  prepared for your testimony and met with these

18  gentlemen, the prosecutors?

19    A.   Yes.

20    Q.   And that was before you testified?

21    A.   Correct.

22    Q.   How many times have you met with them?

23    A.   Met several times.

24    Q.   Three, four or more?

25    A.   Sounds about right, yeah.

1    Q.  When is the last time you met with them?

2    A.  Right before I walked in this courthouse --

3  courthouse.

4    Q.  Did they rehearse with you, or actually practice

5  the questions with you, or tell you what they were going

6  to ask you?

7    A.  Yes.

8    Q.  And did you ever meet with -- before they met

9  with you, did you meet with some federal agents about

10  what you knew about this case?

11    A.  No.  No, I didn't.

12    Q.  Did you ever meet with someone in June of 2019?

13    A.  Yes.

14    Q.  At your residence?

15    A.  Yes.

16    Q.  Who was that?

17    A.  It was the FBI.

18    Q.  Okay.  That's what I'm talking -- you remember

19  meeting with them?

20    A.  Yes.

21    Q.  And what was the purpose of them being there?

22    A.  That if Rodney had contacted witnesses.

23    Q.  Did they talk to you about this case?

24    A.  They didn't go into length, it was really just

25  that if he had contacted witnesses, or he had threatened

1    me or other people that I was aware of being threatened.

2        Q.   Do you remember telling them that you worked from

3    2010 to 2017 at Merida?

4        A.   20, no.

5        Q.   You don't remember that?  That you reported to

6    Henry, do you remember telling him things like that?

7        A.   I could have said that, yeah.

8        Q.   Were -- were those meetings or sessions regarded

9    in any manner?

10       A.   What meetings?

11       Q.   With the FBI?

12       A.   I'm not aware, I don't know.

13       Q.   Was someone -- we have a report of what you told

14   them?

15       A.   Okay.

16       Q.   Do you remember someone taking notes?

17       A.   Yeah, they were taking notes, yeah.

18       Q.   The things you said today about Mr. McInnis

19   telling you to do this and admit patients, you never

20   said anything to them about that on that day; did you?

21       A.   I don't recall them asking me.

22       Q.   Okay.

23       A.   Anything of that.

24       Q.   Did you tell them that?

25       A.   No.

1    Q.  So --

2    A.  I don't recall that, no.

3    Q.  Do you recall telling them that Zuniga advised

4  that he did not have any information about Mesquias'

5  criminal activity?

6    A.  Correct.

7    Q.  You told them that?

8    A.  Yeah.

9    Q.  Okay.  And you didn't say anything about

10  Mr. McInnis' criminal activity according to you; did

11  you?

12    A.  I can't recall that.

13    Q.  So today for the first time is the first time

14  you're saying that Henry did things that what you think

15  were -- were fraud or bad?  You never told the FBI back

16  in June; did you?

17    A.  Not then, no.

18    Q.  Okay.  Did you -- and you didn't -- so today is

19  the first time that you're saying that?

20    A.  No, when we were meeting.

21    Q.  Okay.  Do you have any other notes from those

22  meetings that were not provided to us?

23        MR. CYGANIEWICZ:  If they do, Your Honor,

24  we'd ask for any type of notes of any other interviews,

25  we only have his original 302.

1          MR. FOSTER:  There's been other notes that

2     have been produced, Your Honor.

3          MR. CYGANIEWICZ:  Okay.

4     Q.  (By Mr. Cyganiewicz)  So today is the first time

5     you -- I'm sorry, you didn't tell the FBI about McInnis

6     or Mr. McInnis' activity when they were meeting with

7     you?

8     A.  In June?

9     Q.  Right.

10    A.  I can't recall, you know.

11    Q.  You would agree that if you did it would be in

12    this report?

13    A.  I can't tell you, I mean, I know the only thing

14    that I could remember is that if Rodney had threatened

15    me or contacted me or anybody else, that's really the

16    base of the interview that they're asking me.

17         MR. CYGANIEWICZ:  We would object to that as

18    being nonresponsive, Your Honor, and just adding stuff

19    for the jury.

20         THE COURT:  That's overruled.

21    Q.  (By Mr. Cyganiewicz)  Did you -- you -- who did

22    you open your business with?

23    A.  With Roland.

24    Q.  Okay.  And he's a witness in this case; is he

25    not?

1    A.   I believe so.

2    Q.   And you've talked to him about this case,

3    correct?

4    A.   Not really, try not to talk about it.

5    Q.   Okay.  If the report says that Aguilera kept

6    Zuniga aware of the trial, that's not true, or do you

7    remember that?

8    A.   As far as when it was supposed to -- the dates,

9    yes.

10    Q.   And Aguilera was also an employee of Merida was

11    he not?

12    A.   Yes.

13    Q.   You still talking to him about the case?

14    A.   Only when we are scheduled because somebody has

15    to stay there in San Antonio.

16              MR. CYGANIEWICZ:  Thank you, Mr. Zuniga.

17              THE WITNESS:  Thank you.

18              THE COURT:  Mr. Guerra, anything?

19              MR. GUERRA:  I have no questions,

20    Your Honor.

21              THE COURT:  Thank you.  Mr. Foster, anything

22    else?

23              MR. FOSTER:  Yes, Your Honor, just briefly.

24

25

```
 1                      REDIRECT EXAMINATION
 2    BY MR. FOSTER:
 3       Q.   You were just asked about an initial interview
 4    with the FBI from this year; do you recall that?
 5       A.   Yes.
 6       Q.   And was that interview about a criminal activity
 7    of witness intimidation?
 8       A.   Yes.
 9       Q.   And then did you later speak with agents about
10    the events involved in this case?
11       A.   Yes.
12       Q.   And did you tell them about the fraud and
13    Defendant McInnis' role in it?
14       A.   Yes.
15       Q.   Now, I want to talk about Las Vegas trips
16    briefly.  Did doctors go on these trips to Las Vegas?
17                  MR. HECTOR CANALES:  Object, Your Honor.
18    That's outside the scope of the cross, I don't think
19    either I or Cyganiewicz brought up Las Vegas.
20                  MR. FOSTER:  He certainly did,
21    Mr. Cyganiewicz.
22                  MR. HECTOR CANALES:  Oh, you did?  Forgive
23    me, I withdraw it.
24                  THE WITNESS:  Can you ask the question
25    again?
```

1      Q.   (By Mr. Foster)  Do you recall being asked about

2   trips to Las Vegas?

3      A.   Yes.

4      Q.   Did doctors go on those trips?

5      A.   That I know of only Dr. Virlar went.

6      Q.   And was Dr. Virlar a doctor for the Merida Group?

7      A.   Yes.

8      Q.   And did Defendant Mesquias pay for Dr. Virlar in

9   Las Vegas?

10     A.   I -- I can't tell you that, but -- in?

11     Q.   Yeah, in Las Vegas at the nightclubs?

12     A.   Yeah.

13     Q.   Restaurants?

14     A.   Yes.

15     Q.   Bars?

16     A.   Yes.

17     Q.   Okay.  And Dr. Virlar was the one referring

18   patients to the Merida Group?

19     A.   Yes.

20     Q.   So do you recall when defense counsel placed the

21   list on the screen of all those doctors; do you recall

22   that?

23     A.   Yes.

24     Q.   Were those the doctors who were referring to the

25   Merida Group, or was it primarily Dr. Virlar?

1    A.   Primarily Dr. Virlar.

2    Q.   Now, you were asked a lot of questions about your

3 home health agency and you were asked about payments to

4 marketers?

5    A.   Correct.

6    Q.   Do you pay marketers on a per patient basis like

7 at the Merida Group?

8    A.   No.

9    Q.   Why don't you do that?

10    A.   It's against the law.

11    Q.   Okay.  You were also asked about your medical

12 director, Ms. Trout.  How do you pay her, how do you

13 anticipate paying her for hospice services?

14    A.   Per visit and it's the market val -- market rate

15 for San Antonio is $250.

16    Q.   Would her pay -- does her pay depend on referring

17 patients to your hospice agency?

18    A.   No.

19    Q.   Why not?

20    A.   Because we don't pay for referrals.

21    Q.   Why not?

22    A.   Because it's against the law.

23    Q.   Now, you were asked about running a business and

24 focusing on the census of your home health agency; do

25 you recall those questions?

1    A.   Yes.

2    Q.   Can you explain to the jury how the way in which

3 you focus on the census is different than how Defendant

4 Mesquias and McInnis did it at the Merida Group?

5    A.   I mean, focusing on a census is two things, I

6 mean obviously you want to, you know, you get into

7 business to make a profit and in my opinion there's

8 nothing wrong with that.

9         At the same time, you focus on the census to make

10 sure you could have the staff to service these patients

11 that need the services and care for them the right way

12 that you're supposed to and you're licensed to do so.

13   Q.   And at your company do you allow nurses to make

14 decisions about which patients qualify for home health?

15   A.   They do the assessments, yes.

16   Q.   Okay.  And do you ever take -- if a nurse says

17 that there's a patient who doesn't qualify, have you

18 ever had another nurse go out and admit that patient?

19   A.   No.

20   Q.   Why not?

21   A.   It's not right, it's not good.

22   Q.   Have you ever fired a nurse for not admitting a

23 patient because they didn't qualify?

24   A.   No.

25   Q.   Can you explain to the jury why?

1     A.   Because it's not -- it's not right.

2               MR. FOSTER:  No further questions,

3     Your Honor.

4               THE COURT:  Gentlemen, anything else?

5               MR. HECTOR CANALES:  No, Your Honor.

6               MR. CYGANIEWICZ:  No, Your Honor.

7               MR. GUERRA:  No, Your Honor.

8               THE COURT:  Thank you, sir.  You may step

9     down.

10              Does anybody need a break, we're going to go

11    through one more witness?  Does anybody need a break?

12    All right.

13              Next witness, please.

14              MR. FOSTER:  Thank you, Your Honor.  The

15    United States calls Diana Navarro.

16              THE COURT:  One second.  Please remain

17    standing, ma'am, and raise your right hand.  Let's swear

18    you in.

19              (WITNESS SWORN IN.)

20              THE WITNESS:  I do.

21              THE COURT:  Thank you, ma'am.  Please make

22    yourself comfortable and speak loudly and clearly into

23    the microphone.

24              THE WITNESS:  Yes, sir.

25              THE COURT:  Please proceed.

```
 1                     DIRECT EXAMINATION
 2   BY MR. FOSTER:
 3      Q.   Good afternoon, Ms. Navarro.
 4      A.   Hello.
 5      Q.   Can you introduce yourself to the jury?
 6      A.   My name is Diana Navarro, I'm from San Antonio,
 7   Texas, and I'm 64 years old, and I'm a hospice aid for
 8   28 years.
 9              THE COURT:  Ma'am, go ahead and lower the
10   microphone a little closer to your mouth.  There you go.
11              THE WITNESS:  Hello, I'm Diana Navarro --
12              THE COURT:  No, we heard you, that's fine.
13      Q.   (By Mr. Foster)  Did everyone hear her?  Great.
14   Thank you, ma'am.
15           How long have you lived in San Antonio?
16      A.   All my life.
17      Q.   Okay.  And how far did you go in school?
18      A.   12th grade and nine months as CNA at
19   St. Phillips.
20      Q.   What's a CNA?
21      A.   Certified nurse's aide.
22      Q.   And when did you get that degree?
23      A.   September '74, 1974.
24      Q.   After you got out of school, where did you work?
25      A.   I worked at Northeast Baptist for five years.
```

1    Q.   And what did you do at Northeast Baptist?

2    A.   I worked in the surgical floor as a nurse's aide.

3    Q.   And what did you do there?

4    A.   Worked for surgical floor, I just helped take

5    vital signs and bathe patients.

6    Q.   Did you later start working as a hospice aide?

7    A.   Back in 1993.

8    Q.   1993, and how long did you work as a hospice aide

9    for?

10   A.   20 -- 26, 28 years.

11   Q.   28 years.  Was there a reason that you wanted to

12   work as a hospice aide and you stayed doing it for so

13   long?

14   A.   I just loved it.  I think God really wanted me

15   going into this.  I went -- I went into agency thinking

16   it was home health, but they were hospice and I tried it

17   and I loved it.

18   Q.   What do you love about it?

19   A.   The compassion, the care, the loving, the trust

20   and the honesty for these patients.

21   Q.   Now, was there a period in time where you worked

22   at the Merida Group?

23   A.   Yes.

24   Q.   And who was the boss at the Merida Group?

25   A.   Rodney.

1     Q.   And was that Rodney Mesquias?

2     A.   Yes.

3     Q.   Was part of your job responsibilities at the

4  Merida Group to visit patients?

5     A.   Yes, sir.

6     Q.   When you started visiting the patients on hospice

7  at the Merida Group, were you surprised?

8     A.   Yes.

9     Q.   Can you explain to the jury what you were

10  surprised by?

11     A.   Well --

12     Q.   And can you pull the microphone closer?

13     A.   Hospice.

14     Q.   Thank you, ma'am.

15     A.   When I worked with hospice they were homebound

16  patients, and some of these patients weren't homebound,

17  they were going to H-E-B, Wal-Mart; I had to sit there

18  and wait about 20 minutes before they came, got home.

19     Q.   Patients were on hospice and they were going to

20  H-E-B and Wal-Mart?

21     A.   Wal-Mart, yes.

22     Q.   You've been doing -- been working with hospice

23  for 28 years, have you ever seen anything like that

24  before?

25     A.   No, no, because they were homebound, these

1   patients were homebound, tired, they were too tired to

2   get up and go anywhere.

3       Q.   Ever seen patients like that at a hospice company

4   afterward?

5       A.   No.

6       Q.   Can you explain to the jury why these patients

7   in -- in your opinion didn't qualify for the hospice

8   program?

9       A.   Because I worked home care and home care, I had

10  to be with their time because they did get up and go

11  places, did errands and hospice --

12              THE COURT:   Ma'am, put the microphone close

13  to your mouth.

14              THE WITNESS:   These patients that were

15  with -- because I did do home care and the patients in

16  home care, you know, did go and do errands, where

17  hospice they did not.   Family members or their

18  caregivers would do their errands.

19      Q.   (By Mr. Foster)  Ma'am, you may be able to move

20  the base of the microphone forward.

21      A.   Oh, okay.

22      Q.   Thank you.

23      A.   Uh-huh.

24      Q.   So can you explain to the jury why the patients

25  at the Merida Group didn't qualify for hospice?

1     A.   They weren't homebound.  I -- out of 12, I had

2  about seven patients, maybe more, that did not qualify

3  and -- from A to B I had to travel a lot.  If I had 12

4  patients I did 12 patients out on the road.  And waiting

5  for them, waiting there 20 minutes by the time they got

6  back, you know to me that was a waste of time.

7     Q.   So would the hospice patients be at home when you

8  arrived there?

9     A.   No.  When I called, they said, well, I'll be

10  right there, we're at H-E-B, or I'll be right there, I'm

11  in Wal-Mart.

12     Q.   I want to turn to specific patients.  Do you

13  recall a patient named Mary Flores?

14     A.   Yes.

15     Q.   And what did she tell you about her medical

16  condition and whether she was dying?

17     A.   Well, I think after two times I visit her I asked

18  her, you know what hospice is?  And she goes, yes, but

19  I'm not in hospice.  And I go why?  They gave me this

20  wheel -- electric wheelchair, electric scooter to get

21  into hospice, I was home health.  And I said, oh, wow.

22  She told me, that's why I go to H-E-B, me and my

23  daughter we go to H-E-B and Wal-Mart.  I said okay.  So

24  I dropped her because I didn't want to do -- because I

25  know she wasn't hospice and it was hospice papers.

1    Q.   So you were sent out to go and visit her for
2    hospice?
3    A.   Uh-huh.
4    Q.   And did she qualify for hospice?
5    A.   No.
6    Q.   Did she say whether she was ready to die?
7    A.   Oh, no, she told me she wasn't.
8    Q.   What did she tell you?
9    A.   I'm not ready to die yet, I still got a while to
10   go.  Okay.
11   Q.   And you talked about electric wheelchairs, did
12   you learn whether Merida was promising electric
13   wheelchairs to sign up for hospice?
14   A.   I had another client that he told me about the --
15   after two visits he told me, do you know how I can get
16   ahold of Rodney?  I said, no, ma'am, you call the
17   office.  You need to call the office.  I -- I wouldn't
18   know how to get a hold of him.  I said, what's wrong?
19   He said, I need my $6,000 wheelchair, and I said --
20   scooter, and I said, why?  I was on home health and he
21   promised me the $6,000 scooter to go to hospice.  Oh,
22   okay.
23   Q.   Who did the patient say promised him a $6,000
24   scooter to go to hospice?
25   A.   Rodney, he said Rodney's name.

1    Q.   Rodney Mesquias?

2    A.   Uh-huh.

3    Q.   Now, I want to talk about the type of services

4    that patients at Merida received.

5         Did Defendant Mesquias want lots of patients at

6    the Merida Group?

7    A.   Yes, if we had about 40 and then he said by

8    Friday I want 100 patients.  And we -- I went, well, I'm

9    not a marketer.  By the end of that week we had 100

10   patients, I said woah.

11   Q.   You went from 40 to 100 hospice patients in a

12   week?

13   A.   Yes, and then we were told I had to do 17

14   patients and I said I -- I can't do 17 patients in one

15   day.  I barely can do 12, there's no way you can do 17

16   patients in one day, not being ten, 11, 12 on the road I

17   can't do that.

18   Q.   And in your experience when you go to houses for

19   hospice, outside of Merida, are you at patient's homes

20   when nurses are there?

21   A.   Yes.

22   Q.   Okay.  And outside of Merida, at the other

23   hospice companies you've worked at, do hospice services

24   require the nurses to spend a lot of time with the

25   patients?

1      A.   Yes, that's why we called.

2      Q.   Okay.  And outside of Merida, the other hospice

3   companies you work at, how long do nurses spend with the

4   patient when they go and visit them?

5      A.   Between an hour to two hours.

6      Q.   And at Merida when you were at these patient's

7   houses, how long would the nurses spend with the

8   patient?

9      A.   Five, ten minutes.

10      Q.   Do you have an opinion about why the nurses were

11   spending so little time with the patients?

12      A.   Well, I heard one nurse say I --

13           MR. HECTOR CANALES:  Objection, Your Honor,

14   it calls for speculation to why one nurse was spending

15   time or not.  Also calls for --

16           THE COURT:  Rephrase the question.

17      Q.   (By Mr. Foster)  Sure.  Do you have a -- did you

18   speak with others about that?  Did you speak with

19   employees at the Merida Group about why they were

20   spending so little time with the patients?

21      A.   Well, no, because one nurse did tell me --

22           MR. HECTOR CANALES:  Objection, Your Honor.

23   She said, well no, and everything after that is -- lacks

24   foundation and is hearsay.

25           MR. FOSTER:  She said a nurse did tell me.

1           THE COURT:  Ask her the question about what

2  the nurse told her.

3      Q.  (By Mr. Foster)  Sure.  What did the nurse at the

4  Merida Group tell you?

5      A.  I have too many patients, that's why I have to

6  leave.

7           THE COURT:  And again, ma'am, I'm losing

8  some of your -- you really need to speak loudly into the

9  microphone.

10           THE WITNESS:  I have too many patients,

11  that's why I have to leave.

12      Q.  (By Mr. Foster)  After five minutes?

13      A.  Yes.

14      Q.  Did you become familiar with the lack of

15  compassion for the patients at Merida?

16      A.  Yes.

17      Q.  Can you explain that to the jury?

18      A.  They weren't getting the right services.  They

19  weren't there loving, compassion with them.  Just in and

20  out.  And I -- me as an aide and they were a nurse, I

21  said they need to spend more time with them than what us

22  as an aid is supposed to be.

23      Q.  Do recall a situation that arose with a patient

24  Celia Ortegon?

25      A.  Yes.

1    Q.   In February 2014, did you go to her residence?

2    A.   Yes, her son called me telling me, can you hurry

3    up and get here, it was about 6:00 in the morning, and I

4    said, okay, I'm on my way.   And she was unresponsive on

5    the side doing, and I said, have you called the nurse, I

6    don't know what to do.   So I called the nurse, and I

7    told her, she's unresponsive, she doesn't open her eyes,

8    I'm calling her, she don't open her eyes, and Amy had

9    said I'll get a nurse out there.

10       I said, okay, and I said, Ms. Amy can I please

11   clean her up because she was peed and dirty head to toe.

12   She said, yes, do that and leave her comfortable.   I

13   said okay.   So I finished doing her and I left.   I did

14   tell her, Amy said the nurse is going to come.   I did

15   the rest of my patients and at 2:00 in the afternoon he

16   calls me, Diana they haven't come.   I said, what?   I

17   said, okay, I'll call you right back.   I called Amy and

18   said she was going to send a nurse over.

19       She sent an LVN, that LVN sent her to the

20   hospital, and I said hospital?   Oh my God, this poor

21   lady unresponsive getting into the stretcher in the

22   hospital and then at -- then they refused her because he

23   didn't want no service, you know, to bring her back

24   that's why she's on hospice, they brought her back home.

25   I -- I feel bad that -- that's not the way you're

1    supposed to treat a person that's dying.

2        Q.   So you called for a nurse at around 6:00 a.m.; is

3    that right?

4        A.   Excuse me?

5        Q.   You called for a nurse to come at 6:00 a.m.?

6        A.   Yes, at 6:00 a.m. in the morning.

7        Q.   And by 2:00 a.m. no nurse had come out?

8        A.   No nurse had showed up.

9        Q.   Now, I want to talk about documentation.

10           Did Defendant Mesquias offer to pay you to create

11   fraudulent documents?

12       A.   Yes, they called me -- Amy called me into the

13   office and she had about six papers there and she says

14   can you sign this?  And I said, why?  And she says,

15   they're patients, you know, and I said -- and I looked

16   at them, I wasn't here then.  No, that's okay.  And I

17   said, no.  And she said -- she walks out, comes back in

18   and Rodney's there with -- with head that way and

19   whispered something and says, we'll give you five

20   dollars more, and I said, no, no, no, no money on earth

21   is going to make me do this fraud.  I care for my CNA

22   license.

23       Q.   So when you were offered money to create these

24   fraudulent documents, were you in Ms. Cooley's office?

25       A.   Uh-huh.

1    Q.   Was she a nurse at the Merida Group?

2    A.   Uh-huh.

3         THE COURT:   One second, one second.   Ma'am,

4    you need to answer out loud yes or no.

5         THE WITNESS:   Oh, yes.

6         THE COURT:   Thank you.

7    Q.   (By Mr. Foster)   Okay.   And how -- how big was

8    her office, was it large or small?

9    A.   Small.   Small office.

10   Q.   And did Defendant Mesquias come into that office?

11   A.   Yes, and he was facing the wall with the phone on

12   the ear.

13   Q.   And what were you asked to sign?

14   A.   Those six documents of hospice patients.

15   Q.   And --

16   A.   That I've never seen.

17   Q.   Had you ever seen those patients?

18   A.   No.

19   Q.   Were those dates that these patients were

20   supposedly seen, was that before the time you were

21   working at the Merida Group?

22   A.   Before?   Yeah, before.   I hadn't been there yet.

23   Q.   You weren't working there for the time these

24   patients were supposedly seen?

25   A.   No.

1    Q.   And what did you tell Ms. Cooley and Defendant
2  Mesquias?
3    A.   I said no money on earth is going to make me sign
4  those, I care for my hospice license.
5    Q.   Now, did you ultimately decide to quit working at
6  Merida?
7    A.   Yes.
8    Q.   And did you tell Ms. Cooley why you were
9  quitting?
10   A.   Yes.
11   Q.   And was Defendant Mesquias in her office when you
12 told them that?
13   A.   Yes.
14   Q.   And what did you tell Ms. Cooley and Defendant
15 Mesquias about why you were quitting the Merida group?
16   A.   I said, I'm turning in my papers because I don't
17 want to work here no more, you know this is fraud what's
18 going on here.
19   Q.   You told them, you know this is fraud what's
20 going on here?
21   A.   And she just -- she said, okay, I understand,
22 you're a good aide, you're a good aide, that's she told
23 me.
24   Q.   And after she said you're a good aide, did
25 Defendant Mesquias whisper something in her?

1    A.   She just --

2             MR. HECTOR CANALES:   Objection leading,

3    Your Honor.

4             THE COURT:   Rephrase the question.

5    Q.   (By Mr. Foster)   What happened next?

6    A.   She just told me, we'll give you five dollars

7    more, Diana, you're a good aide.   And I said, no.

8    Q.   Did Defendant Mesquias say something to her prior

9    to her offering the five dollars?

10   A.   No.

11   Q.   What did he do?

12   A.   Just stayed behind me, and walked -- because I

13   walked and he walked right behind me with his phone and

14   just walked all the way to the hall and I was going to

15   say bye to the girls because I had already quit when he

16   just yelled out loud, I don't want nobody, nobody into

17   this office, come into these doors like I'm going to go

18   in again.   That's my feeling.

19   Q.   So after you told him it was fraud, he walked you

20   out of the office?

21   A.   Well, he didn't walk me out, he was behind me.

22   Q.   He was behind you?

23   A.   Yeah.

24   Q.   Making sure you left?

25   A.   I guess.

1          MR. FOSTER:  No further questions,

2    Your Honor.

3          THE COURT:  Mr. Canales.

4                    CROSS-EXAMINATION

5    BY MR. HECTOR CANALES:

6     Q.  Good afternoon, Ms. Navarro, how are you doing?

7     A.  Just fine, sir.

8          THE COURT:  One second, gentlemen, let me

9    get -- technically, there's three, 15-minute sessions

10   left.

11         Please proceed.

12         MR. HECTOR CANALES:  Thank you, Your Honor.

13    Q.  (By Mr. Hector Canales)  I -- I just want to

14   confirm, I think one of the very first things you just

15   told -- you said that -- that the patients weren't

16   eligible for hospice because they weren't homebound,

17   that's what you said, right?

18    A.  Yes, sir.

19    Q.  Okay.  Thank you.

20         MR. HECTOR CANALES:  No more questions.

21         THE WITNESS:  Yes, sir.

22         THE COURT:  Mr. Cyganiewicz?

23         MR. CYGANIEWICZ:  I have no questions,

24   Your Honor.

25         THE COURT:  Mr. Guerra?

1                    MR. GUERRA:  No -- no questions, Your Honor.

2                    THE COURT:  Anything else, gentlemen?

3                    MR. FOSTER:  No, Your Honor.

4                    THE COURT:  Thank you, ma'am.  You're

5      excused.

6                    And gentlemen, does that conclude the -- at

7      least the witnesses from San Antonio that you were

8      concerned about?

9                    MR. LOWELL:  Yes, Your Honor.

10                   THE COURT:  All right.  Is the next witness

11     a lengthy witness?

12                   MR. LOWELL:  Yes.

13                   THE COURT:  Yes.  All right.  Ladies and

14     gentlemen, how about a weekend break?  Ladies and

15     gentlemen --

16                   JUROR:  Friday.

17                   MR. CYGANIEWICZ:  No objection.

18                   THE COURT:  Ladies and gentlemen, thank you

19     for your patience, your hard work, let's go ahead and

20     break early today and we're going to follow the same

21     procedures, obviously, please remember do not discuss

22     the case, I don't know -- it appears there may be media

23     here, there may not, please avoid any attempts, or you

24     know, actively avoid any media reports or television

25     reports, again who knows what's going to happen, but

1    remember the instructions I gave you.

2            Thank you for your patience, your hard work

3    and again, we'll start bright and early on Monday

4    morning hopefully right before 9:00.

5            COURT OFFICER:  All rise for the jury.

6            (JURY OUT.)

7            THE COURT:  All right.  Thank you, everyone.

8    We'll be in recess.

9            (COURT IN RECESS.)

10

11                    REPORTER'S CERTIFICATE

12

13      I certify that the foregoing is a correct transcript

14    from the record of proceedings in the above-entitled

15    matter.

16

17

18    ___/s/ *Sheila E. Perales.*_____
          SHEILA E. HEINZ-PERALES CSR RPR CRR
19        Exp. Date:  January 31, 2021

20

21

22

23

24

25