```
 1              IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION


 3
     UNITED STATES OF AMERICA     )
 4                                )
                                  )
 5   VS.                          ) CRIMINAL ACTION NO.
                                  ) B-18-CR-8
 6                                )
     RODNEY MESQUIAS, HENRY       )
 7   MCINNIS AND FRANCISCO PENA   )
                                  )
 8


 9
                         TRIAL - DAY FIVE
10          BEFORE THE HONORABLE ROLANDO OLVERA
                      OCTOBER 28, 2019
11


12


13                  A P P E A R A N C E S


14
      FOR THE UNITED STATES:
15
          MR. KEVIN LOWELL
16        MR. ANDREW SWARTZ
          MR. JACOB FOSTER
17        ASSISTANT UNITED STATES ATTORNEY
          BROWNSVILLE, TEXAS 78520
18


19    FOR THE DEFENDANT RODNEY MESQUIAS:

20        MR. CHARLES BANKER
          ATTORNEY AT LAW
21        118 Pecan Boulevard
          McAllen, Texas 78501
22
          MR. HECTOR CANALES
23        MR. TONY CANALES
          ATTORNEYS AT LAW
24        2601 Morgan Avenue
          Corpus Christi, Texas 78405
25
```

```
 1   FOR THE DEFENDANT HENRY MCINNIS:

 2        MR. ED CYGANIEWICZ
          ATTORNEY AT LAW
 3        1000 E. Madison Street
          Brownsville, Texas 78520
 4
     FOR THE DEFENDANT FRANCISCO PENA:
 5
          MR. ROBERT GUERRA
 6        ATTORNEY AT LAW
          55 Cove Circle
 7        Brownsville, Texas 78521

 8   FOR THE DEFENDANT FRANCISCO PENA:

 9        MS. ADRIANA ARCE-FLORES
          ATTORNEY AT LAW
10        1414 Victoria Street
          Laredo, Texas 780404
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Thank you, everyone.  Please be

2     seated.  Good morning.

3          Gentlemen, is there an issue that needs to

4     be taken up before the Court?

5          MR. SWARTZ:  Yes, Your Honor, just a couple

6     of issues.

7          One is just a point of clarification.  The

8     witness that will be testifying first is Special Agent

9     Neal Williams, and he'll be talking about some

10    recordings that were done by sources in this case.  And

11    the Government did file a Motion in Limine on an issue

12    about payments to the sources in other unrelated

13    investigations.

14         And the Court granted the Government's

15    Motion in Limine that established Fifth Circuit case law

16    is where there is payments unrelated to the charges in

17    the indictment, defense counsel is not allowed to

18    cross-examine the sources, or cross-examine about those

19    unrelated payments.

20         So I just wanted to make clear, before we

21    get started, so there's no ambiguity that defense

22    counsel is not permitted per Fifth Circuit case law in

23    the Court's order on the Motion in Limine to

24    cross-examine about payments unrelated to this

25    investigation leading to the indictment in this case.

1        THE COURT:  My recollection is they may
2  only -- their questions may -- are limited in scope only
3  to this case, if any.
4        MR. SWARTZ:  Yes, Your Honor.
5        MR. GUERRA:  Yes, Your Honor, I believe the
6  limine was we can ask them if they were being paid for
7  their testimony, but we can't get into the basis of the
8  deal.
9        THE COURT:  Incorrect.  Incorrect.
10       You cannot -- you can ask if they're being
11  paid for testimony in this case.
12       MR. GUERRA:  Correct, right, but we can't
13  ask them -- because my understanding is for two of the
14  cooperating witnesses, one of them is getting -- there
15  is a deal that we don't know what it is, they disclosed
16  the deal to us, we don't know what it is, the other one
17  is getting paid as an informant in unrelated matter but
18  still offering testimony in this case.
19       So my understanding was we could at least
20  talk that they are getting compensated for being here,
21  we just can't go into the basis, or the specifics of
22  that compensation.
23       MR. SWARTZ:  Judge, I think that's --
24  they're not being compensated for anything related to
25  the charges leading to the indictment in this case.

1          THE COURT:  Again, Mr. Guerra, that is

2    incorrect.  You cannot ask them about any compensation

3    outside the scope of this case.

4          MR. GUERRA:  And I don't intend to,

5    Your Honor, but I do intend to ask the witnesses that

6    they struck a deal with the Government and they are

7    getting paid to be here today.  That is proper, correct?

8          THE COURT:  Correct.

9          MR. GUERRA:  Okay.

10          THE COURT:  Well, today is this case.

11          MR. GUERRA:  Yes.

12          THE COURT:  You can ask about payments,

13    any -- does this apply to anyone or are they being --

14          MR. SWARTZ:  No, nobody has been compensated

15    in connection with the case, the investigation leading

16    to the indictment in this case.

17          THE COURT:  Well, then if nobody is being

18    paid then why would you ask how --

19          MR. GUERRA:  Well, it goes to their

20    credibility and intention, Your Honor.

21          THE COURT:  No, but the limine is, again,

22    Fifth Circuit says you cannot ask about compensation

23    having to do with unrelated cases.  So if they're being

24    paid in a third-party case, you cannot ask about that.

25          MR. GUERRA:  Yes, no, agreed, but I believe

1    today there is the FBI agent and one of these witnesses

2    there.  I do have to ask the agent as under the course

3    of the investigation how this particular cooperating

4    witness came to be within the scope of the agent's

5    purview, and they end up having him a wear a wire, I

6    would imagine I get to at least allow him to get --

7    allowed to ask why were you wearing a wire, why did you

8    get a wire on this witness.

9          And so to the extent that they're going to

10   limine that out, I would again object to that limine

11   because I believe it is going to the witness'

12   credibility.

13         THE COURT:  Mr. Guerra, I can only say it

14   one more time.  You cannot -- you need to be careful and

15   not ask about any compensation that's not -- again, if

16   he's not being compensated in this case, you cannot ask

17   about it.

18         MR. GUERRA:  Yes, Your Honor.

19         THE COURT:  All right.  So I can't be any

20   more clearer than that.

21         MR. GUERRA:  Agreed.

22         MR. SWARTZ:  The other issue, just as a

23   housekeeping matter.  The Government intends to play

24   certain audio clips, audio and video clips for the

25   witnesses today.  And in order to expedite things,

1   certain of the clips are in Spanish and English and the

2   Government has pulled excerpts from the transcripts that

3   the Government intends to play.

4          And what the Government would propose to do,

5   and I've passed these -- these packets out to defense

6   counsel, what the Government proposes to do is instead

7   of passing out a binder with lots of paper and lots of

8   transcripts, we've reduced it to just this packet for

9   the -- the clips that we're going to play with Special

10  Agent Neal Williams.

11         And so we propose to pass these out to the

12  jury so they could follow along.  It's really just being

13  used as an aid so they can follow along when the

14  clips -- all of this comes from what's already in

15  evidence so the -- the Court -- I mean the Government

16  proposes to proceed that way.

17         THE COURT:  Gentlemen, have you received a

18  copy of the transcript?

19         MR. GUERRA:  We just received it five

20  minutes ago, Your Honor.  We would object to having the

21  jury consider this as evidence.  We'd ask for a limiting

22  instruction that this is not an exhibit, and we request

23  the Court collect these transcripts before the jury goes

24  back after they're being used for the purposes of this

25  testimony today, Your Honor.

1              THE COURT:  Court agrees, the Court will

2     allow you to distribute these transcripts as an aid

3     only.

4              MR. SWARTZ:  Yes, Your Honor.

5              THE COURT:  With the instruction that this

6     is not an evidence, it's not evidence and then collect

7     them once the audio and video is completed.

8              MR. SWARTZ:  Just, I just don't want there

9     to be confusion, though, all of these excerpts come from

10    transcripts that are in evidence.  I guess I don't want

11    the jury to think that this isn't evidence because

12    what's being played is already in evidence.  This is

13    excerpts of what's already in evidence so they could

14    follow along.

15             THE COURT:  Let's just -- again, we'll say

16    that these excerpts are an aid only to the transcripts

17    are part of the -- understood.  Understood.

18             All right.  Anything else?

19             MR. GUERRA:  Your Honor, I'd like to make a

20    Bill of Review just, basically, on this issue of

21    compensation of the cooperating witnesses, if the Court

22    would allow me.

23             THE COURT:  Please proceed.

24             MR. GUERRA:  Thank you, Your Honor.

25             With regards to any testimony related to any

1    compensation being made to Edgar Jimenez and Jose

2    Aguilar, cooperating witnesses on behalf of the

3    Government, if allowed to ask questions, I would ask

4    Mr. Jimenez and Aguilar that in their capacity as

5    executives and owners for Generous Hospice they did

6    incur some significant debt with the United States

7    Government's, specifically over $160,000 worth of back

8    taxes to the IRS.  They were approached by the federal

9    government, it is our understanding that they were given

10   a deal with the Government and, again, we do not know

11   the specifics of said deal, but it's our understanding

12   that as part of the deal they made with the Government,

13   they were allowed to, in part, wipe out some of that

14   debt.

15          We also believe that there is a possible

16   immunity agreement; again, we were not given the

17   specifics of that, but if we were allowed to ask those

18   questions, we would ask Mr. Aguilar and Mr. Jimenez the

19   basis of their immunity agreement with the Government,

20   the extent of said immunity agreement with the

21   Government, the cases that it involves, including and

22   not limited to any who hospices, Generous and Merida,

23   and we would go to the extent of any immunity that they

24   were granted to testify in this matter, Your Honor.

25          THE COURT:  Anything else, Mr. Swartz?

1              MR. SWARTZ:  Nothing else from the

2    Government, Your Honor.

3              THE COURT:  Anything else, Mr. Guerra?

4              MR. GUERRA:  Nothing --

5              MR. SWARTZ:  I apologize, just a point of

6    clarification on the transcripts.

7              Because everything that's in these packets

8    is in evidence, the Government would request, I mean

9    they are going to be used as an aid to follow along, but

10   the Government requests they do go back with the jury

11   and become a part of the record and evidence in this

12   case.

13             And every -- all the language in here is

14   already in evidence, it's evidence in this case, it's

15   just organized in a slightly different manner.

16             MR. GUERRA:  Well, Your Honor, under the

17   Best Evidence Rule, basically, you know, I understand

18   the Government's doing this for the purposes of

19   expediency and we appreciate that, but whatever gets

20   played in front of the jury we'd like that transcript

21   taken back.

22             If there's -- if they play less, we would

23   like that transcript taken back, if they want to play

24   less but have a more extensive transcript brought in, we

25   would object to that.

1          THE COURT:  Again Mr. Swartz, for the time

2    being the -- the Court will limit its purpose for an aid

3    and aid only.  Obviously, you can refer to the entirety

4    of the transcript that is an exhibit, if necessary.

5          MR. SWARTZ:  Yes, Your Honor.

6          THE COURT:  But we'll -- we'll proceed as

7    we've already discussed.

8          MR. SWARTZ:  Okay.

9          THE COURT:  Anything else?

10          MR. TONY CANALES:  I have, I have,

11    Your Honor.  Good morning, Your Honor.

12          THE COURT:  Good morning, Mr. Canales.

13          MR. TONY CANALES:  The evidence the Court

14    will be hearing regarding the next witness has to do

15    with counts nine and ten.

16          Counts nine and ten, the only party charged

17    in counts nine and ten is Dr. Pena, no other Defendant

18    is charged in counts nine and ten.  That's what the

19    tapes are all about.  I think because we're not charged

20    on counts nine and ten and it's not part of any type

21    of -- of conspiracy, I'm requesting from the Court a

22    limiting instruction.  I submitted it in writing to

23    opposing counsel, I gave the clerk a copy of this; it

24    would go something like this:  You're about to -- to

25    tell the jury, you're about to hear audiotapes, you can

1   consider this testimony and exhibits only on the case

2   against Francisco Pena.  You may not consider that

3   evidence in the case against the other Defendants.  Each

4   Defendant is entitled to have their case decided just on

5   the evidence which applies to him.

6               That's kind of a standard limiting

7   instruction.  We request that instruction be given to

8   the jury, Your Honor, regarding case -- counts --

9               MR. CYGANIEWICZ:  I join on that request,

10   Your Honor, for Mr. McInnis, Your Honor.

11               MR. TONY CANALES:  Nine and ten.

12               MR. CYGANIEWICZ:  If they were tried

13   separately that would not be admissible against

14   Mr. McInnis' statements of Dr. Pena, it's not a

15   co-conspiracy at that point, and it's hearsay to

16   Mr. McInnis, so I join in the request for a limiting

17   instruction.

18               THE COURT:  Government's response, please?

19               MR. LOWELL:  Good morning, Your Honor.

20               Your Honor, the Government opposes the

21   instruction for a couple reasons.

22               Number one, it's not accurate.  There are

23   references to Rodney Mesquias, to the Merida Group and

24   to payments that Mr. Pena was receiving for patient

25   referrals during the course of those recordings.  So

1    that is evidence -- and it's also during the course of

2    the charged conspiracy, it's in 2017.

3              As the Court knows, Mr. Pena's charged with

4    being involved in a conspiracy from 2009 to 2018.

5              The second thing is, Your Honor, just

6    consistent with this Court's practice, it is this

7    Court's practice, as I understand it, to give the jury

8    charge at the conclusion of the case.  The Court can

9    give an appropriate instruction after we've heard the

10   recordings, the Court's had an opportunity to evaluate

11   those tapes at the conclusion of the evidence.

12              MR. TONY CANALES:  Response, Judge.  Rule

13   105, we've already argued this before about Rule 105,

14   but it's a typical instruction that the Courts always

15   give when there's multiple Defendants and we nothing to

16   do with count.

17              THE COURT:  Mr. Canales, again, the Court is

18   going to maintain the status quo in terms of these

19   limiting instructions.

20              The Court believes that the final charge

21   will be more than adequate to address these issues.  If

22   the parties can agree on an issue, that's a different

23   issue, but there's been numerous witnesses that don't

24   reference one of the Defendants and obviously the

25   defense respected to the Defendants never referenced

doesn't ask any questions.  I think that it's quite
clear that some witnesses apply to some and some apply
to the others and we'll move along as we've already done
in the past.

MR. TONY CANALES:  Yes, sir, but I'm just
putting that on now.

THE COURT:  At this time, at this time
your -- your request is denied.

Anything else?

MR. LOWELL:  Your Honor, may I just address
another issue that Mr. Guerra brought up?

THE COURT:  Yes.

MR. LOWELL:  The Government has -- the
Government has no objection to Mr. Guerra asking these
sources, the witnesses, about any immunity agreements
that they may have.

THE COURT:  All right.  Again, my -- the
limine instruction is only limited in scope to
compensation.  Mr. Guerra, technically in your Bill of
Review you mentioned other issues that were not part of
the limine instruction.

MR. GUERRA:  Yes, Your Honor.

THE COURT:  But again, if you were able
to -- I mean, if you phrase your questions appropriately
and carefully, you can get into immunity deal.

```
 1              MR. GUERRA:  Yes, yes, Judge.
 2              THE COURT:  But, and I don't know if -- I
 3    don't know if that was --
 4              MR. LOWELL:  Yeah, I was just clarifying for
 5    the record, Your Honor, that, you know --
 6              THE COURT:  Again, going back -- gentlemen,
 7    you saw -- you saw the case law, you saw the order, it's
 8    only limited in scope to compensation.
 9              MR. GUERRA:  Yes, Your Honor, and I
10    understand that and I apologize if I accidentally
11    through in immunity, I tried to make my Bill of Review
12    as broad as possible just for the purposes -- just for
13    the purposes of clarity of the record and protecting my
14    client's best interest.
15              THE COURT:  A bill of review that --
16              MR. GUERRA:  Yes.
17              THE COURT:  -- issues I did not exclude is
18    not --
19              MR. GUERRA:  Just want to make sure in case
20    I missed a ruling, but we are aware of the Court's
21    instruction, Your Honor.
22              THE COURT:  All right.
23              MR. GUERRA:  And we will --
24              THE COURT:  And if you need a copy of the
25    order that was issued.
```

1          MR. GUERRA:  No, no, no, we have it,

2     Your Honor.

3          THE COURT:  Thank you.

4          MR. SWARTZ:  Your Honor.

5          THE COURT:  Yes, yes.

6          MR. SWARTZ:  We're just having a technical

7     issue, on the laptop, we can see the video but we just

8     can't hear the audio and I believe IT is bringing

9     down another laptop.

10          MR. GUERRA:  No objection, Judge.

11          MR. SWARTZ:  If we could just have a moment

12     to correct that technical issue.

13          THE COURT:  We'll be in recess.

14          Let me know as soon as we're ready to go.

15          MR. SWARTZ:  Yes, Your Honor.

16          THE COURT:  Let the jury know we're on

17     standby, once we get the technical issues worked out.

18          THE CLERK:  Yes, sir.

19          THE COURT:  Let me know as soon as we're

20     ready.

21          MR. SWARTZ:  Thank you.

22          THE COURT:  This witness is Agent Neal

23     Williams and the -- the Government's requested two and a

24     half hours, correct?

25          MR. SWARTZ:  Yes, Your Honor.

```
 1                    THE COURT:  All right.  All right.  We'll be
 2      in -- in recess.
 3                    (COURT IN SHORT RECESS.)
 4                    THE COURT:  Everyone please remain standing
 5      for the jury.
 6                    COURT OFFICER:  All rise for the jury.
 7                    (JURY IN.)
 8                    THE COURT:  Thank you everyone.  Please be
 9      seated.
10                    Ladies and gentlemen, it's -- it's working.
11      Good morning, ladies and gentlemen.
12                    THE JURY:  Good morning.
13                    THE COURT:  I know, perhaps, the weekend was
14      not long enough, but thank you for your service, thank
15      you for your patience, thank you for being here on time.
16                    As you can see, we have been working on the
17      case outside your presence.  I believe the technical
18      issues are now resolved.
19                    MR. SWARTZ:  Yes, Your Honor.
20                    THE COURT:  We're ready to proceed?
21                    MR. SWARTZ:  Yes, Your Honor.
22                    THE COURT:  All right.  Mr. Swartz -- well,
23      before we begin, there is an aid that the Government is
24      going to distribute to the jury.
25                    Ladies and gentlemen, this aid is only to
```

1   assist you during the -- the upcoming audio/video

2   testimony.  It's my understanding that the aid contains

3   transcripts that are in exhibit -- that are exhibits in

4   this trial, but the complete transcript is the exhibit.

5             This summarized -- this -- this summarized

6   versions or portions of transcripts is not an exhibit,

7   all right?

8             MR. SWARTZ:  May I pass up one to the Court,

9   Your Honor?

10            THE COURT:  Please.  All right.

11            Mr. Swartz, please proceed.

12            MR. SWARTZ:  Your Honor, the Government

13   calls FBI Special Agent Neal Williams.

14            THE CLERK:  Raise your right hand.

15            (WITNESS SWORN IN.)

16            THE WITNESS:  I do.

17            THE CLERK:  Thank you.

18            THE COURT:  Thank you, sir.  Please be

19   seated, make yourself comfortable, and be careful to

20   position the microphone and the base close to your

21   mouth.

22            THE WITNESS:  Yes, sir.

23            THE COURT:  So you can speak loudly and

24   clearly.

25            Thank you, sir.

```
 1                    Mr. Swartz, please proceed.
 2                    MR. SWARTZ:   Thank you, Your Honor.
 3                         DIRECT EXAMINATION
 4    BY MR. SWARTZ:
 5        Q.   Good morning, sir.
 6        A.   Good morning.
 7        Q.   Please tell the jury your name.
 8        A.   Neal Williams.
 9        Q.   Special Agent Williams, with whom are you
10    currently employed?
11        A.   The FBI.
12        Q.   Can you tell the jury briefly what you did before
13    coming to the FBI?
14        A.   Before the FBI, I served as a Second Lieutenant,
15    First Lieutenant and a Captain in the U.S. Air Force.
16    My primary duty was as an air battle manager.
17        Q.   And when did you come to the FBI?
18        A.   In February of 2011.
19        Q.   Did you go to the FBI Academy?
20        A.   I did.
21        Q.   Could you tell the jury, just generally, the kind
22    of training you received at the FBI Academy?
23        A.   Yes, sir.  The FBI Academy is about 21 weeks
24    long, and while we're there we receive legal training,
25    we receive investigative technique training, as well as
```

1    tactical training, firearms training, interview and

2    interrogation techniques.

3         Q.   How long was the training at the academy?

4         A.   21 weeks.

5         Q.   After the academy, what was your first posting?

6         A.   My first posting was in Salt Lake City, Utah.

7         Q.   Doing what?

8         A.   My first duty assignment was as a -- I was on the

9    joint terrorism task force working international

10   terrorism and my specialty was the Horn of Africa.

11        Q.   And did you do that work within the

12   United States, or sometimes did you leave the

13   United States to do that?

14        A.   I primarily worked in the United States.  I had

15   some -- some tours that required me to go overseas in my

16   area of specialty, so in Africa.

17        Q.   Can you tell the jury a little bit about the

18   training that you received during the time you were on

19   the terrorism task force?

20        A.   Yes, being -- working in international terrorism,

21   there are places that I -- I don't blend and there are

22   places that -- that an FBI agent isn't well -- welcomed,

23   so having -- having a background in source handling is

24   important, and as such, I went to a couple of courses on

25   how to obtain a source and how -- how to work with

1   sources.  And sources you'll also hear that referred to

2   as an informant, and then I also attended courses on,

3   excuse me, attended courses on counter-terrorism

4   investigations.

5       Q.   How long were you in Utah?

6       A.   About four years.

7       Q.   What did you do after your time in -- in -- with

8   the joint terrorism task force?

9       A.   My next duty assignment was in Laredo, Texas.

10      Q.   What did you do in Laredo?

11      A.   In Laredo, initially I worked public corruption

12  and civil rights violations, and very shortly after

13  that, our -- our office had discovered that there was

14  a -- a void in the health care fraud investigation side

15  of the -- side of the FBI, so I -- I began working

16  health care fraud.

17      Q.   And you were in South Texas?  Was this your first

18  time -- are you new to South Texas?

19      A.   No, in my childhood I lived in Mission and

20  McAllen area for about four-and-a-half years.

21      Q.   Can you describe for the jury generally the kinds

22  of training you received during the time you were in

23  Laredo?

24      A.   Yes, when I was in Laredo, I receive health care

25  specific training, there were a couple different courses

1    I went to, each of them was about -- anywhere from a

2    week to two weeks long.

3        Q.   How long were you in Laredo?

4        A.   A little over three years.

5        Q.   What did you do after your time in Laredo?

6        A.   I transferred to the FBI office in Tyler, Texas.

7        Q.   What were your duties in Tyler?

8        A.   I worked health care fraud there as well.

9        Q.   How long have you been in Tyler?

10       A.   About a year-and-a-half.

11       Q.   So how many years of experience do you have as an

12   FBI agent?

13       A.   A little over eight-and-a-half years.

14       Q.   You mentioned health care fraud investigations.

15   I want to ask you about some of the investigative

16   techniques that are used in health care fraud

17   investigations.  As part of your investigations, do you

18   look at Medicare claims data?

19       A.   Yes.

20       Q.   Can you describe for the jury what kinds of

21   information an investigator can glean from claims data?

22       A.   There's a lot of information to get from claims

23   data.  Excuse me.  We -- we can get the basic patient

24   identifying information, their name, date of birth, date

25   of death, if that's available, meaning if the patient

1  has -- has deceased, we can get -- the specific claims,

2  so basically the billing data that is sent from health

3  care entity to Medicaid and Medicare, that -- that comes

4  through and we -- that helps us to see what -- what

5  types of treatments this patient has been had, or at

6  least what -- what's been claimed.  And -- and we can

7  see the -- the doctors, or the -- or the medical

8  entities that have billed for that care and -- and

9  the -- if there's, like, a -- if there's a subunit

10 within there.

11       So like, an example, for example, in a hospice,

12 there's usually going to be a doctor that is over

13 whatever care has been provided, we can also see who

14 that doctor was, so like a medical director-type

15 position.

16 Q.   And specifically related to hospice from the

17 claims data, can you get any information about the

18 length of stay a particular patient is on hospice, or

19 length of time they're on hospice?

20 A.   Yes, we can -- we can pull reports that show

21 length of stay or -- for patients of a specific doctor,

22 length of stay for a specific hospice entity, or we can

23 look at a particular patient and see when was this

24 patient put on hospice, and how long have they been on

25 hospice, which that one is useful if that patient has

1    bounced around a little bit.  If they started with one

2    entity and then were transferred to another.

3        Q.   What about bank records, do you investigators

4    look at bank -- bank records as part of health care

5    fraud investigations?

6        A.   Yes, we do.

7        Q.   And what kinds of information is relevant to a

8    health care fraud investigation in bank records?

9        A.   Well, in health care, it allows you to see the

10   other -- the other side, what claims -- the claim

11   details don't show you.  Because in the claim detail, we

12   see the -- the dollar amount that was billed for and the

13   dollar amount that was received by the -- the billing

14   entity.

15            So when we get a bank record, we can see that

16   money received on the other side, but we can also see

17   where that money went.  So, for example, if a hospice

18   entity receives money and then they immediately are

19   paying -- paying doctors in -- with a suspicious

20   pattern, then that could indicate kickback activity.

21       Q.   Now, early you mentioned sources, that you used

22   sources during the time you that were at the joint

23   terrorism task force?

24       A.   Yes.

25       Q.   Are sources used in health care fraud

1    investigations?

2        A.   Yes.

3        Q.   And could you describe that for the jury?

4        A.   It's similar to when I was working international

5    terrorism.   There are places that a federal agent is not

6    welcomed, there are places that we won't blend in.   I am

7    not a health care expert, I am health care investigator,

8    so I don't have the industry specific knowledge and

9    lingo.   I don't have the contacts that somebody else may

10   already have.

11          So a source is crucial because they -- they

12   provide that to us, they -- they already have that

13   insight, and already have those contacts so they can

14   provide information either to these are the people that

15   are committing fraud, or they can give us access to the

16   people who are committing fraud at times.

17       Q.   And do health care fraud investigations include,

18   sometimes in your experience as an investigator,

19   investigation of kickbacks?

20       A.   Yes, they do.

21       Q.   And are sources useful in investigating

22   kickbacks?

23       A.   Yes.

24       Q.   How so?

25       A.   Like I said, it's all -- it's about access.   So

1     nobody wants to engage in an illegal kickback
2     relationship with me, but if they're willing to engage
3     in an illegal kickback relationship having a source that
4     has established contacts already has those
5     relationships, if we know that that person -- that
6     there's a -- a doctor, or some other entity that is
7     accepting kickbacks, or paying kickbacks, then having a
8     source on the inside could be beneficial because they --
9     they can participate in that activity for us.
10         Q.   What about body-wires or sort of covert recording
11    devices, are those used sometimes in health care fraud
12    investigations?
13         A.   Yes, they are.
14         Q.   And can you describe for the jury what kind of
15    context where those might be used?
16         A.   If you want to -- its especially helpful when
17    you're using a source because some of these people
18    we're -- we're looking for people who have access to
19    criminal activity and people who have access to
20    criminals, so some of these people don't have the best
21    background, they might have a criminal history
22    themselves and, therefore, every word they say is not to
23    be trusted, but we can record what has happened so that
24    I don't have to take that person's word for it, I can --
25    I can take -- I can hit the play button essentially.

1          If we record something on audio or video, I -- I

2    can ask them what -- what happened, but then I can

3    verify that, I can go back and watch the video and --

4    and say, okay, he was telling me the truth or she was

5    telling me the truth, this is what happened.

6          And -- and it gives -- again, it gives us access

7    to places that we otherwise wouldn't have access.

8     Q.   Agent Williams, I want to focus you on the year

9    2017.   During that time period, were you in the Laredo

10   area with the FBI?

11    A.   Yes, I was.

12    Q.   Were you involved in an investigation regarding

13   the Merida Group?

14    A.   Yes.

15    Q.   Ms. Leal, can we pull up Government's Exhibit

16   L-1.   Agent Williams, does this -- does Government's

17   Exhibit L-1, does that show the location of Merida Group

18   entities?

19    A.   It does.

20    Q.   And in your investigation, were you focused on a

21   particular geographic region?

22    A.   Yes, I was in the Laredo office; therefore, the

23   primary portion of my investigation centered around

24   Laredo.   If you look at the -- the green area that is

25   about to get blown up for you, Laredo is right where

```
 1    that star is, right, right on the Rio Grande River and

 2    that's Webb County, and that's where the majority of

 3    the -- the patients and the activities I looked into

 4    occurred.

 5        Q.   And there's a -- a name on Government's Exhibit

 6    L-1 that says Professional Hospice Care, what is that

 7    entity?

 8        A.   That is a hospice entity that was located in

 9    Laredo commonly known as Merida.  It was -- it was part

10    of the Merida Group.

11        Q.   Who was the owner of that entity?

12        A.   Rodney Mesquias.

13        Q.   Now, if we could zoom back out, please.

14             Were -- were other agents involved in the

15    investigation relating to the Merida Group?

16        A.   Yes.  As you can see on the map, it's spread out,

17    Texas is a big place and this covers a big part of

18    Texas, so we had FBI agents in San Antonio that helped

19    on that portion, we had agents in McAllen from FBI and

20    health and human services who -- who worked -- covered

21    the other counties.

22        Q.   And -- and how did your part of the investigation

23    differ are from what was being done by other agents and

24    other agencies?

25        A.   My -- my part of the investigation centered --
```

1    centered on Dr. Francisco Pena simply because of his

2    role and his, I guess he was -- he was an established

3    doctor in that area and was -- was working with Merida.

4        Q.   Now, earlier when you're talking about

5    investigative techniques, you mentioned claims data?

6        A.   Yes.

7        Q.   Did you look at claims data related to the Merida

8    Group and Professional Hospice in the Laredo area?

9        A.   Yes.

10       Q.   Did that claims data show which physicians

11   referred hospice patients to the Merida entity in the

12   Laredo area?

13       A.   Yes, it did.

14       Q.   Any doctors stand out to you?

15       A.   Yes, the vast majority came from Francisco Pena.

16       Q.   Ms. Leal, can we pull up Government's Exhibit

17   L-2.

18           Was Francisco Pena a medical director for Merida

19   or Professional Hospice?

20       A.   Yes, he was.

21       Q.   Can you give the jury just an overview, based on

22   your investigation, what you learned, just kind of

23   describe what you learned about Francisco Pena?

24       A.   He's a long-standing doctor in the Laredo area,

25   he -- for decades, he's been there.  He's got

1    connections all -- all throughout the medical industry,

2    and he also served as the Mayor of the City of Rio

3    Bravo, which is a small town outside of Laredo.

4        Q.   Did he have offices in the area?

5                MR. GUERRA:   Objection Your Honor, leading.

6                THE COURT:   That's overruled.

7        Q.   (By Mr. Swartz)  Did he have offices in the area?

8        A.   Yes.  As -- as a doctor, he had a clinic in

9    Laredo and then he also had an office in City Hall in

10   Rio Bravo.

11       Q.   Now, focusing on the claims data, when you were

12   looking at the claims data, did anything stand out to

13   you about length of stay at the Professional Hospice or

14   Merida entity in Laredo?

15       A.   Yes, as I mentioned we can run reports where we

16   can look at the length of stay of the patients, and I'm

17   sure people have already learned, the -- the first

18   threshold that we would look at investigatively is six

19   months.  How many patients are over six months?

20               I expect that most hospice entities are going to

21   have a patient or two, an outlier, that goes -- extends

22   beyond six months.  But if the -- if there is a large

23   number of patients over six months, that's -- that's

24   reason to look into things further.

25               And then if they meet further thresholds, the

1   longer the length of stay.  If they're on hospice for a

2   year, or two years, or three years, then obviously the

3   longer they're on, that warrants suspicion.  The higher

4   volume of patients that meet each of those thresholds

5   warrants suspicion.

6          So -- so that -- that would be a reason that we

7   would look into it deeper.  And -- and with -- with the

8   Professional Hospice Care what we learned in the -- in

9   the Laredo area was that over 78 percent of the billing

10  that was done at -- at Professional Hospice Care from

11  2012 to 2016 was for patients over -- who were on

12  hospice for over six months, and then patients that were

13  over -- over one year, actually equaled about half of

14  the billing so just a little less than half of the

15  billing.

16  Q.  Now, with respect to -- you mentioned patients.

17  After looking into the claims data, did you track down a

18  patient that had had a long length of stay with the

19  Merida Group in Laredo?

20  A.  Yes, we did.

21  Q.  Which patient did you contact?

22  A.  Francisca Perez.

23  Q.  Ms. Leal, can you please pull up Government's

24  Exhibit H-29.

25         What company was Ms. Perez on hospice services

1   with?

2       A.   Professional Hospice Care.

3       Q.   Is that the same Rodney Mesquias owned company we

4   were talking about earlier?

5       A.   Yes, when we talked to her she referred to it as

6   Merida.

7       Q.   How much was Rodney Mesquias' company paid for

8   just Ms. Perez?

9       A.   They were paid a little bit over $134,000.

10      Q.   And can we pull up Government's Exhibit E-20,

11  page 566.  If you could zoom in on the top portion.

12           Is this the hospice plan of care for Ms. Perez?

13      A.   Yes, this one looks like it's the initial cert.

14  Sorry, the initial certification and plan of care.

15      Q.   When is the -- when is the certification period

16  starting there?

17      A.   Beginning on September the 19th of 2013.

18      Q.   What doctor's name is on this certification?

19      A.   Francisco Pena.  Or, Fran -- yeah, Francisco

20  Pena.

21           MR. GUERRA:  Your Honor, I object --

22           MR. SWARTZ:  Go down to the bottom, very

23  bottom of the page.

24      Q.   (By Mr. Swartz)  Does the bottom portion show a

25  physician name?

1    A.   Yes.

2    Q.   Whose name is that?

3    A.   Francisco Pena.

4    Q.   Now, was -- was this during the time that

5    Francisco Pena was the medical director for the Merida

6    Group?

7    A.   Yes.

8    Q.   So did you locate Ms. Perez?

9    A.   We did.

10   Q.   When was that?

11   A.   We located here in July of 2017.

12   Q.   Where was she during that time period?

13   A.   She was at the Retama Manor West Nursing Facility

14   in Laredo.

15   Q.   What's -- can you describe for the jury what she

16   was like, what her condition seemed like?

17   A.   She had had multiple strokes over the previous

18   decade, so she was limited in -- in movement.  She was

19   bed bound, meaning she couldn't -- she couldn't get up

20   without major assistance, she couldn't be transported

21   without -- without major assistance.  Had -- really only

22   had use of one side of her body, she could achieve like

23   gross movements with one side, but the other -- the

24   other hand she could manipulate a little bit better.

25   Q.   Was she on hospice at that time?

1    A.   She was on hospice.

2    Q.   And this is 2017?

3    A.   Yes.

4    Q.   So at that point how long had it been since

5  that -- that initial certification we looked at that was

6  September 2013?

7    A.   It -- it had been about a little over three

8  years.

9    Q.   So she had been on hospice for over three years

10  at that time?

11    A.   Yes.

12    Q.   Now, after that time in 2017, did you have an

13  occasion to see her again?

14    A.   Yes, I did.

15    Q.   When was that?

16    A.   July of 2019.

17    Q.   Where was she in July of 2019?

18    A.   At the same nursing facility in the same room,

19  same bed.

20    Q.   Anything stand out to you about that visit?

21    A.   To the non-medical professional, she did not

22  appear to have -- her condition didn't appear to have

23  changed drastically.  I -- I couldn't tell you if she

24  was better or worse than what she had been previously,

25  but she was -- when I walked in, she smiled and she

1    waved at me.

2        Q.   Did they she appear to recognize you from your

3    prior visit?

4        A.   Yes, she --

5              THE COURT:   Go ahead.

6              THE WITNESS:   She -- she -- she smiled and

7    she waved and she said something in Spanish, which my

8    Spanish is horrible, I did understand El Guero, so I

9    knew she was talking to me, she -- and nurse looked at

10   me and said --

11             MR. GUERRA:   Objection, Your Honor, calls

12   for hearsay.

13             MR. TONY CANALES:   That's hearsay.

14             THE COURT:   Please don't refer to what other

15   people said.

16             THE WITNESS:   Yes, Your Honor.

17             THE COURT:   And for those of you who don't

18   understand Spanish, El Guero means either light skinned

19   or blonde individuals.   All right.   Please proceed.

20       Q.   (By Mr. Swartz)   I assume she wasn't referring to

21   your blonde hair?

22       A.   I wish had hair.

23       Q.   Okay.   So -- so this is -- this is summer of

24   2019?

25       A.   Yes.

1        Q.   So at this point, how long had it been since

2    Francisco Pena had placed Ms. Perez on hospice?

3        A.   It had been over five years.

4        Q.   And in the summer of 2019 was Ms. Perez on

5    hospice?

6        A.   No.

7        Q.   So I want to switch topics a little bit.

8             As part of a your investigation, earlier you

9    mentioned that sometimes investigators, as part of their

10   health care fraud investigation will look at bank

11   records.  As part of your investigation into the Merida

12   Group, did you look at bank records?

13       A.   Yes, we did.

14       Q.   And did you identify whether there were payments

15   from the Merida Group to Francisco Pena?

16       A.   Yes.

17       Q.   Ms. Leal, can we pull up Government's Exhibit

18   H-17.

19            What is that?

20       A.   This is a check from Professional Hospice Care

21   paid to the order of Dr. Francisco Pena.

22       Q.   Is that the -- the Rodney Mesquias company we

23   were talking about earlier?

24       A.   Yes.

25       Q.   What's the check amount?

1     A.   $2,000.

2     Q.   And do you see that there's a memo line down at

3  the bottom?

4     A.   Yes.

5     Q.   What does that memo line say?

6     A.   February 2014, services and $500 face-to-face.

7     Q.   As a health care fraud investigator, have you

8  looked at checks in other cases?

9     A.   Yes, I have.

10    Q.   And is there anything that investigators are

11 looking at with respect to specifically checks to

12 doctors?

13    A.   Ways that they might justify, or -- or veil

14 the -- a kickback.  In the case of a kickback case, ways

15 they might veil it because they know most medical

16 professionals know that a kickback is illegal so they're

17 not going to say in the memo line this is for an illegal

18 kickback relationship, they -- they would either leave

19 it blank or call it something else to try to explain it.

20    Q.   And can you explain to the jury how kickbacks are

21 sometimes concealed in checks?

22    A.   They -- they might use that memo line and say

23 this is for services rendered, or for medical

24 directorship fee.  That's, especially working in South

25 Texas, I learned that was a very common technique that

```
1    was used is to explain medical directorship fee or fee

2    for services when at times for services --

3                 MR. GUERRA:  Your Honor -- I'd object, Your

4    Honor, to the narrative, and also the speculation on

5    other cases that have no bearing on the case before the

6    jury.

7                 THE COURT:  That's overruled.  I'll allow

8    the question.

9    Q.  (By Mr. Swartz)  Did you finish your answer?

10   A.  Just -- just that the -- that was a technique

11   that we -- we learned was common in -- in our

12   investigations in other cases.

13   Q.  Ms. Leal, can you please pull up Government's

14   Exhibit H-18.

15        Is that another check from Professional Hospice

16   Care to Francisco Pena?

17   A.  Yes.

18   Q.  And what's the amount of that check?

19   A.  $2,000.

20   Q.  And Ms. Leal, can you pull up Government's

21   Exhibit H-19.

22        Is that another check from Professional Hospice

23   Care to Francisco Pena?

24   A.  Yes.

25   Q.  What's the amount of that check?
```

```
 1        A.   $5,000.
 2        Q.   And what is the memo line say?
 3        A.   Medical, M.D. so med -- medical directorship
 4   August and September services.
 5        Q.   And whose signature is on that check?
 6        A.   Rodney Mesquias.
 7        Q.   Now, I've shown you three examples of checks.
 8   Did you see other checks as you were reviewing
 9   Merida bank records?
10        A.   Yes, we did.
11        Q.   Approximately, how many checks did investigators
12   identify between the Merida Group and Francisco Pena,
13   or, strike that.
14             How many checks did investigators identify that
15   were from the Merida Group to Francisco Pena?
16                  MR. TONY CANALES:   I'm going object to the
17   form of the question what other investigators did,
18   that's not proper, Your Honor.
19                  THE COURT:   Overruled.   Answer if you know.
20                  THE WITNESS:   It was, approximately, 57
21   checks.
22        Q.   (By Mr. Swartz)   What was the approximate amount
23   of those 57 checks?
24        A.   Approximately, $108,000.
25        Q.   And over what time period are we talking about?
```

1     A.   It was roughly 2012 to 2016.

2     Q.   Now, earlier you were mentioning sources, or

3   confidential sources.  Did you use any confidential

4   sources in connection with the Merida investigation?

5     A.   Yes.

6     Q.   Who was your confidential source?

7     A.   Initially, it was Edgar Jimenez.

8     Q.   And did Mr. Jimenez have any connection to the

9   Merida Group?

10     A.   Yes, he had previously served as a chaplain for

11   the Merida Group.

12     Q.   Did -- as he was a chaplain with the Merida

13   Group, did he have contact with Francisco Pena?

14     A.   Yes, because Francisco Pena was the medical

15   director.

16     Q.   Ms. Leal, can you pull up Government's Exhibit

17   E-20, page 648.

18          Focusing on the top, is this a hospice IDG

19   comprehensive Assessment and Plan of Care Update report?

20     A.   Yes.

21     Q.   Who is the patient?

22     A.   Francisca Perez.

23     Q.   And is there a physician listed there?

24     A.   Yes.  You said is there a physician?

25     Q.   Is there a physician listed there?

1    A.   Yes, Francisco Pena.

2    Q.   And is there a medical director listed there?

3    A.   Francisco Pena.

4    Q.   Now, going to the next page, which is

5    Government's Exhibit E-20, page 649.

6         Now, there's some signatures on that middle part?

7    A.   Yes.

8    Q.   It says, meeting summary and IDG team members; do

9    you see that particulate?

10   A.   Yes.

11   Q.   Whose name is by the -- the part that says

12   pastor/counselor?

13   A.   Edgar Jimenez.

14   Q.   Is that the confidential source you were talking

15   about?

16   A.   Yes, sir.

17   Q.   And whose name is under Mr. Jimenez?

18   A.   Francisco Pena.

19   Q.   So -- so focused on the summer of 2017, where was

20   Mr. Jimenez?

21   A.   2017, Mr. Jimenez was a co-owner of a hospice and

22   home health group known as Generous.

23   Q.   Did he still have contact with Francisco Pena?

24   A.   Yes.

25   Q.   So what's Mr. Jimenez with Generous Home Health

1    and Hospice, what kind of contact did he have with

2    Francisco Pena?

3        A.   Francisco Pena had provided a business loan to

4    Mr. Jimenez and his co-owners, and he also served as the

5    medical director of their hospice.

6        Q.   And you mentioned -- we're -- that's in speaking

7    with Mr. Jimenez, were there any other confidential

8    sources you used?

9        A.   Yes, his co-owner Mr. Jose Aguilar.

10       Q.   Co-owner of Generous?

11       A.   Of Generous, yes.

12       Q.   Did Mr. Aguilar prior to this have any contact

13   with -- with Merida, did he have any relationship with

14   the Merida Group?

15       A.   Yes, Mr. Aguilar was a registered nurse, and

16   early in his career as a -- as an RN, he worked for

17   Merida.

18       Q.   Did he have any prior contact with Francisco

19   Pena?

20       A.   Yes.

21       Q.   Now, did the confidential sources, Mr. Jimenez

22   and Mr. Aguilar, tell you anything that led you to

23   believe that they would be useful in investigation of

24   Merida?

25       A.   They -- they shared with us that Mr. Pena was

 1    their medical director, and they shared that he had, on

 2    multiple occasions, asked them for -- for kickbacks

 3    to -- to build up their -- their census.

 4         They were a new hospice and home health company

 5    trying, you know, trying to make it and he -- he offered

 6    them patients but the understanding was the patients

 7    come at a cost.

 8         Q.   And you said "he", are you referring to Francisco

 9    Pena?

10         A.   Yes, sorry.

11         Q.   Did you end up using the confidential sources,

12    Mr. Jimenez and Mr. Aguilar in your investigation?

13         A.   Yes, we did.

14         Q.   How did you use them?

15         A.   Initially, for informational purposes.  They

16    provided information and insight into an industry that I

17    don't have ready access and -- and, eventually, we used

18    them to pay a controlled kickback to Mr. Pena.

19         Q.   A controlled kickback, what does that mean?

20         A.   It means that a kickback in a -- in itself is an

21    illegal activity.  What we do is we -- we fill out

22    paperwork and get authorization to conduct otherwise

23    illegal activity so that -- that allows our sources to

24    use FBI money to go pay a kickback.  And -- and then we

25    monitor the activity through various devices.

1      Q.   And who would this kickback be paid to?

2      A.   Francisco Pena.

3      Q.   So earlier when we were looking at the slide of

4  the Merida Group operations, their operations span a

5  wide, geographic area, why focus on Francisco Pena?

6      A.   Because he had such a high volume of -- of

7  patients, high volume of Merida patients, but also just

8  across the board numerous hospice patients.

9           And it's -- it's just one phase of an

10  investigation.  We -- you know, we go through these

11  information gathering phases where we're -- we're mostly

12  working in -- staring at a computer screen and just

13  doing paperwork, and then we have other phases where

14  we're out talking to people, and then we have -- there

15  come -- comes a phase where you -- you need people that

16  are higher up in an organization, or people with more

17  access to -- to achieve more in -- in your investigation

18  so -- we -- we looked at Francisco Pena just because it

19  is clear that he was a very involved in this.

20           So if we knew that if we could ultimately get his

21  cooperation, then that would -- that would do tremendous

22  things for -- for our investigation and for justice.

23      Q.   Now, ultimately, were you successful in using

24  Mr. Jimenez and Mr. Aguilar to pay kickbacks to

25  Francisco Pena?

1     A.   Yes.

2     Q.   Now, you mentioned -- earlier you mentioned

3   getting authorizations for the kickbacks?

4     A.   Yes.

5     Q.   How -- how exactly is that handled?

6     A.   Before the kickback is made, we do a -- a form

7   that's -- we refer to just as an OIA, otherwise illegal

8   activity, and in it, that we spell out exactly what we

9   plan to do and give a date range of -- we plan to pay

10  these kickbacks to this person using these sources and

11  we -- we don't refer to them by name, we keep -- we use

12  code names and -- and the randomly assigned numbers so

13  as not to divulge their identity prematurely.

14        And whenever I fill out that form, I have to have

15  it signed by a supervisor and by his supervisor and then

16  by -- we have staff attorneys, essentially, that also

17  have to approve it.

18    Q.   And is the authorization only to do those

19  specific acts?

20    A.   Yes.

21    Q.   It's not a blanket authorization to do whatever

22  they want?

23    A.   Those specific acts in that specific date range.

24    Q.   Can you give the jury sort of an idea of what led

25  up to the actual kickbacks themselves?

1      A.   Yes.   Like I said, we had done multiple

2    investigative steps up to this point, and we -- we knew

3    that there was a kickback deal on -- just on the table

4    waiting.   The sources to push it off whenever Mr. Pena

5    would ask them about it, ask them about the money and

6    about, you know, if you want patients, I have them

7    ready.

8           He -- the -- the sources would tell him that they

9    didn't have any money, and leading -- leading up to

10   that, they -- they -- they told us just, we are ready

11   when you are, we -- we had conversations about it and

12   they said we're ready when you are, so as soon as my

13   authorization came through and the money came from the

14   health care fraud unit in Washington D.C., sorry, that's

15   part of the FBI, our -- the FBI health care fraud unit,

16   when the money came down, I was able to set up a meeting

17   with the sources at a previously determined location

18   and --

19     Q.   Let me stop you.

20     A.   Yeah.

21     Q.   You mentioned there was a deal on the table.

22   What was your understanding of the deal on the table

23   was?

24     A.   That Generous would pay money to Francisco Pena

25   and he would in turn provide patients, so a kickback.

1    Q.   How much money?

2    A.   $5,000.

3    Q.   And eventually was there a covert recording done?

4    A.   Yes, there was.

5    Q.   When was the first recording?

6    A.   The first one was on August the 3rd of 2017.

7    Q.   So if you could just walk the jury through what

8    happened leading up to the August 3rd recording.

9    A.   Like I mentioned, the -- the deal had been

10   discussed and we had done all of our paperwork on the

11   back end, and we -- we met with the sources at a

12   previously determined location where I provided them

13   with the money for the kickback as well as a covert

14   recording device.

15   Q.   What happened next?

16   A.   They -- I -- I gave Mr. Jimenez wore the

17   recording device on the first one, and -- do you want me

18   to talk about the device?

19   Q.   Could you just describe -- you talked about a

20   recording device, explain to the jury what that is?

21   A.   So we can -- basically, we have people that are

22   way better at this than me that can hide a recording

23   device in just about anything, and in this case we used

24   a button cam and it is what it sounds like.

25        So if I'm wearing a -- if I was wearing a button

1   cam right now, the -- that button hole right there might

2   have a itty-bitty camera inside of it, and then another

3   button hole on the same button would have a microphone.

4   And not real handy when I have a tie on, but let's

5   assume I'm not wearing a tie.  If I'm wearing a button

6   cam, I turn this way, my camera is looking at you, it's

7   looking wherever I'm looking as long as that button is

8   facing the same way as my face.

9        Sometimes that doesn't always work, sometimes the

10  shirt is a little bit wrinkled like that so then the

11  camera will -- it's going to look wherever the button

12  looks.  The fall back on that is that there's a

13  microphone in there; the microphone hears everything.

14  Q.  So even if the camera is pointing at the ceiling,

15  are you still going to capture audio?

16  A.  Yes, even if -- if my hands are folded because I

17  forget that I'm wearing a button cam it's going to still

18  capture.

19  Q.  Now, you mentioned some -- some money, this deal

20  on the table, how much money was going to be paid at the

21  first recording?

22  A.  The first kickback was $2,500.

23  Q.  Ms. Leal, can you pull up Government's Exhibit

24  C-5.

25       Is that a picture of the $2,500?

1    A.   Yes.

2    Q.   So walk us through.  So the source, the

3  confidential source has the camera.  Which -- which of

4  the sources had the camera?

5    A.   Mr. Jimenez.

6    Q.   And walk us through what happened, they were

7  given the camera, the cash, what happened next?

8    A.   We -- we provided the camera and the cash and

9  gave Mr. Jimenez a brief tutorial on how to work the

10  button cam, which we essentially have it -- have it down

11  to the point where everything is enclosed inside with

12  the exception of a little black button that he could

13  press the button to turn it off and then he could press

14  the button again to turn it off.

15        And that -- so that was the whole lesson that was

16  required for wearing the button cam and operating the

17  button cam.  Once he was comfortable with that, they

18  proceeded to their previously scheduled meeting with

19  Francisco Pena and --

20    Q.   Where was the meeting going to be?

21    A.   The meeting took place at Rio Bravo at City Hall.

22    Q.   And -- what happened next?

23    A.   They conducted their meeting.  When the meeting

24  was done, they placed a phone call to me and said we're

25  finished.

1           We met at the same location where I picked up the
2    button cam from them and asked them just -- a quick
3    debrief, which is essentially, hey, how did it go, what
4    happened, and -- and once the -- once the meeting was
5    done, I took the button cam back to the FBI office
6    where --
7        Q.   And during -- as the meeting was taking place,
8    were you able to watch and listen in real time?
9        A.   No, with the button cam we cannot live monitor.
10       Q.   So did you -- once the meeting was over, did you
11   collect the recording device from Mr. Jimenez?
12       A.   Yes, I did.
13       Q.   What happened -- what did you do with the
14   recording device?
15       A.   Took the device back to my office where I was
16   able to hook it up to one of our internal computers and
17   download the data.
18       Q.   And were you able to watch the video from that
19   recording?
20       A.   Yes.
21       Q.   Did you recognize any people in that recording?
22       A.   Yes.  I was not able to see Mr. Jimenez because
23   he's the one wearing the button, but I was able to
24   ver -- verify his voice, and as well as Mr. Aguilar, and
25   you can see him briefly in the video, and then I also

1  saw and heard Francisco Pena.

2     Q.  So I want to play if we could clip number one.

3        And this one is not in the transcripts.

4           (Video clip one playing.)

5     Q.  (By Mr. Swartz)  Okay.  So whose voice is that

6  that we heard?

7     A.  That is Mr. Jimenez.

8     Q.  And he said, this is -- or actually, he's --

9  he's talking, why is he narrating what's happening?

10     A.  He's -- we -- we told him, you know, basically

11  how to introduce the video, or how -- how to introduce a

12  recording when you first turn it on.  And we -- when we

13  do it, that's called a preamble so we typically will

14  include, here's who I am, here's what I'm doing, here's

15  the date and time and here's what I anticipate

16  happening.

17     Q.  And he said this is Ojos.

18     A.  Yes.

19     Q.  Why did he say this is Ojos?

20     A.  Like I said we don't refer to our sources by

21  their true name.  Ojos was a code name he had as a

22  source.

23     Q.  Why does the source have a code name, get

24  assigned a code name?

25     A.  Because what they do is dangerous.  He -- he --

1  our sources deal with all types of people committing all

2  types of acts, and I mean, they could have any number of

3  things happen as retribution if they found out to be a

4  source they could be killed?

5  Q.   Have sources been killed?

6  A.   Yes.

7  Q.   In the course of recordings or doing operation?

8  A.   Yes.

9         MR. GUERRA:  Your Honor, I'm going to

10  object, to think that this Ojos individual was in any

11  mortal danger going into Dr. Pena's office.  There's

12  been no indication or evidence that that was even the

13  case, and I object to this line of questioning and

14  testimony, ask that it be stricken from the record.

15         THE COURT:  That's overruled.  It was

16  proper.  Let's move on.

17         MR. SWARTZ:  Okay.

18  Q.   (By Mr. Swartz)  So could we continue?

19         (Audio clip playing.)

20  Q.   (By Mr. Swartz)  It's kind of hard to -- well, to

21  make out.  There's a building there; do you see that?

22  A.   Yes.

23  Q.   What building is that?

24  A.   That's City Hall for Rio Bravo, Texas.

25  Q.   And when you watched the video, were you able to

1    see whether or not a kickback payment was made to

2    Francisco Pena?

3        A.  Yes, there was.

4        Q.  Ms. Leal, can you please play clip number two.

5    And this was one is in the transcripts.

6            THE COURT:  Well, ladies and gentlemen,

7    Mr. Swartz, let's be careful.

8            MR. SWARTZ:  Yes, Your Honor.

9            THE COURT:  There's a distinction between

10   the transcripts that are admitted and the aid.  And I

11   think you're referring to the aid as the transcripts,

12   correct?

13           MR. SWARTZ:  Yes, Your Honor.

14           So if we're -- for the sake of clarity, the

15   clip that the Government is about to play is from

16   Government's Exhibit C-3, video number three from 30

17   seconds to one minute and seven seconds.  And it is in

18   the transcripts that are in evidence, which is

19   Government's Exhibit C-4 from page 12 to 14.

20           THE COURT:  And the excerpt is also part of

21   the aid that was handed to the jury; is that correct?

22           MR. SWARTZ:  Yes, Your Honor.

23           THE COURT:  I'm just -- for the record

24   distinguish between the aid that's been handed to the

25   jury and the transcripts that are -- are actual

1  exhibits.

2                   MR. SWARTZ:  Yes, Your Honor.

3                   THE COURT:  All right.

4                   Please proceed.

5     Q.  (By Mr. Swartz)  Agent Williams, do have you a

6  copy of the aid?

7     A.  I do not.

8                   MR. SWARTZ:  May I approach the witness,

9  Your Honor?

10                   THE COURT:  You may.

11     Q.  (By Mr. Swartz)  Okay.  So for clarity on the

12  record, with respect to the aid, the clip that's about

13  to be played is for -- is from pages one through two of

14  the aid.

15          Ms. Leal, would you please play that clip.

16               (Audio clip playing.)

17     Q.  (By Mr. Swartz)  So agent Williams, what do we

18  see on the video right there?

19     A.  You can see Francisco Pena in the background and

20  the -- the hands of the source, Mr. Jimenez, counting

21  out the money that's going to be paid as a kickback.

22     Q.  And the money that we see in the image there, is

23  that the cash we looked at previously in Government's

24  Exhibit C-5?

25     A.  Yes.

1            MR. TONY CANALES:  Judge, at this time, we'd

2    like to renew our request for that special instruction.

3            THE COURT REPORTER:  Would you please use

4    the microphone, Mr. Canales.

5            MR. TONY CANALES:  At this time, Your Honor,

6    I'd like to renew my request for the special instruction

7    that I requested from the Court in the absence of the

8    jury that the Court has already ruled on it.

9            I'd like for the Court to reconsider it and

10   we'd like for the Court to give that special instruction

11   as we speak right now.

12           THE COURT:  The request is denied.

13           MR. CYGANIEWICZ:  Your Honor, I join in that

14   for the record.

15           THE COURT:  Request is denied.

16           Thank you, gentlemen.

17           Please proceed.

18   Q.  (By Mr. Swartz)  Ms. Leal, would you please

19   continue.

20           (Audio clip playing.)

21   Q.  (By Mr. Swartz)  Special Agent Williams, there

22   was a mention in there where Francisco Pena said we were

23   expecting a lot more than that.  What is he referring

24   to?

25           MR. GUERRA:  Your Honor, I'm going to

1    object.   That calls for speculation.

2               THE COURT:  Overruled.

3               THE WITNESS:  It -- he's counting out the

4    money and tells him it's $2,500, so based on the video,

5    it looks like he's referring to the money, expecting

6    more money.

7    Q.  (By Mr. Swartz)  Then on page 2 of the aid at the

8    top, Francisco Pena says, I just gave you nine patients,

9    what the fuck do you want?  Do you know how much I can

10   get from somebody else for 25, for nine patients?

11          What is your understanding what he's referring to

12   there?

13              MR. GUERRA:  Your Honor, again, I'm going to

14   object to the Government testifying through this

15   witness.  It's leading and also again asking for a

16   question that calls for speculation as to what Dr. Pena

17   was thinking at the time he uttered the statement.

18              THE COURT:  That's overruled.  He's

19   referring to what he's referring to in the transcript.

20              Overruled.

21              THE WITNESS:  Again, he's talking about the

22   patients in exchange for a kickback.

23   Q.  (By Mr. Swartz) And Francisco Pena is saying how

24   much he can get from somebody else.  From observing this

25   video, did you get the impression that Francisco Pena

1   was knew to accepting kickbacks?

2       A.   No.

3       Q.   Now, I'm going to come back to this particular

4   recording from August 3rd, but I want to ask you about a

5   later recording.   Later on in the investigation, did you

6   have the -- an opportunity to meet with Francisco Pena?

7       A.   Yes.

8       Q.   When was that?

9       A.   October the 27th of 2017.

10      Q.   Did you record that -- excuse me, did you record

11  that particular interview?

12      A.   Yes.

13      Q.   And so we saw in this -- in the clip that we just

14  played, that was just played a kickback payment, in the

15  interview you had with Francisco Pena on October 27,

16  2017, did you ask him if he ever provided patients in

17  exchange for kickbacks?

18      A.   Yes, I did.

19      Q.   And how did he respond?

20      A.   He at first responded indirectly, and then

21  eventually, after -- after a couple of minutes, he

22  provided an answer of, no, that he had never done that.

23      Q.   Okay.   The Government's going to play another

24  clip.   This is from Government's Exhibit C-9 from three

25  minutes and 28 seconds to six minutes and 17 seconds and

1    it's also in the transcript which is in evidence,

2    Government's Exhibit C-10 at one through two, but since

3    the clip is in English it's not in this particular aid

4    that was provided to the jury.

5         Ms. Leal, could you please play clip number

6    three.

7              (Audio clip playing.)

8    Q.   (By Mr. Swartz)  All right.  So the clip we just

9    listened to, we could hear your voice, who was the other

10   voice that we heard?

11   A.   Francisco Pena.

12   Q.   And did he answer your question at first?

13   A.   At first, no.

14   Q.   What -- what was he talking about there at the

15   beginning?

16   A.   He first responded that he was a medical director

17   for several different companies, and we -- we know

18   through the investigation that that is a commonly used

19   technique to -- to veil a kickback payment is to assign

20   the title of medical director.

21   Q.   And did you re-ask the question after he didn't

22   answer it the first time?

23   A.   Yes.

24   Q.   And then -- then when he answered your question,

25   what did he say?

1    A.  He said no.

2    Q.  And based on your investigation and the recording

3 you did on August 3rd, was that a lie?

4    A.  Yes.

5    Q.  Now, there was a couple references in there

6 when -- at the first part when he wasn't answering your

7 question he mentioned Generous; do you recall that?

8    A.  Yes.

9    Q.  What Generous was he referring to?

10    A.  Generous Home Care, the -- the he home health and

11 hospice company owned by Mr. Jimenez and Mr. Aguilar.

12    Q.  Who paid him the kickback?

13    A.  Yes.

14    Q.  And there was also a reference to a Friends?

15    A.  Yes.

16    Q.  Are you familiar with a Mr. Castillo?

17    A.  Yes.

18    Q.  What relationship, if any, does Mr. Castillo have

19 to Friends?

20    A.  Mr. Castillo is the owner of Friends as well --

21 as well as a couple of other home health companies in

22 the area.

23    Q.  And was there a reference to Mr. Castillo and

24 Friends in one of the other recordings you did?

25    A.  Yes, there was.

1    Q.   Okay.  We're going to come to that.  But -- so

2    that -- the question -- the clip we just listened to,

3    was that the only time in that August -- the October

4    27th interview with Francisco Pena where the subject of

5    kickbacks came up?

6    A.   No.

7    Q.   Did you ask him -- did it come up again?

8    A.   It did come up again.

9    Q.   Ms. Leal, can you please play clip number four,

10   which for the record is Government's Exhibit C-9 from 39

11   minutes and 15 seconds to 40 minutes and 22 seconds, and

12   is in the transcript that's in the -- in evidence as

13   Government's Exhibit C-10 at page 7.

14         But Special Agent Williams, the clip we're going

15   to listen to is in English, so it's not in the aid

16   that's in front of you?

17              (Audio clip playing.)

18   Q.   (By Mr. Swartz)  So in -- in that portion of the

19   recording where Francisco Pena says -- denies that he

20   gives patients for payments, based on your investigation

21   and the recording -- other recordings you did was that a

22   lie?

23   A.   Yes.

24   Q.   All right.  So I want to go back, we kind of

25   jumped forward in time, I want to go back to that August

1    3rd, 2017 recording.

2         When you listen to that recording, was there any

3    references by Dr. Pena about threatening to take

4    patients away from a company if he wasn't paid

5    kickbacks?

6         A.   Yes, there was.

7         Q.   What did he say?

8         A.   He made a reference to another company that he

9    was conducting business with, and he -- he -- he said

10   that they, you know, if they don't pay him and he --

11   he'll take the patients.

12        Q.   Ms. Leal, we're going to play clip number five,

13   which is on page 3 of the aid that's in front of you,

14   Special Agent Williams, and that's -- to be exact, it's

15   pages 3 through 6.

16        And for the record it is -- the portion that's

17   going to be played is from Government's Exhibit C-3,

18   video number four from one minute and ten seconds to two

19   minutes and 32 seconds, which is in evidence.  And the

20   transcript which is in evidence is Government's Exhibit

21   C-4, pages 26 to 28.

22             (Audio clip playing.)

23        Q.   (By Mr. Swartz)  So in that portion we just

24   heard, first of all do you recognize the individual

25   that's in the image in the recording?

1      A.   Yes.

2      Q.   Who is that?

3      A.   That's Francisco Pena.

4      Q.   And there was some -- some other voices you

5   heard, who -- who were they?

6      A.   That was Mr. Jimenez and Mr. Aguilar.

7      Q.   Now, I want to focus on -- at one point Francisco

8   Pena says, Vatito, you have 45 patients that belong to

9   me, 45.  Do you patients belong to doctors?

10     A.   No.

11     Q.   And then he says, if you don't give me at least

12  two grand a month, I'm not going to send you anymore and

13  I'm going to take them away, take them from you, all

14  right?  So is that a reference to a kickback

15  relationship with someone else?

16     A.   Yes.

17               MR. GUERRA:   Objection, Your Honor, calls

18  for speculation.

19               THE COURT:   Overruled.

20     Q.   (By Mr. Swartz)  And he mentions a Castillo, is

21  that the Castillo you mentioned earlier?

22     A.   Yes.

23     Q.   And what company is Mr. Castillo connected to?

24     A.   Friends and Friendly and Del Ama.

25     Q.   And so what's your understanding of what's

Francisco Pena saying here?

A. He's -- it sounds like he's putting himself in that conversation that he -- he had had with Mr. Castillo, and he's saying if -- he's saying that if Mr. Castillo isn't going to give him the amount of money that he wants then he'll take patients away.

Q. Ms. Leal, you can continue.

(Audio clip playing.)

Q. (By Mr. Swartz) So at the end of that clip, Francisco Pena says, my business is to see how much I can get from you, from them and this other guy; isn't that right?

Based on your experience as an investigator and listening to these recordings, what does that suggest to you about the way Francisco Pena conducts business?

A. It suggests that the -- the goal of his health care business is to -- to make money, to -- and whether it be through legitimate -- legitimate thing or a kickback.

Q. And within the context of what's being discussed about the relationship he has with Mr. Castillo and Friends what is the way that he makes money?

A. Through conducting as many kickback relationships as he can with as many people as he can.

Q. All right. So now I'm going to jump back to that

1    October 27 interview that you had with Francisco Pena.

2         When you interviewed Francisco Pena in October of

3    2017, did the clip that we just listened to where he's

4    referring to taking patients away from Friends if he's

5    not paid, did that particular clip lead you to ask

6    Francisco Pena any questions?

7         A.   Yes, it did.

8         Q.   What question did you ask him?

9         A.   We asked him if he had ever taken patients

10   from -- off of one company and put them on another.

11        Q.   So at this point the Government's going to play

12   clip from that particular interview.  It's not in the

13   aid that's in front of you because it's in English, but

14   it is from, for the record, from Government's Exhibit

15   C-9 from 33 minutes and 56 seconds to 35 minutes and 30

16   seconds and it's in the transcript which is in evidence

17   at Government's Exhibit C-10 at page 5?

18              (Audio clip playing.)

19        Q.   (By Mr. Swartz)  So towards the end there,

20   Francisco Pena said, I didn't say, oh, you can't pay me

21   I'm not -- I'm going to take my patients away, no, so

22   he's -- what's your understanding of that statement?

23        A.   That he's saying that he has never moved patients

24   for lack of payment.

25        Q.   And based on what you heard in the August 3rd

1    recording, was that a lie?

2        A.   Yes.

3        Q.   And at the end, he also said that's not ethical.

4    Did the -- does that demonstrate Francisco Pena's --

5    Pena's awareness that it's wrong to tell Castillo he's

6    going to take his patients away if he doesn't get paid?

7        A.   Yes.

8        Q.   So I'm going to jump now back to the August 3rd,

9    2017 recording.

10            During that recording that was done by the

11    sources, did Francisco Pena say anything about whether

12    he would keep patients alive in order to keep hospice

13    patients alive in order to increase his revenue?

14        A.   Yes, he did.

15        Q.   And what do you recall about what he said?

16        A.   He -- it -- it seemed like he was mentoring with

17    reference to a patient that -- that had died, that

18    Generous had that had died on hospice and he -- he was

19    telling them how he had an identical patient who, you

20    know, had a -- had an identical situation and was

21    elderly and how he was able to keep that patient alive.

22        Q.   So I'll play clip number seven, which is on page

23    7 of the aid that's in front of you, Special Agent

24    Williams, it's pages 7 to 8.

25            And for the record, it is from Government's

1    Exhibit C-3, video number three from two minutes and 23

2    seconds to three minutes and four seconds.  And the

3    transcript is in evidence at Government's Exhibit C-4

4    from pages 15 to 16.

5              (Audio clip playing.)

6        Q.  (By Mr. Swartz)  So earlier in the -- the portion

7    we just listened -- listened to Francisco Pena says, los

8    dejamos murier, (speaking Spanish.)  Or they're -- he's

9    saying that they're letting them die.  What is your

10   understanding what he's referring to here?

11       A.  He's commenting that the -- the sources,

12   Mr. Jimenez and Mr. Aguilar, are acting out of line with

13   the business process because they're allowing hospice

14   patients to die.

15       Q.  And these are hospice patients?

16       A.  Yes.

17       Q.  Now, I'm going to jump to another recording.  Did

18   this particular topic keeping hospice patients alive as

19   a business practice, or extending the life of hospice

20   patient, did that come up in any other recordings?

21       A.  Yes, it did.

22       Q.  Which one?

23       A.  It was a recording provided to us by Mr. Rene

24   Cervantes.

25       Q.  Who is Rene Cervantes?

1      A.   Rene Cervantes at the time of our investigation

2   was the Chief of Police for the City of Rio -- sorry,

3   the City of Rio Bravo.

4      Q.   And during that time was Francisco Pena the Mayor

5   of Rio Bravo?

6      A.   Yes.

7      Q.   As police chief, did Mr. Cervantes or Chief of

8   Police Cervantes did he have meetings with Francisco

9   Pena?

10     A.   Yes, did he.

11     Q.   Did he record meetings he had with Francisco

12  Pena?

13     A.   Yes.

14     Q.   And so Mr. Cervantes brought this recording to

15  you?

16     A.   He did, he volunteered it to us.

17     Q.   What was your understanding of why he brought the

18  recording to you?

19     A.   Mr. Cervantes had come to the FBI agent -- FBI

20  office numerous times with things that he thought maybe

21  were bigger than a city issue that he wasn't sure if

22  they rose to the federal level.  So for him to come to

23  our office and -- or call and say, hey, I've seen this

24  thing happen wasn't unusual and this was just another

25  occurrence of that where he provided information to us.

1    Q.   And, approximately, what time period did you get

2   that recording from Mr. Cervantes?

3    A.   It was about September of 2017.

4    Q.   When you -- did you listen to the recording?

5    A.   Yes, I did.

6    Q.   Were you able to identify whether Francisco

7   Pena's voice was on that recording?

8    A.   Yes, it was.

9    Q.   How were you able to identify him?

10    A.   Mr. Pena?

11    Q.   Francisco Pena, correct.

12    A.   By -- by his voice.  I -- I have listened to --

13   at that point I had listened to the August 3rd recording

14   and there's another recording that was from August the

15   18th and I had had an -- couple of in-person

16   conversations with Mr. Pena about other issues.

17    Q.   And did you recognize the voice of Mr. Cervantes

18   on that recording?

19    A.   Yes.

20    Q.   And on that recording, did Francisco Pena make

21   any comments about keeping patients alive in order to

22   make money?

23    A.   Yes, he did.

24    Q.   What do you recall about what he said?

25    A.   That he -- he said the way you make money is by

 1    keeping them alive as long as possible.

 2        Q.   And Government's going to play clip number eight,

 3    which is on page 9 through 12 of the aid.

 4            And for the record, this particular clip is from

 5    Government's -- Government's Exhibit C-1, which is in

 6    evidence, from one hour, six minutes and 20 seconds to

 7    one hour, eight minutes and 45 seconds.  And the

 8    transcript for that portion is in evidence as

 9    Government's -- Government's Exhibit C-2, pages 14 to

10    16.

11                (Audio clip playing.)

12        Q.   (By Mr. Swartz)  So first of all, do you

13    recognize the voice of Francisco Pena in that recording?

14        A.   Yes.

15        Q.   You recognize his voice as the -- as the person

16    that says, and the way you make money is by keeping them

17    alive for as long as you can?

18        A.   Yes.

19        Q.   What -- what stood out to you about that

20    particular comment?

21        A.   About that comment?

22        Q.   Yes.

23        A.   He's supposed to be the medical director for a

24    hospice company.  He's supposed to be in hospice,

25    they're supposed to grant a patient, or a family of

1    patient's witness -- a family of a patient's wishes

2    by -- by the time they've gotten on hospice they should

3    understand this is time to die with dignity, not to seek

4    life extending or curative measures.  So keeping a

5    patient alive -- a hospice patient alive as long as you

6    can doesn't line up with that.

7                   (Audio clip playing.)

8        Q.  (By Mr. Swartz)  So Special Agent Williams, from

9    the context around this recording, could you identify

10   who Francisco Pena is talking about when he's saying

11   that son muy brutos, (speaking Spanish), or they're very

12   done, they don't understand, and he refers to them as

13   stupid, who is he referring to?

14       A.  Generous.  So Mr. Jimenez and Mr. Aguilar.

15       Q.  That's the company he refers patients to?

16       A.  Yes.

17       Q.  That's the company he's a medical director for?

18       A.  Yes.

19       Q.  And at the end there where he says, it's really

20   funny, I say to them you're killing the parities, I gave

21   you money, you idiots.

22            When he says, I gave you money, what is your

23   understanding what he's referring to, what is he

24   equating money with?

25       A.   Patients.

1    Q.  So did the -- did this particular recording, did

2   that corroborate and clarify that prior record -- that

3   reference that we heard in the August 3rd recording?

4    A.  Yes, it did.

5    Q.  How -- how so?

6    A.  Just the underlying theme of patients equal

7   money.  So if -- if I give you patients, I'm giving you

8   money, and that you -- you make as much -- you make your

9   money by keeping them alive as long as possible,

10  basically.

11   Q.  Okay.  Now, I'm going to jump back to that August

12  20 -- I mean the October 27th, 2017 interview where you

13  were speaking with Francisco Pena.

14        When you sat down across from Francisco Pena, did

15  you ask him, or -- let me ask it this way:  When you sat

16  down across from Francisco Pena, did the clips that we

17  just heard, that August 3rd, 2017 clip, the -- the clip

18  from the Rene Cervantes -- Cervantes recording, did that

19  prompt you to ask Francisco Pena any questions?

20   A.  Yes.

21   Q.  And what did you ask him?

22   A.  I -- I asked him if he -- if he'd ever kept

23  hospice patients alive unnecessarily.

24   Q.  What do you recall about his answer, how he

25  answered the question?

1      A.   That, again, he was initially indirect, didn't

2   provide a straight answer, and then when prompted

3   answered no.

4      Q.   I'm going to play clip number nine, which is

5   not -- it's not -- your interview with Francisco Pena,

6   it's not in the aid, but for the record this particular

7   piece of the recording is from Government's Exhibit C-9,

8   20 minutes and 20 seconds to 22 minutes and 23 seconds.

9   And the transcript for that particular recording is at

10  Government's Exhibit C-10 at three?

11            (Audio clip playing.)

12     Q.   (By Mr. Swartz)  There's -- there's a female

13  voice that interjected there and said, is that a no?

14  Whose voice is that?

15     A.   Special Agent Jaime Rice.

16     Q.   Did she go with you to that interview?

17     A.   Yes.

18     Q.   So at first in response to your answer of

19  Francisco Pena was talking about not pushing a patient

20  into death?

21     A.   Yes.

22     Q.   Is it -- is that the question you asked him?

23     A.   No.

24     Q.   With regard to actually extending life, what was

25  his answer?

1    A.   The final answer was no.

2    Q.   So -- and he said, you don't want to prolong

3  life?

4    A.   That's correct.

5    Q.   Based on what you heard in that August 3rd, 2017

6  recording, and the recording that was provided to you

7  from Rene Cervantes, was that statement a lie?

8    A.   Yes.

9         MR. CYGANIEWICZ:  Excuse me, Your Honor.

10 I'm not asking a break, but is it okay if I step out for

11 a minute?

12        THE COURT:  You need a break?

13        MR. CYGANIEWICZ:  I don't -- I don't want to

14 interrupt the jury, but is it okay if I just step out

15 for one moment?

16        MR. SWARTZ:  Your Honor, I'm going to switch

17 topics a little bit so this would actually be a good

18 time for the break, if it pleases the Court.

19        THE COURT:  Let's go.  Ladies and gentlemen,

20 let's take a very quick recess.

21        COURT OFFICER:  All rise for the jury.

22        (JURY OUT.)

23        THE COURT:  We'll be in recess and, sir, you

24 can take a break as well.

25        (Court in short recess.)

1            THE COURT:  The jury's ready?

2            Please remain standing for the jury.

3            COURT OFFICER:  All rise for the jury.

4            (JURY IN.)

5            THE COURT:  Thank you, everyone.  Please be

6    seated.  Please proceed.

7    Q.  (By Mr. Swartz)  Special Agent Williams, we

8    talked about an August 3rd, 2017 recording that was done

9    by the confidential sources; do you recall that?

10   A.  Yes.

11   Q.  Was there another recording done by those same

12   sources after that?

13   A.  Yes, there was.

14   Q.  When was the next recording?

15   A.  August the 18th of 2017.

16   Q.  And how did -- can you give the jury just an idea

17   of how that second recording came about?

18   A.  At the conclusion of the first meeting, based on

19   the -- the original kickback agreement, the sources

20   still owed Dr. Pena another $2,500, so another meeting

21   was going to be necessary to -- to pay him the money.

22        So leading up to it, it worked much like the

23   first -- the first meeting that took place where we met

24   the -- the sources, Mr. Jimenez and Mr. Aguilar, at a

25   previously determined location, provided them with the

1    button camera that I described before, and also provided

2    them with the additional $2,500.

3        Q.   And you said the -- the button camera, which

4    individual wore the button camera this time?

5        A.   This time Mr. Aguilar wore the camera.

6        Q.   The same type of recording device?

7        A.   Same -- same type of -- of camera.  It -- it --

8    it may have actually been the identical camera, we

9    just -- I remember we had to replace the button-head to

10   match the shirt he was wearing, he had a different color

11   buttons, we have extra button-heads for that so we -- we

12   matched it up with his shirt, we installed it, made sure

13   he understood how to work -- how to work it, where the

14   on/off switch was, and yeah.

15       Q.   And you mentioned some cash.

16            Ms. Leal, could you please pull up Exhibit C-A.

17   Is that a picture of the cash you're referring to?

18       A.   Yes.

19       Q.   $2,500?

20       A.   Yes.

21       Q.   Now, what happened -- so you equipped Mr. Aguilar

22   with the recording device, gave the cash to the sources.

23   What happened next?

24       A.   Once they were comfortable with the recording

25   device and understood what the -- what their role was

1    for -- for that meeting, they -- they proceeded to the

2    meeting with Dr. Pena.  This time they met at his

3    medical clinic in Laredo.  They conducted their meeting,

4    and then they placed a phone call to me, we met at a

5    previously determined location where I collected the

6    button cam from them.

7        Q.  Did you download the video from that button cam?

8        A.  Yes, I did.

9        Q.  Did you watch the video?

10       A.  I did.

11       Q.  From that video, were you able to tell where the

12   meeting took place?

13       A.  Yes.

14       Q.  Where did it take place?

15       A.  At the medical clinic, Dr. Pena's clinic.

16       Q.  Were you able to identify Francisco Pena on that

17   video?

18       A.  Yes.

19       Q.  Now, I'll play clip number 10, this is not in the

20   aid in front of you, it's just a short clip.  And for

21   the record it's Government's Exhibit C-6, video number

22   two from 25 seconds to 35 seconds.  It's a

23   ten-minute clip, I mean, ten-second, my apologies.

24   Ten-second clip.

25                   (Audio clip playing.)

1     Q.   (By Mr. Swartz)   There's a -- a building, you can

2    see very briefly there, what building is that?

3     A.   That is the medical clinic.

4     Q.   And from watching the video, and in connection

5    with your investigation, were there any statements by

6    Francisco Pena that were significant to your

7    investigation in relation to his awareness about whether

8    it's illegal to receive kickbacks for patient referrals?

9     A.   Yes.

10     Q.   And I'm going to play clip number 11, which is on

11    page 13 through 16 of the aid.   And for the record, it

12    is Government's Exhibit C-6, video number two from ten

13    minutes and 32 seconds to 12 minutes.   And the

14    transcript in evidence is Government's Exhibit C-7, page

15    9 to 11.

16                (Audio clip playing.)

17     Q.   (By Mr. Swartz) Okay.   So we're -- oh, first of

18    all, do you -- you can see the ceiling and looks like a

19    bookcase there.   Do you recognize what that -- where

20    that is?

21     A.   Yes, that's Dr. Pena's office.   And that --

22    basically, the -- the reason for the -- for the camera

23    angle, like I mentioned before, the button, wherever the

24    button faces that's what you see.   So apparently

25    Mr. Aguilar's shirt was probably wrinkled like that, or

1    if it was on that button maybe sitting on his stomach,

2    something like that, so that would be the reason that it

3    would look up.

4        Q.  And did you recognize the voice of Dr. Francisco

5    Pena there?

6        A.  Yes.

7        Q.  At that -- the clip that we just listened to of

8    Francisco Pena says, acureda te de una cosa (speaking

9    Spanish.)  He's saying it looks bad when one single

10   doctor is referring to one agency.

11           What's the significance of that particular

12   statement to your investigation?

13       A.  It shows that he's aware that one -- if one

14   doctor is referring all of their patients to one

15   hospice, or one home health, or if -- if -- from the

16   other side, if all of a company's patients are coming

17   from one doctor, then either -- either one of those

18   could be -- could look bad, could be an indicator of --

19   of a kickback relationship.

20       Q.  Is he coaching the sources?

21       A.  It appears so.

22               (Audio clip playing.)

23       Q.  (By Mr. Swartz)  Okay.  So there's a number of

24   references here.  There's reference to a Dr. Virlar.

25   Are you familiar with a Dr. Virlar?

1     A.   Yes.

2     Q.   Was that a doc -- the Dr. Virlar that was a

3   medical director for Merida?

4     A.   Yes, Jesus Virlar.

5     Q.   Oh, sure, my apologies.   There's a reference to a

6   Dr. Virlar, is it your understanding that's the

7   Dr. Virlar associated with Merida?

8     A.   Yes, that's Jesus Virlar.

9     Q.   And there's also a reference to a Castillo?

10     A.   Yes.

11     Q.   Is that the Castillo you referenced earlier as

12   being connected to Friends?

13     A.   Yes.

14     Q.   And then there's a reference to -- by the source

15   stating Rodney was given him like $600 per patient; do

16   you see that?

17     A.   Yes.

18     Q.   What significance do these references to these

19   individuals have to your investigation?

20     A.   He's -- he's talking about -- I -- he's talking

21   about Dr. Virlar as a potential avenue to make it --

22   make it where not all the referrals are coming from one

23   doctor to -- to follow the coaching that's being

24   provided by Dr. Pena and the -- Dr. Pena --

25                    MR. GUERRA:   Your Honor -- I'm sorry,

 1   Your Honor, I'm going to object to the characterization,

 2   that's not what either the aid, the transcript or the

 3   video produced.  Dr. Pena did not demonstrate any

 4   knowledge of Dr. Virlar, if fact, he said he didn't even

 5   know him.  The witness is trying to construe that

 6   Dr. Pena is coaching on how to relate with Dr. Virlar.

 7   I believe it's unclear with the testimony, I believe

 8   it's a mischaracterization of the testimony.

 9              THE COURT:  It's overruled.  You'll be able

10   to ask cross.

11      Q.  (By Mr. Swartz)  Okay.  So we can keep playing

12   the -- the clip.

13              (Audio clip playing.)

14      Q.  (By Mr. Swartz)  So where Dr. Pena says, they

15   caught some guys there that were doing the same thing,

16   they're in jail, and based on your investigation, what

17   is the significance of that comment in terms of the

18   potential awareness of Francisco Pena?

19      A.  He's -- they're talking about this kickback

20   relationship and how they're -- how they need to conduct

21   business going forward.  And Dr. Pena's warning that

22   somebody in Houston went to jail for this same thing so,

23   you know, that's like a word of caution is the way I

24   understand that.

25      Q.  Okay.

1                    (Audio clip playing.)

2      Q.   (By Mr. Swartz)  So after this portion we just

3    listened to, were you able to tell from the context of

4    the recording that the kickback payment was made to

5    Francisco Pena?

6      A.   Yes.

7      Q.   I'm going to play clip number 12, which is in the

8    aid at pages 17 -- from pages 17 to 21.  And for the

9    record, it's Government's Exhibit C-6, video number two

10   from 13 minutes and 30 seconds to 15 minutes and 35

11   seconds.  And the transcript is in evidence at

12   Government's Exhibit C-7 from pages 13 to 16.

13          Okay.  So looking at the screen, who do you

14   identify there?

15     A.   That's Francisco Pena.

16                    (Audio clip playing.)

17     Q.   (By Mr. Swartz)  Maybe a little difficult to make

18   out, but there's a female voice there.  Do you know

19   whose voice that?

20     A.   Maria Pena, Dr. Pena's wife.

21     Q.   I'm sorry?

22     A.   Dr. Pena's wife.

23     Q.   And according to the recording in the transcript

24   she says, otra vez (speaking Spanish.)  No check.  Which

25   she says, again, no check.  So what -- for your

 1   investigation, what is the significance of that, the

 2   reference to -- were the sources paying in cash?

 3       A.  Yes, the courses paid in cash again.

 4       Q.  So what significance to your investigation does

 5   it have that Ms. Pena references check?

 6       A.  She's used to receiving checks.

 7       Q.  Based on your investigation, how are -- how can

 8   checks be used in kickback schemes?

 9               MR. GUERRA:  Object, Your Honor.  Asked and

10   answered.

11               THE COURT:  That has been asked and

12   answered.

13               MR. SWARTZ:  Okay.  I'll move on.  We can

14   keep playing.

15               (Audio clip playing.)

16       Q.  (By Mr. Swartz) Okay.  So we're -- the source

17   says, it's 2500 or, son 2,500 (speaking Spanish.)  And

18   Ms. Pena says, like the last time.

19           What do you conclude from that exchange?

20       A.  That they have paid, and she's likening it to the

21   last time that they paid $2,500 on the August 3rd

22   recording.

23               (Audio clip playing.)

24       Q.  (By Mr. Swartz)  So a couple questions about that

25   part we just heard.

1          Right after paying the $2,500, what is the first

2     thing that Francisco Pena references?

3          A.   It looks like a reference to Ms. Pena telling

4     her, write it down so that you won't later say they

5     haven't paid us anything.

6          Q.   And if she doesn't write it down, what does the

7     source say will happen?

8          A.   That she'll forget and she'll give everything to

9     Transitions.

10         Q.   Based on the context, what is your understanding

11    of what everything refers to?

12         A.   Other patients.

13         Q.   And then after that, what does Francisco Pena

14    refer to?

15         A.   He says, who gives you nine patients in one week,

16    in two weeks?

17         Q.   So right after receiving kickback payment, he

18    refers to patients?

19         A.   Yes.

20         Q.   Okay.   Continue.

21              (Audio clip playing.)

22         Q.   (By Mr. Swartz)   So Special Agent Williams, does

23    Francisco Pena refer to Rodney Mesquias?

24         A.   Yes.

25         Q.   Does he refer to his understanding of the amount

 1    that Rodney Mesquias pays to medical directors?

 2        A.  Yes.

 3        Q.  And then he says, he never paid me; you see that?

 4        A.  Yes.

 5        Q.  Based on your investigation, did Merida pay

 6    Francisco Pena?

 7        A.  Yes, they did.

 8        Q.  How much?

 9        A.  They paid him over $108,000.

10        Q.  I want to go -- from this recording, I want to go

11    back to the October 27, 2017 recording where you

12    interviewed Francisco Pena.  I played some clips from

13    that; do you recall?

14        A.  Yes.

15        Q.  Now, can you focus on the -- on that interview

16    and how that came about?  Can you just tell the jury how

17    it came about that you were interviewing Francisco Pena?

18        A.  We -- we had achieved other objectives within the

19    investigation, learned information, collected evidence,

20    and we, before the interview, we had -- we had all of

21    these -- these unanswered questions that needed to be

22    answered to -- to progress in the investigation.  And we

23    determined that Francisco Pena seemed like the -- a guy

24    who might have a lot of those answers.

25        Q.  What was your -- what was your expectation or

1  hope that what would come out of this interview?

2      A.   Ultimately, we -- we wanted answers, and the best

3  way to get those answers is -- is through cooperation

4  with the Government.  We -- we use -- in -- in other --

5  in multiple investigations, we've -- we -- we use

6  statements from people who had been involved in a -- in

7  a scheme or conspiracy, and they -- they come forward

8  and cooperate with the Government.

9      Q.   Did you hope that Francisco Pena would cooperate

10  in your investigation of the Merida Group?

11      A.   Yes.

12      Q.   Did you hope that he would cooperate in your

13  investigation of Rodney Mesquias and Henry McInnis?

14      A.   Yes.

15      Q.   Now, just in terms of practical matters, how did

16  you set up this interview?

17      A.   I -- I knew the days that Dr. Pena was in the

18  office at the clinic, or when he was in Rio Bravo at

19  City Hall, we -- we knew the general days.  So on one of

20  those days that we -- we thought he might be at home, I

21  went with Special Agent Rice and we knocked on the door

22  and that -- that's how it started that day.  We -- we

23  knocked, Mrs. Pena answered the door and told us that

24  Mr. Pena wasn't home.

25      Q.   Did you identify yourselves as FBI agents?

1    A.   Yes, we did.

2    Q.   What happened next?

3    A.   Mrs. Pena said he wasn't home but she called him

4    on her cell phone, and whenever she reached him on the

5    cell phone she allowed me to speak with him.  And on

6    the -- during the phone call, I established a meeting

7    at -- at his clinic later that day.

8    Q.   Did you go to the clinic?

9    A.   Yes, I did.

10    Q.   Can you give the jury just a general idea of what

11    the clinic looks like?

12    A.   As -- as you pull into the -- the parking kind of

13    goes along the side of a road, Musser is the name of the

14    road, and as you pull up there's a gate on the left side

15    as you're facing the building from the north, and back

16    there is a little bit more parking, it looks like

17    probably where employees would park.  And then on the

18    right-hand side, the Northwest corner of the building,

19    there's a door that has handrails and everything, it --

20    it's pretty much implied that that's where patients are

21    expected to walk in for their -- for their meetings, or

22    for their appointments.

23        So we walked in it through that door into a

24    reception area where one of Dr. Pena's employees greeted

25    us.  She had knowledge of -- she expected our arrival

1    and -- and told us to go to the back where Dr. Pena

2    would be waiting for us in his office.

3        Q.   Did you go to the back?

4        A.   Yes, we did.

5        Q.   Did you meet with Francisco Pena?

6        A.   Yes.

7        Q.   Now, is this a voluntary interview?

8        A.   Yes, it is.

9        Q.   Can you explain to the jury what a voluntary

10   interview is?

11       A.   Yes, the -- the term voluntary is what it sounds

12   like.  He -- the -- the interviewee has -- has the right

13   to terminate the interview.  We're -- we're sitting down

14   at -- at his -- his office, so I -- the way I treat that

15   is I'm, you know we're going to have a conversation

16   that's -- that may be uncomfortable, but I'm -- I'm

17   still a guest at his office.

18       Q.   And did you record that meeting?

19       A.   Yes, I did.

20       Q.   Can you just describe for the jury what kind of

21   recording device you used?

22       A.   Yes, we used a covert recording device that is

23   a -- it was audio only, so there's no camera on that

24   one.  And on this audio recorder, it basically is

25   concealed inside of a key fob.

1    Q.   Okay.   Earlier you said that you hoped that
2  Francisco Pena would cooperate with the investigation?
3    A.   Yes.
4    Q.   If that is the case, why did you record the
5  meeting?
6    A.   In the event that he doesn't cooperate, then we
7  have a true and accurate representation of -- of what
8  happened.   And bureau policy is that in a subject
9  interview, so the subject of one of our investigations,
10  that we're required to make every effort to record the
11  interview.
12    Q.   Did you tell Francisco Pena that you were
13  recording the meeting?
14    A.   No.
15    Q.   Did you give Francisco Pena any warnings before
16  the meeting went underway, got started?
17    A.   Yes, I did.
18    Q.   What kind of warnings did you give him?
19    A.   We started off with a -- what we referred to as a
20  1001 admonishment, so --
21    Q.   What's that?
22    A.   In U.S. Criminal Code, Title 18 Subsection 1001
23  simply put states that making a false statement to a
24  federal agent is a federal crime.
25    Q.   Anything else you told him before the interview

1    really got underway?

2        A.  That we had conducted investigations that we

3    believed that he was involved in kickback referral

4    scheme.

5        Q.  Ms. Leal, will you please play clip number 13,

6    which is not in the -- the aid because the discussion is

7    in English.

8            But for the record it is Government's Exhibit C-9

9    from two minutes and five seconds to 3 minutes and 28

10   seconds.  And the transcript is in evidence at

11   Government's Exhibit C-10 at page 1.

12               (Audio clip playing.)

13       Q.  (By Mr. Swartz)  So just to pause it there for a

14   moment, was that Francisco Pena's voice we heard at the

15   beginning?

16       A.  Yes.

17       Q.  And the first you mentioned -- you had spoken to

18   him before, was that something unrelated to this?

19       A.  Yes, it was unrelated to something about city

20   business with Rio Bravo.

21       Q.  Then earlier you mentioned that an aspect of the

22   investigation related to whether hospice patients were

23   being -- well, individuals were putting -- being put on

24   hospice that did not qualify; do you remember that?

25       A.  Yes.

1    Q.   Is the six months requirement significant to that

2    aspect of the investigation?

3    A.   Yes, it is.

4    Q.   And can you explain to the jury what your

5    understanding of the -- that -- what I'm referring to as

6    the six-month requirement is?

7    A.   Yes, the six-month requirement, whenever a doctor

8    certifies a patient for a hospice and signs the form,

9    the -- the doctor, with their signature pared in that

10   same block, has to sign saying that if this disease runs

11   its -- runs its course from the -- the point that we're

12   at right now, that the patient -- we can anticipate that

13   patient dying within the next six months.

14   Q.   Is that a Medicare requirement?

15   A.   Yes.

16   Q.   Did you ask Francisco Pena if he follows that

17   Medicare requirement?

18   A.   Yes.

19   Q.   What was his response?

20   A.   He said he doesn't believe in that rule so he

21   doesn't go by it.

22   Q.   Ms. Leal, can we play clip number 14, please.

23   And for the record it is from Government's Exhibit C-9,

24   seven minutes and 22 seconds to ten minutes and 59

25   seconds, and Government's Exhibit C-10 at page 3.   And

1   it's not in the -- the aid because it's in English.

2          (Audio clip playing.)

3   Q.   (By Mr. Swartz)   Agent Williams, where Francisco

4   Pena says, punto (speaking Spanish.)   Let's leave the

5   six-month rule out because I don't believe in that, what

6   significance does that statement have to your

7   investigation?

8   A.   He had signed numerous documents attesting to the

9   fact that these patients were estimated to die within

10  six months and on certifications, recertifications,

11  multiple recertifications in some instances, and then

12  during the interview he's telling us that he doesn't go

13  by that.

14  Q.   And is -- is that the statement of Francisco Pena

15  that he does not follow the six-month rule, would that

16  explain what you saw in the claims data?

17  A.   Yes, it would explain the unusual volume of high

18  length-of-stay patients.

19  Q.   Explain that to the jury, please.

20  A.   If -- if a patient gets through their first

21  certification period, that's 90 days, they get

22  throughout second certification period, then that's six

23  months and after that it's 60 days from thereon that

24  they get recertified.   So every time they sign to

25  recertify that patient, they sign saying, if this

1    disease run its normal course, this patient will die

2    within six months.  So we -- we rack those up every --

3    every 60 days that these patients are supposed to die

4    within six months, and if -- if you don't go by that,

5    then you're -- you're breaking Medicare's rule.

6        Q.  And -- and earlier in that clip you said six

7    month is not hard and fast, what did you mean by that?

8        A.  That we understand that if the disease runs its

9    normal course, when a doctor signs that, his normal

10   course could be less than six months, it could be like

11   he was saying in the recording, it could be two months,

12   it could be four months, something like that.  But if

13   the disease runs its normal course, as the medical

14   professional he has to sign saying that that's going to

15   be less than six months.

16       Sometimes the disease won't run its normal course

17   and a patient could last eight months.  And

18   understanding that, if -- we expect every hospice

19   company to -- to have outliers, to have a small minority

20   that do live beyond six -- six months, but it should be

21   the small minority.

22       Q.  What you saw in the claims data for the Merida

23   Group, was it a small minority?

24       A.  No, it was unusually high.

25       Q.  And earlier where, I think in response here, your

1    statement about this requirement being in the documents

2    where the doctor has to sign and Francisco Pena says no,

3    did that conflict with documents that investigators saw

4    in the case?

5         A.   Yes.

6         Q.   Were there documents in this case where Francisco

7    Pena did sign documents where he signed a certification

8    that the patient had six months or less to live if the

9    disease ran its normal course?

10        A.   Yes.

11        Q.   Ms. Leal, could you please pull up Government's

12   Exhibit E-20 at page 659.

13             Who is the medical director listed on

14   Government's Exhibit E-20 page 659?

15        A.   Francisco Pena.

16        Q.   And who's the patient?

17        A.   Francisca Perez.

18        Q.   And going down to the bottom of the page, wait,

19   actually, under -- it says verbal order date, there's a

20   statement that says I certify.  Could you read that

21   statement?

22        A.   Yes.  It says, I certify that the patient's

23   prognosis is six months or less if the disease runs its

24   normal course.

25        Q.   And Ms. Leal, could you please scroll down to the

```
 1   bottom of the page.
 2        Whose signature is at the bottom of the page by
 3   the medical director?
 4   A.   Francisco Pena.
 5   Q.   Ms. Leal, could you also please pull up
 6   Government's Exhibit E-21 at page 79.
 7        And focusing on the top, is this a hospice
 8   certification plan of care?
 9   A.   Yes.
10   Q.   What patient is it for?
11   A.   Francisca Perez.
12   Q.   And at the bottom there's a signature block.  You
13   see that?
14   A.   Yes.
15   Q.   And who is listed as the medical director?
16   A.   Francisco Pena.
17   Q.   And in the statement above where it says
18   "certification statement" what does it say after "I
19   certify/recertify"?
20   A.   I recertify -- I certify or recertify the patient
21   is terminally ill with a life expectancy of six months
22   or less if the disease process runs its normal course.
23   Q.   So based on what Francisco Pena was telling you
24   when you interviewed him and you asked him in that
25   six-month requirement, are these certifications
```

1    untruthful?

2        A.  Yes.

3        Q.  At the -- at the end of the interview, what

4    happened?

5        A.  After we had finished asking all -- all of our

6    questions pertinent to the investigation, I provided

7    Mr. Pena with a target letter.

8        Q.  Can you explain to the jury what a target letter

9    is.

10       A.  Yes, in this case the target letter is a

11   letterhead memorandum provided by the Department of

12   Justice to advise the addressee of that target letter

13   that they are the target of a -- a federal investigation

14   of a Department of Justice investigation.

15       Q.  When you arrived at the interview to interview

16   Francisco Pena, did you have that letter with you?

17       A.  I did.

18       Q.  When you got to the interview, did you know

19   whether you were going to give that letter to him or

20   not?

21       A.  No, I had not made that decision yet.

22       Q.  What would influence your decision whether to

23   provide that target letter to Francisco Pena?

24       A.  We -- like we talked about a little bit earlier,

25   we -- we had hoped that he would cooperate.  In -- in

1    other instances we've -- we've had people that we've

2    gone to interview and they start off a little closer to

3    that subject of our investigation category and they --

4    when we let them know through our line of questioning

5    that we have evidence against, you know, evidence that

6    shows that they committed a crime, then those people,

7    when we offer a chance to tell the truth and provide

8    information about, you know, about the rest of the

9    conspiracy, or rest of the scheme, there are instances

10   that those people do comply with that.

11        They -- they say, yes, I -- I did that, how can I

12   make it right?  And that -- that starts the cooperation

13   process.  And -- and, sorry, to finish answering your

14   question.  If -- if we -- if we get through that whole

15   process and if, in this case if Dr. Pena had said, yeah,

16   I -- I did all of that and I shouldn't have, then

17   there's no need for the target letter because he's not

18   going to fall into that target category anymore.  He --

19   he will be somebody who's cooperating with the

20   Government.

21   Q.   And cooperating with the Government in connection

22   with what?

23   A.   The -- the rest of -- the larger -- the -- the

24   larger investigation.

25   Q.   The larger investigation of the Merida Group?

1    A.   Yes.

2    Q.   Of Rodney Mesquias?

3    A.   Yes.

4    Q.   Henry McInnis?

5    A.   Yes.

6    Q.   But during that course of that interview that you

7    had with Francisco Pena, did he lie to you?

8    A.   Yes.

9    Q.   Did he lie to you repeatedly?

10   A.   He did.

11   Q.   Did that influence your decision to actually give

12   him that target letter at the end of the interview?

13   A.   Yes, it indicated that he was not willing to

14   cooperate.

15   Q.   But after providing that target letter to

16   Francisco Pena, did you still have some hope that,

17   perhaps, he would cooperate?

18   A.   Yes, we did.

19   Q.   Was there a discussion about potential

20   cooperation on your side after handing him the target

21   letter?

22   A.   Yes, as we reviewed the letter with him to ensure

23   that he understood, the -- what the -- what the target

24   letter meant, I was explaining to him based on the

25   letter that we -- we still -- we're hopeful that he

1    would -- he would cooperate, that he could get an

2    attorney to speak with our -- with the DOJ attorneys and

3    that, you know, through -- through that process there

4    was -- there was still a chance to cooperate.

5        Q.   Ms. Leal, will you please play clip number 14-A,

6    which is Government's Exhibit C-9 from 37 minutes to 38

7    minutes and 26 seconds and is the transcript at

8    Government's Exhibit C-10 at pages 6 through 7.

9             (Audio clip playing.)

10       Q.   (By Mr. Swartz)  So after that discussion, was

11   this -- was that the very end of the meeting with

12   Francisco Pena?

13       A.   Yes.

14       Q.   And that part we just listened to, was that after

15   you had already provided the target letter to Francisco

16   Pena?

17       A.   Yes.

18       Q.   What happened after you left the meeting with

19   Francisco Pena?

20       A.   After we left his office, Special Agent Rice and

21   myself got in a car and drove back to the Laredo FBI

22   office, which was about maybe a 15-minute drive from one

23   to the -- one place to the other.

24            And before we arrived back at the office, I

25   received a phone call from Mr. Jimenez advising that

1   Francisco Pena had just called him with concerns about

2   the status of their contract.

3       Q.   And Mr. Jimenez was the -- the confidential

4   source that made the kickback payment to Francisco Pena?

5       A.   Yes.

6       Q.   How -- how long was it after you left the office

7   that you received the phone call from Mr. Jimenez?

8       A.   It was for sure less than 15 minutes because I

9   received it on the drive back, you know, some -- some

10  time before -- before 15 minutes had lapsed.

11      Q.   So what happened after the discussion with

12  Mr. Jimenez?

13      A.   Mr. -- that was on October the 27th, which was

14  a -- a Friday.  So Mr. Pena had expressed his concerns

15  to Mr. Jimenez, and on October the 29th, which was a

16  Sunday, that following Sunday, Mr. Pena called

17  Mr. Jimenez and said we need to have this meeting in

18  reference to what they talked about on October the 27th.

19  We need to have this meeting as soon as possible.

20           So Mr. Jimenez informed me of that -- of that

21  meeting request and we determined, okay, go ahead and

22  have the meeting.

23           So on October the 30th, that morning, Monday

24  morning, myself and another agent met with Mr. Jimenez

25  at a previously determined location where we provided a

1    recording device to him.

2          Now, Mr. Jimenez when he's working he has a badge

3    on a lanyard that has -- has a name tag, and it's kind

4    of like the juror cards, about the size of a credit

5    card, and he -- he's got an identification badge on

6    there.  The recording device that we chose for this

7    because of that is about the size of a credit card and

8    could slip right in behind his ID card and it was audio

9    only, so we -- we -- we provided that recording device

10   and we explained how -- how the device operated so that

11   Mr. Jimenez would have an understanding of how to turn

12   it on and turn it off.  And he -- he went and conducted

13   his meeting with Mr. Pena.

14      Q.  Could you speak -- just get a little closer to

15   the mic.

16      A.  Oh, sorry.

17      Q.  So what happened after you gave the recording

18   device to Mr. Jimenez?

19      A.  He went to Dr. Pena's clinic, conducted the

20   meeting, and then placed a phone to call to me to let me

21   know that he was finished with the meeting.  We met him

22   at a previously determined location, collected that

23   device from him, we talked a little bit about, okay,

24   what happened, and he debriefed with us, and then I took

25   the device back to the -- the FBI office where I

 1    downloaded the -- the digital media.

 2        Q.   Did you listen to the recording from that device?

 3        A.   Yes.

 4        Q.   And was this an audio or video recording?

 5        A.   Audio only.

 6        Q.   When you listened to the device, did you identify

 7    any of the voices in it?

 8        A.   Yes, I could identify Mr. Jimenez, Mr. Pena and

 9    Mrs. Pena.

10        Q.   With respect to the recording, what jumped out at

11    you that was of significance to your investigation?

12        A.   As soon as the meeting started, Mr. Pena made

13    a -- made a reference to, we -- we have to put -- I

14    can't remember the exact wording, but it was, in

15    essence, we need to put this thing to rest.  And -- and

16    my understanding was that was with reference to the

17    investigation into my line of questioning three days

18    prior.

19        Q.   So I want to play clip number 15-A, which is

20    Government's Exhibit C-11 from 0 seconds to 18 seconds.

21    And this is not in the aid that's in front of you,

22    Special Agent Williams.

23                 (Audio clip playing.)

24        Q.   (By Mr. Swartz)  And whose voice is that?

25        A.   Mr. Jimenez.

1      Q.   And is Ojos his -- his -- the name that he goes

2   by as a source?

3      A.   Yes, that's his source code name.

4      Q.   And what we just heard, is that the preamble you

5   trained him to do?

6      A.   Yes.

7      Q.   All right.   So getting to the discussion itself,

8   Ms. Leal, could you please play clip number 15, which is

9   in the aid starting at page 22.   And for the record, it

10   is Government's Exhibit C-11 from two minutes and 14

11   seconds to six minutes and 30 seconds.   And the

12   transcript is in evidence as Government's Exhibit C-12

13   from page 3 to 6.

14              (Audio clip playing.)

15      Q.   (By Mr. Swartz)   So we're -- whose voice do we

16   hear there at the beginning?

17      A.   Francisco Pena.

18      Q.   And where Francisco Pena says, ay que cortal lo,

19   (speaking Spanish.)   What is he saying?   Is he saying we

20   need to put an end to it, what is your understanding of

21   what he's referring to?

22      A.   To the investigation to the questions that I had

23   raised with him days prior.

24      Q.   We need to put an end to the investigation?

25      A.   Yes.

1       Q.   Okay.

2                 (Audio clip playing.)

3       Q.   (By Mr. Swartz)  So what -- they're referring to

4    something dated August 20, 2014.  What is your

5    understanding of what they're talking?

6       A.   Yes, I believe they were referring to a -- a

7    contract between Mr. Pena and Generous.

8       Q.   Now, is this -- is it your understanding that

9    Mr. Jimenez was bringing that contract to the meeting?

10      A.   Yes.

11      Q.   Did -- did that strike you as add that

12   Mr. Jimenez was providing a contract to Francisco Pena?

13      A.   Not -- not odd that he would provide a contract,

14   but maybe that he wouldn't already have that contract.

15                (Audio clip playing.)

16      Q.   (By Mr. Swartz)  So the part we just listened to,

17   Francisco Pena says, lo que quiero que me haces is esto

18   (speaking Spanish.)  And he says I want you to do this

19   for me, create a statement.  What significance does it

20   have for your investigation that Francisco Pena is

21   instructing Mr. Jimenez to create a statement?

22      A.   It's 2017 when they're having this conversation,

23   they're making reference to a contract or some -- some

24   other document that was dated August of 2014, and he's

25   asking him to make active amendments to that contract,

1    it -- to -- he's saying take this document and say this

2    is -- figure out how much we -- you've paid me up to

3    this point and let's say -- you know, let's -- let's

4    make that the medical directorship fee essentially.

5                    (Audio clip playing.)

6        Q.   (By Mr. Swartz)  So in this portion we just

7    listened to where Francisco Pena is saying, hace me tuyo

8    (speaking Spanish) and then he says, por servicios

9    (speaking Spanish), he emphasizes "for services", what

10   significance does that have for your investigation?

11       A.   That he's advising Mr. Jimenez when -- when

12   you're making these documents, or altering these

13   documents, make sure you say this is for services.

14   As -- as we had learned previously in the investigation

15   that services was a common way to obscure the kickback

16   payment.

17                   (Audio clip playing.)

18       Q.   (By Mr. Swartz)  This part where Francisco Pena

19   says, who started this, what significance does that have

20   to you?

21       A.   He's not -- after being asked questions by the

22   FBI, he's -- he's not trying -- it seems odd that he's

23   trying to figure out who -- who provided this

24   information, not how can we correct what we've done

25   wrong.

1                    (Audio clip playing.)

2       Q.   (By Mr. Swartz)  So here where -- it sounds like

3  the voice of the source is saying that's exactly why it

4  was that we got the others and other -- another medical

5  director.  Was there a reference in one of the previous

6  recordings to getting another medical director?

7       A.   Yes, when they had the conversation about

8  Mr. Virlar, the -- the sources brought up the name

9  Mr. Virlar as a -- as a potential additional medical

10  director so that it wouldn't look funny with all the --

11  all the referrals coming from one place.

12                    (Audio clip playing.)

13      Q.   (By Mr. Swartz)  There's a reference there to --

14  well, first of all it's kind of hard to hear, but was

15  there a statement by Francisco Pena, you could have been

16  in prison, mijo?

17      A.   Yes.

18      Q.   What significance does that have for your

19  investigation?

20      A.   It's acknowledgment that the activity being

21  conducted is unlawful.

22      Q.   And there's a reference to IDT meetings; is that

23  right?

24      A.   Yes.

25      Q.   And Francisco Pena says last month you haven't

1    done any.  How frequently hospice companies supposed to

2    do IDT meetings?

3        A.  Every two weeks per patient.

4        Q.  And listening to the recording, did you -- what

5    significance does it have to your investigation that

6    this medical director is aware that IDT meetings are not

7    being done?

8        A.  He's -- he's the medical director and so he's

9    responsible for what's happening there.  He's also

10   referring patients to the company that he apparently

11   knows is not conducting these IDT meetings.

12                  (Audio clip playing.)

13       Q.  (By Mr. Swartz)  So where Francisco Pena's

14   talking about these narratieves (speaking Spanish.)  Are

15   these narratives, he's referring to medical records?

16       A.  Yes.

17       Q.  And is it your understanding that they're --

18   Francisco Pena's aware that they're incomplete medical

19   records?

20       A.  Yes.

21                  (Audio clip playing.)

22       Q.  (By Mr. Swartz)  A little bit hard to hear in

23   that part, too, but at the end Francisco Pena says,

24   francamente (speaking Spanish) or frankly, if I did not

25   have the experience that I have everything would have

1    gone to shit by now.

2        What significance does that have to your

3    investigation about the role of Francisco Pena?

4      A.   That he's speaking from experience and he doesn't

5    seem to be concerned about did we do something wrong,

6    based on this conversation I have the experience on how

7    to explain what we've done in a more favorable light,

8    legally speaking.

9      Q.   And stepping back a moment, you just had this

10   meeting with Francisco Pena where he repeatedly lied to

11   you?

12     A.   Yes.

13     Q.   But you requested his potential cooperation?

14     A.   Yes.

15     Q.   What significance is it to your investigation

16   that right after that meeting, Francisco Pena had this

17   meeting that we just listened to with the confidential

18   course?

19     A.   That it's -- I find it significant because it

20   was -- like I said, it was 15 minutes for me to drive

21   back to my office, so within the first 15 minutes, I

22   don't know if he called anybody else before he called

23   Mr. Jimenez, but that was one of the first phone calls

24   that he made after having a confrontation with law

25   enforcement agents.

1    Q.   Was he attempting to obstruct your investigation?

2    A.   Yes.

3            MR. GUERRA:   Objection to form, Your Honor.

4    Calls for a legal conclusion.

5            THE COURT:   Overruled, answer if you know.

6            THE WITNESS:   Based on the recordings, he

7    appeared to be obstructing, yes.

8    Q.   (By Mr. Swartz)  So we've been discussing

9    Francisco Pena.  Is the individual you know to be

10   Francisco Pena, is he present in the courtroom today?

11   A.   Yes, he is.

12   Q.   Could you please identify him by where he's

13   sitting and an article of clothing he's wearing?

14   A.   Can you step to the side just a second.

15          Yes, sir, he's right over there wearing the

16   glasses and a tan kind of greenish tan jacket, I don't

17   know, I'm bad at colors.

18          MR. SWARTZ:   Your Honor, may the record

19   reflect that the witness has identified the Defendant

20   Francisco Pena.

21          THE COURT:   So noted.

22   Q.   (By Mr. Swartz)  Okay.  I want to change subjects

23   a little bit.

24          Can you tell the jury what a Grand Jury is?

25   A.   A Grand Jury, they get appointed just the same

1    way you did, their purpose is a little bit different.

2    During an active investigation, we, as investigators,

3    bring information to the Grand Jury and sometimes we --

4    we go to the Grand Jury to -- to request permission

5    to -- to gain access to other information.

6          And the Grand Jury's ultimate purpose is to

7    determine when -- when we say here's this investigative

8    package, I think that I have done enough and proven

9    enough that it's now time to -- to indict someone,

10   the -- the Grand Jury makes that determination of did we

11   in fact do everything investigatively that was required

12   to take that next step.

13   Q.   And as part of the -- the investigation in this

14   case, were Grand Jury subpoenas issued?

15   A.   Yes, they were.

16   Q.   Were any Grand Jury subpoenas issued to the

17   Merida Group?

18   A.   Yes.

19   Q.   Ms. Leal, would you please pull up Government's

20   Exhibit C-30.

21          Is that the cover page for the Grand Jury

22   subpoena?

23   A.   Yes, it is.

24   Q.   And Ms. Leal, could you please go to the next

25   page.   And if you could zoom in on the top portion under

1     United States District Court.

2          Now, who at -- there's a 2 at the top and then a

3     name, who is the subpoena issued to?

4        A.   Merida Health Care Group.

5        Q.   And if you could scroll down a little bit and

6     zoom in on the bottom portion where there's a date, like

7     a due date.  Right next to clerk.  That's it.

8          Is that -- is that a date where the records

9     were -- were due?

10       A.   Yes.

11       Q.   Okay.  And Ms. Leal, if you could please turn to

12    the fifth page of that exhibit.

13         Is that an attachment to the Grand Jury subpoena?

14       A.   Yes, it is.

15       Q.   Can you explain to the jury what an attachment

16    is?

17       A.   Yes, the -- the Grand Jury subpoena, basically,

18    commands someone to provide information, the attachment

19    spells out a little bit -- in a little bit better detail

20    the specific things that are to be provided.

21       Q.   And in this case, what does the attachment order

22    the Merida Health Care Group to provide?

23       A.   It looks like patient files to include physician

24    orders for home health services and hospice services,

25    face-to-face documents, prescription drug orders,

1    nurse's notes, communication notes, assessments,

2    follow-up and discharge assessments, other patient

3    assessments, medication profiles consent forms and

4    patient progress notes for the patients specified below.

5         Q.   Then just above that paragraph where it says

6    paragraph B, does that paragraph list a number of

7    different entities?

8         A.   Yes, it does.

9         Q.   Are those entities relating to the Merida Group?

10        A.   Yes.

11        Q.   Then below that, below the part where it lists

12   the -- what's requested, there's a list of names.   Are

13   those different patients of the Merida Group?

14        A.   Yes, they are.

15        Q.   And then the last one on there, do you recognize

16   Francisca Perez?

17        A.   Yes, I do.

18        Q.   Ms. Leal, if you could pull up Government's

19   Exhibit E-28, please.

20            First of all, before I start talking about that,

21   why would it be important to have patient files as part

22   of the investigation of the Merida Group?

23        A.   It all goes back to completing that loop of

24   information.   We -- we have referred to the claims data,

25   the claim detail reports, that -- that we get from

1   Medicare, so we know what Medicare is receiving, and

2   then we have the -- the bank records so we know what's

3   happening on the financial end.  And then when we get

4   the medical data that we've requested in the -- in the

5   subpoena, that provides the other side, it provides

6   why -- what has this company done, or how have they

7   documented their justification for what has been billed

8   in those claim detail reports.

9      Q.  And then in response to this subpoena and this

10  request for patient records, did the Merida Group

11  produce those patient files?

12     A.  Yes.

13     Q.  And looking at Government's Exhibit E-28, which

14  is up on the screen, the title says business records

15  affidavit.  What is that?

16     A.  It's -- it's an affidavit that a representative

17  of the company provides to the Grand Jury where -- where

18  they attest to the fact that based on your request we

19  have fulfilled it, we have fulfilled this truthfully and

20  completely.

21     Q.  And there's a name listed there, my name is

22  Tiffany Moczygemba, is it your understanding that was a

23  representative of the Merida Group?

24     A.  Yes.

25     Q.  And focusing on the last two paragraphs,

1    paragraphs six and seven, what do those say?

2        A.   Paragraph six says, the said records were made at

3    or near the time of occurrence of the matters set forth

4    by or from information transmitted by a person with

5    knowledge of those matters.

6            And paragraph seven says, the said records

7    attached hereto are the originals and/or exact

8    duplicates of the originals.

9        Q.   And put in plain English, do those paragraphs say

10   that these are accurate records?

11       A.   Yes.

12       Q.   So is this representative of the Merida Group

13   saying that these records we are providing accurate?

14       A.   Yes.

15       Q.   Why is it important to a Grand Jury to receive

16   accurate records in response to subpoenas issued by the

17   Grand Jury?

18               MR. TONY CANALES:   Object to the form of the

19   question, Your Honor.   Objection calls for the witness

20   to talk about an area he's not involved at all, he's not

21   a lawyer, Grand Jury issues not before this Court,

22   Your Honor.   We object.

23               THE COURT:   Rephrase the question.

24       Q.   (By Mr. Swartz)  During -- in the course of your

25   duties as an investigator conducting health care fraud

1    investigations, are you involved with the issuance of

2    Grand Jury subpoenas?

3        A.   Yes.

4        Q.   Are you involved with the presentation of

5    criminal cases to grand juries for potential indictment?

6        A.   Yes.

7        Q.   Is it important that the Grand Jury receive

8    accurate information in response to its subpoenas?

9        A.   Yes.

10       Q.   Why is that?

11       A.   Because they have a big decision.  If they --

12   they're ultimately responsible for deciding do we --

13   does this person get indicted, and then from there

14   events take place that lead us to arrests, and then

15   ultimately lead us to a trial.

16            So if -- if the information that they are

17   provided is not accurate, then they can't make a

18   well-informed decision.

19       Q.   And when these records that we've just been

20   talking about that were produced in response to this

21   Grand Jury subpoena, were those given to a particular

22   agency?

23       A.   Yes.

24       Q.   Which agency was it given to?

25       A.   Health and Human Services Office of the Inspector

1    General.

2        Q.   What city were they in?

3        A.   McAllen.

4        Q.   And were those records ultimately provided to the

5    Grand Jury?

6        A.   Yes.

7        Q.   Okay.  Switching topics, we're getting towards

8    the end, I want to run through some -- some documents.

9    Are you familiar with the Texas Secretary of State?

10       A.   Yes.

11       Q.   And are you familiar with records obtained from

12   the Secretary of State in connection with the Merida

13   investigation?

14       A.   Yes.

15       Q.   Ms. Leal, if you could pull up Government's

16   Exhibit G-1.

17            Are these records from the Texas Secretary of

18   State?

19       A.   Yes, they are.

20       Q.   Focusing on the name of the entity, what entity

21   is that?

22       A.   Bee Caring Hospice, LLC.

23       Q.   Ms. Leal, if you could go to page 3.

24            Towards the bottom, there's a paragraph that

25   says, managing member number one.  Who is listed there

1    as at managing member of Bee Caring, Hospice, LLC?

2        A.   Rodney Mesquias.

3        Q.   Going to Government's Exhibit G-2, are these

4    records from the Texas Secretary of State?

5        A.   Yes.

6        Q.   And what entity is listed at the top?

7        A.   Bee Caring Hospice Health Care, Incorporated.

8        Q.   And going to page 37 of that same exhibit,

9    there's a signature at the bottom, who signed as

10   President for Bee Caring Hospice Health Care, Inc.?

11       A.   Rodney Mesquias.

12       Q.   Going to Government's Exhibit G-3, are these

13   records from the Texas Secretary of State?

14       A.   Yes.

15       Q.   What entity is listed at the top?

16       A.   BRM Home Health.

17       Q.   Going to page 39, at the bottom, who signed as

18   President?

19       A.   Rodney Mesquias.

20       Q.   Going to Government's Exhibit G-4, are these

21   records from the Texas Secretary of State?

22       A.   Yes.

23       Q.   For which entity?

24       A.   Excellent Home Care Provider Services.

25       Q.   Going to page 40 of Exhibit G-4, there's a

1   section at the top that says assumed name.

2       What assumed name is listed?

3   A.   Merida Health Care Group.

4   Q.   And going to the next page, there is a signature

5   block.   Whose name is listed there in the signature

6   block?

7   A.   Henry McInnis.

8   Q.   And then going to page 45 of that same exhibit,

9   who signed at the bottom as President of that entity?

10  A.   Rodney Mesquias.

11  Q.   Going to Government's Exhibit G-5, are these

12  records from the Texas Secretary of State?

13  A.   Yes.

14  Q.   What entity?

15  A.   Illumina, LLC.

16  Q.   And going to page 27, who signed at the bottom as

17  CEO owner of that entity?

18  A.   Rodney Mesquias.

19  Q.   Going to Government's Exhibit G-6, are these

20  records from the Texas Secretary of State?

21  A.   Yes.

22  Q.   Which entity?

23  A.   Merida Health Group.

24  Q.   And going to page 15 of that same exhibit, who

25  signed as President for the Merida Health Care Group,

```
 1  Inc.?
 2      A.   Rodney Mesquias.
 3      Q.   Going to Government's Exhibit G-7, are these
 4  records from the Texas Secretary of State?
 5      A.   Yes.
 6      Q.   Which entity?
 7      A.   Merida Health Care Group of San Antonio.
 8      Q.   And going to page 56, at the top it says assumed
 9  name and entity information, what is the assumed name?
10      A.   Merida Health Care Group.
11      Q.   And going to the next page, who signed as
12  President?
13      A.   Rodney Mesquias.
14      Q.   Going to Government's Exhibit G-8, are these
15  records from the Texas Secretary of State?
16      A.   Yes.
17      Q.   Which entity?
18      A.   Professional Hospice Care.
19      Q.   And going to page 57, who signed as President?
20      A.   Rodney Mesquias.
21      Q.   Going to Government's Exhibit G-9, are these
22  records from the Texas Secretary of State?
23      A.   Yes.
24      Q.   For which entity?
25      A.   Virtue Home Health.
```

1    Q.   And going page 50, who signed at the bottom as

2    President?

3    A.   Rodney Mesquias.

4    Q.   Finally, going to page -- Government's Exhibit

5    G-10, are these records from the Texas Secretary of

6    State?

7    A.   Yes.

8    Q.   Which entity?

9    A.   Well Care Home Health.

10   Q.   And going to page 44, focusing on the bottom, who

11   signed as administrator?

12   A.   Rodney Mesquias.

13   Q.   And then going up to the section in the middle,

14   who's listed as President?

15   A.   Rodney Mesquias.

16   Q.   Okay.  And finally, as part of this

17   investigation, did investigators request records from

18   the Texas DMV?

19   A.   Yes.

20   Q.   Ms. Leal, can you please pull up Government's

21   Exhibit 01B.  What is this?

22           MR. TONY CANALES:  Your Honor, I'm going to

23   object.  I'm going to object to this exhibit,

24   Your Honor, the topic on this has no reference at all

25   whatsoever, we object to it.

```
 1              THE COURT:  It's overruled, this -- this
 2   exhibit has already been admitted.
 3              THE WITNESS:  It's a list of vehicles
 4   registered for Rodney Mesquias.
 5      Q.  (By Mr. Swartz)  And can you list -- just list
 6   what those vehicles are?
 7      A.  Range Rover, there's another Range Rover, Porsche
 8   Boxer, Ford F-250, Ram 3500, Infinity G25, Chevy Malibu,
 9   BMW X3 and a Toyota RAV-4.
10      Q.  What's the total sales price for those vehicles?
11      A.  $594,333.
12              MR. SWARTZ:  Pass the witness, Your Honor.
13              THE COURT:  Gentlemen, before we get
14   started, ladies and gentlemen of the jury, this is a
15   good time for a break.
16              We'll -- let's have our lunch recess and
17   let's return at 1:45, please.
18              COURT OFFICER:  All rise for the jury.
19              THE COURT:  And -- and just leave the aids
20   there on your chair.
21              (JURY OUT.)
22              THE COURT:  All right, everyone, we'll be in
23   recess.  The Government did take two-and-a-half hours,
24   2.5 hours with the witness, defense will be able
25   appropriated accordingly.
```

1                 Thank you.

2                 (COURT IN LUNCH RECESS.)

3                 THE COURT:  Thank you, everyone.  Gentlemen,

4      please be seated, or come forward as to the issues.

5                 MR. GUERRA:  One issue, Your Honor, on

6      behalf of the defense.

7                 On behalf of Dr. Pena, we would ask the

8      Court to revisit this issue regarding testimony on

9      compensation.  We believe that Agent Williams opened the

10     door with regards to Rene Cervantes.  When he was asked

11     a question by Mr. Swartz as to the identity of Rene

12     Cervantes, he gave an answer that said, he was someone

13     who came to the FBI and would bring things at the city

14     level, bringing outside info, he was another source.

15                 We believe that going into the basis for why

16     he was providing this testimony is relevant because it

17     goes to his intentions and his credibility.  Because as

18     of right now, he's left -- the jury is the left with the

19     impression that Rene Cervantes is just a -- a good

20     citizen who's trying to do right.

21                 And so we believe, in order to paint a full

22     picture for the jury, the basis for why he's providing

23     that testimony, or why he's providing that information

24     and wearing a wire should be disclosed to the jury.

25                 THE COURT:  Government's response, please.

1          MR. SWARTZ:  Your Honor, so Agent Williams

2     did not talk about any compensation to Mr. Cervantes,

3     the other matters in which he may have -- may or may not

4     provided information were not discussed.

5          His testimony was limited to the recording,

6     that one recording that Mr. Cervantes brought to the

7     FBI.

8          So no door has been opened, and the Fifth

9     Circuit case law on this point has been clear that

10    Defendants are not entitled to cross-examine witnesses

11    on compensation to sources in other unrelated

12    investigations.

13          THE COURT:  The -  the defense' request is

14    denied.

15          MR. GUERRA:  Thank you, Your Honor.

16          THE COURT:  Or overruled.

17          MR. GUERRA:  Thank you, Your Honor.

18          THE COURT:  Anything else?

19          MR. GUERRA:  Not on behalf of the defense,

20    Your Honor.

21          THE COURT:  Sandra, do we have all the

22    jurors ready?

23          THE CLERK:  Yes.

24          MR. CYGANIEWICZ:  Let me go look for

25    Mr. McInnis, he went to lunch with his mom.

```
 1              THE COURT:  Well, he should be here.
 2              MR. CYGANIEWICZ:  I know he should.
 3              THE COURT:  All right.  Well, let me take a
 4   brief recess and let me know when he's available.
 5              MR. CYGANIEWICZ:  I will.
 6              (COURT IN SHORT RECESS.)
 7              (JURY IN.)
 8              THE COURT:  Thank you, everyone.  Please be
 9   seated.
10              All right, ladies and gentlemen, welcome
11   back.  We're going to commence with cross.
12              Let's get the witness up here, please.
13              MR. TONY CANALES:  With the Court's
14   permission, Your Honor, Mr. Guerra is on the second --
15   he's going second.  First, second and I'll be the last
16   one.
17              THE COURT:  Guerra's first?
18              MR. GUERRA:  I'm first, Your Honor.
19              THE COURT:  All right.  Any order you want,
20   that's fine.
21              MR. TONY CANALES:  Thank you, Your Honor.
22              MR. GUERRA:  Thank you, Judge.
23              THE COURT:  All right, sir.  I remind you
24   you're still under oath.  Again, please position the
25   microphone close to you and speak loudly and clearly.
```

1    Thank you, sir.

2                 Mr. Guerra, please proceed.

3                 MR. GUERRA:  Thank you, Your Honor.

4                       CROSS-EXAMINATION

5    BY MR. GUERRA:

6    Q.  Agent Williams, what is the current status of the

7    criminal investigation as to Generous Hospice?

8    A.  The current status of the criminal investigation?

9    Q.  As to Generous, yes, sir?

10   A.  Per bureau policy, we don't speak about

11   investigations that don't relate to this one.

12   Q.  Is there an ongoing investigation as to Generous?

13   A.  Per bureau status we can't comment on that.

14   Q.  Okay.  Has Edgar Jimenez received any sort of

15   immunity or proffer agreement for potential testimony in

16   this case?

17   A.  No.

18   Q.  Has Jose Aguilar received any sort of proffer or

19   immunity as part of any potential testimony in this

20   case?

21   A.  No.

22   Q.  Special Agent Williams, you have no medical

23   training; is that correct?

24   A.  Correct.

25   Q.  You haven't been to medical school?

1    A.   Correct.

2    Q.   You haven't been to nursing school?

3    A.   Correct.

4    Q.   You haven't been to physical therapist school?

5    A.   Correct.

6    Q.   And in fact, if I understand your direct

7  testimony correctly, the extent of your medical training

8  was a couple of week long courses with the bureau; is

9  that correct?

10    A.   Anywhere from a few days to a couple of weeks

11  long.

12    Q.   Okay.  And would you say maybe two or three

13  courses; is that fair to say?

14    A.   And then you -- you learn as you progress through

15  casework, too, assisting other people on cases.

16    Q.   Okay.  Prior to taking those courses, you had no

17  training or background in the medical field; is that

18  correct?

19    A.   Correct.

20    Q.   Do you have an undergraduate degree?

21    A.   I do.

22    Q.   From where?

23    A.   Texas Tech.

24    Q.   And I imagine there was no medical basis for that

25  degree; is that correct?

1    A.   That's correct.

2    Q.   With regards to your case load, is this the first

3  Medicaid fraud case that you led an investigation on?

4    A.   The first one that I have started and finished,

5  yes.

6    Q.   Okay.  So there have been others that you kind of

7  jumped in mid-stream; is that correct?

8    A.   Yes, the -- the nature of the Laredo office,

9  agents are there for a short period of time so you pick

10  up somebody's else's when they leave and there are cases

11  that I've passed on as well.

12    Q.   But this is the first time you were, for lack of

13  a better word, one of the originating agents; is that

14  correct?

15    A.   Yes.

16    Q.   Are you the agent in charge of this

17  investigation?

18    A.   I led the Laredo portion of it, yes.

19    Q.   Okay.  And who is the agent in charge of the

20  entire investigation that brings us here to this

21  courtroom?

22    A.   Well, I mean there -- there were a couple of

23  different investigations.

24    Q.   Right.  And in fact, all tolled you'd would agree

25  with me that there were about 15 federal agents that

1    were involved in this investigation; is that correct?

2        A.   That sounds about right.

3        Q.   I mean, I believe you testified earlier when we

4    saw Exhibit L-1 up on the screen that it was a statewide

5    matter, correct?

6        A.   Yes, not the entire state, but yes widespread.

7        Q.   You're right, not the entire state, but we were

8    spanning locations from Laredo, to San Antonio, Houston

9    and the Valley, correct?

10       A.   Yes.

11       Q.   Unless we forget Corpus, that's in the middle as

12   well, correct?

13       A.   That's correct.

14       Q.   And you were one of 15 agents involved in the

15   investigation of this matter; is that correct?

16       A.   That sounds accurate.

17       Q.   Multiple assistance U.S. attorneys involved in

18   this case as well; is that correct?

19       A.   Yes.

20       Q.   Met with witnesses all over the State of Texas;

21   is that fair to say?

22       A.   Yes.

23       Q.   And in fact, as you moved to the Tyler branch,

24   you continued your involvement in this case as well; is

25   that right?

1      A.   Yes.

2      Q.   This investigation spanned several years; isn't

3  that right?

4      A.   A couple of years.

5      Q.   Well, I mean more than a couple, we're looking at

6  medical records going back to 2013; is that right?

7      A.   Are we talking about the -- the span of the

8  investigation, or the span of time that we were looking

9  at?

10     Q.   No, I'm talking about the span of the

11  investigation itself, I mean it started about 2015, is

12  that fair to say?

13     A.   Of -- of -- of our active investigation?

14     Q.   Yes.

15     A.   I'm just trying to get clarity.

16     Q.   Yes.  Yes.

17     A.   Okay.

18     Q.   Is that correct?

19     A.   Yes.

20     Q.   Okay.  So, in other words, given all the time,

21  energy, resources devoted to this matter, you need to

22  show results; is that correct?

23     A.   We need to find the answers.

24     Q.   Okay.  But you need convictions; is that correct?

25     A.   No, we -- we need to find the right -- find the

1    answers.

2       Q.   Okay.  So what would the answer be, justice, is

3    that what you're looking for?

4       A.   Yeah, ultimately, yes.

5       Q.   Okay.  And so if justice does not end up in a

6    conviction, you're okay with that; is that right?

7       A.   Yes, not -- not every case ends with a

8    conviction.  That's correct.

9       Q.   Okay.  Agent Williams, given your lack of medical

10   training, you cannot make a determination of medical

11   necessity; is that correct?

12      A.   That's correct.

13      Q.   And in fact, you talked about earlier today, the

14   only involvement you had with looking at patient

15   information came from patient claims; is that correct?

16      A.   Can you rephrase the question?

17      Q.   Sure.  You never did an in-depth investigation or

18   analysis of patient records; is that correct?

19      A.   We reviewed claims.

20      Q.   That's not my question.  My question is you did

21   not do an in-depth evaluation of patient records; is

22   that correct?

23      A.   I personally did not.

24      Q.   Okay.  And you did not go and look at the medical

25   services that were provided to patients to determine

1    whether or not those medical services were necessary; is

2    that correct?

3        A.   The investigative team did.

4        Q.   But you didn't; is that right?

5        A.   Correct.

6        Q.   And when you say the investigative team, how many

7    doctors were on that team?

8        A.   We -- we refer to -- we -- we refer to medical

9    experts so --

10        Q.   But how many doctors?

11        A.   I'm not sure the exact number of doctors.

12        Q.   When you say medical experts, are you talking

13    about Laura McMillan?

14        A.   No, but her organization, the ZPIC has doctors

15    they refer to.

16        Q.   Who's the medical expert that looked at these

17    files?

18        A.   I don't know the name of him.

19        Q.   You just handed it to over to somebody; is that

20    right?

21        A.   That stuff was handled by the McAllen branch of

22    our FBI and they referred it to the ZPIC.

23        Q.   Now, you talked earlier about Medicare, hospice

24    procedures; do you recall that testimony?

25        A.   If you could refresh me?

1    Q.  Sure.  When you're on Direct Examination with

2  Mr. Swartz, you were talking about the six-month rule;

3  is that correct?

4    A.  Yes.

5    Q.  Okay.  And you would agree with me that for a

6  patient to be eligible for Medicare, they have to have a

7  condition that, within six months of the diagnosis on

8  hospice, would lead to that patient dying if the disease

9  ran its normal course; is that right?

10    A.  Yes.

11    Q.  Okay.  To -- to refer -- well, let me ask you

12  this:  Are you aware that to refer a patient to hospice

13  you need to have two doctors to sign off; are you aware

14  of that?

15    A.  Yes.

16    Q.  You're aware that to have a patient admitted to

17  hospice, you need to have that patient's attending

18  physician and the hospice medical director to certify

19  that the patient qualifies for hospice, correct?

20    A.  Right.

21    Q.  Okay.  You would agree with me that there's a

22  limit of four certifications, there's four

23  recertifications for hospice under Medicare, correct?

24    A.  Can you --

25    Q.  Sure.  Once somebody is certified for hospice,

1    they can be recertified up to four times, correct?

2       A.   They were recertified more times than that.

3       Q.   No, no, no, I'm just talking on the regulations,

4    the regulations allow for somebody to be recertified

5    four times, correct?

6       A.   Okay.

7       Q.   Is that the limit?

8       A.   I don't know.

9       Q.   Are you aware that there is no limit for the

10   amount of times that somebody can be recertified for

11   hospice?

12      A.   If -- if you're telling me that that's the truth,

13   then --

14      Q.   Well, Agent Williams, you're -- you're one the

15   agents in charge of this investigation.  I'm asking you

16   in front of the ladies and gentlemen of the jury, are

17   you aware that there is no limit for the amount of times

18   a patient can be recertified for hospice services?

19      A.   Okay.

20      Q.   Are you aware, yes or no?

21      A.   If -- if you're telling me that -- that that's

22   the truth, then I will take you at your word.

23      Q.   Did you know that at the time you were conducting

24   this investigation?

25      A.   I -- I had gathered from looking at other

companies that there were also long standing hospice
patients.

Q.   Agent Williams, that wasn't my question.   My
question was:   Were you aware at the time you were
conducting this investigation that there was no limit to
a number of times a patient could be recertified for
hospice services under Medicare; yes or no?

A.   No.

Q.   Are you aware that there are studies out there
that claim that hospice patients, up to 12 to 15 percent
of hospice patients don't die within six months?   Were
you aware of that?

A.   No.

Q.   And when you're -- and I would imagine you
weren't aware of that at the time you were conducting
your investigation; is that right?

A.   That's correct.

Q.   And you weren't aware of that at the time you
were reviewing the claims data, correct?

A.   Correct.

Q.   In fact, all you were looking for when you
reviewed that claims data was whether or not a patient
was on hospice for more than six months, correct?

A.   No.

Q.   What were you looking for?

1     A.   I was looking for a high volume of the patients

2   that were on for over six months over a year.

3     Q.   Okay.  And despite that, you didn't look as to

4   the medical necessity behind why those patients were on

5   hospice, correct?

6     A.   That's what the Grand Jury subpoena was for is to

7   collect the medical records to determine if there was

8   medical necessity.

9     Q.   And -- and that brings me to a very good point.

10  When you were talking about the subpoenas with

11  Mr. Swartz, those subpoenas came out -- well, I'm sorry,

12  the subpoena was issued September 2017; is that correct?

13    A.   That sounds right.

14    Q.   Okay.  And the response came September 2017; is

15  that right?

16    A.   I can't remember.

17    Q.   And when you were on direct with Mr. Swartz, one

18  of the names that you and Mr. Swartz took great care to

19  talk about, at least in that subpoena, was Francisca

20  Perez; is that correct?

21    A.   Yes.

22    Q.   And you talked about Francisca Perez during your

23  Direct Examination; do you recall that?

24    A.   Yes.

25    Q.   And the reason why you talked about Francisca

1    Perez was because that was Dr. Pena's patient, correct?

2        A.   Yes.

3        Q.   And of course, you went out to go visit her at

4    the nursing home twice; is that right?

5        A.   Yes.

6        Q.   And I believe your testimony earlier was that at

7    the time you met with Dr. Pena on October 30th, 2017,

8    your hope from that meeting was to get his cooperation

9    in this investigation; do you recall that?

10       A.   It was October 27th.

11       Q.   I'm sorry, October 27th, 2017.  Almost two years

12   ago to the day, correct?

13       A.   Yes, sir.

14       Q.   You wanted his cooperation, correct?

15       A.   Yes.

16       Q.   Even though you were already trying to get

17   Francisca Perez' medical file; is that right?

18       A.   Yes.

19       Q.   And in fact, at the time you walked into that

20   office on October 27th, 2017, you knew that Dr. Pena was

21   a suspect; is that right?

22       A.   Yes, he is the subject of our investigation.

23       Q.   Well, he was even more than an a subject, he was

24   someone who was going to get presented to the Grand

25   Jury, correct?

1      A.   Yes.

2      Q.   And at the time you walked in, let's just be very

3   clear, at the time you walked in to meet with Dr. Pena

4   at this meeting, you called it a voluntary meeting; is

5   that right?

6      A.   Yes.

7      Q.   You never told Dr. Pena that he could have an

8   attorney present if he wanted one; is that right?

9      A.   Right.

10     Q.   You never gave Dr. Pena an admonition that

11  anything he said could be used against him in a court of

12  law, correct?

13     A.   We did, about the -- the 1001 statement, we did.

14     Q.   But the 1001 statement was you telling him that

15  it's a crime to lie to an FBI agent, correct?

16     A.   Right.

17     Q.   My question was, did you tell him anything he

18  said could be used against him in a court of law?

19     A.   No.

20     Q.   Because it was a voluntary statement; is that

21  right?

22     A.   It was a voluntary statement.

23     Q.   And you're just there to get his cooperation,

24  right?

25     A.   That was the first plan was to get cooperation,

1    yes.

2        Q.   Right.   So your plan to get Dr. Pena's

3    cooperation was to not tell him have an attorney

4    present, was to tell him -- or not tell him that what he

5    said could be used against him in a Court of law, and

6    not even to -- and to warn him that if he lied to an FBI

7    agent he would face criminal prosecution, correct?

8        A.   Yes.

9        Q.   And in fact, one of the major things you omitted

10   to Dr. Pena when you walked into his office on October

11   30th, 2017 was telling him that you had him on tape

12   allegedly taking kickbacks; is that correct?

13       A.   Yes.

14       Q.   I mean, I know that the ladies and gentlemen of

15   the jury heard portions of that tape, but you'd agree

16   with me that nowhere in the entirety of that recording

17   do you tell him that Edgar Jimenez and Jose Aguilar have

18   him on tape taking what they believe are kickbacks,

19   correct?

20       A.   Correct, we don't divulge sources.

21       Q.   Right.   You don't even tell them that, hey, we

22   have you dead to rights taking kickbacks; do you?

23       A.   No.

24       Q.   No.   Don't you think that would have helped

25   garner his cooperation if he knew that he was dead to

1    rights on taking bribes?

2       A.   We could have volunteered that information later,

3    but he was dishonest at every point throughout the

4    interview so I --

5       Q.   Even though he was dishonest, you still wanted

6    his cooperation; is that right?

7       A.   Yes.

8               MR. GUERRA:   Could I have the ELMO, please?

9               THE CLERK:   Yes, sir.

10              MR. GUERRA:   Thank you.

11      Q.   (By Mr. Guerra)  Do you recall this document,

12   Agent Williams?

13      A.   (No response.)

14      Q.   Do I need to zoom in?  I can if I need to.

15           I mean, I'll offer to you this is the target

16   letter.  That's what you and Mr. Swartz talked about.

17      A.   I was just reading to clarify.

18      Q.   And just for the credit of the record, we have it

19   marked as Defendant's Exhibit 26.

20           This is the letter that you held in your back

21   pocket when you went to go talk to Dr. Pena on October

22   27th, correct?

23      A.   Yes.

24      Q.   And this letter is actually dated October 26th,

25   2017?

1    A.  Yes.

2    Q.  Okay.  And in this letter, you're telling him

3    you're a target for committing health care fraud; is

4    that right?

5    A.  That's what the letter says.

6    Q.  And again, the letter says, in the future we

7    intend to seek a Grand Jury indictment against you in

8    connection with this investigation; is that right?

9    A.  Yes.

10   Q.  Okay.  However, before doing so, we're offering

11   you an opportunity to provide testimony and/or relevant

12   evidence to the Grand Jury investigating this matter.

13        Is that the letter you recall giving Dr. Pena?

14   A.  Yes.

15   Q.  First sentence of the next paragraph, before

16   making this decision, you may wish to consult with an

17   attorney.  If you choose to hire an attorney, he can

18   contact Mr. Lowell directly to discuss this matter; is

19   that right?

20   A.  Yes.

21   Q.  Again, that was information you didn't feel was

22   necessary to give Dr. Pena at the outset of your meeting

23   with him?

24   A.  We wanted to seek his cooperation at the lowest

25   level, meaning between me and him, and then later we

1    wanted to have this document so that he could recognize

2    if later he decides to come back and say, you know what,

3    it is in my best interest to cooperate, then he and his

4    attorney could come speak with Mr. Lowell and -- and

5    work out, you know, the terms of his cooperation.

6              MR. GUERRA:  Your Honor, I move to admit

7    Defendant's Exhibit 26.

8              MR. SWARTZ:  No objection, Your Honor.

9              THE COURT:  That's number 26, sir?

10             MR. GUERRA:  Yes, Your Honor.

11             THE COURT:  Number 26 is admitted.

12             MR. GUERRA:  Thank you, Your Honor.

13   Q.  (By Mr. Guerra)  The reason why you didn't tell

14   Dr. Pena he could have an attorney present is because

15   you knew if he had an attorney you wouldn't get the

16   information you possibly wanted; is that right?

17   A.  No.

18   Q.  The reason why you did not advise Dr. Pena to

19   have an attorney present is that you wanted him to be

20   backed into a corner; is that right?

21   A.  No.

22   Q.  And as the ladies and gentlemen of the jury heard

23   during the first minutes of that transcript, when

24   Dr. Pena first greets you, he thinks it has nothing to

25   do with Medicaid fraud; is that right?

1      A.   We didn't tell him before the meeting that it was

2    about Medicare fraud.

3      Q.   Right.   And as you talked to him earlier in the

4    beginning of that conversation, you admit previously to

5    discuss issues of corruption in Rio Bravo; is that

6    right?

7      A.   Yes.

8      Q.   Okay.   And in fact, when he greets you he says if

9    this have something to do with Rio Bravo; do you recall

10   that?

11     A.   Yes.

12     Q.   Okay.   So right off the bat, Dr. Pena was aware,

13   or Dr. Pena was a bit confused as to the reason why you

14   were there; is that fair to say?

15     A.   Yes.

16     Q.   But then you quickly changed and came back and

17   told him, no, this is about health care fraud; is that

18   right?

19     A.   Yes.

20     Q.   And then you asked some statements regarding the

21   potential kickbacks; is that right?

22     A.   Yes.

23     Q.   In those statements where you were asking him

24   whether or not he accepted kickbacks, did you ask him

25   specifically which companies he took kickbacks from?

1     A.   No.

2     Q.   Did you say, Dr. Pena, did you take kickbacks

3  from Generous?

4     A.   No.

5     Q.   Did you take kickbacks from Friends?

6     A.   No.

7     Q.   Did you take kickbacks from Transitions?

8     A.   No.

9     Q.   Did you take kickbacks from Merida?

10     A.   No.

11     Q.   So again, you're there, Dr. Pena's wondering why

12  you're there, you lead off with that issue regarding

13  kickbacks, but you never clarify that issue; is that

14  right?

15     A.   A general question about kickbacks, and if he had

16  told the truth and said, yes, then we would have

17  followed up, okay, who with?

18     Q.   Okay.   You never asked him anything else

19  regarding that kickback issue; is that right?

20     A.   Without the transcript, I can't recall 100

21  percent.

22     Q.   Okay.   Let me you ask this:   By the time you

23  walked into that meeting, you believed that you had

24  evidence of Dr. Pena taking money from Jimenez and

25  Aguilar?

1    A.  Yes.

2    Q.  Okay.  And that goes back to August 3rd and

3 August 18, 2017 meetings; is that right?

4    A.  Yes.

5    Q.  And that -- the ladies and gentlemen of the jury

6 you showed them exhibits of $2,500 paid off in two

7 separate installments, correct?

8    A.  Five thousand paid off in two separate

9 installments.

10    Q.  I'm sorry, that's why I'm an attorney not an

11 accountant.

12    A.  That's okay.

13    Q.  Yeah, I couldn't figure it out.

14    Dr. Pena told you, I was never paid for

15 referrals, I was paid for legitimate medical services;

16 that right?

17    A.  Yes.

18    Q.  You don't believe him, correct?

19    A.  No.

20    Q.  You are aware that Dr. Pena was the medical

21 director for Generous, correct?

22    A.  Yes.

23    Q.  And you are aware that Dr. Pena was the medical

24 director for Generous starting in 2014, correct?

25    A.  Yes.

1    Q.   Are you aware that from 2014 to 2016, he wasn't

2    paid the medical services fee to serve as a medical

3    director?

4    A.   He -- he was never technically paid for services.

5    If you listen to the recordings, he was paid for

6    kickbacks and the services were free.

7    Q.   So are you saying Dr. Pena never received a fee

8    as medical director for Generous?

9    A.   He may have received a fee.

10   Q.   As anybody would do when they're giving their

11   professional services, correct?

12   A.   If that's what it was for, then, yes.

13   Q.   I mean, you're getting paid to be here, correct?

14   A.   Correct.

15   Q.   And you're giving your professional services, I

16   mean, you're not being bribed to be here; are you?

17   A.   No.

18   Q.   Are you aware that Dr. Pena loaned Generous

19   $20,000 in June or July of 2014 to help start their

20   business?

21   A.   Yes.

22   Q.   Are you aware that they had not paid back his

23   loan?

24   A.   He said that they had on one of those recordings.

25   Q.   The entirety of the loan?

1     A.   When he talked to Mr. Cervantes in that recording

2   he says they've already paid me back the 20,000.

3     Q.   I believe the testimony was he paid back some of

4   the 20,000?

5     A.   He says that as well, but he also says that they

6   paid back the 20,000.

7     Q.   Roy, could you put up Francisco Pena Exhibit

8   Number 2, please.

9            THE COURT:   Please proceed.

10            MR. GUERRA:   Thank you, Your Honor.

11     Q.   (By Mr. Guerra)  Agent Williams have you seen

12   this document before?

13     A.   No.

14     Q.   Okay.  Roy, could you actually zoom in on the

15   check itself.

16            I'll offer you, Agent Williams, that this is a

17   check for $21,000 to Generous Home Care management from

18   Dr. Pena dated July 9th, 2014.

19            We'll try to zoom -- zoom in.

20            You've never seen this document before?

21     A.   No.

22     Q.   Are you aware that this is the loan that Dr. Pena

23   gave Generous to assist them in the starting of their

24   company?

25     A.   That's what it looks like.

1    Q.   Okay.  Are you aware that Generous was

2   significantly in debt to Dr. Pena?

3    A.   Yes.

4    Q.   Okay.  You're aware that on -- that in October

5   2015, Dr. Pena loaned them money in the amount of

6   $2,500?

7    A.   I'm not aware of that -- that loan.

8    Q.   Are you aware that Dr. Pena loaned them money on

9   December 10, 2015?

10    A.   I'm not aware of that loan.

11    Q.   Are you aware that on August 29th, 2017 Dr. Pena

12   loaned them $5,000?

13    A.   I'm not aware of that loan.

14    Q.   Are you aware that Dr. Pena leased Generous their

15   office space?

16    A.   Yes.

17    Q.   Are you aware that they were behind on their

18   lease payments?

19    A.   No.

20    Q.   Are you aware that the -- Mr. Aguilar and

21   Mr. Jimenez at Generous took numerous pieces of art and

22   furniture from Dr. Pena and never paid him back?

23    A.   I'm not aware of this.

24    Q.   Are you aware that they owed him $2,000 for a

25   painting?

1      A.   For?

2      Q.   A painting?

3      A.   A painting?

4      Q.   Yes.

5      A.   No, sir.

6      Q.   And that was a painting that was used to decorate

7   their offices?

8      A.   I have no knowledge of it.

9      Q.   Okay.  Are you aware that they also took various

10   pieces of art that totaled $7,750 and never paid him

11   back?

12      A.   No.

13      Q.   That never came up with Edgar and Jose?

14      A.   No.

15      Q.   All they told you was that they were paying him

16   bribes; is that right?

17      A.   They -- all -- all they told us is that he had

18   prompted them and that they had access to pay kickbacks.

19      Q.   And so in that transcript that we heard on August

20   3rd, 2017, it's your testimony to the ladies and

21   gentlemen of the jury that that was payment for a

22   kickback; is that right?

23      A.   Yes.

24      Q.   Kickback for what?

25      A.   Patient referrals.

1    Q.   And that was said during that transcript?

2    A.   Yes, he -- he asks -- he says, I was expecting

3    more, and then he talks about nine patients.

4    Q.   Yes, he was also expecting more because he was

5    owed several thousand dollars; are you aware of that?

6    A.   He would have said that, though, right?  If that

7    was -- if that's what the money was for, he would have

8    said that.  He said it's for patients.

9    Q.   Agent Williams, you're speculating as to what Dr.

10   Pena would have said had he received this money at that

11   time, correct?

12   A.   I will tell you that he said it was for nine

13   patients.

14   Q.   That's not what he said, that's not --

15   A.   He said, we were expecting more, I give you nine

16   patient.

17   Q.   Well, could it be that he was expecting more

18   because Generous was in significant debt to him?

19   A.   If that's the case, then it could be.

20   Q.   Agent Williams, is it your testimony that you

21   have never seen any checks paid from Generous to

22   Dr. Pena?

23   A.   From Generous to Dr. Pena.  That's correct.

24   Q.   Roy, could you put up Francisco Pena Exhibit

25   Number 4, please.  Zoom in on that check.

1      You've never seen this check before, Agent

2  Williams?

3      A.   No.

4      Q.   This is a check for $10,000 dated June 25th, 2016

5  from Generous Home Care, that's the company that Edgar

6  and Jose were involved in, correct?

7      A.   Yes.

8      Q.   And it's to Francisco Pena; is that right?

9      A.   Yes.

10     Q.   And what does the memo line say?

11     A.   For loan repayment Generous.

12     Q.   Now, it's your testimony that this is just a

13  fraud, a veil, I believe is the word that you used

14  earlier; is that right?

15     A.   No, this appears to be for a loan repayment.

16     Q.   Okay.  So this is a legitimate loan repayment; is

17  that right?

18     A.   It appears to be.

19     Q.   And that's because these gentlemen owed Dr. Pena

20  money, correct?

21     A.   Yes, for a loan.

22     Q.   Roy, can you bring up Francisco Pena Exhibit

23  Number 5, please.  Can you zoom in on the check.

24      You've never seen this document either?

25     A.   No.

1     Q.   Again, this is a check dated July 22nd, 2016 for

2     $1,000.  Who's it from?

3     A.   Generous Home Care management.

4     Q.   And who's it to?

5     A.   Francisco Pena.

6     Q.   And what does the memo line say?

7     A.   It says loan repayment.

8     Q.   You have no reason to dispute that this is an

9     actual loan repayment; do you?

10    A.   That's what it appears to be.

11    Q.   And you never talked about loan repayments with

12    Jose and Edgar?

13    A.   They discussed that they had taken a loan from

14    Dr. Pena.

15    Q.   Right.  And this is them paying him back,

16    correct?

17    A.   It appears to be.

18    Q.   Roy, can you go to Francisco Pena Exhibit Number

19    6.  Zoom in on the check, please.

20         Again, have you seen this document before?

21    A.   No.

22    Q.   This is a check dated August 19th, 2016 from

23    Generous to -- who's it to?

24    A.   Francisco Pena.

25    Q.   And is it for $5,000, what does the memo line

1   say?

2      A.  Loan repayment.

3      Q.  Again, you have no reason to dispute that this

4   isn't part of the loan repayment; is that right?

5          MR. SWARTZ:  Your Honor, object, he's asking

6   the witness to speculate about the significance of this

7   check and he's already said he wasn't aware of the

8   loans.

9          MR. GUERRA:  Does he have any reason to

10  believe that this wasn't anything but what it says it

11  is.

12         MR. SWARTZ:  He's asking him to

13  speculate about it being a loan.

14         THE COURT:  Ask the question again.  Let me

15  hear the question.

16         MR. GUERRA:  Sure.

17     Q.  (By Mr. Guerra)  Agent Williams, do you have any

18  reason to believe that this Exhibit 6 is a kickback?

19     A.  This one, it -- the memo line says for loan

20  repayment.

21     Q.  Okay.  So based on my math, I count $16,000 paid

22  back from Generous to Francisco Pena as of, at least

23  August 19, 2016, correct?

24     A.  Yes.

25     Q.  Okay.  And we've already gone through one loan

1  check for $21,000; is that right?

2      A.  Yes.

3      Q.  Okay.  And we've talked about $7,750 in

4  antiquities and art that remained outstanding; do you

5  recall that?  We just talked about it.

6      A.  Yes.

7      Q.  And I believe we talked about some other checks

8  that came in, too, that were a loan from Dr. Pena to

9  Generous, correct?

10     A.  We've talked about it, yes.

11     Q.  Right.  So if Generous owes this money to

12 Dr. Pena and they pay him something, why do we not

13 believe that it's not payment for what's owed?

14     A.  Because eventually you run out of the $20,000

15 loan, and I -- I have no knowledge of the art, but if --

16 if what you're telling me is that it's gone, eventually

17 you run out of that.  And then if you go back to the

18 recordings and you pay him money and he says, I was

19 expecting more, I gave you nine patients in the same

20 breath, that doesn't sound like loan repayment, that

21 doesn't sound like art purchase, that sounds like a

22 kickback.

23     Q.  Was Generous doing well financially?

24     A.  No.

25     Q.  Generous was in -- I mean, I'll use the adjective

1    dire, Generous was in dire financial trouble; is that

2    right?

3        A.   Yes.

4        Q.   Generous owed a lot of money to the IRS; didn't

5    it?

6        A.   Yes.

7        Q.   In fact, Generous, at times, was having issues

8    meeting payroll; wasn't it?

9        A.   Yes.

10       Q.   Roy, could you call up Francisco Pena Exhibit 14,

11   please.  Can you zoom into the middle there.

12            Have you seen that document before, Agent

13   Williams?

14       A.   No.

15       Q.   I'll offer to you that this is a notice -- this

16   is a notice of federal tax lien against Generous.  See

17   that there?

18       A.   Yes.

19       Q.   You see that -- you see it's dated February 28th,

20   2018?

21       A.   Yes.

22       Q.   Okay.  This was well after the events that you

23   and Mr. Swartz talked about this morning.

24            But go to the middle, Roy.

25            It shows from 2016 to 2017, Generous owed taxes

1    to the IRS well in excess of $200,000?

2        A.   (No response.)

3        Q.   I mean again, I'm just a lawyer; I don't know

4    math but --

5        A.   Yes, that appears to be accurate.

6        Q.   Right.

7             Roy, could you go to Francisco Pena Exhibit 15,

8    please.

9             And again, notice of federal tax lien.

10            In the middle, Roy.

11            Another $4,000 going in from '17 to '18; is that

12   right?

13       A.   Yes.

14       Q.   And then, Roy go to Francisco Pena Exhibit Number

15   16 as well.

16            Again, federal tax lien, the middle, '17, almost

17   $63,000; is that fair to say?

18       A.   Yes.

19       Q.   Okay.  So Generous was in debt, they weren't

20   paying their medical director, all of a sudden they come

21   back in and they have cash, again, you still believe

22   that that's a kickback, correct?

23       A.   Based on Mr. Pena's comments in the recording,

24   yes.

25       Q.   Okay.  Are you aware that at the time Dr. Pena

1    left Generous they owed him $12,000 in unpaid wages?

2        A.   No.

3        Q.   Well, you should because he told you that.

4        A.   He told me a lot of things, and some of those

5    were true and some of them weren't true.

6        Q.   Okay.  So now you're saying that he lied to you

7    when he said that they owed him $12,000?

8        A.   I'm saying he lied through the interview so we

9    have to approach with scrutiny the other things that

10   were said during the interview.

11       Q.   So you have an unpaid loan, you have these

12   antiquities, you have unpaid medical director fees, but

13   again, when these gentlemen come in it and pay $2,500 in

14   cash on two separate occasions, that's a kickback to

15   you; is that right?

16       A.   It's a kickback to him.

17       Q.   I'm sorry, in your estimation?

18       A.   Sorry, I'm not trying to have -- have an

19   attitude.  I'm saying it was -- it was a kickback in his

20   eyes based on his statements.

21       Q.   Do you know how Generous, when they could afford

22   to pay Dr. Pena, do you know how they did it?

23       A.   Sorry, can you say it again?

24       Q.   Sure.  Do you know how Generous would pay

25   Dr. Pena when they could afford to do it?  Do you know

1    how they do it?

2        A.   How?

3        Q.   They paid by check, okay?

4        A.   Okay.

5        Q.   Are you aware that the first time they paid him

6    cash was when you gave them the $2,500 on August 3rd,

7    2017?

8        A.   Yes.

9        Q.   You're aware of that?

10       A.   Yes.

11       Q.   How are you aware of that?

12       A.   Because they told us that they normally pay by

13   check.

14       Q.   Okay, so you did know that they normally paid him

15   by check?

16       A.   So, yeah, yeah, I forgot about it.   Sorry.

17       Q.   Yes, no, of course.   And so when Dr. Pena came

18   back on August 17th -- or sorry, when Edgar and Jose

19   came back on August 17th with another $2,500, and I

20   believe you and Mr. Swartz talked about this, Ms. Pena

21   was surprised; wasn't she?

22       A.   August 18th?

23       Q.   August 18th, I'm sorry, on August 18th, she was

24   surprised, right?

25       A.   Yes, she said check again.

1    Q.   No, she said cash again.

2    A.   Or cash again, sorry.

3    Q.   Because they normally paid with check; is that

4    right?

5    A.   Yes.

6    Q.   Okay.  And again, based on Ms. Pena's reaction to

7    you, you considered that part and parcel of Dr. Pena and

8    his office accepting kickbacks for referrals?

9    A.   Based on the surrounding conversation, yes.

10   Q.   How many patients got transferred to Generous

11   after August 3rd, 2017?

12   A.   The -- the number was unclear because they

13   essentially had a resolving door.

14   Q.   Okay.

15   A.   Based on that conversation it should have been

16   nine.

17   Q.   And did nine -- did you follow-up, did nine

18   patients go to Generous on August 3rd or shortly

19   thereafter?

20   A.   I did not follow-up, I proceeded to the next

21   phase of our investigation.

22   Q.   Well, don't you think as part of your

23   investigation that would have been information that you

24   should have followed-up on?

25   A.   It could have been useful information.

1    Q.   Not useful information, I mean here we are in a

2    criminal trial, you're accusing Dr. Pena of Medicaid

3    fraud, you're saying he took a kickback from $2,500 to

4    move nine patients, but you have no proof to the ladies

5    and gentlemen of the jury that nine patients went; do

6    you?

7    A.   We have proof that he accepted the kickback for

8    the patients.

9    Q.   Agent Williams, do you have proof that nine

10   patients went to Generous as a result of paying that

11   $2,500?

12   A.   I don't recall the names of the patients, no.

13   Q.   You don't; do you?

14   A.   No.

15   Q.   And again, on August 17th, did I get that right,

16   August 17th?

17   A.   August 18th.

18   Q.   August 18th, 2017 another $2500 was paid in cash

19   to Dr. Pena.  How many patients changed medical

20   practices as a result of that?

21   A.   That was supposed to be for the monthly

22   installment that he required to keep patients on -- on

23   hospice.

24   Q.   You speak of monthly installments.  Do you know

25   how Dr. Pena was supposed to have been paid as a medical

1    director for Generous?  Weekly?  Monthly?

2        A.  He was supposed to be paid for services but --

3        Q.  Right.

4        A.  Monthly.

5        Q.  Do you know -- monthly, that's right.  So if

6    again they come in with $2,500 for a monthly payment,

7    why is that anything but payment for medical services,

8    why is that a kickback?

9        A.  Because he talks to -- talks to them about

10   Mr. Castillo and says if he doesn't pay, then I take my

11   patients.

12       Q.  All right.  Well, let's go talk about

13   Mr. Castillo.  You were able to verify that based on his

14   conversations about Mr. Castillo that Dr. Pena took 45

15   patients away from Mr. Castillo at Friends, correct?

16       A.  No.

17       Q.  Well, based on these allegations that he's moving

18   patients if they don't pay him, you have evidence

19   showing that he would do that over the course of time,

20   correct?

21       A.  That was evidence that he expressed intent.

22       Q.  Oh.

23       A.  To do that that.

24       Q.  But did he do it?

25       A.  I don't know what he did with Mr. Castillo.

1    Q.   How -- how many times can you tell the ladies and

2   gentlemen of the jury that Dr. Pena moved patients when

3   he didn't get paid his "kickback"?

4    A.   I didn't tell them, he told them that in the

5   recording.

6    Q.   Did you verify?  Again, did you verify that?

7    A.   I'm not investigating Mr. Castillo's company.

8    Q.   But you are investigating Dr. Pena.  And so what

9   your criticism of Dr. Pena is, is that he was taking

10   bribes and moving patients as a commodity; isn't that

11   right?

12    A.   Yes.

13    Q.   So did you find out?  Did he do it?

14    A.   I don't know what he did with Mr. Castillo.

15    Q.   I mean, you'd agree with me that there is a

16   difference between action and a threat, correct?

17    A.   Yes.

18    Q.   And you never heard any conversation between Juan

19   Castillo and Dr. Francisco Pena where he tells

20   Dr. Castillo, if you don't pay me, I'm taking 45

21   patients and moving them; you don't recall that

22   conversation; do you?

23    A.   No.

24    Q.   And in fact, the only thing you heard was

25   Dr. Pena talking to Edgar Jimenez and Jose Aguilar,

1    that's it, correct?

2        A.   Correct.

3        Q.   There was no action that substantiated whatever

4    statements he was making in that office; was there?

5        A.   No.

6        Q.   And in fact, there was no conversation that you

7    know of between Juan Castillo and Francisco Pena about

8    that, correct?

9        A.   Correct.

10       Q.   Did you ever talk to Juan Castillo?

11       A.   No.

12       Q.   You didn't think that would have been helpful

13   information to go to him and find out whether or not

14   Dr. Pena actually threatened him with removing 45

15   patients from hospice if he didn't get paid?

16       A.   Sorry, can you rephrase the question?

17       Q.   I'll repeat it.

18       A.   Okay.

19       Q.   I said you never thought to go to Dr. Juan

20   Castillo and ask him if Dr. Pena threatened him with

21   removing 45 hospice patients if he didn't get paid?

22       A.   Mr. Castillo?

23       Q.   Yes.

24       A.   No, we did not talk to Mr. Castillo.

25       Q.   Again, don't you think that would have been

1   helpful, useful information?

2       A.  It could have been useful, yes.

3       Q.  But it not only could have been, it would have

4   been useful information because that statement you just

5   talked about, that we talked about, is the basis for you

6   saying that my client took kickbacks, correct?

7       A.  No, he's accepting kickbacks on video is our

8   basis.

9       Q.  His accepting money is the basis, the kickback

10  part comes from you filling in the blanks; isn't that

11  right?

12      A.  It comes from his statements filling in the

13  blanks.

14      Q.  Oh, I'm sorry.  Did he say, okay, I'm

15  transferring these patients over to you now?  I must

16  have missed that, I'm sorry.

17      A.  Not in the exact words, no.

18      Q.  Okay.  And did he say, thank you for the money,

19  here comes ten patients?  Did -- did he say that on --

20  on the tape?

21      A.  He says, he looks at the money and says, we were

22  expecting more, I gave you nine patients.

23      Q.  Right, we were expecting more because he's owed

24  more, correct?

25      A.  Owed more for the kickback, or for the art and

1    the --

2    Q.  Agent, you know, you know that he's owed money

3    for the loans?

4    A.  Right, I --

5    Q.  You know that Generous is hurting financially?

6    A.  Right.

7    Q.  You know that they're missing payments on their

8    loan on everything else; yet, you think it's a kickback,

9    correct?

10   A.  I think it's a kickback because he accepted it as

11   such.

12   Q.  How many hospices -- well, it's clear that

13   Dr. Pena referred patients to multiple hospices; is that

14   right?

15   A.  Yes.

16   Q.  Okay.  And we talked about Generous, we talked

17   about Friends, we talked about Transitions -- did I miss

18   one?  I may have missed one.

19   A.  Merida.

20   Q.  Merida, okay.  And at the time of the interview

21   was Dr. Pena working for Merida?

22   A.  Let's see.  At the -- let's see, at the time of

23   the interview, I'm not sure if he was still working

24   there, working for them as of October the 27th.

25   Q.  Well --

1      A.   I -- I believe he was not.

2      Q.   I'm sorry.  Roy, could you put up Defendant Pena

3  Exhibit 23, please.  I'm sorry, not 23.  Strike that.

4           22, I apologize, 22.  Can you zoom up to the

5  date.  There you go.

6           What's the date of that letter, sir?

7      A.   January 4th, 2017.

8      Q.   Have you seen this document before?

9      A.   No.

10     Q.   Okay.  I'll offer to you that this is Dr. Pena's

11 resignation from Merida ten months, give or take, prior

12 to the conversation that you had with him.  You've never

13 seen this before?

14     A.   No.

15     Q.   Are you aware that Dr. Pena was telling Merida

16 you owe me $12,000?  $11,500.

17     A.   Yes.

18     Q.   Okay.  Are you aware that that is for past

19 medical director services rendered but never paid for,

20 or is that a kickback, too?

21          MR. SWARTZ:  Your Honor, he's asking the

22 witness to speculate about what that money relates to

23 and the document he has no personal knowledge about.

24          THE COURT:  Rephrase the question.

25          MR. GUERRA:  Yes, Your Honor.

1    Q.   (By Mr. Guerra)  You said that you had access

2    through subpoenas to Merida's medical records; is that

3    right?

4    A.   Yes.

5    Q.   Did you look at checks from Merida to Dr. Pena?

6    A.   Yes, we did.

7    Q.   They paid him checks, right?

8    A.   Yes.

9    Q.   Okay.  And all your subpoenaing and

10   investigation, did you ever see where they were behind

11   on paying him for medical director services?

12   A.   I heard statements from him that they were

13   behind.

14   Q.   And you believe those?

15   A.   The question isn't whether they owed him money,

16   the question would be whether it was based on services,

17   or if it was a kickback veil to services.

18   Q.   Okay.  So here where he's actually writing a

19   letter, you owe me $11,500 in -- in your training and

20   estimation this was part of a veiled kickback demand?

21   A.   It could be.

22   Q.   Okay.  You testified earlier that Dr. Pena, when

23   you met with him on October 27th, 2017, tells you that

24   Merida owes him, approximately, $12,000, 11500; you

25   recall that?

1    A.  Yes.

2    Q.  And now we have a demand letter dated January

3  4th, 2017; is that right?

4    A.  Yes.

5    Q.  So could we at least agree that he was being

6  truthful when he said that he was owed money from

7  Merida?

8    A.  It appears that that is the case, yes.

9    Q.  Okay.  But when I asked you if you thought he was

10  being truthful about the money Generous owed him, you

11  said that you couldn't trust anything he was saying; do

12  you recall that?

13    A.  I said we would have to approach it with

14  scrutiny.

15    Q.  Okay.  Having seen this, does your jaundiced eye

16  change at all as to whether or not Dr. Pena was owed

17  that money?

18    A.  My what?

19    Q.  Your jaundiced eye?

20    A.  Jaundiced eye?

21    Q.  Yeah, your casting with doubt on it?

22    A.  It makes me trust a little bit more the amount of

23  money, the fact that we have highlighted services

24  rendered I -- I still look at with scrutiny.

25         MR. GUERRA:  Sandra, may I have the ELMO,

1   please?

2            THE CLERK:  Yes, sir.

3       Q.  (By Mr. Guerra)  Agent Williams, in all your

4   training and all your experience regarding Medicare and

5   Medicare fraud, what portion of that dealt with

6   hospices?

7       A.  Case studies on -- leading up to this was case

8   studies on -- on hospice fraud.

9       Q.  Okay.  How many prior cases did you investigate

10  hospice fraud?

11      A.  This was the first one that I led.

12      Q.  Okay.  And -- and when you deal with Medicare

13  fraud, you're -- you're talking about DME, durable

14  medical equipment, maybe you're dealing with therapy

15  services; is that right?

16      A.  You could be.

17      Q.  Okay.  But this is your first hospice case,

18  correct?

19      A.  Yes.

20      Q.  Are you aware that under Medicare guidelines,

21  even if a patient is on hospice, a doctor can take no

22  action to end someone's life; are you aware of that?

23      A.  Say it -- saying to end someone's life?

24      Q.  Yes.

25      A.  Okay.  Yes.

1      Q.   Are you aware of that?

2      A.   I mean, there's a difference between that,

3   doing -- ending someone's life and allowing them to die.

4      Q.   Understood.  And that is an important

5   distinction.  However, let me ask you this:  Are you

6   aware that under Medicare guidelines that a terminal

7   patient who is dying but does not have a do not

8   resuscitate order must be given lifesaving services?

9      A.   Okay.

10      Q.   Are you aware of that?

11      A.   I -- if you're telling me that then I -- then I

12   will accept that, yeah.

13      Q.   And so based on your acceptance now, I would

14   imagine you were not aware of that at the time you began

15   your investigation in this case; correct?

16      A.   Not aware of the specific rule, no.

17      Q.   Okay.  And Dr. Pena talked about that on October

18   27, 2017 when he met with you and Special Agent Rice in

19   his office; isn't that right?

20      A.   Yes, when we asked him if he extended life.

21      Q.   And I believe the question was, did you -- well,

22   you asked him if he extended life, and Dr. Pena says he

23   didn't believe in the six -- six-month guideline; is

24   that right?

25      A.   When we asked him if he extended life, he said

1    that he did not push patients to death.

2        Q.   Right.   You're not accusing Dr. Pena of finding

3    someone's who's dying and going over there and giving

4    them paddles to bring them back to life and keep them on

5    hospice for another six months, that's not what you're

6    accusing him of right?

7        A.   No.

8        Q.   What you're accusing him of is basically

9    prolonging someone's life unnecessarily, correct?

10       A.   That would be accurate.

11       Q.   Hospice care is comfort care; is it not?

12       A.   Yes.

13       Q.   If someone is believed to be terminal, you give

14   that person the care to make them comfortable, right?

15       A.   Yes, that's palliative care.

16       Q.   I mean, is that your understanding of it?

17       A.   That's palliative care, yes.

18       Q.   I mean, you were presented as the Medicare expert

19   investigating these crimes, I want to know what you

20   know.   That's your understanding, right?

21       A.   I was not presented as a Medicare expert, but as

22   an investigator, yes.

23       Q.   I'm going go to the -- the aid right now and

24   specifically page 8.   And I apologize Agent Williams.   I

25   don't know if this was the August 3rd or August 18th,

1    2017 conversation, but you recall talking about this

2    with Mr. Swartz earlier today; is that right?

3        A.   Yes.

4        Q.   And Dr. Pena is here, and you and Mr. Swartz

5    focused on this particular part of the testimony when he

6    says, no, I saved another lady identical to this lady

7    from CIMA constipated and, pardon the vulgarity, shit

8    and she would not move.  I put her on IV, fluids,

9    suctioning, suctioning and she's alive today and she's

10   94 years old.

11        And when you and Mr. Swartz talked about this,

12   this was evidence you pointed to to show that he was

13   extending someone's life; is that right?

14       A.   Provided in the context of the conversation yes.

15       Q.   But isn't this giving someone comfort care?  I

16   mean, someone is constipated, they're not feeling well,

17   isn't this making them feel better?

18       A.   It could make them feel better.

19       Q.   Is it the position of the United States

20   Government that Dr. Pena should have let this lady just

21   suffer and die?

22       A.   Let her suffer, no.

23       Q.   Well, if she was constipated and he helped move

24   her bowels, that's not extending her life, maybe it is,

25   but it's making her comfortable, isn't it?

1    A.   Yes.

2    Q.   But would you have rather him do nothing?

3    A.   No, he -- medical directors exist for a reason.

4    Q.   Okay.   So this was a legitimate medical action

5    taken by my client?

6    A.   I'm not saying that either.

7    Q.   Okay.   So you're not saying that this was

8    legitimate, but you are saying that he should have taken

9    this action to help make this patient comfortable; is

10   that right?

11   A.   Well, provided the context of the conversation.

12   Q.   Oh, yes.   It's not --

13   A.   He's not talking about, I did this to comfort

14   this patient, this conversation was he was upset with

15   the guys from Generous with Mr. Jimenez and Mr. Aguilar

16   about letting a patient die because he has likened, I

17   give you patients, I'm giving you money and you're

18   throwing it away.

19   Q.   And I believe part of the problem Agent Williams

20   with the way you and -- and Mr. Swartz went through the

21   direct is that you had snippets of the conversations;

22   isn't that right?

23   A.   We did.

24   Q.   Right.   In other words, as part of a show and

25   tell direct infomercial, you guys would play little

1  segments, comments and play more segments; is that

2  right?

3      A.  We did.

4      Q.  Okay.  So you're saying, and even though it's not

5  on that particular section, you're saying, well, that

6  was part of him being critical of the guys at Generous

7  for letting a patient die, correct?

8      A.  Yes.

9      Q.  You would agree with me that during the course of

10  that conversation, Dr. Pena was critical of the care

11  that they were giving someone, he thought that he -- he

12  thought that they weren't giving that patient the proper

13  medical care; is that right?

14      A.  I can't determine if that's what it was about.

15      Q.  Do you know what happens if you give a patient

16  excess amounts of morphine?

17      A.  If you -- depends on how much you give them but,

18  yes, they could die.

19      Q.  If a patient with a weak or irregular heart beat

20  receives too much morphine, do you know that that

21  patient could go into cardiac arrest?

22      A.  I don't have any medical foundation to draw on.

23      Q.  Okay.  And so if I were to tell that you someone

24  with respiratory problems receiving too much morphine

25  could go into respiratory failure; are you aware of

1    that?

2       A.   No.

3       Q.   I'll go to page 10.   Again, you covered this with

4    Mr. Swartz.

5            Do you recall this part of the testimony?

6       A.   This --

7       Q.   This guy has cancer of the stomach.

8       A.   From talking to Mr. Cervantes; that's correct.

9       Q.   I will tell you right now.   Yes, it is with

10   Mr. Cervantes.

11           Dr. Pena says this guy had cancer of the stomach,

12   he had a gastrostomy tube to be fed, to be fed, did

13   everything necessary to keep him alive for at least I

14   would say two more months.   No, they went and gave him

15   morphine and all that so the guy went into respiratory

16   failure.

17           Are you aware that he's being critical of the

18   medical care that the guys at Generous are giving to

19   their patients?

20      A.   Yes.

21      Q.   Okay.

22      A.   And he continued to refer patients to them.

23      Q.   So you're critical of him referring patients to

24   General even though he's critical of the medical care

25   they're giving?

1    A.   If it's an honest criticism, then it seems

2  suspect that he would continue to be their medical

3  director and continue to provide patients to them.

4    Q.   You had this recording in your possession at the

5  time you went to go interview Dr. Pena at his offices,

6  correct?

7    A.   Yes, I did not have a translation yet.

8    Q.   Understood.  But you knew that this was something

9  there and -- and as we looked at here, there was no

10  translation needed, I mean it's English to English?

11    A.   Correct.

12    Q.   Okay.  So the conversation you and I just had

13  over a couple of minutes you never thought to ask

14  Dr. Pena, hey, if you disagreed with the care at

15  Generous why do you keep sending them patients?  You

16  never thought to ask him that?

17    A.   Again, based on the events that took place in

18  that conversation, he wasn't being truthful, so we

19  didn't want to reveal the -- the full case to him.

20    Q.   So that -- that's a no, you didn't think to ask

21  him that?

22    A.   No, I did not.

23    Q.   Okay.  And let's get right down to it.

24       This is another section right here that you and

25  Mr. Swartz talked about.  And the way you make money is

1    by keeping them alive for as long as you can, it's all

2    right to give them comfort measures but you don't want

3    to kill them.  I mean, if that's the take-away from your

4    testimony, that's it right there, correct?  In a

5    nutshell that's the Government's case against Dr. Pena?

6         A.   He represents it as killing them.

7         Q.   Okay.

8         A.   Right.

9         Q.   Well, if you're giving poor medical care to

10   someone, improper medical care, that would kill them,

11   correct?

12        A.   It could.

13        Q.   Okay.  But also, let's just talk just straight

14   economics.

15        A.   Okay.

16        Q.   A person in the hospital for two days is going to

17   rack up medical fees less than someone in the hospital

18   for two months?

19        A.   That's correct.

20        Q.   Okay.  So if someone is in hospice for two

21   months, they're going to end up billing more, legitimate

22   as it is, they'll bill more than someone on hospice for

23   two days, correct?

24        A.   Yes.

25        Q.   Okay.  And nowhere in -- in the totality of this

1    statement does Dr. Pena say, and this is what I do, I

2    keep them alive so I can make money, correct?

3        A.   He doesn't use those exact words, no.

4        Q.   No, but there -- that is a true statement; is it

5    not, we just talked about it, that's a true statement,

6    you make money if someone stays alive because they're --

7    they're billing, correct?

8        A.   Correct.

9        Q.   But there's nothing in there that Dr. Pena is

10   saying I'm keeping them alive for as long as possible so

11   I can make money, correct?

12       A.   Correct.

13       Q.   And he's not telling Cervantes we need to keep

14   these people alive so we can make money, correct?

15       A.   Right.

16       Q.   All he's saying is the longer they're on -- the

17   longer they're on here, the more you can bill, that's

18   all he's saying, correct?

19       A.   Yes.

20       Q.   You may disagree with that, you may think it's

21   distasteful, but as you talked about, that's just simple

22   economics; is it not?

23       A.   It could be interpreted as that, I guess.

24       Q.   I want to go to page 14 of the aid.  And I'll

25   offer to you that this was a conversation, again, with

1    Edgar Jimenez and Jose Aguilar, I believe it was on

2    August 18th.  Go to page 14.

3         Do you recall talking with Mr. Swartz, coming to

4    the conclusion that Dr. Virlar was going to be the

5    medical director for Generous?

6    A.  It was discussed, yes.

7    Q.  Okay.  And -- and you point to this statement

8    here stating that this is the discussion where they

9    talked about it, correct?

10   A.  This is one of those discussions, yes.

11   Q.  Well, I mean not only is this one of those

12   discussions, I believe when you and Mr. Swartz were

13   talking about the alleged false statements made by

14   Dr. Pena to the FBI, this was one of the statements you

15   referred to, correct?

16   A.  Can you refresh my mind specifically on which one

17   you're talking about?

18   Q.  Which one, this one?

19   A.  On which false statement?

20   Q.  Oh, the one that you said that he was mixed up

21   with Dr. Virlar and to have Dr. Virlar to come in to be

22   the medical director of Generous.

23        I believe it was in the context of your

24   conclusion that if you spread people around you make

25   more money; do you recall that?

1    A.   Okay.   I remember the conversation about where --

2   where Dr. Pena provided that advice.

3    Q.   Right.   But this doesn't say anything about

4   Dr. Virlar coming on as medical director of Generous;

5   does it?

6    A.   This is a -- this is one of those discussions

7   that they had because there was a previous discussion on

8   August the 3rd where -- where he made reference to

9   spreading patients around like you said.

10    Q.   Understood.   Dr. Virlar wasn't involved anywhere,

11   mentioned anywhere in that August 3rd, 2013

12   conversation; was he?

13    A.   Right, that's correct.

14    Q.   And in fact, the only time Dr. Virlar comes up is

15   when mail voice 3, I don't know if that's Jimenez or

16   Aguilar, one of them brings him up, correct?

17    A.   Correct, that would be Mr. Aguilar bringing him

18   up right there.

19    Q.   All right.   And he continues and says, Virlar,

20   you know he was with Merida, I don't know, correct?

21    A.   Yes, they're asking him based on the conversation

22   that he had before, would this be a suitable person to

23   do -- to conduct this activity.

24    Q.   How do you obtain that from this -- I don't see

25   that in this transcript, where do you get that?

1    A.   You have to use the August 3rd transcript and the

2  August 18th transcript.

3    Q.   And where in the August 3rd transcript do you

4  make that connection, Agent Williams?

5    A.   Would you like me to --

6    Q.   Yes, please.

7    A.   Okay.  Do we have a complete copy?

8    Q.   So it wasn't in the portion of the transcript we

9  played to the jury earlier?

10    A.   I -- I'm not finding it right now.

11    Q.   Okay.  So earlier when you said that -- that --

12  that the conversations contained in this aid when you

13  testified on it, there's nothing in the August 3rd

14  conversation, at least what was played to the jury on

15  this aid, that links any sort of conversation hiring

16  Virlar to go to Generous; is that right?

17    A.   Of what was played, that's correct.

18    Q.   And as we talked about earlier, in those tapes

19  there's more conversations, more information in there;

20  is that right?

21    A.   Yes.

22    Q.   Is there a specific conversation that you recall

23  on those tapes that talk about that?

24    A.   In general, there was a conversation that took

25  place where Dr. Pena told them they needed another

1    doctor because it wasn't going look to right if all the

2    patients came from just him.

3        Q.   Okay.  Let's move on, Agent Williams.

4        On page 15.

5        A.   Okay.

6        Q.   We talk -- I guess earlier you talked to

7    Mr. Swartz about Houston.  Again, it was your conclusion

8    based on these transcripts that the Houston testimony

9    was referring to Medicaid enforcement activities up

10   there?

11       A.   It appears to be a discussion about some sort of

12   legal action.

13       Q.   Okay.  And it has nothing do -- are you aware

14   that maybe this conversation had something to do with

15   improper medical services being administered over there?

16       A.   That wouldn't make sense because they're talking

17   about a kickback right before that, they were talking

18   about how much is Rodney paying to Dr. Virlar.

19       Q.   You're not accusing Rodney of -- of taking bribes

20   in Houston; are you?

21       A.   No, that -- that's the conversation they're

22   having was about how much is Rodney paying.

23       Q.   Uh-huh.

24       A.   And then they -- two seconds, literally two

25   seconds later the conversation continues, and then let's

1   see at 11:29, that's when Dr. Pena makes his statement

2   about what has come out of Houston.  So within 15

3   seconds it -- that is -- that's logical that that would

4   be what they were talking about.

5      Q.  And again, they're not talking about Dr. Pena

6   doing anything like that with Edgar or Jose; are they?

7      A.  Right there, I mean he's -- he's the one leading

8   that conversation.

9      Q.  He's not saying he's taking bribes, they're not

10  talking about the scheme that they're engaging in to

11  take bribes; are they?

12     A.  I mean, that's -- that's, yeah, well, yeah I

13  guess in context of that conversation they're talking

14  about Rodney and they're talking about Virlar,

15  Dr. Virlar.

16     Q.  Virlar?  Okay.  And there's nothing in these --

17  nothing in these transcripts that says that Dr. Pena

18  even knows who Dr. Virlar is, correct?

19     A.  Correct.

20     Q.  I'll switch, again we'll go to the aid, we'll

21  look at page 18.  And this is not much to talk about,

22  just -- we had talked about this previously.  This is

23  when Ms. Pena says, again, this is in reference to her

24  receiving cash from Edgar from Jose again, correct?

25     A.  Yes.

1      Q.   Agent Williams, did you -- you prepared some --

2  well, let me ask this:   In the course of your

3  investigation, did you author what are called 302

4  statements?

5      A.   Yes.

6      Q.   Okay.   And for the ladies and gentlemen of the

7  jury, 302 statements are based on your recollection,

8  your -- your transcription, if you will, of an interview

9  with a witness or suspect, correct?

10     A.   Or -- or of events, yes.

11     Q.   Of or of events, yes, of course.   In other words,

12  a meeting or person you boil it down to 302, correct?

13     A.   Yes.

14     Q.   And as you talked about when you and I first

15  started talking, when you give someone a what's that, a

16  1001 warning?

17     A.   Yes.

18     Q.   You're telling them they've got to be truthful

19  when they talk to you; is that right?

20     A.   Yes.

21     Q.   And in fact, when an FBI agent meets with a

22  suspect or a witness and even a United States attorney

23  is present, the crime isn't lying to the United States

24  attorney, the crime is lying to you; correct?

25     A.   Yes.

1    Q.   And as you testified to earlier, you had the

2    capability when you're meeting with someone to record

3    the conversation; correct?

4    A.   Yes.

5    Q.   I mean, it could be surreptitiously, like putting

6    on a button cam, a credit card recorder, or it could

7    just be as open and obvious as putting your i-Phone down

8    and pressing record, correct?

9    A.   Correct.

10   Q.   Why record?

11   A.   Why record?

12   Q.   Yeah.

13   A.   To get a more accurate representation of the

14   conversation.

15   Q.   Okay.  You could also take written notes; is that

16   right?

17   A.   Yes.

18   Q.   You'd agree with me that sometimes written notes

19   may not be accurate, they may not capture everything?

20   A.   That's possible, yes.

21   Q.   Okay.  Are you -- are your written notes

22   accurate?

23   A.   Sometimes more than others.

24   Q.   Okay.  And when you write your 302 reports are

25   those accurate?

1      A.   They're as -- as thorough as we can be.

2      Q.   Right.  Because you know that in writing that 302

3   report it's not just going to go to the Department of

4   Justice, correct?

5      A.   Correct.

6      Q.   You know that somewhere down the line, someone

7   like me, or the other defense attorneys here will be

8   able to review the notes that you've made, correct?

9      A.   That's correct.

10      Q.   And you'll also know that if those 302 statements

11   could be the basis for future criminal prosecution; is

12   that right?

13      A.   That's correct.

14      Q.   And you also know that those 302's could be the

15   basis for a Grand Jury proceeding, correct?

16      A.   Correct.

17      Q.   So it's important for you to be as accurate as

18   possible in those 302's; is that right?

19      A.   That's correct.

20      Q.   Does somebody review the 302's?

21      A.   A supervisor.

22      Q.   Okay.  And what does the supervisor look for when

23   they're reviewing the 302's?

24      A.   They have a general understanding of the case and

25   they'll -- they'll review it based on what they know.

1    Q.   Okay.  Who reviewed your 302's in this case?

2    A.   Most of the time it was my direct supervisor.

3    Q.   Okay.  Were your 302's accurate in this case?

4    A.   I believe they were.

5    Q.   Did you review any of the other agents' 302's in

6    this matter?

7    A.   Some of them.

8    Q.   Did you find them to be accurate?

9    A.   For the most part, yes.

10   Q.   For the most part?  What parts did you not find

11   accurate?

12   A.   I'm saying I could not recall an error that stood

13   out to me.

14   Q.   Earlier when you were talking with Mr. Swartz,

15   and you and I talked about it briefly, touched on it

16   with regards to Dr. Juan Castillo.  And the false

17   statement that you said Dr. Pena made was whether or not

18   he moved patients from one hospice to another; do you

19   recall that?

20   A.   Yes.

21   Q.   Okay.  I'll show you what's been previously

22   marked and admitted as Government's Exhibit C-10 and --

23   and the ladies and gentlemen of the jury do not have

24   this as part of their aid, but it has been admitted.

25        And this is the conversation that I believe you

1    recall hearing earlier; is that right?  And it'll start,

2    have you ever had patients that were on hospice?  And

3    then I guess part-way through the hospice process, you

4    had to switch from one company to another, from one

5    hospice company; do you recall that?

6        A.  Yes.

7        Q.  And then you and Mr. Swartz were talking and you

8    pointed back to these conversations about Dr. Castillo

9    as evidence that he lied to you right here; do you

10   recall that?

11       A.  Mr. Castillo, he's not a doctor.

12       Q.  I'm sorry, Mr. Castillo, I apologize.  But I'm

13   talking about Dr. Pena?

14       A.  Right.

15       Q.  You pointed to this conversation with you on

16   October 27, 2017 whereby you say Dr. Pena lied to you

17   during this conversation; you recall that?

18       A.  Yes.

19       Q.  And you tied it back to that section with Juan

20   Castillo, correct?

21       A.  Yes.

22       Q.  But as we went over with Dr. Pena's talking to

23   Mr. Castillo in that section, he never took the patients

24   away from the hospice and switched them; did he?

25       A.  We don't know if he did.  We know that he did

1    with Merida, though.

2         Q.   We know that he didn't switch, correct?

3         A.   We don't know that he didn't.

4         Q.   But see that's the problem, we don't know if he

5    did --

6         A.   We know he did with Merida.

7         Q.   When, when did he switch patients for Merida?

8         A.   In -- with -- like the instance of Ms. Perez that

9    we talked about.

10        Q.   He switched Ms. Perez?

11        A.   He did.

12        Q.   When?

13        A.   In July of -- or July, or August of 2017.

14        Q.   You mean after he no longer worked as the medical

15   director for Merida?

16        A.   Yes.

17        Q.   Okay.

18        A.   He -- that's -- that's when he -- that's when he

19   switched her over.

20        Q.   Okay.  And -- and that -- that's a crime?

21        A.   It's an indicator.  When -- when doctors --

22   when -- usually if a doctor in the cases that I've

23   worked on, that I've helped with, if a doctor is leaving

24   a hospice, their patients that they had seen as a

25   primary care physician don't typically follow them in

1    their medical directorship, they stick with the

2    organization because when they're at hospice they need

3    that stability.  It's the end of life.

4        Q.  You say typically, how often?

5        A.  It's -- it's just a trend that we notice.

6        Q.  Well, no, no, no, we need more than trends if

7    we're going to convict somebody of a crime.  So how

8    often does that happen?

9        A.  Like I said, it's a trend.  We have more than

10   trends, we have the -- the video evidence.

11       Q.  No, no, no.

12       A.  These were indicators that led us to the future

13   steps in the investigation.

14       Q.  Agent Williams, I'm asking you to pinpoint to the

15   ladies and gentlemen of the jury all the times Dr. Pena

16   moved patients out of hospice because he was no longer

17   getting paid.

18       A.  Right, I recognize the question.  And I don't

19   have specific patients for you.

20       Q.  But you're saying that he's lying to you when

21   he's giving that answer, correct?

22       A.  Right.

23       Q.  But you don't know; do you?

24       A.  We -- we know based on what he has provided in

25   the recordings.

1    Q.   Okay.  Based on trend, correct?

2    A.   No, I said based on the recordings.

3    Q.   With Edgar Jimenez and -- and Jose Aguilar, did

4    they ever ask you to -- to clear their debt?

5    A.   No.

6    Q.   How many patient files of Dr. Pena's did you

7    review?  How many -- let me ask you this:  How many

8    patients did you review of Dr. Pena's as part of your

9    investigation?

10   A.   Claim -- with claims data, multiple patients.  If

11   we're talking about specific patient files, I only

12   reviewed Francisca Perez, but the McAllen agents

13   received.  I think there was one other that was in

14   there.

15   Q.   Claims data, how many claims data -- claims data

16   for how many patients of Dr. Pena's did you review?

17   A.   It's been awhile since I reviewed it so I can't

18   give you an exact number but --

19              MR. GUERRA:  Your Honor, may I have a quick

20   break, Judge?

21              THE COURT:  Absolutely.

22              MR. GUERRA:  Thank you.

23              THE COURT:  Ladies and gentlemen, let's go

24   ahead and take a very brief recess.

25              COURT OFFICER:  All rise for the jury.

```
 1                    (JURY OUT.)

 2                    (COURT IN SHORT RECESS.)

 3                    COURT OFFICER:  All rise for the jury.

 4                    (JURY IN.)

 5                    THE COURT:  Thank you, everyone.  Please be

 6      seated.

 7                    Please proceed.

 8                    MR. GUERRA:  Thank you, Your Honor.

 9         Q.  (By Mr. Guerra)  Agent Williams, do you recall

10      when Merida ceased operations in Laredo?

11         A.  No.

12         Q.  Okay.  Would it have been around the same time

13      that Francisca Perez left Merida to go to a different

14      hospice?

15         A.  Most likely, yes.

16         Q.  Would that explain why she left Merida and went

17      to a different hospice?

18         A.  It could, yes.

19         Q.  You're not a statistician, correct?

20         A.  Correct.

21         Q.  And you don't have any training in the field of

22      statistics?

23         A.  Correct.

24         Q.  Okay.  Earlier you testified under Direct

25      Examination with Mr. Swartz, how in reviewing Merida's
```

1    bank records you saw that from 2012 to 2016 Dr. Pena was

2    paid $108,000, correct?

3        A.   Yes.

4        Q.   You are aware that during that timeframe Dr. Pena

5    was the medical director for Merida -- or sorry, strike

6    that.

7            You are aware that during that time Dr. Pena was

8    the medical director for Professional in Laredo during

9    that time, correct?

10       A.   Yes.

11       Q.   And again, not a mathematician, but that $108,000

12   over four years equates to, approximately, a little over

13   $25,000; is that correct?

14       A.   That's correct.

15       Q.   Is it your testimony that figure, both for the

16   four years and annually, is an improper amount for a

17   medical director to be paid for medical services?

18       A.   Can you repeat the request?

19       Q.   Sure, and it was a bad question on my part.

20           Is it your testimony that the $108,000, which as

21   we both agreed was a little over $25,000 a year, is an

22   improper amount for a medical director to be paid for

23   professional services?

24       A.   If it's for services, then, no, it's not

25   improper.

1    Q.   Right, there's nothing wrong with getting paid
2    that amount, if it is proper, correct?
3    A.   Correct.
4    Q.   There's nothing about that figure that stands
5    out, correct?
6    A.   Correct.
7    Q.   $25,000 a year, that equates to, again, rough
8    math a little over $2,000 a month, correct?
9    A.   Correct.
10   Q.   Nothing wrong with that figure being paid to a
11   medical director if it's for legitimate services,
12   correct?
13   A.   That is correct.
14   Q.   There's nothing in the Medicare guidelines that
15   prohibits a medical director from referring his -- his
16   or her own patients to hospice, correct?
17   A.   Correct.
18   Q.   There's nothing in the Medicare guidelines that
19   establishes a limit of the number of patients that a
20   medical director can refer to a hospice, correct?
21   A.   I'm not aware of a limit.
22   Q.   There's no magic number that says you've referred
23   400 patients that you're also overseeing, therefore
24   that's incorrect, nothing like that, right?
25   A.   Correct.

1    Q.   Now, it may raise suspicions on your end,

2    correct?

3    A.   Yes.

4    Q.   Probably most likely would, right?

5    A.   Right.

6    Q.   But it's not illegal, correct?

7    A.   Correct.

8    Q.   Earlier you testified with Mr. Swartz regarding

9    the development of Edgar Jimenez and Jose Aguilar as

10   confidential sources; do you recall that?

11   A.   Yes.

12   Q.   I believe one of the things that stuck out to me

13   when you testified was they contacted you and said we

14   are ready whenever you are to go videotape Dr. Pena; do

15   you recall that?

16   A.   Yes, we'd have conversations.

17   Q.   How many?

18   A.   How many conversations have we had?

19   Q.   Yes.

20   A.   I don't recall the exact amount leading up to

21   that.

22   Q.   How long did it take for you to develop Edgar and

23   Jose as potential sources?

24   A.   Mr. Jimenez was already a source that was passed

25   to me from other agent the -- on something unrelated.

1    I'm trying to remember the exact date that I started

2    working with Mr. Jimenez.  I would say at least six

3    months, maybe six months before the -- the meetings.

4        Q.   Okay.  So January or February of 2017 is when you

5    began meeting with Mr. Jimenez on this case, correct?

6        A.   That sounds close to right, yes.

7        Q.   And when did you start meeting with Mr. Aguilar?

8        A.   Again, I don't remember the exact dates.  It was

9    after that.

10       Q.   Okay.  Do you recall how far after that?

11       A.   Maybe a -- I don't recall, it was a few months.

12       Q.   Are you aware that Edgar Jimenez and Jose Aguilar

13   left Merida about 2014?

14       A.   Yes.

15       Q.   In your October 27th, 2017 meeting with Dr. Pena,

16   when -- when you and he discussed, you, he and Agent

17   Rice discussed the six-month rule, he relied on his

18   Catholic faith as one of the reasons why he said he

19   didn't believe in it, correct?

20       A.   That he didn't believe in what?

21       Q.   This six-month rule?

22       A.   He -- he made mention of his Catholic faith, yes.

23       Q.   Right.  In other words, he says as part of him

24   being a Catholic, he believes that actions should be

25   taken to extend life, not end life, correct?

1      A.   No, he said that's why he shouldn't push someone

2   into death which was not the question that we asked.

3      Q.   Okay.  And the question you asked was did he --

4   did he extend someone's life, correct?

5      A.   Extend a hospice patient's life, yes.

6      Q.   And his response was, as a Catholic I have to

7   protect life; isn't that correct?

8      A.   He said -- he asked do I extend life -- he --

9   yeah, he asked do I extend life, and then he explained

10  that based on his faith he believes he should not push

11  someone into death which, again, was not the question.

12     Q.   But not pushing someone into death also does not

13  require him to withhold curative measures for someone

14  who is ill, correct?

15     A.   Right.  That's correct.

16     Q.   During that conversation with Dr. Pena, he also

17  referenced the 2017 law signed by Governor Abbott, do

18  you recall that?

19     A.   Yes.

20     Q.   Are you familiar with that law?

21     A.   I -- I'm somewhat familiar, not --

22     Q.   Are you aware that that law that was signed in

23  2017 in the State of Texas prohibits a medical

24  professional from withholding food and water to a

25  terminally ill individual?

1    A.   Yes.

2    Q.   Similar to the Terri Schiavo case, do you

3  remember that; is that right?

4    A.   Yes.

5    Q.   In other words, if someone is dying, Dr. Pena,

6  under the laws of the State of Texas, could not withhold

7  food or water, correct?

8    A.   That's correct.

9    Q.   And he told you that, didn't he?

10   A.   He did.

11   Q.   Now, we talked, you and I talked about palliative

12  medicine.  Are you aware that -- that palliative

13  medicine allows for comfort measures, right?

14   A.   Yes.

15   Q.   Are you familiar with the gastrostomy tube?

16   A.   Yes.

17   Q.   Sometimes referred to as a peg tube?

18   A.   Peg tube, G. Tube.

19   Q.   Right, someone can't eat, they get fed; is that

20  right?

21   A.   Yes.

22   Q.   Similar to what Governor Abbott requires in the

23  State of Texas, right?

24   A.   It -- it could be used that way, yes.

25   Q.   Okay.  Are you aware that palliative measures

1    allow for -- palliative medicine allows for comfort

2    measures that includes curing of constipation?

3         A.   Yes.

4         Q.   And are you aware that palliative medicine allows

5    for comfort measures for treatment of dehydration?

6         A.   Yes.

7         Q.   Food and water, correct?

8         A.   Correct.

9         Q.   Agent Williams, you'll agree with me that the

10   prediction of life expectancy is an inexact science,

11   correct?

12        A.   Yes.

13        Q.   In other words, there is no bright line rule as

14   to when any person, including a medical professional,

15   can determine when someone's going to die; is that

16   right?

17        A.   Right.

18        Q.   Are you aware that Medicaid allows for the fact

19   that this isn't an exact science?  I'm sorry, Medicare.

20        A.   Medicare.

21        Q.   Medicare, I apologize.

22             Let me rephrase the question.  Are you aware that

23   Medicare allows for this inexact science?

24        A.   Yes.

25        Q.   Okay.  Are you aware that per Medicare

1  guidelines, the fact that a Medicare beneficiary lives

2  longer than expected is not cause to terminate Medicare

3  benefits?

4      A.  Yes.

5      Q.  So if someone goes and lives longer than six

6  months, that's not a reason to get them off of Medicare,

7  correct?

8      A.  Correct.

9      Q.  And as you and I talked about, there can be

10  multiple certification periods under Medicare, correct?

11      A.  That's correct.

12          MR. GUERRA:  I'm going to pass the witness,

13  Your Honor.

14          THE COURT:  Mr. Cyganiewicz?

15          MR. CYGANIEWICZ:  Yes, Your Honor, just a

16  few questions.

17                  CROSS-EXAMINATION

18  BY MR. CYGANIEWICZ:

19      Q.  Good morning, sir.

20      A.  Good morning.

21      Q.  I'm sorry, good afternoon.

22      A.  Good afternoon, yes.

23      Q.  We've only visited casually the last -- or today,

24  right, before that we haven't met?

25      A.  That's correct.

1    Q.  Ed Cyganiewicz, I'm representing Mr. McInnis, and

2    I'll --

3    A.  Yes, sir.

4    Q.  You didn't mention anything about him, basically,

5    so I'm just going to have a few questions to follow-up

6    on what Mr. Guerra said.  What's your understanding of

7    the ownership of Generous?  Who owned Generous?

8    A.  The active owners were Mr. Jimenez, Hector

9    Jimenez and Mr. Jose Aguilar.

10   Q.  Okay.  Did you become, throughout this

11   investigation, familiar with Mr. Eddie Zuniga?

12   A.  I -- I wasn't as familiar with his portion

13   because that -- that portion of the investigation was

14   handled by McAllen.

15   Q.  Were you aware that he was also part owner of

16   Generous?

17   A.  No.

18   Q.  Were you aware that he worked -- at least worked

19   there?

20   A.  No.

21   Q.  Did you -- were you aware that he worked at some

22   point for -- as the administrator on the day-to-day

23   basis in San Antonio for Merida?

24   A.  No.

25   Q.  So you're not aware that Eddie Zuniga -- what --

1    I'm sorry, what do you refer your sources as,

2    confidential informants, or confidential sources or

3    snitch --

4        A.   The official term for us is confidential human

5    source or CHS, people call them sources, they call them

6    informants.

7        Q.   So the informants we're talking about this

8    afternoon were Mr. Aguilar and Mr. Jimenez, correct?

9        A.   Yes.

10       Q.   And are you -- they also worked for Merida,

11   correct?

12       A.   At one point they did, yes.

13       Q.   So your two sources, and Mr. Zuniga at one time

14   all worked with Merida?

15       A.   That's my understanding, yes.

16       Q.   They all left Merida?

17       A.   Yes.

18       Q.   You mean they all seemed unhappy with Merida?

19       A.   They didn't ever tell me if they were unhappy or

20   not.

21       Q.   And are all witness in this case against the

22   Defendants?

23       A.   Yes.

24       Q.   Okay.  Regarding the subpoena that you mentioned,

25   what was your involvement in that subpoena?

1      A.   I simply reviewed -- reviewed the -- the data

2  after it was already processed.

3      Q.   So you weren't involved in the preparing, or the

4  issuance, or the serving of the subpoena?

5      A.   No, sir, that was handled by our McAllen office

6  and HHS.

7      Q.   I know you mentioned the subpoena being served

8  around September, and then was it about seven to ten

9  days that -- that they had to comply?

10      A.   I -- I don't remember the exact turn-around on

11  it.

12      Q.   It wasn't a very long period, though; was it?

13      A.   I don't recall.  Without it in front of me I

14  can't really say.

15      Q.   And you're -- you were shown a map of the

16  different offices, or places that associate with Merida?

17      A.   Yes, sir.

18      Q.   And were records contained in all those different

19  locations?

20      A.   It would make sense that they were, but I don't

21  know for sure.

22      Q.   Were you aware that Mr. McInnis ordered all those

23  people in those locations get those records as soon as

24  you can and you have to comply with the subpoena; are

25  you aware of that?

1      A.   I don't know about any conversation, no, sir.

2      Q.   Besides your sources Jimenez and Aguilar, did you

3  ever try to recruit a -- other sources, or were there

4  sources involved in this case?   I'm not asking you for

5  their names.

6      A.   No, sir.

7      Q.   At any point, did you ask someone, or contact

8  someone approach Mr. McInnis anonymously to try to get

9  him recorded and -- and he said I don't know what you're

10  talking about, I don't want to talk to you?

11      A.   I didn't ever have a conversation like that.

12      Q.   Did you ever send somebody to do that to him?

13      A.   I'm not -- I -- I didn't, I'm not aware of any

14  such conversation.

15      Q.   Do you know of any other FBI agents or agents who

16  sent up a source or tried to set up a source to try to

17  basically setup Mr. McInnis?

18      A.   I'm not aware of that.

19          MR. CYGANIEWICZ:   That's all I have,

20  Your Honor.   Thank you, sir.

21          THE WITNESS:   Thank you.

22          MR. TONY CANALES:   May I, Your Honor?

23          THE COURT:   Mr. Canales, yes, please.

24          MR. TONY CANALES:   How much time do I have?

25          THE COURT:   You've got plenty of time.

1           MR. TONY CANALES:  I've got plenty of time.

2                    CROSS-EXAMINATION

3    BY MR. TONY CANALES:

4       Q.  So that nice lady from Laredo called you El

5    Guero.

6       A.  She did.  I -- it was some of the handful of

7    words that I knew.

8       Q.  Maybe she could have called you Pelon, that'd be

9    a different story, right?

10      A.  That would be a compliment, yeah.

11      Q.  Okay.  All right, sir.  My name is Tony Canales,

12   I'm one of Mr. Rodney Mesquias' lawyers, okay?

13      A.  Yes, sir.

14      Q.  I'm introducing myself not only to you but to the

15   jury also, and I'm related that young man back there,

16   okay?

17      A.  Yes, sir.

18      Q.  Let me see if I can go through some of the --

19   trying to do this without repeating things that have

20   been said already.  I'm going to try to cover some

21   things, all right?

22      A.  Sir, I'm -- sorry, sir.  I'm having trouble

23   hearing you.

24      Q.  Okay.  Let me get a little bit closer.  How about

25   now?

1      A.   That's better.

2      Q.   That's better now, okay.

3           We've been talking about a timeline and -- and

4      I -- and there was various dates on the timeline.  And I

5      take it the beginning of that timeline, as far as you

6      are concerned, of the year 2017 --

7      A.   Yes, sir.

8      Q.   -- was when these two gentlemen, your informants

9      come over to Dr. Pena's office and record him.  I think

10     that's August the 3rd of '17?

11     A.   August the 3rd is the first recording, yes, sir.

12     Q.   Very well.  Now, there's some things that

13     happened after that, but the beginning of the timeline

14     is August the 3rd of '17, correct, that's when they --

15     that's when the recording started?

16     A.   Yes, sir.

17     Q.   Very well.  Now, before that date, before that

18     date, I think you -- they asked you a question awhile

19     ago as to whether or not you knew when the Mesquias

20     operation ceased to operate.  And I think they asked you

21     whether or not you knew that it was some time in the

22     jeer 2017, perhaps in April of 2017; do you have any

23     knowledge about that at all?

24     A.   I don't know the exact dates, no, sir.

25     Q.   But you know that by the time, by August the 3rd

1    starting Mesquias operation had ceased to exist.

2        A.   Yes, sir.

3        Q.   All right.   So -- so then when the two

4    individuals go talk to Dr. Pena, Mesquias' companies not

5    only did -- did not -- cease to exist, but these two

6    companies were not involved at all in the meeting of the

7    two -- of the two individuals with Dr. Pena; is that

8    correct?   They were not involved, Mesquias was not

9    involved?

10       A.   In the -- in the meetings?

11       Q.   Yes.

12       A.   That's correct.

13       Q.   So whenever you -- you showed, I think it was

14   Exhibit C-5 the -- Roy is our paralegal, everybody knows

15   that by now, right?

16            Now, you -- you saw this -- can you see it up

17   there?

18       A.   Yes, sir.

19       Q.   And let me just so you can have it in hand, okay?

20            MR. TONY CANALES:   May I approach,

21   Your Honor?

22            THE WITNESS:   I've got it on the screen,

23   too.

24       Q.   (By Mr. Tony Canales)   So if we look at this and

25   we start counting one by one, it happens to be $2500,

1    correct?

2       A.   Yes, sir.

3       Q.   So it's not stacked, nothing else?

4       A.   No, sir.  And we do it that way so we can

5    document the serial numbers if need be.

6       Q.   Sure.  And so there's $2500 that you had there, I

7    take it you will agree with me that that money, this

8    money, did not belong to Rodney Mesquias, correct?  You

9    agree with that?

10      A.   Correct.  Correct.

11      Q.   This money did not belong to Mr. -- any of the

12   two individuals that came to see him, right?

13      A.   That's correct.

14      Q.   This money did not belong to you either, correct?

15      A.   That's correct.

16      Q.   This money was United States Government funds?

17      A.   Yes, sir.

18      Q.   All right.  And so what you had here is you were

19   using Government funds to go see Dr. Pena and,

20   basically, tempt him, tempt Dr. Pena to come forward to

21   make this deal with you?

22      A.   No.

23      Q.   Why else would you show cash if not to tempt

24   somebody to take the bait?  It was bait, right?

25      A.   No, it was a documentation that we were following

1    through with an existing agreement between Dr. Jimenez,

2    Mr. Aguilar and Mr. Pena.

3    Q.   I understand that, but you could have very well

4    written a check for it instead of cash, right?

5    A.   Yes, sir.

6    Q.   All right.   But nevertheless, having cash is

7    tempting; is it not?

8    A.   It -- it could be.

9    Q.   It could be.   And you know whether or not having

10   cash to an 83 year old man was tempting or not; you

11   don't know that?

12   A.   I can't speculate on that, no, sir.

13   Q.   But you will agree that because of the -- of the

14   timetable, this money did not belong to Rodney Mesquias,

15   correct?

16   A.   That's correct.

17   Q.   And you can also tell us that this money did not

18   belong to Generous either?

19   A.   That's correct.

20   Q.   And so this money was not derived, or was this

21   money derived from any funds of Mesquias?

22   A.   No, sir.

23   Q.   And so awhile ago, I believe you were shown a

24   letter, I think it was Exhibit RM-001.   Can you get it

25   up there, Roy.

1          And let's go through this letter, RM-001.  Is

2    there a date on it, correct?

3      A.   Yes, sir.

4      Q.   January the 4th, 2017, right?

5      A.   Yes, sir.

6      Q.   Again, way before the timeline that we spoke

7    about, correct, because the timeline that you talked

8    about with the lawyers for the Government was something

9    that happened in August the 3rd of 2017?

10     A.   Yes, the recordings occurred in August, yes, sir.

11     Q.   So this letter is dated January the 4th, 2017,

12   way before?

13     A.   Yes, sir.

14     Q.   Eight months before?

15     A.   Seven, eight months before, yes, sir.

16     Q.   And it's a letter signed by Dr. Pena?

17     A.   That's correct.

18     Q.   Before coming here today, sir, had you seen this

19   letter, Exhibit RM-001?

20     A.   No, sir.

21     Q.   So -- so did you have any knowledge at all of

22   whether or not Dr. Pena was writing to the administrator

23   of Professional Hospice Care, Inc. as the letter

24   indicates, saying that -- that his services were being

25   terminated; you see that?

1      A.  Yes, sir, I see it.

2      Q.  All right.  And then Dr. Pena saying, in as much

3  as I respect your decision, I expect payment for

4  services rendered through -- through the termination

5  date which you have set for today.  The full amount due

6  is $11,500, correct?

7      A.  Yes, sir.

8      Q.  All right.  Now, would you agree, sir, that if

9  somebody's trying -- oh, and attached to this letter,

10 the second, correct?

11     A.  Okay.

12     Q.  Do you see it there, second page?

13     A.  With some financial information?

14     Q.  Right.  Right.  You see it there?  And that's --

15 that appears RM-000021, correct?

16     A.  Yes, sir.

17     Q.  The very bottom is the page number?

18     A.  Yes, sir.

19     Q.  We have to be able to refer to the record later

20 on so we have to say those numbers, all right, sir?

21     A.  Yes, sir.

22     Q.  All right.  And this, of course, gives you some

23 kind of a breakdown the totals what Dr. Pena's saying

24 that he's owed $11,500?

25     A.  Yes, sir.

1    Q.   Very well.   Now, because you had not seen this

2   letter from Dr. Pena to the hospice, do you know whether

3   or not, do you know, sir, whether or not this letter is

4   backed up by some type of documentation that Dr. Pena

5   was a medical director, was a medical director of

6   Professional Services; do you know that?

7    A.   Can you rephrase the question, please?

8    Q.   If you look at the letter, the very front page?

9    A.   Yes, sir.

10    Q.   The first sentence ends in, I received a call

11   from Maricela Valdez informing me of your intention to

12   terminate my services as your medical director.   Right?

13    A.   Yes, sir.

14    Q.   Now, do you know the rules as to whether or not

15   Medicare requires that a medical director agreement be

16   in place between the parties and that it be in writing?

17   Do you know that?   Did you know that?

18    A.   Yes, sir.

19    Q.   You knew that's just by prior knowledge, correct?

20    A.   Yes, that you're required to have a medical

21   director?

22    Q.   Yes.

23    A.   Yes, sir.

24    Q.   All right.   And did -- before coming here today,

25   sir, were you able to find, or look, or inspect, or

1    subpoena, or investigate whether or not there was a

2    medical director agreement between Dr. Pena and

3    Professional Hospice Care, Inc., or Merida -- Merida

4    Group?

5        A.   I'm not -- I'm not sure about the -- about the

6    contract, no, sir.

7        Q.   Well, would that help you -- if there was some

8    contracts between the parties, would that help you

9    understand as to whether or not payments that were being

10   made were being paid pursuant to an underhanded

11   agreement, or between the parties pursuant to a

12   contract?  Would that help you understand that?

13       A.   No, because the -- the fact that -- that we know

14   the common practice when concealing a kickback is to

15   call it services so we can't know for sure if this is

16   backed up by anything.

17       Q.   Well, you can't know for sure unless you ask the

18   parties, correct?  You ask somebody about it?

19       A.   That -- that's one method, yes, sir.

20       Q.   And of course, we've heard the tapes, did you at

21   any point in time ask Dr. Pena whether or not he had

22   written medical director agreements with Professional

23   Services or Merida; did you ask him that?

24       A.   No, sir.

25       Q.   Okay.  Prior to -- to today, you've told us you

1    haven't seen an agreement yet, correct?

2        A.   Correct.

3        Q.   Prior to today, did you ever ask Mr. Rodney

4    Mesquias whether or not he had an written agreement, a

5    medical director agreement, with Dr. Pena?

6        A.   I've never spoken with Mr. Mesquias, I'm not sure

7    about the other agents.

8        Q.   Prior to today, sir, at any point in time, just

9    like you had a recording of Dr. Pena, do you have a

10   recording, do you have a recording of -- of Rodney

11   Mesquias delivering cash to Dr. Pena?

12       A.   No cash, sir.  My understanding is no cash.

13       Q.   You've got some checks?

14       A.   Yes, sir.

15       Q.   All right.  And we -- and we'll show -- the jury

16   has seen those checks, right?

17       A.   Yes, sir, a sampling of those checks.  We

18   haven't -- they haven't seen all of the checks, to my

19   knowledge, but --

20       Q.   But you've selected -- you have selected -- you

21   and the prosecutors have selected three checks in this

22   particular case, correct?

23       A.   There have been some checks showed, yes, sir.

24       Q.   Well, I've got them right here.  So before I show

25   you what I have in my hand, have you -- have you seen

1    any type of document backup to the checks that you've

2    told -- talked to the jury about?  For example, you

3    showed the jury Exhibit H-17.

4         Let me have H-17, Roy.

5         All right.  Here's H-17.  It's got a check --

6    it's got a number on the top, right?

7    A.   Yes.

8    Q.   All checks usually have -- have some kind of a

9    number on top to be able to tell us, correct?

10   A.   Correct.

11   Q.   And that check has number 62465; am I correct on

12   that?

13   A.   Yes, sir.

14   Q.   All right.  And so the question I have for you

15   is, sir, whether or not you discovered in your

16   investigation that documentation, any documentation that

17   would backup this particular check for medical

18   director's fee?

19   A.   I personally have not.

20   Q.   Well, personally, I mean, just -- you -- you --

21   your agency didn't do it; is that correct?  You didn't

22   do it?

23   A.   Like I said before, I -- I didn't participate in

24   McAllen portion of the investigation so I can't speak to

25   what they -- what review they have done.

1    Q.   All right.  Well, let me show you now Exhibit

2    RM-018 and see if you can put them side to side.  And

3    I'll show you up there H-17, it's got the check number

4    correct, 062465?

5    A.   Yes, sir.

6    Q.   On the right-hand side I have Exhibit RM-018 and

7    do you see a number to that -- for that one?

8    A.   Yes, sir.

9    Q.   So this particular stub, I guess it's called a

10   check stub, matches the check at H-17, correct?

11   A.   Yes, sir.

12   Q.   If you look at the second page by the way, which

13   you'll find at second page of Exhibit 18, RM-0001983, do

14   you see there an invoice?

15   A.   Yes, sir.

16   Q.   And that invoice is from Dr. Pena, correct?

17   A.   Yes, sir.

18   Q.   Family Clinic?

19   A.   Yes, sir, that's his address.

20   Q.   And he's invoicing, he's invoicing Professional

21   Hospice?

22   A.   Yes, sir.

23   Q.   And again, I'm going to ask you this:  Prior to

24   coming here today in your investigation, you didn't find

25   these documents at all?

1      A.   I can't say that they haven't been found, I can

2  say that I have not seen those documents.

3      Q.   You have not seen them?

4      A.   Yes, sir.

5      Q.   Well, the other agent involved in this case is

6  Agent Garcia, he's -- oh, there's my friend, Mr. Garcia,

7  he's giving me the thumbs-up.

8          Mr. Garcia, Mr. Garcia is, basically, the agent

9  in charge of the case, correct?

10     A.   Yes.

11     Q.   Both of you are?

12     A.   Yes, sir.  He -- he -- he was on the McAllen side

13  and I was on the Laredo side.

14     Q.   Very well.

15     A.   Yes, sir.

16     Q.   He's the OIG fellow and you're the FBI?

17     A.   Yes, sir.

18     Q.   Right?  Do you know whether or not Mr. Garcia,

19  OIG, has received a copy, or obtained a copy of this

20  backup documentation that I have in my hand?

21     A.   I don't know.

22     Q.   You don't know?

23     A.   No, sir.

24     Q.   Well, don't you think that having a backup

25  documentation for this particular check is important to

1   be able to reach the conclusion as to whether or not

2   somebody's paying money underhanded or an open payment

3   of funds pursuant to an invoice?

4        A.   No, if they're -- if they're both false, then

5   they're both false, I -- I --

6        Q.   And if one's not false, then it's correct, right?

7   You say assume they're both false?

8        A.   If they're both true, they're both true.   But if

9   they're both false, then that's what a conspiracy is.

10       Q.   And let's go now to the next Exhibit you showed

11  the jury.   I believe you showed them H-18.   And this

12  particular Exhibit, it's 065899, the check number,

13  correct?

14       A.   Yes, sir.

15       Q.   All right.   Again, I'm going to ask you now, did

16  you look for, did you inquire as to whether or not there

17  was any type of documentation submitted by Dr. Pena, or

18  Dr. Pena receiving documentation for the issuing of this

19  check?

20       A.   No, sir, I have not seen that.

21       Q.   And so I'm now going to show you RM-0001984.

22  This is called the Merry Christmas, that's what it says

23  on the bottom, Merry Christmas, correct?

24       A.   Yes, sir.

25       Q.   The check is written 12/18, 2014, correct?

1    A.   Yes, sir.

2    Q.   Now, this check -- this checks that we're talking

3    about H-17 and H-18 that you showed to the jury, this is

4    something that you and your team selected to be able to

5    convince this jury that this money was paid for

6    kickbacks, correct?

7    A.   This is just -- to show that there was payment,

8    there were transactions between the two, yes.

9    Q.   Sure, based on a kickback?

10   A.   Yes.

11   Q.   But kickbacks pretty well documented; is it not,

12   you've got invoices for it, it sort of rebuts your

13   theory that it's a kickback because they're documenting

14   the money, correct?  They're documenting the check?

15   A.   If it's a false document, then it doesn't matter

16   what you document.

17   Q.   And if it it's -- if it's not a false document,

18   it's being documented as a legitimate payment, correct?

19   A.   That's correct.

20   Q.   A legitimate payment because there was an

21   agreement, there was a medical directorship agreement

22   between Dr. Pena and professional hospice and Merida,

23   correct, we talked about that already?

24   A.   Yes.

25   Q.   I've got it here in my hand, you haven't seen

1    them yet; have you?

2       A.   No.

3       Q.   All right.  You have also told us about the next

4    check, or next Exhibit, my friend Mr. Swartz showed you,

5    H-19.

6            And H-19 is a check that part of the indictment

7    showing that there's a check number 66616, correct?

8       A.   Yes, sir.

9       Q.   And so again, I'm going to ask you, tell the jury

10   whether or not part of the investigation that you were

11   able to obtain, or research, investigate or locate the

12   documentation behind H-19 that backed up why check 819

13   was -- was issued?  No?

14      A.   Again, no, sir, I haven't seen that.

15      Q.   Let's look at RM-020.  All right.  Again, can you

16   tell us whether or not the check, which has number 66616

17   corresponds to the check stub that we have here in

18   Exhibit RM-020?

19      A.   Yes.  Yes, sir.

20      Q.   All right.  And if you look at the stub, you

21   don't -- just for the record, I know everybody knows,

22   but just tell us for the record, do you know what -- do

23   you know what I'm talking about when I'm talking about

24   the stub, the check stub?

25      A.   Yes.

1    Q.  Tell us real quick like what it is as for as you

2    know.

3    A.  It's like a receipt, basically.  It shows -- it's

4    the record that Merida keeps when -- or sorry, in this

5    case Professional Hospice Care, it's the record they

6    keep on the back end when they send -- give the check

7    to the agency.

8    Q.  Because when you write the check, when the -- the

9    vendor writes a check, the check leaves you, you have no

10   proof that you cut the check until the check clears,

11   correct?

12   A.  Yes.

13   Q.  But meanwhile, you've got some document in the

14   file that shows why you did it, when you did it, you

15   sent the money out, correct?

16   A.  Yes.

17   Q.  It's a good accounting practice; is it not?

18   A.  Yes.

19   Q.  And you look at the second page, page 0001986 and

20   1987, let's look at 1986.

21       Is that a bill from Dr. Pena, I say a bill, I

22   guess a -- a statement from Dr. Pena requesting funds;

23   is that correct?

24   A.  Yes.

25   Q.  All right.  And the second page is the same

1   thing, each for $2500 totalling $5,000, correct?

2      A.  Yes, sir.

3      Q.  All right.  And again, I'd like to ask you this

4   question is whether or not during your investigation,

5   and so forth, and from the Grand Jury subpoenas and

6   everything you've done in this case, were you able to --

7   were you age to discern, or find out the backup of the

8   check that was issued in Exhibit H-19 as to why it was

9   issued?

10     A.  Sir, I -- I haven't seen those records, so, no,

11  sir.

12     Q.  Well, these are important -- it's an important

13  backup, aren't they?

14     A.  Right, and another agent handled the Grand Jury

15  subpoenas, so I'm just saying I personally have not seen

16  these.

17     Q.  Did you testify before the Grand Jury?

18     A.  No.

19     Q.  So the records you've been talking about that

20  Mr. Swartz and you, this conversation you had about the

21  subpoenas going up there and getting picked up, I take

22  it you didn't take it before the Grand Jury?

23     A.  No, sir, I didn't.

24     Q.  Another agent did?

25     A.  Yes, sir.

1    Q.   So if you left the impression with the grand --

2    with the jury here that the Grand Jury had seen these

3    records because you produced them to them, or you gave

4    it to them, that was not -- that would not be correct?

5    That's the wrong impression?

6    A.   Right, I did not personally.

7    Q.   Is it important for you to know whether or not

8    there was a written medical director agreement between

9    Dr. Pena and hospice, Professional Hospice and Merida;

10   would it be important to know that?

11   A.   It would be good information, yes, sir.

12   Q.   And good information because if you didn't have a

13   medical directorship agreement in writing, that will

14   certainly be a clear indication of fraud because the

15   rules require that a medical director agreement exist,

16   correct?

17   A.   Yes.

18   Q.   And the rules require that you pay pursuant to

19   the medical director agreement, correct?

20   A.   Yes.

21   Q.   Back up a little bit.

22        Way back then, back in August the 3rd of '17, can

23   you tell me whether or not Generous had a medical

24   director agreement at all with Dr. Pena; do you know?

25   A.   I'm not sure when the -- the -- when the contract

1    initially existed, I know that when they had the October

2    the 30th meeting, Mr. Jimenez brought a contract to --

3    to Dr. Pena.

4        Q.   And when he brought contract to Dr. Pena, he

5    brought that contract because those -- that was

6    something to you and -- and -- and -- and the parties

7    had agreed he had to -- you had to produce, correct?

8    You had to show -- you had to show Dr. Pena a contract?

9        A.   Can you rephrase the question?

10       Q.   Why -- why was a medical director agreement shown

11   or brought for Dr. Pena sometime in October of '17?

12   Why?

13       A.   Because they assumed that was something that we

14   might ask for in our investigation so they wanted to

15   make the relationship appear to be legitimate.

16       Q.   And so for the relationship to -- not only to

17   appear legitimate, to be legitimate you've got to have

18   the medical directorship agreement, correct?

19       A.   That would be one aspect, sir.

20       Q.   Let me show you RM-2, just go to the first page

21   of RM-2.

22            You see RM-2 there is a medical directorship

23   agreement between Dr. Pena and -- and Merida, correct,

24   sometime in 2006 -- '16, correct?

25       A.   Yes, sir.

1      Q.   And again, I ask you, prior to today, had you

2   seen this agreement at all?

3      A.   No, sir, I have not.

4      Q.   Did you know that it even existed?

5      A.   No, sir.

6      Q.   Let me show you now Exhibit RM-004.  It's kind of

7   hard to see the dates up there, but that's the best copy

8   that I have, okay, see if you can blow that up, Roy.

9           I'll represent to you that it's -- I think it's,

10  I believe it says April -- April 5th, 2012.

11     A.   I see an S-T, it could be April 1st.

12     Q.   And I stand to be corrected with someone with

13  better eyes, okay?

14     A.   I -- I -- I'm low confident on that answer, I'm

15  just trying to fill in the blanks with you.

16     Q.   Again, it's a medical directorship agreement

17  between Dr. Pena and Merida, correct?

18          I'm sorry, between -- between Professional

19  Hospice and Dr. Pena, correct?

20     A.   That appears to be the case.

21     Q.   And again, I'm going to ask you the same boring

22  question I keep asking you.

23          Prior to today, had you been able to receive,

24  investigate, or know about this particular agreements

25  between Dr. Pena and Professional Services, did you know

1   about it?

2        A.   I have not seen this document.

3        Q.   The series of exhibits that were shown to you by

4   Mr. Swartz, the G Exhibits, one -- I think started

5   between one, two, three, four, and five, all the

6   Secretary of State exhibits, you remember you talked

7   about those?

8        A.   Yes, sir, I remember the Secretary of State

9   records.

10       Q.   Just so the jury can understand, I mean, you and

11   I probably know it, but tell me, are these public

12   records?

13       A.   Yes.

14       Q.   Do you know whether or not these records, they

15   were filed before the Secretary of State, is that a

16   requirement if you want to be able to form a company and

17   call it either an inc, incorporated or an LLC?

18       A.   Yes, sir.

19       Q.   And so the law requires that you -- you -- you

20   file those, correct?

21       A.   Yes.

22       Q.   At anywhere -- at anywhere in these documents,

23   G-5, G-6, all of them, anyone of them, did you find any

24   type of -- of act or event that Rodney Mesquias

25   concealed his name?

1      A.   No, sir.

2      Q.   Is there any type of -- is there anything wrong

3  with filing these records at all with the Secretary of

4  State's office?

5      A.   No, sir.

6      Q.   If you want to be protected in law so you won't

7  get sued by somebody, you've got to file these records,

8  correct?

9      A.   Yes, sir.

10     Q.   You've got to file these reports?

11     A.   Yes, sir.

12     Q.   And you -- you understand that -- that these

13  records were, I guess I would call, see if you agree

14  with me if you call them, normal business public records

15  that are filed in the State of Texas by anybody that's

16  doing business, correct?

17     A.   Yes, sir.

18     Q.   Did you all recover back this money, the exhibit

19  C-5?  Did y'all get the money back?  Did you get the

20  money back?

21     A.   No, sir.

22     Q.   Did you ask for it back?

23     A.   No, sir, the money was paid to Dr. Pena.

24     Q.   Huh?

25     A.   The money was paid to Dr. Pena.

1    Q.   I know, but did you ask Dr. Pena, hey, let me

2    have my money back, anything like that?

3    A.   No, sir.

4    Q.   One -- one more thing, one more last topic.   This

5    letter D-26, your subject or target letter.

6    A.   Target letter, yes, sir.

7    Q.   There's something called a target letter and

8    something called a subject letter, correct?

9    A.   Yes, sir.

10   Q.   Do you know about that?

11   A.   I've never seen a subject letter.   We -- in -- in

12   the FBI we use the term subject to identify the person

13   we're -- the person related to the crime that we're

14   investigating.

15   Q.   Okay.

16   A.   So the target letter, that's -- that's a DOJ,

17   Department of Justice, terminology and form.

18   Q.   So as a result of the interview you had with

19   Dr. Pena, you asked the Government to file criminal

20   charges against Dr. Pena for making a false statement,

21   correct?

22   A.   That was one of the charges, yes.

23   Q.   But you understand that making a false statement

24   could be something oral, right?

25   A.   Yes.

1    Q.  But having a false statement can be something

2 also deceitful, you could be very deceitful to somebody

3 and not tell them the truth, that could be a false

4 statement?

5    A.  Yes.

6    Q.  And in your case, sir, can you tell us whether or

7 not you were deceitful with Dr. Pena when you approached

8 Dr. Pena knowing full well you had a recording, knowing

9 full well that you had two undercover people having

10 recorded him, knowing full well you had this target

11 letter in your back pocket, don't you think you were

12 deceitful to Dr. Pena?

13    A.  No.

14    Q.  So you have -- will you agree with me, then the

15 Government has the right to be deceitful, but Dr. Pena

16 does not have the right to tell you a lie; is that

17 right?

18    A.  No.

19    Q.  You agree you were deceitful?

20    A.  No.

21    Q.  You agree that you hid the truth from Dr. Pena?

22    A.  We hid the recording, we didn't hide any of the

23 evidence pertinent to the case.

24    Q.  You hid the recording, but that was -- you hid

25 the recording and you hid the fact that you had taken

1  out 2500 from official Government funds to try and give,

2  tempt Dr. Pena to take the money, right?  You don't

3  thing that was deceitful on your part?

4     A.  We -- right, we provided the money for the

5  kickback.  The controlled kickback.

6             MR. TONY CANALES:  That's all I have,

7  Your Honor.

8             THE COURT:  Mr. Swartz?

9             MR. SWARTZ:  Yes, sir, thank you.

10                  REDIRECT EXAMINATION

11  BY MR. SWARTZ:

12     Q.  Special -- Special Agent Williams, so you were

13  just shown a bunch of documents?

14     A.  Sorry, can you -- I'm trouble hearing you now,

15  too.

16     Q.  Yes.  Special Agent Williams, you were shown a

17  number of documents by Mr. Canales; do you recall that?

18     A.  Yes, sir.

19     Q.  Now, did you need to see all of that to know that

20  Francisco Pena accepted a kickback from Edgar Jimenez?

21     A.  No.

22     Q.  Ms. Leal, can we play clip number two, please.

23  And this is page 1 of the packet that the jury has?

24             MR. GUERRA:  Your Honor, I'm going to object

25  to replaying testimony that's already been played before

1  the jury.  It kind of goes outside the scope of the

2  redirect.

3           MR. SWARTZ:  I'm going to ask questions

4  about this particular clip that follow up directly to

5  what Mr. Guerra was asking Special Agent Williams on

6  cross.

7           THE COURT:  I'll allow you some leeway,

8  obviously it's limited in scope to Cross-Examination.

9           MR. SWARTZ:  Yes, Your Honor.

10          (Audio clip playing.)

11     Q.  (By Mr. Swartz) Is that the clip where Francisco

12  Pena accepted the kickback from Edgar Jimenez?

13     A.  Yes.

14     Q.  Was there any discussion about a medical

15  directorship agreement in that clip?

16     A.  No.

17     Q.  You were also asked by Mr. Guerra some questions

18  about a loan and some artwork; do you remember -- do you

19  remember that?

20     A.  Yes.

21     Q.  In that clip that you just saw, was there any

22  discussion about a loan?

23     A.  No, sir.

24     Q.  Was there any discussion about some artwork when

25  that money was handed over?

1      A.   No.

2      Q.   Were there any discussions about payments for

3  services?

4      A.   No.

5      Q.   What was the only reference from Dr. Pena as that

6  money was being hand over?

7      A.   The number of patients.

8      Q.   Now, going to -- so that was the August 3rd, 2017

9  recording?

10      A.   Yes.

11      Q.   Going to the -- the next recording, which was on

12  August 8th, 2017?

13      A.   August 18th.

14      Q.   18th?

15      A.   Yes.

16      Q.   Thank you.  May I put that on -- this on the

17  ELMO?

18           Do you see where it says, it's 2500, and then Ms.

19  Pena says, like the last time?

20      A.   Yes.

21      Q.   Is that a reference to the kickback clip we just

22  watched?

23      A.   Yes.  Like the last time, I understand to be a

24  reference to August the 3rd.

25      Q.   And then there's a statement by Dr. Pena in that

1   says, write it down or apunta lo (speaking Spanish)

2   because if you don't, you'll say that they haven't paid

3   us anything; you see that?

4        A.   Yes.

5        Q.   And she'll give everything to Transitions; do you

6   see that?

7        A.   Yes.

8        Q.   What do you understand Transitions to be?

9        A.   Transitions is another hospice.

10       Q.   It's another hospice company that --

11       A.   Yes.

12       Q.   -- has patients?

13       A.   Yes.

14       Q.   And then on the next page, the very next page,

15   this is literally seconds after what we just saw, what

16   does Dr. Pena say?

17       A.   He says, I'm doing -- who gives you nine patients

18   in one week, in two weeks?  And then one of the sources

19   replies, no one.

20       Q.   Is there any reference to a medical directorship

21   agreement there?

22       A.   No.

23       Q.   Is there any reference to a loan?

24       A.   No.

25       Q.   Is there any reference to artwork?

1    A.  No.

2    Q.  What about services, are they saying anything

3 about services?

4    A.  No.

5    Q.  They taking a kickback?

6    A.  Yes.

7    Q.  Now, I want to go to the recording for

8 Mr. Cervantes; do you recall that?

9    A.  Yes.

10    Q.  Now, you were asked some questions about that

11 particular recording, and I think Mr. Guerra was asking

12 you about, say, a DNR; do you remember that?

13    A.  Yes.

14    Q.  And he had some questions about, he -- he said,

15 made some references to Dr. Pena's Catholic faith; do

16 you recall that?

17    A.  Yes.

18    Q.  And then there's a reference to, at one minute --

19 one hour, six minutes and 51 seconds Dr. Pena says what?

20    A.  They want more patients, look.

21    Q.  And then he talks about, I gave them some

22 patients three or four days ago; you see that?

23    A.  Yes.

24    Q.  And then he says, what?

25    A.  And the way you make money is by keeping them

1    alive for as long as you can.

2        Q.   Is he talking about a DNR at that point?

3        A.   No.

4        Q.   Is he talking about his faith at that point?

5        A.   No.

6        Q.   What is he saying the reason to keep patients

7    alive is?

8        A.   You keep them alive because you make money for

9    the longer you keep them alive.

10       Q.   So is he thinking patient's lives and extending

11   that life with money?

12       A.   Yes.

13       Q.   Now, Mr. Guerra was asking you about, there were

14   some comments in here about don't give them too much

15   morphine, they go into respiratory failure; do you

16   remember that?

17       A.   Yes.

18       Q.   And I think you kind of mentioned this, but to be

19   clear, this company, and Dr. Pena sounds very critical

20   of how morphine is administered to these patients; do

21   you remember that?

22       A.   Yes.

23       Q.   But then who is Dr. Pena referring patients to?

24       A.   To Generous.

25       Q.   And in fact, does he use the word, he calls them

1  stupid?

2      A.  Yes.

3      Q.  He says they're killing their patients?

4      A.  Yes.

5      Q.  He says almost homicide?

6      A.  Yes.

7      Q.  Is it consistent with a medical director and a

8  medical director's duties, a legitimate medical

9  director, to refer patients to a company that he thinks

10  is killing their patients?

11      A.  No.

12      Q.  And just to be clear, when Mr. Guerra was asking

13  you about not hastening the death of patients?

14      A.  Yes.

15      Q.  You agree that it's not okay to hasten the death

16  of a patient?

17      A.  Yes, that's correct.

18      Q.  Is that different from extending the life of a

19  patient?

20      A.  Yes.

21      Q.  Can you explain to the jury how?

22      A.  Extending the life is taking measures to keep

23  that patient alive for longer where hastening is taking

24  measures to ensure that that patient will die

25  prematurely.

1    Q.  Mr. Guerra also asked you about a loan; do you

2  remember that?

3    A.  Yes.

4    Q.  And he was showing you some checks; do you

5  remember that?

6    A.  Yes.

7    Q.  It seemed like he was suggesting that, well, the

8  cash was just to pay back a loan; do you remember that?

9    A.  Yes.

10    Q.  Now, going back to the recording from

11  Mr. Cervantes, did Mr. Cervantes -- what was your

12  understanding of when the recording with Mr. Cervantes

13  took place?

14    A.  My understanding is that it was prior to the

15  August the 3rd recording, and based on the events that

16  is were discussed, May, June timeframe of 2017.

17    Q.  So this is at least months before you approached,

18  or Mr. Jimenez and Mr. Aguilar approached Francisco Pena

19  with the payments?

20    A.  Yes.

21    Q.  Can you read for the jury what it says, and this

22  is on page 8 of Exhibit C-2 where Francisco Pena's

23  saying --

24    A.  Okay.  So I even loaned them $20,000 to keep

25  going in San Antonio.

1    Q.   Then what does the next sentence say?

2    A.   They finally paid me, see.

3    Q.   So based on that, does it appear to you that,

4  according to Francisco Pena's own words, that loan had

5  been paid back if there was a loan?

6    A.   Yes.

7    Q.   I'm going to jump to page 14.  And then could you

8  read for the jury where the doctor is speaking at one

9  hour and six minutes and 23 seconds.

10   A.   Besides my $20,000, I've gotten at least $18,000

11  more so I'm not hurting.

12   Q.   So, again, if there was a loan to begin with,

13  it's been paid back?

14   A.   Yes.

15   Q.   And this is months before Mr. Jimenez and

16  Mr. Aguilar paid the cash to Francisco Pena?

17   A.   Yes.

18   Q.   I want to go back, you were asked some questions

19  about moving patients; do you recall that?

20   A.   Yes.

21   Q.   And Mr. Guerra was -- was asking you, well, did

22  you verify that these patients were moved; do you

23  remember that?

24   A.   Yes.

25   Q.   I want to go to Government's Exhibit C-4, and

1    this is the August 3rd, 2018 recording at page 26.

2         Can you read for the jury what the doctor says at

3    the one minute and 27 second line?

4       A.   Yes, the English translation is I can do that.

5    Now, we're going to talk about Castillo.  I told

6    Castillo the following, dude, you have 45 that patients

7    that belong to me, 45.  If you don't give me at least

8    two grand a month, I'm not going to send you anymore and

9    I'm going to take them away from you, all right?

10      Q.   Now, in this particular conversation, is this a

11   conversation with Mr. Castillo, or is this a

12   conversation with Mr. Jimenez and Mr. Aguilar?

13      A.   He's having a conversation with Mr. Jimenez and

14   Mr. Aguilar, it appears to be referencing a conversation

15   with Mr. Castillo.

16      Q.   And in these recordings, kickbacks were paid to

17   Francisco Pena for patients?

18      A.   Yes.

19      Q.   Now, is it possible that Francisco Pena is

20   telling Mr. Jimenez and Mr. Aguilar how he does

21   business?

22      A.   It's possible, yes.

23      Q.   And what could happen if he's not paid?

24      A.   If he's not paid, then he doesn't provide

25   patients.

1    Q.   Not only does he not provide them, but what does

2    he do?

3    A.   Takes them away.

4    Q.   And would that have an influence on people that

5    he has a relationship with?

6             MR. GUERRA:  Objection, Your Honor.  Calls

7    for speculation.

8             THE COURT:  Rephrase the question.

9    Q.   (By Mr. Swartz)  If he's making statements about

10   what he could do, taking patients away if it he's not

11   paid, could that be a threat?

12   A.   It could be.

13   Q.   I want to ask you about the six-month rule,

14   Mr. Guerra was asking you about that; do you remember?

15   A.   Yes.

16   Q.   And he said it's not an exact science; do you

17   remember that?

18   A.   Yes.

19   Q.   But was Francisco Pena saying it wasn't an exact

20   science when you were speaking with him, or did he say

21   something else?

22   A.   I don't recall the -- that portion of the

23   conversation.

24   Q.   Ms. Leal, can we play clip 14, please.

25             (Audio clip playing.)

1    Q.   (By Mr. Swartz)  Dr. Pena says leave the
2    six-month rule out, I don't believe in that, did he
3    write that on the documents where he signed under the
4    certification for -- certifications for Francisca Perez?
5    A.   Are you asking if he amended the document to say
6    I'm not going by the six-month rule?
7    Q.   Correct.
8    A.   No, he did not.
9    Q.   Mr. Canales was asking you about medical
10   directorship agreements; do you remember that?
11   A.   Yes.
12   Q.   And he was asking you, did you -- suggesting that
13   if there's an agreement in place then the relationship
14   must legitimate; do you remember that?
15   A.   Yes.
16   Q.   In your experience as a health care fraud
17   investigator, are sometimes agreements and paper used to
18   conceal illegal activity?
19   A.   Yes.
20   Q.   Are medical directorship agreements sometimes
21   used to conceal kickback relationships?
22   A.   Yes.
23   Q.   Are checks with memo lines sometimes used to
24   conceal kickbacks?
25   A.   Yes.

1    Q.   And are you invoices that say face-to-faces, are

2    those sometimes used to conceal kickbacks?

3    A.   Yes.

4    Q.   I want to show you -- could we go back to that

5    one?  Thank you.

6              THE CLERK:  The ELMO or --

7              MR. SWARTZ:  Yeah, ELMO, please, thank you.

8    Q.   (By Mr. Swartz)  Are you familiar with Jesus

9    Virlar?

10   A.   Yes.

11   Q.   Was he a -- a medical director for the Merida

12   Group?

13   A.   Yes.

14   Q.   Do you know whether or not he had a medical

15   directorship agreement?

16   A.   I don't -- I haven't seen one.

17   Q.   If there was one, would -- does that negate the

18   fact that he was paid kickbacks?

19             MR. GUERRA:  Objection, Your Honor, leading

20   and witness already testified he didn't know the answer

21   of whether or not there was a contract to begin with.

22             THE COURT:  Rephrase the question.

23   Q.   (By Mr. Swartz)  The fact that you indicated that

24   Jesus Virlar was a medical director for the Merida

25   Group.

1      A.   Yes.

2      Q.   Does that mean he wasn't accepting kickbacks?

3      A.   No.

4      Q.   Are you aware that Eduardo Carrillo was also a

5   medical director for the Merida Group?

6           MR. GUERRA:   Objection, Your Honor, leading.

7           THE COURT:   Overruled.

8           THE WITNESS:   Yes.

9      Q.   (By Mr. Swartz)   Does that mean he wasn't

10   accepting kickbacks?

11      A.   No.

12      Q.   In fact, are you aware that both Eduardo Carrillo

13   and Jesus Virlar have plead guilty to health care fraud?

14      A.   Yes.

15      Q.   Are you aware that they both have said that they

16   accepted kickbacks from Merida Group?

17      A.   Yes.

18      Q.   Now, in connection with this case, Government's

19   Exhibit L-3 --

20           MR. GUERRA:   Your Honor, I'm going to object

21   to this line of questioning, it's outside the scope of

22   Cross-Examination.

23           MR. TONY CANALES:   I didn't cover it at all

24   in my cross.

25           MR. GUERRA:   Nor did I.

1          THE COURT:  Mr. Swartz?

2          MR. SWARTZ:  Yes, Your Honor.

3          On Cross-Examination they were asking Agent

4   Williams about approaching Dr. Pena and the efforts to

5   get him to cooperate and that's what this is going to

6   address.

7          THE COURT:  Overruled, let -- let me hear

8   the questions.

9   Q.   (By Mr. Swartz)  So you were asked some questions

10   about your conversations with Dr. Pena when you

11   interviewed him on October 27th, 2017; do you remember

12   that?

13   A.   Yes.

14   Q.   And you were asked questions about the target

15   letter by Mr. Canales and Mr. Guerra; do you remember

16   that?

17   A.   Yes.

18   Q.   And you were asked questions about the efforts to

19   get Dr. Pena to cooperate; do you remember that?

20   A.   Yes.

21   Q.   Now, what happened, why did that not work out?

22   A.   Because Mr. Pena was not truthful with us based

23   on what we already knew from the interview.

24   Q.   And what was your hope in connection with the

25   investigation that would happen with Francisco Pena?

1          MR. GUERRA:  Objection, Your Honor, asked

2    and answered.

3          THE COURT:  Let me hear that question again.

4    What was your what?

5          MR. SWARTZ:  What was your hope, or what was

6    the goal of the -- in terms of the investigation, what

7    was the objective with respect to Francisco Pena.

8          THE COURT:  That's -- that's been asked and

9    answered.

10   Q.  (By Mr. Swartz)  With respect to the

11   investigation, what happened, what happened after the

12   interview with Francisco Pena, did he cooperate?

13   A.  No.

14   Q.  What happened instead?

15   A.  Instead, he arranged a meeting with Mr. Jimenez

16   to attempt to conceal based on what he knew about our

17   investigation from the interview.

18   Q.  And during the -- the interview with Francisco

19   Pena, was he honest with you?

20   A.  No.

21   Q.  Did he lie once?

22   A.  No.

23   Q.  How many times did he lie?

24   A.  Multiple times.

25          MR. SWARTZ:  Pass the witness, Your Honor.

1           THE COURT:  Mr. Guerra, before we commence,

2    let's -- let's take a very quick break.

3           Take a very brief recess.

4           COURT OFFICER:  All rise for the jury.

5           (JURY OUT.)

6           (COURT IN SHORT RECESS.)

7           (JURY IN.)

8           THE COURT:  Thank you, everyone.  Please be

9    seated.

10           You ready?  Mr. Guerra, please proceed.

11           MR. GUERRA:  Thank you, Your Honor, briefly.

12                    RECROSS-EXAMINATION

13    BY MR. GUERRA:

14      Q.  Agent Williams, you had access to subpoena

15    Dr. Pena's bank records in -- in Laredo; is that

16    correct?

17      A.  Sorry, you asked if I had access to his --

18      Q.  If you had access to subpoena Dr. Pena's bank

19    records in Laredo?

20      A.  Did I have access to subpoena them?

21      Q.  Yes.

22      A.  Yes.

23      Q.  In other words, you had the ability to do so,

24    correct?

25      A.  Yes, I did.

1    Q.   You did not; is that right?

2    A.   No.

3    Q.   With regards to the -- I believe you testified

4    with regards to the October 30th, 2017 meeting between

5    Dr. Pena and Edgar Jimenez, and specifically with regard

6    to the medical services agreement, you would agree with

7    me that based on your knowledge Dr. Pena had been

8    working as a medical director for Generous since August

9    2014; is that correct?

10    A.   Yes.

11    Q.   And so the -- the services he was asked to, I

12    guess verify in that contract, were being done since

13    2014; is that right?

14    A.   You're asking if the services were done?

15    Q.   Yes.  Yeah.

16    A.   Services were provided, yes.

17    Q.   Okay.  In any of the tapes that -- that we -- we

18    listened to and you played with Mr. Swartz, was there

19    any -- was there ever any part where Dr. Pena asks why

20    Edgar Jimenez was paying him in cash?

21    A.   Yes.

22    Q.   Okay.  Do you recall the response?

23    A.   I don't recall the response, I remember him

24    saying why cash.

25    Q.   Right.  And are you aware that Mr. Jimenez said

that they paid cash because they were overdrawn on their

bank account?

   A.   That sounds familiar.

   Q.   That wasn't played earlier to the ladies and

gentlemen of the jury, correct?

          MR. SWARTZ:  Your Honor, I object to this

being beyond the scope of the redirect.

          MR. GUERRA:  I'll move on, Your Honor.

          THE COURT:  Move on.

          MR. GUERRA:  No further questions, Judge.

          THE COURT:  Mr. Cyganiewicz?

          MR. CYGANIEWICZ:  I have nothing,

Your Honor.

          THE COURT:  Mr. Canales?

          MR. TONY CANALES:  None, sir.

          THE COURT:  Thank you, sir.

          MR. SWARTZ:  Nothing further, Your Honor.

          THE COURT:  Thank you.  You may step down.

          THE WITNESS:  Thank you.

          THE COURT:  I think this is a good time for

a break, unless you have a very short witness?

          MR. SWARTZ:  We have a long witness,

Your Honor.

          THE COURT:  That's quite all right.  With

that being said, ladies and gentlemen, let's go ahead

1    and take a break for today, and again, we'll meet bright

2    and early tomorrow starting at 9:00 a.m.  Thank you.

3             COURT OFFICER:  All rise for the jury.

4             (JURY OUT.)

5             THE COURT:  Yes, those aids should be left

6    there, or just hand them to Ms. -- I don't know her

7    name.

8             MR. LOWELL:  Ms. Collom.

9             THE COURT:  Collom.  Thank you, everyone.

10   Gentlemen, we'll be in recess, and I -- I do want to,

11   once again admonish everyone to please be here on time,

12   and Mr. McInnis, again, make every effort to be here on

13   time.  Obviously, there's nothing worse than keeping a

14   jury waiting and delaying the proceedings.

15             Anything else?

16             MR. CYGANIEWICZ:  Since you brought that up,

17   Your Honor, I just feel obligated to try to explain that

18   his mom had some sort of shortness of breath when he

19   entered the courtroom and he wanted to comfort her and

20   stay there, it wasn't deliberate or intentional and I'll

21   make sure he's here.

22             THE COURT:  Again, there may be scenarios,

23   and I understand that's -- and that may be an emergency,

24   but let's make every effort to not keep the jury

25   waiting.  Thank you, sir.

1          MR. CYGANIEWICZ:  Yes, sir.

2          THE COURT:  We'll be in recess.  Thank you

3    very much.

4          (COURT IN RECESS.)

5          THE COURT:  Very quickly, who is the next

6    witness tomorrow?

7          MR. LOWELL:  It is Jose Aguilar.

8          THE COURT:  Thank you, everyone.

9          (COURT IN RECESS.)

10

11                REPORTER'S CERTIFICATE

12

13       I certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled

15   matter.

16

17

18          /s/Sheila E. Perales. _____
           SHEILA E. HEINZ-PERALES CSR RPR CRR
19         Exp. Date:  January 31, 2021

20

21

22

23

24

25