```
 1              IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION


 3
    UNITED STATES OF AMERICA      )
 4                                )
                                  )
 5  VS.                           ) CRIMINAL ACTION NO.
                                  ) B-18-CR-8
 6                                )
    RODNEY MESQUIAS, HENRY        )
 7  MCINNIS AND FRANCISCO PENA    )
                                  )
 8

 9
                          TRIAL - DAY SIX
10           BEFORE THE HONORABLE ROLANDO OLVERA
                       OCTOBER 29, 2019
11


12


13              A P P E A R A N C E S

14
     FOR THE UNITED STATES:
15
          MR. KEVIN LOWELL
16        MR. ANDREW SWARTZ
          MR. JACOB FOSTER
17        ASSISTANT UNITED STATES ATTORNEY
          BROWNSVILLE, TEXAS 78520
18

19   FOR THE DEFENDANT RODNEY MESQUIAS:

20        MR. CHARLES BANKER
          ATTORNEY AT LAW
21        118 Pecan Boulevard
          McAllen, Texas 78501
22
          MR. HECTOR CANALES
23        MR. TONY CANALES
          ATTORNEYS AT LAW
24        2601 Morgan Avenue
          Corpus Christi, Texas 78405
25
```

```
 1   FOR THE DEFENDANT HENRY MCINNIS:

 2       MR. ED CYGANIEWICZ
         ATTORNEY AT LAW
 3       1000 E. Madison Street
         Brownsville, Texas 78520
 4
     FOR THE DEFENDANT FRANCISCO PENA:
 5
         MR. ROBERT GUERRA
 6       ATTORNEY AT LAW
         55 Cove Circle
 7       Brownsville, Texas 78521

 8   FOR THE DEFENDANT FRANCISCO PENA:

 9       MS. ADRIANA ARCE-FLORES
         ATTORNEY AT LAW
10       1414 Victoria Street
         Laredo, Texas 780404
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    THE COURT:  Thank you, everyone.  Please be
 2   seated.
 3                    Ladies and gentlemen of the jury, again,
 4   good morning.
 5                    THE JURY:  Good morning.
 6                    THE COURT:  Thank you everyone for being
 7   prompt again; likewise, to all the parties.
 8                    Mr. Lowell, next witness, please.
 9                    MR. LOWELL:  Good morning, Your Honor.
10                    We had originally allocated one hour for
11   this witness.  We'd respectfully ask for an additional
12   hour.
13                    THE COURT:  All right.
14                    MR. LOWELL:  Mr. Aguilar.  This is Jose
15   Aguilar.
16                    THE COURT:  All right.
17                    MR. LOWELL:  Thank you, Your Honor.
18                    THE COURT:  Bring him in.
19                    MR. LOWELL:  The United States calls Jose
20   Aguilar.
21                    THE COURT:  Morning, sir.
22                    Please remain standing and raise your right
23   hand.
24                    Please face Ms. Sandra.
25                    (WITNESS SWORN IN.)
```

```
 1                    THE WITNESS:  Yes.
 2                    THE CLERK:  Thank you.
 3                    THE COURT:  Thank you, sir.
 4                    Please have a seat and position the
 5    microphone closely to you and speak loudly and clearly.
 6                    THE WITNESS:  Yes, sir.
 7                    THE COURT:  Thank you, sir.
 8                    MR. LOWELL:  May I proceed?
 9                    THE COURT:  Please proceed, Mr. Lowell.
10                         DIRECT EXAMINATION
11    BY MR. LOWELL:
12       Q.  Good morning, sir.  Please state your name for
13    the record.
14       A.  My name is Jose Aguilar.
15       Q.  Mr. Aguilar, do you currently live in Texas?
16       A.  That's correct.
17       Q.  And are you a nurse?
18       A.  Yes.
19       Q.  Where do you currently work?
20       A.  For Generous Home Care Management.
21       Q.  And tell the jury what kind of company that is?
22       A.  Generous Home Care Management is a hospice and
23    home health organization.
24       Q.  How many years of experience do you have in
25    hospice?
```

```
 1      A.   Approximately, about six years.

 2      Q.   How about home health?

 3      A.   Rough -- about the same.

 4      Q.   And during that time, approximately, how many

 5   patients have you seen?

 6      A.   At least above 100.

 7      Q.   Mr. Aguilar, directing you to between 2012 and

 8   2013, did you work for the Merida Group?

 9      A.   2012 to 2013, yes.

10      Q.   And did you work in Laredo?

11      A.   I -- I -- yes.

12      Q.   How about San Antonio?

13      A.   Yes.

14      Q.   Are you familiar with Francisco Pena?

15      A.   That's correct.

16      Q.   Mr. Aguilar, I'm showing you Government's Exhibit

17   L-2.

18           Now, did Francisco Pena serve as the medical

19   director for the Merida Group?

20      A.   That's correct.

21      Q.   And during your time at Merida, did you work

22   directly with Francisco Pena?

23      A.   That's correct.

24      Q.   In Laredo?

25      A.   Yes, sir.
```

1    Q.   And did you have conversations with Francisco

2    Pena in his capacity as a medical director?

3    A.   I -- I spoke regularly with Dr. Pena when I was

4    assigned to Laredo.

5    Q.   Now, as a nurse during your time at the Merida

6    Group, would you examine patients?

7    A.   Yes.

8    Q.   Would you interact with them?

9    A.   Yes.

10   Q.   And was part of that interaction to ensure that

11   they had the correct diagnosis?

12   A.   Yes.

13   Q.   And to -- to ensure that they qualified for home

14   health and hospice services?

15   A.   That's correct.

16   Q.   Now, during your time at the Merida Group, did

17   you observe that there was fraud at the company?

18              MR. GUERRA:   Objection, Your Honor, calls

19   for legal speculation, and there's been no foundation

20   through this witness to testify as to those matters.

21              THE COURT:   Rephrase the question.

22   Q.   (By Mr. Lowell)   During your time at the Merida

23   Group, did you handle the patient files?

24   A.   Yes.

25   Q.   And did you review the patient files?

1    A.   Yes.

2    Q.   And during your review of those patient files,

3   did you observe that those files contained false

4   information?

5    A.   Yes.

6    Q.   How common was it to observe false information in

7   the patient files?

8    A.   Very common.

9    Q.   Did the -- the Merida Group -- Merida Group

10  patient files, did they contain false information about

11  whether the patients were homebound?

12   A.   That's correct, they didn't have the criteria for

13  homebound.

14   Q.   And do they also contain false information about

15  whether the patients were about to die?

16   A.   Yes.

17   Q.   Was that common?

18   A.   Common.

19   Q.   And these patient files, did they include the

20  patient files for Francisco Pena?

21   A.   That's correct.

22   Q.   Was Francisco Pena the main medical director for

23  the Merida Group in Laredo?

24   A.   For Laredo, that's correct.

25   Q.   Now, during your time at the Merida Group, how --

1    how important, if at all, was Francisco Pena to the

2    Merida Group's Laredo operation?

3        A.   He was very important.

4        Q.   Could you explain to the jury why he was very

5    important?

6        A.   So, basically, he served as the main referral

7    base as far as referral basis patients to feed the site

8    of Laredo.

9        Q.   Mr. Aguilar, when you say feed, what do you mean?

10       A.   Basically, economics so that they could, you

11   know, make money in that area.

12       Q.   And you mentioned referrals, did Mr. Pena refer a

13   substantial number of patients to the Merida Group?

14       A.   That's correct.

15       Q.   And did you interact with Francisco Pena's

16   patients?

17       A.   That's correct.

18       Q.   In your capacity as a nurse?

19       A.   That's correct.

20       Q.   And were these patients signed up for hospice?

21       A.   Some were hospice; some were home health.

22       Q.   And did they include patients who didn't qualify

23   for hospice?

24       A.   That's correct.

25       Q.   Did they include patients who didn't qualify for

1  home health?

2     A.  That's correct.

3     Q.  And to be clear, these are patients of Francisco

4  Pena?

5            MR. GUERRA:  Your Honor, I'm going to

6  object, been a series of leading questions, Your Honor.

7  This is Direct Examination.

8            THE COURT:  I'll allow the last question,

9  but please -- please avoid leading questions.

10    Q.  (By Mr. Lowell)  You may answer.

11    A.  Can you repeat your question?

12    Q.  Sure.  The patients that you discussed, did

13  those -- did that patient population include patients of

14  Francisco Pena?

15    A.  That's correct.

16    Q.  Mr. Aguilar, I'm showing you what's -- showing

17  you Government's Exhibit L-3.

18        Do you know Rodney -- Rodney Mesquias?

19    A.  That's correct.

20    Q.  Do you know Henry McInnis?

21    A.  That's correct.

22    Q.  And during your time at the Merida Group, were

23  they in charge of the company?

24    A.  Yes.

25    Q.  Were they in charge of the company in

1   San Antonio?

2       A.   Yes.

3       Q.   Were they in charge of the company in Laredo?

4       A.   Yes.

5       Q.   And I believe you testified that you worked in

6   both home health and hospice; is that right?

7       A.   That's correct.

8       Q.   I want to talk about home health.  Can you give

9   the jury an example of a patient that you interacted

10  with that was not homebound?

11      A.   Yes.  There's circumstances, we were assigned to

12  go check on patients in -- in their -- in their homes,

13  and the high pressures on that we have to admit these

14  patients.  So sometimes as a nurse, we couldn't find the

15  patients.  We'd visit several times at their residency

16  and there was no patient to be found.  We'd leave, you

17  know, fliers on the doors that said, sorry, we missed

18  your visit and hope that the patient would call back.

19  And the administration would say, well, take a picture

20  and prove that you're actually doing what it is that

21  you're doing because, you know, Rodney's going to get

22  upset if we don't find that patient.

23           And in one circumstance, I finally found one

24  patient around, it was in the evening, around 6:00,

25  maybe 6:00 -- maybe 7:00 and he was pulling into his --

1    his house in his pickup truck.  And the gentleman gets

2    off and he says to me, he says, you guys again.  Why do

3    you guys keep coming, I don't understand.  And I said

4    well, you know, it's your doctor, you know, I got to --

5    like we've got to look at you, it's like, look, I'm --

6    I'm fine, but I guess let's go through the routine.

7         The gentlemen had a beer in his hand, he was --

8    he was fit and he says, all right, come in my house.

9    And I go in his house and he had a pretty good history

10   of the gentleman, he had this boxing, you know, gloves

11   on the wall from different types of collections that he

12   had so -- so -- so I was curious.  I asked him so -- so

13   what -- what is it, you know, that you do?

14        He's, like, well, I teach the kids out at the

15   local gym to -- to box and to -- I thought he was a

16   marvel of a man, right, but he questioned me and he

17   said, hey, you guys, what, you know, what are you guys

18   really doing, you guys are just kind of just keep coming

19   by and it's taking up my time and that's one

20   circumstance.

21   Q.   Okay.  To be clear, just to break that up a

22   little bit, that was a patient who was enrolled for home

23   health services for the Merida Group?

24   A.   That was a home health patient.

25   Q.   And I believe you said he -- was he a boxing

1    coach?

2        A.    Yes.

3        Q.    And did he teach kids at the local gym?

4        A.    Yes.

5        Q.    And you testified that he was driving with a

6    beer; is that right?

7        A.    That's right.

8        Q.    And the pressure you mentioned, did that come

9    from the top of the company?  Showing you, again,

10   Government's Exhibit L-3?

11       A.    It came from Rodney and Henry McInnis.

12       Q.    Did you certify that patient for home health

13   services?

14       A.    What -- I -- I couldn't, so what I -- I

15   recommended for a discharge.  And not long after, the

16   way it would work is if, let's say a nurse would

17   discharge a patient because they didn't qualify, they

18   would send a nurse who would be willing to recertify

19   that patient.  And so he'd come around again and there

20   you see him on the list again, like he's on the nursing

21   roster, and the gentleman really has absolutely no need

22   for a nurse.

23       Q.    Now, when you were working with those home health

24   files, did you observe that there were false diagnoses

25   in the home health files?

1    A.   That's correct.

2    Q.   And did those false diagnoses include diabetes?

3    A.   That's correct.

4    Q.   Hypertension?

5    A.   That's correct.

6    Q.   Can you provide the jury with an example of false

7  information that you observed in the home health files

8  for the Merida Group?

9    A.   So there's -- there's times that you have to

10  recertify a patient in the -- in the world of nursing,

11  it occurs usually every two months.  And usually, in the

12  home health side, the goal is to have them recover.  And

13  when they recover and they meet their goals, we

14  discharge them back to their normal lives so they can

15  continue to get back to work, or whatever it is that --

16  you know, they were doing before.

17         So in this circumstance, there -- there was a

18  wound that the nurses were treating, and there was a

19  whole chart that spelled out, you know, this wound

20  that's -- it spells out that he has this wound and

21  there's supplies being order and so forth.

22         So you follow that doctor's order, so when I get

23  to the patient's home to my surprise, I mean, there is

24  no wound, and there's no wound.

25         So this happened not just once, this is many

1    patients that, perhaps, they did have a wound and maybe

2    they did need a home health, you know, two months prior,

3    but then they heal.

4         So then at that point, when I called

5    administration, the pressure's on, well, you need to

6    find something to keep this patient on.  You know, you

7    don't discharge, you need to find something.  And the

8    pressure was on -- on the nursing side that we had to

9    find some kind of reason to keep this patient.

10   Q.  Was there also an example of a home health

11   patient --

12              MR. BANKER:  Judge, I'm going to object to

13   leading the witness.

14              THE COURT:  Let me hear the question.

15   Q.  (By Mr. Lowell)  Can you think of another example

16   of a home health patient whose filed you reviewed and

17   you identified false information?

18   A.  Let me see.  There was just many circumstances

19   where just made up diagnoses for patients.  I saw

20   several situations where patients that, you know, they

21   say, oh, high blood pressure, but patients don't have

22   high blood pressure, so yet you're going into this home

23   to supposedly manage high blood pressure and there's --

24   there's no high blood pressure.

25        There was circumstances like with diabetes.

1    Patient, they say -- they put, oh, diabetes, oh, he's

2    diabetic, and you get there and he's, like, I'm not

3    diabetic, and I don't know what my doctor's thinking,

4    there must be some kind of mistake or so forth.

5           Just situations, like there was many.

6      Q.   Now, Mr. Aguilar, did there come a time when you

7    decided to leave the home health side of the Merida

8    Group?

9      A.   Yes, sir.  Yes.

10     Q.   Explain to the jury why you wanted to leave home

11   health?

12     A.   It had become really hard for me.  I had left the

13   hospital at Christus Santa Rosa and I'm familiar with

14   what a real patient is and I felt I was just getting a

15   paycheck for no reason.  It was -- it was getting hard

16   for me to sleep at night because here you have to, well,

17   make-up stuff for patients and, you know, to me that's

18   fraud.  And other -- other coworkers, you know, they

19   felt the same way, but with fear.

20           MR. BANKER:  Speculation about what a

21   coworker felt.

22           THE COURT:  One second, one second.

23           Sir, just limit your answer to -- to

24   yourself and not -- not others.

25           THE WITNESS:  Oh, so -- so, you know, it

1    was -- it was just -- it was hard for me, it was hard

2    for me to, you know, I felt it was just checking vital

3    signs and that's not a reason for a nurse to be in a

4    home.

5            And families would kick us out sometimes,

6    would kick me out sometimes because they were tired of

7    us, or me showing up to their homes trying to give them

8    a service that they didn't need.

9    Q.   (By Mr. Lowell)  Mr. Aguilar, after you decided

10   to leave the home health side of the Merida Group, did

11   you have a conversation with Rodney Mesquias?

12   A.   Yes, sir.

13   Q.   Tell the jury about that conversation.

14   A.   So it built up to a point where, you know, I --

15   it was very stressful for me because I -- I felt, you

16   know, what am I going to document on a patient that has

17   absolutely nothing wrong with him?

18           It was very stressful and --

19           MR. BANKER:  I object, Judge.  That's

20   unresponsive to the question.  That has nothing to do,

21   he's not answering the question as asked.

22           THE COURT:  That's sustained.  Go ahead and

23   answer about your conversation with Mr. Mesquias.

24           THE WITNESS:  So what I -- what I did that

25   day is I brought it, I guess, Rodney could we please

speak in private because I'm having a terrible time.
And he says, sure, sure, you know, let's talk.  And he
took me into the conference room and we were there, and
I said, hey, you know, I just said, I can't do it, I
can't do this anymore.  We got, you know, I got -- my
wife is pregnant, I got so much on the line, you know,
and I -- I just can't do the fraud.  I just can't.

Q.   (By Mr. Lowell)  Mr. Aguilar, what did Rodney
Mesquias say in response?

A.   He -- he didn't say much, he -- he de-escalated
the situation, just, you know, it's okay, all right, all
right, you know, like just -- so just kind of made me
feel like better, like, you know, just calming me down
because I was -- I was pretty -- I was a wreck.

Q.   Did Mr. Mesquias appear shocked that you were
calling the company a fraud?

A.   No.

Q.   Did he ask you any questions about who was
involved with the fraud?

A.   No.

Q.   Was anyone fired as a result of you telling
Mr. Mesquias that there was fraud at the company?

A.   No.

Q.   After that, did you transfer to the hospice side
of the Merida Group?

1    A.   Right.   So -- so the resolution that -- at that

2    point, he said, well, let's put you on the hospice side.

3    And -- in my world, I figured, well, you know, they're

4    patients, they're hospice, they've got to be real sick

5    and maybe that will work for me, and maybe I don't

6    understand home health.   Because I was relatively new to

7    the industry at that time.

8    Q.   And Mr. Aguilar, after you transferred to

9    hospice, did you interact with Henry McInnis?

10   A.   Yes.

11   Q.   And during your interactions with Mr. McInnis,

12   did Mr. McInnis discuss managing costs related to

13   hospice patients?

14   A.   Yes.   Yes.

15   Q.   Tell the jury about those conversations.

16   A.   So basically, the -- the instructions were that

17   it was costing too much, like we were -- we, the nurses,

18   were spending too much money on -- on the patients and

19   we needed to start using cheaper things, or giving them

20   less.

21        For example, instead of giving them two sets of

22   wipees, now, you know, one set of wipees, you know,

23   every two weeks.   The milk, the supplement nutrition to

24   limit them to a certain amount of cases, and they put

25   more constraints on the nursing side.

1       And medications also.  That was one of the bigger

2   things that they were upset about.

3       Q.  Now, based on those cuts and costs, were you able

4   to give the patients, the hospice patients, the supplies

5   they needed?

6       A.  No, no, there was several complaints that came.

7   It started causing many challenges.

8       Q.  And was Rodney Mesquias also involved in

9   overseeing the hospice side of the Merida Group?

10      A.  Yes.

11      Q.  Were Rodney Mesquias and Henry McInnis, were they

12  focused on patient care?

13      A.  No.

14      Q.  Tell the jury what they were focused on.

15      A.  They were focused on making money, numbers.  A --

16  a -- money, more numbers, more patients.  Patients

17  equals numbers.

18      Q.  Now, did you -- did you visit these Merida Group

19  hospice patient in their homes?

20      A.  Yes.

21      Q.  And just as with the home health side, did you

22  observe that patients in hospice didn't qualify?

23      A.  Yes.

24      Q.  A fair amount of them?

25      A.  Fair amount.

1    Q.   Did you observe patients who did not qualify for

2    hospice in Laredo?

3    A.   Yes.

4    Q.   How about San Antonio?

5    A.   Yes.

6    Q.   Now, during your time working in San Antonio, did

7    there come a time when Rodney Mesquias and Henry McInnis

8    came to visit the Laredo office?

9    A.   Yes.

10   Q.   Were you present?

11   A.   Yes, I was.

12   Q.   And during that visit, tell the jury what

13   happened?

14   A.   So what happened was Rodney was upset because

15   there was a -- a stack of referrals of -- that -- that

16   were -- that were not admitted of patients.

17        So basically, he has a whole volume of potential

18   money, right, and he fired many people from that site,

19   and I was out there helping train the -- the new people

20   that he had hired.  And there was an issue with the new

21   nurse that they hired because he had a lot of experience

22   in -- in an ER and ICU.

23        So, you know, the -- the -- the guy didn't admit

24   any patients, so Rodney is upset and he starts, you

25   know, going through all the files, throwing them on the

1    desk, and says he couldn't believe it.  He was yelling

2    out that he couldn't believe it.  You know, he was very

3    upset, very upset.  McInnis is watching him there, I'm

4    watching him throw the files.  He was upset, he wanted

5    us to admit those patients, and they never got admitted.

6          So he sat -- sat down that nurse that, you know,

7    basically, he voices to me, he goes, hey, some of these,

8    they didn't qualify so I didn't move on them.  So he

9    sits that nurse down to make sure call back each and

10   everyone of those referrals.

11   Q.   And that stack of orders you mentioned, those

12   were hospice orders?

13   A.   They were -- they're basically, they had like --

14   it was a mixture of hospice and home health.

15   Q.   And were those orders from Dr. Francisco Pena?

16   A.   Yes, sir.

17             MR. GUERRA:   Objection, Your Honor, leading.

18             THE COURT:   Rephrase the question.

19   Q.   (By Mr. Lowell)  From whom were those doctor's

20   orders from?

21   A.   The referrals were from doc -- Dr. Pena.

22   Q.   Now, Mr. Aguilar, during your time at the Merida

23   Group, did you also participate in falsifying the

24   records to make patients qualify?

25   A.   They -- I had no choice but to participate with

1    some of the mess in the sense that I didn't want to get

2    fired.  And it just became more stressful to me every

3    time I did that, but I was following the instructions.

4         Q.   Mr. Aguilar, in addition to yourself, were other

5    employees involved?

6         A.   Yes.

7         Q.   In Laredo?

8         A.   Yes.

9         Q.   In San Antonio?

10        A.   Yes.

11        Q.   Were doctors involved?

12        A.   Yes.

13        Q.   Were nurses?

14        A.   Yes.

15        Q.   Are you familiar with Antonio Guerrero?

16        A.   I -- I met the man, yes.

17        Q.   Was he also involved in fraudulent activity?

18        A.   Right.  So he was supposed to help them gain more

19   patients also, and he didn't do much, he just was

20   helping get patients for the organization.

21        Q.   Including patients who didn't qualify for

22   hospice?

23        A.   For -- for them, it didn't matter if they

24   qualified or not, it was just getting a patient.

25        Q.   How about Dr. Virlar, was he involved in fraud?

```
 1      A.   Yes.

 2      Q.   How about Amy Cooley?

 3      A.   Yes.

 4      Q.   Amy Cooley, was she a nurse?

 5      A.   She was a director of nursing on the hospice

 6  side.

 7      Q.   Are you familiar with the Gonzaba Medical Group?

 8      A.   Yes.

 9      Q.   Was Dr. Greg Gonzaba also involved in the fraud?

10      A.   Yes.

11      Q.   Did there come a time when you had a conversation

12  with Dr. Greg Gonzaba?

13      A.   Yes.

14      Q.   Could you tell the jury about that conversation.

15      A.   So basically, we -- every -- every two weeks -

16           MR. BANKER:  Your Honor, I'm going to

17  object.  Excuse me.  I'm going to object to hearsay.

18           MR. LOWELL:  The statement of an employee of

19  an organization.  It's a conversation between

20  Mr. Aguilar and that employee.

21           MR. BANKER:  I don't think the foundation

22  has been laid as far as that's concerned at all.

23           THE COURT:  Rephrase that question in terms

24  of Dr. Gonzaba's role.

25           MR. LOWELL:  Okay, Your Honor.
```

1      Q.  (By Mr. Lowell)  So Dr. Greg Gonzaba, was he a

2  medical director of the Merida Group?

3      A.  That's correct.

4      Q.  And you were a nurse?

5      A.  Yes.

6      Q.  And during your employment with the Merida Group,

7  did you have conversations during the course of your

8  employment with Dr. Greg Gonzaba?

9      A.  Yes.

10     Q.  Could you tell the jury about one of those

11  conversations.

12              MR. BANKER:  Again, we would object to

13  hearsay.

14              THE COURT:  That's overruled.

15              You can answer the question.

16              THE WITNESS:  So basically, Dr. Greg Gonzaba

17  was serving as the medical director for -- for the, you

18  know, for the IDG's.  So IDG's is every 14 days we have

19  to meet and talk about the caseloads of each clinical

20  case.

21              And at those days, Greg would, you know,

22  come to me and he'd say, hey, you -- I need you to talk

23  to Rodney and tell him that 2,500 is not enough anymore;

24  that the amount of patients that we've already sent from

25  our medical group is a lot more than $2,500, he needs to

1    pay me at least $5,000, at least.

2              So, you know, I called up Rodney and I told

3    him, hey, you know, Greg is very upset.  He says he --

4    that you owe him money and haven't paid him and -- and

5    he needs to get paid 5,000 now for the amount of --

6    of -- of -- of referrals that they're -- that

7    organization is getting that are Gonzaba patients.

8              The -- the other part to that was Greg gives

9    me the assignment because he says the numbers weren't

10   clear, I'm not sure what kind of arrangement they might

11   have officially had, but he wanted the whole roster of

12   the census that -- that the -- that the hospice side

13   because he felt that Rodney was cheating him out from

14   more money for those patients.

15   Q.   (By Mr. Lowell)  So Mr. Aguilar, based on your

16   conversation with Dr. Greg Gonzaba, was it your

17   understanding that Dr. Gonzaba wanted more money for the

18   patients he referred to the Merida Group?

19   A.   Yes.

20   Q.   Based on your experience at the Merida Group, did

21   Dr. Greg Gonzaba refer a substantial number of patients

22   to the Merida Group?

23   A.   He would use his practice, who was a -- a --

24   the -- if they landed on -- if they were Gonzaba

25   patient, Virlar controlled the channel.  So it could

1    have been anyone of their doctors in the group, but

2    ultimately they had that agreement that that was their

3    patient.  And it was money.

4        Q.  Mr. Aguilar, I'm showing you Government's Exhibit

5    E-4, this is at page 491.

6            Do you see the patient name?

7        A.  Yes.

8        Q.  What patient is that?

9        A.  Teresa O. Calvillo.

10       Q.  And do you see the certification period above her

11   name?

12       A.  Yes, sir.

13       Q.  And what's that date range?

14       A.  From 08/08 -- from 08/08, 2013 to 11/05, 2013.

15       Q.  Now, towards the bottom of the page, do you see

16   the nurse's signature Antonio Guerrero?

17       A.  That's correct.

18       Q.  And was that the same Antonio Guerrero that you

19   said was involved in the fraud?

20       A.  That's correct.

21       Q.  Next to Antonio Guerrero's name, do you see the

22   name Amy Cooley?

23       A.  That's correct.

24       Q.  Is that the same Amy Cooley that you said was

25   involved in the fraud?

1      A.   That's correct.

2      Q.   Immediately below Mr. Guerrero and Ms. Cooley, do

3  you see the name Dr. Virlar?

4      A.   Yes, sir.

5      Q.   Was Dr. Virlar involved in the fraud?

6      A.   That's correct.

7      Q.   Dr. Virlar, he certified Ms. Calvillo for

8  hospice; is that correct?

9      A.   Um -- at this point, yes.

10      Q.   Towards the bottom of the page.

11      A.   If it's there, if this is the recertification,

12  they're all signing off on it.

13      Q.   And in addition to Dr. Virlar signing off on it,

14  did Dr. Greg Gonzaba sign off on it?

15      A.   That's correct.

16      Q.   Is this the same Dr. Gonzaba that you said was

17  involved in the fraud?

18      A.   That's correct.

19      Q.   Now, are you familiar with Fidencio Salinas?

20      A.   Yes, sir.

21      Q.   Was Mr. Salinas an employee of the Merida Group?

22      A.   That's correct.

23      Q.   What did Mr. Salinas do?

24      A.   Salinas, he was a registered nurse, and he was --

25  he was going to be the guy who did the dirty work when

1    it came towards -- if no nurse would recertify that

2    patient because the patient didn't qualify, that -- that

3    was the guy that would be used to make sure that he puts

4    that patient on no matter what.

5        Q.   What do you mean put that patient on no matter

6    what?

7        A.   Whether they -- I mean, they didn't need any

8    service, he's going to be the guy that's just going to

9    make up all the documentation that's required to meet

10   that -- that -- to make it look on paper like that they

11   need it.

12       Q.   So I'm showing you, Mr. Aguilar, this is

13   Government's Exhibit E-8, page 1730.

14            Mr. Aguilar, what -- what patient is at the top

15   of the page?

16       A.   Cerda, Petra.

17       Q.   Petra Cerda?

18       A.   Uh-huh.

19       Q.   And what is the visit date indicated there?

20       A.   12/20, 2013.

21       Q.   And which nurse signed off on this patient visit?

22       A.   Fidencio Salinas.

23       Q.   And is that the same Fidencio Salinas that you

24   said did the dirty work?

25       A.   That's correct.

1    Q.   Are you familiar with ID -- IDG meetings?

2    A.   Very -- very much so.

3    Q.   And what are they?

4    A.   They're interdisciplinary meetings that are

5    required by CMS for us to talk about the cases on a

6    case-by-case basis for each one of the hospice patients.

7    Q.   And did you participate in those meetings with

8    Francisco Pena?

9    A.   That's correct.

10   Q.   And were those meetings in connection with the

11   Merida Group patients?

12   A.   That's correct.

13   Q.   Tell the jury what Francisco Pena would do during

14   those meetings?

15   A.   So a regular meeting with IDG with Francisco Pena

16   is he's going to -- he's going to boast about himself

17   for a good 15 minutes, and he's going to talk about, you

18   know, how brilliant he is and how -- and belittle

19   everyone else at the table.  Everyone just has to

20   listen.

21        After that, sorry, pardon me, after that, what

22   he -- what the routine was, just give me what I have to

23   sign, and he'd sign off, and it was -- it was all

24   business and money and business, money, schemes and

25   things of that nature.

1    Q.   When you say business and money, these -- these

2  were terms that Mr. Pena would discuss during these IDG

3  meetings?

4              MR. GUERRA:   Objection, Your Honor, leading.

5              THE WITNESS:   Right, so --

6              THE COURT:   One second, one second.

7              That's overruled, I -- answer if you --

8  well, answer -- answer what you said.

9              THE WITNESS:   So basically, it -- it

10  would -- it consists of just ways of making more money,

11  it wasn't patient care, it was like, oh, here I got this

12  assisted living, we can make more money there.   There's

13  this possibility to make more money there.

14              But the first 15 minutes were about himself.

15  Either he'd tell this thing, the man -- it's a different

16  kind of human.

17    Q.   (By Mr. Lowell)   What do you mean by that?

18    A.   You know, he's just very, very arrogant, money,

19  money, money.   And, you know, very -- very little

20  patient care conversation.

21    Q.   Now, Mr. Aguilar, did you leave the Merida Group?

22    A.   Yes, sir.

23    Q.   Approximately, what year?

24    A.   Approximately, late 2013, or, no, maybe be --

25  somewhere mid-2013, I can't remember, but in 2013.

1    Q.   Did you then start at Generous?

2    A.   Yes, sir.

3    Q.   And was Mr. Pena the medical director for

4    Generous?

5    A.   That's correct.

6    Q.   Why did you hire Mr. Pena as your medical

7    director?

8    A.   You know, he offered his help and I didn't know

9    many doctors at that -- and since he was about business,

10   I figured it would be the easiest way to help get

11   someone -- a doctor to help me.

12   Q.   Would you have conversations with Mr. Pena when

13   he was the medical director of Generous?

14   A.   Yes.

15   Q.   And during those conversations, what, if anything

16   would Mr. Pena say about extending patient's lives?

17   A.   No one dies on his clock, you need to keep them

18   alive, that's the only way to make money.  Upset if --

19   if a patient died, it means we didn't do our job and

20   we're not doing it right.

21        When a patient stopped eating, peg tubes, that

22   needs to happen and things of that nature.

23   Q.   Were you ever present when Mr. Pena would have

24   discussions with families about the use of a peg tube?

25   A.   Yes, sir.

1    Q.   What, if anything, would Mr. Pena say to these

2    families about the peg tube?

3    A.   So what -- when -- when patients die, and they're

4    in their last moments, right, families are the most

5    vulnerable, they depend on us, the health care

6    professionals, and what we're dealing them on how to

7    guide -- how -- how to guide what's going to happen

8    next.

9         And so when someone's dying, it is not easy.

10   That's not.  And basically, the -- when a patient stops

11   eating and drinking, the -- the conversation is just

12   very one-sided, the -- the man is about power, and he

13   wants -- he wants to make sure he sees that patient as

14   his property.  He doesn't want that patient to die

15   because that patient's going to -- you're going to lose

16   money.

17        Of course, he doesn't tell the family this, so

18   the conversation is he puts people at panic, you need to

19   do this right now, if not, they're going to die and is

20   that what you want, kind of puts them at a point where

21   they feel guilty for not doing anything about it.

22        You know, people believe in their doctors and --

23   and -- and they follow, you know, what they say and --

24   and we as health care professionals fail them.

25   Q.   During those conversations with the families,

```
 1   would Mr. Pena disclose to them that he wanted to make
 2   more money off the patients?
 3      A.   No.
 4      Q.   Now, when you started Generous, did Francisco
 5   Pena loan you money?
 6      A.   That's correct.
 7      Q.   Approximately, how much money did he loan you?
 8      A.   $21,000.
 9      Q.   Did you pay Mr. Pena back?
10      A.   Yes, sir.
11      Q.   Approximately, how much money?
12      A.   Two -- $20,000 then $1,000 after that to equal
13   $21,000.
14              THE COURT:  Ms. Espinoza?
15              THE CLERK:  Yes, sir.
16              MR. LOWELL:  Could we switch it?  Thank you.
17      Q.   (By Mr. Lowell)  I'm showing you Government's
18   Exhibit P-1 at page 1.
19           And was this a $20,000 check that you wrote to
20   Mr. Pena on May 17th, 2016?
21      A.   Yes, sir.
22      Q.   And do you see the memo line?
23      A.   Yes, sir.
24      Q.   What does it say?
25      A.   Loan repayment from Generous.
```

1    Q.   We go to page 2 of Government's Exhibit P-1.

2    Mr. Aguilar, is this another check that Generous paid to

3    Dr. Pena on July 22nd, 2016?

4    A.   That's correct.

5    Q.   And what's the amount?

6    A.   1,000.

7    Q.   And if you look at the memo line, what does it

8    indicate?

9    A.   Loan repayment.

10   Q.   Now, you signed a medical director contract with

11   Mr. Pena in 2014; is that correct?

12   A.   That's correct.

13   Q.   And that was a written contract?

14   A.   Yes, sir.

15   Q.   And under that agreement, you paid Mr. Pena for

16   referring patients to your company; is that right?

17   A.   The contract didn't --

18           MR. GUERRA:   Objection Your Honor.

19           THE COURT:   One second, one second, one

20   second, sir.

21           MR. GUERRA:   I object to the leading.  He's

22   laid no foundation as to the contents of that contract

23   or the witness' knowledge of the contract.

24           He said he signed it, they haven't talked

25   about the content, how it was authored.  Counsel just

1   went strictly into a leading question as to the contents

2   of the contract.

3              THE COURT:  Rephrase the question.

4      Q.  (By Mr. Lowell)  Mr. Aguilar, did there come a

5   time when you entered into a contract with Mr. Pena?

6      A.  Yes.

7      Q.  And what was that contract for?

8      A.  Help patients.

9      Q.  Was it a medical director contract?

10     A.  It was a medical director contract, yes, but

11  it --

12             THE COURT:  And, sir, again put the

13  microphone closely and speak loudly and clearly.

14             THE WITNESS:  It -- it was a medical

15  director contract, at least what I thought at first, but

16  it -- it -- it evolved into something else.

17     Q.  (By Mr. Lowell)  Tell the jury what that

18  something else was.

19     A.  It -- it became a -- as soon as the organization

20  started getting revenue, the -- you know, because we --

21  we started it from scratch and, you know, Pena offered

22  his help to help us to get to a point, and we returned

23  his -- his money we owed, but he voiced this to me,

24  well, now you're getting money, and now it's time, you

25  know, that if I'm going to continue to help you with

1  patients, you're going to have to start, you know,

2  paying up.  And I know you're making that money, so, you

3  know, it became -- he -- the contract pretty much just

4  went out the window and it was just a verbal

5  understanding.

6      Q.  So to be clear, were you paying Mr. Pena for

7  patient referrals?

8              MR. GUERRA:  Objection, Your Honor.  Leading

9  and -- and that's not the substance of the witness'

10 answer.

11             THE COURT:  Rephrase the question, what was

12 the verbal understanding?

13             THE WITNESS:  Basically, he was going to

14 send me patients and I was going to pay him.

15     Q.  (By Mr. Lowell)  Did you then pay Mr. Pena for

16 patient referrals?

17     A.  Yes, sir.

18     Q.  And at the time you did that, you understood it

19 was illegal; is that right?

20     A.  Yes, sir.

21     Q.  Now, did the -- did the Government promise you

22 anything in exchange for testifying here today?

23     A.  No, sir.

24     Q.  Do you have a plea agreement with the Government?

25     A.  No, sir.

1    Q.   Have you pleaded guilty to anything?

2    A.   No, sir.

3    Q.   Have you been offered immunity?

4    A.   No, sir.

5    Q.   Do you understand that you could be prosecuted?

6    A.   I understand.

7    Q.   Now, directing you to 2017, did you participate

8    in an undercover operation involving Mr. Pena?

9    A.   Yes, sir.

10   Q.   Did the F -- did the FBI direct that operation?

11   A.   Yes, sir.

12   Q.   And as a part of that operation, did you pay

13   kickbacks to Francisco Pena?

14   A.   Yes, sir.

15   Q.   At whose direction?

16   A.   FBI.

17   Q.   In total, how much in kickbacks did you pay

18   Francisco Pena?

19   A.   $5,000.

20   Q.   Was that in cash?

21   A.   Yes, sir.

22   Q.   How many separate occasions did you pay Francisco

23   Pena cash for patients?

24   A.   Just that one time.

25   Q.   Did that --

1    A.   Well, divided -- it was twice that we -- those

2  two times it was 2500.   Totalling 5,000.

3    Q.   And in exchange for that $5,000, how -- were

4  patients referred to you?

5    A.   Yes, sir.

6    Q.   Approximately, how many?

7    A.   Nine.

8    Q.   Now, the operation occurred in August 2017; is

9  that correct?

10    A.   Yes, sir.

11    Q.   Now, prior to August 2017, did there come a time

12  when you met with Mr. Pena -- Pena to discuss payments

13  for patients?

14    A.   Yes.

15    Q.   Tell the jury about that conversation.

16    A.   So Mr. Pena, we -- at that time, we used one of

17  his recommendations that was helping us with the -- with

18  the billing part of the organization.   So he was

19  watching our financial's of what money was being billed.

20        So he saw and -- and he -- he said, look, I see

21  how much money you guys are making and I'm going to need

22  more.   And I've been sending you patients and I'm going

23  to need more and, well, he wanted to reach a point where

24  he wanted to get at least $6,000 as a flat rate for the

25  patients he would continue to send.

1     Q.   During that meeting, how much money did you agree

2 to give Mr. Pena?

3     A.   We -- we -- 5,000.

4     Q.   And directing you to August 3rd, 2017, did you --

5 did you meet with Mr. Pena?

6     A.   Yes.

7     Q.   And where was that first meeting on August 3rd,

8 2017?

9     A.   At the mayor's office in Rio Bravo.

10     Q.   Whose decision was it -- was it to meet there?

11     A.   Dr. Pena's.

12     Q.   And was that meeting recorded?

13     A.   Yes.

14     Q.   Audio and video?

15     A.   Yes, sir.

16     Q.   Mr. Aguilar, I'm showing you Government's Exhibit

17 C-5.

18          MR. LOWELL:  Ms. Espinoza, could we go back

19 to the -- thank you.

20     Q.   (By Mr. Lowell)  Mr. Aguilar, showing you

21 Government's Exhibit C-5, was this cash given to

22 Mr. Pena on August 3rd, 2017?

23     A.   That's correct.

24     Q.   For what?

25     A.   For patients.

1          Q.  If we could call up Government's Exhibit C-3.

2                    MR. LOWELL:  And for the record, this is the

3    recording on August 3rd, 2017.  We also have a

4    transcript that's Government Exhibit C-4.

5                    MR. GUERRA:  Your Honor, I'm going to object

6    to the playing of these videos at this time, or any of

7    these.

8                    THE COURT:  One second, Mr. Guerra, I -- I'm

9    not hearing you.

10                    MR. GUERRA:  I'm sorry.  You're not hearing

11   me, I'm sorry.

12                    I'm going to object to playing the videos of

13   this time, it's -- the jury has already seen these clips

14   before, the witnesses that testified to the

15   conversations and there's no need to refresh his memory

16   or play these videos much more.  We believe it's just an

17   improper use of the jury's time.

18                    THE COURT:  The objection is overruled.

19                    MR. GUERRA:  Thank you, Your Honor.

20                    MR. LOWELL:  Thank you, Your Honor.

21                    And I believe we've distributed binders to

22   each of the jurors.  We're about to.

23                    THE COURT:  All right.  Well, let -- let's

24   clarify this.  One second, Mr. Lowell.

25                    Is this an exhibit that's already been

1   admitted, or is it an aid similar to what was done

2   yesterday?

3            MR. LOWELL:  Yes, Your Honor, it's an

4   exhibit that's already been admitted.

5            THE COURT:  All right.  And, again, for the

6   record, which Exhibit are we distributing to the jury?

7            MR. LOWELL:  So this is Government's Exhibit

8   C-3 is the recording, and right now we are handing out

9   C-4, Government's Exhibit C-4, which is the transcript

10  of the recording.

11           THE COURT:  Understood.  Please proceed.

12           MR. LOWELL:  Ladies and gentlemen, we're at

13  tab two.

14           Would the Court like a copy?

15           THE COURT:  Sandra.  Thank you.

16           THE CLERK:  Uh-huh.

17           MR. LOWELL:  So we are at tab two at the

18  bottom of the page, there are page numbers, so page five

19  of tab two.  And the time stamp is 6:25, the center of

20  the page.

21           Could we play the recording?

22           (Audio clip playing.)

23  Q.  (By Mr. Lowell)  Who's Rhonda?

24  A.  Rhonda is a marketer, works close with Dr. Pena.

25  Q.  Mr. Pena says he did not come because of anybody

```
1   else, what is he referring to?
2       A.   Oh, what basically, what -- what this
3   conversation relates -- the patient was Pena's patient,
4   so he got upset that Rhonda took the patient and he's
5   getting no credit.  So he's going to make sure he talks
6   to her about that credit.  And the credit happens to be
7   money, so marketers get paid money when they sell these
8   patients.  So if she made some money, he's going to
9   bring it to her attention that, hey, where's my part?
10              (Audio clip playing.)
11      Q.   (By Mr. Lowell)  Is that Mr. Pena laughing?
12      A.   That's correct.
13      Q.   Why is Mr. Pena laughing?
14      A.   Well, because now the marketers have certain
15  rules that if they -- they won't get paid if the patient
16  doesn't live, like, past five days.  Every other agency
17  does this to -- to the marketers, so he's laughing
18  because, you know, she takes the patient and he's
19  laughing at the fact that she's not going to make any
20  money.
21      Q.   When you say she, are you referring to Rhonda?
22      A.   Rhonda.
23      Q.   Why isn't she going to make any money?
24      A.   Because the patient died already.
25      Q.   And could we go to same tab, page 13.  This is
```

```
 1   going to be time stamp 39.
 2               (Audio clip playing.)
 3      Q.  (By Mr. Lowell)  Mr. Aguilar, was that you
 4   speaking?
 5      A.  Yes.
 6      Q.  And what are you saying to Mr. Pena?
 7      A.  That I have another 2500 coming, but he needs to
 8   help get me patients.
 9               MR. LOWELL:  Can we go to the next clip,
10   please at 45.
11               (Audio clip playing.)
12      Q.  (By Mr. Lowell)  What is Mr. Pena saying there?
13      A.  He's just throwing it back on me, he says, hey,
14   you know, I already got nine patients for you, saying
15   that he -- he could throw us to the side, he doesn't
16   have to use us, he can go make money somewhere else.
17               MR. LOWELL:  Can we go to time stamp 51.
18               (Audio clip playing.)
19      Q.  (By Mr. Lowell)  And Mr. Pena said that $1,800,
20   what did that mean to you?
21      A.  Basically, that, you know, he could go somewhere
22   else and they'll pay him whatever he needs.
23      Q.  And if we could jump to page 15 of the same tab.
24   Bottom of the page, timestamp 2:23.
25               (Audio clip playing.)
```

1     Q.   (By Mr. Lowell)   Why was it important to
2  concentrate on getting more patients?
3     A.   To make money.
4          MR. LOWELL:   If we could go to the next
5  page, this is page 16 of C-4, the top of the page
6  timestamp 2:34.
7          (Audio clip playing.)
8     Q.   (By Mr. Lowell)   What is Mr. Pena discussing
9  here?
10    A.   He's saying that the patients are dying because
11 we're allowing them to die.
12    Q.   Why does that matter?
13    A.   If they die, there's -- there's no more money.
14         MR. LOWELL:   And if we go to the next page,
15 this is page 17, and this is timestamp 3:29.
16         (Audio clip playing.)
17    Q.   (By Mr. Lowell)   Who's Norma Lee?
18    A.   Norma Lee is -- at that time was the director of
19 nurses for the hospice.
20    Q.   Does she work for generous?
21    A.   Yes, sir.
22    Q.   And is that you speaking?
23    A.   Yes, sir.
24    Q.   What was Norma Lee doing?
25    A.   She was discharging patients.

1          MR. LOWELL:  We can continue.

2          (Audio clip playing.)

3     Q.  (By Mr. Lowell)  When Mr. Pena says she does not

4  have the right to discharge patients, what does he mean?

5     A.  Well, basically, from -- for Dr. Pena, the

6  patients are property, they're property.  And he says

7  she doesn't have the right, you know, that Norma

8  shouldn't be -- because he loses money.

9          MR. LOWELL:  And if we could go to page 26.

10  This is timestamp 2:00 the top of the page.

11          (Audio clip playing.)

12     Q.  (By Mr. Lowell)  Now, in this clip, what is

13  Mr. Pena -- he appears to be giving his middle finger;

14  is that right?

15     A.  That's correct.

16     Q.  Why is he doing that?

17     A.  He's using his middle finger towards the phone

18  that he was just talking to the -- the oncology people,

19  and but he's upset because he sends business their way

20  but they're not sending business his way.

21     Q.  And if we could, same page timestamp is 1:02 at

22  the bottom of the page.

23          (Audio clip playing.)

24     Q.  (By Mr. Lowell)  Mr. Pena says, if necessary,

25  I'll take out patients from another company; did you

 1    hear that?

 2        A.   Yes, sir.

 3        Q.   What did he mean by that?

 4        A.   That, basically, they would transfer the patients

 5    from another home health, or hospice and put them on

 6    Generous.

 7        Q.   Why?

 8        A.   You know, for money.

 9        Q.   And based on your experience working with

10    Mr. Pena, was that something he would do from time to

11    time?

12        A.   Oh, yes.  He constantly said if we didn't pay up

13    that he would discharge those patients.

14        Q.   Now, same tab, if we could go to page 28.

15                MR. GUERRA:  Your Honor, I'm going to object

16    just as a matter of course, the Government timestamps

17    are -- seem to be internal, and we're having a hard time

18    following through because those aren't the timestamps

19    that correspond to the actual exhibits that we've been

20    provided.

21                So, in other words, when he says timestamp

22    1:30, that's minute one, you know 30 seconds of their

23    clip but that's not reflected in our exhibits.

24                In other words, if that's 1:30 in the actual

25    exhibits we have, it would be, you know, 25 -- minute

1    25, second 45, or something like that.  Or 45 seconds.

2              THE COURT:  Mr. Guerra, do you -- at least,

3    all I can --

4              MR. GUERRA:  Well, I mean I --

5              THE COURT:  Exhibit C-4 seems to

6    correspond -- do you have Exhibit C-4?

7              MR. GUERRA:  We do have Exhibit C-4,

8    Your Honor, but I guess they're using -- when they're

9    playing right there it says minute two, 19 seconds,

10   that's not reflected in -- in what we have, that's just

11   the internal clip that he's playing through the record.

12             They provided us with a binder, I think that

13   should resolve that issue.

14             THE COURT:  All right.  The objection is

15   overruled, please proceed.

16     Q.  (By Mr. Lowell)  So we are on page 28.  This is

17   the timestamp at the top of the page 2:19.

18             (Audio clip playing.)

19     Q.  (By Mr. Lowell)  What is Mr. Pena saying here?

20     A.  Basically, that -- what he's saying is he has

21   other accounts that he's sending patients to.  So he

22   just can't dedicate sending patients just to our

23   account, that he needs to keep everyone happy and all

24   the agencies that he's dealing with.  That we would do

25   the same if we were in his shoes, wouldn't we.

1    Q.   And if we could go to tab three.  Tab three for

2    the record, this is Government's Exhibit C-6 and we're

3    going to be reviewing the transcript which is

4    Government's Exhibit C-7.  And within tab three, we're

5    going to go to page 6.  Timestamp at the top of the page

6    is 7 minutes, 57 seconds.

7                    (Audio clip playing.)

8    Q.   (By Mr. Lowell)  When Mr. Pena says, those --

9    those two that refuse, get them back, what is he

10   referring to?

11   A.   He's giving an instruction that, you know,

12   basically they -- they can't refuse, like there's no

13   way, go -- go get those -- that referral back.

14          Again, he sees patients as property and just,

15   basically, he's giving instructions to his office

16   personnel, you're going to get those patients back.

17   There's no way they're going to refuse.

18   Q.   And if we could go to page 10 from the same tab.

19   This is timestamp 11:10, 11 minutes, 10 seconds towards

20   the bottom of the page.

21                    (Audio clip playing.)

22   Q.   (By Mr. Lowell)  Discussion mentions Rodney,

23   who's Rodney?

24   A.   Rodney Mesquias.

25   Q.   And what's this discussion about?

 1      A.   That Rodney pays Virlar $6,000, roughly, per

 2   patient.

 3      Q.   And if we go to the next page, this is page 11,

 4   timestamp is 11 minutes and 29 seconds.

 5               (Audio clip playing.)

 6      Q.   (By Mr. Lowell)  So Mr. Pena says at timestamp 11

 7   minutes, 29 seconds, they caught some guys there doing

 8   the same thing, they're in jail.  What was Mr. Pena

 9   referring to?

10      A.   What he was referring to at that time in the

11   context of what we were talking about was that he was

12   upset that he just can't be the main referral source for

13   the organization because at some point it's going to

14   flag out that he's the only one sending us patients.

15           So he wanted us to find someone else; that's when

16   the possibility of -- of -- of using Virlar as a medical

17   director, and he recommends against it.  And he tells

18   the story about how he compared our -- our current

19   situation to, perhaps, being similar to that that's

20   going to be from -- the people that got caught in

21   Houston doing the same thing.

22      Q.   And that same thing, was that the same -- was

23   that what you were doing with Mr. Pena?

24      A.   Right, you know, pay per referral, kickbacks.

25      Q.   And if we go to page 14.  Timestamp is four

1    minutes and 19 seconds, the center of the page.

2              (Audio clip playing.)

3    Q.  (By Mr. Lowell)  What's going on in this portion

4    of the conversation?

5    A.  The remaining balance that was owed is being paid

6    for the patients there, and he says make sure that he --

7    he tells his wife to take account for the -- the monies

8    because she could, you know, forget that we paid her.

9    Q.  And if we could go to the next page, page 15.  At

10   the top of the page timestamp 14 minutes 42 seconds.

11             (Audio clip playing.)

12   Q.  (By Mr. Lowell)  What is Mr. Pena referring to

13   when he says nine patients?

14   A.  He's -- he's boasting himself at that point.

15   He's like saying that I'm the man, who does this for

16   you, who's your daddy-type situation.

17   Q.  And if we could go to page 18.  And we're at

18   the -- the bottom of the page, the timestamp is 17

19   minutes 15 seconds.

20             (Audio clip playing.)

21   Q.  (By Mr. Lowell)  What is Mr. Pena discussing in

22   this portion of the recording?

23   A.  So basically, he's talking about another scheme,

24   marketing tactic that he has that he's going to be --

25   takes this picture where he's playing dominoes with --

1   with patients and, you know, he's just another one of

2   those schemes to -- to lure in order to make himself,

3   you know, appear something he's not.

4       Q.   When you say appear something he's not, what do

5   you mean?

6       A.   On -- on the front end, well, it's like two

7   people in one, you know that says this, I'm great and

8   I'm really good to people, but it's the complete

9   opposite, it's -- it's about money, it's about himself,

10  it's about being arrogant, it's about belittling others,

11  and it's about power and knowing that he's in control of

12  lives.

13      Q.   And could we jump down to same page 17 minutes 42

14  seconds.

15              (Audio clip playing.)

16      Q.   (By Mr. Lowell)  Mr. Pena refers to himself as

17  the Alzheimer's guru; do you see that?

18      A.   That's correct.

19      Q.   What did Mr. Pena mean by that?

20      A.   Again, it's another way of -- that arrogance that

21  he carries and -- and -- and the context of the guru, to

22  me, is again his way of saying like he controls, he

23  controls these -- it's just like I can control those

24  lives, those Alzheimer's patients, that that's his

25  thing.  It's funny to him.  It's -- they're not humans,

1   it's about him, everything's about him.

2     Q.  You mention it's funny to him, what do you mean

3   by that?

4           MR. GUERRA:  Objection, Your Honor, calls

5   for speculation.

6           THE COURT:  Rephrase the question.

7     Q.  (By Mr. Lowell)  You mentioned that Mr. Pena said

8   it was funny to him; is that right?

9     A.  Right.  In the beginning he says I made something

10  very funny.  To him, it's about seeking this attention,

11  portraying this picture of how good of a man he is, but

12  it's just to lure the vulnerable in.

13    Q.  Now, based on your interactions, conversations

14  with Mr. Pena, how, if at all, were Alzheimer's patients

15  important to him?

16    A.  Alzheimer's patients were important in the sense

17  that they were going to -- it's hard to gauge when an

18  Alzheimer's patient is really going to die.  So they

19  live longer in the world of hospice because you just

20  don't know how quickly they will deteriorate.  You know,

21  other dementias are similar, like, you know frontal lobe

22  or Lewy Body dementia, things of that nature.

23          THE COURT:  Again, sir, you need to speak

24  loudly and clearly.

25          THE WITNESS:  All the dementias basically.

```
 1   They die a lot slower.
 2       Q.  (By Mr. Lowell)  You mentioned they die a lot
 3   slower, why does that matter?
 4       A.  It matters in the context of making money.
 5       Q.  What do you mean by that?
 6       A.  Well, some dementia patients might live two years
 7   and they completely continue to qualify, but they make
 8   money.
 9       Q.  Who makes money?
10       A.  Well, he makes money.
11       Q.  Who's he?
12       A.  Dr. Pena.
13               MR. LOWELL:  Your Honor, I pass the witness.
14               THE COURT:  Gentlemen, before we start,
15   let's take a very quick recess for the jury.
16               Sir, you may step down for a brief recess.
17               COURT OFFICER:  All rise for the jury.
18               THE COURT:  And we'll start momentarily.
19               (JURY OUT.)
20               THE COURT:  And gentlemen, the defense will
21   have, if needed, three one-hour sessions.
22               Do you want to reiterate the order again,
23   Mr. Guerra, first or --
24               MR. BANKER:  Yes.
25               MR. GUERRA:  Thanks.  You don't even like
```

```
 1   stop and think about that one.
 2              THE COURT:  Well, whatever order y'all --
 3   whatever order y'all want.
 4              We'll take a brief recess.
 5              (COURT IN SHORT RECESS.)
 6              COURT OFFICER:  All rise for the jury.
 7              (JURY IN.)
 8              THE COURT:  Thank you, everyone.  Please be
 9   seated.
10              Gentlemen.
11              MR. GUERRA:  It's me, Your Honor.
12              THE COURT:  Mr. Guerra, please proceed.
13                      CROSS-EXAMINATION
14   BY MR. GUERRA:
15       Q.  Mr. Aguilar, good morning.
16       A.  Good morning, sir.
17       Q.  My name is Robert Guerra and I represent
18   Dr. Francisco Pena.
19            First of all, I guess the question I have for is
20   you how are you doing after having been subjected to the
21   torment of having Dr. Pena as your medical director?
22       A.  I -- I'm not understanding what you're --
23       Q.  Well, you told the ladies and gentlemen of the
24   jury that you had to endure Dr. Pena boasting about
25   himself and being arrogant; do you recall that?
```

1    A.   Oh, yes.

2    Q.   Okay.  Are you okay with -- with all that?  It

3  seems like it was a traumatic experience for you.

4    A.   It -- it was.

5    Q.   Yeah.  I'm -- I'm sure it was.  And so while you

6  subjected yourself to that traumatic experience, how

7  much money did Generous make?

8    A.   I -- I wouldn't be able to tell you, but

9  Generous --

10    Q.   Do own 60 percent of the company; do you not?

11    A.   Somewhere like 57.

12    Q.   Okay.  So you're the majority owner, correct?

13    A.   Yes, sir.

14    Q.   And so your other partner is Edgar Jimenez,

15  correct?

16    A.   Yes, sir.

17    Q.   And who's the other partner, there's a third;

18  isn't there?

19    A.   There's Mike Lyon and he's five percent.

20    Q.   Okay.

21    A.   And there's Melissa Elder, and she's five

22  percent.

23    Q.   So if Melissa, Mr. Lyon, Edgar, even if they went

24  away and sold, Jose Aguilar was still the majority owner

25  of Generous Hospice, correct?

1    A.   Yes, sir, that's correct.

2    Q.   And during the term that Dr. Pena was the medical

3    director at Generous you were the majority owner,

4    correct?

5    A.   Yes, sir.

6    Q.   So all that abuse, the arrogance, listening to

7    Dr. Pena belittle, how much money did you make during

8    that timeframe?

9    A.   I wouldn't be able to tell you, but money was

10   made.

11   Q.   Well, a lot of money was made, correct?

12   A.   Money to run the operations.

13   Q.   Okay.   Well, money that you personally profited

14   from; isn't that right?

15   A.   Yes.

16   Q.   And in fact, Generous owed a lot of money to the

17   IRS; isn't that right?

18   A.   We did.

19   Q.   Do you still owe that money?

20   A.   Yes, sir.

21   Q.   Okay.   So let's just go -- so we know how much

22   money you made, and I'm not an accountant, but I'm

23   pretty sure -- Roy, could we call up defense Francisco

24   Pena Exhibit Number 14?  Can you zoom in at the top,

25   Roy.

1           Notice of federal tax lien.  You've seen this

2    document before; have you not?

3       A.   Yes, I've been working with IRS.

4       Q.   Right.

5           And so, Roy, go to the middle where it shows the

6    amount.

7           From 2016 -- well, I'm sorry, in the calendar

8    year of 2017, it looks like you owe the IRS, at that

9    time, and this document was dated February 15th, 2018,

10   in 2017 Generous owed the United States Government over

11   $200,000 in back taxes; isn't that correct?

12      A.   Yes, sir.

13      Q.   To generate a tax bill of over $200,000 in one

14   year, that's a significant amount of money; wouldn't you

15   agree?

16      A.   Oh, yes.

17      Q.   And you pocketed that money, correct?

18      A.   No.

19      Q.   You -- you made no money off -- off of Generous?

20      A.   We had another partner during that time that

21   embezzled.

22      Q.   Oh, okay.  So besides yourself, besides --

23      A.   I made money, but what I'm getting at is we all

24   made money, Pena made money, I made money.

25      Q.   Right.

1    A.   My partner who embezzled made money, yes.

2    Q.   Yes, but Mr. Aguilar, the reason I bring this up

3  is, when you were talking to Mr. Lowell about those

4  tapes and you were saying that it was all about money

5  for Francisco Pena, it was all about money for you, too;

6  wasn't it?

7    A.   I have a responsibility to keep running the

8  organization.  I had to make money.

9    Q.   Yeah, you have to make money.  So you were

10  focused on making money as well; weren't you?

11    A.   Yeah.

12    Q.   Okay.  So when you're going there casting

13  aspersions basically saying Dr. Pena was all about

14  money, you were about money, too; isn't that right?

15    A.   Yes.

16    Q.   And at the end of the day, we listened to those

17  tapes on August 3rd and August 18th, 2017, the purpose

18  of those meetings, separate and apart from you recording

19  Dr. Pena, is you asking him for more patients; isn't

20  that right?

21    A.   Right, we were both making money.

22    Q.   Right, but you went to him saying, doctor, I need

23  patients for my hospice; isn't that correct?

24    A.   Right, we -- we had that agreement.

25    Q.   Right.

1        A.   He would give me patients.

2        Q.   You needed the patients to keep the business

3   running; isn't that right?

4        A.   That's correct.

5        Q.   And at the end of the day in August 2017,

6   Generous was in such financial trouble you couldn't even

7   make payroll; isn't that correct?

8        A.   There was moments, yes, yes.

9        Q.   No, I'm talking about August 2017, you could not

10  make payroll, correct?

11       A.   There was moments, I don't know the dates.

12       Q.   Well, in August 2017, you couldn't even make

13  payroll at the end of your August 18, 2017 meeting on

14  your way out the door, you asked Dr. Pena for $500;

15  isn't that correct?

16       A.   No.

17       Q.   You asked him to pay you some money from the

18  money that the Government gave you to induce him as part

19  of a kickback; isn't that right?

20       A.   No.   That's not right.

21       Q.   You never paid Dr. Pena for the medical director

22  services that he incurred while he was working for

23  Generous; isn't that right?

24       A.   We paid him.

25       Q.   You paid him everything, you never owed him any

1    money?

2        A.  We actually got straight with the numbers, that's

3    when he started getting more aggressive.

4        Q.  So it's your testimony under oath that you never

5    owed Dr. Pena money for medical director services?

6        A.  Yes, I never -- we got caught up with the

7    payments.

8        Q.  And how did you pay him?

9        A.  We paid him with the checks.

10       Q.  So how much money did you pay him for medical

11   director services?

12       A.  It started off from 2,000, 2,500, somewhere

13   around that range, and then that's when he -- he starts

14   getting more aggressive saying, hey, we need to make

15   money and 2,500 ain't enough.  He wanted more.

16       Q.  Okay.  And when was that conversation?

17       A.  It was throughout -- throughout -- several times

18   he would bring it up.

19       Q.  Okay.  And so it's your testimony that Dr. Pena

20   made you pay him money for patient referrals; is that

21   right?

22       A.  He said that if I didn't help him, that he's

23   going to take those patients out.

24       Q.  Okay.

25       A.  He's going to discharge them.

1    Q.   What about paying him to be a medical director?

2  He was entitled to get paid to be a medical director;

3  was he not?

4    A.   Yeah, he got paid to see patients for us, but --

5    Q.   Right.

6    A.   -- other than that, it was just, you know, hey,

7  we didn't really go by the contract.

8    Q.   That's being a medical director, isn't it, seeing

9  patients?

10    A.   It was a mixture, I guess.

11    Q.   You needed a medical director to run Generous as

12  a hospice; did you not?

13    A.   Yes.

14    Q.   By -- by law, that's required, correct?

15    A.   Right.

16    Q.   And Dr. Pena did go see those patients for

17  Generous; did he not?

18    A.   Some of them.

19    Q.   And you paid him to be the medical director to do

20  that job; did you not?

21    A.   Well, we paid him, but it reached the point where

22  he's saying, hey, the ones I'm sending you, right, you

23  need to start paying me more.

24    Q.   To be the medical director?

25    A.   No, for the patients.

1    Q.  Okay.  So then there should be in -- in Jose

2    Aguilar's world, there's two payments that should be

3    made, correct?  One is medical director and one is

4    kickbacks?

5    A.  That's what made it challenging working for

6    Mr. Pena because for Mr. Pena it was money.  So in my

7    world I wish it would have stayed at what a normal

8    medical directorship, or what -- what that normal would

9    have been, but Mr. Pena's pressure, he says, hey, I see

10   the money you're making, he is the one that put his

11   biller in control so he could see the finances, he saw

12   the money we were making and he -- he took advantage of

13   that by saying, hey, I know you guys are making more,

14   you owe me more, I have those patients, I'm going to

15   move them out if you don't pay me more.

16   Q.  And so he moved those patients?

17   A.  He kept threatening that he would.

18   Q.  But he moved them; didn't he?

19   A.  Towards the end, he even sent letters that he was

20   upset that we still had those patients.

21   Q.  Didn't he send you letters because you owed him

22   money for medical directorship?

23   A.  No, sir.  He -- in his world, in his world, we

24   owed him and we kept owing him for patients that were --

25   were on service when he's no longer our medical

director.

Q.   Mr. Aguilar, I know you testified earlier that you received nothing to be here today.  Has Generous been audited?

A.   We've -- we've been working with the IRS if that's what you mean.

Q.   Well, no, actually it wasn't, but I appreciate that.  I'm asking have you been audited by Medicaid or Medicare?

A.   Yeah, we've had several surveys.

Q.   Have you entered into -- has Generous entered into any agreements to avoid prosecution?

A.   Not until now.

Q.   What do you mean not until now?

A.   Like, I haven't had any -- anybody tell me anything.

Q.   Is there an agreement to avoid prosecution for Generous for your testimony here today?

A.   No.

Q.   So you're here today just being a good citizen, a good steward?

A.   Yes, sir, yes.

Q.   Okay.  Even though you basically admitted on the stand to committing fraud dating back to your time in Merida; isn't that right?

1    A.   That's right, and I'm willing to hone up to it,

2    yes.

3    Q.   And you're willing to risk your nurse's license

4    for that?

5    A.   Yes, yes.

6    Q.   And you're willing to risk your company for that?

7    A.   Yes.

8    Q.   Okay.  You also leased offices from Dr. Pena;

9    isn't that right?

10   A.   Yeah, because that was -- that was part of his

11   thing.

12   Q.   Okay.  Was that part of the medical services

13   director contract?

14   A.   It's -- it's part of him making money out of any

15   little scheme, like, it's saying, hey, you know what,

16   you better help me with this, you're going to -- you're

17   going to -- you're going to rent this from me.

18   Q.   Mr. Aguilar, you testified earlier that you knew

19   exactly what Dr. Pena was and what he was doing back in

20   your time at Merida; is that right?

21   A.   I had to work with him at -- at Merida.

22   Q.   You had to work with him at Merida?

23   A.   Yes.

24   Q.   But when you went to Generous you didn't have to

25   work with him then?

1      A.   No, I didn't have to work with him then.

2      Q.   And I believe the testimony you offered Mr.

3  Lowell was, well, I needed to get a leg up, so let me go

4  with Dr. Pena because he knows a lot of people; is that

5  right?

6      A.   Right.

7      Q.   But during your time there at Merida, you knew of

8  other doctors; isn't that right?

9      A.   Not -- not -- I knew of other doctors, but Pena's

10  the one that offered, he says, hey, I'll help you, I'll

11  help you.

12      Q.   And you were so concerned with the fraud that

13  Dr. Pena was allegedly doing at Merida you turned him

14  down, correct?

15      A.   I -- I -- at that time I didn't know Pena was

16  doing fraud with Merida.  I knew that the other guys

17  were.

18      Q.   But that's not your testimony?

19      A.   But not Pena.

20      Q.   Earlier, sir.  Your testimony earlier was that

21  you knew at the time you were at Merida that patients

22  were being diagnosed for services that weren't

23  necessary?

24      A.   Right.

25      Q.   Is that correct?

1     A.   That's correct, from the Laredo side.

2     Q.   Wasn't Dr. Pena in Laredo?

3     A.   Give me a chance to explain.

4     Q.   Okay.

5     A.   Okay.  When I saw those patients in Laredo.

6     Q.   With Merida.

7     A.   With Merida, I didn't quite know they were Pena's

8     yet until after the fact.

9     Q.   When did you find out?

10    A.   I found out not too long from then.  And as far

11    as my understanding then, I had very limited, like I

12    didn't know much about the industry in two -- in that --

13    in that timeframe.

14    Q.   Well, first of all, sir, so you found out shortly

15    after leaving Merida, in your words, that Dr. Pena might

16    have been involved in some of these bad acts; is that

17    correct?

18    A.   Like, I found out in 2014, yeah.

19    Q.   Right around the time you were starting Generous,

20    correct?

21    A.   Yes, sir, yeah.

22    Q.   And none of that phased you from hiring him as

23    the medical director for Generous, correct?

24    A.   Yeah, I just -- I took the risk.

25    Q.   Because it was about money for you, too, wasn't

1  it Mr. Aguilar?

2      A.  Yeah, yes, about money.

3      Q.  Yeah, it was.  You needed to make money too?

4      A.  He wanted money; I wanted money, yes.

5      Q.  So you didn't have a problem, fraud and all, with

6  hiring someone you thought was being fraudulent,

7  correct?

8      A.  Well, what I really thought that Mr. Pena wanted

9  to do things the right way.  Say, hey, you know, the

10  idea is creating Generous was to make something

11  different, to help, to really be about something.

12      Q.  So basically, it's your testimony to the ladies

13  and gentlemen of the jury that from the outset, Generous

14  knew what it was getting into, correct?

15      A.  I knew the guy was a businessman and I knew there

16  was some shady stuff, yes.

17      Q.  And you knew that it was all about money; is that

18  right?

19      A.  Well, I mean it's about money, yes, yes.

20      Q.  So when did you pull the plug?

21      A.  I pulled the plug when -- when I realized that I

22  was headed down the wrong path, like, I needed to be

23  real with myself.  I couldn't just -- I couldn't

24  continue.  Why, why, where are we headed?

25      Q.  You pulled the plug when the FBI came knocking on

1    your door; is that right?

2       A.   No, sir.

3       Q.   Okay.   When was the first time you had any

4    interaction with the FBI?

5       A.   I submitted a report to the FBI somewhere in

6    2014.

7       Q.   About what?

8       A.   About the Merida fraud.

9       Q.   About the Merida fraud, which you said Dr. Pena

10   was a part of, correct?

11      A.   In the report, I can't remember what I reported

12   to the -- to the FBI, but I put a formal report in.

13      Q.   About the Merida fraud?

14      A.   Yes.

15      Q.   Okay.   And so now, whether or not Dr. Pena may or

16   may not have been involved with that group, you don't

17   recall if you reported him to the FBI in 2014; is that

18   correct?

19      A.   I don't recall, no.

20      Q.   Was that the only interaction you had with the

21   FBI before 2017?

22      A.   Well, it was just that on the deal, you know,

23   that we go online and you report what's going on, that's

24   all I did.   I found myself -- I believe it's necessary

25   to do it, but I just -- I'm just telling you what

1    happened.

2        Q.   Okay.

3        A.   How it happened.

4        Q.   So after you made your contact with the FBI --

5        A.   I never contacted them, I sent them a report.

6        Q.   I apologize.  When you made your hotline call

7    warning about fraud; is that fair to say?

8        A.   Yes, sir.

9        Q.   In 2014?

10       A.   Yes, sir.

11       Q.   The next time you met with the FBI wasn't until

12   2017; correct?

13       A.   Yes, sir.

14       Q.   So you had no crisis of conscious over those

15   three years as long as you were making money; is that

16   right?

17       A.   You know, to me I had a responsibility to my

18   organization, to the employees and the families, the

19   patients and that's all my focus has been.

20       Q.   In fact, I mean, you made more money during your

21   time at Generous than Dr. Pena did; isn't that right?

22       A.   I -- I don't know what Dr. Pena made his money,

23   like --

24       Q.   You don't know how much time -- you don't know

25   how much money Dr. Pena made working for Generous?

1    A.  Oh, working for Generous, yes, but as far as

2  working for all the other organizations.

3    Q.  I'm not talking about that, sir, and I apologize

4  for asking a bad question.

5        My question is this --

6    A.  I could show you exactly how much he made if you

7  wanted to go to the bank account, all the details are

8  there.

9    Q.  But you don't know how much you made, correct?

10    A.  Like I -- I don't know how much I made, but I

11  made money, yes.

12    Q.  But we can agree that during Dr. Pena's tenure at

13  Generous, you made more than he did, correct?

14    A.  Probably, I don't know.

15    Q.  Okay.  And so we talked about the loan, we talked

16  about the lease, there was also some artwork that you

17  took from Dr. Pena and never paid him for; is that

18  right?

19    A.  That's not right.

20    Q.  Okay.  You paid him for the artwork?

21    A.  The -- the artwork, I paid him for the artwork.

22    Q.  Okay.  You paid him for over $7,000 worth of

23  artwork?

24    A.  No, he's imagining all kinds of things.  He

25  thinks that I took certain artwork, which he wanted to

1   sell me some kind of desk and bed frame, and I don't

2   know what, which I didn't ever agree to.

3       Q.   Uh-huh.

4       A.   I -- outside of that, that's where we started

5   having some real conflicts because I didn't take that.

6   Now, I paid him for some artwork, because he pretty

7   much provided it, right, and, again, it goes back to the

8   same thing of trying to keep the man happy because if I

9   don't keep him happy, he doesn't send patients.

10      Q.   When did he stop sending patients to you?

11      A.   Not -- not too long after the -- the recordings.

12      Q.   Not too long after the recordings, okay.

13           Did you ever consider Dr. Pena to be a friend,

14   sir?

15      A.   I -- I considered Dr. Pena to be more of a

16   mentor.

17      Q.   A mentor.  Someone who was trying to help you

18   out, start up your own business; is that right?

19      A.   I thought he was a good man.

20      Q.   Okay.  And now you're telling the ladies and

21   gentlemen of the jury that he's not?

22      A.   He's not.

23      Q.   Okay.

24      A.   He's not.  I was fooled.

25      Q.   You were fooled.  Besides having Dr. Pena invest

1    in Generous, did you ever ask him to invest in any other

2    side projects?

3        A.   He asked me.

4        Q.   Okay.   Did you ever ask Dr. Pena to invest in

5    your Spider Robot Home Security System?

6        A.   No, he asked me to come up with something because

7    he had this grant that he was going -- the way he

8    offered it is this:   He had this scheme a grant.   He

9    said, look, I'm the mayor of Rio Bravo.   If we get this

10   grant and come up with whatever for this Rio Bravo, I'll

11   get the $36,000 grant, but you're going to give me

12   10,000 out of that grant.   That's the spider-bot.

13       Q.   Okay.   And what about the Hackberry?

14       A.   That was a project again that --

15       Q.   Is that him, too?

16       A.   The idea was that project was actually a good

17   positive project, he was trying to reach the -- you

18   know, the -- the community there that doesn't have the

19   resources of having access and that's -- was just not

20   related to this.

21       Q.   Okay.   Well, I understand that, but the

22   impression you're giving the ladies and gentlemen of the

23   jury is basically you were being held hostage by

24   Dr. Pena; isn't that right?

25       A.   Not hostage, it's if I don't keep the man happy,

```
 1   right.
 2       Q.  Right.
 3       A.  Business goes south.
 4       Q.  So you had to do whatever it took to keep your
 5   business afloat; is that right?
 6       A.  Yeah.
 7       Q.  But you weren't being held hostage by this man
 8   because not only did you have a relationship with him on
 9   Generous, you had all these other little schemes as you
10   said, correct?
11       A.  He would bring the schemes to the table and it --
12   he'd put pressure on us to figure out how to make it
13   happen.  It never went through because --
14       Q.  Okay, so you were pressured to pay him kickbacks;
15   is that right?
16       A.  Yeah.
17       Q.  You were pressured to continue paying him more
18   money as a medical director, correct?
19       A.  I mean, yeah, yeah, it felt that way, yes.
20       Q.  You were pressured to keep him on as medical
21   director for the business; is that right?
22       A.  It reached a point where it was getting old and
23   I -- I had to find another medical director.
24       Q.  You were pressured to engage in these schemes
25   with him, correct?
```

1    A.   Yes.

2    Q.   I mean, these are your words, sir.

3    A.   Yeah, I'm being honest with you, it's a very --

4    you've got to understand.   If -- if I didn't comply with

5    what he's asking for, it was a matter of saying, well,

6    I'm going it pull all those patients out of your census

7    and now you're not going to have any money.

8    Q.   But he never did, correct?

9    A.   He never did but he kept threatening.

10   Q.   Okay.   How much staff did you employ over at

11   Generous?

12   A.   Jesus Christ, we -- I -- I -- we've had a lot of

13   staff.

14   Q.   A lot of turn-over?

15   A.   A lot of what?

16   Q.   Turn-over.

17   A.   No, very little turn-over.

18   Q.   Okay.   How many patients could Generous

19   reasonably take care of during this time?

20   A.   At that time?

21   Q.   Yeah.

22   A.   We were little then.   Roughly 30.

23   Q.   Right?

24   A.   40, maybe 50, I don't know.

25   Q.   In other words, during that timeframe when

 1    Dr. Pena was the medical director, all that time you

 2    were talking about, Generous could comfortably,

 3    reasonably only hold 30 patients; is that right?

 4        A.   No, we could accommodate -- at that time, we

 5    could have gone up to 50, the -- the -- really it just

 6    depends on the amount of demand that's in the market.

 7        Q.   Which other doctors provided you patients in your

 8    hospice?

 9        A.   No other doctors.

10        Q.   No other doctors?  So all of your patients were

11    from Dr. Pena?

12        A.   From Laredo.

13        Q.   From Laredo.  What -- okay, you have an another

14    location, isn't that right?

15        A.   Yes.

16        Q.   You had San Antonio, correct?

17        A.   Yes.

18        Q.   And during this timeframe you also had another

19    business in San Antonio, correct?

20        A.   Yes.

21        Q.   Okay.  How many patients did you have in

22    San Antonio?

23        A.   Well, it's the same business.

24        Q.   Well, I understand, sir, but different location,

25    correct?

1    A.   Yes.

2    Q.   Obviously, Laredo and San Antonio are in two

3 different locations.

4    A.   Yes.

5    Q.   How many patients did you have in Laredo -- in

6 San Antonio?

7    A.   I don't remember.

8    Q.   More or less than Laredo?

9    A.   Maybe the same.  I don't remember.

10   Q.   Okay.  So as we sit here today is Generous still

11 in business?

12   A.   Yes, sir.

13   Q.   And how many patients does it have in its Laredo

14 office?

15   A.   Today?

16   Q.   Yeah.

17   A.   Like seven.

18   Q.   Okay.  And what about San Antonio?

19   A.   Like 75.

20   Q.   Okay.  So would you agree with me that the

21 business is doing better now than it was during the

22 relevant time periods, correct?

23   A.   Yes, once we got rid of a lot of the bad parts to

24 the organization, we -- we actually started putting

25 oversight processes, doing the best that we can to be a

better organization.

Q. Who's your medical director in San Antonio, sir?

A. Mark Ibanez.

Q. Who?

A. Mark Ibanez.

Q. And how long has he been the medical director there?

A. Roughly, six months.

Q. Okay. Yesterday we talked to Agent Neal Williams, do you know Mr. Williams; don't you?

A. I -- I've met the guy, but I don't know him.

Q. Okay. Well, you met him on several occasions, correct?

A. Yes.

Q. Okay. And in fact, Agent Williams was the individual who brought you and Edgar Jimenez in to make those recordings that the ladies and gentlemen of the jury saw; is that right?

A. It was the FBI, but if you -- I had to just -- I don't know him, like --

Q. Well, he was your contact; was he not?

A. Right.

Q. He was the individual who gave you the camera to wear; is that right?

A. Yes.

1    Q.   You were the one wearing the camera; isn't that

2    right?

3    A.   Once I wore the camera on -- on -- I think it was

4    the second -- the second recording.

5    Q.   And yesterday, the ladies and gentlemen of the

6    jury heard from Agent Williams and said that he was

7    working with Edgar on a previous case, but you came into

8    his world in about January or February of 2017; isn't

9    that correct?

10   A.   I -- I don't remember the dates.

11   Q.   Does that sound about right to you?

12   A.   I -- I don't remember the dates, but --

13   Q.   Okay.  From whenever time you started working

14   with Agent Williams, up until those August 2017 tapes,

15   did you ever pay any sort of kickback or bribe to

16   Dr. Pena?

17   A.   Yeah, we were -- we were already involved with

18   Dr. Pena with patient referrals, I was paying him for

19   those patients.

20   Q.   My question was, did you make payments during

21   that timeframe?

22   A.   For the patients to pay him?

23   Q.   Yes.

24   A.   Yes.

25   Q.   Okay.  Did you report that to Agent Williams?

1    A.   No, I didn't.

2    Q.   Why not?

3    A.   Because I was afraid.

4    Q.   Afraid of what, sir?

5    A.   That I'd get in trouble.

6    Q.   Why?

7    A.   It's a scary thing, you know, it's not --

8    Q.   You're working with the FBI at this point,

9    correct?

10   A.   No, I -- I just -- you know, contributing what I

11   can.

12   Q.   Well, I know but I'm asking you, once you started

13   talking to Agent Williams you just testified that you

14   were making kickbacks to Dr. Pena, but you didn't report

15   those to Agent Williams, correct?

16   A.   Right.

17   Q.   You knew at the time that you were talking with

18   Agent Williams that he wanted you to be a confidential

19   source for Dr. Pena, correct?

20   A.   No, I -- I didn't know, I -- I didn't even know

21   what I was facing, I just wanted to do the right thing.

22   Q.   And when were you told what you were facing?

23   A.   Not even now.

24   Q.   Okay.  And if you wanted to do the right thing,

25   then why not tell Agent Williams, hey, I just paid a

1  kickback to Dr. Pena?

2      A.  I'm just -- just telling you how it happened.

3      Q.  Well, and I know, but my question is I'm asking

4  you why not tell him, to do the right thing, report on

5  crime, you were in the midst of committing a crime --

6      A.  If I could go back in time I would do it.

7      Q.  I understand you didn't do it, sir, I'm just

8  asking why, why didn't you do it?

9      A.  I don't know.

10     Q.  Did it happen?

11     A.  I -- I -- I told the Government, yes, that --

12     Q.  You told the Government, who did you tell?

13     A.  I believe during my test -- testimony in

14  testifying I -- I -- whoever was there at the table, I

15  don't know.

16     Q.  Well, sir, this is your first testimony; is it

17  not?

18     A.  No, because I was interrogated.

19     Q.  Interrogated by whom?

20     A.  You know, I was asked questions and I had to tell

21  the truth and just like here as I am today I'm just

22  telling the truth.

23     Q.  Okay.  Well, you bring something up, you say you

24  were interrogated or interviewed.  These were

25  conversations that you had with federal agents; is that

1    correct?

2        A.   I don't know what they were.

3        Q.   Well, they obviously told you they were FBI

4    agents; did they not?

5        A.   To me, I -- I don't know who's -- who's an FBI,

6    I'm just here, I'm just telling my story.

7        Q.   But you were told at the beginning, whatever

8    interview you may have had, that you had to tell the

9    truth or else risk criminal prosecution, correct?

10       A.   No, they -- they said I -- I'm still at risk of

11   criminal -- criminal prosecution, I -- I'm just here to

12   tell you my -- the truth.

13       Q.   And you only told them limited things; isn't that

14   right?

15       A.   Right, I was scared.

16       Q.   Okay.  And all the times you met with them, how

17   many times did you meet with them?

18       A.   I -- I wouldn't know.

19       Q.   More than five?

20       A.   Maybe five.

21       Q.   Okay.  And FBI agents were present the entire

22   time?

23       A.   I don't know if they were agents or --

24       Q.   Okay.  In one of those prep sessions was

25   basically a dress rehearsal for what we just heard

1  today; isn't that right?

2     A.   There was no rehearsal.

3     Q.   You never went over those tapes with anybody from

4  the federal government?

5     A.   The -- the tapes of what actually happened?

6     Q.   Well, I'm assuming so.

7     A.   I was questioned about those tapes, but it was

8  not a rehearsal.

9     Q.   But, well, did you go through and watch those

10 tapes with the Government?

11    A.   They showed me the clips.

12    Q.   But you didn't watch them?

13    A.   What -- I don't understand your question.

14    Q.   Well, I asked you if you watched the clips, you

15 said they showed me, that implies that you weren't

16 paying attention.  You were paying attention; weren't

17 you?

18    A.   I -- I don't understand where you're going with

19 this.

20    Q.   Well, when the Government showed you these clips,

21 did you watch them?

22    A.   We watched them now; did we not?

23    Q.   Well, I'm not disputing that, but what I'm --

24 what I'm asking you is did you watch those clips with

25 the Government; yes or no, simple answer?

1      A.   Yes.

2      Q.   Okay.  And then did you go through like you did

3   with the ladies and gentlemen of the jury where they

4   would stop and ask you questions about what you were

5   seeing?

6      A.   Did they go through, yes, they -- they questioned

7   what -- what I -- my -- what I -- what was happening,

8   they wanted to know.

9      Q.   Right, not just questioning the entire thing, but

10  they did go and stop and play a clip and say

11  Mr. Aguilar, tell us what happened here?

12     A.   No, they showed me the entire thing.

13     Q.   Okay.

14     A.   And they said, okay, you know, that what was my

15  involvement and -- and I had to say the truth.

16     Q.   Did you -- did they ever suggest any answers to

17  you?

18     A.   No.

19     Q.   Okay.  Did they say, well, you know what, you

20  should probably phrase it this way instead?

21     A.   No, I don't know.  I don't know, no.  It was not

22  an easy process, it's just like you questioning me now.

23     Q.   Five times, correct?

24     A.   About five times.

25     Q.   This was after the tapes; was it not?

A.   It was about five times that I remember.

Q.   How many times did you meet with Agent Williams before you wore the camera?

A.   Agent Williams, before the camera?

Q.   Yes.

A.   Once.

Q.   He told you how to put the camera on, correct?

A.   No.

Q.   He told you what to say at the beginning of the tape to identify yourself; did he not?

A.   He did not tell me what to say.

Q.   So Agent Williams gives a camera and says have fun, go talk to Dr. Pena?

A.   He says, they -- they give me the camera, I put it in my pocket.

Q.   It wasn't a button camera?

A.   Yes, it -- it had like a button.

Q.   Okay.

A.   And, like, I do what I do.

Q.   And what you did was go in there and surreptitiously record someone who was your mentor about what you guys were doing; is that right?

A.   What I did was normal routine for us, for me doing business with Dr. Pena, whether I had a camera that day or not, if it would have been any other day, it

1   would have been similar without a camera.

2      Q.   But that's not true, is it?

3      A.   That's true.

4      Q.   You never paid him cash in the past, did you?

5      A.   Well, I never paid him cash, but I'm talking

6   about as far as the --

7      Q.   Okay.  So that's one difference on what happened

8   on those two days, correct?

9      A.   Yes.

10      Q.   And the reason why Ms. Pena was asking you, otra

11   vez, again, is because you never paid in cash, correct?

12      A.   We never paid them in cash.

13      Q.   You never did.  So when you gave her cash on

14   August 18, 2017 she goes, why are you paying me in cash

15   again, correct?

16      A.   Right.

17      Q.   And the reason why -- you told them, it wasn't

18   played on the clips, but you told them the reason why

19   you're paying cash; do you recall?

20      A.   I -- I didn't tell them, my partner told them.

21      Q.   Okay.  And what did Edgar tell them?

22      A.   That the account was negative.

23      Q.   The account was overdrawn and this was the only

24   way you could pay them, correct?

25      A.   Correct.

1    Q.   Was the account overdrawn?

2    A.   It was.

3    Q.   So there you were telling the truth?

4    A.   Yes.

5    Q.   Sir, the reason I ask about your meetings with

6    the Government and the prep sessions is because during

7    your direct, you were asked very specific pointed

8    questions about certain individuals who prior to today

9    you had never mentioned; do you recall that?

10   A.   I don't know what your question is.

11   Q.   Well, I'll tell you what my question is.  When

12   were you first asked questions by the Government about

13   Greg Gonzaba?

14   A.   Oh, it's been months ago, maybe -- maybe a year

15   ago.

16   Q.   Okay.  Were there FBI agents present at that

17   meeting?

18   A.   I'm not sure if it was FBI.

19   Q.   Okay.  When were you first asked questions about

20   Fidencio Salinas?

21   A.   That was recently.

22   Q.   How recent?

23   A.   Just maybe Sunday.

24   Q.   Okay.  You testified earlier to the ladies and

25   gentlemen of the jury that Fidencio Salinas was the bad

1  man; in other words, when something couldn't get done,

2  go to Fidencio and he's going to sign those medical

3  records; do you recall that?

4      A.  Why he is.

5      Q.  That's bad; isn't it?

6      A.  Oh, yeah.

7      Q.  I mean, this was the reason why you told the

8  ladies and gentlemen of the jury earlier you couldn't

9  even sleep during your time at Merida; remember that?

10     A.  Uh-huh.  Uh-huh.

11     Q.  Is that a yes?

12     A.  Yes, sir.

13     Q.  And this was the reason why you had to leave

14 Merida because bad stuff, like Fidencio Salinas signing

15 medical documents was taking place?

16     A.  Yes.

17     Q.  Right?

18     A.  Yes.

19     Q.  So why is it the first time you ever talk about

20 Fidencio Salinas on Sunday?

21     A.  I just have to answer the questions.  I'm just

22 here to testify.

23     Q.  Right.  And that brings up my point, sir.  If

24 you're here to do the right thing, if you're here to,

25 basically, let it all out --

1     A.   Yes.

2     Q.   -- that's a pretty big deal, why not mention it

3   for the first time on Sunday?

4     A.   My brain, I can't keep up with the whole world.

5   It's impossible.

6     Q.   But sir, you just said the salient point.  You

7   were asked that question specifically by the Government

8   and then and only then did you talk about the bad acts

9   of Fidencio Salinas, correct?

10     A.   Right, because there were several nurses, not

11   just him, there's other people.

12     Q.   But you're here to be a crusader, if you're

13   blowing the whistle on all these people, why leave stuff

14   out?

15     A.   Jesus Christ, because I'm only human.

16     Q.   You're only human.  That's your explanation?

17     A.   Yes.

18     Q.   You were asked questions about Antonio Guerrero

19   for the first time on Sunday as well?

20     A.   That -- I might have been asked before about the

21   guy, but for the -- I guess you could say I was asked

22   about him on Sunday.

23     Q.   Right.  And the only reason you talked about

24   Antonio Guerrero is because you were asked that, right?

25     A.   Right.  You see if -- if I can explain.  There

1    was a circle of -- there was a circle, there was a
2    circle of nurses that were very -- they were willing to
3    do the fraud.
4         And if you were in that circle, Rodney treated
5    you like royalty.  He got you an apartment, a car, you
6    got paid more because you were willing to just -- to
7    do -- to do the fraud, to just do the dirty work.  So --
8    and that reference if you're saying all these -- these
9    folks, I --
10   Q.  Sir, you know we get reports of when you talk to
11   the agents, correct?
12   A.  Yes, sir.
13   Q.  Do you know that none of these individuals are in
14   those reports?
15   A.  Well, I just -- I don't know what you're going
16   with this, I don't --
17   Q.  Where I'm going, sir, is that you're here trying
18   to be a good citizen, trying to let go of your
19   conscious, but it seems to me as if you're just telling
20   the Government what they want to hear?
21   A.  No, that's not true.
22   Q.  Then why not mention these individuals when
23   you're blowing the whistle on everybody?
24   A.  I -- I mean, mentioning them I guess now?  I -- I
25   don't understand what you --

1    Q.  Better late than never, right?

2    A.  I mean --

3    Q.  When did you work for Merida in Laredo, sir?

4    A.  Somewhere from -- it must have been somewhere mid

5    two -- 2013 maybe.  At some point I was assigned to go

6    out there and help in Laredo.

7    Q.  When did you work for Merida in general, and I

8    apologize if I missed this earlier?

9    A.  From 2012, 2013.

10   Q.  You were only there, at most two years, if that?

11   A.  If that.

12   Q.  Okay.  And when did you get to Laredo?

13   A.  I don't know the -- the timeline on when I

14   exactly got there, but I was assigned to Laredo by

15   Rodney.

16   Q.  Okay.  Merida had -- was already in business at

17   the time you joined in Laredo; is that right?

18   A.  At that time they were called Outreach,

19   eventually they called themselves Merida.

20   Q.  And you bring up a good point.  They were maybe,

21   at least I didn't know about Outreach, but Professional

22   before they became Merida, right?

23   A.  They went Outreach, Professional, BRM, you just

24   never knew what you were working.

25   Q.  But you would agree with me that they did have a

1    presence in Laredo, an ongoing business operation before

2    you started working there, correct?

3        A.   They had -- because I was working on the home

4    health side, and during my home health side they

5    recently had purchased an organization called

6    Professional.

7        Q.   When did you first meet Dr. Pena in Laredo?

8        A.   On the assignment that they gave me.

9        Q.   When?

10       A.   I -- I guess mid-2013, somewhere around there.

11       Q.   Okay.  So right before you were getting ready to

12   leave?

13       A.   No.

14       Q.   Okay.  Halfway through your tenure with Merida is

15   when you met Dr. Pena?

16       A.   I -- I can't remember the dates, but I -- they

17   gave me an assignment and I met Dr. Pena.

18       Q.   Who's they?

19       A.   Rodney Mesquias and McInnis.

20       Q.   Where did you meet them?

21       A.   We met at -- at his clinic.

22       Q.   Okay.  The one that you recorded him at?

23       A.   On the second recording.

24       Q.   On the second recording, the August 18, 2017

25   recording?

1      A.   Yes, sir.

2      Q.   How many of your hospice patients are homebound?

3      A.   Of the hospice patients are homebound?

4      Q.   Yes, sir.

5      A.   Pretty much all of them.

6      Q.   There's no definition in the Medicare guidelines

7   that a hospice patient be homebound; is there?

8      A.   Right, it's very different regulation for -- for

9   hospice in their homebound criteria versus home health.

10     Q.   Right.  I'm just bringing up hospice.

11     A.   Okay.  So --

12     Q.   There's nothing as -- as an owner of the hospice,

13   there's nothing in the Medicare guidelines that requires

14   a Medicare beneficiary on hospice to be homebound,

15   correct?

16     A.   Not on the hospice side.

17     Q.   Not on the hospice side.

18          And as you know, the definition of someone who --

19   someone who's a beneficiary that qualifies for hospice

20   for Medicare is that they have to have a condition that,

21   if it runs its normal course, would result in death

22   within six months, correct?

23     A.   Yes, sir.

24     Q.   You would agree with me that that is not an exact

25   science, correct?

1    A.   It is not an exact science.

2    Q.   You would agree with me that it's exceedingly

3  difficult to predict the date that one person could die,

4  correct?

5    A.   I wouldn't say it's exceedingly, but it -- you --

6  you just can't tell.

7    Q.   You'd agree with me that there is no limit on the

8  number of recertifications a hospice patient can have

9  under Medicare, correct?

10    A.   I agree.

11    Q.   Right?

12    A.   Yes.

13    Q.   And I would imagine even over at Generous you

14  have some people who have been certified more than five

15  times, right?

16    A.   Yes, sir.

17    Q.   And for a patient to qualify for hospice

18  initially, they have to be certified for hospice by

19  their primary care physician and their -- and the

20  medical director for the hospice, correct?

21    A.   Either the primary care physician sends the

22  referral, or the medical director, you know, certifies

23  the patient, it just depends on the scenario, but you

24  need a doctor.

25    Q.   Two doctors, correct?

1    A.  Not two doctors, you need a doctor.

2    Q.  Well, is that because a primary care physician

3 can be a medical director as well?

4    A.  A primary care physician can be a medical

5 director.

6    Q.  Right.

7    A.  But it's just -- I mean, I'm not sure what you --

8    Q.  There's no prohibition in the Medicare guidelines

9 that prohibits that, right?

10    A.  The challenge is when you have a primary care

11 physician that refers patients your way is when it

12 becomes a challenge.

13    Q.  I understand, but it's not prohibited; is it?

14    A.  It is.

15    Q.  It is?  What section of the Medicare regulations

16 prohibit that?

17    A.  The Stark Law.

18    Q.  Well, that's for anti-kickbacks and referrals,

19 right?

20    A.  Right.

21    Q.  But I'm not asking about that.  I'm just saying

22 it is allowed for a primary care physician to refer a

23 patient to the hospice where he's the medical director,

24 correct?

25    A.  No.

1    Q.   No?

2    A.   No.

3    Q.   Is that how you run your hospice, sir?

4    A.   No.

5    Q.   You don't?

6    A.   We've learned the hard way.

7    Q.   So how -- what do you mean the hard way?  I mean

8  what penalties have you faced?

9    A.   Well, we're here today.

10    Q.   This is the hard way?

11    A.   Yeah.

12    Q.   There's nothing in the Medicare rules and

13  regulations that prohibits a patient -- or excuse me,

14  that requires care and treatment to be withheld from a

15  patient, correct?

16    A.   Repeat the question.

17    Q.   Sure, that was a bad question on my part.

18  There's nothing in the Medicare rules and regulations

19  that requires care to be withheld from a patient,

20  correct?

21    A.   That requires care be withheld.

22    Q.   Right.  In other words, you can't withhold food

23  and water from someone even if they're on hospice,

24  correct?

25    A.   Correct.

1    Q.   Even if they're terminal and they're brain dead,

2  you can't withhold food and water from them, correct?

3    A.   It's just -- the scenario you're placing just

4  doesn't -- I don't understand.

5    Q.   Well, unless the family comes in and says stop

6  feeding them, anybody providing care for that person has

7  to feed them, correct?

8    A.   Every organization carries its philosophy and,

9  you know, Medicare guidelines is just limited to an

10  extent that the organization itself has to build

11  philosophies around that.  For example, other

12  philosophies in other organizations will say giving

13  water, added misery.

14    Q.   Who says that?

15    A.   That would be like, example, River City Hospice.

16    Q.   Okay.  But you're aware of the law, hopefully in

17  the State of Texas that requires a patient who -- to

18  have food and water even though they're terminal,

19  correct?

20    A.   You're -- I believe it's important that true

21  comfort for a patient needs water and food, and -- and

22  they can accept it, if that's what they want and it

23  makes them feel good they should not be denied.

24    Q.   Well, not only if they can accept it, sir.

25  Absent a standing order, from the patient or the family,

1     the medical provider has to give them food and water,

2     correct?

3         A.   Well, I mean the family usually is the one

4     that's, you know, feeding the patient and --

5         Q.   Well, what if the patient is alive but can't

6     swallow, basically is brain dead but there's no order

7     saying withhold food and water?  You have to give it to

8     them, don't you?

9         A.   I mean, it -- the scenario that you're painting,

10    it would be impossible to give a brain-dead person food

11    and water.

12        Q.   If they have a heartbeat, if they're still alive?

13        A.   Right, if you're telling me they can't swallow.

14        Q.   Yeah.

15        A.   You pet them at risk for aspiration.

16        Q.   That's right.  So you would use something like a

17    peg tube; wouldn't you?

18        A.   You could keep them alive with a peg tube.

19        Q.   Right.  And not only keep them alive, you're

20    doing your ethical duty to do so absent any orders

21    saying withhold food and water, correct?

22        A.   Depends on the -- on the clinical scenario that

23    you're painting.

24        Q.   Okay.  But let's just say whatever clinical

25    scenario you want to picture, absent a standing order to

1    withhold food and water, you've got to give it to them,

2    correct?

3         A.   Are you referring to the hospital setting or the

4    hospice setting?

5         Q.   Hospice, sir.

6         A.   If a patient's family chooses not to continue to

7    give water and let the disease run its course because

8    the patient can no longer swallow, our job is to keep

9    that patient comfortable.

10        Q.   Correct.  But first of all, that wasn't my

11   question.  Second of all, you kind of added the proviso,

12   if the family requested.

13          My scenario was if there is no standing order, no

14   order saying withhold food and water, you as a hospice

15   and as a provider cannot withhold those services,

16   correct?

17        A.   This is just complicated.  You see you've got to

18   have a power of attorney from --

19        Q.   Sir, why won't you answer my question, yes or no?

20        A.   I don't understand your question.  It doesn't

21   make sense to me.

22        Q.   Okay.  We'll move on.

23          We mentioned Fidencio Salinas, wasn't he one of

24   the original investors of Generous?

25        A.   Yes.

1    Q.   And didn't you and he along with other investors

2  get into an disagreement?

3    A.   Yes.

4    Q.   Didn't you kick him out of Generous?

5    A.   Yes, sir.

6    Q.   And wasn't there a lawsuit as a result of that?

7    A.   We attempted mediation with Mr. Salinas, we tried

8  to find some resolution.

9    Q.   Right.

10   A.   And Mr. Salinas didn't want to continue to pursue

11 anything.

12   Q.   Did you harbor any ill-well towards Mr. Salinas?

13   A.   I'm sorry?

14   Q.   Harbor any ill-will towards him?

15   A.   I love the guy.

16   Q.   Bad feelings?  You love him?

17   A.   I love the guy.  He's a good guy.

18   Q.   So you came in here and you basically said he was

19 the leading director of a wide scale fraud in medical

20 records, but you love him?

21   A.   Yeah.  I -- I mean, you got to understand, we're

22 human and, yes, the guy's done some bad stuff, but, you

23 know, he's -- you don't -- well, it's just the way it is

24 I --

25   Q.   Okay.  Who were the founding members of Generous?

1    A.   Eddie Zuniga originally made the name Generous

2    and then he bailed because of Rodney Mesquias threat

3    toward Generous, and so he left me the -- you know, the

4    original paperwork, and Mr. Rodney continued to threaten

5    the organization that he would do anything in his will

6    to make sure that Generous did not get off the ground.

7    Q.   Okay.   So Eddie Zuniga was a former employee over

8    at Merida, correct?

9    A.   Yes.

10   Q.   Did he leave before or after you did?

11   A.   I left first.   We -- we -- we would talk about

12   this possibility of making an organization that would

13   really provide the services the right way.   In late

14   nights, we talked about how health care needed change

15   and, you know, unfortunately Eddie couldn't continue on.

16   Q.   And this was your change, correct?

17   A.   Huh?

18   Q.   This was going to be your change at Generous,

19   correct?

20   A.   What change?   Like --

21   Q.   Change -- change health care?

22   A.   It's an attempt to make things better.   Generous

23   was an attempt to make things better.

24   Q.   Okay.   So you get up with Eddie to do Generous,

25   Fidencio is one of the founding members as well,

1    correct?

2         A.   Right.

3         Q.   And Cecilia Aguilar?

4         A.   She's my wife.

5         Q.   Okay.  Anyone else founding members of Generous?

6         A.   Well, she -- she was not in agreement with me

7    opening Generous, my wife.

8         Q.   But she was listed as a founder; was she not?

9         A.   She's -- has never been listed as a founder,

10   she's helped with the organization.

11        Q.   Okay.  So the three or four of you come up,

12   you're going to found Generous and then in your

13   testimony Rodney Mesquias is threatening everybody,

14   correct?

15        A.   Yeah, yeah.

16        Q.   Eddie takes off, right?

17        A.   Yes.

18        Q.   And then that just leaves you, Cecilia and

19   Fidencio together?

20        A.   Right.

21        Q.   Okay.  When does Edgar Jimenez come in?

22        A.   The -- Dr. Pena brings Edgar Jimenez, he

23   introduces us.

24        Q.   Okay.

25        A.   But I had met Edgar Jimenez during IDG, like a

1    year before then.

2        Q.   And Edgar Jimenez was a chaplain over at Merida,

3    correct?

4        A.   Yes, sir.

5        Q.   Okay.  Did you ever work any cases with Edgar?

6        A.   No.

7        Q.   Okay.  So you were doing the nursing stuff in

8    San Antonio and Laredo, Edgar was the chaplain, but your

9    paths never crossed; correct?

10       A.   What is that?

11       Q.   Your paths never crossed while working at Merida,

12   correct?

13       A.   Yes, they did, when I was assigned to Laredo.

14       Q.   Okay.  All of you have these threats from Rodney,

15   but you persevere and continue starting up Generous,

16   correct?

17       A.   I did the best I could.

18       Q.   Right.  But, in other words, even in the face of

19   threats, you still continued with forming the business;

20   is that right?

21       A.   That's one of the reasons why I put the first

22   report to the FBI because I -- I -- the threats were

23   becoming serious.

24       Q.   Right.  And so in the face of these threats, in

25   the face of starting up a business from scratch, you go

1    and you hire Merida's medical director in Laredo?

2        A.   Right.   So what happens is -- I'm just telling

3    you the story you want to hear it.   What happens is

4    Mr. Fidencio Salinas recommends Dr. Pena my way and

5    that's where I meet Edgar Jimenez for the first time.

6            Mr. Salinas -- was never a plan for us to put him

7    in to Generous but Eddie Zuniga vouched for him.   They

8    said that Mr. Salinas didn't know any better and that

9    they were damn good friends and gave him an opportunity

10   to be a part of this because we wanted to build

11   something.

12       Q.   Okay.   And so that's how the relationship took

13   off; is that right?

14       A.   Yes, sir.

15       Q.   And then you and Edgar got rid of Fidencio later

16   on; is that right?

17       A.   Fidencio did some pretty serious things.

18       Q.   Right.   But you knew that Fidencio was doing some

19   bad stuff, you brought him in anyway, correct?

20       A.   I brought him in thinking that we could -- that

21   maybe Fidencio didn't know any better and we could make

22   him better.

23       Q.   Let me ask this question, and I apologize if I

24   didn't ask it earlier.

25           Did you feel that you committed fraud while at

1  Merida?

2      A.  Yes.

3      Q.  Did Edgar Jimenez commit fraud while at Merida?

4      A.  I can't speak for Edgar.

5      Q.  Did you commit fraud while at Generous?

6      A.  Yes.

7      Q.  Did Edgar commit fraud while at Generous?

8      A.  I can't speak for Edgar.

9      Q.  Why?

10     A.  Because he's not here.

11     Q.  He's your partner, isn't he?

12     A.  He's like my partner, yeah.

13     Q.  I mean, the two of you went into Dr. Pena's

14 office together to record him, correct?

15     A.  Right.

16     Q.  And I would imagine since he's your partner, you

17 guys talked on an almost daily basis, correct?

18     A.  He's my business partner, yeah.

19     Q.  Yeah.  So it's a simple question, and you're

20 making claims as to all these other people who weren't

21 your business partner, but for the man who was your

22 business partner since 2014, the question to you is:

23 Did Edgar Jimenez commit fraud while at Generous?

24     A.  Well, being that he's my business partner and we

25 engaged with Dr. Pena the way we did, I would say yes.

1    Q.  Did you -- did you pay any kickbacks to any other

2  doctors other than Dr. Pena while at Generous?

3    A.  No.

4    Q.  What other doctors did you have any -- any

5  patient relationships with?

6    A.  We worked with several doctors.

7    Q.  In Laredo?

8    A.  In -- not in Laredo, but in San Antonio.

9    Q.  Okay.  And you never paid them kickbacks?

10    A.  No.

11    Q.  With regards to the August 3rd, 2017 tapes that

12  we watched, sir, you and Mr. Lowell talked about, well,

13  here's the money and there's a conversation of nine

14  patients.  Do you recall that?

15    A.  Yes, sir.

16    Q.  Did you get those nine patients?

17    A.  We had -- we got some of them.

18    Q.  When?

19    A.  During this same course time.  The -- Dr. Pena

20  was upset because he's, like, I'm sending you these

21  patients within that two -- two-week span, not all the

22  nine made it, so there was -- the discrepancy we were

23  debating back and forth to say what happened to the

24  remaining balance of the patients.

25    Q.  And who were these nine patients?

1      A.   I can't tell you by name, I don't know.

2      Q.   Okay.

3                MR. GUERRA:   One second, Your Honor.

4                Your Honor -- I'll pass the witness,

5      Your Honor.

6                THE COURT:   Gentlemen?   Does anybody need a

7      break before we start up again?

8                Next, please.

9                MR. CYGANIEWICZ:   Judge, could I take a

10     five-minute break?

11               THE COURT:   You need a five-minute break?

12               MR. CYGANIEWICZ:   Yes, just about two

13     minutes.

14               THE COURT:   That's fine.   We'll take a

15     break, ladies and gentlemen.

16               COURT OFFICER:   All rise for the jury.

17               (JURY OUT.)

18               (COURT IN SHORT RECESS.)

19               COURT OFFICER:   All rise for the jury.

20               (JURY IN.)

21               THE COURT:   Thank you, everyone.   Please be

22     seated.

23               All right.   Mr. Banker, please proceed.

24               MR. BANKER:   Thank you, Your Honor.

25

```
 1                    CROSS-EXAMINATION
 2   BY MR. BANKER:
 3       Q.   Mr. Aguilar, my name is Charles Banker and I'm
 4   one of the attorneys representing Rodney Mesquias.  And
 5   I have a few questions for you.  If you don't understand
 6   a question, or you want me to repeat it, I certainly
 7   will, just let me know, okay?
 8       A.   Yes, sir.
 9       Q.   Now, let's talk about this recorded meeting that
10   we've been privy to for the last couple days.  The
11   meeting where there was a recording and you paid Mr. --
12   Dr. Pena?
13       A.   Okay, yes.
14       Q.   The money, okay?  Let's talk about that.  Just by
15   way of clarification, that wasn't your money that you
16   paid Dr. Pena?
17       A.   That's correct.
18       Q.   That was the Government's money?
19       A.   Yes, sir.
20       Q.   Now, that wasn't Rodney Mesquias' money?
21       A.   Yes, sir, it's not Rodney Mesquias' money.
22       Q.   There's -- there's no connection to that money
23   and Rodney Mesquias, right?
24       A.   That's not Rodney Mesquias' money.
25       Q.   And the only time in those tapes that Rodney
```

1    Mesquias' name came up was when you said Rodney

2    Mesquias, right?

3       A.   (No response.)

4       Q.   You told Dr. Pena something about Rodney Mesquias

5    paying Virlar $600, you said that, right?

6       A.   I believe it was my -- my partner.

7       Q.   Okay.  One of you said that, right?

8       A.   It was said somewhere.

9       Q.   Okay.  And then -- and then it was -- it was you

10   who said, or you all who said something about Rodney

11   Mesquias paying Dr. Pena $2,500 as a medical director at

12   some point, right, you mentioned -- there was --

13      A.   No, Pena mentions that.

14      Q.   Okay.  All right.  Were you told prior to that

15   meeting to talk about Rodney Mesquias?

16      A.   No, sir.

17      Q.   The Government's agents never mentioned to you

18   that they were looking at Rodney Mesquias in any way?

19      A.   No, sir.

20      Q.   Okay.  And it just so happenstance that you

21   brought up Virlar and Rodney Mesquias, right; is that

22   what you're saying?  You just decided to -- Jimenez

23   decided to bring that up?

24      A.   The conversation was the -- Mr. Pena was saying

25   this might look awkward in the future if he's just the

1    one sending referrals, so we needed to find another

2    medical director to try and cover it up.

3        Q.   Okay.   Was Mr. Jimenez always in the meetings

4    that you had with the Government when you all talked

5    about what you're going to do that day?   Were you all

6    together all the time?

7        A.   No.

8        Q.   So there -- there could have been separate

9    meetings with the Government and Mr. Jimenez?

10       A.   Right.   I mean, that -- that I -- I don't know.

11       Q.   Okay.   Were you all ever together in any meetings

12   together, you and --

13       A.   No.

14       Q.   -- Mr. Jimenez and the Government?

15       A.   No.

16       Q.   Always separate?

17       A.   Not relevant to this.

18       Q.   So relevant to something else?

19       A.   Right.

20       Q.   How much were you getting paid for your work as

21   an informant in this case?

22       A.   I'm not getting paid anything.

23       Q.   Okay.   You stated in -- in the -- in the cross of

24   Mr. Guerra that -- that when you met with the Government

25   you realized they have something on you, right?

1   A.   Who's Mr. Guerra?

2   Q.   The attorney that just talked to you.

3   A.   Okay.

4   Q.   Just cross-examined you but --

5   A.   Yeah, I'm sorry, I didn't --

6   Q.   So you did say to him that you -- when you talked

7   to the Government, at least the first time, you had some

8   kind of understanding that they might be looking at you

9   for something, right?

10   A.   No.

11   Q.   You didn't think that they had some kind of case

12   against you of fraud or some kind of illegal activity?

13   A.   No.

14   Q.   When did you first meet with them about any kind

15   of cooperation?

16   A.   I -- I -- I just can't remember, but it must --

17   must have been that year.

18   Q.   2017?

19   A.   Yes.

20   Q.   Okay.  Where did you meet them the first time?

21   A.   The first time, I mean, I believe the OIG.

22   Q.   Okay.  And did they call you to come meet them

23   over there, or did you just happen to be there and they

24   showed up?

25   A.   Right, I -- I -- they -- they -- I just followed

1    Jimenez.

2        Q.   You followed Jimenez?

3        A.   Right, at the -- that someone needed to speak.

4        Q.   Someone needed to speak to you, or speak to

5    Jimenez?

6        A.   To me.

7        Q.   So you're saying Jimenez told you to come along?

8        A.   No, what I'm saying is that -- do you want to

9    hear the full story?

10       Q.   I do.  I want to hear the story about how you and

11   Jimenez started talking to the Government.

12       A.   Okay.  So, and to make things clear, how this

13   story.  So what happened was one of our business

14   partners at that time, you know, I'm sure I don't know

15   if I should say this or not, but he was involved with

16   the -- with the -- a scam with the creams, with the --

17   the fraudulent medication.

18       Q.   Was that Mr. Karam?

19       A.   Yes, sir.

20       Q.   Okay.  So Mr. Karam was one of the original

21   investors?

22       A.   He loaned us money.

23       Q.   Okay.  All right.  And how much money did he loan

24   you?

25       A.   21,000.

1     Q.   21,000 just like Dr. Pena?

2     A.   Yes, sir.

3     Q.   And so when you say he just loaned you money, he

4   was also an investor?

5     A.   He invested.

6     Q.   Okay.  Was he a partner?

7     A.   Eventually, he -- what he wanted, what Mr. Karam

8   wanted, as we had the money to pay him, he says -- what

9   he would like is a partnership with Generous.

10     Q.   So he would like a partnership?

11     A.   Yes, in -- in exchange to paying him anything

12   back.

13     Q.   Okay.  And so in that partnership, how -- how

14   would he get paid?

15     A.   Well, he was going to be alongside with us.

16     Q.   Okay.

17     A.   Working together.

18     Q.   And get profits?

19     A.   Profits, yeah.

20     Q.   Okay.

21     A.   If there was any.

22     Q.   I'm sorry?

23     A.   If we could make any.

24     Q.   If what?

25     A.   We could make profits.

1    Q.   Okay.  And so back to Mr. Karam and how this all

2  started with the Government, we're very interested in

3  that.

4    A.   I'll give you the story.

5    Q.   Okay.  So Mr. Karam was involved in some kind of

6  pain medication cream, right?

7    A.   That's correct.

8    Q.   And that was the same Karam who was involved with

9  Dr. Virlar in that scheme, right, you remember that?

10   A.   I didn't -- I didn't know that until later.

11   Q.   Okay.  All right.  But now you know that, Virlar

12  was involved in that?

13   A.   I -- I knew that Karam would speak to Virlar,

14  like a friendship, but I didn't know the extent of their

15  relationship as far as the fraud they were doing with

16  the creams.

17   Q.   Okay.  And you -- you do know that -- that Virlar

18  plead guilty to that, right?

19   A.   I don't know that.

20   Q.   Okay.  But you know he got charged in a federal

21  indictment for that?

22   A.   I -- I don't know that.

23   Q.   Do you know if Karam got charged with a federal

24  indictment in that?

25   A.   I don't.

1    Q.   Okay.  All right.  So then it's your

2  understanding that Karam is in deep problems with some

3  of this Medicaid -- cream medication, right?

4    A.   I don't know.

5    Q.   Okay.  So then what happened, what did you do

6  next?

7    A.   I'll tell you the story.  I show up to the office

8  one day and there's -- I guess the DEA is there, and

9  they're -- they're raiding the office, right.  And to my

10 surprise, I don't work DEA, we do home health and

11 hospice right, I got very surprised.

12   Q.   I didn't quite understand that last sentence.

13 Did you say DEA showed up at the office?

14   A.   They were raiding the office.

15   Q.   They were raiding the office?

16   A.   Yes.

17   Q.   When was that?

18   A.   Jesus, somewhere around the same time maybe.

19   Q.   2017?

20   A.   Yeah, yeah.

21   Q.   Beginning months of 2017?

22   A.   Maybe, I don't remember.

23   Q.   And so tell me what happened next?

24   A.   So they're very interested in Mr. Karam and just

25 like, you know, I'm -- I'm interested in Mr. Karam, I

1    didn't know what I was involved with having this kind of

2    partner in our office.

3        Q.   All right.  So they showed interest in talking to

4    Karam?

5        A.   I believe that, you know, they -- they even took

6    the computer of Mr. Karam was working with because --

7        Q.   Did they take a bunch of your files?

8        A.   No, Mr. Karam had several businesses he was

9    operating from one of our offices.

10       Q.   Okay.  So you're saying they just raided the --

11   what Karam had, they took what Karam had?

12       A.   No, they looked at the whole office, but they

13   were really focused on Karam.

14       Q.   Did they take any of that -- any of those

15   supplies or documentation or papers, files?

16       A.   From patient files.

17       Q.   Computers?

18       A.   For whatever that they didn't --

19       Q.   How about his files?

20       A.   They took everything from there.

21       Q.   Okay.  And where was Mr. Karam, was he there?

22       A.   Was he there?  Was he there?  I don't remember

23   seeing him there.

24       Q.   Okay.  So then how did it go from that raid to

25   then you and Mr. Jimenez walking over to the OIG office?

1    A.   So I -- at that point, I'm, you know, I --
2  whatever I got to contribute to report any kind of
3  illegal activity --
4    Q.   I can't understand you, sir.
5    A.   At that point, whatever I got to report, if
6  there's illegal activity happening in my organization,
7  my obligation is to report it, at least from whatever I
8  know.
9    Q.   Okay.  So you're saying -- I thought you said
10  earlier it was Mr. Jimenez that said, hey, we need to go
11  talk to the OIG?
12    A.   Right.  Right.  So they're -- basically, someone
13  from there, they had questions for me.
14    Q.   From OIG?
15    A.   For -- for Karam.
16    Q.   Regarding Karam?
17    A.   Right.
18    Q.   And they -- they didn't call you directly, your
19  understanding they made contact with Jimenez?
20    A.   Right, I mean that's the way I remember it.
21    Q.   Okay.  So you're saying you went over there, they
22  had some questions to you about Karam?
23    A.   Yes, sir.
24    Q.   Okay.  So where was that office located?
25    A.   Off of San Pedro.

```
 1      Q.  San Antonio?

 2      A.  Yes.

 3      Q.  Okay.  And so did -- when you got to the office,

 4  what happened?

 5      A.  Well, there was a lot of questions about, you

 6  know, Karam.

 7      Q.  Okay.  And were you and Jimenez in the same room

 8  when those questions were asked?

 9      A.  Yes.

10      Q.  Okay.  And who asked those questions?

11      A.  I -- you know, I don't remember the faces that

12  were there, it was many people, I -- I don't know who

13  they were.

14      Q.  Were they also federal agents, besides the OIG

15  agents?

16      A.  I don't know what they were.

17      Q.  And so what kind of questions did they ask you

18  about Karam?

19      A.  They were just questions about the guy, and what

20  we know about the guy, how we met the guy and how I met

21  the guy and --

22      Q.  Okay.  Did you tell him anything incriminating

23  about Karam?

24      A.  I just told them what I knew about Karam.

25      Q.  And what was that?
```

1     A.   Well, just the guy had a boot store, seemed like

2  a good guy.

3     Q.   Okay.

4     A.   I was surprised, you know, that -- I had heard

5  that he was selling these scar creams, but I didn't know

6  they were fraudulent.

7     Q.   How long was that meeting?

8     A.   30 minutes or so, maybe less.

9     Q.   All right.  So then what happened after that

10  30-minute meeting?

11     A.   That's it.  He --

12     Q.   You just left and walked out?

13     A.   Yeah, we just went -- stayed a mystery question

14  stayed in my mind.

15     Q.   I'm sorry?

16     A.   Like a mystery stayed in my mind what -- what's

17  next.

18     Q.   How did you get from that meeting that was done

19  regarding talks about Karam to the point of then getting

20  a -- a wire put on you, being handed some money and

21  going and making this meeting with Dr. Pena; how did --

22     A.   I never got a wire on me.

23     Q.   You had the video?

24     A.   That's -- I thought --

25     Q.   Was that on the other guy?

1    A.   I got the camera thing and a recording device.

2    Q.   Well, that's a wire, I mean, that's what I'm

3  talking about, you had that on you, right?

4    A.   You said wire.   I misunderstand what you're

5  saying.

6    Q.   Okay.   So how did we get -- how do we transition

7  from that OIG meeting in some time at the beginning of

8  the year, to then you getting dressed up and prepared to

9  go talk to Dr. Pena?   How did we get from there, from

10  that to that?

11    A.   How do we get to there?   Hum.   Just -- just

12  getting to there.

13    Q.   I'm sorry?

14    A.   Just got to there, that's it.

15    Q.   You just -- you just got to there?   Are you

16  trying to withhold from the jury some -- some important

17  information?

18    A.   I'm not withholding anything, it's just -- if

19  you -- a little bit about me, I'm really tired and --

20  you're asking me --

21         THE COURT:   Sir, one second.

22         MR. BANKER:   The witness is not being

23  responsive, Judge, to my question.

24         THE COURT:   Sir, just listen to the question

25  and answer the question.

1                 Repeat the question.

2      Q.   (By Mr. Banker)  My -- my question is, what is

3  your memory two years ago about how you got from that

4  OIG meeting to get wired up and prepared to talk to

5  Dr. Pena?  How did that happen?

6      A.   I -- I don't understand your question.

7      Q.   Okay.  Let's -- let me ask you this way.  After

8  the meeting with the OIG, did you have another meeting

9  with Government agents?

10     A.   Yes.

11     Q.   Okay.  And -- and when was that?

12     A.   I don't know.

13     Q.   Was it shortly after the OIG meeting, or months

14  after the OIG meeting?

15     A.   Sporadic.

16     Q.   When was the first time?

17     A.   The -- if I remember it was the Karam.

18     Q.   When was the second time?

19     A.   I -- I really don't remember.  I -- I don't

20  remember.

21     Q.   When was the third time?

22     A.   I -- I don't remember.

23     Q.   Fourth time?

24     A.   Maybe fourth time, I don't know.

25     Q.   You said earlier it was at least five?

1      A.   It was at least five.

2      Q.   And have you no memory of those meetings?

3      A.   I don't remember the timeline when -- when we met

4  and then -- and some of the subject matter had nothing

5  to do with what we're here for today.

6      Q.   Okay.  So the -- the next meeting after the OIG

7  meeting, okay, let's talk about that.  I'm not asking

8  you when it was, it was after the OIG meeting, right, it

9  wasn't before, correct, it was after, okay?

10     A.   Okay.

11     Q.   You'll agree with that?  Who called you to go

12  have that meeting?

13     A.   OIG called.

14     Q.   Okay.  So an officer from OIG had your cell

15  number?

16     A.   Yes.

17     Q.   All right.  And they called you?

18     A.   Yes.

19     Q.   And said come by the office?

20     A.   Yes.

21     Q.   So you -- you came by there?

22     A.   Yes.

23     Q.   Did you go with Jimenez?

24     A.   No, sometimes no; sometimes yes.

25     Q.   Okay.  And so what -- what -- what was discussed

1    at that second meeting?

2       A.   Believe it or not, I -- I report abuse in health

3    care, I report elder abuse, I report any other kind of

4    things I find in health care just -- just what I -- I've

5    been doing.

6       Q.   So are you saying for a long time you've been

7    making reports?

8       A.   Yeah.

9       Q.   How long?

10      A.   Well, since I -- I met with -- with OIG.

11      Q.   You mean in -- in that first meeting?

12      A.   Well, actually since before.  I mean, I've

13   reported -- before I even met OIG, I reported Rodney to

14   the FBI.

15      Q.   Right, but you know what, as I recall your

16   testimony about that, was that you were bothered by the

17   fact that he -- you said he threatened you about your

18   going -- going in your own business, right?

19      A.   He threatened Ed -- no, he threatened Eddie

20   Zuniga.

21      Q.   Right.

22      A.   And he threatened me.

23      Q.   Okay.  Now, you know that -- that Eddie was also

24   working there with him at Merida, right?

25      A.   Yes, sir, yes.

1    Q.   Okay.  And when you made your -- when you made

2    your transition to do Generous, you -- you weren't

3    working at -- at Merida, right, or were you?

4    A.   No, I wasn't working in -- at Merida when -- I

5    got out first, and then Eddie gets out second, and

6    Rodney gets very upset.

7    Q.   Okay.  But did you know that when Zuniga went to

8    invest with you in Generous, he was still working with

9    Rodney?

10   A.   He -- he kept it underground because he needed

11   his employment.

12   Q.   And let's talk about that.  Let's talk about that

13   for a minute.  He kept it underground.  That means that

14   he didn't tell his boss about the fact that he was

15   investing in another health -- health hospice

16   organization?

17   A.   He said he was terrified of Rodney.

18   Q.   I'm not asking that, sir.  I'm not asking you

19   that.  He kept it from Rodney, right?

20   A.   That was his choice.

21   Q.   Right?  Right?  Right.  And you don't think

22   there's anything wrong with the fact that you're working

23   for a company and you're getting paid a very good salary

24   in the range of $120,000?

25   A.   That's not what I was making.

1    Q.   I'm not asking you what you're making.

2    A.   Oh.

3    Q.   I -- Zuniga, not you.

4    A.   Oh, okay, well, good money for him.

5    Q.   Right, I agree.   That he's working and he's

6    making a great salary, and then don't you think there

7    would be what they call kind of a conflict of interest

8    that then he would go and invest in another competitive

9    business to -- to the one that he's involved with --

10   with Merida?   Don't you think that would be a conflict

11   of interest?

12   A.   That -- that -- I can't speak for him.

13   Q.   Okay.   No, I'm just asking you, don't you think

14   that would be a conflict of interest?

15   A.   I --

16   Q.   If the person -- a trusted employee under covers

17   or underground, like you said, goes and starts to invest

18   in a -- in a competitor, that would be a conflict of

19   interest, right?

20   A.   I believe that in this country we have the right

21   to start our own business.

22   Q.   Okay.

23   A.   And if Eddie wanted to start his own business he

24   has that right.

25   Q.   Do you know there's -- there's many companies

1    because of that threat of an employee branching out on

2    their own, and maybe even taking patients, taking

3    clientele with them, sometimes organizations get

4    non-compete agreements; have you ever heard of those?

5        A.   I -- I've heard of them, but if he had one, I

6    wasn't aware.

7        Q.   Okay.  And if he had one, that would even make

8    this whole scenario even worse, right?  I mean, he has a

9    non-compete agreement, he's working for the guy and

10   undercover he goes and -- and hooks up with another

11   organization that does the same work, that -- that would

12   be -- that would be pretty darn unethical, correct?

13       A.   He is the one that built the name Generous and

14   invited me into this.

15       Q.   I'm not asking you that, sir.

16            MR. LOWELL:  Objection.  No foundation,

17   Your Honor; calls for speculation.  This witness already

18   testified he's not familiar with any agreements.

19            THE COURT:  Rephrase the question.

20       Q.   (By Mr. Banker)  All I'm asking is that scenario

21   that I just painted, that would be, from just a common

22   sense point of view, a real unethical, wouldn't be

23   right, to do that, right?

24       A.   I disagree with you.  I believe that every man

25   here on earth deserves the right to make a business if

1   that's what they wish to do.

2      Q.  Okay.  And so when you made that report, like you

3   said Rodney to the FBI, you -- you -- your report to

4   them had to do with "the threats" that you said were --

5   he was making against you and Zuniga, right?

6      A.  Right.

7      Q.  Right.  Okay.  So, the -- I guess you were

8   hoping, by making that report, that maybe he wouldn't be

9   able to compete with you in your -- in your -- in your

10  new business venture, right?

11     A.  No.

12     Q.  Because maybe you would kind of get the FBI

13  looking at him for some reason and that would make your

14  business look a little bit better, or have better

15  potential; is that fair to say?

16     A.  That's not fair to say.  The man was a bully.

17     Q.  Okay.

18     A.  He bullied Eddie Zuniga.  He was terrified of the

19  man.

20              MR. BANKER:  Judge, I would ask that the

21  witness be instructed to not go beyond the questions and

22  make off the -- remarks -- unresponsive.  That's

23  completely nonresponsive, Judge.

24              THE COURT:  Limit your answers to the

25  questions, sir, but that was a very open-ended question.

1    Please proceed.

2                    THE WITNESS:   I'm sorry.

3                    MR. BANKER:   Okay.   Thank you, Judge.

4         Q.   (By Mr. Banker)   So my point is you had a

5    business interest for the success of Generous to make

6    this claim against Rodney back in 2014, right?   Yes or

7    no?

8         A.   No.

9         Q.   All right.   After this whole thing with Karam

10   came out, what became of you and Karam's relationship?

11        A.   What -- what happened with Karam is we couldn't

12   figure out what was happening with -- with the funds,

13   and this puts us back to the IRS situation.

14             When I hired consultants from External to

15   evaluate what was happening in the organization, even

16   though I was as President, I was still out seeing

17   patients on the ground.   We trusted in Karam to run the

18   organization because he had the business background.

19             So we couldn't figure out why we were having

20   financial troubles, so we hired these outside

21   consultants who did a complete evaluation of the

22   organization, and the conclusion of the -- of the

23   assessment of their findings was that we were

24   self-sabotaging ourselves and it didn't make any sense.

25             So when we looked into the numbers and we looked

1    at bank statements after bank statements, we found that

2    Mr. Karam had embezzled $160,000, approximate.

3        Q.  Okay.  So at that point he was no longer your

4    friend?

5        A.  And he knew that.

6        Q.  How long had you known him before that?

7        A.  Jesus, maybe for four -- 2014.

8        Q.  How did you meet him?

9        A.  Met him through an agency called Adventia.

10       Q.  Is that another health care agency?

11       A.  Yes, sir.

12       Q.  Okay.  And how -- how did that meeting happen?

13       A.  Just out of a -- he would come into the office,

14   if I was there, got to meet the guy, and that was it.

15       Q.  You mean at your office at Merida or -- or where

16   was that?

17       A.  No this was Adventia, I was no longer

18   working with Merida anymore.

19       Q.  So but after Merida you went to work for another

20   company?

21       A.  Yes, sir.

22       Q.  While you were getting ready to get Generous

23   started?

24       A.  Not when I met Karam, we still had nothing.

25       Q.  How long did you work for Adventia?

1    A.  Not too long.  A couple months.  Two or three

2  months.

3    Q.  Okay.  And that's -- and you quit there or were

4  you fired?

5    A.  I -- I -- I just left.

6    Q.  So you quit?

7    A.  Quit.  Uh-huh.

8    Q.  What did you do after that?

9    A.  I went looking to work at different hospice

10  organizations to see, you know, maybe if there was an

11  ethical one that I could work with and -- and find a

12  place for me to be happy at.

13    Q.  Okay.  Then -- then you did -- did you find

14  another one?

15    A.  I didn't.

16    Q.  Okay.  So you were unemployed?

17    A.  It -- it reached a point that that's when I

18  started talking to Eddie Zuniga, he says, hey, I've got

19  this idea.  I said, okay, what's your idea?  Why don't

20  we just start our own, or why we just buy one?  I said,

21  well, that sounds like a good idea.  I'm a nurse, what's

22  happening out here, you know, I -- I -- it's a mess.

23    Q.  Okay.  So this started with a conversation

24  between you and Zuniga?

25    A.  Yes.

1      Q.   The idea of Generous?

2      A.   The idea of Generous.   It didn't have a name

3   then.

4      Q.   Who wanted to bring in Karam?

5      A.   Karam brought himself in after we had the money

6   to pay him to return on the loan, he said he had bigger

7   interest in us, that he wanted into the organization.

8      Q.   Now, you said you had to pay him, I didn't

9   understand that?

10      A.   I had the money to pay him the -- the return on

11   the 21,000, and he says, no, consider the 21,000 as a

12   part of my way of saying I want to buy in with you guys.

13      Q.   So I get that.   But how did it come about that it

14   started with him giving 21,000?   I mean, how did that

15   happen?

16      A.   He loaned us the money.

17      Q.   And so how did it happen that you had a -- a

18   meeting with him and talked about the money?

19      A.   We just -- we -- he just loaned us the money.

20      Q.   Who brought him in you -- you or Zuniga?

21      A.   No, I -- Zuniga was out of the picture once Karam

22   comes in, Zuniga got threatened by Rodney and he bales.

23      Q.   Okay.   So my question was you met Zuniga -- I

24   mean, excuse me, you met Karam through Adventia, you

25   were working there?

1    A.   Adventia, yeah.

2    Q.   Did you then contact him and say, hey, do you

3    want to make an investment in my company, or how did it

4    happen?

5    A.   No, no, we asked him, say, hey, we're looking to

6    do this idea, can you lend us the money if you have it?

7    And he said, yeah, I've got plenty of money, here's 21.

8    Q.   Who's we?  You and who?

9    A.   Me and Jimenez.

10   Q.   Oh, you and Jimenez, okay.  So was it Jimenez

11   that had the idea of asking him, or was that you who had

12   the idea?

13   A.   It was my idea.

14   Q.   Because you saw he was some kind of businessman?

15   A.   Yeah, he was always offering to help.

16   Q.   Okay.  All right.  And let's switch gears here

17   for a minute.  Let's talk about the Generous business,

18   okay?

19        You had these investors, and then you went to the

20   process of getting some kind of legal legitimacy in

21   making this company, right?

22   A.   The excruciating pains of building something from

23   scratch.

24   Q.   Right, got you.  And in that process, you learned

25   that the Government requires that you have a medical

1    director, right?

2        A.   Well, yes.

3        Q.   Okay.  And -- and that medical director should be

4    under contract, right, a contract?

5        A.   Uh-huh.

6        Q.   It could be a written contract or a verbal

7    contract, right?

8        A.   Written.

9        Q.   Written, okay.  And so as a result of that

10   contract, you pay him a certain amount of money per

11   month?

12       A.   Dr. Pena didn't ask --

13       Q.   I'm not asking you -- sir, yes or no, you pay him

14   money per month?

15       A.   You pay medical directors per month based on the

16   contract.

17       Q.   Right.  Okay.  And -- and the going rate, you

18   found out, I guess in your investigations or your

19   knowledge, is about -- around, what, 2500, 3,000 a

20   month?

21       A.   2,000 to 2500.

22       Q.   Okay.  And also you learned that that medical

23   director has -- has certain duties that they're supposed

24   to do as a medical director for your company, right?

25       A.   Yes, sir.

1    Q.   Okay.  They're supposed to attend those meetings,

2    IGT meetings, they're supposed to evaluate whether

3    certification should happen, meet with patients, and

4    they can also do face-to-faces, right?  You've heard of

5    that?

6    A.   Yes, sir.

7    Q.   So also a nurse can do a face-to-face, right?

8    A.   No, sir.

9    Q.   No, they can't?

10   A.   No.

11   Q.   Only the medical director?

12   A.   Only the medical director.

13   Q.   Okay.  And so would it surprise you to know that

14   a nurse could do that if that's the truth?  Not sure?

15   A.   Honestly, if you're a nurse practitioner in that

16   sense, but a nurse can't do a face-to-face.

17   Q.   Okay.  Maybe I should have said nurse

18   practitioner versus --

19   A.   Nurse practitioner can do a face-to-face if she's

20   supervised by a doctor.

21   Q.   Right.  That's my fault, okay, so nurse

22   practitioner.  And those face-to-faces they can be paid

23   on a per time basis, right, how many they do?

24   A.   Right.  You get paid on a face-to-face for the

25   work that they do, yeah.

1    Q.   And those are all for Professional Services,

2    that's what that profession is saying, they're qualified

3    to do, they've gained experience to do and they do,

4    right, and you pay them?

5    A.   Right.

6    Q.   Okay.  Did you -- did you ever get a lawyer to

7    help consult with and -- and talk about these type of

8    guidelines and what you had to do, and the nature of

9    this contract, and what the medical director's duties

10   were, did you ever talk to a lawyer?

11   A.   No, sir.

12   Q.   Okay.  Who informed you about that?  Is that

13   something you learned on your own, or how -- how did you

14   get to know about that right?

15   A.   Right.  So again, all the regs are there on CMS,

16   it's pretty black and white, tells us what you have to

17   do.

18   Q.   So you read up on it yourself?

19   A.   Right, and -- and --

20   Q.   Okay.  And --

21   A.   And joint commission also teaches you a lot of

22   that.

23   Q.   And so you stated earlier that you -- you didn't

24   know that a medical director could also be the primary

25   care physician for a patient that was referred to

1    hospice, you didn't know that that was okay?

2       A.   That's not okay.

3       Q.   Okay.  So -- well, that's what you -- you don't

4    thing it's okay?

5       A.   No, it's not okay.

6       Q.   Okay.  All right.  So you're -- are you saying

7    then that it was your understanding that any kind of

8    referral that came from that doctor's own medical

9    practice and came into hospice was somehow illegal?

10      A.   It is illegal.

11      Q.   Okay.  And so when you met with Dr. Pena about

12   being the -- your med -- him being your medical

13   director, right, was that -- was that after, or before

14   he made the investment in your company?

15      A.   Dr. Pena invested with us, we -- before we even

16   kicked anything off, Saul brings him to the table, and

17   he says Dr. Pena's willing to be our medical director.

18      Q.   Okay.  That was before the investment?

19      A.   Just -- just before, yes.

20      Q.   Okay.  And you had had the previous relationship

21   with Dr. Pena through your -- your work with Merida,

22   right?

23      A.   With Merida, is that what you said?

24      Q.   Right.

25      A.   Yes.

1    Q.  Okay.  And -- and although you didn't like, you

2    stated you didn't like his attitude when he was arrogant

3    and -- and, of course you know Dr. Pena has -- has --

4    has many, many years of experience as a -- as a

5    physician, right?

6    A.  Yes.

7    Q.  He's got advanced medical degrees, right?

8    A.  Yes.

9    Q.  He's -- he's -- he's been a successful fellow

10   over the years, right?  Mayor of a small town outside

11   Laredo?

12   A.  Yes.

13   Q.  Okay.  I mean, and -- and so no one should --

14   should act arrogantly, we know that, that's not proper,

15   but, you know, he -- he -- he did -- he did kind of

16   boast about his abilities and his knowledge and that

17   type of thing; is that right, and that bothered you?

18   A.  There's -- it -- again, I can't speak for

19   everyone, but if you'd like for me to --

20   Q.  Yes or no, did it bother you or not?

21        MR. LOWELL:  Your Honor, objection.  He was

22   going to provide an answer, it was an open-ended

23   question and then Banker inserted himself and said, yes

24   or no.

25        MR. BANKER:  Judge, I think it was a yes or

1   no, did it bother you or not, yes or no?

2             THE COURT:  The original question was it

3   bothered you, but rephrase the question if you'd like a

4   yes or no.

5       Q.  (By Mr. Banker)  Did that -- did that aspect of

6   his personality bother you?

7       A.  It -- it belittles you.

8       Q.  Okay.  All right.  And you didn't like that

9   obviously, right?

10      A.  I'm thinking no one likes to be belittled.

11      Q.  Right.  But when it came to hiring him --

12            THE COURT:  Again, sir, speak loudly and

13  clearly, or -- or lower the microphone as well.

14      Q.  (By Mr. Banker)  When it came to hiring him as

15  your medical director at -- at Generous, you thought he

16  could be a good asset to your company, right?

17      A.  You know what, in the beginning, I thought, you

18  know, again he gives you one front and I --

19      Q.  I'm sorry?

20      A.  He gives you one -- one front, you see one side

21  of the man, and then it -- then you see the real side of

22  the man.

23      Q.  Okay.  Well, I'm not asking you that, I'm saying

24  when you made the --

25      A.  I thought he was the greatest decision I made.  I

1    thought he was a good man.

2       Q.  Well, I'm not asking you whether it was a good

3    decision.  I'm saying when you made that decision, you

4    thought he would be a benefit to your company, right?

5       A.  Yes.

6       Q.  Even though you didn't really like the way he --

7    he said things and belittled people and that type of

8    thing?

9       A.  He didn't belittle me when I first met him, it

10   wasn't until after the fact.

11      Q.  I mean, while you were at Merida he did not

12   belittle you?

13      A.  He -- he -- he makes you feel very little in the

14   conversations.

15      Q.  So it wasn't belittling, it was just making you

16   feel a little inferior?

17      A.  Again, not everyone's here, but --

18      Q.  Okay.  So that's a little bit different than your

19   earlier testimony to the Government when you were saying

20   he would be, you know, arrogant and -- and -- and made

21   people feel belittled, like you said, and that type of

22   thing.  So now you're saying while at Merida it wasn't

23   that way?

24      A.  Well, I just met the man, you know, and -- I just

25   have respect for people, and even if they talk to me a

1    certain way, I just accept it.

2        Q.   Now, you also said at Merida in those IDG

3    meetings, you know, it was kind of all business with

4    them, and he looked at a patient from a business point

5    of view, remember that testimony?

6        A.   But what -- what a typical IDG would be, first,

7    he talks about himself a good 15 minutes, and then after

8    that it's just give me what I have to sign, and then any

9    other schemes on his mind.

10       Q.   Okay.  And so that didn't bother you as far as

11   when you decided to go and hire him as -- as your

12   medical director?

13       A.   It didn't bother me, you know, I had -- I had a

14   set mind, I wanted to build something.

15       Q.   Okay.  So it must not have bothered you that bad?

16       A.   I could take a lot.

17       Q.   You in fact, in your testimony, I think on cross,

18   you saw that he was kind of a mentor for you?

19       A.   Yeah.

20       Q.   Okay.  So which is it, is he a mentor and someone

21   you look up to and you trusted, and you trusted his

22   judgment, or is it somebody that you really didn't like

23   that much and he was --

24       A.   I -- I have nothing against Dr. Pena, I think he

25   has a good side, but he has a bad side.

1    Q.   Okay.  So when you made that decision to hire

2    him, you -- you didn't think he was involved in any kind

3    of fraudulent activity, right?

4    A.   You know, at that time I'm relatively naive to

5    really understanding the business.  My -- my drive is,

6    at that point, to make something happen, to build

7    something.

8    Q.   Okay.  So the -- the answer -- you didn't answer

9    the question.  When you -- when you hired him, you

10   didn't think that he was involved in any kind of

11   fraudulent activity, right?

12   A.   I -- I don't -- I don't think -- I don't think

13   that, I just felt like he's close enough to the madness

14   but can -- what else could I do, what choice did I have?

15   Q.   Say that again, I didn't hear that.

16   A.   I knew he was close enough to Rodney and it might

17   have been something there, but I didn't want to look

18   into it.

19   Q.   Okay.  So you don't have any kind of -- you

20   didn't have any kind of knowledge that when he was

21   working for Rodney that he was doing anything

22   fraudulent, right?

23   A.   At that time all I know was that the IDG's and so

24   forth, I didn't have any knowledge there.

25   Q.   Right, you didn't have any knowledge.  You -- you

1    respected the guy.

2        A.   Yeah.

3        Q.   You respected his medical judgment, right?

4        A.   At that time.

5        Q.   You saw how much experience that he had, right?

6        A.   At that time.

7        Q.   Right?  Is that right?  Pretty much?

8        A.   Looking at a timeline.

9        Q.   Okay.  So then you had no knowledge that when he

10   was working for Rodney that he would be -- he would ever

11   certify someone as being qualify for hospice when they

12   weren't, right?  You didn't know -- you had no personal

13   knowledge about that?

14       A.   I was out there training and I got to see some of

15   the patients that were questionable, but I didn't know

16   quite yet that they were being sent from his side.

17       Q.   Okay.  Now, let's talk about that for just a

18   brief moment -- moment.  Are you an LVN or registered

19   nurse?

20       A.   I'm a registered nurse.

21       Q.   So you know when it comes to that certification

22   question, the doctor is the only one who can do that,

23   correct?

24       A.   To recertify a patient?

25       Q.   To certify.

1    A.   Based off on what the nurse reports in.

2    Q.   Right.

3    A.   But preferably the face-to-faces should be the --

4    the gold standard.

5    Q.   Certification has to come from the medical

6    director, right?

7    A.   Ultimately, the medical director signs off.

8    Q.   And that -- and that medical director is an

9    experienced doctor, in this case with Dr. Pena many

10   years, right?

11   A.   (No response.)

12   Q.   And you're not saying your assessment in the

13   field and what you may have observed, you don't --

14   you're not saying that you thought, in any way that at

15   that point that -- that the doctor's opinion would --

16   was -- was false; did you?

17   A.   It -- again, if you're talking about a timeline

18   of how these -- the story unfolded, if you're telling me

19   if was this 2014, you know, I -- I -- I can only give

20   you parts of what I know there, and if you're -- if

21   you're telling me if it's further down the road, then it

22   all starts accumulating to a pattern of behavior.

23   Q.   All right.  All right.  The fact of the matter is

24   you didn't see anything fraudulent with Mesquias' Merida

25   and you -- you then felt confident that you could hire a

1    legitimate medical director in Pena, right?

2       A.   Let me clarify what I'm trying to say.  I saw a

3    stack of referrals where Rodney Mesquias was upset that

4    they came from a Dr. Francisco Pena.

5       Q.   Okay.

6       A.   The nurse that was there tells me he didn't admit

7    them because those -- a lot of those patients didn't

8    qualify.  And I went out with the nurse to evaluate some

9    of these patients and the nurse was right because I was

10   out there training.  Whether it was all Francisco Pena

11   or not, there was something not right there.

12      Q.   Okay.  But you didn't question his judgment, you

13   hired him, right, that's the point?

14      A.   Yes, yes, I didn't question, yes.

15      Q.   All right.  So then you paid Dr. Pena with

16   checks?

17      A.   Yes.

18      Q.   That was a monthly check of how much?

19      A.   Initially started at 2500, and then every -- the

20   whole arrangements changed.

21      Q.   Okay.  So how long did you pay him at the 2500?

22      A.   I -- I -- I would have to look at the statements,

23   I -- I don't know.

24      Q.   And that started in 2014?

25      A.   2014, the guy wasn't asking for -- for anything,

1    he's -- he's in his position where he's just helping us.

2        Q.   Okay.  All right.  So he's -- you're saying he

3    didn't ask for any money?

4        A.   In 2014, no, he goes, don't worry, I'm doing you

5    this favor.

6        Q.   All right.  How about 2015?

7        A.   Huh?

8        Q.   2015.

9        A.   Just about when the agency actually starts having

10   its -- its numbers so that it can have money, that's

11   when the different Pena came out.

12       Q.   Okay.  Had you been giving him checks?

13       A.   I gave him several checks.

14       Q.   Okay.  And that was for his -- per the contract?

15       A.   It was for patients, like, for him sending us

16   patients in Laredo and for some of the visits he made.

17       Q.   Okay.  All right.  And so the only time you paid

18   him cash was in this incident where you were on tape,

19   where you were on tape, correct?

20       A.   Yes, sir.

21       Q.   And that's when you say he changed, he began to

22   change?

23       A.   No, he changed right after the agency starts

24   getting revenue coming in, like, he -- he -- he changes

25   because he's the one that puts our biller into our

1    organization because he wants to keep eyes on us, on our

2    financial's.

3        Q.   So he put a biller in your organization to check

4    your -- your -- your finances, okay, and that's when you

5    say he changed?

6        A.   Right, he became -- he became a constant pressure

7    from his side.

8        Q.   Okay.  And so is that when you say you started

9    paying him more?

10       A.   I had to keep paying him more because he wanted

11   to be happy, and he said if I didn't, you know, the

12   threat was that he would not send us patients, or take

13   them out.

14       Q.   All right.  Now, I want to back up a little bit

15   and talk a little bit more about this -- you -- you

16   becoming an informant.  Okay.  We talked about how it

17   started with the Karam thing, right?  And -- and it was

18   your understanding from the FBI that Karam was in

19   trouble?

20       A.   No, FBI don't tell you much.

21       Q.   Okay.  So who told you Karam was in trouble?

22       A.   I -- just the fact that they're -- they were

23   looking for him, I assumed the guy must be in trouble.

24       Q.   Okay.  And so at what point did you begin to say

25   I want to agree to help the FBI?

1    A.   Since the moment in 2014 when I put the Rodney

2    report.

3    Q.   Okay.  So what did you do to help the FBI in

4    2014?

5              MR. LOWELL:  Objection.  Asked and answered,

6    we've covered this ground.

7              THE COURT:  That's been asked and answered.

8    Q.   (By Mr. Banker)  Besides making the report that

9    you made to -- to the "hotline" did you do anything

10   else?

11             MR. LOWELL:  Objection.  Asked and answered.

12             MR. BANKER:  Judge, I don't thing he

13   answered that one:  He made it sound like he'd been

14   cooperating since 2014, and I don't think that's --

15             THE COURT:  My understanding -- it's my

16   understanding he stated he -- 2014 was the isolated

17   incident, but I'll allow you to clarify.

18   Q.   (By Mr. Banker)  After that isolated incident,

19   did you do anything else for the FBI?

20   A.   Just -- you know, answered their questions.

21             THE COURT:  You need to answer his question.

22             THE WITNESS:  Like --

23   Q.   (By Mr. Banker)  You answered their questions?

24   A.   Like whatever information I have to give, I -- I

25   turn it in.

1    Q.   So you would -- you would call an agent with the

2    FBI?

3    A.   Right.

4    Q.   You had an agent that you had on your phone,

5    or -- or how did that happen?

6    A.   Right.  So the -- the -- he handed me his card,

7    and it was an OIG guy, and I just report in.

8    Q.   So anything that came up, you -- you then

9    would -- would make contact with them?

10   A.   Yeah, anything.

11   Q.   And then in 2017 is when Karam got -- got

12   arrested, or was investigated?

13   A.   I don't know if he ever got arrested.

14   Q.   Right, he was investigated?

15   A.   Right.

16   Q.   And you were told he was being investigated,

17   right?

18   A.   Well, even Karam voiced that they went to his

19   house.

20   Q.   Okay.  So at that point, again, you stated

21   earlier that you had several meetings with agents after

22   that initial OIG report, or that meeting that you had

23   after the Karam investigation started, and you started

24   talking to them about what -- what kind of stuff?

25              MR. LOWELL:  Objection.  Asked and answered.

1          THE WITNESS:  Not related to this.

2          THE COURT:  One second, one second.

3          And gentlemen, again, let's -- it has been

4    asked and answered and since, but I think we're mixing

5    entities.  So let's be a little more clear.

6          MR. BANKER:  Okay.

7          THE COURT:  I mean, originally, we have

8    everything from FBI, DEA, OIG.

9          MR. BANKER:  Right.

10          THE COURT:  And I think your line of

11    questioning is now leading to FBI; is that correct?

12          MR. BANKER:  Correct.  Yes, Your Honor.

13          THE COURT:  Let's clarify that.  All right.

14    Q.  (By Mr. Banker)  So in any of those meetings that

15    you had, after that initial OIG meeting when you and

16    Jimenez went over there, did you start talking to an FBI

17    agent?

18    A.  The most contact I've made with the -- our

19    Government side is going to be with OIG, and very rare

20    with FBI, maybe two times.

21    Q.  Okay.  And in the -- in the FBI meetings, what

22    did you talk about?

23    A.  One was Karam.

24    Q.  Okay.

25    A.  And the other meeting must have been when -- when

1    we -- when I put the camera in the recording.

2        Q.   What did they ask you about Karam?

3        A.   Just the questions about how I met the guy, you

4    know, just what I knew about him.

5        Q.   Okay.   And did -- did anybody -- again, did

6    anybody say they were kind of looking at you?

7                    MR. LOWELL:   Objection.   Asked and answered.

8                    THE COURT:   That's been asked and answered.

9        Q.   (By Mr. Banker) Okay.

10       A.   They -- they voiced that --

11                   THE COURT:   One second, asked and answered.

12   Next question, please.

13                   MR. BANKER:   Judge, he's -- if I might

14   interrupt.   I did ask that before, but now he's saying

15   he voiced -- they voiced that, which is inconsistent

16   with what he said before.   He was just about to say,

17   they voiced that; I would like him to continue with that

18   sentence.

19                   THE COURT:   All right.   Finish what you were

20   going to say.

21                   THE WITNESS:   I -- could you repeat the

22   question one more time?

23       Q.   (By Mr. Banker)  You were going to say they

24   voiced what when -- when I asked you about them looking

25   at you, they voiced what?

1    A.   They voiced that, I, you know, that they're --
2    I'm not -- that I'm not immune to any kind of
3    prosecution.  They were very clear that whatever I said
4    I will be held accountable, and I'm just here to clear
5    the record on doing the right thing.
6    Q.   Okay.  So it was -- it was your understanding
7    that -- that they -- they may have something that they
8    could -- they had against you, and you understood that,
9    they voiced that to you?
10   A.   I'm here to testify of the crime and that's all.
11   Q.   Okay.  They voiced to you that they -- they were
12   looking at you, they could prosecute you, right?
13   A.   No, they -- they don't -- they don't tell you
14   those things, they don't tell you those things.  They're
15   very -- they don't share anything with you.  I report
16   in, and that's all I do.  And if I do a crime, I'm just
17   as -- as -- you know, get prosecuted, that's all.
18   Q.   My point is during the whole time you're talking
19   to the FBI, there was an impression, they had -- they
20   voiced this thing that maybe you could -- you could be
21   investigated, right?  You could be looked at?
22            MR. LOWELL:   Objection --
23   Q.   (By Mr. Banker)  That was how -- that was over --
24   A.   I never said that they were going to look at me,
25   or so forth, it -- it -- I just did the right thing and

1    to report my circumstances.

2         THE COURT:   That's been answered numerous

3    times.

4         Let's move on.

5    Q.   (By Mr. Banker)   All right.   So then you say you

6    think it was the second time you met with the FBI that

7    this whole idea of Dr. Pena came up?

8    A.   No, that was just brought on one -- one day to

9    the next.   I knew what I was doing was already wrong,

10   you know, and just --

11   Q.   You knew what you were doing was wrong?

12   A.   Right, with -- with Pena, I knew it was wrong.

13   Q.   And you told -- did you tell the Government that?

14   A.   I -- I failed to tell them the full -- full truth

15   and I -- I lied to them and, you know --

16   Q.   You say what now?   You did what?

17   A.   That I lied to them completely, like, with

18   certain parts of how -- how long me and Pena had been in

19   business with this situation but, you know, that's --

20   it's true, that's all.

21   Q.   So you're saying that they started asking you

22   about Pena?

23   A.   What I'm getting at is as far as the amount of

24   kickbacks, well, it wasn't just that involvement of the

25   2500, we -- there was more agreements between us,

1    between Pena.

2       Q.   So are you -- are you saying this is the first

3    time you've said anything about that?

4       A.   No.

5       Q.   Okay.  So how did it come about that Pena's name

6    came up in those meetings?

7       A.   Well, it's part of me testifying.

8       Q.   You told them about Pena?

9       A.   I -- I don't understand your question.  I --

10      Q.   How did the -- how did this -- this start with

11   Dr. Pena, and you and the FBI, how did that begin, how

12   did that whole process start and you became -- you wore

13   a wire, you go in there, you take their money, how did

14   that start, how did that whole --

15      A.   I volunteered myself, I said, you know, I'll do

16   it and I did it.

17      Q.   Okay.  Did they start the conversation about

18   Pena?

19      A.   There was no conversations.

20      Q.   So out of the -- just out of the air it came

21   about your -- you're wiring yourself up and taking money

22   and going and talking to Pena?

23      A.   Yeah.

24      Q.   Now, was Jimenez with you when you started this

25   whole deal with the recording and getting wired up?

1    A.   Jimenez was -- was there when -- when we obtained

2  the recording.

3    Q.   How many days before the actual meeting that you

4  had on tape did you start this?

5    A.   Before that?

6    Q.   Yes.

7    A.   It was just like last minute thing, it was

8  nothing even planned.

9    Q.   Okay.  How many days before, more or less?

10   A.   I -- it wasn't even -- it was just a -- not even

11 an expected, I wasn't even expecting it.

12   Q.   So you can't say how many days before you --

13   A.   There was no plan, there was no plan to do

14 anything to Pena, no.

15   Q.   Okay.  If there was no plan, how did it start,

16 how did this whole process start?

17   A.   Basically, that video you guys saw is another day

18 working with Pena, another day dealing with patients.

19   Q.   Sir, I'm not asking you that.  How did it start

20 where you got wired up, you gave -- were given money,

21 how did that whole process start, that's all I'm asking

22 you.

23   A.   I was asked to volunteer; I volunteered to do it

24 and that's all I did.

25   Q.   Okay.  So how many days before it happened were

1  you asked to do that?

2     A.  It was just that -- that same day, just that --

3  just that day, that's it.

4     Q.  So the same day it happened, earlier in the day,

5  early in the morning or -- or --

6     A.  It must have been somewhere in the morning, said,

7  hey, you know.

8     Q.  I'm sorry?

9     A.  They just reached out and geared up and then

10  that's it.

11     Q.  So the FBI reached out to you?

12     A.  Well, yeah, and they just said to meet in a

13  parking lot and -- and then that was it.

14     Q.  Where was that, what parking lot was that?

15     A.  Like somewhere in Laredo.

16     Q.  Okay.  They asked -- they called you and said

17  meet me over there?

18     A.  They didn't call me, huh-uh.

19     Q.  They called Jimenez?

20     A.  Uh-huh.

21     Q.  Or who did they call?  Called Jimenez and said

22  meet them over there?

23     A.  Uh-huh.

24          THE COURT:  Sir, you need to answer out

25  loud.

1          THE WITNESS:  Yeah.

2          THE COURT:  No, huh-uh and uh-huh.

3          THE WITNESS:  Yes, sir, they called Jimenez.

4     Q.  (By Mr. Banker)  Okay.  And so what time of the

5     day was that, if you remember?

6     A.  I can't remember.  It must have been either

7     somewhere in the morning, and then another time in the

8     afternoon.

9     Q.  Okay.  And so what happened when you met him

10    there?

11    A.  It was just the -- this is the money, looked at

12    the money, positioned the camera, got the recording and

13    that was it.

14    Q.  Okay.  Was Jimenez there with you when that

15    happened?

16    A.  Yes, sir.

17    Q.  Okay.  And so did -- did -- were you surprised by

18    this whole event?

19    A.  It was different for me.

20    Q.  You didn't know that that was going to happen?

21    A.  No, I didn't know it was going to happen.

22    Q.  But you'd already told them about you and Pena?

23    A.  Like, no, no.

24    Q.  There was never any discussion about doing any

25    kind of referrals to him, or paying for referrals?

1       A.   No, sir.

2       Q.   None of that was discussed prior to that meeting?

3       A.   No.

4       Q.   Where they wired you?

5       A.   No.  Not with FBI.

6       Q.   With anybody, with any agency?

7       A.   No agency.

8       Q.   So no agency before that day, that morning,

9   talked to you about this idea of Pena taking a kickback?

10      A.   That's correct.

11      Q.   Until you met with the agents that morning, you

12  and Jimenez, they wired you up, right?

13      A.   Yes, sir.

14      Q.   Had you ever done that before?

15      A.   No.

16      Q.   Okay.  And you go in and -- and they give you the

17  cash, did they brief you on what to say?

18      A.   No.

19      Q.   Okay.  How long did that process take?

20      A.   It was in two parts, that's why there's two

21  videos and --

22      Q.   How long did the process of you getting prepared

23  take?

24      A.   About ten minutes.

25      Q.   Okay.  How many agents were involved?

1        A.   I -- I just saw one.

2        Q.   And that was all in the parking lot in Laredo?

3        A.   Yes.

4        Q.   Okay.  Were you sitting in a car, or where were

5   you -- where were you -- what were you doing?

6        A.   I was in a vehicle.

7        Q.   Okay.  And he didn't brief you on what you're

8   supposed to do?

9                 MR. LOWELL:  Objection.  Asked and answered.

10                THE COURT:  That's been asked and answered.

11       Q.   (By Mr. Banker)  So then you go in after that

12  first meeting at the parking lot with the -- with the

13  wire and with the cash and with Jimenez, right?

14       A.   Yes.

15       Q.   And you go to -- you go to the mayor's office?

16       A.   Yes.

17       Q.   Okay.  And then you say you then came back and

18  did something else in the afternoon?

19       A.   Basically, returned the equipment, and that was

20  it.

21       Q.   Okay.  You gave -- what did you -- what did

22  you -- what did you give them?

23       A.   The -- the recording and the device.

24       Q.   Okay.  How did you and Jimenez get over to the

25  mayor's office?

1      A.   Well, we drove.

2      Q.   Okay.  So did -- did you -- do you ever -- did

3    you do that ever after that, did you ever put a wire on

4    and do that type of thing?

5      A.   We did it again on the second part, that's the

6    second video, and, yeah, I've done it once before

7    something unrelated.

8      Q.   You did it once before what?

9      A.   Like after, after that, again.

10     Q.   Okay.  So the second time with Pena was it on

11   another day?

12     A.   It was on another day.

13     Q.   How many -- do you remember how many days after?

14     A.   I -- I can't, I'd have to look at the dates, but

15   it happened on another day.

16     Q.   Okay.  So the same protocol, you met at the same

17   place, did you --

18     A.   Different place.

19     Q.   You met at a different place?  Okay, you and

20   Jimenez?

21     A.   Yes.

22     Q.   Okay.  Were you briefed at all about what you

23   were going to do?

24     A.   They don't brief you, no.

25     Q.   How did you know what to do?

1     A.   It just -- they -- we knew what to do, do

2   business as usual.

3     Q.   I got you.   Okay.   So you did that again with

4   Dr. Pena?

5     A.   Yes.

6     Q.   We saw the video of that?

7     A.   Yes.

8     Q.   So did you do it afterwards?

9     A.   With Dr. Pena?

10    Q.   No, with anybody?

11    A.   No.

12    Q.   Did you ever have -- remember having a meeting

13  with Dr. Virlar?

14    A.   Yes, sir.

15    Q.   At a restaurant in Laredo?

16    A.   Yes, sir.

17    Q.   And you put on a wire there; didn't you?

18    A.   That would be the -- the next time.

19    Q.   Okay.   And so who arranged that?   Who told you to

20  do that?

21    A.   It was a marketer who insisted that Dr. Virlar

22  wanted to meet with us.

23    Q.   So was the Government involved in that deal?

24    A.   To -- no.

25    Q.   So you're saying you did that on your own?

1      A.   Yeah, Dr. Virlar wanted to meet with us.

2      Q.   So a marketer contacted you and said Dr. Virlar

3   wanted to meet?

4      A.   Yes.

5      Q.   And you took it upon yourself then to record it?

6   Record the meeting?

7      A.   Well, just -- I'm reporting in because I --

8   because the original report I knew that Dr. Virlar had

9   some ties with the whole fraud, so I reported it in.

10     Q.   You reported what in?

11     A.   The fact that Dr. Virlar wanted to meet.

12     Q.   And who did you report that to?

13     A.   OIG.

14     Q.   And -- and so did they -- did they tell you to

15   record --

16     A.   They --

17     Q.   -- the meeting?

18     A.   They asked if I will volunteer and I volunteered.

19     Q.   Did you -- did you -- did you know that

20   Dr. Virlar was already talking to the Government and --

21   and -- and debriefing and that type of thing?

22     A.   I didn't know.

23     Q.   You didn't know it?  I mean, the OIG officer

24   didn't tell you that when you called in and said, hey, I

25   want to tape Dr. Virlar?

1    A.   No, I didn't know that.  No, they don't tell you,
2    they don't talk to you.
3    Q.   Okay.  Well, so you're sure you called in?  You
4    sure you made that call to the OIG?
5    A.   Yeah.
6    Q.   Okay.  And they say go ahead and do it?
7    A.   They -- they called me in and they gave me the
8    device.
9    Q.   They gave you the device, right, is that what
10   you're saying?
11   A.   Yes.
12   Q.   So when you made the call to OIG, they then
13   called you in and said, hey, go put on this device and
14   go over there?
15   A.   Yes.
16   Q.   Okay.  What was your understanding that you
17   wanted to try to achieve at that meeting?
18   A.   I'm just -- I'm not trying to achieve anything,
19   I'm just reporting in and -- and going with the flow.
20   Q.   In -- in that meeting, you were also you were
21   talking to Dr. Virlar about referrals and that type of
22   thing, right?
23   A.   Right.
24   Q.   You wanted to try to get him to pay you
25   referrals, right?

1    A.   Well --

2    Q.   I mean give you referrals for money?

3    A.   I was wondering because we -- you know, we knew

4  and, you know, that Virlar's style was to pay per

5  referral and so it was perhaps still --

6    Q.   So he never -- he never took the bait, right, in

7  that whole four-hour -- it was about four hours, right?

8    A.   Roughly, but, yeah, it -- it was nothing that

9  Virlar -- that we ever reached any kind of agreement,

10  no.

11    Q.   Yeah, he never said, okay, I'll do that, right?

12    A.   No.

13    Q.   You kept pushing it though, remember?

14    A.   I -- if I did, I don't remember.

15    Q.   Okay.  But the -- the meeting lasts for four

16  hours; do you remember that?

17    A.   Because even Virlar goes to the office later on

18  to try to be our medical director.

19    Q.   I'm sorry?

20    A.   Like Virlar, after that he goes to our office

21  trying to be the medical director so there was some

22  possibility.

23    Q.   Okay.  And after you did that taping, you went

24  back to OIG and gave them the tape recorder?

25    A.   Yes.

1    Q.   Okay.  And they -- they paid you?

2    A.   No.

3    Q.   They didn't pay you for -- for the -- the

4    money -- for paying the bill?  Did you pay the bill

5    there?

6    A.   Generous picked up the tab.

7    Q.   Okay.  But they -- they didn't reimburse you?

8    A.   Yes, they might have reimbursed for the -- for

9    the tab, but I -- I don't remember.

10    Q.   They did reimburse you; is that what you're

11    saying?

12    A.   They might have.

13    Q.   Okay.  You don't -- you remember them giving you

14    $600 for that?

15    A.   Right, I -- I don't remember, but they -- they

16    might have.

17    Q.   Okay.

18              MR. BANKER:  May I have just a quick moment,

19    Your Honor?

20              THE COURT:  Sure.

21              (Brief pause in proceedings.)

22              MR. BANKER:  I'll pass the witness,

23    Your Honor.

24              THE COURT:  Ladies and gentlemen, at this

25    time let's go ahead and take our -- excuse me.

1           Let's go ahead and take our lunch break.

2    It's 12:35.  Please report back before 2:05.  All right?

3                COURT OFFICER:  All rise for the jury.

4                THE COURT:  We'll be in recess.

5                (JURY OUT.)

6                (COURT IN LUNCH RECESS.)

7                THE COURT:  Thank you, everyone.  Please be

8    seated.  Yes.  Ms. Sandra has asked me about our,

9    perhaps, cell phone issues.

10               We will inform security that the entire

11   defense team and/or prosecution team, whether it's

12   attorneys, or paralegals, or assistants, they will be

13   allowed to bring in their devices or I-Pads.

14               Was there anything else on that?

15               MR. LOWELL:  Your Honor, could -- good

16   afternoon, Your Honor.

17               Could the paralegals have the devices on

18   them in the courtroom and use them to communicate with

19   witnesses just to coordinate witness -- getting

20   witnesses up to the courtroom, and just sort of

21   logistical things.

22               THE COURT:  Technically -- well, again,

23   our -- our rules are that every -- that phones be on

24   airplane mode, but if -- if it's to coordinate the

25   efficiency of the trial, I would allow that, sure.

```
 1              MR. LOWELL:  Thank you, Your Honor.
 2              THE COURT:  All right.  Anything else on
 3    phone/I-Pad issues?  All right.
 4              Let's bring the --
 5              MR. GUERRA:  I think my client is going
 6    through security right now, Your Honor.
 7              THE COURT:  Oh, I'm sorry.
 8              MR. GUERRA:  No, I'm -- I'm sorry, I hate to
 9    make this announcement, but --
10              THE COURT:  No, I thought everybody was
11    ready.  We're a little -- well, I guess we are on
12    schedule.
13              MR. GUERRA:  Yes, I'll go get him.
14              Thank you, Your Honor.
15              (COURT IN SHORT RECESS.)
16              THE COURT:  Thank you, everyone.  Please be
17    seated.  Mr. Cyganiewicz.
18              MR. CYGANIEWICZ:  May I proceed, Your Honor?
19              THE COURT:  And, sir, again, speak loudly
20    and clearly into the microphone.  You're still under
21    oath.
22              Mr. Cyganiewicz, please proceed.
23              MR. CYGANIEWICZ:  Thank you.
24                        CROSS-EXAMINATION
25    BY MR. CYGANIEWICZ:
```

1    Q.   Good afternoon, Mr. Aguilar.

2    A.   Good afternoon.

3    Q.   Have you had a chance to enjoy some lunch?

4    A.   I ate lunch.

5    Q.   Let me start -- I'm Ed Cyganiewicz, I represent

6    Mr. McInnis; again, like another lawyer has asked, if

7    you don't understand something, just let me know, and I

8    don't think I'll be as and long detailed.

9         I just wanted to go back into your -- your

10   background -- your educational background.

11        Where did -- you're a nurse, correct?

12   A.   That's correct.

13   Q.   What kind of nurse are you?

14   A.   I'm a registered nurse.

15   Q.   Where did you go to school at?

16   A.   San Antonio College.

17   Q.   SAC, they call that?

18   A.   That's correct.

19   Q.   Not UTSA, but San Antonio College?

20   A.   San Antonio College.

21   Q.   Is that a two-year program, or a four-year

22   program?

23   A.   An Associate's, two-year program.

24   Q.   Two-year?

25   A.   Yes, sir.

1    Q.   So you didn't finish a four-year program?

2    A.   No, sir.

3    Q.   Did you do any advanced studies in nursing after

4    that?

5    A.   No, sir.

6    Q.   So you're -- extended your education to a

7    two-year associate program, correct?

8    A.   That's what I have, a two-year associate program.

9    Q.   When did you get that associate degree?

10   A.   Late 2010.

11   Q.   Ten?

12   A.   Late 2010.

13   Q.   Regarding your history with Merida, when did you

14   start with them?

15   A.   2012.

16   Q.   Okay.   I think you may have mentioned earlier to

17   either the prosecution or defense lawyer, that you were

18   relatively new at this in 2012; is it that correct?

19   A.   With regards to home health and hospice, that's

20   correct.

21   Q.   With hospice you didn't -- you didn't have any

22   knowledge, or any education; did you, at that point in

23   2012?

24   A.   Not at that point.

25   Q.   And at home health, you didn't have any further

1    education or experience?

2        A.   That's correct, I did not have home health

3    experience.

4        Q.   And for -- so 2012 to -- when did you leave

5    Merida?

6        A.   Roughly, 2013.

7        Q.   So you were there for just a year or --

8        A.   About so.

9        Q.   And how long did you work on the hospice side,

10   if -- if at all?

11       A.   Probably, half the time that I was there.

12       Q.   Half?

13       A.   About half.

14       Q.   Okay.   Six months?

15       A.   Approximately.

16       Q.   And what offices did you work out of?

17       A.   San Antonio.

18       Q.   Did you ever go to Laredo?

19       A.   That's correct.

20       Q.   So it's San Antonio and Laredo, correct?

21       A.   That's correct.

22       Q.   And the conversations you had with Dr. Pena, that

23   you described earlier, they're -- they all occurred in

24   Laredo, correct?

25       A.   Laredo.

1      Q.   And how long were you in -- you were in

2  San Antonio for those two years, basically?  Or one

3  year, I'm sorry?

4      A.   Yes.

5      Q.   And who was the administrator when you were in

6  San Antonio?

7      A.   Eddie Zuniga.

8      Q.   And did -- you have an administrator now, don't

9  you, at Generous?

10     A.   That's correct.

11     Q.   What's the administrator's job?

12     A.   Basically, does the administration, the office.

13     Q.   Day-to-day operation?

14     A.   Day-to-day operation.

15     Q.   Schedules?

16     A.   Not schedules, there will be schedulers for that.

17     Q.   Okay.  So what else would the administrator do?

18     A.   Overseeing operations, reporting.

19     Q.   Mr. Zuniga, is he a nurse?

20     A.   No, sir.

21     Q.   Mr. McInnis is not a nurse or doctor, correct?

22     A.   No.

23     Q.   Is that common in the practice that the

24  administrators are not medically trained or not nurses?

25     A.   Sadly, yes.

1    Q.   And you worked with Eddie on a day-to-day basis,

2    basically?

3    A.   Yes, sir.

4    Q.   And I guess, at some point, you left -- you left

5    Merida and formed your own.  Did you -- did you -- did

6    you form -- did you work for someone else before you

7    formed Generous?

8    A.   I worked with Christus Santa Rosa on the med/surg

9    floor before.

10    Q.   For how long?

11    A.   For the hospital.  From 2009 to 2011.

12    Q.   Okay.  But after you left Merida in 2013 in the

13    San Antonio office, where did you work for?

14    A.   I went to CIMA.

15    Q.   Okay.  And how long were you there?

16    A.   Not too long.

17    Q.   A couple of months?

18    A.   Like three months, maybe if that.

19    Q.   When you left Merida, was Mr. Zuniga still

20    working there?

21    A.   That's correct.

22    Q.   And at some point you and Mr. Zuniga -- let me go

23    into the history of the formation of Generous?

24    A.   Yes.

25    Q.   Him and you and who else formed Generous

1    originally, was it Mr. Jimenez?

2        A.   No, Mr. Jimenez, no.

3        Q.   Okay.  Tell us who formed Generous first?

4        A.   Eddie Zuniga registered the organization.

5        Q.   Okay.

6        A.   And he came up with the name Generous Home Care

7    Management.  And he invited me into this idea.

8        Q.   And who were the original owners?

9        A.   Me and Eddie Zuniga.

10       Q.   Did Mr. Jimenez ever get involved in that?

11       A.   Not at that timeline.

12       Q.   But some time later?

13       A.   That's correct.

14       Q.   And did he become an owner also?

15       A.   That's correct.

16       Q.   And he was also working for Merida at some point;

17   was he not?

18       A.   That's correct.

19       Q.   So both you, Mr. Zuniga and Mr. Jimenez, all

20   former Merida employees, left and formed a different

21   hospice company?

22       A.   Well, when Eddie Zuniga leaves the organization

23   under threat by Rodney --

24       Q.   My question is, did you -- go ahead, I'm sorry.

25       A.   Under threat by Rodney he was forced to leave our

1   partnership.

2      Q.   So all three of you, at one point, worked for

3   Merida?

4      A.   At one point prior to Generous.

5      Q.   And all three are witnesses against Mr. Mesquias

6   at this trial, correct?

7      A.   Yes.

8      Q.   And you're -- I think you're not getting paid for

9   any type of testimony?

10     A.   No, sir.

11     Q.   And you've met with these individuals, or these

12  prosecutors a few times, at least, correct?

13     A.   Yes, sir.

14     Q.   These other agents sitting in the audience, have

15  you -- have you met with them?

16             MR. LOWELL:   Objection.  Asked and answered.

17             MR. CYGANIEWICZ:   I never asked that

18  question, Your Honor.

19             MR. LOWELL:   All of these questions have

20  been covered in cross.

21             MR. CYGANIEWICZ:   This is Cross-Examination.

22             THE COURT:   This is Cross-Examination.

23             THE WITNESS:   I've not met -- I've seen

24  faces, but I've not met with them.

25     Q.   (By Mr. Cyganiewicz)  They're all agents,

1    correct?

2         A.   I don't know.

3         Q.   Is there anyone here monitoring, or watching your

4    testimony?

5         A.   You guys.

6         Q.   Besides defense lawyers, are these people here to

7    watch you and --

8         A.   The jury?  The jury.

9         Q.   The jury, how about the -- no, the -- the people

10   in the audience?

11        A.   Well, I'm -- I don't understand your question.

12        Q.   Are the people in the audience here to watch you

13   monitor your testimony, the agents sitting?

14        A.   I would think if someone woke up today to come

15   here to see my testification, right?

16        Q.   Yeah.  And you haven't talked to them?

17        A.   No.

18             THE COURT:  Sir, you need to answer loudly.

19        Q.   (By Mr. Cyganiewicz)  Now, with Generous, you --

20   well, first, I know that they touched on this very

21   briefly, but you always said something like, a man has a

22   right to leave, or a woman has a right to leave and make

23   their own business or do their own thing, correct?

24        A.   That's the American dream, yes.

25        Q.   And I don't think you never heard, you're not

1    aware that a non-compete clause in a contract is very

2    common?

3        A.   No, I'm not aware of what non-compete is, I've

4    heard of them, but I'm not aware exactly, I've never had

5    to sign one.

6        Q.   Let me explain it.  It's when somebody -- did you

7    have a written contract with Merida when you were

8    employed?

9        A.   No, sir.

10       Q.   Some people who do have contracts with employers,

11   I'll explain a non-compete.

12       A.   Yes.

13       Q.   Reach an agreement that say if you leave this

14   office within a certain amount of time, you cannot open

15   the same business within a certain area for a certain

16   period of time.  Does that make sense to you?

17       A.   If that's what you're saying, and then that

18   explains why Eddie Zuniga left our partnership.

19       Q.   But as an owner of a hospice, you think it's okay

20   if somebody who knows all your patients, knows all your

21   information, leaves and then forms another company that

22   competes with you, you think that's -- that's their

23   right to do that?

24       A.   With all due respect, during the time of the

25   formation of this we had zero patients.

1     Q.   I'm just asking you is that the way you feel

2  about a non-compete?

3     A.   I don't understand your question.

4     Q.   Okay.  Anyway, and Mr. -- while Mr. Zuniga was

5  working for Merida, he was looking for another job,

6  he -- we -- somebody covered that, correct?

7     A.   He expressed very sensitive information to me.

8     Q.   He was looking for another job while he was at

9  Merida, right?

10     A.   He was terrified.

11     Q.   Can you --

12           MR. CYGANIEWICZ:  Judge --

13           THE COURT:  Sir, sir.

14           MR. CYGANIEWICZ:  I know you want to argue

15  with me, and.

16           THE WITNESS:  I don't want to argue, sir.

17           MR. CYGANIEWICZ:  You're not arguing?

18           THE COURT:  Gentlemen, one second.

19           Sir, please listen to the question and only

20  answer the question.

21           MR. CYGANIEWICZ:  Can you read back the

22  question and repeat the question?

23           (Question read back.)

24     Q.   (By Mr. Cyganiewicz)  Was he looking for another

25  job while working at Merida was the question?

1     A.   Not that I'm aware of.

2     Q.   And if he said that you wouldn't doubt anything

3   he said; would you?

4     A.   I -- I -- I would -- I don't know what you're

5   saying, like, I don't know --

6     Q.   What is Mr. Zuniga doing now; do you know?

7     A.   I don't know.

8     Q.   Now, getting back to running a business, what's

9   the purpose of running a business?

10    A.   What's the purpose?

11    Q.   Yes.

12    A.   (No response.)

13    Q.   Are people in business to make money or lose

14  money?

15    A.   I mean, usually, it's to make money.

16    Q.   Is there sometimes when they're in business to

17  lose money, because you said usually?

18    A.   Yeah, usually.  If you're business-mind-oriented

19  you're about money and that's it.

20    Q.   And you're in the business with Generous to make

21  money, correct?

22    A.   No.

23    Q.   You're not -- you're not -- you're not in the

24  business of making money, you don't want to make money?

25    A.   I make money, but I'm not in it for money.

1    Q.   Oh, okay.  But that's the purpose of a business

2  is to make money, correct?

3    A.   Right, but I don't have a business degree.

4    Q.   And are the costs of running a business an

5  important factor in your profit and loss?

6    A.   That's correct.

7    Q.   You try to keep costs down and -- to the best of

8  your ability?

9    A.   I'm -- I monitor and supervise responsibly, the

10  way we're using resources.

11    Q.   You try to keep costs down, don't you?  Doesn't

12  every business?

13    A.   No.

14    Q.   You'll just let people spend whatever they want?

15    A.   You're welcomed to look at my books.

16    Q.   You're telling the jury you don't care about

17  costs, but you'll let them do whatever they want?

18    A.   If the patient needs something I give it to them.

19    Q.   Okay.  And what -- what is a census?  You've

20  heard that term used in a hospice business, correct?

21    A.   That's correct.

22    Q.   Is that just a good fancy name for the number of

23  patients you have?

24    A.   It's a common word that's used in the hospital

25  setting, hospitals and in organizations regards --

1    Q.   My question --

2    A.   -- how many doctors refer to the census as to the

3    amount of patients that are on service.

4    Q.   What is a census?

5    A.   I just gave you the definition.  Basically, a

6    census is a common word that nurses and doctors use in

7    hospital, whether it be in home health and hospice, and

8    it's used to determine the amount of patients that are

9    on service.

10   Q.   Census is an amount of patients?

11   A.   Yes.

12   Q.   There's no -- no confusion about that, correct?

13   A.   Correct.

14   Q.   And have you a census in hospice, in your company

15   now; do you not?

16   A.   Yes, sir.

17   Q.   I think I mentioned Mr. Zuniga, but Mr. McInnis

18   is not a nurse or doctor, correct?

19   A.   Correct.

20   Q.   You're familiar with the hospice rules and

21   regulations, I think you testified to?

22   A.   Some, not all.

23   Q.   Okay.  Okay.  Were you -- did you say that you --

24   okay.

25          And is a nurse -- is an administrator allowed to

1    certify patients?

2       A.   No.

3       Q.   Recertify patients?

4       A.   No.

5       Q.   Make entries on any medical reports?

6       A.   No.

7       Q.   Can they go in and change medical reports?

8       A.   They shouldn't.

9       Q.   And that's what -- that's what your

10   administrator -- your administrator is not a nurse at

11   this point, correct?

12      A.   My administrator for my organization, Generous,

13   is a nurse.

14      Q.   Okay.  So they -- your administrator can certify

15   patients?

16      A.   If -- if necessary, however, we have different

17   departments built to oversee.

18      Q.   Now, there's different regulations, I think you

19   said, or different regulations for hospice as compared

20   to -- to home health, correct?

21      A.   That's correct.

22      Q.   And I think you -- you mentioned the word CMS,

23   and I know we've heard that before.  Can you explain to

24   the jury what CMS is?

25      A.   So CMS, basically, puts the guidelines forward

1    for patients and organizations, right, so if you ever

2    have a question about the organization that's currently

3    giving you a service, or your loved one, you can go

4    there and look at what your rights are, you can go there

5    and look at what the regulations are, and to -- it's an

6    open source way of getting informed about health care

7    with regards to CMS.

8        Q.   You're familiar with some of the CMS regulations?

9        A.   Yes, sir, some of them.

10       Q.   Do they -- what, do they govern or keep track of

11   Medicare; is that -- what's the relationship between

12   Medicare and CMS?

13       A.   Medicare is actually going to be the funding part

14   of it.

15       Q.   Right, and CMS runs it for Medicare, basically?

16       A.   It's basically supposed to be a type of oversight

17   and it spells out the regulations for it.

18       Q.   And are those regulations published?

19       A.   Yeah, they're open source.

20       Q.   And do you -- do they hand out information, or

21   checklists, or pamphlets, CMS, on -- on regulations?

22       A.   They -- they submit magazines, I believe, to

23   patients and --

24       Q.   How about to the providers?

25       A.   I'm sure, yeah, to our organization they also

1    send regular letters.

2        Q.   They send you regular things on the new

3    regulations and what you should do and not do, correct?

4        A.   That's right.

5        Q.   And do they make recommendations at times on what

6    to do?

7        A.   They -- the latest I've seen as the -- there's a

8    loft of change that's been happening, and I try to keep

9    up as best as I can.

10       Q.   All right.  And that's not easy at times, is it?

11       A.   It's a lot.

12       Q.   And they inform you of those changes, correct?

13       A.   You have to take the initiative to go in there

14   and look for yourself.

15       Q.   And do they tell you what the regulations are,

16   CMS?

17       A.   Just the changes that's coming and the timeline.

18       Q.   So it's important for you, or anybody in a

19   hospice business to keep track of those and keep updated

20   on those; is that right?

21       A.   That's correct.

22       Q.   Okay.  And what is a joint commission, I heard

23   you use that phrase?

24       A.   Joint commission is the accreditation part.  They

25   also help you keep in -- in compliance with CMS.  It's

1    actually a higher standard than CMS.

2        Q.   Okay.  And do they make recommendations on what

3    you should do and advise nurses, or recommend on how

4    it --

5        A.   They have a better practice library.  They have

6    a -- a large amount of volumes that if you ever have

7    questions, you can go to them for resources.

8        Q.   Okay.  So did -- nurses go out to visit patients

9    in the homes, correct?

10       A.   That's correct.

11       Q.   And just for example, if they're certifying

12   someone or recertifying -- recertifying someone for

13   hospice, is there a checklist that they have to go down?

14       A.   Yes, sir.

15       Q.   Okay.  Would you -- is there also a place -- I

16   think we've seen of places where there's narratives

17   where they can write notes?

18       A.   Yes, sir.

19       Q.   Do you train your nurses on how to properly do

20   that?

21       A.   Yes, sir.

22       Q.   Okay.  Do you agree that it's probably better to

23   be more specific than vague?

24       A.   I -- that -- what -- what -- I -- I can say to

25   the question that it's important we paint a clinical

1  picture that's relevant to the patient.

2      Q.   Okay.  And that's the more specific, probably the

3  better?

4      A.   It's just the way you word it, but --

5      Q.   I'm just trying to think, are they general terms,

6  or does a nurse go into specifics.

7      A.   They have to paint a picture of the clinical

8  scenario based on their physical assessment, that's

9  head-to-toe.

10     Q.   And does a picture, painting of a picture include

11  how -- how the patient has progressed, or changed from

12  the previous encounter with the nurse?

13     A.   Right.

14     Q.   How -- if it's improved in appetite or not

15  improved or --

16     A.   There's sections there, yeah.

17     Q.   And they're all in a checklist?

18     A.   They're -- they're on the checklist as far as the

19  way the system is -- is there on the clinical note, it

20  just kind of points you one to the next page.

21     Q.   Are the -- are the nurses required, or maybe not

22  required, should they note changes in a patient's

23  condition?

24     A.   Right, I mean that's our obligation to assess

25  them, identify and report.

1    Q.   And how -- how do they assess certain areas, for

2  example, how would they assess somebody's food intake?

3  Is there a test that they do?

4    A.   Sometimes they have -- if the patient comes out

5  of the hospital with a swallow study, there will already

6  be documentation that supports the fact that they are

7  unable to swallow and they're having aspirations, things

8  of that nature.

9         And other times, individuals, as they progress in

10  their illness, they -- they have the inability to

11  swallow.

12    Q.   How about their ability to -- to eat?

13    A.   Which is likewise.

14    Q.   Ability to walk?

15    A.   Ability to walk.

16    Q.   That's my point is I'm not trying to confuse you

17  is that it's more -- it's better to be more specific and

18  to track the patient's progress from previous visits; is

19  that right?

20    A.   It's really important so that you can hand off

21  report to the next nurse that comes in so we can get a

22  better picture.   The more information we can have, it

23  helps the next nurse that works with the patient.

24    Q.   The more information, the better.   That's what --

25  that's what you said?

1    A.   With regards to the clinical picture.

2    Q.   Of course.  And if a nurse, or anybody described

3    a patient as either good or better, would that be --

4    A.   Those terminologies, I discourage them in our

5    organization because they don't really quantify.

6    Q.   They don't show the picture, do they?

7    A.   They don't.

8    Q.   They don't compare to the way the patient was

9    progressing, does it?

10   A.   Yeah, it's -- we discourage that kind of

11   documentation in our organization.

12   Q.   I just wanted to see you if would agree with me

13   on that, that the more the better, basically, and you

14   discourage that very general vague wording in your

15   business?

16   A.   Right, because good could be very different.  And

17   when it comes to clinical situations, that word isn't --

18   Q.   Now, what happens -- what is quality assurance?

19   A.   Quality assurance, what they call is that we're

20   looking at a -- a wide variety of situations, right.

21   Q.   And who's we?

22   A.   The administration part.

23   Q.   Okay.  Is it the nurses or doctors?

24   A.   At this point, it's nurses, right, and we sit

25   with doctors, if necessary.

1    Q.   Right.

2    A.   To kind of look at -- let's say, if there's a

3    trend of UTIs, let's say for whatever reason this month

4    we've had several falls, or we've had several UTIs,

5    perhaps, we need to look into trying different methods

6    to reduce those falls, or -- or reduce those UTIs, maybe

7    washing our hands more often and taking those right

8    steps to prevent these situations.

9    Q.   And I'm sorry, I should probably know this, but

10   what's a UTI?

11   A.   A urinary tract infection.

12   Q.   So if -- if -- well, just can you go through the

13   logistics on how something gets to quality assurance?

14   Say for example, a nurse goes out, fills out a form and

15   says, good, better, very vague, what's the next step in

16   that?

17   A.   In quality assurance, it doesn't involve good or

18   very vague.

19   Q.   I'm just using as an example.  Does it involve

20   looking at or checking people's records?

21   A.   What it involves is running a -- a battery of

22   labs, if we have to run labs to check if there's an

23   organism growing in the -- and see if culture and

24   sensitivity, it involves the whole thing we have to

25   report it.  So let's say if UTI got identified early

1  enough, then what we're going do is track that

2  infection, that's quality assurance, for the next seven

3  days or two weeks until it gets resolved, if that gets

4  resolved or not.

5      Q.  Is quality assurance that actually will send the

6  record back to -- for more clarification, or for

7  changes, or something like that?

8      A.  Quality assurance teaches the organization where

9  our weaknesses are as far as how we're delivery care,

10  perhaps, we need to train more on how to reduce falls,

11  so when you get trends and you analyze the data, you can

12  identify that data and find plan to educate your staff.

13      Q.  Educating your staff is -- I'm sorry.

14          MR. LOWELL:  Excuse me.  Your Honor, we'd

15  object, relevance outside the scope, we didn't talk

16  about quality assurance.

17          MR. CYGANIEWICZ:  He says he's in a hospice

18  business, Your Honor.  He talked about hospice

19  regulations.  This is just general cross about how

20  quality assurance and ITD and these things work, it's

21  been testified throughout the entire trial.  I'm not

22  restricted to what he's asking on Cross-Examination,

23  Your Honor.  On re-cross, yes.

24          THE COURT:  All right.  Go ahead,

25  Mr. Cyganiewicz.

1    Q.   (By Mr. Cyganiewicz )  Is quality assurance --

2    well, let me back up.  What if there's a disagreement

3    amongst nurses about a patient's prognosis, or

4    diagnosis, who intervenes at that point?

5    A.   It needs to be taken very serious so --

6    Q.   I know, but my question -- I'm not asking you for

7    serious, how is that resolved?

8    A.   Well, you see they have an ITG team, right.

9    Q.   Does quality assurance get involved is my

10   question?

11   A.   Yes.

12   Q.   And are there -- okay.  Let me get into this, is

13   it IDT, or is there second initials for those type of

14   meetings?

15   A.   They call it IDT, IDG.

16   Q.   So an IDT or IDG.

17   A.   It's the same.

18   Q.   You do those then in your business now, correct?

19   A.   That's correct.

20   Q.   And we've heard some testimony about it, can you

21   just explain to me on what -- who was involved in those

22   meetings?

23   A.   Right.  So they -- the group, which is the

24   doctor, the nurse, the psyche social team, the CNA,

25   whoever's in -- in contact with those patients, sit down

1    together and they discuss the cases and the challenges

2    they're currently working with.

3        Q.   And generally, it wouldn't be an administrator

4    like Mr. Zuniga involved in it; would it?

5        A.   Oh, no.

6        Q.   Who was the -- when you were in San Antonio, who

7    was the director of nurses?

8        A.   Amy Cooley.  With regards to Merida?

9        Q.   Yeah, in San Antonio when you were working there

10   who was the director of nurses?

11       A.   Amy Cooley.

12       Q.   And you're saying she committed some sort of

13   fraud?

14       A.   She facilitated it.

15       Q.   And you -- you basically admitted you committed

16   fraud?

17       A.   I admit it, yes.

18       Q.   And other people at Generous committed fraud?

19       A.   No, I -- I admitted that I committed fraud.

20       Q.   And you haven't been charged with any kind of

21   fraud charge; have you?

22       A.   I haven't been charged, but I'm admitting here

23   openly.

24       Q.   Right.  And that's from -- is it even too late to

25   charge you; do you know?

1    A.  I don't know, I'm here to testify.

2    Q.  You have not -- as you sit here today, you've not

3 been charged with that?

4    A.  I'm here to testify.

5    Q.  And that's a no to my question, you've not been

6 charged?

7    A.  I've not been given a formal charge, but we're

8 here to testify.

9    Q.  We know you're here to testify.

10     Did Mr. Zuniga -- did you say Mr. Zuniga

11 performed -- facilitated fraud at Generous?

12    A.  Yes.

13    Q.  Was he charged with any type of fraud offense?

14    A.  I don't know.

15    Q.  Okay.  Who else at Generous committed fraud?

16    A.  As far as I'm concerned, me.

17    Q.  How about Arturo Guerrero?  You said he committed

18 fraud; did he not and was he charged?

19    A.  You mean Antonio?

20    Q.  Yes, what did I say Arturo?

21    A.  Merida, though.

22    Q.  Okay.  Has he been charged?

23    A.  I don't know.

24       THE COURT:  I'm sorry, who were you

25 referring to Antonio?

1          MR. CYGANIEWICZ:  Arturo Guerrero.

2          Antonio Guerrero, excuse me.

3          THE WITNESS:  He was with Merida.

4     Q.  (By Mr. Cyganiewicz)  But he has not been

5  charged?

6     A.  I don't know.

7     Q.  Do you know if Dr. Gonzaba has been charged with

8  any type of fraud?

9     A.  I don't know.

10    Q.  Do you know who -- was Amy Cooley the director of

11 nurses when you left?

12    A.  That's correct.

13    Q.  You know who followed her?

14    A.  Who followed her?

15    Q.  Yes.

16    A.  What does that mean?

17    Q.  Who followed her as director of nurses; do you

18 know?

19    A.  Like her -- like an aide, someone below?

20 Gabriel, some guy named Gabriel.

21    Q.  Gabriel Gonzalez?

22    A.  I don't know his last name.

23    Q.  You know Janina Gonzales, did you meet her at

24 Merida?

25    A.  No, I -- I don't know her.

1     Q.   And I think you -- you said something about

2   Generous has patients that have been recertified more

3   than five times, correct?

4     A.   That's correct, sir.

5     Q.   Did you report any type -- I know -- I think

6   you've -- you're classing yourself -- classifying

7   yourself as a volunteer, correct?

8     A.   I'm volunteering.

9     Q.   Okay.   It's commonly called an informant, did --

10  you don't like that word, or has anybody characterized

11  you as a snitch, or an informant, or a confidential

12  source?

13    A.   Today is the first time that I hear that.

14    Q.   In your eyes you're a volunteer?

15    A.   I see myself.

16    Q.   Out of the goodness of your heart?

17    A.   That's correct.

18    Q.   You're not doing it to help the Government, or to

19  go along with their narrative?

20    A.   I just want an end to all this, I'm coming out

21  with the truth.

22    Q.   I know you mentioned this guy, Karam, is it,

23  K-a-r-a-m, a few times?

24    A.   Karam.

25    Q.   Was he main your marketer in San Antonio?

A.   He was at some point.

Q.   Did he -- did he bring you a -- provide a bunch
of patients?

A.   He did.

Q.   More than anybody else?

A.   (No response.)

Q.   If you don't know, that's fine, but he gave you a
lot of patients, correct?

A.   Yes.

Q.   And how did you pay him?

A.   I -- he had a salary.

Q.   Okay.  Did he have a contract also?

A.   No.  Or not that I remember.

Q.   Do you remember Mr. Karam giving Dr. Virlar
$8,000?

A.   No.

Q.   A bribe, no?

A.   No.

Q.   So isn't that how Dr. Virlar got involved in this
case and got arrested?

A.   No.

Q.   Do you -- do you know about Dr. Virlar, the --
Dr. Virlar's house being raided after he gave Mr. Karam
$8,000?

A.   No, sir.

1    Q.   And do you know that's the reason why Mr. --

2  Dr. Virlar made a deal with the Government?

3    A.   I don't -- I don't -- all this is new information

4  for me.

5    Q.   I know you talked about conversations you had

6  with Dr. Pena, were you ever asked by any agent to go

7  out and try to tape somebody else?

8    A.   No.

9    Q.   I think, did you talk about a conversation

10 Dr. Virlar had at a restaurant -- yeah, you -- that was

11 recorded, correct?

12   A.   It was a recorded conversation.

13   Q.   Have you listened to that conversation?

14   A.   No, no.

15   Q.   Do you know why the Government hasn't played it

16 yet, or do you know if they plan to?

17   A.   I -- I don't know, they don't tell me much.

18   Q.   And I think you said you're also wired at another

19 time on an unrelated incident?

20   A.   That would be that one.

21   Q.   That one, okay.  I think the last thing you said

22 before lunch was, I failed to tell the Government the

23 truth and I lied to them.

24   A.   Yes, sir, I did.

25   Q.   Did -- are you talking about these people, the

1    prosecutors, that you failed to tell them the truth and

2    lied to them?

3        A.   Right, I didn't disclose my full information that

4    I had.

5        Q.   But today you're -- want the jury to believe

6    you're telling the whole full truth, right?

7        A.   I'm here because --

8        Q.   As a volunteer?

9        A.   -- it's the right thing, that's all.

10       Q.   To -- to -- out of goodness of your heart?

11       A.   Yes, sir.

12                MR. CYGANIEWICZ:   Thank you.

13                Pass the witness, Your Honor.

14                THE COURT:   Mr. Lowell?

15                MR. LOWELL:   Thank you, Your Honor, may I

16   proceed?

17                THE COURT:   Yes, sir.

18                     REDIRECT EXAMINATION

19   BY MR. LOWELL:

20       Q.   Good afternoon, Mr. Aguilar.

21            On Cross-Examination, counsel for Francisco Pena,

22   Robert Guerra, was asking you some questions about

23   Mr. Pena; do you remember those questions?

24       A.   I --

25       Q.   Not every one of them, do you remember questions

1    about a peg tube?

2        A.   Yes, sir.

3        Q.   And do you remember questions about conversations

4    between Mr. Pena and the family members regarding the

5    peg tube?

6        A.   Yes, sir.

7        Q.   Were you present for some of those conversations?

8        A.   Yes, sir.

9        Q.   Could you tell the jury what Mr. Pena would say

10   during those conversations?

11       A.   So --

12               MR. GUERRA:   Objection, Your Honor.   This

13   was already covered by counsel during Direct

14   Examination, it's repetitive.

15               MR. LOWELL:   He opened the door.

16               THE COURT:   That's overruled.

17       Q.   (By Mr. Lowell)  You may proceed.

18       A.   So basically, in the moments of someone's last

19   moments that it becomes a scenario where families are

20   the most vulnerable and they don't want their loved one

21   to die and then circumstances -- they need to have a peg

22   tube, you need to have one, you need to get them in

23   there or they're going to die.   And just putting

24   families on the edge.

25               And it's not really giving them a -- it's just a

1    one-sided situation about consequences about getting

2    this procedure done, or just kind of putting them in a

3    point of panic.  And a lot of these families, they --

4    they're low income and, you know, they -- they trust in

5    us and we fail them.

6         Q.  Would it be fair to say that those family members

7    were manipulated?

8         A.  Definitely.

9         Q.  How so?

10        A.  Well, he'll -- the options are -- are given on

11   the table, it's just one-sided, you, you need this peg

12   tube, or he's going to die.  And it's, you know, they

13   don't consider the fact of the relationship, maybe

14   between a son and -- and their father.  At some point,

15   it's like, is this really what your father would have

16   wanted.  It's not the family's decision, it's not, you

17   know, their decision it's Mr. Pena's decision that this

18   needs to be done because I'm the doctor.

19        Q.  How, if at all, did that benefit Mr. Pena?

20        A.  It continues to make money.  I mean, you're --

21   you keep the patient alive, and you still continue to

22   make money.

23        Q.  Now Mr. Aguilar, you were asked questions on

24   Cross-Examination by Charles Banker, that's counsel for

25   Rodney Mesquias, about your time at the Merida Group,

1  okay?  I want to go back to that timeframe.  You were a

2  nurse; is that right?

3      A.   That's correct.

4      Q.   And you visited patients in San Antonio?

5      A.   Yes, sir.

6      Q.   In Laredo?

7      A.   Yes, sir.

8      Q.   And during your time as a nurse at the Merida

9  Group, what if anything did you observe about the

10  medical records?

11     A.   They're just --

12              MR. BANKER:  Your Honor, I'm going to

13  object.  That's been asked and answered.

14              MR. LOWELL:  Mr. Banker asked questions

15  about his time at the Merida Group, I'm just exploring.

16  He opened the door.

17              MR. BANKER:  I think --

18              MR. LOWELL:  I'm asking Mr. Aguilar to

19  elaborate on his experience there.

20              MR. BANKER:  I believe that was part of the

21  record originally, he asked that same question as I

22  recall.

23              THE COURT:  Rephrase the question in terms

24  of the questions that Mr. Banker asked.

25              MR. LOWELL:  Yes.

1        Q.   (By Mr. Lowell)  Mr. Aguilar, you were asked

2   questions by Mr. Banker about fraud at the Merida Group;

3   do you remember those questions?

4        A.   Yes, sir.

5        Q.   Did you see fraud at the Merida Group?

6        A.   Yes, sir.

7        Q.   What, if any -- what if any fraud did you see

8   with respect to the medical records?

9        A.   It -- they're several inconsistencies on the

10   chart.  So as a nurse, as we're going to go out to

11   recertify a patient, there was -- sometimes there was no

12   wounds that we're supposedly treating.  Sometimes the

13   patient's diabetic, but he's not diabetic, sometimes the

14   patients have -- is hypertension and they're not

15   hypertensive.  So there were many circumstances that

16   just -- they didn't match and, you know, so you had

17   these extensive diagnoses that were made up.

18        Q.   Now, what if any fraud did you observe with

19   respect to homebound patients at the Merida Group?

20        A.   There was many patients who were not homebound

21   and it made --

22            MR. BANKER:  Your Honor, I'll object.  He

23   talked about some details of what he witnessed on direct

24   testimony.  I think this is just a repetition of what

25   was stated on direct, I mean, he -- he talked about that

1  clearly.

2             THE COURT:  It's overruled in part and

3  sustained in part.

4             Rephrase the question, limited in scope to

5  Mr. Banker's question.

6             MR. LOWELL:  What was Mr. Banker's question?

7  Mr. Banker's question was about what fraud he observed

8  at the Merida Group, and I'm just simply trying to

9  clarify the record.

10            MR. BANKER:  My question about that was

11  about Dr. Pena, whether he observed any fraud on

12  Dr. Pena's part.  I didn't go -- they had already gone

13  into his testimony about what he says he saw at Merida

14  Group.

15            THE COURT:  That's overruled.  Answer the

16  question, if you know.

17            THE WITNESS:  Can you just repeat the

18  question?

19    Q.  (By Mr. Lowell)  Yes.  What, if any, fraud did

20  you observe in relation to the homebound patients at the

21  Merida Group?

22    A.  So basically, a lot of families were very hard to

23  find.  Usually, because they were out doing things.  And

24  when we did find them, they would -- they would voice,

25  like hey, guys, why are you guys keep coming, oh, with

1    your doctor, your doctor.  So we're instructed to -- to

2    use the excuse that it's the doctor who wants this --

3    who wants us to go out there and continue to recertify

4    them.

5         And you know, he says, hey, you know, I'm busy, I

6    got things to do, either they're out shopping or, like

7    they're just -- there's no skilled need, there's no

8    reason to have a nurse in that home.

9    Q.   And Mr. Banker also asked you questions about

10   Francisco Pena and what you observed about Mr. Pena at

11   the Merida Group; do you recall those questions?

12   A.   Yes, sir.

13   Q.   What if any fraud did you observe in connection

14   with Mr. Pena?

15   A.   What I could say about that is when I got to

16   Laredo and we had -- there was a stack of -- that Rodney

17   was upset those patients didn't get admitted.  And the

18   new nurse that was there, you know, was concerned,

19   voiced to me, hey, look they didn't qualify, but now I

20   have to go out with him to see these patients that

21   didn't qualify for neither home health nor hospice.

22   What I could tell is from that angle, and some of those

23   patients that -- that we did see -- that I did see with

24   that nurse that day, they ended up on Generous.  They

25   never -- they never -- they never, you know, and

 1    they're -- it was like peg tube patients, so and you're

 2    talking years apart.  Some of them have died now on our

 3    service, but it's -- it's -- it's just -- it is what it

 4    is.

 5              MR. LOWELL:  Your Honor, I'll pass the

 6    witness.

 7              THE COURT:  Mr. Guerra.

 8              MR. GUERRA:  Thank you, Your Honor.

 9                     RECROSS-EXAMINATION

10    BY MR. GUERRA:

11    Q.  Mr. Aguilar, you just testified with Mr. Lowell

12    right now that Dr. Pena wanted these individuals on a

13    peg tube because he continued to make money, correct?

14    A.  Yes, sir.  Yes, sir.

15    Q.  You continued to make money too as a result of

16    that, correct?

17    A.  Yes, sir.

18    Q.  Did you give that money back?

19    A.  Did I give the money back?

20    Q.  Yeah.

21    A.  I just ran an organization.

22    Q.  I understand you run an organization, sir, but

23    obviously that bothered you, correct?

24    A.  I -- I don't understand, if it bothers me to run

25    an organization.

1    Q.   No, well, I don't know if it does or does not,

2    but when I say it bothers you, it bothered you in your

3    testimony that Dr. Pena would advocate for a peg tube,

4    correct?

5    A.   What bothered me about the situation was that he

6    wasn't allowing the family to make a choice.  That

7    bothered me.

8    Q.   That he didn't allow the family to make a choice?

9    A.   Yes, sir.

10   Q.   Even though Dr. Pena was the only medical

11   director making a decision for the benefit of that

12   patient, correct?

13   A.   He was making a decision for himself.

14   Q.   And you too, correct?

15   A.   Well --

16   Q.   I mean, Dr. Pena wasn't -- wasn't directly

17   receiving benefits as a result of the insertion of a peg

18   tube; was he?

19   A.   It was the kickbacks.

20   Q.   Oh, I'm sorry, but, yes, but Generous made money

21   the longer the patient was on hospice, correct?

22   A.   Yes, sir.

23   Q.   You are Generous, correct?

24   A.   Yes, sir.

25   Q.   You made money?

1    A.   We made money, me and Pena made money, yes.

2    Q.   Okay.  But you made money as the owner of

3    Generous as a result of these actions, correct?

4    A.   Correct.

5    Q.   And the original question I had for you, sir, was

6    did you give that money back?

7    A.   Well, I've paid my taxes, I continued on trying

8    to do better.

9    Q.   You paid your taxes?

10   A.   Not completely but I'm almost there.  I've made

11   arrangements.

12   Q.   Yes, but did you give that money back to

13   Medicare?

14   A.   Yes, we're actually paying back.

15   Q.   How many times?

16   A.   On those patients, I'd have to look at the books,

17   but we -- we are paying back on those patients.

18   Q.   How much?

19   A.   Like 13,000 a month, it depends on a case by

20   case.

21   Q.   You're making payment back to Medicare $13,000 a

22   month; that right?

23   A.   Right.

24   Q.   Was that based on any sort of agreements, or

25   administrative action you had with Medicare?

1    A.   It's just normal procedures that they have when a

2    patient lives beyond the six months.

3    Q.   You have to give the money back?

4    A.   Yes, sir.

5    Q.   At the end of the day you didn't disagree with

6    Dr. Pena's medical decision, you disagreed with his

7    bedside manner; is that right?

8    A.   I disagreed with his -- with his medical

9    decisions because it was just so one-sided.

10   Q.   So then as the owner of the company you fired

11   him?

12   A.   As the owner of the company it reached the point

13   that, yes, we couldn't work with the guy.

14   Q.   When did you fire him again?

15   A.   I wouldn't know, I would have to look at the

16   record.

17   Q.   Okay.  You have a very clear memory as to a lot

18   of things, but you don't have a clear memory as to when

19   you fired this man who's your medical director, but you

20   disagreed with the medical judgment?

21   A.   I disagreed with his medical judgment because it

22   was so one-sided.

23   Q.   Right, so you can recall many things and many

24   details, but you can't recall when you fired this man?

25   A.   Right, I mean, not the dates, I'd have to look

```
1   back.
2      Q.   Okay.  And you can't recall when you fired this
3   individual who you claim you disagreed with his bedside
4   manner, correct?
5      A.   I -- I'd to look back, but I -- I'm -- I'm
6   testifying what I saw.
7      Q.   And you disagreed with his general attitude,
8   correct?
9      A.   Very much.
10     Q.   Yet, you kept him on?
11     A.   That's correct.
12     Q.   Were you subpoenaed to be here today, sir?
13     A.   Yes, sir.
14     Q.   Was this the first time you've ever testified in
15  Court?
16     A.   Yes, sir.
17              MR. GUERRA:  Pass the witness, Your Honor.
18              THE COURT:  Mr. Banker?
19              MR. BANKER:  Thank you, Your Honor.
20                       RECROSS-EXAMINATION
21  BY MR. BANKER:
22     Q.   Mr. Aguilar, the prosecutor asked you about
23  things you noticed at Merida in the -- in the health --
24  home health and the hospice, correct?  I mean, we -- you
25  went into some -- some detail there?  You had five -- at
```

1    least five meetings with the Government that you've

2    talked about here earlier, right?

3         A.   That's correct.

4         Q.   And -- and when did you first tell the Government

5    about what you -- what you said here today?

6         A.   I -- it must have been one of those

7    conversations, like one.

8              THE COURT:  Sir, you need to speak up.

9              THE WITNESS:  It must have been at least one

10   of those conversations.

11        Q.   (By Mr. Banker)  So do you remember specifically

12   what you told them?

13        A.   I just gave the information that I had.

14        Q.   And you don't remember which conversation it was?

15        A.   I -- I don't remember.

16        Q.   The fact of the matter is you felt tremendous

17   pressure to go along with the narrative of the

18   Government here?

19        A.   No, sir.  No.

20        Q.   The fact of the matter is when Karam's office was

21   raided, you thought you were a target, right?

22        A.   No, sir.

23              MR. LOWELL:  Objection, asked and answered.

24              THE COURT:  That's been asked and answered,

25   move on.

1    Q.   (By Mr. Banker)  And as a result of that, there's

2  a pressure over you now --

3    A.   No, sir.

4    Q.   -- to talk about what the Government wants you to

5  say, right?

6    A.   No, sir.  No pressure.

7    Q.   No pressure?

8    A.   No pressure.

9    Q.   So you didn't feel any pressure that day they

10  came in and raided that office?

11    A.   I didn't feel -- I was concerned for Karam, but I

12  had -- I had no pressure.

13    Q.   The fact of the matter is you were concerned with

14  you?

15    A.   With me?

16    Q.   With yourself, right?

17    A.   No.

18    Q.   It was -- it was within Generous, correct?

19    A.   I -- I did not do the fraud on the creams.

20    Q.   Well, in your heart of hearts you may not have

21  thought you did, but you didn't know whether the

22  Government knew you had or not, right?

23    A.   I -- I -- I do what I got to do, and if I have --

24  if I owe something, I'll pay for it.

25    Q.   You did what you had to do, and you went along in

1   those five meetings with the Government's narrative

2   because you were afraid that you would get caught up in

3   that same scheme, right?

4       A.   That is not true at all.

5       Q.   Who mentioned -- who first mentioned Rodney

6   Mesquias to you in those meetings?

7       A.   No one, I -- in 2014, I put a report to FBI about

8   Rodney Mesquias.

9       Q.   Well, you've already stated in your other

10  Cross-Examination I did of you, that you did that

11  because of what you said were threats to you and Zuniga,

12  right?  That's why you made that -- that report?

13      A.   Right.  I made that 2014 report because Rodney

14  was very aggressive during those times.

15      Q.   Okay.

16      A.   To the point --

17      Q.   You've answered that, you've answered that,

18  right?  You -- you've already stated you made that

19  report and you made that report, you stated, on my

20  Cross-Examination because of his aggressive nature

21  toward you and Zuniga, right, that's what you stated

22  earlier?

23      A.   Right.

24      Q.   Okay.  You didn't say anything about any kind of

25  fraud, right, you just said --

1    A.   No, it was -- it was -- I put the -- if you could

2    see the report, if they have it, I -- I put the --

3    everything there, everything that needed to be said.

4    Q.   Have you seen the report?

5    A.   I haven't seen it.   The last I saw it I erased

6    it.

7    Q.   I'm sorry, you what?

8    A.   The Government should have it.

9         The last I saw it I erased it from my computer,

10   but in 2014 I submitted a formal report regarding

11   criminal activity of this man.

12   Q.   So have you seen it when you met with the

13   Government agents at all, did they show it to you, hey,

14   what about this?

15              MR. LOWELL:   Objection.   Asked and answered.

16   Outside the scope.

17              THE COURT:   It is outside the scope.   Let's

18   move on.

19   Q.   (By Mr. Banker)   So you think you remember

20   vaguely saying something about Rodney in one of those

21   meetings and that's it, right?

22   A.   It came up, the same report, whatever was in the

23   report it came out.

24   Q.   In preparation for this trial, though, you met

25   with the Government on many occasion, right?

1            MR. LOWELL:  Objection, asked and answered.

2            MR. BANKER:  I don't think he answered that

3    one, Judge.  I didn't ask that one.

4            THE COURT:  It's been -- he estimated five

5    times.

6            MR. BANKER:  No, I'm talking about in

7    preparation for trial.  I didn't --

8            THE COURT:  All right.  I'll --

9    Q.  (By Mr. Banker)  In preparation for trial, did

10   you meet with the Government agents?

11   A.  Yes, sir.

12   Q.  Okay.  And they went over with you what you're

13   supposed to say here today, right?

14   A.  No, sir.

15   Q.  They went in detail about this Rodney Mesquias

16   question, right?

17   A.  No, they -- they told me to testify.

18   Q.  Okay.

19   A.  To tell them what I know.

20   Q.  Do you know when you had those meetings with the

21   Government agents back whenever that was, two years ago,

22   were they recording that conversation?

23   A.  I don't know.

24   Q.  Were they writing notes about your conversation?

25   A.  I don't know.

```
 1      Q.   How many Government agents were there when you
 2   talked about that?
 3      A.   I don't know.
 4               MR. LOWELL:  Objection, outside the scope.
 5               THE COURT:  That's sustained.
 6               MR. BANKER:  I'll pass the witness.
 7               THE COURT:  Mr. Cyganiewicz?
 8               MR. CYGANIEWICZ:  Nothing further,
 9   Your Honor.
10               THE COURT:  Thank you, sir.  Anything else?
11               MR. LOWELL:  Nothing further, Your Honor.
12               THE COURT:  Thank you, sir.  You may step
13   down.
14               Before we call the next witness, does
15   anybody need a quick break?  Going once.
16               Next witness, please.
17               Sir, you may step down.
18               THE WITNESS:  Okay, thank you.
19               MR. SWARTZ:  Thank you, Your Honor.  The
20   Government calls Janina Gonzales.  Ms. Espinoza, I'm
21   going to use the ELMO.
22               THE CLERK:  ELMO?  Raise your right hand.
23               (Witness sworn in.)
24               THE WITNESS:  I do.
25               THE CLERK:  Thank you.
```

1          THE COURT:  Thank you.  Please make yourself

2    comfortable, but position the microphone and base

3    closely to you and speak loudly and clearly into the

4    microphone, okay?

5          Please proceed, Mr. Swartz.

6          MR. SWARTZ:  Thank you, Your Honor.

7                    DIRECT EXAMINATION

8    BY MR. SWARTZ:

9    Q.  Good afternoon.

10   A.  Good afternoon.

11   Q.  Would you please tell the jury your name.

12   A.  Janina Gonzales.

13   Q.  Ms. Gonzales, what city or town do you live in

14   currently?

15   A.  Harlingen, Texas.

16   Q.  Are you a licensed nurse?

17   A.  Yes.

18   Q.  What sort of license do you have?

19   A.  Registered nurse.

20   Q.  Where did you get your -- where did you go to

21   school to become a registered nurse?

22   A.  Originally, here in Brownsville, the UT-B.

23   Q.  You're going to have to speak up just a little

24   bit.

25   A.  Sorry.  UT-B, University of Texas in Brownsville.

1    Q.   Thank you.   What year was that?

2    A.   2010.

3    Q.   Where did you work immediately after getting your

4  RN license in 2010?

5    A.   Valley Baptist Medical Center in Harlingen.

6    Q.   How long did you work there?

7    A.   About two-and-a-half years.

8    Q.   What sort of position did you have at Valley

9  Baptist?

10    A.   Lastly, charge nurse, but initially just a floor,

11  a regular floor nurse on a medical surgical floor.

12    Q.   At some point after working at Valley Baptist,

13  did you come to work at a company called Bee Caring

14  Hospice?

15    A.   Yes.

16          THE COURT:   Again, ma'am, you're going to

17  have to speak loud.

18          THE WITNESS:   Sorry.   I feel like I'm

19  yelling.

20          THE COURT:   Go ahead and pretend you're

21  yelling.

22          THE WITNESS:   Yes, I worked at Bee Caring

23  Hospice.

24    Q.   (By Mr. Swartz)   Thank you, ma'am.

25          I'm placing on what's -- placing Government's

1    Exhibit L-1 on the monitor.  It should appear right in

2    front of you.  And I'm going to zoom in on the bottom.

3         Does that show Bee Caring Hospice?

4    A.   Yes.

5    Q.   Is that where you worked?

6    A.   Yes.

7    Q.   How long did you work there?

8    A.   No longer than six months.

9    Q.   From, approximately, what -- what time period to

10   what time period?

11    A.   October 2012 until about March/April 2013.

12    Q.   Who was the owner of Bee Caring Hospice?

13    A.   Rodney Mesquias.

14    Q.   Did you interview with anybody in particular for

15   the job?

16    A.   I did at that time the DON, the director of

17   nursing was Jose Louis, I interviewed initially with

18   him, and then I went back and had like a second

19   interview with Rodney.

20    Q.   So when you -- after you interviewed with

21   Mr. Mesquias and you were brought on to Bee Caring

22   Hospice, what were your duties?

23    A.   I was hired to be a case manager, or what that

24   means is you're working inside the office handling

25   patient's information, all patient data, so I believe

1    around that timeframe, give or take, there's about 50

2    patients, and so my job was just to manage that.  We

3    have all their history and physicals, you know, intake

4    work-flow, everything that relates to patient care

5    information.  And also helping the nurses that are on

6    the field, the ones that are working actually outside in

7    the city, the cities that they have their assignments.

8         Q.   So a case manager, did you do that for the entire

9    time you were at Bee Caring Hospice?

10        A.   No, I only actually did that for about two months

11   and then I was asked to step out and do fieldwork.

12        Q.   Can you describe for the jury what fieldwork is?

13        A.   So fieldwork is skilled nursing care where you

14   actually go into the patient's homes and that's where

15   you're providing direct nursing care to the patient.

16        Q.   Now, during that time period you were at Bee

17   Caring Hospice, as part of your job did you complete

18   paperwork relating to hospice patients?

19        A.   Yes.

20        Q.   Did you complete paperwork relating to certifying

21   hospice patients?

22        A.   Yes.

23        Q.   Did you complete paperwork relating to

24   recertifying hospice patients?

25        A.   Yes.

1    Q.   And during that time you're at Bee Caring

2    Hospice, were you ever instructed to lie in that

3    paperwork?

4    A.   Yes.

5    Q.   Can you tell the jury about that, please?

6    A.   What we were told specifically in a meeting held

7    by Henry McInnis, who was the administrator, is that we

8    were told to target appetite specifically when we're

9    marking down that whether patients are having good or

10   bad appetite, you know, always mark poor appetite.

11   Always indicate that there is poor appetite to show that

12   the patient is declining.

13   Q.   Okay.  And you mentioned a name, Henry McInnis?

14   A.   Yes.

15   Q.   I'm placing what's on the monitor what's been

16   admitted as Government's Exhibit L-3.

17        Do you see Mr. McInnis on Government Exhibit L-3?

18   A.   I do.

19   Q.   And is that here -- is that him in the middle?

20   A.   Yes.

21   Q.   Can you -- I want to ask more about the

22   paperwork, but before we get there, can you tell the

23   jury, based on what you observed during the time you

24   were at Bee Caring, what did Mr. McInnis do at the

25   company?

1      A.   He was the main supervisor, the main director who

2  ran the whole show is the best way I can explain it.

3          We have, as nurses our -- the chain of command is

4  to report to director of nursing.  Like I said at the

5  time was Lupe, well, basically Lupe was not a

6  supervisor, it was Henry who was giving all of the

7  directions.

8      Q.   Lupe, what was Lupe's position?

9      A.   The director of nursing.

10     Q.   And what sort of -- is that a high nursing

11  position in organization?

12     A.   Yes.

13     Q.   And does -- did Lupe -- Lupe have some sort of a

14  license?

15     A.   No, he -- I mean, you are supposed to be a

16  registered nurse, you know, or be a nurse, and to be the

17  director of nursing just means that you're in charge of

18  training and monitoring and overseeing your clinical

19  staff.

20     Q.   And what did you mean that -- mean by Lupe wasn't

21  really the director of nursing, what did you mean by

22  that?

23     A.   He never gave clinical direction.

24     Q.   Who was giving clinical direction?

25     A.   Henry.

1    Q.   So was Henry McInnis really the director of

2    nursing there?

3    A.   It felt that way.

4    Q.   Was Henry McInnis at nurse meetings?

5    A.   Oh, was he a nurse meetings?

6    Q.   Yes.

7    A.   Yes.

8    Q.   Was he at trainings?

9    A.   Yes.

10   Q.   Did you ever hear him instructing other nurses on

11   how to perform their duties?

12   A.   Yes.

13   Q.   Did he instruct you on how to perform your

14   duties?

15   A.   Yes.

16   Q.   What if any medical training did Henry McInnis

17   have, if you know?

18   A.   None.

19   Q.   Did he have any kind of nursing license?

20   A.   No.

21   Q.   Any kind of medical license whatsoever?

22   A.   None.

23   Q.   Do you know if he had any medical experience at

24   any other organization prior to Merida?

25   A.   No.

1     Q.   Okay.   So back to the documents.

2          You said that you were instructed to lie in

3     medical records.   Can you just explain to the jury, you

4     mentioned a meeting, can you just walk the jury what --

5     through what happened in that meeting?

6     A.   We were called together as a, you know, nursing

7     staff, hey, we are going to have a meeting this morning,

8     let's all get -- let's all get together in said

9     conference area.

10         And while we're there, okay, you know, Henry

11    again takes over the -- the -- the meeting and tells us,

12    hey, guys, I just want you all to know that we're

13    looking over the notes and I've been noticing that we

14    have been marking good appetite on some of our patients

15    when y'all are going in there, you're marking that, you

16    know, they're alert, they're awake, they're oriented,

17    they know what they're doing, they're eating well.   You

18    know, remember they are hospice patients so we need to

19    show that they're not eating well.   They're expected to

20    die in six months or less according to, you know, the

21    rules and regulations of hospice so y'all need to be

22    marking that they are -- they have poor appetite.

23    Q.   And -- and just to be clear, was the instruction

24    to mark poor appetite mark declining because it's true

25    or because it -- or to make it a falsehood in the

1    medical record?

2       A.   Because, again, he said auditor's look at it and

3    we need to show that we're -- that we have evidence that

4    the patient is declining.

5       Q.   Okay.  You said auditors, and who is saying this?

6       A.   Henry.

7       Q.   Mr. McInnis is saying auditors will look.  What

8    was your understanding what that meant?

9       A.   Bottom line it's falsification of documentation.

10      Q.   In order to cover up what was really happening?

11           MR. CYGANIEWICZ:  Objection to the leading,

12   Your Honor.

13           THE COURT:  Rephrase the question.

14      Q.   (By Mr. Swartz)  What was your understanding of

15   why you were being instructed to put these lies in the

16   paperwork?

17      A.   Just that, that we were -- we were being led to

18   believe that we need to show that the patient is

19   declining, whether or not that might be true.

20           Again, when you're dealing with the hospice

21   patient, someone who is in their end-term of life, you

22   know, they fluctuate.  They'll have days where maybe

23   they'll eat really well.  They can eat a whole buffet

24   one day and then the next day that's it.

25           But we were strictly told that we need to put at

1   all times poor appetite, that they're declining to show

2   proof of declination.

3       Q.  So based on your experience working at the Merida

4   Group and based on what you saw in the paperwork, what

5   you yourself put in the paperwork, if somebody like

6   auditors were to come and look at the paperwork, would

7   it appear that patients qualify for hospice when they

8   don't qualify?

9           MR. CYGANIEWICZ:  I object, Your Honor.

10  That calls for speculation on her part, how it would

11  appear to someone else, speculation in her mind.

12          THE COURT:  Rephrase the question.

13      Q.  (By Mr. Swartz)  What would be the effect with

14  respect to people coming in and looking at the paperwork

15  of these lies in the medical records?

16          MR. CYGANIEWICZ:  Same objection,

17  Your Honor, what the effect of someone only calls for

18  speculation on her part.

19          MR. SWARTZ:  She's -- she's testified that

20  she was in this meeting where Mr. McInnis instructed --

21          MR. CYGANIEWICZ:  She's asked what people

22  were thinking, Your Honor, that's speculation.

23          THE COURT:  I think you've established --

24  well, you can ask her if she lied on the paperwork.

25      Q.  (By Mr. Swartz)  Did you yourself lie on the

1    paperwork?

2        A.   Yes.

3        Q.   And was that at the direction of Mr. McInnis?

4        A.   Yes.

5        Q.   Did you interact with other employees at the --

6    at Bee Caring Hospice?

7        A.   Yes.

8        Q.   Did you have a sense of whether other employees

9    were lying in the paperwork?

10       A.   Yes.

11       Q.   What was that sense?

12       A.   I would often ask them, guys, what are we doing?

13   And I was often told, and always told, just do your job.

14       Q.   Who would say that?

15       A.   My colleagues.

16       Q.   Did you see false diagnoses in medical records?

17       A.   I saw the -- how would I say it?

18            People were being admitted for Alzheimer's

19   specifically, for instance, that -- that was a -- that

20   was a big one, in general just because -- you know the

21   spectrum of Alzheimer's is from here to here.  You can

22   be at the beginning onset of Alzheimer's --

23            THE COURT:  Ma'am, again, speak loudly into

24   the microphone.

25            THE WITNESS:  Sorry, you can be at the

1    beginning of, you know, just barely got diagnosed by

2    your doctor with Alzheimer's doesn't mean you're going

3    to die right now.

4              And then you can have Alzheimer's endstage

5    diagnosed Alzheimer's where you're no longer eating,

6    you're no longer aware of your surroundings, you're

7    practically bedridden, that qualifies you for hospice

8    care, for palliative care, for comfort care, and there

9    were some cases that, yes, I would see that why are you

10   on hospice care just because you have a diagnosis of

11   Alzheimer's?  So was that an error, yes.

12   Q.   (By Ms. Swartz)  Now, during the time you were at

13   Bee Caring Hospice, or the Merida Group, do you

14   understand those to be the same thing?

15   A.   Yes.

16   Q.   You were visiting patients in the field, you go

17   to patient's homes?

18   A.   Yes.

19   Q.   Were there any ever instances where patients were

20   unaware that they were referred to hospice?

21   A.   Yes.

22   Q.   Could you describe that for the jury.

23   A.   So there was a time that I was told to go and

24   evaluate patient -- patients for hospice services, and

25   the whole process of the intake was really bad.  There

1    were no doctor's orders, and in order for you to go and

2    evaluate --

3               MR. CYGANIEWICZ:  Your Honor, I object to

4    the nonresponsive and narrative form of the answer.

5               THE COURT:  I'll give -- well, that's

6    overruled in part.

7               Answer the question as succinctly as you

8    can, and let's keep it in question/answer format.

9               MR. SWARTZ:  Yes, Your Honor.

10              THE COURT:  You can answer -- you can

11   explain a little bit though.

12   Q.   (By Mr. Swartz)  You were -- you were explaining

13   orders.  What are patients that are going on to hospice

14   required to have orders?

15   A.   Yes.  So specifically going back to your

16   question, there was a case I went into a patient's home

17   because I had a demographic sheet and was told it was

18   referred by Dr. Pelly that I needed to go evaluate for

19   hospice care services.

20              I walk into the home and I see, yes, a bedridden

21   client who had a trach, anyways, long story short, that

22   patient was not at all a hospice candidate, was not at

23   all a palliative candidate.  Mother described to me son

24   had been living this way for many, many years.  He was

25   chronically ill, and he was living with chronic

```
 1    conditions.  And Dr. Pelly was simply covering for a --
 2    the -- the -- the primary physician over the weekend,
 3    Dr. Pelly stood at the door, looked in, asked if
 4    everything was okay, if anything was needed, the mother
 5    said no, and it just so happened that Dr. Pelly referred
 6    that patient to hospice assuming that hospice care
 7    services were needed.
 8        Q.   So it was your understanding that this was not
 9    Dr. Pelly's patient?
10        A.   Correct.
11        Q.   But Dr. Pelly referred this patient to hospice?
12        A.   Correct.
13        Q.   Without any kind of order?
14        A.   Right.
15        Q.   What was -- did you -- what was the mother's
16    reaction when you used the word hospice?
17        A.   She was immediately startled by me, and I was
18    immediately embarrassed.
19        Q.   Now, you mentioned a Dr. Pelly.  Was Dr. Pelly a
20    medical director at Bee Caring Hospice?
21        A.   Yes.
22        Q.   Did you interact with other medical directors
23    when you were there?
24        A.   By phone only.
25        Q.   I'm sorry?
```

1          THE COURT:  I'm sorry?

2          THE WITNESS:  By phone only.

3     Q.   (By Mr. Swartz)  Did you ever have any concerns

4     that Merida medical directors were not doing what they

5     were supposed to do?

6     A.   Yes.

7     Q.   Could you describe that.

8     A.   So the medical directors, their job is to give

9     orders, and their job is to tell us, as nurses, you

10    know, the plan of care, to create a plan of care, to

11    also do the face-to-face visits, which is, you know, go

12    into the home, or create an appointment if you can, have

13    the patient go into your office so that way a physician

14    can do a head-to-toe assessment and reevaluate for

15    ongoing need in hospice care.

16         Doctors were not doing that, the nurses were the

17    ones filling out the paperwork and the doctors were

18    signing off.

19    Q.   Did you ever see Merida medical directors

20    providing any services other than just signing

21    paperwork?

22    A.   No.

23    Q.   Were they just rubber-stamping documents?

24    A.   Yes.

25    Q.   Now, you said you worked at Merida for about six

1    months?

2        A.   At Bee Caring, yes.

3        Q.   At Bee Caring.  Why did you leave, were -- did

4    you resign, were you fired?

5        A.   I left, I come -- I left very angry, I left very

6    hurt, I left very disappointed, I resigned, yes, I

7    resigned.  I left a letter, I delivered it,

8    hand-delivered it to Rodney's office, he was out that

9    day, hand-delivered it to Henry, hand-delivered it to my

10   DON, turned it in to HR and I let everyone I'm done.

11       And my reason for that is because I kept getting

12   a growing, growing gut feeling that this is wrong.  I

13   was hurt, again, by the -- just the knowing that there's

14   a lack of integrity.

15            MS. ARCE-FLORES:  Judge, at this time I'm

16   going to object to narrative.

17            THE COURT:  Again, sustained in part and

18   overruled in part.  I'll allow you to explain why you

19   resigned.

20            THE WITNESS:  Those are my main reasons.

21       Q.   (By Mr. Swartz) Let me -- let me ask you this.

22   You have a nursing license, and do you feel like it's

23   part of your duties as a nurse to look out for patients?

24       A.   That's our primary duty.

25       Q.   That's your primary duty.

1      Do you feel like have you an ethical duty to

2 your -- to your patients?

3      A.   Absolutely.

4      Q.   Do you feel like as an employee of Bee Caring

5 Hospice, the company owned by Rodney Mesquias and

6 supervised by Henry McInnis, that you were able to carry

7 out those ethical duties to patients?

8      A.   No.

9      Q.   Now sometime after you left Merida, did you file

10 a complaint?

11      A.   I did.

12      Q.   Or make a complaint?  When was that?

13      A.   I waited several years until 2015.

14      Q.   Why did you wait so long to make a complaint?

15      A.   I was scared, I didn't think my -- it was going

16 matter, I didn't think anybody was going to listen.

17      Q.   Was there something that prompted you to make a

18 complaint?

19      A.   Yes, I was working for another company with

20 unfortunate causes had to close, and that owner knew

21 about previous alleged remarks that Rodney had been

22 involved in -- in prior Medicare fraud, and when he

23 showed me his mug shot, it just brought a flood of

24 memories, and also when that company was closing, Henry

25 had the -- called the company requesting, or stating

1    he'd be more than willing to take on their patients.

2       Q.  And what was it about that call that prompted you

3    to make the complaint?

4       A.  It reminded me that they haven't changed.  It's

5    about getting more patients.

6               MR. SWARTZ:  Pass the witness, Your Honor.

7               THE COURT:  All right.  The defense has

8    three, 18-minute sessions.

9               Please proceed, Mr. Canales.

10              MR. HECTOR CANALES:  Thank you, Your Honor.

11                     CROSS-EXAMINATION

12   BY MR. HECTOR CANALES:

13      Q.  Good afternoon, Ms. Gonzales.  My name is Hector

14   Canales; I represent Rodney Mesquias, okay?

15         How -- how much do you charge to make false

16   medical records?

17      A.  How much do I charge?

18      Q.  Yeah.

19      A.  What do you mean?

20      Q.  How much did you charge -- how much do you charge

21   to make false medical records?

22      A.  I don't.

23      Q.  You don't, okay.  When is the last time you made

24   one?

25      A.  I don't know what you're talking about.

1     Q.   You've never -- you've never made a false record

2  yourself?

3     A.   No.

4     Q.   Okay.  So records that you made at Merida were

5  true?

6     A.   Those were to the best of my knowledge, to the

7  best of my ability to be true and accurate.

8     Q.   Okay.  So despite whatever was told to you,

9  whoever told it to you, and whatever circumstances, you

10  told the truth in medical records that you created,

11  fair?

12     A.   Fair.

13     Q.   All right.  So you resisted whatever pressure you

14  claim to have been under, you resisted it?

15     A.   To the best of my ability, yes.

16     Q.   All right.  All right.  And -- and did others

17  resist it, too?

18     A.   I can't answer for others.

19     Q.   You don't know, all right, you don't know.  And

20  so -- and so you left -- I wrote down angry, right?

21     A.   Correct.

22     Q.   And you also left disappointed, right?

23     A.   Correct.

24     Q.   All right.  And -- and that anger and

25  disappointment that you felt, how -- I mean, zero to

1    ten, ten being like, I mean, you're really angry,

2    severely disappointed, and zero be the least amount of

3    anger, where was it, zero to ten?

4         A.   Ten, that's why I left.

5         Q.   All right.   So -- but I mean, okay, ten.   So we

6    got a ten out of ten.   And isn't it true that you were

7    angry and disappointed in part because you didn't get to

8    become -- you were -- I guess your -- your attempt to

9    become the director of nursing failed?

10        A.   I never asked to become director of nursing, I

11   never sought to become director of nursing.

12        Q.   And Michelle Trevorah, do you know Michelle

13   Trevorah?

14        A.   Trevorah, yes.

15        Q.   Yeah, and Michelle was a director of nursing,

16   right?

17        A.   Right.

18        Q.   Right.

19        A.   Well, after I left, I believe she became one.

20        Q.   And you wanted that spot?

21        A.   No.

22        Q.   You didn't want that -- you didn't want to be a

23   director of nursing?

24        A.   Never.

25        Q.   Within -- between field nurse and director of

1    nursing on the -- on the hierarchy, I think you said

2    something about the hierarchy, the chain of command?

3        A.   Uh-huh.

4        Q.   Which is higher, director of nursing or field

5    nurse?

6        A.   Director of nursing would be our clinical

7    supervisor.

8        Q.   Okay.  And where does case manager fit in, is the

9    case manager in the middle between director of nursing

10   and field?

11       A.   Yes, I would think so.

12       Q.   All right.  And so you came in your first two

13   months you were at case manager, right?

14       A.   Uh-huh.

15       Q.   Which is above a field nurse, right, but below

16   a -- the director of nursing, right?

17       A.   Right.

18       Q.   And then after two months, you go down to become

19   a field nurse, right?

20       A.   Right, I was asked.

21       Q.   Okay.  Did your pay change at all between being a

22   case manager and a field nurse?

23       A.   Not at all.

24       Q.   No.  Does -- does a director of nursing get paid

25   more than the -- than a field nurse?

1    A.   I would not know that.

2    Q.   You wouldn't know.  Are there more

3  responsibilities as the director of nursing than as a

4  field nurse?

5    A.   There's supposed to be, yes.

6    Q.   Right.  And it's a higher level, right?

7    A.   It's supposed to be, yes.

8    Q.   All right.  And what were you being paid, ma'am,

9  there as a case manager/field nurse?  What was your

10  salary?

11    A.   I want to say it was about 47, 48,000 a year.

12    Q.   Okay.  All right.  And I take it then that you

13  would defer to the -- a primary care provider's

14  diagnosis of -- of a patient, right, rather than your

15  own diagnosis, right?

16    A.   I'm sorry, can you --

17    Q.   Primary -- let me ask you this way.  A primary

18  care provider is in a better position than you were as a

19  field nurse to make a diagnosis over any particular

20  hospice patient, right?

21    A.   Oh, yes, it's a doctor.

22    Q.   Right.  And they are also in a better position

23  than you are to give any opinion as to the prognosis of

24  a hospice patient's diagnosis, right?

25    A.   Correct.

1    Q.   And you recognize, you understand the difference

2    between diagnosis and prognosis, right?

3    A.   Right.

4    Q.   And you would agree that within the context of

5    hospice, that a prognosis is -- is -- is a -- requires

6    the clinical judgment of a medical doctor, right?

7    A.   Yes.

8    Q.   In other words, their opinion, correct?

9    A.   Correct.

10   Q.   And that that opinion of a prognosis is not an

11   exact science, correct?

12   A.   It's based on science.

13   Q.   Right, but it's not an exact science, it's a

14   prediction, right?

15   A.   Right.

16   Q.   Of how that diagnosis is going to play out?

17   A.   Right.

18   Q.   Right?  Okay.  And that -- that opinion is, by

19   its very nature, imprecise, right?

20   A.   Right.

21   Q.   Okay.  And I think I want to make sure my notes

22   were that you said that a patient with endstage

23   Alzheimer's disease qualifies for hospice care, right?

24   A.   Correct.

25   Q.   Do you recall the name -- the patient Petra

1  Cerda?

2      A.  No, I don't.

3      Q.  That's okay.  The meeting that you described

4  on -- on -- on direct here, were there other nurses

5  involved at that meeting?

6      A.  Yes.

7      Q.  Okay.  Do you remember the names of those nurses

8  who were at that meeting?

9      A.  Yeah, it was all of us.  It was myself, Michelle

10 Trevorah, Joe Garza, Lupe Ruiz, Randy and his wife, I

11 forgot her name, it's with an M., Maritza, and I think

12 that's it.

13     Q.  Okay.  All right.  Let me show -- could we

14 have -- is the ELMO hot right now?

15            THE CLERK:  Yes, sir.

16     Q.  (By Mr. Hector Canales) Okay.  What about

17 Dr. Shekar, do you remember a Dr. Shekar?

18     A.  Not well, no.

19     Q.  No?  Never had any interaction with the doctor,

20 it's spelled S-h-e-k-a-r, Dr. Nirupaman Shekar?

21     A.  It's not ringing a bell, sorry.

22     Q.  Not ringing a bell, okay.

23            All right.  Let me show you, these are part of

24 the medical records in the case for Ms. Petra Cerda.

25 Did you participate in IDG meetings?

1     A.   Those were rare.

2     Q.   My question to you, ma'am, was did you

3  participate in --

4     A.   Yes.

5     Q.   -- any IDG meetings?

6     A.   Yes.

7     Q.   Okay.  All right.  So you can see up here

8  Dr. Shekar there you see highlighted?

9     A.   Uh-huh.

10    Q.   Now that you see it in black and white, does it

11 ring any bells?

12    A.   No, sorry.

13    Q.   Okay.  And here Petra Cerda, what's the diagnosis

14 according to this document, or -- and there's multiple,

15 what are the diagnosis for Ms. Cerda?

16    A.   The primary is dementia.

17    Q.   All right.

18    A.   And the secondary is Alzheimer's.

19    Q.   All right.  And what else?

20    A.   She has chronic airway obstruction and

21 unspecified essential hypertension.

22    Q.   Okay.

23         MR. SWARTZ:  Your Honor, just for the

24 record, what exhibit and what page number are we looking

25 at?

1          MR. HECTOR CANALES:  This is Exhibit, Petra

2     Cerda is Exhibit E, it's Government Exhibit E-8, E-8 and

3     we are looking at bates number 285990.

4          And for the record, it ends on 286005.  16

5     pages.

6     Q.   (By Mr. Hector Canales)  While I'm there, it

7     shows here that the medical director signed this on

8     November 25th of '13, correct?

9     A.   Uh-huh.

10    Q.   That's during your time period, right?

11    A.   Correct.

12    Q.   And this particular document involves the

13    certification period of 10/08/13 through December 6th of

14    '13, correct?

15    A.   That's what it states, yes.

16    Q.   All right.  And you testified, let's see, you

17    left when, what was the -- when were you there?

18    A.   It's --

19    Q.   You left this April of '13?

20    A.   It was like March or April of 2013.

21    Q.   March or April of 2013.  Does -- does that lady

22    look familiar to you?

23    A.   No.

24    Q.   Okay.  And these dates right here, how long had

25    you been gone?

1      A.   Probably a month.

2      Q.   A month?

3      A.   Yeah.

4      Q.   I thought you left in 2013?

5      A.   Oh, I'm sorry, I didn't -- yes, you're right.

6      Q.   So how long?

7      A.   I just saw the month.

8      Q.   Roughly, you don't have to be precise, roughly?

9      A.   Almost three years.

10     Q.   Three years, all right, three years, okay.

11          And so when you go in to do these visits at home

12     at somebody -- at a patient's home, you fill out a --

13     did you go with an I-Pad, or a little phone, or device,

14     where you provided with some -- some equipment in order

15     to enter in your findings?

16     A.   Yes.

17     Q.   All right.  And what -- so which was it?  Tell

18     the jury how -- what -- what -- what supplies did you

19     have?

20     A.   It was like a type of an I -- I-Pad tablet.

21     Q.   Okay.  All right.  And so you would actually go

22     in there, and whatever you found, you would put in there

23     and that would -- that would create an electronic

24     record, right?

25     A.   Correct.

1   Q.   And at the end of that, you would get an

2   opportunity to write a narrative, right?

3   A.   Right.

4   Q.   Okay.  And as far as you know, did all of the

5   nurses that were involved there at Bee Hospice, did they

6   have the same equipment?

7   A.   To my understanding, yes.

8   Q.   Okay.  All right.  And so here we have a series

9   of -- of notes, correct, and it tells us who entered the

10   note -- the date and who entered the notes as it relates

11   to this particular patient, correct?

12   A.   Uh-huh.

13   Q.   And we just need a yes or a no.

14   A.   I'm sorry, yes.

15   Q.   That's all right.  And so here we have Rosaura

16   Perez, SW what's SW mean to you?

17   A.   Social worker.

18   Q.   All right.  And did social workers, was it your

19   experience that in addition to nurses going and doing

20   visits with family -- with the patient that the social

21   workers would go, too?

22   A.   Correct.

23   Q.   And who else on the IGT team would also make

24   regular visits other than a social worker and a nurse?

25   A.   A chaplain.

1    Q.   A chaplain, right.   And everybody would get an
2    opportunity -- everybody had their little I-pad, right?
3    A.   Uh-huh, yes.
4    Q.   And everybody had the opportunity to put in a
5    narrative, right?
6    A.   Correct.
7    Q.   Would you agree with me here, what we see here on
8    the page is the narrative of those nurses -- of -- of at
9    least one nurse, two nurse -- a nurse and a social
10   worker, right?
11   A.   Yes, I see that.
12   Q.   Okay.   On -- on the fifth page of this document,
13   on January the 3rd, what -- who does it indicate has put
14   in a note?
15   A.   Myself.
16   Q.   And everything in this note is true?
17   A.   If I put it in, yes, that's me.
18   Q.   Okay.   All right.   All right.   And so you say in
19   there, you got there, and the patient was sitting
20   with -- at bedside, right?
21   A.   Correct.
22   Q.   And I've highlighted there that -- that there was
23   symptoms you say was consistent with a known HX, that's
24   history, right?
25   A.   Yes.

1    Q.   Of COPD and advancing primary diagnosis, right?

2    A.   Correct.

3    Q.   Do you recall what the primary diagnosis was that

4    was advancing here according to you?

5    A.   Dementia.

6    Q.   Is Alzheimer's a form of dementia?

7    A.   Yes.

8    Q.   It's a more specific description of the disease

9    dementia, right?

10   A.   Correct.

11   Q.   And above and below you, you have other nurses,

12   right, Patricia Cardoza?  Do you know Ms. Cardoza?

13   A.   Yes.

14   Q.   And there's other -- and then you've got Rebecca

15   Salinas, an LVN, right?

16   A.   Yes.

17   Q.   And with this particular patient, let me -- see

18   your name anywhere else on the -- on this page, any

19   other entries by you?

20   A.   No, I do not.

21   Q.   How about there, any entries by you?

22   A.   No.

23   Q.   Look at this entry here.  Any reason to believe,

24   as you sit up here today, any reason to believe that

25   Rebecca Salinas was any different than you and put in

1    the truth in this document?

2         Do you have any evidence here or any opinion

3    about Ms. Salinas?

4              MR. SWARTZ:   Your Honor, object to the --

5    asking her to speculate about another nurse and what

6    that nurse might have been thinking when she put in that

7    entry.

8              MR. HECTOR CANALES:   I'm asking her what's

9    in her mind, Your Honor, if she has anything here.

10             THE COURT:   Rephrase the question

11   appropriately.

12   Q.   (By Mr. Hector Canales)  Ma'am, do you, in your

13   mind, I'm not asking you what -- what -- anything about

14   what Ms. Salinas is thinking, do you have any thoughts

15   here or any basis to question Rebecca

16   Salinas' truthfulness here?

17   A.   I don't know who she is.

18   Q.   So I take it the answer is no?

19   A.   I wouldn't be able to give an answer at all

20   because I don't know who she is.

21   Q.   Okay.  Did -- do you recall -- have you ever had

22   a patient tell you, I'm going to take five pills at one

23   time so I can die already?  Have you ever had a patient

24   tell you that?

25   A.   No.

1    Q.   Have you ever been around the caregivers of

2   people with late onset dementia?

3    A.   Yes.

4    Q.   Describe from a difficulty level zero to ten, ten

5   being the most difficult, how difficult it is, in your

6   experience for caregivers to take care of people, family

7   members who -- who are suffering from late onset

8   dementia?

9    A.   Eight, nine, ten, it can vary.

10    Q.   Very stressful, right?

11    A.   It varies per family, but it's usually stressful.

12    Q.   On this page, is your name here?

13    A.   No.

14    Q.   Is it common that patients with onset -- late

15   onset dementia require 24-hour supervision?

16    A.   Yes.

17    Q.   Is that part of the reason why hospice is -- is

18   appropriate for somebody with late -- with Alzheimer's

19   dementia?

20    A.   Not for custodial care, no.

21    Q.   No, okay.   Irma Garza, you know Ms. Garza?

22    A.   I do not.

23    Q.   Sylvia Ake?

24    A.   I don't know who that is.

25    Q.   Delia Jasso?

1      A.   I don't know who that is.

2      Q.   I think I asked you Irma Garza; didn't I?

3      A.   Yeah, and I said I don't know who that is.

4      Q.   You don't know.  Okay.  All right.

5           So you don't know any of these people?

6                THE COURT:  And the first of three sessions

7  have concluded.

8                MR. HECTOR CANALES:  Thank you, Your Honor.

9      Q.   (By Mr. Hector Canales)  I think Marissa Oliver,

10  you know Marissa, right?

11      A.   She worked with me, yes.

12      Q.   Okay.  Is Marissa a truth-teller?

13      A.   Say again?

14      Q.   Marissa, is she a truth-teller?

15      A.   She was the one who told me to look down and keep

16  doing your job.

17      Q.   Are you saying she is or isn't a truth-teller?

18      A.   No.

19      Q.   No, okay.  Have you reported Ms. Oliver to the

20  State Board of Nursing?

21      A.   No.

22      Q.   Why not?

23      A.   Because she did it in -- I don't know, I

24  didn't -- I didn't have a reason to report her.

25      Q.   Okay.  No reason.  Okay.

1          Your name here?  No.  Irma Garza, Irma Garza,

2    Irma Garza.  Stop me if -- stop me if you see your name.

3       A.  No longer working there during those times.

4       Q.  You're no longer here working here anymore,

5    you're right.  Okay.  But the patient is still being

6    seen, right?

7       A.  Correct.

8       Q.  Now, when -- when you were working there, so on

9    this -- on this document there's one entry that has your

10   name on it, only one, right, as we've gone through

11   there, services were rendered here, correct?

12      A.  Correct.

13      Q.  In other words, you provided services, right?

14      A.  Right.

15      Q.  The patient was real, correct?

16      A.  Yes.

17      Q.  Right?  This is not a situation where you have --

18   where you're going out and creating a medical record

19   of -- for a patient that -- that did not exist that had

20   died, right?

21      A.  No.

22      Q.  That would be fraud to do that, to make up a

23   record about somebody who's not even alive anymore,

24   right?

25      A.  Right.

1    Q.   Same Exhibit E-8, 286103.

2         Now, this is the actual entire visit note that we

3    just saw that we looked up there, correct?

4    A.   I have to go back and look at the other -- the

5    other --

6    Q.   Sure, I'll do that for you.

7    A.   -- date.

8    Q.   So this note here we have is January the 3rd of

9    '13, right?

10   A.   Yes.

11   Q.   And here, there was what we just looked at

12   January the 3rd of '13, right?

13   A.   Yes.

14   Q.   All right.  And so what we just looked at here,

15   was a document that had a summary of a bunch of

16   narratives, right, from a period of time?

17   A.   Uh-huh.

18   Q.   A long span period of time.  What we now have

19   here is the actual, the full report from that day, you

20   agree?

21   A.   Yes.

22   Q.   Okay.  So again, everything in here, same patient

23   by the way, Petra Cerda, everything in here truth

24   because you put it?

25   A.   Correct.

1    Q.   Really did have impaired reading skills, right?

2    A.   Correct.

3    Q.   Do you recall the age of this patient?

4    A.   No.

5    Q.   What do you put here as the -- as the functional

6    assessment stage in here, what do you say?

7    A.   Seven.

8    Q.   Is that otherwise known as a FAST score?

9    A.   Yes.

10   Q.   You must have seen some deterioration in -- in

11   Petra Cerda's nutritional status, right?

12   A.   Correct.

13   Q.   You saw some tooth problems, right?

14   A.   Yes.

15   Q.   And that she wasn't always able to physically

16   shop or cook or feed herself, right?

17   A.   Correct.

18   Q.   Immune compromised.  That means she has an

19   inability to fight off disease, right?

20   A.   Right.

21   Q.   That there's a history and a diagnosis of AD,

22   what's AD?

23   A.   Alzheimer's disease.

24   Q.   Okay.  You did a cognitive assessment, you

25   performed one on -- on Ms. Cerda?

1      A.   Correct.

2      Q.   She was unable to repeat three or four words

3  after a few minutes of unrelated activity?

4      A.   Correct.

5      Q.   Right?  Why did you do that?

6      A.   Also for cognitive assessment, ability to recall

7  information.

8      Q.   And you scored her a 7-C, correct?

9      A.   Correct.

10      Q.   And that was based on your review of the patient

11  that day, on January --

12      A.   3rd.

13      Q.   -- 3rd of 2013?

14      A.   Yes.

15      Q.   Correct?  And do you have any recollection,

16  ma'am, of Ms. Cerda, who her primary care provider was,

17  or at least one of them?

18      A.   No, you mentioned Shekar, but I don't remember.

19      Q.   Okay.  Okay.

20           One last time, sometimes after we've talked about

21  somebody, remember her?

22      A.   I do not.

23           MR. HECTOR CANALES:  No further questions.

24  Thank you.

25           THE COURT:  Gentlemen?  Mr. Cyganiewicz?

1          MR. CYGANIEWICZ:  Yes, Your Honor.

2                    CROSS-EXAMINATION

3   BY MR. CYGANIEWICZ:

4       Q.   Good afternoon.

5       A.   Good afternoon.

6       Q.   I'm Ed Cyganiewicz; I'm a lawyer for Mr. McInnis.

7   We've never had a chance to talk; have we?

8       A.   No.

9       Q.   And I'm assuming that you've met with the

10  gentleman here to my right to -- before you testified,

11  correct?

12      A.   I've met with the attorney Mr. Swartz, yes.

13      Q.   Mr. Swartz, the one who was asking you the

14  questions?

15      A.   Yes.

16      Q.   I guess, did he kind of prepare you and what he

17  was going to ask you?

18      A.   He asked -- he interviewed me about what was

19  going to --

20      Q.   What he was going to ask you today?

21      A.   Right.

22      Q.   Okay.  And how many other previous meetings did

23  you have with any of those gentlemen?

24      A.   Like total how many have I met?

25      Q.   Yeah.

1    A.   Less than a handful of times.

2    Q.   Excuse me?

3    A.   Less than a handful of times.

4    Q.   Okay.   A handful being five?

5    A.   About.

6    Q.   Okay.   And now you're -- you now work where, I'm

7    sorry?

8    A.   I'm a school nurse.

9    Q.   In Harlingen?

10   A.   In San Benito District.

11   Q.   And you graduated from UT-B; did you say?

12   A.   Correct.

13   Q.   Was your school you went to before then or

14   afterwards, no?

15   A.   That's the only school.

16   Q.   Is it an Associate's Degree?

17   A.   Yes.

18   Q.   Two-year program?

19   A.   Yes.

20   Q.   Did you ever complete a four-year program?

21   A.   No.

22   Q.   Any type of advanced studies in nursing?

23   A.   No.

24   Q.   So when you started in -- for Bee Caring, that

25   was -- you were licensed for, what, practicing for a

1  couple of years or not even?

2      A.  About two-and-a-half years.

3      Q.  And that was your first or second job as a nurse?

4      A.  That was my second.

5      Q.  And when you -- when you were first hired by

6  Merida, you -- you were interviewed by Mr. Mesquias?

7      A.  When I was hired for Bee Caring --

8      Q.  Yes.

9      A.  -- in Harlingen, I was interviewed by Lupe Ruiz,

10  the DON.

11      Q.  Lupe Ruiz?

12      A.  Uh-huh.

13      Q.  And then?

14      A.  Then like a second interview with him and Rodney

15  together.

16      Q.  And Mr. McInnis was not involved in that,

17  correct?

18      A.  Correct.

19      Q.  He was not involved in the interview.  And you

20  were hired as a case manager?

21      A.  Yes.

22      Q.  And that would be, I think you said working

23  inside, correct?

24      A.  Yes, an office job.

25      Q.  And how long did you work inside before you went

1  outside to the fieldwork?  Excuse me.

2      A.   It was almost like two months.

3      Q.   And what did you prefer?

4      A.   Fieldwork.

5      Q.   And before you started with Bee Caring, did you

6  have any experience in hospice?

7      A.   Yes.

8      Q.   From with who?

9      A.   From Valley Baptist.

10     Q.   For how long?

11     A.   Maybe six months also.

12     Q.   So what was your job at Valley Baptist?  I

13 thought you said you were on the floor, a

14 surgical floor.

15     A.   I worked in neuro med/surge floor that also

16 transitioned into a hospice palliative floor.

17     Q.   And were you trained on a -- to work a computer

18 at the Bee Caring?

19     A.   Yes.

20     Q.   And who trained you on that?

21     A.   Henry.

22     Q.   Who taught you how to do a home visit?

23     A.   Lupe.

24     Q.   And he was the director of nursing, correct?

25     A.   Correct.

1    Q.   And who followed Lupe as the director of nursing?

2    A.   What do you mean by that?

3    Q.   Who took his place when he was no longer a

4    director of nursing?

5    A.   I don't know, I wasn't there.

6    Q.   Did you know Michelle Trevorah?

7    A.   Yes.

8    Q.   Was she at some point later a director of

9    nursing?

10   A.   My understanding was yes.

11   Q.   And you're telling us that you didn't leave angry

12   and disappointed because you were not named director of

13   nursing?

14   A.   Not at all.  I never wanted to be director.

15   Q.   You never did?  You weren't upset or angry that

16   Michelle got moved in before you?

17   A.   Never.

18   Q.   Did -- so Lupe told you how to do the home visit,

19   correct?

20   A.   Yes.

21   Q.   Did he explain to you about the assessing during

22   the visit?

23   A.   Sorry, I was coughing.

24   Q.   Did he explain to you how to do the assessment

25   before the visit?

1      A.   No.

2      Q.   During the visit, who taught you how to do the

3   assessment?  The checklist and all the narratives that

4   you were preparing?

5      A.   Lupe taught me how to do an actual physical

6   assessment in the home, and then the explanation of the

7   narratives to show, you know, examples of -- or evidence

8   was Henry.

9      Q.   Okay.  And did Henry ever go out to those visits

10  with you?

11     A.   No.

12     Q.   Did -- did -- were you told on -- it's important

13  to document the assessments?

14     A.   Yes.

15     Q.   Would it be safe to say that you would be the

16  more specific you are the better?

17     A.   Yes.

18     Q.   To avoid general terms and vague terms?

19     A.   Yes.

20     Q.   If you're not documenting correctly, are you

21  doing your job correctly?

22     A.   No.

23     Q.   If your document is not correct then you're not

24  doing your job correct, are you?

25     A.   Correct.

1    Q.   You always did your job correct?

2    A.   To the best of my ability, yes.

3    Q.   And all those records are true?

4    A.   To the best of my ability, yes.

5    Q.   If you have -- if there's a disagreement, or a

6    problem with -- with some of the entries, how -- how was

7    that resolved?

8    A.   It wasn't, it was left in the air.

9    Q.   Are you familiar with quality assurance?

10   A.   Yes, that was not --

11   Q.   What do they do?

12   A.   That was not my job.

13   Q.   You're familiar with them?

14   A.   Yes.

15   Q.   And there was somebody at Harlingen doing quality

16   assurance, correct?

17   A.   There was someone there for a temporary time

18   before she got fired.

19   Q.   Who was that, do you know?

20   A.   It was Amy, I don't remember her last name.

21   Q.   And what was the job as for as your understanding

22   is on --

23   A.   To review the note to see that there's

24   consistency, in one note to the other.

25   Q.   And if there were disagreements about the --

1   amongst the nurses, how would that be resolved?

2        A.   Amy, Henry, Lupe and the nurse.

3        Q.   Okay.   Who's Joe Garza, did you get to meet him

4   at all?

5        A.   He was an LVN.

6        Q.   And you mentioned there was some IDT meetings, is

7   that what they call them?

8        A.   Yes, interdisciplinary --

9        Q.   Who was generally present during those meetings?

10        A.   Henry, a chaplain, a social worker, myself.

11        Q.   Mr. McInnis was never at those meetings, was he?

12        A.   I just said Henry.

13        Q.   Excuse me?

14        A.   I said Henry.

15        Q.   So the administrators were at those meetings you

16   were telling us?   Okay.   And that's common as far as you

17   know?

18        A.   Yes.

19        Q.   Not just the nurses, or the doctors, or the

20   chaplain but administrators, correct?

21        A.   For Bee Caring only we're talking about, yes.

22        Q.   And you're saying it's common in the industry for

23   administrators?

24        A.   No.

25        Q.   Who did the intake on the new patient referrals?

1      A.   Rodney's I think -- I don't know if it was his

2  sister or sister-in-law.

3      Q.   Who certified the patients?

4      A.   It's the physician who certifies.

5      Q.   And who recertified the patients?

6      A.   Again, the physician.

7      Q.   You're not going to say Henry was involved in

8  that, are you?

9      A.   No.

10     Q.   Who's Kermit Wade?

11     A.   I don't know.

12     Q.   Shannon Lenders, do you know who they are?

13     A.   She was the one who did the intakes.

14     Q.   Okay.  So she -- wasn't she running that office

15  at some time, Shannon?

16     A.   Not running the office, she was just in charge of

17  intakes.

18     Q.   She did the intakes?

19     A.   Uh-huh.

20     Q.   Did you report any disagreements amongst the

21  nurses to the director of nursing?

22     A.   No, I mean I went to him once when Michelle was

23  telling me stuff, I don't even remember what.

24          I think --

25     Q.   Are you familiar with any CMS regulations in

1    hospice?

2        A.   A few, yes.

3        Q.   Do you know what the joint commission is?

4        A.   Yes.

5        Q.   What's your understanding of what the joint

6    commission does?

7        A.   A joint commission reviews, basically, the work

8    of any running facility that's involved in Medicaid and

9    Medicare.

10       Q.   Do they make recommendations at times?

11       A.   I don't know if they do recommendations.   I

12   thought they just kind of, like, gave their stamp of

13   approval, but I'm not sure if they give a

14   recommendation.

15       Q.   You talked about a meeting that Mr. McInnis had

16   with you.   Who else was present at this one meeting?

17       A.   The same names I mentioned before, myself,

18   Marissa, Oliver, her husband Randy, Joe Garza, Michelle

19   Trevorah and Henry.

20       Q.   And did you -- do you know who Patricia Cardoza

21   was?

22       A.   Yes, she came on later, she wasn't --

23       Q.   You were there when she was there?

24       A.   Yes.

25       Q.   Okay.   Did you ever meet with her about the

1   complaints she was getting about your documentation?

2      A.  Did I meet with her about what?

3      Q.  Did you meet with Patricia Cardoza about the

4   complaints about not documenting your -- your documents

5   correctly?  She never had a meeting with her?

6      A.  No.

7      Q.  She didn't tell you to be more specific and don't

8   use the words good or better, but -- no?

9      A.  No.

10     Q.  Did the nurses ever tell you, you were not

11  assessing the -- doing the assessments correctly?

12     A.  No.

13     Q.  They never said that your -- your documents are

14  vague?

15     A.  No.

16     Q.  Wasn't that the whole purpose of the meeting with

17  Mr. McInnis?

18     A.  No.

19     Q.  Didn't he -- wasn't the purpose to educate you on

20  how to be more specific about the -- the narratives

21  you're making?

22     A.  No, the -- the reason why he called us in is

23  because quite a few nurses kept documenting good

24  appetite and that seemed to be a problem.

25     Q.  You saw the word that you used good in this

1    example, right?

2        A.   Yes.

3        Q.   And that -- did you -- did you notice the entry a

4    few months before where it was 70 percent, and then when

5    you saw the patient it was 60 percent, and you said it

6    was good, right?

7        A.   Correct.

8        Q.   Wasn't McInnis -- Mr. McInnis' point saying when

9    it goes from 70 to 60 you should say it was declining?

10   Wasn't that the whole purpose of the meeting is that

11   you're not using the right terminology, that it's

12   actually declining, but you never say that, you just say

13   good?

14       A.   He never told us to give specifics, no.  Instead

15   of using the word good, he wanted us to use the word

16   poor.

17       Q.   But I thought didn't he say the word -- would you

18   agree that someone that goes from 80 to 70 percent to 60

19   percent is declining?

20       A.   Yes.

21       Q.   But you didn't use that word; did you, you used

22   good?

23       A.   I used the word good in quotation marks because

24   that is what the son stated, that's what quotation mark

25   means, and then I gave my assessment and observation

1  right immediately following.

2     Q.  So you saw this December 12th, right, Ms.

3  Cardoza?

4     A.  No.

5     Q.  70 to 80 percent.  Meals a day with Ensure,

6  correct?  You see that, correct?

7     A.  Yes.

8     Q.  Okay.  And then was it a few days later or a week

9  later you say it's down to 60 percent and you said the

10  diet intake was good, correct?

11     A.  I put good because that is what the patient's son

12  said.

13     Q.  Okay.  But you -- you review the previous

14  notations; don't you?  Doesn't this give you an entire

15  complete picture?

16     A.  It gives us a view, yes.

17     Q.  I guess the question is I -- wasn't Mr. McInnis

18  telling you that the proper word there should have been

19  decline and not good, and that was the whole -- the

20  whole deal about the meeting?

21     A.  That would have been the proper training.

22     Q.  Okay.

23     A.  That was not.

24     Q.  And no matter what Mr. McInnis, you say he told

25  you, or didn't tell you, you never changed any records,

1    or your records are correct?

2        A.   All my records --

3        Q.   Yes.

4        A.   -- are the way that I saw it in the home.

5        Q.   Correct.  So you never changed anything?

6        A.   No.

7             THE COURT:  The second 18-minute session has

8    expired.

9             MR. CYGANIEWICZ:  Thank you, Your Honor.

10       Q.   (By Mr. Cyganiewicz)  And I think you mentioned

11   earlier that patient -- patients fluctuate, they go up

12   and down, don't they?

13       A.   Right.

14       Q.   Would that be one of the reasons why it's

15   important to document their decline and use that word

16   decline?

17       A.   It's important to document the specificities of

18   the declination.

19       Q.   Can you tell us the patient that Mr. McInnis tell

20   you -- told you, allegedly, to say something that's not

21   true about?

22       A.   No, it wasn't a specific person.

23       Q.   Okay.  And was there a specific record that you

24   could tell us?

25       A.   No.

1    Q.   And there's other people at that meeting, right?

2    A.   Right.

3    Q.   And you're telling us it wasn't about the -- the

4  complaints that Ms. Cardoza had about you not properly

5  using the right terminology?

6    A.   No, she wasn't -- she wasn't even working with

7  us.

8    Q.   But didn't she complain about you; do you know

9  that?

10    A.   I don't.

11    Q.   You're not aware of that then?

12    A.   No.

13    Q.   You're not aware that that's why Mr. McInnis

14  called the meeting is because of her complaints about

15  you?

16    A.   No.

17    Q.   Mr. McInnis did call that meeting; didn't he?

18    A.   He called the meeting.

19    Q.   And was Michelle there?

20    A.   Michelle was there.

21    Q.   Was Lupe there?

22    A.   Yes.

23         MR. SWARTZ:  Your Honor, asked and answered.

24  He's gone over the attendees at this meeting already two

25  or three times.

1          THE COURT:  That's been asked and answered.

2     Q.  (By Mr. Cyganiewicz) When you -- when you assess

3  a patient, how -- how would measure someone's pain?

4     A.  We use a pain scale when they're not able to

5  talk, otherwise, we use a -- a -- just like the other

6  attorney did it zero to ten, or zero to five, give me a

7  number, a numerical scale.  If you're not able to speak

8  then we have to go by facial.

9     Q.  If you use the -- how would you test someone's

10  shortness of breath?

11     A.  Chain stoking is a form of when you're towards

12  end of life you'll start noticing that the patient takes

13  bigger, deeper breaths, your inner costal region, which

14  is like your ribs but going in a little bit deeper, or

15  more deeper I should say, so you -- you start to see

16  like real evidence that the patient is having some

17  shortness of breath.

18     Q.  Did you once tell the federal government that

19  Mr. Garza "encouraged" you to make changes, little

20  changes if the patient declines you need to document

21  that?

22     A.  Who told me that?

23     Q.  Do you remember telling the federal agents that,

24  Mr. Joe Garza?

25     A.  That he told me to change something?

1    Q.   Yeah.   Did you tell Mr. Joe -- did you tell the

2    federal agents that Mr. Joe Garza encouraged -- I got

3    encouragement from Joe Garza to make little changes if

4    the patient declines we need to -- to mention that?

5    A.   I can't recall that, no, I'm sorry.

6    Q.   Isn't that what Mr. McInnis was telling you that

7    you have to mention decline and not just put good?

8    A.   No.

9    Q.   You don't recall that?

10        Is there anyone else besides Maritza that you're

11   saying is not a truth-teller?

12   A.   No response.

13   Q.   Any of these other people in these documents, do

14   you know them to be -- not to be truth-tellers?

15   A.   I would consider us all part of that group to

16   have been told to misinterpret information.

17   Q.   What other nurses are not truth-tellers?   Is

18   Mr. Garza, Joe Garza a truth-teller?

19   A.   He's not someone I can trust, no.

20   Q.   And again, you didn't get upset because

21   Mr. McInnis didn't put a good word in for you to be

22   director of nurses?

23   A.   I don't know why that keeps coming up.   I've

24   never wanted to be a director, why would I want more

25   responsibility of a company that I don't --

1    Q.   Well, it's more moneys, isn't it?

2    A.   I don't know and I don't care for that.

3    Q.   You didn't want to advance your career?

4    A.   Not at all.

5    Q.   So you're saying you didn't leave because you

6    weren't named director of nursing?

7    A.   I wanted to -- I wanted to pursue my bachelor's.

8    Q.   You did not leave because you were -- because you

9    were not named director of nurses?

10             MR. SWARTZ:   Objection, Your Honor, asked

11   and answered.

12             THE COURT:   That's been asked and answered.

13             MR. SWARTZ:   Third or fourth time.

14   Q.   (By Mr. Cyganiewicz)  Can you tell us, point out

15   one record where you lied because Mr. McInnis told you

16   to?

17   A.   No.

18   Q.   So all your stuff is true, right, all the

19   records?

20   A.   To the best of my ability, again, for the fifth

21   or sixth time.

22             MR. CYGANIEWICZ:   One moment, Your Honor.

23             THE COURT:   I'm sorry?

24             MR. CYGANIEWICZ:   One moment, please.

25   Q.   (By Mr. Cyganiewicz)  When is the last time you

1    spoke to these prosecutors before -- before testifying?

2       A.   (No response.)

3       Q.   Today, yesterday?

4       A.   No, maybe -- maybe a week -- well, yesterday we

5    met, I mean, you saw me here.

6       Q.   Right.  You were here yesterday and you spoke to

7    them, correct?

8       A.   Yes.

9       Q.   Was that the last time?

10      A.   Yes.

11      Q.   Thank you.

12             MR. CYGANIEWICZ:  We'll pass the witness,

13   Your Honor.

14             THE COURT:  Mr. Guerra?

15                     CROSS-EXAMINATION

16   BY MS. ARCE-FLORES:

17      Q.   Good afternoon, Ms. Gonzales.

18      A.   Good afternoon.

19             THE COURT:  Ms. Arce-Flores, very quickly.

20             MS. ARCE-FLORES:  Yes, Judge.

21             THE COURT:  One second, one second, one

22   second, one second.  Hold on.

23             A JUROR:  Break time, please.

24             THE COURT:  Do you need a break?

25             MS. ARCE-FLORES:  I actually have one

1    question, Judge.

2                    A JUROR:  Okay.

3                    MS. ARCE-FLORES:  One.

4                    THE COURT:  I have to warn you that's the

5    most famous line that all attorneys say.  I'm not

6    picking on Ms. Arce-Flores, all attorneys say that all

7    the time.  Let's see where that goes, all right, please

8    be patient.

9       Q.  (By Ms. Arce-Flores)  Ms. Gonzales, you stated

10   that your employment was with Bee Caring in 2012, 2013

11   and that was in Harlingen, correct?

12      A.  Correct.

13      Q.  Is that the only place you ever worked during the

14   period of time you worked with Bee Caring?

15      A.  Yes.

16                   MS. ARCE-FLORES:  Thank you.

17                   THE COURT:  Thank you.

18                   MS. ARCE-FLORES:  That's all I have, Judge.

19                   MR. SWARTZ:  Your Honor, I do have some

20   questions, but now would be a good time for a break.

21                   THE COURT:  All right.  Let's take a very

22   brief recess.

23                   Thank you, everyone.

24                   COURT OFFICER:  All rise for the jury.

25                   (JURY OUT.)

1          COURT OFFICER:  All rise for the jury.

2          (JURY IN.)

3          THE COURT:  Thank you everyone.  Please be

4   seated.

5          Thank you, ma'am.  And again, yell into the

6   microphone.

7          Mr. Swartz, everyone, we're ready?

8          MR. GUERRA:  Yes, Your Honor.

9          THE COURT:  Please proceed.

10         MR. SWARTZ:  Thank you, Your Honor.

11                 REDIRECT EXAMINATION

12   BY MR. SWARTZ:

13     Q.  Ms. Gonzales, I have just a few more questions

14   for you.  Earlier during Cross-Examination by the

15   defense attorneys, you made the statement, I would

16   consider us all part of that group to have been told to

17   misinterpret information.  Can you explain to the jury

18   what you meant by that?

19     A.  We were all at fault for either following or

20   listening in to what we were told.  I cannot -- I cannot

21   state for others whether or not they really were putting

22   down poor or good, that was our direct command and our

23   instructions.  I know that for myself, you'll always see

24   good, or for the most part see good in quotation marks

25   if that is what is told to me, I have to write what is

```
 1    told from the patient or the caregiver, and then I tried

 2    my best to explain what I observed in the home.

 3        Q.   And then you were -- you were mentioned also that

 4    there was an employee -- when Mr. Canales was showing

 5    you some of those records, there were a bunch of

 6    different names and different nurses, and there was one

 7    name you did recognize; do you remember that?

 8            And with respect to that particular nurse, you

 9    said that that was a person that said to keep your --

10    the language you used, keep your head down, do your job

11    and keep your head down, what did you say?

12        A.   It was Maritza who told me, you know, when I had

13    asked, guys, what are we doing, why -- why -- like are

14    y'all going to write those -- are you going to write

15    what they're telling us to do, and she just said, keep

16    your head down and do your work.

17        Q.   And what was your understanding of what that

18    meant?

19        A.   Do as you're told, whether or not it's true.  Do

20    as you're told.

21        Q.   And what was it you were being told to do?

22        A.   Lie.

23        Q.   By whom?

24        A.   By Henry McInnis.

25        Q.   And so was there a conversation among the nursing
```

1    staff after that meeting about people's reaction to the

2    instructions that Mr. McInnis was giving about lying in

3    medical records?

4        A.   Yeah, that was the same day I was initiating

5    that -- those questions, that's why -- I don't

6    understand why you're --

7                MR. CYGANIEWICZ:  Objection, that's

8    nonresponsive to the question as to whether or not there

9    was a meeting.

10               THE COURT:  I'm sorry, and to be quite frank

11   again, speak loudly and answer the question as best you

12   can.

13       Q.   (By Mr. Swartz)  Let me just -- I'll just break

14   it into some smaller pieces.  After the meeting with

15   Mr. McInnis, were you earlier testified that he

16   instructed employees to lie in paperwork to cover for

17   potential audits; do you remember that?

18       A.   Yes.

19       Q.   Was there a later discussion following that

20   meeting among the nurses?

21       A.   I initiated a question --

22               MR. CYGANIEWICZ:  Again, Your Honor, that's

23   nonresponsive as to whether there was a later meeting.

24               MR. SWARTZ:  I think she is --

25               THE COURT:  That's overruled.  That's

1    overruled.  Answer if you understand the question.

2       Q.  (By Mr. Swartz)  You may answer.

3       A.  Later on, yes, with one of the nurses I

4    approached them and said, guys, what are you really

5    going to be writing down because this is what -- this is

6    what we're being told, and it doesn't feel right, and

7    that was the only one that -- who replied to me,

8    everyone else just looked at me, gave me that -- the

9    look that well --

10            MR. CYGANIEWICZ:  Objection, Your Honor,

11   speculation on what a look may mean, those people can

12   testify what their intents were.  That's calling for

13   speculation.

14            THE COURT:  Overruled.  You can answer how

15   you felt.

16            THE WITNESS:  They gave me a look, but no

17   response, and the only one that responded was Maritza.

18      Q.  (By Mr. Swartz)  And Maritza's response was?

19      A.  What I mentioned earlier, keep your head down and

20   do your work.  If you want your job, you're going to

21   keep your head down and do your work.

22      Q.  So from your observation, from that discussion

23   that you initiated where Maritza responds, keep your

24   head down and do your work, and then nobody else sort of

25   responds awkwardly it sounds like?

1      A.   Right.

2      Q.   What was your understanding of what was going to

3  happen with these other employees?

4      A.   My understanding was that --

5           MR. CYGANIEWICZ:   Your Honor, I'm going to

6  object.   Speculation as to her understanding meant to

7  what other people would have said or done.

8           MR. SWARTZ:   Her own understanding what

9  would be done.

10          THE COURT:   That's overruled.

11          Answer if you understand the question.

12          THE WITNESS:   Again, the inclination is that

13 everyone was going to proceed with lying, whether or not

14 it was done, again, everyone has to answer for their

15 own.

16     Q.   (By Mr. Swartz)  And so when Mr. Canales is

17 putting these medical record up on the screen and

18 walking you through all the details, can the jury rely

19 on those medical records to show what the -- what was

20 really going on with the patient at that time?

21          MR. HECTOR CANALES:   Objection, Your Honor.

22 It invades the province of the jury.   The jury can rely

23 on whatever the jury wants to rely on, this witness --

24 this question seeks to invade the province of the jury.

25 It's completely inappropriate.

1           MR. SWARTZ:  Well, I can simplify the

2   question.

3           THE COURT:  Rephrase the question.

4       Q.   (By Mr. Swartz)  Based on what you observed from

5   that meeting where Mr. McInnis gave those directions,

6   and what you observed in the reactions of other

7   employees at the company, can medical records, such as

8   what Mr. Canales put on the screen, can those be relied

9   upon?

10          MR. HECTOR CANALES:  Objection, Your Honor.

11  It's the same question, same objection.

12          THE COURT:  Overruled, answer if you

13  understand.

14          THE WITNESS:  It cannot be -- I cannot deem

15  it as accurate and I cannot deem it as truthful

16  following my note, I don't know why a patient would be

17  on hospice three years, would be questionable to me.  So

18  I can't rely on that.

19          MR. SWARTZ:  I'll pass the witness,

20  Your Honor.

21          THE COURT:  Mr. Canales.

22                  RECROSS-EXAMINATION

23  BY MR. HECTOR CANALES:

24      Q.   Ms. Gonzales, you left -- first of all, are you

25  changing your testimony, ma'am, that the doctor is the

1   one who gives his opinion as to the diagnosis for

2   terminal illness, are you changing that?

3       A.   I'm not.

4       Q.   Okay.  All right.  And -- and you don't -- you

5   haven't -- they didn't ask you a single question here

6   today, Mr. Swartz didn't ask you a single question about

7   a specific patient; did he?

8       A.   Not a specific patient, no.

9       Q.   In all the interviews and times that you spent,

10  you were here all day yesterday; weren't you?

11      A.   No.

12      Q.   How long were you here yesterday?

13      A.   Two hours.

14      Q.   All right.  In those two hours, did anybody show

15  you any documents and go, the -- besides the ones I did

16  about Ms. Cerda?

17      A.   No.

18      Q.   No.  Okay.  And so it's the doctors who make the

19  call, right, as to whether or not a patient is eligible

20  for hospice, right?

21      A.   It's the doctor.

22            MR. SWARTZ:  Objection, Judge, it's beyond

23  the scope of the redirect.  I didn't ask about doctors

24  and doctor's diagnoses and who qualifies patients, I

25  just asked about the reliability of the medical records.

1          MR. HECTOR CANALES:  He asked questions that

2     elicited questions from the witness about the

3     qualification for hospice, Judge.  I'm entitled to go

4     into not just what he asked, but what she answered,

5     that's what counts, not my questions, not his questions

6     but what she says.

7          THE COURT:  Gentlemen, gentlemen, I'll allow

8     her to answer.  I think she already answered before you

9     stood up.

10         MR. HECTOR CANALES:  I didn't hear the

11    answer I was talking too much, sorry.

12    Q.  (By Mr. Hector Canales)  Could you tell me your

13    answer?

14    A.  What was your question?

15    Q.  It's the doctor?

16         THE COURT:  It's only the doctor.

17    Q.  (By Mr. Hector Canales)  And as far as this

18    particular -- do you even know the allegation are in

19    this case?

20    A.  Health care fraud.

21    Q.  When, like particular instance, are you aware the

22    allegation in this case is regarding from February of

23    '16 to April of '16; are you aware of that?

24    A.  No.

25    Q.  And -- and so when it comes to -- you can't -

1    you don't know anything about that day because you were

2    long gone three years, right?

3        A.  Correct.

4        Q.  Right.  So you're of no help to the jury when it

5    comes -- they've called you as a witness up here over a

6    period of time when you were gone three years?

7                MR. SWARTZ:  Objection, Your Honor.  Same

8    type objection Mr. Canales made to my question.

9                THE COURT:  Rephrase the question.

10       Q.  (By Mr. Hector Canales)  You were long gone;

11   weren't you?

12       A.  Yes.

13       Q.  All right.

14               MR. HECTOR CANALES:  Good objection.

15       Q.  (By Mr. Hector Canales)  And --

16               MR. HECTOR CANALES:  In the interest of

17   time, no further questions.

18               THE COURT:  Mr. Cyganiewicz, anything else?

19               MR. CYGANIEWICZ:  I have nothing Your Honor.

20   Nothing further.

21               THE COURT:  Ms. Arce-Flores?

22               MS. ARCE-FLORES:  Nothing, Judge.

23               THE COURT:  Anything else?

24               MR. SWARTZ:  Nothing further, Your Honor.

25               THE COURT:  Thank you, ma'am, you may step

1    down.

2                    THE WITNESS:  Thank you.

3                    THE COURT:  Ladies and gentlemen, I believe

4    we have one more witness -- well, we do have one more

5    witness.  We may go past 5:00, we'll see, but I told

6    everybody to try and get through it as quickly as

7    possible.

8                    So the next witness, please.

9                    MR. FOSTER:  Thank you, Your Honor.

10                   The United States calls Dr. Ricardo

11   Escamilla.

12                   THE COURT:  Please remain -- sir, one

13   second.  Please remain standing and rise your right hand

14   and Ms. Sandra is going to swear you in.

15                   (Witness sworn in.)

16                   THE WITNESS:  I do.

17                   THE COURT:  Thank you, sir.  Please have a

18   seat, make yourself comfortable, but position the

19   microphone closely to you and speak loudly and clearly

20   into the mic.

21                   Mr. Foster, please proceed.

22                            DIRECT EXAMINATION

23   BY MR. FOSTER:

24       Q.  Good afternoon, Doctor, can you please introduce

25   yourself to the jury.

1    A.   My name is Dr. Ricardo Escamilla.

2    Q.   And are you currently employed?

3    A.   I am.   I work for a primary care clinic called

4    MedFirst in San Antonio, and I've been there for the

5    last, probably going on 13 years.

6    Q.   Can you tell the jury about your educational

7    background.

8    A.   I have a Bachelor's Degree and a Masters in

9    Science from the health -- from San Antonio, UT

10   San Antonio, and I did my residency there as well, my

11   medical school where I obtained my Doctors or Doctorate

12   in Medicine.   I did my residency there, too, in family

13   medicine.   And then a year later I became board

14   certified in family medicine.

15   Q.   Now, have you worked with hospice companies

16   before?

17   A.   I've worked with hospice companies since I

18   graduated.

19   Q.   Why were you interested in hospice?

20   A.   My main interest, I was introduced to hospice

21   through my residency program.   They have a fellowship

22   there after family medicine that is shared with internal

23   medicine that is in geriatric and palliative medicine.

24        And so around that time as well I had two

25   relatives that were in need of that, and one of my

1    relatives, it went very, very well for him, despite his

2    condition, hospice helped him quite a bit.

3         And my grandmother, even being a doctor at the

4    time, and even being a part of the family, unfortunately

5    she went through a lot of unnecessary treatment that

6    actually didn't do anything for her.  It just prolonged

7    her life and -- and made her suffer more.

8         So I thought that I could be part of that and

9    that I could help people have an experience more like my

10   uncle than my grandmother.

11        Q.   Sorry to hear about your grandmother.

12             Did you become aware with the company called the

13   Merida Group?

14        A.   I did.

15        Q.   And did you work for the Merida Group?

16        A.   I did for a brief period of time.

17        Q.   Who hired you?

18        A.   Rodney Mesquias.

19        Q.   What was Rodney Mesquias's role in the company?

20        A.   I believe he was the owner.

21        Q.   What was your title at the Merida Group?

22        A.   I was an associate medical director.

23        Q.   You said that you were only there for a brief

24   period of time, why was that?

25        A.   I was fired.

1    Q.   Why were you fired?

2    A.   I was fired, I was told because I wasn't

3  referring patients to the company.

4    Q.   Who told you that you were fired for not

5  referring patients to the company?

6    A.   Rodney Mesquias.

7    Q.   What did you think about that?

8    A.   At that point, I knew it wasn't a good place to

9  work so I was happy to move along.

10   Q.   Is it illegal to condition a medical director's

11  pay on referring patients to a company?

12   A.   It is.

13   Q.   Is that a kickback?

14   A.   It is.

15   Q.   Now, while you were working in that brief period

16  of time at the Merida Group, did you also become aware

17  whether Merida was billing Medicare for patients who

18  didn't qualify for hospice?

19   A.   I did become aware of that.

20   Q.   Now, can you explain to the jury the hospice

21  requirements?

22   A.   The hospice requirements are that the patient has

23  a chronic severe illness that is -- that we're likely

24  not going to be able to cure, and that they are willing

25  to forego extensive or drastic treatments and just

1    concentrate on managing their pain, giving them a good

2    quality of life instead of actual length of time.

3         Q.   Are you familiar with the certificate of terminal

4    illness?

5         A.   I am.

6         Q.   And is there a time limit in which the patient

7    must be likely to pass away if the disease runs its

8    natural and usual course?

9         A.   There is.   Usually, for these illnesses, the

10   patient has to have a prognosis of less than six months.

11        Q.   In making that prognosis --

12             COURT OFFICER:   Excuse me, Your Honor.   The

13   jury is having difficulty understanding what he's

14   saying.

15             THE COURT:   All right, sir.   Again, pretend

16   you're yelling.

17             THE WITNESS:   Okay.

18             THE COURT:   You're -- again, you have to

19   speak very loudly.   Don't be afraid of the microphone.

20             THE WITNESS:   Okay.

21        Q.   (By Mr. Foster)   Now, you're talking about the

22   requirement that there be a prognosis of less than six

23   months.   Do you use objective clinical facts in

24   assessing the patient in regard to that requirement?

25        A.   Yes, we do.

1    Q.   Can you explain that to the jury.

2    A.   Well, the patient has to be not just have a

3    chronic illness, or a severe diagnosis, like cancer.

4    Those can be illnesses that are severe and serious, but

5    they have to be at the level of health that we believe

6    as doctors that they're going to pass away in six

7    months.

8    Q.   And in your experience, do doctors typically

9    agree about whether a patient has less than six months

10   to live?

11   A.   Yes.

12   Q.   In your experience, how long is the average time

13   that a patient is on hospice at a legitimate company?

14   A.   Hospice is still, I believe, very under-utilized.

15   A lot of patients don't go in there until they're very

16   ill, and I know on average most people spend there about

17   less than 30 days.

18   Q.   Less than 30 days.  You mentioned the difference

19   between a chronic illness and having less than six

20   months to live.  I want to talk about a couple of

21   different diseases.  Alzheimer's.  Is Alzheimer's a

22   chronic incurable disease?

23   A.   It is.

24   Q.   Do all Alzheimer's patients qualify for hospice?

25   A.   They do not.

1    Q.   What if the patient is confused?

2    A.   That doesn't qualify them.

3    Q.   What if they're a handful for their caregiver?

4    A.   That does not qualify them.

5    Q.   What if their caregiver is very stressed out

6  because they have to take care of an Alzheimer's

7  patient?

8    A.   That does not qualify them.

9    Q.   What if the patient is violent?

10   A.   That does not qualify them either.

11   Q.   What if the patient has suicidal thoughts, says

12  to a family member, I -- I don't want to deal with this

13  anymore?

14   A.   That does not qualify them.

15   Q.   Can you explain that to the jury.

16   A.   For example, the -- the example that you used as

17  cancer, there's some cancers that are very fast, and

18  there are some that are slower.  Prostate cancer, for

19  example, tends to be one of those that is very slow

20  growing, but of course, there's exceptions, but

21  typically, I'll give you an example of my grandfather.

22  He was diagnosed with, at least a score ten prostate

23  cancer in his 60s.  And he ended up dying in his 90s

24  from a heart attack.

25        So that would be an example of a -- a chronic

1  serious illness, but that would not qualify him for

2  hospice because it is likely to be longer than the six

3  months.

4      Q.  And similarly with Alzheimer's, is Alzheimer's

5  likely to be longer than six months?

6      A.  Absolutely, years.

7      Q.  What about COPD?

8      A.  Also can be years.

9      Q.  What about CHF?

10     A.  Also years.

11     Q.  Can you explain to the jury what CHF is?

12     A.  Congestive heart failure, and that also has, you

13  know, chronic long term illness.  The way we

14  differentiate with congestive heart failure is they have

15  to have symptoms.  It actually takes a lot of calories

16  for the patient's heart to beat and so they'll begin to

17  lose weight.  They will usually have to walk with a lot

18  of assistance, usually limited to ten, 15 feet before

19  they get short of breath, and they will also get short

20  of breath with just normal conversation.

21         When the patient continues to have one of the

22  signs of that is lower extremity edema, and once they

23  continue to have that edema, and those symptoms despite

24  maximum medical management, then that's a poor sign as

25  well.

1          Injection fractures are another test that we use

2   to test the function of the heart, and typically --

3          MR. HECTOR CANALES:  Judge, I object to the

4   narrative at this point.  Q and A, please.

5          THE COURT:  Again, sir, I know you're trying

6   to answer the questions as -- as briefly as possible.

7   Let's keep this in a question/answer format.

8   Q.  (By Mr. Foster)  You mentioned fractures.  Can

9   you tell the jury whether they are widely accepted

10  clinical indications of whether a patient has less than

11  six months to live?

12  A.  There is, and that example there's a CHF less

13  than 20 percent.  In other examples like Alzheimer's,

14  something like a FAST score would be indicative of a

15  terminal illness.

16  Q.  Now, turning to your work as a medical director

17  at Merida, was that a full-time job?

18  A.  That was a part-time job.

19  Q.  How many of the patients on hospice at Merida

20  were patients you had previously seen before?

21  A.  Few to none.

22  Q.  When you started at the Merida Group, what did

23  you discover about the size of the census there?

24  A.  I thought it was larger than average.

25  Q.  What do you mean by that?

1    A.   Most hospices that I've worked with dealt with

2   about a census of 50.  When I was at Merida, I think it

3   was about 100, twice that much.

4    Q.   What were you told by other Merida employees

5   about Defendant Mesquias' attitudes towards recertifying

6   patients?

7    A.   I heard that he wanted them certified at any

8   cost.

9    Q.   Recertified at any cost?

10    A.   Yes.

11    Q.   After you started working at the Merida Group,

12   did you go out and visit some of the patients?

13    A.   I did.

14    Q.   What percentage of the patients would you say you

15   visited before recertifying?

16    A.   Probably, about 30 percent.

17    Q.   And the remainder, did you rely on nurses to

18   assess their condition?

19    A.   I would.

20    Q.   When you went to visit patients, what did you

21   observe about their condition?

22    A.   A lot of times I noticed that their physical

23   condition did not match what was presented to me.

24    Q.   When you say their physical condition did not

25   match what was presented to you, what do you mean?

1    A.   A lot of times these patients were walking on

2    their own, they were doing activities of daily living

3    like you and I would, and that's usually not consistent

4    with hospice patients.

5    Q.   And when you say it didn't match what you were

6    given, how did seeing patients not at home walking on

7    their own differ from the information you had been

8    given?

9    A.   It was very different.  On paper, everybody that

10   I was seeing qualified.

11   Q.   When you say on paper, were these Merida Group

12   patient documents that were given to you?

13   A.   They were.

14   Q.   And did they say these patients who were walking,

15   driving, leaving, qualified for hospice?

16   A.   They did.

17   Q.   And was that true or false?

18   A.   It was false.

19   Q.   Now, do you recall even a patient who was

20   working?

21   A.   Yes.

22   Q.   And can you tell the jury what you recall about

23   that patient who was working while on hospice?

24   A.   I heard that some of the nurses weren't able to

25   complete their visits because he was out working, I

1    think, as a greeter at Wal-Mart.

2       Q.   Can a patient qualify for hospice and be working

3    as a greeter at Wal-Mart?

4       A.   No.

5       Q.   Now, you talked about patients not qualifying.

6    Were these the types of situations where a reasonable

7    doctor could disagree whether the patient was dying or

8    not dying?

9       A.   No.

10       Q.   Can you explain that to the jury.

11       A.   This is not a -- a perfect science, but there are

12    guidelines that we follow, and these were not even close

13    to being borderline.

14       Q.   Now, these patients who were not even close to

15    being borderline, what, if anything, did you notice

16    about the length of time they'd been on hospice?

17       A.   I noticed that it was extremely long.

18       Q.   When you say extremely long, can you explain to

19    the jury what you mean?

20       A.   Some patients were there for years.

21       Q.   And what did that mean to you that you were

22    seeing patients there for years?

23       A.   Well, to me that told me that those patients

24    might have been ill, but they're more of a custodial

25    type of illness, that they do need help with their

1    activities of daily living, but they weren't terminal.

2        Q.   And when you say custodial, what do you mean?

3        A.   Custodial meaning that they can benefit from

4    somebody going in there and helping them, take showers

5    and they can benefit from durable medical equipment,

6    things like that, but that they're not terminal.

7        Q.   Now what is a medical director required to do if

8    patients don't qualify for hospice services?

9        A.   We're supposed to help transition them back in to

10   see their primary care doctors, or into whatever it is

11   they need really to get settled with another primary

12   care doctor.

13       Q.   And did you attend what are called IDG meetings?

14       A.   I did.

15       Q.   And at those IDG meetings were patients

16   discussed?

17       A.   They were.

18       Q.   Now, did you have the patient's entire file or

19   medical record before you when you discussed these

20   patients?

21       A.   No, not typically.

22       Q.   Who did you rely on in deciding whether a patient

23   should be recertified?

24       A.   On the information the nurses give us.

25       Q.   And as you spent more time at Merida, did you

1  begin to question the information that the nurses were

2  giving you about patients?

3         MR. HECTOR CANALES:  Objection, Your Honor,

4  leading.  Suggesting the answer to the witness.

5         THE COURT:  Rephrase the question.

6  Q.  (By Mr. Foster)  As you began to spend time at

7  Merida, what, if anything, did you notice about the

8  information that the nurses were giving you?

9  A.  I noticed that nurses would make comments that

10  were contrary to what was on paper.  For example, this

11  you know, a person that is walking, eating fine,

12  actually has gained weight, that's how I heard about the

13  comments about that gentleman.  It was not just a

14  one-time comment, it was something that over time

15  happened.  And that led me to question those patients.

16  Q.  And can you explain to the jury whether you

17  became aware of a criteria list?

18  A.  There is.  In the industry, there's a criteria

19  list for every disease.

20  Q.  And did you have concerns about how the criteria

21  list was being used at Merida?

22  A.  I did.  The criteria list is common in the

23  industry like I said, but it is used really more to

24  exclude patients.  In the Merida Group, I thought it was

25  actually being used to include patients and change their

1   charts to -- to match somebody that did qualify.

2        Q.   And since you began to realize that the charts

3   were being changed, can you tell the jury whether or not

4   you believe that you certified some patients who did not

5   qualify for hospice?

6        A.   I did.  Based on the information that I was

7   given, I -- I certified patients that I believed were

8   appropriate for hospice.

9        Q.   And if I gave you Merida files would you trust

10  what is in them?

11       A.   I would not.

12       Q.   Now, as you spent more time at Merida, did you

13  begin to try to not admit and discharge patients?

14       A.   I did.  As I got to know the information that I

15  was given, I did try and discharge patients that were

16  not appropriate.

17       Q.   And what were you told about -- what were you

18  told by other Merida employees about Defendant

19  Mesquias's reaction to them?

20            MR. CYGANIEWICZ:  Your Honor, I would object

21  about the vague question about the various employees

22  without naming them and specifying them, compound and

23  vague question.

24            THE COURT:  Overruled.

25       Q.   (By Mr. Foster)  You can answer the question.

1    A.  I'm sorry, repeat it again?

2    Q.  Yeah, what were you told by other Merida

3  employees about Defendant Mesquias' reaction?

4    A.  I was told that he was not going to like that.

5    Q.  Did you feel pressure to keep patients on hospice

6  who didn't need it?

7    A.  I did.  Throughout my first months there, I also

8  kept hearing stories about nurses and staff that were

9  fired before if they didn't do what -- as they were

10  told.

11   Q.  And how did that influence you that there were

12  nurses and staff members being fired if they didn't do

13  what they were told?

14   A.  Well, definitely, I think it put a pressure on me

15  thinking about my job.

16   Q.  Now, were there some patients eventually who you

17  refused to admit or recertify?

18   A.  There were.

19   Q.  Now, can you tell the jury what would happen to

20  those patients?

21   A.  Typically, they would go on the list of patients

22  to start making arrangements to transition them back to

23  their primary care doctor.

24        But what I found out was going on there was that

25  they were being changed to other doctors and they were

1    still staying on services.

2        Q.   So if you determined that a patient didn't

3    qualify for hospice at the Merida Group, would they come

4    off services?

5        A.   They would not.

6        Q.   And how did you find that out?

7        A.   There were lists of the doctor's patients that

8    were on board and I would continue to get orders

9    sometimes from specific patients that I would recognize

10   at the time by name while I was on call, so we cross

11   cover and so I knew the patients were still on services.

12       Q.   After you started to try to discharge patients,

13   how did that impact your census, or the number of

14   patients you were given at the Merida Group?

15       A.   My census, the number of patients that I was

16   directly taking care of decreased.  It was much smaller,

17   and the patients that I had were more appropriate.

18       Q.   Now, can we bring up what's been admitted as

19   Government's Exhibit H-26, please.  Thank you.

20            Are you familiar with patient named Jack High?

21       A.   Yes, I am.

22       Q.   Did you ever personally meet Jack High, or

23   examine him?

24       A.   No, I never did.

25       Q.   Did you recertify Jack High for hospice?

1    A.   I did.

2    Q.   Did Jack High actually qualify for hospice?

3    A.   No, he did not.

4    Q.   Can you explain to the jury why you recertified

5    Jack High if he didn't qualify?

6    A.   Based on the information that I was given when I

7    was there the first couple of months, he met the

8    criteria for hospice.

9    Q.   Did you later discover that the information you

10   had been given about Mr. High was false?

11   A.   I did.  I found out it was incorrect and that's

12   when I refused to certify him anymore.

13   Q.   And what did you find out that led you to the

14   conclusions that the information you'd been given about

15   Jack High was false?

16   A.   Repeat that, please.

17   Q.   Yes.  What did -- why did you refuse to continue

18   to certify Jack High?

19   A.   Because I found out that he was much healthier

20   than was portrayed.

21   Q.   And what sort of things did you find out?

22   A.   That he was walking and -- and pretty much

23   independent.

24   Q.   And were you given the opportunity to review Jack

25   High's patient file before testifying?

1        A.   I was.

2        Q.   And can you tell the jury what you observed from

3    your review of the patient file?

4        A.   That there was not enough information there, and

5    based on what I know now to -- for him to qualify.

6        Q.   And if you had had that information at the time

7    of the recertifications, would you have recertified Jack

8    High?

9        A.   No, I wouldn't have.

10       Q.   Now, after you referred -- refused to recertify

11   Jack High because he didn't qualify for hospice, do you

12   know what happened to him?

13       A.   He got moved to a different panel.

14       Q.   When you say moved to a different panel, what do

15   you mean?

16       A.   That means that another doctor certified him.

17       Q.   For hospice at the Merida Group?

18       A.   Yes.

19       Q.   And can we bring up Government Exhibit H-27.

20   Now, looking at H-27, Jack High was on hospice for over

21   four years.  What do you think of that?

22       A.   Very unusual for a hospice patient.

23       Q.   Can you explain that to the jury.

24       A.   Again, most people that are appropriate for

25   hospice have a prognosis and do pass away before six

 1   months.

 2       Q.   Now, how were you supposed to be paid as a

 3   medical director at Merida?

 4       A.   In my part-time job I was just paid a consultant

 5   fee, so it was per hour.

 6       Q.   And would you submit time to Merida?

 7       A.   I would give them a -- a time sheet, yes.

 8       Q.   And how much were you paid each hour?

 9       A.   I was paid $250 per hour.

10       Q.   And was the compensation supposed to be dependent

11   on you referring patients?

12       A.   No.

13       Q.   Was it contractual agreements?

14       A.   No.

15       Q.   And so are you familiar with Anti-Kickback

16   Statute?

17       A.   Yes, I am.

18       Q.   What is the Anti-Kickback Statute?

19       A.   The Anti-Kickback Statute is that we're not

20   supposed to give orders for medical treatment for

21   patients that do not need it.

22       Q.   And how does the Anti-Kickback Statute apply to

23   work as a medical director?

24       A.   It means that I really -- I mean, I guess that

25   it -- you just can't get paid for referring patients.

1    Q.   So you can be -- can you be paid for legitimate
2  work?
3    A.   You can get paid for additional work that you do,
4  but not for referrals.
5    Q.   Not for referrals.  Did there come a time when
6  you received a payroll check for an amount that didn't
7  match the hours you had submitted to Merida?
8    A.   It was.  I did get a paycheck that I thought
9  surely was an error.
10   Q.   Why were you -- did you feel sure it was an
11  error?
12   A.   Because it was not even ten percent of what it
13  should have been.
14   Q.   What did you do after you received this payroll
15  check that wasn't ten percent of what it should have
16  been?
17   A.   I asked -- I called the officer manager and asked
18  him about it because I thought they would correct it.
19   Q.   Did they correct it?
20   A.   No, he didn't.  He told me that that's what
21  Rodney had told him to pay me.
22   Q.   And did you talk with Defendant Mesquias?
23   A.   I did.  I got off the phone and I spoke with
24  Rodney himself.
25   Q.   And what did Defendant Mesquias tell you?

1    A.  He told me that he couldn't pay me anymore

2  because I hadn't referred any patients to him.

3    Q.  What did you tell him when he said that?

4    A.  I said, Rodney, this is pay for the last month's

5  worth of work.  You know that that is against the law to

6  get paid for referrals.  You know, I -- I do expect you

7  to pay me for it.

8    Q.  And what did he say?

9    A.  He said that if I didn't refer any patients to

10  him, he couldn't afford to pay me.

11    Q.  Did he ever pay you the money he owed you for

12  your legitimate work as medical director?

13    A.  No, he didn't.

14    Q.  Is that the last conversation you ever had with

15  Mr. Mesquias?

16    A.  Yes.  I told him that I would be happy to -- if

17  he'd pay me, I'd be happy -- even if he didn't, I'd be

18  happy to stay and transfer the care of patients to

19  somebody that could take care of them.  I didn't want to

20  just leave them without a doctor.  And he told me that

21  that was -- that wouldn't be necessary, that he would

22  tell his nurses that evening not to call me anymore.

23         MR. FOSTER:  Thank you.

24         No further questions, Your Honor.

25         THE COURT:  Gentlemen.

```
1              MR. HECTOR CANALES:  You want me to proceed,

2    Your Honor?

3              THE COURT:  Yes.  The defense has three,

4    25-minute sessions.

5                        CROSS-EXAMINATION

6    BY MR. HECTOR CANALES:

7       Q.  Dr. Escamilla, good afternoon.

8       A.  Hello.

9       Q.  My name is Hector Canales; I represent Rodney

10   Mesquias, okay?

11      A.  Hello.  Yes.

12      Q.  Okay.  Yesterday you met with the Government,

13   correct?

14      A.  Yes.

15      Q.  You reviewed medical records?

16      A.  Yes.

17      Q.  Specifically, Mr. High?

18      A.  Yes.

19      Q.  Did you review any other patient records?

20      A.  Yes.

21      Q.  Which other patient records did you review, sir?

22      A.  Very limited a line-up of patients.

23      Q.  A line-up?

24      A.  Of pictures, yeah, like pictures.

25      Q.  But actual medical records or just pictures?
```

1     A.   Pictures.

2     Q.   Kind of like this?

3     A.   Yes, sir.

4     Q.   All right.

5     A.   And a couple of other orders.

6     Q.   Okay.  But -- but the actual records themselves,

7   medical records, was that just Jack High?

8     A.   Yes.

9     Q.   All right.  And did you select the medical

10   records to review, or did they select them for you?

11     A.   They showed them to me.

12     Q.   They showed them to you?

13     A.   Yes.

14     Q.   All right.  So they picked the records to show

15   you?

16     A.   Yes.

17     Q.   All right.  Did you say let me have them all?

18     A.   No.

19     Q.   So, okay, and how long did they give you to look

20   at them?

21     A.   All the time I needed.

22     Q.   All right.  And how long was that?

23     A.   I don't know, a couple of hours.

24     Q.   Couple of hours, all right.  Do you recall -- all

25   right.  And so you -- also, you've had at least two

1    other meetings with the Government, correct?

2        A.   Yes.

3        Q.   One by telephone and one in person?

4        A.   A couple in person, yes.

5        Q.   A couple, both in person?

6        A.   Uh-huh.

7        Q.   Okay.  All right.  I believe the first one took

8    place April 19th of 2017, correct?

9        A.   I would assume so, I can't remember the dates.

10       Q.   All right.  Gosh, we're already in -- in October,

11   so two-and-a-half years ago, right?

12       A.   Yes.

13       Q.   Okay.  And then another one on September the 28th

14   of '17, you had a second meeting, right?

15       A.   Again, I met several times with them.

16       Q.   Okay.  And those meetings, sir, did you go to

17   them, or did they contact you?

18       A.   They came to me.

19       Q.   All right.  And how is that, what's that feel

20   like when the -- when the United States of America shows

21   up as a doctor and says (knocking) we want to talk to

22   you about your practice?  What's that feel like?

23       A.   Well, that's something that doesn't happen

24   everyday.

25       Q.   Right.  So I'm sure then have you a pretty clear

1    recollection.  Did that cause your heart to -- heart

2    rate to speed up a little bit?

3        A.   Not very much.

4        Q.   Not very much, right, because you didn't think

5    you'd done anything wrong, right?

6        A.   Right.  I knew.

7        Q.   In fact, in fact, you made it a point, did you

8    not, you stated very emphatically to the Government,

9    right, that everything you did was legitimate, right?

10       A.   Everything I did with the information I was

11   given, yes.

12       Q.   All right.  But you didn't qualify it back then,

13   right, about the patient records, you didn't make any

14   qualifications back two-and-a-half years ago, you just

15   said everything I did was legitimate, right?

16       A.   No.

17       Q.   The qualification that you just made about, well,

18   the medical records, that was the result of the two

19   hours you spent yesterday reviewing the documents they

20   showed you, right?

21       A.   No, initially they just came and talked to me

22   about what I knew.

23       Q.   But you told them, did you not, sir, that you

24   refused, you refused to be swayed by any pressure,

25   right?

1    A.   I did.

2    Q.   And that was the truth when you told them that,

3  right?

4    A.   Yes.

5    Q.   All right.  And you also told them that you found

6  that when you found a patient that didn't qualify, you

7  discharged them, right?

8    A.   I tried to.

9    Q.   No, sir.  You didn't say you tried to, you told

10  the Government that when you found -- you found several

11  patients --

12    A.   I refused to --

13    Q.   Excuse me.  Let me finish.

14    A.   Sorry.

15    Q.   That you found several patients that you believed

16  did not qualify and as a result you discharged a large

17  number of hospice patients, true?  That's what you told

18  them?

19    A.   I would not certify them.

20    Q.   We're going to get to your certifications in a

21  minute, sir, and -- and I'm on a clock here so --

22    A.   Sure.

23    Q.   -- if you'll please answer my questions directly,

24  all right.  It is true that on April the 19th of 2017

25  you told the Government that you discharged a large

1    number of patients to Merida because you believed they

2    didn't qualify for hospice?

3        A.   If I think they didn't qualify I would discharge

4    them.

5        Q.   Right.  And so if you had run across somebody you

6    had -- you discharged them, right?

7        A.   I would.

8        Q.   It didn't matter what -- what anybody said, it

9    didn't matter whether Rodney Mesquias or King Kong told

10   you to -- to certify that patient, you didn't give up

11   your license and your medical judgment; did you?

12       A.   No, my judgment.

13       Q.   That's right, you held onto that, right?

14       A.   I tried to.

15       Q.   Right.  You told them that you would not certify

16   a hospice patient if you believed the patient was even

17   questionable, right?

18       A.   Or inappropriate.

19       Q.   Right.  Because you -- you told them because you

20   didn't want to jeopardize your medical license, right?

21       A.   I don't recall saying that.

22       Q.   You don't recall saying that?

23       A.   No.

24              MR. HECTOR CANALES:  May I approach,

25   Your Honor?

1   Q.  (By Mr. Hector Canales)  Read that line right

2   there to yourself.

3   A.  I don't recall saying that.

4   Q.  You don't recall saying that?  The agents got it

5   wrong?

6           MR. FOSTER:  Objection, Your Honor.  We've

7   covered this.

8           THE COURT:  Rephrase the question.

9   Q.  (By Mr. Hector Canales)  You didn't tell the

10  Government.  If the Government -- if the Government said

11  that -- that you didn't want to put your license at

12  risk, they got it wrong, they misheard you?

13          MR. FOSTER:  Objection, improper

14  impeachment, Your Honor.

15          THE COURT:  Rephrase the question.

16          MR. HECTOR CANALES:  I'm just asking him --

17          THE WITNESS:  I don't recall saying that.

18  Q.  (By Mr. Hector Canales)  You don't recall saying

19  that, okay.  But you knew, somewhere deep down you knew

20  that in answering these questions with the Government

21  your license could be at risk?

22  A.  No.

23  Q.  All right.  Now, let's talk a little bit about

24  certification.  Let's back up a little bit.

25          A doctor's eligibility on hospice is based on

1   your clinical judgment about somebody's prog -- their

2   prognosis of their death, right?

3       A.  Yes, it's -- there's a set criteria that we

4   follow.

5       Q.  Right.  But it's -- but even that criteria, it

6   takes a judgment, it takes an opinion of a doctor taking

7   all the facts of a patient, applying those facts, and

8   reaching an opinion about -- about a patient's

9   prognosis, right?

10      A.  Yes.

11      Q.  Right.  And that opinion can be different from

12  doctor to doctor to doctor to doctor, right?

13      A.  Not typically.

14      Q.  That wasn't my question, all right.  My question

15  was your opinion -- have you ever had a different

16  opinion about -- about how to treat a patient than

17  another doctor?

18      A.  Yes.

19      Q.  About the same diagnosis?

20      A.  Yes.

21      Q.  About the same patient?

22      A.  Yes.

23      Q.  Is the doctor that disagreed with you, is he

24  committing -- is -- is he a -- committing fraud?

25      A.  I don't know.

1    Q.  Is it possible, isn't it -- you know this for a

2    fact though, don't you, doctor, that two doctors can

3    have two different opinions and they can both be right?

4    A.  Yes.

5    Q.  Let me show you what is marked as Government

6    Exhibit A-30.  Have you ever reviewed the Medicare

7    Benefit Policy Manual?

8    A.  Not recently, no.

9    Q.  But you have?

10   A.  I have.

11   Q.  The Government show you this, this is their

12   document, did they show you this yesterday?

13   A.  No, I did not see it yesterday.

14   Q.  An individual is considered to be terminally ill

15   if the medical prognosis -- let me stop right there.

16   Prognosis is a prediction of the future, correct?

17   A.  Yes.

18   Q.  Prognosis is an opinion, correct?

19   A.  It's an educated guess based on criteria.

20   Q.  Let me ask you this, let me ask you this:  What's

21   an advocate to you?

22   A.  Somebody that is working towards the benefit of

23   somebody else.

24   Q.  All right.  Somebody -- would you agree that one

25   of the things an advocate does is they take a side, they

1    take a position, they choose sides?

2        A.   Right.

3        Q.   Okay.  And would you agree, sir, are you here

4    today as an advocate for one side or the other, for

5    either the Government or for my client Mr. Mesquias?

6        A.   I try to make it a practice to be on the side of

7    the patient.

8        Q.   Okay.  All right.  But, sir, are you here to

9    state facts, or are you here to advocate for one side or

10   the other?

11       A.   I'm here to advocate for the truth.

12       Q.   Okay.  So even if that truth is not -- is not

13   consistent with the Government's theory, the

14   Government's case, you're going to still -- you're not

15   going to advocate for them regardless; are you?

16       A.   I'll answer to the best of my ability.

17       Q.   Okay.  All right.  Terminally ill is the medical

18   prognosis is that the individual's life expectancy is

19   six months for less if the illness runs its normal

20   course, right?

21       A.   Right.

22       Q.   That's the standard?  It's normal that illnesses

23   don't act normal all the time, right?

24       A.   They're common for a reason.

25       Q.   Right.  But -- but an illnesses normal course can

1    vary from patient to patient to patient, right?

2        A.   The minority of them, do.

3        Q.   All right.  Now, in reaching a decision to

4    certify the patient is terminally ill, I'm right here, I

5    jumped right here, okay, the hospice medical director

6    must consider at least the following.  And I'll stop

7    here for a second.

8             You were a medical director for Merida, correct?

9        A.   Yes, I was associate medical director.

10       Q.   Have you been a medical director for any other

11   hospices before or since?

12       A.   Yes, a multitude.  Right now I'm working for one

13   and I've been there for four years.

14       Q.   All right.  And what do they pay you, sir, to be

15   a medical director, what are the terms of your

16   compensation?

17       A.   Again, hourly for my consultation.

18       Q.   Is it capped?  Is there -- is there a maximum

19   number of hours in which they'll pay you for?

20       A.   No, but there's strict guidelines for it.

21       Q.   Right.  But they don't say, all right, we're

22   going to charge you $150 an hour, but we're only going

23   to -- regardless of how many hours you work, we're going

24   to only compensate you a maximum of ten or 20 hours a

25   week?

1     A.   No, I'll tell you what happens now is that if it

2  does seem longer than normal, it gets moved to a --

3  another director at the hospice.

4     Q.   And what is your hourly rate that they -- that

5  you charged?

6     A.   Ever since I've been working for hospices it's

7  been 250.

8     Q.   250?

9     A.   Per hour, yes.

10    Q.   All right.  And was that the same for -- at

11  Merida?

12    A.   Yes.

13    Q.   Okay.  And is your agreement in writing with

14  the -- the current group?

15    A.   Yes.

16    Q.   All right.  And did you have an agreement in

17  writing with Merida?

18    A.   I did.

19    Q.   Is that it?

20    A.   I can't recall.

21    Q.   Well, look to the last page, sir.

22    A.   That is my signature, I believe.

23    Q.   All right.  Well, so is it -- isn't that your

24  agreement, your -- your medical director agreement, your

25  contract with Merida?

1     A.   The last page definitely is mine.

2     Q.   Right.  And in the front page, that's your --

3  that's you too, right?

4               THE COURT:  Gentlemen, gentlemen, one

5  second.

6               MR. FOSTER:  Just for the record,

7  Your Honor, could we have the exhibit and page number,

8  please.

9               MR. HECTOR CANALES:  I'm about to offer it

10  into evidence, I'm having him prove it up right now,

11  Your Honor.

12     Q.   (By Mr. Hector Canales)  That's your medical

13  agreement?

14     A.   I don't recognize it.

15               THE COURT:  One second, one second, that

16  changes it.  Is this document not an exhibit, it's

17  already been admitted?

18               MR. HECTOR CANALES:  No, sir, it's not.  I'm

19  proving it up right now.

20               THE COURT:  All right.

21               MR. HECTOR CANALES:  It's Cross-Examination,

22  Your Honor, it's not my --

23               THE COURT:  First of all, I need to know if

24  the Government has an objection to the -- the

25  documentation.  Gentlemen, obviously, the vast bulk of

1   documentation should have already been admitted into

2   evidence before trial.

3            MR. HECTOR CANALES:  Not -- not evidence

4   that's based on Cross-Examination and impeachment,

5   Your Honor.  In my case in chief, but this is not our

6   case in chief.

7            THE COURT:  One second, one second.  Only

8   rebuttal evidence and Cross-Examination is not -- that's

9   overly broad Mr. Canales.  Rebuttal evidence, obviously,

10  that's unanticipated, no one can anticipate, that's

11  correct.  But this type of exhibit.

12           MR. HECTOR CANALES:  I'm not required,

13  Your Honor, as the Defendant to prove anything,

14  Your Honor.

15           THE COURT:  One second, gentlemen.

16           Ladies and gentlemen, why don't you take a

17  quick five-minute break, let me look at this exhibit and

18  see what's going on.

19           COURT OFFICER:  All rise for the jury.

20           (JURY OUT.)

21           THE COURT:  All right.  Do we have an extra

22  copy?

23           MR. HECTOR CANALES:  Yes, sir.

24           THE COURT:  All right.  I've been handed

25  what appears to be -- gentlemen, everybody, you can sit

1    down.  Excuse me.  All right.

2              Well, Mr. Canales, tell me about this, again

3    this doesn't --

4              MR. HECTOR CANALES:  This is the medical

5    director agreement that Mr. -- that Dr. Escamilla had

6    with -- with Merida.

7              He has testified that his hourly rate was

8    $250, by contract, it was actually $150.  He's -- so

9    Your Honor, we're under no obligation under the Code of

10   Criminal Procedure to proffer any evidence as the Court

11   well knows, it's not our burden, this is -- we're not in

12   our case in chief.  When the -- I cannot anticipate

13   everything that the Government is going to do and bring

14   this -- bring his contract into -- into issue.

15             They have, they brought it into issue, and

16   now I believe it is proper within proper

17   Cross-Examination to prove it up, that's what I did.  He

18   has established that this is his -- that's his

19   signature, this is his contract, that he had a con -- he

20   testified about it that he had an agreement, now we're

21   actually just trying to introduce the actual -- actual

22   agreement.

23             THE COURT:  Again, I -- the issue in this

24   agreement, I don't think is -- that's not the issue.

25             MR. HECTOR CANALES:  And it's a major issue.

1    It's a major issue in this case.

2              THE COURT:  No, no, no.  You misunderstand

3    what I mean.

4              MR. HECTOR CANALES:  I apologize for jumping

5    the gun.

6              THE COURT:  This is -- my point is this,

7    this is a document that should have been pre-admitted

8    into evidence on either side.  I'm just wondering why it

9    was not.

10             MR. HECTOR CANALES:  Not from my side,

11   Your Honor.  Why -- why should we have to offer -- this

12   is not -- I didn't call this witness.  Why -- why would

13   I put on my exhibit list -- he's not on my witness list.

14             THE COURT:  Then gentlemen, do you have any

15   objection to this?

16             MR. FOSTER:  Your Honor, Mr. Canales still

17   has not given the Government a copy of the document.

18             THE COURT:  Again, I don't see a problem

19   with the document per se.  My concern though, again, the

20   parties were to exercise due diligence in exchanging all

21   exhibits that could have been reasonably anticipated,

22   this appears to be one of them, but outside that

23   comment, I don't see a problem with it.

24             MR. FOSTER:  That's -- that's fine,

25   Your Honor.  I mean, we have requested discovery,

1    obviously, and exhibits and there are other medical

2    director agreements on the exhibit list, but we do not

3    object to the admission of this exhibit.

4              We'd ask that things be marked for

5    identification if they're going to be admitted if

6    they're new.

7              THE COURT:  Again, gentlemen, each side

8    needs to follow the rules.  This -- this better be the

9    exception not the rule, if you anticipate, I mean, again

10   standard documentation, make sure you mark it, make sure

11   you show it to the other side.  Again, we've been

12   through this so let's -- let's mark it --

13             MR. HECTOR CANALES:  It's marked,

14   Your Honor.  That's my copy, the witness' copy is

15   marked.

16             THE COURT:  What number is it?

17             MR. HECTOR CANALES:  100.  RM-100.

18             THE COURT:  All right.  Exhibit 100 is

19   admitted.

20             Let's bring the jury back in.

21             COURT OFFICER:  All rise for the jury.

22             (JURY IN.)

23             THE COURT:  Thank you, everyone.  Please be

24   seated.

25             Ladies and gentlemen, out of an abundance of

1    caution, we will be running a little late today.  It is

2    our goal to finish with this witness, so some days we'll

3    finish early, some days will run late.

4              Mr. Canales, please proceed.

5              MR. HECTOR CANALES:  Thank you, Your Honor.

6    Q.  (By Mr. Hector Canales)  Let me show you what's

7    been marked and introduced into evidence as Defendant's

8    Exhibit RM-100.  This is the document I showed you, and

9    you have a copy there, a hard copy in front of you as

10   well.

11        This is your medical director agreement with

12   Merida Health Care Group/hospice, correct?

13   A.  I believe so.

14   Q.  It's dated the 20th of June 2014, correct?

15   A.  It looks like it, yes.

16   Q.  Okay.  And you're familiar with all these

17   definitions here of attending physician and IDT, right,

18   you know what all that is, correct?

19   A.  That looks like the typical hospice contract,

20   yes.

21   Q.  What was that again?

22   A.  That looks like the typical contract that I

23   signed.

24   Q.  A typical contract that you signed?

25   A.  Yes.

1     Q.   Similar to the one that you signed after Merida

2  with the new group what was that called again?

3     A.   Brookdale Hospice.

4     Q.   Brookdale Hospice?

5     A.   Yes.

6     Q.   Similar, okay.  I want to draw your attention

7  here to the second page, section 1 point 10.  Part of

8  there's an obligation to maintain accurate timely,

9  records that include all services provided, services are

10  furnished in accordance with this agreement, clinical

11  documentation will be turned in on a weekly basis,

12  right, and that was one of the responsibilities you had

13  under this agreement, right?

14     A.   Yes.

15     Q.   All right.  And these agreements, is it your

16  understanding, sir, was it part of your intent, sir,

17  in -- in signing and entering into this agreement with

18  Merida to comply with what's known as safe harbor?

19     A.   I don't remember what that definition of that is.

20     Q.   Okay.  All right.  There was a -- was it part of

21  your intention in entering into this written agreement

22  with Merida so that you could comply with the law?

23     A.   True.

24     Q.   How much were you going to be compensated for

25  there by Merida?

1     A.   It looks like 150.

2     Q.   That's under market value for what you're being

3   compensated for now, right?

4     A.   Yes, now.

5     Q.   Now, you're at 250?

6     A.   Yes, and I couldn't -- I give my best guess at

7   the time you asked.

8     Q.   Sure, sure, okay.  And that's your signature,

9   right?

10     A.   Yes.

11     Q.   Did you consult with counsel before you signed

12   this agreement, your own counsel?

13     A.   No.

14     Q.   Let's get back to Government Exhibit A-30, okay?

15   In reaching the decision to certify the patient is

16   terminally ill, the hospital medical director must

17   consider at least the following information.  Let me

18   just stop there.  At least.  Is it fair to say, sir,

19   that this is a non-exclusive list?

20     A.   Yes.

21     Q.   In other words, this is the minimum, you can do

22   more, right?

23     A.   Yes.

24     Q.   All right.  But at least this.

25          And is that consistent with your understanding of

hospice and eligibility and certification of hospice is
that Medicare provides these -- these guidelines, right?

A.   Correct.

Q.   Right.   In other words, they don't spell out
everything have you to do, they're giving you a picture
of what they want the doctor to base his or her opinion
on, fair?

A.   Fair.

Q.   And here, have you ever heard that process
described as a holistic approach?

A.   All the time, yes.

Q.   How often?

A.   All the time.

Q.   All the time.   So one diagnosis of a terminal
condition of the patient, right?

A.   Right.

Q.   And a diagnosis is factual, right, versus
prognosis opinion?

A.   When you follow the conditions that we're
supposed to follow, yes.

Q.   Number two, other health conditions, whether
related or unrelated to the terminal condition.   Is that
also known as a comorbidity?

A.   It is.

Q.   Okay.   Current clinically relevant information

1    supporting all diagnoses.  So that -- doesn't that

2    recognize that a patient in the real world, in real

3    life, you know, especially people with hospice, they

4    don't have just one problem, they got lots of problems,

5    lots of medical problems?

6       A.   Right.

7       Q.   Right.  So even if you've got a diagnosis that's

8    not terminal, that's not fatal, right, it should be

9    considered as part of the -- the -- the -- the holistic

10   clinical judgment, right?

11      A.   Yes.

12      Q.   For instance, you can have, you know, diabetes,

13   right, and diabetes isn't necessarily terminal, right?

14      A.   Right.

15      Q.   But if you're diabetic and you've got another

16   terminal condition, that complicates things, right?

17      A.   That does complicate things.

18      Q.   Because when you're dealing with different body

19   systems, right, you're dealing with the kidneys, and

20   let's say maybe you've got, you know, respiratory

21   disease, those two things can interact to -- with each

22   other to cause -- together cause a terminal problem that

23   may be separately they don't, right?

24      A.   True.

25      Q.   Medicine is complicated, right?

1      A.   It can be.

2      Q.   All right.  It's not just a science, there's an

3  art to medicine, right?

4      A.   Small percentage of it, yes.

5      Q.   Right.  And -- and here Medicare, Uncle Sam,

6  acknowledges that in the sentence, would you agree?

7  Predicting of life expectancy is not always exact.

8  That's a true statement, right?

9      A.   Yes.

10     Q.   And so when you were predicting the life

11  expectancy of Jack High, right, back in 2014, which

12  we're going to get into in detail here in a second.

13     A.   Sure.

14     Q.   When you were doing that, that was not an exact

15  science was it?

16     A.   No.

17     Q.   You were doing the best with what you had, right?

18     A.   With the information I was given.

19     Q.   Right.  And another doctor at another period of

20  time, right, can look at the same patient and have a

21  different view of that patient's life expectancy because

22  such a task isn't exact, right?

23     A.   Not on this particular patient.

24     Q.   Not on this particular patient.

25           And so as I stand here today, without having

1   shown you anything, you only have relying on what the

2   Government has shown you, are your feet set in concrete,

3   is there anything I could show you that will change your

4   mind that Jack High was eligible, or are your feet set

5   in concrete, sir?

6        A.   I'm -- I was open for any additional information.

7        Q.   All right.   But right now the Government didn't

8   show you any that changed your mind?

9        A.   No.

10       Q.   In fact, they convinced you that -- that your

11  statement from two-and-a-half years ago that everything

12  you did was legitimate you're backing off of that?

13            MR. FOSTER:   Objection, misstates the

14  testimony, Your Honor.

15            THE COURT:   Rephrase the question.

16       Q.   (By Mr. Hector Canales)   Well, are you backing

17  off of it or not?

18       A.   I --

19            MR. FOSTER:   Same objection, Your Honor.

20            THE COURT:   Rephrase the question.

21       Q.   (By Mr. Hector Canales)   Did you not -- I've got

22  to go back.   Did you not tell them in 2017 that you

23  resisted all attempts of -- of -- of pressure to certify

24  people who weren't eligible and that the people you

25  certified were eligible?

1    A.   At the time with the information I was given,

2  yes.

3    Q.   And then based on what they told you and they

4  showed you yesterday, you backed off of that to where

5  now your position is, no, Jack High wasn't certified?

6    A.   I'm not backing off of it, knowing now what I

7  know, I still think that this gentleman is not eligible.

8    Q.   All right.  Well, you -- well, so that's very

9  different than what you said two years ago, right?

10   A.   No.

11   Q.   It's the same?

12   A.   I believe so.

13   Q.   Okay.  The fact that a beneficiary lives -- agree

14  to disagree here's my question.  Agree or disagree, true

15  or false to this statement:  The fact that a beneficiary

16  lives longer than expected in itself is not a cause to

17  terminate benefits?

18   A.   That's true.

19   Q.   A-31, Government's Exhibit A-31, here we've got

20  claims processing manual.  Before we had benefit policy

21  manual.  True or false?  Hospice care is available for

22  two, 90-day periods and an unlimited number of 60-day

23  periods during the remainder of the hospice patient's

24  lifetime.  True or false?

25   A.   True.

1    Q.   However, a beneficiary may voluntarily terminate

2    his patient -- his hospice election -- election

3    termination dates are retained on CWF.  That's obviously

4    true, right, they can terminate when they want to?

5    A.   Right.

6    Q.   Last sentence, it should be noted that predicting

7    life expectancy is not always accurate.  There it is

8    again, right?

9    A.   Right, it's not exact.

10   Q.   Do you think Medicare is trying to make a point

11   there, repeat this over and over?

12   A.   They're trying to set guidelines.

13   Q.   Right.  Because let's talk about these

14   guidelines, right, these are the guidelines, because you

15   brought up an interesting issue on hospice in your

16   direct of under-utilization; do you recall saying that,

17   the hospice is under-utilized?

18   A.   Yes, in general.  By the general public, yes.

19   Q.   That's right.  And -- and part of the reason for

20   that, sir, isn't it true that hospice has a stigma, or

21   nobody -- isn't it true, sir, that hospice has a --

22   there's a stigma to hospice in terms of with doctors and

23   patients not wanting to be on it because it's -- it's

24   dealing with death?

25   A.   There's not enough education that's happening.

1    Most people would use it if they know what it was for.

2        Q.   Right.  And so a patient who only has 30 days --

3    who was only on hospice for 30 days, when you say

4    under-utilized, when a patient was only on hospice for

5    30 days and then they die, they really lost out on five

6    months of hospice benefits at minimum, right?

7        A.   It is under-utilized by appropriate patients.

8        Q.   That's what we're talking about, if it was an

9    appropriate patient.  If an appropriate patient does not

10   elect to get on hospice who's eligible until the last 30

11   days, there's an under-utilization of this benefit for

12   that patient and their family, right, if they're only on

13   it for 30 days right?

14       A.   Sure.

15       Q.   And the fact that somebody was on it for more

16   than six months, we know it doesn't disqualify them,

17   right?

18       A.   No.

19       Q.   And so part of the education is to get people

20   aware of these benefits, right, and to not be scared of

21   going on hospice, right?

22       A.   Right.

23       Q.   There's been a movement within CMS to promote the

24   benefits, the hospice -- the hospice benefit, right?

25       A.   Again, appropriate benefits, yes.

1    Q.   Of course, of course.   Because there's been an

2    under-utilization of it, that's your experience, right?

3    A.   Yes.

4    Q.   And when you saw patients that didn't qualify,

5    you discharged them?

6    A.   I attempted to.

7    Q.   Let's talk about Jack High.   You treated Jack

8    High, right?

9    A.   Yes.

10   Q.   You were the medical director for Jack High?

11   A.   I was -- he was on my panel.

12   Q.   Right.

13   A.   For a short time.

14   Q.   We're about to go over the timeframe in which you

15   did that.

16   A.   Sure.

17   Q.   But according to the Government's Exhibit here,

18   H-27 when did Jack High die?   What's the date?   What's

19   it say?

20   A.   06/12, 2018.   06/16, 2018.

21   Q.   DOD, date of death?

22   A.   Yes.

23   Q.   Okay.   Writing that down so we can remember.

24   Okay.   In this case, Count Two, the certification period

25   is between what date?

1    A.  08/14, 2013 to 10/12, 2013.

2    Q.  With me?

3    A.  Yes.

4    Q.  Okay.

5           THE COURT:  The first 25-minute session is

6    up.

7           MR. HECTOR CANALES:  Thank you.

8    Q.  (By Mr. Hector Canales)  Now, I'm going to show

9    you quickly here a series of exhibit -- of medical

10   records.

11   A.  Yes, sir.

12   Q.  Out of Jack High's file which is E-16, Government

13   Exhibit E-16, right?  I'm going to go through them real

14   quick, we're going to identify your name and signature

15   on these documents?

16   A.  Sure.

17   Q.  All right.  And get a date, and we're going to

18   get a date range from you're here and then we're going

19   to come back and talk about them specifically, okay?

20   A.  Okay.

21   Q.  First, I want to go through just the -- the date

22   range here, okay?

23          The first one here, and by the way, this series

24   of exhibits, Your Honor, they are already in evidence,

25   but I am remarking them as Defendant's Exhibit RM-101.

1   So again, I'm going to offer -- I'm going to offer these

2   exhibits, they're already in evidence, but we're going

3   to re-package them as a Defense Exhibit.

4           THE COURT:  So for clarification, they're

5   currently Government Exhibits with a different number

6   that you're going to use a different defense number.

7           MR. HECTOR CANALES:  Yes, Your Honor.

8           THE COURT:  Okay.

9           MR. HECTOR CANALES:  Yes, Your Honor.

10   Q.   (By Mr. Hector Canales)  So what we have here,

11   the first one is Jack High physician, and we are looking

12   at here an IDG meeting on April the 15th of '14.  With

13   me?

14   A.   Yes.

15   Q.   So that's our start date.  August of '14.

16        That's you right there, right?

17   A.   Yes.

18   Q.   Now, we're moving to September the 9th, Jack

19   High, Dr. Escamilla, as the medical director, you signed

20   off on this, it's a plan of care order on December 19th

21   of '14, correct?

22   A.   Correct.

23   Q.   That's your signature again, right?

24   A.   Yes.

25   Q.   September the 15th, right?

1     A.  Yes.

2     Q.  With this certification period.  Did you ever

3  talk to Ms. Cooley?

4     A.  I don't remember her.

5     Q.  Another one, looking for the date.  Here we go.

6  Verbal certification, November the 15th again, right?

7     A.  Nine.

8     Q.  Nine, sorry, you're right.  Thank you.  There was

9  IDG meeting in October '14, those are your initials,

10 correct?

11    A.  Yes.

12    Q.  That means somebody printed this document out,

13 made a hard copy of it, and you signed it, right?

14    A.  Yes.

15    Q.  How about Belinda Gonzalez, talk to her lately?

16    A.  No, not lately.

17    Q.  Another plan of care for Jack High in October

18 17th.  You signed that one, right?

19    A.  Yes.

20    Q.  You signed it twice; see that?

21    A.  Yes.

22    Q.  Now, here's a narrative for certification of

23 terminal illness for Jack High?

24    A.  Right.

25    Q.  That you signed?

1   A.   Yes.

2   Q.   In December.   So we started in August, went up to

3   December, correct?

4   A.   Yes.

5   Q.   Another recertification of Jack High in December,

6   signed by you, right?

7   A.   Yes.

8   Q.   And electronically signed by Ms. Gonzalez?

9   A.   Yes.

10   Q.   December 23rd, '14, you're listed as medical

11   director and you confirm that here; do you not?

12   A.   Yes.

13   Q.   Another certification with Jack High signed by

14   you in January of '15, correct?

15   A.   Yes, 30th.

16   Q.   I'm sorry, I didn't hear you?

17   A.   01/30.

18   Q.   01/30, that's right.   Here's notes.   That's your

19   initials, right?

20   A.   Yes.

21   Q.   That is also 01/30/15.   29, this one, one day out

22   of order.   Your initials on a plan of -- or no, this is

23   a verbal recertification, correct?

24   A.   It says so on the top.

25   Q.   Okay.   With your initial?

1    A.   Yes.

2    Q.   Still on 01/30?

3    A.   Yes.

4    Q.   All right.   No dispute, right?

5    A.   No.

6    Q.   All right.   02/15 line of care?

7    A.   Yes.

8    Q.   02/13, right?

9    A.   Yes.

10   Q.   All right.

11           MR. HECTOR CANALES:   This group of

12   documents, Your Honor, Defendant has marked for purposes

13   of identification as Defendant's Exhibit Rodney Mesquias

14   101.   I'll tender them to the -- the -- to the clerk

15   after the examination, Your Honor.

16   Q.   (By Mr. Hector Canales)   Now, so the last date we

17   had on here was February 13th, '15.   February 13th of

18   '15.

19           Are these -- are these documents that you

20   reviewed yesterday?

21   A.   I don't -- I know some of them are not.

22   Q.   Where are those documents, by the way?

23   A.   I don't know.

24   Q.   You don't know?

25   A.   I don't know.

1    Q.   Did they give you your own copy?

2    A.   No.

3    Q.   Did you take them overnight and study for today?

4    A.   No.

5    Q.   Did you ask to do that?

6    A.   No.

7    Q.   Did they offer?

8    A.   They offered to show me any records I wanted.

9    Q.   I meant, sir, excuse me.  Did you -- did they

10   offer you could keep them to study overnight?

11   A.   No.

12   Q.   All right.  Now, within there, and we're going to

13   go through them in detail, but within there you saw IDT

14   meetings, plan of cares, and cert -- and

15   recertifications of Jack High, right?

16   A.   Yes.

17   Q.   And -- and that ranged from August of '14 to

18   February of '15, correct?

19   A.   Right.

20   Q.   But Jack High didn't die until three years after

21   your last certification of him?

22   A.   Right.

23   Q.   Right?

24   A.   Right.

25   Q.   And -- and given what we know from Medicare,

1    well, we certainly don't have an under-utilization

2    problem here with Jack High; do we?

3        A.   No.

4        Q.   All right.  But the fact that Jack High lived

5    longer than you certified that he would, six months,

6    isn't cause for -- to terminate benefits according to

7    the requirements outlined by CMS, right?

8        A.   Not by those -- by those guidelines.

9        Q.   And there's no doubt Jack High had Alzheimer's,

10   right, as a diagnosis?

11       A.   I don't know that now.

12       Q.   You don't know that now?

13       A.   Right.

14       Q.   All right.  What -- if -- if I told you that Jack

15   High couldn't tell the difference between a watermelon

16   and a chair, do you think that would be supportive of

17   the diagnosis Alzheimer's dementia?

18       A.   It tells me that he probably has Alzheimer's but

19   not how severe it is.

20       Q.   And the fact that he goes and -- and takes a

21   knife, stabbing at a chair, throws the knife at his wife

22   and tells a nurse that he thought that chair was a

23   watermelon, does that give you any indicator of how

24   severe his Alzheimer's is?

25       A.   Yes.

1     Q.   And, severe, right?

2     A.   It's not severe enough for hospice.

3     Q.   Not severe enough for hospice, okay.   What else?

4   Incontinence?

5     A.   Incontinence can be a sign.

6     Q.   You start adding things together, though, right?

7   One thing all by itself may not be enough, so you're

8   saying the watermelon example all by itself isn't

9   enough, right?

10    A.   Right.

11    Q.   But you start adding things up, you create a

12   picture, right?

13    A.   Right.

14    Q.   The holistic approach, right?

15    A.   Right.

16    Q.   Sundowning?

17    A.   Not criteria.

18    Q.   Not all by itself, right?

19    A.   Nope.

20    Q.   All right.   But what about -- are you getting

21   closer if you've got a guy who's mistaking the

22   watermelon, sundowning, right, who's getting violent,

23   who can't remember words, who won't eat, are we getting

24   closer?

25    A.   Not that criteria for Alzheimer's.

1    Q.   All right.   Everything's the same in your mind?

2    A.   Yes.

3    Q.   So that wouldn't matter?

4    A.   The examples you showed me, no.

5    Q.   Okay.   Now, names.   Nurses.   Who were the nurses

6    that were lying?

7    A.   I don't remember their specific names, and I

8    didn't know they were lying at the time, but it seems

9    like that there were multiple.

10   Q.   All right.   You -- no specifics, right?   Okay.

11   Overnight nothing came into -- while you were studying

12   this, nothing came into your head?

13   A.   No.

14   Q.   All right.   You said that you noticed nurses

15   would make comments.   Who, specifics?

16   A.   Different staff, I was --

17   Q.   I understand that, names, specifics, you gave

18   generalities, I'm now asking for specifics?

19   A.   I don't remember their names.

20   Q.   You didn't write it down anywhere?

21   A.   No.

22   Q.   FAST scores.   FAST scores, again, are a -- are an

23   exercise of a health care provider's clinical judgment

24   taking something they see and applying it to a set of

25   criteria, right?

1    A.   Right.

2    Q.   Right.   Doc -- nurses can have different -- can

3  look at the same patient and come up with a different

4  FAST score without being liars, right?

5    A.   They should not.

6    Q.   They should not, but they can because there's an

7  aspect of judgment calls, right?

8    A.   No.

9    Q.   Like a -- like a pain score, right, somebody

10  can -- can give one pain score and give another?

11    A.   No.

12    Q.   Why not, it's all a judgment.

13    A.   No, those are -- those are criteria that are kind

14  of set.   In order for the patient to be incontinent, he

15  has to be incontinent all the time.   I can be

16  incontinent right now, you know, for one episode but

17  that doesn't make me terminally ill.

18    Q.   All right.   Let's look at this first, this first

19  document, part of Exhibit 101 here, all right?   It says

20  ITG meeting, right, that you had back in August of '14.

21  You had that meeting with all these -- with the -- with

22  the nurse, Melissa Quismorio, right?

23    A.   I don't remember their names.   It's been four

24  years ago.

25    Q.   Right.   But you had -- but you had these IDT

1    meetings and all these folks signed off on it, right?

2        A.   Correct.

3        Q.   And so services were rendered, right?

4        A.   Correct.

5        Q.   Right?  And if you got paid for this meeting,

6    there's nothing wrong with that, right?

7        A.   Right.

8        Q.   That's not a kickback for a doctor go to an IDT

9    meeting, is it?

10       A.   Right.

11       Q.   So all these people here, did any of those people

12   tell you, hey, this person is not eligible?

13       A.   Yes.

14       Q.   At this meeting?

15       A.   Some -- well, I don't --

16       Q.   This document?

17       A.   I don't remember, but those nurses were among the

18   ones that would make comments.

19       Q.   Oh, now you know, which ones?  What was the name?

20       A.   Melissa is one that I recall, I don't remember

21   her last name.

22       Q.   Do you know her name?

23       A.   Melissa, I don't remember her last name.

24       Q.   Do you know if it was this Melissa?

25       A.   It was the RN.

1    Q.   Who was the social worker?

2    A.   I don't recall.

3    Q.   Who's the next one?  Is Melissa there?

4    A.   No, but I -- I recall Diane and Esther probably.

5    Q.   Right, but nobody in here, sir.  You signed it?

6    A.   Yeah.  Those -- those orders are done after we

7    have the meeting.

8    Q.   They're during what?

9    A.   I think they're done after the meeting.  They

10   have to have time to print them and -- but those are not

11   available when we're having the IDT meeting.

12   Q.   Is that your handwriting?

13   A.   Yes.

14   Q.   Are you a careless physician?

15   A.   No.

16   Q.   Are you going to, before you put your -- your

17   signature to something -- when you put your signature to

18   something, you're putting your license on the line; are

19   you not?

20   A.   I'm responsible for it, yes.

21   Q.   Is that something you take seriously, right?

22   A.   Yes, very much so.

23   Q.   Right.  So when did you that, AD stands for what?

24   A.   Alzheimer's disease.

25   Q.   FAST 7-B is what you put, right?

1    A.   Right.

2    Q.   B and B equals what?  What's that mean?

3    A.   That's a PPS scale.

4    Q.   No, no, no, excuse me.  Right here, B and B.

5    A.   Oh, bladder and bowel incontinent.

6    Q.   ESAD stands for what?

7    A.   Endstage Alzheimer's Disease.

8    Q.   Requires total care?

9    A.   Right.

10   Q.   Prog less than six months?

11   A.   Right.

12   Q.   That's your handwriting?

13   A.   Yes.

14   Q.   Your signature?

15   A.   Yes.  That was based off the --

16   Q.   Excuse me, sir.  Excuse me, sir.  He died four

17   years later, right?

18   A.   Right.  That was based on the information that

19   was given at the time.

20   Q.   Sir, I don't have a question to you.  Are you

21   being an advocate right now?

22        THE COURT:  Sir, there's no need to answer

23   unless there's a question.

24        THE WITNESS:  Okay.

25   Q.   (By Mr. Hector Canales)  Are you trying to

1    advocate something, sir, here?

2       A.   No.

3       Q.   Okay.   In January, again, your handwriting,

4    right?

5       A.   Right.   Right.

6       Q.   Your signature?

7       A.   Right.

8       Q.   Your diagnosis?

9       A.   Yes.

10      Q.   Now, Rodney, you say, you got fired because, for

11   lack -- for lack of a better term, because you weren't

12   producing, fair?

13      A.   Because I wasn't referring patients, yes.

14      Q.   Did the Government tell you how much -- how

15   much -- how much you billed?

16      A.   No.

17      Q.   This is from Government Exhibit A-19-A, it's an

18   electronic spreadsheet, Your Honor.   I printed out a

19   portion of that spreadsheet.

20           Do you know, sir, that according to the

21   Government that you billed $1,041,000?

22      A.   I don't bill anything.

23      Q.   You don't bill anything?

24      A.   No.

25      Q.   Your patients that you -- that you had 55

1   patients, that's part of your hospice medical

2   directorship.

3       A.   Yes, but I'm not involved in billing.

4       Q.   They didn't tell you this to you; did you, that

5   you accounted for a million dollars in bills, your

6   patients and payments of $766,000, right?

7       A.   That's information I never get to find out.

8       Q.   But you got fired because you don't produce,

9   right?

10      A.   I got fired because I wouldn't refer more

11  patients to them, or patients to him.   That's what he

12  told me.

13      Q.   Now, your time there, again, refresher, '14 and

14  '15 -- end of '14, the beginning of '15.   Government's

15  case here it's alleged prior to that.   Are you with me?

16  You see these dates right here?

17      A.   Yes.

18      Q.   August of '13, that's a full year for the records

19  we reviewed, right?

20      A.   Yes.

21      Q.   Do you have any idea -- do you have any idea who

22  the doctors were who were certified for this particular

23  period?

24      A.   No.

25      Q.   Some doctor had a difference of opinion than you,

1    I -- we now know, right?

2       A.   Yes.

3       Q.   Because your testimony without knowing the

4    doctor, not having been involved back in during this

5    time periods, that he was ineligible?

6       A.   I don't know.

7       Q.   You don't know.  You can't say one way or the

8    other?

9       A.   No.

10      Q.   October 1 of '13, right before this period,

11   right?  You see that, right before October the 12th?

12      A.   Yes.

13      Q.   Steven Dellwo, do you know that nurse?

14      A.   No.

15      Q.   Steven Dellwo documented a FAST score?

16      A.   Yes.

17      Q.   Any reason to believe that when Steven Dellwo

18   points out that the patient reportedly took a knife,

19   sliced up the chair while insisting it was a watermelon

20   and throwing the knife at the wife, can you tell this

21   jury here you have any reason to believe Steven Dellwo

22   made that up?

23      A.   No, I believe what the nurses tell me.

24      Q.   What's the reason Steven Dellwo said that Jack

25   High couldn't sign this document?

1    A.  Why he couldn't sign this document?

2    Q.  Yeah, what's it say?

3    A.  I don't know.

4    Q.  The bottom right corner.  Right here.

5    A.  That he can't sign for himself.

6    Q.  Who's GH?

7    A.  I don't know.

8    Q.  Gloria, Ms. Gloria?

9    A.  I don't know.

10   Q.  You don't know her?  07/30/12.  Way before your

11   time, right?

12   A.  Uh-huh.  Yes.

13   Q.  All right.  The wife Gloria states patient is

14   having confusion, forgetfulness and needs 24 and a

15   little degree sign.  What does that mean?

16   A.  Hours.

17   Q.  24-hour supervision for safety.  Patient has

18   wandering episodes outside of the home and the family

19   has since made sure doors are locked and bolted to

20   prevent elopement?

21   A.  For him to walk away from the building.

22   Q.  Is that something that a nurse should document

23   those sorts of -- of facts?

24   A.  Yes.

25   Q.  Increased confusion and forgetfulness.

1          THE COURT:  The second session has expired.

2          MR. HECTOR CANALES:  Thank you, Your Honor.

3     Q.  (By Mr. Hector Canales)  Patient was taken to the

4   ER July 15th for vomiting, lost three pounds due to --

5   due to -- due to vomiting.

6          Again, important things when you take into

7   account the holistic approach, right?

8     A.  That doesn't make him hospital -- hospice

9   appropriate.

10    Q.  Did I ask you that, sir?

11    A.  No, but --

12    Q.  Well, why did you say that?

13    A.  Because when I'm trying to interpret the holistic

14  approach, to me these things make him more of a

15  supervision issue, but not hospice yet.

16    Q.  Okay.  Because you've made up your mind, haven't

17  you?

18    A.  That's the standard protocol.

19    Q.  You told the Government -- you told the

20  Government something, and no matter what I show you,

21  your feet are set in concrete; aren't they?

22    A.  No.

23    Q.  Did they show you this?

24    A.  Yes.

25    Q.  This exact one, you remember this one, January --

1    or from -- from July 31st of '12?

2        A.   No, I don't remember the date.

3        Q.   Oh, okay.  You were pretty quick to say yes

4    there.  Did you take notes of what they showed you or

5    didn't show you?

6        A.   I'm answering to the part that you read to me.

7        Q.   You know Dr. Greg Gonzaba?

8        A.   No.

9        Q.   See that certification period here 08/14?  See

10   that?

11       A.   Yes.

12       Q.   What's that date?

13       A.   08/13/12 it looks like.

14       Q.   What's that little Rx mean to you right here?

15       A.   It's a prescription.

16       Q.   What's the prescription by who?

17       A.   By that doctor ordering an evaluation.

18       Q.   And what else?

19       A.   Treatment, if necessary.

20       Q.   You got a different opinion from Dr. Gonzaba,

21   right?

22       A.   I can't know what he was thinking.

23       Q.   You know back in August of 2013, what's

24   sundowning?

25       A.   Sundowning is when patients get confused,

```
 1    typically in the evenings.
 2        Q.  How many times had Mr. High sundowned in the last
 3    week?
 4        A.  I don't know.
 5        Q.  Well?
 6        A.  Four times it says.
 7        Q.  Okay.  These are all out of E-16.  There's a
 8    certification and plan of care for 08/14/13, the same
 9    certification period we've been talking about in this
10    case.  The certification Gonzaba, right?
11        A.  It looks like it, yes.
12        Q.  You got a difference of an opinion from
13    Dr. Gonzaba, right?
14        A.  Yes.
15        Q.  He made this opinion a year before you made
16    yours?
17        A.  Yes.
18        Q.  Would you agree that -- now, Gonzaba Medical
19    Group, that's not a hospice group, is it?
20        A.  No, it's a family practice, I believe.
21        Q.  Okay.  And the primary -- you would agree that
22    the primary care provider is in a better position to
23    know the patient than a non-primary care provider
24    medical director?
25        A.  Not necessarily.  To me that order is to --
```

1    Q.  Sir, my question to you was, right, free to

2    disagree?

3              MR. FOSTER:  Allow the witness to answer,

4    Your Honor.

5              MR. HECTOR CANALES:  He didn't answer.

6              THE COURT:  Ask a different question.

7    Q.  (By Mr. Hector Canales)  Do you know, sir,

8    whether Gonzaba was the primary care provider?

9    A.  I do not know.

10   Q.  Were you the primary care provider for Jack High?

11   A.  No.

12   Q.  So we have an order here from a primary provider

13   group, right?

14   A.  I believe so.

15             MR. HECTOR CANALES:  Pass the witness,

16   Your Honor.

17             THE COURT:  Mr. Cyganiewicz?

18                     CROSS-EXAMINATION

19   BY MR. CYGANIEWICZ:

20   Q.  Good evening, Doctor.

21   A.  Hello.

22   Q.  You practice in San Antonio, correct?

23   A.  Yes, sir.

24   Q.  All your life?

25   A.  Yes, sir.

1    Q.   Still practicing there?

2    A.   Yes.

3    Q.   And the Merida patients that you saw were all in

4    the San Antonio office?

5    A.   Yes.

6    Q.   Never went to Laredo?

7    A.   No.

8              MR. CYGANIEWICZ:   That's all I have, Judge.

9              THE COURT:   Mr. Guerra, anything else?

10             MR. GUERRA:   Nothing, Your Honor.

11             THE COURT:   Mr. Foster?

12             MR. FOSTER:   Thank you, Your Honor

13   Mr. Canales can have I a copy of the A-19-A and A-30 and

14   31 you were using, please?

15             MR. HECTOR CANALES:   I'll look for it.   I'm

16   a mess over here right now.

17             MR. FOSTER:   Okay, thank you.

18                       REDIRECT EXAMINATION

19   BY MR. FOSTER:

20   Q.   Dr. Escamilla, you recall being asked questions

21   about the documents that you reviewed?

22   A.   Yes.

23   Q.   Were you given a stack of documents?

24   A.   Yes.

25   Q.   Can you indicate to the jury how big that stack

1   of documents was?

2       A.   It was about this big (indicating).

3       Q.   How much time were you given to go through them?

4       A.   All the time I wanted.

5       Q.   The Government restrict you in any way from going

6   through them?

7       A.   No.

8       Q.   What was your conclusion about whether Mr. High

9   qualified for hospice?

10      A.   That he had a chronic medical condition, but

11  not -- did not qualify for hospice.

12      Q.   You were showed lots and lots of documents by

13  Mr. Canales regarding Jack High; do you remember those?

14      A.   Yes.

15      Q.   Documents talking about sundowning?

16      A.   Yes.

17      Q.   Watermelons?

18      A.   Yes.

19      Q.   Things like that.  Do any of those documents

20  change your opinion?

21      A.   No, they actually reinforce my opinion.

22      Q.   They reinforce your opinion.  Can you explain why

23  that is to the jury?

24      A.   The fact that this gentleman is able to get up

25  and walk, the fact that this gentleman is not wheelchair

1    bound, or that has, you know, still enough strength to

2    sit by himself and do those things tells me that he's

3    not hospice appropriate.

4        Q.   Now, they showed you some documents, some

5    certifications you signed, and I'm going to put on the

6    ELMO what's been admitted as E-16 at page 2562.

7            Do you recall seeing this document on

8    Cross-Examination?

9        A.   Yes.

10       Q.   Do you see that writing in there about Jack High

11   and the narrative condition?

12       A.   Yes.

13       Q.   Who provided you with that information?

14       A.   The nurses do.

15       Q.   Did you ever go out and independently verify any

16   of that information?

17       A.   No, I did not.

18       Q.   And showing you the other certification you

19   signed, E-16 at page 2575.

20           Do you see that information there?

21       A.   Yes.

22       Q.   And who provided you with that information?

23       A.   That's from the nurses as well.

24       Q.   Now, Mr. Canales, he showed you a timeframe and

25   it ended in February of 2015; do you remember that?

1      A.   Right.

2      Q.   Now, I want to show you what's previously been

3    admitted as Government Exhibit E-16, 2745.

4           Is this a hospice face-to-face encounter?

5      A.   It looks like it, yes, from the title.

6      Q.   And if we go down to the bottom, do you see a

7    signature there?

8      A.   Yes.

9      Q.   And whose signature is that?

10     A.   It looks like Dr. Virlar's.

11     Q.   Now, I'm going to show you what's previously been

12   admitted as E-16, 2742.

13          Do you see this certificate of terminal illness?

14     A.   Yes.

15     Q.   And if we go down to the bottom, whose signature

16   is that?

17     A.   It looks like Dr. Virlar's.

18     Q.   So explain to the jury what happened after that

19   February timeframe that Mr. Canales talked to you about?

20     A.   During that timeframe, I -- I became more aware

21   that -- that information I was given was wrong, and so

22   that's when I refused to certify for them.

23     Q.   And when you say the information that was given

24   to you was wrong, did you learn that the nurses had been

25   providing you with false information about Jack High?

1     A.   Yes, I did learn that after the fact.

2     Q.   False information about clinical indications such

3   as FAST scores?

4     A.   Right.

5     Q.   And if you had known that, would you ever have

6   certified Mr. High?

7     A.   I would not have.

8     Q.   Now, you were asked a lot of questions, and I

9   don't have these exhibits, and those pages weren't

10  referenced.  But you were asked questions about these

11  Medicare guidelines; do you recall that?

12    A.   Yes.

13    Q.   You were asked questions about things in the

14  Medicare guidelines that predicting life expectancy is

15  not always exact; do you -- do you recall that?

16    A.   Yes.

17    Q.   And that illness, I believe Mr. Canales he said

18  it doesn't act normal all of time; do you recall that?

19    A.   Right.

20    Q.   And he said prognosis is an opinion; do you

21  recall that?

22    A.   Yes.

23    Q.   And he also referenced the regulation that

24  hospice is unlimited?

25    A.   Right.

1    Q.   Do any of those things explain why Merida had so

2   many unqualified patients on hospice?

3              MR. HECTOR CANALES:   Objection, Your Honor.

4   Calls for speculation.   The witness has no -- no

5   personal knowledge or specific memory about any of this,

6   he's just speaking in generalities and that doesn't

7   qualify him to make a specific opinion when he can't

8   provide specifics.

9              MR. FOSTER:   He was their medical director,

10   Your Honor.

11              THE COURT:   It's overruled.   Answer if you

12   know.

13              THE WITNESS:   Can you ask it again, just so

14   can I --

15    Q.   (By Mr. Foster)   Sure.   Predictions, not an exact

16   science, there can be gray areas, all of these things,

17   was that what was going on at Merida?

18    A.   No, there was something more than that.

19    Q.   When you say something more than that, can you

20   explain to the jury what you mean?

21    A.   I think the word falsifying records and telling

22   at least me erroneous information so that I would go

23   along with it.

24    Q.   Now, you also talked about hospice being

25   under-utilized when Mr. Canales asked you about that; do

1    you recall that?

2        A.   Right.

3        Q.   And you tried to say something about appropriate

4    patients and he cut you off; do you recall that?

5        A.   Right.

6        Q.   Can you explain to the jury what you meant there.

7        A.   Well, it's under-utilized in that a lot of people

8    don't know about it and a lot of people think that

9    sometimes they actually think that we will kill patients

10   and that's not true.

11            And so when a person is not aware of that,

12   they're fearful of going into it.   And the only time

13   they do sign up for is when it's blatantly obvious to a

14   non-medical person that the person is passing away.

15       Q.   Now, does the fact that hospice is under-utilized

16   mean that people should be on hospice who don't qualify

17   for it?

18       A.   No.

19       Q.   Does the fact that hospice is under-utilized mean

20   that Jack High should have been on hospice?

21       A.   No.

22       Q.   Now, Mr. Canales also asked you when you saw

23   patients who didn't qualify you discharged them, do you

24   remember those questions?

25       A.   Yes.

1    Q.   Did Merida ever discharge those people from

2  hospice who did not qualify for the services?

3    A.   No, they did not.

4    Q.   Mr. Canales also showed you this Exhibit A-19-A

5  and it showed the money that was billed based on the

6  patients for whom you were an attending physician; do

7  you recall that?

8    A.   Yes.

9    Q.   What -- who billed that money to Medicare?

10   A.   I imagine the company.

11   Q.   The hospice company?

12   A.   Yes.

13   Q.   Owned by Rodney Mesquias?

14   A.   Yes.

15   Q.   You didn't bill that money as a physician, right?

16   A.   No.

17   Q.   That's what the company bills?

18   A.   Right.

19   Q.   How were you paid?

20   A.   Hourly.

21   Q.   Okay.  And let's talk about that.

22       Now, you were asked some questions about this

23  contract; do you remember?

24   A.   Yes.

25   Q.   And did it turnout that Merida actually paid you

1    less than you recalled?

2        A.   Yes.

3        Q.   Okay.   Now, in terms of this contract, you see

4    this compensation provision here?

5        A.   Yes.

6        Q.   How much does it say you're going to get paid?

7        A.   150 per hour.

8        Q.   And this looks like a typical contract; is that

9    fair?

10       A.   Yes.

11       Q.   On the paper, right?

12       A.   Yes.

13       Q.   Sometimes are things different in reality than

14   they are on pieces of paper?

15       A.   Yes.

16       Q.   And does this contract say anything about you

17   only being paid your $150 an hour if you referred

18   patients to Rodney Mesquias?

19       A.   No.

20       Q.   Did Rodney Mesquias actually follow the terms of

21   this contract?

22       A.   He did not.

23       Q.   Did he comply with the contract?

24       A.   No.

25       Q.   You were asked if the written agreement complied

1   with the law; do you recall that?

2       A.  Yes.

3       Q.  Did Rodney Mesquias comply with the law?

4       A.  No, he didn't.

5               MR. FOSTER:  No further questions,

6   Your Honor.

7               THE COURT:  Mr. Canales?

8                   RECROSS-EXAMINATION

9   BY MR. HECTOR CANALES:

10      Q.  Yesterday was the first time you told the

11  Government that you -- you didn't believe the

12  documentation at Merida.  That was the first time you

13  told them that?

14      A.  I've come to know.

15      Q.  That was the first time you told them that was

16  yesterday afternoon preparing for today?

17      A.  No.

18      Q.  That was part of their warning you about what was

19  coming, weren't they?

20      A.  No, I think I told them that before.

21      Q.  In April, in it September, two-and-a-half years

22  ago you told them that?

23      A.  Yes.

24      Q.  About documentation?

25      A.  That's what I recall, yes.

1          MR. HECTOR CANALES:  May I approach,

2    Your Honor?

3          MR. FOSTER:  Objection, Your Honor.

4    Improper impeachment.  He said what he recalled and he

5    testified to it.

6          MR. HECTOR CANALES:  The Government's notes,

7    Your Honor, don't say that.

8          MR. FOSTER:  Objection, Your Honor.

9    Improper impeachment.

10          THE COURT:  Sustained.

11    Q.  (By Mr. Hector Canales)  You promised not to be

12    an advocate here today, right?

13    A.  Yes, sir.

14          MR. HECTOR CANALES:  No further questions.

15          THE COURT:  Is there anything else?

16          MR. FOSTER:  Nothing further, Your Honor.

17          THE COURT:  Thank you.  Thank you, sir, you

18    may step down.

19          All right, ladies and gentlemen.

20          Thank you, sir, you're excused.

21          THE WITNESS:  Thank you.

22          THE COURT:  All right, ladies and

23    gentlemen -- before we start up doing all that, ladies

24    and gentlemen, we're done for the day.  We'll be in

25    recess.

1          Again, we'll start promptly tomorrow at

2    9:00.

3          The -- the security officer can collect

4    those, don't worry about that.

5          All right.  Thank you, everyone.  We'll be

6    in recess.

7              COURT OFFICER:  All rise for the jury.

8              (JURY OUT.)

9              (COURT IN RECESS.)

10

11                REPORTER'S CERTIFICATE

12

13     I certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled

15   matter.

16

17

18        /s/Sheila E. Perales_____
          SHEILA E. HEINZ-PERALES CSR RPR CRR
19        Exp. Date:  January 31, 2021

20

21

22

23

24

25