```
1              IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF TEXAS
2                     BROWNSVILLE DIVISION

3
    UNITED STATES OF AMERICA        )
4                                   )
                                    )
5   VS.                             )  CRIMINAL ACTION NO.
                                    )  B-18-CR-8
6                                   )
    RODNEY MESQUIAS, HENRY          )
7   MCINNIS AND FRANCISCO PENA      )
                                    )
8

9
                          TRIAL - DAY SEVEN
10            BEFORE THE HONORABLE ROLANDO OLVERA
                        OCTOBER 30, 2019
11

12

13                    A P P E A R A N C E S

14
     FOR THE UNITED STATES:
15
          MR. KEVIN LOWELL
16        MR. ANDREW SWARTZ
          MR. JACOB FOSTER
17        ASSISTANT UNITED STATES ATTORNEY
          BROWNSVILLE, TEXAS 78520
18

19   FOR THE DEFENDANT RODNEY MESQUIAS:

20        MR. CHARLES BANKER
          ATTORNEY AT LAW
21        118 Pecan Boulevard
          McAllen, Texas 78501
22
          MR. HECTOR CANALES
23        MR. TONY CANALES
          ATTORNEYS AT LAW
24        2601 Morgan Avenue
          Corpus Christi, Texas 78405
25
```

```
 1   FOR THE DEFENDANT HENRY MCINNIS:

 2        MR. ED CYGANIEWICZ
          ATTORNEY AT LAW
 3        1000 E. Madison Street
          Brownsville, Texas 78520
 4
     FOR THE DEFENDANT FRANCISCO PENA:
 5
          MR. ROBERT GUERRA
 6        ATTORNEY AT LAW
          55 Cove Circle
 7        Brownsville, Texas 78521

 8   FOR THE DEFENDANT FRANCISCO PENA:

 9        MS. ADRIANA ARCE-FLORES
          ATTORNEY AT LAW
10        1414 Victoria Street
          Laredo, Texas 780404

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    COURT OFFICER:  All rise for the jury.

2                    (JURY IN.)

3                    THE COURT:  Thank you, everyone.  Please be

4      seated.  Good morning.

5                    Ladies and gentlemen of the jury, good

6      morning, and thank you for your promptness.

7                    Gentlemen?  Mr. Lowell?

8                    MR. LOWELL:  Good morning, Your Honor.

9      Thank you.

10                    The United States calls Jesus Virlar.

11                    THE COURT:  Please remain standing, sir.

12      Raise your right hand.

13                    (WITNESS SWORN IN.)

14                    THE WITNESS:  Yes, ma'am.

15                    THE CLERK:  Thank you.

16                    THE COURT:  Thank you, sir.

17                    Sir, please make yourself comfortable and

18      position the microphone closely to you, and speak loudly

19      and clearly into the microphone.

20                    Mr. Lowell, please proceed.

21                    MR. LOWELL:  Thank you, Your Honor.

22                         DIRECT EXAMINATION

23      BY MR. LOWELL:

24        Q.  Good morning, please state your name for the

25      record.

1    A.   My name is Jesus Alfredo Virlar Cadena.

2    Q.   Do you currently live in Texas?

3    A.   Yes, I live in San Antonio half of the week and

4    the rest in Laredo, Texas with my parents.

5    Q.   And were you a doctor?

6    A.   Yes, graduated --

7    Q.   How long?

8    A.   I graduated from University of Texas Medical

9    Branch in 2000, did my residency in Indiana University

10   from '01 to 2003, and then relocated back to

11   San Antonio.

12   Q.   As a doctor, where did you practice primarily?

13   A.   In the hospital setting at Main Methodist

14   Hospital, the Baptist Facilities, Santa Rosa Facilities,

15   Nix Hospital, Southwest General Hospital, as well as

16   some nursing home facilities.

17   Q.   Mr. Virlar, what do you currently do for a

18   living?

19   A.   Currently, I'm in the automotive business with my

20   family, Collision Parts and Managing Collision Center.

21   Q.   Did you previously work for the Merida Group?

22   A.   Yes, I did.

23   Q.   Were you one of the medical directors there?

24   A.   Yes, sir.

25   Q.   Approximately, what timeframe?

1       A.   Between 2012 all the way to 2016, 2017.

2             THE COURT:  Raise the mic a little bit.  Get

3    closer to the microphone, get it closer to you.

4             There you go.

5             THE WITNESS:  Okay.

6       Q.   (By Mr. Lowell) And using trial director, can we

7    pull up Government's Exhibit L-2.

8             Now, Mr. Virlar, which region on this map were

9    you based?

10      A.   Out of San Antonio.  Right there.

11      Q.   Mr. Virlar, were you arrested in 20 -- 2018?

12      A.   Yes, sir.

13      Q.   And after that, did you enter into a plea

14   agreement with the United States?

15      A.   Yes, I did.

16      Q.   Did you plead guilty to two different charges?

17      A.   Yes, I did.

18      Q.   Conspiracy to Commit Health Care Fraud?

19      A.   Yes, I did.

20      Q.   Conspiracy to Violate the Travel Act?

21      A.   Yes, I did.

22      Q.   Could we please pull up Government's Exhibit J-2.

23            Mr. Virlar, is this your plea agreement and

24   statement of facts?

25      A.   Yes, it is.

1      Q.   I want to talk about each of the crimes that you

2  were charged with.   Let's start with the Conspiracy to

3  Commit Health Care Fraud.

4          Did that charge relate to your time as a doctor

5  at the Merida Group?

6      A.   Yes, it did.

7      Q.   Do you know Rodney Mesquias?

8      A.   Yes, I do, sir.

9      Q.   Do you see him in the courtroom?

10     A.   I believe he's straight ahead.

11     Q.   Could you please identify him by where he's

12  sitting and what he's wearing?

13              THE COURT:   Go ahead and stand up.

14              Sir, you can stand up if you need to.

15     Q.   (By Mr. Lowell)  Would you like to come a little

16  closer, sir?

17              THE COURT:   The defense table is --

18              MR. LOWELL:   The defense table is right

19  here.

20              THE WITNESS:   He looks different.   He looks

21  heavier and with glasses.

22              THE COURT:   Can you identify him?

23              THE WITNESS:   Yes, sir.

24              THE COURT:   Go ahead and get back to the

25  mic.

```
 1                 THE WITNESS:  Yes, I can identify him.
 2                 MR. LOWELL:  Your Honor, may the record
 3     reflect that Mr. Virlar identified Rodney Mesquias.
 4                 MR. HECTOR CANALES:  Well, Your Honor, I'd
 5     object.  I'd like the record to reflect he wasn't sure,
 6     it wasn't a positive identification.
 7                 THE COURT:  Why don't you go back and stand
 8     around and --
 9                 MR. HECTOR CANALES:  Your Honor, I would
10     object to the --
11                 THE COURT:  That's overruled.  Go back.
12                 He says he looks heavier and wears glasses.
13     I don't know if you heard that.
14                 THE WITNESS:  Oh, right there.
15        Q.  (By Mr. Lowell)  Can you identify by where he's
16     sitting and what he's wearing?
17        A.  He's wearing a jacket, light blue tie.  He's
18     heavier.
19                 THE COURT:  Get back to the stand.  All
20     right.
21                 MR. LOWELL:  May the record reflect --
22                 THE COURT:  Rephrase the question so he can
23     answer into the mic, I don't know -- Sheila, did you get
24     that?
25                 COURT REPORTER:  Yes, sir.
```

```
 1                    THE COURT:  All right.  Never mind.
 2                    MR. LOWELL:  May the record reflect the
 3      identification of Mr. Virlar.
 4                    THE COURT:  So noted.
 5          Q.  (By Mr. Lowell)  Now, do you also know
 6      Mr. Francisco Pena?
 7          A.  Yes, I do, sir.
 8          Q.  Do you know Henry McInnis?
 9          A.  Yes, I do, sir.
10          Q.  And did you work with Rodney Mesquias, Henry
11      McInnis and Francisco Pena at the Merida Group?
12          A.  I worked with Henry McInnis and Rodney Mesquias
13      mostly.  With Mr. Fran -- Dr. Francisco Pena at Doctors
14      Hospital, and also when I visited him in his clinic with
15      Roland Aguilera.
16          Q.  Now, Mr. Virlar, you've been sued before; is that
17      right?
18          A.  Yes, sir.
19          Q.  And are you on the hook for, approximately,
20      $14,000,000?
21          A.  That is correct, for a malpractice case.
22          Q.  Have you also been caught in undercover
23      investigative recordings?
24          A.  Yes, I have.
25          Q.  And during your time at the Merida Group, you
```

1    weren't nice to other employees; were you?

2        A.  No, I wasn't.  I was completely the opposite,

3    rude, obnoxious, cocky.

4        Q.  And in -- in addition to your involvement with

5    the scheme at the Merida Group, were you involved in

6    other schemes?

7        A.  Yes, sir.

8        Q.  And did that other scheme include a kickback

9    scheme, a health care kickback scheme in San Antonio?

10       A.  Yes with topical pain creams.

11       Q.  Okay.

12               THE COURT:  Speak loudly and clearly into

13   the microphone.

14               THE WITNESS:  Yes, sir.

15       Q.  (By Mr. Lowell)  And to be clear, that was a

16   scheme that was separate from what you were doing at the

17   Merida Group; is that correct?

18       A.  Yes, very separate.

19       Q.  Now, as a part of your plea agreement, you agreed

20   to cooperate with the United States; is that correct?

21       A.  That is correct.

22       Q.  And as part of that cooperation, have you met

23   with the Government?

24       A.  Yes.

25       Q.  Have you reviewed documents?

1    A.  Yes, I have.

2    Q.  And in exchange for testifying here today, do you

3    hope to do less time in jail?

4    A.  Yes, I do.

5    Q.  Who ultimately decides your jail sentence?

6    A.  The Judge.

7    Q.  In addition to your plea -- plea agreement, you

8    also entered into a proffer agreement; is that right?

9    A.  That is correct.

10   Q.  And under that proffer agreement, the Government

11   agreed not to use certain statements against you in a

12   prosecution; is that correct?

13   A.  That is correct.

14   Q.  At this point, has the United States made any

15   promises to you about what prison sentence it may

16   recommend?

17   A.  None whatsoever.

18   Q.  And in order to get the possible ben -- benefit

19   of a lower prison sentence, what's your bottom line

20   understanding of what you must do today?

21   A.  Tell the truth and nothing but completely the

22   truth.

23   Q.  And Mr. Virlar, if you were to lie or mislead

24   this jury, what could happen to you?

25   A.  Have additional charges.

1    Q.   You could be prosecuted for other crimes; is that

2    right?

3    A.   That is correct.

4    Q.   Now, this health care fraud conspiracy charge

5    that you pleaded guilty to, did you -- did you agree

6    with others to commit health care fraud?

7    A.   Yes, I did.

8    Q.   Did you agree with Rodney Mesquias to commit

9    health care fraud?

10   A.   Yes, we did.

11   Q.   Did you agree with Henry McInnis to commit health

12   care fraud?

13              MR. HECTOR CANALES:  Your Honor --

14   Your Honor, I'm going to object to the previous question

15   and the current question both as leading.

16              THE COURT:  Rephrase the question.

17   Q.   (By Mr. Lowell)  During the course of the --

18              MR. HECTOR CANALES:  Your Honor, excuse me,

19   I apologize.  I instruct that -- I would request an

20   instruction from the Court for the jury to disregard the

21   answer to the previous leading question.

22              THE COURT:  Disregard the previous answer.

23   Please rephrase the question.

24   Q.   (By Mr. Lowell)  During the course of the

25   conspiracy, who, if anyone else, did you agree to commit

```
 1    health care fraud?
 2        A.   I agreed to health care fraud with my partner
 3    Rodney Mesquias, my partner Henry McInnis, as well as
 4    clinicians that were part of my group.
 5        Q.   In addition to those individuals, did you also
 6    agree to commit health care fraud with Francisco Pena?
 7                  MR. GUERRA:  Objection, Your Honor, leading.
 8                  THE COURT:  Rephrase the question.
 9                  Who were the other clinicians?
10        Q.   (By Mr. Lowell)  Who were the other clinicians?
11        A.   Other medical directors at Merida included
12    Vicente Gonzaba, Benjamin Zertuche, Dr. Francisco
13    Martinez, as well as Dr. Posada, and other physicians
14    that I would hear the names about, but I do not recall.
15        Q.   In addition to those individuals, who, if anyone
16    in Laredo, did you agree to commit with -- health care
17    fraud with?
18        A.   Could you be more specific, please?
19        Q.   Yes.  Focusing on Laredo, what, if any -- who, if
20    anyone in the medical profession, did you agree to
21    commit health care fraud with?
22        A.   With Dr. Francisco Pena.
23        Q.   Now, were there different ways that you and your
24    co-conspirators committed health care fraud?
25        A.   Yes, we would falsify the clinical information in
```

1  the charts so that it will look as if the patient

2  appears sicker than they really truly are so that they

3  would meet hospice criteria.

4       Q.  So to be clear, Mr. Virlar, did you sign up

5  patients who were not dying for hospice?

6       A.  Yes, I did.

7       Q.  As a part of that conspiracy, did you sign up

8  patients who were not homebound for home health?

9       A.  Yes, I did, multiple.

10      Q.  As a part of that conspiracy, did you cause false

11 claims to be submitted to Medicare?

12      A.  Yes, I did, multiple.

13      Q.  As a part of that conspiracy, did you manufacture

14 fake records that were sent to the Grand Jury?

15      A.  Yes, I did, multiple.

16      Q.  What's the purpose of sending those fake records

17 to the Grand Jury?

18      A.  They were, essentially, attempt to cover up the

19 fraudulent fraud that we were committing on those

20 patients.

21      Q.  When you mean cover up the fraud, explain to the

22 jury what you mean by that?

23      A.  Basically, we were saying that the patients were

24 sick by documenting false diagnosis, false clinical

25 objective findings, and since the Grand Jury requested

1  more records to verify if that was truly real, we went

2  ahead and manufactured more medical records stating that

3  on certain visits, at certain times these patients were

4  examined when, in fact, they had not been examined.  So

5  what was written on those charts was completely copied

6  from previous fake medical records.

7      Q.  Was it part of the conspiracy to receive

8  kickbacks in exchange for patient referrals?

9      A.  Yes, very common.

10     Q.  Was it part of the conspiracy -- conspiracy to

11 conceal your ownership --

12             MR. HECTOR CANALES:  Objection, Your Honor,

13 objection, Your Honor, also calls for lead -- leading

14 question.

15             THE COURT:  Well, let me hear the entirety

16 of the question.  Let me hear the question, I didn't

17 hear -- and, sir, again, position the mic close to you.

18 You can move the base if that helps you.

19     Q.  (By Mr. Lowell)  As a part of the conspiracy,

20 what, if anything, did you do to conceal your ownership

21 in a company, the Merida Group Company?

22     A.  I placed the ownership of the company under my

23 then current girlfriend Micaela Wood.

24     Q.  How old was your girlfriend at the time?

25     A.  She was 19.

1    Q.   In addition to Rodney Mesquias, Henry McInnis and

2  Francisco Pena, were there other Merida Group employees

3  involved in the conspiracy?

4    A.   Multiple employees.

5    Q.   Were there marketers?

6    A.   Yes.

7    Q.   Nurses?

8    A.   Yes.

9    Q.   What about other doctors?

10   A.   Other doctors as well.

11   Q.   And could we please pull up Government's Exhibit

12  L-2.

13       And again, Mr. Virlar, what was your role?

14   A.   I was the medical director for the San Antonio

15  market for Merida Hospice.

16   Q.   And as part of the conspiracy, what was your

17  role?

18   A.   To furnish patients to increase the census, grow

19  the company, increase the revenue.

20            THE COURT:  Sir, again, when you face the

21  jury, you're facing away from the microphone so either

22  move the microphone or --

23            THE WITNESS:  My job was, basically, bring

24  patients into hospice, which basically for every patient

25  would get $110 a day so the more patients, the higher

1    the revenue, and that would allow the company to have

2    increased revenue and increased profits.

3            So my job was medical

4    director/marketer/business partner, make sure the

5    company succeeds, grows, et al, at the cost of the

6    patient.

7    Q.   (By Mr. Lowell)  And what was Dr. Carrillo's

8    role?

9    A.   Dr. Carrillo's role was brought in to do the

10   face-to-faces of the patients throughout Texas due to

11   the lack of time.  Most of the time I was working from

12   7:00 a.m. up until midnight so I did not have time to do

13   face-to-faces, so Dr. Carrillo would be brought into

14   town and he would basically do what I was doing,

15   fraudulently documenting diagnoses that were

16   nonexistent, clinical objective findings that were

17   nonexistent so that patients would qualify and meet

18   criteria for hospice.

19   Q.   And Dr. Francisco Pena, what was his role?

20   A.   Dr. Francisco Pena's role was similar to mine, as

21   a medical director to recruit patients, place patients

22   in hospice and keep them in hospice so that their

23   revenue of the company grows.

24   Q.   What, if any conversations did you have with

25   Dr. Francisco Pena about illegal kickbacks?

```
 1      A.   On one particular visit, me and Roland Aguilera,

 2  who was the director to of nursing for Merida in

 3  San Antonio, went to Dr. Francisco's office because he

 4  had stopped sending patients.  And Rodney had asked

 5  Mr. Aguilera to go talk to Dr. Pena and see what could

 6  be done.

 7          So when we walk into his office, Dr. Pena was

 8  pretty blunt, I'm not sending patients until I get paid,

 9  which is unusual because physicians, we don't ask

10  straight out give me money for the patients.  We ask is

11  there a medical directorship position that I can have.

12          So he was blunt asking Roy Aguilera if you don't

13  give me my money, we're not going to be sending patients

14  and I'll be transferring patients from Merida.

15      Q.   Mr. Virlar, I'm going to ask you to speak a

16  little bit louder into the microphone, okay?

17      A.   Okay.

18      Q.   I think you mentioned something about as doctors

19  we don't talk about payments for patients; is that -- is

20  that accurate?

21      A.   That's correct.  We don't ask directly pay me for

22  this patient, pay me for this service, we simply say --

23              MR. HECTOR CANALES:  Objection, Your Honor,

24  to the we, testifying without personal knowledge or

25  identifying who else is in his answer.
```

1          THE WITNESS:  Physicians.

2          THE COURT:  Overruled.  But answer -- again,

3     you're answering about yourself.

4          And again, position the microphone closely

5     to your mouth.  All right.  Let's start over.

6          MR. LOWELL:  Thank you, Your Honor.

7     Q.   (By Mr. Lowell)  Mr. Virlar, you mentioned

8     something about as -- as a physician you don't openly

9     talk about payments for patients; do you remember that?

10    A.   Yes, I do.

11    Q.   Explain to the jury what you meant by that.

12    A.   As physicians, when we talk privately, and we

13    have this grudge that other entities make money off of

14    our business, our patients.  And so we talk amongst

15    ourselves, are you working, are you sending patients

16    with us -- to this entity, home health, DME company,

17    hospice, and it's like, well, yes, I'm sending patients.

18    Well, are you the medical director?  No, I'm not.  Then

19    why are you sending patients?  So that is spoken amongst

20    the physicians, it's known by everyone, all physicians.

21    Not by the public, but by physicians.

22          So if we're sending you patients to the hospice,

23    to home health care, we expect remuneration for that.

24    Basically, position of a directorship, or maybe for a

25    family member a job.

1     Q.   Why not talk openly about it?

2     A.   It is against law to receive any remuneration for

3   a patient referral, anti-kickback as well as the Stark

4   Law.

5     Q.   How important, if at all, at that time was

6   Dr. Pena to the Merida Group's Laredo operation?

7     A.   Dr. Pena was the primary referral source for the

8   Laredo Merida practice.

9     Q.   Now, I want to be clear about what your job was

10  as a medical director, as a doctor, at the Merida Group.

11  Were you paid to give a truthful medical opinion?

12    A.   No, I was not.

13    Q.   Tell the jury what you were paid to do.

14    A.   I was paid to bring patients into the Merida

15  Group, basically evaluate patients and document what was

16  necessary to fit that patient to meet hospice criteria.

17    Q.   When you say what was necessary to meet hospice

18  criteria, explain to the jury what you mean by that.

19    A.   Basically, I would go see a patient.  If they

20  have congestive heart failure but they're walking

21  around, well, that doesn't mean they need hospice.

22         So I would basically document, patient with short

23  of breath, unable to ambulate without maximum assist,

24  patient complain of chest pain with minimal exertion, so

25  I would add symptoms, diagnoses so that they would meet

1    hospice criteria.

2       Q.  So Dr. Virlar, just to be clear, would you lie in

3    those patient files?

4       A.  Yes, I would.

5       Q.  Were you paid to be a real doctor?

6       A.  No, I was not.

7       Q.  Were you paid to promote the fraud at the Merida

8    Group?

9                MR. HECTOR CANALES:  Objection, Your Honor,

10   leading.

11               THE COURT:  That's overruled.

12      Q.  (By Mr. Lowell)  You may answer.

13      A.  Oh, yes, I was.

14      Q.  How were you paid to promote the fraud?

15      A.  I would receive a medical directorship of $5,000

16   a month, as well as a quarterly bonus, so the more

17   patients that I would refer, the bigger that quarterly

18   bonus, that would be my incentive.  Also, our trips to

19   Vegas, trips to Napa, and as well as $300 for gym

20   membership at Gold's when I was in Laredo.

21      Q.  Mr. Virlar, are you familiar with the term

22   prognosis?

23      A.  Yes, I am, sir.

24      Q.  As a medical director with the Merida Group, were

25   you paid to give a truthful prognosis for patients?

1      A.   No, I was not.

2      Q.   Were you paid to give a truthful diagnosis?

3      A.   No, I was not.

4      Q.   Could we please pull up Government's Exhibit L-3.

5           Now, Mr. Virlar as a doctor for the Merida Group,

6    did you routinely have conservations with Rodney

7    Mesquias and Henry McInnis?

8      A.   Yes.

9           MR. CYGANIEWICZ:   Objection to the compound

10   question and grouping together the -- the two people.

11   That calls for a vague answer and it's a vague question

12   and a compound question.

13          THE COURT:   Overruled.

14     Q.   (By Mr. Lowell)  You may answer.

15     A.   Yes, I would have multiple conversations via

16   group text with Rodney Mesquias, Mr. Henry McInnis, the

17   marketers and whenever I would refer a patient, I would

18   let them know via text, here's another one, please send

19   your marketer as soon as possible because I have other

20   patients.

21          And at one point, we were communicating through

22   an encryption application called Wickr so that if we

23   will be investigated, there will be no trace of it.

24     Q.   You mentioned an encryption application; is that

25   right?

1      A.   That is correct.

2      Q.   And using that encryption application, would you

3  communicate with Rodney Mesquias?

4      A.   Yes, I would, on multiple occasions.

5      Q.   Using that encryption device, would you

6  communicate with Henry McInnis?

7      A.   Yes, I would.

8      Q.   And what, if anything, was the purpose of using

9  the encrypted device to communicate with them?

10     A.   To hide the fraud.

11     Q.   Now, you mentioned earlier that you signed up

12 patients who did not qualify for hospice.  At whose

13 direction did you do that?

14     A.   Rodney Mesquias and Henry McInnis.

15     Q.   What about the home health patients that you

16 qualified for home health fraudulently?  At whose

17 direction did you that?

18     A.   Henry McInnis and Rodney Mesquias.

19     Q.   And with respect to the payments for patient

20 referrals to the Merida Group, who, if anyone, gave you

21 that direction?

22     A.   Could you please repeat the question?

23     Q.   Yes.  With respect to the kickbacks that you

24 received at the Merida Group, who, if anyone, gave you

25 direction that you would receive those kickbacks?

1      A.   I don't understand your question.

2      Q.   You testified earlier that you received kickbacks

3   as part of the health care fraud conspiracy; is that

4   right?

5      A.   That is correct.

6      Q.   And from whom did you get those kickbacks?

7      A.   Oh, from Rodney Mesquias and Henry McInnis.

8      Q.   Now, Mr. Virlar, as part of the conspiracy, did

9   the fraud take place in different towns in Texas?

10     A.   Multiple towns throughout Texas.

11     Q.   And I'm showing you Government's Exhibit L-1,

12  could we pull that up.

13          Mr. Virlar, I want to focus on the towns that are

14  depicted and blown-up there.  And if you -- you can use

15  your finger and you can circle the towns as we go

16  through them.

17          Now, just going through them, could you circle

18  the towns that are depicted and blown-up where you were

19  involved in the fraud, or there was fraud occurring.

20  Could you name them as you circle them?

21     A.   San Antonio, Austin, Eagle Pass, Pearsall,

22  Dilley, Cotulla, Laredo, Houston, Texas City, other

23  towns near Texas City in Galveston, Corpus Christi and,

24  of course, Harlingen.

25          I was also -- I was supposed to travel to El Paso

1    where they were going to be up and running with a

2    hospice.

3         I also participated in the opening of an Odessa

4    hospice branch where I gave phone orders, instruction

5    over the phone, and I never saw the patient who I

6    treated over the phone, spoke with the patient, had

7    absolutely no contact with that patient.

8         Q.   At whose direction did you do that?

9         A.   Rodney Mesquias and Henry McInnis.

10        Q.   Now, were there plans to expand outside of the

11   State of Texas, the fraud?

12        A.   Yes, the plan was to go to Dallas, Fort Worth,

13   other Texas major cities, and from there expand to

14   Louisiana.

15        Q.   Now, after you started with the Merida Group, did

16   you visit the Merida Group's corporate headquarters?

17        A.   Yes, I did.  I was invited by Rodney to visit his

18   condominium in Sapphire in South Padre.  So he met me

19   there with his wife Stephanie, ordered wine, some

20   flowers, and eventually he took me to McAllen, I

21   believe, or Harlingen to look at the main office of

22   Merida.  And that was my very first time visiting there

23   and it was a pretty big operation, I was very surprised.

24        Q.   Now, during that visit to the headquarters of the

25   Merida Group, did you review patient records?

1     A.   Yes, I was caught off guard.  He asked me if I

2   could help complete some medical records and so they

3   brought in some boxes, one of his nurses, and these were

4   already sort of prepped, and so he asked me to, you

5   know, just fill out the missing information using some

6   previous clinical information that was already

7   documented there.

8        And so his nurse assisted me by sort of a

9   directing me, okay, this is this part of the record,

10   this is the clinical information and it goes with this

11   record.  So I was basically copying the clinical

12   information from one finding, one evaluation, making

13   other fraudulent evaluations on a patient that I had

14   never seen, or I wasn't aware had seen because I was

15   very caught off guard that I didn't look at the names, I

16   was just basically, okay, well, let me fill this

17   paperwork so I can get out of here.

18        And Rodney Mesquias basically said, anything you

19   need, lunch, coffee, let them know, and it was in his

20   office where I was basically fraudulently filling out

21   paperwork so that patients would be meeting hospice

22   criteria.

23        And it was about two boxes, I was there most of

24   the day.  And he asked me to return to do similar work,

25   and he would invite me on numerous occasions, but I

1    would sort of stall because I knew that was wrong.  And

2    that was the very first time where it was the big red

3    flag, but I ignored it, I had my own agenda, and I went

4    ahead and filled out those fraudulent medical

5    documentations.

6        Q.   And to be clear, Mr. Virlar, at whose direction

7    did you create that false documentation?

8        A.   Mr. Rodney Mesquias and Henry McInnis.

9        Q.   Was Henry McInnis also present in the office that

10   day?

11       A.   Yes, he would be.

12       Q.   Tell the jury what kind of information you

13   falsified in those records?

14       A.   The time of evaluation, the date, so that it

15   would fall between the billing period, or the

16   certification period.  The objective findings, whether

17   they had shortness of breath, whether they couldn't eat,

18   whether they were having trouble urinating, breathing.

19   And of course the diagnoses, you know, making sure they

20   did not have CHF or Alzheimer's or COPD, I would

21   basically throw that in there and basically try and make

22   it fit with the flow of the information that I had in

23   front of me.

24       Q.   And when you say make it fit, to be clear, are

25   you saying you were lying in the records?

1      A.   Yes, I was.

2      Q.   Now, after creating these false records, did you

3  go to South Padre Island?

4      A.   Yes, I did.

5      Q.   Where did you go?

6      A.   To the Sapphire, the condo, and also had dinner

7  with Rodney Mesquias and his wife, some family members

8  of his.

9      Q.   What was your understanding of why you were able

10  to use Rodney Mesquias' condo?

11      A.   Basically, I'm the primary referral source, he

12  kept sending me patients, this is your reward, and I had

13  pretty much free access to the condominium whenever I

14  would want to, he would just say, just let me know what

15  weekend you want and it's yours.

16      Q.   Now, Mr. Virlar, as medical director for the

17  Merida Group, did you sign up patients with Alzheimer's?

18      A.   Yes, I did.

19      Q.   And in plain English, what is Alzheimer's?

20      A.   Alzheimer's is when have you a -- your smarts are

21  not as they used to be, you're a little bit slow, a

22  little bit slow memory, but it encompasses a broad

23  spectrum where you may forget where you had breakfast

24  this morning, or you may be completely bedbound, not

25  knowing that you're supposed to be eating, not knowing

1    that your sister, your brother is right next to you, not

2    knowing that you're supposed to get out of bed to go

3    have a bowel movement, so it's a pretty big spectrum.

4        Q.   Now, some of these patients, a lot of these

5    patients you signed up for hospice services for the

6    Merida Group; is that right?

7        A.   That is correct.

8        Q.   And for those specific patients, they were not

9    dying; is that right?

10       A.   That is correct.

11       Q.   Did they qualify for hospice?

12       A.   No, they did not.

13       Q.   But you signed them up anyway?

14       A.   Multiple patients.

15       Q.   And you interacted with these patients?

16       A.   Yes, I did.

17       Q.   Would it be fair to say that they were

18   vulnerable?

19       A.   Very vulnerable, a lot of them were lonely, they

20   just wanted someone to listen to them.

21       Q.   And when you signed them up, did they have a

22   choice?

23       A.   They did not.  You know, we basically counseled

24   them, you tell them the benefits of hospice, you lie to

25   them.  You know, things that could benefit them.  You

1    know, we'll send a chaplain to talk to you, we'll send a

2    nurse to check on you, we'll provide you Meals on

3    Wheels, we'll give you some Boost, some Ensure, some

4    supplements, some incontinent supplies, you're inducing

5    them.

6        Q.   You mentioned we lied to them, who would lie to

7    them?

8        A.   I myself, the physician, the marketer who then

9    come and sign them up with their consent, the nurse who

10   would be waiting at home to tuck them -- tuck them into

11   the clinical information to verify that I was giving an

12   honest, truthful evaluation and that that patient would

13   truly meet hospice criteria.  So that is a -- a check,

14   the nurse has to also be in agreement, a separate entity

15   a nurse employed by the hospice agency has to use her

16   own, basically, clinical skills, her own judgment.

17        And then, of course, the chaplain who would come

18   in and, basically, reinforce the belief that they're

19   dying, prepare them to accept God in their journey, and

20   of course, the home health aide who is now visiting them

21   every week, you know, letting them know that, well, you

22   you're okay, you know, everything's going to be okay,

23   just trust in us.

24        Q.   So you're mentioning all these different people

25   that are part of the team, would it be fair to say

1    they're all misleading these patients?

2       A.   All of us were misleading the patients.  And by I

3    mean all of us, the Merida Hospice Group.

4       Q.   I want to focus on the role of the chaplain.  How

5    would the chaplain mislead these patients?

6       A.   The chaplain is a religious person who basically

7    comes to your home and is letting you know that it's

8    okay to accept death, it's a natural process, and that

9    he's there to facilitate that role, to help you with

10   your beliefs, to reassure you that it's going to be

11   okay.

12          And so that is reinforcing a false belief into

13   that patient that they're actually dying when they're

14   not.  So you have a physician that lied to you that

15   you're dying, that you're pretty sick, and now you have

16   a -- a clergy, a person of the church, basically

17   reinforcing, again, that you're dying and that he's

18   there to, basically, you know, make peace, so they can

19   make peace with God and prepare for death.

20      Q.   Did these patients have a choice?

21      A.   They did not.

22      Q.   What do you mean by that?

23      A.   They were being counseled.  When they would try

24   to say, I don't need hospice, we would, again, use

25   inducements, well, you're giving away this nurse that's

1  coming to see you, you're giving away this chaplain

2  that's coming to see you, you were going to take away

3  the hospital bed that we delivered to you, we're going

4  to take away the Ensure, the incontinence supplies.

5       So if you stop hospice, you're being punished

6  because we're going to be taking away all these things

7  from you.  And so that would basically then make the

8  patient say, well, okay, let me just continue with

9  hospice.

10     Q.  And to your knowledge were there other medical

11  directors at the Merida Group who were signing up these

12  same kinds of patients?

13     A.  Yes, multiple medical directors.

14     Q.  And based on your conversations with Rodney

15  Mesquias together with Henry McInnis, was there an

16  interest from a financial perspective in signing up

17  these patients?

18     A.  Absolutely, that was the whole goal, basically.

19  You sign up patients not because you want to help them,

20  but because you want to increase the revenue of the

21  hospice agency, of the company.

22       Again, every patient we signed up, we get $110

23  per day whether or not that patient is seen for the

24  month.  When you're on hospice, Medicare sends you $110

25  a day per patient so that you can provide nursing,

1    hospice, medications, medical equipment so that patient

2    is at home, comfortable, receiving appropriate care

3    during their terminal diagnosis.

4         So we have ten patients signed up in if one day,

5    that's about 1,000, 1500, $1600 for that day times 30

6    days, that's a pretty big chunk of money.

7         And then the more you sign up, the more you get

8    paid.  If you discharge a patient from hospice, just one

9    patient, well, you're giving away $3,000 for the month.

10   Q.   And to be clear, the patient didn't see any of

11   that money?

12   A.   Absolutely not.

13   Q.   Where did that money go?

14   A.   That money got deposited directly into the Merida

15   account.

16   Q.   Now, I want to focus on an example of one of

17   these Alzheimer's patients.

18        Do you recall visiting an Alzheimer's patient who

19   lived in a home, she was locked in a home in

20   San Antonio?

21   A.   Yes, I did.

22   Q.   Could you tell the jury about that patient.

23   A.   There was a lady that got referred by adult

24   protective services to Merida so that she could be

25   signed up for --

1           MR. HECTOR CANALES:  I object, Your Honor,

2    and ask him which patient we're referring to in the

3    medical records so that I can essentially object or

4    cross-examine on this.  Vague.

5           THE COURT:  Overruled.  You can answer the

6    question.

7           MR. HECTOR CANALES:  Is he referring to a

8    document?

9    Q.  (By Mr. Lowell)  Mr. Virlar, do you recall the

10   name of the specific patient?

11   A.  I do not recall the name because there were so

12   many patients, but this patient in particular, I

13   recalled because of her circumstances and how sad they

14   were and how we, basically, took advantage of her.

15          So here's adult protective services trying to

16   help the patient, but in reality Ms. Jenny Veale, who's

17   APS employees was referring patients to Merida Hospice

18   in exchange for Merida using her husband Lavar Veale's

19   DME Company for incontinence supplies.

20          So we get the referral, well, Merida gets the

21   referral, the marketer Rosie contacts me, tells me

22   there's this referral, please, go see her so you can

23   sign her up for hospice.  Not so you can go and evaluate

24   and assist, no, so you can sign her up for hospice.

25          So I go the very first time, it's on the west

1    side of San Antonio, it's a small wooden house, sky blue

2    painted around, and there's a chain-link fence.

3          And so I walk in there and I noticed that the

4    door is locked.  And so I sent a text to Rosie, Roland

5    Aguilera, letting them know that I'm here to see the

6    patient but the door's locked, there's nobody here.  And

7    Rosie lets me know that, well, the patient is there, but

8    the son is not there, so he'll be available tomorrow.

9          So I left the premises, basically, the property,

10   and I returned the following day and the son met me

11   there.  And so he opened up the door and I walk in there

12   and it's dark, musty living room with only a stool in

13   the center and this elderly lady, thin, frail just

14   walking around not knowing who I was, or who the

15   gentleman was that was her son.  And so we have this

16   elderly person locked up from the outside by her son.

17         And I was there, basically, to assess her.  Well,

18   I see her walking, I know she's not oriented, doesn't

19   recognize any of us, but she's not dying, you know,

20   she's walking around.  And I didn't even examine her

21   lungs, I didn't -- I didn't touch her.  I just looked at

22   her son and said, well, I -- I have what I need, and

23   then I'll -- I'll send this to Merida Hospice and, you

24   know, we'll go ahead and help her out.

25         And by help her out, basically, I meant we're

1    going to sign her up for hospice.  And the son basically

2    remarked that, well, I can't put her in a nursing home

3    because she owns property so that's out of the question.

4    Well, we'll help her out.

5         So I filled out the clinical information, making

6    sure that she would meet hospice criteria, and I sent

7    that to Merida.  And I still remember that very clearly

8    because here is the son looking -- locking up his mom

9    and basically keeping her locked up, but, you know, it's

10   just dark, musty, no furniture inside and the lady just

11   walking around, I mean, confused.

12       Q.  So to be clear, did you sign up this particular

13   patient for hospice care with the Merida Group?

14       A.  Yes, I did.

15       Q.  And was Rodney Mesquias aware that you signed up

16   this specific patient?

17       A.  Yes, he was, because after I left, you know, via

18   group text, I sent him a text saying, hey, boom, patient

19   seen and she's good to go.

20       Q.  Did she qualify for hospice care?

21       A.  She did not.

22       Q.  Tell the jury why you signed her up.

23       A.  As another patient, it's another $110 a day.

24       Q.  Did you have any idea whether that patient got

25   any services?

1       A.   None whatsoever.

2       Q.   Now, would you also get drinks with Rodney

3  Mesquias and Henry McInnis?

4       A.   On numerous occasions.

5       Q.   On these occasions, would you all discuss the

6  patient census?

7       A.   It would always be about business, patient

8  census, which doctors to approach, which physicians I

9  knew, had patients to send to hospice, and when I could

10 meet with those physicians with Rodney and/or Henry

11 McInnis so I could bring them on board.

12      Q.   Now, why was the census so important?

13      A.   The census determines the profit, revenue of

14 hospice agencies.  It's all that matters is the census.

15      Q.   Would you -- three of you, would you discuss

16 patient referrals?

17      A.   All the time.

18      Q.   Tell the jury about those discussions.

19      A.   It was basically, hey, Virlar, you know, we're at

20 50, we got to hit 75, you know.  Then we would hit 75,

21 hey, Virlar, we got to hit 100.  And Virlar, what do you

22 know about this doctor?  Oh, he's got a large Medicare

23 population.  Okay, then let's meet up with him.  Hey,

24 Virlar, this nurse wanting to discharge this patient

25 from hospice so we're going to be switching the nurse to

1    a different patient, and now another nurse will be

2    taking care of this patient.

3         Virlar, can you go to Corpus Christi with me to

4    talk to Dr. Tenorio because he's a WellMed doctor and

5    well -- so we can get more business, grow the business.

6         Virlar, I'm going invite Posada to Las Vegas, he

7    has a large WellMed population, he feels he's getting

8    cheated, he's one of my, you know, main guys in the

9    valley.  Can you talk to him while we're in Vegas?  And

10   so I spoke with Dr. Posada at Vegas at Mandalay Bay at a

11   night --

12   Q.  Mr. Virlar, before we get to Dr. Posada, focusing

13   on these conversations with Henry McInnis and Rodney

14   Mesquias over drinks, would you also discuss medical

15   directors who had been fired?

16   A.  Yes.  So it wasn't that medical directors will be

17   fired, it was sort of like, hey, man, have you heard

18   from Rick Escamilla?  Yes, he's upset.  Well, I'm not

19   paying him.  And, you know, it was -- it wasn't getting

20   referrals so they wouldn't pay.

21        Have you heard from Fernando Martinez?  Well,

22   yeah, he asked me why he hasn't been paid his medical

23   directorship.  Well, he hasn't sent anything so I'm not

24   going to pay him.

25        So he wouldn't technically fire them, he would

1  just not pay them, and so then those physicians would

2  just stop, you know, answering their calls, so we just

3  ignore him.

4     Q.  And staying in those same discussions, were there

5  conversations about nurses who had been fired?

6     A.  Yes.

7     Q.  Tell the jury about those discussions.

8     A.  So he would always -- Henry McInnis, as well as

9  sometimes Roy Aguilera would say, we're moving this

10  nurse because they're saying that this patient doesn't

11  qualify so Rodney asked me to move the nurse to another

12  patient.

13        And then if the nurse was insistent on

14  discharging a patient from hospice, or if there was word

15  that the nurse or provider were trying to send a patient

16  to a home health agency of another company, those

17  individuals will be terminated.

18     Q.  Now, Mr. Virlar, focusing on the benefits that

19  you received, you would receive a check; is that right?

20     A.  Yes, sir.

21     Q.  Would you also receive tickets to sporting

22  events?

23     A.  Yes, sir, seventh row up tickets to the Spurs,

24  also boxing match in Las Vegas, Canelo, I believe.

25     Q.  Who owned the tickets to the San Antonio Spurs?

1     A.   Rodney Mesquias.

2     Q.   What was your understanding of why you were being

3   taken to the Spurs games?

4     A.   It was my reward for being the number one

5   referring physician.

6     Q.   In addition to those tickets, did you also go on

7   trips?

8     A.   Yes, to Las Vegas, Napa, San Francisco where he

9   paid for the hotel right at the -- on the bay.

10    Q.   And as a medical director for the Merida Group,

11  what was your understanding of the reason you were

12  getting -- you were being taken on those trips?

13    A.   The main reason for those trips was because I was

14  referring patients.  Those trips and those sporting

15  events came to a complete stop once I stopped being the

16  hospitalist for Gonzaba Medical Group.

17    Q.   Now, you mentioned trips to Las Vegas.  Did

18  Rodney Mesquias go on those trips?

19    A.   Yes, he was always available.

20    Q.   Did Henry McInnis?

21    A.   Yes, he did.

22    Q.   Who covered the alcohol and food expenses?

23    A.   Mr. Rodney Mesquias.

24    Q.   Who covered the nightclub expenses in Vegas?

25    A.   Mr. Rodney Mesquias.

1    Q.   And as a Merida Group doctor together with the

2    leadership of the Merida Group at these Las Vegas

3    nightclubs, were you given a security detail?

4    A.   Yes, we would be escorted to the table, sat down,

5    and the rest of the crowd will be kept away from the

6    table.  And when we would be -- when I would need to go

7    to the restroom or some other person within our group,

8    they were escorted through the back, the kitchen area

9    straight into the restroom, they would wait for us and

10   then they would escort us back to our table.

11   Q.   And to be clear, were other doctors taken on

12   these trips to Las Vegas?

13   A.   Yes, sir.

14   Q.   Do you know an individual named Dr. Rolando

15   Posada?

16   A.   Yes, sir, I met him in Vegas at the Mandalay Bay

17   at the nightclub Light.

18           MR. LOWELL:  Your Honor, may I approach the

19   witness?

20           THE COURT:  You may.

21   Q.   (By Mr. Lowell)  Mr. Virlar, I'm showing you

22   Government's, this is a demonstrative Exhibit 1, do you

23   recognize that individual?

24   A.   Yes, sir.

25   Q.   Tell the jury who that is?

1     A.   This is Dr. Rolando Posada.   When I met him in

2   Vegas he did not have the mustache.

3                MR. LOWELL:   Permission to publish,

4   Your Honor?

5                THE COURT:   You may.

6                MR. LOWELL:   Could we switch to the ELMO?

7     Q.   (By Mr. Lowell) Is this Dr. Posada?

8     A.   Yes, he is.

9     Q.   And did Dr. Posada go on these trips to

10  Las Vegas?

11    A.   Yes, he did.

12    Q.   Who -- who brought him on these trips to

13  Las Vegas?

14    A.   He was a guest of Mr. Rodney Mesquias.

15    Q.   And did Dr. Posada go alone on these trips?

16    A.   No, he was with his lover, one of the Merida

17  nurses.

18    Q.   Did you have conversations with Dr. Posada on

19  this trip?

20    A.   Yes, I did, at the club.

21    Q.   Was Dr. Posada also involved in the fraud?

22    A.   Yeah, yes, he was.

23    Q.   Tell the jury how Dr. Posada was involved in the

24  fraud?

25    A.   He was the main referral for Merida in the Valley

```
 1    for home health as well as hospice patients.  So Rodney

 2    wanted more hospice patients from his WellMed population

 3    and he asked me to coach him, if you will, and let him

 4    know how I was doing it in San Antonio so that he could

 5    basically employ the same tactics in the Valley and

 6    Harlingen.

 7              MR. LOWELL:  May I approach the witness

 8    again, Your Honor?

 9              THE COURT:  You may.

10              MR. LOWELL:  Thank you.

11    Q.  (By Mr. Lowell)  Government's Demonstrative

12    Exhibit 2.

13         Do you recognize that individual?

14    A.  Yes, this is Dr. Vincent Gregory Gonzaba.

15              MR. LOWELL:  Permission to publish?

16              THE COURT:  You may.

17    Q.  (By Mr. Lowell)  Do you know Dr. Greg Gonzaba?

18    A.  Yes, I do.

19    Q.  Was Dr. Gonzaba involved in the fraud?

20    A.  Yes, he was.

21    Q.  How?

22    A.  He was one of the medical directors, and he was

23    the -- one of the initial to be partners with me and

24    Rodney Mesquias to form a partnership for Merida

25    Hospice.
```

1    Q.   What, specifically, did Dr. Greg Gonzaba do?

2    A.   He would refer patients from the Gonzaba Clinics

3   and also fraudulently document diagnoses that did not

4   meet hospice criteria, or symptoms that were not true of

5   patients.

6    Q.   Now, was Dr. Gonzaba a member of the Gonzaba

7   Group?

8    A.   Yes, he is.

9    Q.   Why would Dr. Gonzaba -- were these Gonzaba

10   patients?

11    A.   Yes, they were for the most part Gonzaba

12   patients.

13    Q.   Why would Dr. Gonzaba refer Gonzaba patients to

14   the Merida Group?

15    A.   The main moneymaker at Gonzaba Medical Practice

16   is the Medicare advantage population.  We're at full

17   risk, so that means that Gonzaba Medical Group pays 100

18   percent of the patient's care if they're in a nursing

19   home, in a rehab facility, or in this a hospital

20   setting.  So whenever the patient ends up hospitalized,

21   if it's for two days, or if it's for ten weeks, Gonzaba

22   Medical Group is 100 percent responsible financially for

23   that patient.

24        When you sign a patient into hospice, they

25   automatically revert to standard Medicare.  So now that

1  patient, when he ends up in the hospital setting,

2  Gonzaba Medical Group is no longer financially

3  responsible, it the U.S. taxpayer, Medicare who is

4  responsible for that hospitalization, that

5  rehabilitation, that nursing home stay.

6       So for every patient that got sent to hospice,

7  they are shifting the financial responsibility away from

8  the Gonzaba Medical Group to Medicare, the U.S.

9  Government, the taxpayer.

10  Q.  And you were a Gonzaba Group doctor; is that

11  right?

12  A.  Yes, I was.

13  Q.  How did it benefit you financially to refer these

14  high cost patients to hospice?

15  A.  So as we're basically transferring the high cost

16  patients, our expenses are going down for the medical

17  group and our profit margin is increasing.

18       So every quarter, the Gonzaba Medical Group

19  physicians would receive a quarterly bonus.  So the less

20  expenses, the bigger the bonus.  So you're talking of

21  quarterly bonus checks of 50,000 to $100,000 a quarter.

22  Q.  And these patients that were sent from the

23  Gonzaba Group, these high cost patients that were sent

24  from Gonzaba to the Merida Group, these patients include

25  parents who did not qualify for hospice?

1    A.   That is correct.   They did not meet hospice

2    criteria, but they had a costly secondary diagnosis.

3    For example, a CHF patient may be experiencing kidney

4    failure and was about to start dialysis, so rather than

5    Gonzaba Medical Group being financially responsible for

6    dialysis three times a week, we would, basically, sign

7    up that patient into hospice for CHF or COPD, another

8    diagnosis that was part of hospice criteria but did not

9    meet hospice criteria.

10        In other words, the patient was not actively

11   dying from CHF or COPD, but that was a diagnosis that we

12   could use to get them into hospice so that that patient

13   is now covered by Medicare for dialysis and for the

14   hospitalizations.

15    Q.   Ask you about a couple other names, Dr. Benjamin

16   Zertuche; do you know him?

17    A.   Yes, I do.

18    Q.   Did Dr. Zertuche also refer patients to the

19   Merida Group?

20    A.   Yes, he did.

21    Q.   How was he involved?

22    A.   He was the main medical director for the

23   Pleasanton area, like about 30 minutes south of

24   San Antonio is a big area, and so he would fraudulently,

25   again, sign up patients via writing that they were

1    sicker than they appeared, adding symptoms, adding

2    physical exam findings.  And he was the medical director

3    for two nursing homes in his practice area, as well as a

4    group home.  So he would mainly refer from those

5    facilities as well as his clinic.

6        Q.  Antonio Guerrero, do you know him?

7        A.  Yes, Mr. Antonio Guerrero first was Gonzaba

8    Medical Group case manager assisting me managing the

9    hospital managed care population.  And being the liaison

10   being myself and Gonzaba clinical doctors.  And United

11   Health Care got notice that he was being invited --

12            MR. HECTOR CANALES:  Objection, Your Honor,

13   at this point this part of the answer is nonresponsive

14   to the question.

15            THE COURT:  Let's break it up into question

16   and answer.

17       Q.  (By Mr. Lowell)  Do you know Antonio Guerrero?

18       A.  Yes, I did.

19       Q.  What was his role at the Merida Group?

20       A.  He was a nurse to, basically, assist, evaluate,

21   tuck in patients.

22       Q.  How, if at all, was Mr. Guerrero involved in the

23   fraud?

24       A.  He knew and was aware that if patients did not

25   meet criteria, he had to document that they met criteria

1    in exchange for the free housing that Mr. Mesquias was

2    providing for him.

3        Q.   What free housing was Mr. Mesquias providing

4    Mr. Guerrero?

5        A.   Mr. Rodney Mesquias was paying for Mr. Guerrero's

6    apartment at The Elan, which is a luxury apartment

7    complex in San Antonio, Texas.

8        Q.   When you say Mr. Guerrero would make sure

9    patients meet criteria, just to break that down into

10   simple terms, what does that mean?

11       A.   He was committing fraud by documenting false

12   information so that patients would stay within hospice

13   and meet criteria that was fraudulent.

14       Q.   Now, based on your conversations with Rodney

15   Mesquias and Henry McInnis, was it your understanding

16   that you were expected to refer patients to the Merida

17   Group?

18       A.   Yes, 100 percent.

19       Q.   And was that written into a contract?

20       A.   There's no contract stating that you send 100

21   percent of patients to the hospice entity, or that

22   you're required to send 100 percent of the patients to

23   the hospice entity because that is illegal.

24       Q.   Did you have conversations with Rodney Mesquias

25   about payment per doctor's order?

1    A.   No -- well, yes and no.  In the beginning,

2  there's no specific, hey, I send you a patient you send

3  me X amount of dollars for that patient.  But then it

4  was, hey, I'm sending you all these patients, your

5  census is at 50, where's the ownership you promised?

6    Q.   Mr. Virlar, from your perspective, would it be

7  fair to say you from financially incentivized?

8    A.   100 percent.

9    Q.   Would you explain that to the jury?

10   A.   My financial incentive came from two ends; one,

11 from the increased revenue of the hospice census; and,

12 two, from the increased profit sharing of the Gonzaba

13 payment structure.

14   Q.   Now, I want to show you some checks.  Could we

15 pull up Government's Exhibit M-7.  And if we could blow

16 it up and highlight it, please.

17       Mr. Virlar, who signed this check?

18   A.   Mr. Rodney Mesquias.

19   Q.   For how much?

20   A.   $12,200.

21   Q.   What does it say it's for in the memo line?

22   A.   It says F2F, which basically means the

23 face-to-face encounters, basically paying me to go see

24 those patients.  And on those patients, of course, I am

25 expected to write what is necessary to have the patients

1  meet criteria.  Not what is truthful, but what is

2  necessary to keep them in hospice.

3       Q.   Was this a check for legitimate medical services?

4       A.   No, it was not.

5       Q.   What was it a check for?

6       A.   To ensure that patients were kept in hospice.

7       Q.   Could we go to M-8, please.

8            Mr. Virlar, who signed this check?

9       A.   Mr. Rodney Mesquias.

10      Q.   How much?

11      A.   $8,800.

12      Q.   What does it say in the memo line?

13      A.   October 2015, 44 face-to-face visits.

14      Q.   Was this at a payment for legitimate professional

15  services?

16      A.   No, it was not.

17      Q.   What was it a payment for?

18      A.   To evaluate patients and document fraudulent

19  physical exam findings, fraudulent diagnoses and

20  fraudulent prognosis.

21      Q.   Had you not falsified that information, would you

22  have received that check?

23      A.   Absolutely not.

24      Q.   Could we go to M-9, please.

25            Who signed this check, Mr. Virlar?

```
 1       A.   Mr. Rodney Mesquias.

 2       Q.   How much?

 3       A.   $5,600.

 4       Q.   What does it say in the memo line?

 5       A.   28 face-to-faces.

 6       Q.   Was this a payment for legitimate professional

 7  services?

 8       A.   No, it was not.

 9       Q.   Explain to the jury what it was a payment for.

10       A.   It was a payment to go visit the patients and

11  document what was necessary to keep the patients in

12  hospice via fraudulent physical exam findings,

13  fraudulent clinical diagnosis and fraudulent prognosis.

14       Q.   Now, I want to pivot and discuss the patients

15  that you would find for the Merida Group.  Could you

16  tell the jury where would you find these patients, where

17  would you go?

18       A.   Initially, when I started as the medical

19  director, almost exclusively they were from the hospital

20  where I would work at:  Methodist, Baptist, Santa Rosa

21  facilities.  And then when those patients were

22  transferred to nursing homes, then also from nursing

23  home facilities.  And also sometimes rather than having

24  the patient be sent from the clinics to the hospital for

25  admission, I would recommend that they instead contact
```

1    the hospice agency and send them home with hospice.

2         After I left -- well after I was terminated by

3    Gonzaba Medical Group, then those patients were being

4    referred from the nursing facilities where I was seeing

5    patients.  When that slowed down, then we started

6    recruiting patients from San Antonio housing projects,

7    buildings, from adult day care centers and also from

8    personal group homes.

9    Q.   Now, you mentioned -- did you mention public

10   housing projects?

11   A.   That's correct, the San Antonio Housing Authority

12   buildings.

13   Q.   Okay.  And would you go see patients in the

14   housing projects?

15   A.   Yes, these were patients that had already been

16   contacted by recruiters with Merida Hospice and had

17   already been notified that I would -- a doctor would be

18   visiting them.

19   Q.   At whose direction would you go to these public

20   housing projects?

21   A.   Henry McInnis and Rodney Mesquias.

22   Q.   Would you mislead these patients?

23   A.   Yes, absolutely.

24   Q.   Could you explain to the jury how you would

25   mislead these specific patients.

1    A.   Again, I'm going to see patients and I already

2   know that some of these patients do not meet hospice

3   criteria.   But I already know what Mr. McInnis and

4   Mr. Mesquias' expectations are, as well as mine.   You

5   know, I'm there to, basically, sign up patients, to keep

6   the census up because I'm no longer at the hospital so

7   the census has been dropping.

8         And so we'll go see the patients, there was a

9   gentleman in the -- one of the San Antonio housing

10   buildings, Hispanic, who I signed up for Alzheimer's but

11   the gentleman lived alone, was independent, sometimes he

12   was not at home, so I would have to wait for him.   And

13   so on him I would document what needed to be documented

14   so that he would meet hospice criteria.

15    Q.   You mentioned group homes, was that another

16   source of patients for the Merida Group?

17    A.   Yes, it was.

18    Q.   Could you explain to the jury what a group home

19   is?

20    A.   A group home is for patients that are not capable

21   of financially residing at a nursing facility, or out of

22   preference they prefer to be in a private home where

23   it's either all males or all females.

24         Most of these patients are psychiatric patients,

25   some of them are elderly that they don't have any

1     resources to be in a private facility, and owner of the

2     home is usually a non-clinician, somebody without any

3     clinical experience.  Or in one of them, there was a --

4     a nurse, I didn't verify her credentials but she stated

5     she was a nurse it, and so some of them have, you know,

6     five to seven patients.

7          And I would go in there, evaluate them and, in

8     exchange for having access to those patients, Merida

9     would provide a person to go and assist with the house

10    chores, or taking care of some of those patients'

11    medical equipment, you know, hospital bed, incontinence

12    supplies.  And I would sign up those patients for

13    hospice or home health services.

14         And a lot of them had psychiatric illness, you

15    know, bi-polar, some of them were vets, you know,

16    chronic smokers, others were just bedbound, demented

17    patients.

18         I remember one particular African American lady

19    asking if she was going to get a purse for letting me go

20    into her home and sign up her, you know, resident into

21    hospice, and I just laughed and said I don't know.  And

22    I'll let the marketer know and the marketer --

23              MR. HECTOR CANALES:  Objection, Your Honor,

24    narrative here, nonresponsive.

25              THE COURT:  Overruled as to nonresponsive,

```
 1   but let's break it up into question and answer.
 2                 COURT OFFICER:  Excuse me, Your Honor.  The
 3   jury needs a break.
 4                 THE COURT:  Ladies and gentlemen, let's go
 5   ahead and take a quick recess.
 6                 COURT OFFICER:  All rise for the jury.
 7                 (JURY OUT.)
 8                 THE COURT:  All right.  We'll be in recess.
 9   Sir, if you need a restroom break.
10                 (COURT IN SHORT RECESS.)
11                 (JURY IN.)
12                 THE COURT:  Thank you, everyone, please be
13   seated.  And ladies and gentlemen of the jury, welcome
14   back.
15                 Mr. Lowell, please proceed.
16                 MR. LOWELL:  Thank you, Your Honor.
17       Q.  (By Mr. Lowell)  Now, Mr. Virlar, at some point
18   did you become owner of a -- of one of the Merida Group
19   companies?
20       A.  Yes, I did.
21       Q.  And was that for Professional Hospice?
22       A.  That is correct.
23       Q.  And could you explain to the jury who Micaela
24   Wooten is?
25       A.  Micaela Wooten was my girlfriend at the time.
```

1    Q.   And was Ms. Wooten listed as the owner on paper

2    for Professional Hospice?

3    A.   Yes, she was.

4    Q.   Was that to hide something?

5    A.   That was to hide my ownership.

6    Q.   Why?

7    A.   There's rules in health care that you cannot be

8    an owner and refer -- self refer to your own company.

9    Q.   And, again, how old was Ms. Wooten at the time?

10   A.   She was 19.

11   Q.   Had she ever run a business?

12   A.   Never.

13   Q.   Did she have any management responsibility at

14   Professional Hospice?

15   A.   She had none.

16   Q.   Did she have any decision making capacity at

17   Professional Hospice?

18   A.   She had none.

19   Q.   Did she hire and fire employees?

20   A.   She had no power whatsoever to fire or hire.

21   Q.   Did Rodney Mesquias give Ms. Wooten checks based

22   on this false ownership arrangement?

23   A.   Yes, he did.

24   Q.   Now, prior to coming to go Court today, did you

25   review certain checks that were issued to Ms. Wooten?

1      A.   Yes, I did.

2      Q.   And was that Government's Exhibit N-1 through

3  N-8, the checks to Ms. Wooten?

4      A.   (No response.)

5      Q.   We can call them up.  Could we go to N-2, please.

6           Mr. Woo -- Mr. Virlar, who signed this check?

7      A.   Rodney Mesquias.

8      Q.   Who's it made out there?

9      A.   Micaela Wooten.

10     Q.   For how much money?

11     A.   $40,940.09.

12     Q.   What does the memo line say?

13     A.   Owner distribution.

14     Q.   Was that true or false?

15     A.   False.

16     Q.   Tell the jury what the payment was actually for.

17     A.   It was a payment for me.

18     Q.   Who ultimately controlled this money, you or

19  Ms. Wooten?

20     A.   I did.

21     Q.   Why was the payment going to Ms. Wooten?

22     A.   It is against the law to receive remuneration for

23  patient referrals.

24     Q.   Could we go to N-4, please.

25          Mr. -- Mr. Virlar, to whom was this check made?

1      A.   Micaela Wooten.

2      Q.   Who signed it?

3      A.   Rodney Mesquias.

4      Q.   How much money?

5      A.   $80,155.31.

6      Q.   What does the memo line say?

7      A.   Owner distribution.

8      Q.   Was that true or false?

9      A.   That is false.

10     Q.   Tell the jury what the payment was actually for.

11     A.   That was a payment for me.

12     Q.   Who ultimately controlled this money, you or Ms.

13  Wooten?

14     A.   I did.

15     Q.   And there were additional checks to Ms. Wooten;

16  isn't that right?

17     A.   That is correct.

18     Q.   And were those checks made pursuant to the false

19  ownership arrangement that was set in place?

20     A.   That is correct.

21     Q.   Now, Mr. Virlar, directing you to the fall of

22  2017, was the Merida Group served with a Grand Jury

23  subpoena for patient records?

24     A.   Yes, they were.

25     Q.   Could we bring up Government's Exhibit E-30.   I

1  believe it's page 5.

2       Mr. Virlar, what kind of records did the Grand

3  Jury request from the Merida Group?

4    A.  From what my understanding it was clinical,

5  face-to-face records.

6    Q.  Were these medical records that typically justify

7  hospice services?

8    A.  That is correct.

9    Q.  Were these medical records that typically justify

10 home health services?

11   A.  That is correct.

12   Q.  Did the Merida Group provide a response to the --

13   A.  Yes, they did.

14   Q.  -- Grand Jury subpoena?

15      Did you participate in responding to that request

16 for records?

17   A.  Yes, I did.

18   Q.  Do you know Roland Aguilera?

19   A.  Yes, I do.

20   Q.  Did Mr. Aguilera also participate in responding

21 to this Grand Jury subpoena?

22   A.  Yes, he did.

23   Q.  Did you create false patient records in order to

24 respond to this Grand Jury subpoena?

25   A.  Yes, I did.

1   Q.   At whose direction?

2   A.   Rodney Mesquias and Henry McInnis.

3   Q.   Did the Merida Group provide those false records

4   to the Grand Jury?

5   A.   Yes, they did.

6   Q.   Could you explain to the jury why the Merida

7   Group did that?

8   A.   They were trying to provide clinical --

9   fraudulent clinical information to state that those

10  hospice claims were true and valid to justify the

11  billing that had already been made and collected on

12  those fraudulent claims.

13  Q.   Do you have any idea how many pages of false

14  information you created in order to respond to that

15  subpoena?

16  A.   There were over 40 to 100 pages spent over four

17  hours.

18  Q.   And the records that you created, if we could

19  highlight the patient names at the center of the

20  subpoena, did they relate to those patients indicated

21  there?

22  A.   Yes, sir.

23  Q.   Mr. Virlar, how did you know which records, which

24  patient records to manufacture?

25  A.   Roland Aguilera called me and informed me that

1   Henry and Rodney wanted me to, you know, do some

2   face-to-faces that were missing.  And there were a lot

3   of other clinical papers that CTI, certificates of

4   terminal illness, that were also, you know, needed.  And

5   so I informed Mr. Aguilera that I would only do

6   face-to-faces that I had previously documented so that I

7   could basically at least say, fraudulently but at least

8   say I saw those patients previously and I could copy

9   from my previous fraudulent face-to-face to create more

10   fraudulent face-to-faces.  And any patient that I had

11   not seen previously that I would not be doing those

12   face-to-faces, I could ask the other medical directors

13   to complete those fraudulent face-to-faces.

14        In exchange I asked for $5,000 and I asked him to

15   make sure that he let Rodney Mesquias and Henry McInnis

16   know that unless I was going to be paid $5,000 for doing

17   that fraudulent face-to-faces, then I will not be doing

18   them.

19        So Mr. Roland Aguilera contacted Rodney Mesquias

20   and Henry McInnis and informed me that, yes, you know,

21   you'll get paid your $5,000, just go ahead and do this.

22   And so I did.

23   Q.   And to be clear, was Rodney Mesquias aware that

24   you were manufacturing these records?

25   A.   Yes, because he provided me with lunch when I was

1    doing them at Merida office on a Sunday afternoon.   I

2    asked Roland Aguilera to call him and he called to my

3    cell phone and said, hey, I want some pizza, and he went

4    ahead and sent some pizza over.

5        Q.  And was Henry McInnis also aware?

6            MR. CYGANIEWICZ:  Your Honor, I object.  I

7    mean, the only reason he would know that is from

8    hearsay, Your Honor.  He never spoke to Henry about

9    this, there's no evidence of that fact, hearsay.

10           MR. LOWELL:  He mentioned Henry McInnis and

11   Rodney Mesquias.

12           THE COURT:  Just -- just rephrase the

13   question and let -- let me hear the question as to Henry

14   McInnis.

15       Q.  (By Mr. Lowell)  Was it your understanding based

16   on your creation of these records and participation in

17   the manufacture of these records that Henry McInnis was

18   aware that you were creating --

19           MR. CYGANIEWICZ:  Objection, speculation at

20   this point, what is his understanding, he never spoke to

21   Mr. McInnis about that.

22           THE COURT:  Rephrase the question and did he

23   speak with Mr. McInnis.

24       Q.  (By Mr. Lowell)  Did you speak with Mr. McInnis?

25       A.  No, I did not.

1    Q.   Did you speak with Mr. Aguilera?

2    A.   Yes, I did.

3    Q.   Did Mr. -- did Mr. Aguilera participate in

4    manufacturing these records?

5    A.   Yes, he did.

6    Q.   And during your conversations with Mr. Aguilera,

7    did he mention Henry McInnis?

8    A.   Yes, he did.

9    Q.   What did Mr. Aguilera say?

10   A.   That he had spoken with Henry McInnis regarding

11   the $5,000 and that he had agreed to pay me the $5,000

12   for creating those fraudulent face-to-faces.

13   Q.   Did you ever get that $5,000?

14   A.   I did not.

15   Q.   Now, shortly after the Grand Jury subpoena, did

16   you sign up another patient for Rodney Mesquias?

17   A.   Yes.  So this is all happening and it's, you

18   know, finally dawns on me it's something pretty severe.

19   And me and my partner Rodney Mesquias had a clinic,

20   Medica de Medicina on the south side of San Antonio and

21   so I'm there and Rodney asked me to go with him to go

22   see a patient to sign up for hospice that Omar, one of

23   the patient recruiters had found.

24        And so he drives me to see this patient, Rodney

25   Mesquias drove me there, and so we go into to see this

1   lady, this Caucasian female, sort of a little bit obese,

2   you know, bedbound, and they wanted me to sign her up

3   for hospice.  So I'm reviewing her clinical information

4   and I informed Rodney Mesquias, look, she's on CIMA

5   Hospice or was on CIMA Hospice and basically discharging

6   her from hospice because she doesn't meet criteria but

7   the patient wants to remain on hospice because of the

8   hospital bed so she has that incentive.

9       And Rodney Mesquias was like, don't worry about

10  it, just sign her up.  And I reminded him, well, there's

11  that federal investigation.  Don't worry about it.

12      So we ended up signing that patient for hospice

13  even though there's already another hospice entity,

14  CIMA, saying she doesn't meet criteria and had

15  discharged her.  She had been with them for over a year.

16      And so now Merida Hospice, myself, Mr. Rodney

17  Mesquias, with Omar there, are saying, no, she meets

18  hospice criteria, let's admit her when, in fact, she did

19  not.

20  Q.  Was rod -- at that time was Rodney Mesquias a

21  nurse?

22  A.  Yes, he was.

23  Q.  Now, as a medical director for the Merida Group,

24  were you familiar with the medical records, the patient

25  files?

1      A.   Well, I mean I would see the -- during what we

2   call IDG, where we sit down and discuss the patients

3   with the nursing staff, the chaplain, there would be

4   medical record brought in front of me.

5      Q.   And I believe you testified that you also

6   manufactured and falsified records?

7      A.   That is correct.

8      Q.   And was it your understanding that other

9   individuals, other Merida Group employees, were doing

10   the same thing?

11      A.   That is correct.

12      Q.   Nurses?

13      A.   Yes, they were.

14      Q.   Doctors?

15      A.   Yes, they were.

16      Q.   Do you have an opinion on the integrity of the

17   Merida Group's records?

18      A.   Zero integrity --

19            MR. HECTOR CANALES:   Objection, Your Honor.

20   Objection Your Honor as to his opinion on somebody's --

21   an entity's integrity, it's irrelevant.

22            THE COURT:   Overruled.

23            THE WITNESS:   No integrity, zero, everybody

24   had an agenda that was basically reinforced by

25   Mr. Rodney Mesquias.  We do what we need to do to keep

1   the patient in hospice.  And this was done basically by,

2   you know, reinforcing -- reinforcing that, you know,

3   idea, if you go against that idea as a nurse, you get

4   transferred away from that patient.  If you go against

5   that idea as an employee, I mean, basically you get --

6   you get terminated.  As a medical director, you don't

7   get your medical directorship stipend so everybody --

8            MR. CYGANIEWICZ:  Your Honor I'm going to

9   object, now to nonresponsive and a narrative.

10            THE COURT:  That's overruled.  Finish the

11   question.

12            THE WITNESS:  So, yes, to that question.

13   Q.  (By Mr. Lowell)  So I want to talk about some

14   specific medical records.

15         Could we call up Government's Exhibit H-30.

16         Mr. Virlar, do you recognize the -- the

17   individual in the picture?

18   A.  Yes, I do.

19   Q.  Who is it?

20   A.  That's Ms. Teresa Calvillo.

21   Q.  And between November 2013 to February 2014, did

22   you see Ms. Calvillo?

23   A.  Yes, I did.

24   Q.  As a Merida Group doctor?

25   A.  Yes, I did.

```
 1      Q.   Was she terminally ill at that time?

 2      A.   No, she was not.

 3      Q.   Was she qualified for hospice at that time?

 4      A.   No, she did not.

 5      Q.   Did she communicate?

 6      A.   Yes, she could in Spanish.

 7      Q.   Could she hold a conversation?

 8      A.   Yes, she could in Spanish.

 9      Q.   Based on your conversations with her, did she

10  know where she was?

11      A.   Yes, she did.

12      Q.   Was she walking at that time?

13      A.   Yes, she was.

14      Q.   Was she eating?

15      A.   Yes, she was.

16      Q.   Could we pull of the Government's Exhibit E-4 at

17  863.  And if we could highlight the top center of the

18  page.

19           Mr. Virlar, is this an order for hospice?

20      A.   Yes, it is.

21      Q.   For Teresa Calvillo?

22      A.   Yes, it is.

23      Q.   And, again, is this between November 2013 and

24  February 2014?

25      A.   Yes, it is.
```

1     Q.   And during that timeframe, did you certify that

2   Teresa Calvillo was hospice qualified?

3     A.   Yes, I did, fraudulently.

4     Q.   Was it true or false?

5     A.   It was false.

6     Q.   At whose direction?

7     A.   Rodney Mesquias and Mr. Henry McInnis.

8     Q.   And blowing up the center of the page, is that

9   your handwriting?

10     A.   Yes, it is.

11     Q.   Is there false -- did you add in false

12   information to this file?

13     A.   Yes, I did.

14     Q.   Could you explain to the jury what you falsified

15   in this specific file.

16     A.   I said service for COPD, so I'm saying that she

17   has the guidelines for severe COPD for hospice but she

18   does not.  It says she's short of breath at rest, but

19   she was not.  Otherwise, she would not be able to

20   ambulate.  Uses nebulizers.  She did not.  Minimal

21   activity with generalized weakness.  I mean, no, she was

22   active.  PPS 40 percent, that was always handed to me by

23   the nursing staff, I don't know what that is.

24     Q.   To be clear, was the -- what is CHF?

25     A.   CHF is congestive heart failure.

1       Q.   Is CHF a diagnosis that you would typically

2    falsify?

3       A.   Yes, it would be.

4       Q.   Let's go to E-4, 0864, please.

5            Directing you to the bottom of the page,

6    Mr. Virlar.  Actually, if we could highlight the middle

7    page, please.

8            Mr. Virlar, is this a hospice order that you

9    signed for Ms. Calvillo?

10      A.   Yes, it is.

11      Q.   Could you read the certification into the record?

12      A.   I certify that reasonable, medically predictable

13   life expectancy of this patient is six months or less if

14   the terminal illness runs its normal course.  I approve

15   recertification of this patient to the medical -- to the

16   Medicare hospice benefit.

17      Q.   Was that true or false?

18      A.   Completely false.

19      Q.   Tell the jury why it was false.

20      A.   The patient did not have severe COPD.

21      Q.   Showing -- so to be clear, the terminal diagnosis

22   was false?

23      A.   That is correct, she did not have a terminal

24   illness.

25      Q.   Showing you E-4, 702.  This is from the same

```
 1    certification record.  If we could highlight the field
 2    relating to oxygen.
 3          Mr. Virlar, based on this -- these entries right
 4    here, does it indicate that Ms. Calvillo is breathing
 5    just fine?
 6    A.   She's breathing completely normal.
 7    Q.   Is that consistent with the diagnosis of COPD?
 8    A.   It is not.
 9    Q.   Directing you to the medications.
10          Was Ms. Calvillo taking any medications at this
11    time for COPD?
12    A.   No, she was not, and she's on some medications
13    that can actually suppress the respiratory drive.
14    Q.   Let's go to E-4, 0868.
15          Mr. Virlar, is this another medical record from
16    the Merida Group for Ms. Calvillo?
17    A.   Yes, it is, it's a nursing note.
18    Q.   Directing you to the top of the page, do you see
19    the primary diagnosis of CHF?
20    A.   Yes, I do.
21    Q.   Was that true or false?
22    A.   That was false.
23    Q.   And this is a Merida Group patient file?
24    A.   That is correct.
25    Q.   By the way, do you know Dr. Patricia Arizaca?
```

1        A.   Yes, I do.

2        Q.   Was she the primary doctor for Ms. Calvillo?

3        A.   Yes, she was.

4        Q.   She didn't work for the Merida Group; did she?

5        A.   No, she did not.

6        Q.   And if we could pull up side by side, this is

7   Government's Exhibit E-4, 479.

8            So Mr. Virlar, looking at the document to your

9   right, I believe, is that the diagnoses identified by

10  Dr.  Arizaca?

11       A.   No, it is not.

12       Q.   Well, other side, then.

13       A.   No, right, I mean there is -- that's heart

14  failure on Dr. Arizaca's note.

15       Q.   So to be clear, Dr. Arizaca in her list of

16  diagnoses, doesn't indicate CHF; is that right?

17       A.   That is correct.

18       Q.   She was the primary doctor for Ms. Calvillo?

19       A.   That is correct.

20       Q.   Now, if you look at the other document right next

21  to it, is that the Merida Group patient file for

22  Ms. Calvillo?

23       A.   That is correct.

24       Q.   And does it indicate there that Ms. Calvillo has

25  CHF?

1     A.   Yes, it does.

2     Q.   Now, with respect to the timing on the

3  Dr. Arizaca patient file where it doesn't list CHF, was

4  that within three months of you signing up Ms. Calvillo

5  for hospice with the Merida Group?

6     A.   Yes, it is.

7     Q.   Showing you Government's -- if we could pull up

8  Government's L-2, please.

9          You see Dr. Carrillo there, Mr. Virlar?

10    A.   Yes, I do.

11    Q.   In addition to yourself, did Dr. Carrillo sign

12  false hospice orders for -- for Ms. Calvillo?

13    A.   Yes, he did.

14    Q.   Directing you to E-4, 0121.  Mr. Virlar, is this

15  a hospice order signed by Dr. Carrillo for Teresa

16  Calvillo?

17    A.   Yes, it is.

18    Q.   Was it true or false?

19    A.   False.

20    Q.   Could you explain to the jury what's false about

21  it.

22    A.   The terminal diagnosis COPD is false.  She was

23  not terminally ill with COPD.

24         The diagnosis of dementia, she did not have

25  dementia.

1      Diagnosis of Parkinson's disease, she did not

2  have Parkinson's.

3      Q.  If we could pull up side by side E-4-0479.

4  Mr. Virlar, this is the Dr. Arizaca patient file for Ms.

5  Calvillo.

6      Had Dr. Arizaca, Ms. Calvillo's primary

7  physician, had she diagnosed her with Parkinson's?

8      A.  She had not.

9      Q.  Dementia?

10      A.  She had not.

11      Q.  Could we go to E-4-0841.  If we could highlight

12  where it says patient states.

13      Mr. Virlar, can you read that into the record.

14      A.  Patient states she does not have funeral

15  arrangements in place, however wants to be cremated.

16      Q.  Why is it relevant to indicate that in the file?

17      A.  Well, part of the scheme was, basically, having

18  patients believe that they were truly dying.  So, here,

19  Ms. Calvillo basically is not thinking of dying because

20  she's not dying and so that's why she does not have any

21  funeral arrangements.

22      So the social worker, or the chaplain will go

23  visit the patients to, again, reinforce the belief that

24  they were actively dying and to make necessary

25  arrangements for their funeral home.

1          Of course, that was all just to reinforce that

2    fraudulent belief that they were ill when they were not

3    actively dying.

4        Q.  Let's go to Government's Exhibit H-32, please.

5    Do you recognize the individual in the picture,

6    Mr. Virlar?

7        A.  Yes, I do, Mr. Arcadio Castaneda.

8        Q.  And did you see Mr. Castaneda?

9        A.  Yes, I did.

10       Q.  And between June 2014 and August 2014, did you

11   see Mr. Castaneda?

12       A.  Yes, I did.

13       Q.  And was that your capacity as a Merida Group

14   doctor?

15       A.  Yes, sir.

16       Q.  And was Mr. Castaneda terminally ill at that

17   time?

18       A.  No, he was not.

19       Q.  Was he qualified for hospice?

20       A.  No, he was not.

21       Q.  Could he communicate?

22       A.  Yes, he could, in Spanish.

23       Q.  Could he hold a conversation?

24       A.  Yes, he could, in Spanish.

25       Q.  Based on your conversations with him, did he know

```
 1    where he was?

 2        A.   Yes, he did.

 3        Q.   Was he walking?

 4        A.   Yes, he was.

 5        Q.   Eating?

 6        A.   Yes, he was.

 7        Q.   Let's go to Government's Exhibit E-6 at 0359.

 8             Mr. Virlar, we're going to highlight the

 9    diagnosis.  What diagnosis is indicated here?

10        A.   CHF, congestive heart failure, unspecified.

11        Q.   Was that true or false?

12        A.   That was false.

13        Q.   If we highlight, I certify.  Could you read that

14    into the record Mr. Virlar.

15        A.   Certification period 06/03/2014 --

16        Q.   Well, directing you to the bottom of the page

17    where you certify --

18        A.   Okay.

19        Q.   -- this patient as having less than six months to

20    live, was that true or false?

21        A.   That was false.

22        Q.   And CHF unspecified, was that a false diagnosis

23    that you would typically use as a Merida Group doctor?

24        A.   Yes, it would be.

25        Q.   Showing you E-6-0502.  I'm going to highlight the
```

1     center of the page, Mr. Virlar.

2         Mr. Virlar, are these your notes?

3     A.   Yes, they are.

4     Q.   Are they true or false?

5     A.   They're false.

6     Q.   Could you tell the jury what's false about them?

7     A.   The diagnosis of CHF, the PPF of 40 percent,

8     again, I don't know how to come up with that, I didn't

9     come up with that, always handed to me by the nursing

10    staff.  Ambulates with assistance, he could ambulate by

11    himself.  Oxygen as needed with shortness of breath, but

12    he hardly ever -- he didn't need the oxygen.

13    Q.   All of that is false; is that right?

14    A.   That is correct, sir.

15    Q.   Bottom of the page, you can highlight Amy Cooley.

16        Do you know Ms. Cooley?

17    A.   Yes, sir.

18    Q.   Was she a nurse?

19    A.   Yes, she was a director of nursing.

20    Q.   She involved in the fraud?

21    A.   Yes, she was.

22    Q.   How?

23    A.   Basically, she would support the fraudulent

24    clinical information by also documenting fraudulent

25    nursing information to justify the hospice admission.

1    Q.   Was Dr. Arizaca, Patricia Arizaca, was she also

2    the primary physician for Arcadio Castaneda?

3    A.   Yes, she was.

4    Q.   Showing you E-6-0347, and we'll do a side by side

5    with E-6-059.  I'm sorry, E-6-359.

6         Mr. Virlar, do you see Dr. Arizaca's list of

7    diagnoses for Mr. Castaneda?

8    A.   Yes, I do.

9    Q.   Does it indicate in Dr. Arizaca's file that

10   Mr. Calvillo has CHF unspecified?

11   A.   It does not.

12   Q.   Directing you to the document right next to it,

13   is that your false order for Mr. Castaneda?

14   A.   Yes, it is.

15   Q.   And when you compare the two, can you tell the

16   jury what's different?

17   A.   That Dr. Arizaca's note does not have congestive

18   heart failure, and that Merida Hospice order diagnosis

19   has congestive heart failure.

20   Q.   Merida Group order was false; is that right?

21   A.   That is correct, sir.

22   Q.   Now, going to E-6, 0348, Mr. Virlar, is this also

23   part of Dr. Arizaca's file for Mr. Castaneda?

24   A.   Yes, it is.

25   Q.   And is there anything in this particular document

1    that's relevant?

2    A.   Yes, sir.  On the objective, physical examination

3    where Dr. Arizaca's actually touching, examining the

4    patient, she states, cardiac regular rhythm and rate, no

5    significant murmurs, no significant congestive heart

6    failure findings.

7         So she's documenting in her note that the patient

8    does not have congestive heart failure findings.

9    Q.   And, again, this is the primary care physician

10   for Mr. Castaneda; is that right?

11   A.   That is correct.

12   Q.   Any indication there that Mr. Castaneda is about

13   to die?

14   A.   None whatsoever.

15   Q.   Could we go to Government's E-6, 0447.

16        I believe there's a portion here that reads

17   hospice employees are aware; do you see that?

18   A.   If you could please highlight it.

19   Q.   Mr. Virlar, could you read that portion into the

20   record?

21   A.   Yes, hospice employees are aware that Mr. Arcadio

22   is from Mexico and don't understand English.

23   Q.   Now, for the folks -- for the patients who didn't

24   understand English, would it be fair to say that during

25   your time at the Merida Group that you manipulated them?

1      A.  Yes, we misinformed --

2              MR. HECTOR CANALES:  Objection, Your Honor.

3  That's argumentative.

4              THE COURT:  That's overruled.  You -- you

5  can answer the question, if you know.

6              THE WITNESS:  We misinformed them,

7  basically, we would translate what would be advantageous

8  for the patient to sign up for hospice, not being

9  truthfully, you know, fair with the patient, not being

10  upfront and truthful.

11      Q.  (By Mr. Lowell)  Was that a common practice at

12  the Merida Group?

13      A.  Yes, it was.

14      Q.  Could we go to Government's Exhibit E-6, 0429.

15  Could we highlight the name Steven Dellwo.

16              Was Mr. Dellwo a nurse with the Merida Group?

17      A.  Yes, he was.

18      Q.  Did he get along with Rodney Mesquias?

19      A.  He did not.

20      Q.  Could you tell the jury why?

21      A.  Mr. Dellwo at times would voice concerns that

22  patients were not hospice appropriate --

23              MR. HECTOR CANALES:  Objection, Your Honor,

24  calls for hearsay, none of this is in furtherance of any

25  conspiracy, Your Honor.

             MR. LOWELL:  Mr. Dellwo's an employee of the
company.

             THE COURT:  Overruled.

             MR. HECTOR CANALES:  That's still -- that's
not where the inquiry ends, Your Honor.

             THE COURT:  It's overruled.  I'll allow --
I'll allow the question.

             THE WITNESS:  So in IDG --

             THE COURT:  Well, one, one second.  Again,
let's rephrase the question so it's question and answer.

    Q.  (By Mr. Lowell)  During the course of your
employment at the Merida Group, did you have
conversations with Mr. Dellwo?

    A.  Yes, I did.

    Q.  And did those conversation take place during
IDT's?

    A.  Yes, they did.

    Q.  Could you tell the jury about those
conversations?

    A.  During IDG, you're presenting the patient,
basically the nurses state their clinical findings from
the home visits, their vital signs, basically, they're
giving you a presentation of the patient to advocate for
the patient to remain in hospice or to advocate to
discharge a patient from hospice.

1      And so Mr. Steven Dellwo would be upfront and

2  say, Dr. Virlar, this patient doesn't need to be in

3  hospice, he doesn't meet criteria.  And I'll be like,

4  okay, Steven.  And then basically I would do what was

5  done.

6      Basically, I would say, well, let's just

7  recertify him for another course and then we'll -- we'll

8  discuss it.  That information would get back to Rodney

9  and then Mr. Mesquias would go ahead and say to Roland

10  Aguilera, hey, Mr. Steven --

11          MR. HECTOR CANALES:  Objection, Your Honor,

12  this is hearsay upon hearsay upon hearsay, nothing is in

13  furtherance.

14          THE COURT:  Let's break it up into question

15  and answer as opposed to a broad narrative.

16  Q.  (By Mr. Lowell)  Mr. Virlar, I want to direct you

17  to E-6, 0494.  We're still on the patient file of

18  Arcadio Castaneda.

19      And Mr. Virlar, what does it indicate here about

20  Mr. Castaneda's breathing?

21  A.  It's normal.

22  Q.  And is that consistent with the false diagnosis

23  of CHF that you placed in that hospice order?

24  A.  It is not.

25  Q.  Showing you Government's Exhibit E-6, 1221.

1    Would you highlight the center of the page, please.

2         What, if anything is significant about this

3    document, Mr. Virlar?

4       A.   Again, I list false diagnosis for CHF, congestive

5    heart failure, as well as his female friend is also on

6    hospice with Merida, that the patient is optimistic

7    about his health.  If you're dying, you're not going to

8    be optimistic, you're going to be sad.

9              MR. HECTOR CANALES:  Objection, Your Honor,

10   calls for speculation as to how somebody would feel --

11   how some other person would feel about their condition.

12   There's nothing he could ever know, so asking him if he

13   knows does not address the objection, Your Honor.

14             THE COURT:  That's overruled.  I'll allow

15   him to refer to the document.

16      Q.   (By Mr. Lowell)  Mr. Virlar, I'm directing you to

17   the last sentence, that highlighted portion where it

18   says "I offer to prayer, scripture and let him know that

19   God is in control."  How is that relevant to this

20   hospice file?

21      A.   Again, here's a patient that is optimistic and

22   happy about his health because he is in good health, and

23   here's a chaplain, social worker reinforcing a false

24   belief that, no, you need to be ready because you are

25   declining in health, you'll be passing away, you make --

1  you need to make amends with, you know, your God.   And

2  it's a religious cleric.

3              MR. HECTOR CANALES:  Objection to the

4  interpretation of the document, Your Honor.   There's

5  nothing as such stated in the document, there's no needs

6  to amend, he's interpreting the words of a chaplain.

7  It's improper.

8              THE COURT:  Overruled.   Answer, if you know.

9              THE WITNESS:  So it's, again, to reinforce a

10  false belief into the patient that they're dying.

11     Q.   (By Mr. Lowell)  Could we go to E-6, 1310.

12         Mr. Virlar, is this another hospice order for

13  Mr. Castaneda?

14     A.   It is a clinical note of face-to-face encounter

15  with the patient signed by Dr. Zertuche.

16     Q.   What is the diagnosis?

17     A.   Congestive heart failure.

18     Q.   Is that true or false?

19     A.   That is false.

20     Q.   Is that consistent or inconsistent with

21  Dr. Arizaca's diagnoses?

22     A.   Inconsistent.

23     Q.   Let's go onto Government's Exhibit H-28.

24              MR. GUERRA:  Your Honor, I object.

25              May we approach, Judge?

1                    (BENCH CONFERENCE.)

2              THE COURT:  Yes, Mr. Guerra.

3              MR. GUERRA:  Yes, Your Honor.  I object to

4    having Dr. Virlar go through any sort of medical files

5    on Francisca Perez and offer his medical expertise, or

6    opinion criticizing the medical judgment of

7    Dr. Francisco Pena.  He was the primary care physician

8    for Ms. Perez, as well as one of the doctors who

9    certified her for hospice.

10              Repeatedly, during pretrial motions, we

11   asked the Government to identify any doctors that would

12   opine and examine the medical judgment of Dr. Pena; they

13   repeatedly told the Court that there were none.

14              They are now bringing in Dr. Virlar to offer

15   medical opinions as to the necessity of the care that

16   Dr. Pena provided Ms. Perez, that goes outside the

17   scope, Your Honor, and it's against the rules and we ask

18   that he be prohibited from providing that testimony.

19              MR. LOWELL:  Your Honor?

20              THE COURT:  Yes, Mr. Lowell.

21              MR. LOWELL:  He's not providing any medical

22   opinion.  He's already testified that he's an insider to

23   this fraud and, pursuant to that fraud, he would falsify

24   medical orders and documents.

25              He's going to testify that he knows

1    Ms. Perez, he's going to identify the specific false

2    statements, inconsistencies, incompatibilities between

3    the Merida Group patient file, the nursing home patient

4    file, and other documents in this Merida Group patient

5    file.

6              That's significant for the jury to hear.

7    They're facts.  This is false, this is true, these are

8    inconsistencies in the file.

9              MR. GUERRA:  Your Honor, as we covered

10   throughout this trial, these are medical opinions, his

11   medical opinion versus the medical opinion of Dr. Pena.

12   And the Government was asked to identify this person as

13   someone who would testify on his opinions, they refused

14   to do it, they did not do it, and we're asking this

15   Court prohibit him from offering these opinions.

16             MR. LOWELL:  Your Honor, it's the same

17   scenario that we just did with Dr. Gonzaba's file.  Here

18   is the nursing home file of Ms. Perez, it doesn't list

19   any terminal diagnoses.  Here's the Merida Group file,

20   does it list terminal diagnosis?  Yes.  Can these two

21   documents --

22             THE COURT:  Address the -- address -- I

23   understand that this is under the same -- same mode of

24   questioning that you've been asking, but his main

25   complaint is you did not identify Dr. Virlar in response

1    to his question.  Is that correct or incorrect?

2                 MR. LOWELL:  I did not identify Dr. Virlar

3    as a medical expert, he's not a medical expert, we're

4    not tendering him as a medical expert in this case.  If

5    I can clarify upfront with him, I'm not offering any

6    medical opinions from you, I'm simply reading portions

7    into the record from documents that are in evidence and

8    identify the inconsistencies between the Merida Group

9    files and files from other sources that are part of the

10   Merida Group files.

11                They've been reading medical opinions into

12   the record throughout their Cross-Examinations and then

13   asking witnesses whether they agree or disagree with

14   them.

15                MR. GUERRA:  Your Honor, I'm just speaking

16   on behalf of Dr. -- Ms. Perez, but the main

17   inconsistency here is Dr. Arizaca is a primary care

18   physician and then they're doing that comparison to

19   actual hospice record.

20                Dr. Pena is both a primary care physician

21   and medical director for the hospice.  Therefore, there

22   is no comparison and -- and, again, it goes to why we

23   asked that the Government provide us notice that it's

24   going to be an issue in this case.

25                THE COURT:  Anything else?

1              MR. GUERRA:  No.

2              MR. HECTOR CANALES:  Your Honor, I would add

3    based on the Government's comment that we would request

4    an instruction from the Court that this witness is not

5    being tendered by the Government as an expert and

6    offering any medical opinion.  Because that is true, we

7    were not given notice, he's not listed as an expert as

8    to give medical opinions, so I think the jury needs to

9    understand the context of which he is being offered and

10   which he -- which he isn't.  Just like the -- just like

11   Mr. Guerra said.

12             MR. LOWELL:  He's a fact witness,

13   Your Honor.  He's a -- he's a participant in the fraud.

14             MR. HECTOR CANALES:  I'm not asking you to

15   make the clarification, I'm asking Court to give the

16   instruction to the jury.

17             THE COURT:  Mr. Guerra, your objection is

18   overruled.

19             Mr. Canales, you're asking for a limiting

20   instruction on this witness?

21             MR. HECTOR CANALES:  Yes, Your Honor, that

22   he's not being offered -- as Mr. Lowell just told the

23   Court, he's not being offered as an expert of offering

24   medical opinions.

25             MR. LOWELL:  Is he being offered as a lay

1    witness, as someone who was involved in the fraud, who's

2    involved in part as a lay witness, he's testifying to

3    facts.

4              THE COURT:  Back to basics, gentlemen.  If

5    you would like the Court to issue some kind of limiting

6    instruction, I need to see the prospective limiting

7    instruction, unless you want to ask -- unless you want

8    to ask that question.

9              MR. LOWELL:  Judge, it's real simple, the

10   Government is not disputing the fact that he is not an

11   expert.  The limiting instruction is that this witness

12   is lay testimony, he's not providing medical opinion.

13             THE COURT:  Again, again, do you --

14             MR. LOWELL:  I'm happy to ask the question,

15   I don't have an instruction.

16             THE COURT:  That was my question.  I can

17   either do a limiting instruction, or make that clear to

18   the jury that he's not a medical expert.

19             Are you going to make that clear?

20             MR. LOWELL:  I can make that clear if the

21   Court's not satisfied.

22             MR. HECTOR CANALES:  Judge, you know,

23   honestly, Judge, that does not cure the problem.  The

24   Court has to cure the problem, not the litigant.  The

25   function of the Court is to -- is to address the jury as

1    to what the scope of this evidence is.  And quite

2    frankly, Your Honor, them doing it is no substitute for

3    the harm being done.  You must do it.

4             MR. LOWELL:  May I say something?  I

5    anticipate that they are going -- they are going to

6    offer similar testimony from the doctors on their

7    defense witness list who are going to come in and say

8    that certain patients did not qualify for services.

9             If the Court thinks such an instruction is

10   appropriate, the Court can issue that instruction at the

11   close of the case.  I don't think it's appropriate right

12   now.  This witness is testifying to facts he observed

13   during the course of his employment.  False information,

14   inconsistent information, not medical opinion.

15            THE COURT:  Again, gentlemen, I'm going

16   to -- I've already said this, the Court's intent is to

17   give a jury charge, which is the Court's charge, that

18   covers the instructions that the Court deems adequate.

19   I think it's premature to make these kinds of arguments

20   at this point in time.

21            If the parties come to a scenario where they

22   agree that the limiting instruction is appropriate,

23   evidently, the parties are not in agreement at this

24   time, the Court will entertain proffering that limiting

25   instruction.  Up to this point in time, that's not been

1    the case.  The Court did draft a rough draft on a

2    different issue, the parties didn't agree to it, and

3    here we are again on a similar scenario where the

4    parties are disagreeing.

5              Mr. Lowell, you've already stated you're

6    going to attempt to ask the questions.  So in response

7    to your request, Mr. Canales, the Court is not going to

8    issue a specific limiting instruction at this point in

9    time to the jury unless the parties agree in writing as

10   to what that specific instruction is going to be.

11             Anything else?  All right.

12             (OPEN COURT.)

13             THE COURT:  Mr. Lowell, please proceed.

14   Q.   (By Mr. Lowell)  Mr. Virlar, you're not, just to

15   be clear, you're not testifying as a medical expert in

16   this case; are you?

17   A.   No, sir, just on the patients that were under my

18   service.

19   Q.   And were those based on facts that you observed

20   during the course of your employment at the Merida

21   Group?

22   A.   That is correct.

23   Q.   And are you -- are you here to identify

24   inconsistencies in the files?

25   A.   That is correct.

1          MR. GUERRA:  Your Honor, I'm going to object

2    to this witness, again, testifying and offering any sort

3    of medical opinion through the guise of being a fact

4    witness.  In the review of Ms. Perez' file and any other

5    files that he may be presented in this case, Your Honor.

6    He just testified that he's a fact witness and he's not

7    offering medical opinion.

8          MR. HECTOR CANALES:  Join in that objection,

9    Your Honor.

10          THE COURT:  Government's quick response?

11          MR. LOWELL:  Your Honor, he's testifying as

12   a fact witness.  He's going to read certain portions of

13   admitted exhibits into the record and compare them.

14          MR. GUERRA:  But, Your Honor, and be that as

15   it may, that does not allow him to make any sort of

16   medical conclusions as a result.

17          THE COURT:  Your objection is overruled.

18          MR. GUERRA:  Thank you, Your Honor.

19   Q.   (By Mr. Lowell)  Mr. Virlar, I'm showing you

20   Government's Exhibit H-28.

21        Do you know Francisca Perez?

22   A.   Yes, I do.

23   Q.   Did you see her as a patient during the course of

24   your employment with the Merida Group?

25   A.   Yes, I did.

1    Q.   Is that as a Merida Group doctor?

2    A.   Yes, sir.

3    Q.   She qualified for hospice at that time?

4    A.   She did not.

5    Q.   Showing you E-20-0560.  And if we could highlight

6    the top half of the page, please.

7         Mr. Virlar, what is this document?

8    A.   It is a Merida Health Care Group hospice referral

9    form.

10   Q.   And who, if anyone, referred Ms. Perez to the

11   Merida Group for hospice?

12   A.   Dr. Pena.

13   Q.   What diagnosis is indicated in this document?

14   A.   Chronic respiratory failure.

15   Q.   And if we could do a side-by-side with E-20,

16   1627.

17        Mr. Virlar, when you were reviewing the patient

18   file for Ms. Perez, did you identify a nursing home

19   document, a document from a nursing home?

20   A.   Yes, I did.  The one on the right.

21   Q.   And does that document from -- first of all, what

22   nursing home is it?

23   A.   Retama West in Laredo, Texas.

24   Q.   Was it your understanding that Ms. Perez was

25   living at that nursing home 24/7?

1        A.   Yes, it was.

2        Q.   Does the nursing home list Francisca Perez'

3   conditions?

4        A.   Yes, they do.

5        Q.   Does it list chronic respiratory failure?

6        A.   They do not.

7        Q.   And is that nursing home documented within the

8   same general timeframe, or near the timeframe of the

9   hospice order referral from Dr. Pena?

10        A.   Yes, it is.

11        Q.   Is that consistent or inconsistent?

12        A.   Inconsistent.

13        Q.   Based on your experience as a doctor, would you

14   visit nursing homes?

15        A.   Yes, I would, often.

16        Q.   In your experience, would a nursing home

17   typically record serious diagnoses for patients?

18        A.   Yes, they would, as part of their guidelines.

19        Q.   And is chronic respiratory failure a terminal

20   diagnosis?

21        A.   Yes, it is.

22        Q.   And is it indicated in the nursing home file for

23   Ms. Perez?

24        A.   It is not.

25        Q.   And if we could go to E-20, 0652.  If we could

```
 1    highlight -- is this an IDG meeting for the Merida
 2    Group?
 3         A.   Yes, it is.
 4         Q.   Is this in connection with Francisca Perez?
 5         A.   Yes, it is.
 6         Q.   And what doctor participated in this meeting?
 7         A.   Dr. Francisco Pena.
 8         Q.   And does it indicate here that her breathing is
 9    fine?
10         A.   Yes, it's at a greater than 98 percent.  Normal.
11         Q.   Now, did Mr. Pena, based on your review of the
12    Merida Group patient file, did Mr. Pena recertify
13    Ms. Perez multiple times?
14         A.   Yes, he did.
15         Q.   I want to focus on 2016.  If we could go to
16    E-20-515.  If we could highlight the diagnosis, please.
17              Is this a hospice order from Dr. Pena?
18         A.   Yes, it is.
19         Q.   Is it for Ms. Francisca Perez?
20         A.   Yes, it is.
21         Q.   And what's the terminal diagnosis that's stated
22    here?
23         A.   That has been switched to Alzheimer's disease
24    unspecified.
25         Q.   And Alzheimer's unspecified, was -- in your
```

1    experience at the Merida Group, just focusing on you,

2    was that a diagnosis that you would typically falsify?

3        A.   Yes.

4        Q.   Why?

5        A.   It is a broad enough term where it allows us to

6    easily cover the fraud.

7        Q.   And if we could do a side-by-side pulling up

8    E-20, 0545.

9            Mr. Virlar, what is this document?

10       A.   The one on the right-hand side is doctor's

11   progress note filled out by Dr. Francisco Pena.

12       Q.   Now, in just your experience interacting, just

13   focusing on your interactions with severe Alzheimer's

14   patients, once we have a terminal diagnosis, can they

15   communicate?

16       A.   No, they're nonverbal, staring out into space.

17       Q.   Are they alert?

18       A.   They're awake, but not alert to their

19   surroundings.

20       Q.   Okay.  And if we highlight Dr. Pena's progress

21   note where it says alert, oriented, is that consistent

22   or inconsistent with someone who's -- has a terminal

23   diagnosis of Alzheimer's based on your interactions with

24   such patients?

25            MR. GUERRA:  Your Honor, I'm going to

1    object.   Again, it calls for a medical conclusion that

2    this witness is not qualified to give.

3                    THE COURT:   Overruled.

4                    THE WITNESS:   It is inconsistent.

5    Q.   (By Mr. Lowell)   Now, did Dr. Carrillo also sign

6    orders for Ms. Perez?

7    A.   Yes, he did.

8    Q.   Showing you E-20-0949.

9         Is this a hospice order for Ms. Perez?

10   A.   Yes, it is.

11   Q.   And what terminal diagnosis did Mr. Carrillo

12   give?

13   A.   Chronic respiratory failure and CHF in

14   parentheses.

15   Q.   Okay.   We don't have to pull it up, but going

16   home -- back to the nursing home file for Ms. Perez, did

17   it indicate that she had chronic respiratory failure?

18   A.   It did not.

19   Q.   If we go to E-20-0795.

20        And Dr. Virlar, is this an order that you signed?

21   A.   Yes, it is.   It's certification narrative stating

22   that fraudulently she qualifies for hospice by saying

23   that she has chronic respiratory failure, which she did

24   not; by saying that she has terminal Alzheimer's, which

25   she did not.

1    Q.   Okay.  So you falsified that order?

2    A.   Yes, I did.

3    Q.   If we go to Government's Exhibit L-2.

4         For this patient Francisca Perez, you signed a

5    false order for Ms. Perez; is that right?

6    A.   That is correct.

7    Q.   Dr. Carrillo signed an order for Ms. Perez?

8    A.   That is correct.

9    Q.   And Dr. Pena signed an order for Ms. Perez; is

10   that right?

11   A.   That is correct.

12   Q.   If we go to Government's Exhibit H-34.

13        Do you recognize this patient?

14   A.   Yes, I do.

15   Q.   Who is that?

16   A.   Ms. Petra Cerda.

17   Q.   Between February 2016 and April 2016, did you see

18   Ms. Cerda?

19   A.   Yes, sir.

20   Q.   Was that in your role as a Merida Group doctor?

21   A.   Yes, sir.

22   Q.   She terminally ill at that time?

23   A.   She was not.

24   Q.   Was she qualified for hospice?

25   A.   She did not.

1    Q.   Did she communicate?

2    A.   She did.

3    Q.   English or Spanish?

4    A.   Spanish.

5    Q.   Could she hold a conversation?

6    A.   In Spanish.

7    Q.   Based on your conversations with her, did she

8    know where she was?

9    A.   She did.

10   Q.   Showing you Government's Exhibit E-91.

11        Is this a hospice order for Ms. Cerda signed by

12   Dr. Carrillo?

13   A.   It is.

14   Q.   What's the date at the bottom of the page?

15   A.   01/16, 2015.

16   Q.   And if we do a side-by-side with E-8917, and if

17   it we could highlight the certification at the center of

18   the page, please.

19        Mr. Virlar, is this a hospice recertification for

20   Petra Cerda?

21   A.   Yes, it is, sir.

22   Q.   And do you see the year?

23   A.   Yes, 05/24, 2013.

24   Q.   And at the center of the page, what doctor signed

25   up Ms. Cerda for hospice?

1    A.   Dr. Posada.

2    Q.   Is that the same Dr. Posada that you saw in

3  Vegas?

4    A.   Yes, sir.

5    Q.   And at that time, according to this order, did

6  Dr. Posada say that Petra Cerda had less than six months

7  to live six years ago?

8    A.   Yes, he did.

9    Q.   Could we go to E-8-889.

10        And if we look at the note and highlight the

11  first sentence, please.

12        Could you read that first sentence into the

13  record, Mr. Virlar.

14    A.   Patient at home hanging clothes on the line

15  outside.

16    Q.   And Mr. Virlar, based on your experience, just

17  focusing on your interactions with terminally ill

18  patients, have you observed them hanging up clothes

19  outside?

20    A.   No, that's a very functional capacity.

21    Q.   Let's go to E-8165.  I'm sorry, 1865.

22        Mr. Virlar, this is a record from an IDG meeting

23  from the Merida Group, and it indicates in roughly the

24  center of the page that "patient attends a daycare from

25  8:30 to 4:00 p.m. Monday through Friday, no new concerns

1    to report at this time."  What is a daycare?

2        A.   A daycare is a facility where elderly patients go

3    to socialize and participate in activities.

4        Q.   Based on your experience interacting with true

5    hospice patients, would you expect to see them in a

6    daycare five days a week?

7        A.   Absolutely not.

8        Q.   Why?

9        A.   They're bedbound, unresponsive and with their

10   family on their last days.

11       Q.   I'm showing you E-8-2019, same patient file,

12   Merida Group patient file for Petra Cerda.  We're going

13   to highlight the last three sentences of the narrative

14   notes at the bottom of the page.

15            Could you read that into the record, Mr. Virlar.

16       A.   Patient asked chaplain to go outside with her to

17   see her plants.  Chaplain followed.  Patient cut a few

18   flowers from her garden and gave them to the chaplain

19   saying I hope you come back soon.  Chaplain assured

20   patient to be back for another visit soon.  Chaplain

21   said a prayer and read a scripture.

22       Q.   And focusing on your just your experience and

23   interactions with patients who are about to pass away,

24   would you expect a patient who is about to pass away to

25   be outside cutting flowers?

1      A.   Absolutely not.

2      Q.   Could we go to Jack High, Government's Exhibit

3   H-26.

4           And Mr. Virlar, this is a -- between August 2013

5   and October 2013, did you sign a false hospice order for

6   Jack High?

7      A.   Yes, I did.

8      Q.   Let's go to E-16, 916.  If we could highlight the

9   name, the patient name at the top of the page, the

10  certification period and the diagnosis.

11          Mr. Virlar, what diagnosis did you give Jack

12  High?

13     A.   Unspecified -- unspecified debility.

14     Q.   Is that true or false?

15     A.   That's false.

16     Q.   And unspecified debility, was that a typical

17  false diagnosis that you would use in the Merida Group

18  patient files?

19     A.   Yes, it was.

20     Q.   Could you tell the jury why?

21     A.   It's a broad, non-specific term, again, easy to

22  facilitate fraud.

23     Q.   Directing you to the bottom of the page

24  highlighting the two doctors' names.

25          Did you sign this hospice order?

1    A.   Yes, I did.

2    Q.   Dr. Greg Gonzaba sign this hospice order?

3    A.   Yes, he did.

4    Q.   If we go to E-16, 931.

5         Mr. Virlar, do you recognize this document?

6    A.   Yes, it's a physician note written by me.

7    Q.   Okay.  Is this document true or false?

8    A.   It is false.

9    Q.   Could you explain to the jury what's false about

10   it.

11   A.   The endstage Alzheimer's disease, the dementia,

12   the severe debility.

13   Q.   Is this during that same timeframe between August

14   and October 2013?

15   A.   Yes, it is.

16   Q.   When you stated that Mr. High had less than six

17   months to live back in 2013, was that a lie?

18   A.   It is a complete lie.

19   Q.   If we could go to E-16, 0931.

20        Mr. Virlar, what's this document?

21   A.   It is a face-to-face document written in a

22   physician progress note.

23   Q.   Did you fill out this document?

24   A.   Yes, I did.

25   Q.   Was this true or false?

1     A.   It is false.

2     Q.   Could we go to E-16, 1145.  I'm going to be

3  directing you to the center of the page in the

4  narrative.

5          It reads, "patient is under the care of Dr. Gary

6  Johnson psychiatrist."  Just focusing on your

7  experience, in your experience, have you seen terminally

8  ill patients, patients who have less than six months to

9  live, going to see psychiatrists?

10    A.   No, they don't.

11    Q.   Why is that?

12    A.   They're bedbound, with families.  If you need to

13  talk to a psychiatrist, for a psychiatrist to be able to

14  diagnose and treat you.

15    Q.   Going to E-16, 0289.  And if we could highlight

16  the nurse, Rodney Mesquias.

17         Does Mr. Mesquias' name appear on this document

18  for Jack High?

19    A.   Yes, it is.

20    Q.   Did your name appear on this document for Jack

21  High?

22    A.   Yes, it does.

23    Q.   How about Amy Cooley?

24    A.   Yes, it does.

25    Q.   And at this -- in this document, did you falsely

1    certify that Jack High had less than six months or less

2    to live?

3        A.   Yes, I did.

4        Q.   Let's go to E-16, 1547.

5             Is this another hospice order for Mr. High?

6        A.   Yes, it is.

7        Q.   And directing you to the bottom of the page, who

8    signed this document?

9        A.   Dr. Carrillo.

10       Q.   And I believe you testified that Dr. Carrillo was

11   also part of the Conspiracy to Commit Health Care Fraud;

12   is that right?

13       A.   Yes, he was.

14       Q.   One more patient file.  Let's go to Government's

15   Exhibit H-36.

16            Mr. Virlar, do you know this individual?

17       A.   Yes, that's Ms. Joanne Conti.

18       Q.   Tell the jury about Joanne Conti.

19       A.   Middle-aged Hispanic lady, very vocal, pizzazz,

20   matter of fact, doesn't sugarcoat it, tells you what she

21   wants, what she needs, and I could never just stop by

22   and quickly runaway from her.  She'd be like, hey, sit

23   down, listen to me.  So very demanding, an advocate for

24   her health.

25       Q.   Now, between December 2014 and March 2015, did

1   you see Joanne Conti as a doctor at the Merida Group?

2       A.  I -- yes, I did.

3       Q.  And was she qualified for hospice at that time?

4       A.  No, she did not.

5       Q.  Showing you E-10-583.

6           Is this an order that you signed for Ms. Hospice

7   [sic]?

8       A.  It is.

9       Q.  For Ms. Conti?  This is the order?

10      A.  Yes, it is.

11      Q.  Okay.  And did you sign it?

12      A.  I'm sorry?

13      Q.  Did you sign it?

14      A.  Yes, I did, sir.

15      Q.  And was that during the certification period that

16  we just looked at?

17      A.  Yes, it is.

18      Q.  Is that true or false?

19      A.  It is false.

20      Q.  And what false information did you put in this

21  document?

22      A.  The interstitial lung disease, the hypoxemias,

23  the need to be on continuous oxygen, well, that was

24  actually filled out by the nursing staff.

25      Q.  Could we go to --

1    A.   Interstitial lung disease, COPD at the bottom.

2    Q.   Could we go to E-10824.  If we could highlight

3    the summary, please.

4         Could you read that summary into the record,

5    Mr. Virlar.

6    A.   Chaplain visited patient in her house.  Patient

7    was awake, alert and responsive.  Patient was alone.

8    She has a daughter, Patricia De La Rosa, she comes

9    around every now and then to help her mother.  Patient

10   is a Catholic affiliated with St. James Catholic Church.

11   Chaplain recommended patient for holy communion to the

12   deacons of the church.  Chaplain invited patient for

13   prayer and scriptural reading.  Chaplain asked patient

14   if she is in pain.  Patient at this time, she's not in

15   pain.

16   Q.   And the references to the scriptural readings,

17   why was that relevant to the fraud?

18   A.   Again, to reinforce the belief that he's there

19   for her during this time of grief and severe illness

20   where she's going to be passing away.

21   Q.   Showing you E-10, 903.

22        Mr. Virlar, do you recognize the handwriting in

23   this document?

24   A.   Yes, sir, Dr. Arcadio's handwriting.

25   Q.   Did you say Dr. Carrillo?

1    A.   Yes, sir.

2    Q.   Is this a hospice face-to-face sheet?

3    A.   Yes, it is.

4    Q.   And directing you to the center, do you see where

5    it says comatose?

6    A.   Yes, I do.

7    Q.   What does comatose mean?

8    A.   Comatose means you're completely unresponsive in

9    bed, most of the time on life support.

10   Q.   And at any point in your interactions with Ms.

11   Conti, was she comatose?

12   A.   Quite the contrary, she was very alert and

13   verbal.

14   Q.   Do you see the word cachexia there?

15   A.   Yes, I do, sir.

16   Q.   What does that mean?

17   A.   That means, in general terms, skin and bones.

18   Extremely thin.

19   Q.   And finally, let's go to E-10-904.

20        Mr. Virlar, what is this document?

21   A.   It's, again, the face-to-face physical

22   examination of Ms. Conti.

23   Q.   And who signed this document?

24   A.   Dr. Carrillo.

25   Q.   Dr. Carrillo was -- was he part of the Conspiracy

1  to Commit Health Care Fraud?

2     A.   Yes, he was.

3           MR. LOWELL:  Your Honor, I'll pass the

4  witness.

5           THE COURT:  One second.  Ladies and

6  gentlemen, let's go ahead and take a -- a quick break

7  and we'll start momentarily.

8           COURT OFFICER:  All rise for the jury.

9           (JURY OUT.)

10           THE COURT:  Thank you, everyone.  Please be

11  seat.  Gentlemen, the defense will have three, two-hour

12  sessions, however let's go ahead and whoever goes first,

13  we'll probably break for lunch after, approximately, an

14  hour, about 12:30 range; all right so -- we'll break it

15  up at an appropriate time for lunch about 12:30, all

16  right?  All right, we'll be in recess.

17           (COURT IN SHORT RECESS.)

18           (JURY IN.)

19           THE COURT:  Thank you.  Please be seated.

20           All right.  Mr. Canales, please proceed when

21  ready.

22           MR. HECTOR CANALES:  Thank you, Your Honor.

23                  CROSS-EXAMINATION

24  BY MR. HECTOR CANALES:

25     Q.  Mr. Virlar, my name is Hector Canales and I

1    represent Rodney Mesquias in this case; do you

2    understand?

3        A.   Yes, sir.

4        Q.   Given what you've said here today, sir, you would

5    agree if you're telling the truth, you're a corrupt man,

6    right?

7        A.   I was -- I just took a sworn this morning to

8    testify under oath to just say the truth.

9        Q.   Yes, sir.   Yes, sir.   And if all that's true,

10   you're a corrupt man, right?

11       A.   I'm just stating the truth under oath.

12       Q.   Sir, yes.   And all the things that you've said up

13   here for the last two-and-a-half hours makes you a

14   corrupt man.   If you're here to tell the truth, that's

15   the truth, right, you're a corrupt man?

16       A.   I am a felon, yes, I am.

17       Q.   Corrupt man.   That means you're corrupt, right?

18       A.   No, it means I'm a felon.

19       Q.   All right.   So you can be a felon and not be

20   corrupt?

21       A.   No, I accept the responsibility for my past

22   actions.

23       Q.   You're greedy, though, right?

24       A.   Yes, I was.

25       Q.   You're a liar?

```
 1      A.   Yes, I was.

 2      Q.   Right?  You're dishonest?

 3      A.   Yes, I was.

 4      Q.   You're deceitful?

 5      A.   Yes, I was.

 6      Q.   You're unreliable?

 7      A.   Yes, I was.

 8      Q.   Despicable?

 9      A.   I was very.

10      Q.   Evil?

11      A.   Yes, I was.

12      Q.   Dishonorable?

13      A.   Yes, I was.

14      Q.   Selfish?

15      A.   I was very selfish.

16      Q.   And you've been that way your whole life; haven't

17 you, sir?

18      A.   No, I have not.

19      Q.   You have a history, you have a history of being

20 corrupt, greedy, dishonest, deceitful; do you not, sir?

21      A.   Since the start of -- with Gonzaba Medical Group

22 due to the high bonus checks, it affected me.

23      Q.   Sir, my question to you is you have a history,

24 yes or no?  You have a history of being greedy,

25 deceitful, a liar, a cheat, you have a history of that;
```

1   do you not?

2       A.   I have a history of lying in patients' charts

3   and --

4       Q.   You had -- you had that history before you ever

5   met my client, true?

6       A.   Not that I recall.

7       Q.   Not that you recall.  In fact, in fact, sir,

8   you're here because you entered into an agreement that

9   has the potential, the potential to significantly reduce

10  a sentence for bribery, right?

11      A.   That is correct.

12      Q.   But it's only a potential, it's not guaranteed,

13  right, this potential that you -- that you spend less

14  time in jail, right?

15      A.   That is correct.

16      Q.   And that potential is based on you substantially

17  cooperating, providing -- helping, the Government,

18  right?

19      A.   By only telling the truth under oath.

20      Q.   And -- and during your history, sir, of being a

21  liar, a cheater, that sort of thing, you have -- you

22  were under oath back then, too, right?

23      A.   I don't understand the question.

24      Q.   Right.  An oath has never stopped you from lying;

25  has it?

A.   I don't understand your question.

Q.   Right.  Well, you took an oath when you became a medical doctor, right?

A.   Yes, I did.

Q.   And you violated that oath, you ran right through that red light; didn't you?

A.   Which oath?

Q.   The oath to become a doctor, the Hippocratic Oath?

A.   Yes, I violated the Hippocratic Oath.

Q.   So that oath didn't stop you, right?

A.   No, it did not.

Q.   All right.  You made a solemn vow to your wife to be faithful to her, right?

A.   Yes, I did.

Q.   Right?  That didn't stop you, right?

A.   That is correct.

Q.   Right, you made that oath before God; did you not?

A.   Yes, I did.

Q.   Just like in your Hippocratic Oath, you got up there just like you did here today and you raised your right hand; didn't you?  When you -- to give the Hippocratic Oath?

A.   I don't recall on that.

1    Q.  All right, you don't recall that.  How about when

2    you got married, though, you swore, didn't you, you

3    swore to your wife in front of God, right?

4    A.  That is correct.

5    Q.  In front of your friends and family?

6    A.  That is correct.

7    Q.  How many people were there?

8    A.  My whole family.

9    Q.  That didn't stop you?

10   A.  No, it did not.

11   Q.  But today all of a sudden, the oath you took

12   today, that's going to stop you, that's what you want

13   this jury to believe, right?

14   A.  I accepted my full responsibility and --

15   Q.  Sir, that wasn't my question to you.  You want

16   today, the fact -- you want today to leave the

17   impression with the jury that because today you raised

18   your right hand that that's enough, that now, hey, no --

19   no more, no more lies, right?

20   A.  Well, I swore to tell the truth, otherwise, I

21   could be charged with additional charges.

22   Q.  Right, but there were consequences, too, to

23   violating your prior oaths, right?

24   A.  Absolutely.

25   Q.  Right.  And so there's consequences today?

1      A.   Absolutely.

2      Q.   Right.   But whatever is in your best interest,

3   sir, that's what -- that's what is the -- the

4   determining factor as to what you say is -- you act in

5   your own self-interest, right?

6      A.   I did in the past, I'm here so that individuals

7   like yourself know what is happening in the health care

8   industry.

9      Q.   But you're not reliable, you said it yourself,

10  right?   But you're --

11     A.   In my past I was not reliable.

12     Q.   Okay.   All right.   And -- and what in your past

13  now -- would you agree, sir, that the past is a good

14  predictor of the future?

15     A.   It is not.

16     Q.   It's not?   Let's look at this plea agreement in

17  particular, all right?   And -- and part of the

18  Government's Exhibit J-2, I'm going to turn to the

19  portion that has the plea agreement.

20          We got here Count Two charged the Defendant with

21  Conspiracy to Violate the Travel Act.   Do you know what

22  that is, sir?

23     A.   Yes, it's basically when you commit a fraud,

24  bribery under the State law and the federal government

25  can piggyback on the State law to press charges.

1      Q.   Right.   Bribery, that's the pain cream, right?

2      A.   That's correct.

3      Q.   That's the bribery for the pain cream, correct?

4      A.   Yes, sir.

5      Q.   Let's look at what the agreement exactly says.

6  The first sentence, the parties understand this plea

7  agreement, and the parties are to this plea agreement,

8  by the way, that's your signature, right?

9      A.   Yes, it is, sir.

10      Q.   Right.   And that's Mr. Lowell, right?

11      A.   Yes, it is.

12      Q.   That's the gentleman who was asking you questions

13  here earlier?

14      A.   Yes, it is.

15      Q.   So this is the gentleman representing the

16  United States who you have the agreement with, right?

17      A.   That is correct, sir.

18      Q.   All right.   So let's go back and see what

19  agreement you have with Mr. Lowell.   The potential for a

20  Motion for departure under Section 5K1 of the

21  United States Sentencing Guidelines.

22           Now, sir, would you agree with me that potential

23  means that there are strings attached?

24      A.   No, it does not.

25      Q.   It's contingent, it might not happen, right?

1    A.   Right, means nothing.

2    Q.   All right.  Defendant understands and agrees

3    whether such motion is filed will be determined solely

4    by the United States through the United States

5    Department of Justice, Criminal Division.

6         That means, doesn't it, sir, that means that

7    Mr. Lowell here is the one person, and his team, they're

8    the ones who decide whether or not they file this motion

9    to reduce your sentence for the pain cream bribery?

10   A.   That I don't know.

11   Q.   Well, sir, you lost your license, but you're -

12   shall you're an educated man?

13   A.   That is correct.

14   Q.   Right?  And so did you -- did you read this plea

15   agreement before you entered into it?

16   A.   Right, but it states the United States Department

17   of Justice, not Mr. Lowell.

18   Q.   Is he not with the Department of Justice?

19   A.   As well as other individuals.

20   Q.   All right.  Who's Mr. Lowell with there?

21   A.   In front of me?  With other individuals.

22   Q.   No, on the document, sir.  You know what I'm

23   asking, in front of the document?

24   A.   That's his signature, says United States

25   Department of Justice.

1    Q.   Were you instructed today to be evasive with me?

2    A.   No, sir.

3    Q.   You're not -- you don't -- you don't want to do

4    that, right?

5    A.   No, I do not.

6    Q.   Right, you want to answer questions directly and

7    honestly, right?

8    A.   Yes, I do.

9    Q.   That's what you're supposed to be doing today,

10   right?

11   A.   Yes, because I'm under oath.

12   Q.   Right.  Right.  And because you're trying to get

13   substantial assistance, right?

14   A.   Yes and no.

15   Q.   All right.  So here we've got solely by -- by

16   United States Department of Justice, and we agree now,

17   is there any confusion, sir, do you have any confusion

18   or any doubt that Mr. Lowell is from the Department of

19   Justice?

20   A.   None.

21   Q.   Should the Defendant's cooperation in the sole

22   judgment and discretion -- does the word and there mean

23   they've got to have both, it's their discretion, it's

24   their judgment and discretion, got to have both?

25   A.   I believe so.

1    Q.   Amount to what?  What is the -- what is in their

2    discretion and judgment, sir, as it relates to their

3    judging your testimony?

4    A.   I cannot answer that question.

5    Q.   It's right there.  I circled it for you.

6         What are they trying to determine, sir?

7    A.   I don't know the definition of substantial

8    assistance.

9    Q.   What does it mean to you as just a -- as a former

10   medical doctor?

11   A.   Just means assist.

12   Q.   Substantial, what does that mean to you?

13   A.   Again, my definition may be different than

14   theirs.

15   Q.   Well, what's yours, sir?  That's what I'm --

16   A.   Interest in reviewing the records that were

17   presented to me and answering truthfully on the stand.

18   Q.   Does substantially mean a little bit or a lot?

19   A.   It means a lot.

20   Q.   So if you say something contrary to what they

21   believe is the truth, that's not substantially

22   assisting, right?

23   A.   Could you repeat the question, please?

24   Q.   If you say something that's opposite of them,

25   that could cost you your deal?

1    A.   Oh, no, they're asking me just to be truthful.

2    Q.   Yeah, but if you say something -- if the truth is

3  opposite of what they say, they have the power, the sole

4  right, the sole discretion is with them to say, you know

5  what, deal's off, no -- no 5K motion for you.

6    A.   They have the power to do that at any point.

7    Q.   Are you being careful today, sir?  Have you been

8  very, very careful in order to make sure that everything

9  you say is in line with the Government's position?

10   A.   No, I'm just being very careful in understanding

11 your questions.

12   Q.   All right.  Well, did you understand that

13 question, then?  Because you didn't answer it, but did

14 you understand my question?

15      Are you being careful to make sure that you don't

16 say anything that could cost you this potential for a

17 departure?

18   A.   It actually hasn't even crossed my mind this

19 morning.

20   Q.   Have you served on over a -- the Sentencing

21 Guidelines, sir, do you know what those are?

22   A.   Yes, with my attorney.

23   Q.   Excuse me?

24   A.   Yes, with my personal attorney.

25   Q.   And -- and, sir, under the Sentencing Guidelines

1    for this pain cream, how many years are you looking at?

2       A.   I believe, if I'm not mistaken, between one and

3    three, but we only spent about ten minutes going over

4    the big book of Sentencing Guidelines.

5       Q.   Right.  But you don't want to go to jail for a

6    day if you don't have to, right?

7       A.   Absolutely.

8       Q.   Right, but years, you're looking at years, right?

9       A.   That is correct, sir.

10      Q.   All right.  That's not the end of the deal,

11   though, is it?

12           Part of the deal here is that you understand and

13   agree that the United States will request the sentencing

14   be deferred, what does deferred mean to you?

15      A.   To postpone.

16      Q.   Until that cooperation is complete.  Right?

17      A.   That is correct.

18      Q.   And today you're cooperating?

19      A.   That is correct.

20      Q.   And so you haven't been sentenced; have you?

21      A.   No, that is scheduled for February.

22      Q.   Right.  That -- the full weight, the full weight

23   of the United States Department of Justice, they've got

24   that hanging over you; don't they, that they haven't

25   sentenced you, right?

1      A.   No, they don't.

2      Q.   Right, but -- but I mean, you would -- you tell

3    the truth whether you've been sentenced or not, right?

4      A.   Correct, and I haven't been sentenced.

5      Q.   Right, but -- but did you tell them that, hey,

6    man, you can sentence me, it doesn't matter, it's not

7    going to affect what I say whether I'm sentenced or not,

8    did you tell them that?

9      A.   No, I did not.

10      Q.   But they decided, they decided to make you agree,

11    and you agreed that they would delay that sentence until

12    after they heard you here today, right?

13      A.   No, they did not make me agree on the sentencing.

14      Q.   But you agreed, sir, to the -- you agreed to let

15    them hold it over your head.

16      A.   No.  Again, I just accepted responsibility and

17    they asked for me to be truthful with everything I knew,

18    and I stated, yes, I would say everything I knew and be

19    truthful about everything I knew.

20      Q.   Sir, sir, nobody's saying that's not part of --

21    but did you not know that?  Is today the first time this

22    has been pointed out to you about this deferral of your

23    sentence?

24      A.   No, it has not been.

25      Q.   Okay.  All right.  So you knew that, right?

A.   Yes, I did.

Q.   And -- and how many times has your sentence been delayed?

A.   I think it was only set once.

Q.   Okay.  And it -- and -- and is it -- has it -- is it reset again?

A.   I don't believe so.

Q.   When is it set for?

A.   February.

Q.   February?

A.   Correct.

Q.   All right.  And so during this time, have you spent a day in jail?

A.   When I was arraigned.

Q.   All right.  And so you -- and then -- then you, at that point you plead not guilty, right, and got out of jail?

A.   I got out of jail.

Q.   Right, but you said not guilty?

A.   I believe I did.

Q.   All right.  And so then since that point in time, have you spent a day in jail?

A.   No, I have not.

Q.   The agree -- you told Mr. -- or the jury here that the Government hadn't made you any promises as part

1    of your plea, right?

2        A.   That is correct.

3        Q.   That's not entirely correct, though; is it?   They

4    have made -- the United States has made some promises to

5    you; haven't they?   True?

6        A.   Well, I don't see the word promise.

7        Q.   Agrees?   Is agree not a synonym for a promise?

8        A.   I don't believe so.

9        Q.   Well, they've made some agreements with you not

10   promises.   You find a meaningful distinction there you

11   want the jury to understand there's a distinction

12   between a promise and an agreement for you, right?

13       A.   That's correct.

14       Q.   Could you tell the jury what the difference

15   between an agreement and a promise is?

16       A.   An agreement may be under at this moment, but it

17   may change in the future.   A promise is a promise.   At

18   this moment or in the future that stays the same.

19       Q.   So an agreement is something can you break in the

20   future, and a promise is something you can't; did I

21   understand that right?

22       A.   An agreement can always be brought again for

23   further discussion and arrangements of that agreement,

24   modification of an agreement.

25       Q.   All right.   But a promise cannot?

1      A.   A promise is a promise, otherwise, you'll be

2  breaking it.

3      Q.   All right.  All right.  So here what we have is

4  an agreement, not a promise?

5      A.   That is correct.

6      Q.   All right.  And what are they agreeing to do

7  here, sir, on paragraph 13-A?

8      A.   They agree not to oppose Defendant's anticipated

9  request to the Court and the United States Probation

10  Office that he receive a two-level downward adjustment.

11      Q.   So they're agreeing that it -- when you get to

12  sentencing, they're not going to oppose a request by you

13  for a departure, right?

14      A.   Based on that statement, yes.

15      Q.   And they have another agreement in B.  Here's the

16  one I really want to focus in on.  What are they also

17  agreeing to do?

18      A.   At the time of sentencing the United States will

19  dismiss the superseding indictment against Defendant in

20  Case Number B-18-008.

21      Q.   That's this case, right?  The case that we're

22  sitting -- where you're testifying in here today, right?

23      A.   I was not aware of that.

24      Q.   Whatever case out there, they're going to dismiss

25  all the charges against you in this other case, whatever

1    18-008 is, right?

2       A.  That's what it states.

3       Q.  That's a pretty big agreement; isn't it?  That's

4    very meaningful to you, right?

5       A.  Yes.

6       Q.  You bargained for that; did you not?

7       A.  My personal attorney actually guided me and

8    counseled me.

9       Q.  Sure, sure, of course you're represented, but

10   these are your -- you ever heard the term plea bargain,

11   have you ever heard that term, sir, plea bargain?

12      A.  Yes, I have.

13      Q.  Right?  And that's what happened here.  You had

14   representation, United States of America has

15   representation, and a bargain, a negotiation was made

16   and here we have it, right?

17      A.  That is correct.

18      Q.  Now, as part of the plea bargain and agreement,

19   statement of facts is entered.  And I want to ask you

20   some questions from that statement of facts.

21         This is Government Exhibit J-2.

22         It was part of the conspiracy Jesus Virlar Cadena

23   and his co-conspirators would enter into agreements with

24   various marketers whereby Jesus Virlar Cadena was paid

25   through other illegal bribes, kickbacks in exchange for

1     ordering prescription drugs, including compounded

2     medicines such as pain cream and scar cream for

3     patients.

4          Are you with me, did I read that right?

5     A.   Yes, you did.

6     Q.   All right.  Now, this is the pain cream count.

7     And the pain cream that we're talking about here are

8     these bribes and kickbacks and -- and pain creams have

9     nothing to do with hospice, right?

10    A.   That is correct.

11    Q.   This is a crime that you were involved in in

12    San Antonio with other people completely unrelated to

13    everybody at this table over here, right?

14    A.   Actually, Micaela Wooten was the person receiving

15    and assisting me with this scheme also.

16    Q.   Do you see Micaela Wooten over here?

17    A.   No, but --

18    Q.   Sir, that's all my -- that's my question.  She's

19    not there, all right, this is not the hospice, this is

20    pain cream, right?

21    A.   That is correct.

22    Q.   All right.  And so my question to you here, sir,

23    is and -- and you're taking bribes, right?

24    A.   Yes.

25    Q.   Taking, or paying, or both?

1      A.   No, no, just taking.

2      Q.   Just taking them, right, no big deal?

3      A.   No, it is a big deal.

4      Q.   And -- and -- and so -- and that's with

5    conspirators, Marco Karam was one of your

6    co-conspirators in this pain cream bribery scheme,

7    right?

8      A.   Yes, he was.

9      Q.   Now, tell the jury how you know and met Marco

10   Karam?

11     A.   I met Marco Karam as a marketer and then as the

12   physician hospitalist for his sister who's dying of lung

13   cancer.  And so I was at North Central Baptist Hospital

14   with her for about three hours because she was

15   non-smoker with terminal lung cancer, and he was

16   appreciative that I had spent that much time with her

17   since none of the other physicians had spoken with her

18   at length about her prognosis.

19     Q.   I didn't understand who's Marco -- how did you

20   meet -- who's Marco Karam again, who is he?

21     A.   Marco Karam is a marketer who I met as he was

22   marketing to me, and we became close friends after I

23   took care of his dying sister from lung cancer at North

24   Central Baptist Hospital and that's how I solidified our

25   friendship.

1    Q.   All right.   And who introduced you to Marco

2    Karam?

3    A.   That, I don't recall.

4    Q.   Well, what were the circumstances?

5    A.   He was a marketer for home health, DME, hospice,

6    so he was approaching physicians.

7    Q.   All right.   Which hospice was he work -- or -- or

8    marketer, who was he marketing for?

9    A.   Multiple home health agencies, multiple hospice

10   agencies.

11   Q.   What year was this, sir, roughly, approximately?

12   A.   It was I want it say around 2010, 2011, whenever

13   his sister expired.

14   Q.   Is Marco Karam a friend of John Rivas?

15   A.   That, I don't know.

16   Q.   Who's John Rivas?

17   A.   John Rivas was a -- is the attorney who

18   introduced me, Vincent Gonzaba and Tom Gonzaba to

19   Mr. Rodney Mesquias.

20   Q.   Right.   That occurred, that introduction occurred

21   at a restaurant, right?

22   A.   Right, at Chris Madrid's in San Antonio.

23   Q.   So John Rivas introduced you to Mr. Mesquias?

24   A.   Yes, he did.

25   Q.   All right.   That was the first introduction you

1    ever had with Mr. Mesquias?

2       A.   Yes, because John Rivas knew that me, Tom Gonzaba

3    and Greg Gonzaba were looking to partner up to start a

4    hospice to, basically, facilitate the transfer dumping

5    of Gonzaba patients into hospice.

6       Q.   Excuse me, sir, excuse me, sir.  Okay.  So let me

7    get back to the co-conspirators here.

8            Who else -- so you were conspiring -- and

9    what's -- what's going on with Marco Karam?  Is he -- is

10   he indicted, is he in jail, what's his status?

11      A.   As far as I know, he is indicted, it came in the

12   news several years ago.

13      Q.   All right.  And who were your other

14   co-conspirators?  I think you said your girlfriend, you

15   got your girlfriend mixed up, Ms. Wooten, in this pain

16   cream?

17      A.   That is correct.

18      Q.   Excuse me.  All right.  Was she -- has she been

19   indicted in the pain cream as one of your

20   co-conspirators?

21      A.   Not that I'm aware of.

22      Q.   All right.  Who did you -- who did you pay the

23   money to, the bribe?

24      A.   Marco Karam actually paid Micaela directly at

25   first in cash and then in checks.  So it would go into

1    Micaela Wooten's personal bank account.

2       Q.   Okay.  Now, as a result of this pain cream, there

3    was an investigation, right, an FBI investigation into

4    this pain cream, this bribery scheme, right?

5       A.   That is correct.

6       Q.   And part of how you got here today was one day, a

7    couple of years ago, the FBI raided your house, right?

8       A.   Well, they stopped by with a search warrant.

9       Q.   They just stopped by with a friendly search

10   warrant, huh, right?

11      A.   Yes, because I was pulling out of the driveway

12   and one of the agents, a female lady, asked if I was

13   Dr. Virlar, and I said yes, and she showed me the search

14   warrant and asked me to pull back in so they could talk

15   to me.

16      Q.   Was this a surprise to you, sir?

17      A.   Not necessarily.  I was already expecting it and

18   I had noticed some vehicles following me around at

19   times.

20      Q.   All right.  And -- and -- but did the FBI give

21   you any advanced warning that they were going to come

22   and search your home?

23      A.   No, they did not.

24      Q.   And so they caught you coming out of the

25   driveway?

1     A.   That is correct.

2     Q.   Well, had that ever happened to you before, sir?

3     A.   Never.

4     Q.   What's that feel like?

5     A.   It was ugly.

6     Q.   Were you scared?

7     A.   Yes, I was.

8     Q.   Feel a lot of pressure?

9     A.   No, just scared.

10    Q.   Okay.  And what were you scared of?

11    A.   Well, that they were going to be, like, in the

12    movies, interrogating me for hours and, basically,

13    ransacking the -- the home.

14    Q.   Right, but -- but personally, what were you

15    scared of?

16    A.   That I was going to go to jail.

17    Q.   Was that your first thought?

18    A.   No, my first thought was I got caught.

19    Q.   Was your first thought about your girlfriend?

20    A.   Not one bit.

21    Q.   I didn't understand you.

22    A.   Not one bit.

23    Q.   Not one bit.  Not a single remorse for her?

24    A.   Not at the moment I was basically thinking of I

25    got caught, now what do I do?

1    Q.   You were concerned about yourself, right?

2    A.   I was concerned about myself at that very moment

3    under those circumstances, yes, I was.

4    Q.   Which is consistent with your character of being

5    selfish, right?

6    A.   In the past I was very selfish.

7    Q.   Now, do you recall when that was, sir, roughly,

8    the --

9    A.   No, I don't, sir, just --

10   Q.   2017, October 2017, does that ring a bell?

11   A.   Yes, sir.

12   Q.   All right.  And how long did this -- this search

13   last?

14   A.   Until like 4:00 or 5:00 in the afternoon.

15   Q.   When did it start?

16   A.   Around 7:30, 7:45 a.m.

17   Q.   7:00 -- so all day long?

18   A.   All day long.

19   Q.   And describe to the jury, was it -- how many

20   agents were there?

21   A.   There was a leader who was sitting in front of me

22   in the kitchen, there was an IT tech who had a laptop

23   and was analyzing my phone and then asked for my other

24   electronics, there was agent lady, Laura, brunette,

25   there was another agent, a blonde tall, there was

1    another male agent, blonde.

2         Laura and the blonde agent were the first ones to

3    go in there and try and talk so they could "help me" and

4    ask me to listen to some recordings.

5         And so I listened to the recordings and I still

6    said, I would love to help you, but I'm going to wait

7    until I speak with my attorney, I'd like to have an

8    attorney present.

9         And Laura persisted, well, we'd like to help you,

10   so let's talk.  And I'm like, well, I'd like to talk in

11   front of an attorney and I would love to help you with

12   information, but I'd like to do it in front of my

13   attorney.

14        And another male agent was there and so it came

15   to a point where they were like, okay, well, we're going

16   to execute this warrant.  And I was like, I understand.

17   And so that's when they the rest of the agents came into

18   the home, the IT gentleman, the older gentleman who was

19   in charge, the tall blonde lady, and other male agents,

20   two or three more went to the bedroom, the living room,

21   and then there were other agents in the garage.

22        And so I have some cameras, mobile cameras, and

23   so those were basically, you know, moved around and so

24   they wouldn't be recording.

25        And while they went through the -- my home, I

1    just sat in the kitchen table with the senior agent in

2    front of me.  And eventually I started having a

3    conversation with the tall, blondish lady, I just came,

4    you know, being at ease and we just started talking

5    about, you know, if I was married, or girlfriends and

6    other questions like that.

7            And before I knew it, it was already after 4:00,

8    and once they had their -- what they needed, they went

9    ahead and left.  They took my laptop, Mac, it was brand

10   new, they took a USB drive where I had basically

11   fraudulently created a paper that seemed like a -- a

12   loan but it was made up.  They also took a scanner where

13   I would scan all the documents of patients or credit

14   card payments.  And also took a -- I believe a server,

15   computer server that I had upstairs for years.

16   Q.   Let me ask -- let me ask you a question.  All of

17   what you're talking about there took from roughly 7:30

18   to 4:00 or 5:00 in the afternoon?

19   A.   That's correct.

20   Q.   All right.  And sounds like there was, what, half

21   a dozen to a dozen or so agents there?

22   A.   That's correct.

23   Q.   All right.  And were they dressed in their, you

24   know, in their, like you see on TV with their

25   windbreakers and --

1    A.  Not at all, very professional, you know, suits

2    and --

3    Q.  Suits?

4    A.  -- business attire.

5    Q.  All right.  All right.  And they showed you the

6    warrant, right?

7    A.  Yes, they did.

8    Q.  All right.  And the investigation was there

9    because of the pain cream?

10   A.  That is correct.

11   Q.  All right.  And, now, prior to today, sir, prior

12   to today, in preparation for your testimony, you have

13   met with the Government, right?

14   A.  On multiple occasions.

15   Q.  Multiple occasions.  And I think this week, you

16   have been meeting with the Government this very week,

17   right?

18   A.  Yes, reviewing stacks of charts, medical charts

19   I'd never seen, medical notes.

20   Q.  Did you go over, sir, did you review the event,

21   this -- this event, this search of your home, did you go

22   over those events with the Government?

23   A.  No, no, just strictly patient charts.

24   Q.  All right.  So no -- no attempt to refresh your

25   memory by the Government of the -- of the -- of the

```
 1   raid?
 2       A.   None whatsoever.
 3       Q.   So everything you're talking about, you're doing
 4   through memory right now?
 5       A.   That is correct.
 6       Q.   And so it's true also that during that raid that
 7   you, amongst the things that you've said you told the
 8   Government, the -- there at the -- at your house, you
 9   also told them that you had recently been found by a
10   jury to have committed malpractice in causing
11   catastrophic injuries to a patient of yours, correct?
12       A.   The allegation of the medical --
13       Q.   Sir, was there a verdict against you at the
14   same -- roughly within -- within weeks of this search of
15   your home?
16       A.   Yes, it was a $14,000,000 verdict against me.
17       Q.   Right.  And -- and the subject of that was it was
18   a medical malpractice claim where a young woman was
19   determined that your negligent catastrophically injured,
20   put a woman in a vegetative state, right, that's why
21   there's so much money involved?
22       A.   It was alleged that as the leader being the
23   hospitalist I was fully in charge of the patient, there
24   were over 20 doctors involved in the patient's care.
25       Q.   It was more than alleged, sir.  A jury -- a jury
```

1   issued a verdict, right?

2       A.   May I finish answering the question, please?

3       Q.   No, sir, you can answer my question.

4            It wasn't just alleged, it was proven and a jury

5   came back and returned a verdict against you, right?

6       A.   The jury believed the experts of the Plaintiffs

7   versus the experts of the -- my team and Dr. Gonzaba's

8   team.

9       Q.   And as a result, now to my question, are you

10  ready?

11      A.   Yes, sir.

12      Q.   All right.  And as a result, the jury found

13  against you, held you responsible for turning this young

14  woman into a vegetable?

15      A.   Myself and Dr. Gonzaba, the Gonzaba Medical Group

16  for 14 million, the surgeon Dr. Patel signed -- had

17  agreed already prior to surgery.

18      Q.   Are you not taking responsibility for the jury's

19  findings, sir, is that why you're trying to throw

20  everybody else in there?

21      A.   No, I accepted the jury's decision, I'm not a --

22      Q.   But you want to make sure and point out there are

23  other people involved, right?

24      A.   There were over 20 physicians involved in that

25  patient's care?

1    Q.   But you want, you're -- you're making great

2    effort to make sure and point out that -- that other --

3    others were involved, right?

4    A.   That it's a team effort when we take care of

5    patients.

6    Q.   But you said yourself here this morning that

7    you're responsible for at least 60 percent of that,

8    right?

9    A.   The jury decided that I was responsible

10   financially for 60 percent of the judgment.

11   Q.   Right.  Right.  Right.  Okay.  And -- and you

12   personally, right, you personally have 60 percent of the

13   $14,000,000, right?

14   A.   That is correct.

15   Q.   How much money is that?  Have you -- did you

16   do -- when that news hit you, did you do the math to

17   figure out, oh, my God what is 60 percent of 14 million?

18   A.   No, actually just said that's 14 million, so I'm

19   making $500,000 a year, so two years is one million so

20   two times seven, that's 14 million so basically, you

21   know --

22   Q.   That had to have shooken you?

23   A.   It did.

24   Q.   Does it shake you today?

25   A.   No, actually I'm pretty happy I'm not in medicine

1  now.  I'm back to the person I was before medicine.

2      Q.  Have you -- what's the patient's name, the lady

3  who's now a vegetable?

4      A.  I don't recall.  She's in a --

5      Q.  You don't remember -- excuse me, excuse me, you

6  don't remember her name?

7      A.  Not at this moment.

8      Q.  How long was the trial?

9      A.  It was -- it was long.

10     Q.  Were you there?

11     A.  I was there.

12     Q.  Were you paying attention?

13     A.  I was paying attention.

14     Q.  How old was she?

15     A.  I believe she was in her 30s.

16     Q.  Have you paid her?

17     A.  I'm sorry?

18     Q.  Have you paid her what you owe her?

19     A.  No, we're appealing the case.

20     Q.  Do you ever intend to pay her?

21     A.  I'm sorry?

22     Q.  Do you ever intend to pay her?

23     A.  I do not have --

24     Q.  Do you intend to pay her?

25     A.  Through the malpractice insurance, but not me

1    personally, I don't have 14 million.

2        Q.   But you knew when the FBI came to your house that

3    day, you didn't have $14,000,000; did you?

4        A.   Well, no, I don't have 14 million.

5        Q.   And that verdict, to be clear, in time was weeks,

6    just a couple of weeks before the FBI showed up to your

7    house, right?

8        A.   Yes.

9        Q.   So you've got -- and so the trial was -- had just

10   finished, too, right?

11       A.   That is correct.

12       Q.   So you've got this trial going on where you're

13   being accused, and you get a verdict, and then separate

14   and apart from that, you also know that you see

15   Government agents -- you know they're looking at you,

16   right, because of the pain cream?

17       A.   That is correct.

18       Q.   And so then here comes the -- now here comes the

19   Government, that's two massive problems in your life,

20   right?

21       A.   Right, but it's oranges to apples.  The medical

22   malpractice lawsuit, I mean, that goes with the job.

23   And so on that I'm like, well, we're appealing, it's

24   something that happens in the medical physician industry

25   so it's part of --

1    Q.  So no stress, you weren't stressed with it then?

2    A.  I was stressed, but not -- you're trying to

3    compare apples to oranges.

4    Q.  And then do you recall, you know, when -- when

5    they're doing the -- when they were raiding your house

6    and looking for things, you had $2,000 in cash on you,

7    right?

8    A.  Yes, I did.

9    Q.  Right.  And they asked you about that, they asked

10   you, boy, that's a lot of cash, why do you have so much

11   cash on you, they asked you that, do you recall that?

12   A.  Yes, they did.

13   Q.  Right.  And you told them because you were going

14   to file for bankruptcy?

15   A.  That is correct.

16   Q.  And was that a truthful statement that you were

17   going to file for bankruptcy?

18   A.  Yes, once the judgment is finalized I will be

19   filing for bankruptcy if it's against me.

20   Q.  Right.  But you were keeping cash because you

21   wanted to conceal your cash and hide it from the

22   bankruptcy process, right?

23   A.  No, basically I called a bankruptcy attorney who

24   was recommending by Mr. John Rivas, and he counseled me

25   as to --

1           MR. LOWELL:  Objection, calls for privileged

2    conversations.

3           THE COURT:  One second, one second, one

4    second.  Again, the question was proper, but do not

5    discuss conversations with your attorney.

6           THE WITNESS:  Okay.

7           THE COURT:  All right?

8           MR. HECTOR CANALES:  Your Honor, the witness

9    is free to waive -- he owns the privilege.  If he wants

10   to discuss them, he's free to waive the privilege, it's

11   his privilege.  So respectfully, Your Honor, I don't

12   think that instruction is -- is proper.  He can decide

13   himself whether he wants to say what his lawyer told

14   him.

15          THE COURT:  Sir, again, the question was

16   proper.  It's your discretion whether you -- you

17   decide -- Mr. Canales, that -- it's well taken.  If you

18   decide you want to discuss attorney/client privilege

19   that's up to you.

20          THE WITNESS:  No, I was not hiding money.

21     Q.  (By Mr. Hector Canales)  All right.  But -- but

22   you -- you believed that if -- I think the -- I think

23   your statement was that if it was in cash, it couldn't

24   be part of the bankruptcy, right, something to that

25   effect?

1    A.   If you could repeat the question, please?

2    Q.   Right.   That if it was in cash, if you're

3    carrying cash, all right, that in bankruptcy your

4    creditors, people who owe you money, they can go get

5    stuff from your bank accounts, right?

6    A.   That is correct.

7    Q.   So if you're holding cash that's not in your bank

8    account, they don't know about it and they can't get it,

9    right?

10   A.   Well, no, they know about it, I'm cashing my

11   payroll check, but rather than having it deposited, I'm

12   asking for cash.

13   Q.   There we go.   Now we got it.   So rather than

14   you -- you made a conscious decision rather than to --

15   rather than to deposit your check, you're cashing it so

16   that that that money doesn't stay in an account that is

17   subject to them grabbing it in bankruptcy, right?

18   A.   That is correct.

19   Q.   Right.   So you're trying to keep that cash away

20   from this lady you can't remember that you turned her

21   into a vegetable, that was your plan, right?   You didn't

22   want her to get the money.   That's why you had the cash,

23   right?

24   A.   I didn't want her to get my cost of living money.

25   I have bills to pay and --

1    Q.   So did she, doctor.

2    A.   That is --

3    Q.   She had bills, too.

4    A.   That is correct.

5    Q.   That is -- that is an incredibly dishonest and

6    despicable thing for you to do, isn't it, to hide money,

7    plant money to keep it away from this woman?

8    A.   I'm not hiding the money, they're seeing my

9    payroll check being cashed at a bank.  A bank is going

10   to document how much you cash and they will ask for an

11   ID, they would ask for my bank account to verify that I

12   am a member of that bank, and it's recorded at the bank.

13   Q.   Were you saving this money for her to give it to

14   her in cash, or was your intent, wasn't your intent

15   really to go out and spend the money yourself?

16   A.   No, I still I have money saved.

17              THE COURT:  Mr. Canales, at this time, let's

18   go ahead and take a brief recess -- well, not a brief

19   recess.

20              Ladies and gentlemen, it's now 12:30, let's

21   go ahead and take a lunch break and we'll reconvene at

22   2:00.

23              COURT OFFICER:  All rise for the jury.

24              (JURY OUT.)

25              THE COURT:  All right.  Thank you, everyone.

1    We'll be in recess for lunch.

2                    (COURT IN LUNCH RECESS.)

3                    THE COURT:  Thank you, everyone.  Please be

4    seated.

5                    Let's call the witness, please.

6                    Thank you, sir.  Please have a seat.

7                    I remind you you're still under oath.

8                    THE WITNESS:  Yes, sir.

9                    THE COURT:  Please answer loudly and

10   clearly.

11                   Mr. Canales, please proceed.

12                   MR. HECTOR CANALES:  Thank you, Your Honor.

13       Q.  (By Mr. Hector Canales)  Mr. Virlar, are you

14   ready to proceed?

15       A.  Yes, sir.

16       Q.  A little bit of housekeeping.  I want to go back,

17   I'm going to put on the screen here, again, Government

18   Exhibit J-2.  This is the plea agreement; beforehand, we

19   showed up there that -- the dismissal of a Case Number

20   B-18-008; do you recall that?

21       A.  Yes, sir.

22       Q.  All right.  And, sir, this is B-18-008, correct?

23       A.  That is correct.

24       Q.  All right.  So the Government, your agreement,

25   your plea bargain, is going to result in, if they like

1  your testimony, it's going to result in a dismissal all

2  this, right?

3      A.   I believe so.

4      Q.   All this is gone?

5      A.   If that's what it means, yes, sir.

6      Q.   Well, is it?

7      A.   I guess it is, I had not noticed that before.

8      Q.   Now, I had in my notes, did you say you hadn't

9  noticed that before?

10      A.   That is correct.

11      Q.   Is that what you just said?

12           That's a pretty good bargain; isn't it?

13      A.   Yes, it's -- but I hadn't noticed it.

14      Q.   You hadn't noticed it?

15      A.   No.

16      Q.   All right.  Your lawyer didn't tell you about

17  that?

18      A.   We talked about a lot of legal jargon and --

19      Q.   All right.  Are you happy with the -- do you

20  remember the Court asking you during your plea whether

21  or not you were satisfied with the services of your --

22  of your attorney?

23      A.   Yes.

24      Q.   All right.  And when you -- let's now go back to

25  that October FBI meeting that first time when the FBI

1    came to your house.

2         Did you have a lawyer at that point in time?

3    A.   I believe I had already spoken with Mr. Jason

4    Davis regarding the topical pain creams.

5    Q.   All right.  So the answer is, yes, you had a

6    lawyer at the time of the FBI search of your home?

7    A.   Yes, sir, I do believe so.

8    Q.   Okay.  All right.  And we're going to get to that

9    into a little bit more detail but, shortly thereafter,

10   after that raid, you had, at least, two meetings where

11   the Government to your lawyer's office where they come

12   to ask you questions, right?

13   A.   That is correct.

14   Q.   All right.  But before you had that, you wanted

15   a -- you wanted to -- you wanted a deal, right, you

16   asked the Government at that -- at your house, at that

17   raid, you asked them, you told them, in other words, you

18   told them you wanted to cooperate with the Government,

19   right?

20   A.   I stated to the FBI agents I wanted to help them,

21   but not without having an attorney present.

22   Q.   Right.  But you -- but you said -- but you told

23   them, even knowing your lawyer wasn't there, you asked

24   the Government what would they give you in return for

25   your cooperation, you asked for that?

1    A.   No, it was, basically, just in the movies and you

2    read the media it says, if you ever get arrested have an

3    attorney present.

4    Q.   And if a -- if a Government agent took that down

5    and said that, yes, that -- that you asked him what you

6    would give him in return for his cooperation, you

7    would -- they would -- they were wrong?

8    A.   Would you repeat the question, please?

9    Q.   Right.   If a Government agent said that, took

10   down notes and said that you asked for, what would you

11   give me in return for cooperation, you're telling this

12   jury you didn't say that?

13   A.   I would never say that.

14   Q.   You would never or you didn't?

15   A.   I would never -- that sounds like I'm trying to

16   negotiate with an agent, that's -- I wouldn't.

17   Q.   Oh, that's where you draw the line.   Back on that

18   day, you drew -- that's your line is negotiating with an

19   agent --

20   A.   No.

21   Q.   -- from your -- that -- that's a -- that's a

22   bridge too far for Mr. Virlar?

23   A.   No, he's misinterpreting my statement.

24   Basically, I'm not, just like anyone else, speak to law

25   enforcement without an attorney present.

 1       Q.  But you did speak with them, right?  You said --

 2  you said that, and my notes here that "you would love to

 3  help -- love to help you, being an agent, with info".

 4  That's what you said and that's what you told Mr.

 5  Lowell, right?

 6       A.  Correct, without -- but with an attorney present.

 7       Q.  But you talked to them anyway?

 8       A.  Not regarding the case.

 9       Q.  You talked to them about -- they -- they told you

10  about recordings, right, that they had some recordings

11  with -- between you and your girlfriend Wooten, Micaela

12  Wooten, right?

13       A.  That is correct.

14       Q.  And they said, hey, you want to listen, right?

15       A.  Yes, they did.

16       Q.  Right.  And you did, and you said, ultimately,

17  you said, yeah, let me hear, right?

18       A.  No, I mean, they said, we to talk to you and I

19  said --

20       Q.  Excuse me, sir.  Did you hear the recordings or

21  not?

22       A.  They were played by the agents.

23       Q.  Did you hear the recording or not?

24       A.  Of course, they're being played by the agent.

25       Q.  Okay.  All right.  So -- so you -- and you

1    listened to them all, were you listening closely?

2         A.   No, just played like a few minutes and they would

3    stop and ask again, would you like to talk?  And, again,

4    I would repeat the same statement, I would love to help

5    you, but not without an attorney present.

6         Q.   Did you hear on the recordings, sir, that you

7    told Micaela Wooten to tell a white lie to the

8    Government about her filing of how to handle some tax

9    returns?

10        A.   Yes, I did.

11        Q.   Now, this was a record -- did you know that your

12   girlfriend was recording you?

13        A.   No, I did not.

14        Q.   Well, when you told her to tell a white lie to

15   the Government about her taxes, that was in relation to

16   money she was receiving based on the pain cream?

17        A.   Yes and no.

18        Q.   But you're telling your girlfriend to lie to the

19   Government about the pain cream, that was part of an

20   effort that you had to conceal information from the

21   Government that you thought would get you in trouble,

22   right?

23        A.   I was petrified of the IRS because that's who

24   brought down Al Capone, the IRS, so when she mentioned

25   the IRS, well, it's going to show, basically, the money

1   from Merida as well as the money from the pain creams.

2       Q.   How about the Department of Justice, Kevin

3   Lowell, are you petrified of the Department of Justice?

4       A.   Honestly, the only thing I kept thinking was the

5   IRS.

6       Q.   As you sit here today, sir, are you -- so you're

7   petrified of the IRS, we made that clear, are you also

8   petrified of Mr. Lowell and the Department of Justice in

9   Washington, D.C.?

10      A.   No, I am not.

11      Q.   Is that because you have a deal with them and you

12  don't have one with the IRS?

13      A.   No, no, I've accepted my responsibility and I've

14  moved on and I've made peace with myself.

15      Q.   Well, have you called the IRS and accepted

16  responsibility with them?

17      A.   I always pay my taxes, I pay what I owed.

18      Q.   Sir, that wasn't my question.  Have you called

19  the IRS and -- and -- and accepted responsibility for --

20  for telling Wooten to lie to them?

21      A.   I have not been contacted by the IRS.

22      Q.   So you're going to wait for them to call then

23  before you accept responsibility?

24      A.   I have accepted responsibility, that's why I'm

25  here.

1    Q.   Not with the IRS though, right?

2    A.   I've paid all my past due taxes.

3    Q.   And you didn't -- you didn't accept

4    responsibility until they came for you about the pain

5    cream?

6    A.   That is correct.

7    Q.   Would you agree, sir, that the character of a

8    person is revealed, you know, when -- when -- when they

9    do things, not when people are looking, but when people

10   aren't.  That's when you know somebody's real character?

11   A.   That's integrity.

12   Q.   Okay.  Integrity.  So which -- you would agree,

13   sir, you have zero integrity?

14   A.   I had zero integrity, I'm trying to recover my

15   integrity.

16   Q.   I want to -- one second here.  I'm going to shift

17   gears a little bit on us, okay?

18        All right.  I want to talk to you now a little

19   bit about some of the records, medical records in this

20   case, okay?

21   A.   Okay.

22   Q.   Before I do so, I want to talk to you about what

23   you've looked at here over the last few days getting

24   ready for your trial here today, okay?

25   A.   Okay.

1    Q.   Have you looked at some medical records of some

2    hospice patients?

3    A.   Yes, I have.

4    Q.   All right.  Where did you look at them?

5    A.   In the -- in this building.

6    Q.   In this building, all right.

7         Who provided them to you?

8    A.   The -- Mr. Lowell's staff.

9    Q.   When did this happen?

10   A.   On Saturday, Sunday, Monday and Tuesday.

11   Q.   Prior to Saturday -- so -- so let me -- so we've

12   got Saturday, you said Saturday, how long?

13   A.   I believe I got here -- we started around -- I'd

14   say around 10:00 or 11:00 in the morning until 9:00 in

15   the evening.

16   Q.   Saturday from -- tell me the time again?

17   A.   More or less around 10:00.

18   Q.   10:00 a.m. to when?

19   A.   To around 9:00 p.m.

20   Q.   9:00 p.m., okay.  And then Sunday?

21   A.   Sunday from about 2:00 p.m.

22   Q.   Okay.

23   A.   Until I was here around the same time.

24   Q.   Until 9:00 again?

25   A.   I believe so.

1    Q.   Okay.  Monday?

2    A.   Monday, I believe at 10:00 a.m.

3    Q.   Okay.

4    A.   Until 1:00 a.m.

5    Q.   1:00 a.m.?

6    A.   Yes, sir.

7    Q.   Okay.  Okay.  How about yesterday?

8    A.   Yesterday from 8:45 a.m. until 1:30 this morning.

9    Q.   1:30 past midnight?

10   A.   Yes, sir.

11   Q.   And then what about today, this morning?

12   A.   No, sir.

13   Q.   Okay.  All right.  So now prior to Saturday, had

14   the Government ever provided you any medical records, or

15   these same medical records to review?

16   A.   I don't believe so.

17   Q.   This was the first time?

18   A.   Yes, sir.

19   Q.   All the prior meetings from 2017 up until last

20   Saturday, 2017 from at the -- where the FBI came to

21   your -- to your house, raided your house, until

22   Saturday, they had -- you -- they had never shown you

23   these medical records, right?

24   A.   I don't believe so.

25   Q.   Now, what did they tell you to do with the

1   records?

2       A.   Review them and point out inconsistencies and

3   whatever clinical information were not truthful and was

4   fraudulent.

5       Q.   And who told you that?

6       A.   Well, Mr. Lowell's staff and himself.

7       Q.   Are those agents here in the courtroom?

8       A.   Yes, except for one FBI agent.

9       Q.   All right.  And did they stay in the room with

10  you while you were reviewing them?

11      A.   Yes, sir.

12      Q.   Okay.  And then the instructions were to point

13  out inconsistencies, right?

14      A.   And, basically, stuff that was not truthful.

15      Q.   Okay.  Did they tell you to find anything that

16  was consistent and truthful?

17      A.   Oh, yes, I mean, basically, whatever I did not

18  point out, if it was significant, I will -- the thing is

19  the charts are not reliable, they're fraudulent.

20      Q.   Sir, sir, my question:  Did they -- did they tell

21  you to also find anything that was truthful and

22  consistent?

23      A.   No.

24      Q.   So you were just looking for negatives, right?

25      A.   Correct.

1    Q.   And, sir, is it your testimony here that 100

2    percent of everything in those medical records is

3    fraudulent?

4    A.   You can't make that decision because you don't

5    know what is fraudulent and what is not because

6    everybody was, basically, making up fraudulent things.

7    So the integrity --

8    Q.   Everybody?

9    A.   Nursing staff, marketers, chaplain, medical

10   directors.

11   Q.   Oh, everybody?

12   A.   For the majority of the part, yes.

13   Q.   Okay.   Who was it?   Was there anybody at

14   Merida -- could you give me a name right now, according

15   to you a name at Merida who you don't think was

16   fraudulent, or -- or is everybody just like you?

17   A.   Nursing staff had a --

18   Q.   Sir, I'm -- I'm not asking for an explanation, my

19   question is very specific.   A name, can you give me a

20   name of a nurse, or a doctor that you think is

21   legitimate?

22   A.   No, I can't.

23   Q.   All right.   So your position is here you want the

24   jury to believe that the -- the whole, everything, the

25   whole ball of wax is bad?

1      A.   The overall majority, yes.

2      Q.   I'm not saying the overall majority.  All of it?

3  50 percent of it?  What -- what -- you're saying all --

4      A.   90 percent.

5      Q.   90?

6      A.   90.

7      Q.   Did you show them the ten percent?

8      A.   No, I didn't find any in the charts that I had in

9  front of me.

10     Q.   So you're just guessing about numbers now, what

11 is it?

12     A.   I'm telling you who I interacted with, what I

13 reviewed, and based on everything in front of me,

14 everyone was lying.

15     Q.   Everyone, okay.  That's the -- that's what I want

16 to know.  Everybody's lying?

17     A.   In the charts that I reviewed.

18     Q.   Okay.  All right.  And would that include

19 non-Merida staff?  In other words, doctors and nurses

20 who were not part of Merida, they're all lying, too?

21     A.   Dr. Arizaca was, Dr. Montemayor was, Dr. Vincent

22 and Greg Gonzaba was, Dr. Zertuche was, Nurse

23 Practitioner Cynthia Calvillo was, Nurse Practitioner

24 Rosan Estrada, who had no supervisory position and --

25     Q.   Everybody is a liar?

1    A.   -- was still allowed to see patients, even though

2    in the State of Texas, she may not see independent

3    patients.

4    Q.   Sir, sir, my question to you is:  Did they tell

5    to you do this, did they tell you to run through this

6    laundry list of people to say everybody is a liar?  Did

7    they tell you that?

8    A.   I'm simply replying to your question.

9    Q.   No, sir, you're not.  Did they -- my question

10   was, did they tell you to run through and say, everybody

11   is a liar?

12   A.   No.

13   Q.   Did you get that kind of feeling, though, that

14   that's what they're after?

15   A.   No, sir.

16   Q.   Did you get that kind of, like, did they leave

17   that impression around you that, hey, you know what,

18   that's really what's going to be substantially assist us

19   in the case?

20   A.   No, actually --

21   Q.   They didn't you that impression?

22   A.   No.

23   Q.   Did they give you the impression --

24          THE COURT:  And, sir, again, the defense is

25   entitled to ask you yes or no questions.  Please listen

1    carefully and answer the question.

2             THE WITNESS:  Yes, sir.

3    Q.  (By Mr. Hector Canales)  Now, you worked --

4    you've had -- you used to work for the Gonzaba Medical

5    Group, right?

6    A.  Correct.

7    Q.  You were a hospitalist for the Gonzaba Medical

8    Group in San Antonio, right?

9    A.  Yes, I was.

10   Q.  That meant that you were -- your responsibilities

11   were at hospitals to see the patients that were part of

12   the Gonzaba Medical Group to see them at the hospital,

13   right?

14   A.  And manage remotely by a managed-care population,

15   the WellMed Medicare vantage patients.

16   Q.  All right.  So you would see their Gonzaba

17   Medical Group patients at the hospital, right?

18   A.  That's correct.

19   Q.  Okay.  And you had a salary with them, right, to

20   do that job?

21   A.  That is correct.

22   Q.  Right.  How much did you get paid a year to do

23   that job by the Gonzaba Medical Group?

24   A.  The base salary was 120,000, and my bonus

25   structure was dependent upon the money I saved for the

1  group based on the length of stay, the bed days as well

2  as cutting down the costs and utilization of home health

3  services, rehabilitation, LTAK, medications.

4      Q.  Right.  And -- and so cost savings is illegal,

5  right, for a business to try to save costs, that's a

6  crime; isn't it?

7      A.  It is not.

8      Q.  Oh, okay.  So what you're talking about with your

9  bonus structure there, that's legal to say -- to not

10  spend too much money, it's legal?  Right?

11      A.  I don't understand your question.

12      Q.  I think you answered it.

13          How much of a bonus did you get from the Gonzaba

14  Medical Group back in '17; do you remember?

15      A.  I believe my total compensation for the year was

16  about a little bit over half a million dollars.

17      Q.  All right.  So you got 125, $150,000 base and

18  then the rest was bonus?

19      A.  That is correct.

20      Q.  Okay.  And when you're at -- when a patient would

21  come to you at the -- at the hospital, part of your job

22  used to be as a -- as a physician, would be to decide

23  how to treat that patient in the hospital, right?

24      A.  Yes and no.  Yes and no.

25      Q.  To give orders, right, to treat the patient as

1    they come to you, that's part of your responsibility as

2    the hospitalist?

3        A.   They get triaged first in the emergency

4    department and then they come to me.

5        Q.   Sure, all right.  So somebody comes in, they --

6    they -- they triage them, right, is that the -- is that

7    the term?

8        A.   Well, nurse evaluates, then they go to the

9    emergency department physician, then that physician

10   makes the determination whether they need to be admitted

11   or not.

12       Q.   Right.  And then that -- then that physician has

13   a decision to make as to when, or if to discharge the

14   patient, right?

15       A.   From the emergency department.

16       Q.   Right.  And -- and from the hospital, that's

17   within -- the ER is within the hospital, right?

18       A.   Correct.

19       Q.   And the doctor then in exercising his or her

20   clinical judgment will decide where -- what to do with

21   that patient, just to send him home, or whether to send

22   him -- refer him to a specialist, or for some other type

23   of care, right?

24       A.   That is correct.

25       Q.   That's all within the umbrella of your duties,

1    that's with you're getting paid the 125- or $50,000 to

2    do, right, that decision?

3        A.   No, that's the initial decision of the emergency

4    department physician.  He is THE one that makes that

5    determination first, and then the emergency department

6    physician contacts me, let me know, I already evaluated

7    patient X, they need to be admitted for this diagnosis,

8    and then that's when I go down to the ER and, basically,

9    do my evaluation and my admission orders.

10       Q.   I'm not talking about admission, right, you --

11   what you just described was the admission of a patient,

12   right?

13       A.   Correct.

14       Q.   I'm talking about discharge.  On discharge,

15   that's you, that's the hospitalist that's going to

16   decide on the discharge, right?

17       A.   Right, but I need to admit first before I can

18   discharge.

19       Q.   I understand, but I'm not -- I'm talking about

20   discharge, are you with me?

21       A.   I'm with you.

22       Q.   I'm not on admission, discharge.  The role of

23   discharging a patient is compensated by the primary

24   group, in this case the Gonzaba Medical Group, right?

25       A.   Could you rephrase the question, please?

1    Q.   Sure.   The act, the -- the clinical judgment, the

2    act, the order of discharge, that is a -- a -- an act

3    that is paid for by the Gonzaba Medical Group?

4    A.   Well, we don't get paid to discharge a patient.

5    Q.   Part of your responsibilities is discharging as

6    a -- under the -- as a hospitalist with the Gonzaba

7    Medical Group?

8    A.   Correct.

9    Q.   Right.   That's not a role of a medical director

10   of a hospice, discharging from a hospital, that's not

11   that role, that role, the discharging comes from your

12   role as the hospitalist for the group, right?

13   A.   That is correct.

14   Q.   Just like the referral.   If a hospitalist, or a

15   primary care physician is referring a patient to

16   hospice, that is an act that is compensated for by that

17   primary care provider's employer, right?   It's part of

18   their responsibility.

19   A.   Employers, if you are talking in general, don't

20   pay hospitalist to send patients to hospice.   If you're

21   talking about Gonzaba paying a hospitalist to send

22   patients to hospice, they're incentivizing the

23   physician.

24   Q.   Right, they're paying him, right?   Gonzaba is

25   paying for their referral.

1    A.   Gonzaba -- they're incentivizing me to send a

2  patient to hospice to refer it.

3    Q.   That's right.

4    A.   Merida has to -

5    Q.   Time-out, time-out, time-out.  That's what I'm

6  asking, I want to make sure.  The referral for the act

7  of referring, that's paid for by the Gonzaba Group,

8  right?

9    A.   Not --

10   Q.   Yes or no, sir, yes or no?

11   A.   Let me explain.

12   Q.   No, sir.  It's a -- it is a --

13   A.   No, no.

14   Q.   You're --

15   A.   You're not letting me explain.

16   Q.   I'm entitled to a straight answer here.

17   A.   Then re-ask that question, please.

18   Q.   Sure.  When they're making the referral,

19  they're -- when a primary care physician within the

20  Gonzaba Group is making a referral to hospice, he's

21  doing so under his responsibilities and hat as an

22  employee of Gonzaba?

23   A.   That is correct.

24   Q.   And getting paid for it by Gonzaba?

25   A.   I guess indirectly through the bonus structure,

1    yes.

2        Q.   Now, you also -- in addition to being a medical

3    director with the Merida Group, with Bee Caring, after

4    Bee Caring shut down, was that the last medical

5    directorship hospice that you had?

6        A.   No, actually I went to work for Bee First and

7    they were paying me $5,000 a month to refer patients,

8    and since I stopped referring patients, Marcus from Bee

9    First came down to Laredo to the Starbucks and told

10   me --

11       Q.   Sir, what I'm asking you is, isn't it true that

12   you went to work for Altus Hospice and CIMA Hospice as

13   their medical director after you worked for Rodney?

14       A.   I went to work for Bee First first and then to

15   CIMA and then to Altus.

16       Q.   That's what I just said, I just said after.

17   After -- stop, all right, let me -- I don't know if I

18   can do any better.

19            After Bee Caring, you were medical director at

20   two other hospices, right?  Yes or no?

21       A.   Bee -- Bee Caring is different than Bee First,

22   they're two separate entities.

23       Q.   Whatever, Mesquias, after Mesquias' entity shut

24   down, you went to go work for two other hospice groups?

25       A.   I was with Bee First working, and then I went to

1    work for CIMA.

2        Q.   Sir, I'm not asking about -- I'm asking you,

3    after -- after your employment from the hospices with

4    Rodney, you were employed with Altus and CIMA, correct?

5        A.   That is correct.

6        Q.   Thank you.  And Altus and CIMA -- Altus is one of

7    the largest hospice companies in the State, right?

8        A.   They have several locations throughout the State.

9        Q.   All right.  My question to you was:  Do you know,

10   sir, you know, whether or not Altus is one of the

11   largest hospice companies in the State?

12       A.   I know they're a substantial size.

13       Q.   And CIMA also, right?

14       A.   Yes.

15       Q.   And where were those located, Al -- first with

16   Altus, where was Altus located?

17       A.   San Antonio, Corpus Christi, Laredo and Houston.

18       Q.   And you had written contracts, medical director

19   agreements, with Altus and CIMA; did you not?

20       A.   With CIMA, yes.  I don't recall with Altus.

21       Q.   All right.  And with CIMA, right, that's the one

22   you recall right now was CIMA, you had a written

23   agreement, right?

24       A.   Yes.

25       Q.   That you signed.  And they were going to pay you

1    $7,500 a month, right?

2       A.   No, I believe we stated 250 an hour.

3       Q.   Up to a maximum of $7,500 a month, right?

4       A.   No, I don't recall that.

5       Q.   All right.  And do you recall, sir, a contract

6    with Altus?

7       A.   No, I don't.

8       Q.   All right.  And --

9              MR. HECTOR CANALES:  May I approach,

10   Your Honor?

11             THE COURT:  You may.

12      Q.   (By Mr. Hector Canales)  Just to refresh your

13   memory here.

14      A.   Yes, it is.  I think you passed it.  That is my

15   signature.  And, yes, it is 7,500 per month.

16      Q.   All right.  And that's with Altus?

17      A.   No, that's with CIMA.

18      Q.   CIMA.

19      A.   That's an electronic signature, $250 per hour,

20   for the amount of $250 per visit.

21      Q.   All right.  So you have -- so does this refresh

22   your memory, sir, that you had contracts with Altus and

23   CIMA?

24      A.   Yes.

25      Q.   All right.  For medical directorship?

1     A.   That is correct.

2     Q.   All right.  And this all occurred after the fact?

3     A.   That is correct.

4     Q.   And that with Altus, sir, that you had $250 an

5  hour, not to exceed ten hours per month, and then you

6  had a separate fee for face-to-faces of $250 per visit?

7     A.   That is correct.

8     Q.   That's correct, okay.

9          Those were the market rates, the $250 an hour,

10  $7,500 a month, those were the market rates?

11     A.   Well, the $250 per hour.

12     Q.   Right, but one of them has $7,500 a month.

13     A.   Up to, correct.

14     Q.   Were you committing fraud at Altus and CIMA?

15     A.   No, I was not.

16     Q.   Did they pay you?

17     A.   They did.

18     Q.   Did you refer patients there?

19     A.   I did.

20     Q.   I thought you said earlier on, sir, that if you

21  referred a patient over to a hospice and they paid you

22  back for it, that that was some sort of illegal

23  remuneration is the word you used?

24     A.   Here's --

25     Q.   Sir, sir, is that --

1    A.   With Gonzaba.

2    Q.   Was it illegal -- was it illegal when Altus and

3  CIMA paid you for patients that you referred?

4    A.   Yes, basically it's the medical directorship is a

5  stipend, I was thinking of the Gonzaba relationship.

6    Q.   So Altus and CIMA, these agreements here from

7  your perspective, this is also health care fraud?

8    A.   That is correct.

9    Q.   All right.  And did you tell the Government that?

10   A.   No, it was never brought up and, no, I didn't --

11   Q.   So if they don't ask, you're not saying?

12   A.   No, it just didn't cross my mind.

13   Q.   Oh, it didn't?

14   A.   No, because the Merida was mostly managed care

15  fraud which is pretty -- I mean, the numbers were just

16  high.  And this is just a fee for service Medicare, one,

17  two patients every month, whereas with Gonzaba and

18  Merida it was eight to ten patients every other day.

19   Q.   So one to two is all right, that's -- that's -

20  and where is that in the rules, sir?  What -- what rule

21  or law are you referring to that one or two is okay,

22  eight to ten is a time problem, what --  what -- what

23  rule are you referring to?

24   A.   It's not okay, but the Merida Group, Gonzaba left

25  a significant impression.

1    Q.   All right.  Let me show you what has been marked

2   and admitted as Defense Exhibit -- Defendant Exhibit

3   RM-8.  This is a medical director agreement between you

4   and Bee Caring Hospice, correct?

5    A.   That is correct.

6    Q.   All right.  And it's dated what?

7    A.   November the 1st, 2011.

8    Q.   All right.  And the compensation there under this

9   agreement is the same amount of compensation that Altus

10  and CIMA agreed to pay you, correct, the $250 an hour?

11   A.   That is correct.

12   Q.   And it was for a year, right, to be renewed

13  automatically?

14   A.   Yes, sir.

15   Q.   And you signed it?

16   A.   That is correct.

17   Q.   The Government showed you -- this is M-7, a check

18  for $12,200, correct?

19   A.   That is correct.

20   Q.   Government -- Defendant's Exhibits RM-17 is a

21  check stub for the same check in the same amount,

22  agreed?

23   A.   Yes, sir.

24   Q.   Second page of the exhibit is an invoice you

25  created, right?

1     A.   That would be created by the Merida staff and I

2  would sign.

3     Q.   All right.  So along -- you created -- you sent

4  in an invoice for 61 face-to-faces, right?

5     A.   May I please see that signature?

6     Q.   My question to you is 61 face-to-faces, right?

7     A.   Correct.

8     Q.   At $200?

9     A.   Correct.

10     Q.   Equals the amount of the check, right?

11     A.   That is correct.

12     Q.   Government H-8 was shown to you, a check for

13  $8,800, Bee Caring Hospice, right?

14     A.   That is correct.

15     Q.   This is the same company that you had your

16  medical director contract with, right, Bee Caring

17  Hospice?

18     A.   That is correct.

19     Q.   I show you what's exhibit -- Defense Exhibit

20  RM-16, same check stub, right?  Same check, same amount?

21     A.   That is correct.

22     Q.   Again, the invoice, 44 face-to-faces at $200

23  equals the amount of the check, right?

24     A.   That is correct, that invoice was not created by

25  me.

1    Q.   Next page of the invoice actually lists the

2    actual face-to-faces; does it not?

3    A.   Yes, it does.

4    Q.   That all add up to the $8,800?

5    A.   Yes, but sometimes I would not actually see the

6    patients and would just sit down and write the

7    face-to-faces and hand them to Rosie so she could then,

8    basically, submit them for that invoicing.

9    Q.   And that's something in your -- that you would

10   conceal, you would conceal from Merida that -- that if

11   you made a false invoice that you didn't actually go see

12   them?  You kept that to yourself?

13   A.   No, Rosie Avila was aware, Roland Aguilera was

14   aware.

15   Q.   Because everybody, everybody's just like you,

16   right?

17   A.   Everybody was with the same game plan.

18   Q.   And since everybody's with the same game plan,

19   according to you, any -- any record I put up, any

20   medical record I put up, any business record I put up,

21   your answer is going to be same, they were in on it,

22   too, right?

23   A.   I would just question the credibility of any

24   documentation.

25   Q.   Exactly.  Any document I put up you're going to

1  have the same answer to it where you're going to

2  question the credibility of it, right?

3     A.   Absolutely.

4     Q.   Absolutely.  Because that's what -- that's how

5  you're going to help spend less time in jail?

6     A.   No, I'm just being truthful.

7     Q.   Over this period of time, how many of these

8  Merida nurses, staff did you talk to?

9     A.   None.

10    Q.   If any?

11    A.   While reviewing this?

12    Q.   Yeah.  How many -- how many, what's the answer?

13    A.   Repeat the question, please?

14    Q.   How many did you talk to since Saturday?

15    A.   To no one.

16    Q.   Did you get through all the records?

17    A.   Every single page.

18    Q.   Every single --

19    A.   That was provided to me I went through it.

20    Q.   All right.  And so did you confirm with any of

21  these -- any -- and how many -- how many nurses were

22  involved in all those medical records?

23    A.   There was Antonio Guerrero, there was Ms. Amy

24  Cooley, Roland Aguilera.

25    Q.   Numbers-wise, numbers-wise, how many, dozens?

1    A.   Over -- over ten.

2    Q.   Over ten?

3    A.   Yes, sir.

4    Q.   More than 20?

5    A.   I don't know.

6    Q.   Well, you looked.

7    A.   I looked.

8    Q.   And -- and did you -- so you didn't talk to

9    anybody, so you couldn't confirm with them one way or

10   the other, get their side of it?

11   A.   I worked with Antonio Guerrero very closely and

12   Roland Aguilera very closely.

13   Q.   How about Janina Gonzales, do you remember that

14   name?

15   A.   Repeat it, please.

16   Q.   Janina, remember Janina?

17   A.   No, sir.  Do you have a picture?

18   Q.   If Janina said that everything she did was

19   honest, you would disagree with her?

20   A.   I will question the circumstances.

21   Q.   Does that mean you disagree with her, or would

22   you -- would you take her testimony under oath that what

23   she did was honest?

24   A.   I would question the circumstances at the moment.

25   Q.   If a doctor said that he resisted any pressure,

1    that he never succumbed to any pressure, would you take

2    that doctor's word for it?

3        A.   I would, again, question it under what

4    circumstances.

5        Q.   Let's shift to some of these patients.  Calvillo,

6    Teresa Calvillo, this is Government Exhibit H-30; this

7    is my handwriting to be clear, okay?

8            That period right there from November 6th to --

9    of '13 to February 3rd of '14, that's a 90-day period,

10   would you agree?

11       A.   What's the question?

12       Q.   That's a 90-day span of time?

13       A.   I'll take your word for it.

14       Q.   I don't want you to.  Is it not 90 days or not?

15       A.   It appears to be.

16       Q.   All right.  Why is 90 days -- what significance

17   does the 90-day certification period have in the hospice

18   world?

19       A.   90 days of revenue.

20       Q.   It doesn't mean -- tell you whether it's the

21   first or second or third certification period for a

22   particular patient?

23       A.   No, that I did not know.  I would just look at

24   the top header where they would write it whether it was

25   the first, second or third, or 12th, or 15th.

1      Q.  Well, sir, don't you know that there are certain

2  rules and regulations that differ depending on the

3  certification period?

4      A.  No, I do not.

5      Q.  Do you know when a face-to-face is needed and not

6  needed?

7      A.  For the recertifications.

8      Q.  Right.  But for -- it's for -- a face-to-face is

9  required only for recertifications for the third

10  certification period and on, right?

11      A.  No, that I don't know.

12      Q.  So let me show you here Government Exhibit A-31.

13  This is a portion of the Medicare claims processing

14  manual.  Hospice care is available for two 90-day

15  periods, and an unlimited number of 60-day periods

16  during the remainder of the hospice patient's lifetime.

17  Did you know that or was that new to you today?

18      A.  For a qualifying admitting diagnosis.

19      Q.  Yes, sir, yeah, but how -- the two 90-day periods

20  and unlimited 60 days after for a qualified, did you

21  know that, or is this new for you today?

22      A.  It is new.

23      Q.  Now, this is -- this is a prescription, an order,

24  right?

25      A.  Correct.

1     Q.   For who?

2     A.   It is for Teresa Calvillo.

3     Q.   When?

4     A.   08/05, 2013.

5     Q.   Right.  That's the initial, or the first period,

6     the first 90 days for Ms. Calvillo, correct?

7     A.   It's to evaluate.

8     Q.   Is that it, is it just to evaluate?

9     A.   And then Merida and the staff --

10    Q.   Sir, is there a reason why you won't say the next

11    word?

12    A.   Please do hospice evaluations and admission.

13    Q.   Okay.  All right.  And so somebody from the

14    Gonzaba Group here on August the 5th of '13 is trying

15    to -- is -- is -- is ordering the evaluation and

16    admission for hospice of Calvillo, that's what it says

17    there, right?

18    A.   (No response.)

19    Q.   That's what it says?

20    A.   Yes, it does.

21    Q.   Okay.  And so somebody at the Gonzaba Group, some

22    doctor, right?

23    A.   That is correct.

24    Q.   You had a disagreement with this doctor?  I take

25    it -- I take it by your testimony today --

1      A.   I do.

2      Q.   -- you have a difference of opinion with this

3  doctor?

4      A.   Yes, I do.

5      Q.   Has another doctor ever had a different opinion

6  than you?

7      A.   Absolutely.

8      Q.   Is it possible for two doctors to have two

9  different opinions and they both be true?

10     A.   It depends on their circumstances.

11     Q.   There are circumstances where it could be true,

12  right?

13     A.   Correct.

14     Q.   They could both be right?

15     A.   Correct.

16     Q.   Now, here's a medical record of Ms. Calvillo's,

17  exhibit, Ms. Calvillo is -- this is out of Government

18  Exhibit D-1 from the Gonzaba Medical Group.

19          So this is a medical record from Ms. Calvillo's

20  primary care provider, correct?

21     A.   Correct.

22     Q.   And it is a -- assessing her problems, right?

23     A.   That is correct.

24     Q.   Problem number four is pulmonary hypertension,

25  correct?

```
 1      A.   That is correct.

 2      Q.   Problem number five is emphysema, correct?

 3      A.   Correct.

 4      Q.   Those pulmonary emphasis are both revolving,

 5  centering around the respiratory system, correct?

 6      A.   Correct.

 7      Q.   She has a problem with colostomy, see that,

 8  what's colostomy?

 9      A.   It's a bag -- when you have colon surgery it's,

10  rather than defecating through your anus, it basically

11  defecates into the bag.

12      Q.   So she's got -- and did you -- when you were

13  shown all these records, were they just Merida records,

14  or were they primary care physician records, too?

15      A.   Everything that was available in the boxes.

16      Q.   Okay.  Well, that wasn't my question, right?

17           Did they show you primary care physician records

18  or just Merida records?

19      A.   Both.

20      Q.   Both.  Okay.  And so Ms. Calvillo has the -- the

21  bag?

22      A.   Correct.

23      Q.   Okay.  And problem eight there is chronic

24  obstructive asthma, right?

25      A.   Correct.
```

1    Q.   And that chronic obstructive asthma is causing,

2  according to the primary care physician, chronic

3  obstructive pulmonary disease changes, correct?

4    A.   That is correct.

5    Q.   Which is what you said she was on service for,

6  COPD, right?

7    A.   Well, for a hospice --

8    Q.   Sir, that's what you said she was on for COPD,

9  right?

10    A.   With the meaning for terminal COPD.

11    Q.   All right.  I don't -- it doesn't say -- you just

12  say on service for COPD, that's what your handwriting

13  says, right?

14    A.   That is correct.

15    Q.   Right, okay.

16         And this was done by Dr. Arizaca, who you

17  disagree with, you have a difference of opinion with

18  Dr. Arizaca, correct?

19    A.   That is correct.

20    Q.   All right.  But she wrote this note on 07/28 of

21  '13, correct?

22    A.   That is correct.

23    Q.   Prior to the certification period here?

24    A.   That is correct.

25    Q.   The initial certification period, the first 90

1    days, you remember there's -- you learned today that

2    there's two 90-day periods, right?

3        A.   That is correct.

4        Q.   Right.  So we just saw the -- the one that you

5    certified was the first -- was the second 90-day period,

6    this November to February, correct?

7        A.   Correct.

8        Q.   But the first certification period for -- for Ms.

9    Calvillo, which begins with -- it starts on 08/08,

10   right?

11       A.   Correct.

12       Q.   Which starts with this evaluation?

13       A.   That is correct.

14       Q.   And that's not you?

15       A.   No, it is not.

16       Q.   Some other doctor?

17       A.   That is correct.

18       Q.   And so the first certification period here of 90

19   days was certified by Greg Gonzaba?

20       A.   That is correct.

21       Q.   You signed it here, but you're not certifying it,

22   Dr. Gonzaba is certifying it, correct?

23       A.   That is correct.

24       Q.   And again, you're disagreeing, now you've got a

25   disagreement with a second doctor, Dr. Gonzaba?

1     A.   That is correct.

2     Q.   So we have three opinions, two for and one

3  against?

4     A.   Correct.

5     Q.   All right.  How about Dr. Padilla?  Have you

6  heard of Dr. Padilla with a -- as it relates to the

7  Gonzaba Medical Group?

8     A.   He was my boss and we interacted on a daily basis

9  Monday through Friday discussing the hospital patients.

10     Q.   I -- I guess, too, since he's around you that he

11  must be a crook, too?

12     A.   Yes, he is.  He would guide me, send that one to

13  hospice, send him to your hospice, emphasis on your

14  hospice.

15     Q.   Everybody's a crook around you, right?

16     A.   Everybody was doing what needed to be done to get

17  patients that did not qualify for hospice into hospice.

18  Ms. Calvillo had a fracture as you noticed on the

19  diagnosis.

20     Q.   Sir, I haven't asked -- sir, let me give -- all

21  right.  Here Dr. -- here we're talking about Teresa

22  Calvillo again, and this note indicates that new --

23  Dr. Padilla ordered new hospice to Generations, right?

24     A.   That is correct.

25     Q.   And then we've got Ms. Calvillo with a terminal

1   diagnosis of what, COPD, right?

2       A.   That is correct.

3       Q.   And there's a certification, again, by who?

4       A.   Patricia Arizaca.

5       Q.   Again, you disagree?

6       A.   Yes, who is -- COPD does not equal hospice.

7       Q.   And Generations, Generations Hospice, they're one

8   too, are they crooks too?

9       A.   Dr. Jose Cisneros as the medical director, yes,

10  he was previously investigated for health care fraud

11  involving hospice.

12      Q.   All right.  And what about San Antonio Inspire?

13      A.   I believe that was --

14      Q.   Are they crooks, too?

15      A.   Yes, they were owned by Dr. Justos Cisneros.

16      Q.   So therefore, whoever that is, he's a crook to?

17      A.   He got investigated in the past by the Justice

18  Department for hospice fraud and he's a very close

19  friend of Dr. Bill Gonzaba and David Padilla.

20      Q.   Everybody, okay.  All right.

21           Sir, hospice certification is not based on

22  somebody's being homebound; is it?

23      A.   That is correct.

24      Q.   Homebound is for home health eligibility, right?

25      A.   Well, yes and no.

1    Q.   All right.  Well, just -- here's my question:

2   Are you familiar with the kids with like Make-A-Wish?

3    A.   No, sir.

4    Q.   You never heard of the Make-A-Wish Foundation,

5   you see those kids who have a -- who have a last wish

6   that they're terminal and they have -- they have a dream

7   and --

8    A.   Right.  I've heard of the Make-A-Wish, but I did

9   not know that it was hospice.

10    Q.   I didn't say it was, I just asked you if you were

11   familiar with Make-A-Wish?

12    A.   Okay, I've heard about it.

13    Q.   Okay.  And those kids, generally, they're dying,

14   they're terminal, right?

15    A.   That's what they state on the television, yes.

16    Q.   Right.  Right.  And you've seen those kids out

17   at, you know, fulfilling their dreams, maybe at a -- at

18   the World Series or something, right?

19    A.   That is correct.

20    Q.   The fact that somebody is in -- is dying, right,

21   is terminal doesn't mean that they can't be doing some

22   things that would otherwise be normal life activities;

23   does it?

24    A.   I guess it depends on the circumstances.

25    Q.   Right.  They're -- they're not -- but those kids,

```
 1    I mean, there's no doubt in your mind that they're --

 2    they're dying, but yet even though you're dying you can

 3    still go out and about?

 4        A.   Clinically we're not dying, but we're not on

 5    hospice.

 6        Q.   Do you think that was a direct answer to my

 7    question?

 8        A.   No, sir.

 9        Q.   Why aren't you giving me direct answers?

10        A.   Because I took care of children at Christus Santa

11    Rosa Hospice and those children were in an inpatient

12    hospice facility.

13        Q.   Sir, so why aren't you being direct?  Do you

14    think that helps you with the Government to not be

15    direct?  Does that help you?  You feel like you're

16    helping them, you're living up to your deal by not

17    answering direct questions by your own admission?

18        A.   No, I'm just clarifying the question.

19        Q.   Oh, okay, so you're doing it for my benefit,

20    everybody's benefit.  You're being indirect, not being

21    straight-up for everybody's benefit here?

22        A.   No, for the jury.

23        Q.   Because you're here to help, right?

24        A.   To clarify things.

25        Q.   What's his name?
```

1      A.   I just forgot.

2      Q.   Do you recognize him though?

3      A.   Yes, sir.

4      Q.   Remember his name now?

5      A.   Yes, sir.  Mr. Castaneda.

6      Q.   Uh-huh.  Certification period at issue here is

7  from June 3rd to August; you see that?

8      A.   Yes, sir.

9      Q.   How long is that?

10     A.   60 days.

11     Q.   Uh-huh.  So what's that tell you, is it -- is it

12  beyond the first or second period?

13     A.   Beyond the second.

14     Q.   Okay.  And you -- the diagnosis of CHF, right?

15     A.   That is correct.

16     Q.   And you went through a long here deal with how

17  CHF, they didn't have CHF, right?

18     A.   That is correct.

19     Q.   Do you know a Dr. Noah Greene?

20     A.   Yes, a cardiologist for WellMed.

21     Q.   Is he a crook, too?

22     A.   I don't know him personally.

23     Q.   Well, so, is he a crook, do you know?

24     A.   I don't know.

25     Q.   Do have you any reason to think he was in on it,

1    too?

2        A.   I don't know anything about him.

3        Q.   You what?

4        A.   I don't know anything about him.

5        Q.   Do you know Noah Greene did an assessment?

6        A.   Yes, he did, preoperative with the fistula

7    placement.

8        Q.   Do you remember what his conclusion was of the

9    heart?

10       A.   Yes.  He said that he may have had a heart attack

11   in the past, and then on the cardiac echo, or on the --

12   there's a -- there's no diagnosis of CHF, you just

13   see chronic kidney disease, diabetes mellitus, coronary

14   disease, cardiovascular disease.

15       Q.   He has heart some problems though, right?

16       A.   But no CHF that's documented.

17       Q.   Unless this surgery is urgent, would recommend

18   the following prior.  He's saying unless you've got to

19   do it, go another route, right?

20       A.   That is correct.

21       Q.   Coronary artery disease, correct?

22       A.   Correct.

23       Q.   CVA, what's CVA stand for?

24       A.   Cervical vascular accident, stroke.

25       Q.   Stroke.  Right.

1        Here's a record from the Baptist Health System.

2   08/07/13, you see that?

3       A.  Yes, I do.

4       Q.  Prior to that date, right?

5       A.  Yes, it is.

6       Q.  Mr. Castaneda, you see that?

7       A.  Yes, I do.

8       Q.  Is there a diagnosis for congestive heart

9   failure?

10      A.  Yes, there is.

11      Q.  That's inconsistent with what you said this

12  morning, right, that there was no congestive -- no

13  diagnosis for congestive heart failure?

14      A.  That was inconsistent with Dr. Fiala's note and

15  Dr. Greene's note and Dr. Arizaca's note.

16      Q.  But there is it?

17      A.  That is correct.

18      Q.  Is the Baptist Health System, are they corrupt,

19  are they crooked, too?

20      A.  No, but they have a data entry personnel who may

21  not be medically inclined.

22      Q.  But you're just guessing now, aren't you?

23      A.  Yes, I am.

24      Q.  Now, you're just substan- -- now, you're just

25  trying to help.

1     We've shown you something inconsistent and your

2  instinct is to -- sir, and your instinct is to come and

3  support the Government's theory, right, that's what --

4  that's what your instinct was?

5     A.   I'm explaining who the data entry is.

6     Q.   Right, so that -- so that -- because it helps you

7  get what you want?

8     A.   No.

9     Q.   It's in your interest to explain, right?

10    A.   It clarifies the confusion that you're trying to

11 create with that diagnosis.

12    Q.   I'm trying to create confusion?

13    A.   Yes, you have three physicians that do not have

14 CHF listed in their notes.

15    Q.   Okay.  So everybody is wrong but you the

16 deceitful liar, right?

17    A.   No, Dr. Fiala because she does not list CHF,

18 Dr. Greene is correct, the cardiologist, the specialist

19 because he does not list CHF.  So we have the two

20 specialists of the heart saying no CHF.  I'm doing the

21 opposite, I'm saying she has CHF.

22    Q.   How about Bill Gonzaba, Bill Gonzaba another

23 crook?

24    A.   It was part of the initial meeting between me,

25 Rodney Mesquias and Greg Gonzaba.

1      Q.   William T. Gonzaba?

2      A.   That's Greg's brother.

3      Q.   Right, he's part of it too.  So, I don't know,

4   let's hear it, is he a crook, too?

5      A.   Yes, he will benefit from the bonus checks.

6      Q.   So anybody who benefited from those bonus checks

7   was a crook in your mind?

8      A.   Because every Thursday afternoon --

9      Q.   Sir, I'm just asking you is that true, is that

10   your position?

11      A.   Yes.

12      Q.   All right.  And so did you know that Bill,

13   William T. Gonzaba, was the primary care physician for

14   Mr. Castaneda?  Did you know that?

15      A.   I believe I saw somewhere in there that it was

16   mostly Patricia Arizaca, and but Dr. Gonzaba was the one

17   that sent the initial referral.

18      Q.   Let me ask you, did they give you any hints about

19   where to go look?  In other words, say, hey, here I want

20   you to -- I want you to look at this?

21      A.   That was the box.  Here's the box.

22      Q.   Right.  And so they came in and they gave you the

23   box and they just gave you a blank stare and you knew

24   what to do?

25      A.   Find anything that's, you know, inconsistent, not

1    truthful and anything that you did wrong.

2       Q.  And did you find this document?

3       A.  No, I believe I did not see that one.

4       Q.  Did you see that -- I'm going to start at the

5    back here so we -- so we get the date.

6           Did you see that on February the 18th of '14

7    with -- with Mr. Castaneda, which is four months before

8    the Government's date up here, that Mr. -- that

9    Dr. Gonzaba, what's he do?

10      A.  He's stating, I recommend you consider hospice

11   services, hospice services are free for appropriate

12   patients such as you.

13      Q.  We got another doctor you disagree with, right?

14      A.  That is correct.

15      Q.  What does he say he had -- what type of

16   discussion has Dr. Bill Gonzaba had with Mr. Castaneda?

17      A.  He's documenting that he had -- that he had

18   advanced directive -- or that he is actually documenting

19   that there is an advanced directive on file, and that --

20   and end of life discussion has occurred.

21      Q.  Did you find out, sir, did you, in your review in

22   those four days and dozens and dozens of hours, did you

23   see the history with Dr. Gonzaba and Mr. Castaneda over

24   a four, almost six-month period leading up to where he

25   is slowly telling him, finally leading up to, hey,

1    you're dying, get your affairs in order, and I recommend

2    you go to hospice?  Did you come across that in all

3    those hours?

4        A.   No, the reason he was placed on hospice was to

5    not pay for dialysis.

6        Q.   Sir, my question to you again, sir --

7                 MR. HECTOR CANALES:  Judge, will you please

8    instruct the witness to carefully listen to my question

9    and answer my questions directly.  I'm on a time limit

10   here.

11                THE COURT:  Please listen to the question

12   and answer the question.

13       Q.   (By Mr. Hector Canales)  Did you find these

14   documents, sir?  Did you find them?

15       A.   No, some of them I did not.

16       Q.   Why not?

17       A.   They weren't in the --

18       Q.   Did you need more time?

19       A.   No, they weren't in the box.

20       Q.   Oh, they weren't.  These weren't in the box that

21   they gave you?

22       A.   I don't recall the one by Tom Gonzaba or the

23   advance directive one, no.

24       Q.   Okay.  Fair enough.  They didn't give them to

25   you.

1           Did you find this one, another referral?

2      A.   Yes, I did.

3      Q.   Well, you recognized that one.  Do you remember

4  this one that quick?  Remember that one?

5      A.   No, I'm sorry, I didn't see the -- I saw one by

6  Patricia Arizaca, I did not see the New Century Hospice,

7  no, I did not, sir.

8      Q.   All right.  This is another one you did not see?

9      A.   That is correct.

10     Q.   And it's a referral to hospice, right?

11     A.   That is correct.

12     Q.   On 10/14?

13     A.   That is correct.

14     Q.   Now, New Century, that's not Rodney?

15     A.   No, it's not.

16     Q.   We all remember Ms. Conti?

17     A.   Yes.

18     Q.   She's pretty memorable, right?

19     A.   Yes.

20     Q.   Okay.  December of '14, Dr. Gonzaba says,

21  pulmonary fibrosis, right?

22     A.   Well, Dr. Gonzaba signed a note --

23     Q.   Sir, again, I am just asking you to confirm

24  what's on the paper.  I'm not asking for your opinion,

25  your interpretation, I'm just saying that's what it

1    says?

2       A.   It says pulmonary fibrosis.

3       Q.   Right.  And that's -- and that's done by --

4    that's not your signature?

5       A.   That is Greg Gonzaba's signature.

6       Q.   Right, okay.  And your testimony is his pulmonary

7    fibrosis is fake?

8       A.   It was not documented on the CT scan that I saw

9    on the records.

10      Q.   But it is documented here Baptist Health System

11   by Victor Martinez-Soria, right?

12      A.   That is correct.

13      Q.   So I guess he's a crook, too?

14      A.   No, that's --

15      Q.   Or is his real?

16      A.   That's a working diagnosis on admission.

17      Q.   So this is -- but, this one's real, right?

18      A.   It's a working diagnosis on admission.

19      Q.   That makes it -- it's a real working diagnosis?

20      A.   It's a possible working diagnosis.  It only

21   becomes real after he runs his process and you obtain

22   objective data to substantiate that diagnosis.

23      Q.   It just says diagnosis, sir?

24      A.   Right.  It's like when somebody comes in with

25   chest pain.

1   Q.   Does this conflict with your testimony earlier?

2   Is it inconsistent with your testimony or there's no

3   evidence of pulmonary fibrosis?

4   A.   Not on the CAT scan that I reviewed it did not

5   list pulmonary fibrosis.

6   Q.   You didn't -- you didn't -- you must not have

7   seen this either in your review?

8   A.   I -- I saw it and I didn't agree with it because

9   then they did a CAT scan of her lungs and it's clear

10  without fibrosis.

11  Q.   Next page, there it is again, right?  This is on

12  the discharge instructions?

13  A.   That is correct.

14  Q.   There it is, it is says it right?

15  A.   That is correct.

16  Q.   There's an interstitial lung disease, right?

17  A.   That is correct.

18  Q.   I think you said earlier that didn't exist

19  either?

20  A.   Not documented or substantiated by the objective

21  data of the CAT scan.

22  Q.   Morbid obese, that's true, right?

23  A.   Yes, it is.

24  Q.   Oh, yeah, and the primary diagnosis, I missed

25  that one.  Again, pulmonary fibrosis, right?

1      A.   That is correct.

2      Q.   And on -- true or not, sir, on -- on 09/12 of

3   '14, prior to this certification date, about three

4   months, Dr. Montemayor with the Gonzaba Group has a

5   diagnosis with Conti of pulmonary fibrosis?

6      A.   That is correct.

7      Q.   But pulmonary fibrosis is fake in your -- in your

8   opinion?

9      A.   It was not documented on the CAT scan, and it

10   does not equal automatic hospice.

11      Q.   That's your direct answer?

12      A.   Yes, sir.

13      Q.   How about Dr. Gabriel Gonzalez, do you know him?

14      A.   I don't believe I've ever met him.

15      Q.   I -- I just didn't hear you.

16      A.   No, sir, I don't know him.

17      Q.   So you don't know whether he's a crook or not?

18      A.   That is correct.

19      Q.   Would you trust his medical records?

20      A.   No, I wouldn't.

21      Q.   Even though you don't know him?

22      A.   Based on the habitual fraudulent documentation at

23   Merida, if it's Merida documentation of him, no, I

24   wouldn't.

25      Q.   Is he -- does he work for -- so you don't think

1    he's trustworthy?

2        A.  No, I don't.

3        Q.  So if he got up there on the stand, whatever he

4    said, your advice would be don't believe him?

5        A.  No, I'm not saying that, I'm just saying

6    depends -- depending on the circumstances, my trust of

7    him is this much (indicating) based on the --

8        Q.  But you don't know him?

9        A.  Right, but based on the habitual practice of how

10   we ran things at Merida, I wouldn't.

11       Q.  Are you assuming that he works with Merida?

12       A.  I'm assuming that any physician related to Merida

13   has some influence to lie.

14       Q.  And do you know if he was related to Merida or

15   not?

16       A.  No, no, I don't.

17       Q.  But even so, you're going to get up there under

18   oath and say I don't trust this guy?

19       A.  I don't trust any documentation by him under

20   Merida paperwork.

21       Q.  How about you, would you trust you?

22       A.  No, that's why when I was looking at my

23   documentation, I was like, I don't even know what's reel

24   on this note.

25       Q.  You don't even trust yourself, do you?

1    A.   I don't trust my documentation on any Merida

2  paper.

3    Q.   And how about your word, sir?  How about just

4  your integrity and character?  Would be it fair, sir,

5  would it be fair, do you think it would be reasonable

6  for a person to not believe you given -- given your

7  history of deceit and lying?

8    A.   Back then, I was not -- it was one goal was

9  money, make money for everyone, Gonzaba, Merida and

10  basically, you know, I was sleeping six hours and it was

11  just money, money, money, women, women, and Rodney was

12  there with me drinking, womanizing and --

13    Q.   And now, sir, now all we have -- now you're a

14  changed man?

15    A.   I accepted responsibility.

16    Q.   And therefore you've changed?

17    A.   And, yes, I'm happier, thank God, I'm not

18  practicing medicine.

19    Q.   And so and all you have here to do is take your

20  word for it, right?

21    A.   I'm trying to recover the integrity that I lost.

22    Q.   Right.  And -- and, sir, and the only thing we

23  have here is to take your word for it?

24    A.   My truth under oath.

25    Q.   Right.  And that's it, we just got to take your

1    word for it?

2        A.   Under oath, sworn oath to give truthful

3    testimony.

4        Q.   And you took -- and this oath is different -- you

5    take it more seriously than the oaths you've taken in

6    the past, right?  This oath is different?

7        A.   I don't understand your question.

8        Q.   You don't remember my questions about the oaths

9    you've taken in the past?

10       A.   Which ones?

11       Q.   The one to be a doctor?

12       A.   That one I violated, the Hippocratic Oath.

13       Q.   The oath to your family, your wife?

14       A.   I violated my wife's oath just like Rodney did.

15       Q.   It's been a pleasure, sir.  Thank you.

16       A.   Thank you.

17                THE COURT:  All right.  I assume

18   Mr. Cyganiewicz is next, or Mr. Guerra?

19                MR. GUERRA:  I'll let Mr. Cyganiewicz go

20   next, Your Honor.

21                THE COURT:  All right.  Do we need a break

22   before we start up again?

23                POTENTIAL JUROR:  Yes.

24                MR. CYGANIEWICZ:  Yes, Your Honor.

25                THE COURT:  Mr. Cyganiewicz.

 1              MR. CYGANIEWICZ:  Are you talking to me, I'm

 2   sorry.

 3              THE COURT:  Mr. Cyganiewicz, would you like

 4   a break before you start?

 5              MR. CYGANIEWICZ:  I would love a break, Your

 6   Honor.

 7              (JURY OUT.)

 8              (COURT IN SHORT RECESS.)

 9              (JURY IN.)

10              THE COURT:  Thank you, everyone.  Please be

11   seat.

12              Mr. Cyganiewicz, when you're ready.

13              MR. CYGANIEWICZ:  Thank you, Your Honor.

14                      CROSS-EXAMINATION

15   BY MR. CYGANIEWICZ:

16      Q.  Good afternoon, sir.

17      A.  Good afternoon.

18      Q.  I don't think I'm going to take as long as

19   Mr. Canales, and, again, I would ask that if you don't

20   understand my question, please let me know and try to

21   restrict your answers to the questions.  They will a

22   have a chance to come back and rehabilitate you, or

23   question you again.

24      A.  Yes, sir.

25      Q.  Is that okay with you?

1      A.   Yes, sir.

2      Q.   Are you currently in the hospice business?

3      A.   No, sir.

4      Q.   What type of business are you in now?

5      A.   Automotive with my family, a collision center and

6   collision parts.

7      Q.   Of course, you lost your license, correct?

8      A.   Not yet.

9      Q.   No, are you still a doctor or not?

10      A.   I believe so, I haven't received a letter by the

11   Texas Medical Board.

12      Q.   Okay.  Let me --

13      A.   But I don't practice.

14      Q.   Are you -- are you a licensed physician as you

15   sit here this morning, or this afternoon?

16      A.   I don't know.

17      Q.   You don't know?

18      A.   No, sir, I'm not practicing so --

19      Q.   So you haven't been notified by the State or

20   anybody that your license has been revoked, or you just

21   don't know that either?

22      A.   No, I don't know.  I haven't checked my mail in

23   about two weeks.

24      Q.   Okay.  So you want me to call you doctor or

25   mister?  I don't know.

1      A.   No preference.

2      Q.   Did you say earlier that you were familiar with

3  some of the medical regulations regard -- regarding

4  Medicare when you worked for Merida or not?

5      A.   That I was not.

6      Q.   You were not?

7      A.   No, sir.

8      Q.   So you don't know what CMS is or --

9      A.   Well, no, I know CMS, but I did not know, 90, 90,

10  60, 60.

11      Q.   Right.   That's the basic recertification periods

12  you didn't know anything about that?

13      A.   Correct.

14      Q.   You didn't know you had to recertify them after a

15  certain period of time?

16      A.   Well, no, I didn't know specifics regarding

17  multiple 90 days or --

18      Q.   You didn't know the specifics about the time

19  periods?

20      A.   Correct.

21      Q.   You're not telling the jury that six months

22  everything ends?

23      A.   No, I'm not, sir.

24      Q.   It could actually, under the rules it could last

25  indefinitely; could it not?

1    A.   Yes, it just was brought to my attention.

2    Q.   Now you -- now you understand that?

3    A.   Yes, sir.

4    Q.   So you know what CMS is, you know what the joint

5    commission is?

6    A.   Yes, I do.

7    Q.   Does the -- does the joint commissions at times

8    make recommendations about changes in the rules and

9    regulations?

10   A.   Yes, they do.

11   Q.   And how were those changes explained to the

12   people at Merida?

13   A.   That, I don't know.

14   Q.   You would agree that it would be important for

15   everyone to know the changes, correct?

16   A.   Correct.

17   Q.   And you're not aware that there were meetings

18   held about the changes that -- that --

19   A.   No I'm not.

20   Q.   -- everyone has to be more specific in their

21   narratives?  You don't know anything about that?

22   A.   Well, in the clinical narratives they did tell us

23   in the beginning that debility and adult failure to

24   thrive were no longer acceptable diagnoses.

25   Q.   Exactly.  And there were meetings to explain

1    these changes; were there not, or no?

2        A.   Not --

3        Q.   Well, that's all right, you were never in

4    Harlingen, right?

5        A.   No, sir.

6        Q.   All your patients that you dealt with were either

7    in San Antonio, Laredo?

8        A.   And throughout Texas, sometimes they would ask me

9    to go to Houston.

10       Q.   Okay.

11       A.   And to --

12       Q.   Never in Harlingen?

13       A.   Well, I was in Harlingen.

14       Q.   Any patients in Harlingen is what I meant?

15       A.   Physically, no.

16       Q.   And were those changes, do you remember any

17   changes in 2014 or 2015 about the codes being changed

18   and requiring more specificity in the stuff you

19   mentioned, failure to thrive?

20       A.   No, I -- just that diagnoses, the qualifying

21   diagnoses has changed.

22       Q.   You also mentioned something about IDT meetings?

23       A.   Correct.

24       Q.   You're aware of what those are, right?

25       A.   Yes, sir.

1    Q.   Are they the same, or is it also commonly called

2    I -- IDG meetings, or --

3    A.   Interchangeably.

4    Q.   Okay.  And I think you mentioned RNs and the

5    medical, yourself was present, correct, at those

6    meetings?

7    A.   Correct.

8    Q.   Chaplain and a social worker?

9    A.   Correct.

10    Q.   Most of your -- well, actually, you always worked

11    out of the San Antonio office; did you not?

12    A.   Yes, sir.

13    Q.   And who was the administrator there?

14    A.   (No response.)

15    Q.   Or who handled the day-to-day operations there

16    when you were there?

17    A.   In the beginning it was Melissa Ortiz.

18    Q.   Well, let's start at the beginning.

19    A.   Melissa Ortiz.

20    Q.   And did Eddie Zuniga come in at some point?

21    A.   Yes.

22    Q.   You know Eddie, right?

23    A.   Yes, sir.

24    Q.   Okay.  And you know Roland Aguilera, correct?

25    A.   That is correct.

1    Q.   Have you known those gentlemen for a long time?

2    A.   Yes.

3    Q.   Can you tell me how you first met Mr. Aguilera?

4    A.   He was working as a director of nursing at

5    Westover Hills, a school nursing facility, and his

6    marketer David Reyes asked me if I could start using

7    their facility for the WellMed population for the

8    Gonzaba population.  And so, you know, I asked them,

9    well, it depends on your nursing staff.  And so of

10   course he took me to Westover Hills and introduced me to

11   Roland Aguilera and the rest of the nursing staff.

12   Q.   And what -- was he also a friend of yours?

13   A.   He eventually became a friend.  At that moment he

14   was not.

15   Q.   Was he your best man or were you his best man at

16   the wedding?

17   A.   He was my best man.

18   Q.   Is that the -- were you only married --

19   A.   My second marriage -- my second marriage.

20   Q.   You were married twice?

21   A.   Yes, sir.

22   Q.   And I'm assuming you were married when you were

23   having an affair with this 19-year-old?

24   A.   Yes, I was.

25   Q.   In that regard I know there was some sort of

1    discussion with you and Mr. Canales about what's the

2    difference between an agreement and a promise.  Remember

3    that?

4        A.  Yes, sir.

5        Q.  Promises should last forever, is that what you

6    were saying, or what was your distinction?

7        A.  That's the understanding.  A promise is basically

8    fixed, never going to change; an agreement, you know

9    that sometimes you can modify agreements.

10       Q.  So when you took your vows and your wife took

11   your vows about being faithful, and richness or poor, or

12   health, or -- was that -- is that a promise or an

13   agreement?

14       A.  It was a promise.

15       Q.  Okay.  And either way you broke it, whether it

16   was a promise or an agreement, correct?

17       A.  That is correct.

18       Q.  And I think you've said something about you were

19   never a liar, or deceitful, or a cheat, or a crook until

20   you joined Merida; is that what you're trying to tell

21   us?

22       A.  No, no, I never said that.

23       Q.  So when did you first become a crook, a liar and

24   a cheat?

25       A.  Well, crook you're talking about fraud in the

1    business world.

2        Q.   Okay, so you were -- you were committing fraud

3    before you started with Merida?

4        A.   No, no, no.

5        Q.   Okay.  I thought you said that you didn't lie,

6    you weren't dishonest, that all started when you

7    joined --

8        A.   Back then, back then I was a completely different

9    individual.

10       Q.   Back when?

11       A.   Back when I was committing fraud.

12       Q.   With Merida?

13       A.   Back when I was a hospitalist.

14       Q.   With Merida?

15       A.   With Merida.

16       Q.   Okay.  So before that you were -- you were fine?

17       A.   No, no, I wasn't perfect, no.  I was arrogant, I

18   was rude, I was not --

19       Q.   Were you a liar and cheater and dishonest?

20       A.   I was a womanizer, you know, I was --

21       Q.   I guess a womanizer could be a cheater and a

22   liar, correct?

23       A.   No, it's a cheater.

24       Q.   And now you're wanting to tell the jury that

25   those days -- as soon as I left Merida I've been totally

1  truthful, I'm not dishonest, I'm not a cheater --

2      A.  No, no, no as soon as I met agents and outside my

3  attorney's office realized what I had done and the

4  severity and the consequences, that was my, basically,

5  slap in the face and, well, learn from it, accept it.

6      Q.  That's --

7      A.  Move on.

8      Q.  That's when you got arrested and that's when you

9  decided to make a deal?

10     A.  No, I didn't decide to make a deal.

11     Q.  As a matter of fact, didn't you talk to the

12  agents for the first time the day you -- after the --

13  the raid at your house?

14     A.  No, no, I spoke with the -- when the agents came

15  with a search warrant, we had very minimal conversation.

16  They wanted to talk in detail, and I said I couldn't

17  without an attorney present.

18     Q.  Let me -- I'm going to get back to that in a

19  minute, I was losing my track -- my train of thought

20  here on -- San Antonio, you're saying everybody that --

21  I thought you were saying everybody involved with Merida

22  was -- was a crook, the doctors, all those nurses that

23  made notations, everyone was deceitful; is that -- is

24  that true, did you say that or not?

25     A.  I did say that.

1    Q.   And that includes Mr. Zuniga?

2    A.   Yes.

3    Q.   That includes your good friend Mr. Aguilera?

4    A.   Yes.

5    Q.   Have they been charged with anything?

6    A.   I don't know, sir.

7    Q.   You don't talk to them anymore?

8    A.   No, sir.

9    Q.   So did you -- did you ever leave any blank

10   prescription forms signed by you with Mr. Eddie Zuniga?

11   A.   I left it with Ms. Tammy Ortegon.

12   Q.   So you did leave prescription forms that you

13   signed with someone, correct?

14   A.   That's correct.

15   Q.   You're not saying it's Eddie, you're saying it's

16   someone else?

17   A.   Basically, it will be a locked box.

18   Q.   Excuse me?

19   A.   It will be a locked box where we will leave our

20   prescriptions, and sometimes for IDT, you know,

21   basically sign them, pass them over to the nursing

22   staff; or, if there was going to be a preplanned

23   admission coming in, I would leave pre-signed

24   certificates.

25   Q.   So you left those -- you didn't leave them with

1    Eddie?

2        A.   I don't recall.

3        Q.   Was Mr. -- are you being investigated by the

4    pharmacy board because of that, or were you

5    investigated?

6        A.   Um --

7        Q.   Was that some mail you didn't receive yet or

8    didn't check your mail?

9        A.   I haven't received any notification.

10       Q.   Excuse me?

11       A.   I haven't received any notification.

12       Q.   You're not under investigation by the Texas

13   Pharmacy Board?

14       A.   Not that I'm aware of.

15       Q.   Did you also leave those blank prescription forms

16   for Mr. Aguilar, or is it Aguilera?

17       A.   Aguilera.

18       Q.   Excuse me.  You also left some for him?

19       A.   Yes, sir.

20       Q.   And that also didn't lead to any type of pharmacy

21   board review or discipline?

22       A.   Well, there was one nurse --

23       Q.   I'm talking about you.  Are you under any

24   investigation; you're telling us that you're not?

25       A.   Not that I know of.  I'm under investigation by

1    the Texas Medical Board for the Merida, you know, pain

2    cream.

3        Q.   And that's the -- that's the case you plead

4    guilty to?

5        A.   That is correct, sir.

6        Q.   And that's the case you've agreed to cooperate

7    with the Government on, that's part of your -- I mean, I

8    know Mr. Canales spent a lot of time and made some good

9    points about the deal, but you basically want to make

10   sure these people here to my right are happy, correct?

11       A.   No, no, I just want to make sure that everybody

12   understands that it's not just me.  I accept

13   responsibility, I took responsibility and I've moved on.

14       Q.   Have you accepted responsibility for this

15   indictment that's going to be dismissed?

16       A.   I didn't know -- I was not aware it was going to

17   be dismissed.

18       Q.   You're not aware of that -- you lawyer didn't say

19   part of the deal is all these charges will get

20   dismissed, he didn't tell you that?

21       A.   No, sir.

22       Q.   Is that a letter that maybe he wrote that you're

23   still waiting on in the mailbox?

24       A.   Possibly.

25       Q.   It's possible?

1      A.   Possible, I don't check my mail.

2      Q.   Did the San Antonio office also have a director

3   of nurses?

4      A.   Yes, they did.

5      Q.   And, of course, Mr. Zuniga was the administrator,

6   correct?

7      A.   That is correct.

8      Q.   And he was there on a day-to-day basis pretty

9   much?

10      A.   Yes, sir.

11      Q.   And so were you pretty much?

12      A.   Towards the end I was.

13      Q.   When -- let me go over the timeline as to when --

14   when did you start working for Merida?

15      A.   Back around 2011.

16      Q.   And who introduced you to them?

17      A.   Mr. John Rivas.

18      Q.   That was 2011?

19      A.   Then, I guess, yes.

20      Q.   And were you -- is that -- when you started, were

21   you working with the hospice side of it?

22      A.   That's correct.

23      Q.   And did you work on the hospice side until, what,

24   2017?

25      A.   Well, no, no, I was also working on the home

health care side.

Q.   How long -- when did you leave Merida?

A.   I will say 2017.

Q.   That was before your arrest or right after your arrest, or right after the raid?

A.   I'll say a little bit after the raid.

Q.   And how long -- how much -- were you arrested the day of your raid?

A.   No, sir.

Q.   How much longer after that were you arrested?

A.   I don't recall.

Q.   And you haven't spent in time in jail?

A.   Just that one day.

Q.   And you talked to the -- to the agents that same night, or that same day of your raid, and you're saying it was informal but they showed you -- played some tapes with you, right?

A.   That's correct.

Q.   And did you --

A.   But --

Q.   Did you call your lawyer when they came?

A.   No, no, they had my phone so they were analyzing it.

Q.   Okay.

A.   Afterwards, I called my --

1     Q.   Have you seen any results of -- I mean, they have

2   all kinds of forensic computer people that could check

3   everything, right?

4     A.   Correct.

5     Q.   Have -- have you been notified of anything they

6   found?

7     A.   No, sir.

8     Q.   They took your computers?

9     A.   Well, a computer MacBook and a server I had up on

10   the second floor.

11    Q.   Did they check your bank records?

12    A.   I don't know, sir.

13    Q.   And to this day, as you sit here, you still --

14   they still have this over you, right, you haven't been

15   sentenced?

16    A.   That is correct.

17    Q.   And they're waiting for you to see what happens

18   here, correct?  You don't know that?

19    A.   No, sir.

20    Q.   You don't know that?  Why would you think that if

21   you've agreed to cooperate that they would -- why

22   would -- why would they want to wait until after your

23   testimony?

24    A.   That, I don't know.

25    Q.   Okay.  To see if you agree with their narrative;

1    isn't it?  I mean, isn't that pretty obvious?

2        A.   That's speculation.

3        Q.   You want to make them happy.

4        A.   That's speculation.

5        Q.   That's speculation?  Is assuming that everyone

6    involved in Merida is fraud is -- that's not

7    speculation?

8        A.   That's my common knowledge.

9        Q.   That's your common knowledge?

10       A.   Being at Merida most of the day --

11       Q.   Assuming things is your common knowledge?

12       A.   Because I was there most of the day.

13       Q.   You're not going to agree that your sentencing

14   really depends on the story you tell today?

15       A.   Not really.

16       Q.   Mr. McInnis wasn't the owner of Merida; was he?

17       A.   I don't know, I wasn't the owner, supposedly, but

18   I was.

19       Q.   Was he a doctor or a nurse?

20       A.   No, he was not.

21       Q.   Did he certify patients?

22       A.   No.

23       Q.   Recertify patients?

24       A.   No, sir.

25       Q.   Admit patients?

1      A.   No, sir.

2      Q.   Discharge patients?

3      A.   No, sir.

4      Q.   He was trying to build up a census, right, that's

5  the amount of patients you have?

6      A.   That is correct.

7      Q.   Isn't that what every business is supposed to do,

8  more customers?

9      A.   That is correct.

10     Q.   He never gave you any money; did he?

11     A.   (No response.)

12     Q.   Do you have any cash or checks signed by

13  Mr. McInnis that --

14     A.   No, sir.

15     Q.   You -- let me just go over this.  I just want to

16  make sure I understood this.  You were talking to these

17  people until 1:30 last night, 1:30 in the morning?

18     A.   Most of the day was just basically going through

19  the charts and flagging what was incorrect.

20     Q.   Did you calculate how many hours you spent with

21  them?

22     A.   No.

23     Q.   Since Saturday?  Ten to -- 10:00 in the morning

24  to 9:00, 2:00 to 9:00, 10:00 to 1:00 a.m. and then last

25  night 8:00 in the morning to 1:30 a.m.?

1    A.  Yes, sir.

2    Q.  Did you ask them for specific records to look at?

3    A.  No, no, no, when I --

4    Q.  Or did they give you the records to look at?

5    A.  No, they gave me boxes.

6    Q.  Right.  And did you ask, I want to see certain

7    records, or they just -- did they decide on what records

8    for you to look at?

9    A.  Yes, sir.

10   Q.  You knew Dr. Carrillo, correct?

11   A.  No, I never met him.

12   Q.  You never did.  You didn't know anything about

13   his drug abuse?

14   A.  Yes, I heard that he got arrested and convicted

15   for cocaine use.

16   Q.  How about -- how about, did you ever abuse drugs?

17   A.  Yes, me and Eddie Zuniga, Omar and even Rodney

18   were doing marijuana at Eddie Zuniga's house.

19   Q.  Eddie Zuniga?

20   A.  Yes, sir.

21   Q.  Now, I know you've talked about -- in addition to

22   going over the records, you've met them to -- met the

23   prosecutor -- met with the prosecutors to, basically,

24   prepare you for trial?

25   A.  Well, to review the charts.

1    Q.   Okay.  Did you talk to them, did they ask you

2    questions about what they were going to ask you in

3    Court?

4    A.   No, sir.

5    Q.   Never?

6    A.   Well, I mean, they're just reviewing the chart,

7    well, we're going to discuss this patient.

8    Q.   Okay.

9    A.   Is this your handwriting?

10   Q.   But before you came down here on Saturday and

11   spent Saturday, Sunday, Monday, Tuesday with them, did

12   you have any other meetings with these people?

13   A.   With my attorney present.

14   Q.   Right.  Right.  I mean, I'm not asking who -- I'm

15   just asking you how many times have you met with them

16   then?

17   A.   I believe two or three.

18   Q.   Okay.  Two or three there, and then all -- since

19   Saturday here, so let me go back to when you first --

20   the day of your raid.  Remember that date?

21   A.   Yes, sir.

22   Q.   When was it?

23   A.   Well, the date that the search warrant was

24   served, but I don't recall the specific day.

25   Q.   You don't remember it being in October?

1   A.   It was around that time.

2   Q.   2017?

3   A.   Around that time.

4   Q.   Wasn't it October 11th, 2017?

5   A.   Maybe, but I don't recall the specific day.

6   Q.   And I think Mr. Canales questioned you, we have

7   notes, reports from the interviews you had with all

8   these agents, there's over like 30 pages, have you ever

9   had a chance to review any of these?

10   A.   No, sir.

11   Q.   Well, just let me ask you a few questions.  Your

12   first interview was on October 12th, 2017; isn't that

13   the day after the raid?

14   A.   I don't recall.

15   Q.   And, well, the notes here say October 12th, is

16   there any reason to doubt that?

17   A.   No, sir, there isn't.

18   Q.   You don't remember meeting with anybody the day

19   after the raid?

20   A.   Not the day after.

21   Q.   So you weren't arrested yet, right?

22   A.   That is correct.

23   Q.   You wanted to not be arrested, right, and just

24   stay out of jail?

25   A.   I expected to be arrested.

1    Q.  But you were -- at this point, you were still out

2  of jail?

3    A.  Yes, sir.

4    Q.  So you agreed to meet with them the next day,

5  correct?

6    A.  Yes, sir.

7    Q.  You remember Agent David Keagy, Laura Sirles, is

8  that the young blonde lady you were talking about?

9    A.  No, no, Laura is the young lady brunette, black

10  hair.

11    Q.  And they talked to you at -- what's 17827 Salado

12  Draw?

13    A.  That is my home address.

14    Q.  And that's where they met with you the day after,

15  correct?

16    A.  No, sir, that's the day of the search warrant was

17  served.

18    Q.  Excuse me?

19    A.  That's when the search warrant was served.

20    Q.  And the day after, didn't you meet with them or

21  no?

22    A.  I don't recall.

23    Q.  This is the day of the search warrant?

24    A.  If I -- if it says so I was talking with Laura at

25  17827 Salado Draw that was at my home so --

1    Q.   That's when you're talking about, you want to

2    listen to these calls with your 19-year-old girlfriend?

3    A.   That is correct, sir.

4    Q.   And on that day you don't say anything about

5    Mr. McInnis; did you?

6    A.   That is correct.

7    Q.   And you -- did you know, I think you mentioned

8    you thought someone was following you?

9    A.   Yes, sir.

10   Q.   Did you ever see the report where they actually

11   were watching your civil trial?

12   A.   They mentioned that afterwards, I don't know when

13   but they mentioned that.

14   Q.   And you didn't know that they were taping -- that

15   Ms. Wooten, your girlfriend, was taping you at that Tai

16   restaurant with -- who was present during that

17   conversation?

18   A.   It was me, Micaela la Wooten and Roland Aguilera.

19   Q.   Roland was there?

20   A.   Yes, sir.

21   Q.   Was your trial where you had a $14,000,000

22   judgment in September?

23   A.   I don't recall the specific date.

24   Q.   You have a Toyota Avalon?

25   A.   No, that's my father's vehicle, I have a Toyota

Tundra.

Q.   Now, during the search warrant, I thought it was
the 11th but it could be the 12th, did they -- did they
find some cash in your wallet?

A.   No, well, I don't remember if it was the wallet
or a -- like a little satchel.

Q.   Do you remember telling them why you had the
cash?

A.   Yes, sir.

Q.   What did you tell them?

A.   Well, I mean, I don't recall.

Q.   You recall telling them that you were filing for
bankruptcy and any money in his bank could be taken,
however, he cashed his checks that -- so you could keep
the money?

A.   Well --

Q.   Remember saying that?

A.   Yes.

Q.   Okay.  And is that the money you're trying to
keep from this poor young lady that you turned into a
vegetable?

A.   No, no, basically a bank can't freeze your
account without you knowing.  I have bills to pay, so it
was basically -- I'm not hiding it.

Q.   You haven't -- you haven't paid her a penny, have

1   you?

2        A.   No, it's -- I'm going to appeal the decision.

3        Q.   I know you keep saying accepting responsibility,

4   have you accepted responsibility and never apologized to

5   her?

6        A.   I felt horrible, I mean she's -- I felt horrible,

7   I mean, she was young.

8        Q.   You haven't accepted responsibility, you didn't

9   apologize; did you?

10       A.   They do not allow us to approach the -- the

11   mother.

12       Q.   As a matter of fact, you not even didn't accept

13   responsibility you filed an appeal, right, arguing?

14       A.   Well, I accepted responsibility for taking care

15   of her.

16       Q.   Yeah.  Are you fighting that case still to this

17   day?

18       A.   Yes.

19       Q.   Okay.  And did you accept responsibility by

20   trying to hide cash and not give -- not making that

21   unavailable to her?

22       A.   No, no, no.

23       Q.   Not accepting responsibility?

24       A.   No, no, the cash will always be available to her.

25       Q.   It would?

1      A.   Yes, sir.

2      Q.   Is it going to be available if you spend it, if

3  you hide it?

4      A.   I wasn't spending it or hiding it.

5      Q.   But you're no longer a cheat, or a deceitful

6  person, right, and you're not corrupt, you're a

7  different person as you talk to this jury today,

8  correct?

9      A.   That is correct, sir.

10      Q.   That's what you want them to believe, at least.

11      A.   That's what I'm -- that what I am now, sir.

12      Q.   And then how many other meetings with the agents

13  did you have and your lawyer before you started talking

14  to the prosecution on this case?

15      A.   Well, I mean, I think Mr. Lowell was there on

16  some of those meetings, one or the second, but I don't

17  recall the specific number of meetings.

18      Q.   Let me ask you if you recall some specific

19  statements.  Out of these 30 pages, do you remember

20  saying two sentences about Mr. McInnis?

21      A.   I don't have any recollection of what I stated.

22      Q.   Do you remember telling him, Henry told you

23  you're doing great, keep sending patients; remember

24  that?

25      A.   Yes, sir.

1      Q.   That you told the agents that Henry was up in

2    San Antonio when you first opened, but since that time

3    he's always been in Harlingen, do you remember that?

4              MR. LOWELL:   Objection to improper

5    impeachment.

6              MR. CYGANIEWICZ:   Judge, he said he didn't

7    remember, I'm just trying to ask if he said those

8    things, that's just regular Cross-Examination.

9              MR. GUERRA:   And, Your Honor, I would --

10              THE COURT:   One second.

11              MR. GUERRA:   I'm sorry, Your Honor.

12              And with regards to the 10/30/17 meeting

13    there is a recording of a said meeting.   At least

14    according to the agent notes, if there is a recording,

15    we'd ask that it be provided to us.

16      Q.   (By Mr. Cyganiewicz)   Basically, did you --

17              THE COURT:   That's a different issue.   Let's

18    go back to the -- are -- are --

19              MR. CYGANIEWICZ:   I'm just asking him if he

20    recalls making these statements, Your Honor.

21              THE COURT:   All right.   Mr. Lowell,

22    I'm don't know if he's to -- are you attempting to

23    impeach?

24              MR. CYGANIEWICZ:   No, I'm just asking if he

25    remembers making these statements.

1    Q.   (By Mr. Cyganiewicz)   And he says he doesn't; is

2    that right?

3    A.   That's correct, I don't remember.

4    Q.   Just let me follow-up on Mr. Guerra's question.

5    This -- this -- this conversation -- were any of these

6    meetings taped?

7    A.   I believe they asked me, or notified me they were

8    going to be taping them.

9    Q.   Have you listened to any tapes?

10   A.   No.   Well, they gave me a CD of the recording

11   between me, Micaela and Roland.

12   Q.   Right.   That's --

13   A.   About five minutes and I was like.

14   Q.   How about the -- the meetings with the agents?

15   A.   No.

16   Q.   And your lawyer was present, right?

17   A.   Correct.

18   Q.   And you -- you understand that your lawyer,

19   without telling me what he said, did you understand what

20   a proffer agreement was?

21   A.   That whatever I said wouldn't be used against me.

22   Q.   Can't be used against you.   So there's no reason

23   not to say everything at that point, was there?

24   A.   Well, I was still leery of everything.

25   Q.   Was it important -- so you lied to them then?

1    A.   No, no, no.

2    Q.   Not telling them everything?

3    A.   No, I told them everything but --

4    Q.   You told them everything you knew?

5    A.   Yes, but --

6    Q.   And everything you knew was two sentences about

7    Mr. McInnis?

8    A.   If that's what's recorded there, yes.

9    Q.   And the recording, if there is one, is the best

10   evidence of what exactly you said, right?

11   A.   At that moment under those circumstances, yes.

12   Q.   Today when you talked about Mr. McInnis is the

13   first time you ever said anything like that, right?

14   A.   Which statement?

15   Q.   You never said anything about -- well, I'll just

16   pass that.  Excuse me.

17        So now today you're not a liar any longer, you're

18   not deceitful, you're not dishonest, correct?

19   A.   I'm doing my best to --

20   Q.   You changed?

21   A.   -- answer the questions truthfully and to my

22   recall.

23   Q.   But you told the jury earlier that you're a

24   changed person, you're a different person, is that --

25   A.   That is correct.  I mean, back then I was cocky,

```
1    obnoxious, rude, I wouldn't listen.
2         Q.   No, but how deceitful, crook?
3         A.   Correct.
4         Q.   A liar?
5         A.   True, true.
6         Q.   But not today?
7         A.   No, sir.
8                   MR. CYGANIEWICZ:   That's all I have,
9    Your Honor.
10                  THE COURT:   Mr. Guerra?
11                  MR. GUERRA:   Thank you, Your Honor.
12                  May I proceed?
13                  THE COURT:   Please.
14                        CROSS-EXAMINATION
15   BY MR. GUERRA:
16        Q.   Mr. Virlar, good afternoon.
17        A.   Good afternoon, sir.
18        Q.   My name is Robert Guerra and I represent
19   Dr. Francisco Pena; do you understand that?
20        A.   Yes, sir.
21        Q.   As we sit here today, you cannot tell the ladies
22   and gentlemen of the jury if you still have your medical
23   license, correct?
24        A.   That is a correct.
25        Q.   You put in years and time to become a doctor, you
```

1   valued your medical license; did you not?

2       A.   Up to a certain point, and then it became a

3   burden.

4       Q.   Okay.  So the reason why you don't know why you

5   have a medical license is because it's a burden to you;

6   is that right?

7       A.   I just -- I'm happy doing the automotive parts,

8   collision work, I haven't checked, don't really care.

9       Q.   And so you don't care that you violated the rules

10  of the Texas Board of Medical Examiners by failing to

11  update your malpractice suit, correct?

12      A.   No, what I'm saying is I don't care to be a

13  practicing physician.

14      Q.   Right, so you never told the Texas Board of

15  Medical Examiners that you were found liable for

16  malpractice, correct?

17      A.   I don't understand your question.

18      Q.   Well, sure.  As a licensed doctor during the time

19  that you cared about your medical license, you should

20  have been aware that you were required to notify the

21  Texas Board of Medical Examiners of any malpractice

22  suits, are you aware of that?

23      A.   Well, that would be my malpractice attorney doing

24  the notification.

25      Q.   No, no, no.  As a doctor, ethically, you had the

1  responsibility to notify the Texas Board of Medical

2  Examiners that you were found liable in a malpractice

3  suit; are you aware of that?

4      A.  When we renew our license, we do, and I renewed

5  my license last year.  And I also stated there that I

6  had been indicted and never knew --

7      Q.  Mr. Virlar, that wasn't my question.  All I asked

8  was were you aware that you're required to notify the

9  board of medical examiners of your malpractice suit; yes

10 or no?

11     A.  Only at the time of renewal of the license.

12     Q.  Did you notify them of your malpractice suit?

13     A.  When I renewed my license.

14     Q.  You did?

15     A.  That's to the best of my recollection.

16     Q.  And you understand, sir, that when you make an

17 affirmation or attestation to the board of medical

18 examiners, you're doing so under the penalty of perjury,

19 correct?

20     A.  That is correct.

21     Q.  Right.  So if you were to affirmatively gone to

22 the Texas Board of Medical Examiners and not notified

23 them of your malpractice suit saying that you weren't on

24 the malpractice suit, that would be lying to them; isn't

25 that right?

1      A.   Yes, it would.

2      Q.   And as we sit here today, it's your testimony

3    that you notified them that you were found liable in a

4    malpractice suit, correct?

5      A.   When I renewed the application for my medical

6    license, I do not have a recollection if I did or did

7    not, but it does ask you to list everything because the

8    very first time that I applied for my medical license it

9    got denied for a traffic ticket.

10     Q.   Sir, when did you last renew your medical

11   license?

12     A.   Last year, at around November.

13     Q.   November 2018?

14     A.   I believe so.

15     Q.   Before you pleaded guilty to whatever crimes that

16   you are accepting responsibility for, correct?

17     A.   Right, but I mentioned I had been indicted.

18     Q.   I understand that, sir.  All I'm asking is you

19   renewed your license before you pleaded guilty, correct?

20     A.   I don't know the exact dates.

21     Q.   June 2019 is when you pleaded guilty as part of

22   the plea agreement with the Government; does that sound

23   familiar?

24     A.   Yes, sir.

25     Q.   Okay.  So just real simple.

1    A.   Right, it would be before.

2    Q.   It would be before, thank you.

3         And when you accepted responsibility as part of

4    the plea agreement, you accepted responsibility only for

5    part of your crimes; is that right?

6    A.   No, for everything.

7    Q.   Okay.  So having the charges dismissed in this

8    case, which you said you were unaware of earlier,

9    correct, so if you're unaware that they're being

10   dismissed, how are you accepting responsibility for

11   them?

12   A.   Like I said, I feel horrible and I told the

13   justice department whatever you want to know about my

14   crimes, I'll be happy to answer them truthfully.

15   Q.   Truthfully, okay.  So you feel bad and because

16   you feel bad you're going to answer everything

17   truthfully, correct?

18   A.   No, regardless of how I feel, I have to answer it

19   truthfully.

20   Q.   You have to answer truthfully; is that right?

21   A.   That is correct.

22   Q.   And in the -- are you aware that you met with the

23   federal government over ten times before you took that

24   seat here today?

25   A.   No, sir.

1    Q.   You didn't know?

2    A.   Well, I'm not counting.

3    Q.   Okay.  Well, I was and you did meet with them

4    over ten times.  And so I'm asking you, Mr. Virlar, were

5    you truthful when you spoke with the Government each and

6    every time you talked to them?

7    A.   As best to my recollection under those

8    circumstances.

9    Q.   What does that mean?

10   A.   That I did my best at that moment.

11   Q.   You did your best at that moment to be truthful?

12   A.   To recall and answer truthfully questions they

13   had.

14   Q.   Okay.  So you, overcome with guilt, right, trying

15   to make amends; is that right?  Is that why you're here

16   today?

17   A.   No, I'm here to accept responsibility and

18   whatever punishment I deserve.

19   Q.   Okay.  So you're here to accept responsibility,

20   but you're only going to talk about things that you were

21   asked, correct?

22   A.   I don't know the policy of how to proceed.

23   Q.   Well, you're telling the ladies and gentlemen of

24   the jury that you want to make amends, correct?

25   A.   And if you ask, I'll answer truthfully to the

1    best of my knowledge.

2        Q.   Okay.   But why does somebody have to ask you

3    about bad things for you to make amends?

4        A.   (No response.)

5        Q.   You never told the Government that you thought

6    what Altus was doing was fraud, correct?

7        A.   I've mentioned a lot of things to my attorney.

8        Q.   No, sir.   I didn't ask what -- I'm not asking

9    what you're talking about with your attorney.

10        I'm asking that you, in an attempt to make

11    amends, never mentioned to the Government that you

12    thought what Altus was doing was fraud, correct; yes or

13    no?

14        A.   No.   Basically, I did not mention it.

15        Q.   Right.   And you never mentioned to the

16    Government, at any point, that what CIMA was doing you

17    considered to be fraudulent, correct?

18        A.   That's correct.

19        Q.   And the only reason you didn't do that is because

20    they didn't ask you; is that right?

21        A.   No, I mean, basically, I knew they had agents.   I

22    mean, I met with some of their individuals that were,

23    basically, trying to get more information from me, I

24    didn't know which way to go so I'm, like, I'll just wait

25    until they ask and then I'll be truthful.

Q.   But does that sound like someone who's trying to make amends?  If you're involved in wrongdoing at CIMA and Altus, wouldn't you be telling people that they're doing things wrong?

A.   (No response.)

Q.   You would, wouldn't you?

A.   You want to.

Q.   No, no.

A.   Hold on.  You want to, but then sometimes when you mention things, they're like, they're not interested.  I mentioned something to the DEA.

Q.   Uh-huh.

A.   And they told me they weren't interested.

Q.   Okay.

A.   In a major drug deal.

Q.   Did you mention to the DEA -- well, did you mention to the DEA that Altus and CIMA are doing the wrong things?

A.   No, sir.

Q.   Because you talked to the DEA as part of the pain cream investigation, correct?

A.   That is correct.

Q.   Okay.  Were you aware of the DEA's raid of Mr. Marco Karam's office?

A.   Yes, it was -- he had mentioned it.

1    Q.   He had mentioned it.  Did you know anything about

2    it?

3    A.   I did not.

4    Q.   Did you and Mr. Karam talk about -- about this

5    raid?

6    A.   Not about the raid, no, sir.

7    Q.   No, what did you guys talk about?

8    A.   When I found out about Marco being approached by

9    the IRS and the justice department I went to him to the

10   flea market and, basically, I told him, hey I read the

11   rules for the anti-kickback, if you'll list her as a

12   full employee versus a 1099, then maybe we can get out

13   of this mess.

14   Q.   Have you made amends, sir, for attempting to

15   obstruct justice?

16   A.   I believe I haven't.

17   Q.   You haven't.  In other words, you went to

18   Ms. Wooten to tell her to lie to federal agents,

19   correct?

20   A.   That is true.

21   Q.   But you haven't made amends for that either; is

22   that right?

23   A.   I cannot approach her.

24   Q.   Are you accepting responsibility for that?

25   A.   That's why I'm here, sir.

1    Q.   Okay.   And you've told the truth today; is that

2    right?

3    A.   That's correct, sir.

4    Q.   You never entered into an agreement with

5    Francisco Pena to conspire to commit Medicare fraud,

6    Medicare fraud, correct?

7    A.   Not verbally with each other.

8    Q.   Right.   You never had an agreement with Mr. Pena

9    to conspire to commit Medicare fraud, correct?

10   A.   Correct.

11   Q.   In fact, you only met Francisco Pena one time,

12   right?

13   A.   On that occasion, yes, and then after that the

14   Christmas party for Laredo Medical Center and then at

15   Doctors Hospital.

16   Q.   Okay.   Two times?

17   A.   About three times.

18   Q.   Three times.   Do you know how many times you told

19   the federal government on multiple occasions you met

20   with Francisco Pena?   One time, sir.   Does that surprise

21   you?

22   A.   No, it doesn't surprise me.

23   Q.   Right.   Mr. Cyganiewicz was asking you about an

24   October 30th, 2017 meeting with the Department of

25   Justice, correct?

1      A.   Correct.

2      Q.   And a lot of people were there, this -- this

3   actual meeting occurred at your attorney's office,

4   correct?

5      A.   Which -- which meeting and which state?

6      Q.   I know there's a lot.

7      A.   I know.

8      Q.   But I'm talking about the October 30th, meeting.

9   You're aware that occurred at your attorney's office,

10  Jason Davis?

11     A.   If that's what's documented, I'll take that as a

12  yes.

13     Q.   Okay.  Do you remember who was at that meeting?

14     A.   My attorney, Laura, several agents.

15     Q.   Laura Sirles, is that how you pronounce her last

16  name?

17     A.   I believe so.

18     Q.   Okay.  And she is a federal agent, correct?

19     A.   That's correct.

20     Q.   And Mr. Joshua Blaze, a federal agent, he was

21  there; is that right?

22     A.   I don't know.

23     Q.   Special Agent Michael Garcia, do you remember him

24  being there in that meeting?

25     A.   Yes, sir.

1    Q.   Huh?

2    A.   Yes, sir.

3    Q.   And you see him at counsel table here, right?

4    A.   Yes, sir.

5    Q.   A gentleman by the name of Brandon Knight or

6    Kite, you remember him being there?

7    A.   I don't know him.

8    Q.   Forensic accountant, doesn't sound familiar?

9    A.   No, sir.

10   Q.   What about Bud Paulson, do you remember him being

11   there?

12   A.   Don't know who that is.

13   Q.   Assistant U.S. Attorney.  Doesn't ring a bell?

14   A.   No, sir.

15   Q.   You remember Mr. Lowell being there?

16   A.   Yes, sir.

17   Q.   Okay.  So you remember at that meeting with

18   several federal agents there, Assistant U.S.,

19   United States attorneys, do you remember telling them

20   that you were introduced to Francisco Pena in 2016?

21   A.   If that's what's documented, yes.

22   Q.   Do you know there's no other recollection, no

23   other recounting of any other meeting with Mr. Pena?

24   A.   I don't know why.

25   Q.   You never told them about any other meeting,

1    correct?

2        A.   Maybe so.

3        Q.   In fact, on -- as of October 30th, 2017 you only

4    told them about one meeting with Mr. Pena?

5        A.   Correct.

6        Q.   And at no point during that interview, do you

7    tell them that you conspired with him to commit Medicare

8    fraud; do you know that?

9        A.   Well, I didn't say conspired, just simply stated

10   to them that he had requested money for the patients.

11       Q.   He requested money to see patients; is that

12   right?  That was your testimony earlier today?

13       A.   He requested money to send patients.

14       Q.   No, sir.  You testified earlier under Direct

15   Examination at that witness stand that he requested

16   money to see patients.

17            Do you not recall your testimony this morning?

18       A.   No, sir.

19       Q.   In fact, it was so truthful, so believable to me,

20   I wrote it down, see, s-e-e, Big letters that that's

21   what you said.  You don't recall that?

22       A.   No.

23       Q.   You would agree with me that a medical director

24   with a contract has to see patients, right?

25       A.   No, sir.

1    Q.   A medical director doesn't have to see patients?

2    A.   I was medical director for CIMA prior to Merida

3    and I did not do face-to-faces, I was simply sent

4    patients and then they had other medical directors who

5    would do the --

6    Q.   You never saw patients while medical director for

7    CIMA?

8    A.   Prior to Merida in 2011 I was the hospice

9    director for CIMA in San Antonio.

10   Q.   Okay.  Well, let's not talk about what happened

11   before you met Dr. Pena, let's talk about what happened

12   after.

13   A.   Okay.

14   Q.   Okay?  You were medical director 2016 for CIMA;

15   is that right?

16   A.   That is correct.

17   Q.   Did you see patients at that time?

18   A.   Yes, I did.

19   Q.   And that was part of your contract as a medical

20   director, correct?

21   A.   Correct.

22   Q.   You were also a medical director for Altus?

23   A.   Late, I believe in 2017.

24   Q.   Even better in 2017.  You met and saw patients,

25   correct?

1      A.   I referred patients to Altus, I don't believe I

2  saw patients for Altus.

3      Q.   Weren't you required to see patients as part of

4  your medical director agreement?

5      A.   I never read the agreement, I just signed it.

6      Q.   You don't know what you signed as a contract

7  agreement.

8      A.   That is correct.

9      Q.   As a medical director with the contractual

10  agreement to see patients, the agreement between the

11  parties is doctor, you see patients, hospice will pay

12  patients -- will pay you to see those patients, correct?

13      A.   Not necessarily.

14      Q.   Okay.  Is that not how payment for services

15  works?

16      A.   In hospice, yes and no.  In hospice, you have the

17  option to do face-to-faces for additional payments, or

18  you can simply just refer and not be paid to see the

19  parent.

20      Q.   And -- and Mr. Virlar, I appreciate you bringing

21  this up because that brings me to a great point.  As we

22  sit here today, you don't know what the agreement

23  between Mr. Pena, Dr. Pena and Merida was; correct?

24      A.   That is correct, sir.

25      Q.   You only met him one time, you don't know what

1   they had agreed to, correct?

2       A.   That is correct, sir.

3       Q.   You'd never seen their contract, have you?

4       A.   No, I have not, sir.

5       Q.   Are you aware that Dr. Pena was terminated from

6   Merida in January 2017?

7       A.   I was not aware.

8       Q.   Are you aware at that time of termination

9   Dr. Pena was owed money from Merida for services

10  rendered?

11      A.   I was not aware.

12      Q.   Are you aware that Dr. Pena was owed $12,000

13  because he provided medical director services and wasn't

14  paid for it?

15      A.   I was not aware, sir.

16      Q.   So you can't tell the ladies and gentlemen of the

17  jury that the relationship between Dr. Pena and Merida

18  was fraud; can you?

19      A.   If he's requesting money for the referrals that

20  he's sending, yes, that is fraud.

21      Q.   But you don't know that, correct?

22      A.   He mentioned it in front of me and Roland

23  Aguilera.

24      Q.   No, no, no, you said he wanted money to see

25  patients, that was your testimony earlier today, sir.

1    A.  No, he wanted money to send patients, I might

2  have misspoken, but he wanted money to send patients.

3    Q.  So now that's your testimony, he wanted money to

4  send patients, correct?

5    A.  That is correct.  And that's why Rodney asked

6  that Roland go down to Laredo to speak with him.

7    Q.  Do you recall meeting with the federal -- you

8  know what, hold on.  Let's go back to this October 30th,

9  2017 meeting.

10    Do you recall telling the assembled federal

11  agents, all of the assistant U.S. attorneys in the room,

12  do you remember telling them that you're not sure if

13  Dr. Pena is getting paid by referrals?

14    A.  No, I don't recall, sir.

15    Q.  You don't recall?

16    A.  No, sir.

17    Q.  So if it appears in a case agent's notes, that's

18  not something that you told them on October 30th, 2017?

19    A.  No, I don't recall at this moment mentioning

20  that.  If it is in the notes, then, yes, I did say that.

21    Q.  Okay.  So if we can rely on those notes, we can

22  say that you told the agents, the assembled U.S.

23  attorneys, that on October 30th, 2017 you didn't know if

24  Dr. Pena was being paid per patient per referral,

25  correct?

1     A.   That is correct.

2     Q.   And so if you didn't know in 2017, how can you

3   know now?

4     A.   All I knew was that he was requesting, and was

5   very blunt, that he would not send patients to Merida

6   unless he got paid.

7     Q.   Right, but you don't know if that was payment for

8   services as a medical director to see patients, correct?

9     A.   He was very clear that he would not send patients

10   if he did not get paid.

11    Q.   If he didn't get paid for having seen patients in

12   the past, seen patients as a doctor.

13    A.   I believe he said sending patients.

14    Q.   Well, now we have a miss -- misunderstanding

15   based on your testimony earlier today, sir?

16    A.   No, no, I recall because I was very shocked that

17   he mentioned that to Roland in front of me.

18    Q.   So you -- you're shocked then, so shocked that on

19   October 2017 you told the Government you didn't know if

20   he was being paid by referrals, correct?

21    A.   Correct.

22    Q.   And then in one of your other meetings with the

23   federal government on March 8th, 2018 do you recall

24   having a meeting at your attorney's office then, sir?

25    A.   No, I don't, sir.

1    Q.   And again, with your attorney Mr. Jason Davis

2  there in San Antonio, do you recall meeting the

3  Government, then?

4    A.   I met the Government multiple times.

5    Q.   Over ten, we know.  But you don't recall this

6  particular meeting, correct?

7    A.   No, no, I just don't recall the particular date.

8    Q.   You recall meeting at this meeting with FBI Agent

9  Ms. Sirles -- Ms. Laura again, do you know if she was at

10  this meeting?

11    A.   She was at multiple meetings.

12    Q.   Okay.  And David Keagy, do you remember him being

13  there?

14    A.   I don't know who that is.

15    Q.   And FBI forensic accountant Brandon Kite?

16    A.   I don't know who that is.

17    Q.   Ms. Sirles, Mr. Keagy, and I don't know if

18  Mr. Kite asked you questions or not, but during that

19  meeting, they talked a lot about Merida; do you recall

20  that?

21         MR. LOWELL:  Objection, improper

22  impeachment.

23         THE COURT:  Sustained.

24    Q.   (By Mr. Guerra)  Do you recall having a

25  conversation with those agents about various doctors?

A.   We had a lot of conversations, don't recall the
specifics.

Q.   Okay.  Do you remember talking to them about Dr.
Ben Zertuche?

          MR. LOWELL:  Objection, improper
impeachment.

          THE COURT:  Sustained.  Again, Mr. Guerra
you're referring to third party notes.

          Rephrase your question.

          MR. GUERRA:  Yes, Your Honor.

Q.   (By Mr. Guerra)  You never told any of the agents
on March 8th, 2018 anything about Dr. Pena, correct?

          MR. LOWELL:  Same objection.

          MR. GUERRA:  Your Honor, I'm --

          THE COURT:  You can ask him what he said.

          MR. GUERRA:  Correct.

          THE COURT:  Yesterday.

Q.   (By Mr. Guerra)  You never told the agents, or
the -- you never told the FBI agents on March 8th, 2018
anything about Dr. Pena, correct?

A.   I don't recall.

Q.   Okay.  Do you recall them asking you about
Dr. Pena during that meeting?

A.   No, I don't, sir.

Q.   And because you weren't asked, you didn't say

1   anything about Dr. Pena, correct?

2     A.  I was just listening.

3     Q.  You were just listening?  Weren't they

4   interviewing you, sir?

5     A.  Correct, to their questions.

6     Q.  When you met with the Government over these four

7   occasions, you looked at multiple patient files,

8   correct?

9     A.  That is correct, sir.

10     Q.  Over multiple days, correct?

11     A.  That is correct.

12     Q.  Thousands of documents?

13     A.  It was multiple boxes.

14     Q.  Right.  I mean, that's a lot of stuff to go

15   through, right?

16     A.  Correct.

17     Q.  Did you take any notes?

18     A.  No, I did not, sir.

19     Q.  So everything you came in and testified on today

20   was based strictly on your memory?

21     A.  On my recall.

22     Q.  Okay.  And you said you -- you did these reviews

23   in a conference room; is that right?

24     A.  On the second floor.

25     Q.  In -- in this -- in this building, correct?

1      A.   In this building.

2      Q.   Windowless conference room?

3      A.   No, it had windows.

4      Q.   Okay.  Did you sit there and meet with -- were

5  federal agents there when you reviewed these?

6      A.   Mr. Neal and I believe Mr. Garcia was there.

7      Q.   Neal Williams?

8      A.   That's the tall, white gentlemen.

9      Q.   Yeah, FBI agent?

10     A.   Yes, sir.

11     Q.   Right, and Special Agent Michael Garcia, correct?

12     A.   Yes, sir.

13     Q.   Earlier you testified to the ladies and gentlemen

14  of the jury that you would go to Las Vegas, private

15  clubs, things like that.

16     A.   Right.

17     Q.   Dr. Pena never went with you?

18     A.   No, he did not, sir.

19     Q.   You also talked about tickets to Spurs games and

20  things like that, Dr. Pena never went with you, there?

21     A.   No, he did not sir.

22     Q.   I believe you talked about trips to South Padre

23  Island, things like that?

24     A.   Yes, sir.

25     Q.   Dr. Pena wasn't there; was he?

1    A.   No, sir.

2    Q.   It would be true to say that you've had more

3    conversations in your lifetime with Dr. Posada than

4    you've had with Dr. Pena, correct?

5    A.   No, because with Posada it was only that one time

6    at Light at the Mandalay Bay; with Dr. Pena it was in

7    his office with Roland, and then at the social Christmas

8    party for LMC, but it was just social, I was at a table

9    with another physician and he came over, sat down with

10   his spouse and then he was dancing and just, you know,

11   enjoying the social Christmas party.

12   Q.   And that -- that reminds me, is the reason why

13   you even met Dr. Pena back in 2016, you asked Roland to

14   make an introduction to you because Dr. Pena was the

15   Chief of Medicine at the Laredo hospital?

16   A.   That is correct, sir.

17   Q.   And you were looking for an in over at Laredo; is

18   that right?

19   A.   That is correct, sir.

20   Q.   But nothing ever came of that meeting, correct?

21   A.   That is correct, sir.

22   Q.   You had never had a business relationship with

23   Dr. Pena, correct?

24   A.   That is correct, sir.

25   Q.   And as we sit here today, you don't know to which

1    hospice companies Dr. Pena referred his patients to; is

2    that correct?

3        A.   That is correct, sir.

4        Q.   Earlier when you talked about, and I know you

5    went in-depth with Mr. Cyganiewicz and Mr. Canales,

6    about the time the FBI came to your house, and I'm not

7    going to go over that, I think that's been covered

8    extensively, but I do want to ask you a question.

9            You had the agents come to your house, they told

10   you that they had recordings of you talking with Ms.

11   Wooten, correct?

12       A.   That is correct.

13       Q.   And you said, I don't want to talk to you, I'd

14   rather have my attorney present, correct?

15       A.   That is correct, sir.

16       Q.   Then they played the tapes, correct?

17       A.   That is correct.

18       Q.   And it was after listening to those tapes you

19   realized I should probably cooperate with the

20   Government; is that right?

21       A.   No, I still mentioned -- I would mention to them

22   I would love to help you, but I need to be present with

23   my attorney.

24       Q.   Okay.  And did your desire to help them come

25   about because you heard yourself on those tapes?

1    A.   No, no, I was saying that before they played the

2    tapes, and then they would play the tapes, hoping that I

3    would start speaking with them, but I still mentioned

4    the same statement, I would love to have my attorney

5    present.

6    Q.   And your meeting with -- with the -- with -- with

7    the federal agents came, what, a day or two after that

8    raid; is that correct?

9    A.   I don't recall specifically what day.

10   Q.   It was sooner rather than later after that raid?

11   A.   Yes, sir.

12           MR. GUERRA:  Pass the witness, Your Honor.

13           THE COURT:  Mr. Lowell?

14           MR. LOWELL:  Thank you, Your Honor.

15                   REDIRECT EXAMINATION

16   BY MR. LOWELL:

17   Q.   Mr. Virlar, you were asked a lot of questions

18   about being a despicable human being; do you remember

19   that?

20   A.   Yes, sir.

21   Q.   And we don't have enough time to go through every

22   single despicable thing you've done in your life; do we?

23   A.   No, we don't.

24   Q.   And what you said about that patient earlier

25   today, the patient who was in a vegetative state; do you

1    remember talking about her?

2        A.   Ms. Johana Puente.

3        Q.   And you remember talking about how you were

4    concealing that money because you didn't want to have to

5    give it to her?

6        A.   Well, not concealing it, basically keeping it out

7    of reach of the -- whoever is in charge of basically

8    collecting when you lose a lawsuit.

9        Q.   And when did that occur, that event?

10       A.   I was already working at Doctors Hospital, so it

11   was the paychecks from Doctors Hospital as a

12   hospitalist.

13       Q.   And, approximately, what year was that?

14       A.   I believe 2018.

15       Q.   And when you were a medical director at the

16   Merida Group, you were also despicable; is that right?

17       A.   That's correct, sir.

18       Q.   You were also disgraceful?

19       A.   That is correct, sir.

20       Q.   You were disgraceful to the medical profession?

21       A.   Yes, I was.

22       Q.   Took advantage of patients?

23       A.   Yes, I did.

24       Q.   In the most vulnerable stages of their life; is

25   that right?

1      A.   That is correct.

2      Q.   And during that time you were also very good

3  friends with Rodney Mesquias; is that right?

4      A.   That is correct.  I met his mom, his dad, his

5  son, his daughter, actually enrolled his aunt who he

6  moved down from Corpus Christi to San Antonio, I had his

7  jet skis at my home in the driveway, I was supposed to

8  get my own room at his lake house, for me and Micaela,

9  and went to numerous concerts, events, went to his

10  graduation from MP school, nurse practitioner school in

11  Alabama.  He would always try and give me the book, The

12  Art of War, that's how we should all think.  So it was a

13  very good relationship.

14      Q.   You're also very good friends with Mr. McInnis;

15  is that right?

16      A.   That is correct.

17      Q.   And that was when you were one of the despicable

18  medical directors at the Merida Group; is that right?

19      A.   That is correct, sir.

20      Q.   Now, you were asked about cheating on your wife;

21  do you remember that?

22      A.   Yes, sir.

23      Q.   And I believe in response you mentioned something

24  about Rodney Mesquias; is that correct?

25      A.   Yes, he was also sleeping around with the nurses

1    from Merida, even having a threesome with one of them

2    who then we went drinking in San Antonio and he told

3    her, hey, take care of Virlar, and the nurse, me and her

4    went and had sex.  And I believe she was married.

5        Q.   That was when you were a medical director at the

6    Merida Group?

7        A.   That is correct.

8        Q.   Now, again, focusing on this time when you're

9    this despicable doctor at the Merida Group, who paid

10   you?

11       A.   I'm sorry?

12       Q.   Who paid you?

13       A.   Mr. Rodney Mesquias.

14       Q.   Who rewarded you for committing fraud?

15       A.   Mr. Rodney Mesquias and Henry McInnis.

16       Q.   Did you -- do you think standing here today that

17   you were an asset to the Merida Group?

18       A.   I was their number one asset, and I was rewarded

19   handsomely.  Whatever I asked for, I would get.  I had

20   access to his condo in Stone Oak area, I had access to

21   his Porsche and -- 24/7, actually used the condo to

22   sleep with some of the nurses, and also access to the

23   Spurs tickets, I would log in and go by myself, and if

24   anybody else wanted to go they would have to ask me

25   first if I was using the tickets.  And I also, like I

1    say, he bought a lake house, I was supposed to get my

2    own room which was promised by his wife Tammy to

3    Micaela, they --

4              MR. HECTOR CANALES:  Objection, Your Honor,

5    to the narrative here.

6              THE COURT:  Let's break it up into question

7    and answer.

8    Q.  (By Mr. Lowell)  Yes, I mean, just to be clear.

9    How were you an asset, specifically, you, Mr. Virlar,

10   what -- let me ask the question.  What about you was an

11   asset to Rodney Mesquias and Henry McInnis?  How were

12   you an asset to them?

13   A.  I was the number one referring physician.

14   Q.  You were committing fraud; is that right?

15   A.  That is correct.

16   Q.  At their direction?

17   A.  That is correct.

18   Q.  And during your time there, you, together with

19   Rodney Mesquias and Henry McInnis, were despicable to

20   patients; is that right?

21   A.  That is correct.

22   Q.  How so?

23   A.  We lied to them about their prognosis, we lied to

24   them about their false diagnosis.  We would take away

25   medical equipment, or did not provide medical equipment.

1    Sometimes the families would request Aricept or Namenda

2    for their Alzheimer's, but because they were expensive,

3    we would not provide that.

4         They would request Marinol Megace, an appetite

5    stimulant, but that would not be provided because they

6    were expensive.

7         So it was, basically, collect the money, minimize

8    the expenses, the services to the patients.

9    Q.   That's something you guys did together, right?

10   A.   Yes, sir.

11   Q.   Now, I don't if you mentioned it, but did you go

12   to Mr. McInnis' wedding?

13   A.   I don't recall.

14   Q.   Okay.  And I believe you mentioned automatic

15   hospice; do you remember that?

16   A.   What's the question?

17   Q.   You were asked questions on Cross-Examination --

18   Cross-Examination about diagnoses, do you recall those

19   questions?

20   A.   Yes, sir.

21   Q.   Okay.  And you -- you've -- I believe you

22   mentioned about something about how that's not an

23   automatic admission to hospice; do you remember that?

24   A.   Yes, sir.

25   Q.   Could you explain to the jury what that means?

1      A.   I mean, whoever smokes in the jury, if you smoke

2   for over five years, you're going to have a little bit

3   of COPD, that doesn't mean that you automatically should

4   be in hospice.

5           You know, there are, basically, other individuals

6   with a little bit of Alzheimer's.  As we get older, we

7   forgot things, but that doesn't automatically enroll us

8   in hospice.

9           Some of us have a little bit of CHF, you know, we

10   get short-winded after walking half a block, we have to

11   rest, take our water pill, but just because we can't

12   walk a full city block doesn't mean that we should be in

13   hospice.

14      Q.   Mr. Virlar, you talked about going to Vegas, do

15   you remember that?

16      A.   Yes, sir.

17      Q.   Did you go to Vegas with anyone sitting at this

18   table, this table right here?

19      A.   No, sir.

20      Q.   Did we go to Vegas together?

21      A.   No.

22      Q.   Who, if anyone did you go to Vegas with in this

23   entire courtroom?

24      A.   Wendy Hill, Rodney Mesquias, Tammy Ortegon, his

25   nephew back there with Tammy Ortegon, Henry McInnis.

1    Q.   Who paid for your drinks in Las Vegas?

2    A.   Mr. Rodney Mesquias and Henry McInnis.

3              MR. HECTOR CANALES:  Your Honor, that's

4    outside the scope of Cross-Examination, nobody asked him

5    about --

6              MR. LOWELL:  He was asked about questions.

7              MR. HECTOR CANALES:  Who?  I didn't ask

8    questions about Vegas.

9              MR. LOWELL:  I believe Mr. Guerra did.

10             MR. GUERRA:  My only question was to make

11   sure he didn't mention Mr. Pena, and that's it.

12             THE COURT:  It's been asked and answered.

13             The Vegas issue has been asked and answered.

14   Q.   (By Mr. Lowell)  You were asked questions about

15   Henry McInnis in connection with patient admissions, do

16   you remember that?

17   A.   Yes, sir.

18   Q.   Did Henry McInnis push patient admissions?

19   A.   Yes, sir.

20   Q.   How so?

21   A.   He would be part of the group text where he'd get

22   notification of the patient being referred, and he would

23   be, that's great, Virlar, keep it up, keep them coming.

24   And Rodney would also be there as part of the

25   conversation as well as Eddie Zuniga.

1    Q.  We're not going to go through all the details of

2    those patient files again, but to be clear, you,

3    Dr. Virlar, Mr. Virlar, signed fraudulent orders for

4    each of the patients that we walked through; is that

5    right?

6    A.  That is correct, sir.

7         MR. GUERRA:  Your Honor, I'm going to object

8    as to Ms. Perez, that was covered in -- in previous

9    discussions with the Court that he cannot offer any sort

10   of medical opinion with regard to Francisca Perez.

11        MR. LOWELL:  I'm talking about whether he

12   signed --

13        THE COURT:  Again, the -- the objection is

14   overruled.  The question was documents he signed.

15        MR. GUERRA:  Yes, Your Honor.

16        THE COURT:  And he did sign the documents

17   as -- as to that.

18        MR. GUERRA:  Yes, Your Honor.

19        THE COURT:  As to the individual.

20   Q.  (By Mr. Lowell)  Focusing on your orders,

21   Mr. Virlar.

22   A.  Yes, sir.

23   Q.  Did you sign fraudulent orders for each of those

24   patients?

25   A.  Yes, I did.

1    Q.   At whose direction?

2    A.   Rodney Mesquias and Henry McInnis.

3    Q.   Defense counsel was asking you a lot of questions

4    about the time that you spent here at the U.S.

5    Attorney's Office reviewing records; do you remember

6    that?

7    A.   Yes, sir.

8    Q.   And I believe someone said ten days over the

9    course of your cooperation with the Government you've

10   met with the Government; is that right?

11   A.   Over ten times I believe they said.

12   Q.   How many times have you met with Rodney Mesquias

13   and Henry McInnis?

14   A.   Since the initial fraudulent subpoena?

15   Q.   Now, you were also asked questions about your --

16   one of your cases; do you remember that, one of your

17   criminal cases?

18   A.   Yes, sir.

19   Q.   Now, I'm showing you Government's Exhibit J-2.

20   You see that, Mr. Virlar?

21   A.   Yes, sir.

22   Q.   You see the case number at the top right of the

23   page?

24   A.   Yes, B-19-557.

25   Q.   Okay.  Do you see here that you were charged with

```
1    Count One, Conspiracy to Commit Health Care Fraud?
2        A.  Yes, sir.
3        Q.  Do you see that you were charged along with
4    Rodney Mesquias, Henry McInnis, Jose Garza and Francisco
5    Pena?
6        A.  That is correct, sir.
7        Q.  And was that in connection with your time at the
8    Merida Group?
9        A.  That is correct, sir.
10       Q.  And this specific case hasn't been dismissed; is
11   that correct?
12       A.  That is correct, sir.
13             MR. CYGANIEWICZ:  Objection, Your Honor.
14   That's a misstatement, Mr. McInnis was not charged in
15   that indictment.  It's an information.  Leading a false
16   impression with the jury, I mean it's one Defendant,
17   this guy.
18             MR. LOWELL:  I can clarify, Your Honor.
19             THE COURT:  Clarify that issue.
20             MR. LOWELL:  Yes.
21       Q.  (By Mr. Lowell)  So is this a statement of facts
22   right in front of you, Mr. Virlar?
23       A.  Yes, sir.
24       Q.  And do you see that your name is here?
25       A.  Yes, sir.
```

1      Q.   And is this the Conspiracy to Commit Health Care
2   Fraud charge?
3      A.   Yes, sir.
4      Q.   And as a part of this statement of facts, did
5   you -- did you acknowledge that you agreed with Rodney
6   Mesquias, Henry McInnis, Jose Garza and Francisco Pena
7   to commit health care fraud?
8      A.   That is correct, sir.
9      Q.   Now, if we go to page 5 of this exhibit, this is
10  count 2, Conspiracy to Violate the Travel Act, is this a
11  separate charge that was lodged against you?
12     A.   Yes, sir.
13     Q.   That was a totally different scheme, right?
14     A.   That is it correct, sir.
15     Q.   If we go to page 2, those two charges, they
16  haven't been dismissed; is that right?
17     A.   That is correct, sir.
18     Q.   And for those two charges, I want to focus on the
19  time that you're facing in prison.
20          Do you see the punishment range there?
21     A.   Yes, sir.
22     Q.   And for Count One, do you see you're facing a
23  maximum term of ten years of imprisonment?
24     A.   That's correct, sir.
25     Q.   As well as some fines?

1       A.   That's correct, sir.

2       Q.   If you go to the bottom of the paragraph for

3   Count Two, do you see you're facing a term of five years

4   imprisonment?

5       A.   That is correct, sir.

6       Q.   And that's still hanging over your head, right?

7       A.   That is correct, sir.

8            MR. LOWELL:  Pass the witness, Your Honor.

9            THE COURT:  Mr. Canales.

10                      RECROSS-EXAMINATION

11   BY MR. HECTOR CANALES:

12       Q.   You know by law you're required to report any

13   felony 30 days after that event?

14       A.   No, I did not know that, sir.

15       Q.   Texas Medical Board rules say 30 days after an

16   event you have to report a felony, right?

17            MR. LOWELL:  Objection, outside the scope.

18   Outside the scope.

19            MR. HECTOR CANALES:  He brought it up,

20   Judge.

21            THE COURT:  Yeah, that's -- that's

22   sustained.  That's -- well --

23            MR. LOWELL:  He didn't ask about the Texas

24   Medical Board.

25            THE COURT:  You did ask him about this

1     indictment.

2               MR. HECTOR CANALES:  He testified to that,

3     Your Honor, after I had an opportunity to cross -- to

4     cross-examine him.

5               THE COURT:  Gentlemen, he did present the

6     indictment number B-57, if that's what you're

7     referring --

8               MR. HECTOR CANALES:  Right.

9               THE COURT:  I don't have the case number,

10    was it B-57?

11              MR. LOWELL:  Your Honor, just to clarify, I

12    presented Government's Exhibit J-2.  That's a statement

13    of facts and plea agreement of Mr. Virlar.

14              MR. HECTOR CANALES:  Which --

15              MR. LOWELL:  This is a different document.

16              MR. HECTOR CANALES:  Which references, Your

17    Honor, the plea agreement there references the

18    information which deals with the felony -- pleading

19    guilty to a felony.

20              THE COURT:  Mr. Canales, you can ask him

21    about that indictment.

22       Q.  (By Mr. Hector Canales)  You didn't report -- you

23    didn't report J-2 within 30 days to the medical board;

24    did you?

25       A.  No, sir.

1    Q.  No, sir?

2    A.  No, sir.

3    Q.  Right.  And so, but you -- but you said earlier

4    that -- so you failed in your obligation to tell the

5    medical board that you're a felon, right?

6    A.  Well, I -- yes and no.  I reported the pain cream

7    but since on this, there's a lot going on, I really

8    didn't even know there was that rule.

9    Q.  But it's your obligation to know, sir.  Ignorance

10   is not a defense?

11   A.  That is correct.

12   Q.  Right?  And -- and, you know, this stuff you can

13   verify, right?  You can go on the Texas Medical Board

14   and find out what you've done and what you haven't done,

15   right?

16   A.  That is correct.

17   Q.  Right?  And that's what we've done here.  You go

18   on line, right, and the Texas Medical Board still has

19   you licensed; do you know that?

20   A.  I did not know that, sir.

21   Q.  Because you haven't told, you haven't disclosed

22   to the public, right, that you're a felon?  Right?

23   A.  I haven't thought about being a doctor, being

24   just preoccupied.

25   Q.  Right, because that's not part of -- you've taken

1    responsibility to such a degree that you haven't even

2    told the State board that you are a felon?

3        A.   Well --

4        Q.   What would happen to you, sir, if you did, with

5    your license?  Would it remain active?

6        A.   They know I'm under investigation under

7    indictment, and so they're waiting for further

8    information.  So I've already received two letters by

9    the State medical board.

10       Q.   Well, as far as your malpractice information, you

11   didn't tell them about Diana Puente; did you?  There it

12   is -- you talk about some claim in Indianapolis.

13              MR. LOWELL:  Objection, Your Honor.  This is

14   not in evidence.

15              MR. HECTOR CANALES:  I'm impeaching him,

16   Your Honor, it's demonstrative.

17              THE COURT:  Gentlemen, this is outside the

18   scope of redirect.

19              Let's move on.

20              MR. HECTOR CANALES:  Judge, this is part of

21   the Government putting -- introduced his -- his -- his

22   plea.  The witness has said over and over on direct and

23   on re-cross that he's taken responsibility and this

24   directly goes to impeach his statement and his

25   credibility that he's taken responsibility for his acts,

1    not just in this indictment, but with other people in

2    his duties as a -- as a former -- or, as a physician.

3                THE COURT:  Back to the point.  You can --

4    you can ask him if he's -- if you want to ask him if

5    he's accepted responsibility, I think that's been asked

6    but --

7                MR. HECTOR CANALES:  Well, Judge, when he

8    denies something --

9                THE COURT:  Going into this specific issue

10   is outside the redirect.

11               MR. HECTOR CANALES:  When he denies

12   something, Your Honor, I should be able to show evidence

13   that he's not telling the truth.

14               THE COURT:  Unless I ask you to move on, and

15   I'm now asking you, please move on, sir.

16   Q.  (By Mr. Hector Canales)  During -- during lunch,

17   did you go and look up the information you said -- you

18   mentioned on redirect here Diane Puente, right?

19   A.  I was actually walking towards my truck and I was

20   thinking Patel, Patel and that's when I hit me, oh, Ms.

21   Puente.

22   Q.  Did it hit you, sir, that Ms. Puente has no short

23   term memory, that she was 41 years old, that she is now

24   41?

25   A.  That is correct.

1    Q.   Right.   And -- and how old was she, sir, did it

2    hit you how old she was when -- when she -- when you

3    turned her into a vegetable, did it hit you how old she

4    was then?   How old -- how old of a patient she was at

5    that time?

6    A.   When she was under my care, I believe she was in

7    her 30s.

8    Q.   35, did that hit you?

9    A.   Yes.

10   Q.   Did it -- did it hit you, sir, that after --

11   after you failed to give her proper care, that she no

12   longer -- that she's wheelchair bound, did that hit you?

13   A.   One of the physicians failed her.

14   Q.   Sir, my question, did it hit you that she's

15   wheelchair bound?

16   A.   It was devastating.

17   Q.   That wasn't my question.   Did it hit you then

18   over lunch too, she's wheelchair bound?

19   A.   (No response.)

20   Q.   Yes or no?

21   A.   (No response.)

22   Q.   Do you remember that or no?   Is that a fact you

23   remember or no?

24   A.   It still haunts me.

25   Q.   Does it --

1    A.   I feel sorry for the lady.  And her -- and her

2  daughter, she has one daughter.

3    Q.   Right.  And --

4    A.   And her mother is the one that's in charge of her

5  daughter.

6    Q.   And it should haunt you sir, too, it should

7  because she can't -- she doesn't even know who her own

8  daughter is, right?

9    A.   That is correct.

10   Q.   She can't walk or stand anymore because of you?

11   A.   Because of the 20 physicians that were involved

12  in her care.

13          MR. HECTOR CANALES:  No more questions.

14          THE COURT:  Mr. Cyganiewicz.

15          MR. CYGANIEWICZ:  Just one question.

16                RECROSS-EXAMINATION

17  BY MR. CYGANIEWICZ:

18   Q.   Do you not understand that your cases that are

19  still pending are not going to be dismissed unless these

20  people are happy with your story that you're telling

21  today?

22   A.   No, sir, it hasn't --

23   Q.   You don't understand that?

24   A.   No, no, that hasn't crossed my mind, I'm just

25  here to tell the truth and be truthful under oath and to

1   just demonstrate there was a lot of fraud.

2     Q.  Do you understand that if they're not happy with

3   the narrative you're saying they may not dismiss those

4   cases?

5     A.  It doesn't matter.

6           MR. CYGANIEWICZ:  Thank you.

7           MR. GUERRA:  Nothing further, Your Honor.

8           THE COURT:  Anything else?

9           MR. LOWELL:  Nothing further, Your Honor.

10         THE COURT:  Thank you, sir.  You're excused.

11   My understanding is we have one more very short witness.

12           MR. FOSTER:  That is correct, Your Honor.

13           THE COURT:  Ladies and gentlemen, it is my

14   goal to end long before yesterday, but we -- we may go

15   just a little bit past 5:00, all right, maybe 5:15, 5:30

16   but not past 5:30.

17           Next witness, please.

18           MR. FOSTER:  Thank you, Your Honor.

19           The United States calls Dr. Gabriel

20   Gonzalez.

21           THE COURT:  Well, one second.  Anybody real

22   quick break, anybody?  Attorneys?  All right.  Let --

23           MR. CYGANIEWICZ:  I'm not going to stand up,

24   Your Honor.

25           THE COURT:  Any -- anybody can raise their

1  hand, that's quite all right.  Let's proceed.

2              MR. FOSTER:  Thank you, Your Honor.

3              THE COURT:  Please remain standing, sir, and

4  raise your right hand.

5              (WITNESS SWORN IN.)

6              THE WITNESS:  Yes, I do.

7              THE COURT:  Thank you, sir.

8              Please make yourself comfortable and adjust

9  the microphone close to you, speak loudly and clearly.

10 Thank you, sir.

11             Mr. Foster, please proceed.

12             MR. FOSTER:  Thank you, Your Honor.

13                     DIRECT EXAMINATION

14 BY MR. FOSTER:

15    Q.  Good afternoon, Dr. Gonzalez.

16    A.  Good afternoon.

17    Q.  Can you introduce yourself to the jury, please.

18    A.  Yeah, my name is Dr. Gabriel Clemens Gonzalez.

19    Q.  And are you a doctor?

20    A.  Yes, sir.

21    Q.  What city do you live in?

22    A.  Weslaco, Texas.

23    Q.  How long have you lived in the Weslaco area?

24    A.  Over 23 years.

25    Q.  Do you practice medicine there?

1       A.   Yes, sir.

2       Q.   Can you describe your practice to the jury?

3       A.   I'm internal medicine specialist.

4       Q.   And how many years have you been practicing

5    there?

6       A.   I mean, in Weslaco, approximately, 29 years.

7       Q.   And can you explain to the jury what it means to

8    be a primary care doctor in Weslaco, Texas?

9       A.   Well, I take care of patients with illnesses like

10   diabetes, hypertension, heart disease, neurological

11   problems, problems with kidneys, common things like

12   colds and so forth.  But being an internist we handle

13   patients that are more complicated that have multiple

14   issues.

15      Q.   Now, can we bring up what's been previously

16   admitted as Government Exhibit H-34, please.

17      A.   Where is that?

18      Q.   You'll see it on the screen in front of you.

19      A.   Oh.  Yes, sir.

20      Q.   All right.  Do you recognize the woman in this

21   photo?

22      A.   Yes.

23      Q.   Who is it?

24      A.   She's my patient, her name is Petra Cerda.

25      Q.   When you say that she's your patient, how long

1    has she been a patient of yours?

2        A.   She's been a patient of mine for, approximately,

3    14 years.

4        Q.   14 years.   How often do you see Ms. Cerda?

5        A.   Well, I'm supposed to be seeing her every four

6    months.

7        Q.   Every four months.   Is she alive today?

8        A.   Yes, sir.

9        Q.   How is she doing?

10       A.   She's doing fairly well.

11       Q.   Fairly well.   Have you ever certified Ms. Cerda

12   for hospice?

13       A.   No, sir.

14       Q.   Why not?

15       A.   Because she's never fit the criteria for hospice.

16       Q.   Never fit the criteria for hospice.   Can you

17   explain to the jury what you mean by that?

18       A.   Well, yes.   She never had a terminal condition.

19   By that -- by that I mean illnesses where the patient is

20   expected to die within six months or so.

21       Q.   So she's never had a terminal condition in the 14

22   years you've been seeing her?

23       A.   That's correct, sir.

24       Q.   Never had a terminal condition in any of those

25   four months periods you've been seeing her over 14

1   years?

2       A.   That's correct, sir.

3       Q.   Now as part of your practice, have you referred

4   other patients to hospice before?

5       A.   Yes, sir.

6       Q.   Can you explain to the jury the difference

7   between the condition of patients you've referred to

8   hospice and that of Ms. Cerda?

9       A.   Most of the patients that I have sent to hospice

10  are patients that have either multiple organs that are

11  failing, they have terminal cancers, they have other

12  illnesses where you're not going to expect them to live

13  for very long.

14      Q.   And how is that different from Ms. Cerda's

15  condition?

16      A.   Ms. Cerda's condition, she never had any illness

17  where I expected her to die within six months.

18      Q.   Now, do you recall receiving a letter from the

19  Merida Group at a point in time?

20      A.   Yes, sir.

21      Q.   And can we bring up what's been admitted as

22  Government Exhibit D-3-A.  And can we zoom in on the

23  text there.  Thank you.

24          Now, do you recall receiving this letter from an

25  employee of the Merida Group?

1       A.   Yes, sir.

2       Q.   And did the letter surprise you when you received

3   it?

4       A.   Yes, sir.

5       Q.   Can you explain to the jury why the letter

6   surprised you?

7       A.   It surprised me because on the time before I saw

8   the patient, she did not have any -- anything to qualify

9   her for hospice.  I recalled very distinctly mentioning

10  this letter to one of my employees that I did not know

11  what had happened to Ms. Cerda, that maybe she had been

12  admitted to another hospital, that something critical

13  might have happened to her, but from the previous time I

14  had seen her, this was a surprise to me.

15      Q.   So you were concerned that something might have

16  happened to Ms. Cerda?

17      A.   Yes, that I was not aware of.

18      Q.   That you were not aware of.  And did Merida send

19  you an order form as well as this letter?

20      A.   That's correct, sir.

21      Q.   And can we bring up what's been admitted as

22  Government Exhibit D-3 at page 2.  And can we zoom in on

23  the text there.  Thank you.

24           Now, do you recognize this?

25      A.   Yes, sir.

1      Q.   Did you receive that from the Merida Group?

2      A.   Yes, sir.

3      Q.   And focusing in on the box that says, please

4  check all of data that applies, did you check evaluate

5  and treat?

6      A.   Yes, sir.

7      Q.   And what did that mean?

8      A.   For them to evaluate her for hospice services.

9      Q.   And did you expect to receive the results of any

10  evaluation?

11      A.   Yes, sir.

12      Q.   Did you ever receive the results of any

13  evaluation from the Merida Group?

14      A.   No, I didn't.  No, I didn't.

15      Q.   Is the hospice company responsible for evaluating

16  patients to make sure they have less than six months to

17  live?

18              MR. HECTOR CANALES:  Objection, leading,

19  Your Honor.

20              THE WITNESS:  Well --

21              THE COURT:  Hold on one second.

22              Rephrase the question, sir.

23              One second, one second, let him rephrase the

24  question.

25      Q.   (By Mr. Foster)  Did you expect to receive an

1   evaluation?

2        A.   Yes, sir.

3        Q.   Can you explain to the jury why that is?

4        A.   Well, the patient needs to be admitted, and

5   usually with my experience that I have with hospices is

6   that I receive a letter stating the condition and why

7   the patient will qualify to be admitted to hospice.

8        Q.   Did you ever receive such a letter from the

9   Merida Group?

10       A.   No, sir.

11       Q.   Did the Merida Group ever ask that you certify

12   Ms. Cerda as being terminally ill?

13       A.   No, they did not.

14       Q.   Never asked you -- did they ever ask you to sign

15   one of those certificates of terminal illness?

16       A.   No, they did not.

17       Q.   Now, did you -- how did you find out that Ms.

18   Cerda had been placed on hospice?

19       A.   Actually, I found it through Agent Garcia that

20   came to my office.

21       Q.   From Agent Garcia.  You never found it out from

22   the Merida Group?

23       A.   That's correct.

24       Q.   And what did you think when you found that out?

25       A.   I was surprised.

1     Q.   Why were you surprised?

2     A.   That an agent comes to my office and tells me

3   that my patient is in hospice and not from the hospice

4   itself.

5     Q.   You thought it was strange that you didn't find

6   out from the hospice itself?

7     A.   Yes, sir.

8     Q.   Now, you mentioned finding out from Agent Garcia

9   at the Department of Health and Human Services Office of

10   Inspector General.  Can we pull up Government Exhibit 3

11   at page 1.

12         COURT CLERK:  Can you repeat that?

13         MR. FOSTER:  Government -- I'm sorry.

14   Defense Exhibit 3, I guess, at page 1.

15         COURT CLERK:  I do not have that exhibit.

16         MR. FOSTER:  It was this -- I believe it was

17   the same exhibit we were just looking at.

18         COURT CLERK:  Oh, our Exhibit D-3?

19         MR. FOSTER:  GX D-3, I apologize.  Can we

20   zoom in on the text there.

21     Q.   (By Mr. Foster)  Now, did you respond to the OIG

22   with a letter?

23     A.   Yes, sir.

24     Q.   And can you read what you read -- what you wrote

25   in that letter to the jury.

1     A.   I don't think my patient Petra Cerda was eligible

2   for hospice back in February of 2016.  I only signed

3   request form to evaluate and treat as sons Guillermo

4   Cerda request as per letter that was attached.  I was

5   never notified that she was admitted for hospice care.

6     Q.   Now, I want to show you what's been admitted as

7   Government Exhibit H-35.

8          Do you see the length of time that Ms. Cerda was

9   placed on hospice by the Merida Group, Bee Caring

10  Hospice Health Care?

11    A.   Yes.

12    Q.   About how long was that?

13    A.   August 14, 2012 through November 30th, 2017.

14    Q.   You -- you raised your eyebrows when you looked

15  at that.  What do you think about that?

16    A.   I was not even aware about 2012.  That's even

17  four years before I got their letter from their

18  chaplain.

19    Q.   Have ever placed any of your patients on hospice

20  for that long?

21    A.   No.

22    Q.   Why not?

23    A.   By that time they probably would be dead, or I

24  would release them from hospice.

25    Q.   Thank you.

1           MR. FOSTER:  No further questions,

2   Your Honor.

3           THE COURT:  Defense has three, ten-minute

4   sessions.

5                   CROSS-EXAMINATION

6   BY MR. HECTOR CANALES:

7      Q.  Sorry about -- hello, Dr. Gonzalez.  My name is

8   Hector Canales and I represent Rodney Mesquias, okay?

9      A.  Okay.

10     Q.  All right.  That's your signature right there?

11     A.  Yes, sir.

12     Q.  All right.  And what was the diagnosis that

13  you -- that it indicates on your order, sir?

14     A.  Alzheimer's disease.

15     Q.  And you signed this on February the 9th of '16?

16     A.  Yes, sir.

17     Q.  Right?  And you're -- you're here to say that

18  you're surprised that -- that -- that your order was

19  followed to evaluate and treat, you were surprised that

20  she was evaluated and treated?

21     A.  Yes.

22     Q.  But that was your order, you ordered it?

23     A.  Well, evaluation and admission to hospice are two

24  completely different things, sir.

25     Q.  Okay.  So if there's an evaluation and an

1   admission, that's something -- that's a distinction that

2   you make, right?

3       A.   That's correct.

4       Q.   Now, you got -- now, did anybody force you to

5   sign this, to put your name to this document?

6       A.   No.

7       Q.   You did so willingly and knowingly?

8       A.   Yes.

9       Q.   Okay.  And if you disagree with a patient's

10  request, if you don't think it's in their -- in their

11  best interest, you're obligated as a physician -- they

12  have a right to reject a patients request, right?

13      A.   Yes, sir.

14      Q.   Okay.  But in this particular case, Ms. --

15  Ms. Cerda's son, Guillermo, they wanted this, right?

16      A.   There's a request.

17      Q.   Right?

18      A.   Yes.

19      Q.   And -- and you -- you agreed with that request?

20      A.   The request, yes, sir.

21      Q.   All right.  Have you ever spoken to Rodney

22  Mesquias?  Do you know who that is?

23      A.   I don't remember him.

24      Q.   Okay.  Rodney didn't give -- make you a call and

25  say, doc, you better sign this order to evaluate and

1    treat, or else, or anything to that effect; did he?

2        A.   No, he did not.

3        Q.   You weren't coerced by anybody to put your

4    signature to this?

5        A.   That's correct.

6        Q.   Okay.  And you received a request for medical

7    records from the OIG Special Agent Michael Garcia,

8    right?

9        A.   That's what it looks like, yes, sir.

10       Q.   And he wanted the complete file for Petra Cerda

11   from 2015 to present, right?

12       A.   That's correct.

13       Q.   And you -- and you gave it to him; didn't you?

14       A.   Yes, sir.

15       Q.   And but that file, sir, this is it, that's what

16   you produced, this is the complete file from '15, right,

17   that's it?  You gave it all?

18       A.   That's what you have.

19       Q.   Okay.  That's not very much, is it?

20       A.   I don't know.  I haven't seen what you have

21   there.

22       Q.   Okay.  All right.  Well, let's go through it real

23   quick.  Let's go through what you have in here real --

24   real quick because you said 14 years she was your

25   patient, right?

1      A.   That's correct.

2      Q.   And so we've got a little demonstrative aid here

3  for you -- of your notes.  Can we switch to the --

4  switch to the computer.

5           And doctor, I'll give you my copy here, all

6  right, just so you --

7                MR. HECTOR CANALES:  May I approach,

8  Your Honor?

9                THE COURT:  Yes, sir.

10     Q.   (By Mr. Hector Canales)  Just so you can be

11  certain.

12          The first record in that -- in your -- that you

13  produced is on January the 5th of 2015, correct?

14     A.   That's correct.

15     Q.   All right.  Now, zoom in on that, Roy.  Can we

16  blow that up?

17          On January the 5th, Ms. Cerda comes in, and you

18  say she has been absolute -- she has absolutely no

19  physical complaints.  States she's been feeling great.

20  Right?

21     A.   That's what it says.

22     Q.   All right.  So back to the timeline.

23          The next record is in May, May 5th, right, we're

24  going -- we've basically, you know, five months later,

25  right?  And, again, no physical complaints.  She's been

1    feeling great, right?

2        A.   That's correct.

3        Q.   All right.  So now all of a sudden we get to June

4    26th, a month later.  Now all of a sudden, just a month

5    after she's feeling great, there you say the patient is

6    debilitating, she's basically homebound and she has no

7    transportation and is very difficult for her to

8    become -- to become, that's probably a typo -- into the

9    office weekly, medication prepared for her.  Now, that's

10   a significant decline, right, to go from no physical

11   complaint, absolutely fine to debilitated homebound,

12   right?  That's a marked change you would agree?

13       A.   Yes.

14       Q.   Okay.  And -- and to be debilitated or homebound

15   qualifies you, doesn't it qualify you, sir, for Medicare

16   benefits?

17       A.   Medicare benefits?

18       Q.   Home health care benefits, isn't that the

19   criteria for home health, do you know?

20       A.   For home health, yes.

21       Q.   All right.  So she is now eligible, according to

22   you, she is eligible for some Medicare benefits?

23       A.   Correct.

24       Q.   Now, go back, Roy.  Go back to that.  Go back to

25   that June 26th there.

1         How old, if you go to the very top there, how old
2    is she at this point in time?
3        A.   88 years old of age.
4        Q.   What is the -- what is the normal life expectancy
5    here in the United States?
6        A.   Currently.
7        Q.   Yes, sir?
8        A.   In the 80s.
9        Q.   Is she passed the normal life expectancy at 88
10   years old?
11       A.   Yes.
12       Q.   All right.  Let's go back to the timeline.
13   September the 11th, so now we're just in June and now
14   we're September the 11th, right?  So we've gone from the
15   sixth month to -- so three months later she comes back
16   and sees you, right?
17        And you note that she comes in the clinic with
18   her son, due to her having what?  What do you say she
19   has there, sir?
20       A.   Dementia.
21       Q.   All right.  Do you -- that's the -- she didn't
22   have that just a month before; did she?
23       A.   Well, I don't know that.
24       Q.   Well, do you need to go back and look at your
25   record?  Let's go back and look at the record.

1          See we're back on June?  Do you see any dementia

2    there?

3        A.   Well, I --

4        Q.   You say she is debilitated?

5        A.   Uh-huh.

6        Q.   Right?  But can you be debilitated and not

7    have -- not have dementia, right?

8        A.   Oh, yes.

9        Q.   Okay.  All right.  There's no mention in June of

10   dementia, we agree?

11       A.   Correct.

12       Q.   All right.  So let's go back -- so let's go a

13   month later, or three months later, now you're saying

14   she has got dementia.  Was that true when you said it?

15       A.   Yes.

16       Q.   You wouldn't have put it in there unless you

17   document -- unless you believed it, right?

18       A.   Correct.

19       Q.   So now she's -- she is debilitated, she's 88

20   years old, she's debilitated and she's got dementia,

21   right?

22       A.   Correct.

23       Q.   And she -- she also has some urinary

24   incontinence; doesn't she?

25       A.   Yes.

1    Q.   The reason for the appointment.

2    A.   Yes.

3    Q.   All right.  Next.  Let's go back to the -- and

4    now she comes back, and now we've moved from the ninth

5    month to just over a month later, five weeks later.

6         What do you say there in her present physical

7    history illness?  What does it say there, Dr. Gonzalez?

8    A.   On the underlying it says, the patient has fairly

9    advanced Alzheimer's and really she will continue to

10   benefit from home health services for medications and to

11   be checked up periodically.

12   Q.   And -- and is that why you put on your order to

13   the hospice company Alzheimer's disease is because you

14   found that she had Alzheimer's here?

15   A.   Yes, sir.

16   Q.   And was it beginning, or -- how do you describe

17   the Alzheimer's here?

18   A.   Severe.

19   Q.   Severe and advanced, right?

20   A.   Yes.

21   Q.   Right there under your assessment you say it's

22   late onset, correct?

23   A.   Yes.

24   Q.   This is a rapid decline; would you not agree that

25   all of a sudden here at the beginning of the year in --

1    in June, she was absolutely fine; now in -- now on --

2    where are we at, October here, it's late onset, this is

3    happening pretty quick; isn't it?

4       A.  Do you know what late onset means, sir?

5       Q.  Sir?

6       A.  No, do you -- do you know what it means?

7       Q.  My question -- I get to ask the questions here,

8    sir, not you?

9       A.  No, I'm trying to answer.

10             THE COURT:  One second.  Gentlemen, doctor,

11   please be patient.  Only answer his questions, you're

12   not allowed to ask any questions.

13             THE WITNESS:  No, because he's assuming --

14             THE COURT:  Again.

15             THE WITNESS:  Okay.

16             THE COURT:  The defense has the right to ask

17   you very limited questions, so please listen carefully.

18             THE WITNESS:  Okay.

19      Q.  (By Mr. Hector Canales)  My question here, sir,

20   is within a four-month period of time, your records have

21   gone from absolutely nothing wrong to Alzheimer's

22   disease, late onset, incontinent, debility and -- and

23   homebound in a four-month period, sir, that's what's

24   happened, right, within those four months?

25      A.  Yes, sir.

1    Q.   Okay.   Thank you very much.   Let's go back to the

2  timeline.   Then we get to the order that you signed,

3  correct?

4        So now we know where the Alzheimer's came from in

5  your order, right?

6    A.   Yes, sir.

7    Q.   Okay.   Now, can I have the ELMO back?

8            THE CLERK:   Yes, sir.

9    Q.   (By Mr. Hector Canales) All of the records that

10  we just went through and that were produced there in

11  time occurred prior to February the 10th of '16,

12  correct?

13    A.   Yes, sir.

14            MR. HECTOR CANALES:   Pass the witness.

15            THE COURT:   Mr. Cyganiewicz?

16            MR. CYGANIEWICZ:   I have no questions,

17  Your Honor.

18            THE COURT:   Mr. Guerra?

19            MR. GUERRA:   No questions, Your Honor.

20            THE COURT:   Mr. Foster, anything else?

21            MR. FOSTER:   Yes, thank you, Your Honor.

22                    REDIRECT EXAMINATION

23  BY MR. FOSTER:

24    Q.   Dr. Gonzalez.

25    A.   Yes.

1     Q.  Do you remember defense counsel was asking you

2  some questions about Alzheimer's disease with late

3  onset.

4       Let's put this page up on the ELMO, which is D-3

5  at page 15.

6       Do you recall he wouldn't let you explain?

7     A.  Yes.  Late onset means that you develop at a

8  later age.  If you put early onset, that means somebody

9  with Alzheimer's in their early 60s, below -- before 65

10  years of age.

11     Q.  Does having late onset Alzheimer's mean you

12  qualify for hospice?

13     A.  No, sir.

14     Q.  Does being 88 years old mean you qualify for

15  hospice?

16     A.  No, sir.

17     Q.  Does everyone who lived past their normal life

18  expectancy qualify for hospice?

19     A.  No, sir.

20     Q.  Does having dementia mean you qualify for

21  hospice?

22     A.  No, sir.

23     Q.  What about urinary incontinence?

24     A.  No, sir.

25     Q.  Did Ms. Cerda qualify for hospice?

1    A.   No, sir.

2    Q.   Your documents talk about home health.  Is being

3  qualified for home health different than qualified for

4  hospice?

5    A.   It's different.

6    Q.   Defense counsel talked about this, supposedly

7  severe decline in 2016.  You were seeing Ms. Cerda every

8  four months, did she have a severe decline in health in

9  2016?

10    A.   Well, there was some decline.

11    Q.   Uh-huh, but severe enough to be on hospice?

12    A.   No, sir.

13    Q.   Do you recall you received this evaluate and

14  treat form, and do you recall testifying that you were

15  concerned that maybe something had happened to Ms. Cerda

16  and that's why you signed it; is that right?

17    A.   Yes, sir.

18    Q.   And the next time you see -- you saw her, had

19  anything happened to her?

20    A.   No, she seemed to be the same as last time I had

21  seen her.

22    Q.   And in the four months after that, how is she

23  doing?

24    A.   About the same.

25    Q.   And today?

1    A.   About the same, just older.

2    Q.   Okay.  And -- and what do you think about whether

3    she should be on hospice ever during this time period as

4    her primary care doctor who treats her every four

5    months?

6    A.   She never qualified for hospice, sir.

7    Q.   And you've said that you worked with other

8    hospice companies.  Did they communicate with you the

9    same or different than Merida communicated with you?

10   A.   Differently.

11   Q.   Can you explain that to the jury.

12   A.   Well, they keep me informed about the patient,

13   they ask me to sign their admission orders.  They ask me

14   if I want to relinquish my care to -- to the hospice

15   physician, which I usually do if the patient is very

16   sick and maybe needing narcotics because I cannot always

17   provide narcotics in the middle of the night and their

18   physicians can do that, and I don't have that ability.

19   At least at that time.

20   Q.   And did the Merida Group ever ask you any of

21   those questions?

22   A.   No, sir.

23   Q.   Did they ever follow-up, consult with you about

24   whether Ms. Cerda should be on hospice?

25   A.   No, sir.

1          MR. FOSTER:  No further questions,

2   Your Honor.

3          THE COURT:  Mr. Canales, anything else?

4                RECROSS-EXAMINATION

5   BY MR. HECTOR CANALES:

6      Q.  Have you ever had another doctor disagree with

7   your opinion?

8      A.  Yes, sir.

9      Q.  It happens all the time, right?

10     A.  Excuse me?

11     Q.  Happens all the time in the practice of medicine

12  where one doctor differs -- has a different opinion

13  about a patient's prognosis over another one?

14     A.  Yes, sir.

15     Q.  All right.  And you understand that hospice

16  eligibility is based on a doctor's opinion about a

17  patient's terminal illness?

18         MR. FOSTER:  Objection, outside the scope,

19  Your Honor, all these questions.

20         THE COURT:  I'll allow that question.

21     Q.  (By Mr. Hector Canales)  Do I need to repeat?

22     A.  Please.

23     Q.  Sure.  If I can even remember, now you threw me

24  off.

25         Yeah, you understand that -- that eligibility for

1    hospice is premised on an opinion of life expectancy,

2    right?

3        A.   It's more than an opinion, there should be some

4    facts, too, sir.

5        Q.   Sure, like a diagnosis, right?

6        A.   Not all diagnoses lead to requiring hospice.

7        Q.   Right.  You've got to look at more than just the

8    diagnosis, you've got to look at the whole picture,

9    right, the holistic approach, right?

10       A.   Correct.

11       Q.   But there's no dispute here from you that she had

12   Alzheimer's disease, right?

13       A.   That's correct.

14       Q.   Thank you.

15                MR. HECTOR CANALES:  Pass the witness.

16                THE COURT:  Anything else?

17                MR. FOSTER:  No, nothing further,

18   Your Honor.

19                THE COURT:  Thank you, sir.  You're excused.

20                THE WITNESS:  Okay.  Thank you.  Excuse me.

21                THE COURT:  Very good.

22                THE WITNESS:  I'm just passionate about my

23   work.

24                THE COURT:  And ladies and gentlemen,

25   everybody is going to be excused along with the doctor.

1              Let's go ahead and break for the day.

2     Again, let's follow the same procedures, please show up

3     promptly before 9:00 and we'll start with the next

4     witness.

5              Everyone have a nice evening.

6              COURT OFFICER:  Please raise for the jury.

7              (JURY OUT.)

8              THE COURT:  All right.  All right.  Thank

9     you, everyone.  We'll be in recess.

10             (COURT IN RECESS.)

11

12                    REPORTER'S CERTIFICATE

13

14       I certify that the foregoing is a correct transcript

15    from the record of proceedings in the above-entitled

16    matter.

17

18

19       _/s/Sheila E. Perales._____

20       SHEILA E. HEINZ-PERALES CSR RPR CRR
         Exp. Date:  January 31, 2021

21

22

23

24

25