```
 1              IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION


 3
     UNITED STATES OF AMERICA      )
 4                                 )
                                   )
 5   VS.                           )  CRIMINAL ACTION NO.
                                   )  B-18-CR-8
 6                                 )
     RODNEY MESQUIAS, HENRY        )
 7   MCINNIS AND FRANCISCO PENA    )
                                   )
 8

 9

10                      TRIAL - DAY NINE
              BEFORE THE HONORABLE ROLANDO OLVERA
11                     NOVEMBER 1, 2019


12


13                  A P P E A R A N C E S

14
      FOR THE UNITED STATES:
15
          MR. KEVIN LOWELL
16        MR. ANDREW SWARTZ
          MR. JACOB FOSTER
17        ASSISTANT UNITED STATES ATTORNEY
          BROWNSVILLE, TEXAS 78520
18

19   FOR THE DEFENDANT RODNEY MESQUIAS:

20        MR. CHARLES BANKER
          ATTORNEY AT LAW
21        118 Pecan Boulevard
          McAllen, Texas 78501
22
          MR. HECTOR CANALES
23        MR. TONY CANALES
          ATTORNEYS AT LAW
24        2601 Morgan Avenue
          Corpus Christi, Texas 78405

25
```

```
 1   FOR THE DEFENDANT HENRY MCINNIS:

 2        MR. ED CYGANIEWICZ
          ATTORNEY AT LAW
 3        1000 E. Madison Street
          Brownsville, Texas 78520
 4
     FOR THE DEFENDANT FRANCISCO PENA:
 5
          MR. ROBERT GUERRA
 6        ATTORNEY AT LAW
          55 Cove Circle
 7        Brownsville, Texas 78521

 8   FOR THE DEFENDANT FRANCISCO PENA:

 9        MS. ADRIANA ARCE-FLORES
          ATTORNEY AT LAW
10        1414 Victoria Street
          Laredo, Texas 780404
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    THE COURT:  Thank you, everyone.  Please be
 2     seated.
 3                    Ladies and gentlemen, welcome back.
 4                    I understand that one of you had a slight
 5     emergency that caused some tardiness, but thank you for
 6     being here.
 7                    Let's proceed.
 8                    MR. LOWELL:  Good morning, Your Honor.
 9                    The United States calls Michael Petron.
10                    THE COURT:  Please remain standing, sir.
11     We'll swear you in.
12                    THE CLERK:  Please raise your right hand.
13                    (WITNESS SWORN IN.)
14                    THE WITNESS:  I do.
15                    THE COURT:  Thank you, sir.
16                    Please make yourself comfortable, position
17     the microphone closely to you and speak loudly and
18     clearly into the microphone.
19                    THE WITNESS:  Yes, sir.
20                    THE COURT:  Thank you, sir.
21                    MR. LOWELL:  May I proceed?
22                    THE COURT:  Please.
23                         DIRECT EXAMINATION
24     BY MR. LOWELL:
25        Q.  Good morning.  Please introduce yourself to the
```

1    jury.

2         A.   Good morning.  My name is Michael Petron, spelled

3    P-e-t-r-o-n.

4         Q.   Mr. Petron, what is your current occupation?

5         A.   I'm a managing director at a consulting firm

6    named Stout.

7         Q.   Could you walk through your education.

8         A.   Sure.  I have an undergraduate degree with a

9    double major in economics and statistics, I have one

10   Master's Degree in Statistics and one Master's Degree in

11   Accounting.

12        Q.   How about your professional qualifications?

13        A.   I am a certified public accountant, licensed in

14   the Commonwealth of Virginia and I'm also a certified

15   fraud examiner.

16        Q.   How about speaking engagements?

17        A.   I've had numerous speaking engagements over the

18   years.  At least, I'd say, 20 to 30 speaking engagements

19   across the country, generally speaking to law

20   enforcement and to the United States attorneys offices.

21        Q.   You work for a company called Stout; is that

22   right?

23        A.   I do.

24        Q.   And how many people do you manage at Stout?

25        A.   About 115 people.

1    Q.   Have you assisted the Department of Justice in

2    the investigation of this case?

3    A.   I have.

4    Q.   When did you start?

5    A.   Would have been sometime in the fall, say of

6    October 2017.

7    Q.   And have you worked on other health care fraud

8    investigations?

9    A.   I have.

10    Q.   Approximately, how many?

11    A.   100, 150.  I'm not sure.

12    Q.   Now, have you been retained by the Government

13    before to testify as a witness?

14    A.   I have.

15    Q.   And have you been retained by the private sector

16    as a witness?

17    A.   I have.

18    Q.   How many times have you testified in federal

19    court in criminal cases?

20    A.   Give or take, 20.

21    Q.   Focusing on this case, when were you retained?

22    A.   In the fall, so October 2017.

23    Q.   And what were you retained to do?

24    A.   A few different things.  I was retained to

25    examine financial records, so probable -- primarily bank

1    accounts and credit card statements, and then the second

2    major area was health care claims data.

3        Q.   Were you hired to make a conclusion in this case?

4        A.   No.

5        Q.   Were you hired to give an opinion about the

6    Defendant's guilt or innocence?

7        A.   No.

8        Q.   What are you summarizing in general?

9        A.   I'm summarizing voluminous data.  So voluminous

10   bank accounts, 12 credit cards, hundreds of thousands of

11   records contained within the Medicare claims data.

12       Q.   Now, have you analyzed every single bank account

13   that Merida Group?

14       A.   I have not.

15       Q.   Every single account of the Defendants?

16       A.   I have not.

17       Q.   Approximately, how many bank accounts did you

18   analyze?

19       A.   35.

20       Q.   For multiple banks?

21       A.   Multiple banks.

22       Q.   Now, you talked about the banking information,

23   how about the claims data, did you also analyze claims

24   data?

25       A.   A ton.

Q.   For the Merida Group?

A.   Correct.

Q.   For Francisco Pena?

A.   Yes.

Q.   Now, when you went through the Medicare data, what did you do?

A.   Well, first and foremost I upload the Medicare data into data basis on my platform, and then, from there, I will summarize that information depending upon whatever characteristics are asked of me.

Q.   How voluminous was -- were the claims data and banking in this case?

A.   Extensive.   I believe the claims data was over 800,000 records and we had 3500 - 4,000 pages of bank records.

Q.   Did you prepare exhibits in this case?

A.   I did.

Q.   What kind of exhibits?

A.   They're referred to as summary exhibits.

Q.   And are those summary exhibits based on your analysis of the claims data?

A.   That's correct.

Q.   Your analysis of the banking records?

A.   Correct.

Q.   Could we call up Government's Exhibit L-1

1    together with Government's H-16, please.

2         Mr. Petron, what does this depict?

3    A.   So, Government Exhibit L-1 is a map of the State

4    of Texas showing the location of the Merida Group

5    entities.   That's on the left.

6         On the right is a map that I created commonly

7    referred to as a heat map that shows the dispersion of

8    Merida Group beneficiaries throughout the State based

9    upon the Medicare billing data.

10   Q.   When you say Medicare beneficiaries, is that --

11   what does that mean in plain English?

12   A.   A patient.

13   Q.   A patient of the Merida Group?

14   A.   Correct, a Medicare patient of the Merida Group.

15   Q.   Now, when you created this heat map, what, if

16   anything, did you notice about the aspersion of

17   patients?

18   A.   Well, you can observe here that there are

19   patients located throughout the State.   I mean, the

20   dispersion is obviously centralized down here in the

21   Valley and in the major metropolitan areas, but it's not

22   limited to those areas.

23        You can see the blue dots are, you know, spread

24   pretty consistently throughout all of the population

25   centers.

1    Q.   Is there a concentration of patients right here

2  in the Valley?

3    A.   That's correct.

4    Q.   If we could bring up L-2, please, together with

5  H-15.

6        Mr. Petron, what do we see here?

7    A.   So what we see here on the left is a group -- is

8  a showing by county of where the Merida Group entities

9  were located and the medical directors at particular

10  entities.

11        And on the right, this heat map is for population

12  centers in more of more than 500 beneficiaries.  So you

13  can see in red here the -- the bright dots are the major

14  metropolitan areas, and then you can see some of the

15  yellowish, you know, green dots in Laredo and some other

16  places, but not down here in the Valley, Houston,

17  San Antonio.

18    Q.   Now, the doctors in the Medicare -- the medical

19  director chart, were you able to draw certain

20  connections, links, between them and Merida Group

21  patients?

22    A.   Correct.  So, for example, Dr. Pena in Laredo, if

23  you look at the Medicare billing data, you can see that

24  Dr. Pena is often an attending physician for those

25  patients.

1   Q.   Those are patients of the Merida Group?

2   A.   Correct.

3   Q.   In Laredo?

4   A.   Correct.

5   Q.   How about Dr. Virlar and patients in San Antonio?

6   A.   The same holds true there where Dr. Virlar is the

7   attending physician for a number of Medicare

8   beneficiaries in the San Antonio area.

9   Q.   How about Dr. Carrillo and Merida Group patients

10  in the Valley?

11  A.   Mr. Carrillo is present in the Merida Group for

12  those patients in the Valley.

13  Q.   Can you pull up H-15 together with H-8.

14       Now, Mr. Petron, focusing on your analysis of the

15  claims data, how much money -- could you tell the jury

16  how much money the Merida Group billed?

17  A.   The Merida Group billed a little over

18  $152,000,000.

19  Q.   152,000,000?

20  A.   $152,000,000.

21  Q.   Across the State of Texas?

22  A.   This is even broader than the State of Texas,

23  my -- my map I restricted to the State of Texas, but I

24  think there are about 300 beneficiaries or patients

25  outside of the State of Texas.

1    Q.   So it doesn't include everybody?

2    A.   This map does not include everyone.

3    Q.   Now, based on your analysis of the claims data,

4 how much was paid to the Merida Group on those

5 150,000,000 -- approximately, $150,000,000 in bills?

6    A.   It's about $124,000,000, if memory serves.

7    Q.   And where was that money deposited?

8    A.   Into various Merida Group bank accounts.

9    Q.   And who controlled the Merida Group's corporate

10 bank accounts?

11    A.   By and large, Mr. Mesquias.

12    Q.   And based on your analysis of the Medicare

13 documents, during what timeframe did he control those

14 accounts?

15    A.   I had access to the banking records from,

16 approximately, 2011 through 2018, and he was the

17 signatory on those accounts for those time periods.

18    Q.   And prior to that, did you also have access to

19 Medicare -- certain Medicare records?

20    A.   I had access to Medicare records going back to

21 2009, but no banking records before 2011.

22    Q.   Okay.  And do those records pre-2011, do they

23 include EFT agreements?

24    A.   Correct.

25    Q.   And what are EFT agreements?

1    A.   They're agreements between a provider and the

2    Medicare program about the electronic data interchange

3    of information.

4    Q.   And based on your review of those records,

5    between 2009 and 2011, who controlled the corporate bank

6    accounts at the Merida Group?

7    A.   Mr. Mesquias.

8    Q.   That was Medicare money going into those

9    accounts?

10   A.   Correct.

11   Q.   What are proceeds, Mr. Petron?

12   A.   Proceeds, as I've defined them in this matter,

13   are any monies paid from Medicare into the Merida Group.

14   Q.   Were you able to track proceeds from Medicare

15   into Merida Group bank accounts?

16   A.   I was.

17   Q.   Could we go to Government's Exhibit L-3, please.

18        Now, Mr. Petron, in your analysis of those bank

19   records, did you identify a financial relationship, a

20   link between Rodney Mesquias and Francisco Pena?

21   A.   I did.

22   Q.   What did you see?

23   A.   I saw money being transferred from the Merida

24   Group entities to Mr. Pena.

25   Q.   Approximately, how much money did you identify

1    from Rodney Mesquias to Francisco Pena?

2        A.   Testing my memory.   I believe it's $108,000,

3    approximately.

4        Q.   Could we do a side by side, L-3 together with

5    H-18.

6        A.   This would be one example of a check written from

7    Professional Hospice to Dr. Pena in the amount of

8    $2,000.

9        Q.   Mr. Petron, who signed this check?

10       A.   That appears to be Mr. Mesquias' signature.

11       Q.   Let's pull up H-17 on the right.

12            Is this another check to Mr. Pena?

13       A.   Correct.   This is an another example of a check

14   from Professional Hospice signed by Mr. Mesquias for

15   services in February of 2014.

16       Q.   Going to H-19, what is this?

17       A.   This is a third example for $5,000 to Dr. Pena

18   signed by Mr. Mesquias, and the memo reads:   MD

19   directorship August and September services.

20       Q.   Now, in addition to that relationship between the

21   Merida Group and Francisco Pena, did you also identify a

22   financial link between the Merida Group and Henry

23   McInnis?

24       A.   I did.

25       Q.   Let's pull up H-65.   Put H-65 on the right and

1    then also pull up that together with L-3, please.

2        Mr. Petron, approximately, how much money did the

3    Merida Group pay Henry McInnis?

4        A.  Approximately, $513,000.  You can see that sort

5    of on the bottom right.

6        Q.  And could we add to the right Government's

7    Exhibit H-66.

8        In addition to Dr. Pena, Henry McInnis, did you

9    also identify a financial relationship between the

10   Merida Group and Dr. Eduardo Carrillo?

11       A.  I did.

12       Q.  How much money was paid to Dr. Carrillo?

13       A.  I believe it's in the two hundred thousand dollar

14   range, $224,000, I believe.

15       Q.  Now, did you also identify money in a financial

16   relationship between the Merida Group and Joe Garza?

17       A.  I did.

18       Q.  Approximately, how much money did the Merida

19   Group pay Joe Garza?

20       A.  $258,000, approximately.

21       Q.  Could we pull up H-11 together with L-2.

22       Mr. Petron, did you establish a connection

23   between patients living in Laredo and the Merida Group?

24       A.  I did.

25       Q.  Would you tell the jury about that.

1    A.   Sure.  So on the chart on the left-hand side,

2  this is a summary of all patients where Dr. Pena was the

3  attending physician at any of the Merida Group entities.

4  So you can see that there were billings under four

5  entities, two of them, obviously, much larger than the

6  others, Professional Hospice Care and Virtue Home

7  Health.

8         In total, Dr. Pena was attending 423 patients

9  with 986 claims.  There was a total billed amount on

10  those claims of $4.5 million with a paid amount of just

11  over $3.1 million.

12    Q.   And to be clear, those were patients of the

13  Merida Group?

14    A.   Correct, these are all patients of Merida Group

15  entities.

16    Q.   And who was the attending doctor for those

17  patients?

18    A.   Dr. Pena.

19    Q.   Did you also identify links between Dr. Virlar,

20  Dr. Pena on the one hand and a specific Merida Group

21  entity?

22    A.   I did.

23    Q.   Were they the top two doctors for a specific

24  Merida Group entity?

25    A.   Yes.

1     Q.   Was that an entity controlled by Rodney Mesquias?

2     A.   It was.

3     Q.   Could we pull up H-52 together with L-2.

4          Would you tell the jury about this exhibit?

5     A.   So again, on the left, just focusing on the

6     Professional Hospice Care entity within the Merida

7     Group, Dr. Virlar and Dr. Pena represented the majority

8     of patients seen at that entity.

9          Dr. Virlar, 46 percent of the patients; Dr. Pena

10    second at 20 percent of the patients.

11    Q.   Let's go to Government's Exhibit H-3, please.

12         Mr. Petron, what does this depict?

13    A.   This depicts a summary of the banking records

14    where the Merida Group entities paid Mr. Mesquias by

15    check.  In total, Mr. Mesquias received over $4.1

16    million.

17    Q.   And is this $4.1 million separate from the

18    124,000,000 you mentioned earlier?

19    A.   I wouldn't necessarily say separate, it could

20    have been derived from the $124,000,000.

21    Q.   Okay.  And to be clear, Rodney Mesquias

22    controlled this personal account here?

23    A.   These checks, I was never -- I was only able to

24    locate $50,000 of these checks being deposited into

25    Mr. Mesquias' personal accounts.  So this information is

1    derived from checks written off of the Merida Group

2    entity accounts.   But I never saw them actually being

3    deposited.

4        Q.   Let's go to Government's Exhibit L-3 together

5    with H-7.

6             What is this, Mr. Petron?

7        A.   So on the right we have payments to an individual

8    named Micaela Wooten from Professional Hospice Care.

9    She received over $414,000.

10       Q.   And what does it indicate in the memo line for

11   Ms. Wooten?

12       A.   A profit distribution, or a distribution -- some

13   type of profit sharing or distribution.

14       Q.   Do you have any idea whether Ms. Wooten was an

15   owner of the company?

16       A.   It's my understanding that she was listed as an

17   owner.

18       Q.   Let's go to -- let's go to Exhibit L-2 together

19   with H-7, please.

20            What is this document, Mr. Petron?

21       A.   The one on the left is a -- is the map that we

22   have seen with the medical directors at various

23   entities, and the right is the -- the payments to

24   Ms. Wooten.

25       Q.   Could we go to Government's Exhibit H-10 together

1    with Government's Exhibit L-2.

2        A.   So on the right, on Exhibit H-10, we have a

3    summary of Medicare billed and paid amounts where

4    Dr. Carrillo was the attending physician.  So you can

5    see that there are a total of 147 unique beneficiaries,

6    441 claims with over $1.9 million billed and $1.3

7    million paid.

8        Q.   Let's pull up Government's Exhibit H-11 together

9    with L-2.

10       A.   This a summary of where Dr. Pena was the

11   attending physician, we briefly, I think, looked at this

12   already where Dr. Pena primarily in Professional Hospice

13   and Virtue Home Health had 123 beneficiaries, 986

14   claims, 4.5 million billed, 3.1 million paid.

15       Q.   Let's please pull up L-2 together with H-12.

16       A.   H-12 changes the summary to focus more on

17   Dr. Virlar in the San Antonio area.  Dr. Virlar had a

18   total of 833 beneficiaries, almost 4,000 claims with

19   over $17,000,000 billed and over $13,000,000 paid for

20   those Merida Group patients.

21       Q.   So among the three doctors that worked for Rodney

22   Mesquias, among those three depicted in the map, was

23   Dr. Virlar the top doctor?

24       A.   By far.

25       Q.   Let's go to H-14, please, together with L-2.

1          Focusing on these three doctors, Dr. Virlar,

2    Dr. Pena, Dr. Carrillo, approximately, how many patients

3    were tied to these specific doctors?

4        A.   1,096.

5        Q.   Let's pull up L-2 together with H-20.

6             What does this depict, Mr. Petron?

7        A.   H-20 is an example of a check to Dr. Carrillo in

8    the amount of $5,750 for 27 face-to-face.

9        Q.   Who signed that check?

10       A.   That appears to be Mr. Mesquias' signature.

11       Q.   Let's pull up L-2 together with 21.

12       A.   This is another example of a check to

13   Dr. Carrillo for $11,600 signed by Mr. Mesquias for

14   face-to-face.

15       Q.   Let's go to L-2 together with 22.

16       A.   Yet, a third example, Dr. Carrillo -- Carrillo

17   for $2,000, memo line ten F2F.

18       Q.   Who signed the check?

19       A.   It again, it is Mr. Mesquias' name.

20       Q.   Let's go to L-2 together with 23.

21       A.   This is a check from Bee Caring Hospice, so a

22   different entity, to Dr. Virlar for $12,200 signed by,

23   again, Mr. Mesquias, although that signature looks

24   slightly different.   The memo -- memo line reads:   F2F

25   September 2015 services.

1    Q.   Let's go to L-2 together with 24.

2    A.   Same company check on November 19, 2015 for

3    $8,800 to Dr. Virlar signed by Mr. Mesquias with a memo

4    reading October 2015, 44 face-to-face visits.

5    Q.   Let's go to L-2 together with 25.

6    A.   Again, Bee Caring Hospice, November 2016, check

7    to Dr. Virlar signed by Mr. Mesquias, 28 F2Fs.

8    Q.   Let's go to L-2 together with H-17, please.

9    A.   And this is an example to Dr. Pena from

10   Professional Hospice Care for $2,000 signed by

11   Mr. Mesquias for February 2014 services and $500

12   face-to-face.

13   Q.   Could we jump to H-26.

14        Mr. Petron, is this Jack High, Count Two from the

15   indictment?

16   A.   That is correct.

17   Q.   And could you tell the jury what this slide

18   depicts?

19   A.   This slide depicts a claim of service during

20   Mr. High's certification period, August 14th, 2013

21   through October 12th, 2013 for hospice services in the

22   amount of $2,567.52.

23   Q.   Showing you Government's Exhibit H-28.

24        Is this Count Three from the indictment?

25   A.   Correct.  This is Count Three for Ms. Perez for a

1  certification of December '13 through March '14 for

2  hospice services with a claim of $4,089.52.

3      Q.  Page 30?

4      A.  I believe this is Count Five; is that correct?

5      Q.  Count Four.

6      A.  Count -- I'm sorry, Count Four.  Certification

7  period of November 2013 through February 3rd, '14 from

8  Professional Hospice Care for hospice services with a

9  claim in the amount of $4,304.70.

10      Q.  Let's go to H-32, please.

11      A.  This is Count Five for a beneficiary with

12  certification period of June 2014 through August 31st,

13  '14 from Bee Caring Hospice with a claim in the amount

14  of $4,448.19.

15      Q.  Let's go to Government's Exhibit H-34.  This is

16  Count Six.

17      A.  Finally, Count Six.  We have a certification

18  period of February 2016 through April 9th, '16, the

19  provider was Bee Caring Hospice with a claim amount of

20  $3,202.85.

21      Q.  And finally, let's call up Government's Exhibit

22  H-36.

23          Is this Count Seven, Mr. Petron?

24      A.  That's correct.  Ms. Conti, with a certification

25  period of December '14 through March '15 from Bee Caring

1    Hospice with a claim in the amount of $1,282.61.

2        Q.   And so each of these examples that we just went

3    through, these were specific claims that were submitted

4    to Medicare?

5        A.   That is correct.

6        Q.   They were submitted to Medicare by the Merida

7    Group?

8        A.   Correct.

9        Q.   And did Medicare pay the Merida Group for each of

10   these specific claims?

11       A.   Correct.

12       Q.   Did you also identify the movement of money

13   between and among various Merida Group entities?

14       A.   I did.

15       Q.   Let's go to L-2 together with H-47.

16           Tell the jury about that.

17       A.   So I found numerous transactions between -- I'm

18   sorry, do you want me to speak to this chart or?

19       Q.   Not that chart but just generally what did you

20   see?

21       A.   I found numerous transactions between the various

22   Merida Group entities with BRM being the central -- the

23   central account that was used.  So millions of dollars

24   being sent to and from the Merida Group entities into

25   and out of the BRM account.

1    Q.   And was BRM based in the Valley?

2    A.   That's correct.

3    Q.   Could we go to L-1 and H-57.

4    A.   There we go, yeah.  So the summary on the

5  right-hand side represent the movement of money between

6  2011 and 2017 to and from BRM Home Health.  So you can

7  see the amounts in red are amounts being deposited into

8  BRM while the amounts in black are amounts that BRM is

9  sending to the other Merida Group entities.

10       So in -- in most situations, I think in all but

11  one or two situations there is more money moving into

12  BRM than going out from BRM.

13    Q.   Could we go to H-58, please.

14    A.   So H-58 represents examples of payments from BRM

15  Home Health to those entities, but these are specific

16  examples over $10,000 where I was able to trace the

17  Medicare proceeds through the Merida Group entities from

18  BRM to another Merida Group entity.

19    Q.   How about H-61?

20    A.   Same example -- same type of an example, but in

21  this situation these are Merida Group entities paying

22  the Chase Credit cards in the amounts over $10,000, and

23  the amounts in red represent how much Medicare money was

24  contained within each payment.

25    Q.   If we could go to H-62, please.

1     A.   Yet, a third type of an example where the Merida

2  Group entities are paying off an American Express or

3  numerous American Express credit cards.

4     Q.   Now, as a part of your analysis, your financial

5  analysis, did you look at activity in Las Vegas?

6     A.   I did.

7     Q.   And just describe that for the jury at a high

8  level?

9     A.   So at a high level I went through the Chase

10  credit card transactions, they were here either in the

11  name of one of the Merida Group entities or Mr. Mesquias

12  personally, and identified transactions over $1,000.  I

13  classified them into various categories, one of which

14  was expenses in Las Vegas.

15     Q.   Generally, what kinds of expenses would you --

16  would you see?

17     A.   I put them into three or four categories.  Like

18  hotel, nightclubs, there were dining expenses and

19  tickets and shows.

20     Q.   Showing you Government's Exhibit H-46.

21          Can you walk me through this example?

22     A.   Sure.  H-46 is the top level summary of purchases

23  over $1,000 for categories that I have generally

24  referred to as lifestyle categories.

25          So you have at the top travel, $167,000; Spurs,

1    San Antonio Spurs basketball, $139,000; various tickets,

2    so these are concerts and shows, $122,000; jewelry store

3    expenses for jewelry related things, 118,000; expenses

4    related to Las Vegas, 112,000; and then so on down this

5    list.

6        Q.   Let's go to H-48, please.

7        A.   So H-48 then represents the details that make up

8    that previous chart that I just gave you.

9            So, for example, for dining there was a total of

10   $31,000; for transactions over $1,000, these are the

11   restaurants where those transactions took place.  Bike

12   transactions at 16,900, and then jewelry transactions at

13   over $118,000.

14           This is page 2.  This has the details of the

15   Las Vegas expenditures as well as retail expenditures,

16   so you can see that there are transactions totalling

17   $112,000, the largest of which Hakkasan, MB Light

18   Nightclub, Omni of Las Vegas at the very bottom Access

19   Encore for 12,000, those are nightclubs in Las Vegas.

20   On the right-hand side you have retail purchases, the

21   largest Hilburn and Louie Vuitton.

22       Q.   If we go to the next page, please.

23       A.   So here in the top left are the Spurs,

24   San Antonio Spurs basketball expenses for $139,000,

25   there's other sport and leisure merchants for $19,000,

1    generalized tickets, so the largest being expenses for

2    StubHub for $91,000, and finally vehicle related

3    expenses totalling almost $62,000.

4        Q.   There's a -- there's a -- excuse me.   There's a

5    Porsche indicated there in the cars?

6        A.   I'm sorry, there's it --

7        Q.   A Porsche?

8        A.   There's Porsche, there's Land Rover, Jaguar, a

9    BMW expenses.

10       Q.   Go to the next page, please.

11       A.   These are expenses related to travel, so you can

12   see expenses related to cruise lines, hotels, airfares,

13   ski trips, anything that I could classify as travel

14   totalling over $167,000.

15            MR. LOWELL:   Your Honor, we'll pass the

16   witness.

17            THE COURT:   Each side will have 32 minutes.

18                      CROSS-EXAMINATION

19   BY MR. HECTOR CANALES:

20       Q.   Good morning, Mr. Petron.

21       A.   Good morning.

22       Q.   How are you doing today?

23       A.   Good.

24       Q.   All right.   My name is Hector Canales and I

25   represent Rodney Mesquias in this case, okay?

1    A.  Okay.

2    Q.  Now, I'm going to put on the screen with

3 permission with -- from opposing counsel here, this is

4 your -- your CV, correct?

5    A.  Correct.  When I had hair, yes.

6    Q.  Yeah.  All right.  And so you work for Stout, and

7 how long have you worked for Stout?

8    A.  Stout acquired my previous firm in February of

9 2014.

10    Q.  All right.  And I see here you're from -- your

11 offices are in -- in D.C.?

12    A.  Correct.

13    Q.  All right.  We're kind of mad at Washington right

14 now because of the Astros.  But you've got some degrees

15 in -- in accounting and in statistics, correct?

16    A.  That's correct.

17    Q.  All right.  And so you're -- you are a private

18 citizen, I take it, then, right?

19    A.  I am.

20    Q.  You're not a Government employee?

21    A.  I am not.

22    Q.  Right.  And you don't work for free; do you?

23    A.  I do not.

24    Q.  No.  And you're not -- you're on the clock as we

25 sit here today, right?

1      A.   I am.

2      Q.   And I believe you said the Government reached out

3  to you sometime in the fall of '17 to contract with

4  your -- with -- with your firm, right?

5      A.   That is correct.

6      Q.   And that's not an unusual thing; is it?

7      A.   It's not.

8      Q.   Right.  And in fact, you're a -- part of your job

9  is you're a professional witness, right?

10      A.   I would not say I'm a professional witness.

11      Q.   Well, it's certainly part of your -- part of your

12  responsibilities and -- and duties as when you're

13  working with the Government, right?

14      A.   It is ultimately if it comes to it an end that I

15  have do if necessary for a particular matter.

16      Q.   When you're doing your work, you have to -- you

17  presume and expect that this work is going to be

18  presented in -- in trials like this one?

19      A.   I always have to have that assumption going in,

20  yes.

21      Q.   That's right.  And as part of your -- your resume

22  here, you list some of your experience as a testifier,

23  right?

24      A.   Correct.  There -- there are a variety of rules

25  related to testimony, and one of them is to disclose all

1   situations in which I've testified, and so I keep this

2   record, yes.

3       Q.   And these are -- these are some of these cases

4   here, right?

5       A.   That is correct.

6       Q.   And -- and in all of these cases here, you're

7   testifying for the Government, right?

8       A.   The fourth one down on -- I'm testifying for the

9   Government, but it's the State of California as opposed

10  to the United States.

11      Q.   All right.  Not for the Defendants?

12      A.   Correct.

13      Q.   Is that the case for all of these cases that you

14  list?

15      A.   No, there are a few, if you keep going, that I

16  will have testified for private companies, or at the

17  very bottom I testified against the Government.

18      Q.   Okay.  In civil matters where you had company

19  versus company?

20      A.   Some civil matters, company verse company, but I

21  have a number of engagements actively -- active against

22  the Government and I've testified against the

23  Government.

24      Q.   Okay.  And what's your hourly rate, sir?

25      A.   It's $365.

1    Q.   $365 an hour.

2    A.   Correct.

3    Q.   All right.  P-e-t-r-o-n, right?

4    A.   Correct.

5    Q.   And in this particular case, we've been provided

6    notice from Mr. Lowell here in the United States back in

7    August of 2019 that you had billed the United States how

8    much?

9    A.   At this point it's $227,000.  I think to date

10   it's a little over 250,000.

11   Q.   And how much -- and -- and back in August, they

12   still owed you, roughly, $100,000, right?

13   A.   Correct.

14   Q.   Is the Government caught up on their bill to you?

15   A.   Unfortunately, not.

16   Q.   All right.  So how much have they paid you?

17   A.   They have paid me the difference between these

18   two amounts, so call it 104,000 to date.

19   Q.   I'm sorry, I'm slow.  So how much -- so they have

20   paid anymore than the 123?

21   A.   Oh, I'm sorry, I misread it.  I thought the --

22   the right-hand side was the amount outstanding.

23        The amount paid is 123,000 to date, so they owe

24   about 104,000 as of August.

25   Q.   Right.  So, but as we sit here today, have they

1  paid you anymore than the 123 that they sent back here

2  in August?

3      A.   They have not.

4      Q.   Okay.  All right.  So your -- the meter has been

5  running, but they haven't paid -- they haven't paid

6  any -- any money since -- well, actually even this 123,

7  do you remember when they paid that?

8      A.   I do not know the date that those payments were

9  made.

10      Q.   And do you submit your bills every two weeks,

11  every 30 days?

12      A.   Monthly.

13      Q.   Monthly, all right.  And so are -- is the

14  Government past 30 days, past 60 days, past 90 days,

15  how -- how far behind are they?

16      A.   I'd have to look and talk to my accounting

17  people.  I'm not exactly sure.

18      Q.   Did you bring any of your -- and I take it, sir,

19  that you keep your time, right?

20      A.   Absolutely.

21      Q.   And the Government probably requires that you do

22  that?

23      A.   Correct.

24      Q.   Right?  And when you submit your bill, you submit

25  some backup information for it, you don't just, you

1   know, you submit a bill and then your -- your time-logs,

2   right?

3      A.   For instance, we would have everyday how -- what

4   person, how many hours and the activities that they did.

5      Q.   Do you have those time-logs with you?

6      A.   I do not.

7      Q.   Why not?

8      A.   No one asked me to bring them.

9      Q.   And so -- now, these -- these exhibits that you

10  went over, as we were going along, we -- we -- we -- I

11  printed them -- I printed them out as -  are -- as they

12  were -- as they were being referenced, did you create

13  these?

14     A.   Yes, my firm did.

15     Q.   Okay.  All right.  And so this is the part of

16  what you're getting paid for, right, is the creation of

17  these -- of these documents, these pages?

18     A.   Yes, sir.

19     Q.   All right.  And so there are one, two, three,

20  four, five, six, seven, eight, nine, ten, 11, 12, 13,

21  14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27,

22  28, 29, 30, 31, 32, 33, 34, 35, 36, 37.  37 pages that

23  they went over with you.  So we've got 250K and 37

24  pages, right?

25     A.   That were introduced here in Court, yes.

1    Q.   So we did 250,000 divided by 37, that's $6,756 a

2    page, right?

3    A.   If that's the way you want do the math, sure.   I

4    would never characterize our work in that way.

5    Q.   Right.   But -- but what it boils down to, what it

6    comes down to here today, that's what -- if we were

7    going to select this -- each page, that's what it would

8    cost per page?

9    A.   I wouldn't agree with that statement.   That's the

10   way the math works, but I wouldn't agree with the

11   statement.

12   Q.   And is that amount, sir, per page greater than

13   the $1,200 for Ms. Conti?

14   A.   The mathematical amount, yes, if you're comparing

15   67 to 1200, yes, 67 is more.

16   Q.   And 67 is more than 3200?

17   A.   Correct.

18   Q.   And it's more than 4400, right?

19   A.   Correct.

20   Q.   And it's more than 4300, right?

21   A.   That's correct.

22   Q.   It's more than 4,000?

23   A.   That is correct.

24   Q.   And it's more than 2500, right?

25   A.   That is correct.

1    Q.   Now -- and -- and -- if I understand your

2    testimony correctly, all that you've done is summarize

3    and organize and distill down into these 37 pages

4    voluminous documents, right?

5    A.   That is correct.

6    Q.   And those documents kind of come in two

7    categories, see if you agree with me.  One, is going to

8    be the claims data, right?

9    A.   Correct.

10    Q.   And then the second are going to be bank records?

11    A.   Correct.

12    Q.   And the -- the -- did you interview or discuss --

13    did you -- did you interview or have any discussions

14    with any doctors in this case?

15    A.   I did not.

16    Q.   Any nurses?

17    A.   I did not.

18    Q.   All right.  Any of the patients involved?

19    A.   I did not.

20    Q.   Any of their families?

21    A.   No.

22    Q.   Okay.  The only people you talked to in this case

23    about the -- the -- about the facts of this case are

24    the -- is the Government, right?

25    A.   That is correct.

1    Q.  Okay.  And when it came to evaluating, let's --

2  let's deal with the -- with the bank records side, okay?

3  I think you had some charts here.  Well, here, let me

4  put this one up, H-60 -- H-66.

5         You went and summarized payments to Jesus Virlar

6  Cadena, correct?

7    A.  That is correct.

8    Q.  How did you know, or what -- why did you pick

9  him?  Why did you pick Jesus Virlar Cadena?

10   A.  I was asked to summarize payments to Dr. Virlar.

11   Q.  So the Government provided you with a list of

12  people to go in and say find all the payments, summarize

13  the payments of individual X?

14   A.  Correct.

15   Q.  All right.  And who did they tell you to look at?

16   A.  Dr. Virlar, Dr. Carrillo, Dr. Pena, I'm sorry,

17  Mr. Garza, Mr. Mesquias, Ms. Wooten, other entities that

18  were associated with the Merida Group, and I could be --

19  I could be leaving one or two off, I'm sorry.

20   Q.  Okay.  All right.  And so they -- they gave you

21  the assignment, you didn't yourself -- you didn't look

22  at all the people who received money, you just looked at

23  the people they told you to look at?

24   A.  Correct.

25   Q.  All right.  And when it came to -- when it came

1  to looking at -- you analyzed, also, certain expenses,

2  right, like the -- you looked at Vegas, right?

3      A.   Correct.

4      Q.   All right.  Did you look at other business

5  expenses, for instance, did you -- did you go in and

6  look at money spent on quality assurance?

7      A.   I looked at all the transactions over $1,000, so

8  I saw business expenses, but did not summarize those

9  business expenses.

10     Q.   Right.  But did the Government tell you, hey,

11 look, we want you to look, we want you to look at --

12 at -- at Las Vegas -- they told you to look at Las

13 Vegas, right?

14     A.   I think the instructions were look for

15 personal-type related expenses.

16     Q.   Okay.  All right.  And so some of these expenses

17 you're talking about are personal expenses, and some are

18 business expense, right?

19     A.   That's a -- an important distinction so I don't

20 know how those expenses were classified on the books and

21 records of the Merida Group entities.  I'm just telling

22 you from a layman's understanding what looked like

23 personal versus business.

24     Q.   Right.  But so I guess what I'm looking at --

25 what I'm wanting to know is, for instance, did you

1   create a summary here -- can you tell us how much Merida
2   spent on computer compliance software?
3      A.   So what I do know is that about -- I classified
4   $867,000 into personal-type expenses.  There was another
5   $900,000 of expenses greater than $1,000 that I would
6   have classified as some type of business related
7   expense.
8      Q.   Right, but you didn't -- you didn't pull out, for
9   instance, you can't tell us, as you sit here today, that
10  whether or not some of these, like for instance, some of
11  these Amex charges here, whether some of those charges
12  went to cover software licensing, compliance licensing?
13     A.   Correct.  I did not have the American Express
14  detail records to do the analysis.
15     Q.   And but -- had the Government told you, hey, go
16  out -- go and find out how much Merida is spending on
17  quality assurance and employees on quality assurance,
18  that's some -- that's something, with your experience
19  you could have done, right?
20     A.   Absolutely.
21     Q.   Have you been asked to do that, right?
22     A.   Had I been asked and had I been -- had access to
23  the records to do that, yes.
24     Q.   But those -- you did have access to those
25  records.  All of the expenses, all the bills that Merida

1    paid, you -- you had them all?

2       A.   I did not have them all.   There were many

3    accounts missing, I did not have the American Express

4    records, I did not have the internal accounting

5    documents of the companies, I had the bank statements

6    and the Chase credit cards.

7       Q.   Is it your experience, sir, that if the

8    United States of America wants something in the context

9    of litigation like this is if they want it, they can get

10   it?

11      A.   It's my experience that sometimes the

12   United States doesn't quite get everything that I would

13   like them to get.

14      Q.   Right.   But in this case, you don't even know

15   because you didn't ask for things, like, to determine

16   how much money Merida spent on compliance with rules and

17   regulations, right?

18      A.   I was never asked to exam compliance.   I did ask

19   for further financial documents that I didn't get.

20      Q.   How about lawyers' fees?   Did you put a category

21   in there, did you look at how much Merida, if any, if

22   they spent any money on lawyers?

23      A.   I did not categorize that, no.

24      Q.   Okay.   Or training, or training, right?   Did you

25   break that out?

1     A.   I did not.

2     Q.   Okay.   Or -- or their -- their payroll, did you

3  break out their payroll?

4     A.   I did not have access to the payroll accounts.

5     Q.   But -- but you went and you pulled out Cirque de

6  Soleil and StubHub?

7     A.   Correct.

8     Q.   The Government gave you enough information to

9  break out his cars and -- and entertainment, right?

10    A.   Correct.   I was asked to look for personal-type

11 expenses.

12    Q.   Does Stout have season tickets for the Nationals?

13    A.   We do not, unfortunately.

14    Q.   Is that common though where companies have

15 tickets to professional teams?

16    A.   It's not uncommon.

17    Q.   Have you, sir, ever been taken to a ball game?

18    A.   I have been taken to a ball game.

19    Q.   All right.   And -- and, sir, did that -- did that

20 ruin your integrity?

21    A.   I sure hope not.

22    Q.   And, sir, are -- when you get paid, do you get

23 paid by the Government in -- in -- in cash or with a

24 check?

25    A.   Usually it's neither one of those, it's a wire

1   transfer.

2       Q.   Okay.  And when there's a wire transfer, there's

3   usually a memo on there, right, it will say it's for

4   professional services?

5       A.   I -- I -- honestly, I don't see the wire details

6   so I'm not sure how they represent it.

7       Q.   Already.  And but are you being paid here, sir,

8   for your -- for your time or your testimony, which have

9   they bought?

10      A.   Time, sir.

11      Q.   Why not your testimony?

12      A.   I guess it depends upon how you're looking at it.

13  I'm being compensated for my time.

14      Q.   And so if I were to say your -- your testimony,

15  that would be an insulting kind of thing to -- to say to

16  you, right, because it implies that you're -- you're

17  being bought, right?

18      A.   I guess everyone could take it however they want

19  to take it.  I'm compensated for my time, whether I'm

20  analyzing records, whether I'm testifying, whether I'm

21  speaking with someone all the same amount.

22      Q.   That -- that's -- that's right.  And so it really

23  does depend, right, it's -- on your perspective, right,

24  and how cynical you may be about whether or not somebody

25  like yourself is being paid for their -- their time or

1    their testimony, right?

2        A.   I guess I'm not quite following your distinction,

3    or your cynicism comment, I'm here to summarize facts

4    and to tell you facts that I found in the documents and

5    the data that I've received.

6        Q.   And so -- all right.  So let me -- now, I

7    think -- I want to switch gears to the claims data side.

8        A.   Sure.

9        Q.   And the claims data side, you received -- it

10   comes in some big spreadsheets, excel spreadsheets,

11   right?

12       A.   Correct.

13       Q.   All right.  And so -- and there's no medical

14   records that come with the claims data, it's just an

15   excel spreadsheet that's got a bunch of numbers on it,

16   right?

17       A.   And letters.

18       Q.   Numbers and letters, names of doctors, initials

19   of patients, amounts, that sort of thing, right?

20       A.   Correct.

21       Q.   Okay.  And -- let me find this.  Sorry, while I

22   find what I'm looking for.

23            It will be the last one that I come across for

24   sure.

25       A.   Always is.

1      Q.   Here it is, sorry.   H-9.

2           And what I want to focus in on here is this

3      column here, number of beneficiaries and the provider

4      name.   All right, so we have a series of -- of both

5      hospices and -- and plus home health care companies,

6      right?

7      A.   Correct.

8      Q.   And -- and, sir, are you -- are you an expert in

9      the regulations, the CFRs and the statutes on home

10     health care and hospice?

11     A.   I'm not.

12     Q.   Okay.   All right.   But you know the difference

13     between a hospice and a home health care?

14     A.   I do.

15     Q.   Okay.   And you know here, what we're summarizing

16     here are the -- we have two types of providers here, we

17     have a hospice provider and a home health provider,

18     right?

19     A.   Correct.

20     Q.   Two different types of patients, right?

21     A.   Correct.

22     Q.   Okay.   And so here they all are on the left.   And

23     we're dealing with a total number of beneficiaries, is

24     that -- just so to make sure our lingo is right,

25     beneficiaries are patients, right?

1    A.   Right.

2    Q.   Beneficiaries they're Medicare beneficiaries,

3  right?

4    A.   Specific to Medicare, correct.

5    Q.   So in the claims world, in your world, the --

6  they're not patients, they're beneficiaries?

7    A.   That's just in my world what they're called, yes.

8    Q.   Right.  Okay.  All right.  Now, we're -- just

9  making sure our lingo was on the same page.

10        So we're talking about a total, the total

11  universe of patients, 9,339 patients, right?

12    A.   That is correct.

13    Q.   And that's where this -- this $100,000,000 figure

14  comes from, right, are these here?  You've got them

15  right here, it's even more than that, 150 and 124?

16    A.   Correct.  The 152,000,000 is how much was billed

17  to the Medicare program and Medicare paid $124,000,000.

18    Q.   All -- all of those, all of those.

19    A.   Correct, all of those.

20    Q.   And -- and so, sir, can you -- what percentage --

21  now, you did not -- out of these nine -- 9300 patients,

22  you didn't conduct a random representative sample out of

23  those patients; did you?

24    A.   I did not.

25    Q.   And it -- as a statistician, you know that in

1   order to fairly and reliably draw any inference from a

2   sample, that sample must be randomly selected and

3   representative of the whole, right?

4       A.   I guess it depends upon the outcome and what it

5   is you're trying to randomly represent.

6       Q.   Right.  If you want to prove that those 9,339

7   patients are fraudulent, you've got a couple of options;

8   one, is you've got to go review every single one of

9   them, right?

10      A.   I guess that's one possibility, rather impossible

11  task but, yes.

12      Q.   The other possibility -- the other possibility is

13  to go and try to design a statistical tool, right?

14      A.   You could.

15      Q.   To -- to do that, right?

16      A.   You can design a statistical sample to test the

17  representativeness of whether or not the underlying

18  claims are fraudulent or what proportion of those claims

19  are fraudulent.

20      Q.   And you didn't do that here?

21      A.   That's not what I was asked to do.

22      Q.   Okay.  And so the answer is you did not do that?

23      A.   Correct, that's not what I was asked to do.

24      Q.   All right.  Just wanted to make clear.

25           And so, sir, can you -- can you tell me, sir,

1    there are, I think Count Two, Count Three, Count Four,

2    Count Five, Count Six and Count Seven, how many patients

3    is that?

4        A.   That's six.

5        Q.   Six, sir.  Six out of nine -- and do you know,

6    sir, whether or not any of these six are hospice or home

7    health patients?

8        A.   We can -- I have them listed on the chart so I

9    can tell you.

10       Q.   Do you know right now though?

11       A.   I think most of them are hospice, but we could

12   just look at them.

13       Q.   You're not sure?

14       A.   I think they're hospice, we can --

15       Q.   Okay.  All of them?

16       A.   I -- I know my memory is that most of them are

17   hospice.

18       Q.   Okay.  And what --

19       A.   I don't know if they're all hospice.

20       Q.   -- percentage, sir, is six out of 9,339?

21       A.   A small one.

22       Q.   Can you work it out?

23       A.   Sure.  .06 percent.

24       Q.   Point 0 what?

25       A.   Six.

1      Q.   Six percent.

2      A.   Correct.

3      Q.   So we got 9,339 versus 6 equals .06?

4      A.   Correct.

5      Q.   So these patients here, that's an extremely small

6   number, right?

7      A.   Correct.  And it's my experience that the

8   Government doesn't try to allege every single patient in

9   an indictment.

10      Q.   Right.  And these particular patients, you didn't

11   pick them; did you?

12      A.   I did not.

13      Q.   And so from a statistical standpoint, sir, these

14   six, because they're not the product of a random

15   generalized sample, cannot tell you anything about the

16   rest of the 9,000, right?  From a statistical

17   mathematical standpoint?

18      A.   I mean, if you're asking my expert opinion as a

19   statistician, those six are not drawn from a valid

20   statistical random sample.

21      Q.   Therefore --

22      A.   But I wouldn't --

23      Q.   Therefore, you cannot extrapolate from them,

24   correct?

25      A.   So if I could finish.  So I would not want to do

1    a random statistical extrapolation.  It doesn't mean the

2    six can't be instructive in some way, just not

3    statistically.

4        Q.  Right.  And if you can't do it statistically in

5    your world means you can't do it reliably, right?

6        A.  If I was asked to produce an estimate of the

7    loss, or an estimate of the amount of fraud in this case

8    and asked to give an expert opinion, using statistics,

9    then, yes, I would want to do that statistical sample,

10   but there's many ways to slice an apple.

11       Q.  Right.  But it hasn't been done here?  They

12   didn't pay you $250,000 to do a statistical sample; did

13   they?

14       A.  That's correct, they did not.

15       Q.  They paid you $250,000 to create 37 charts about

16   how we spent our money and where it went, right?

17       A.  I think there's a lot in those charts besides how

18   we spent the money and where it went.

19       Q.  And according to your own testimony, you didn't

20   really even get to finish, sounds like?

21       A.  Get to finish what?

22       Q.  Well, you didn't have all the records.  Did you

23   tell them, hey, I don't have all the records, I've got

24   more work to do?

25       A.  I did say that I was missing some records and I

1    could do more work, yes.

2        Q.   And -- and so I guess -- did they pay for your --

3    your -- your -- or are you going to -- they haven't even

4    caught up, are you going to bill them for the -- I

5    presume you flew down here?

6        A.   Correct.

7        Q.   And I presume that you stayed in a hotel?

8        A.   Correct.

9        Q.   Rented a car?

10       A.   Yes.

11       Q.   All right.  And so you're going to put that on

12   your bill?

13       A.   They reimburse for expenses.

14       Q.   Is that part of the contract that they're going

15   to pay for all your travel and expenses?

16       A.   Correct.

17       Q.   Reimburse for your meals?

18       A.   Well, the Government does this funky thing with

19   per diems, but, yes.

20       Q.   Let's do this math.  Do you have -- maybe you've

21   already done it.  I didn't see it anywhere, I didn't see

22   it in here.

23            Do you know what these -- what these total, what

24   these amounts here on the Counts Two to Seven, do you

25   know what they total?

1      A.   I don't, and -- 17, 18, call it -- 19, 20,000.

2      Q.   2,567.52 plus 4,089.52 plus 4,304.70 plus

3   4,448.19 plus 3,202.85 plus 1,282.61.

4           That look about right?

5      A.   It does.

6      Q.   So we got a total here of 19,895.39, right?

7      A.   Correct.

8      Q.   That's, what, $19,895.39, that's the total amount

9   of payments, that's the payment, right, that's the

10   payment for Counts Two to Seven, is what that totals up

11   to, do you agree?

12      A.   I agree.

13           MR. HECTOR CANALES:   Pass the witness.

14           THE COURT:   Does anybody need a break?

15   Mr. Cyganiewicz.

16           MR. CYGANIEWICZ:   Your Honor, I'm going to

17   yield my time to Mr. Guerra.

18           I have no questions of this witness.

19           THE COURT:   Mr. Guerra.

20           MR. GUERRA:   Thank you, Your Honor.

21           May I proceed?

22           THE COURT:   Please.

23                       CROSS-EXAMINATION

24   BY MR. GUERRA:

25      Q.   Mr. Petron, good morning, sir.

1    A.   Good morning.

2    Q.   How are you?

3    A.   I'm well.   You?

4    Q.   I'm hanging in there.   It's been a long couple

5  weeks.

6         Mr. Petron, based on the -- the CV that

7  Mr. Canales brought up and showed you and the ladies and

8  gentlemen of the jury earlier, you list on there about

9  25 cases, does that sound about right?

10   A.   Sure.

11   Q.   Okay.   Unfortunately, I know you're -- you

12 probably like details, so do we, so we counted them up

13 and it was 25, I'll offer to you.

14        Are you aware that 20 out of those 25 cases

15 are where you testified on behalf of the Government?

16   A.   I'm aware.

17   Q.   Okay.   Does that sound about right to you?

18   A.   Sure.

19   Q.   Okay.   In this case, you testified earlier to the

20 ladies and gentlemen of the jury that you've billed the

21 Government $250,000, correct?

22   A.   Correct.

23   Q.   You've only been paid about 123,000; is that

24 right?

25   A.   Correct.

1    Q.   And I understand, you know, bills get paid or

2    don't get paid on occasion, but that money has been

3    incurred since October 2017; is that right?

4    A.   Correct.  That's over the course of the last two

5    years.

6    Q.   Right.  Do you know how long Dr. Francisco Pena

7    worked for the Merida Group?

8    A.   I do not.

9    Q.   Okay.  It was in your summary charts, and I'll

10   offer to you that it was from 2012 to 2017.

11   A.   Okay.

12   Q.   Okay?  And I believe your testimony earlier was

13   that during that time period that Dr. Pena was paid

14   $108,000 during that time period for Merida; is that

15   about right?

16   A.   You're testing my memory.  I believe that's about

17   right.

18   Q.   Sure, we can bring it up if you need us to but --

19   A.   If -- if you know that that's the number, that's

20   the number that's in my head, but --

21   Q.   Well, that was the number that was on the H

22   series exhibits that Mr. -- Mr. Lowell and Canales

23   showed up there.

24   A.   Perfect.  Those numbers are accurate.

25   Q.   So from 2012 to 2017, $108,000, how much is that

1    per year, just averaged out annually?

2        A.   20 -- 20 something.

3        Q.   I'm not going to get out my I-Phone because I'm

4    pretty sure that's easy for both of us to figure out.   A

5    little over 20,000 a year; is that right?   How much is

6    that a month, again, average, ballpark?

7        A.   Average ballpark call it 8-, 9,000.

8        Q.   No, no, no, I'm sorry, if it it's 20,000 a year?

9        A.   I'm sorry, I'm -- I'm --

10       Q.   Again, I'm not the math guy, you are, but in my

11   feeble attorney mind that's about $2,000?

12       A.   A little less than.

13       Q.   A little less, give or take, right?

14       A.   Right.

15       Q.   Could we go ahead and call up Government Exhibit,

16   Roy, H-17.   I think even the equipment is cold, it needs

17   to warm up a little bit as well.

18            But I'll offer to you this is Government's

19   Exhibit H-17 and it shows, as you testified to with Mr.

20   Lowell, that Professional paid Dr. Pena about $2,000 for

21   this particular time period; is that right?

22       A.   Correct.

23       Q.   Okay.   Roy, could we call up Government Exhibit

24   H-18, please.

25            And again, here $2,000 for this time period

1    Professional to Dr. Pena; is that right?

2        A.   Correct.  So that's consistent with the monthly

3    calculation that we just did.

4        Q.   Absolutely.  And then just so we get them all out

5    because I know you talked about this with Mr. Lowell.

6             H-19, Roy, please.

7             This is $5,000, but the memo line notes that it's

8    for two months, right?

9        A.   Correct.  Correct.

10       Q.   That's about right.  And I take it you're a

11   baseball fan, right?

12       A.   I'm a sports fan.

13       Q.   As am I.  But you are familiar in baseball

14   there's a term, crooked number, you know.

15   Unfortunately, when my Astros are losing the World

16   Series is because they only scored one run an inning and

17   your Nationals would score two or three in an inning and

18   they would call that a crooked number, right?

19       A.   If you say so.

20       Q.   Well, one is one, a crooked number like a two,

21   exactly.

22            Roy, could we call up Exhibit H-20, Government

23   Exhibit H-20.

24            Now, this is what I would call a crooked number,

25   not because it's crooked, but because it's not $2,000 or

1    $5,000, right?  What's the number on the screen?

2        A.  5750.

3        Q.  5750, there's all sorts of squiggly lines if we

4    were to write it out, you know.  That was paid to

5    Dr. Carrillo, right?

6        A.  Yes, I would not call that a crooked number in

7    your definition of the word crooked.

8        Q.  Well, to me there's more numbers than there are

9    zeros, basically, 575.

10            Let's go to H-21, Roy.

11            There's eleven, six.  Again, there's all sorts of

12    numbers, but, my point --

13        A.  Well, there's zeros, too, though.

14        Q.  What's that?

15        A.  I said, there's -- I mean, if the definition that

16    we're trying to get at is zero versus not, then there's

17    a bunch of zeros here as well so --

18        Q.  No.  And in fact, this is the very simple

19    point I'm trying to make, Mr. Petron.

20            These checks look different than the checks that

21    were given to Mr. Pena; is that right?

22        A.  In -- in what way, just that they're larger in

23    amount.

24        Q.  Larger in amount, different numbers.  The -- the

25    three checks the Government showed you and that I showed

1   you for Dr. Pena were straight $2,000, $2,000 and a

2   $5,000 for two months, correct?

3       A.   Correct.

4       Q.   And as you've testified earlier, based on your

5   math, that kind of is consistent with paying a flat

6   monthly rate, correct?

7       A.   The average is about a little less than 2,000

8   so --

9       Q.   But I understand.  But, actually, you said,

10  yourself that that's consistent with the item up here.

11      A.   That's consistent, absolutely.

12      Q.   Yeah.  We don't know what's going on here; is

13  that right?

14      A.   I do not know specifically what the derivation of

15  the $11,600 is.

16      Q.   And that's exactly right.  You're only here for

17  the interpretation of numbers?

18      A.   I wouldn't even say I'm here for the

19  interpretation of them, I'm just here to tell you what

20  the numbers are.

21      Q.   Crunching numbers, right?  I mean, you did do

22  some calculation, did you not?

23      A.   I did.

24      Q.   You took some out, you played around with an

25  excel spreadsheet and that's how you got the

1    summary exhibits that Mr. Canales showed you, correct?

2        A.   Correct.  I summarized all that information.

3        Q.   Yeah, and I'm not trying to say that you made

4    stuff up, Mr. Petron.

5        A.   Good because I did not.

6        Q.   And I'm not accusing you of that, sir, but you

7    know, I know that you took the data and you would take a

8    column from an excel spread sheet, a couple of columns

9    that were relevant to your calculations and then put

10   them in other exhibit and that's how we got these

11   30-plus pages that Mr. Canales talked to you about; is

12   that about right?

13       A.   Correct.  I summarized about 800,000 records.

14       Q.   Summarized, whatever, you used excel

15   spreadsheets, took relevant data out of those columns,

16   charts and made these, correct?

17       A.   Correct.

18       Q.   Before I forget, how much have you billed the

19   United States Government during your professional career

20   as a -- in your capacity right now?

21       A.   I have no idea.

22       Q.   Would it be more than $1,000,000?

23       A.   Probably, yes.

24       Q.   More than 2,000,000?

25       A.   I don't know.

1      Q.   20 cases?   And I mean the $250,000 that you

2   billed the United States Government to date in this

3   case, is that par for the course for you given what you

4   do?

5      A.   This is a somewhat larger than normal case.

6      Q.   Okay.

7      A.   Not the largest case I've ever worked on, but

8   larger than average.

9      Q.   Okay, this is the largest case you've ever worked

10  on?

11     A.   I said this is not the largest case I've ever

12  worked on.

13     Q.   Oh, I'm sorry, okay.   So 250,000 would be less

14  than what you would normally charge given the size of

15  those other cases, correct?

16     A.   So I'll be clear.   This is a larger case than I

17  normally work on.

18     Q.   Right.

19     A.   But not the largest case I've ever worked on.

20     Q.   Mr. Petron, would it be outside the realm of

21  possibility that you've billed the United States

22  Government for professional services over $2,000,000 in

23  your career?

24     A.   In my career?

25     Q.   Yeah.

1     A.   20 years, probable -- possibly.

2     Q.   Oh my gosh, 20 years.  Well, how about in the

3  past five?

4     A.   I don't know.  I don't know the numbers.

5     Q.   Okay.  You don't know how much you've billed the

6  Government over the past five years?

7     A.   I do not.

8     Q.   You're a number guys, right?

9     A.   I am.

10    Q.   You're the managing partner of your office?

11    A.   I have lots of things to manage.

12    Q.   Well, but also as the managing partner of your

13  office, what you do manage, I mean you're in business,

14  right?

15    A.   I am.

16    Q.   Part of the things have you to manage is how much

17  money is coming in this; is it not?

18    A.   It is.

19    Q.   And as the managing partner of your business, you

20  do know how much you and the other people beneath you

21  are billing, correct?

22    A.   Not in the level of detail that you're asking me.

23    Q.   Really?  Is Stout, the -- the office you work for

24  for Stout, is it just a single office, or is it part of

25  a larger firm?

1      A.   It's part of a larger firm.

2      Q.   Right.   And is there a managing partner of the

3   entire firm?

4      A.   We have a president.

5      Q.   Oh, okay.

6      A.   CEO.

7      Q.   You have a CEO of your firm, correct?

8      A.   Mr. Stout.

9      Q.   Oh, okay.   I didn't know there was a Mr. Stout.

10  You -- you report to Mr. Stout as the managing partner

11  for your branch office, correct?

12     A.   Indirectly, yes.

13     Q.   Well, no, no, not even indirectly.   I would

14  imagine Mr. Stout wants to know the financial health of

15  each and every individual office, correct?

16     A.   I report to someone named Mr. Risius, and

17  Mr. Risius is a partner with Mr. Stout.

18     Q.   Okay.   And, but I guess, and let me get to my

19  question, Mr. Petron.

20          Being an office, part of the larger firm and the

21  managing partner of said office, you would have access

22  to know how much money your office brings in because you

23  have to report that up the chain; do you not?

24     A.   I could get access to the information, I just

25  don't know it.

1    Q.   Okay.   And how much has your office billed the

2   Government, not just you, but your office billed the

3   Government?

4    A.   I have no idea.

5    Q.   In the past year you don't know how much your

6   office has billed the Government?

7    A.   I do not.

8    Q.   If I were to -- wanted to hire you, I believe you

9   told Mr. Canales that your hourly rate was $365 an hour?

10    A.   Correct.

11    Q.   Do you have a flat fee for testifying?

12    A.   I do not.

13    Q.   So you've been on the clock since the moment you

14   stepped on the plane in Washington, D.C. to come down?

15    A.   That's not -- no.

16    Q.   How does it work?

17    A.   I only charge when I'm actually working.

18    Q.   So were you working yesterday when you were

19   sitting in the back of that courtroom watching

20   testimony?

21    A.   I've never been in this courtroom before.

22    Q.   You weren't here yesterday taking notes?

23    A.   No.

24    Q.   My apologies.   When did you arrive?

25    A.   I arrived Monday evening.

```
 1      Q.   Okay.  And were you billing then?

 2      A.   No.

 3      Q.   Only when you walked into this courthouse?

 4      A.   I only bill when I work.

 5      Q.   Okay.  And have you worked since you've been here

 6  Monday?

 7      A.   I have prepared, yes.

 8      Q.   Right.  In meeting with the Government?

 9      A.   I have once.

10      Q.   How -- how much have you billed since you've been

11  in Brownsville, Texas, sir?

12      A.   I don't know.  I haven't done my time yet for

13  this week.

14      Q.   And I know --

15      A.   So I mean, call it maybe eight to ten hours, not

16  including today.

17      Q.   Okay.  Not including today of course, and that's

18  prep time; is that right?

19      A.   Correct.

20      Q.   So we'll add that at the very least to the

21  $250,000?

22      A.   You could, yes.

23      Q.   Do you have a services contract with the

24  Government?

25      A.   What do you mean by a services contract?
```

1      Q.   Sure.  Basically, when -- to get hired to testify

2  I would imagine you're not -- I mean, you're not an

3  employee of the United States Government, correct?

4      A.   Correct.

5      Q.   Have you ever been an employee of the

6  United States Government?

7      A.   No.

8      Q.   Have you ever had a DOJ dot gov e-mail address?

9      A.   I have.

10     Q.   Do you currently have that e-mail address?

11     A.   I believe it is active, yes.

12     Q.   Why do you have -- and I imagine that's the

13 e-mail address for anyone working with the United States

14 Government; is that right?

15     A.   Yeah, correct.  I have it because a lot of the

16 information that I get is sensitive health care

17 information, otherwise protected Grand Jury information,

18 and so the Government provides me a mechanism to get

19 that information securely.

20     Q.   Okay.  How long have you had that e-mail address,

21 sir?

22     A.   Eight years, nine years maybe.

23     Q.   How much of your personal business is derived

24 from testifying as an expert witness for the DOJ?

25     A.   Not much.  You know, testimony is not something

1    that occurs, even though I have done it a number of

2    times, it's not something that occurs frequently.  So I

3    would say a very small portion of it is from testimony.

4        Q.   And that's a bad question on my part, and let me

5    rephrase it.

6        A.   Sure.

7        Q.   And I know the distinction you're making.

8            How much of your personal business, your

9    collection you bring into Stout, how much of it is based

10   on working for the United States Government?

11       A.   It varies, obviously, from time to time and case

12   to case.

13       Q.   No, no, no, no, I'm saying total.  Like as we sit

14   here today, if we were to look at the income sheet for

15   Michael Petron bringing money into Stout, how much of

16   that money comes from working for the DOJ?

17       A.   It varies from time to time, so if you give me a

18   time period I can try to estimate for you.

19       Q.   Within the past year?

20       A.   I'd probably estimate two-thirds to 70 percent.

21       Q.   70 percent of your personal income into Stout

22   comes from working with the DOJ, correct?

23       A.   I would say my personal revenue, if you want to

24   call it, origination revenue, something like that.

25       Q.   Okay.  And as we sit here today, you don't know

1  how much money that is; that right?

2      A.  I do not.

3      Q.  And I believe your testimony with Mr. Canales was

4  that you did not conduct any sort of statistical

5  analysis, come up with a statistical tool to find out

6  how many of those claims that we talked about, those --

7  those 14,000 claims, whatever it was, were fraudulent;

8  is that right?

9      A.  Correct, I developed no statistical sample.

10     Q.  You weren't asked to do it; is that right?

11     A.  Correct.

12     Q.  You didn't offer it to the Government, did you?

13     A.  It's something they know I can do if they need

14  that to be done, yes.

15     Q.  Right.  But as you're sitting here, you're

16  looking at it, you're going, oh my gosh, this is so

17  much.  Hey, guys, we need to conduct a statistical

18  analysis to find out how much fraud is here, did you do

19  that?

20     A.  So generally speaking in a case like this we

21  would not do that so --

22     Q.  But -- and I know Mr. Petron, you didn't do it,

23  but I'm asking did you offer it to the Government?

24     A.  Did I offer it?

25     Q.  Sure.  Did you suggest it and say, hey, we need

1    to do this?

2        A.   I don't remember one way or the other.

3        Q.   And was we sit here today, you didn't go through

4    and -- and you can't tell the ladies and gentlemen of

5    the jury how much any of those figures up there are

6    based on fraud; is that right?

7        A.   No, my job is not the -- to give an opinion on

8    what is fraud or not fraud, my -- I'm just here to

9    summarize and add up the information.

10       Q.   Right.  And so -- and I believe you testified

11   this with Mr. Canales, you didn't look at any medical

12   files; is that right?

13       A.   I did not.

14       Q.   All right.  You did not conduct any sort of

15   medical review on these things; is that right?

16       A.   Correct, I did not.

17       Q.   You're not familiar with the way patients are

18   referred in Laredo; is that correct?

19       A.   I mean, I have a general understanding of --

20       Q.   No, no, you don't know how patients are referred

21   in Laredo, Texas; is that correct?

22       A.   I don't have any specific knowledge.

23       Q.   Thank you.  And you don't know anything about

24   Dr. Pena other than he showed up in these columns; is

25   that correct?

1      A.   Correct.

2      Q.   You don't know what his relationship is to

3  Mr. Mesquias; do you?

4      A.   Besides the financial information that we've

5  already talked about, no.

6      Q.   The $108,000, besides that, you don't know what

7  the contractual agreement between Dr. Pena and Merida

8  Group is, correct?

9      A.   Correct.

10      Q.   You've never --  you never reviewed that

11  contract?

12      A.   I did not review the contract.

13      Q.   You never asked to review the contract?

14      A.   I don't remember if I did or I did not.

15              MR. GUERRA:  Pass the witness, Your Honor.

16              THE COURT:  Mr. Lowell.

17              MR. LOWELL:  Thank you, Your Honor.

18                    REDIRECT EXAMINATION

19  BY MR. LOWELL:

20      Q.   Mr. Petron, you were asked about the nine --

21  9,000 patients at the Merida Group; do you remember

22  those questions?

23      A.   I do.

24      Q.   Now, if Merida Group employees were to tell you

25  that between 70 and 80 percent of those 9,000 patients

1    didn't qualify for services, would that concern you?

2        A.   Absolutely.

3        Q.   Can you tell the jury why?

4        A.   That would imply that there are 8,000 patients

5    that are being billed to Medicare that otherwise don't

6    qualify for the services for which Medicare is paying.

7        Q.   You were also asked about the six patients; do

8    you remember that?

9        A.   I do.

10       Q.   And you mentioned something about in your

11   experience the Government typically charges a small

12   collection of patients; is that right?

13       A.   Correct.

14       Q.   How long would be -- will you be in this

15   courtroom if we went through every single patient in

16   that population?

17       A.   By billings would go up substantially, so it

18   would be hours and hours and hours to detail on

19   beneficiary by beneficiary basis all of their billings.

20       Q.   How long would we be sitting in the courtroom?

21       A.   We would be here for months.

22       Q.   Now, you also had some questions about business

23   expenses; do you remember those?

24       A.   I do.

25       Q.   What, if anything, did you observe about the

1    business expenses at the Merida Group?

2       A.   Well, when I examined the credit cards, I

3    classified personal expenses that we've gone over and

4    business expenses, and there were substantial volumes of

5    both.

6       Q.   Anything unusual?

7       A.   Well, unusual in the sense of there are business

8    expenses being spent for personal reasons, that could

9    become problematic.

10      Q.   How?

11      A.   You have certain tax issues that arise in that

12   situation and so that would, you know, give rise to

13   further investigation.

14      Q.   For what?

15      A.   Potential tax evasion, tax fraud, things of that

16   nature.

17               MR. LOWELL:  Pass the witness, Your Honor.

18               THE COURT:  Mr. Canales.

19                    RECROSS-EXAMINATION

20   BY MR. HECTOR CANALES:

21      Q.   Mr. Petron, you are why aware, sir, are you not,

22   that the Medicare has a program integrity manual for

23   statistical sampling and overpayment estimation, right?

24      A.   Yes, I'm very familiar with it.

25      Q.   This is it, right?

1    A.   Yes.

2    Q.   So there's an entire -- and there's an entire

3    manual about how to do statistical sampling for

4    overpayments and estimations, right?

5    A.   There is.

6    Q.   There's a rule for how to do it?

7    A.   There's guidelines I would say.

8    Q.   Okay.  Right.

9    A.   But those guidelines are applicable in a very

10   narrow set of administrative procedures, not here in a

11   criminal court.

12   Q.   Oh, okay.  All right.  But -- but there's

13   statistical ways to accomplish the task to avoid having

14   to have -- be here for years if the Government wants to?

15   A.   There are statistical ways that one could draw a

16   sample, yes.

17   Q.   Okay.  All right.  And, sir, I just -- can I get

18   the ELMO back?

19           THE CLERK:  Yes, sir.

20   Q.   (By Mr. Hector Canales)  Here, going back here,

21   is this a fair summary of your hourly rate?  Is it

22   accurate?

23   A.   It is.

24   Q.   And the amount of you charged and the pages that

25   we went over; remember that?

1              MR. LOWELL:  Objection, asked and answered.

2              MR. HECTOR CANALES:  I'm just laying --

3              THE COURT:  I haven't heard the question.

4              MR. HECTOR CANALES:  I just want to lay a

5    foun -- well, let me just do this, Judge.

6              I want to offer and mark as Defendant's

7    Exhibit RM-102 under Federal Rule of Evidence 1006 a

8    summary of the witness' testimony.

9              MR. LOWELL:  Objection, Your Honor.  Summary

10   of what?

11             MR. HECTOR CANALES:  Of his -- of his

12   testimony, Your Honor.  They've -- they've -- under Rule

13   1006 I can offer a document that fairly summarizes his

14   testimony.

15             MR. LOWELL:  Your Honor, the bottom line is

16   inaccurate.

17             MR. HECTOR CANALES:  Well, he said .06.  We

18   did the math.

19             THE COURT:  All right.

20             MR. HECTOR CANALES:  That's what I was

21   trying do when he objected.

22             THE COURT:  He wants to admit this

23   handwritten note, any objection to his --

24             MR. LOWELL:  Your Honor, we object.  That's

25   Mr. Canales' interpretation of the 9,000 patients, he's

1    suggesting inappropriately to the jury that there was

2    less than one percent of patients who did not qualify

3    for hospice.

4           MR. HECTOR CANALES:  Your Honor, I'm not

5    saying that, Your Honor.  That wasn't his testimony.

6    His testimony was, I asked him 9,339 and six of that

7    what percentage --

8           THE COURT:  Mr. Canales, the objection is

9    sustained.  I'll allow you to use your handwritten note

10   for demonstrative purposes, but as an exhibit --

11          MR. HECTOR CANALES:  For the record,

12   Your Honor, I want to make sure and let the Court be

13   aware that I'm offering this pursuant to Federal Rule of

14   Evidence 1006 which specifically allows for this exact

15   type of -- of document, not just to be demonstrative but

16   to be evidence for the jury to take with them.

17          THE COURT:  Overruled.

18          MR. HECTOR CANALES:  Tender this as a bill

19   then, Your Honor.  I'd like to have this marked as

20   Defendant's Exhibit 1 as a -- as a bill.

21          THE COURT:  That will be allowed.

22          MR. HECTOR CANALES:  Thank you, Your Honor.

23   Pass the witness.

24          THE COURT:  One second.

25          MR. GUERRA:  Nothing further, Your Honor.  I

```
 1   have no further questions.
 2              THE COURT:  Anything else, Mr. Lowell?
 3              MR. LOWELL:  Nothing further, Your Honor.
 4              THE COURT:  Thank you, sir.  You may step
 5   down.
 6              Ladies and gentlemen, let's go ahead -- do
 7   we have another witness?
 8              MR. LOWELL:  We can take a break.
 9              No more witnesses, Your Honor, that was our
10   last witness.
11              THE COURT:  Wait, wait, one second.
12   You're -- you're excused, sir.
13              Government's update, please?
14              MR. LOWELL:  Good news that was our last
15   witness, the Government rests.
16              THE COURT:  All right.  Ladies and
17   gentlemen, I realize I jinxed everybody by complimenting
18   everyone on their promptness and the late starting, I
19   know we had some trouble with -- with that, but you're
20   going to get a nice surprise today.  I've granted a
21   request for -- we're going to start the defense on
22   Monday.  Everybody get a -- as I explained in my opening
23   instructions, the trial will proceed in numerous stages.
24              First, the Government gets to go first,
25   present their case; then we will have defense.  We'll
```

1    start the defense on Monday.

2              Have a nice long weekend, have a nice break

3    and -- but again, absent some kind of minor emergency,

4    again, let's keep to our promptness, let's have everyone

5    here promptly before 9:00 a.m., all right?

6              You're excused at this time.

7              COURT OFFICER:  All rise for the jury.

8              (JURY OUT.)

9              THE COURT:  All right, gentlemen.  We'll be

10   in recess.

11             Gentlemen, we're going -- again, we'll start

12   promptly at 9:00.  Have a nice weekend, make sure you --

13             MR. HECTOR CANALES:  Your Honor, we'd like

14   to make our -- our motions right now.  I think it's a

15   proper time and be a good use of the Court's time.

16             THE COURT:  Do you all need a quick break

17   before we do that?

18             MR. HECTOR CANALES:  Five minutes to

19   organize but we'd like to --

20             THE COURT:  Let's take a quick recess and

21   we'll come back momentarily.

22             (COURT IN SHORT RECESS.)

23             THE COURT:  Thank you, everyone.  Please be

24   seated.

25             Gentlemen, please come forward.  All right.

1    Let the record reflect that the Government has rested

2    its case in chief.  The jury is no longer present.

3              Gentlemen, it's my understanding that the

4    defense would like to bring up some issues, some

5    motions.  Please proceed.

6              MR. HECTOR CANALES:  Yes, Your Honor.  Thank

7    you very much.

8              Hector Canales on behalf of Defendant Rodney

9    Mesquias.  At this time, Your Honor, now that the

10   Government has rested its case in chief, we bring forth

11   a timely, a Motion for -- for Acquittal of -- based on

12   the fact, Your Honor, that there is -- and we would move

13   that as to Rodney Mesquias Counts One through Seven,

14   Count Eight, Count 11 and Count 12, that Mr. Mesquias is

15   named in, in the indictment, as well as the forfeiture

16   portions of the indictment be dismissed on the basis

17   that there's insufficient evidence to sustain a

18   conviction as it is presently -- as the Government has

19   put in their -- in their case.

20             Notably, Your Honor, I would tender to the

21   Court for its consideration, United States v Ganji, 880

22   F.3rd 760, Fifth Circuit case, 20 -- 2018, I'm tendering

23   a copy to -- to opposing counsel, and I'll hand to the

24   Court as well.

25             Most notably, this was a case where the

1   Fifth Circuit, Your Honor, reversed an acquittal at the

2   trial court -- a conviction at the trial Court level

3   involving home health care.  And the Fifth Circuit in

4   this case reasoned that a fraud cannot be the basis --

5   legal activity cannot be the basis of a fraud.

6            In the Ganji case, Your Honor, you had a

7   physician who was referring patients to a home health

8   care company and the Government -- and that physician

9   was being compensated with a -- under a professional

10  services agreement for the referral of those patients to

11  the -- to that home -- home health where she served as a

12  medical director, the exact fact pattern we have in this

13  particular case.

14            But the Fifth Circuit noted, as the

15  testimony in this case is, that such practice is legal,

16  that the referring to a -- a doctor referring to a home

17  health agency, or a hospice, which he's a medical

18  director is legal.  It is -- there's no prohibition in

19  the regulations, or in the statute from -- for such.

20  And the Ganji Court recognized, in fact, that that is a

21  legal preference.  And they gave credence to the idea of

22  the continuity of care.

23            And so the bottom line, Your Honor, is that

24  the activities that the Government is basing, in

25  particular, Your Honor, their conspiracy count for

1    conspiracy for -- to violate the Anti-Kickback Statute,

2    is premised on legal activity.

3            The evidence in this case is that -- that

4    Dr. Virlar, Dr. Pena, Dr. Carrillo had medical

5    directorship agreements, that they were paid, and that

6    is illegal -- it is legal to refer their patients to a

7    hospice and/or home health at which they are the -- the

8    medical director.

9            Therefore, they cannot be held liable for

10   fraud as the result of legal activity.

11           Moreover, Your Honor, on the anti-kickback

12   side, we have the safe harbor provisions, that payments

13   were made pursuant to a written contract for

14   professional services.  And there is evidence of -- of

15   that -- of that as well.

16           So -- and secondly, Your Honor, I'll tender

17   to the Court another case.  This is a -- actually, a

18   memorandum and opinion order out of the Northern

19   District of Dallas by Chief Judge Barbara Lynn.  It's in

20   United States ex rel Wall v Vista Hospice Care, and I

21   will tender a copy to the Court, and I think I've got

22   two.  Here, you can have that one.

23           Now, Judge, this case is a false claims qui

24   tam case, but it involves hospice, and it involves the

25   False Claims Act.  And so while the -- as the Court is

1    well aware there are several mechanisms in which the

2    Government can pursue fraudulent claims, health care

3    fraud claims.  They can do it civilly through the False

4    Claims Act, they can even do it criminally through the

5    False Claims Act, you can do it through the Health Care

6    Fraud Statute and/or the Anti-Kickback.

7            But -- but, Judge Lynn in this case does an

8    excellent review of the hospice rules, regulations.  And

9    this case deals with what I think we have here, which is

10   what is the Court to do when the case boils down to

11   differences of opinion?  Hospice is a very unique

12   situation, Judge, for health care fraud.

13           I've done a considerable amount of research,

14   and there are very few hospice cases out there.  There

15   are a lot of home health cases.  And one of the

16   interesting things I'm sure the Court has seen and --

17   and -- through the evidence in this case is that hospice

18   is premised on a doctor's prognosis.  We've probably

19   beat that horse a lot, but there's a reason for it,

20   Judge, and -- and these two opinions, especially this

21   particular opinion with Judge Lynn, brings this home

22   where fraud, right, fraud cannot be the basis of a

23   difference of -- mere difference of opinion of clinical

24   judgment between two doctors.

25           Now, in this case it's very important to

1    understand, Judge, and this is why -- and I would

2    anticipate Mr. Guerra will try to bring this home, but

3    there are no doctors' opinions in the case, right?  And

4    to contradict, or if you do, you have, maybe -- maybe

5    you have Virlar versus Gonzaba, right, you have these --

6    but about a prognosis, about a prognosis of a terminal

7    illness, chocolate versus vanilla, I like chocolate, no

8    chocolate's better than vanilla, no, the Astros are

9    better than the -- those are differences of opinion that

10   cannot for the basis of fraud because two doctors'

11   opinions can be different and they can both be true.

12            And if the Court -- when the Court goes

13   through this order, done an excellent review of that,

14   and I'm going to take the time to take one quote.  This

15   is part of the discussion.  And it says "if all that was

16   necessary to proof falsity" -- falsity of the claims,

17   all right -- "if all that was necessary to prove falsity

18   was to put up a medical expert to review medical records

19   and provide an opinion at odds with that of the

20   certifying physician, hospice providers would be subject

21   to potential FCA, False Claims Act, liability, quote,

22   any time a relator could find a medical expert who

23   disagreed with the certifying physician's clinical

24   judgment, that situation would be directly at odds with

25   the assurances given by CMS that doctors need not --

1    need not fear the exercise of their medical judgment as

2    to the future course of a terminal patient."

3              That's what this case is about.  Judge Lynn

4    recognized that, ruled accordingly, and we are asking

5    the Court here to grant our Motion of Acquittal on all

6    these counts against my client Mesquias because the --

7    the -- the -- arguably, the -- the Government doesn't

8    even have an expert opinion.

9              But even if you want to give them that, put

10   it in light most favorable to the Government, all we

11   have here, Judge, is a difference of opinion as to the

12   terminal prognosis of six patients.  And that,

13   Your Honor, coupled with the fact that the payments were

14   subject to a professional services agreement under safe

15   harbor, that those referrals are legal, it's a legal

16   preference for the continuity of care purposes, warrants

17   a no reasonable juror could find and convict my client

18   on any of these counts, and we move, Your Honor, that

19   those counts be dismissed and our motion be granted.

20             Thank you.

21             THE COURT:  I'm assuming everyone wants to

22   make a same or similar motion?

23             MR. CYGANIEWICZ:  Judge, on behalf of

24   Mr. McInnis, we -- we adopt those arguments, and also

25   point out that Ganji case and Judge Lynn's ruling.

1      So let me formally ask for a directed

2  verdict of acquittal on behalf of Mr. McInnis on Counts

3  One, Two through Seven, Count Eight and Count 11 for

4  those same reasons argued by Mr. Canales.

5      And in addition, that we just seriously

6  submit that the Government has not met its burden of

7  proof that there's evidence sufficient, that they have

8  not proven every element of the offenses as required in

9  those counts, especially the money laundering count,

10 Your Honor.  There's been no evidence, or at least

11 insufficient evidence presented at this point in time as

12 to Mr. McInnis on the money laundering, in particular,

13 and ask the Court to at least grant the Motion for

14 Directed Verdict as to that count as to Mr. McInnis.

15     And, again, for the record, Judge, we're

16 adopting and -- the arguments of counsel by -- of

17 Mr. Mesquias and ask for a ruling in our favor that a

18 Judgment of Acquittal be entered on behalf of

19 Mr. McInnis.

20     THE COURT:  Mr. Guerra.

21     MR. GUERRA:  Your Honor, Robert Guerra here

22 for Francisco Pena.  We join in the Motion for Acquittal

23 made by counsel for Mr. Mesquias, as well as counsel for

24 Mr. McInnis.  And we ask that the Court grant an

25 acquittal for Francisco Pena on Counts One, Three,

1    Eight, Nine, Ten and 12.

2            The evidence presented by the Government in

3    its case in chief is insufficient to sustain a

4    conviction.  We believe that the jury could find --

5    could not find beyond a reasonable doubt that every

6    single element of the crimes that were made -- that were

7    accused were actually made in this case, Your Honor.

8            And specifically, we further adopt the

9    arguments made by Mr. Canales with regards to the

10   opinion of the Ganji case and the opinion out of the

11   Northern District of Texas, specifically with regards to

12   the Anti-Kickback Statute -- or excuse me, the kickback

13   count, which is Count 12.

14           There were three instances within that

15   indictment as to Dr. Pena.  As the Court, who -- who sat

16   through the two weeks of direct evidence presented by

17   the Government doesn't show, and we have not seen any

18   direct evidence showing that those payments made were

19   part of any sort of kickback scheme.

20           The law allows under the safe harbor for a

21   medical director to refer patients to a hospice that

22   he's working at.  That's what happened.  We have

23   legitimate contracts that were made, and we have

24   legitimate payments that were made for medical service.

25           None of that is illegal and the Government

1    fails to meet its burden to show that Dr. Pena received

2    kickbacks for those referrals.  That would be a clear

3    cut motion for -- ground for acquittal.

4              As to Counts One and Three, Your Honor,

5    again, the bulk of the testimony that this Court heard

6    and that the jury heard focused on activities well

7    outside of Laredo.  The one substantive count,

8    Count Three, Francisca Perez, for the -- for the time

9    period of which the fraud was alleged, there was no

10   evidence, not even any medical evidence, which we argued

11   in our Motion to Exclude, but there was no evidence that

12   the certification during that period was fraudulent.

13   None.

14             And the reason why we filed our Motion in

15   Limine and Motion to Exclude was that the Government set

16   the ground rules.  They said that the actions taken by

17   Dr. Pena were medically unnecessary.  We asked them to

18   provide evidence of that; they failed to do so.

19             And as the Court would review Counts One, at

20   least Count One, the allegations as to all of the

21   Defendants, and in particular Dr. Pena, is that the

22   actions taken were medically unnecessary.

23             This Court and this jury heard no evidence

24   to that effect, much less any evidence that would

25   sustain a finding of guilt, Your Honor.

1          So for those reasons, we ask that a Motion

2     for Acquittal be granted for Dr. Pena on Counts One,

3     Three, Eight, Nine, Ten and 12.

4               THE COURT:  Thank you.

5               MR. GUERRA:  Thank you, Judge.

6               THE COURT:  Government's response for each

7     respective motion?

8               MR. LOWELL:  Thank you, Your Honor.

9          The motion should be denied in its entirety.

10    There has been compelling and overwhelming evidence

11    presented in this case, and it's been consistent.

12    Employee after employee after employee, doctor after

13    doctor, two of whom have pleaded guilty to committing

14    health care fraud, have testified in this case, pointed

15    the finger at Henry McInnis, Rodney Mesquias, Francisco

16    Pena as being involved in this conspiracy.

17         And what those two doctors did is they

18    clarified for the jury and for this courtroom that this

19    is not a medical opinion case.

20         Dr. Carrillo and Dr. Virlar took the stand

21    and they said, we were paid, and they were very clear,

22    we were paid to fraudulently rubber-stamp hospice

23    orders.  We were paid to fraudulently rubber-stamp home

24    health orders, that was our job, we were not legitimate

25    doctors.

1            That cannot be the basis of a legitimate

2     professional services contract.  There is no fraud

3     exception under the Anti-Kickback Statute.

4            So on their testimony -- testimony alone,

5     the motion should be denied.

6            The two cases are readily distinguishable

7     because it's not a medical opinion case.  At virtually

8     every level of this company that the evidence that has

9     been elicited during this trial has shown every level

10    has been fraudulent.

11            And I want to focus on these -- the Pena

12    counts.  The Court will recall that was Francisca Perez,

13    she was a substantive count tied to Dr. Pena.  There was

14    evidence that Dr. Pena, Dr. Carrillo and Dr. Virlar all

15    signed fraudulent and false orders for Ms. Perez.  And

16    we had the nursing home records for Ms. Perez which

17    reflected that she did not have the terminal diagnosis

18    that Dr. Pena put on his hospice order.

19            So for all those reasons, Your Honor, in

20    addition to all the employees that took the stand and

21    were quite clear, crystal clear that they acted at the

22    direction of Rodney Mesquias and Henry McInnis, and that

23    Dr. Pena was just another medical director in Laredo

24    doing the same exact thing.

25            And the Court saw the evidence today, the

1    hundred patients down in Laredo tying Dr. Pena to this

2    conspiracy.  It's overwhelming.  The motion should be

3    decide.

4                    THE COURT:  Mr. Guerra?

5                    MR. GUERRA:  Yes, Your Honor, briefly.

6                    As the Court well knows and -- and given Mr.

7    Lowell's argument, the Court well knows Dr. Virlar and

8    Dr. Carrillo basically cited maybe one time they met

9    with Dr. Pena, and at no time did they even offer any

10   evidence that this was part of any scheme or any plan,

11   much less that Dr. Pena knew or was part of anything

12   that was going on, first of all.

13                   Second of all, with regards to those medical

14   records, again, they didn't show the ladies and

15   gentlemen of the jury anything that showed Dr. Pena's

16   involvement with fraudulent certification.

17                   Dr. Pena was outside of whatever Carrillo

18   and Virlar were doing, first of all.  And second of all,

19   the Government needed to bring that evidence to light in

20   front of the jury, they didn't do it, we renew our

21   Motion for Acquittal on that count, Your Honor.

22                   MR. LOWELL:  Your Honor, just a couple of --

23   couple of witnesses, Your Honor, just for the record.

24   Ernesto Gonzalez, Roland Aguilar, Jose was one of the

25   sources who testified, as well as Joe Garza, all

1    testified clearly that Dr. Pena, like Dr. Virlar, and

2    like Dr. Carrillo, was being paid for patient referrals.

3             THE COURT:  Thank you, gentlemen.  All

4    right.  Gentlemen.

5             MR. HECTOR CANALES:  The only thing I'd like

6    to add, Your Honor, is just in the -- in the Wall case,

7    there is a discussion in there that I'd like to call to

8    the Court's attention about the role of statistical

9    analysis in hospice cases in extrapolating from a subset

10   to an entire patient population that I would really like

11   to call the Court's attention to in -- in that -- I

12   think it's extremely instructive about this last witness

13   and for any potential future proceedings.

14            Thank you.

15            THE COURT:  All right.  Thank you,

16   gentlemen.  Respectfully gentlemen all three defense

17   motions are denied.  The case will continue on Monday.

18            Anything else?

19            MR. HECTOR CANALES:  No, Your Honor.

20            MR. GUERRA:  No, Judge.

21            THE COURT:  All right.  We'll be in recess.

22            (COURT IN RECESS.)

23            THE COURT:  Gentlemen, please come forward.

24   Ms. Sandra has asked that I come back to the courtroom.

25            What is the latest issue?

1          MR. TONY CANALES:  We have an issue, Judge.

2          The Government in the past, the last two

3   weekends, pursuant to the batting order agreement that

4   we had, the Government at 5:00 on Sunday, each Sunday,

5   they've been giving the list of witnesses.

6          The Court yesterday when we talked, I

7   misspoke, as to when I could provide the list of

8   witnesses.  They want it by today at 5:00.  It's

9   impossible for me to do it today at 5:00.  I would like

10  to be able to apply what's good for the goose is good

11  for the gander.

12         They allowed -- they didn't give me their

13  instructions, their list of witnesses until Sunday.

14  I'll be more than glad to do it by Sunday.  I don't have

15  it today by 5:00 because what has happened, Judge, is

16  that the Government has been going around talking to our

17  witnesses, and when they've been talking to witnesses

18  from the last two weeks, some of the witnesses now are

19  getting a little bit shaky about coming in.  So I'm

20  having trouble logistically bringing my witnesses.

21         I will be more than glad to give them the

22  list of witnesses that we plan to call by Sunday at

23  5:00, the same thing that they gave us, Sunday at 5:00.

24  I just cannot do it today by 5:00.

25         I'll -- I can come up with a bunch of names,

1   but that's not -- they're not -- they're not going to be

2   realistic names because I'm having trouble with them.

3            I've got to get them committed to be here.

4            THE COURT:  All right.  Mr. Lowell?

5            MR. LOWELL:  Your Honor, just as an initial

6   matter, Mr. Canales went on the record just yesterday

7   and agreed to provide us with the updated list.

8            On Mr. Mesquias' list alone, there are 25

9   witnesses.  They've represented that their case will

10  take two to three days.

11           We're not trying to waste this Court's time,

12  we do not want to waste the jury's time, I would just

13  suggest that Mr. Canales give us an updated list

14  consistent with what he represented in Court of who he

15  expects to testify in this case over those two to three

16  days.

17           THE COURT:  Gentlemen, again, I don't

18  believe this is an exact science, to be quite frank,

19  again, and I don't know what lists or updates were given

20  between the parties.  I did instruct you -- each party

21  to exercise due diligence.

22           For example, obviously, all can I say is,

23  for example, the Government gave me a list initially of

24  44 witnesses, obviously, we didn't call 44 witnesses.

25           So back to the point.  If you need to -- the

1    lists are estimates, is an estimate, obviously, I'm not

2    telling you how to do your job, but I mean, if you need

3    to overestimate and cut down, obviously, that's a better

4    practice than -- than underestimating.

5                MR. TONY CANALES:  Well, I could do that,

6    but, you know, I could do that, Judge.  All I want to

7    have is the same -- same rule that I applied to him on

8    Sunday.

9                And -- and by the way, on all day Sunday, a

10   couple of times on Sunday, last Sunday we requested

11   of -- of the Government the list of witnesses, and they

12   didn't give it to us until 7:00 on a Sunday.  The

13   previous Sunday the same thing.

14               I would -- I'll give them the names that

15   I've got because I'm having trouble.

16               Why am I having trouble?  Because, you know,

17   logistics.  So I'll give them the names, but I don't

18   want to do an over-inflated list of people that, you

19   know, that I'm not going to call, it's got to be a good

20   faith basis for it.

21               THE COURT:  So Mr. Lowell, Mr. Canales has

22   already just stated that he doesn't believe he can give

23   you an accurate list by today.  Is it correct that the

24   Government's practice was to provide the Government's

25   updated list on Sunday at what time?

```
 1                    MR. LOWELL:  Your Honor, what we would do is
 2     we gave -- we had an initial list of Government
 3     witnesses and then every evening we would send the
 4     specific witnesses that we intended to call the
 5     following day.  So it may have been three or four
 6     witnesses we would e-mail to all counsel, sometimes it
 7     varied each night when we'd get it to them, we made
 8     substantial cuts as we've gone along as the Court has
 9     noticed, but we did a daily update with the exception of
10     Saturdays of the witnesses that we intended to call the
11     following day.
12                    THE COURT:  All right.
13                    MR. TONY CANALES:  But when we left on a
14     Friday, I didn't even get any e-mail about the witnesses
15     for Monday, I didn't get the list until --
16                    THE COURT:  All right.  Okay.  If -- if --
17                    MR. TONY CANALES:  I have the e-mail right
18     here.  My faithful assistant has got the e-mail.
19                    THE COURT:  So you're requesting to
20     update --
21                    MR. TONY CANALES:  On Friday?
22                    THE COURT:  -- on Sunday.
23                    MR. TONY CANALES:  I'm sorry, on Sunday.
24                    THE COURT:  On Sunday at what time?
25                    MR. TONY CANALES:  7:00?  Same time they
```

1   gave it to me.

2              THE COURT:  Was it 7:00 or 5:00?  I've heard

3   two different times.

4              MR. TONY CANALES:  Don't be greedy Canales.

5   I'll take the 5:00, okay, I'll take the 5:00.

6              THE COURT:  You've already given them your

7   initial list, obviously.

8              MR. TONY CANALES:  Sure, sure we did.

9              THE COURT:  All right.  The Court will grant

10  your list to update by 5:00 on Sunday.

11             MR. TONY CANALES:  On Sunday.

12             THE COURT:  All right.

13             MR. TONY CANALES:  Thank you, Your Honor,

14  that's it.

15             THE COURT:  How many did you have on your

16  initial list?

17             MR. TONY CANALES:  Oh gosh.

18             MR. LOWELL:  25, approximately.

19             MR. TONY CANALES:  25.  It's going to be a

20  lot less.

21             THE COURT:  All right.  So again, each

22  party, I don't see Mr. Cyganiewicz, but instruct him.

23  Each party is instructed to attempt to give at least

24  prior notice the day -- the night before the witnesses

25  are called -- needed -- they intend to call the

 1    following day.

 2              MR. TONY CANALES:  Yes, Your Honor.

 3              MR. GUERRA:  Yes.  We understand Dr. Pena,

 4    we've been working with the Government when it's our

 5    turn.

 6              THE COURT:  All right, gentlemen.

 7              Anything else?

 8              MR. TONY CANALES:  No, thank you.

 9              MR. LOWELL:  No, Your Honor.

10              THE COURT:  All right.  Have a nice weekend

11    everyone.

12              MR. LOWELL:  Thank you.

13

14                   REPORTER'S CERTIFICATE

15

16       I certify that the foregoing is a correct transcript

17    from the record of proceedings in the above-entitled

18    matter.

19

20

21       _/s/Sheila E. Perales_____
         SHEILA E. HEINZ-PERALES CSR RPR CRR
22       Exp. Date:  January 31, 2021

23

24

25