```
 1            IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF TEXAS
 2                  BROWNSVILLE DIVISION


 3
    UNITED STATES OF AMERICA      )
 4                                )
                                  )
 5  VS.                           )  CRIMINAL ACTION NO.
                                  )  B-18-CR-8
 6                                )
    RODNEY MESQUIAS, HENRY        )
 7  MCINNIS AND FRANCISCO PENA    )
                                  )
 8

 9
                      TRIAL - DAY ELEVEN
10          BEFORE THE HONORABLE ROLANDO OLVERA
                    NOVEMBER 5, 2019
11


12


13                 A P P E A R A N C E S

14
     FOR THE UNITED STATES:
15
         MR. KEVIN LOWELL
16       MR. ANDREW SWARTZ
         MR. JACOB FOSTER
17       ASSISTANT UNITED STATES ATTORNEY
         BROWNSVILLE, TEXAS 78520
18

19   FOR THE DEFENDANT RODNEY MESQUIAS:

20       MR. CHARLES BANKER
         ATTORNEY AT LAW
21       118 Pecan Boulevard
         McAllen, Texas 78501
22
         MR. HECTOR CANALES
23       MR. TONY CANALES
         ATTORNEYS AT LAW
24       2601 Morgan Avenue
         Corpus Christi, Texas 78405
25
```

```
1    FOR THE DEFENDANT HENRY MCINNIS:

2        MR. ED CYGANIEWICZ
         ATTORNEY AT LAW
3        1000 E. Madison Street
         Brownsville, Texas 78520
4
     FOR THE DEFENDANT FRANCISCO PENA:
5
         MR. ROBERT GUERRA
6        ATTORNEY AT LAW
         55 Cove Circle
7        Brownsville, Texas 78521

8    FOR THE DEFENDANT FRANCISCO PENA:

9        MS. ADRIANA ARCE-FLORES
         ATTORNEY AT LAW
10       1414 Victoria Street
         Laredo, Texas 780404
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    THE COURT:  Thank you, everyone.  Please be

2      seated.

3                    Gentleman, it's my understanding there are

4      some issues that have to be taken up outside the

5      presence of the jury?

6                    Mr. Swartz?

7                    MR. SWARTZ:  Yes, Your Honor.  Just very

8      briefly, Your Honor.

9                    After our charge conference from yesterday,

10     we went back over the final version of the jury charge.

11     I noticed that after we put in some additional

12     information about the money laundering conspiracy charge

13     there was, basically, now a duplicative unanimity

14     section.  I've discussed that with counsel for

15     Mr. Mesquias and so we are in agreement that the

16     unanimity section should be taken out, the duplicative

17     one.  We've gone over that with your able clerk and we

18     believe that -- that portion has now been corrected.

19                    THE COURT:  That paragraph has been deleted?

20                    MR. SWARTZ:  Yes, Your Honor.

21                    THE COURT:  All right.

22                    MR. SWARTZ:  There's two paragraphs on page

23     19 that were deleted.

24                    THE COURT:  Very good.  Parties agreed to

25     it, right, Mr. Canales?

1          MR. TONY CANALES:  Yes, Your Honor.  That's

2   from jury pattern --  pattern jury charge 1.25.  We

3   believe it's been repeated before in the definition of

4   money laundering so we have no objection to it.

5          On a different matter, Your Honor.

6          THE COURT:  Anything else?

7          MR. TONY CANALES:  Yes, Your Honor.

8          Just for the record, Your Honor, yesterday

9   I -- in my discussions, I just would like to be able to

10  clarify that my request for instructions 12, 13 -- 12,

11  13, 14 -- 12, 13 and 15, I think the Court informed me

12  that you were going to issue an order declining them,

13  but I didn't have the order.  I need to have an order

14  from the Court saying you're -- you're declining these

15  particular instructions.

16          THE COURT:  Yes, if they're -- these are

17  objections that you did not present yesterday?

18          MR. TONY CANALES:  No, I did present them,

19  they were -- they were not objections -- they were

20  objections in the form that you did not include them in

21  the jury charge.

22          THE COURT:  Correct.

23          MR. TONY CANALES:  I said they should have

24  been included in the jury charge so, therefore, I submit

25  to the Court that portion that you have to have -- you

1    have to enter an order saying denied on these particular

2    ones.

3                    THE COURT:  All right.  Well, I -- I just

4    want to be clear, did I already overrule the objection

5    or --

6                    MR. TONY CANALES:  I don't think you did, so

7    that's my --

8                    THE COURT:  All right.  Well, let's go

9    through --

10                    MR. SWARTZ:  My recollection, Your Honor, is

11    that the Court did overrule them, but if we need to make

12    the record clear, that's fine.

13                    THE COURT:  Out of an abundance of caution,

14    you said it was 12, 13 and 15?

15                    MR. TONY CANALES:  Yeah, 12, 13, yeah, and

16    15, Your Honor.

17                    THE COURT:  All right.  Your objection as to

18    12, 13 and 15 are overruled.

19                    MR. TONY CANALES:  Thank you, Your Honor.

20                    THE COURT:  If I haven't already done so.

21    All right.  Anything else?

22                    MR. SWARTZ:  No, Your Honor, thank you.

23                    THE COURT:  All right.  Gentlemen --

24                    MR. SWARTZ:  Your Honor, I -- forgive me.  I

25    believe we do need to still test the sound for our power

1  points, if we could do that just before the jury comes

2  in.

3          THE COURT:  Gentlemen, you'll have plenty of

4  time while I read our work product, but please proceed.

5          MR. SWARTZ:  Thank you.

6          THE COURT:  And gentlemen, remind me as to

7  how you want to split up your direct, closing and

8  rebuttal closing in terms of timeframe?

9          MR. FOSTER:  Thank you, Your Honor.

10          I'll take, approximately, an hour to close

11  and Mr. Lowell will take, approximately, a half-hour for

12  rebuttal, maybe slightly different, but that's what's

13  anticipated.

14          THE COURT:  All right.  Gentlemen, do you

15  want any kind of time warnings on the hour-and-a-half?

16          MR. HECTOR CANALES:  I'll take ten minutes,

17  Judge.

18          THE COURT:  Ten-minute time warnings?

19          MR. GUERRA:  Same, Your Honor.

20          MR. CYGANIEWICZ:  Just notify me when I've

21  completed an hour.

22          THE COURT:  Very good.

23          MR. LOWELL:  Your Honor, we are ready.

24          THE COURT:  All right.  Let's bring in the

25  jury, please.

1             COURT OFFICER:  All rise for the jury.

2             (JURY IN.)

3             THE COURT:  Thank you, everyone.  Please be

4    seated.

5             Ladies and gentlemen of the jury, again,

6    welcome back.  Again, thank you everyone for your

7    promptness and your hard work thus far.

8             As I said previously outside to you, we are

9    now in the final stages of the trial.  With respect to

10   that, it is now my duty to read this document which is

11   entitled final jury instructions.  I will be reading it

12   to you, please be patient, please listen carefully, this

13   will be your guide, your instruction manual to assist

14   you in your deliberations.

15            Once I complete the bulk of this document, I

16   will allow all of the parties to present their closing

17   arguments.  Everyone will be allowed the exact amount of

18   time.  I've given each party an hour-and-a-half;

19   however, because the Government has the burden of proof

20   in this case, they're allowed to split it up in how --

21   however they chose to do so, an hour and 30 minutes, but

22   they get to split it up.

23            With that said, please listen carefully and

24   I'll try and get through this as quickly as possible

25   without Ms. Sheila's hands going crazy.  All right.

1              Ladies and gentlemen, as I stated, this is

2    entitled United States versus -- of America v. Rodney

3    Mesquias, Henry McInnis, and Francisco Pena.

4              Criminal No. 1:18-CR-00008.

5              Final Jury Instructions.

6              Section 1.  General Instructions.

7              Members of the Jury:  I will first give you

8    some general Instructions.  Then, I will give you some

9    specific rules of law on this case.  Finally, I will

10   explain the procedures you should follow in your

11   deliberation.

12             You must disregard any impression I may have

13   given you during trial that I favor either side --

14   either side or that I have an opinion about the facts of

15   this case.  You are the sole judges of the facts of this

16   case.  Other than my Instructions to you on the

17   applicable law, you should dis -- disregard anything I

18   may have said or done during the trial when deciding

19   your verdict.

20             The next section is entitled, Duty to Follow

21   Instructions.

22             As jurors, you must only judge the facts.

23   It is your sworn duty to follow my Instructions along

24   with the rules of law explained in these Instructions.

25             You must not disregard or give special

1   attention to any one instruction, and you must not

2   question the wisdom or correctness of any rule I may

3   direct you to follow.  You must not substitute or follow

4   your own notion or opinion about what the law is or

5   ought to be.  You must base your verdict solely on the

6   evidence, without prejudice or sympathy.

7            The next section is entitled, Burden of

8   Proof and Evidentiary Standard.

9            In -- in a criminal trial, Defendants are

10   always presumed innocent, meaning the Defendants started

11   the trial with a clean state.  Remember, the indictment

12   I read to you at the beginning of trial is not evidence

13   of guilt.

14            The law does not require the Defendants to

15   prove their own innocence.  Instead, the law requires

16   the Government to prove each Defendant is guilty beyond

17   a reasonable doubt.  If the Government failed to reach

18   this burden for any Defendant, you must find that

19   Defendant not guilty.  Although the Government's burden

20   of proof is strict, the Government need not prove the

21   Defendants' guilt beyond all possible doubt.  The law

22   only requires the Government's proof overcomes any

23   reasonable doubt about each Defendant's guilt.

24            A reasonable doubt is a doubt based on

25   reason and common sense after careful and impartial

1    consideration of all evidence presented.  Thus, proof

2    beyond a reasonable doubt is proof so persuading that

3    you would be willing to rely and act on it without

4    hesitation in making the most important decisions of

5    your own affairs.

6              The next section is entitled, A Defendant's

7    Right to Remain Silent.

8              As already mentioned, the Government has the

9    burden of proof throughout the Court -- throughout the

10   entire trial.  The Defendants never have to prove their

11   innocence.  That said, none of the Defendants need to

12   present any evidence or testify to support their

13   innocence.  Each Defendant has the right to remain

14   silent.  Thus, you may not hold any Defendant's decision

15   not to testify or not to present evidence against him.

16             The next section is entitled, Evidence:

17   What is Proper Evidence?

18             The evidence you are to consider consists of

19   the testimony of the witnesses, the documents, and other

20   exhibits admitted into evidence, and any fair inferences

21   and reasonable conclusions you can draw from the facts

22   and circumstances proven.

23             The next section is entitled, Evidence:

24   Excluding What is Not Evidence.

25             Statements, objections, or arguments made by

1   the attorneys are not evidence.  It is each attorney's

2   job to -- to point out what is significant or helpful to

3   their side of the case, and in doing so, call your

4   attention to certain facts or inferences that could

5   otherwise escape your notice.  That said, what the

6   attorneys said here during the trial is not binding on

7   you.

8           Similarly, do not assume that I have any

9   opinion about the issues of this case based on anything

10  I said or did during trial.  If I sustained objections

11  to certain questions, you must disregard those questions

12  and answers.  Do not speculate about what the witness

13  would have said if permitted to answer the question.

14  Your verdict must be based only on the legally

15  admissible evidence and testimony.

16          The next section is entitled, Evidence:

17  Inferences, Direct and Circumstantial.

18          Now that we've discussed what is not

19  evidence, let us -- let us discuss what is evidence.

20  There are, generally, two types of evidence:  direct

21  evidence and circumstantial evidence.  Direct evidence

22  is testimony from a witness who saw, heard, or touched

23  the subject of questioning.  Circumstantial evidence is

24  evidence that proves a fact from which you can logically

25  conclude another fact exists.  You should consider and

weigh all of the -- all of the evidence presented to you.  So, do not be concerned with whether it is -- whether evidence is direct or circumstantial evidence. The law does not distinguish between the weight you should give either direct or circumstantial evidence. But the law require that, after weighing all of the evidence -- both direct and circumstantial -- you must be convinced of the Defendant's guilt beyond a reasonable doubt to find that Defendant guilty.

To do this, you may draw any reasonable inferences you feel are justified from the evidence.  In other words, you may make reasonable deductions and reach conclusions that common sense dictates from the facts established by the evidence.

Once again, the law does not require you to accept all of the evidence as true or accurate. Rather -- excuse me.  Rather, it is your job to decide whether the Government proved the Defendants are guilty beyond a reasonable doubt.

The next section is entitled, Credibility of Witnesses.  Excuse me.

An important aspect of determining whether the Government and its burden -- met its burden of proof is weighing the validity and character of each individual witness and the testimony offered.  It is

1   your job to make judgments about the witnesses'

2   testimony.  You should decide whether you believe all or

3   any part of what each witness said and decide the

4   importance of that testimony.  In making that decision,

5   I suggest you ask yourself these questions:  Did the

6   witness come across to you as honest?  Did the witness

7   have any reason not to tell the truth?  Did the witness

8   have a personal interest in the outcome of the case?

9   Did the witness have any relationship with either the

10  Government or the Defendant?  Did the witness see or

11  hear any events about which the witness testified?  Did

12  the witness have the opportunity and ability to

13  understand the questions and answer them directly?

14  Did -- did one witness's testimony differ from the

15  testimony of other witnesses?  These are a few examples

16  of the considerations that will help you determine the

17  accuracy and reliability of each witness.

18          In other words, your job is to think about

19  the testimony of each witness you heard and decide how

20  much you believe each witness.  In making up your mind

21  and reaching a verdict, do not make any decisions simply

22  because there were more witnesses on one side than on

23  the other side on that point.  You will always -- you

24  will always bear in mind that the law never imposes upon

25  a defendant in a criminal case the burden or duty of

1    calling any witnesses or pro -- or producing any

2    evidence.

3                The next section is entitled, Impeachment by

4    Prior Inconsistencies.

5                The testimony of a witness may be

6    discredited by showing that the witness testified

7    falsely, or by evidence that at some other time the

8    witness said or did something, or failed to say or do

9    something, which is inconsistent with the testimony the

10   witness gave at this trial.

11               Earlier statements of a witness were --

12   earlier -- excuse me.  Earlier statements of witness

13   were not admitted in evidence to prove that the contents

14   of those statements are true.  You may not consider the

15   earlier statements to prove that the content of an

16   earlier statement is true; you may only use -- you may

17   only use earlier statements to determine whether you

18   think the earlier statements are consistent or

19   inconsistent with the trial testimony of the witness and

20   therefore whether they affect the credibility of that

21   witness.

22               If you believe that a witness has been

23   discredited in this manner, it is your exclusive right

24   to give the testimony of that witness whatever weight

25   you think it deserves.

1                  Next section is entitled, Impeachment by

2      Evidence of Truthful -- of Truthful/Untruthful

3      Character.

4                  You have heard the testimony of various

5      individuals.  You also heard testimony from others about

6      their opinion about whether other witnesses are truthful

7      people.  It is up to you to decide from what you heard

8      here which witnesses told the truth in this trial.  In

9      deciding this, you should bear in mind the testimony

10     about witness's reputation for truthfulness as well as

11     all the other factors already mentioned.

12                 The next section is entitled, Expert Opinion

13     Testimony.

14                 During the trial, you heard the testimony of

15     Laurie McMillan, who expressed opinions on specialized

16     knowledge.  If scientific, technical, or other

17     specialized knowledge might help the jury understand the

18     evidence or in determining a fact at issue, a witness

19     qualified by knowledge, skill, experience, training or

20     education may testify and state an opinion about such

21     matters.

22                 Just because such a witness expressed an

23     opinion does not mean you accept this opinion.  You

24     should judge this testimony like any other testimony.

25     You may accept it or reject it and give it as much

1    weight as you think it deserves -- considering the

2    witness's education and experience, the soundness of the

3    reasons given for the opinion, and all other evidence in

4    the case.

5             The next section is entitled, Cautionary

6    Instruction -- Transcript of Tape-Recorded Conversation.

7             Government's Exhibits C-2, C-4, C-7, C-10,

8    C-12 and C-14 have been identified as typewritten

9    transcripts of the oral conversations.  The

10   transcript -- transcripts also purport to identify the

11   speakers engaged in this conversation.

12            I admitted the transcripts for the limited

13   and secondary purpose of aiding you in following the

14   content of the conversation as you listen to the tape

15   recording, and also to aid you in identifying the

16   speaker.

17            You are specifically instructed that whether

18   the transcripts correctly or incorrectly reflect the

19   content of the conversations or the identity of the

20   speakers is for you to determine based on your own

21   evaluation of the testimony you have heard about the

22   preparation of the transcripts and from your own

23   examination of the transcripts in relation to your

24   hearing of the tape recording itself as the primary

25   evidence of its own contents.  If you should determine

1    that the transcripts are, in any respect incorrect or

2    unreliable, you should disregard them to that extent.

3    What you heard on the tapes is evidence, not the

4    transcripts.

5         The next section is entitled, Cautionary

6    Instruction -- Transcript -- Transcript of Foreign

7    Language -- Tape Recorded Conversation.

8         Among the exhibits admitted during the trial

9    were recordings that contained conversations in the

10   Spanish language.  You were also provided English

11   transcripts of those conversations.  The Government

12   provided those transcripts to you so that you can

13   consider the content of the conversations on the

14   recordings.  Whether a transcript is an accurate

15   translation, in whole or in part, is for you to decide.

16   You should not rely in any way on any knowledge you may

17   have of the -- of the language spoken on the recording;

18   your consideration of the transcripts should be based on

19   the evidence introduced in the trial.

20        In considering whether the transcripts

21   accurately describe the meaning of a conversation, you

22   should consider the testimony presented to you about

23   how, and by whom, the transcript was made.  You may

24   consider the knowledge, training, and experience of the

25   translator, as well as the nature of the conversation

1   and the reasonableness of the translation given all the

2   evidence in the case.

3          We are now at Roman section -- excuse me.

4   Section Roman Number Two entitled, Specific

5   Instructions.

6          After considering the witness testimonies

7   and exhibits, it is your duty to apply that evidence to

8   the individual factors of the charged offense.  You

9   should use the following considerations to make this

10  determination.

11         The next sections are entitled by various

12  definitions.  The first one is entitled, Sometime On or

13  Around.

14         You will note that the indictment charges

15  that the offenses were committed sometime on or around

16  specific dates.  The Government does not have to prove

17  that the offense was committed on that exact date, so

18  long as the Government proves beyond a reasonable doubt

19  that the Defendants committed the crimes on or around

20  the dates alleged in the indictment.

21         Next section is entitled, Venue-Conspiracy.

22         The events presented at trial happened in

23  various places.  There is no requirement that the entire

24  conspiracy take place in the Southern District of Texas.

25  But for you to return a guilty verdict, the Government

must prove by a preponderance of the evidence that either the agreement or an overt act took place in the Southern District of Texas.  This means the Government has to convince you only that it is more likely than not that part of the conspiracy took place in the Southern District of Texas.  All other elements of the offense must be proved beyond a reasonable doubt.  You are instructed that Brownsville, Harlingen, McAllen, Corpus Christi, Laredo, Sugar Land, and Houston are all located in the Southern District of Texas.

Voluntary -- the next section is entitled, Voluntariness of Statements.

In determining whether any statement, claimed to have been made by any Defendant outside court and after an alleged crime has been committed, was knowingly and voluntarily made, you should consider the evidence on such a statement with caution and great care, and you should give such weight to the statement as you feel it deserves under all the circumstances.

In that regard, you may consider factors such as the age, training, education, occupation, and physical and mental condition of the Defendant in question, his treatment while under interrogation, and all the other circumstances in evidence surrounding making the statement.

1           The next section is entitled, Identification

2   Testimony.

3           In any criminal case, the Government must

4   prove not only the essential elements of the offense or

5   offenses charged, but it must also prove, beyond a

6   reasonable doubt, the identity of the Defendants as the

7   perpetrators of the alleged offenses.

8           In evaluating the identification testimony

9   of a witness, you should consider, as already mentioned,

10  all the factors to determine the credibility of any

11  witness in general.  You should also consider whether

12  the witness had an adequate opportunity to observe the

13  person in question at the time or times about which the

14  witness has testified.  You may consider all matters,

15  including how long the witness had to observe the person

16  in question, the prevailing conditions at the time -- as

17  for visibility, distance, and the like -- and whether

18  the witness had known or observed the person in question

19  at earlier times.

20          You may also consider the circumstances

21  surrounding the identification itself including, for

22  example, how the Defendants were presented to the

23  witness for identification, and the length of time the

24  last -- that elapsed between the incident in question

25  and the next opportunity the witness had to observe the

Defendants.

If, after examining all the testimony and evidence in this case, you have a reasonable doubt about the identity of any of the Defendants as the perpetrators of the alleged offense -- of the offenses charged, you must find those Defendants not guilty.

The next section is entitled, Aiding and Abetting (Agency).

The Defendants' guilt may be established without proof that the Defendants personally did every act constituting the offense alleged.  The law recognizes that, ordinarily, anything a person can do for himself may also be accomplish -- accomplished by him through the direction of another person as his or her agent, or by acting in concert with, or under the direction of, another person or persons in a joint effort or enterprise.

If another person is acting under the direction of a Defendant or the Defendant joins another person and performs acts with the intent to commit a crime, then the law holds the Defendant responsible for the acts and conduct of such other persons just as though the Defendant had committed the acts or engaged in such conduct.

Before the Defendants may be held criminally

responsible for the acts of others, it is necessary that
the accused deliberately associate himself in some way
with the -- the crime and participate in it -- in it
with the intent to bring about the crime.

Mere presence at the scene of a crime and
knowledge that a crime is being committed are not
sufficient to establish that the Defendants either
directed or aided and abetted the crime unless you find
beyond a reasonable doubt that the Defendant was a
participant and not merely a knowing spectator.

In other words, you may not find any
Defendant guilty unless you find the Government proved
beyond a reasonable doubt that some person or persons
committed every element of the offense as defined in
these Instructions, and the Defendant voluntarily
participated in its commission with the intent to
violate the law.

For you to find any Defendant guilty of this
crime, you must be convinced that the Government proved
each -- proved each of the following beyond a reasonable
doubt:

Number 1, That the offense was committed by
some person;

Number 2, That the Defendant associated with
the criminal venture;

1                    Number 3, That the Defendant purposefully

2    participated in the criminal venture; and

3                    Number 4, That the Defendant sought by

4    action to make that venture successful.

5                    "Associated with the criminal venture" means

6    that the Defendant shared the criminal intent of the

7    principal.  Element (2) cannot be established if the

8    Defendant had no knowledge of the principal's criminal

9    venture.

10                    "Participated in the criminal venture" means

11    that the Defendant engaged in some affirmative conduct

12    designed to aid the venture or assist the principal of

13    the crime.

14                    The next section is entitled, Caution:

15    Consider Only the Crime Charged.

16                    Remember, you are here to decide whether the

17    Government has proved beyond a reasonable doubt that

18    each Defendant is guilty of the crime charged.  The

19    Defendants are not on trial for any act, conduct, or

20    offense not alleged in the indictment.

21                    Next section is entitled, Caution:  Multiple

22    Defendants and Single Count.

23                    You should consider the case of each

24    Defendant and the evidence related to that Defendant

25    separately and individually.  The fact that you may find

one of the Defendants guilty or not guilty should not control your verdict for any other Defendant.

Next section is entitled, Caution:  Multiple Defendants and Multiple Counts.

A separate crime is charged against one or more of the Defendants in each count of the indictment. Each count, and the evidence related to it, should be considered separately.  The case of each -- the case of each Defendant should be considered separately and individually.  The fact that you may find one or more of the accused guilty or not guilty of any of the crimes charged should not control your verdict for any other crime or any other Defendant.  You must give separate consideration to the evidence as to each Defendant.

Next section is entitled, Caution: Punishment.

Finally, if you find any of the Defendants guilty, it will be my duty to decide what the punishment will be.  You should not be concerned with punishment in arriving at your verdict.

Next section is entitled, Similar Acts.

You have heard evidence of acts of the Defendants which may be similar to those charged in the indictment, but which were committed on other occasions. You must not consider any of this evidence in deciding

whether the Defendant committed the acts charged in the indictment.  But you may consider this evidence for other narrow purposes.

If you find beyond a reasonable doubt from other evidence in this case that the Defendant did commit the acts charged in the indictment, then you may consider evidence of the similar acts allegedly committed on other occasions to determine:

Whether the Defendant had the state of mind or intent necessary to commit the crime charged in the indictment; or

Whether the Defendant had a motive or the opportunity to commit the acts charged in the indictment; or

Whether the Defendant acted according to a plan or in preparation for commission of a crime; or

Whether the Defendant committed the acts for which he is on trial by accident or mistake.  These are the limited purposes for -- for which any evidence of other similar acts may be considered.

The next section is entitled, Summaries and Charts Received in Evidence.

Certain charts and summaries have been received in evidence.  You should give them only such weight as you think they deserve.

1           Next section is entitled, Accomplice-

2     Co-Defendant-Plea Agreement.

3           In this case, the Government called Jose

4     Garza and Jesus Virlar-Cadena as two of its witnesses.

5     Both Mr. Garza and Mr. Virlar were named as

6     co-Defendants in the indictment and entered into plea

7     agreements with the Government.  These agreements

8     provide for the dismissal of some charges and a

9     non-binding recommendation for a favorable sentence.

10    This is called plea bargaining, and it is lawful and

11    proper.

12          An accomplice who has entered into a plea

13    agreement with the Government is not prohibited from

14    testifying.  On the contrary, the testimony of such a

15    witness may alone be of sufficient weight to sustain a

16    guilty verdict.  You should receive this testimony with

17    great care.  You should never convict a Defendant upon

18    the unsupported testimony of an alleged accomplice

19    unless you believe that testimony beyond a reasonable

20    doubt.

21          The fact that an accomplice has entered a

22    guilty plea to the offense charged is not evidence of

23    the guilt of any other person.

24          The next section is entitled, Accomplice-

25    Informer-Immunity.

1           The testimony of an alleged accomplice,

2    and/or the testimony of one who provides evidence

3    against a Defendant as an informer for pay, for immunity

4    for punishment, or for personal advantage or

5    vindication, must always be examined and weighed by the

6    jury with great -- with greater care and caution than

7    the testimony of ordinary witnesses.  You, the jury,

8    must decide whether the witness's testimony has been

9    affected by these circumstances, by the witness's

10   interest in the outcome of the case, by prejudice

11   against the Defendant, or by the benefits that the

12   witness has received either financially or as a result

13   of being immunized from prosecution.  You should keep in

14   mind that this testimony is always to be received with

15   caution and weighed with great care.

16           You should not convict any Defendant upon

17   the unsupported testimony of such a witness unless you

18   believe that testimony beyond a reasonable doubt.

19           Next section is entitled, Impeachment by

20   Prior Conviction (Witness Other Than Defendant).

21           You have been told that the witness Eduardo

22   Carrillo was convicted in 2015 of health care fraud and

23   aggravated identity theft.  A conviction is a factor you

24   may consider in deciding whether to believe that

25   witness, but it does not necessarily destroy the

1    witness's credibility.  It has been brought to your

2    attention only because you may wish to consider it when

3    you decide whether you believe the witness's testimony.

4    It not evidence of anything else.

5              Next section is entitled, Witnesses' Use of

6    Addictive Drugs.

7              The testimony of a witness who is shown to

8    have used addictive drugs during the time about which

9    the witness testified must always be examined and

10   weighed by the jury with greater care and caution than

11   the testimony of ordinary witnesses.  You should

12   not consider any Defendant to -- not consider any

13   Defendant -- excuse me.  Excuse me.  Let me rephrase

14   that.  You should not convict any Defendant upon the

15   unsupported testimony of such a witness unless you

16   believe that the -- that testimony beyond a reasonable

17   doubt.

18             Next section is entitled, Multiple

19   Conspiracies.

20             You must determine whether the conspiracy

21   charged in the indictment -- indictment existed, and, if

22   it did, whether the Defendant was a member of it.  If

23   you find that the conspiracy charged did not exist, then

24   you must return a not guilty verdict for that

25   conspiracy, even though you find that some other

conspiracy existed.  If you find that a Defendant was
not a member of the conspiracy charged in the
indictment, then you must find that Defendant not
guilty, even though that Defendant may have been a
member of some other conspiracy.

Next section is entitled, Evidence on
Medicare Claims.

The Government is not required to prove that
each and every claim submitted by the Merida Group
entities to Medicare was fraudulent.  Nor is it a
defense to the crimes of Conspiracy to Commit Health
Care Fraud (Count One) or health care fraud (Counts Two
through Seven), that Defendants submitted some number of
legitimate -- legitimate claims.  However, in -- in
order for you to find the Defendants guilty of
Conspiracy to Commit Health Care Fraud (Count One) or
health care fraud (Counts Two through Seven), you must
find that the Government proved the elements of these
offenses beyond a reasonable doubt.

The next section is entitled, Medicare
Regulations.

The violation of a civil Medicare
regulation, if such violation occurred, is not alone a
criminal offense.  I hereby instruct you that the
evidence of alleged violations does not necessarily mean

that a crime has been committed, but that -- that same
evidence may or may not be relevant in determining the
Defendants state of mind -- mind and whether the
Defendants acted with criminal intent.

Next section is entitled, Safe Harbor Theory
of Defense.

In Count 12 the Government has alleged a
conspiracy to violate the Anti-Kickback Statute by
paying fees in exchange for the referral of Medicare
beneficiaries.

Congress has authorized certain limited
exceptions to the Anti-Kickback Statute prohibitions,
which exceptions sometimes are called "safe harbors"
found in both 42 U.S.C. Section 1320a-7b(b)(3)(B)(i) and
42 C.F.R. Section 1001.952.  One such safe harbor
exception includes payments made under a "personal
services and management contracts".

The Defendants contend that the payments
reflected in certain checks that are the subject of the
charges in Counts 12 are protected under a "personal
services and management contracts", safe -- safe harbor
found at 42 C.F.R. Section 1001.952(d)(1)-(7).

You must decide whether these checks paid to
Defendants are or are not within the requirements of the
"personal services and management contracts", safe

1    harbor.  If you find that the -- the checks in issue

2    were paid for reasons protected from prosecution, you

3    must find these Defendants "not guilty" of the violation

4    of the Anti-Kickback Statute charged in Count 12.

5                To assert the "personal services and

6    management contracts" safe harbor as an affirmative

7    defense, the Defendant must prove each of the following

8    elements by a preponderance of the evidence.  To prove a

9    fact by a preponderance of the evidence means to prove

10   that the fact is more likely so than not so.  This is a

11   lesser burden than the -- lesser burden than to prove a

12   fact beyond a reasonable doubt.

13               The elements which the Defendant must prove

14   by a preponderance of the evidence to establish safe

15   harbor are as follows:

16               Number (1), The agency agreement is set out

17   in writing and signed by the parties;

18               Number (2), The agency agreement covers all

19   of the services the agent provides to the principal for

20   the term of the agreement and specifies the services to

21   be provided by the agent;

22               Number (3), If the agency agreement is

23   included to provide for the services of the agent on

24   a -- on a periodic, sporadic or part-time basis, rather

25   than on a full-time basis for the term of the agreement,

1    the agreement specifies exactly the schedule of such

2    intervals, their precise length, and the exact charge

3    for such intervals;

4              Number (4), The term of agreement is for not

5    less than one year;

6              Number (5), The aggregate compensation paid

7    to the agent over the term of the agreement is set in

8    advance, is consistent with fair market value in

9    arms-length transactions and is not determined in a

10   manner that takes into account the volume or value of

11   any referrals or business otherwise generated between

12   the parties for which payment may be made in whole or in

13   part under Medicare, Medicaid or other federal health

14   care programs;

15             Number (6), The services performed under the

16   agreement do not involve the counseling or promotion of

17   a business arrangement or other activity that violates

18   any State or Federal law;

19             Number (7), The aggregate services

20   contracted for -- contracted for do not exceed those

21   which are -- are reasonable.

22             The next section is entitled, Relevant Terms

23   Defined.

24             Number 1.  The word "knowingly" means that

25   the act was done voluntarily and intentionally, not

1  because of mistake or accident.

2  Number 2.  The word "willfully" means that

3  the act was committed voluntarily and purposefully, with

4  the specific intent to do something the law forbids;

5  that is to say, with bad purpose either to disobey or

6  disregard the law.

7  Number 3.  The words "scheme or artifice"

8  means any plan, pattern, or course of action involving a

9  false or fraudulent pretense, representation, or promise

10  intended to deceive others in order to obtain something

11  of value, such as money, from the institution to be

12  deceived.

13  Number 4.  The phrase "intent to defraud"

14  means that a Defendant acted knowingly and with the

15  specific intent to deceive, ordinarily for the purpose

16  of causing some financial loss to another or bringing

17  about some financial gain to the Defendant.  The

18  Government does not have to prove that the Defendant had

19  actual knowledge of or specific intent to violate the

20  applicable health care fraud statutes.

21  Number 5.  A representation is "false" if it

22  is known to be untrue or is made with reckless

23  indifference as to its truth or falsity.  A

24  representation is also "false" when it constitutes a

25  half truth, or effectively omits or conceals a material

fact, provided it is made with intent to defraud.

Excuse me.

Number 6.  Similarly, a representation is "material" if it has a natural tendency to influence, or is capable of influencing, the institution to which it is addressed.

Number 7.  Finally, health care "benefits" mean the -- the "health care items or services covered under a health insurance plan" or as defined "in state program rules."

Number 8.  A "health care benefit program" is defined as "any public or private plan or contract affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan or contract."

Number 9.  "Interstate commerce" means commerce or travel between one state, territory, or possession of the United States, including the District of Columbia.  "Commerce" includes travel, trade, transportation, and communication.  Only a minimal effect is required to show that the health care benefit program "affected interstate commerce."

Number 10.  A "conspiracy" is an agreement

1  between two or more persons to join together to

2  accomplish some unlawful purpose.  It is a kind of

3  "partnership in crime" in which each member becomes the

4  agent of every other member.  One may become a member of

5  a conspiracy without knowing all the details of the

6  unlawful scheme or the identities of all the other

7  alleged conspirators.  If a Defendant understands the

8  unlawful nature of a plan or scheme and knowingly and

9  intentionally joins in that plan or scheme on one

10  occasion, that is sufficient to convict him for

11  conspiracy even though the Defendant had not

12  participated before and even though the Defendant played

13  only a minor part.

14          The Government need not prove that the

15  alleged conspirators entered into any formal agreement,

16  nor that they directed stated between themselves all the

17  details of the scheme.  Similarly, the Government need

18  not prove that all the of the details of the scheme

19  alleged in the indictment were actually agreed upon or

20  carry out.  Nor must it prove that all of the persons

21  alleged to have been members of the conspiracy were

22  such, or that the alleged conspirators actually

23  succeeded in accomplishing their unlawful objectives.

24          Mere presence at the scene of an event, even

25  with knowledge that a crime is being committed, or the

1    mere fact that certain persons may have associated with

2    each other, and may have assembled together and

3    discussed common aims and interests, does not

4    necessarily establish proof of the existence of a

5    conspiracy.  Also, a person who has no knowledge of a

6    conspiracy, but who happens to act in a way which

7    advances some purpose of a conspiracy, does not thereby

8    become a conspirator.

9          Number 11.  An "overt act" is an act

10   performed to effect the object of a conspiracy, although

11   it remains separate and distinct from the conspiracy

12   itself.  Though the overt act need not be of a criminal

13   nature, it must be done in furtherance of the object of

14   the conspiracy.

15         The next section Roman Numeral Number 3 is

16   entitled, Instructions on the Counts Listed in the

17   Indictment.

18         Count One:  The next -- the next section is

19   entitled, Count One:  Instructions for Conspiracy to

20   Commit Health Care Fraud.

21         Title 18, United States Code, Section 1349

22   makes it a crime for anyone to knowingly and willfully

23   combine, conspire, confederate and agree with each other

24   and others, known and unknown to the Grand Jury, to

25   execute a scheme and artifice to defraud Medicare, or to

1   obtain by means of materially false and fraudulent

2   pretenses, representations and promises, money and

3   property owned by, and under the custody and control of

4   Medicare, in connection with the delivery of and payment

5   for health care benefits.

6          For you to find Rodney Mesquias, Henry

7   McInnis and/or Francisco Pena guilty of the crime

8   charged, the Government must convince you that it proved

9   each of the following beyond a reasonable doubt:

10          Number 1.  The Defendant and at least one

11   other person made an agreement to commit the crime of

12   health care fraud, as charged in the indictment;

13          Number 2.  The Defendant knew the unlawful

14   purpose of this agreement;

15          And number 3.  The Defendant joined in the

16   agreement willfully.

17          The next section is entitled, Counts Two

18   through Seven, entitled, Health Care Fraud.

19          Title 18, United States Code, Section

20   1347(a) makes it a crime for anyone to knowingly and

21   willfully execute, or attempt to execute, a scheme and

22   artifice to defraud Medicare, or to obtain any of the

23   money -- money of property owned by or under the custody

24   or control of Medicare by means of false or fraudulent

25   pretenses, representations, or promises.

1           The next section is literally a table chart.

2   I will attempt to summarize the chart by reading it into

3   the record as follows:

4           Count Two, Defendant Rodney Mesquias and

5   Henry McInnis, certification periods August 14, 2013 to

6   October 12th, 2013, Entity, Professional Hospice Care,

7   Description of Services, hospice services, patient J.H.,

8   Medicare payment, $2,567.52.

9           The next line on the table is Count Three,

10  includes Rodney Mesquias, Henry McInnis and Francisco

11  Pena.  Certification period December 18, 2013 to March

12  17, 2014, entity, Professional Hospice Care, description

13  of services, hospice services, patient F.P., Medicare

14  payment $4,089.52.

15          The next line of the table is Count Four,

16  includes Rodney Mesquias and Henry McInnis.  Well, just

17  the name Henry at least on -- on this form.

18  Certification period, November 6th, 2013 to February 3,

19  2014, entity, Professional Hospice Care, description of

20  services, hospice services, patient T.C., Medicare

21  payment $4,304.75.

22          Next line is line five, Defendants Rodney

23  Mesquias and Henry McInnis, certification period, June

24  3, 2014 to August 31, 2014, entity, Bee Caring,

25  description of services, hospice services, patient A.C.,

1   Medicare payment $4,448.19.

2          Next line of the table is Count Six,

3   includes Defendants Rodney Mesquias, Henry McInnis.

4   Certification period, February 10, 2016 to April 9,

5   2016, entity, Bee Caring, description of services,

6   hospice services, patient P.C., Medicare payment

7   $3,202.85.

8          Next line is Count Seven, Rodney Mesquias

9   and Henry McInnis.  Excuse me.  Certification period

10  December 23, 2014 to March 22, 2015, entity, Bee Caring

11  hospice, description of services, hospice services,

12  patient J.C. and Medicare payment $1,282.61.

13         I know -- I now go back to the general text

14  of the charge.

15         Count Two charges Defendants Rodney Mesquias

16  and Henry McInnis with health care fraud in connection

17  with Medicare beneficiary Jack High.

18         Count Three charges Defendants Rodney

19  Mesquias, Henry McInnis, and Francisco Pena with health

20  care fraud in connection with Medicare beneficiary

21  Francisca Perez.

22         Count Four charges Defendants Rodney

23  Mesquias and Henry McInnis with health care fraud in

24  connection with Medicare beneficiary Teresa Calvillo.

25         Count Five charges Defendants Rodney

Mesquias and Henry McInnis with health care fraud in connection with Medicare beneficiary Arcadio Castaneda.

Count Six charges Defendant Rodney Mesquias and Henry McInnis with health care fraud in connection with Medicare beneficiary Petra Cerda.

Count Seven charges Defendants Rodney Mesquias and Henry McInnis with health care fraud in connection with Medicare beneficiary Joanne Conti.

For you to find Rodney Mesquias, Henry McInnis and/or Francisco Pena guilty of this crime, you mist be convinced the Government proved each of the following beyond a reasonable doubt:

Number 1.  The Defendant knowingly and willfully executed a scheme or artifice to defraud Medicare by means false or fraudulent pretenses, representations, or promises in connection with the delivery of or payment for health care benefits, items or services;

Number 2.  The Defendant acted with specific intent to defraud Medicare.

Number 3.  The false or fraudulent representations the Defendant used were material; and

Number 4.  The operation of the health care benefit program affected interstate commerce.

The Government does not have to prove that

1    the Defendant had actual knowledge of -- of or specific

2    intent to violate the applicable health care fraud

3    statutes.

4              It is not necessary that the Government

5    prove all the details alleged in the indictment

6    concerning the precise nature of the alleged scheme, or

7    that the alleged scheme actually succeeded in defrauding

8    someone.  What must be proven beyond a reasonable doubt

9    is that the accused knowingly executed or attempted to

10   execute a scheme that was substantially similar to the

11   scheme alleged in the indictment.

12             Next section is entitled, Conspirator's

13   Liability for Substantive Counts.

14             A conspirator is responsible for offenses

15   committed by another conspirator if the conspirator was

16   a member of the conspiracy when the offense was

17   committed and if the offense was committed in

18   furtherance -- furtherance or, as a foreseeable

19   consequence of, the conspiracy.  Thus, if you have first

20   found the Defendant guilty of the conspiracy charged in

21   Count One and if you find beyond a reasonable doubt that

22   during the time the Defendant was a member of that

23   conspiracy, other conspirators committed the offenses in

24   Counts Two through Seven in furtherance of and as a

25   foreseeable consequence of that conspiracy, then you may

1    find the Defendant guilty of counts Two through Seven,

2    even though the Defendant may not have participated in

3    any of the acts which constitute the offenses described

4    in counts Two through Seven.

5           Next section is entitled, Count Eight,

6    Conspiracy to Commit Money Laundering.

7           Title 18, United States Code, Section

8    1956(h), makes it a crime for anyone to conspire with

9    someone else to commit an offense against the laws of

10   the United States.

11          Rodney Mesquias, Henry McInnis and/or

12   Francisco Pena are charged with conspiring to commit

13   money laundering.

14          A "conspiracy" is an agreement between two

15   or more persons to join together to accomplish some

16   unlawful purpose.  It is the kind of "partnership in

17   crime" in which each member becomes the agent of every

18   other member.

19          For you to find the Defendants guilty of

20   this crime, you must be convinced that the Government

21   has proved each of the following beyond a reasonable

22   doubt:

23          First:  That the Defendants and at least one

24   other person made an agreement to commit the crime of

25   conspiracy to commit health care fraud and health care

1  fraud, as charged in the indictment;

2          Second:  That the Defendants knew the

3  unlawful purpose of the agreement and joined in it

4  willfully, that is, with the intent to further the

5  unlawful purpose; and

6          Third:  That one of the conspirators during

7  the existence of the conspiracy knowingly committed at

8  least one of the overt acts described in the indictment,

9  in order to accomplish some object or purpose of the

10  conspiracy.

11          One may become a member of a conspiracy

12  without knowing all the details of the unlawful scheme

13  or the identities of all the other alleged conspirators.

14  If a Defendant understands the unlawful nature of a plan

15  or scheme and knowingly and intentionally joins in that

16  plan or scheme on one occasion, that is sufficient to

17  convict him for conspiracy even though the Defendants

18  had not participated before and even though the

19  Defendants played only a minor part.

20          The Government need not prove that the

21  alleged conspirators entered into any formal agreement,

22  nor that they directly stated between themselves all the

23  details of the scheme.  Similarly, the Government need

24  not prove that all of the details of the scheme alleged

25  in the indictment were actually agreed upon or carried

1    out.   Nor must it prove that all the persons alleged to

2    have been members of the conspiracy were such, or that

3    the alleged conspirators actually succeeded in

4    accomplishing their unlawful objectives.

5              Mere presence at the scene of an event, even

6    with knowledge that a crime is being committed, or the

7    mere fact that certain persons may have associated with

8    each other, and may have assembled together and

9    discussed common aims and interests, does not

10   necessarily establish proof of the existence of a

11   conspiracy.   Also, a person who has no knowledge of a

12   conspiracy, but who happens to act in a way which

13   advances some purpose of a conspiracy, does not thereby

14   become a conspirator.

15             Next section is entitled, Multiple Objects

16   of Conspiracy.

17             Count Eight of the indictment charges the

18   Defendants with conspiracy to commit three separate

19   substantive money laundering crimes:

20             Subsection a.   to knowingly conduct and

21   attempt to conduct financial transactions affecting

22   interstate and foreign commerce, which involved the

23   proceeds of specified unlawful activity, that is, health

24   care fraud and Conspiracy to Commit Health Care Fraud,

25   with the intent to promote the carrying on of specified

1   unlawful activity, that is health care fraud and

2   Conspiracy to Commit Health Care Fraud, and that while

3   conducting and attempting to conduct such financial

4   transactions knew that the property involved in the

5   financial transaction represented the proceeds of some

6   form of unlawful activity in violation of Title 18,

7   United States Code, Section 1956(a)(1)(A)(i);

8                   Subsection b.  to knowingly conduct and

9   attempt to conduct financial transactions affecting

10  interstate and foreign commerce, which involved proceeds

11  of specified unlawful activity, that is, health care

12  fraud and Conspiracy to Commit Health Care Fraud,

13  knowing that the transactions were designed in whole or

14  in part to conceal and disguise the nature, location,

15  source, ownership, and control of the proceeds of the

16  specified unlawful activity, and that while conducting

17  and attempting to conduct such financial transactions,

18  knew that the property involved in the financial

19  transactions represented the proceeds of some form of

20  unlawful activity, in violation of Title 18, United

21  States Code, Section 1956(a)(1)(B)(i); and

22                  Subsection c.  to knowingly engage and

23  attempt to engage, in monetary transactions by -- by,

24  through or to a financial institution, affecting

25  interstate and foreign commerce, in criminally derived

1   property of a value greater than $10,000, such property

2   having been derived from a specified unlawful activity,

3   that is, health care fraud and Conspiracy to Commit

4   Health Care Fraud, in violation of Title 18, United

5   States Code, Section 1957.

6           The Government does not have to prove that

7   Defendants willfully conspired to commit each crime as

8   charged in the indictment.  It is sufficient if the

9   Government proves beyond a reasonable doubt that

10  Defendants willfully conspired to commit at least one of

11  those crimes.  But to return a verdict of guilty, you

12  must all agree on at least one of the crimes the

13  Defendants conspired to commit as charged in Count One

14  through Seven.

15          Count -- next section is entitled, Count

16  Nine, Obstruction of Criminal Investigation of Health

17  Care Offenses.

18          Title 18, United States Code, Section 1518

19  makes it a crime for anyone to willfully prevent,

20  obstruct, mislead, and delay or attempt to willfully

21  prevent, obstruct, misled or delay the communication of

22  information and records relating to Health Care Fraud to

23  agents of the Federal Bureau of Investigation.  For you

24  to find Francisco Pena guilty of this crime, you must be

25  convinced the Defendant -- excuse me, you must be

1    convinced the Government proved each of the following

2    beyond a reasonable doubt:

3            Number 1.  The Defendant prevented,

4    obstructed, misled, delayed, or attempted to prevent,

5    obstruct, mislead or delay, the communication of

6    information or records relating to a violation of a

7    federal health care offense to a criminal investigator;

8    and

9            Number 2.  The Defendant did so willfully.

10           "Criminal investigation" means any

11   individual -- excuse me, criminal investigator --

12   "criminal investigator" means any individual duly

13   authorized by a department, agency, or armed force of

14   the United States to conduct or engage in investigations

15   for prosecutions for violations of health care offenses.

16           "Federal health care offense" means a

17   violation of, or a criminal Conspiracy to Commit Health

18   Care Fraud and payment or receipt of illegal kickbacks.

19           Next section is entitled, Count Ten, False

20   Statement.

21           Title 18, United States Code, Section 1001

22   makes it a crime for anyone to knowingly and willfully

23   make a false, fictitious, or fraudulent statement in a

24   matter within the jurisdiction of the Federal Bureau of

25   Investigation.  For you to find Francisco Pena guilty of

this crime, you must be convinced that the Government

has proved each of the following beyond a reasonable

doubt:

Number 1.  The Defendant made a false

statement to the Federal Bureau of Investigation, an

agency within the executive branch of the United States,

regarding a matter within its jurisdiction;

Number 2.  The Defendant made the statement

intentionally, knowing it was false;

Number 3.  The statement was material; and

Number 4.  The Defendant made the false

statement to mislead the Federal Bureau of

Investigation.

It is not necessary to show that the Federal

Bureau of Investigation was in fact misled.

Count 11, Conspiracy to Obstruct Justice.

Title 18, United States Code, Section

1512(k) makes it a crime for anyone to knowingly and

willfully combine, conspire, confederate and agree with

others to obstruct, influence, and impede a federal

Grand Jury investigation, by causing false and

fictitious records to be provided to federal

investigators in response to a federal Grand Jury

subpoena.  For you to find Rodney Mesquias and/or Henry

McInnis guilty of this crime, you must be convinced the

1    Government proved each of the following beyond a

2    reasonable doubt:

3              Number 1.  The Defendant and at least one

4    other person made an agreement to commit the crime of

5    obstructing justice as charged in the indictment;

6              Number 2.  The Defendant knew the unlawful

7    purpose of this agreement and joined in it willfully,

8    that is, with the intent to further the unlawful

9    purpose.

10             Count 12, Conspiracy to Pay and Receive

11   Health Care Kickbacks.

12             Title 18, United States Code, Section 371

13   makes it a crime to conspire to pay and receive

14   kickbacks.

15             For you to find Rodney Mesquias and/or

16   Francisco Pena guilty of this crime, you must be

17   convinced the Government proved each of the following

18   beyond a reasonable doubt:

19             Number 1.  The Defendant and at least one

20   other person made an agreement to commit the crime of

21   paying or receiving kickbacks, as charged in the

22   indictment;

23             Number 2.  The Defendant knew the unlawful

24   purpose of this agreement and joined in it willfully,

25   that is, with the intent to further the unlawful

1   purpose; and

2          Number 3.   One of the conspirators during

3   the existence of the conspiracy knowingly committed at

4   least one of the overt acts described in the indictment

5   to accomplish -- to accomplish some object or purpose of

6   the conspiracy.

7          Next section is entitled, Unanimity of

8   Theory.

9          Count 12 of the indictment acuses Rodney

10  Mesquias and Francisco Pena of conspiring to pay and

11  receive kickbacks two ways:   Number (1) -- let me see.

12  That should state in two ways:   Number (1), that Rodney

13  Mesquias and Francisco Pena conspired to receive

14  kickbacks; and number (2) that Rodney Mesquias and

15  Francisco Pena conspired to pay kickbacks.

16          The Government does not have to prove both

17  of these theories beyond a reasonable doubt for you to

18  return a guilty verdict on this charge, proof beyond a

19  reasonable doubt for one theory is enough.   But to

20  return a guilty verdict -- but to return a guilty

21  verdict, all of you must agree the Government proved the

22  same theory beyond a reasonable doubt.   This means you

23  all must agree the Government proved beyond a reasonable

24  doubt that Rodney Mesquias and Francisco Pena conspired

25  to receive kickbacks; or you must all agree the

```
 1    Government proved beyond a reasonable doubt that Rodney
 2    Mesquias and Francisco Pena conspired to pay kickbacks.
 3              Ladies and gentlemen, the next section is
 4    entitled, Closing Arguments.
 5              The Government will now -- Government will
 6    now make its closing argument, followed by each
 7    Defendant's closing argument.  Since the Government
 8    carries the burden here, I will allow the Government to
 9    make additional closing arguments after all the
10    Defendants have made their closing arguments.  As a
11    reminder, closing arguments are not evidence.  After
12    both sides have made their closing arguments, the Court
13    will give you additional Instructions about
14    deliberations, selecting a foreperson, and submitting
15    questions to the Court.
16              Counsel, before I commence with closing
17    arguments, during the course of my reading of these
18    first 20 pages, the Court's noted very minor typos that
19    the Court is going to amend, or -- or revise while
20    closing arguments are taking place.
21              Specifically, I will call your attention to,
22    and I'm just going to go through this very quickly.
23              On page 7, the word crime is missing an e,
24    the Court is going to add the e to the word crime in
25    the -- in one of the paragraphs.
```

1            On page 11, state of mind is misspelled.

2    The Court -- it is spelled as -- with an e rather than a

3    d, the Court will revise it to state of mind as opposed

4    to state of mine.

5            On page 12, the last sentence, the number

6    seven, instead of a -- of a period, there's a -- a semi

7    colon -- excuse me, excuse me, the word reasonable is

8    misspelled as reasonably, the Court will revise that to

9    read reasonable rather than reasonably.  Period.

10           On page 15, count -- the table count number

11   four, the -- Mr. McInnis' last name is blacked out,

12   Count Four should read Rodney Mesquias, Henry, including

13   Henry McInnis, it currently just reads Rodney Mesquias,

14   Henry.

15           And on page 20, the number two in Count 11,

16   there should be a period after the term unlawful purpose

17   as opposed to semicolon and with an and.  There is no --

18   there's nothing to follow number two, so it's just

19   unlawful purpose period.

20           And on page 21, the Court inserted the word

21   in, i-n, in the very first sentence where it says, Count

22   12 of the indictment accuses Rodney Mesquias and

23   Francisco Pena of conspiring to pay and receive

24   kickbacks in two ways.  Currently it just reads received

25   kickbacks two ways.

1            Again, these are not substantive changes

2    just minor -- minor corrections.

3            Any objections, gentlemen?

4            MR. LOWELL:  No objection.

5            MR. CYGANIEWICZ:  Judge, I failed to mention

6    earlier and I noticed when I received this copy last

7    night that the -- starting with the verdict forms, the

8    pages are not numbered correctly in case you're making

9    reference to page numbers later.

10           My copy has page 22, then goes to page 19.

11           THE COURT:  All right.  Thank you,

12   Mr. Cyganiewicz.

13           Yes, and I am noting that -- I've not gotten

14   that far, but after page 22, it then jumps to 19, so

15   let's correct the page numbers.

16           So 19 will be -- all of the pages after page

17   22 will be revised to read accordingly in numerical

18   order starting with 23 thereon.

19           MR. CYGANIEWICZ:  Yes, sir.

20           THE COURT:  Any objections, gentleman to

21   those minor --

22           MR. LOWELL:  No objection.

23           MR. GUERRA:  No objections, Your Honor.

24           THE COURT:  Thank you, gentlemen.  All

25   right.  Mauricio, do your magic.  All right.

```
 1                    Ladies and gentlemen, before we get to the
 2    closing arguments, let's go ahead and take a very brief
 3    recess and we'll start momentarily.  All right.
 4                    COURT OFFICER:  All rise for the jury.
 5                    (JURY OUT.)
 6                    THE COURT:  Thank you, everyone.  Please be
 7    seated.
 8                    Ladies and gentlemen, we'll take a very
 9    brief recess and, Rachel, just get that revised document
10    to counsel.
11                    COURT OFFICER:  All rise.
12                    (COURT IN SHORT RECESS.)
13                    THE COURT:  Thank you, everyone.  Please be
14    seated.
15                    (JURY IN.)
16                    THE COURT:  Ladies and gentlemen, welcome
17    back.  Out of an abundance of caution, I remind you
18    we're now proceeding with closing arguments.
19                    We have some very talented and very
20    passionate attorneys that are advocates for their
21    respective positions and clients.  But I remind you that
22    nothing the attorneys say is either evidence or
23    testimony, it is their sum -- it is their summary and
24    their advocacy of the position they intend to present
25    that they believe the evidence showed.
```

```
 1                   With that being said, Mr. Foster, are you
 2     ready to proceed?
 3                   MR. FOSTER:   Thank you, Your Honor.
 4                   May it please the Court.
 5                   Ladies and gentlemen of the jury, it was
 6     about power; it was about control over people's lives.
 7     That's what Joe Aguilar told you, and that's what this
 8     $150,000,000 health care fraud scheme is about.   Bribe
 9     after bribe after bribe paid by Defendants Mesquias and
10     McInnis to doctors like Defendant Pena to commit fraud
11     on the Medicare program designed to benefit the
12     vulnerable and the disabled among us.
13                   Ladies and gentlemen, in the past two weeks,
14     you have seen what these Defendants never wanted you to
15     see.   Witness after witness after witness has told you
16     about a massive health care fraud conspiracy that
17     stretched from Defendant McInnis' corporate headquarters
18     near here in Harlingen throughout the Valley and across
19     Texas.
20                   And you have heard from the Defendants'
21     partners in crime, the people they did their dirty work
22     with, Virlar, Carrillo, Garza, the men they worked with,
23     not for a day, not for a week, not for a month, but for
24     years to commit these crimes.
25                   And what those three co-conspirators told
```

1  you is consistent with what you heard from marketers,

2  intake coordinators, nurses, doctors, FBI sources, FBI

3  agents, all of whom spoke with one voice, the Merida

4  Group was a massive fraud.

5          What you learned was that there were

6  patients, patients who were walking, talking, gardening,

7  driving, teaching boxing, working at -- as greeters at

8  Wal-Mart, just out there living.  But on paper, on

9  paper, these Defendants made it look like those same

10  patients declining, dying.  Patients who were supposed

11  to be homebound regularly leaving the home.  Patients

12  who were supposed to have less than six months to live

13  on hospice for year after year.

14          Ladies and gentlemen, Joanne Conti told you

15  what you need to know about the Merida Group.  She came

16  into this courtroom, she was right up there, and she

17  told you about her experiences.  She was active, she

18  went to her grandchildren's football games, went to

19  Corpus, liked to spend time with her family.

20          And then in 2014, Rodney Mesquias repeatedly

21  told her that she was going to die.  And that was a lie.

22  It was a dirty, lucrative lie that made the Merida Group

23  over $50,000.  And that lie had devastating

24  consequences.  Ms. Conti told you she couldn't sleep at

25  night because she feared that if she went to sleep she

1   would take her last breath.  Her son stopped coming

2   around because he didn't want to see her die.

3            But make no mistake about it, hospice is not

4   a place for a person like Ms. Conti.  When she started

5   speaking about the corruption, Defendants Mesquias and

6   McInnis, they tried to bribe her.  They tried to give

7   her a free power wheelchair not even covered by

8   Medicare, and they got it from a pawnshop, a faulty

9   wheelchair that almost killed her, crashed in a store.

10           Ms. Conti wasn't on hospice because of a

11  mistaken prognosis, Ms. Conti wasn't on hospice because

12  hospice is an inexact science.  Ms. Conti was on hospice

13  because of fraud, plain and simple.

14           Now, these three Defendants, they told lies

15  for money, and they knew what they were doing.  They

16  knew what they were doing was wrong.

17           How did they know?  They were told.  Nurse

18  after nurse, employee after employee told them, I can't

19  lose my license.  These patients don't qualify.  This is

20  fraud.

21           But what Defendant Mesquias and McInnis did,

22  they fired those nurses, they fired those employees,

23  they hired new ones.  They thought they were above the

24  law.

25           And you heard directly from Defendant Pena.

1    Ladies and gentlemen, it's not everyday that you get to

2    see a crime caught on tape.  You heard him talk about

3    how he keeps patients alive on hospice to make more

4    money.

5             You heard him talk about how he doesn't care

6    if Medicare requires that a patient on hospice has only

7    six months to live.  He puts patients on hospice, anyone

8    who has an incurable disease to make money.  And you

9    heard him talk about nurses, nurses don't have the

10   right, he said, to discharge patients from hospice

11   because those patients are his property, his money.

12            Ladies and gentlemen, you also heard that

13   the Defendants tried to game the system.  They tried to

14   game the system by creating boxes and boxes of fake

15   medical records.  They tried to game the system when

16   they were served -- when they received a subpoena from a

17   Federal Grand Jury asking them for documents that they

18   didn't have because they were committing fraud.  They

19   created them.

20            Defendant Pena, when he was interviewed by

21   the FBI, he lied, and then he tried to obstruct justice

22   by creating fake contracts, fake documents to interfere,

23   to obstruct, all to prevent justice from being done.

24            Now, when you game the system, ladies and

25   gentlemen, you can make a lot of money.  Over

1   $124,000,000 Merida was paid off of over $150,000,000

2   billed.

3            And as Laurie McMillan told you at the

4   beginning of this case, when you have fraud, it drives

5   up the cost for everyone.  It makes it so those Medicare

6   funds aren't there for the people who actually need it.

7            There's nothing wrong with having a condo in

8   South Padre Island, nothing wrong with going to Vegas

9   with your friends, there's something wrong with stealing

10  Medicare money and using those dollars on nightclubs,

11  fancy cars, tailors to come to the office and make you

12  nice suits which is what Defendant Mesquias and his

13  co-conspirators did.

14            But this case is about something much more

15  than that.  Much more than money, much more than

16  dollars.  It's about vulnerable people, people who had

17  real health problems, people with Alzheimer's, people

18  with dementia, people in housing projects, people who

19  needed care and didn't get the care that they needed and

20  deserved.  Because when Defendant Mesquias and McInnis

21  looked at these patients, and when Defendant Pena looked

22  at them, they didn't see people, they saw dollar signs.

23            You remember witness after witness.  Did

24  Defendant Mesquias ever have any compassion for the

25  patients?  No.  McInnis?  No.

1          You heard Defendant Pena talk about the

2   patients.  How did they all talk about them?  They

3   talked about them like sources of revenue.  And if

4   there's one shocking thing I think we've learned

5   together in these couple of weeks is that you can't

6   trust all doctors, you can't trust all Medicare

7   providers.  Because behind closed doors, there are some

8   who are willing to break the law and put profit over

9   patients.

10          Ladies and gentlemen, this morning I'm going

11  to walk through the charges in the indictment.  The

12  Judge has given you the law that applies to each one of

13  those charges.  I'm going to go through, briefly, the

14  evidence that supports each one of these charges and why

15  there's overwhelming evidence that the Government has

16  proved its case beyond a reasonable doubt.

17          First charge is Conspiracy to Commit Health

18  Care Fraud.  You remember at the beginning of this case,

19  we've heard a lot about, oh, it's only six patients.

20  Well, Count One isn't about six patients, it's about a

21  conspiracy, a conspiracy that began in 2009 and

22  continued until the close of Merida.

23          Now, what is a conspiracy?  A conspiracy is

24  simply a coming together of people to accomplish an

25  unlawful act.  And in this case, there's no disputing

1    that the three Defendants came together.  McInnis and

2    Mesquias worked together hand-in-hand everyday.  And

3    Pena came together with them at the Merida Group.

4            The only substantive question for you is

5    whether when they came together were they doing

6    something unlawful?

7            Now, before we get to that evidence, I want

8    to take us back to the beginning of the case, to Ms.

9    McMillan.  Ms. McMillan explained to you that Medicare

10   is a trust-based system to encourage medical care to get

11   to Medicare beneficiaries.  Medicare trusts that these

12   providers, when they submit an application, when they

13   make promises to Medicare in those Medicare

14   certifications, are going to know the rules, are going

15   to abide by the rules, and agree that they will face

16   penalties if they don't do so.  And once they submit

17   that application, they're able to send in claims and get

18   paid without anyone reviewing those medical records

19   upfront.

20           But Medicare has some very simple rules,

21   very common sense rules.  You can't pay kickbacks and

22   bribes.  What's a kickback?  Ms. McMillan explained it's

23   very simple.  It's anything of value that you're giving

24   in exchange for a patient being referred to a medical

25   provider.  So payments to a medical director, they're in

exchange for patients, that's a kickback.  Payments,
things of value given to patients to sign up for
services, like power wheelchairs, that's a kickback.
Paying marketers on a per patient basis to go out into
the hospitals, out into the streets and to find
patients, that's a kickback.

Medicare has one very simple rule for
kickbacks.  You don't pay them.  And it has simple rules
hospice.  The patient has to be terminal.  Six months or
less.  Simple rules for home health.  You have to be
homebound.  You cannot submit claims if the beneficiary
is not homebound.

And Ms. McMillan explained that Medicare
would not pay a dime if it knew there were kickbacks, if
it knew that patients didn't qualify for hospice, or if
it knew that patients weren't homebound.  And because of
the Defendants' lies in this case, Medicare paid a lot
more than a dime, it paid over $124,000,000.

Now, the Medicare enrollment certifications
are clear.  Everyone who signs them agrees to abide by
Medicare's rules.  And there's the data interchange
agreement which allow the providers to get paid.  Same
rules, claims must be complete, accurate, truthful.

Now, Defendant Mesquias, he made a lot of
promises to Medicare.  He made promises on 33 separate

1    occasions that he wouldn't pay kickbacks and bribes,

2    that he would follow Medicare's rules regarding hospice

3    and home health.  And he broke those promises day after

4    day, month after month, year after year.

5              Henry McInnis made the same promises to

6    Medicare.  He knew what the rules were.

7              Francisco Pena, same thing.  And you've

8    heard a lot about truth-tellers.  Truth-tellers being

9    people who tell the truth.  These Defendants lied on

10   scores of occasions in the agreements they submitted to

11   Medicare and in every claim they submitted.

12             So how did the fraud work?  Fraud was pretty

13   simple.  As Melissa Hernandez told you Defendant

14   Mesquias would say it, you saw her, she recalled it

15   vividly, feed the machine, feed the machine, feed the

16   machine.

17             What did Mesquias mean?  The witnesses told

18   you.  Eddie Zuniga told you that when the hospice

19   program had started they couldn't get very many patients

20   because there aren't that many patients who are actually

21   dying, actually have less than six months to live.  So

22   Defendants Mesquias and McInnis came up with a plan.

23   They came up with a marketing plan.  And that plan was

24   to go out, to tell patient that they didn't have to die

25   to be on hospice and to offer them free supplies, free

1    inducements to sign up.

2              Now, these patients were lied to.  They were

3    vulnerable, they were indigent and in many cases they

4    were coming out of hospitals and they were being offered

5    free things.

6              And you've heard about the evidence of

7    chaplains, of nurses who would go out and see them and

8    face the heartbreak of telling these people that they're

9    going to die.  Counseling them on God's plan for death.

10   It wasn't their time to die.  Some patients were being

11   deceived that they didn't have to die to be on hospice;

12   other patients were being deceived that they were dying

13   when they weren't.  All to make the Defendants more

14   money.

15             How did they get the marketers to go out and

16   do it?  There's overwhelming the evidence the way they

17   did it was they paid the marketers on a per patient

18   basis.  Defendant Mesquias agreed to it, Defendant

19   McInnis agreed to it.  They came together, they offered

20   the marketers per patient payments, kickbacks, for

21   patients they brought in.

22             Ladies and gentlemen, that's an agreement,

23   that's a conspiracy.  If you think the Defendants did

24   that, that alone is sufficient to convict them on Count

25   One.

1          So they have these marketers going out

2     there.  They're getting patients, patients don't qualify

3     because they're telling them you don't need to be dying.

4          What do they do when they get their

5     patients?  Well, there's one thing that is very clear

6     from all the witness testimony, and that is that

7     Defendant Mesquias ran a tight ship.  He made the rules

8     and Defendant McInnis was his enforcer.  He enforced the

9     rules at Merida Group.  And these rules were very

10    different than Medicare's rules because their rules was

11    that every referral that comes in from a marketer, they

12    want admitted.

13         It doesn't matter for hospice whether

14    patients have six months or less to live.  They want

15    everyone with Alzheimer's on hospice whether or not

16    they're dying, everyone with CHF whether or not they're

17    dying, everyone with heart disease, cancer whether or

18    not they're dying.  That's what Mesquias told them,

19    that's what McInnis told them.  That is an agreement, a

20    coming together to commit fraud, a conspiracy.

21         Martha Ramos told you that Mr. McInnis

22    talked to her about, let's move these patients from home

23    health to hospice.  And there was a lot of evidence from

24    and you heard the witnesses in the case.  These are two

25    different programs, two different qualifications, but

1   they would send intake coordinators, marketers,

2   non-medical professionals to rifle through these files,

3   find people with diagnoses and move them from the home

4   health program to the hospice program.

5          Why did Defendant McInnis say they did it?

6   To make more money.  Defendant Mesquias said the same

7   thing.

8          So they have all these patients, the

9   patients don't qualify.

10          How do they get them admitted?  Another

11   aspect of the conspiracy was the medical directors.  And

12   you heard from two of the three medical directors on

13   this screen who have plead guilty and admitting

14   committing health care fraud with these Defendants.

15          Eduardo Carrillo.  He said he was a rubber

16   stamp.  He's not exercising medical decision making.

17   You heard he would just gets stacks and stacks of paper,

18   face-to-face visit forms, go ahead and sign them.  You

19   heard there was one time he went out to see patients and

20   Defendant McInnis said, you don't need to see them at

21   all, they're across the canal, don't worry about it,

22   just sign, just sign.

23          Now, you heard a lot about how Defendant

24   Carrillo was a bad man, about how Defendant Carrillo had

25   an opioid induced seizure in the Merida offices.

1   Defendant McInnis, Defendant Mesquias, they knew he was

2   addicted to opioids, they knew he had a serious problem,

3   did it brother them?  Not at all.  They had him continue

4   to sign stacks and stacks of paper, continue to

5   fabricate documents all so they could make more money.

6          Jesus Virlar.  You heard he was despicable.

7   You heard he was a bad person.  You heard his medical

8   malpractice left a woman in a vegetative state.

9          Jesus Virlar, he's not part of the

10  Government, Jesus Virlar is their medical director and

11  they knew, they knew he had left this woman in a

12  vegetative state; they didn't care.

13         Rodney Mesquias, he set aside a room in his

14  lake house for him.  He let him drive his Porsche.  He

15  let Dr. Virlar fabricate document after document to keep

16  patients in home health.  Keep them on hospice all to

17  make more money.

18         Now, let's think about some of the things

19  you've heard.  It's been suggested that these men are

20  liars, these men are -- got into trouble making

21  everything up.  These are common sense, ladies and

22  gentlemen.  For these men to have come into this

23  courtroom under penalty perjury, said all of these

24  things about the Merida Group, exposing themselves to

25  more jail time, their deals being ripped up, and then

1     what happens, turns out that Amber Kelso comes into this

2     courtroom, says pretty much the same thing that they

3     did.  Melissa Hernandez, Joanne Conti, they didn't

4     expect her to be alive, walk into this courtroom.

5     Pretty much the same thing as Dr. Carrillo and

6     Dr. Virlar, the corruptions, the fraud.

7                Ladies and gentlemen, for these doctors to

8     have made up all those things about the Merida Group, to

9     have lied as the Defendants are suggesting about the

10    Merida Group and then have everyone else come into the

11    courtroom and corroborate what they're saying, I mean

12    they'd have to be the luckiest men in the world.

13               And, ladies and gentlemen, as we know, these

14    two doctors are not the luckiest men in the world.  They

15    were telling the truth, the truth about Henry McInnis,

16    the truth about Rodney Mesquias, the truth about

17    Dr. Pena.

18               And what do we know?  Dr. Virlar was the

19    model.  Roland Aguilera told you about that.  That's how

20    Defendant Mesquias talked to -- talked about him.  He'd

21    even send Dr. Virlar to talk to patients and families,

22    get more people signed up, make more money.  He even

23    went into a side business with him, another clinic.

24               Both those Defendants told you that they

25    were paid bribes to rubber stamp orders for patients who

1    didn't need it.

2              And Joe Garza came into this courtroom

3    charged in this indictment, plead guilty to committing

4    all the crimes that have been detailed here, the

5    Conspiracy to Commit Health Care Fraud, sat on that

6    witness stand, told you about how he's now chopping

7    lumber, working at a rehab facility.  The anguish that

8    he is in for this role in the fraud.  And he

9    corroborated what those two doctors said.  Below

10   Mesquias, below McInnis, Garza was right below them

11   receiving the orders, communicating with them on a near

12   daily basis if not everyday and passing those along to

13   the rest of the organization.

14             Now, what was Defendant Pena's role in all

15   this?  Defendant Pena had the same role as Virlar and

16   Carrillo.  As Ernesto Gonzalez told you when he went out

17   to meet Defendant Pena, Defendant Pena said just go

18   through my medical records, pick out anyone you want to

19   put on hospice, go ahead, sign them up with Merida.

20             Ladies and gentlemen, that's an agreement,

21   that's a conspiracy right there.  Conspiracy with

22   Defendant's Mesquias and McInnis to sign up patients for

23   hospice who didn't actually need the services.

24             You also heard from Jose Aguilar, Roland

25   Aguilera.  Defendant Pena, and this is corroborated by

1    the tapes, in a meeting he's going to boast about

2    himself, he doesn't care about patients, you're going to

3    give them a stack of forms, he's going to recertify

4    every patient for more episodes of home health, more

5    episodes of hospice.  That's the reason the patients end

6    up on home health and hospice for years.  Not because

7    they need it, but because Virlar, Carrillo, Pena, birds

8    of the same feather flock together.  They recertify

9    every patient, nearly everyone.

10              And you don't have to take it from these

11   Defendants because tapes don't lie.

12              (Audio playing.)

13              MR. FOSTER:  Leave the six months out

14   because I don't believe in that.  Ladies and gentlemen,

15   that's the conspiracy right there.  Defendant Mesquias

16   wanted to leave the six months out, Defendant McInnis

17   directed that people leave the six months thing out of

18   it.

19              What's the problem with that?  Each one of

20   these Defendants promised to Medicare that the six-month

21   thing was at the heart of the rules and regulations for

22   certifying a patient for hospice.  And so each time they

23   submitted one of those enrollment applications, it was

24   fraud.  Each one -- time they came together to do this

25   plan together, it was a conspiracy to commit fraud.  You

1   can't leave the six-month thing out of it, that's fraud.

2   Punto.

3            (Audio playing.)

4            MR. FOSTER:  What's going on here?  They're

5   talking about a nurse, a nurse who saw the patients that

6   Defendant Pena was referring and discharged them.

7            What's his reaction?  He's not concerned,

8   he's not worried about, oh, maybe these patients didn't

9   qualify.  He says, she doesn't have the right because he

10  views these patients as property.  Same mentality that

11  Rodney Mesquias had, same mentality that Henry McInnis

12  has.  Nurses don't have the right to tell us patients

13  don't qualify because these are valuable, these Medicare

14  numbers, not even people, are valuable.  They're money,

15  not people.

16           And Joe Aguilar talked about this and it was

17  anguishing.  He sat there and you had the opportunity to

18  observe him, and you can Judge for yourself, but there

19  was real torment there because when patients are in

20  their dying days, when families are vulnerable, and when

21  Defendant Pena comes to them, puts them in a panic, we

22  all know that people can be kept alive on machines, you

23  can keep people alive on peg tubes and trach's,

24  artificial ways of extending the life process.  That's

25  not what's right for the families, that's not what's

1  right for the patients.  It's what Defendant Pena did to

2  make more money for himself and for every co-conspirator

3  hospice like the Merida Group that he worked with.

4          Now, these Defendants weren't alone.  You've

5  heard about some of the medical directors, you've seen

6  some of the medical directors, but there were others

7  involved in the fraud, too.  Dr. Pelly, you eat what you

8  kill.  Dr. Gonzaba insisting on getting paid for his

9  patients.  Fraudulently documenting patients who didn't

10 meet hospice criteria.  You remember Amber Kelso.  She

11 said that when she quit the Merida Group, she went to go

12 see Dr. Gonzaba and he confessed to her, he said, I know

13 what they're doing is wrong, I would like to leave, too,

14 but I'm scared of Rodney.

15         Dr. Posada, he goes to Vegas with the boys.

16 Defendant Mesquias wants Dr. Virlar to teach Dr. Posada

17 how to commit the fraud, how to take these patients who

18 are on managed care, not traditional Medicare, managed

19 care which means the Government gives you a contract and

20 they say, if you keep costs down, you get to keep the

21 savings, the amount between what the contract is and how

22 much you save.

23         Dr. Virlar explained to you how the fraud

24 works.  The way you do it is you take the patients who

25 are high cost, not necessarily dying, but they want

1    medications, they want supplies, they're costing some

2    money and you can dump them on the hospice program

3    because that way Medicare pays for it, the company, Well

4    Med, they don't pay for it.  Virlar gets bonuses, Posada

5    gets bonuses, Gonzaba gets bonuses, everyone profits

6    except the patients, except the Medicare program.

7              Zertuche, another doctor you heard about

8    involved in the fraud, another medical director involved

9    in the fraud.

10             So, ladies and gentlemen, was this just a

11   difference of opinion?  And I want to make one thing

12   clear when we talk about this.  The Defense has no

13   burden of proof, the Government has the burden at all

14   times.  And we embrace that burden to prove that these

15   crimes occurred beyond a reasonable doubt.

16             But when the Defense raises arguments, when

17   they make claims, the Judge will instruct you you're

18   entitled to use your common sense.  You're entitled to

19   hold those claims up and scrutinize them with common

20   sense.

21             What does common sense mean?  That just

22   means the type of judgment that you would use everyday

23   in your day-to-day life.

24             And there's one very simple question that

25   you might ask yourself using common sense at the end of

1    the day.  Is the evidence that you've heard in these

2    past two weeks consistent with a legitimate hospice

3    company and a legitimate medical director trying to

4    provide care for their patients?  Or is it consistent

5    with a hospice company and a medical director trying to

6    make money off their patients and conceal it from the

7    Government?  Use your common sense, ladies and

8    gentlemen.

9            This isn't a case about difference of

10   opinion.  Defendant Mesquias would say at the management

11   meetings with Defendant McInnis "the longer you keep

12   them on hospice, the more money you make."  They weren't

13   trying to go out and get medical opinions, they were

14   trying to keep patients on hospice as long as possible.

15           And Defendant Mesquias would say things, say

16   things that honestly would be shocking if we hadn't

17   heard them from nearly a dozen witnesses.  Every time

18   someone wanted to not admit or discharge a patient, he

19   would yell, he would scream, he would say "don't fuck

20   with my patients, don't fuck with my money."

21           Ladies and gentlemen, that's not the type of

22   talk that occurs at a legitimate medical provider.  It's

23   not the type of talk, frankly, that should occur

24   anywhere.  And you heard that the employees were

25   terrified of him, they were afraid that they would lose

1    their job if they didn't follow his Instructions to

2    commit fraud.  So some employees quit, some employees

3    stayed and helped Defendant McInnis and Mesquias commit

4    fraud because their livelihood depended on it.

5            And this isn't about difference of opinions

6    because only one opinion matters and that opinion was

7    the patient's qualified.  Someone came back with an

8    opinion that the patients didn't qualify, one, they'd be

9    fired, and, two, Defendant McInnis would say get another

10   nurse, have that nurse go qualify them.  Defendant

11   Mesquias would say get another nurse, have that nurse go

12   qualify them.  That's not a legitimate difference of

13   opinion.  If every time you hear an opinion you don't

14   like, you tell someone they'll be fired until they give

15   you the one that you want to hear.

16           And it's not a difference of opinion if you

17   cut primary care doctors out of the process.  It's not a

18   difference of opinion if you receive complaints day

19   after day, week after week, month after month, year

20   after year.  These Defendants knew the patients didn't

21   qualify but they didn't care.

22           Belinda Gonzalez told you, she wasn't

23   exercising her medical judgment, she felt more like a

24   body with a license being put in place.

25           Ricardo Escamilla, Alvio Gonzalez, doctors,

1    you heard the cross-examination.  I don't have to repeat

2    it.  You heard it time after time, witness after

3    witness, prognosis, not diagnosis, inexact science,

4    etcetera, etcetera, and every witness said the same

5    thing.

6              Now, there are rules, there's objective

7    medicine.  Think about what they're saying.  They're

8    essentially suggesting no one can ever commit fraud

9    because it's just an opinion.  That is not why Medicare

10   has detailed rules and regulations, that is not why

11   there's the entire science of medicine, clinical

12   evidence, and it is not what accounts for why patients

13   were on hospice for years at the Merida Group.

14             Why else is this not about difference of

15   opinion?  Well, Defendants fabricated the medical

16   records.  They directed nurses and doctors to create

17   fake diagnoses and to create medical conditions that

18   made it look like the patients were sicker than they

19   actually were.

20             And Dr. Escamilla told you when he actually

21   went out and saw these patients they looked nothing like

22   what you would have expected if you had gone by what was

23   in these patient files.  You can't trust these patient

24   files, ladies and gentlemen.  Witness after witness has

25   told you that.

1            You also heard a lot about cherry picking,

2    six patients.  Witness after witness told you the huge

3    percentages of these patients didn't qualify for -- for

4    services.  Not six patients, hundreds upon hundreds upon

5    hundreds upon thousands of them.  And Special Agent

6    Williams explained to you what the data showed.  78

7    percent of the billing that was done at Professional

8    Hospice Care was for patients who were on hospice for

9    over six months and over one year.  That equaled to over

10   half the billing, or a little less than half the

11   billing -- excuse me, patients who were certified to die

12   within six months.  And of course a few here, a few

13   there can live a little longer than six months, you

14   heard testimony about that.  One or two here, one or two

15   there that's not a federal case.

16            But when there is a plan and a policy to put

17   patients on hospice longer than six months, that's a

18   Conspiracy to Commit Health Care Fraud.  And you know

19   Medicare reviewed claims.  Ms. McMillan told you about

20   that.  They found that 97, over 97 percent of the claims

21   that were committed didn't satisfy Medicare's

22   requirements.

23            And it wasn't cherry picking.  You saw

24   Dr. Virlar, you saw Dr. Carrillo, you saw Joe Garza,

25   they drew circles all over this map to show where the

1    fraud was, covered nearly the whole State of Texas, even

2    places we don't have on the map showing that it was a

3    massive fraud.

4            And as you heard Defendant McInnis and

5    Mesquias they wanted uniformity, they wanted the rules

6    to be the same in every location.  And the Judge has

7    instructed you, it isn't about the number of witnesses

8    that come into Court, if we had to bring a witness into

9    Court from every location, we'd be here for a long time,

10   ladies and gentlemen.  You can assess the evidence and

11   based on the evidence determine that this was a

12   widespread fraud.

13           And that's what the instruction shows.

14   Government's not required to prove that every claim

15   submit was fraudulent, we're just required to prove that

16   the Defendant's intended to get more than they were

17   entitled to.

18           Sure, some patients were ill, some patients

19   probably qualified for these services, clearly not a

20   lot, but some.  The problem was the Defendants got

21   greedy.  They tried to get more patients more money that

22   they weren't entitled to.

23           Another part of the conspiracy is intending

24   to join it, intending to be part of it.  And it's pretty

25   simple here.  Dr. Carrillo told you all about that.  The

1    first time he goes out he tries to assess the patients.

2    He says some don't qualify.  He comes back, he's told

3    no, no, no, don't do that.  You're not going to get

4    paid.  You're not going to get paid unless you recertify

5    every one of them.  And he's told, don't do those

6    examinations, take this pamphlet.  This pamphlet shows

7    exactly what Medicare requires.  And they didn't want

8    him to go out and assess the patient, they wanted every

9    patient file to reflect this medical information.

10           Now, Defendant Mesquias, Defendant McInnis,

11   they didn't see the patients, they didn't know what

12   condition the patients were in.  When they came together

13   and gave those Instructions, that was a conspiracy, that

14   was an agreement, that was health care fraud.  And Joe

15   Garza, he corroborated what Dr. Carrillo said about that

16   meeting.  Same thing, this is what the Defendants

17   wanted.

18           Janina Gonzalez, she told you, too, they

19   were trying to create health care fraudulent records to

20   defeat audits, to defeat this day from ever happening.

21           And they admitted it.  Defendant McInnis

22   told Mr. Garza, Medicare is seeking money back, what's

23   the reason?  We're keeping them on services so long,

24   it's not the right thing to do.  And you heard, did they

25   change what they were doing, did they change the

1   marketing plan, the admissions plan, change keeping

2   people on hospice?  No.  They knew it was the wrong

3   thing and they continued the fraud.

4           Now, Counts Two through Seven are the

5   substantive offenses of health care fraud for each

6   beneficiary.

7           Count Two is Jack High.  Now, Jack High was

8   certified by Dr. Virlar for the claims specified in

9   Count Two for unspecified debility, which Dr. Virlar and

10   others testified is basically a made-up diagnosis.

11           And what do we know about Jack High?  He was

12   on hospice for a ridiculous amount of time, over four

13   years.  And you've heard from Amber Kelso, after Merida

14   shut down, they tried to transfer him to another

15   hospice.  Another hospice wouldn't take him because he

16   didn't qualify.

17           Amber Kelso told you about Jack High.  He

18   was out there dancing the Macarena.  Never qualified for

19   hospice during the entire time she saw him.  This is

20   ridiculous.

21           Ricardo Escamilla.  First time he's provided

22   with the recertification papers, he recertifies him

23   based on what's in the file, those lies that contaminate

24   the medical records.

25           But then he finds out Jack High doesn't

1    qualify.  He's out there walking, he has a little

2    Alzheimer's but you do not get put on if you have

3    Alzheimer's.  It doesn't mean you're dying.  What

4    happens after he re -- refuses to recertify him?

5    Defendant Mesquias gets Dr. Virlar to recertify him.

6    It's not a difference of opinion, that's fraud.

7              Francisca Perez.  Now, Ms. Perez is

8    certified by Defendant Pena.  And she's certified for

9    chronic respiratory failure.  But what do we know?  The

10   nursing home that Ms. Perez is in doesn't have that

11   diagnosis at all.  And when you look at the IDG notes,

12   her oxygen is fine.  She's not having respiratory

13   failure.  She has a lot of health issues, sure, but

14   she's not dying.  She's kept on hospice for three years.

15             And what do we know?  She's still alive

16   today.  Special Agent Williams went out and saw her in

17   2017, went out and saw her two years later in 2019, she

18   recognized him, El Guero, and she looked about the same

19   today as she did then.  Not dying, chronically ill,

20   sure, but not suitable for hospice.

21             Teresa Calvillo on hospice for three years.

22   Still alive today.  Certified by Dr. Virlar, COPD.  He

23   told you that was false and fraudulent.

24             Now, what do we learn when we look at Teresa

25   Calvillo's files?  And I think this is really telling,

1    ladies and gentlemen, because it shows that these

2    Defendants were just making stuff up.  They were just

3    making stuff up to make money.  So we have one time

4    she's certified for COPD.  We have another time that

5    she's certified for chronic airway obstruction with a

6    secondary condition of Parkinson's disease, which she

7    never had.  We have another certification dementia

8    unspecified and then one COPD.

9            Dr. Virlar, Dr. Carrillo creating these fake

10   medical records like all the other doctors at the Merida

11   Group.

12           And I -- I think that this was a -- a moment

13   at the trial that bears notice because you might

14   remember that Mr. Canales was cross-examining a witness

15   about Teresa Calvillo.  And he showed the witness a

16   patient file, a note that said from Ms. Redway patient

17   is not appropriate for hospice.  And he tried to get the

18   witness to agree that this was a textbook case of

19   hospice, patient was not appropriate, she came off

20   services.

21           But the defense didn't show the witness what

22   happened next.  And what happened next was after Ms.

23   Redway said that Ms. Calvillo shouldn't be on hospice,

24   not dying, doesn't need the services, the Defendants had

25   Dr. Virlar sign her up for another episode of hospice,

1    one that stretched two more years, one that made the

2    Defendants over $154,000 based off Ms. Calvillo alone.

3            Arcadio Castaneda.  On hospice for a little

4    under three years, still alive today.  Certified by

5    Dr. Virlar.  He testified it's false and fraudulent.

6            You can look at these files.  He's being

7    certified for congestive heart failure.  Doctor's

8    patient files show he has no significant congestive

9    heart failure findings.

10           And what do we know about Mr. Castaneda?

11   Chaplains are going out to see him.  Speaks only

12   Spanish, he's being counseled on end of life services.

13   End of life services that he didn't need because he

14   wasn't dying.

15           Melissa Hernandez.  When we pull up the

16   picture of Mr. Castaneda, she laughs, it's ridiculous.

17   He's out there walking, driving, he didn't qualify.

18           Count Six, Ms. Cerda.  In the middle, this

19   is the certification for the counts from Dr. Pelly

20   Alzheimer's disease unspecified.  You see in the notes

21   she's hanging clothes on the line outside, she's out

22   gardening, she's not dying from Alzheimer's disease.

23           Dr. Gonzalez, he came into this courtroom,

24   you saw him.  He told the Judge he was passionate about

25   his patients.  And she never had a terminal condition.

1    They signed her up without his knowledge, without

2    consulting with him, without keeping him in the loop.

3    She was never going to die within six months and she's

4    still alive today.

5              THE COURT:  And you have about ten minutes

6    in your first hour.

7              MR. FOSTER:  Thank you.

8              Joe Garza told you the same thing.  She

9    didn't qualify for hospice care.

10             Joanne Conti, I talked about her.  You saw

11   her in this courtroom.  Lies in her file, lung disease.

12             Ernesto Gonzalez told you he recommended her

13   for home health, but Defendant Mesquias said, no, she

14   should be put on hospice, that's where we make more

15   money.  And she was on hospice for yearly two years,

16   over $50,000.

17             And Defendant Mesquias when she said she

18   didn't want to be on hospice, he told her she had to be.

19   He was her hostage.

20             How ridiculous are these patient files?

21   They said she was comatose, they said she was cachectic,

22   which means skin and bones, dying because of wasting

23   away.  That's how pervasive the fraud is.

24             Now, the Defendants don't have to do

25   everything in the conspiracy.  You'll receive

1    Instructions on conspiracy and aiding and abetting.

2    They don't have to press the button on the claims, they

3    don't have to admit every patient, what is important is

4    they controlled the admission and discharge of every

5    patient at the Merida Group.  And they made money.

6               Now, there's no requirement that we have to

7    prove that they made a certain amount of money.

8               They could have committed this fraud for

9    other reasons:  To be in the inner circle, to get extra

10   cash, to get the power, to get the perks.  And we know

11   that Defendant Pena, he would take a dollar any place he

12   could get it.  It might not be a lot of money, but it's

13   easy money.  Just sign the stacks of paperwork, get in

14   extra cash.

15              Now, the indictment also charges a

16   Conspiracy to Commit Money Laundering.  And the money

17   laundering conspiracy is pretty simple.  What happens is

18   you get fraudulently obtained proceeds from the health

19   care fraud scheme and you transfer them in various

20   different ways.  One way is called promotion, to promote

21   the continuation of the fraud; another way is called

22   concealment; and the third way is called spending.

23              And you saw this chart before.  When the

24   money comes in, it goes out to promote, to continue the

25   fraud in more areas of the company.

1              One of the ways it continues the fraud is

2   through kickbacks to the physicians, to Dr. Virlar, to

3   Dr. Pena.  The Medicare money comes in based on the

4   health care fraud they're committing and then it goes

5   out to them in the form of kickbacks to sign up more

6   patients, to promote that conspiracy.

7              There's also concealment.  We'll talk about

8   this in the kickback count, but they conceal the

9   kickback scheme that's occurring with these fake and

10  fraudulent contracts.  Contracts themselves even say

11  compensation can't be tied in any way to the referral of

12  patients, but you hear how they talk about it.  You hear

13  how they talk about what this money is really for.  It's

14  for patients, not for providing services, and you don't

15  get paid unless you play your role in the scheme.

16             Micaela Wooten, you heard about her.

17  19-year-old girlfriend of Dr. Virlar's.  Gets paid over

18  $414,000, named as the owner of Professional Hospice and

19  fraudulent documents signed by Mesquias.  That's to

20  conceal the fraud.  The last theory of money laundering

21  is spending.  If you have unlawful proceeds and you

22  spend over $10,000, that's a crime, and there's a lots

23  of those examples.  Lots of those examples.

24             And what that money was used for, private

25  security, fancy nightclubs, San Antonio Spurs tickets,

1   the perks of the fraud.  Cars for Defendant Mesquias,

2   cars for Defendant McInnis, cars for Defendant Pena.

3   All with Medicare money, all with the proceeds of fraud.

4              Now, Counts Nine and Ten charge Obstruction

5   of Health Care Investigations and False Statements for

6   Defendant Pena.

7              And here, the tapes really don't lie.

8              (Audio playing.)

9         MR. FOSTER:  Never.  It's not what Ernesto

10  told you, it's not what Roland Aguilera told you, it's

11  not what Jose Aguilar told you.  Defendant Pena wants

12  payment for patients.  That was a lie.

13             (Audio playing.)

14        MR. FOSTER:  This is how these Defendants

15  talk when they're not in the courtroom, not about

16  services, not about sham medical director agreements,

17  about payments for patients, kickbacks and bribes.

18             What other false statements did he make?

19             (Audio playing.)

20        MR. FOSTER:  We know that's a false

21  statement, Francisca Perez.  We know that's a false

22  statement because of all the other patients you heard

23  about.  When Defendant Pena's at IDG meetings he signs

24  whatever paper is put in front of him, it doesn't matter

25  whether they qualify for services.

1               What else did he lie about?

2               (Audio playing.)

3               MR. FOSTER:  We know the way these

4    Defendants make money, and we know that they lied, that

5    Defendant Pena lied when the FBI came to talk to him

6    because he knew what he was doing was wrong.

7               (Audio playing.)

8               MR. FOSTER:  It's not ethical, ladies and

9    gentlemen, but the Defendant did it.  You can see right

10   here on the screen.  He discharged Francisca Perez from

11   Merida Hospice to CIMA Hospice, transferring her,

12   unethical.  We know why the Defendant transfers

13   patients, to make money.  He says if he doesn't get

14   paid, he'll move his patients.

15               And what does he do?  We don't need to play

16   these, they're -- what does he do after the FBI comes

17   and interviews him?  Within a few minutes, he's on the

18   phone with that FBI source, he's talking to him, FBI is

19   out there and then they have this subsequent meeting

20   where Defendant Pena tries to obstruct the crime.  He

21   admits it looks bad, he's saying we need to cover it up

22   with these fake medical director agreements so it looks

23   like we're not paying for patients.  He's worried.  Who

24   started this?  How do we stop this?  How do we interfere

25   with the investigation?

1            Now, Defendants McInnis and Mesquias, they

2      did the same thing.  They conspired to obstruct justice.

3      They received that subpoena, that subpoena for patient

4      records, and they had a problem.  And we all know what

5      the problem was, the problem was they had been billing

6      Medicare for services without having the necessary

7      documents, certificates of terminal illness,

8      face-to-face sheets, all those documents that Medicare

9      requires be completed before the claim is submitted.

10           And so what do they do?  They create these

11     records.  Roland Aguilera gets on the phone with

12     Defendant McInnis and Mesquias.  They say go find them.

13     He tries to find them, they don't exist.  And at that

14     point they have a choice.  They could tell the truth to

15     the Government, they could say we don't have these

16     records, they could try and pay that money back, they

17     could do lots of things.  But they made a different

18     choice and for Defendant McInnis and Defendant Mesquias

19     it was a criminal choice.  They said have Dr. Virlar

20     create those records.  Records going back to 2011, six

21     years before, having them certify that patients in 2011

22     were going to die in six months when they were still

23     alive on that day in 2017.

24           And this was a pervasive practice at the

25     Merida Group.  Ernesto Gonzalez talked about it.

1    Documents weren't being done, they just have medical

2    directors create them out of whole cloth.

3                Now, ladies and gentlemen, the last count

4    charged in the indictment is the kickback conspiracy.

5    And you've heard a lot about it already.  The other

6    medical directors have told you that's what they were

7    involved in.  Defendant Pena has talked about the way he

8    does business.

9                And does anyone think that the man you heard

10   on those tapes, when he was having private conversations

11   with Defendant Mesquias, wasn't speaking exactly the

12   same type of way?

13               Joe Aguilar told you he always talks about

14   money, about his schemes.

15               Jesus Virlar explained Defendant Pena's was

16   the same as his.  He went down there, he talked to

17   Defendant Pena, and Defendant Pena was pretty blunt.

18   I'm not sending patients until I get paid.

19               Roland Aguilera, he corroborated that

20   testimony.  Said Rodney wants all the money.  He wants

21   money and he's not paying me enough for patients.  What

22   do you think about that?  It's obvious, this is fraud.

23               And you've seen these checks supposedly

24   Merida Group's medical directorships.  And there's an

25   instruction that there's a safe harbor for legitimate

1    medical director agreements.  The problem is that in

2    this case that instruction doesn't apply at all because

3    these weren't real medical director agreements.

4            And what the instruction tells you is the

5    safe harbor doesn't apply if the relationship takes into

6    account in any way the value or volume of patient

7    referrals.  And that's what was going on here.  Medical

8    directors didn't get paid if they didn't send patients.

9    So there's no safe harbor for that type of relationship.

10           And let's talk about these contracts.  On

11   one side here we have Defendant Pena's contract, Exhibit

12   4; on the other side here we have Dr. Escamilla's

13   contract, Exhibit 200.  Looking at these on their face

14   you might think, oh, these are legitimate.  But in

15   reality, these are just pieces of paper.  And if people

16   aren't following what's written on the paper, then none

17   of these words are worth the paper they're written on.

18           Dr. Escamilla, he has nothing to gain here.

19   He came here and he told you, Defendant Mesquias fired

20   him for not referring patients.  He thought most of the

21   patients were fraudulent, he tried to discharge them,

22   Defendant Mesquias didn't like that so he got rid of

23   him.

24           Now, ladies and gentlemen, as I said, the

25   Defendants had choices.  Every step of the way, they had

1    choices.  When a nurse came to them and said this

2    patient doesn't qualify, Defendant McInnis, Defendant

3    Mesquias had the choice to say, okay, fair enough, let's

4    stick to real patients.

5              Every time a medical director wanted money

6    for referrals, they had the choice to say, no, we only

7    pay for legitimate medical director choices.

8              And Defendant Pena when the FBI came to see

9    him, he had a choose, too, tell the truth, cooperate in

10   the investigation.

11             But each one of these Defendants made a

12   different choice, they made a criminal choice, and that

13   choice didn't only impact them, it impacted each one of

14   the patients that we've heard about in the courtroom

15   today.

16             Because as you've heard, if patients are put

17   on hospice too early, they waive their rights to

18   curative medical treatment.  They can't get physical

19   therapy they need.  They can't see the Alzheimer's

20   specialist they need.  If they have shortness of breath,

21   they can't get help, like Richard McDonald the patient

22   that Ms. Kelso told you about who wanted to see his

23   grandchildren, who wanted to live, whose primary care

24   doctor said take him off services.  And the Defendants

25   they refused to at the cost of his health.

```
1              And as you heard, if patients are put on
2    hospice too early, that means later on if they actually
3    need legitimate hospice services, agencies won't want to
4    take them.  A lot of their benefits have been used up,
5    there's a lower reimbursement amount.  It is to their
6    detriment.
7              These patients, Jack High, Joanne Conti,
8    Mr. Castaneda, Ms. Perez, all the patients you've heard
9    about in this courtroom, the Defendants viewed them as
10   property, not people.
11             And you have an opportunity, ladies and
12   gentlemen, you have an opportunity to give them a voice,
13   you have an opportunity to say their names, and you have
14   the opportunity to say the only word that is appropriate
15   given the mountain of evidence before you, and that word
16   is guilty of all counts.
17             Thank you.
18             THE COURT:  Thank you, Mr. Foster.
19             All right.  The Government used an hour and
20   seven minutes, Mr. Lowell you'll have 23 minutes
21   remaining.
22             Ladies and gentlemen, let's take a very
23   brief recess before we start up again.
24             (COURT IN SHORT RECESS.)
25             COURT OFFICER:  All rise for the jury.
```

```
 1                    (JURY OUT.)
 2                    THE COURT:  Thank you, everyone.
 3                    Everyone please be seated.  We'll be in
 4        recess.
 5                    (COURT IN SHORT RECESS.)
 6                    COURT OFFICER:  All rise for the jury.
 7                    (JURY IN.)
 8                    THE COURT:  Thank you, everyone.  Please be
 9        seated.
10                    Let me know when you're ready, Mr. Canales.
11        You want a ten-minute warning?
12                    MR. HECTOR CANALES:  Yes, sir.
13                    THE COURT:  Let's get everybody situated.
14                    All right.  Mr. Canales, whenever you're
15        ready.
16                    MR. HECTOR CANALES:  Thank you, Your Honor.
17        May it please the Court, opposing counsel, ladies and
18        gentlemen of the jury.
19                    Before I get into response to what you just
20        heard, and -- and go through the testimony, the actual
21        testimony and evidence in this case, on behalf of
22        Rodney, his wife Tammy, his mother Bea, his two sons, I
23        want to sincerely thank you for your services as a
24        juror.
25                    Second to serving in our Armed Forces, in my
```

1    view there's nothing more patriotic, or nothing more

2    citizen and more American than serving as a juror.  And

3    I know that's a little, you know, hokey, but it's true,

4    in my opinion.

5           For 20 years I've been trying cases with my

6    father, who's been trying cases for 50 years, and this

7    system of justice is unique to our country.  And it

8    empowers citizens to judge, to evaluate testimony.  Not

9    just what's said, how it's said.  The manner in which

10   it's said, the manner in which it's brought.  There's a

11   lot of things to it.  If you just put things on paper,

12   right, or if you just have lawyers get up there and talk

13   about it, it's not enough.  It's about what comes from

14   that chair and it's about the documents.

15          Testimony, evidence has multiple forms,

16   right?  Not just the words, but what's on the page.  And

17   then it's also important, and you're going to see, we're

18   going to go over some Instructions and things, you're

19   going to see that, you know, I guess turning to a little

20   bit here to a response.

21          I guess, if you, nowadays, if you just say

22   it enough, loudly enough in the right form, looking the

23   right way, it must be true, right?  If you just make the

24   allegations, general allegations and you say it over and

25   over and over and over and you market that message and

1    that thing over and over, well, it must be true.  We all

2    know that's not the case, but that's the world we live

3    in today.  And the Government isn't any less immune to

4    that and to try to appeal to that nature of us than

5    anybody else.

6              But it's different.  This is a different

7    world.  This is a system that looks behind it and

8    underneath it.  So you already know what's about to

9    happen.  You saw what just happened up there couldn't

10   have been, as I was sitting there thinking, I said, man,

11   I've seen this movie before.  I -- this is exactly,

12   right, the statements that were made in here, that movie

13   has been played for and that's what we saw for the last

14   two weeks.  Witnesses would come up, give these broad

15   stroke generalizations, unsupported, uncorroborated

16   testimony, generalizations about conspiracy, oh, 80

17   percent, 50 percent, 70 percent.  And then what happened

18   with every single witness?  It fell apart.

19              Another side.  And we've all heard about it,

20   and I think we mentioned this in either voir dire or in

21   opening, we've all heard of the two sides to every

22   story.  It's true.  It's true.

23              But in our system here, there's a third

24   side.  The third side, right, it's their side, our side,

25   the side that comes out here in this room.  The side

1    that comes out in Court, the third side through

2    Cross-Examination.  The truth is revealed through cross.

3    And each and everyone of these witnesses, and I guess so

4    right now the Government, you come out and make these

5    general allegations, you wrap the American flag around

6    Jose Virlar and you dangle to him a promise, a hope, the

7    potential, remember that?  The potential for lesser

8    sentence for crimes that have nothing to do with my --

9    my client.  That's all it takes I guess nowadays.

10            I hope not.  I hope, and I -- and I have

11   faith, I have faith in the system and I have faith in

12   you that you will follow the Court's instruction, that

13   you will hold the Government to its burden.  Not to this

14   marketing generalization, but you're going to hold them

15   to their burden.

16            Because, you know, this case, this case is

17   not about Spurs tickets, lifestyle, personalities,

18   whether somebody yells or curses or not, it's not about

19   those things.  This case to you, ladies and gentlemen,

20   at its core, it's about six patients.  It's about six

21   patients, you know.  And the Government when they put

22   these cases together, it's their choice, they decide how

23   to order things, right?

24            So even though we're dealing with how this

25   case, I submit to you, is about Counts Two to Seven.

1    That is the foundation of what they're attempting and

2    they have failed miserably to meet their burden to do.

3    It starts with those.  Those patients, those counts,

4    they don't meet their burden, everything else crumbles.

5    You cannot build a house on a weak foundation.  And I

6    submit to you we're going to go through the documents

7    here, we're going go to go through it, and I told you at

8    the very beginning in opening that it was going to be

9    tedious, that there was going to be some detail.  And I

10   hope that we try to do this and present this case in the

11   most efficient way that we could.  But there's no

12   getting around it, even though they want to, look at all

13   those boxes over there.  Remember I rolled up here,

14   right, put all that stuff up there, we went through it

15   they never did.  You know what's going to happen?  Just

16   like it did in trial, you know what's going to happen

17   next?  When we're all finished here, the Government gets

18   the last say because they have the burden.

19            Mr. Lowell is going to get up here and he's

20   going to have, you know, 15 or 20 minutes, or so to

21   talk.

22            You know what's going to happen?  The same

23   thing that happened in the trial.  There's going to be a

24   scramble and all of a sudden they're going to try to

25   respond and try to put up documents.  But they don't put

1    it up when they're supposed to.  Only if a -- only as a

2    reaction.  And that tells you, ladies and gentlemen, a

3    lot about the proof in this case.

4              I apologize I'm going to do my best to stand

5    over here to try to not give my back to anybody.

6              All right.  Let me show you the first slide

7    here.  You're right they cherry picked.  Kind of going

8    backwards.  We had a witness, a $250,000 witness to come

9    in here to tell us, to show to us that these six

10   patients -- that these six patients right here represent

11   .06 percent.

12             Or, in other words there was 9,339 patients

13   out there, that was the entire world of Merida, that's a

14   combination, folks, of hospice and home health.  Maybe

15   it was intentional, maybe it was unintentional, I don't

16   know what happened there --

17             COURT REPORTER:  I'm sorry, Mr. Canales.  I

18   apologize.  There was coughing over your talking.  Start

19   over with intentional.

20             MR. HECTOR CANALES:  Maybe it was

21   intentional, unintentional.

22             COURT REPORTER:  Thank you.

23             MR. HECTOR CANALES:  The confusion of the

24   requirements of home health, you have to be homebound

25   versus hospice, terminally ill.

1          These are not minor differences in terms of

2    what the criteria is.  This particular case, Counts Two

3    to Seven we'll show you in a second is all hospice.  The

4    home health issue, there's no evidence about it.  Two to

5    seven, they picked.

6          This table, this Government with its

7    unlimited resources and unlimited abilities chose, I

8    don't know why, six patients out of 9,339.  And they

9    just didn't stop at those six, within those six, they

10   chose specific either 90-day period or 60-day period and

11   said those periods are fraud.

12         Why they don't come in and -- and say that,

13   instead, oh, it's just general, you know, it's easy.

14   They're counting, they're counting on you not holding

15   them to their burden and just saying, close enough, good

16   enough.

17         We know that these six are not

18   representative of the whole.  The $250,000 statistician

19   didn't perform any statistics, didn't go in there and

20   say, well -- out of these, let's figure out -- let's

21   gets a representative sample of the whole group, right?

22   Because in order to -- to determine if these six can

23   tell us anything about the -- the rest, about any other

24   fraud, right, you've got to have -- you've got to get --

25   make sure that they are representative of the group.

1   But they're not.

2            We talked about -- you're right, we made a

3   big deal about diagnosis and prognosis.  Why?  Because

4   it's part of the program.  Right?  Because a diagnosis

5   is a fact.  And we're going to show you, I'm going to go

6   through in detail, again, like we did here, I'm going to

7   show you these diagnosis of these patients were real.

8   And they came from doctors, not from Virlar or Carrillo,

9   not from doctors who were indicted, right, they came

10  from hospitals and other doctors who the Government has

11  not made a single allegation in this case.

12           You know who has?  Dr. Virlar's buddies, his

13  best man, his silent business partners.  They've come in

14  and said stuff.  Uncorroborated without any support,

15  they just throw the mud up on the wall and hope it

16  sticks.

17           Well, that's not enough.  That's not proof

18  beyond a reasonable doubt.

19           Dr. Virlar and his -- and his buddies aren't

20  subject to belief.  These are not men that you would

21  trust to tell you to cross the street if something was

22  in it for them.  You wouldn't trust these men right now

23  with the matters of -- of importance in your life.  Of

24  course not.  As it relates to your family and to your

25  children, to your loved ones or your own personal

1    safety.  Of course not.

2              And therefore, they can't be trusted here to

3    support what the Government wants.  You know what,

4    because they have embraced them.  They've adopted him.

5    They want you to believe and say what he says is the

6    truth.  I sat there in shock.  Mr. Foster gets up there

7    and says, oh, but he -- he -- he swore an oath to the

8    United States.  It's like -- it's like hearing a -- it's

9    like, you know, oh, oh, you know, oh, honey, I won't do

10   it again, I mean it this time.  He believes that.  You

11   know what, he has to.  He better because he put him up

12   there as a Government witness.

13             Doctors and nurses with different prognosis,

14   prescription/opinion is not fraud.  I apologize it's

15   hard to read in here with the -- with all the lights

16   it's -- it's bright, but what we have here is

17   Dr. Gonzalez, a portion from Dr. Gonzalez' testimony.

18             Have you ever had another doctor disagree

19   with you?

20             Yes, sir.

21             Has a difference of opinion about a

22   patient's prognosis over one another?

23             Yes, sir.

24             Melissa Hernandez, as a nurse said the same

25   thing.  A nurse can have two different opinions or

1     prognosis about a patient.

2                    Yes.

3                    And they can both be right.

4                    Remember that testimony?  Why is that

5     important?  It's important because there's a couple of

6     steps that the Government has to prove here in order to

7     show that these -- these -- these patients were

8     fraudulently admitted into hospice.

9                    But it's undeniable that within the hospice

10    program, hospice program depends upon an opinion.  I'm

11    not making this up, right, it depends, again, upon what?

12    A diagnosis.  So we went through great pains to show you

13    where these illnesses came from, that the illnesses in

14    all six of these patients was -- were -- was real.

15                   And then when the issue came up, he said,

16    oh, well you can't trust all the nurses.  Even though

17    they all came up here and they all said, well, somebody

18    was doing it, but not me.

19                   Did you notice that?

20                   Everybody was critical, judgmental, another

21    thing that's happening in this world.  People are so

22    judgmental about everybody else, but -- but not me.

23    What I did was right.

24                   And that was the truth for Escamilla, oh,

25    no, Dr. Escamilla's the same way.  Oh, everybody else

1   but not me, I did right.

2            All right.  And it's important because first

3   you have this diagnosis and that's what the opinion is

4   based on.  If the diagnosis is factual, there's a basis

5   for it, right?  That's where -- that's where if there's

6   going to be fraud it's got to come in.  But there isn't

7   any here.  And we showed those diagnoses came not from

8   anybody employed by Merida, but from other doctors, from

9   the Baptist Health Systems, right, from Dr. Arizaca,

10  from doctors from the -- from the -- from the Gonzaba

11  Medical Group, right?  And we're going to go through

12  that in -- in detail.

13           So when you have just a mere difference of

14  opinion, a crime, ladies and gentlemen, cannot be based

15  on somebody getting up there and saying, I disagree with

16  that nurse, I disagree with that doctor.  That doesn't

17  establish fraud, that establishes a disagreement.

18           Because this prediction of the future, I

19  mean, honestly we get two weathermen who give two

20  predictions about the future and one's right and -- and

21  the weather turns out one way and doesn't turn -- I

22  mean, one's a fraud?

23           No, that's common sense.  We know that.

24           So let's turn to the first witness that we

25  talked about here in terms of defining -- defining

1   hospice, Laurie McMillan.  She said, prognosis of life

2   expectancy is not an exact science.

3          Was that Laurie McMillan's expert opinion?

4   No, it wasn't.  I knew the answer to the question when I

5   asked it.  She had to say yes.  You know why?  Because

6   it's not just her saying it, she didn't make that up.

7   Right?  It comes from the Government's Exhibit A-30.  It

8   comes from the Medicare manuals, right?

9          Right here from the Medicare manuals it

10  says, right there, predicting of life expectancy is not

11  always an exact science.  The fact that beneficiary

12  lives longer than expected in itself is not cause to

13  terminate benefits.

14          These are hard concrete facts.  One of my

15  favorite, you know, legal idols is President --

16  Secretary John Adams.  John Adams famously said facts

17  are stubborn things.  This is a very stubborn fact.

18  Neither one of us gets an opportunity to debate this

19  fact, but it says right there, it's not an exact

20  science.

21          What's going on here, what is CMS, what is

22  Medicare trying to say?  They're saying there's room for

23  disagreement about this prognosis because the

24  certification, ladies and gentlemen, the certification

25  that the doctors give is, I certify that the patient has

1    a life expectancy of less than six months if, if,

2    conditional, if it runs -- the disease runs its normal

3    course.

4            So nothing happens, we don't treat this

5    person, we don't do anything, what's going to happen?

6    It's a prediction.  But to even emphasize the point

7    more, CMS says, the fact a beneficiary lives longer than

8    expected, expected than what, six months, is not cause

9    to terminate the benefits.

10           They understand that these things are going

11   to happen.  They forget to tell you, you know, they --

12   they look at it, you know what, at first glance, when I

13   first started learning about hospice and getting into

14   this, hey, the length of stay is that really -- that's a

15   good point.  We've known it for years.

16           But what have we learned?  What have we

17   learned when we talk to doctors and nurses?  That there

18   are -- there are diseases that kill you quick and fast,

19   right?  You can have a heart -- a heart attack, a

20   stroke, right, lung cancer, pancreatic cancer kills you

21   quick, faster than six months.

22           There are other diseases out there that are

23   slow.  Remember I talked to somebody up here, I can't

24   remember the witness's name, cruel, cruel, slow death.

25   Deaths by a thousand cuts.

1          Hospices who have a high number of

2    Alzheimer's patients, therefore, are going to have

3    longer lengths of stay, right, versus a hospice that

4    specializes and really goes out and says and -- and --

5    and markets to cancer doctors, to the oncologists.  It's

6    legal to do by the way.  We heard it from everybody up

7    here, marketing is legal.  You can go and advertise the

8    services of hospice, right?  Doctors can advertise,

9    lawyers can advertise, businesses can advertise, they

10   can say, hey, here's a service that we provide.

11          And if you market to a cancer, an

12   oncologist, and you're getting all these fast killing

13   diseases, well, how is that going to affect the data on

14   the length of stay?  You're going to have a shorter

15   length of stay in your patient population because all

16   your patients have diseases that kill you quick.

17          Or if you're getting patients from managed

18   care, the elderly, the Gonzaba Medical Group, those

19   patients are going to have slow disease processes.  So

20   how is that going to affect your numbers?  Right?

21          Instead, you know what, they had a

22   statistician who could have done all that stuff.  It's

23   called self stratification, right, where you make sure

24   you've got for granted that you got people from each

25   different location, from different -- they have the

1    right disease mixture, you know, all these sort of

2    things.

3              They're not telling you that.  They just

4    want you to go all over and -- and be impressed by these

5    numbers and be impressed by the fact that somebody lived

6    longer than an initial 180 -- the initial 180 days.

7              Don't fall for it.

8              It's more complicated than that.  This is

9    not simple stuff.  Each case is difficult.  Each case

10   has details.  You just can't come in here and say it,

11   it's not enough.

12             Again, Laurie McMillan unlimited.  This is

13   the idea that the certification process can continue.

14   It's built into the system.

15             Hit the next slide, Roy.

16             All right.  Hit it again, Roy.

17             Again, the holistic approach.  What's the

18   point?  Why do I keep harping on this?  This is why it's

19   important.  Again, because it fits into what is defining

20   what hospice is because you need to know what hospice is

21   in order to judge whether a fraud has been committed

22   here, right?  And it's a holistic approach.  It's not a

23   checkbox formula.  You've got look at the individual

24   patient.  The doctor has to look at the -- at the

25   circumstances of each of these patients.  It's an

1    individualized approach, which is exactly the opposite

2    and specific, which is exactly the opposite of what the

3    Government has spent our last two weeks trying to do

4    here and just paint with a broad stroke.

5              That's not what hospice is.  That's not how

6    it's to be evaluated.  You look at the diagnosis of the

7    terminal condition and it says, at least, right?  In --

8    in reaching a decision to certify the patient is

9    terminally ill the hospice medical director must

10   consider at least the following.

11             Remember, I asked Ms. McMillan at least,

12   this is not the whole list, at least this.  Look at the

13   whole approach.  All right.  So now, again, McMillan

14   another very important concept, we're -- I'm laying the

15   foundation here.  I took the time to do this and I'm

16   taking it again to lay the foundation for, again, what

17   hospice is because it's very important here because --

18   that the primary care provider is allowed to also serve

19   as the medical director, right?  And that the hospice

20   has to have a medical director because this -- this

21   relates to an understanding why the Government hasn't

22   met its burden on kickbacks.  Right?

23             They want to say that because -- that

24   Dr. Virlar, right, was the -- was the primary care

25   provider and also the medical director that when we paid

1    him for the medical director services, those checks and

2    that agreement we have, oh, it's not worth the paper

3    it's written on.

4              It is.  Why?  Because it's mandated by law.

5    And guess what, we were following the law, we were

6    complying.  How -- I'll tell you folks, those types of

7    contracts, having those contracts, complying with the

8    law, you heard testimony about that we had quality

9    assurance people, we spent hundreds of thousands of

10   dollars on software, all of that behavior is 100 percent

11   inconsistent with the intent to cheat, to defraud.  It's

12   opposite.

13             If you are trying to cheat and defraud,

14   you're not going to go out and spend money on

15   compliance, right?  You're not going to hire a lawyer to

16   submit your -- your applications to CMS.  And they are.

17   You can check them out in the A series, that was

18   application that we signed they were submitted by a

19   lawyer.  That is completely inconsistent with the state

20   of mind the Government wants you to believe my client

21   had.

22             Got to have a medical director.  They can --

23   they can be the same person.  And so McMillan who after

24   we -- she says, okay, you know what those

25   certifications, paying for those CTIs, the certification

1    is not kickback.  For their role as a medical director,

2    the role includes those certifications of terminal

3    illness.  Again, very important.  We're going to get

4    into more detail about the -- the kickback side.

5            But there is a safe harbor, exception,

6    right, when you're paying for professional services.  It

7    was real clumsy at times, but I would ask a lot of these

8    witnesses who were getting paid by the Government if

9    they were being paid for their time and for their

10   testimony, right?

11           Why?  What was that question about?  Well,

12   that question was about is to say that, you know what,

13   they're -- they're not being paid for their -- their

14   testimony isn't bought.  Right?  Money's being paid, but

15   how do you characterize it?  It's in the eye of the

16   beholder.  The witness is always going to say, no, no,

17   no, you haven't bought my testimony, right, what you've

18   bought is my time.

19           It's the same thing here.  It's the same

20   thing here, where they're not paying for the referral,

21   they're paying for the professional services and for the

22   certification, for the -- for the IDG meetings, for the

23   role of what a medical director does.

24           And she says that's not a kickback, right

25   there.  She -- she then -- she then goes -- she then

1  says there at the very bottom, she doesn't know what the

2  market value is.  And that's important because, again,

3  Ms. McMillan didn't come in here and provide any

4  specifics.  She just came to give generalities.  She

5  didn't have any specifics about a single patient, a

6  single doctor, a single certification.  She was here to

7  educate about the hospice program, right, and she did

8  that -- she did that here.

9         She goes on to say, all right, because we

10  got face-to-faces, you'll see in a little bit the checks

11  that the Government put up in front of you, those nice

12  slides that cost us $6,500 a piece from our $250,000

13  expert, he made this nice little chart for the

14  Government, right, those were all face-to-face payments.

15  You'll see the memo line.

16         And she says, face-to-face, put another way

17  is a legitimate professional service that a doctor can

18  expect to be paid for was my question.

19         She said yes.

20         Is it a kickback?  No.  Payments for

21  face-to-faces are not kickbacks.

22         Couldn't be anymore clear than the

23  Government's own expert.

24         Here you go, here's the example.  That

25  check, the second check, the first check was -- this is

1    the check to Dr. Virlar, F2F, face-to-face services,

2    that's what they allege.  McMillan says it's not a

3    kickback.

4              Here's another check.  This is the check to

5    Dr. Carrillo for face-to-faces, McMillan says that's not

6    a kickback.

7              You apply her testimony, again, and this is

8    Dr. Pena, there's another one for face-to-face service

9    medical professional services; that's not a kickback.

10             Not because I said it, their lawyer -- their

11   expert said it.  And then she had -- didn't know

12   anything about Rodney's intent.  She can't help us at

13   all.  The Government has to prove beyond a reasonable

14   doubt that Rodney willfully, and the Court has given you

15   Instructions on willfully, intentionally knew that he

16   was crossing the line and did it anyway.  She doesn't

17   have any information about that.

18             So I want to step back a little bit here and

19   go over some of the key sections of the Court's charge.

20   It was read to you, you'll have it here in front of you,

21   but you're going to get it, but this comes straight out

22   of charge, all right.

23             So here are, and, again, this is all kind of

24   set up for the -- the evidence that we're going to get

25   to in more detail here.

1          We're always presumed innocent.  The law

2    does not require us to prove our innocence and the

3    Government is required to prove reasonable doubt.  If

4    the Government fails to establish that, you must, it's

5    not may, or maybe, must find the Defendant not guilty.

6          What's reasonable doubt mean?  The Court

7    defines it.  Reasonable doubt, according to the Court

8    says -- is -- is proof so persuading that you would be

9    willing to rely and act on it without hesitation in

10   making the most important decision of your own affairs.

11         Reasonable doubt.  Hesitation, pause, that's

12   it.  That's enough.  If Virlar doesn't give you pause,

13   nothing will.  Virlar is -- is an icon of reasonable

14   doubt.  Nothing -- he is not a truth-teller, nothing

15   that he says comes without some reasonable doubt.

16         Our right to remain silent.  Everybody knows

17   this.  You can't hold that against us.  But as a -- as

18   I've said earlier, there is evidence in the case, we

19   have Defense Exhibits, you're going to get our Defense

20   Exhibits, they're in there, some of them were alluded to

21   and we showed the medical agreements.  They're here.

22   The Defense does have evidence.

23         What's proper evidence?  I already kind of

24   touched on this, documents, exhibits.  I'll submit to

25   you that there has been testimony from Dr. Gonzaba,

1    there has been testimony from Dr. Posada, there has been

2    testimony from Dr. Pelly, there has been testimony from

3    Dr. Zertuche, there has been testimony from Dr. Chandra

4    Hassan, there has been testimony from dozens of doctors

5    and dozens of nurses.

6              You know why?  Because testimony, evidence

7    is not just that comes from the stand, it comes from the

8    records, comes from the documents.  And if these

9    documents weren't so -- if they were so unreliable, why

10   did the Government put them in evidence?  They're the

11   Government's Exhibits.  They put them in, not us.  They

12   all say Government Exhibits.  You'll find them in the E

13   series and the D series exhibits.  They're there.

14             Thousands of pages.  And you know what,

15   those thousands of pages are only of these six.  If we

16   brought in the nine thousand, you know, nine hundred and

17   thirty-three patients, we'd fill up this room.

18             So -- so we have here direct and

19   circumstantial evidence and the credibility of

20   witnesses.  It says, in other words, your job is to

21   think about the testimony of each witness you heard and

22   decide how much you believe each witness.  That's why

23   it's so important, this is so important here, is it's

24   not just what they say, but how they say it.  And I

25   think when you think back, we go through some of these

1     witnesses, what they -- how they said what they said

2     completely undermines their -- their -- their

3     credibility.

4            Somebody can deny not being angry at

5     somebody.  Does that make it so?  No.  You've got to

6     look at their face, you've got to look at the

7     circumstances.

8            Do they have an agenda or not?  Right?  Do

9     they have something to gain or not?  And I submit to you

10     that over and over, the Government put up witnesses,

11     didn't tell you a thing, didn't tell you a thing about

12     the -- what -- what skeletons they had in their closet

13     until we got up, and either I, or co-counsel, or the

14     co-Defendant's counselor came up and brought things up.

15     Over and over and over.

16            You're only to consider the crime of -- the

17     crime charged.  We're not on trial for any act, conduct

18     or offense not alleged in the indictment.  This isn't a

19     popularity contest.  This isn't who's the best -- who's

20     the best boss, who's the nicest guy, who's the meanest

21     guy.  No, this is about a willful intent to commit

22     fraud.  That's it.  Not about what kind of car you

23     drive, anything -- they -- they'd like to color --

24     they'd like for you to -- to color the way you look at

25     my client based on that, to infer some sort of

1    wrongdoing.  Resist that.  You know why?  Not only

2    because it's wrong, but because the Court says so and

3    the Court's Instructions say not to.

4              Medicare regulations.  I talked about CFRs,

5    we got into all these details, right?  A violation of

6    civil Medicare regulation, if such violation occurred,

7    is not alone a criminal offense.  If you don't die,

8    the -- the regulatory I's are crossed, the regulatory

9    rule T doesn't make you a criminal, that is common

10   sense, all right?

11             This doesn't mean if you check a box wrong,

12   or somebody did one thing is out of place that -- that

13   that amounts to a violation -- you didn't follow some

14   rule but that that means it's a crime or a fraud has

15   occurred.

16             This is not a civil case, right?  You recall

17   Ms. McMillan went over that.  Mr. Guerra did an

18   excellent, excellent job in distinguishing the

19   differences between civil proceedings and criminal

20   proceedings and the options that are available in terms

21   of that.

22             This is a criminal proceeding not a civil

23   proceeding.

24             Count One.  Count One is the count on -- on

25   conspiracy.  And you have -- and you see here at the

1    bottom that -- that there's some agreement that's to be

2    made.

3              I submit to you Count One, and that the

4    Government's theory in this case is control and -- and

5    dependent on the specific.  Count One is the general.

6    And this is what they want.  This is how they've

7    orchestrated, this is how they put it together.  They

8    want the general to go first.  They want you to buy into

9    it and oh, just paint with a broad brush and everything

10   else behind it goes.  Once one domino falls the rest go.

11             This case is about Counts Two to Seven.  The

12   specific, these particular patients, those particular

13   dates.  And look at it when you go back into the jury

14   room look at the description of the services.  Not a

15   single one of them has got home health care.  They're

16   all hospice.  There are specific dates here.  They have

17   to prove those specific facts, not some other date, not

18   some other periods, those.

19             Here's the definition of knowingly, the

20   definition of willfully.  Purposefully with the specific

21   intent to do something the law forbids.  You got to do

22   what you're doing is wrong.  There's no evidence of

23   that.  Rodney Mesquias didn't sign a single

24   certification to put people into hospice for Counts Two

25   to Seven.

1              So let's get into it.  Let's get into it.

2    These are all facts in the case, Jack High, he's 76.

3    The diagnosis, severe Alzheimer's debility.  The

4    certification came from Dr. Gonzaba.  The history

5    provided by nurses who aren't charged here, who saw

6    that -- remember the watermelon?  This man -- this

7    man -- this man's Alzheimer's was so severe that he

8    didn't know the difference between a chair and a

9    watermelon.  Sundowning and escapes.

10             And -- and, again, maybe this is just

11   confusion on -- on -- on the Government's part, or maybe

12   worse, I don't know, but the fact that you're not

13   homebound, there's plenty of testimony in here, the fact

14   that he can escape bears nothing on your eligibility for

15   hospice.

16             It would for home health, right, if you

17   could run -- if you can leave, if you can escape, well,

18   by definition, by a fact, you're not homebound.  That's

19   the problem.  But that's not what hospice is about.

20   That's the example we ask the questions about the Make a

21   Wish kids, we know all that.

22             I saw the other night, for those sports fans

23   here, you know, Jimmy Lee he made his great speech,

24   don't ever give up.  He's in a tuxedo, he died two

25   months after he gave that great speech.  Right?  But he

1    was at an event with tuxedo moving around, telling

2    stories, laughing, crying, if the Macarena had been

3    around there, he might have done that, too.  That

4    doesn't mean he wasn't terminal.  These are two

5    different concepts.

6              Jack High's wife Gloria, she was

7    overwhelmed, they put her -- she asked for respite care

8    to give her a break.  When they sent her husband Jack to

9    the nursing home for four or five days because he was so

10   hard to handle.  He wished he was dead.  Functional

11   declining, dependence.  He's totally dependent.  All

12   those are the diagnosis.  That's the holistic approach

13   of what we're looking at here.

14             So when we look at stuff, so when we look at

15   Jack High in this particular count, we've got to pay

16   attention to August the 14th of '13, right?  And so

17   here's the certification for that period.

18             And they told you, Jose Virlar signed it.

19   Maybe it's just an accident, maybe not.  But he didn't.

20   Gonzaba signed it.  There's the certification for that

21   particular period.  Right there, folks, you can't meet

22   your burden.

23             Dr. Gonzaba testified in this case right

24   here in this document that's his certification.  Does

25   Virlar agree?  No.  Why?  Well, we know he's got plenty

1    of reasons, right, to come in and say differently.

2    Because there's a second jury here, remember, remember I

3    told you that, opening statement?  You're not the only

4    jury here.

5              This table, all those agents out there, this

6    whole side over here, all those agents, they're judging,

7    too.  They're judging, and you know what, and he knows

8    that, he knew that up there.

9              There's a certification by Gonzaba.  And how

10   did he get there?  Remember the August the 13th date,

11   was it by the hand of Virlar?  No.  It was by Greg

12   Gonzaba.  He told him.  It was his opinion, it was

13   Gonzaba's professional judgment, clinical judgment.

14             To evaluate entry.  Again, here is.  He's

15   the one.  Look, he says here to evaluate and treat,

16   release all care to the hospice medical director.

17             Who was that?  Him.

18             Is that okay?  Yes, it is.

19             We know that from -- we know that from

20   McMillan, we know that -- remember that concept I kept

21   bringing up, continuity of care, right, where doctors

22   want to -- patients want to keep their -- their doctors

23   and -- and doctors want to keep their patients, so they

24   refer them to a hospice in which they have -- where

25   their medical directors.  Just like doctors admit

1    patients to hospitals at which they have privileges so

2    they can continue to care for the -- for those people.

3    There's nothing, you know, sinister about this, this is

4    just how it works.  Good medicine.  It's legal.

5            This is his -- this is Dr. Virlar's notes

6    on -- on -- on Mr. High.  There's his signature.

7            So Two is gone, Ms. Gonzaba.

8            Count Three.  Francisca Perez, 88 years old.

9    88 years old.  Chronic respiratory failure.  We'll show

10   you where that comes from.  Certified by Dr. Pena.  This

11   woman had a history of -- she had a stroke, she's 88,

12   stroke, dementia, respiratory failure, she was bedbound,

13   she -- she had a feeding tube, a peg tube.

14           Go through the records and -- and they're

15   not just his records, they're records from all over.

16           The chaplain.  I don't think the Government

17   is saying the chaplain is a liar, the chaplain said he

18   spoke with the family members and told them to start

19   making funeral arrangements.  This was a holistic

20   approach, the doctors have to take a holistic approach

21   and I would submit to you, you should too.

22           Edgar Jimenez, this is the chaplain, right?

23   This is on December the 18th.  If you look at the bottom

24   there, that's the -- that's the start of the

25   certification period.  What does he say?  She's a

1   bedbound patient.

2              So I don't know.  Maybe that counts now.

3   With Jack High they seem to think bedbound, I still

4   submit to you its -- it gets into the hospice side in

5   terms of the holistic approach, right, but when they

6   talk about Jack High, the fact that he's not bedbound is

7   supposed to be important.

8              When it comes to Francisca Perez's ailments,

9   now all of a sudden that's a fact we're going to let it

10  go.  But she's bedbound, she had a stroke.  She's

11  active, but what, slowly declining.  She's not suffering

12  from one of these fast killing diseases.

13             We spoke about the DNR, do not resuscitate.

14  Right?  And how important it was to respect his mom's

15  wishes.  The chaplain is talking to the son.  This isn't

16  made up, this is real.  Dr. Virlar didn't type this out,

17  not all these records, you know, I mean, they -- they

18  want to just kind of splash this idea that -- that

19  Virlar poisons everything and just throw the baby out

20  with the bath water.  You're smarter than that.

21             We've gone through the details here.  That's

22  not the case.  There's nothing unreliable about this

23  document.  This is what she was at that time.  And this

24  is part of the basis for the certification, right?

25             And it wasn't just the chaplain, you've got

1    a nurse, Eduardo Ramos, who certified her on the same

2    day.  Because you have multiple disciplines coming to

3    see her.  It wasn't just one person, right?  You've got

4    the chaplain coming on the 18th, you've got the nurse

5    coming they're and all evaluating her, what, so they can

6    go to the IDG meeting where they all come together.

7            And I've showed you these over and over

8    where everybody signs off, the nurse, the chaplain, the

9    social worker, they all sign and those happen every two

10   weeks as they're supposed to.  Again, an indication of

11   the state of mind of Merida, of compliance.  If they're

12   trying to rip people off, why go through all of that,

13   why pay all these people?  It doesn't make sense, it

14   doesn't fit.

15           The hospice nurse conducted a multi-body

16   recertification assessment.  She's unable to verbalize

17   simple needs.  Unable to carry an intelligible

18   conversation due to confusion, an Alzheimer's patient

19   continues to be fully dependent on all ADLs, assisted

20   daily living activity.  She has a peg tube, she can't

21   feed herself, she can't clean herself, she can't do

22   these.

23           Is it unreasonable for a doctor to come in

24   and say, you know what, I think given the fact that

25   you're 88 and you have all these things going on in your

1   life, you know, that you're going to die within six

2   months?  Yes.

3               Is it reasonable that another doctor could

4   come in there and be much more optimistic and have a

5   different perspective and say no?  Yes.

6               Can they both be right?  I submit to you

7   they are because it's an opinion.  But what the facts

8   are undisputed about that Francisca Perez was a real

9   patient, who received -- who qualified for Medicare, who

10  actually -- who -- and services were rendered and

11  provided, right, and that she had these things.  That's

12  not in dispute.

13              This isn't where, like Dr. Carrillo went

14  over there and billed for fake patients, patients were

15  dead, that's fraud.  Right?  That's fraud.  These

16  patients are real.  And the services they received and

17  the conditions they were suffering from were real.

18              Here's the IDG meeting, all right, on

19  Francisca Perez, for that same certification period and

20  they say she's got chronic respiratory failure.  And

21  here are the signatures.  Everybody went.

22              Erica Pena, registered nurse, Jackeline

23  Bassini was the social worker, Edgar Jimenez was the

24  counselor, and Dr. Pena was the doctor.  They all met,

25  they all signed off.

1            Again, more.  Francisca Perez, 03/10 within

2    the certification period at issue with her, within

3    Count Three.  The patient is disoriented times three.

4    That means person, place, everything's gone.  Totally

5    bedbound, depends totally on staff for all assistance

6    and personal care.

7            We talked about, and you heard about how

8    comorbidities, it's not just the primary diagnosis, it's

9    all the secondary diagnoses, too, all the things that

10   are going on.  It says here that, again, the peg tube,

11   limited ROM, range of motion, to upper and lower

12   extremities with contractors to hands with right hand

13   closed.  This is the effect of a stroke, she can't move.

14   Limited range of motion, she's got her hand like this.

15   All of those things, the ability to feed yourself,

16   clothe yourself, all of that effects the person's

17   ability to stay healthy, to stay alive, to thrive,

18   right?

19           That's a patient you look at them, and you

20   know what I'd say she fits the description of that -- of

21   probably that classic conception of what hospice looks

22   like.  Somebody lying on their bed completely

23   incapacitated, that looks like death.  Well, it's not

24   limited to that.  It could be death and also be where

25   you're mobile.

1          It's complicated, right?  It's not black and

2     white, it's gray.  The world is complicated.

3          Teresa Calvillo.  This is a really

4     interesting one.  She's 79 years old, COPD, chronic

5     obstruction pulmonary disease.  Severe chronic lung

6     disease, HDH, hypertension, they're are all the

7     diagnoses she had.  You can have more than one, folks.

8     The PCP was in the Gonzaba Medical Group, Dr. Arizaca.

9          How did Teresa Calvillo end up over there in

10    hospice with Merida?  Was it through the -- the hand of

11    Dr. Virlar?  No, it was Dr. Arizaca.  The Government

12    hasn't charged, the Government hasn't given a plea deal,

13    the Government hasn't (unintelligible).

14          You see some of the details there about her

15    PPS score, 40 percent, functional decline, her history,

16    tachycardia, she's got her heart rate going fast,

17    dyspnea, shortness of breath on a minimal assertion, and

18    she was receiving oxygen treatment.

19          That's another thing you've got to remember,

20    too.  In these medical records, these patients are being

21    treated for their symptoms within hospice.  You go to

22    hospice, you're not going to get any care to cure

23    disease, but Alzheimer's and these -- these

24    (unintelligible) and these COPD's, they're not curable.

25    It's not like a cancer where in theory you could get

1  chemo, you could get surgery to cure some things, and

2  the cure rates are low, or you give up those

3  opportunities to be cured.

4           These diseases don't have cures.  But you --

5  within hospice you're able to treat the symptoms because

6  hospice is about palliative care, it's about comforting.

7  So if you're short of breath, guess what, you can get

8  oxygen.  And guess what, when you get oxygen, you're not

9  short of breath anymore.  Your oxygen levels go up.  So

10  when you're being treated, you know, you got a headache,

11  you get Aspirin, the headache goes away.

12           So when a patient, when they come to visit

13  you they're taking an assessment of what you have.  But

14  you're also, those symptoms, are being mitigated or

15  being depressed by the treatments that you're receiving.

16  That explains why some of these treatments, when doctors

17  and these nurses make these visits, they go up and down

18  because they're getting treatment for the symptoms --

19  they're getting treated for the symptoms.  That's the

20  point.

21           So, again, here is the certification period.

22  November the 6th, that they have brought up, right?

23           But prior to that, how did she get here?

24  This is the second certification period, the second 90

25  days, the second half of the first six months.  How did

1    she get here in the first place?  Was it through Virlar

2    or Calvillo?  No, it was right here by Dr. Arizaca,

3    wrote the script.

4                And I don't -- I can't remember the

5    different -- some of these witnesses up there.  Do you

6    remember that one witness when I zoomed on in Rx up

7    there, and he fought and fought about I don't know what

8    Rx is, he's a nurse, a prescription, he put a

9    prescription pad.  You've got to ask yourself, I got to

10   bring this up at this point, you've got to ask yourself

11   what's going on there?  Why were these witnesses, why

12   were these Government's witnesses who are scripted, who

13   met with the Government several times, why won't they

14   give on something simple and basic like that when we ask

15   them questions?  What's going on?  Is there an agenda

16   going on?  Are they trying to please somebody?  Are they

17   really just being neutral fact witnesses coming in here

18   to tell us what's going on, or do they have a little --

19   some agenda going on?

20                I submit to you there was example after

21   example after example after example of that and when I

22   saw that Rx that's what made me think.

23                And she didn't just say, you know, to

24   evaluate Dr. Arizaca, she said to admit.  That's

25   testimony, that's evidence right there uncontroverted by

1    the Government that Patricia Arizaca on 08/05/13

2    believed, had a clinical judgment that Teresa Calvillo

3    was terminal.  The fact that they want to bring in a,

4    you know, Dr. Virlar, or somebody else to say different,

5    that's their prerogative, but it doesn't change that

6    evidence.

7              And there's no evidence, there's nothing to

8    undermine Dr. Arizaca.  All right.  But she's not alone.

9    Antonio Guerrero, an RN, same thing.  Did an initial

10   evaluation, right, and -- and you'll see here the

11   evaluation is consistent with the admissions, right?  It

12   talks about she had a colostomy bag.  She used a walker,

13   had unsteady gait, she had, oh, the recent fracture to

14   the right hip.  I think this was the patient, remember

15   it was somebody would -- wouldn't -- wouldn't agree

16   about, you know, the -- whether she had two fractures or

17   not?

18             So the initial certification to get into

19   hospice, again, is done here by Dr. Gonzaba.  And that's

20   very, very important here because when he does this, he

21   does this, he's certifying for a six-month period.  And

22   Count Four is the second six months, months three

23   through six.

24             Dr. Gonzaba's certification and opinion is

25   what Count Four is all about.  Gonzaba just didn't

1   disappear though when it comes to the second 90 days.

2   He signed, as you might expect, he signed on 11/15,

3   which is now in the -- in the specific count period, he

4   signed the plan of care.  He was the medical director.

5   There's his signature right there.

6              He's taking care of this patient.  He's

7   saying she's terminal, his opinion, he's exercising his

8   clinical judgment.  By the way, Dr. Arizaca works for

9   Dr. Gonzaba, she is a physician within the Gonzaba

10  Medical Group.

11             Same thing here.  Another example,

12  additional, Gonzaba stays with her care.  He doesn't

13  just do it once, he continues to do it.  Again as the

14  medical director, and you see here, the first one is

15  there on 12/13 and the next one is on 12/27, that's

16  fourteen days later.  That's exactly according to the

17  regulations.  Every fourteen days have you to have IDG

18  meetings where everybody, all the disciplines of the

19  hospice, are getting together and they're discussing the

20  patient and they're all -- and they're all signing --

21  signing off on it.  Again, that's what he's doing.

22             Count Five, Castaneda.  79 years old.  This

23  is the one with Dr. Tom Gonzaba.  This is probably the

24  most egregious example of -- of the Government failing

25  to meet their burden.  This -- this -- Mr. Castaneda had

1    a prior stroke.  His wife in the records, if you go

2    through the records, this poor man, his wife died the

3    week that he went into hospice.  We all know how -- how

4    the death of loved ones affects us emotionally,

5    spiritually, it affects our ability to fight diseases,

6    it adds stress.  That is -- that's part of the holistic

7    approach you have to look at here in this case of why

8    now?  Why -- why Mr. Castaneda went into hospice now?

9    What you're going to see when we go through the

10   timeline, about two or three months before Gonzaba wrote

11   all those notes, Instructions to leading up to time and

12   saying, I need to go to hospice, I recommend you go to

13   hospice.

14           He didn't go right away, but as soon as his

15   wife dies, he goes.  That's the holistic approach.  He

16   had the end of life discussions.  And -- and these

17   documents we marked, I admitted as a separate exhibit, I

18   think it's Defense Mesquias Exhibit either 100 or 101,

19   we put these series of medical records together, but it

20   shows the progression in leading up of how Mr. Castaneda

21   got into hospice on October the 16th of '13, he --

22   Dr. Tom Gonzaba, this is different, he is the brother,

23   Greg or Greg/Vincent Gonzaba is the other Gonzaba that

24   we've -- I've shown you all these records on, there's

25   two.

```
 1              Tells him to consider hospice service.
 2   You're in progressive decline.  A couple of months later
 3   he comes back in again, remember he tells them,
 4   explains, hey, if you've got an emergency, go to the
 5   hospital, here's our deal, but be sure and go to the
 6   Baptist Health System where we have people so we can
 7   communicate.  Continuity of care.
 8              A few months later to January, all of a
 9   sudden Dr. Gonzaba does the assessment, chest pain,
10   heart damage, CHF, he seems short of breath, discussing
11   things, and he tells him, the same day at the end he
12   tells him, I anticipate your symptoms will worsen over
13   the next six to 12 months.  He ends up telling him, it's
14   recommended that due to your decline, review your
15   advanced directives with both your family and me.  Get
16   your affairs in order.  He's telling him.
17              A couple of months later, he has that end of
18   life discussion, you probably remember the -- it's a
19   big -- it's right there on the page big bolded area end
20   of life discussion, yes or no, check yes.  They had it.
21   And he tells him on that same day that he recommends due
22   to his decline in health and progression of your
23   disease, I recommend you go to hospice services.
24              And you know what he's doing and then he
25   markets hospice because you know what who wants to go to
```

1    hospice?  Oh, me, me, me.  No.  No.  Nobody wants to

2    send their loved one to hospice.  This is not -- this is

3    not, you know, a happy thing.  This is a scary thing.

4            So what have you got to do?  You encourage

5    people, you -- you show them the upside of the program.

6    And you know what, it's not going to cost them any money

7    out-of-pocket.  There's nothing wrong with that, you can

8    market it.

9            Now, somehow in the Government's view of

10   things, that is a sinister thing to do.  That somehow

11   telling people, hey, you get benefits that we're taking

12   advantage of them.  I couldn't disagree more.  I think

13   that is a distortion, right, a complete distortion of

14   what hospice is really about.  And it ignores the

15   reality on the ground, folks, of that -- that doctors

16   and patients don't want to be on hospice, right?

17           And that there's a huge underutilization,

18   one of the witness experts brought that out,

19   underutilization of hospice.  What does that mean?

20   People aren't using it enough, that's why the Government

21   allows people to market about what it is and explain the

22   benefits of it.

23           And you know what, what some of the benefits

24   are to it?  That you not only get your medications, but

25   you know what you get what we call DME, right, you get

1    medical equipment, all right?  You get a wheelchair.

2    You get a hospital bed.  You get these things.  Those

3    aren't kickbacks, those are services that are part of

4    the -- a part -- a part of the care.

5            And -- and so Dr. Tom Gonzaba isn't doing

6    anything wrong here.  He's educating and encouraging his

7    clients to -- his patient to do something that he

8    believes in.  And you see here, all right, so that's

9    February 28th, right, in June the 3rd, he's making --

10   March, June, so you've got two months there, boom, he

11   goes in.  And what happens?  His wife dies in that

12   period.  That's the straw -- that's the last straw that

13   broke that camel's back, put him into hospice.

14           Count Six.  Petra Cerda.  89 years old,

15   dementia, Alzheimer's, certified by Dr. Pelly, and

16   Dr. -- and Gerardo Reyna, an RN, face-to-face was

17   conducted by Sid Fernald, another nurse.  She had a

18   history of COPD, she was incontinent, she had heart

19   disease.  Oh, yes, Dr. Gonzalez.

20           And Dr. Gonzalez is referring her over.  I

21   misspoke, he -- I'm sure it wasn't intentional.  He

22   misspoke in his argument to you.  Dr. Gonzalez had no

23   idea, I guess he forgot that Dr. Gonzalez was the one

24   who -- who sent the order to Merida.  We'll see that in

25   a second, and you'll see the -- the -- and Dr. Gonzalez

1   also documents her decline as sharp significant decline.

2   We'll go through that timeline in a second here.

3            She's unable to care for herself, she's got

4   decreasing weight, her food intake is going down.  And

5   then down here at the bottom CTI by other doctors within

6   her hospice treatment, Dr. Shekar, Dr. Posada,

7   Dr. Pelly, Dr. Marin, all these doctors, all these

8   doctors certify her.

9            Now, you could choose to believe the

10  Government's theory that everybody down here is in on

11  it.  You could be a cynic.  You could believe that just

12  based on what they say must be right because that's the

13  only -- that's the only explanation, everybody and

14  everything must be fraud, all these nurses, all these

15  doctors, everybody is terrified of Rodney.  It doesn't

16  add up.  It doesn't add up.

17           So here's her certification, right?  And you

18  see there is received by Reyna, 20/10, here we've got

19  the -- this is the certification period for that.  It's

20  done by Lorenzo Pelly, see there at the bottom.  There

21  's no corroborating evidence that Lorenzo Pelly is a

22  criminal or engaged in any kind of fraud.  Unless you

23  want to believe Dr. Virlar and his best man.  And I

24  don't even think he said anything about it.  But they

25  sure tried to just lump everybody in there.

 1              That's all they got.  So here's what --
 2  here's what Nurse Reyna says on the -- on the date, the
 3  day of the certification period at issue.  Performed an
 4  assessment.  Gives the FAST score, all the
 5  comorbidities, the risk for falls, gives this whole
 6  picture and then Sid Fernald, another -- another nurse
 7  who on the ninth, two days before he did a face-to-face
 8  evaluation of -- of Ms. Cerda.  He came up.  We've got
 9  two nurses, four or six other doctors going on out there
10  and we got Dr. Gonzalez to establish, again, that the
11  diagnosis is real.  This patient did have problems.
12              We don't even have -- even if you're not
13  convinced, even if you don't believe about Pelly,
14  Fernald and Reyna and Shekar and all these other people
15  here, we've got Dr. Gonzalez, the Government's own
16  witness.  Who in January and May he -- he thinks she's
17  great.  Then all of a sudden in June he says, she's
18  debilitated, basically homebound.
19              In May, on May 5th, absolutely no
20  complaints, feels great.
21              June 26th, two months later, she's
22  homebound.  That is a huge drop in a very short period
23  of time.
24              And then in September, a couple of months
25  later, he says she's got dementia.

1            And then October, more than a month later,

2      she not just has dementia, she's got a specific type of

3      dementia, advanced Alzheimer's, and that she'll continue

4      to benefit from home health services.

5            This is their guy, this isn't Virlar, these

6      medical records aren't made up.  This woman experienced

7      a sharp decline, the very thing -- and at -- and at her

8      age, she's 89 years old.  It's not a far leap to say

9      that when have you that sharp of decline, you've got all

10     the things going on with her life, that somebody -- that

11     Dr. Pelly says, hey, I think you're terminal.

12           So Dr. Gonzalez testifies that he wanted the

13     complete file, and I went Petra Cerda, and, yes, that's

14     correct.  He goes on and talks about her and her

15     underlying illnesses.  And he explained that the -- by

16     his order to put her on hospice, and that was his order.

17     And here it is, right here.  That's his signature.  He

18     puts in there Alzheimer's, because you know what, she

19     had Alzheimer's and he filled out the order.  And he

20     said to evaluate and treat her.

21           And that's how she got to hospice.  Not

22     through some sinister, elaborate conspiracy by Rodney

23     and the whole world.  He -- she got to hospice because

24     Dr. Gonzalez sent her there.  Sometimes the simple

25     explanation is the one.  Not these elaborate conspiracy

 1    theories, right?  And here it is.

 2              Count Seven, Ms. Conti.  This is the one,

 3    right, so we talked about the diagnosis, where does the

 4    diagnosis come from?  You remember her?  This diagnosis,

 5    again, doesn't come from some grand plot and conspiracy

 6    out there, it comes from some independent doctors.  All

 7    right.

 8              And let's -- and let's -- let's get to that.

 9    All right.  Before we get to that, also, certification,

10    it's not Dr. Virlar, right, it's done by Gonzaba.  It's

11    Gonzaba's opinion that they have to prove.

12              And Ms. Conti there was this idea, oh, she

13    didn't know, she was a prisoner.  She backed off all

14    that.  She was upset with how she was being treated.

15    She -- she felt like, you know, she didn't like people's

16    bedside manner, all right?  But she consented, and we

17    showed that over and over.  This idea that the doctors

18    didn't know, or the patients didn't consent over and

19    over with each of these nurses and -- and witnesses, we

20    showed the consents.  They're all in there.

21              And she consented, look, and she says in

22    here that the attending physician was Dr. Montemayor,

23    not a doctor who's involved in this -- in this

24    conspiracy.  And remember that little (unintelligible)

25    there, I'm dizzy, I don't -- I don't want to do that, I

1    was hung over.  That was, to me, one of my favorite

2    moments of the -- in the trial.

3             Oh, yeah and then you got other doctors,

4    Dr. Rincon.  Dr. Rincon certified Joanne Conti, right?

5    And did her plan of -- and did her plan of care.  But

6    you know what, but let's focus in on the primary care

7    doctor, Dr. Montemayor.  Where did that pulmonary

8    fibrosis come from?  It came from her, you're currently

9    on hospice service which I feels provides you with an

10   extra layer of care you need at this time.  That's

11   agreement.

12            But the Government only cares about doctors

13   who disagree.  They only care about doctors who fit

14   their theory of the case.  And I got -- and I got to

15   tell you, you know what, I get emotional and I'm going

16   to apologize right now to you all.  If there's something

17   I said or did, or the way I -- I behave, if that offends

18   you, I apologize.  Please don't take it out on my

19   client.  But I am passionate about this stuff.  My

20   client's life is on the line, and it is very upsetting

21   to me, right, that the -- the point of all this is for

22   the truth to come out, not to win, not to win, justice

23   is not about the Government winning, all right.

24            And so when you've got bad facts against

25   you, they're obligated to show those bad facts, not to

1    cover them up, not minimize them.  But that's what

2    happens, that's what happened.  In my view, that's what

3    happened here.  That's how you send up witnesses over

4    and over, over and over, and you know what, they don't

5    turn out to be who they are.  Because you're not looking

6    for truth, you're just looking for the right words.

7    You're just looking for them to say what you want them

8    to say, good enough, boom, that's it, let's go.  And

9    that's not how it's supposed to work, that's not what

10   their job is.

11            Their job is not to secure convictions,

12   their job to present the whole truth, not halves.  And

13   so, yes, I get upset.  And you know what, this should

14   have been brought out that Montemayor was in agreement,

15   that Dr. Gonzalez, all this stuff that we had to spend

16   time doing, it shouldn't have to come out in cross.

17   These are all their records, they had them right there.

18   But you know what happened?  They didn't look.  They

19   didn't look until this trial started until all this

20   happened, you know what, and they sent Virlar back in

21   there for four days without a note pad, without anything

22   just look through all these and find some bad stuff.

23            Why not find some good stuff?  All you want

24   to do is win?  And can't you just imagine it, you can

25   just think Dr. Virlar really did it, there wasn't some

1    coordination going on there?  Can't you just imagine

2    they bring in all this stuff and some agent walks in

3    there and puts the box down and they just stare at each

4    other?  How is he supposed to know what he's supposed to

5    do?  He knew.  All right.

6              So pulmonary fibrosis.  We didn't make that

7    up.  Dr. Virlar didn't, and Roland Aguilar didn't get

8    together, they're ambulance business buddies, they

9    didn't get together and make this up.  They didn't make

10   up pulmonary fibrosis, they didn't make up interstitial

11   lung disease.  That's what's on the certification,

12   that's as real as it can get.

13             They didn't make up this Baptist Health

14   record.  They didn't -- they didn't pressure Dr. Soria

15   to come up with a diagnosis all on his own of toxic

16   pulmonary fibrosis, interstitial lung disease, there it

17   is, it's right there.  These are independent places.

18             And I -- and I submit to you, you know what,

19   the -- not only -- not only could a Government -- not

20   only can the witness lose credibility, so can they.  And

21   they should.  They deserve to lose credibility here

22   because you know what, when you get up there and you say

23   one thing, right, and it's within your own files, in

24   your own records, and it's different, they should lose

25   credibility.  That's what not meeting your burden is all

1    about.

2           Oh, yeah, then this guy, Ernesto Gonzalez.

3    He lied about transferring Joanne Conti to Generations.

4    And I submit to you the Government put him up there

5    knowing he lied.  Knowing that his testimony was going

6    to be what it was and knowing he was a liar.  Remember

7    that?  He is the one -- I asked him here, sir, he --

8    Ernesto Gonzalez is the guy who left who was working who

9    was multi-tasking, he was working on the side, Rodney

10   was paying him a bunch of money, right, and he and his

11   buddy started up -- were starting up another business,

12   right, and he went.  And this patient who they thought

13   wouldn't qualify he went and he got her -- he got Ms.

14   Conti to leave -- to leave hospice, to leave Merida to

15   go over to Generations.

16          And when we confronted him with his own

17   signature, what did he say?  Oh, no.  First he said no,

18   no, I didn't have anything to do with it, I wasn't

19   around.  And then we confronted him with his own

20   signature, he says, well, wait a second.  What does he

21   say here, well, actually that isn't my signature, it's

22   similar, but it's not.

23          And I said, well, you've got to say that

24   because if it is your signature, then everything you

25   just said was a lie.  And he goes, yep, you're right.

1   You're right.  And here's what we were talking about to

2   him about, here's the transfer, right, of Ms. Conti

3   going over to Generations.  This supposedly unqualified

4   patient, Generations wants her.  Generations hasn't been

5   charged.

6          And over here on the right side of the

7   screen, see Ms. Conti signed February the 9th and then

8   we have this signature here.  And that's Ernesto

9   Gonzalez.  So he says looks a lot like mine, but it's

10  not because I can't admit it because if I do, then I'm a

11  liar.

12         The prior previous page, here is his

13  signature.  There's his name.  All I can think of is

14  my -- is my -- one of my favorite movies, My Cousin

15  Vinny, identical.  They're identical.  It's him.  He's a

16  liar.

17         And if that weren't enough, if that weren't

18  enough, all right, did the Government say, oh, my God we

19  made a mistake, did they explain it in closing?  No.

20  No.  No.  They just put a move on, they put up Conti,

21  and Conti cements the lie.  Conti gets up there and says

22  that Ernesto, Mr. Gonzalez came by your home to get you

23  to sign the paperwork for Generations.  Yes, he did.

24  Then he she is, well, I don't think we talked about

25  February the 9th, no, no, she goes, I don't think it was

1    the same day.  Ultimately she says, yes, it was the same

2    day.

3              Now, why is this important?  It's important,

4    folks, because the -- the credibility of these

5    witnesses, the Ernesto Gonzalezes of -- of this world

6    and of this case, cannot be trusted.  There is doubt.

7    He got up here, what's he hiding?  Why -- what's going

8    on?  There's some agenda.  That is reasonable doubt.  So

9    what's going on here with Ms. Conti and these -- and

10   these counts?  And maybe there's a conspiracy, but it

11   certainly doesn't involve my client.  She requested the

12   transfer.

13             Belinda Gonzalez, I didn't see anybody

14   receive kickbacks.

15             Steven Dellwo, we saw his -- the nurse

16   Dellwo, he -- she has no reason to believe he's

17   dishonest.  Here's his records, this is about Jack High.

18   He is the one who did the watermelon, he took down that

19   record.  It's true, it happened.

20             THE COURT:  Ten minutes, Mr. Canales.

21             MR. HECTOR CANALES:  Thank you, Your Honor.

22             Belinda Gonzalez, she also said

23   Dr. Escamilla he wouldn't have engaged in fraud.

24   Dr. Escamilla, you know, he says, hey, I wouldn't have

25   done -- I didn't do anything, I resisted.  Right?

1           He didn't give up his medical judgment.  He
2   told them you would not certify hospice patients if you
3   believed the patient was even questionable or
4   appropriate?
5           So look what he does here.  Every example on
6   the page is a certification, R.E., that's him, all
7   different certifications.
8           What just happened?  There we go.
9           Multiple -- multiple accounts.  She says --
10  talking about others.  I'm going to start speeding up
11  here, I'm running out of time, folks, okay.
12          No way of knowing about others.  She wasn't
13  shown the medical records.  Melissa Hernandez wasn't
14  shown medical records.  Amber Kelso she said everything
15  she did was true.  Oh, here again, every -- everybody
16  else was fraudulent but what I did was good.  She worked
17  on Jack High.
18          Jose Aguilar admitted, hey, that was the
19  cash, but he goes it didn't come from Rodney.  It wasn't
20  Rodney's cash.  Admits he committed fraud.
21          Roland Aguilera.  The Government put him up
22  there to say about -- to try to create this impression
23  about this great close relationship, supposed
24  relationship that Rodney had with him.  He was his
25  freaking best man.  They left that out.  Why?  They

 1   either didn't know, which suggests that they're not

 2   doing their homework, or they knew and that's worse.

 3   Either way they deserve to lose the credibility and your

 4   trust.

 5            Roland Aguilera tells the truth if he feels

 6   it's necessary.

 7            Janina Gonzales.  Neal Williams, Mesquias

 8   wasn't involved in the meeting.

 9            Plea agreement, we got to get to the plea

10   agreements, all right?  The -- the Court says you should

11   receive this testimony with great care and never convict

12   a Defendant on the unsupported testimony of an alleged

13   accomplice.  Unsupported testimony.

14            Dr. Virlar, Dr. Carrillo, Mr. Garza, there's

15   no support, none.  It's just their -- it's just their

16   word which isn't worth anything.

17            You've got to believe it beyond a reasonable

18   doubt, everything that they say.  You can't.  And that's

19   not because of anything I did, that's their own

20   behavior.  We got the potential, remember I went through

21   the potential, the actual -- the actual plea agreement.

22            It's only -- he only gets the deal if they

23   like what he says.  If he -- if they say Virlar, Garza,

24   Carrillo if they provide substantial assistance, then

25   they get it.  That's the carrot.  That's why they

1   haven't sentenced them.  They're holding it over their

2   head, the full weight of the United States of the

3   justice department is hanging over their head.

4          You think that doesn't influence them?  So

5   you know what, demand the corroborating evidence, it's

6   not there.  Just them saying so, making a conclusion

7   saying my -- I did it, my client is the -- you know is a

8   fraud, he did it with me, that's not enough.  Got to

9   have something to support it or it's not there.

10          Oaths.  Some oath isn't going to stop

11   Virlar, it never has, it never will.  When he's got

12   something in it for him, that's all that matters to him.

13          And you know what, how did Virlar get here

14   in the first place?  He got here because of his problems

15   with the pain cream, right?  The FBI search.  He was

16   under tremendous pressure.  The FBI hits his house, he

17   gets hit with this big malpractice claim, he's going to

18   have to bankruptcy, and the FBI comes, what does he do?

19   Hey, I'll say whatever I've got to say to get out of

20   what?  To get out of the allegation that he was involved

21   with some crime with my client?  No.  To get out of an

22   allegation that he was involved with the pain cream with

23   Marco Karam.  Something totally different.

24          So he comes out and now you see what his

25   real motivation is.  He's worried about himself and he

```
 1   will say and he has said and will say anything.  And you
 2   know what, con men are good at what they do.  How many
 3   con men out there who aren't personable, who aren't
 4   friendly, who aren't good liars?  He's had his whole
 5   life to practice at it, he's good at it.  Take him for
 6   what he is, nothing more, nothing less, and that is a
 7   despicable, self-serving, self-interested liar.
 8            Here's the plea agreement.  We went over
 9   that.  Sole judgment, sole discretion, sole right of
10   this table, the second jury.  There it is, we
11   highlighted it during trial, here it is again.  It's an
12   exhibit, it's in the J series.
13            Two years.  During all this point in time,
14   they didn't sit him down, Dr. Virlar, to look at medical
15   records until we were in the middle of this trial.
16   There's something fishy about that, folks.
17            The addictive drug instruction goes directly
18   to Dr. Carrillo.  It tells you, the Court tells you be
19   careful.  Be careful about what he says.  You've got to
20   have support, you've got to have doc -- you've got to
21   have -- it cannot be unsupported.
22            Carrillo has a history of telling lies,
23   bills for dead patients, takes sex for payments, doesn't
24   pay child support, and he owes federal taxes and
25   defaults on his loans.
```

1           This is the guy you're going trust one of

2    your most important decisions in your life to?  That's

3    reasonable doubt.

4           People with this type of resume, you

5    wouldn't -- you wouldn't buy a coat from him.  You can't

6    convict somebody based on their testimony, people with

7    this type of character.  They'll do whatever they need

8    to save their own skin, he's proved that.

9           Cooperating agreement.  It's the same one.

10   He's not a truth-teller and he admits that.  He has to.

11   If he wants you to believe that other stuff, right,

12   every good con man is going to tell you a little bit of

13   truth in here, right?  A little bit.

14          Joe Garza.  Weak, fearful.  He said it

15   himself.  Plead guilty because he was afraid of losing

16   his home, his -- his son.  But when he left, we say, he

17   said it -- he says his lawyer said it, but either way

18   the words were said, don't worry, you didn't do anything

19   wrong.

20          What does that tell you?  It tells you he's

21   pleading guilty not because he is, but because he's

22   weak, he was fearful.  If he was -- if he was -- he says

23   he did it because he was afraid.  If he was afraid -- if

24   his testimony, you want to believe that testimony that

25   he committed health care fraud because he was afraid of

1    losing his job, what would he do to avoid going to jail?

2            Do you think he'd elaborate?  Do you think

3    he'd say more than what really happened?  You bet.

4            When the weight of the United States

5    Government comes on your shoulders, it is heavy, and Joe

6    felt it.  And so you know what, he just prepared the

7    Government's case.  No specifics.  11th hour plea, the

8    last minute, after two years.

9            Professional services agreement, safe harbor

10   defense, very important when you look at the charge

11   here.  All right?  This is where it's not a kickback,

12   this is what McMillan was talking about.  It's not a

13   kickback if we have a contract.

14           And we only have to prove it by

15   preponderance of the evidence, more likely than not, 51.

16   I don't get to score a touchdown across the end line

17   like reasonable doubt, all I've got to do is cross the

18   50 yard line, more likely than not, tip the scales,

19   that's it.  Very low burden, different, the Court's

20   Instructions tells you about that.

21           The term that I showed you is for one year,

22   market rates.  Here's the agreement.  Here's the

23   agreement with Merida and -- and Virlar on November the

24   11th responsibilities to be a hospice, it's for one

25   year, $250 an hour.  Meets all the elements that are in

1   here.  They're right here.  They're in our exhibits.

2   This is why McMillan said no kickbacks because those

3   agreements are there.  They are worth the paper they're

4   written on and they took the time to do them.

5           Remember Dr. Virlar signed other agreements

6   to establish the market rates here.  We don't have to

7   just take our word for it, Virlar said he entered into

8   these agreements after Merida with two other hospices.

9   They hired him, too.  Altus and CIMA, they paid him

10  $7,500 a month and $250 an hour.  So that establishes

11  our market rates, our checks are within the market rate.

12  There's the evidence right there, straight from --

13  straight from Virlar.

14          THE COURT:  Mr. Canales, please wrap it up.

15          MR. HECTOR CANALES:  Yes, sir.  Let me

16  scroll there.  There's the agreement, there's the

17  checks, fast forward here.

18          Verdict.  I submit to you answer -- answer

19  Count Two first because two sets the stage for

20  everything else, not guilty.  They didn't prove it.

21  They don't prove Count Two everything else falls.

22  Everything else falls.  You've got to the specifics

23  before you get to the general.

24          Count Two, Jack High, not guilty.

25  Conspiracy, not guilty, you can't have a conspiracy.

1          Count Three, not guilty.  Four, five, six

2    and seven, not guilty.  Once those go, everything goes.

3    There can't be no money laundering or obstruction if

4    there's no fraud.  Not guilty count -- sorry, I'm trying

5    to read up there -- Count 11, Count 12, Count 12 is the

6    kickback.  We've got safe harbor, we got McMillan, we've

7    got the documents.  And require, and hold the Government

8    to their burden, ladies and gentlemen.

9          I wish I had more time, but you have the

10   power to stand up for our system, to stand up for my

11   client and to make sure that you hold the Government to

12   their burden.  Because if you don't do it, who will?  If

13   you don't do it now, when?

14          Thank you so much for your time.  I

15   appreciate it.

16          THE COURT:  Thank you, Mr. Canales.

17          Ladies and gentlemen, let's go ahead and

18   take a lunch recess.  Please report back at 2:30 and we

19   will reconvene.

20          Thank you, everyone.

21          COURT OFFICER:  All rise for the jury.

22          (JURY OUT.)

23          THE COURT:  Thank you, everyone.

24          We'll be in recess.

25          (COURT IN LUNCH RECESS.)

1            THE COURT:  Thank you, everyone.  Please be

2    seated.

3            Ladies and gentlemen of the jury, welcome

4    back.  Again, thank you for your promptness.

5            Mr. Cyganiewicz.

6            MR. CYGANIEWICZ:  Yes, sir.

7            THE COURT:  And before you begin, you wanted

8    a ten-minute warning before one hour, is that what you

9    said?

10            MR. CYGANIEWICZ:  Just at an hour would be

11    sufficient, Your Honor.

12            THE COURT:  All right.  Thank you,

13    Mr. Cyganiewicz.

14            MR. CYGANIEWICZ:  May it please the Court.

15            THE COURT:  Please, when you're ready.

16            MR. CYGANIEWICZ:  Mr. Prosecutors, opposing

17    counsel.

18            Good afternoon.  I get stuck in the middle

19    after lunch, so I'm going to try to be direct and not

20    repeat a lot of things that Mr. Canales has talked

21    about.

22            But I do also want to thank you for the

23    attention, it's very, very, very serious matter and I

24    know you've taken it seriously.  Literally, Mr. McInnis

25    on behalf of his family, his wife and kids also want to

1   extend his thanks, and on behalf of everyone in the

2   courtroom, staff, everybody we try to accommodate you as

3   -- as best we can.

4          But his future, his life will soon be in

5   your hands and you will have to make a decision.  And it

6   will be easy to say, really, who cares, let's -- let's

7   get out of here, I mean, they're all involved.  I know

8   you're not going to do that.  You took an oath to base

9   your decision on the evidence, and I'm sure you will.  I

10  know you've -- you've looked at the witness and

11  considered their testimony.

12         I'm going to try to just, first, talk about

13  some of the things in the Court's charge.

14         First of all, I know Mr. Canales talked

15  about it, and I'll try to speak up, is that the

16  Defendants, when they start, are presumed to be innocent

17  and they start with a clean slate.  And this burden of

18  proof, this highest burden, Mr. Canales mentioned

19  crossing the goal line, is on them and only them, and it

20  never shifts.  And I think you understand that.

21         I've tried cases around here for a while and

22  some judges call it the -- the criminal -- beyond a

23  reasonable doubt is the heavy weight burden.  And the

24  civil burden, a preponderance of the evidence is -- is

25  the feather weight.  It's more likely than not.  Where

```
 1   beyond a reasonable doubt you have to be sure before you

 2   take someone's liberty away.  You have to be sure.

 3              And your job, most important the Judge will

 4   tell you what the law is, and as we said what we say is

 5   not evidence, but your job is to decide the credibility

 6   of witnesses.  You could choose to believe somebody in

 7   part or not -- not at all, or not believe anybody.

 8              The Government has presented witnesses and

 9   Mr. Canales had told you time after time, we were just

10   trying to get the truth out.

11              Their -- their, in my opinion, their

12   credibility is at issue, and even the Government putting

13   on witnesses like this, their -- their credibility is at

14   issue.

15              Did they rush to judgment, did they rush?

16              Just for example, Ernesto Gonzalez, he can't

17   still admit that whether the records say left and right

18   fracture, that it's two fractures.  He insists that his

19   testimony three years today, or this week was better

20   than it was four -- four years ago.

21              It's just that he's the one who says, oh,

22   Ms. Conti, Ms. Conti, she should have never, ever been

23   eligible for hospice, but he leaves Merida, goes to

24   another company and then immediately signs her up for

25   hospice.
```

1        Now, that brings me to a point and -- out of

2   the nine -- 9,000 patients the Government calls a cherry

3   picking, whatever you want to call it, selective

4   picking, just looking for ones, and they come up with

5   these six patients out of the 9,000, and they'll say,

6   well, we could have, you know, we could have taken three

7   months and brought everybody in.  Bring them in.  Bring

8   them in.  If that's what it takes, I mean we'll stay

9   here for a year if we have to.  That's not an excuse.

10  Bring them in, or bring eight in, bring ten in, bring 20

11  in.  .06 percent of the patients.

12        And then when, really Mr. Canales and the

13  Defense starts saying that, well, all these documents,

14  all these patients, there's no fraud involved.  They've

15  all been certified and recertified by independent

16  doctors.

17        Did you notice the shift in strategy?  It's

18  like, uh-oh, well, maybe we didn't look at all those

19  records.  No, all the records are now fraud, every

20  doctor involved is -- is corrupt.  Gonzaba, all these

21  other doctors who are not even charged, independent

22  doctors, now everybody is involved, everybody --

23  everybody's committing fraud.

24        If there's no fraud on the hand-picked six

25  patients, you just can't lump every -- this generic wide

1     brushing, I think they've used, it's vague, or is it

2     just a major conspiracy.  Where are the patients, where

3     are the records?  Show me one record where a witness has

4     testified that Henry told him or her to change it?

5     Where is that record?

6              He instructed me, well, and if we didn't get

7     instructed, if we didn't do it, we would get fired.

8     Just think about that for a second.  Was there one nurse

9     that testified that in fact she was fired?  Out of all

10    these nurses and -- not one was fired.  Mr. Ernesto

11    Gonzalez was fired because he was looking for another

12    job, out there looking for and actually competing

13    with -- with Merida.

14             He -- he joins Generations, and then I'll go

15    through the list of witnesses, but then you have, I

16    guess the anti-Merida conspiracy where you have Joe

17    Aguilar and Eddie Zuniga leave, they form general --

18    they form Generous, you have Dr. Virlar with his buddy

19    and his best man Rolando Aguilera forming another

20    company.  Then you get Eddie Zuniga joining Rolando

21    Aguilera in his new company.

22             And not does he not just join them, they're

23    talking about their testimony.  They're talking about

24    the trial.  They were warned about Mr. Canales'

25    questioning.  That's improper.  Anything Mr. Zuniga

1   says, anything -- you can't even believe that.  That's

2   improper.  They're talking and preparing amongst

3   themselves.

4           And they'll say, we used the word script,

5   every witness got up there, the same story, they or they

6   or they or they or they did this, they did that, I would

7   object and say, well, Your Honor, it's vague -- these

8   are compounding questions.

9           I remember one, or two, or three instances

10  where a lady after that type of testimony, I objected

11  and said, well, no, Mr. McInnis was not involved, he was

12  not involved in that discussion.  He may have been

13  present.

14          Or the best example is Dr. Virlar on the

15  obstruction count.  Oh, I talked to Henry, Henry, you

16  know, change these records.

17          Your Honor, objection, ask him if he's --

18  no, no, actually, I never had a direct conversation with

19  Mr. McInnis about those records.

20          So let's talk about the obstruction and

21  maybe hopefully get that out of the way.

22          Dr. Virlar and Roland are in San Antonio

23  with a bunch of records.  They're -- they're looking at

24  records, they're doing something with records.

25  Mr. McInnis is not present, Mr. McInnis had no

1    conversations with Dr. Virlar, and the two people there

2    present are not charged with obstruction.

3            What Henry did was actually the opposite.

4    He didn't say destroy records, get rid of these records,

5    he said, send trucks to locations, we need to find these

6    records, we've got to comply with the subpoena.  There's

7    nothing that controverts that.

8            And on the money laundering?  Let's talk

9    about that briefly.  What money did Mr. McInnis get

10   besides his paychecks?  You hired -- the Government

11   hires this guy what $400 an hour, or $365 an hour,

12   that's all he does is work for the Government, he's

13   probably billed other millions, he has an interest in

14   the outcome; I'm saying he's lying, but he didn't have

15   any contact with Mr. McInnis.

16           He puts up one exhibit where he paid 500,000

17   over a seven or eight-year period.  Is there -- and you

18   know the Government has resources like you would not

19   believe.  They can look at bank records, they could find

20   out what you had for lunch yesterday.  They can -- all

21   kinds of forensics.  You know they went through his

22   records, his bank records with a fine-tooth comb.

23   Nothing.  His paychecks.  That's money laundering?

24           And then Mr. Canales said if there's no

25   fraud, there's no money laundering, if there's no fraud,

1   there's no obstruction.  There's no obstruction anyway.

2   Not to Mr. McInnis, and there's no money laundering to

3   Mr. McInnis.  He got his paycheck.  Like all the other

4   employees he had a family to take care of, he was

5   getting his paychecks.  Are there bonuses, kickbacks?

6   Where?

7           So let's go back to the six patients.

8   Again, I think the evidence is pretty clear, Mr. McInnis

9   was -- was in Harlingen, he ran the day-to-day

10  operation, did the scheduling, the payroll.  He had no

11  contact with patients.  He had no contact with patients

12  in San Antonio.  He had no contact, or -- with patients

13  in Laredo.  I think one of those patients may be from

14  Harlingen, but he doesn't have contact with the

15  patients.  He doesn't have contact.  He can't admit, he

16  can't discharge, he can't certify, he can't recertify,

17  he can't even pay someone without being told who to pay.

18          He's running the day-to-day operations and,

19  you know, he may have been forceful, maybe at times he

20  was rude, I think Joe put it the best, Mr. Garza, he

21  goes, yeah, from time to time he would yell.  But if you

22  believe all these other people, the last one was Martha

23  Ramos where, you know, she's trying to say how Dr. Pelly

24  is dirty and Henry comes in and starts -- she starts

25  questioning him about why you're on vacation and says

1    he's intoxicated and he says, basically, you want to

2    leave, go ahead and leave.

3              She leaves and then files a complaint.  And

4    she's saying, oh, Henry, Henry was instructing us.  No

5    what Henry was doing with Janina, let's talk about that,

6    is regulations change all the time.  Mr. McInnis had a

7    meeting saying that the -- the regs need to be more

8    specific now, you just can't say good, bad, you have to

9    be more specific on the underlying symptoms, the

10   underlying diagnoses.

11             And we saw the reports that I think I showed

12   you briefly where one day Ms. Janina says it's 80

13   percent, 70 percent appetite, three meals a day.  A

14   couple entries later, it's 60 percent, two meals a day

15   and she says appetite's good.  Mr. McInnis is having a

16   meeting, and it's not just her, it's a staff meeting, it

17   wasn't anyone one-on-one instruction or demanding that

18   something be changed, because even today she says all my

19   record are correct.  She didn't change anything.

20             Show me one document that was changed

21   because he told someone to change it?  He's not a

22   doctor, he can't sign anything, he's not a nurse.

23             And then she says, well, he was even at the

24   IDT, IDG meetings.  It's been consistent.  She's the

25   only person that ever said that.  It's the chaplain, the

1   social worker, the nurse, the doctor, administrators

2   don't go to those meetings.

3            You can look at all the records.  I think

4   there's one here from when I was questioning her where

5   they list the people at the IDT meetings.  Nurse, social

6   worker, counselor, medical director, scribe throughout

7   the entire time.  Not Mr. McInnis, not the

8   administrator.  He's not at those meetings.

9            So let me jump back to your job as choosing

10  a credibility of witnesses.  The Judge instructs you

11  that an important aspect is weighing the validity and

12  character of each individual witness and testimony.

13  Decide whether you believe all or any part.

14           And these are questions you should ask

15  yourself:  Did the witness have any reason not to tell

16  the truth?  Yeah, half of them are making deals.  They

17  have -- they want to make these people happy.  They know

18  that's why their sentencing isn't now, that's why their

19  sentencing is being delayed to see what they say.

20           Joe Garza put it to bed, hey, a conviction

21  would be a bonus for me.  They want to make them happy.

22           And remember Mr. Canales, and I don't know

23  if we have to spend a lot of time on these plea

24  agreements, but it's solely the prosecution who decides

25  whether they file this 5K motion requesting the Judge to

1    reduce their sentence.

2              So you know they want to make the Government

3    happy, you know they want the lowest possible sentence,

4    you know they're looking for probation.  They have to

5    make them happy.

6              So did the witness have any relationship

7    with the Government?  Did one witness's testimony differ

8    from the testimony of other witnesses?  Absolutely.

9              In making up your mind or reaching a verdict

10   you do not make decisions simply because there's more

11   witnesses on one side.

12             And impeachment.  Testimony of witnesses may

13   be discredited by showing or fail to say or do something

14   which is inconsistent with the testimony that we're

15   given today.

16             Let me -- let me -- let me visit with you

17   about that briefly, because you heard this throughout

18   the trial you heard this expression, 302s.  You maybe

19   even hear that on TV sometimes.

20             A 302 is nothing more than a report by a

21   Government agent sitting down at the table with the

22   Defendant and his lawyers taking notes as well as they

23   can about what was said.  And a lot of these interviews

24   as we talk about went back three, four years ago.

25   Mr. Gonzalez, Ernesto, says, no, I don't even know if we

1    need to spend time on him, my memory is a lot better

2    now.  But the purpose is to document what was said.

3              And something else you may see on TV that

4    really is not realistic is this trial by ambush.  Maybe

5    I'm outdating myself when I say it's not like Perry

6    Mason used to do.  I don't know if Perry Mason is still

7    on TV, but you see all this stuff on TV where there's

8    surprises at trial.

9              This is an open discovery process.  We've

10   gotten those 302s and those notes a year ago, if not

11   longer.  When you go through it, the -- the little

12   anti-Merida conspiracy of Roland Aguilera, his best man

13   Dr. Virlar, Mr. Zuniga, Mr. Aguilar, Ernesto Gonzalez,

14   even Janina, four, five Dr. Carrillo, I don't know if

15   he's still a doctor, they all were interviewed three or

16   four years ago when, you would think that their memory

17   would be a lot fresher.

18             None of them said what they said in the

19   courtroom this week.  None of them really mentioned

20   anything about Henry instructing fraud three or four

21   years ago.

22             Joe Garza didn't say it until last week.

23   Because every time they would meet with the witness,

24   we'd get another report.  Okay, well he's still -- and

25   then when they get these -- when they testify, well, no,

1    when did you ever say that before?  Wasn't your memory

2    better then?  Wasn't it closer to the event?  Weren't

3    you told to tell us everything you know?  You don't

4    think Mr. McInnis instructing people to commit fraud was

5    important?  No, it just gets more important as you get

6    closer to trial because they want to make these people

7    happy.  They want to make these people happy.

8              And, you know, maybe some of you thought

9    about this, but why not record the interviews?  As a

10   matter of fact, I think one witness Dr. Virlar said one

11   was recorded.  We never got that recording, we never --

12   you never heard that recording.  There was another

13   recording with Dr. Virlar and his 19-year-old girlfriend

14   about how they're committing IRS fraud, you didn't hear

15   that conversation on tape.

16             Why not record it?  You know why, because

17   it's open to interpretation if it's not recorded.  You

18   can decide, well, I don't remember him saying that, or

19   no that's not what he meant, but if you have it

20   recorded, video or tape with all the resources this

21   Government has, with all the investigators, with these

22   ten or 30 people in the courtroom, they don't want to

23   record a statement or an interview of an important

24   witness, you know why.  So what, we're to told it

25   against Mr. McInnis, it's his fault they didn't record

1    him?

2            Half of my questions was, well, why are you

3    saying this now for the first time?  I mean, we could

4    eliminate all that, let's hear what you said.  Show me

5    on that tape where you say Mr. McInnis instructed you to

6    do anything.  It doesn't exist.

7            And you know, and -- and they all made

8    deals, and Joe, no matter what you believe, Henry, don't

9    worry, Henry didn't do anything wrong.  Don't -- oh no,

10   no, no, no, my lawyer said that.  No, Joe, that's not

11   the way it happened.  You were right next to your

12   lawyer, he may have heard what you said but, no, don't

13   worry, Henry didn't do anything wrong.

14           Well, three days before trial they meet with

15   them, now he's saying now Henry told him this and Henry

16   told him that.  He always said Henry ran the day-to-day

17   operations in Harlingen.

18           Eddie Zuniga ran the day-to-day operations

19   in San Antonio.  So any dealings with patients or staff,

20   that's Mr. Zuniga in San Antonio.  He was -- I think one

21   of the witnesses, maybe Belinda, said that, yeah, I was

22   in Harlingen for a week trained by Mr. McInnis and then

23   I went to San Antonio and he was really never around in

24   San Antonio.

25           But they want you to think, they want you to

1    believe that he's just in charge, if Rodney knows

2    something then Henry knows something.  Even one of the

3    witnesses saying, yeah, I'm assuming that Henry told the

4    nurses that.

5             This is not a place to assume anything.

6    This is not a place to assume anything.

7             It's they, they, they, they.  Well,

8    objection.  Well, no, I didn't speak to Mr. McInnis, no

9    Mr. McInnis was not involved in that conversation.

10            Even if you believe -- I don't think it's

11   been proven.  They haven't met that burden, that high

12   burden.  Even if you believed there was a conspiracy,

13   what was -- what was his role?  I mean, he doesn't even

14   have any contact with those patients.  If he's not

15   dealing with those patients and if they're saying, no,

16   he can't certify, recertify, he's doing his job.  If --

17   if -- what's his role?

18            They, they, they, just want to mix it all

19   up, make these vague general accusations.  Once you tear

20   down the fraud involved and the six patients, what else

21   is there?

22            Oh, don't be afraid, bring in more patients.

23   No, there's just a general atmosphere of fraud.

24   Everybody's committing fraud.  All those documents are

25   fraud.  You can't rely on those documents.  They don't

1   even get to that strategy until we show that all these

2   patients were certified and recertified, Mr. Canales

3   pointed out by independent doctors who are not charged.

4           Dr. Virlar plead guilty to some sort of pain

5   cream scam he had going, had nothing to do with Merida.

6   Castillo plead guilty to some scheme where he's billing

7   for dead people.  Which reminds me, the patients, these

8   9,000 patients were provided services.  They're

9   complaining that they got an electric wheelchair instead

10  of a manual one?  Would they complain if they got

11  crutches instead of a wheelchair?  They were provided

12  services.

13          You know, some -- really, I think we heard

14  two complaints from patients over the 9,000 about maybe

15  not having supplies, or not liking -- Ms. Conti didn't

16  like Mr. Mesquias, didn't like the bedside manner and

17  what he was saying.  Out of all those, one or two

18  patients.  You can't just generalize.  And everything's

19  fraud.  You can't trust those documents, you can't trust

20  those doctors, you can't trust those nurses.

21          That goes to the credibility of the

22  witnesses.  As I just explained and the Judge says, he

23  even says when someone's made a deal, you need to look

24  at that carefully and with caution.

25          The burden of proof.  Defendants are always

1    assumed -- presumed innocent.

2            Indictment, I read to you is not evidence of

3    any guilt, it sounds horrible but where's the evidence?

4            The law does not require the Defendants to

5    prove their own innocence.  The law requires the

6    Government to prove Defendant is guilty each and every

7    element of the offense beyond a reasonable doubt.

8            And then more importantly, a reasonable

9    doubt is doubt based on reason and common sense after

10   careful and impartial consideration of all evidence.

11   Proof beyond a reasonable doubt is proof so persuading

12   you would be willing to rely and act on it without

13   hesitation in making the most important decisions in

14   your own affairs.

15           Really?  Without hesitation, without pause

16   you're going to believe Dr. Virlar, Dr. Carrillo,

17   Rolando Aguilera, Joe Garza, Ernesto Gonzalez, Joe

18   Aguilar, they don't say anything about this three or

19   four years ago, but now they're trying to make everybody

20   happy.  Their credibility is at issue, the Government's

21   credibility is at issue presenting witnesses like this.

22           Dr. Virlar is, I have no integrity.

23   Dr. Carrillo, I have a history of lying, I'm not known

24   to be a truth-teller.  But doc, you want them all to

25   believe the truth, you want them to believe you today,

1    right?  Oh, yeah, oh yeah, today I'm changing, today I'm

2    changed, today I'm telling the truth.

3            Would you depend on them for important

4    decisions, your children, your family?  There's got to

5    be hesitation.

6            Now, during the trial I think there was 16

7    or 17 witnesses, I'm sorry, I still got to use the

8    yellow pad, but there were at least ten or eleven

9    witnesses, some I didn't even question had nothing to do

10   with Mr. McInnis.

11           Laurie McMillan, Ms. Conti doesn't know him,

12   Amber Kelso, I don't think I had any questions, Diana

13   Navarro, Neal Williams never interviewed the Defendant.

14   The case agent here, you never heard from Mike Garcia,

15   he was sitting here the whole trial.  No other FBI

16   agents.

17           Melissa Hernandez, Belinda Gonzalez, I was

18   in Harlingen one week and Henry didn't direct me to

19   change records.

20           Dr. Escamilla, I don't think I asked any

21   questions, or Dr. Gonzalez.

22           Then you had Mr. Petron to put on a big show

23   for, what, $300,000 to just tell us how much Mr. McInnis

24   got paid.

25           And Martha Ramos.  I guess they didn't know

1  that she was evicted by someone from Dr. Pelly's office.

2  All her complaints were against Dr. Pelly and Henry and,

3  you know, Henry told her to leave if you don't like it.

4  So she leaves, starts complaining about Dr. Pelly and

5  files a complaint.

6           And I asked her, do you know anybody, or

7  have you ever known anyone who worked for Dr. Pelly?

8           Oh, no, no, no, no.

9           Well, how about your mother-in-law?

10          Well --

11          Aren't you divorced?

12          Yeah.

13          Oh, you're not angry with her?

14          No.

15          She didn't evict you from your house?

16          Oh, yeah, yeah, she evicted me from my house

17  and Henry yelled at me, but I'm not mad at any of those

18  people, I'm here to tell the truth.

19          That's credibility issues.

20          So who do you have left, Ernesto Gonzalez?

21  Really?  That's not his signature?  That's not two

22  fractures, my memory is better today than it was ever

23  before.

24          Jose Aguilar who left to start a competition

25  or competitor, and then you have Carrillo, history of

1    lying, stealing medicines from his own patients, a drug

2    addict, liar, history of lying.  And remember, he was

3    honest about one thing.  The last question I think I

4    asked was, aren't you saying this for the first time

5    about Mr. McInnis?  Yeah, yeah, basically I am.

6            And then he -- he tried to emphasize how

7    Henry's -- no, no, you don't -- he actually said that,

8    no, you can talk to him on the phone.  But Henry never

9    said that.  Remember, I had to come back and explain it?

10   No, we're talking about this tele-medicine, telethon

11   medicine and screen to screen.  You can't believe

12   anything Carrillo said, you can't really believe

13   anything Virlar said, or if you believe parts of it, you

14   have to have some hesitation, you have to have some

15   pause, you have to have some doubt, you have to have

16   some questions.

17           So you have left, Aguilar, Carrillo, Virlar,

18   Roland, Joe Garza.  Disgruntled employees are people

19   making deals.

20           And can anybody point out one record that

21   was changed because Mr. McInnis instructed someone to?

22   No, it's just this, no, it was the atmosphere of fraud,

23   everybody was committing fraud, all the records are

24   fraud, all the witnesses are lying.  They have to do

25   that after we show that the six patients there was no

1    fraud involved at all.

2           People with deals want to make the

3    Government happy.  They want you to believe they're

4    telling the truth today, that their memory is better

5    today, never made these statements about Henry before.

6    They'll say anything to stay out of jail, to --

7    Carrillo, I plead guilty and cooperated to stay out of

8    jail.  Virlar, I have no integrity.  This ties into the

9    re -- the required burden of proof, beyond a reasonable

10   doubt, the highest burden.

11          How sure do you have to be?  I'll submit to

12   you maybe, probably, likely, that's not sufficient.  You

13   have to have some doubts.  The highest burden of any

14   type of case.  Why do you think that is?  Because you're

15   fighting for someone's life, not more money.  You have

16   to be sure not more likely than not.

17          Different than a civil case?  Of course.

18   How sure?  Not maybe, not possibly, not sure is not

19   beyond a reasonable doubt.  That's the law.  You've

20   taken oaths to find it, follow it.  I wouldn't rely on

21   any of those witnesses.

22          Look at the evidence, look at the witness --

23   list of witnesses.  I've talked to you about the 302s,

24   the deals, that's why the sentencing is delayed.

25          And the Government will probably get up here

 1   for the last 20 minutes and say, well, we have to make

 2   deals to get justice.

 3          Well, these guys only made deals after they

 4   got caught.  I agree with Mr. Canales, I think Joe got

 5   scared, threatened to lose his house, never said

 6   anything like this about Mr. McInnis before, tells me,

 7   don't worry, Henry didn't do anything wrong.

 8          But if you remember the testimony about

 9   Dr. Carrillo, Joe's the person who dealt with

10   Dr. Carrillo on a daily basis, the patient files, the

11   855s, he is the one who was dealing with Dr. Carrillo.

12          Their future, these witnesses, depends on

13   the prosecutors, and as I said, Joe said, oh, yeah, a

14   bonus would be -- a conviction would be a bonus.

15          They, they, they.  Where's the -- where's

16   the evidence?  Where's the supporting evidence?  Where's

17   the phone records?  Where's the bank records?  Then when

18   medical records are shown to be certified by

19   legitimately, it's like, oh, no, we can't rely on those

20   witnesses now.

21          One thing, I think -- I may have been the

22   first person to bring that up, throughout the whole

23   trial I think you were -- there was an attempt to leave

24   you with an impression that no one dies on hospice.

25   Even though it was like close to one person a day, 20 or

1   25 a month, 20 or 25 percent of the whole population.

2   These people were being serviced.  Again, it's not like

3   Dr. Carrillo, where, okay, that lady's dead, I'm going

4   to bill.  They're getting services.

5            Some of them aren't all happy, but out of

6   9,000, I think we saw two -- two people that had some

7   sort of complaint.  Out of the 9,000 we saw six that

8   were specifically named, and you know before they did

9   that, they had to go and try to find the best six, or

10  maybe they didn't even look.

11           And then when we talk about those six on how

12  these are legitimate patients with legitimate hospice

13  needs, oh, no, we can't rely on any of those records

14  even though none of the Defendants are even involved.

15  Gonzaba, Patricia.  Where are the nurses that were

16  fired?  Oh, no, if we don't do this, we're going to get

17  fired.

18           Where's the nurses that got fired?  I think

19  they could find them if they wanted to, or if they even

20  existed.

21           Where are the specific medical records that

22  Henry instructed others to commit fraud?  No contact

23  with those patients.

24           I talked to you about the obstruction, what

25  Mr. McInnis wanted to do was just get those records, we

1    need to get those records.  He's not in San Antonio,

2    he's not talking to Dr. Virlar.  Virlar and Roland are

3    over there doing it and they don't even get charged.

4            And I think Ms. McMillan and Mr. Canales

5    talked about there's no hard limit if the disease runs

6    its normal course, it could be more than six months,

7    even though Janina said, no, it's either six months

8    or -- I'm sure it's six months, you have to die within

9    six months.  No, there's no limits on recertification,

10   there's no billing for dead patients in this case,

11   doctors are required to certify, Henry's not at these

12   IDT or IDG meetings, doctor, social worker, nurse.

13           He does have a meeting about the changing

14   the codes and need to be more specific.  Janina says,

15   oh, he's always at those meetings even though there's

16   nothing there saying Mr. McInnis was present.  Even

17   Mr. Zuniga said that administrators don't go to those

18   meetings.

19           There's a lot of general vague testimony

20   regarding Henry and the fraud.  My question is, you have

21   to have some sort of hesitation, you have to have some

22   sort of doubt.  No contact with these patients.

23           Joe, don't worry, he didn't do anything

24   wrong.

25           Henry was an employee trying to help and

1    support his family like anyone else.  He had a duty to

2    run the day-to-day operation, the scheduling, the

3    payrolls.  He's not an owner, does not make final

4    decisions, can't order payments, can't decide who gets

5    paid, only gets his paychecks, cannot certify, cannot

6    recertify, cannot admit, cannot discharge, can't force

7    doctors or nurses to change records.

8               Well, but if we don't, we'll get fired.

9               Who was fired?

10              Can't sign medical records, I'm not at the

11   IDT meetings, cannot assess patients.  He didn't submit

12   claims to Medicare.  Maybe forceful, yeah, he yelled

13   from time to time.  Yeah, maybe he went to Vegas.  You

14   know how common it is for law firms, or banks, or

15   corporations to have season tickets for Spurs or any

16   team?  You know how common it is for a business to take

17   their employees as a reward to -- on a trip, or to

18   recruit employees, or to entertain doctors or to

19   entertain patients?

20              No contact with those patients.

21              Not one specific record that he did anything

22   regarding these patients.  No fraud involving the six.

23   He's not in San Antonio, he's not in Laredo.  These

24   generic, general terms they, they, they, it's just not

25   sufficient.

1           The Judge tells you that even if you believe

2    there's some sort of conspiracy associating or working,

3    that doesn't make you guilty.  Presence alone is not

4    guilt.  You have to be willfully, knowingly

5    participating in the conspiracy.

6           Bottom line is that the evidence is just not

7    sufficient to support that as to Mr. McInnis.

8           I think the right thing to do would be to

9    find him not guilty.  He tried to comply with the

10   subpoena.  There's no extra money except for his

11   paychecks, had no contact with these patients.  Those

12   six patients don't involve fraud, you can't just throw

13   in the big generic general conspiracy.

14           What benefit did he receive besides his

15   paycheck?  It's not sufficient.  It's not sufficient.

16   It's not close.  Do the right thing.  Mr. McInnis is not

17   guilty.

18           Thank you.

19           THE COURT:  Thank you, Mr. Cyganiewicz.

20           Ladies and gentlemen, do we need a break?

21   Anybody?

22           All right.  Mr. Guerra.

23           MR. GUERRA:  Yes, Your Honor.  Thank you.

24   May I have a 30-minute warning, please, in the event

25   such is needed?

1           THE COURT:  Please proceed.

2           MR. GUERRA:  Thank you, Your Honor.

3           May it please the Court, co-counsel, counsel

4    for the Government.

5           Ladies and gentlemen of the jury, good

6    afternoon.  I know usually over the past two weeks when

7    you've seen me, that means that we're almost done with

8    whatever it is we're doing, be it a witness or whatever,

9    if I come up, that's means we're almost at the end of

10   the line, and that's actually correct.

11          After I finish speaking and speak on behalf

12   of my client, Dr. Pena, you will get the chance to hear

13   from the Government one last time.  But before we do all

14   that, on behalf of Dr. Pena and co-counsel Adriana

15   Arce-Flores, I do want to extend my deepest thanks to

16   all of you.

17          I know that this is something different, out

18   of the norm than what you normally do.  I know this has

19   been a very difficult case, very technical.  You know,

20   it's not everyday that all of us get to go through

21   oodles and oodles of medical records, but yet here we

22   are.

23          And I can say I appreciate, and I know

24   Dr. Pena appreciates your attentiveness throughout this

25   entire endeavor.  And we appreciate the decision and the

1    hard work that you're going to do that followed up on

2    the two weeks that you've done.

3              We know when you go back there, you're going

4    to listen to everything, consider it, and when it's time

5    to issue your -- your verdict, you will do your job.

6              So having said all that, the end justify the

7    means.  That's what the Government is presenting to you

8    right now.  The ends justifies means.

9              Lies, rumors, assumptions.  Government

10   informants, expert witnesses bought and paid for by the

11   Government, cooperating witnesses.  This is the

12   evidence, ladies and gentlemen, that the Government is

13   presenting to you in the hopes that it carries the day

14   against my client Dr. Francisco Pena.

15             They think by showing you this evidence, you

16   will find that they have met their burden and proven

17   every single element in that count, in that charge

18   beyond a reasonable doubt.

19             When we started this journey together about

20   two weeks ago, I said -- I stood right here in front of

21   you and I told you that as we listen to the evidence,

22   the Government would not be able to provide any direct

23   evidence, any direct testimony that Dr. Pena conspired

24   with the co-Defendants to commit Medicare fraud.

25             There was no direct evidence that Dr. Pena

1    conspired with the co-Defendants to authorize hospice

2    services for patients who didn't qualify.  No direct

3    evidence that he conspired to launder money, and

4    absolutely no evidence, at all, to show that he

5    conspired with Mr. Mesquias to violate the Anti-Kickback

6    Statute.  None.

7              Over the course of two weeks, witnesses came

8    up to this very witness stand, took an oath, talked to

9    all of you, and over and over again we waited for that

10   direct evidence.  And over and over again that direct

11   evidence never came.  Why?  Because it's simply not

12   there.

13             What do we know?  What evidence did we hear

14   about Dr. Pena?  Well, he is a long time doctor out of

15   Laredo.  A medical director for Professional Hospice.

16   Not forever.  For 2012 to 2016.  And he got paid by

17   contract a medical director services fee.

18             And we have that in evidence, ladies and

19   gentlemen.  Here it is.  Rodney Mesquias number two.

20   Contract for the directorship for the Merida Group there

21   in Laredo starting March 14th, 2016.

22             Now, we've heard a lot about safe harbor and

23   the provisions that go into safe harbor, and Laurie

24   McMillan talked about it that it's fine.  Mr. Canales

25   talked about it.

1               This directorship agreement, RM-02, for a

2       year.  For the standard rate that people in and around

3       the area, fair market area, pay for medical

4       directorship.  Their own expert, Laurie McMillan,

5       couldn't even tell you what fair market value was.

6       Didn't even conduct a survey.

7               Yet, we can go in and offer testimony that

8       these director agreements were shams, veils, fraudulent.

9       Based on what?  Where is the direct evidence to show

10      that?

11              And at the end of the day, Rodney -- Rodney

12      Mesquias Exhibit Number 1, this is Dr. Pena's, basically

13      his letter to Merida saying that as of January 4th, 2017

14      we're done.  We're no longer in an employer/employee

15      relationship.

16              And oh, by the way, you owe me $11,500 for

17      medical director services actually rendered.  That's in

18      evidence.  You can look at it.  Page 2 is the invoice

19      showing that he actually performed those services and

20      was requesting payment for those services.

21              Now, the question I have for you, ladies and

22      gentlemen, is if this is a sham, if this is a fraud, why

23      are we documenting it?  Why do we have a contract

24      talking about, hey, this is what we're going to do.  Oh,

25      bit way, it's a fraud, it's a sham.  Here's my letter

1    asking you to pay me for services, here's an invoice but

2    it's all fake.

3             Do you really believe that's the case?

4             Is there any testimony that no medical

5    services were rendered here?  No.  Absolutely not.

6             The question is whether or not these

7    services were medically necessary and were, in fact,

8    legitimate.  And I'll argue to you that it was.

9             Now, on behalf of Dr. Pena, the question I

10   have for you, ladies and gentlemen, is what evidence

11   have you heard directly for Dr. Pena?  The witnesses who

12   came up here talked a lot about Rodney Mesquias and

13   Henry McInnis, but did you ever hear any evidence, any

14   testimony of Dr. Pena going to Harlingen?

15            Did you hear any evidence, any testimony of

16   Dr. Pena going to San Antonio, Houston, Corpus, or any

17   other Merida location?

18            You never heard any evidence, never saw any

19   test -- never heard any testimony or saw any evidence of

20   Dr. Pena having a conversation with Rodney Mesquias,

21   Henry McInnis, Jose Garza, or any other administrator in

22   Merida to talk about this alleged conspiracy that he was

23   engaged in.

24            You never heard of any conversations that he

25   had with Virlar and Carrillo, that he allowed them to go

1     through his medical files and falsify documents.

2               You never heard any evidence that Dr. Pena

3     allowed any other doctor to go through his files and

4     falsify medical records.

5               You didn't hear any testimony of Dr. Pena

6     going to -- to Las Vegas, Spurs games, any other perks,

7     privilege that Mr. Foster talked about earlier this

8     morning that were afforded medical directors who played

9     ball.  Dr. Pena never had that.

10              And then of course, you know, we've talked a

11    lot about Michael Petron, you know the million-dollar

12    man, he's billed over $1,000,000 to the Government, at

13    least in his career.  I don't know about you, but when I

14    was cross-examining Mr. Petron, and had him on the

15    stand, I was waiting for the other shoe to drop.  I was

16    waiting for him to say and, oh by the way Mr. Guerra,

17    guess what, not only do we have all this financial

18    information, I had the secret bank account where I can

19    show you that Rodney Mesquias, on behalf of Merida, was

20    funneling hundreds of thousands of dollars in kickbacks,

21    benefits, something to Dr. Pena for patient referrals.

22              Did we get that?  No.

23              Mr. Petron just said I saw that Merida paid

24    Dr. Pena $108,000 over the course of his five-year term

25    of employment with the company.  And again, I got

1  Mr. Petron to confirm my lawyer math that that's a

2  little about two -- $20,000 a year, which is consistent

3  with the medical services agreement that Dr. Pena

4  entered into with Merida.

5            There's nothing wrong with that.  There's

6  absolutely nothing wrong with that.  And Mr. Petron

7  couldn't show you anything else.  He went through time

8  and again charts, bank accounts, all these other

9  benefits that maybe somebody else was getting.  Virlar

10  was getting it, Carrillo was getting it, but not

11  Dr. Pena.

12            But the Government wants to you assume, hey,

13  let's just sweep in Dr. Pena, he's a medical director,

14  so is Carrillo, so is Virlar, let's get everybody

15  together and we can convict them all.

16            That's not how it works, ladies and

17  gentlemen, and you know that.  You took your oath, you

18  -- you will have your charge, you have your Bible, your

19  instruction manual of what the Government has to prove.

20            And I am telling you right here in this very

21  spot where we started it all off two weeks ago that the

22  Government has not met their burden of proof to show

23  that Dr. Francisco Pena has committed any of the crimes

24  beyond a reasonable doubt.

25            Any attempt by the Government to show that

1    Dr. Pena was part of this massive statewide conspiracy

2    is not only inaccurate, it's just dead wrong.

3              And there's something else.  What other

4    evidence did the Government not show you?  What other

5    witnesses didn't come up here to testify against

6    Dr. Pena?  Francisca Perez is alive, we heard that, we

7    never heard from her.  We never heard from a family

8    member for Francisca, and don't you think that would

9    have been helpful?  If Francisca was in bad shape,

10   wouldn't a family member have been able to come in and

11   say, oh, my gosh, Dr. Pena was just a horrible doctor,

12   he never helped my mom, never helped my grandma?  Never

13   heard that.

14             Never heard testimony from any of Francisca

15   Pena's current medical providers right now.  All we get

16   is the recollection from Neal Williams.  She called me

17   Guero.  Okay.  Well, we know she's alive, but what's her

18   condition?  What has her condition been like since the

19   time of the certification period until right now?

20             We don't know.  Dr. Pena doesn't have that

21   burden of proof, the Government does.

22             And when we're speaking of witnesses that

23   were not called, where are the nurses, the

24   administrators, the intake clerks, all those individuals

25   that you heard a parade coming in talking about the

1    other Merida locations, where are they criticizing

2    Dr. Pena, saying that he was authorizing hospice

3    services for people who were not qualified?  They're not

4    there.

5              The closest I could think of getting ready

6    for this was they brought in Roland Aguilera.  How many

7    IDT meetings did Roland Aguilera go to; do you recall?

8    I can tell you, one.  That's it.  One.

9              And you know what his big complaint was?

10   Dr. Pena talked about himself and the meeting didn't

11   last very long.  Okay.

12             But you know what Roland Aguilera also

13   admitted?  There is no set timeline for an IDT meeting,

14   first of all; second of all, Roland couldn't tell you

15   whether or not Dr. Pena did or did not do his job in the

16   IDT meetings.  His biggest concern, his biggest

17   complaint, his biggest gripe was that Dr. Pena talked

18   about himself, and in his estimation it was too short.

19   That's it.  Is that a crime?  Is that fraud?  Is that

20   something that you can convict on?  Absolutely not.

21             I don't want belabor the point, but I think

22   it's a point that I have to make on behalf of my client

23   and it's this.  The Government was painting in

24   generalities, broad strokes.  All the Merida files

25   are -- are fraudulent, therefore, you can't trust them.

1   Corruption is everywhere because everybody was doing it.

2   It existed on all levels.

3         Joe Garza got up on this stand as part of

4   his plea, took an oath to tell the truth, hopeful he's

5   going to a reduction in his sentence, one of the first

6   questions he was asked by the Government, if you recall,

7   was a very direct question -- in the legal parlance we

8   call it leading, it's something that we do in

9   Cross-Examination all the time, but the question was:

10  Mr. Garza, isn't it true that you entered into a

11  conspiracy with Dr. Pena to commit Medicare fraud?  I

12  objected; Judge asked to rephrase.

13        When the non-leading question was asked, you

14  remember what Joe Garza's reaction was?  He stumbled.

15  He didn't know what to do.

16        And finally he came around and said, oh,

17  yeah, um, um, yeah, Dr. Pena.

18        So when I took him on Cross-Examination, I

19  asked him:  Why did you say that?  You had one

20  conversation maybe your entire life with Dr. Pena, how

21  could you tell the ladies and gentlemen of the jury that

22  you conspired to commit Medicare fraud?

23        Do you recall what his answer was?  I

24  assumed.  I assumed.

25        Can you base a conviction beyond a

1   reasonable doubt on an assumption?  Especially an

2   assumption by a witness who has a deal to make those

3   type of assumptions.  It's in his best interest to do

4   so.

5          And, look, Joe Garza, you remember his

6   testimony.  He met with the Government before, during

7   and after his plea.  At no point until he took that

8   stand did he ever mention Dr. Pena to the federal

9   government at all.

10         He talked about Pelly, he talked about

11  Posada, he talked about a couple of other doctors in the

12  lead up to this trial.  But all of a sudden he gets up

13  here, and oh, yes, we conspired.  It's Medicare fraud,

14  absolutely.  Under the penalty of perjury, we committed

15  Medicare fraud.

16         Do you believe him?  I don't.

17         Generalities.  We'll talk about the videos

18  later on, but there was something coming out of those

19  videos.  Jose Aguilar, Neal Williams, those were the two

20  people, the custodians of those videos who came out here

21  to show you everything that was happening on those

22  videos.

23         They said Dr. Pena received money to

24  transfer patients, kickback, referral, done.  Okay.

25  Agent Williams, were those patients ever transferred?  I

1    didn't follow-up on that.  Mr. Aguilar, those patients

2    get transferred?  I -- I -- I -- I don't know.  Maybe.

3    I think they -- maybe they died.

4              I don't know and maybe isn't enough for a

5    conviction.  It's not.

6              Mr. Canales and Mr. Cyganiewicz told you

7    what beyond a reasonable doubt is.  I don't know and

8    maybe, that's just more than reasonable doubt, that is

9    substantial doubt.

10             And that's crucial, ladies and gentlemen,

11   it's crucial because what are we asking you to do?

12   We're asking you to convict individuals of a crime.

13   Wouldn't you want specificity?  Names, dates, people,

14   places, times.  Not only would you want it, I think you

15   would require it.

16             But again, here we are painting with a broad

17   brush.  And in fact, even this morning, even this

18   morning Mr. Foster kept talking about Defendants,

19   Defendants, Defendants this, Defendants that.  It

20   doesn't work that way.

21             When he said Defendants instructed Amber

22   Kelso, Defendants instructed Belinda Gonzalez, there was

23   never any testimony at all that showed Dr. Pena had any

24   sort of relation, any sort of knowledge of more than

25   half of those witnesses.

1              If you noticed there was a reason why myself

2    and Ms. Arce-Flores never asked questions, or if we did

3    we asked one or two questions of a witness.  And why is

4    that?  It had absolutely nothing to do with either our

5    client, or what he was doing in Laredo.  Period.

6              Yet, the Government continually wants you to

7    say, well, all the Defendants were doing this, and all

8    the Defendants were doing that.  No, ma'am.  No, sir.

9    To convict somebody beyond a reasonable doubt doesn't

10   work that way.

11             And I think there was something else going

12   on throughout the trial, something odd and I'm sure you

13   noticed it too.  It bordered on the verge of something

14   miraculous, you know, witnesses as Mr. Cyganiewicz said,

15   all of a sudden their memories got a little bit better.

16   Two, three, four years after a certain incident, two

17   three, four years after they may have met with the

18   Government for the first time.  All of a sudden their

19   memory comes back.  Maybe they took a special pill, I

20   don't know.

21             But witnesses who at no point had either

22   described a conversation or a meeting with Dr. Pena, all

23   of a sudden are coming up on this stand and saying,

24   whoa, yeah, I got it.  Now -- now I remember, here in

25   2019 I remember there was this one time in 2015 that he

 1    told me to do X, Y and Z, that he told me to commit this

 2    crime.

 3              Why is that?  I mean, is that really a

 4    function of their memory coming back?  I don't think so.

 5    That gives me reasonable doubt.  It gives me significant

 6    doubt.

 7              I think the more rational explanation is

 8    simply they understood what they needed to say, exactly

 9    what they needed to say to further their own interest.

10    Whatever it may have been, whether it was for a deal,

11    whether it was to have a personal axe to grind, whether

12    it was to advance their own businesses that are going

13    outside.  Whatever it is, these witnesses knew exactly

14    what they had to say to further their own interests.

15              Simple as that.

16              And so one of the -- the most important

17    witnesses that I can think of was Ernesto Gonzalez.  And

18    I know Mr. Cyganiewicz and Mr. Canales talked about

19    Ernesto Gonzalez, but, to me, I was wondering, where --

20    where does Ernesto fit in with all of this?  I got my

21    answer this morning.  The Government was using Ernesto's

22    testimony on this witness stand to tell you that they

23    had proven beyond a reasonable doubt that Dr. Pena

24    conspired with co-Defendants to defraud Medicare.  They

25    were using Ernesto Gonzalez' testimony to show that.

1    And what was his testimony?  His testimony,

2    he came up with this wild story that Dr. Pena invited

3    him into his office at some point in 2015 and said, take

4    a look at all the patient files you want and whatever

5    qualifies sign them up.  I'm good.  Do it.

6    There's just a slight problem with that,

7    ladies and gentlemen.  At no point prior to Mr. Gonzalez

8    taking that witness stand had he ever said anything like

9    that at all.

10    Remember, Ernesto Gonzalez, he was racked

11    with guilt, he had to leave Merida, he was having

12    trouble sleeping because of all the fraud that was going

13    on.  He meets with Dr. Pena in 2015, 2016, and remember

14    I drew out the timeline for you on the ELMO over here.

15    First time he meets with the federal

16    government, January 2017.  Does he talk about Dr. Pena?

17    Not at all.  Someone who has got such a guilty

18    conscious, got so much on his mind that he's physically

19    affected by what he's seeing doesn't blow the whistle.

20    Well, give him the benefit of the doubt.  Fast forward

21    to March, 2017.

22    Again, Ernesto slept on it some more, and he

23    still -- he told you, I'm still racked with guilt, I

24    don't know what's happening, I have to get this off my

25    chest.

1           So what does he do?  He tells the FBI, well,

2     maybe I overheard some people saying that Dr. Pena

3     approached them.  Okay.

4           Racked with guilt some more.  Does he go

5     contact special Agent Garcia?  He's been to his office

6     twice already, he's met with him.  No.  He waits.  And

7     he waits and he waits and he waits two years before he

8     says anything else.

9           Coincidentally, if you want to believe him,

10    before trial started you want to believe me, at the time

11    trial started.  But either way, why wait two years to

12    all of a sudden have a great recollection of this

13    massive fraud that you were being asked?  And oh, by the

14    way, he never did it.  He said he was asked to go

15    through those files but he never did.  If you believe

16    him, which I tell you, you should not.

17          And that brings us to Mr. Jesus Virlar.  We

18    shouldn't call him doctor anymore even though he's

19    listed as a doctor.  And what is he really?  And I'm not

20    going to call him names, you've heard it all, but we

21    know what motivates Mr. Virlar to reduce his sentence.

22    That's what he wants, that's what he came in here to do.

23          And again, Mr. Virlar was asked, did you

24    conspire with Dr. Pena to commit Medicare fraud?  Yes, I

25    did.  That was his answer.  Okay.

1                Again, like Ernesto Gonzalez, Dr. Virlar,

2      Mr. Virlar must have had a great surge in memory, maybe,

3      you know, he took some Ginseng, or something like that

4      because all of a sudden, oh, yeah, I -- I did conspire

5      with Dr. Pena to commit Medicare fraud.  The only

6      problem is Dr. Virlar never told anybody that he did.

7      And in fact, over the course of his entire lifetime,

8      Dr. Virlar maybe had one, maybe two conversations with

9      Dr. Pena ever.

10                And that one conversation he had was at

11     Dr. Virlar's insistence.  He wanted to meet Dr. Pena

12     because he was the Chief of Medicine at Laredo General

13     Hospital.  Virlar was asking for more business.  And his

14     biggest complaint was Dr. Pena said to him unprompted,

15     allegedly, I'm not going to send anymore patients to

16     Merida because I'm not getting paid.

17                Well, we know Merida wasn't paying Dr. Pena.

18     We have it in -- in black and white in the letter,

19     Rodney Mesquias Exhibit Number 1, they were behind, they

20     were not paying their medical directors, first of all.

21                Second of all, where's the proof?  Where's

22     the proof beyond a reasonable doubt that Dr. Pena did

23     that?

24                Where's the proof that because he wasn't

25     getting paid Dr. Pena stopped sending patients to

1     Merida, or started withdrawing patients from Merida?

2               Again, if you have someone like Mr. Virlar

3     telling you, do we accept it as gospel?

4               Should we accept it as gospel?

5               I think to convict somebody beyond a

6     reasonable doubt we would need a little bit more, just a

7     little bit more than the word of Jesus Virlar to say

8     that this actually happened.  That this rose to the

9     level of a conspiracy to commit Medicare fraud.

10              Then, of course, there's Mr. Carrillo,

11    Eduardo Carrillo.  He said, well, I -- I may have signed

12    some -- some -- some certifications for Francisca Perez,

13    Count Three, but I don't remember what.  Okay.

14              Well, let's talked about Francisca Perez.  I

15    know Mr. Canales talked about Francisca Perez, he showed

16    you some documents, but for the record, I want just to

17    talk about Ms. Perez and the medical conditions that she

18    has.  And this is in Exhibit E-20, it's bate-stamp

19    240-449.

20              Hospice certification and plan of care.

21    Principle diagnosis for Francisca Perez:  Chronic

22    respiratory failure.  Cerebral thrombosis with

23    infarction, unspecified essential hypertension,

24    pertinent diagnoses.  Functional limits:  Ambulation,

25    walking, bowel bladder incontinence, contracture.

1    Remember Mr. Canales talked about Francisca couldn't
2    unclench her left-hand.  Why?  Because she had strokes.
3    She had a history of strokes.  Francisca was bedbound at
4    the time she was put on hospice.
5                Activities permitted:  Complete bedrest.
6    During that certification period, the one in question
7    that went from December 18th, 2013 to March 17, 2014,
8    when Francisca Perez was recertified for hospice, the
9    certification was she was going to die, if the diseases
10   that she had ran their normal course over the next six
11   months.
12               So what happened?  Never heard of this from
13   the Government, never heard it from Mr. Carrillo.
14   Again, this is from E-20, 240-802.
15               Francisca Perez was sent to the emergency
16   room on April 24th, 2014.  She was in bad shape.  She
17   had a reversal in her -- in her condition.  Now, this --
18   her condition, she was bedridden.  The left side of her
19   body was paralyzed because of multiple strokes.  Her
20   left hand was clenched, she could not unclench it.
21               And it got worse.  She got sent back to the
22   hospital on this date.  Past medical history includes
23   that she's bedridden, that she has gastrostomy tube fed,
24   her peg tube, she couldn't eat on her own, they had to
25   feed her.  A total care patient.

1             In the past she's had one or two strokes

2    affecting the right frontal lobe and the right parietal

3    lobe.  That's why her left side was completely

4    paralyzed.  That's why she had those issues.

5             The patient has a history of dementia,

6    vascular for Alzheimer's secondarily.  Her stroke has

7    rendered her with long standing left hemiparesis with

8    particular affliction of the left hand which is very,

9    very contracted.

10            Within six months of her being certified,

11   this happened.  And just, again, leaving that hospital

12   her -- her diagnosis, new stroke, aspirational

13   pneumonia, metabolic encephalopathy, hypertension,

14   dementia, vascular and Alzheimer's both, cardiomyopathy,

15   bedridden, total care, gastrostomy fed patient.

16            I know you saw this.  Francisca Perez's

17   condition was so dire they signed a DNR order for her

18   two months later.  And as you know from the part of

19   closing that Mr. Canales talked about Francisca, her

20   family was having issues coming to grips with the fact

21   that she may die.  She was being counseled, the family

22   was being counseled over and over again about end of

23   life, how DNR was necessary.

24            The fact of the matter is, ladies and

25   gentlemen, there was no conspiracy to unnecessarily

1    place Francisca Perez on hospice, she -- she needed to

2    be on hospice.  She is alive today, God bless her, thank

3    God.  But that doesn't change the fact that for the

4    certification period on Count Three Francisca Perez

5    needed to be on hospice.

6            Another thing with regards to Carrillo and

7    Virlar before I forget, I want to show you one last time

8    because I know you'll miss it.  Exhibits 3 -- L-2, the

9    map, you've seen the map, the Government took great pain

10   to put this map of Carrillo and Virlar and Pena all

11   together.  These are the medical directors in Texas.

12   They want you to believe that Dr. Pena was the same as

13   Virlar, the same as Carrillo, doing the exact same thing

14   that Carrillo and Virlar were doing.  That the medical

15   records show they may have been doing, that their own

16   testimony showed that they were doing.

17           But -- but did you hear any testimony that

18   put Dr. Pena on that level?  Did you see any evidence

19   that put Dr. Pena on that level?

20           I mean, this morning Mr. Foster said, when

21   he was talking about Dr. Pena, he mentioned Francisca

22   Perez and other patients.  Where are the other patients?

23   Who are the other patients?

24           I asked Jose Aguilar, name those patients,

25   all those patients that came off of hospice that were

1    part of this alleged kickback, who are they, where are

2    they, what are their conditions now?  The only patient

3    you have even heard of from Dr. Pena is Francisca Perez.

4    That's it.  All these claims, all these millions billed,

5    you've heard from one related to Dr. Pena.  That's it.

6              And, again, Government Exhibit L-3, trying

7    to show Dr. Pena on the same level as Carrillo and

8    Virlar.  You know better.  You know that's not true.

9              There's another thing that kind of stood out

10   to me while watching the Government's direct this

11   morning, or excuse me, the Government's initial close,

12   and that was their reliance on Jose Aguilar.  You

13   remember Jose.  I believe Mr. Foster said that he was

14   anguished as he stood here -- sat here and testified on

15   the stand.

16             Anguished?  Did you take Mr. Aguilar to be

17   anguished?  I certainly didn't.  I took Mr. Aguilar to

18   be someone who was scared.  Not scared for the

19   situation, not scared for people or individuals, he was

20   scared because his schemes were coming undone.

21             Jose Aguilar was an informant for the FBI,

22   brought into it by his business partner, co-owner and

23   co-founder of Generous, Edgar Jimenez.

24             You heard the testimony, he always had a

25   scheme, come and invest in my new hospice.  He got

1    Dr. Pena to invest, he got Marco Karam to invest, he had

2    cameras and all sorts of little things.  Always looking

3    for a scheme, always looking for an investment.

4              And you know what, ladies and gentlemen,

5    he's asking you to invest as well.  He's scheming with

6    you, with the Government to have you believe his

7    testimony.

8              This is a man who would go to someone he

9    called in his own words his mentor and wear a camera to

10   tape him, wear a camera to get him to say things that

11   could be used against him in a court of law later on.

12             You know, the one thing that struck me about

13   those tapes, and I apologize if I belabor the point,

14   when I had Jose Aguilar up there was the fact that he

15   paid cash, cash that was given to him by the

16   United States Government in an attempt to bait Dr. Pena

17   to do what he wanted him to do.

18             You remember the tapes.  What was Dr. Pena's

19   reaction?  Oh, cash, you always pay me by check.  The

20   first installment of $2,500 Dr. Pena said, you paid by

21   check.  The second installment of $2,500, what did Ms.

22   Pena say, we heard her, God bless her, we heard her over

23   everybody else, otra vez, again?  Because it wasn't

24   cash.  It was check.

25             And why was he paying?  Because he owed,

1    ladies and gentlemen.  He owed Dr. Pena money.  Whether

2    or not he paid back the loan, we argue that he didn't,

3    but even if you believe that he did, he owed money for

4    medical director services.  He testified that he went

5    two years without paying Dr. Pena for his medical

6    directorship.  Two years.

7              Jose Aguilar also testified that he entered

8    into a contract with Dr. Pena at Generous starting in

9    2014.  Two years without paying medical services.

10             And then Jose comes in and he says, oh my

11   gosh, Dr. Pena comes to me and he says you better pay me

12   money once they start making money.  Heck yeah.  He did

13   the work.  He helped them start up that company from

14   scratch.  There's no such thing, ladies and gentlemen,

15   as a free lunch.  Dr. Pena earned that money

16   legitimately to care for those hospice patients at

17   Generous and Jose Aguilera still didn't want to pay him

18   for that.

19             And again, I go back to it because it bears

20   repeating, and it is critical, did those patients move?

21   Nine patients, did they get transferred?  We don't know.

22   We don't know.

23             Oh, and before I forget, let's just add this

24   to the tally board.  Jose Aguilar also owed Dr. Pena

25   $7,000 for art, owed him money for lease.  So when

1    Dr. Pena gets paid this money in cash, not check as --

2    as they're supposed to, Dr. Pena didn't know what it was

3    for.  They want you to believe, yeah, it's a kickback.

4    Where's the proof?  Beyond a reasonable doubt, where's

5    the proof?

6            I know they'll come back and they'll play

7    the tapes, but ladies and gentlemen of the jury, you

8    have those tapes, you can go back and listen to them if

9    you want.  They'll play you little snippets here and

10   there, but you have those tapes.

11           And there's another person you did not hear

12   from and that's Edgar Jimenez, the co-owner of Generous,

13   the other individual who was an informant for the FBI.

14   Jose Aguilar's running buddy, the two of them would wear

15   that wire and go into Dr. Pena's offices.  Why didn't we

16   hear from him?

17           I think it's really critical that we didn't

18   hear from Edgar Jimenez because he was the one who was

19   taping Dr. Pena on October 30th, 2017, the alleged

20   attempt to obstruct justice.  We didn't hear from Edgar

21   because, oh, by the way, on those tapes, the alleged

22   attempt to obstruct justice the Government told you

23   Dr. Pena wanted to back-date a contract.  Who brought

24   that contract to the meeting?  Edgar Jimenez.  Edgar

25   brought it.

1           And you know why he brought it?  Because he

2     told Dr. Pena, I lost it.  Didn't hear about that; did

3     we?

4           And at the end of the day, that contract was

5     for services that nobody disputes were actually

6     rendered.  And when Dr. Pena tells Edgar Jimenez, oh we

7     need to find who it did this, where is this coming from?

8     Did he tell him to lie, did he tell him to make stuff

9     up?  He's just wondering, concerned who's coming after

10    me, where's this coming from?  If Jimenez was being

11    honest with him, he would tell him it's the FBI.  But

12    did he?  You didn't hear the tapes.

13          And speaking of the FBI, let's talk about

14    Mr. -- Mr. Williams, Special Agent Neal Williams.  He

15    got up there on the stand and he told you, this was the

16    first health care investigation that he started running

17    with in toto, the full, from the beginning.  I don't

18    think there's any dispute this was an incomplete

19    investigation.

20          Neal Williams had these individuals wearing

21    wires, going in there with cameras, that's all he did.

22    He had those tapes, he went in there on October 27th,

23    2017 armed with a target letter.  Defendant Exhibit 27.

24    When he walked into Dr. Pena's office on October 27th,

25    2017 Neal Williams had this letter at the ready.

1          Waited until Dr. Pena talked to him before

2   he gave him this letter.  At no point did he say,

3   Dr. Pena, you are a target of a Grand Jury

4   investigation.  At no point did he tell Dr. Pena before

5   the interview started, if you don't participate or

6   cooperate with me, you will be indicted by a Grand Jury.

7   At no point did he recommend to Dr. Pena that his

8   attorney be present.  Why?  Just a friendly

9   conversation.  No big deal, right?  Wrong.

10          Agent Williams told you exactly what he was

11  doing in that conference room, exactly what he was doing

12  in that office that day, and exactly what he wanted from

13  Dr. Pena when he walked into that office.

14          He wanted cooperation.  He wanted to put

15  the screws on Dr. Pena so that Dr. Pena would become the

16  next Virlar or Carrillo and testify against Rodney

17  Mesquias and Henry McInnis.  That's what it was all

18  about.

19          So why tell somebody that you're under

20  investigation?  Why tell somebody that if you don't

21  cooperate you're going to go the Grand Jury?

22          And -- and here's the killer part.  I asked

23  Agent Williams on the stand, at any point in your

24  investigation did you tell Dr. Pena that you had him on

25  tape allegedly conspiring to take a kickback?  Did you

1     tell him that Jose Aguilar and Edgar Jimenez had him on

2     tape?

3                Remember what his answer was?  Um, no.

4     We -- we don't do that.  Really?  Because you know who

5     got that basic courtesy to get cooperation?  Jesus

6     Virlar.

7                Remember that testimony?  When FBI agents

8     raided Jesus Virlar's house, knocked on his door, they

9     said, we want you to cooperate.  He says, no, I'd rather

10    have my attorney.  Well, before we do that, hold on,

11    let's put a pin on that.  Before we do that, let's

12    listen to these tapes, just listen.  All you've got to

13    do is listen.  Virlar got that courtesy that my client

14    did not.  And the reason why?  Because they wanted to

15    set up Dr. Pena, they wanted him to cooperate, they

16    wanted him to testify.

17               And because he didn't cooperate, because he

18    didn't testify, here we are.

19               The Government, through Agent Williams is

20    saying, well, Dr. Pena lied.  False statement to a

21    federal agent.  Dr. Pena lied.  I have the list of all

22    the alleged lies that Dr. Pena told, allegedly according

23    to Mr. Foster from this morning.

24               Number one, Dr. Pena took kickbacks for

25    referrals.  Now, remember to convict Dr. Pena of that,

1    he has to show that he knowingly and willfully uttered a

2    false statement to the FBI.

3           Did Agent Williams ever say, Dr. Pena, did

4    you take a kickback from Generous, or Dr. Pena did --

5    did you take a kickback from Merida?  That wasn't his

6    question.  Just general, did you ever take a kickback?

7           Did Dr. Pena intentionally lie to him,

8    knowingly and willfully tell a false statement?  No.  If

9    you're referring to whatever payments that Jose Aguilar

10   gave him, Edgar Jimenez, Dr. Pena didn't consider that a

11   kickback, that was -- that was payment for monies that

12   were owed.  Was Dr. Pena taking a kickback when he

13   received money from Merida?  No, money that he was owed.

14          But that rises to the level of knowingly and

15   willfully uttering a false statement to a federal agent?

16   Absolutely not.

17          So then we'll go to the second one, the

18   second false statement that they played the tapes again

19   a little snippets with Agent Williams was that Dr. Pena

20   was getting payment for putting people on hospice who

21   weren't eligible.

22          And what was the reference, who was the

23   patient that Mr. Foster referred to when he said that?

24   Francisca Perez.  And we talked about her.  And this is

25   where I got the part where he says and other patients

1   you've heard about.  Other than Francisca Perez, what

2   other patients did you hear about relating to Dr. Pena?

3              So then the next false statement is

4   Dr. Pena's statement about keeping people alive on

5   hospice.  And we talked about this.  We've talked about

6   this with Agent Williams, we talked about this with

7   everybody else.  Hospice care is comfort care,

8   palliative care.  That doesn't mean that in taking

9   someone on hospice you have to take any steps, medically

10  or otherwise, to end their life.  You give them medical

11  care.  It's not curative care, you're not curing

12  their -- their underlying diseases, but you're making

13  them comfortable.

14             So if someone can't swallow, if someone

15  can't feed themselves, you do give them a peg tube, you

16  give them water.  And absent any order out there by a

17  family member, or someone capable of issuing that order,

18  you have to do it.  A doctor is bound to do it, legally

19  and ethically a doctor is bound to do it.

20             And we talked about, when I asked Agent

21  Williams and I asked other individuals, do you know the

22  2017 law that Governor Abbott signed into law in Texas

23  that requires doctors to give a patient food and water?

24  That's the law, folks.  And Dr. Pena, when they talk

25  about, oh, I don't believe the six months.  Yeah,

```
 1   Dr. Pena admits it, it's on the tapes.  He doesn't
 2   believe that hospice is limited to six months or die.
 3              You know why?  Because that's not the
 4   standard.  That is not the standard for hospice.  I
 5   figure at this point, I'm sure you guys are now hospice
 6   experts and you're probably tired of us on the Defense
 7   telling you this, but the standard is six months or less
 8   to live if the disease runs its normal course.  But
 9   there are outliers.
10              Laurie McMillan didn't even know that 12 to
11   15 percent of people on hospice live longer than six
12   months.  It can happen.
13              And Dr. Pena told Agent Williams, I don't
14   believe in taking any steps that would shorten
15   somebody's life.  And, oh, by the way, as the Government
16   sits here and says, Dr. Pena keeps people alive for as
17   long as possible.  Where's the evidence?  Where's the
18   medical proof to show that he took steps to
19   unnecessarily extend lives?  Unnecessarily extend lives,
20   where is the evidence, show me that beyond a reasonable
21   doubt.  It's not there.
22              And don't even think that Jose Aguilar's
23   testimony about a peg tube counts.  Again, unspecified,
24   no specifics, no details.  And he -- he -- Jose kind of
25   covered that up by saying, oh, well, you know, it was --
```

1    he was just being arrogant.  Maybe.  I'm not disputing

2    it.  We've seen the tapes, but was it medically

3    necessary?  Was it helping someone who needed help?

4    Were there medical orders to the contrary that Dr. Pena

5    was blatantly ignoring by putting whatever Jose Aguilar

6    was recounting?  Was that -- was that true?  I -- you

7    know, and then the -- the best part about that whole

8    subject when I talked to Jose was he goes, well, he did

9    that so he could make money.  Dr. Pena did that so he

10   could make more money.  Really?

11             Where was the evidence to show that he was

12   making more money by putting people on peg tubes?  Where

13   was the evidence of a kickback giving his way other than

14   the medical directorship that he was being paid?

15             In fact, the one person who was making more

16   money as a result of that action, who was it?  Jose

17   Aguilar, Generous.  He didn't want to answer that

18   question to me.  He said, well, Generous makes money.  I

19   go, yes, but who is Generous?  Well, I don't know.  Sir,

20   you own 60 percent, you are Generous.  If that's what

21   you're arguing, you're making the money, not him.

22             Generous was in bad shape, you know that.

23   That was the whole reason why Jose Aguilar and -- and

24   Edgar Jimenez were doing what they were doing, going to

25   the FBI and testifying.  $200,000 plus in tax liens,

1    couldn't make payroll.  I don't think so.

2            We can't believe Jose Aguilar and we surely

3    can't believe Edgar Jimenez.

4            We've talked a little bit, you've heard the

5    other attorneys talk about the Government experts,

6    Laurie McMillan, Michael Petron.

7            Laurie McMillan.  Remember her?  Remember

8    her testimony?  She works for a company Qlarant.  Her

9    company had an $87,000,000 contract over two years with

10   the United States Government to go out and find fraud.

11   That's her job.  Her job, find fraud, that's it.

12           And, you know, what did she say if she

13   doesn't find fraud?  Control her company.  But even more

14   galling than that, like I get it, she has a job, we all

15   have jobs, even more galling than that is her analysis.

16   When she comes in and talks about all the claims that

17   she reviewed, at no point did Laurie McMillan, who is a

18   nurse by the way, conduct any sort of medical

19   examination, any sort of medical review at all to

20   determine the validity of those claims.  In fact, all

21   she did was say, oh, man, this claim goes over six

22   months, fraud.  That's it.  Those are her standing

23   orders.

24           And I asked her, do you have any leeway, any

25   variance, can we go and -- and say well, you know what,

 1   maybe let's look at this study, or look at this journal?

 2   No.  No.  If I see it over six months, it goes in the

 3   fraud column.  That's it.

 4          So Laurie McMillan did say something good,

 5   as Mr. Canales talked about.  Laurie McMillan talked

 6   about the safe harbor provision, how it is okay to have

 7   these medical directorships, Laurie McMillan said it is

 8   okay for a doctor who's a medical director to refer

 9   patients to the hospice.  There's nothing wrong with

10   that.  Absolutely nothing wrong with that.  That's the

11   law, ladies and gentlemen.

12          Laurie McMillan said you can have an

13   unlimited number of hospice recertifications provided

14   the patient qualifies.  Nothing wrong with that.

15          And then Michael Petron, the million-dollar

16   man.  Again, from October 2017 to today, two years, he's

17   billed the Government $250,000.  He takes issue with

18   Dr. Pena making $108,000 over five years.  Think about

19   that.  There's something wrong with this picture.

20          And as Mr. Canales said, he had all the

21   tools to do a statistical analysis.  He could have told

22   you how many of those claims at Merida were fraudulent.

23   He was never asked and he never offered.

24          I'm just going to create a heat map, maybe

25   make some tabulations and that's it.  Broad, general

1   strokes.

2            I told you I would talk about the videos,

3   and I want to go back to them, you know.  And I -- when

4   we started opening, I told you there's going to be

5   things in that video, those videos, I didn't like, that

6   I personally disagreed with, maybe behaviors or

7   attitudes that I found offensive.  Nothing has changed.

8   Nothing over those two weeks has changed my mind.

9            But do those videos show what the Government

10  purports them to show?

11           Do those videos show evidence of kickbacks?

12           Do they show Dr. Pena taking bribes?

13           Do they show Dr. Pena lying to federal

14  agents or obstructing justice?  Beyond a reasonable

15  doubt?  I don't think so.

16           Now, the Government likes to take little

17  snippets out and play it, and I'm sure the minute I sit

18  down they'll play more snippets, and you know what, if

19  Judge Olvera gave them the time, they'd probably show

20  the tapes back to back to back to back again.

21           They are what they are.  However, those

22  tapes, the comments within those tapes, the way you make

23  money is by keeping them alive as long as possible.

24  Again, we asked the witnesses on the stand, it's a true

25  statement.  Is it course, absolutely vulgar?  Probably.

1     Do I agree with it?  No.  But is it a true statement?

2              If someone who is in the hospital or in a

3     hospice for two days going to make money for whatever

4     company, more or less than someone who's on hospice for

5     two months?  More or less than someone who's in the

6     hospital for two months?

7              I think I used the term it's simple

8     economic.  Well, yeah, I think it is.  If anybody's had

9     any interaction with the medical field, I mean, you

10    know.

11             I don't agree with his statement, like I

12    said, I'd probably find it vulgar, but does it rise to

13    the level of a crime?

14             Does it rise to the level of a crime beyond

15    a reasonable doubt?

16             And more importantly, is there evidence to

17    show that he kept people on hospice long enough, longer

18    than is necessary medically simply for the purposes of

19    making money?  You know, that's the biggest thing that's

20    missing throughout this entire case.

21             Where's the review, where's the medical

22    review of the patients, where's the medical review of

23    the files to show that wasn't necessary, that was

24    improper, you did that strictly for money?  Where?

25             I don't have that burden, none of the

1    Defendants have that burden, that burden rests with the

2    Government and they have to do it beyond a reasonable

3    doubt.

4              Have they done it?  No, they surely have

5    not.

6              Now, briefly, ladies and gentlemen I just

7    want to go through the jury charge just so we're clear

8    on what you are being asked to do in this case, and

9    particularly with Dr. Pena.

10             This is Count One, Instructions for

11   Conspiracy to Commit Health Care Fraud.

12             This is what they have to prove that

13   Dr. Pena did beyond a reasonable doubt, every single one

14   of these things.  And as you've been instructed by the

15   Judge, as you've been instructed by the other attorneys,

16   if they cannot prove every single one of these items

17   beyond a reasonable doubt, you must, must find Dr. Pena

18   not guilty.

19             The Defendant, and at least one other person

20   made an agreement to commit the crime of health care

21   fraud?  The Defendant knew of the unlawful purpose of

22   this agreement?  The Defendant joined in the agreement

23   willfully?  Again, where's the evidence?  Where's the

24   proof beyond a reasonable doubt that Dr. Pena is guilty

25   on Count One?  It's not there.  It doesn't exist.

1          Count Three.  We've heard talk of the

2     substantive counts Two through Seven.

3          Count Three, Francisca Perez, the only one

4     that pertains to Dr. Pena.  Here are the elements.

5     Dr. Pena knowingly and willfully executed a scheme or

6     artifice to defraud Medicare by the means of false or

7     fraudulent pretenses, representations, or promises in

8     connection with its delivery of or payment for health

9     care benefits, items, and services.  Beyond a reasonable

10    doubt for Francisca Pena?  Absolutely not.  You know

11    that.

12         And, if you get past number one, let's go to

13    number two.  The Defendant acted with specific intent to

14    defraud Medicare?  Beyond a reasonable doubt on

15    Francisca Perez?  Absolutely not.

16         But even if you get past one and two, the

17    false and fraudulent representations the Defendant used

18    were material and the operation of the health care

19    benefit program affected interstate commerce.

20         They can't even get there.  One and two is

21    the critical part and they fail.  They haven't proven

22    that beyond a reasonable doubt, ladies and gentlemen.

23    You know that.

24         THE COURT:  You have 30 minutes, Mr. Guerra.

25         MR. GUERRA:  Thank you, Your Honor.

1  Conspiracy to Commit Money Laundering.  This is Count

2  Eight.  Because he got paid?  I mean, is he laundering

3  money to take benefits?  I -- I haven't seen it.  I

4  don't think it's there and it's not done beyond a

5  reasonable doubt.

6              Again, for Count Eight you must find

7  Dr. Pena not guilty.

8              Count Nine, Obstruction of Criminal

9  Investigations of the Health Care Offenses.

10             And this is what we've talked about, and

11 here's what you have to find.  The Defendant prevented

12 obstructed, misled, delayed or attempted to prevent,

13 obstruct, mislead or delay the communication of

14 information or records relating to a violation of a

15 federal health care offense to a criminal investigator

16 and the Defendant did so willfully.

17             Where's the evidence?  Where is the evidence

18 beyond a reasonable doubt that he did that?

19             Now, they'll say, well, October 30th, 2017

20 he got ahold of Edgar Jimenez and he told Edgar Jimenez,

21 we need to talk; that he told Edgar Jimenez, we need to

22 get to the bottom of this.  They had it on their power

23 point this morning.

24             But is that what this count actually

25 requires?

1               Did you find any evidence that Dr. Pena

2    prevented, obstructed, misled, delayed or even attempted

3    to do any that of the communication of communication or

4    records relating to a violation of a health care claim?

5               Did you see that?

6               Did you hear that?

7               Did the Government provide you that

8    evidence?  And if they did, did they prove this beyond a

9    reasonable doubt?  Absolutely not.

10               Hesitation is reasonable doubt.  They don't

11    get there.

12               Count Ten, False Statement.  And we've

13    talked about that.  We've talked about everything that

14    happened with Agent Williams over and over again.

15               The Government cannot meet its burden there

16    on Count Ten, ladies and gentlemen.

17               And here's the last one, Conspiracy to Pay

18    and Receive Health Care Kickbacks.

19               Mr. Canales talked about it, safe harbor

20    provision.  And let's talk about, it's in the jury

21    Instructions.  The agency agreement is set out in

22    writing and signed by the parties.  The agency agreement

23    covers all of the services the agent provides to the

24    principal for the term of the agreement and specifies

25    the services to be provided.  The term of the agreement

1   is for not less than one year.  The aggregate

2   compensation is consistent with fair market value and

3   arms-length transaction.

4           You've heard the testimony.  Even Virlar

5   talked about what the going rate was for a medical

6   director.  These agreements that Dr. Pena had with the

7   Merida Group fall within the safe harbor provision.  And

8   for that very reason, you cannot find that he conspired

9   with Rodney Mesquias to violate the Anti-Kickback

10  Statute.

11          Ladies and gentlemen, you were asked by

12  Mr. Foster at the end of closing to be the voice, be the

13  voice for these patients.  And the Government may even

14  ask you to send a message by your verdict.

15          We're asking you to send a message as well.

16  We're asking you to send a message on behalf of the

17  residents of the Southern District of Texas that you

18  will not tolerate Medicare fraud, that you will stand up

19  to it and root it out where you find it, but you are

20  also sending a message to the federal government that

21  anybody accused of a crime in the Southern District of

22  Texas must have their guilt proven beyond a reasonable

23  doubt.

24          The message you're sending to the Department

25  of Justice is that you must prove every element of every

1    single count against someone convicted of a crime, or

2    someone accused of a crime beyond a reasonable doubt.

3              That is the message we're asking you to

4    send, ladies and gentlemen, by finding Francisco Perez

5    not guilty on all counts.

6              We appreciate your time, we appreciate your

7    consideration, God bless you.

8              THE COURT:  Thank you, Mr. Guerra.  Ladies

9    and gentlemen, let's go ahead and take a very brief

10   recess before we resume.

11             COURT OFFICER:  All rise for the jury.

12             (JURY OUT.)

13             THE COURT:  Thank you, everyone.  Please be

14   seated.  We'll be in recess.

15             (COURT IN SHORT RECESS.)

16             (JURY IN.)

17             THE COURT:  Thank you, everyone.  Please be

18   seated.

19             Mr. Lowell, are you ready to proceed, sir?

20             MR. LOWELL:  Yes, Your Honor.

21             THE COURT:  Please proceed.

22             MR. LOWELL:  Thank you.

23             Good afternoon, ladies and gentlemen.  We're

24   getting to the end.  At the outset, I want to clear all

25   that smoke that these Defense attorneys were blowing

```
 1    over this courtroom.  They were blowing smoke all over
 2    this courtroom trying to trick, trying to deceive you,
 3    fool you, like the Defendants fooled that Grand Jury,
 4    like the Defendants fooled Medicare, pocketing
 5    $120,000,000, stealing that money, trying to trick,
 6    deceive and fool you like they deceived those patients
 7    telling the patients they needed their last rites,
 8    telling their patients they were about to die.  Not
 9    going to happen.  Not going to happen with this jury.
10    None of you is going to be tricked.
11            Now, the Government's burden never shifts.
12    We have the burden.  But that doesn't mean, ladies and
13    gentlemen, that you have to ignore what these Defense
14    attorneys, these same Defense attorneys that talked to
15    you two weeks ago during their opening statement.  They
16    said certain things during that opening statement.  Two
17    weeks ago was a long time ago, but I'm going to remind
18    you because they just talked for about three hours today
19    and you should remember what they told you two weeks
20    ago.
21            We got a record and we got a transcript.
22    Let's go to slide one, please.  Slide one, Defense
23    Counsel for Rodney Mesquias.  He told you Dr. Vincent
24    Gonzaba from San Antonio, you're going to hear from
25    Dr. Gonzaba.  Dr. Gonzaba's not part of any fraud.  He
```

1   stands by his clinical judgment.

2                   MR. HECTOR CANALES:  Judge, I'm going to

3   object to this.  This is shifting the burden, this is

4   totally improper argument on -- on the -- on part of Mr.

5   Lowell, and he knows it.

6                   He's obviously angry, but, you know, this is

7   wrong, Judge.

8                   MR. LOWELL:  Totally fair.  It's opening

9   statement.

10                  MR. HECTOR CANALES:  Judge -- it violates

11  your order, and they did hear from Mr. Gonzaba.  He

12  testified in the records, this is a completely improper

13  and he knows it.

14                  THE COURT:  Gentlemen, gentlemen, your

15  objection is overruled, Mr. Canales.

16                  Please proceed.

17                  Ladies and gentlemen, this is closing

18  arguments.  Each side is entitled to give their opinion.

19                  MR. LOWELL:  May I proceed, Your Honor?

20                  THE COURT:  According to what the facts have

21  shown.

22                  MR. LOWELL:  Thank you, Your Honor.

23                  Where's Dr. Gonzaba?  He didn't testify in

24  this case.  Next slide.

25                  Mr. Canales said in opening statement, and

1    he said it again today, Rodney Mesquias didn't sign a

2    single, didn't certify a single person, didn't provide a

3    single, didn't interview a patient, didn't assess a

4    patient, he did not assess any of those patients, any of

5    the six patients for which the doctors relied upon.

6              That wasn't true.  He said this again today.

7              Next slide.  Here it is right here.  Start

8    of care for Dr. -- for Jack High, patient Jack High is

9    one of the substantive counts, he's Count Two.  Right

10   there.  Rodney Mesquias, registered nurse.  He's

11   signing, part of the certification for this specific

12   patient.  Right under him is his good buddy, his own

13   best friend Dr. Virlar.  So that wasn't true.

14             Next slide.  Mr. Canales also told you about

15   these 27 nurses, these 14 doctors in addition to

16   Dr. Virlar, Dr. Carrillo.  Where are they?  Where are

17   they, ladies and gentlemen?

18             Next slide.

19             MR. HECTOR CANALES:  Judge, I'm going to

20   object again.  That is completely -- that is

21   objectionable, he's shifting the burden.  He can't do

22   that.  You don't have to call anybody.  The Government

23   -- it's the United States Government, they've got all

24   the power in the world to call people.  It's their case.

25             THE COURT:  Mr. Canales, the objection is

1    overruled.   The Court's charge is quite clear the burden

2    never shifts to the Defense.

3              Please proceed.

4              MR. LOWELL:   This is a document and he kept

5    going.   This is a document that Mr. Canales showed you

6    just today and he focused on the right side of this

7    document.   This is the certification for Jack High.   And

8    he focused on Dr. Greg Gonzaba.   He forgot to show you

9    who signed right next to Dr. Gonzaba, Dr. Virlar, Rodney

10   Mesquias's best friend.

11             Why didn't Mr. -- why did Mr. Canales cover

12   this up?   Why didn't he show you the whole document?

13             Next slide.   We also heard about

14   Dr. Gonzalez, Dr. Gabriel Gonzalez, if you recall

15   Dr. Gonzalez came into the courtroom, he testified about

16   his patient Petra Cerda.   He was a good, honest doctor.

17   You saw him, he's from right here in the Valley.   He

18   took the stand, he knows this patient Petra Cerda, and

19   he testified that he signed this document and he very

20   clearly stated at the top of this document evaluate and

21   treat.

22             That's not certify the patient for hospice

23   as Mr. Canales suggested to you today.   It's evaluate

24   and treat.

25             And what happened to Ms. Cerda?   You heard

1    the testimony from Dr. Gonzalez.  Ms. Cerda was hijacked

2    like the other patients in this case by the Merida Group

3    without his knowledge.

4           Let's go to Henry -- let's go to Henry

5    McInnis, counsel for Mr. McInnis.

6           Again, two weeks ago he gave an opening

7    statement and he represented to you that Mr. McInnis

8    said "get all the records.  We need to comply with the

9    Grand Jury subpoena".  We need to comply with the Grand

10   Jury subpoena.

11          That's not what Mr. McInnis did.

12          MR. CYGANIEWICZ:  Objection, Your Honor.

13   Again, that's improper attempt to shift the burden to

14   try to show the jury that we didn't call witnesses which

15   is our absolute right.  Dr. Virlar even testified that

16   Mr. -- Mr. McInnis was trying to comply.

17          Improper argument.  It's an attempt to shift

18   the burden of proof, Your Honor.

19          THE COURT:  The objection is overruled.

20   Please proceed.

21          MR. LOWELL:  Thank you, Your Honor.

22          The testimony was crystal clear.  Roland

23   Aguilera testified that the direction of Henry McInnis,

24   sitting right over there at that table, he and

25   Dr. Virlar manufactured false records.  That's not

1   compliance.

2           MR. CYGANIEWICZ:  Objection, Your Honor.

3   That's a mis -- misstatement of the evidence,

4   Your Honor.  There's nothing to that effect in the

5   record.

6           THE COURT:  The -- the objection is

7   overruled.

8           Please proceed.

9           MR. LOWELL:  Next slide.

10          Mr. Pena's counsel fared no better.  He just

11  finished, talked to you for about roughly an hour.  Also

12  talked to you two weeks ago.

13          We have the transcript right here.  And what

14  counsel said to you two weeks ago was that Mr. Pena had

15  nothing to do with home health.  That was completely

16  wrong.

17          Next slide.  Mr. Pena, direct evidence, hard

18  data showing Dr. Pena involved with 33 patients for the

19  Merida Group for the home health company of the Merida

20  Group.

21          These examples are key, ladies and

22  gentlemen.

23          If we could switch to the ELMO, please.

24          So we had the home health patients from two

25  weeks ago where he said no evidence of Mr. Pena's

1   involvement in home health, and then we had counsel say

2   today, counsel for Mr. Pena, that there was no direct

3   evidence of Mr. Pena discharging a patient, taking a

4   patient back.  It's right here.  It's right here, ladies

5   and gentlemen.  Discharge patient from Merida Hospice,

6   patient to transfer to CIMA Hospice.

7               Top of the page, this is Francisca Perez.

8   Second page of the document, Dr. Francisca -- Francisco

9   Pena.

10              Completely contradicted by evidence, direct

11  evidence.  Can you trust their message?

12              Let's jump to slide eight.  If you have

13  kids, you've heard this before, blame it on everybody

14  else, right?  Every single one of these Defense

15  attorneys got up and they blamed everybody else.  He did

16  it, she did it, somebody else did it.

17              All of these witnesses, they're all lying,

18  they're all making it up.  They all got together and

19  said we're going to get Dr. Pena, Rodney Mesquias and

20  Henry McInnis.  It's ridiculous.  It's ridiculous,

21  ladies and gentlemen, that all of these witnesses,

22  they're part of their own conspiracy, conspiracy to take

23  them out.  It doesn't mean make any sense.  These folks

24  are from different towns, some of them don't even know

25  each other, and yet they all sat around a table and said

1   we're going to take out these Defendants.

2           Their testimony was consistent, it was

3   clear.  At the direction of Rodney Mesquias and Henry

4   McInnis they falsified doctor's orders.  At the

5   direction of Rodney Mesquias and Henry McInnis they

6   signed up patients who didn't qualify.  And Dr. Pena

7   demanded, commanded kickbacks for his patients.

8           That's clear from the tapes.

9           Dr. Pena's convicted based on those tapes,

10  ladies and gentlemen.  He didn't know he was being

11  recorded.  That's the real Dr. Pena on those tapes.

12          Slide nine.  Spent a lot of time attacking

13  Dr. Virlar and Dr. Carrillo.  Let's take them out of the

14  equation.  Let's just imagine we take their testimony

15  and we throw it in the trash.  Remember, Dr. Carrillo

16  and Dr. Virlar, they're friends.  Imagine you don't have

17  that testimony.  You still have all these other

18  witnesses that describe the fraud, that describe the

19  fraud, ladies and gentlemen.

20          But of course, you don't need to throw away

21  their testimony because the parts of their testimony

22  relevant to this case, the fraud, the exploitation of

23  patients, the payment for patients, was consistent.

24  They're all saying the same thing.  It's a broken

25  record.

1          Let's go to slide 12, please.

2          This whole idea of cherry picking, cherry

3   picking patients, ridiculous.  Dr. Carrillo you'll

4   recall confirmed, not six patients, 147 patients.  Is

5   that cherry picking?  He confirmed he signed fraudulent

6   orders for them, 147 in Laredo, San Antonio and the

7   Valley.

8          Next slide.

9          Dr. Virlar, cherry picking?  833 patients

10  across Texas.  He admitted, I signed fraudulent orders

11  for them.  Why is he going to lie about that?

12  Dr. Virlar is their doctor.  He was their number one

13  doctor.  They chose Dr. Virlar, not the Government.

14         Next slide.

15         Again, on this whole idea of cherry picking,

16  you take Dr. Virlar, Dr. Pena, Dr. Carrillo, we have

17  directing you to the bottom of the page here, we have

18  over 5,000 separate bills sent to Medicare based on

19  these three doctors.  Immediately next to that, we have

20  over 1,000 patients connected to Dr. Pena, Dr. Virlar

21  and Dr. Carrillo.  Cherry picking, six patients?

22         Go to slide 16, please.

23         Ladies and gentlemen, Henry McInnis was the

24  number two at this company.  You heard from nurses that

25  he directed the falsification of records.  Of course

1    Mr. McInnis is not admitting patients, he's an

2    administrator, he's not a doctor, he's not a nurse, but

3    he got other people to do his dirty work.  He directed

4    other people to commit the fraud.  He pressured them.

5              His counsel today said there's no example of

6    a nurse getting fired.  There's Dorothy Watts, she was a

7    registered nurse, you heard about her.

8              MR. CYGANIEWICZ:  Judge, she did not

9    testify.

10             THE COURT:  Clarify the statement.

11             MR. LOWELL:  You heard about a nurse.  She

12   didn't testify, but you heard about her in the

13   testimony.  She was terminated because she didn't go

14   along with the fraud.  Henry McInnis terminated her.

15   That's an example.

16             As the number two, he worked right with

17   Rodney Mesquias creating that intense pressure on others

18   to go along with the fraud.  You saw the nurses on the

19   stand, the pressure they were under, the pain they felt

20   to go along with this fraud.  That pressure is coming

21   right from Mr. McInnis and Mr. Mesquias.

22             Next slide, please.

23             Mr. McInnis made $500,000 during this

24   scheme.  His co-conspirator Joe Garza living on the

25   couch, sister's house, he made far less, only made

1  258,000.  Joe Garza told you about Mr. McInnis'

2  directives to further this scheme.

3            Next slide.

4            Rodney Mesquias, he's at the top.  Witness

5  after witness after witness testified about

6  Mr. Mesquias.  Don't fuck with my patients.  Don't fuck

7  with my money.  Who says that?  What legitimate, honest

8  business owner who's -- who's running a legitimate

9  company says that?  Mr. Mesquias, like Mr. McInnis

10  directed others to do his dirty work.  Directed others

11  to falsify records.  Fired people who didn't go along

12  with the fraud.

13            Next slide.

14            Last but not least, Mr. Pena.  You've heard

15  him on the tapes, you've heard about him on the

16  evidence.  You've gotten this inside look into this

17  world, this world of health care fraud.  We took you

18  right into Mr. Pena's clinic.  You heard how he views

19  patients.  Not from the Government, you heard directly

20  from his mouth how he treats patients, what he thinks

21  about them, how he uses them.

22            And by the way, this whole idea of a Texas

23  law prohibiting Mr. Pena from doing certain things, you

24  heard those tapes.  Did Mr. Pena once talk about a Texas

25  law?  He talked about money as his motivation for

1    keeping patients alive.  That was crystal clear.

2              Next slide.

3              Again, hard data, evidence, confirming

4    Mr. Pena's ties, his conspiracy with Mr. McInnis and

5    Mr. Mesquias.  It's right here on these numbers.  2012

6    to 2017 you have at least four Merida Group companies,

7    123 patients, not one, not one patient, 123.  You have a

8    nearly 1,000 separate bills that the Merida Group sent

9    to Medicare where Dr. Pena was the doctor.  It's not one

10   patient, ladies and gentlemen.

11             Next slide.

12             Counsel today also talked about this loan,

13   this idea of a loan, this idea of artwork.  Again, in

14   the recordings not a single mention by Mr. Pena of

15   needing a repayment on artwork.  Not once did he talk

16   about artwork.

17             And then we have these checks, loan

18   repayment.  This is before the source gives the cash to

19   Mr. Pena.  By this point, that $21,000 loan, this is May

20   and July of 2016, it had already been paid back.  There

21   was no confusion on Mr. Pena's part.

22             Next slide, please.

23             THE COURT:  You have, approximately, five

24   minutes.

25             MR. LOWELL:  And just to drive that point

1    home further, Mr. Pena multiple times, this is July of

2    2017, again, before the cash kickbacks were paid, I even

3    loaned the $20,000, they finally paid me.

4              Next slide.

5              They -- again, same recording, July 2017

6    they paid $20,000.

7              Next slide.

8              Besides my $20,000, I've gotten at least

9    18,000 more so I'm not hurting.

10             This man's already been paid.

11             Ladies and gentlemen, this case is about

12   more than just lies and fraud.  It's about truth.  Truth

13   is the only thing that matters in this courtroom and

14   that's why I started with that opening statement.

15   That's why I went through what they told you and what

16   was truth, what is truth.  It's also about justice.

17   It's about justice.

18             You're here today, you can deliver that

19   justice on behalf of the patients who were manipulated,

20   on behalf of Medicare, that $124,000,000 that was

21   deposited into the bank accounts of the Merida Group.

22   You can deliver justice on that.

23             You can deliver justice for all those

24   patients, those nameless patients, a lot of them we

25   don't even know their names, we don't their names, but

1    you heard their stories.  You heard about them, they

2    spoke through that evidence.

3              You heard about how they were exploited,

4    their religious beliefs exploited at this most

5    vulnerable period of their life.  You have the

6    opportunity to deliver justice to those patients.

7              Ladies and gentlemen, on behalf of the

8    Government, on behalf of the patients who were lied to

9    in this case, on behalf of the Medicare money that was

10   stolen, on behalf of everyone who was lied to, we would

11   ask that you deliver justice to Henry McInnis, convict

12   Henry McInnis for his involvement in this scheme; we

13   would ask that you deliver justice to Rodney Mesquias

14   for leading this scheme, tricking patients, tricking

15   that Grand Jury, those grand jurors; and we'd ask that

16   you deliver justice to Dr. Pena exploiting patients, the

17   most vulnerable time of their life, extending each and

18   everyday, every gasp of breath for this man is another

19   dollar.  It's disgraceful.

20             Members of the jury, thank you.

21             Thank you, Your Honor.

22             THE COURT:  Thank you, Mr. Lowell.

23             Ladies and gentlemen, again, I must

24   reiterate that nothing you've heard from any of the

25   attorneys is either testimony nor evidence.  Once again,

1    it is their opinion and advocacy with respect to their

2    respective clients.

3            I do have some further Instructions I need

4    to read to you before you -- you commence your

5    deliberations, I should say.  Please listen carefully.

6            It won't be anywhere near as long as before,

7    but please listen carefully.

8            This section is entitled, Roman Numeral

9    Number Four, Instructions Regarding Deliberations.

10            To reach a verdict, whether it is guilty or

11    not guilty, all of you must agree.  In other words, your

12    verdict must be unanimous on each count of the -- on --

13    excuse me.  Must be unanimous on each count of the

14    indictment.  Your deliberations will be secret, and you

15    will never have to explain your verdict to anyone.

16            It is your duty to consult with one another

17    and to deliberate to reach an agreement, if possible.

18    Each of you must decide the case for yourself, but only

19    after a fair and impartial deliberation of the evidence

20    with your fellow jurors.  During your deliberations, do

21    not hesitate to reexamine your own opinions and change

22    your mind if you are convinced that you were -- that you

23    were wrong.  But do not give up your honest beliefs

24    about the weight or effect of the evidence because of

25    the opinion of your fellow jurors, or for the mere

1   purpose of returning a verdict, or in the hopes of

2   simply expediting the end of the trial.  Remember, your

3   duty is to decide whether the Government has proved each

4   Defendant's guilt beyond a reasonable doubt.

5            Now I will give you the Instructions of what

6   you should do when you go to the jury room.  First, you

7   should select one of your fellow jurors to -- as your

8   foreperson.  The foreperson will help guide your

9   deliberations and will speak for you here in the

10  courtroom.

11           Next, a verdict form has been prepared for

12  your convenience.  The verdict form is attached to the

13  jury charge, ladies and gentlemen.  The foreperson will

14  write the unanimous answer of the jury, either guilty or

15  not guilty, in the space provided on the form.  After

16  your deliberation -- deliberations, the foreperson

17  should date and sign the verdict.

18           Ladies and gentlemen, I'm not going to read

19  the verdict form, but as that paragraph indicates, there

20  are 25 questions to this verdict form.  Each one has a

21  blank that must be filled in, guilty or not guilty,

22  based upon your vote, unanimous vote, I should say, and

23  at the very end on the last page there is a -- also a

24  blank for the jury foreperson to sign.

25           If you need to communicate with me during

1   your deliberations, the foreperson should write out the

2   message and give it to the Marshal.  I will either reply

3   in writing or bring you back into the courtroom to

4   answer your message.

5            And ladies and gentlemen, I'm going to add a

6   further admonishment on that.  For the vast majority of

7   questions that the Court receives from a jury, and I'm

8   not telling you not to ask questions if you feel it's

9   necessary, but in the vast scenarios, the majority of

10  scenarios, the Court will give you a very frustrating

11  answer that says, ladies and gentlemen of the jury, I

12  cannot answer your question, please refer back to the --

13  the Charge of the Court and/or the exhibits and go back

14  to your deliberations.

15           It's a standard answer that's printed out

16  that I give in most instances, but there are occasions

17  where there are questions that can be answered, for

18  example, if an assistance, or a lack of an exhibit or

19  what have you.  But I do give you that admonishment that

20  be cautious with the type of questions you ask, but feel

21  free to do so if you feel it's necessary.

22           And then finally, please keep in mind that,

23  until you have reached a unanimous verdict, you should

24  not reveal to any person, not even to me, how the jury

25  stands, numerically or otherwise.

1          Ladies and gentlemen, that concludes the

2    written Instructions as to the Charge of the Court, or

3    the final jury Instructions.  I am going to add some

4    miscellaneous issues because of the fact that we have

5    two alternate jurors.

6          As to the two alternate jurors, technically

7    you're still on duty, but you will not be part of the

8    deliberations.  So technically, you will be in recess

9    and will be called back only in the event that one of

10   the jurors becomes incapacitated and is not able to

11   proceed with the deliberations.  In that event, one of

12   you would be called and then you would step in for the

13   juror.  So I give that instruction to the two alternate

14   jurors.

15         In addition, I'm going to give you some

16   further Instructions.  Obviously, it's now close to

17   5:00, and as I've already said, you are the sole judges

18   of the facts in this case, but you also are going to be

19   the judges of how you deliberate.

20         You shall keep your time as you deem

21   appropriate.  You decide when to recess.  You decide

22   when to show up in the morning, when to leave in the

23   afternoon.  There's no way for me to predict how long

24   your deliberation will take, so, again, you must guide

25   yourselves in that.  I am not going to be going into the

1    jury room and saying, ladies and gentlemen, you're free

2    to take a recess.

3              I do know it's close to 5:00 and I'm

4    assuming you'll want to take a recess for the day, but

5    you're free to show up tomorrow at the time you agree

6    upon.  Technically, the courtroom does open by 8:00.

7    Technically, if you want to work past 5:00, we need to

8    make arrangements with security for that, but, again,

9    any decision you make as to what time you want to show

10   up, or what time you want to leave is up to you.

11             As I told you before on a different

12   miscellaneous matter, now that you begin your

13   deliberations, if you decide to have a working lunch,

14   the Government can provide food for you for a working

15   lunch, if that's a decision you make.  Or,

16   alternatively, as I've already, you're the judges of

17   your time, if it you want to break for lunch, you get to

18   decide how long you get to break for lunch.

19             Ladies and gentlemen, that concludes my not

20   only Instructions in the written form, but the

21   miscellaneous additional Instructions.

22             Do the alternate jurors have any questions?

23   Back to my point, they're free to go.  Once you all

24   decide what time you want to leave, that's the only

25   caveat as to the remainder of you.

 1            With that said, you're now in recess and,

 2    again, you're free to begin initial deliberations and/or

 3    leave for the evening if you should so desire.

 4            Please begin your deliberations.  I'm

 5    handing the signed and executed final jury Instructions

 6    that I have signed to Ms. Sandra.  The Marshal will take

 7    it to the jury room and you will begin your

 8    deliberations as instructed and as you deem appropriate

 9    with your schedule.

10            COURT OFFICER:  All rise for the jury.

11            (JURY OUT.)

12            THE COURT:  Thank you, everyone.

13            Ladies and gentlemen, please be seated.  We

14    are in recess.  Thank you very much.

15            (COURT IN RECESS.)

16

17                   REPORTER'S CERTIFICATE

18

19     I certify that the foregoing is a correct transcript

20    from the record of proceedings in the above-entitled

21    matter.

22

23

24    __/s/_Sheila E. Perales._____
      SHEILA E. HEINZ-PERALES CSR RPR CRR
25    Exp. Date:  January 31, 2021